IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| ROGER DEAN GILLISPIE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 3:13-cv-416 |
| v. | ) |
| | ) |
| THE CITY OF MIAMI TOWNSHIP, | ) |
| MATTHEW SCOTT MOORE, TIM | ) |
| WILSON, THOMAS ANGEL, MARVIN | ) |
| SCOTHORN, JOHN DIPITREO, | ) JURY TRIAL DEMANDED |
| STEPHEN GRAY, OTHER | ) |
| UNIDENTIFIED MEMBERS OF THE | ) |
| MIAMI TOWNSHIP POLICE | ) |
| DEPARTMENT, MONTGOMERY | ) |
| COUNTY, KENNETH M. BETZ, | ) |
| DENISE RANKIN, RALPH NICKOSON, | ) |
| OTHER UNIDENTIFIED EMPLOYEES | ) |
| OF THE MIAMI VALLEY REGIONAL | ) |
| CRIME LAB, GENERAL MOTORS | ) |
| COMPANY, RICK WOLFE, KEITH | ) |
| STAPLETON, ROBERT MILLER, | ) |
| DAVID BURKE, ROBERT BURKE, AND | ) |
| OTHER UNIDENTIFIED EMPLOYEES | ) |
| OF GENERAL MOTORS COMPANY, | ) |
| | ) |
| Defendants. | ) |

## **COMPLAINT**

Now Comes Plaintiff, Roger Dean Gillispie, by and through his attorneys, and

complains of Defendants the City of Miami Township, Matthew Scott Moore, Tim

Wilson, Thomas Angel, Marvin Scothorn, John DiPitreo, Stephen Gray, other

unidentified members of the Miami Township Police Department, Montgomery

County, Kenneth M. Betz, Denise Rankin, Ralph Nickoson, other unidentified

employees of the Miami Valley Regional Crime Lab, General Motors Company, Rick

Wolfe, Keith Stapleton, Robert Miller, David Burke, Robert Burke, and other unidentified employees of General Motors Company.

## Introduction

1.    Plaintiff, Roger Dean Gillispie, was framed for a series of sexual assaults that he did not commit, and has spent over 20 years incarcerated as an innocent man. Tragically, his conviction was no accident, as his wrongful conviction was the result of police misconduct perpetuated by officers from the Miami Township Police Department. This misconduct included, but was not limited to, witness manipulation; cover-ups; the fabrication, destruction, and suppression of evidence; and perjury. The unlawful conduct was not limited to officers from Miami Township; it included employees of General Motors Corporation who conspired with officers from the Miami Township Police Department to wrongfully convict Mr. Gillispie. Plaintiff's wrongful incarceration was extended when, in violation of his rights, agents of the Montgomery County—employees of the Miami Valley Regional Crime Laboratory—and employees of Miami Township discarded forensic evidence.

2.    Mr. Gillispie brings this action pursuant to 42 U.S.C. § 1983 and Ohio law seeking redress for the wrongs done to him, as well as to deter future misconduct and reform the improper policies and practices that emboldened the defendants to frame him and violate his rights.

2

**Jurisdiction and Venue**

3.     This Court has jurisdiction over Mr. Gillispie's federal claims pursuant to 28 U.S.C. § 1331, and over his state-law claims pursuant to 28 U.S.C. § 1367.

4.     Venue is proper because, upon information and belief, the nearly all of the individual defendants reside within this district, and nearly all of the events giving rise to the claims asserted herein occurred within this district.

**Parties**

5.     Plaintiff Roger Dean Gillispie is a 48-year old resident of Fairborn, Ohio.

6.     Defendant City of Miami Township (the "Township") is an Ohio municipal corporation that operates the Miami Township Police Department ("Department").

7.     Defendants Matthew Scott Moore, Tim Wilson, Thomas Angel, Marvin Scothorn, John DiPitreo, Sephen Gray, and other unidentified members of the Miami Township Police Department (the "Defendant Officers") were at all times relevant to this Complaint law enforcement officers with the Department. At least one of the Defendant Officers was, at times relevant here, a policymaker, or had been delegated such authority, for the Township.

8.     At all times relevant, the Defendant Officers acted under color of law and within the scope of their employment for the City of Miami Township and the Department. They are sued in their individual capacities.

3

9.      Montgomery County, Ohio (the "County") is a political subdivision, and the governmental body that owns and operates the Miami Valley Regional Crime Lab ("MVRCL"), a forensic science lab.

10.     Kenneth M. Betz, Denise Rankin, Ralph Nickoson, and other unidentified employees of the MVRCL (the "County Defendants") were at all times relevant employees of the County. They are sued in their individual capacities.

11.     At all times relevant, the County Defendants acted under color of law and within the scope of their employment for Montgomery County, Ohio. They are sued in their individual capacities.

12.     General Motors Company ("GM") is a Delaware corporation with its principle place of business in Michigan that, at all times relevant, maintained a number facilities in the Dayton, Ohio area.

13.     At all times relevant, Defendant Richard "Rick" Wolfe was employed by Defendant GM and was a policymaker for the company, working first as the District Manager for Security over five divisions of GM operations in the Dayton Area and later as the Manager or Supervisor of Fire and Training. Defendant Wolfe was also a part-time, auxiliary police officer for the Department, a qualification known to and valued by Defendant GM. At all times relevant, Defendant Wolfe maintained relationships with officers in the Department, a fact known and valued by Defendant GM.

14.     At all times relevant, Defendants Robert Miller, Keith Stapleton, David Burke, and Robert Burke (collectively, with Defendant Wolfe, the "GM Defendants") were security guards and supervisors working for Defendant GM near Dayton.

## Background

15.     Mr. Gillispie grew up in the Dayton area, and had a strong supportive group of family and friends. He is fortunate to enjoy that support to this day. In his early 20s, Mr. Gillispie worked a full-time job, was an entrepreneur, and had no criminal history. From 1985 to the spring of 1990, Mr. Gillispie was employed as a security guard for General Motors in Dayton, Ohio.

16.     Outside of work, Mr. Gillispie loves to fish. During the summer of 1988, Mr. Gillispie would spend most of his time not at work fishing, boating, and water skiing with friends.

## The Rapes

17.     In August of 1988, several incidents of rape, all involving forced oral sex, were reported near Dayton in Montgomery County, Ohio.

18.     The first reported incident involved twin sisters, C.W. and B.W., who were sexually assaulted on August 20, 1988, a Saturday, as they left the Best Products store near the Dayton Mall.

5

19.    In broad daylight, the perpetrator approached the twins, claimed to be a law enforcement officer, brandished a gun, and forced the sisters to drive him to a secluded area where he ordered them to perform oral sex on him.

20.    After contacting the authorities, both C.W. and B.W. provided a description of their attacker to the police.

21.    That description contradicted Mr. Gillispie's features in significant ways.

22.    After finding out about the twins' experience, another women, S.C., reported that a similar incident had happened to her on August 5, 1988. According to S.C., the incident occurred in Montgomery County but well outside of Miami Township, in Harrison Township. Further, S.C. informed authorities that a man claiming to be a law-enforcement officer approached her in a retail parking lot, brandished a gun, and forced her to perform oral sex on him.

23.    Like the twins, S.C. gave authorities a description of her attacker that significantly contradicted Mr. Gillispie's features.

24.    At the time, two veteran officers in the Department were responsible for investigating the rape of the twins. First was Sergeant-Detective Steven Fritz, who supervised the Department's detective division. Second was Detective-Corporal Gary Bailey, who Sergeant Fritz assigned to be the "lead" detective on the matter. As Detective Bailey's direct supervisor, Sergeant Fritz would read and approve of

6

supplemental investigative reports Detective Bailey would author. At various times, Sergeant Fritz and Detective Bailey together discussed the investigation.

25.     Under the direction of Sergeant Fritz and Detective Bailey, the Department created a flyer with a composite image of the perpetrator and that described the incident involving the twins.

26.     At some time, a "Wanted" flyer bearing a different composite image was also created. That flyer included information about the assault of S.C. and the twins as well.

27.     At some point, one of the victims called the Department reporting additional details related to the pants size of the perpetrator. This information, which later confirmed that Mr. Gillispie was not the individual who committed the sexual assaults, was put into a supplemental report authored by Detective Bailey and approved by Sergeant Fritz. The report was then placed in the case file.

## Rick Wolfe and Other GM Employees Implicate
## Mr. Gillispie in the August 1988 Rapes

28.     In 1988, and for years to follow Defendant Rick Wolfe was employed by General Motors, and was a high-ranking supervisor for GM such that Defendant Wolfe's actions were those of Defendant General Motors.  From 1987 to 1991, Defendant Wolfe was the District Manager in the Security Department and supervised five divisions in the Dayton Area, which included 80 security officers and 15 other supervisors.

29.     Defendant Wolfe, along with other GM Defendants, supervised Mr. Gillispie.

30.     Defendant GM hired Defendant Wolfe to serve in this post due to his connections and continuing and/or prior experience as a part-time police officer for the Township. In addition to his relationship with the Defendant Officers, Defendant Wolfe worked for and had continuing connections with the Township's Police Chief in 1988—James E. Moore, Defendant Moore's father.

31.     The GM Defendants harbored malice against Mr. Gillispie. From time-to-time employees of Defendant GM would target Mr. Gillispie for unfair treatment, and agreed amongst themselves to cause him difficulties in his job. Mr. Gillispie was eventually terminated from his job at GM.

32.     Thereafter, in furtherance of the agreement to harass Mr. Gillispie and as a way to prevent him from talking action following his termination, the GM Defendants chose to use Defendant Wolfe's connections and prior and ongoing and/or employment with the Department to implicate Mr. Gillispie in the rapes. To this end, in 1989 or 1990, Defendant Wolfe used his connections at the Department to arrange a meeting with officers from the Department. Defendant Wolfe and another GM Defendant went to the Department's police station, toting a single picture—a copy of Mr. Gillispie's work identification badge.

33.     At the station, Defendant Wolfe and his GM compatriot met with the two detectives who were charged with investigating the rape of the twins—Sergeant

8

Fritz, the supervisor, and Detective Bailey, the lead detective. Because of Wolfe's stature in the Department as an active or prior auxiliary police officer, the Chief of Police (Defendant Angel) and another Department supervisor (Defendant Scothorn) attended the meeting.

34.     In the meeting, Defendant Wolfe and the other GM employee attempted to direct the rape investigation toward Mr. Gillispie by giving the Department the single photograph of Gillispie. In so doing, they claimed falsely that some GM employees had seen a composite, thought it looked like Mr. Gillispie, and had then reported this up-the-chain to various GM employees and GM Defendants, including Defendants Stapleton, Miller, and Wolfe.

### The Rapes are Investigated
### by Sergeant Fritz and Detective Bailey

35.     The Chief of Police (Defendant Angel) and a high-ranking Captain (Defendant Scothorn) directed Fritz and Bailey to investigate the GM Defendants' contention that Mr. Gillispie perpetrated the August 1988 rapes.

36.     A supplemental report documenting the meeting described above was written and then signed by both Detective Bailey and Sergeant Fritz.

37.     Sergeant Fritz and Detective Bailey conducted an extensive investigation of Mr. Gillispie, and documented the steps of their investigation in supplementary reports. Doing so was both Fritz and Bailey's standard practice.

38.     In this investigation, among other things, Detective Bailey and Sergeant Fritz obtained Mr. Gillispie's description from State records; compared the

9

description of the perpetrator with Mr. Gillispie's profile (including the pants size that had been documented in a prior report); and took other investigative steps concerning Mr. Gillispie's status as a possible suspect. This investigation was documented in reports signed by Detective Bailey, Sergeant Fritz, or both.

39. In the end, the detectives produced supplemental reports documenting the meeting described above, many of their investigative steps, and explained why Detective Bailey Sergeant Fritz ultimately excluded Mr. Gillispie as a suspect.

40. Over the course of the investigation, Detective Bailey received a number of other "tips," and considered them accordingly. In so doing, he would create a supplemental report regarding the potential suspect or "tip." These, too, were approved by Sergeant Fritz and placed in the case file.

41. In the 1990, after Sergeant Fritz and Detective Bailey had excluded Mr. Gillispie as a suspect, Defendant Wolfe returned to the Department, again with a goal of implicating Mr. Gillispie in the 1988 rapes. This time, Defendant Wolfe arrived with several GM identification badges, again including Mr. Gillispie's.

### Moore and the Defendant Officers Take Over
### and Conspire with the GM Defendants

42. In June of 1990, the investigation of the twins' incident was reassigned to Defendant Moore by Defendants Angel, Scothorn, and Wilson.

43. As it had before, the Montgomery County Sheriff's department remained responsible for investigating S.C.'s incident, owing to the location she reported being outside of the Township and, instead, in Harrison Township.

10

44. Thereafter, Defendants Moore and Wolfe set out to frame Mr. Gillispie for the sexual assault of the twins. Together, through numerous conversations, they fabricated evidence, withheld and destroyed evidence, unlawfully undermined Mr. Gillispie's defense, and ultimately provided false and misleading testimony at Mr. Gillispie's criminal trials.

45. Defendant Wolfe admits that Defendant Moore provided him and other GM Defendants with a copy or copies of one or several composite images. Defendant Wolfe further admits that, though he had previously spoken with Fritz about the rapes, he worked primarily with Moore in his dealings with the Department.

46. At some point thereafter, Defendant Wolfe returned to the Department with several GM identification cards, again including a photograph of Mr. Gillispie.

47. Bringing multiple photographs to the Department was an attempt to make it appear as if Defendant Wolfe came to the Department with these photographs without Moore's assistance and that this was the first time Mr. Gillispie had been named by Defendant Wolfe or anyone at GM as the perpetrator of the rapes. It was also an attempt to make the GM Defendants role in fingering Mr. Gillispie appear to be innocent, and to conceal the fact that GM Defendants had previously brought a single image—of Mr. Gillispie—to the Department in connection with the rapes.

48. In addition, and as part of their conspiracy with the GM Defendants, the Defendant Officers removed from the case file supplemental reports authored by

11

Bailey and approved by Fritz, which included exculpatory evidence for Mr. Gillispie. Among other things, these reports documented: the initial meeting with Defendant Wolfe and other Defendants described above; Detective Bailey and Sergeant Fritz's investigation of Mr. Gillispie; the pant size of the perpetrator called in by one of the twins; and myriad other reasons Mr. Gillispie was eliminated as a suspect.

49.    These reports were later destroyed.

50.    These reports were destroyed to prevent Mr. Gillispie from using them in his defense.

51.    Next, though he had no probable cause, Defendant Moore created unduly suggestive photo line-ups for the twins to view. Moore intentionally set out to make this photo spread misleading. Among other things, Defendant Moore made Mr. Gillispie's face appear larger than the other photos, placed it on a different color background than the other photos, and used a picture of Mr. Gillispie that had a different finish than the other photographs. This was all done to manipulate the twins, and ensure that they would select and identify Mr. Gillispie.

52.    In addition, Moore made suggestive comments to the victims in an effort to get them to identify Mr. Gillispie, despite the fact that he did not match their initial description. Moore's supervisors, including Defendants Angel, Wilson, and Scothorn, approved of Defendant Moore's conduct. Ultimately, these efforts succeeded, and the twins selected Mr. Gillispie from an unduly suggestive photo-spread.

12

53.    Though the investigation of S.C.'s complaint was the responsibility of the Montgomery County Sheriff's Department, Defendant Moore went beyond his jurisdiction and attempted to influence S.C. to identify Mr. Gillispie. Using similar methods of pressure employed with the twins, Detective Moore succeeded in getting S.C. to identify Mr. Gillispie.

### Arrest and Prosecution

54.    Mr. Gillispie was subsequently arrested by the Defendant Officers, who searched his home and confiscated his property without lawful justification. None of the evidence recovered from Gillispie's residence was in any way corroborative of the notion that he had performed the 1988 sexual assaults. Indeed, all of the evidence recovered at his home suggested that Mr. Gillispie was not the perpetrator.

55.    Throughout the course of the corrupt, sham "investigation" that was designed to frame Mr. Gillispie, the Defendant Officers and GM Defendants conspired to secure Mr. Gillispie's conviction. Among other things, these co-conspirators concealed, destroyed (or took actions designed to cause the destruction of) evidence. In addition, they pressured and manipulated witnesses, convincing some not to testify, and by lying to the victims regarding Mr. Gillispie's background and characteristics.

56.    For example, though interviews of witnesses and suspects were recorded, Defendant Moore would frequently turn the tapes off and on at times

13

designed to make it appear the individual being recorded had made statements inculpating Mr. Gillispie though they had not. In the course of "transcribing" these recorded interviews, Defendant Moore would insert lies and falsehoods into the statements and refused to ever turn the tapes over to the Montgomery County Prosecutors' office or to defense counsel for Mr. Gillispie.

57.    Defendant Moore, in furtherance of the conspiracy described herein and with agreement of his co-conspirators, later destroyed these recordings altogether.

58.    Additionally, to account for the large differences between the true perpetrator and Mr. Gillispie, Defendant Moore manipulated and lied to the victims of the rapes about Mr. Gillispie saying, among other things, that he had dyed or cut his hair to change his appearance. These statements were complete lies Defendant Moore made up to secure Mr. Gillispie's wrongful conviction even though he knew that his statements were completely false.

59.    The Defendant Officers, in furtherance of a conspiracy, took additional unlawful steps to hamper Mr. Gillispie's defense. For one, they attempted to undercut Mr. Gillispie's alibi for the August 20, 1988 assault of the twins. The co-conspirators knew that, at trial, Mr. Gillispie would argue that he was camping and fishing in Kentucky, and would adduce evidence to that effect. Accordingly, the Defendant Officers went to the campground that Gillispie identified and obtained registration cards demonstrating that Mr. Gillispie was fishing in Kentucky at the

14

time the twins were assaulted. Rather than turning these cards over to the defense, they were destroyed.

60.    Likewise, though it was the Department's practice and procedure to administer a polygraph examination to a suspect in a sex-crime case, with the approval of the additional Defendant Officers, Defendant Moore refused to permit Mr. Gillispie to take a polygraph examination even though he had requested one.

61.    As described above, the Defendant Officers and GM Defendants further conspired to make it appear as if the "investigation" of Mr. Gillispie began in June of 1990, when Moore took over the case, and not before when Defendant Wolfe met with Sergeant Fritz, Detective Bailey, and a number of other Defendants. These co-conspirators, therefore, attempted to make it seem like the investigation began in June of 1990 when several GM photographs were provided to the Department via Defendant Wolfe, not when the single picture was previously provided to Sergeant Fritz and Detective Bailey.

62.    To this end, the Defendant Officers and GM Defendants also agreed to withhold supplemental reports prepared by Detective Bailey and approved by Sergeant Fritz, as they knew the reports included exculpatory information for Mr. Gillispie's defense.

63.    These reports were later destroyed by the Defendant Officers.

64.    The Defendant Officers' and GM Defendants' conspiracy to frame Mr. Gillispie continued at trial when they served as prosecuting witnesses and provided

15

false and misleading testimony before the jury. Their testimony included lying about when the investigation began, how Mr. Gillispie became a suspect, and regarding the number of times the GM Defendants met with the Defendant Officers to steer the investigation toward Mr. Gillispie. Acting as an agent of Defendant GM, Defendants Miller and Wolfe provided testimony designed to conceal the animus stemming from Mr. Gillispie's employment and their and targeting of Mr. Gillispie. Likewise, Defendant Moore provided perjured testimony when he denied going to Kentucky to review the camping receipts relevant to Mr. Gillispie's alibi defense.

### Additional Exculpatory Evidence Withheld and Destroyed

65.    After a jury trial in 1991, Mr. Gillispie was convicted of the sexual assaults of B.W., C.W., and S.C.

66.    At the crime scene, hair samples were recovered. These samples—which were of highly probative, exculpatory value—were in the custody and care of either the Department and/or the County (at the MVRCL). These samples were not provided to the defense before Mr. Gillispie's initial trial wherein he was convicted.

67.    Once this evidence was located and turned over by Defendant Rankin, Mr. Gillispie was granted a new trial.

68.    After the retrial, the Department and County were ordered to retain this evidence. Nonetheless, through the Defendant Officers and/or County Defendants, the Department and/or County caused this evidence, which would have been exculpatory, to be lost and destroyed.

16

69.     The testimony provided at the retrial was essentially identical to the first trial. Mr. Gillispie was again convicted of the sexual assaults.

70.     The clothing belonging to one or both of the sisters contained evidence of the sexual assault, as the perpetrator's ejaculate was located on a piece of the sisters' clothing. Despite knowing of its highly probative evidentiary value, the Defendant Officers, spoliated this evidence by returning it to the twins, where the exculpatory evidence (the perpetrator's ejaculate) was then compromised and destroyed.

### Mr. Gillispie Continually Asserts His Innocence

71.     All along, Mr. Gillispie has asserted that he is innocent of the crimes for which he was convicted.

72.     Accordingly, even after the conviction, Defendant Moore and other Defendant Officers have continued to work to keep Mr. Gillispie behind bars by repeating their lies and misrepresentations in post-conviction proceedings and through efforts to conceal their own misconduct, thereby causing Mr. Gillispie further damage.

### Mr. Gillispie's Wrongful Conviction Was Caused by the Department's Widespread Practices, Customs, and Policies

73.     Though unknown to Mr. Gillispie or his defense counsel at the time of his conviction, the Department, the Chief of Police, Defendant Angel, other high-ranking Department officers, including Defendants Wilson and Scothorn, engaged in a systematic process of rigging criminal prosecutions against persons whom they

17

and/or other "friends of the Department" (like Defendant Wolfe) had problems with. These defendants were policymakers or delegated such authority for the City of Miami Township, on account of their ranks in the Department, and Mr. Gillispie is one of their victims. In particular, files would often be destroyed or removed from case files, and reports would be written that included lie and misstatements later used to secure convictions. Moreover, despite being warned, the Department chose to approve of rather than discipline its officers for the widespread misconduct in the Department.

74. This misconduct led to Mr. Gillispie's conviction. Though the Department has consistently denied that these sorts of widespread practices existed, it knew of and attempted to "cover-up" the misconduct of its highest-ranking officers.

## Legal Claims

### Count I:     42 U.S.C. § 1983 — Suppression of Exculpatory Material

75. Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

76. The Defendant Officers, GM Defendants, and County Defendants, acting individually and in conspiracy with each other, destroyed, failed to disclose, and otherwise withheld and/or suppressed exculpatory information and material from the prosecution and, thus, from Plaintiff.

18

77.    As a result of these violations, Plaintiff was deprived of his right to fair trial and was falsely convicted for a crime of which he was innocent.

78.    Defendants were acting under color of law and within the scope of employment when they took these acts.

79.    Through the doctrine of *respondeat superior*, Defendant GM is liable for the conduct of its employees falling within this Count.

80.    The City, County, and GM are liable because the violation of Plaintiff's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for these Defendants.

81.    Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

### Count II:    42 U.S.C. § 1983 — Suggestive Identification

82.    Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

83.    Defendants Moore and Wilson, acting individually and in conspiracy with each other GM Defendants, used improper and suggestive procedures to cause Plaintiff to be misidentified as the perpetrator. This misconduct tainted the pretrial identifications of Mr. Gillispie, which were offered against him at trial, and the in-court identifications during his trial.

84.    As a result of these violations, Plaintiff was deprived of his right to fair trial and was falsely convicted for a crime of which he was innocent.

19

85.     These Defendants were acting under color of law and within the scope of their employment when they took these acts.

86.     Through the doctrine of *respondeat superior*, Defendant GM is liable for the conduct of its employees falling within this Count.

87.     The Township, County, and GM are liable because the violation of Plaintiff's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for these Defendants.

88.      Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

### Count III:   42 U.S.C. § 1983 — Fabricated Evidence

89.     Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

90.     Defendants Moore and Wolfe, acting in conspiracy with the remaining Defendant Officers and GM Defendants, fabricated evidence, including without limitation, false police reports, fabricated statements attributed to witnesses, and their own fabricated testimony offered at both trials.

91.     As a result of these violations, Plaintiff was deprived of his right to fair trial and was falsely convicted for a crime of which he was innocent.

92.     These Defendants were acting under color of law and within the scope of employment when they took these acts.

20

93.     Through the doctrine of *respondeat superior*, Defendant GM is liable for the conduct of its employees falling within this Count.

94.     The Township, County, and GM are liable because the violation of Plaintiff's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for these Defendants.

95.     Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

### Count VI:   42 U.S.C. § 1983 —Malicious Prosecution

96.     Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

97.     Defendants Moore, Wilson, Angel, Scothorn, DiPitreo, other unidentified members of the Miami Township Police Department, acting in conspiracy with GM Defendants, Stapleton, Miller, D. Burke, R. Burke, and other unidentified employees of General Motors Corporation, instigated and continued the prosecution of Plaintiff without probable cause and acting out of malice.

98.     As a result of the malicious prosecution, Plaintiff was falsely convicted for a crime of which he was innocent.

99.     These Defendants were acting under color of law and within the scope of employment when they took these acts.

100.     Through the doctrine of *respondeat superior*, Defendant GM is liable for the conduct of its employees falling within this Count.

21

101.    The Township, County, and GM are liable because the violation of Plaintiff's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for these Defendants.

102.    Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

**Count V: 42 U.S.C. § 1983 — Destruction of Exculpatory Evidence**

103.    Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

104.    Defendants Moore, Wilson, Angel, Scothorn, DiPitreo, Gray, and other unidentified members of the Miami Township Police Department, suppressed, destroyed, or caused to be destroyed exculpatory and materially-favorable evidence, including but not limited to police reports, audio recordings, alibi evidence, and crime-scene evidence containing genetic material. This evidence was destroyed in bad faith, and in furtherance of their conspiracy with GM Defendants.

105.    Defendants Betz, Rankin, Nickoson, and other unidentified employees of the Miami Valley Regional Crime Lab, acting individually and in conspiracy amongst, destroyed exculpatory evidence and materially-favorable evidence, including but not limited to crime scene evidence containing genetic material. This evidence was destroyed in bad faith.

106.    As a result of these violations, Plaintiff was deprived of his right to fair trial and was falsely convicted for a crime of which he was innocent.

22

107.   These Defendants were acting under color of law and within the scope of employment when they took these acts.

108.   The Township, and County are liable because the violation of Plaintiff's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for these Defendants.

109.   Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

### Count VI: Ohio State Law — Malicious Prosecution

110.   Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

111.   Defendants Moore, Wilson, Angel, Scothorn, DiPitreo, other unidentified members of the Miami Township Police Department, acting in conspiracy with Defendants Wolfe, Stapleton, Miller, D. Burke, R. Burke, and other unidentified employees of General Motors Corporation, instigated and continued the prosecution of Plaintiff without probable cause and acting out of malice.

112.   As a result of the malicious prosecution, Plaintiff was falsely convicted for a crime of which he was innocent.

113.   These Defendants were acting under color of law and within the scope of employment when they took these acts.

114.   Through the doctrine of *respondeat superior*, Defendant GM is liable for the conduct of its employees falling within this Count.

115.    Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

**Count VII:  Ohio State Law—Infliction of Emotional Distress**

116.    Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

117.    Defendants Moore, Wilson, Angel, Scothorn, DiPitreo, other unidentified members of the Miami Township Police Department, Wolfe, Stapleton, Miller, D. Burke, R. Burke, and other unidentified employees of General Motors Corporation, acting individually and in conspiracy among themselves and others, intentionally and/or recklessly engaged in extreme and outrageous conduct that caused Plaintiff severe emotional distress and also bodily harm from his distress.

118.    These Defendants were acting under color of law and within the scope of employment when they took these acts.

119.    Through the doctrine of *respondeat superior*, Defendant GM is liable for the conduct of its employees falling within this Count.

120.    Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

24

## Count VIII: Ohio State Law — Spoliation of Evidence

121.    Plaintiff incorporates every paragraph in this Complaint as if fully set forth here.

122.    Defendants Moore, Wilson, Angel, Scothorn, DiPitreo, Gray, other unidentified members of the Miami Township Police Department, Betz, Rankin, Nickoson, and other unidentified employees of the Miami Valley Regional Crime Lab, willfully destroyed evidence in a manner that disrupted Plaintiff's criminal proceedings, knowing that there was pending or probable litigation that would involve this evidence.

123.    As a result of the absence of this evidence, Plaintiff was falsely convicted for a crime of which he was innocent.

124.    Plaintiff suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result.

WHEREFORE Plaintiff Dean Gillispie respectfully requests that this Court enter judgment in his favor and against Defendants the City of Miami Township , Matthew Scott Moore, Tim Wilson, Thomas Angel, Marvin Scothorn, John DiPitreo, Stephen Gray, other unidentified members of the Miami Township Police Department, Montgomery County, Kenneth M. Betz, Denise Rankin, Ralph Nickoson, other unidentified employees of the Miami Valley Regional Crime Lab, General Motors Corporation, Rick Wolfe, Keith Stapleton, Robert Miller, David Burke, Robert Burke, and other unidentified employees of General Motors

25

Corporation, awarding compensatory damages, costs, and attorneys' fees, along with punitive damages against each of the individual Defendants in their individual capacities, as well as any other relief this Court deems appropriate.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a jury trial on all issues so triable.

RESPECTFULLY SUBMITTED,

/s/ Michele L. Berry
Attorneys for Plaintiff

Michele L. Berry (0018939)
THE LAW OFFICE OF MICHELE BERRY, LLC
114 East 8th Street
Cincinnati, OH 45202
Tel: 513.919.5315
Fax: 513.376.8752
mberry@mberrylaw.com

Mike Kanovitz*
David B. Owens*
LOEVY & LOEVY
312 North May St., Suite 100
Chicago, IL 60607
(312) 243-5900

*Motion to appear pro hac vice pending