# In The Matter Of:

*Roger Dean Gillispie v.*
*Miami Township, Ohio, et al.*

---

*Roger Dean Gillispie*
*November 5, 2018*

---

*Charlene Nicholas & Associates, LLC*
*5227 Virginia Springs Court*
*Clayton, OH 45322*
*Tel: 937-836-7878*
*Fax: 937-836-0018*

Original File Gillispie_Roger_Dean_11.05.18_MW.txt
Min-U-Script® with Word Index

1

                    IN THE UNITED STATES DISTRICT COURT

                     FOR THE SOUTHERN DISTRICT OF OHIO

                              - - -

ROGER DEAN GILLISPIE,            :
                                 :
            Plaintiff,           :
                                 :
       vs.                       :   CASE NO. 3:13-CV-416
                                 :
MIAMI TOWNSHIP, OHIO, et al., :
                                 :
            Defendants.          :

                              - - -

                           DEPOSITION

of ROGER DEAN GILLISPIE, taken before me, Mary E. Wright,

a Registered Professional Reporter and Notary Public in

and for the State of Ohio at Large, as on

Cross-Examination, at the offices of Surdyk, Dowd and

Turner, 8163 Old Yankee Street, Suite C , in the City of

Centerville, County of Montgomery, and State of Ohio, on

Monday, the 5th day of November, 2018, beginning at 9:42

a.m.

                              - - -

2

1    APPEARANCES:

2         On Behalf of the Plaintiff:

3              DAVID B. OWENS, ESQ.
               OMAVI SHUKUR, ESQ.
4              LOEVY AND LOEVY
               311 North Aberdeen Street, 3rd Floor
5              Chicago, Illinois, 60607

6
          On Behalf of Miami Township, Ohio:
7
               CHRISTOPHER T. HERMAN, ESQ.
8              SURDYK, DOWD AND TURNER
               8163 Old Yankee Street, Suite C
9              Dayton, Ohio, 45458

10
          On Behalf of Matthew Scott Moore:
11
               TODD M. RASKIN, ESQ.
12             MAZANEC, RASKIN AND RYDER COMPANY
               100 Franklin's Row
13             34305 Solon Road
               Cleveland, Ohio, 44139
14

15        On Behalf of Thomas Angel, Stephen Gray and
          John DiPietro:
16
               JONATHAN T. DETERS, ESQ.
17             SCHROEDER, MAUNDRELL, BARBIERE & POWERS
               5300 Socialville Foster Road, Suite 200
18             Mason, Ohio, 45040

19
          On Behalf of Robert Miller:
20
               ANNE P. KEETON, ESQ.
21             FREUND, FREEZE AND ARNOLD
               1800 Fifth Third Center
22             1 South Main Street
               Dayton, Ohio  45402
23

24

25

3

1        On Behalf of Richard Wolfe:

2            MATTHEW C. SCHULTZ, ESQ.
             BRANNON AND ASSOCIATES
3            130 West Second Street, Suite 900
             Dayton, Ohio, 45402

4

5        On Behalf of Tim Wilson and Marvin Scothorn:

6            PATRICK KASSON, ESQ.
             REMINGER COMPANY, LPA
7            200 Civic Center Drive, Suite 800
             Columbus, Ohio, 43215

8

9        Also Present:

10           RICHARD WOLFE
             ANDREW CLARK, CLVS, VIDEOGRAPHER
11                      - - -

12                INDEX TO EXAMINATION

13   ROGER DEAN GILLISPIE                      PAGE

14     Cross-Examination by Mr. Herman .............   5

15     Cross-Examination by Mr. Raskin ............. 111

16     Cross-Examination by Ms. Keeton ............. 170

17     Cross-Examination by Mr. Schultz ............ 176

18     Cross-Examination by Mr. Kasson ............. 181

19     Direct Examination by Mr. Owens ............. 194

20     Recross-Examination by Mr. Kasson ........... 195

21                      - - -

22                INDEX TO EXHIBITS

23   DEFENDANT'S EXHIBITS                     INTRODUCED

24     1 - Interrogatory Responses ..................  84

25                      - - -

**Roger Dean Gillispie - November 5, 2018**

4

1          VIDEOGRAPHER:  We are going on the record at
2    9:42 a.m. on Monday, November 5, 2018.  This will be media
3    unit number one of the deposition of Roger Dean Gillispie
4    taken by the defense in the matter of Roger Dean Gillispie
5    versus Miami Township, Ohio, et al., filed in the U.S.
6    District Court, For Southern District of Ohio, Case Number
7    3:13, dash, C as in Charles, V as in Victor, dash, 416.
8    The deposition is being held at 8163 Old Yankee Street,
9    Suite C, Dayton, 45458.
10          My name is Andrew Clark, I am the videographer,
11   and Mary Wright is the court reporter and we are from
12   Charlene Nicholas and Associates.  Counsel will now state
13   their appearance and affiliation for the record.
14          MR. HERMAN:  Chris Herman on behalf of the Miami
15   Township police department.
16          MR. RASKIN:  Todd Raskin representing Scott
17   Moore.
18          MR. DETERS:  Jon Deters representing John
19   DiPietro, Thomas Angel and -- sorry -- no, I got a brain
20   fart, sorry -- John DiPietro, Thomas Angel and --
21          MR. RASKIN:  Steve Gray?
22          MR. DETERS:  Steve Gray, sorry.
23          MS. KEETON:  Anne Keeton representing Robert
24   Miller.
25          MR. SCHULTZ:  Matt Schultz representing Richard

5

1   Wolfe.

2           MR. KASSON:  Patrick Kasson representing

3   Defendants Wilson and Scothorn.

4           MR. SHUKUR:  Omavi Shukur representing Dean

5   Gillispie.

6           MR. OWENS:  I'm David Owens, also representing

7   Dean Gillispie.  I think counsel for three of the

8   defendants in this action aren't here and it's our

9   understanding they don't -- they aren't planning on being

10  present today.

11          And then also for the record, Mr. Wolfe is also

12  here again, correct, Mr. Wolfe?

13          MR. WOLFE:  Yeah.

14          MR. OWENS:  All right.

15          MR. WOLFE:  That's correct.

16          MR. OWENS:  Thank you.

17          VIDEOGRAPHER:  The court reporter will now swear

18  in the witness.

19                        - - -

20                  ROGER DEAN GILLISPIE,

21  a witness of lawful age, having been by me first duly

22  cautioned and sworn, testified on his oath as follows:

23                        - - -

24                  CROSS-EXAMINATION

25  BY MR. HERMAN:

**Roger Dean Gillispie - November 5, 2018**

6

1      Q.    Good morning, Mr. Gillispie.  My name is Chris

2   Herman and I represent the Miami Township police

3   department.

4           In a nice, loud clear voice, can you please tell

5   us your name and spell your last name for the record?

6      A.    Dean Gillispie, D-E-A-N, G-I-L-L-I-S-P-I-E.

7      Q.    Now your full name is Roger Dean Gillispie, is

8   that correct?

9      A.    That's correct.

10      Q.    All right.  And it's my understanding that

11   amongst some friends or family, that you go by Dean, your

12   middle name?

13      A.    I solely go by Dean.

14      Q.    Okay.  Can you please tell us your date of

15   birth?

16      A.    4/10/65.

17      Q.    Mr. Gillispie, I know that you've testified in a

18   court before but I'm wondering have you ever testified in

19   a deposition before?

20      A.    No, I have not.

21      Q.    Okay.  As you can see here, there's a video

22   camera at the end of the table here so your vid-- your

23   deposition is being videotaped today.

24           And there's also a court reporter down at the

25   end of the table.  She's recording everything that all of

1  the attorneys will ask you and all of your responses.

2        Now although we have this on video, we want to

3  make it easier for the court reporter at the end of the

4  table here to get everything that you and I say and the

5  other attorneys in this room so I'll ask that if I'm

6  putting a question to you, that you wait until the

7  question is done and then when you give your answer, I'll

8  do my best and I'll make sure that I don't talk over you

9  because it's difficult for her to try and get everything

10  that you and I are saying if we're talking together, okay?

11      A.   Got it.

12      Q.   Now, and then although there is -- the --

13  although this deposition is being videotaped, this is

14  unlike most interactions that we would have like in a --

15  in an informal setting so you might shake your head or nod

16  it or say uh-huh or huh-uh.

17        Just so that the record is clear, I'm going to

18  ask that you verbalize yes, no and that type of thing.

19  And if I happen to ask you is that a yes or a no, I just

20  want to make sure that the record is clear as to what your

21  answer is, okay?

22      A.   Got it.

23      Q.   This deposition is -- is not a race.  It's not a

24  marathon.  I want you to know that if at any point you

25  need to take a break, you're more than welcome to do so.

**Roger Dean Gillispie - November 5, 2018**

8

1           The only -- the only thing that I would require

2     of you, and I think all the other attorneys here as well,

3     is that if we're in the middle of a question, that you

4     answer that question.  Okay?

5           A.    Yes.

6           Q.    Do you have any questions for me right now?

7           A.    No.

8           Q.    Okay.  Di-- are you taking any medication at

9     all?

10          A.    I take vitamins and one small cholesterol.

11          Q.    Okay.  Those wouldn't impair your ability to

12    speak truthfully here today or remember events, would

13    they?

14          A.    No.

15          Q.    Okay.  Can you tell us your current address?

16          A.    1512 Glendale Drive, Fairborn, Ohio.

17          Q.    And how do you spell Glendale, is it one or two

18    words or --

19          A.    G-L-E-N-D-A-L-E, one word.

20          Q.    Is that a home or is it an apartment?

21          A.    It's my parents' home.

22          Q.    Okay.  And can you tell us the names of your

23    parents please?

24          A.    Roger and Juana Gillispie, J-U-A-N-A.

25          Q.    They both still live with -- or -- you said it's

**Roger Dean Gillispie - November 5, 2018**

9

1   their house.  They're both still alive?

2        A.   Yes, fortunately, yes.  Very grateful for that.

3        Q.   Your father's name is Roger.  Your name is also

4   Roger.  Does he have a different middle name?

5        A.   Allen.

6        Q.   Allen, okay.  Does anybody else live at your

7   parents' house besides your mother, your father and you?

8        A.   No.

9        Q.   Okay.  Can you please tell me how long you've

10  been living at that address presently?

11       A.   Presently from -- when I got out of prison?

12       Q.   Yes, yes.

13       A.   December 22nd, 2011.

14       Q.   Is that the only address you've had since your

15  release from prison?

16       A.   Yes.

17       Q.   During that time span -- and we're looking

18  almost at seven years now -- has it only been your mother,

19  your father and you that lived at that residence?

20       A.   Yes.  My siblings have come in for, you know,

21  vacation or just to stay for a week or two but --

22       Q.   But nothing --

23       A.   -- not resided there permanently, no.

24       Q.   Nothing long term then?

25       A.   Right.

**Roger Dean Gillispie - November 5, 2018**

1     Q.   Okay.  On a -- on a subject of siblings, you do

2  have a few siblings, is that right?

3     A.   Correct.

4     Q.   Can you please tell us their names?

5     A.   Jody, R-I-P-I-E, Ripie.

6     Q.   How do you spell Jody?

7     A.   J-O-D-Y.  James, J-A-M-E-S, Gillispie.  Zandra,

8  Z-A-N-D-R-A, Gillispie.

9     Q.   So you have three siblings.  Is -- obviously

10  Jody is married I assume?

11     A.   Yes.

12     Q.   Okay.  And what is her husband's name?

13     A.   Merive.

14     Q.   Merive?  M-E-R-V?

15     A.   Yeah.  M-E-R-I-V-E I believe.

16     Q.   Okay.  Your brother James, is he married?

17     A.   No.

18     Q.   Is he divorced?

19     A.   Yes.

20     Q.   Okay.  Who was his ex-wife, what's her name?

21     A.   He's had a couple.  I don't know.

22     Q.   Do you recall either of his two ex-wives' names?

23     A.   Yeah, the first one, Shelly.

24     Q.   Okay.  Do you not recall the other one?

25     A.   No.

**Roger Dean Gillispie - November 5, 2018**

1      Q.   Okay.

2      A.   It was during my incarceration.

3      Q.   Have you ever had any contact with James's

4  ex-wives at all?

5      A.   Shelly.

6      Q.   Okay.  How recently have you had any contact

7  with Shelly Gillispie?

8      A.   Probably -- the last time was probably --

9  what -- three or four months ago.  She's the grandmother

10  of his -- my nephew's child so --

11      Q.   So James and Shelly have children together?

12      A.   They have one child.

13      Q.   Okay.

14      A.   Nick.

15      Q.   And Nick has?

16      A.   One child.

17      Q.   One child.

18      A.   Lane.

19      Q.   Okay.  So Shelly is Lane's grandmother?

20      A.   Grandmother.

21      Q.   Okay.  And that was within the last few months

22  you said?

23      A.   Yeah.

24      Q.   Okay.  Do you maintain any constant or regular

25  contact with Shelly at all?

**Roger Dean Gillispie - November 5, 2018**

12

```
 1        A.    No.
 2        Q.    Is it just to see her at family occasions and
 3   that type of thing?
 4        A.    Correct.
 5        Q.    Okay.  So James and Shelly have one son and what
 6   was his name again?
 7        A.    Nick.
 8        Q.    Do they have any other children?
 9        A.    No.
10        Q.    Do Jody and Merive have any children?
11        A.    No.  Merive has children from a previous
12   marriage.
13        Q.    Are they adults?
14        A.    Yes.
15        Q.    Your sister, Zandra, is she married or not?
16        A.    No, divorced.
17        Q.    Do you know her ex-husband's name?
18        A.    Mark Whitfield.
19        Q.    Do you recall the last time you've had any
20   contact with Mark Whitfield?
21        A.    Telephone contact would probably be it.  He
22   lives in Nebraska.
23        Q.    How long ago would that have been?
24        A.    I couldn't tell you.
25        Q.    Is it since your release from prison?
```

**Roger Dean Gillispie - November 5, 2018**

1      A.    Oh, yes.

2      Q.    Okay.

3      A.    They have a child.

4      Q.    Zandra and Mark have a child?

5      A.    Yes.

6      Q.    Is that child an adult?

7      A.    Yeah.

8      Q.    Your conversations with Mark Whitfield over the

9   telephone, how often are those?

10      A.    Very rare.

11      Q.    What type of things do you talk about with

12   Mr. Whitfield?

13           MR. OWENS:  Objection.  Form.  Go ahead.  You

14   can answer.

15           THE WITNESS:  My niece.

16   BY MR. HERMAN:

17      Q.    Okay.  Anything else that you speak to him

18   about?

19      A.    No.

20      Q.    Do you ever talk to him about the criminal case

21   that is the subject matter of this lawsuit and your

22   lawsuit that you filed in the Southern District of Ohio?

23      A.    No.

24      Q.    What's Zandra and Mark's daughter's name?

25      A.    Natalie.

**Roger Dean Gillispie - November 5, 2018**

14

1    Q.    Do Jody and Merive live in the Dayton area?

2    A.    No.

3    Q.    Can you tell us where they live?

4    A.    Omaha, Nebraska.

5    Q.    Okay.

6    A.    I'm sorry, Lincoln, Nebraska.

7    Q.    All right.  And how often do you -- do you talk

8    over the telephone or do you get to see them at holidays,

9    how often do you see Jody and Merive?

10   A.    Jody comes home two to three times a year.

11   Q.    And do you talk to her on the phone occasionally

12   or through social media or e-mailing or any of that type

13   of thing?

14   A.    Telephone.  Text.

15   Q.    Okay.  How frequently do you telephone and text

16   with your sister Jody?

17   A.    We were texting last night.

18   Q.    Okay.  Well, that's last night.  Do you text on

19   a weekly basis or more often or less often?

20   A.    There's a text thread that we're going back and

21   forth, all of us are on, you know, throughout the week,

22   throughout the days.

23   Q.    All right.  And on that text thread, is -- does

24   it include your brother James, your sister Zandra and your

25   parents?

**Roger Dean Gillispie - November 5, 2018**

15

1      A.    My parents are not texters.

2      Q.    They are not?

3      A.    No.

4      Q.    Okay.  Do they -- do your parents e-mail at all?

5      A.    No.

6      Q.    Okay.  A land line, that's their form of

7  communication?

8      A.    That's correct.

9      Q.    Okay.  Do you remember the last time that you

10  talked to Jody or Merive about your criminal case and the

11  civil case that you filed against Miami Township?

12      A.    I wouldn't have talked to Merive about it and I

13  don't recall talking to my sister about it.

14      Q.    Okay.  Have you ever talked to Jody about the

15  case that we're for -- here for today?

16          MR. OWENS:  Objection.  Vague.  Go ahead.

17          THE WITNESS:  She knows about it.

18  BY MR. HERMAN:

19      Q.    Okay.  Have you talked to her about the claims

20  that you're raising?

21      A.    No, I don't speak to them about any of this.

22      Q.    Okay.  Your brother James, does he also -- does

23  he live in the Dayton, area?

24      A.    No, he does not.

25      Q.    Where does he live?

**Roger Dean Gillispie - November 5, 2018**

16

1      A.   Niceville, Florida.

2      Q.   And how often do you speak to your brother

3  James?

4      A.   Same thing, the -- the thread and the -- the

5  texting thread and, you know, we talk on the phone about

6  fishing.

7      Q.   Okay.  Do you and James talk about this case

8  that you filed against Miami Township and the other

9  defendants?

10         MR. OWENS:  Objection.  Vague.  Go ahead.

11         THE WITNESS:  No.

12  BY MR. HERMAN:

13     Q.   Have you ever talked about this case with your

14  brother James?

15     A.   Like I say, they know about it.  This has

16  affected my whole family.

17     Q.   Okay.  So if I understand you then -- well, let

18  me a-- let me go to Zandra.  How often do you talk to

19  Zandra?  Where does she live?

20     A.   She lives in Naples, Florida now.

21     Q.   Okay.  Are you the only sibling still living in

22  Ohio then?

23     A.   Correct.

24     Q.   Okay.  And the nature of your communications

25  with Zandra -- I know you've mentioned a text thread.  Do

1    you call her from time to time, does she call you at all?

2         A.   Yes.

3         Q.   How often would you say that is?

4         A.   We speak more often than the rest because she is

5    more involved in making sure my parents are at their --

6    everything's okay with them.  Other than me living there,

7    she is always in constant contact with them.

8         Q.   Is Zandra the youngest --

9         A.   Correct.

10        Q.   -- of the four kids?  And what do you mean by

11   making sure things are okay with your mother and father,

12   Roger and Juana?

13        A.   Well, they want to appear strong and positive

14   and upbeat through this but it's been hell on them.

15        Q.   What do you mean they want, who -- who are you

16   referring to when you say they?

17        A.   My parents.

18        Q.   Okay.

19        A.   And they don't tell me things that I should be

20   knowing.

21        Q.   What type of things are your parents keeping

22   from you that they feel you shouldn't know --

23             MR. OWENS:  Objection to the form.

24             MR. HERMAN:  -- if you know?

25             MR. OWENS:  Sorry.  Objection to the form of the

**Roger Dean Gillispie - November 5, 2018**

1  question.  Go ahead.

2              THE WITNESS:  You know, how is their health and

3  other than just their appearance, you know, how are they

4  doing.  You know, you can live with somebody and not know

5  how they're doing.

6              I do my best to see how they're doing every day

7  and try to make sure they're okay but they tell her more

8  things than they tell me.  They tell her more things than

9  they tell any of us.

10  BY MR. HERMAN:

11      Q.    Does Zandra share those things with you about

12  your --

13      A.    It's a --

14      Q.    -- mother and father's health?

15              MR. OWENS:  You got to let him finish the --

16              THE WITNESS:  I understand.

17              MR. OWENS:  -- finish the question.  I also have

18  some objections.  Let me object.  I object to the form of

19  the question.  It's compound.  Go ahead.

20              THE WITNESS:  What was your question?

21              MR. HERMAN:  Can you read it back to him please?

22              REPORTER:  I'm sorry, he overspoke so I didn't

23  get the --

24              MR. OWENS:  Can you just ask it again?

25              REPORTER:  -- last -- can you just ask him

**Roger Dean Gillispie - November 5, 2018**

19

1  again?  I'm sorry.

2          MR. HERMAN:  I think it was -- well, honestly, I

3  don't remember what it was.

4          MR. OWENS:  You asked something about

5  conversations that he had with Zandra --

6          MR. HERMAN:  That's right, that's right.

7          MR. OWENS:  -- sharing with the parents.

8          MR. HERMAN:  What -- does Zandra share with you

9  conversations that she has about your parents and their

10  health?

11          MR. OWENS:  Objection.  Form.  Go ahead.

12          THE WITNESS:  When it's important.

13  BY MR. HERMAN:

14      Q.   Okay.  What do you consider important in terms

15  of that information?

16      A.   That they're not feeling well, that they might

17  need to see the doctor, that they're going to see the

18  doctor.

19      Q.   Do you have a driver's license?

20      A.   Yes, I do.

21      Q.   Okay.  How old is your father Roger?

22      A.   Seventy-three.  I'm sorry, he's 74.

23      Q.   And your mother, how old is she?

24      A.   She is 73.

25      Q.   Do you -- I know you said that this has affected

**Roger Dean Gillispie - November 5, 2018**

20

1  your -- your mother and your father.  Do you mean the

2  criminal case or the civil case that you've filed against

3  the township and all the defendants?

4          MR. OWENS:  Objection.  Vague, but go ahead.

5  And -- and to the extent you want him to clarify a

6  question, you can ask him to clarify a question if there's

7  something that you don't understand.

8          THE WITNESS:  This --

9          MR. HERMAN:  Would you like to take a break,

10  Mr. Gillispie?

11          THE WITNESS:  No.  I was kidnapped from my home

12  for something I had absolutely nothing to do with.  This

13  has a major effect on every single person in my family.

14          My sister was in high school.  My brother was in

15  the military.  When they took me, my mother completely

16  forgot about my sister.

17  BY MR. HERMAN:

18      Q.   Who did?

19      A.   My mother.

20      Q.   Forgot about which sister, Zan--

21      A.   Zan--

22      Q.   --dra?

23      A.   --dra.

24      Q.   Is she the one that was in high school?

25      A.   That's correct.  Because of the fight she had to

1  put up to try to save my life in prison for a crime I had

2  nothing to do with.  This has a major effect on everyone

3  in my family.

4      Q.   So it sounds to me that the criminal case and

5  the time that you spent in prison is having more -- had

6  more of an effect or impact on your mother and father and

7  your extended family than the fact that you filed this

8  suit, is that what you're saying?

9      A.   This isn't over until this is all the way done.

10 This comes right back up in their face.

11     Q.   What do you mean --

12     A.   Every time we have something like this, every

13 time something is going on like this, it's right back up.

14 We have to relive this.  When does it end?

15     Q.   What do you mean by when this comes back up or

16 every time we have to do this?

17     A.   This case.  This case.

18     Q.   You filed this case --

19     A.   Yes, I did.

20     Q.   -- is that correct?  Okay.

21     A.   That's correct.

22     Q.   And before you filed this case, did you talk to

23 your parents and your extended family about what if any

24 impact that would have on their health and their

25 well-being?

**Roger Dean Gillispie - November 5, 2018**

22

1            MR. OWENS:  Objection to the form of the
2    question.  Go ahead.
3            THE WITNESS:  Yes.  We knew this was probably
4    going to be a factor.
5            MR. HERMAN:  And did they participate in the
6    decision for you to file a lawsuit?
7            MR. OWENS:  Objection.  Go ahead.  It's -- it's
8    vague but go ahead.
9            THE WITNESS:  Ask me that again.
10   BY MR. HERMAN:
11        Q.   Did they -- did you have discussions with them
12   about the impact this may have on them and did -- did they
13   also participate with your decision making process in
14   filing this lawsuit?
15        A.   I had a discussion with every one of them and
16   let them know that at some point, this was going to be
17   coming back up again.
18        Q.   And they understood that?
19        A.   Yes, they did.
20        Q.   Okay.  And did they express to you any
21   reservations about you filing this lawsuit because of the
22   toll and impact that you're claiming it had on your mother
23   or your father and your extended family?
24            MR. OWENS:  Objection.  It's argumentative.  Go
25   ahead.

**Roger Dean Gillispie - November 5, 2018**

23

1           THE WITNESS:  I'm not claiming anything.  I know

2   for a fact that it has an effect on them.

3           MR. HERMAN:  Has that effect that the criminal

4   case had on your parents affected you in any way, shape or

5   form?

6           MR. OWENS:  I'm sorry, I'm -- are you asking

7   about -- objection.  It's vague.  Whatever.  I got a

8   little confused if you're asking about the impact on him

9   or the impact that -- observing parents but --

10  BY MR. HERMAN:

11      Q.   You understood my question.  Do you understand

12  my question?

13      A.   No.

14      Q.   Okay.  So you've -- you've told us that the

15  criminal case impacted your mother and your father and

16  your siblings, correct?

17      A.   (Witness nodded affirmatively.)

18      Q.   Is that a yes?

19      A.   Yes.

20      Q.   Okay.  Now seeing that, has that impacted you in

21  any way the way that your parents and your siblings

22  responded to the criminal case?

23      A.   No.

24      Q.   So you're not affected in any way by the way

25  your mother and father are responding to the criminal case

**Roger Dean Gillispie - November 5, 2018**

24

1    and then this civil case?

2        A.   I'm extremely affected by it, yes.  It's my

3    parents.

4        Q.   Okay.  In fairness, a moment ago, you said that

5    you weren't affected so -- but you are affected by their

6    reactions and -- and whatnot to the case?

7            MR. OWENS:  Objection to the

8    mischaracterization.  I think he was actually confused.  I

9    was actually confused about your question but go ahead.

10   BY MR. HERMAN:

11       Q.   Mr. Gillispie, if you don't understand my

12   questions, then ask me to rephrase them, okay?  If you

13   answer my question, I'm assuming you're going to -- you

14   understand it, okay?

15       A.   Okay.

16       Q.   Do your parents drive, do they have their

17   driver's license?

18       A.   Yes.

19       Q.   Okay.  So in terms of them having to get to

20   doctor's appointments and that type of thing, they take

21   care of that themselves?

22       A.   Depends on what the appointment is for.

23       Q.   Okay.  Are there times where you are taking your

24   mother and father to a doctor's appointment or something

25   of that nature?

**Roger Dean Gillispie - November 5, 2018**

25

1       A.   Yes.

2       Q.   Okay.  On -- what sort of appointments are you

3  having to go and take them to the doctor instead of one of

4  them going?

5       A.   My mother has injections in her eyes so she

6  can't drive after that.  So if my brother-- my -- my

7  father's at an appointment, I take them.

8       Q.   And I know a little earlier you shared with us

9  that your parents tell your sister Zandra more about their

10  health and condition and whatnot than what they share with

11  you.  Do you know why that is that they are more open with

12  Zandra and not more open with you?

13           MR. OWENS:  Objection.  Foundation.  You can

14  answer.

15           THE WITNESS:  She's the baby.

16  BY MR. HERMAN:

17       Q.   And you're the oldest?

18       A.   Correct.

19       Q.   Okay.  You have a high school degree?

20       A.   Yes, I do.

21       Q.   What school did you graduate from --

22       A.   Fairborn.

23       Q.   -- high school?

24       A.   Fairborn High School.

25       Q.   Class of?

26

1          A.    '84.

2          Q.    After your gradua-- graduation from high school,

3   did you enter into college or try to get an Associate's

4   degree or get anything after your high school diploma?

5          A.    Sinclair Community College.

6          Q.    Okay.  What years did you attend Sinclair

7   Community College?

8          A.    I believe '85, '86.  '85.

9          Q.    And was there a certain degree that you were

10  pursuing at Sinclair?

11         A.    Fire science technology.

12         Q.    Okay.  At that time -- so we're talking about in

13  '85 or '86 -- do you know was that an Associate's degree

14  that you were pursuing at Sinclair in fire science

15  technology?

16         A.    Correct.

17         Q.    Did you complete that degree work for fire

18  science technology?

19         A.    Did not.

20         Q.    Okay.  Is there a reason that you didn't

21  complete that at Sinclair?

22         A.    I got the job I was going to school for.

23         Q.    What job was that?

24         A.    General Motors plant protection.

25         Q.    Was it a two-year degree that you were pursuing

**Roger Dean Gillispie - November 5, 2018**

27

1    then at Sinclair?

2        A.   Correct.

3        Q.   And how -- how many credits short did you fall

4    of obtaining your degree from Sinclair?

5        A.   I don't recall.

6        Q.   What year did you get the job working for GM

7    plant protection?

8        A.   I started as a intern in '84 at the Inland

9    Division.

10        Q.   And just so that our record is clear, when we're

11    referring to GM, we're talking about General Motors; is

12    that correct?

13        A.   That's correct.

14        Q.   All right.  General Motors had a pretty

15    substantial auto industry here back through the 1980s when

16    you started working as an intern there in 1985 --four,

17    correct?

18        A.   Correct.

19        Q.   After you started working at GM in 1984, did you

20    pursue any other degrees or certificates or anything of

21    that nature before you became incarcerated?

22        A.   There was a few different requirements that I

23    went through.  I couldn't tell you now what they all were.

24        Q.   Do you mean requirements related to your job at

25    General Motors?

Roger Dean Gillispie - November 5, 2018

28

1       A.    Correct.

2       Q.    Ca-- do you recall the nature of -- those

3   classes?  I don't know if it wa-- it's like an education

4   or -- what's the nature of them?

5       A.    They were certificate type programs you go to

6   get certified in different things.

7       Q.    What type of areas or fields were you certified

8   in then back in 1984?

9       A.    I can't recall.

10      Q.    Okay.  You mentioned fire science.  Have you

11  ever had any experience with arson investigations or

12  anything of that nature, or anything related to fire

13  science?

14      A.    Not on the investigation form of it, no.

15      Q.    Okay.

16      A.    Mostly in the maintenance of equipment.

17      Q.    Is that something that you were tasked with at

18  General Motors then, maintaining fire safety equipment

19  at -- wherever you were working there?

20      A.    That's correct.

21      Q.    So you started in 1984 at General Motors and you

22  said that the Inland Division -- which I believe was up in

23  Vandalia, Ohio, is that right?

24      A.    It was the Dayton plant.

25      Q.    Okay.  So were there two Inland plants, one in

Roger Dean Gillispie - November 5, 2018

29

1    Vandalia and then one in Dayton?

2         A.    Correct.

3         Q.    And you were assigned to the Dayton Inland

4    plant?

5         A.    Correct.

6         Q.    Do you remember the address or what street it

7    was on?

8         A.    Do not.

9         Q.    Did you have -- ever have occasion to have to

10   work up at the Vandalia Inland Division while you were

11   working at General Motors?

12        A.    No.

13        Q.    Then can you tell us what was the job -- what

14   was your job title when you started at General Motors?

15        A.    You're a -- security plant protection.

16        Q.    And how did you apply for such a job?

17        A.    Fill out an application.

18        Q.    That's it, got an interview and then --

19        A.    Yeah, it was an interview process, yeah.

20        Q.    Was there any requirement that you have a high

21   school diploma or any other, you know, degrees after high

22   school?

23        A.    None that I know of.

24        Q.    Can you tell us what were your duties then as a

25   security plant protection employee at the Dayton Inland

30

1    plant?

2         A.    You were scheduled on a key round.  If you were

3    on gate duty, you were scheduled for vehicle traffic in

4    and out.  If you were on the fireman duty, you were inside

5    the plant maintaining fire equipment.

6         Q.    So it sounds like there were three areas.  You

7    said key round?

8         A.    Key rounds, yes.

9         Q.    Can you tell -- what does that mean?  I don't

10   know -- I don't under-- I don't know what that means.

11        A.    Key round is a certain point in the plant where

12   there's a key you put in and turn and it signals to the --

13   the main operator that you have been in that location and

14   observed what was going on at that time.

15             And then you go to the next key round.  And it

16   makes a way throughout the plant that you've observed

17   what's going on through the plant.

18        Q.    What's the purpose of observing what's going on

19   through the plant?

20        A.    Any hazards, any potential fire risks.

21        Q.    When did you last work for GM, do you recall

22   that date?

23        A.    I do not.

24        Q.    Do you recall was it before you were charged in

25   the criminal matter?

**Roger Dean Gillispie - November 5, 2018**

31

1          MR. OWENS:  Objection.  Form.

2    BY MR. HERMAN:

3          Q.   When I -- when I say the criminal matter, I'm

4    talking about the case involving a rape at Best Products

5    on August the 20th, 1988 and a rape that occurred up in I

6    believe Harrison Township on August the 5th, 1988.

7               So when I say the criminal case, I'm referring

8    to those and it's the case that you were charged with

9    rape, kidnapping and several other -- other charges.  When

10   I say the criminal case, that's what I mean.  Do you

11   understand that?

12        A.   Yes.

13        Q.   Okay.

14             MR. OWENS:  Just to be clear, my objection, I

15   thought that question was vague with respect to what you

16   meant by before the case.

17   BY MR. HERMAN:

18        Q.   So you started to work at GM in 1984 but you

19   don't recall when you stopped working for GM, correct?

20        A.   Correct.

21        Q.   When you were indicted in the criminal case, do

22   you recall were you still working for GM at that time?

23        A.    I was not employed at General Motors.

24        Q.   Okay.  And correct me if my -- I'm wrong, so the

25   case filed against you was 1990 CR 2667 so the case was

**Roger Dean Gillispie - November 5, 2018**

32

1    filed in 1990 then, is that your understanding?

2         A.    Yes.

3         Q.    Okay.  So getting back, you said there was key

4    round, fireman and parking lot.  In the time that you were

5    employed at GM, did you serve in all three of those

6    different roles?

7         A.    Not parking lot but -- gate entrance.

8         Q.    Gate entrance?

9         A.    Gate traffic.

10        Q.    Okay.

11        A.    Shipping.  Product shipping out the gate.

12        Q.    So gate traffic, fireman and key round.  If I

13   understand you then, you worked in all three of those

14   capacities while you were a security plant protection em--

15        A.    Correct.

16        Q.    --ployee, correct?  Okay.  Is there any one of

17   those that you did more often than the other?

18        A.    I did equal amount of both.  Due to the -- due

19   to the employment that I was in, I usually was filling in

20   vacation spots.

21        Q.    So were you a full time employee when you were

22   hired on in 1984?

23        A.    I -- in 1984 when I was hired on, it was as-- it

24   was called a pre-diem (phonetic) job.

25        Q.    Per diem?

**Roger Dean Gillispie - November 5, 2018**

33

1    A.    Per diem.  I worked 40 hours a week or more.

2    Q.    At that time though, if I understand you, it was

3 to fill in vacation of other security personnel that were

4 taking vacation and type of thing?

5    A.    That's usually what it was, yes.  I'm -- I was

6 an employee there -- most of the guys would take time off

7 when they had fireman duty for the week.

8    Q.    When you say most of the guys, who do you mean?

9    A.    Most of the people that I worked with at General

10 Motors.

11    Q.    Is it fair to say you were a security guard at

12 General Motors -- like -- what is the official title just

13 so that I have an understanding?

14          MR. OWENS:  Objection.  Compound.  Go ahead.

15          THE WITNESS:  It was security plant protection.

16 That's all I know.

17 BY MR. HERMAN:

18    Q.    Okay.  Help me understand this then.  So you

19 weren't full time but you were getting full time work

20 covering other people's vacations and whatnot?

21    A.    Correct.

22    Q.    Okay.  So did that mean that -- did you have

23 health benefits tied to your employment with GM?

24    A.    No.

25    Q.    Did you get to participate in the 401(k) while

1   you were employed by GM?

2       A.   No.  They didn't have it.

3       Q.   They didn't have it for all GM employees or they

4   didn't have it for you because you were not -- you were

5   just a vacation filler in guy?

6       A.   As -- as far as I understood it, GM had a GM

7   retirement plan.

8       Q.   Okay.  Did you get to participate in the GM

9   retirement plan?

10      A.   No.

11      Q.   Were there any benefits that you received in

12  your employment at GM besides the fact that you received a

13  paycheck?

14      A.   No.

15      Q.   Did some of the other security plant protection,

16  if you know, get to participate in the GM benefit plan or

17  get to have health insurance?

18      A.   I don't know what their status was.

19      Q.   Okay.  Is there some reason that -- that you --

20  that you're aware of that you didn't get to have health

21  insurance or get to participate in the benefit plan?

22      A.   I don't know what the politics were.

23      Q.   Can you tell us what sort of hours you would

24  have at GM then while you were working as security plant

25  protection?  I know you said 40 hours a week.  Was it a

**Roger Dean Gillispie - November 5, 2018**

35

1   set schedule or it would fluctuate?

2        A.   Depending on the week that I was working, it

3   could be work first shift, get off first, go in on third.

4   The hours were very staggered.  I worked every shift.

5        Q.   What were the hours of first shift?

6        A.   I believe they were 7:00 to 3:00.

7        Q.   Then second shift?

8        A.   3:00 to 11:00.

9        Q.   And then third shift?

10       A.   11:00 to 7:00.

11       Q.   Okay.  Is there any one of those three shifts,

12   first, second or third, that you primarily worked?

13       A.   No.

14       Q.   Okay.  So it's fair to say then that you were

15   just simply -- wherever GM had somebody taking some time

16   off, you would just be plugged into those spots on the

17   weekly work schedule?

18       A.   Yes.

19       Q.   And was the schedule simply that it would come

20   out every week and then you'd figure out what your

21   assignments were for that week?

22       A.   Correct.

23       Q.   Was it any longer duration than just one week,

24   one week, one week that you would be scheduled?

25       A.   If someone took a two-week vacation, I would

Roger Dean Gillispie - November 5, 2018

36

1  normally be in that whole span.

2      Q.   Okay.  Did you serve as security plant

3  protection at any of the other facilities besides the

4  Dayton Inland plant?

5      A.   Harrison Radiator.

6      Q.   Okay.

7      A.   Dayton and Moraine.

8      Q.   So those are two separate locations for

9  Dayton -- for Harrison Radiator, correct?

10      A.   Correct.

11      Q.   They had a Dayton plant, yes?

12      A.   Yes.

13      Q.   And a Moraine plant?

14      A.   Yes.

15      Q.   Okay.  During all of the time that you served as

16  a security plant protection, out of those three that

17  you've identified, which one did you work the most at?

18  Inland Dayton?

19      A.   I worked at Inland Dayton for four months.

20      Q.   Okay.  Is it fair to say that was at the

21  beginning of your employment with GM?

22      A.   Correct.

23      Q.   Okay.  And then were you then reassigned to

24  Harrison Radiator to be at Dayton or Moraine?

25      A.   Correct.

37

1     Q.   Did you ever go back and work for Inland after

2   you were reassigned to Harrison Radiator?

3     A.   No.

4     Q.   While you were working at Inland for those four

5   months do you recall the name of your immediate

6   supervisor?

7     A.   Depended on what shift I was on.

8     Q.   Okay.  Do you recall the names of any of the

9   supervisors regardless of what shift it was?  While -- and

10   I'm talking about while at Inland.

11     A.   At Inland, no.

12     Q.   Do you recall the names of your immediate

13   supervisors while you were working at Harrison Radiator,

14   regardless of what shift it was?

15     A.   Yes.

16     Q.   What were the names of those immediate

17   supervisors that you -- you can tell us?

18     A.   Kepperling (phonetic).

19     Q.   Is that a last name?

20     A.   Yes.

21     Q.   Do you know the first name?

22     A.   Bob Kepperling.

23     Q.   Do you know how to spell Kepperling?

24     A.   No.

25     Q.   Do you remember what particular shift Bob

**Roger Dean Gillispie - November 5, 2018**

38

```
 1    Kepperling was your supervisor?
 2         A.   Mostly first.
 3         Q.   Who else do you recall being one of your
 4    supervisors at -- your immediate supervisors at Harrison
 5    Radiator?
 6         A.   Miller.
 7         Q.   Is that Robert Miller?
 8         A.   Correct.
 9         Q.   One of the defendants -- defendants that you
10    named in this lawsuit, correct?
11         A.   Yes.
12         Q.   Do you remember what shift Robert Miller worked
13    and was your supervisor?
14         A.   I don't remember what --
15         Q.   Can you remember any other supervisors besides
16    Mr. Kepperling and Mr. Miller?
17         A.   Gearhardt (phonetic).  Don't know his first
18    name, don't remember.
19         Q.   Gearhardt?
20         A.   Gayheart (phonetic), Gayheart.
21         Q.   How about what shift was that that you recall
22    him working --
23         A.   I --
24         Q.   -- and being your supervisor?
25         A.   -- mostly recall third with him.
```

**Roger Dean Gillispie - November 5, 2018**

39

1      Q.   Do you recall any other supervisor names, your
2   immediate supervisor?
3      A.   Don't recall names.  I know there was a couple
4   others but I don't remember their names.
5      Q.   David Burke, was he ever one of your immediate
6   supervisors?
7      A.   He was next step up.
8      Q.   Okay.  Robert Burke, was he ever one of your
9   immediate supervisors?
10     A.   Excu-- excuse-- Robert Burke was the next step
11  up.
12     Q.   Okay.  What about Rick Wolfe, was he ever one of
13  your immediate supervisors?
14     A.   He was the next step up.
15     Q.   Okay.  Let's talk about these steps then so that
16  we can all have an understanding as to the hierarchy of
17  the supervisors there at GM.
18          So at -- at the bottom I guess is the security
19  plant protection.  You guys are -- I'll call it boots on
20  the ground at the plant and everything, checking to make
21  sure that everything is safe?
22     A.   Correct.
23     Q.   Okay.  So then immediately above the
24  security pla-- who's immediately above le-- above that
25  then?

Roger Dean Gillispie - November 5, 2018

40

1       A.    Your s-- your shift sergeants.

2       Q.    So that would have been Bob Kepperling, yes?

3       A.    Yes.

4       Q.    Bob Miller?

5       A.    Yes.

6       Q.    Mr. Gayheart, who you can't recall his first

7    name?

8       A.    Correct.

9       Q.    And then some other supervisors who you can't

10   remember, they were the shift sergeants?

11      A.    Correct.

12      Q.    So is it fair to say that you reported directly

13   to your sift-- shift sergeant, whoever that happened to

14   be?

15      A.    Correct.

16      Q.    Okay.  Who, if you know, was the next step up

17   above the shift sergeants in terms of the security at GM?

18      A.    For awhile, it was Burke, Robert Burke.

19      Q.    Robert Burke?

20      A.    And Stapleton.

21      Q.    Keith Stapleton?

22      A.    Yes.

23      Q.    Do you recall Robert Burke and Keith Stapleton's

24   titles at GM?  I know you've shared with us shift

25   sergeants.  What was the title above them?

Roger Dean Gillispie - November 5, 2018

41

1        A.    I don't recall what it was.

2        Q.    Can I use the term security guard and security

3    instead of security plant protection and we'll

4    understand -- have that understanding then, is that okay?

5        A.    That's up to you.

6        Q.    Is that okay with you?

7        A.    That's fine with me.

8        Q.    If I use the term security guard, I mean

9    security plant protection --

10       A.    Okay.

11       Q.    -- okay?  Do you understand?

12       A.    Yes.

13       Q.    Okay.  So security guards would report to shift

14   sergeants, correct?

15       A.    Correct.

16       Q.    Would a security guard ever have to report to

17   the Robert Burkes or the Keith Stapletons in the hierarchy

18   at the security?

19             MR. OWENS:  Object.

20             THE WITNESS:  Sure.

21   BY MR. HERMAN:

22       Q.    What would be the circumstances where a security

23   guard would be reporting two steps above them if you know?

24       A.    If you had an incident of a fire or chemical

25   spills or things like that and they required more

**Roger Dean Gillispie - November 5, 2018**

42

1    information, you would see them.

2         Q.   Would you see the shift sergeant first and then

3    provide more information to the supervisors above the

4    shift sergeants?

5         A.   If it was something of the nature I just spoke

6    of, they were usually on the scene with you.

7         Q.   Okay.  Were the shift sergeants also there if

8    it -- if it was a fire or the other things that you

9    described?

10        A.   Yes.

11        Q.   Okay.  Is it fair to say then that in one of

12   those situations that you described, the shift sergeant

13   and the person immediately above them would still be

14   getting all that information from you, the security

15   guards, so it's not as if you skipped over the sh-- the

16   shift sergeants and went straight to their supervisor?

17             MR. OWENS:  Objection.  Vague.

18             THE WITNESS:  He would usually do a report and

19   shift supervisor was there and whatever they done after

20   that was -- whatever was next.

21   BY MR. HERMAN:

22        Q.   You shaid-- you said shift supervisor, did you

23   mean to say shift sergeants?

24        A.   Correct.

25        Q.   Okay.

**Roger Dean Gillispie - November 5, 2018**

43

1     A.    Same.  When I say shift sergeants, you say shift
2  supervisors, they're the same.
3     Q.    Okay, thanks.  Can you tell us who in the
4  security structure at GM was above the Robert Burke and
5  Keith Stapletons of GM?
6     A.    Rick Wolfe.
7     Q.    Okay.  Do you recall Rick Wolfe's title at GM
8  when you were working there?
9     A.    No.
10    Q.    During your time working at GM, and I'm talking
11 about Rick Wolfe's position, was Rick Wolfe the only
12 person that you knew that held that position while you
13 worked at GM?
14    A.    As far as I knew at the time.
15    Q.    Okay.  You said at the time.  Have you come to
16 learn that there were other people in that level of Rick
17 Wolfe's hierarchy at GM security?
18    A.    No.
19    Q.    Harrison Radiator had two sites, you said Dayton
20 and Moraine?  Do you recall did Kepperling work -- well,
21 let me back up a second.
22         Can you tell me did Kepperling, Miller and
23 Gayheart, were they the shift sergeants/shift supervisors
24 for both the Dayton and Moraine Harrison Radiator plants?
25    A.    They would go back and forth the same as I did.

**Roger Dean Gillispie - November 5, 2018**

44

1        Q.    Okay.  So your shift sergeants weren't -- were
2    not exclusively assigned to the Dayton Harrison Radiator
3    plant or the Moraine Harrison Radiator plant, is that
4    correct?
5        A.    That's the way I remember it.
6        Q.    And you weren't exclusively assigned to either
7    the Dayton or the Moraine plants in your job as a security
8    guard?
9        A.    Right.
10       Q.    Do you recall ever having any direct contact
11   with Keith Stapleton while you were working at GM?
12       A.    Yeah.
13       Q.    Okay.  Tell me about direct -- any direct
14   contact you would have with Keith Stapleton.
15            MR. OWENS:  Objection.  Form, foundation.  Go
16   ahead.
17            THE WITNESS:  Whatever it would entail with the
18   job.
19   BY MR. HERMAN:
20       Q.    Let -- let me ask you this way.  Who was in
21   charge of the schedule when they would assign security
22   guards to shifts and whatnot?  Is it going to be the shift
23   sergeants or the folks that are above the shift sergeants?
24       A.    I don't recall.
25       Q.    You don't -- do you have any idea who was in

**Roger Dean Gillispie - November 5, 2018**

45

1   charge of scheduling at GM for the security guards?

2           MR. OWENS:  Objection.  Foundation.  Go ahead.

3           THE WITNESS:  I don't recall.

4   BY MR. HERMAN:

5       Q.  You said that you did have direct contact with

6   Keith Stapleton while you worked at GM, correct?

7       A.  Yes.

8       Q.  Do you recall the nature of your contacts with

9   him?  Tell --

10          MR. OWENS:  Objection.

11          MR. HERMAN:  Tell us what you would -- why you

12  would have direct contact with him instead of one of your

13  shift sergeants.

14          MR. OWENS:  Objection.  Compound, vague, lack of

15  time frame.  Go ahead.

16          THE WITNESS:  Anything to do with the job that

17  came up that you either wrote a report on or information

18  they needed on incidents.

19  BY MR. HERMAN:

20      Q.  And is there some reason that you would work

21  with Keith Stapleton then and not one of the shift

22  sergeants who were your immediate supervisor?

23      A.  They were usually both at the same time.

24      Q.  What do you mean they were usually both at the

25  same time, you mean your communications?

**Roger Dean Gillispie - November 5, 2018**

46

1    A.   If you had an incident in the plant, your shift

2  supervisor was usually there on scene with you.  If we

3  needed to proceed on up to explain what the situation was,

4  we were usually both there because we were on scene.

5    Q.   Okay.  So it was never just you and Keith

6  Stapleton.  It would be you, Keith Stapleton and one of

7  the security supervisors?

8         MR. OWENS:  Objection to the form of the

9  question.  Go ahead.

10        THE WITNESS:  I can't recall any conversations,

11 you know, individually as far as --

12 BY MR. HERMAN:

13   Q.   Do you know whether or not Keith Stapleton was

14 in charge of scheduling you for work as a security guard?

15   A.   I don't recall.

16   Q.   Do you know if Keith Stapleton was ever critical

17 of any of your work while you were employed at GM?

18        MR. OWENS:  Objection.  Vague.  Go ahead.

19        THE WITNESS:  I think everyone there was

20 critical of my work.

21 BY MR. HERMAN:

22   Q.   When you say everyone, can you tell me the names

23 of everyone who you say is cri-- was critical of your

24 work?

25   A.   I couldn't give you names.

**Roger Dean Gillispie - November 5, 2018**

47

1    Q.   Well, you just said everyone was critical of
2    your work. You don't know who it was?
3    A.   In my opinion, all eyes were on me because I was
4    looking for a job at General Motors to be permanently
5    hired.  I felt that everyone was paying attention and
6    watching what I was doing for future employment,
7    permanent.
8    Q.   Were you during the time that you were employed
9    at GM, the only -- the only one looking for permanent
10   employment at GM amongst the security guards?
11   A.   When I was hired in, there was four other people
12   with me.
13   Q.   On -- and they were not full time, is --
14   A.   Correct.
15   Q.   -- that correct?
16   A.   They were hired in under the same capacity that
17   I was.
18   Q.   Can I call you guys fill-ins, is that fair, like
19   you would fill in for the full time guys?
20   A.   I was full time employed at General Motors.
21   Q.   Okay.
22   A.   Full schedule.  Plus overtime.
23   Q.   Who were these other four folks that were in the
24   same capacity as you?
25   A.   Couldn't tell you their names.  I don't

**Roger Dean Gillispie - November 5, 2018**

48

1    remember.

2         Q.   Did you ever have a discussion with Keith

3    Stapleton about him being critical of any of your work at

4    GM?

5         A.   I don't recall, no.

6         Q.   Now you told us that all eyes were on you,

7    correct?  I think that was the term that you used?

8         A.   That was my opinion, yes.

9         Q.   Okay.  Why did you have that opinion?

10             MR. OWENS:  Objection.  Asked and answered.  Go

11   ahead.

12             THE WITNESS:  I was in a position of employment

13   for future permanent employment.  Everything I did was

14   being scrutinized to make sure I was the right person for

15   employment.  So yes, they were paying attention to what I

16   was doing.

17   BY MR. HERMAN:

18        Q.   Did that bother you that they were paying close

19   attention to your work while you were at GM?

20        A.   I knew my job.  I did my job very well in my

21   opinion.

22        Q.   But did that bother you that they were closely

23   watching you?

24        A.   Not to any degree to affect me, no.

25        Q.   Would you have annual reviews at GM, maybe like

**Roger Dean Gillispie - November 5, 2018**

49

1    on the date of your hire, then the anniversary date?

2         A.    No.

3         Q.    Was there any type of feedback that you would

4    receive from any of your supervisors, be it your shift

5    supervisors or the folks above them or the -- or the Rick

6    Wolfe higher up there, any reviews or reports or anything

7    critical of your work?

8         A.    I don't recall.

9         Q.    Do you ever recall getting into any arguments

10   face-to-face with Keith Stapleton?

11        A.    I'm not going to say arguments, no.

12        Q.    What are you -- did you have a contentious

13   conversation ever with Keith Stapleton?

14        A.    In my opinion, no.

15             MS. KEETON:  I'm sorry, what -- no or -- I

16   didn't hear it.  There was --

17             REPORTER:  It came up.

18             MS. KEETON:  Okay.

19             MR. HERMAN:  Take a break.

20             VIDEOGRAPHER:  All right.  Stand by.  This will

21   conclude the media unit number one.  The time is

22   10:42 a.m.  We are now off the record.

23             (A brief recess was taken.)

24             VIDEOGRAPHER:  This will be the beginning of

25   media unit number two.  The time is 10:54 a.m.  We are

**Roger Dean Gillispie - November 5, 2018**

50

1  back on the record.

2  BY MR. HERMAN:

3      Q.  Mr. Gillispie, I want to talk to you now about

4  the criminal investigation in your case.  You're aware

5  that Gary Bailey was the detective who was initially

6  assigned to the investigation of these case-- these

7  crimes?

8          MR. OWENS:  Objection.  Form.  Go ahead.

9          THE WITNESS:  As I understand it.

10 BY MR. HERMAN:

11     Q.  Okay.  Have you ever talked to Gary Bailey ever?

12     A.  No.

13     Q.  Okay.  And there was another detective, Sergeant

14 Steven (phonetic) Fritz who was also assigned to your case

15 at the Miami Township police department.

16         My first question with respect to him is before

17 you were indicted, did you have any occasion to speak to

18 Steve Fritz?

19         MR. OWENS:  Objection.  Compound.

20         THE WITNESS:  No.

21 BY MR. HERMAN:

22     Q.  During the criminal investigation of your case,

23 you did have occasion to speak to Detective Scott Moore;

24 is that correct?

25     A.  Correct.

**Roger Dean Gillispie - November 5, 2018**

51

1    Q.   Okay.  Can you tell me do you recall the first
2  time that you spoke to Scott Moore?
3    A.   On the telephone.
4    Q.   Okay.  He called you?
5    A.   Correct.
6    Q.   And where were you when he called?
7    A.   I don't know where I was at.
8    Q.   Okay.  Do you recall that conversation that you
9  had with Scott Moore on the telephone?
10    A.   I -- yeah, I vaguely recall it.
11    Q.   Well, tell us what you remember about that
12  conversation.
13    A.   Called, said he needed to talk to me about a
14  incident.  Wanted me to come to the police station.
15    Q.   Okay.  Did he describe to you what the incident
16  was in regards to?
17    A.   Never said.
18    Q.   Okay.  What was your response to him asking to
19  speak to you at the police department?
20    A.   What it pertained to.
21    Q.   Okay.  And did he explicitly say anything at all
22  about what it pertained to?
23    A.   No.
24    Q.   Okay.  Was there anything else that the two of
25  you talked about during that conversation?

**Roger Dean Gillispie - November 5, 2018**

52

1      A.   Not that I recall.

2      Q.   So he invited you to come down to the police

3  station.  Did you go down there?

4           MR. OWENS:  Objection to the form of the

5  question.  Misstates his testimony.

6  BY MR. HERMAN:

7      Q.   Did you go to the police station and talk to

8  Detective Scott Moore then?

9      A.   No.

10      Q.   Okay.  So after that first conversation over the

11  telephone, do you recall any other meetings or

12  conversations over the telephone with him?

13      A.   I don't recall any.

14      Q.   Do you recall being interviewed at the Miami

15  Township police department?

16      A.   Yes.

17      Q.   Okay.  Tell me what you remember -- well, first

18  of all, who was present when you were interviewed?

19      A.   Moore.

20      Q.   Detective Scott Moore?

21      A.   Correct.

22      Q.   Was there anybody else present besides Detective

23  Scott Moore and you?

24      A.   No.

25      Q.   Tell us what you remember about that interview.

Roger Dean Gillispie - November 5, 2018

53

1       A.   He -- had a series of questions he asked me and

2   I answered them.

3       Q.   Do you remember what those questions were?

4       A.   Each individual question?

5       Q.   Any of the questions.

6       A.   He asked me where I was at on certain dates.

7       Q.   Okay.  Did the dates pertain to the sexual

8   assaults that occurred on August 5th and August 20th of

9   1988?

10      A.   At that time, I had no clue what they pertained

11  to.

12      Q.   Okay.  Did you eventually have an understanding

13  that those were the dates of these rapes when he was

14  talking to you?

15      A.   Well after our meeting, yes.

16      Q.   Okay.  Did you tell Detective Moore where you

17  were on those dates if you remember?

18      A.   I told him where I thought I would have been.

19      Q.   Okay.  And do you remember what -- what you told

20  him where you thought you might have been?

21      A.   I would have probably been at Cave Run Lake if

22  they were on the weekends.

23      Q.   What other -- what else do you remember from

24  that conversation with Scott Moore?  You talked about

25  where you may have been on those dates.  What else?

**Roger Dean Gillispie - November 5, 2018**

1      A.   He did the questions.  I just answered them.

2      Q.   So the only answer that you remember giving him

3 is that you were at Cave Run Lake on weekends?

4          MR. OWENS:  Objection to the characterization of

5 his prior testimony.  Go ahead.

6          THE WITNESS:  I assumed I was at Cave Run Lake.

7 BY MR. HERMAN:

8      Q.   Is there anything else that sticks out in your

9 mind from that second interaction with Scott Moore?

10     A.   No.

11     Q.   Did you have any other meetings or conversations

12 with Scott Moore after the second one?

13     A.   When he come to arrest me.

14     Q.   Where were you when he came to arrest you?

15     A.   At my house.

16     Q.   Is that a different address from what your

17 parents are currently living at?

18     A.   Correct.

19     Q.   Who was with him when he came to arrest you --

20     A.   I -- several people.

21     Q.   -- do you recall?

22     A.   No.

23     Q.   Okay.

24          MR. OWENS:  I think he was answering your

25 question.  What was your answer?

**Roger Dean Gillispie - November 5, 2018**

55

1          THE WITNESS:  Several people.  At that time, I

2     had no clue what their names were.

3     BY MR. HERMAN:

4          Q.    Since that time, have you come to have an

5     understanding of who the people were that came with Scott

6     Moore to arrest you?

7          A.    I -- vaguely, yes.

8          Q.    Okay.  What are the names of the people that you

9     vaguely think were there?

10         A.    I know there was Fairborn police there.  He had

11    a couple detectives with him.

12         Q.    Do you remember there being anybody else from

13    the Miami Township police department besides Scott Moore?

14         A.    Yeah.

15         Q.    But you don't recall their names?

16         A.    No.

17         Q.    Where did you go after being arrested, taken to

18    jail?

19              MR. OWENS:  Objection.  Compound.

20              THE WITNESS:  Took me to the Miami Township

21    police department and then to the county jail.

22    BY MR. HERMAN:

23         Q.    Did you have any conversations with Scott Moore

24    upon your arrest?

25         A.    No.

Roger Dean Gillispie - November 5, 2018

56

1      Q.   Did you say anything to him about why -- what am
2  I under arrest for or anything of that nature?
3      A.   He stated all that when he was arresting me.
4      Q.   Okay.  And did you have any response to that?
5      A.   What kind of response would you have to charges
6  like that?
7      Q.   Did you profess your innocence or anything of
8  that nature?
9      A.   I don't recall.
10     Q.   Is Scott Moore the only person that you recall
11  talking to you from the Miami Township police
12  department -- well, strike that.
13          Is Scott Moore the only employee of the Miami
14  Township police department that you recall speaking to
15  during your criminal case?
16          MR. OWENS:  Objection.  Vague.
17          THE WITNESS:  As far as I recall, I don't know.
18  I don't know who all I spoke to at that time.  I don't
19  believe there was anyone else.  I don't know.
20  BY MR. HERMAN:
21     Q.   Okay.  But just Scott Moore is all you recall?
22     A.   Correct.
23     Q.   Okay.  You hired Dennis Lieberman as your
24  defense attorney in the criminal case, correct?
25     A.   Correct.

**Roger Dean Gillispie - November 5, 2018**

57

1      Q.   Can you tell us who paid for all of his attorney

2  fees and expert witness fees and all of that during the

3  pendency of your criminal case?

4      A.   My parents.

5      Q.   Did you pay any of it?

6      A.   After I sold my house.

7      Q.   When did you sell your house?

8      A.   Don't remember the dates.

9      Q.   Do you remember the amount of money that you

10  paid to Dennis Lieberman's law firm in your-- their

11  defense of you in the criminal matters?

12      A.   I don't recall what they were.

13      Q.   Do you know anybody who would have that

14  information?

15      A.   Somebody would.

16      Q.   Do -- do your parents recall how much money they

17  spent?

18      A.   They never stopped spending money.

19      Q.   Okay.  You don't know the amount of fees then?

20      A.   No.

21      Q.   Okay.  Do you know Steven Fritz?

22      A.   Yes.

23      Q.   Okay.  How do you know Steven Fritz?

24      A.   He was -- a private investigator when I met him.

25      Q.   And this was while -- he was working for a firm

**Roger Dean Gillispie - November 5, 2018**

58

1   called the Area Wide Investigations, does that sound

2   familiar to you?

3        A.   I don't recall what the name was.

4        Q.   Was he the private investigator that Dennis

5   Lieberman hired for you during the criminal case?

6             MR. OWENS:  Objection.  Foundation.  Go ahead.

7             THE WITNESS:  As far as I know, yes.

8             MR. HERMAN:  Okay.  Do you recall the first time

9   you met with Steven Fritz?

10            THE WITNESS:  I --

11            MR. OWENS:  Objection.

12   BY MR. HERMAN:

13        Q.   Was it -- what was your answer?

14        A.   Didn't answer.

15        Q.   Okay.  Do you recall the first time you met with

16   Steven Fritz?

17        A.   I don't recall.

18        Q.   Was it before your case went -- your criminal

19   case went to trial in February of 1991?

20        A.   I would assume but I'm not confident.  I don't

21   know.

22        Q.   Okay.  Were you aware that Steven Fritz was an

23   employee at the Miami Township police department when you

24   began to work with him in your criminal case?

25            MR. OWENS:  Objection to the form of the

**Roger Dean Gillispie - November 5, 2018**

59

1    question.  It's vague.  Foundation.  Go ahead.

2          THE WITNESS:  I didn't know what his previous

3    employment was.

4    BY MR. HERMAN:

5    Q.   Have you ever found out what Steven Fritz's

6    previous employment was before he served as an

7    investigator on your criminal case?

8    A.   Through the 20 years of litigation, yes.

9    Q.   Okay.  Do you recall when the -- when you first

10   found out that Steven Fritz was working at the Miami

11   Township police department before he investigated your

12   case?

13   A.   I have no clue.

14   Q.   Did you have any conversation -- tell me where

15   these conversations with Steven Fritz took place.

16         MR. OWENS:  Objection.  Assumes facts.

17   BY MR. HERMAN:

18   Q.   Do you re-- you recall having conversations with

19   Steve Fritz, is that correct?

20   A.   Not -- not right at this moment, no.

21   Q.   Do you remember any communications or any

22   conversations with Steven Fritz?

23   A.   Me personally, no.

24   Q.   Did he ever have occasion to come and visit you

25   at the Montgomery County jail pending your first criminal

**Roger Dean Gillispie - November 5, 2018**

60

1    trial?

2         A.   I don't recall any.

3         Q.   Is there anything you recall about your

4    conversations or meetings with Steven Fritz before your

5    criminal trial in February of 1990 (sic)?

6         A.   He was hired by my lawyer is all I -- whatever

7    communications we had was mostly through that.

8         Q.   What do you mean they were mostly through that,

9    through your attorney or -- what -- what do you mean?

10        A.   I didn't sit down and have personal

11   conversations with Fritz, no.

12        Q.   So you never met him face-to-face?

13        A.   Yes.

14        Q.   Okay.  When would you have met with him

15   face-to-face?

16             MR. OWENS:  Objection to the form of the

17   question.

18             THE WITNESS:  Whenever they said I needed to

19   meet with him.

20   BY MR. HERMAN:

21        Q.   Okay.  When you say they, you mean your

22   attorneys?

23        A.   Correct.

24        Q.   Okay.  Where would these meetings occur --

25             MR. OWENS:  Objection.

**Roger Dean Gillispie - November 5, 2018**

61

1           MR. HERMAN:  -- in jail, at your attorney's
2      office, where?
3           MR. OWENS:  So the -- the problem is that
4      you're -- you keep saying these meetings and these
5      conversations.
6           I don't think he's testified to a number of
7      meetings or a number of conversations so I think it's
8      misleading as a question.  You can answer.
9           THE WITNESS:  I don't recall.
10     BY MR. HERMAN:
11         Q.   Do you recall ever sitting down with your
12     attorney in a room with Steven Fritz?
13         A.   I don't recall any.
14         Q.   Okay.  Do you recall any conversation that
15     you've had with Steven Fritz about his investigation of
16     your criminal case?  And I'm sorry, while he was with the
17     Miami Township police department?
18         MR. OWENS:  What -- what -- I'm sorry, can --
19     you're asking about when he was an investigator or when he
20     was a police officer?
21     BY MR. HERMAN:
22         Q.   That's what -- that's why -- I meant to clarify
23     it.  While Steven Fritz -- did you -- do you recall any
24     conversation that you had with Steven Fritz about Fritz
25     investigating your case while he worked at the Miami

**Roger Dean Gillispie - November 5, 2018**

62

1    Township police department?

2         A.   I don't recall any conversations.

3         Q.   Do you recall Steven Fritz ever telling you that

4    he and/or Detective Gary Bailey eliminated you as a

5    suspect in your criminal case?

6         A.   Never heard it.

7         Q.   Do you recall having any discussions with Steven

8    Fritz about the pant size of the suspect in the criminal

9    case?

10        A.   No recollection.

11             MR. OWENS:  All right.  Chris, maybe this --

12   while you're thinking, just -- I want it to be clear for

13   the record.  I think given our Brady claims that, you

14   know, obviously his knowledge and the -- the knowledge of,

15   you know, alleged Brady material is something that I

16   think's discoverable but by allowing him to answer these

17   questions, we're not waiving more generally

18   attorney/client or work product privileges that he may

19   otherwise have that extend beyond that so --

20             MR. HERMAN:  Okay.

21             MR. OWENS:  -- I just want to be clear.

22             MR. RASKIN:  What -- what -- what would those

23   privileges be?

24             MR. OWENS:  So I think like typically --

25             MR. RASKIN:  I mean I'm not talking about the

1  privilege that you all have with your client but I'm not

2  aware of any other privileges existing.

3         MR. OWENS:  Like with his criminal defense

4  attorneys?

5         MR. RASKIN:  His criminal defense attorney

6  signed an affidavit.

7         MR. OWENS:  Right, but I don't think that

8  means --

9         MR. RASKIN:  Okay.  I just want to understand.

10  I'm not here to argue with you.  I just want to

11  understand.

12         Are you saying that there is some privilege that

13  you think that this plaintiff has with Mr. Lieberman that

14  you're not waiving?

15         MR. OWENS:  Correct.

16         MR. RASKIN:  Okay.  Thank you.  Just to be

17  clear, any other privilege other than the privilege that

18  you're claiming that Mr. Gillispie has with Mr. Lieberman

19  that you're not waiving?  Obviously you're not waiving

20  your own attorney/client privilege with your client but

21  any others?

22         MR. OWENS:  The work product privilege that

23  Mr. Lieberman might have over other things unrelated to

24  Brady.  Things in his fil-- there are other criminal

25  defense attorneys -- Mr. Hoffman, Mr. Godsey who

**Roger Dean Gillispie - November 5, 2018**

64

1  represented him in the post conviction, so I think more

2  generally, we're not waiving the attorney/client or work

3  product privileges.

4         I think that by putting at issue the -- you

5  know, the ba-- the informa-- what was known to the

6  criminal defense attorneys, obviously you're allowed to

7  explore that and if Mr. Gillispie himself knew about some

8  of that information, I think that's discoverable.

9         MR. RASKIN:  Yeah, I -- again, I'm not looking

10  to have a -- a debate.  I just want to understand the

11  nature of what you said.  Thank you.

12  BY MR. HERMAN:

13      Q.  During your -- before your criminal trials, did

14  you have occasion to review the police reports that were

15  provided to your attorneys in discovery?

16      A.  I don't recall any of that.

17      Q.  Have you read any of the police reports

18  concerning your criminal case in preparation for today's

19  deposition?

20      A.  I've been going over these for 20 plus years.

21      Q.  Okay.  Would you agree with me that

22  Detective Bailey was one of the Miami Township employees

23  who was char-- charged with investigating your criminal

24  cases?

25         MR. OWENS:  Objection.  Foundation.

**Roger Dean Gillispie - November 5, 2018**

65

1          MR. HERMAN:  You've read the police reports,
2     correct, you said over these 20 years?
3          MR. OWENS:  Objection.  I -- that
4     mischaracterizes his testimony.  He didn't say that he had
5     read the police reports.
6     BY MR. HERMAN:
7          Q.   Have you read the police reports in your
8     criminal case?
9          A.   I don't recall reading any police reports.
10         Q.   Okay.
11         A.   I've read the li-- the paperwork associated with
12    this but I haven't read everything.
13         Q.   What do you mean by the paperwork associated
14    with this?
15         A.   I have read the appeals that I have had
16    throughout the years to a certain point and then I said
17    don't send them no more, I don't want to read them.
18         MR. OWENS:  Can -- I'm sorry.  So it's important
19    that you don't talk to him about conversations you've had
20    with your attorney, okay?
21    BY MR. HERMAN:
22         Q.   Yeah, I don't -- I don't want to talk about
23    anything that you've talked to your attorneys about, okay?
24    Yes?
25         A.   Yes.

**Roger Dean Gillispie - November 5, 2018**

66

1      Q.    Okay.  So is it your testimony that you don't
2  recall ever reading a police report related to your
3  criminal trials?
4      A.    Ever?
5      Q.    Yes.
6      A.    I can't recall.
7      Q.    Okay.  Do you remember a woman named Tori
8  Strohman (phonetic), who you dated around 1987 or 1988?
9      A.    Yes.
10     Q.    Okay.  I believe her last name now is Tori
11  Mitchell, do you have that understanding as well?
12     A.    Correct.
13     Q.    Okay.  In one of your post conviction pleadings,
14  she signed an affidavit on your -- on your behalf, do you
15  know that?
16     A.    I don't recall.
17     Q.    Okay.  Can you tell me do you recall the last
18  time you've ever had any contact with Tori Strohman
19  Mitchell?
20     A.    Four months ago, three months ago.
21     Q.    That was the last time that you've had contact
22  with her?
23     A.    May have sent a message.  I don't know.
24     Q.    What was --
25     A.    I can't recall.

**Roger Dean Gillispie - November 5, 2018**

67

1          Q.   What was the purpose for the two of you talking
2     four months ago?
3          A.   I was in Florida where she lives and wanted to
4     see her parents.
5          Q.   Did you -- did you talk about your criminal case
6     with her at all?
7          A.   No.
8          Q.   Did you talk about this civil case with her at
9     all?
10         A.   No.
11         Q.   Knowing that she filed an af-- or she signed an
12    affidavit on your behalf, I'm wondering if you took any
13    part in helping her to prepare the facts that were in that
14    affidavit?
15         A.   No.
16         Q.   You did not help her to prepare any of the facts
17    that are in the affidavit?
18         A.   I did not.
19         Q.   Okay.  Do you know who did help her to prepare
20    the facts that were in that affidavit?
21              MR. OWENS:  Objection to the form of the
22    question.  Go ahead.
23              THE WITNESS:  I don't know.
24    BY MR. HERMAN:
25         Q.   Did Tori Strohman visit you at any point while

**Roger Dean Gillispie - November 5, 2018**

68

1    you were incarcerated?

2        A.    Yes.

3        Q.    Okay.  How often would she visit?

4            MR. OWENS:  Objection.  Assumes -- these

5    questions are just --

6            MR. HERMAN:  You're --

7            MR. OWENS:  -- unfair.

8    BY MR. HERMAN:

9        Q.    Yeah.  How many times did she visit you, do you

10   know?

11       A.    No, I couldn't calculate them.

12       Q.    Was it more than once?

13       A.    Yes.

14       Q.    Was it throughout the period that you were

15   incarcerated from 1991 through 2011?

16       A.    Early -- early in the con-- in the time.

17       Q.    Do you mean she would come to visit you in the

18   days or months or years shortly after your incarceration

19   began?

20           MR. OWENS:  Objection to the form of the

21   question.  Go ahead.

22           THE WITNESS:  Throughout roughly the first ten

23   years.

24           MR. HERMAN:  Did -- can you tell me what -- what

25   would you talk about when she would visit you at -- at

**Roger Dean Gillispie - November 5, 2018**

69

1   prison?

2           MR. OWENS:  Objection.  Vague.  Or -- sorry.

3   Compound.  Go ahead.

4           THE WITNESS:  Life.

5   BY MR. HERMAN:

6       Q.   Did you talk about Scott Moore's investigation

7   of your criminal case?

8       A.   Not that I recall.

9       Q.   Do you recall talking to her or her te-- telling

10  you anything about Scott Moore interviewing her in

11  relation to your criminal case?

12      A.   I don't recall.

13      Q.   Is there a reason after about ten years after

14  your incarceration she stopped coming to visit you?

15      A.   Transferred prisons.

16      Q.   What was the prison that you were initially in

17  when you were incarcerated?

18      A.   Warren Correctional.

19      Q.   And then where were you transferred from Warren?

20      A.   London Correctional.

21      Q.   Okay.  Do you recall her visiting you any time

22  after that transfer from Warren to London Correctional

23  Institution?

24      A.   No.

25      Q.   I want to turn now to your complaint that you

1    filed against the Miami Township police department and the

2    other defendants.

3           In -- in paragraph 61, you allege that though it

4    was the department's practice and procedure to administer

5    a polygraph examination to a suspect in a sex crime case,

6    Defendant Moore refused to permit Mr. Gillispie to take a

7    polygraph examination even though he had requested one.

8           Can you tell us about that conversation that you

9    had with Scott Moore about your request to take a

10    polygraph?

11           MR. OWENS:  Objection to the form of the

12    question.  It's misleading and assumes that that statement

13    says that there was a conversation with Mr. Moore.

14    BY MR. HERMAN:

15        Q.   Did -- did you have a conversation with

16    Detective Moore about taking a polygraph?

17        A.   There was no conversation.

18        Q.   Did you ask him to take a polygraph?

19        A.   Yes, I did.

20        Q.   And what was his answer?

21        A.   I don't --

22        Q.   If you re--

23        A.   -- recall.

24        Q.   I'm sorry, I spoke over to you.  What was your

25    answer?

Roger Dean Gillispie - November 5, 2018

71

1          A.   I don't recall.

2          Q.   As you sit here today, do you have any evidence

3     that the Miami Township police department had a practice

4     or procedure to administer a polygraph exam to a suspect

5     in a sex crime case?

6          A.   I have no clue what their policy was.

7          Q.   In paragraph 74 of your amended complaint, you

8     allege that the department engaged in a systematic process

9     of rigging criminal prosecutions against persons whom they

10    and/or other, quote, unquote, friends of the department,

11    and then in parentheses, like Defendant Wolfe, had

12    problems with.

13          What evidence do you have that the Miami

14    Township police department had a systematic process of

15    rigging criminal prosecutions?

16          A.   I don't even understand that question.

17          Q.   Do you have any evidence that the Miami Township

18    police department has rigged any criminal prosecutions?

19          A.   No.

20          Q.   Are there any witnesses that you can think of

21    that you may call to testify that the Miami Township

22    police department has rigged criminal prosecutions?

23               MR. OWENS:  Objection.  Foundation.  Go ahead.

24               THE WITNESS:  Not at this time, no.

25    BY MR. HERMAN:

Roger Dean Gillispie - November 5, 2018

72

1      Q.   I'm sorry, what?

2      A.   No.

3      Q.   Not at this time?

4      A.   No.

5      Q.   That's no, you don't have any witnesses?

6      A.   I don't know of any.

7      Q.   Before Scott Moore's first telephone call to you

8  before you were indicted, did you know anybody who was

9  employed at the Miami Township police department?

10     A.   No.

11     Q.   Before Scott Moore first called you on the phone

12  in that criminal case, had you had any interaction with

13  the Miami Township police department?

14     A.   No.

15     Q.   In paragraph 74 of your complaint, you allege

16  despite being warned, the department chose to approve of

17  rather than discipline its offers-- officers for the

18  widespread misconduct in the -- in the department.

19          Can you tell me when you say despite being

20  warned, what was the warning that you were referring to in

21  your complaint?

22          MR. OWENS:  Objection to the form of the

23  question.  This is not a verified complaint, you know

24  that, right?

25  BY MR. HERMAN:

Roger Dean Gillispie - November 5, 2018

73

1      Q.   Do you have ev-- any evidence that there was a
2  warning as alleged in paragraph 74 of your complaint?
3      A.   I do not know.
4      Q.   I'm sorry?
5      A.   I do not know.
6      Q.   In paragraph 75 of your complaint, you allege
7  that the department knew of and attempted to cover up the
8  misconduct of its highest ranking officers.
9           What evidence do you have that there was a
10  cover-up of misconduct on behalf of any Miami Township
11  police department officers?
12           MR. OWENS:  Just for clarification, you're
13  talking about the first amended complaint --
14           MR. HERMAN:  I am.
15           MR. OWENS:  -- not the original complaint?
16  BY MR. HERMAN:
17      Q.   I'm sorry, yes.  All of these questions relate
18  to your first amended complaint, okay?
19      A.   Read the question again.
20      Q.   You allege that the department knew of and
21  attempted to cover up the misconduct of its highest
22  ranking officers.  What evidence do you have that there
23  was a cover-up of officers' misconduct?
24      A.   I don't know.
25      Q.   Why have you alleged then that there was a

Roger Dean Gillispie - November 5, 2018

74

1   cover-up of misconduct in your amended complaint?

2           MR. OWENS:  Objection on the basis of

3   attorney/client privilege and I'm going to direct the

4   witness not to answer.

5           MR. HERMAN:  Do you ha-- do you know of any

6   evidence of a cover-up at the Miami Township police

7   department?

8           MR. OWENS:  You can answer that.

9           THE WITNESS:  No.

10          MR. HERMAN:  In your amended complaint, you

11  claim that there was a conspiracy between the Miami

12  Township police department and GM employees to frame you.

13  Why do you believe that there was a conspiracy, why do you

14  allege that?

15          MR. OWENS:  Objection to the form of the

16  question.  It's privileged.  I'm going to direct you not

17  to answer.

18          MR. HERMAN:  What evidence do you have that

19  there was a conspiracy between the Miami Township police

20  department and employees of General Motors in connection

21  with your criminal case?

22          MR. OWENS:  You can answer.

23          THE WITNESS:  I don't -- read the question.  I

24  don't understand the question.

25          MR. HERMAN:  Can you read it back to him,

**Roger Dean Gillispie - November 5, 2018**

75

1   please?

2              (The requested question was read back.)

3              THE WITNESS:  I do not know.

4   BY MR. HERMAN:

5       Q.   Do you know of any witnesses that will support

6   this allegation that there was a conspiracy between Miami

7   Township police department and GM against you?

8       A.   I do not know.

9       Q.   You don't know who those witnesses would be?

10      A.   No.

11      Q.   That's a no?

12      A.   No.

13      Q.   Okay.  I just want to make sure that everybody

14  else at the end of the room can hear you.  What -- what

15  evidence do you have in support of your claim that the

16  Miami Township police department has policies, practices,

17  customs involving the suppression of exculpatory material?

18             MR. OWENS:  Objection.  Foundation.  You can

19  answer to the extent you can.

20             THE WITNESS:  I don't know.

21  BY MR. HERMAN:

22      Q.   Are you aware of any other instances where the

23  Miami Township police department suppressed material in

24  any other case?

25      A.   I do not know.

Roger Dean Gillispie - November 5, 2018

76

1      Q.   Are you aware of any practice or custom that the

2  Miami Township police department had to suppress the

3  exculpatory material in your criminal case?

4      A.   I do not know.

5      Q.   In count two of your suggestive identification

6  claim under section 1983, what evidence do you have that

7  the township police department had policies or practices

8  or customs or procedures designed to create a suggestive

9  identification in their photo lineups?

10          MR. OWENS:  Objection to the form the question.

11  Also to the extent that it calls for information that

12  is --

13          MR. HERMAN:  I'm not asking for -- comm--

14  communications that you have had with him or any of his

15  prior attorneys.

16          I'm just asking what evidence of these policies,

17  procedures, custom, practices as alleged in his

18  complaint --

19          MR. OWENS:  Well --

20          MR. HERMAN:  -- does he have to support that?

21          MR. OWENS:  Yeah, but you said what he knows

22  about it.  So if I had a conversation -- I told him here's

23  the nine things that we have to help our Mone-- Monell

24  claim, that -- that -- so if the question were what

25  information do you know apart from anything that's been

77

1  communicated to you from your attorneys or if that's what

2  you want to stipulate your questions refer to, I'm fine

3  with that.

4  BY MR. HERMAN:

5      Q.   I -- I don't care about what you've -- I don't

6  want you to tell me what you've talked to your attorneys

7  about, okay?  Do you understand that?

8      A.   Yes.

9      Q.   I'm asking you do you have any evidence of any

10 policies, practices, customs or procedures by the Miami

11 Township police department related to your suggestive

12 identification claim?

13     A.   I don't know.

14     Q.   You don't know what the evidence is in support

15 of that claim?

16     A.   I don't know what their policies are.

17     Q.   Okay.  Are you aware of any policies or

18 procedures or customs or practices of the Miami Township

19 police department as alleged in this case?

20     A.   I don't know any of their policies, no.

21     Q.   Do you know any of their procedures?

22     A.   Only the ones that were practicing on me.

23     Q.   Okay.  What are those procedures that were

24 practiced on you that you can share with me?  What

25 procedures are you talking about?

Roger Dean Gillispie - November 5, 2018

78

1      A.    The suggestive lineup?

2      Q.    Yes.

3      A.    That was definitely one.

4      Q.    What was -- what was suggestive about the

5  procedure of the lineup?  That's my question for you.

6      A.    All the backgrounds were blue and mine was

7  yellow.

8      Q.    So the color of the background in the photo

9  array, that was suggestive, is --

10     A.    Correct.

11     Q.    -- that your answer?  Besides the color of the

12  background, was there anything else suggestive of that

13  photo array?

14     A.    The photo of my whole head in the square, the

15  rest of the people from mid chest up.

16     Q.    What else about that photo array?

17     A.    The finish of the photo.

18     Q.    What is it about the finish that you believe was

19  suggestive?

20     A.    Glossy and mat finishes were used in the --

21     Q.    In the photo array?

22     A.    Correct.

23     Q.    Okay.  What else?

24     A.    At this time, that's all I can think of.

25     Q.    Can you identify any policy, practice or

**Roger Dean Gillispie - November 5, 2018**

1    procedure from Miami Township police department regarding

2    the background of the color that's supposed to be used in

3    a photo array?

4         A.   Don't know their policy.

5         Q.   Okay.  Are you aware of any policies or

6    procedures with -- with respect to the size of the

7    person's face that appears in a photo array?

8         A.   Don't know their policy.

9         Q.   Are you familiar -- can you identify any

10   policies or procedures with respect to the finish of the

11   photos that are used in the photographs?

12        A.   Don't know their policy.

13        Q.   You allege that the Miami Township police

14   department fabricated evidence.  What evidence is it

15   you're claiming was fabricated in your criminal case?

16             MR. OWENS:  Objection to the -- I think that's a

17   privileged --

18             MR. HERMAN:  I don't see how.

19             MR. OWENS:  -- as the way in which you asked it

20   so -- if you're saying what does this allegation refer to

21   specifically, which is how I understood the question.

22   BY MR. HERMAN:

23        Q.   No.  In your criminal case, are you alleging

24   that there was -- that the Miami Township police

25   department fabricated evidence?

**Roger Dean Gillispie - November 5, 2018**

80

1      A.   Yes.

2      Q.   Okay.  What evidence do you believe was

3  fabricated in that criminal case?

4      A.   I don't recall.

5      Q.   Since earlier you said that you're not -- you

6  don't know of any policies, practices or procedures from

7  Miami Township police department, is it a fair statement

8  that you then don't know about their policies, practices

9  or procedures related to this fabricated evidence claim?

10     A.   I don't know any of their policies.

11     Q.   Do you believe that they have a policy or a

12  procedure to fabricate evidence?

13     A.   I do not know.

14     Q.   Can you tell me what role the Miami Township

15  police department played in your malicious prosecution

16  claim under section 1983?

17          MR. OWENS:  Objection, vague, go ahead.

18          THE WITNESS:  You -- you -- repeat the question.

19          (The requested question was read back.)

20          THE WITNESS:  I don't understand the question.

21  BY MR. HERMAN:

22     Q.   What don't you understand about it?

23     A.   What you're asking.

24     Q.   You've alleged a malicious prosecution claim

25  saying that i-- other identif-- unidentified persons

**Roger Dean Gillispie - November 5, 2018**

81

1  instigated and continued the prosecution of plaintiff

2  without probable cause and acting out of malice.  That's

3  in paragraph 98 of your amended complaint.

4          Given that, can you tell me what role then the

5  Miami Township police department played in the continued

6  proseca-- prosecution of your case?

7      A.   I don't know.

8      Q.   And then you're not familiar with any policies

9  or procedures that it might have with respect to

10  prosecuting criminal cases, are you?

11      A.   I do not know any of their policies.

12      Q.   In count five of your amended complaint

13  concerning your destruction of exculpatory evidence, what

14  evidence are you claiming was destroyed in your criminal

15  case?

16      A.   Rape kits.

17      Q.   What's the basis of that belief?

18          MR. OWENS:  Were you done answering?

19          THE WITNESS:  Also hair taken from the scene.

20  BY MR. HERMAN:

21      Q.   Is there any else-- anything else besides rape

22  kits and hair taken from the scene that you believe was

23  destroyed?

24      A.   Not that I recall right now.

25      Q.   What role do you believe the Miami Township

1    police department took in allegedly destroying rape kits?

2         MR. OWENS:  Objection.  Foundation.  You can

3    answer.

4         THE WITNESS:  I do not know.

5    BY MR. HERMAN:

6    Q.    What role do you believe the Miami Township

7    police department took in destroying -- in allegedly

8    destroying hair from the scene as you've just said?

9    A.    I do not know that either.

10   Q.    Are you making any claims against the Miami

11   Township police department that it failed to train its

12   officers in connection with any aspect of your criminal

13   case?

14        MR. OWENS:  Objection to the form of the

15   question, the foundation.

16   BY MR. HERMAN:

17   Q.    You can answer.

18   A.    I don't know what their policies for training

19   were.

20   Q.    My question was a little different.  I'm asking

21   you are you going to make -- are you making a claim that

22   the township failed to train its officers with respect to

23   any -- any aspect of your criminal case?

24        MR. OWENS:  Object to the form of the question

25   to the extent you're trying to say that his testimony

**Roger Dean Gillispie - November 5, 2018**

1    alone will somehow narrow or define the scope of our

2    claims.  Go ahead.

3              THE WITNESS:  I don't know what their policies

4    are.

5              MR. HERMAN:  Do you have a belief that the Miami

6    Township police department failed to train its officers in

7    any way, shape or form in connection with your criminal

8    case?

9              MR. OWENS:  You can answer.

10             THE WITNESS:  Obviously something was wrong.

11             MR. HERMAN:  Well, you're going to have to

12   explain to me what you mean by obviously something was

13   wrong.

14             MR. OWENS:  Ob-- objection to the form of the

15   question as argumentative.

16   BY MR. HERMAN:

17        Q.   What was so obviously wrong about their

18   training?

19        A.   They sent a innocent man to prison.

20        Q.   And what training do you believe that they

21   should have had to, in your belief, prevent this from

22   happening?

23        A.   I don't know what type of training they --

24        Q.   Do you know --

25        A.   -- needed.

**Roger Dean Gillispie - November 5, 2018**

84

1      Q.    I'm sorry, go ahead.

2      A.    I don't know what trype of-- type of training

3  they needed.  I do not know.

4      Q.    Have you ever filed a wrongful prisonment --

5  imprisonment claim under Revised Code 2743.48 or any other

6  claim related to your imprisonment other than in this

7  case?

8      A.    I have no clue what all was filed.

9          MR. OWENS:  Are you done with the complaint?

10          MR. HERMAN:  Yeah.

11  BY MR. HERMAN:

12      Q.    Have you seen a mental health professional since

13  your release from prison?

14      A.    No.

15      Q.    Could we go off the record?

16          VIDEOGRAPHER:  This will conclude the media

17  number two.  The time is 11:46 hours.  We are now off the

18  record.

19          (A brief recess was taken.)

20          VIDEOGRAPHER:  This will be the beginning of

21  media unit number three.  The time is 12:04 p.m.  We are

22  now back on the record.

23  BY MR. HERMAN:

24      Q.    Mr. Gillispie, I'm going to hand you what's been

25  marked as defendant's exhibit 1 and I'll represent to you

**Roger Dean Gillispie - November 5, 2018**

85

1  that these are your responses to Miami Township's first

2  set of interrogatories.

3          And I know that before we came back on to the

4  record here, you had signed a verification page just

5  verifying that these responses are true and accurate.

6          What I'd like to do now is go through a few of

7  these and ask you some questions about those and then I

8  should be done with my part of this, okay, Mr. Gillispie?

9      A.    All right.

10     Q.    First of all, for the record, you acknowledge

11 that these are your responses to Miami Township's

12 interrogatories or questions?

13     A.    Yes.

14     Q.    You've seen this document before?

15     A.    Yes.

16     Q.    Okay.  I want to -- turn to page six and it's

17 interrogatory number six.  I won't read the interrogatory

18 out loud or anything to put it on the record but I want to

19 cover a few things that are in your answer to

20 interrogatory number six.

21          At one point here, you say that while at the

22 Montgomery County jail, you suffered a tooth injury.  And

23 the scope of this question is to name -- is the name,

24 office, address and specialty of any hospital, physician,

25 practitioner, et cetera -- my question for you is so while

Roger Dean Gillispie - November 5, 2018

86

1   you were -- what was this tooth injury, did -- tell us

2   about that and is this part of your damages claim, this

3   tooth injury?

4           MR. OWENS:  Objection with respect to the phrase

5   damages claim but you can answer.

6           THE WITNESS:  I was fed a bologna sandwich that

7   had a rock in it.

8   BY MR. HERMAN:

9       Q.   Okay.

10      A.   Where it probably fell on the ground and was put

11  on the bread.

12      Q.   But you don't know if it fell on the ground and

13  was put on the bread, you're assuming that I assume?

14      A.   I'm assuming but rocks come off the ground.

15      Q.   Or people can pick them up and put them in a

16  sandwich; that's fair, too, right?

17      A.   Yes.

18      Q.   Okay.  So you bit onto something hard in a

19  sandwich?

20      A.   I bit onto a rock.

21      Q.   Okay.  Did you spit out a rock?

22      A.   Correct.

23      Q.   Okay.  And did you have to have some dental work

24  with respect to biting down on that rock?

25      A.   My tooth exploded.

**Roger Dean Gillispie - November 5, 2018**

87

1      Q.   Okay.  Do you have a partial or a fake tooth
2  or --
3      A.   I have a filling.
4      Q.   A filling, okay.  So you didn't lose the whole
5  tooth?
6      A.   No.
7           MR. OWENS:  Just remember to pause to --
8           THE WITNESS:  Yes.
9           MR. OWENS:  -- before -- so you're not talking
10  at the same time.
11  BY MR. HERMAN:
12      Q.   Have you had any other teeth problems since that
13  incident back at the Montgomery County jail that you're
14  claiming are related to, you know, any part of this case?
15      A.   At the Montgomery County jail, there was no --
16  nothing done to the tooth.
17      Q.   Okay.  Where did you -- when did you have that
18  tooth repaired?
19      A.   After I was in prison.
20      Q.   Okay.  Was that at Warren County --
21      A.   Warren Correctional --
22      Q.   Warren --
23      A.   -- Institution.
24      Q.   -- Correction, okay.  Did you have to pay for
25  that filling?

**Roger Dean Gillispie - November 5, 2018**

88

1      A.   With my life.

2      Q.   Did you pay some sort of money for that filling?

3      A.   No monetary, no.

4      Q.   Further down in your answer, you talk about

5  plaintiff's-- quote, unquote, plaintiff states that after

6  falling and injuring his back, he saw a medical

7  professional at Warren Correctional Institution.  Do you

8  see that?

9      A.   Yeah.

10      Q.   Okay.  Can you tell us about this incident where

11  you fell and injured your back in -- do you recall what

12  year it was?

13      A.   I don't remember the year.

14      Q.   Do you remember the circumstances of you falling

15  and what was the nature of the injury to your back?

16      A.   I worked in the maintenance department at Warren

17  Correctional.

18      Q.   Okay.

19      A.   We were taking out the acoustic ceilings that

20  were in various areas of the dayrooms in the cell blocks

21  and painting the ceilings above with black enamel paint.

22  We were on ladders painting and fell off the ladder

23  directly onto my back.

24      Q.   Do you recall how high up the ladder you were?

25      A.   I was more than halfway up that 8-foot ladder.

**Roger Dean Gillispie - November 5, 2018**

89

1      Q.   Okay.  Tell us about -- you saw a medical

2  professional there.  Did you -- you didn't have surgery or

3  anything to your back, did you?

4      A.   I saw medical staff at the prison.

5      Q.   What sort of treatment did you receive as re--

6  as a result of that fall?

7      A.   Tylenol.

8      Q.   Okay.  Are you claiming any continuing back

9  injury today as you sit here?

10     A.   My back has never been the same since.

11     Q.   You were released from prison in December of

12  2011, correct?

13     A.   Correct.

14     Q.   Have you gone to any back doctors or specialists

15  for the care and treatment of that back injury?

16     A.   Yes.

17     Q.   What -- what's the name of the doctor that

18  you've seen related to the back injury?

19     A.   I started with Dr. Dean.

20     Q.   Is that who's identified later in here,

21  Dr. Jacob Dean?

22     A.   Correct.

23     Q.   Okay.  Do you recall -- so this is after you

24  were released from prison, is that correct?

25     A.   Correct.

1    Q.   Okay.  Is he the only person that you saw
2  related to your back injury?
3    A.   No.
4    Q.   Who else did you see?
5    A.   He sent me to Tuttle Rehab.
6    Q.   Where is Tuttle Rehab?
7    A.   Enon, Ohio.
8    Q.   Okay.  I want to back up.  Do you remember what
9  year it was that you fell and injured your back at Warren?
10   A.   I don't remember what year it was.  It was very
11 early on.
12   Q.   And when you say very early, just so I
13 temporally get a -- get an idea like within the first five
14 years of your incarceration or -- more?
15   A.   The first five years, yes.
16   Q.   Are you still -- are you doing any rehab at
17 Tuttle Rehab currently?
18   A.   No.
19   Q.   Okay.  There's a John Accrocco, is that how you
20 pronounce his name at --
21   A.   Yes.
22   Q.   -- Tuttle Rehab?  A-C-C-R-O-C-C-O?
23   A.   Correct.
24   Q.   Is he the doctor that you saw at Tuttle Rehab or
25 is he a physical therapist?  I -- I don't know.

**Roger Dean Gillispie - November 5, 2018**

91

1      A.   He is a rehab physician.

2      Q.   And are you still currently seeing John Accrocco

3  at Tuttle Rehab?

4      A.   No.

5      Q.   What were the dates of your treatment with

6  Tuttle Rehab if you recall?

7      A.   I don't recall.

8      Q.   Did you get this treatment in the first year or

9  two after your release from prison?

10     A.   No.  Due to the -- not having health care, it

11  took a while for me to get health coverage to be able to

12  see a doctor.

13     Q.   But as we sit here, you don't know when you

14  first saw Jacob Dean and then were referred to Tuttle

15  Rehab?

16     A.   I can't recall right now.

17     Q.   There's also a Dr. Hugh Moncrief identified in

18  your response to interrogatory number six.  You state here

19  that he performed surgery on your back, is that right?

20     A.   That's correct.

21     Q.   Do you remember what year you had the back

22  surgery?

23     A.   Approximately two and a half years ago,

24  approximately.

25     Q.   So maybe around 2015?

**Roger Dean Gillispie - November 5, 2018**

92

1      A.   I -- I don't know right at this time.

2      Q.   Was -- was it after you filed this lawsuit in

3  2013?

4      A.   That I seen?

5      Q.   Dr. Moncrief for your --

6           MR. OWENS:  When you --

7           MR. HERMAN:  -- back surgery.

8           MR. OWENS:  -- had your surgery.  I'm sorry.

9           THE WITNESS:  Yes.

10  BY MR. HERMAN:

11     Q.   Okay.

12     A.   I -- I suffered through it for my entire

13  incarceration.

14     Q.   Was Dr. Moncrief's surgery successful, do you

15  have the back pain anymore?

16     A.   It was successful as far as the extreme pinched

17  nerve that I had.  I still have pain but it's not --

18  debilitating like it was before.  It's definitely very

19  painful still but I was to the point of only being able to

20  walk ten, 15 yards at a time.

21     Q.   And is this before the back surgery that you

22  were only able to walk that far?

23     A.   Correct.

24     Q.   You had insurance at the time that you had this

25  surgery with Dr. Moncrief?

**Roger Dean Gillispie - November 5, 2018**

93

1      A.   Yes, I did.

2      Q.   Do you know what your out-of-pocket expenses

3  were for the surgery?

4      A.   I don't recall what they were.

5      Q.   Are you currently treating with anybody for your

6  back problems, back complaints?

7      A.   At this time, no.

8      Q.   I'm turning to number sev-- interrogatory number

9  seven.  It begins on page six and carries over to page

10  seven.

11          Asking about psychologists, psychiatrists,

12  counselors, social workers that you've treated to in the

13  last five years.

14          In your answer, you wrote plaintiff objects to

15  this request as overbroad and intruding on the

16  attorney-psychotherapist privilege.  Should plaintiff

17  disclose a retained expert concerning emotional damages,

18  plaintiff will supplement this response.

19          I -- I believe earlier I -- did I ask you if you

20  were seeing any mental health professionals?

21          MR. OWENS:  You did.

22          THE WITNESS:  Yes, you did.

23  BY MR. HERMAN:

24      Q.   And your answer was no I believe, correct?

25      A.   Correct.

**Roger Dean Gillispie - November 5, 2018**

94

1      Q.    Okay.  Turning to interrogatory number eight, do
2  you see there's a highlighted part on exhibit 1?
3      A.    Yes.
4      Q.    Okay.  Now I'll represent to you that's the
5  form -- that I got it from your attorneys, okay.  So I
6  didn't highlight this at all.
7           And the question is -- who have you communicated
8  with from the Miami Township police department at any time
9  concerning the amended complaint, okay, and you write in
10  here Defendants Moore and DiPietro.
11          Now we've talked about your communications with
12  Defendant Moore.  I'm now wondering what communications
13  have you had with Defendant DiPietro, if you recall any?
14      A.    I don't recall.
15      Q.    Aside from Detective-- Defendant Moore and
16  DiPietro, do you recall speaking to any other Miami
17  Township police department employees in connection with
18  your amended complaint or the criminal case?
19      A.    I don't remember talking to -- no.
20      Q.    Interrogatory number ten on page eight, it
21  continues over to page nine, and -- line six and seven,
22  from the top, you say damages related to not being able to
23  pursue his life goals, both professionally and personally.
24          MR. OWENS:  Wait, on --
25          MR. HERMAN:  And this --

**Roger Dean Gillispie - November 5, 2018**

1           MR. OWENS:  -- page nine?

2           MR. HERMAN:  Yes.

3           MR. OWENS:  Oh.  Yeah.

4           MR. HERMAN:  And this is with respect to our

5    question to you i-- to identify all damages and injur--

6    injuries.  So you say here that you were unable to pursue

7    your life goals, both professionally and personally.  Can

8    you please explain to me -- what life goals are you

9    talking about?

10          MR. OWENS:  Just answer the question.

11          THE WITNESS:  I started working when I was 15

12   years old.  I wanted to be a millionaire by the time I was

13   38.  I was working with a friend of my father's, building

14   houses, flipping houses.

15          I was working at General Motors.  I was

16   remodeling houses for two realty companies in town, as I

17   grew.  This is in the eighties -- before flipping a house

18   was a term, before it was a TV show.

19          I bought my first house when I was 21 years old,

20   when I was able to buy a house at 21 years old.  The first

21   vehicle I ever bought was ordered brand new from General

22   Motors when I was 17 years old.  I was driven.  Driven.

23   BY MR. HERMAN:

24       Q.  So one of your life goals was to make a million

25   dollars by the time you were age 38, you shared that with

Roger Dean Gillispie - November 5, 2018

96

1    us, right?

2        A.   That's correct.

3        Q.   Any other life goals aside from, you know,

4    setting this benchmark of how much money you wanted to

5    make by the time you were age 38?

6        A.   I was hoping to have my own construction

7    company.  I was hoping to have a family.  I'd like to had

8    a child or two.  I turned 25 years old in the county jail.

9    Prime time of your life.  Prime time.

10           I didn't get released from prison till I was 45

11   years old.  What time do I have to pursue my goals now at

12   53 years old?

13       Q.   From the time you were a teenager until your

14   incarceration at age 25, had you made any efforts to start

15   your own construction company?

16       A.   I had started remodeling for two real estate

17   companies in town.

18       Q.   And how long had you done that?

19       A.   For a year, year and a half.

20       Q.   So the remodeling/flipping houses was about a

21   year, a year and a half?

22       A.   No, I started working with the house things when

23   I was old enough to drive.

24       Q.   Since you were released from prison in 2011,

25   have you made any attempts to start your own construction

**Roger Dean Gillispie - November 5, 2018**

97

1   company or pick up where you left off flipping and

2   remodeling houses?

3       A.   Are your parents alive?

4       Q.   I ask the questions and you answer.  That's how

5   this action is.

6       A.   My parents are still alive.  Thank God for that.

7   I lost 20 years of being around my parents.

8       Q.   My question though to you was --

9            MR. OWENS:  Let him --

10           THE WITNESS:  You asked me --

11           MR. OWENS:  -- answer.

12           MR. HERMAN:  I asked you if you've done anything

13   to start your own construction company since getting

14   released from prison.

15           MR. OWENS:  I think that he's explaining what

16   he's done since his release.  That might impact your

17   question if -- I mean -- I think it's a fair answer.  If

18   you don't like a answer, you can ask a follow-up but you

19   got to let him answer.

20           THE WITNESS:  I'm answering the question.  There

21   is no amount of money to me to accept for the time I get

22   to spend with my parents now.

23           And if anyone in this room's parents are dead,

24   they would give a day's pay to talk to them for five

25   minutes, I guarantee.

**Roger Dean Gillispie - November 5, 2018**

98

1         I have that opportunity right now.  And that's

2    what I'm pursuing, time with my parents.  Fishing with my

3    dad.  Hunting with my dad.

4         Whatever they want to do, that's what I want to

5    do.  That's the dream I'm pursuing right now.  That is

6    more important to me.

7    BY MR. HERMAN:

8         Q.   So have you given up on this life goal of owning

9    a construction company then due to your parents' age?

10        A.   I don't give up on anything.  This could come

11   later on.  I don't know.

12        Q.   Okay.

13        A.   At this time right now, my parents are the main

14   focus.  I get to visit my brother in Florida to go fishing

15   with him.  Family's my focus, the people who helped get me

16   out of this.

17        Q.   So the construction company has taken a back

18   seat to family now, is that what you're saying?

19        A.   I've got more hopes and dreams than anybody in

20   this room.

21        Q.   Okay.

22        A.   More than anyone in here.  There is a lot of

23   things I'd like to pursue but at this time, my parents are

24   more important.

25        Q.   Further down in that answer, the second to last

**Roger Dean Gillispie - November 5, 2018**

99

1    sentence, it begins in further answering, plaintiff states

2    that he suffered dignitary, personal and emotional harms

3    from being labeled as a sex offender and being on sex

4    offender registries after his release.

5           My question related to this is you no longer

6    ha-- are required to report as a sex offender, is that

7    correct?

8        A.    That's correct.

9        Q.    Okay.

10       A.    November 30th of 2017, I was completely

11   exonerated of all these crimes.  I was the 2,076th person

12   to be exonerated in the United States since 1989 for

13   crimes they did not commit.

14       Q.    What happened on November --

15       A.    I'm --

16       Q.    -- thir--

17       A.    -- still answering the question.

18       Q.    Go ahead.

19       A.    When you're put on a sex offender registry, you

20   get a mailing out if-- within a half a mile of your

21   community.  Everyone in my community knew I didn't do

22   this.  But you're still on that registry and that don't go

23   away.

24           It don't go away today.  It didn't go away

25   yesterday.  It didn't go away November 30th.  There's

Roger Dean Gillispie - November 5, 2018

100

1   somewhere on that Internet you could look me up as a sex

2   offender.

3       Q.   Have you gotten onto the Internet and found your

4   name listed in a sexual offender registry anywhere?

5       A.   I do not care what people think about me --

6       Q.   And that --

7       A.   -- or where I'm listed at.  I don't look for

8   things like that.

9       Q.   So the answer is no, you have not found your

10  name on any sex offender registries, you personally?

11      A.   I have not looked for them --

12      Q.   Has --

13      A.   -- at any recent time.

14      Q.   Has -- do you know anybody, friend, family,

15  anybody, your attorneys that -- or anybody that has said

16  hey, we found your name on a sex offender registry?

17          MR. OWENS:  Objection to the form of the

18  question.  You can answer -- to the extent that it doesn't

19  in-- involve any conversations you've had with your

20  attorneys.  Go ahead.

21          THE WITNESS:  Yeah, I don't know what they've

22  researched.

23  BY MR. HERMAN:

24      Q.   What happened on November 30th, 2017 that you

25  say you were exonerated?

**Roger Dean Gillispie - November 5, 2018**

1       A.   The Ohio Supreme Court refused to hear the last
2   argument of the prosecutor.
3       Q.   What do you mean by you were exonerated?
4       A.   I was found innocent of every crime they accused
5   me of.
6       Q.   Who found you innocent of every crime that you
7   were accused of?
8       A.   When the Ohio Supreme Court refused to hear the
9   ruling.
10      Q.   So you believe the --
11      A.   The ruling was all indictments dropped with
12  prejudice on July 20 something of 2017.  The prosecutor
13  appealed that to the Ohio Supreme Court.  The Ohio Supreme
14  Court to-- refused to hear his argument.  That's when it
15  was over.
16      Q.   So has a court specifically said to you you are
17  exonerated?
18           MR. OWENS:  Objection to the form of the
19  question.  Go ahead.
20           THE WITNESS:  There is no court who has ever
21  apologized for what they done to me.  Nor do I expect it
22  to happen.  The word exonerated has not come out of any
23  court official's mouth to me yet.
24  BY MR. HERMAN:
25      Q.   Okay.  And you've not seen it in any legal

**Roger Dean Gillispie - November 5, 2018**

102

1   opinions of any of the courts that you were exonerated, is

2   that correct?

3       A.   Legal documents, I do not -- I don't recall.

4       Q.   Okay.  Have you calculated the total costs and

5   expenses that you have paid for the defense of your

6   criminal cases, any appeals done by any attorneys hired

7   after that or any costs and expenses by the Ohio Innocence

8   Project, have you calculated those amounts at all that you

9   have paid or family members or friends have paid?

10      A.   I haven't calculated any other than the toll

11  it's had on my life.

12      Q.   So the answer is you don't know what the amount

13  of all of those monies are?

14      A.   Not monetary value, no.

15      Q.   Okay.  If you'll turn to page 12.  And at the

16  bottom is interrogatory number 16.  There Miami Township

17  asked you to identify the specific date upon which you

18  learned of the supplemental reports allegedly authored by

19  Bailey and approved by Fritz as described in paragraph 49

20  of your amended complaint.

21          Your answer raises a -- an objection here that

22  it's vague and confusing.  And further, that there's an

23  attorney/client privilege here.

24          What I want to know, Mr. Gillispie, is the --

25  the date you found out about these supplemental reports.

**Roger Dean Gillispie - November 5, 2018**

103

1   I don't want to hear anything that your attorneys

2   discussed with you at any point related to those reports.

3   I just want to know what date you first learned of those

4   allegedly supplemental exculpatory reports.

5       A.   I don't remember the date of it.

6       Q.   Do you remember who told you about these

7   allegedly supplemental exculpatory reports?

8           MR. OWENS:  So this is the -- the problem with

9   our objection.  I think -- I mean there are follow-- three

10  follow-up questions I can think of to the one you just

11  asked that don't involve privilege issues like was it

12  before or after your trial, was it before or after this

13  appeal, if you would like to but that's an objectionable

14  question.  I could confer with him outside about what the

15  answer is but to pre-- preserve the privilege --

16          MR. HERMAN:  Well, let me ask it this way.

17  Besides your attorneys, did somebody else tell you about

18  these supplemental exculpatory reports?

19          THE WITNESS:  It would only be my attorneys.

20          MR. HERMAN:  Okay.

21          MR. KASSON:  And David, I don't mean to

22  interrupt here but is it your -- you anticipate that

23  Dennis and Lou are going to testify in this case?

24          MR. OWENS:  That what?

25          MR. KASSON:  That Dennis and Lou would testify

**Roger Dean Gillispie - November 5, 2018**

104

1  in this case as prior lawyers?

2          MR. HERMAN:  Dennis Lieberman and Lou --

3          MR. OWENS:  Oh.

4          MR. HERMAN:  -- Hoffman.

5          MR. OWENS:  Sorry.  Possibly.  I -- so my

6  position is that -- that their knowledge about the reports

7  is certainly discoverable, right, but -- and I think that

8  also if -- you know, if -- so -- I -- I think that --

9  Dennis probably will.

10          I don't know about Lou but -- I don't know how

11  that impacts anything with respect to the -- the answer to

12  this question unless I'm misunderstanding something about

13  the privilege.

14          MR. KASSON:  I mean it just seems to me that

15  if -- if Dennis is in any way going to weigh in and say

16  look, this would have impacted how I would have done

17  things or had I learned it here or there I mean --

18          MR. RASKIN:  Well, that --

19          MR. KASSON:  -- that privilege is waived.

20          MR. RASKIN:  You already have.

21          MR. KASSON:  I don't understand how it couldn't

22  be.

23          MR. RASKIN:  Yeah, in --

24          MR. KASSON:  It's in the affidavit.

25          MR. RASKIN:  -- the affidavit.

**Roger Dean Gillispie - November 5, 2018**

105

1           MR. KASSON:  I don't understand how that

2     privilege --

3           MR. RASKIN:  I think the privilege is waived.

4           MR. KASSON:  -- isn't waived.  I mean it's --

5           MR. RASKIN:  I don't think that's a privilege.

6           MR. KASSON:  -- a close call.  I mean if he's

7     going to offer any -- any testimony along those lines,

8     then it opens up kind of fair game to explore all those

9     things including --

10          MR. OWENS:  Sure.

11          MR. KASSON:  -- including when Fritz first

12    raised, you know, this issue and so --

13          MR. RASKIN:  Well, here, I have --

14          MR. KASSON:  -- I mean he clearly ought to be

15    able to testify as to when he learned from anybody about

16    this issue 'cause it's material to those things that

17    Dennis is going to testify to.

18          MR. RASKIN:  Pat -- Pat, I've got Lieberman's

19    affidavit here.

20          MR. KASSON:  Yeah.

21          MR. OWENS:  I unders-- I understand that.  I --

22    so I think that the question is like -- if you want to ask

23    him specifically did you ever have a conversation with

24    Lieberman about these reports, I'm not going to object.

25          And so -- so -- but the -- the question that you

**Roger Dean Gillispie - November 5, 2018**

1   asked was broader than that, did you -- you know, so if

2   you had said did you learn about this after you were

3   convicted or before you were convicted, something like

4   that, that could do -- be a neutral way.  Did you ever

5   have any conversations with Lieberman about these reports,

6   did you ever have any -- you know.

7              MR. HERMAN:  I'll ask those questions then --

8              MR. OWENS:  All right.

9              MR. HERMAN:  -- just because Pat I think makes a

10  fair point because of the affidavits.

11             MR. OWENS:  I -- I mean I'm not trying to step

12  on that actually.  I agree.  So I total-- I totally agree.

13  I'm -- I'm -- I understand that.  I just -- I don't want a

14  broader question to -- to go beyond that.

15             MR. HERMAN:  So then I'll ask you, did you learn

16  about these supplemental exculpatory reports after your

17  conviction or before your conviction?

18             MR. RASKIN:  I'm going to object to the form of

19  that question.

20             MR. OWENS:  You can answer.

21  BY MR. HERMAN:

22     Q.   To the allegedly exculpatory --

23     A.   After.

24     Q.   -- reports?  After your conviction.

25             MR. RASKIN:  So did you change your question to

**Roger Dean Gillispie - November 5, 2018**

107

1  allegedly --

2          MR. HERMAN:  Yes, I did.

3          MR. RASKIN:  -- exculpatory -- I'll withdraw the

4  objection now.

5  BY MR. HERMAN:

6      Q.    Thanks.  And as we were maybe alluding to, was

7  it your attorney Dennis Lieberman who told you about these

8  supplemental reports -- allegedly sup-- exculpatory

9  supplemental reports?

10      A.    I don't recall.

11      Q.    Do you recall if the first time you learned

12  about these allegedly exculpatory supplemental reports --

13  was it after the Ohio Innocence Project took up your case

14  on your behalf?

15          MR. OWENS:  Go ahead.

16          THE WITNESS:  I would probably say yes.

17  BY MR. HERMAN:

18      Q.    So that would have been when Mark Godsey and Jim

19  Petro became involved with taking up your cause after your

20  conviction?

21      A.    Mark Godsey started my case in '03.  Jim Petro

22  didn't come on till after that, long after that.

23      Q.    What are your sources of income now?

24          REPORTER:  I'm sorry, I didn't --

25          THE WITNESS:  I'm sorry.

**Roger Dean Gillispie - November 5, 2018**

108

1              REPORTER:  -- hear that.

2   BY MR. HERMAN:

3        Q.   What are your sources of income currently?

4        A.   I'm on Social Security.  And I speak all over

5   the world about wrongful convictions and get a small fee

6   for that.

7        Q.   What do you mean by a small fee, can you give me

8   a -- what is the number you get for your speaking

9   engagements?

10       A.   Depends on where I'm speaking.

11       Q.   Okay.  Can you give us what is the least amount

12  you've received for a speaking engagement and the most

13  amount you've received for a speaking engagement?

14       A.   From $100 to -- you know, who -- who -- when

15  you're asking me when I get paid, I've been speaking and

16  people walk up and hand me a check, you know.  How do

17  you -- what are you asking?

18       Q.   Let me ask you this.  So you've said -- in your

19  response to interrogatory number 24, you talk about a

20  pants size issue raised in the courts and that from time

21  to time, you talk about this during speaking engagements.

22            So my -- I guess my question to you is are you

23  being hired or asked to come and speak to a group of

24  people about your experience in this criminal case?

25       A.   I'm being asked to speak about wrongful

Roger Dean Gillispie - November 5, 2018

109

1    incarceration.

2        Q.   And who has asked you to come and speak about

3    wrongful incarceration?

4        A.   I've had everything from Rotary clubs to

5    senators.

6        Q.   And are you paid for those invitations to come

7    and speak about wrongful imprisonment?

8        A.   It's -- most generally, yes.

9        Q.   Okay.  So those times when you're invited to

10   speak about wrongful imprisonment, you said on the low end

11   it's a hundred dollars for you to come and speak but you

12   didn't give us a high end as to what amount you're paid to

13   speak about wrongful imprisonment.

14          And I don't -- I'm not talking about people

15   handing you checks on the street or anything like that.

16       A.   I'm talking about people handing me checks after

17   I've spoken.

18       Q.   Okay.  What is the amount -- when you have a

19   speaking engagement, do you enter like an a-- agreement

20   with the person who's putting on the presentation?

21       A.   No.

22       Q.   Okay.  What's the most amount of money that

23   you've been paid then for a speaking engagement?

24       A.   Some of the universities will pay $500.

25       Q.   Okay.  Is that the most that you've received is

**Roger Dean Gillispie - November 5, 2018**

110

1   $500?

2       A.   There again, we go back to what I'm receiving

3   from people -- the -- who were in the audience.  Isn't

4   that the same?

5            MR. OWENS:  Just answer the question that he's

6   asked, okay?

7   BY MR. HERMAN:

8       Q.   What other source of -- sources of income do you

9   have besides Social Security and getting paid for speaking

10  engagements?

11      A.   None.

12      Q.   Are you currently employed?

13      A.   No.

14      Q.   Is there a reason that you've not sought

15  employment since your release from prison?

16      A.   I answered that question earlier, that I'm

17  spending time with my parents, who are in age.

18      Q.   And you've been out of prison for seven years

19  now, correct?

20      A.   Correct.

21      Q.   Have you sought any employment like a regular

22  full time job since then?

23      A.   I was on a sex offender list since I've been out

24  of prison.

25      Q.   Okay.

**Roger Dean Gillispie - November 5, 2018**

111

1      A.   What kind of job do you get with that?

2      Q.   My question to you was have you attempted to

3  gain any gainful employment since your release from

4  prison?

5      A.   No.

6      Q.   That's all the questions I have you for now but

7  I know these other folks will have some questions and may

8  be a good time to take a lunch break but I'm finished.

9          VIDEOGRAPHER:  All right, stand by.  This will

10  be the end of media unit number three.  The time is

11  12:42 hours.  We are now off the record.

12          (A lunch recess was taken.)

13          VIDEOGRAPHER:  This will be the beginning of

14  media unit number four.  The time is 1:32 p.m.  We are now

15  back on the record.

16                    CROSS-EXAMINATION

17  BY MR. RASKIN:

18      Q.   Mr. Gillispie, my name is Todd Raskin.  We met

19  before the -- your deposition started this morning and I

20  represent Scott Moore.  So I'm going to be asking you some

21  questions this afternoon.

22          If at any time I ask you a question that's

23  unclear to you, please ask me to rephrase it or repeat it

24  'cause it's important that we communicate with one

25  another, okay?

**Roger Dean Gillispie - November 5, 2018**

112

1          A.    Okay.

2          Q.    I'm probably the oldest guy in this room which

3   means I think slower than everybody else.  Please give me

4   an opportunity to get my question out before you answer it

5   and I'll give you the same courtesy before asking you

6   another question, fair enough?

7          A.    Yeah.

8          Q.    If you need to take a break at any time, just

9   tell me, whether it's to consult with your lawyer or

10  stretch your legs, use the restroom, just tell me and

11  we'll take a break, fair enough?

12         A.    Yes.

13         Q.    All right, good.  Am I correct, sir, that you

14  have never seen any order of any court, state or federal,

15  which declared you to be innocent of the crimes that you

16  were charged with?

17         A.    That explicitly said you are innocent, no.

18         Q.    Thank you.  And when you say no, you mean no,

19  you have not seen such an order, is that correct?

20         A.    That is correct.

21         Q.    Thank you.  Let me ask you some questions about

22  your knowledge of Officer -- former Officer Gary Bailey.

23  Do you know of your own knowledge what investigation, if

24  any, Mr. Bailey undertook while he was a member of the

25  Miami Township police department into the rapes which

**Roger Dean Gillispie - November 5, 2018**

113

1    ultimately resulted in your being charged with a variety

2    of those crimes?

3         A.   I don't know what his -- I do not know.

4         Q.   Okay, fair enough.  Do you know of your own

5    knowledge when Mr. Bailey was reassigned out of the

6    detective bureau and to a road patrol assignment at Miami

7    Township police department?

8         A.   I do not know.

9         Q.   Do you know for how long Mr. Bailey was assigned

10   as the primary investigator into the rapes which

11   ultimately resulted in your being charged for those

12   crimes?

13        A.   I do not know.

14        Q.   Do you know of your own knowledge if you were

15   ever eliminated as a potential suspect by former Officer

16   Bailey?

17        A.   I do not know.

18        Q.   Do you know of your own knowledge if you were

19   ever eliminated as a potential suspect by former Officer

20   Fritz?

21        A.   I do not know up unto the appeals process.

22        Q.   And whatever you learned in the appeals process

23   was as a result of --

24        A.   After.

25        Q.   Excuse me, sir.

114

1      A.    I'm sorry.

2      Q.    Whatever you learned in the appeals process or

3  the legal process leading up to your release from prison

4  is information you got from somebody else as opposed to of

5  your own knowledge, is that true?

6      A.    That is correct.

7      Q.    Okay, fair enough.  Do you know of your own

8  knowledge whether or not Mr. Fritz actually did any

9  investigation at all into the rapes which ultimately

10 resulted in your being charged with crimes?

11     A.    I do not know.

12     Q.    Do you know when Mr. Bailey left the Miami

13 Township police department?

14     A.    I do not know.

15     Q.    Do you know the circumstances under which he

16 left?

17     A.    I do not know.

18     Q.    How about Mr. Fritz, do you know when he left

19 the Miami Township police department?

20     A.    Do not know that.

21     Q.    Do you know the circumstances under which he

22 left?

23     A.    No.

24     Q.    Are you aware that Mr. Fritz's wife was also a

25 police officer with Miami Township?

**Roger Dean Gillispie - November 5, 2018**

115

1      A.    Only during the appeals process.

2      Q.    But you did become aware of that?

3      A.    Yes.

4      Q.    What did you learn about that?

5      A.    His wife worked at the police department.

6      Q.    Is that all you learned?

7      A.    Correct.

8      Q.    Okay.  So as you sit here today, you don't know

9   the circumstances under which either Mr. Bailey, Mr. Fritz

10  or Mrs. Fritz left the Miami Township police department,

11  correct?

12     A.    Correct.

13     Q.    Okay.  I learned from your answers to some

14  questions that you were asked earlier today that you first

15  met Mr. Fritz when your criminal defense lawyer

16  Mr. Lieberman hired him to become a part of your criminal

17  defense team, is that true?

18     A.    That's where I first heard his name.

19     Q.    Okay.  My question was a little different than

20  that.  My question was when you first met him.  Did --

21  did -- can you tell me when you first met Mr. Fritz

22  physically?

23     A.    I don't recall when it was.

24     Q.    Do -- did you meet him though?

25     A.    Yes.

Roger Dean Gillispie - November 5, 2018

116

1     Q.   Okay.  Well, did you -- did you see Mr. Fritz on

2  more than one occasion leading up to your criminal trial?

3     A.   Yes.

4     Q.   Help me to -- or approximate for me, if you

5  would please, the number of times that you would have met

6  with Mr. Fritz either alone or along with other members of

7  your criminal defense team leading up to your first trial.

8     A.   I couldn't tell you --

9     Q.   Did you --

10     A.   -- how many times if -- I don't know how many

11  times we met.

12     Q.   What would your best estimate be?

13     A.   I would say maybe three or four times.

14     Q.   Three or four times, okay.

15     A.   Guessing.

16     Q.   Well, I don't want you to guess but I am asking

17  for your best estimate.  Would that --

18     A.   Best estimate --

19     Q.   -- be your best estimate?

20     A.   -- would be three or four times.

21     Q.   Okay.  So can you explain for us how your

22  criminal defense team worked with one another when you

23  were present to observe?

24        MR. OWENS:  Objection to the form of the

25  question.  I'm going to instruct you not to answer.

**Roger Dean Gillispie - November 5, 2018**

117

1           MR. RASKIN:  Grounds?

2           MR. OWENS:  You're -- privilege.

3           MR. RASKIN:  Well, I didn't ask him to disclose

4    what was discussed.  I just asked him to describe how his

5    team -- defense team worked.

6           I'm not sure that I understand that privilege

7    but if that's your instruction, I'll see if I can -- you

8    going to stand on that instruction?

9           MR. OWENS:  Well, what i--

10          MR. RASKIN:  We don't have speaking objections

11   here so if you can stand on that obsu-- obstruction--

12   instruction, that's fine, I'll ask another question.  But

13   I'm not interested in having the same kind of speaking

14   objections that you engaged in earlier today.

15          MR. OWENS:  I didn't think it was a speaking

16   objection.  I thought it was an op-- attempt to meet and

17   confer to resolve a potential dispute but, you know,

18   that's why I was reaching out, not to argue with you.

19          MR. RASKIN:  Okay.  So then, I'll be happy to

20   consider that.

21          MR. OWENS:  So -- my -- what I thought you had

22   asked was that -- what was the structure of the defense

23   team meetings, right?

24          MR. RASKIN:  I think what I asked was how they

25   worked together but okay.

**Roger Dean Gillispie - November 5, 2018**

118

1            MR. OWENS:  Well, I mean --

2            MR. RASKIN:  Yeah.

3            MR. OWENS:  It -- it just seems like -- the --

4    if you're asking him like what was the relationship

5    between like how -- so -- why don't -- why don't you

6    just -- I'll withdraw the objection but I do think that it

7    is close to something that is covered by the privilege so

8    I think it's the next question but we'll see.

9            MR. RASKIN:  Read back the question please,

10   madam reporter.

11            (The requested question was read back.)

12            THE WITNESS:  It was Dennis Lieberman.  That's

13   the only team that I seen was him.

14   BY MR. RASKIN:

15       Q.   Is it your testimony that Mr. Lieberman was your

16   only criminal defense attorney?

17       A.   No.

18       Q.   Okay.  So there were others that worked with

19   Mr. Lieberman?

20       A.   In the courtroom.

21       Q.   Okay.  Did you only observe your criminal

22   defense team in the courtroom or did you have occasion to

23   observe how they worked with one another outside of the

24   courtroom as well?

25       A.   Only in the courtroom.

**Roger Dean Gillispie - November 5, 2018**

119

1      Q.    Only in the courtroom.  Were you ever present

2  when Mr. Lieberman gave instructions to Mr. Fritz about

3  what he wanted Mr. Fritz to do or look into?

4      A.    No.

5      Q.    Are you aware of any facts of your own knowledge

6  that either Mr. Bailey or Mr. Fritz individually or

7  collectively eliminated you as a suspect in the rapes?

8      A.    Ask the question again.

9      Q.    Sure.  Are you aware of any facts of your own

10 knowledge that either Mr. Bailey or Mr. Fritz individually

11 or collectively eliminated you as a suspect in the rapes?

12     A.    No.

13     Q.    Are you aware of any facts that either

14 Mr. Bailey or Mr. Fritz ever communicated to Scott Moore

15 their belief that you were not a viable suspect in the

16 rapes?

17             MR. OWENS:  Based upon his own knowledge?

18             MR. RASKIN:  You can answer my question.

19             MR. OWENS:  Well, I'll object to the -- to the

20 extent that the question is vague.  Go ahead.

21 BY MR. RASKIN:

22     Q.    You can answer.

23     A.    To my knowledge, what they spoke about, I have

24 no idea.

25     Q.    Do you know of your own knowledge when the case

**Roger Dean Gillispie - November 5, 2018**

120

1    file was provided to Mr. Moore by either Mr. Fritz or

2    Mr. Bailey?

3         A.   No idea.

4         Q.   And when you say no idea, would that extend to

5    your having no knowledge of whether that occurred in 1989

6    or 1990 and if so, in what month of which year?

7         A.   What is your question?

8         Q.   When the case file was provided to Mr. Moore by

9    either Mr. Fritz or Mr. Bailey.  You said you had no idea,

10   isn't that correct?

11        A.   Correct.

12        Q.   All right.  So when you have no idea, does that

13   mean you don't know wha-- in what year it was provided,

14   what month it was provided?

15             MR. OWENS:  Objection to the form of the

16   question.  Go ahead.

17             THE WITNESS:  I don't know when it happened.

18             MR. RASKIN:  Okay, you can't say whether it was

19   1989 or 1990, can you?

20             MR. OWENS:  Objection to the form of the

21   question.

22   BY MR. RASKIN:

23        Q.   You can answer.

24        A.   I don't know when it happened.

25        Q.   Okay.  Now I'm asking you more specifically, can

**Roger Dean Gillispie - November 5, 2018**

121

1    you say whether or not Mr. Moore -- Mr. Bailey or

2    Mr. Fritz provided the case file to Mr. Moore in 1989?

3         A.   I don't know when it was turned over to him.

4         Q.   Okay.  And I assume your answer with regard to

5    1990 would be the same, you don't know when he got it, is

6    that right?

7              MR. OWENS:  Objection to the form of the

8    question.  You can answer.

9              THE WITNESS:  I don't know.

10   BY MR. RASKIN:

11        Q.   Describe for us your relationship with Rick

12   Wolfe when you were both employed at General Motors.

13        A.   He was the -- the head supervisor of the GM

14   Security Division.

15        Q.   Had you known Mr. Wolfe before the two of you

16   worked together?

17        A.   No.

18        Q.   During the time that the two of you worked

19   together, was there any ill will or bad blood between the

20   two of you?

21        A.   During the time we worked together?

22        Q.   Yes, sir.

23        A.   I felt I was heavily scrutinized.

24        Q.   I believe in response to Mr. Hoffman's

25   questions, you were saying you felt you were heavily

**Roger Dean Gillispie - November 5, 2018**

122

1    scrutinized 'cause you were amongst a group of people

2    looking to get hired permanently?

3            MR. OWENS:  Objection.  And just to clarify the

4    re-- for the record, I think you meant Mr. Herman.

5            MR. RASKIN:  Mr. Herman --

6            MR. OWENS:  Hoffman --

7            MR. RASKIN:  -- I'm sorry.

8            MR. OWENS:  -- was the criminal defense

9    attorney.

10            MR. RASKIN:  Sorry about that.  I would never --

11            MR. HERMAN:  Thank you.

12    BY MR. RASKIN:

13        Q.   -- insult him by being a criminal defense

14    attorney.  Sorry, Chris.  Let me strike that question then

15    and -- and -- and rephrase it.

16            My understanding from your earlier answers to

17    Mr. Herman's questions were that you felt you were being

18    heavily scrutinized because you were one of a group of

19    temporary employees who were seeking permanent employment

20    at General Motors.  Is that a correct understanding of

21    your answer?

22        A.   Yes.

23        Q.   Okay.  So my question was much more specific

24    than that.  I'm interested in knowing whether or not there

25    was any ill will or bad blood between you and Mr. Wolfe

**Roger Dean Gillispie - November 5, 2018**

123

1    specifically.

2         A.   I feel I was being more scrutinized than the

3    rest.

4         Q.   Did you not understand my question?

5         A.   I understand your question.  I just feel that I

6    was -- above the rest on scrutinization (sic).

7         Q.   By Mr. Wolfe or generally speaking?

8         A.   In general.

9         Q.   Okay.  Now again, I'm going to have to ask you

10   to focus on the question that I'm asking you.  During the

11   time that you and Mr. Wolfe worked together, was there any

12   ill will or bad blood between you two specifically?

13        A.   No.

14        Q.   The campground where you would go camping in the

15   summer of 1988, was that Twin Knobs?

16        A.   Correct.

17        Q.   Was there any other campground in Kentucky where

18   you and your buddies would go camping throughout the

19   summer other than Twin Knobs?

20        A.   A couple times, we went to Zelpo.

21        Q.   Spell that for me please.

22        A.   Z-E-L-P-O.

23        Q.   Okay.  Any others?

24        A.   No.

25        Q.   All right.  Did there come a time when you told

124

1   Detective Moore that you were camping in August of 1988 at

2   Twin Knobs campground and therefore couldn't have

3   committed the rapes?

4           MR. OWENS:  Objection.  Compound, vague.  Go

5   ahead.

6           THE WITNESS:  During his first -- having me in

7   to the police station, he asked me where I was on certain

8   dates.  I said probably Kentucky.

9   BY MR. RASKIN:

10      Q.   And when you said probably Kentucky, did you

11  mean camping at Twin Knobs?

12      A.   Correct.

13      Q.   Am I correct in understanding that you and some

14  of your friends would regularly, almost every weekend

15  during the summer of 1988, go camping at Twin Knobs in

16  Kentucky?

17          MR. OWENS:  Objection.  Form.  Go ahead.

18          THE WITNESS:  Quite a bit.

19  BY MR. RASKIN:

20      Q.   Help me to unders-- I know you know what quite a

21  bit means but help me to understand what your thinking is

22  please when you say quite a bit.

23      A.   Close to every weekend.

24      Q.   Okay.

25      A.   Not every weekend.

Roger Dean Gillispie - November 5, 2018

125

1          Q.    All right.

2          A.    But quite a bit.

3          Q.    And quite a bit means almost every weekend as

4     far as you're concerned?

5               MR. OWENS:  Objection to the form of the

6     question.  Go ahead.

7               THE WITNESS:  Yeah.

8     BY MR. RASKIN:

9          Q.    Okay.  And did you believe that you had been

10    camping in Kentucky during the period which included

11    August 5th of 1988?

12         A.    Ask the question again.

13         Q.    Did you believe that you had been camping in

14    Kentucky during the period which included August 5th of

15    1988?

16         A.    At that point in time, speaking with him, at

17    that time, I assumed that's where I would have been.

18         Q.    Okay.  And did you also believe, in speaking

19    with Detective Moore, that you were camping in Kentucky

20    during the period of time that encompassed August 20th of

21    1988?

22         A.    I only assumed that's where I would have been.

23         Q.    I see.  Did you tell him that's where you

24    thought you had -- were?

25         A.    Yes.

**Roger Dean Gillispie - November 5, 2018**

126

1          Q.   Okay.  Are you aware of -- well, strike that.

2   And when you told Detective Moore that you believed during

3   the period that encompassed August 5th, 1988 and

4   August 20th, 1988 that you were camping in Kentucky, did

5   you mean at the Twin Knobs campground?

6          A.   Correct.

7          Q.   You would go camping with a group of buddies of

8   yours, is that right --

9               MR. OWENS:  Objection.

10               MR. RASKIN:  -- in the --

11               MR. OWENS:  Go ahead.  Sorry.

12               THE WITNESS:  Correct.

13               MR. OWENS:  Let him finish the question.

14               THE WITNESS:  Yes, I know.

15               MR. OWENS:  And I'll try to do better at that,

16   too.

17   BY MR. RASKIN:

18          Q.   Help me to understand how that worked.  And in

19   particular, my question is -- is this.  Did one of your

20   group have to sign in or did you all sign in?

21          A.   One person.

22          Q.   Okay.  And was it always the same person?

23          A.   Correct.

24          Q.   Who was that?

25          A.   Jerry Fyffe.

**Roger Dean Gillispie - November 5, 2018**

127

1        Q.    Jerry Fyffe.  And that's P-F-Y--

2        A.    J-E-R-R-Y, F-Y-F-F-E.

3        Q.    F-Y-F-F-E, sorry.  So did you tell

4    Detective Moore that the campground wouldn't have any

5    record of you actually signing in on any weekend in the

6    summer of 1988?

7        A.    No idea what their recordkeeping was.

8        Q.    Well, I thought you told me only one person in

9    your group had to sign and that was Jerry Fyffe?

10            MR. OWENS:  Objection to the form of the

11    question.  It's argumentative.  Go ahead.

12            THE WITNESS:  He signed in.  How they kept a

13    record after that, I don't know.

14    BY MR. RASKIN:

15        Q.    Okay.  Well, did you ever sign anything on any

16    weekend that you camped at Twin Knobs indicating that you

17    were one of the people camping there?

18        A.    Not that I recall.

19        Q.    Did you tell Detective Moore that?

20            MR. OWENS:  Objection.  Form.  It's vague.

21            THE WITNESS:  Not that I recall.

22    BY MR. RASKIN:

23        Q.    Did you have any difficulty understanding my

24    question?

25        A.    Ask it again.

**Roger Dean Gillispie - November 5, 2018**

128

1    Q.   Well, I'll be -- try and be more specific 'cause

2    I don't want there to be any miscommunication between us.

3    When Detective Moore interviewed you about the crimes

4    which occurred on August 5th, 1988 and August 20th, 1988,

5    did you tell him that you never signed any document at

6    Twin Knobs campground which would show that you were

7    actually there on either of those two dates?

8         MR. OWENS:  Objection to the form of the

9    question.  It misstates his prior testimony.  Go ahead.

10        THE WITNESS:  No.

11   BY MR. RASKIN:

12        Q.   And I'm -- am I correct in understanding that as

13   far as you know, there never was a document that you

14   signed on either August 5th or August 20th of 1988

15   reflecting that you were present at Twin Knobs campground?

16        A.   No.

17        Q.   I am correct about that?

18        A.   Yes.

19        Q.   Thank you.  Were you provided with a copy of the

20   petition for post conviction relief and new trial that was

21   filed on your behalf by Mr. Godsey and Mr. Petro?

22        A.    I probably was.  It depend-- I requested them

23   not to send me anything a certain point into this because

24   I couldn't take it emotionally.

25        Q.   Okay.  So as you sit here today, you don't know

**Roger Dean Gillispie - November 5, 2018**

129

1   if you actually read what they filed on your behalf?

2        A.   Correct.

3        Q.   Okay, fair enough.  Are you aware that

4   Mr. Godsey and Mr. Petro represented to the court that

5   Detective Moore lied when he testified about obtaining

6   Twin Knobs campground records?

7        A.   Ask the question again.

8        Q.   Are you aware that Mr. Godsey and Mr. Petro

9   represented to the court, on your behalf, that

10  Detective Moore lied when he testified about obtaining

11  Twin Knobs campground records from August of 1988?

12       A.   Yes.

13       Q.   Do you have any facts that you're aware of which

14  support that allegation?

15       A.   Me personally, no.

16       Q.   Any information that you might have about that

17  subject would have been information that you got from

18  others?

19       A.   Ask your question again.

20       Q.   Any information that you might have on that

21  subject, would that be information that you got from

22  others?

23       A.   During the trial, it came up.

24       Q.   You had two trials.  During which one?

25       A.   I don't recall.

Roger Dean Gillispie - November 5, 2018

130

1      Q.   And what is it that came up?

2      A.   That he had stated that he did not go --

3 Mr. Moore -- to Kentucky to pick up receipts from the

4 campground.

5      Q.   Okay.  And did you come to learn that that may

6 not have been true?

7      A.   Yes, I did.

8      Q.   And how did you learn it?

9      A.   From the campground ranger.

10      Q.   And what did the ranger say?

11      A.   There was an officer here just a couple days ago

12 requesting these campground records.

13      Q.   And did he identify the officer?

14      A.   I don't recall.

15      Q.   All right.  Okay.  Have you now told me

16 everything you know about that topic?

17           MR. OWENS:  Objection to the form of the

18 question.

19           THE WITNESS:  To the best of my knowledge right

20 now.

21 BY MR. RASKIN:

22      Q.   Thank you.  Let me ask you about Tori Mitchell

23 Strohman -- or I guess it would be Tori Strohman Mitchell,

24 wouldn't it?  Her mid-- maiden name was Strohman?

25      A.   Yes.

**Roger Dean Gillispie - November 5, 2018**

131

1      Q.   Was it?  Okay.  She was your former girlfriend?

2      A.   Yes.

3      Q.   Okay.  And the two of you would have sex

4  outdoors, would you?

5      A.   Is that relevant?

6           MR. OWENS:  Answer the question.

7           THE WITNESS:  Yeah.

8           MR. RASKIN:  Okay.  Are you aware that -- that

9  Miss Strohman took or drove with Detective Moore to both

10 of the locations where the rapes occurred and identified

11 those locations as places where you and she had had sex

12 with one another?

13          MR. OWENS:  Objection to the form of the

14 question.

15          MR. RASKIN:  You can answer.

16          MR. OWENS:  And lacking foundation.

17          MR. RASKIN:  You can answer.

18          MR. OWENS:  It's also not true but go ahead.

19          MR. RASKIN:  All right, okay.  I'm going to ask

20 you not to do that and if you do it again, I'm going to

21 adjourn the deposition and we're going to go to court

22 because in this district, we don't permit speaking

23 objections and we certainly don't permit that kind of

24 editorializing.

25          MR. OWENS:  Well, the problem is that you've

**Roger Dean Gillispie - November 5, 2018**

132

1  asked the witness a completely unfair question --

2        MR. RASKIN:  No, no.

3        MR. OWENS:  -- in my -- so --

4        MR. RASKIN:  Wait -- and -- but that isn't

5  grounds for either a speaking -- even if you think that's

6  true -- which I -- I don't, but even if you think that's

7  true, David, that doesn't give you the right in the

8  context of this proceeding to either editorialize or

9  engage in speaking objections.

10        So I'm going to have to insist that you do

11  neither or I'm going to adjourn at least my portion of

12  this deposition and go to the judge and ask him to

13  instruct you not to do that and then we'll start all over

14  again.  It's your call.

15        MR. OWENS:  I think you've got a witness here

16  you should ask some questions to.

17        MR. RASKIN:  I didn't ask for your advice.  I'm

18  telling you what I'm going to do if you keep engaging in

19  the conduct that you are.

20        MR. OWENS:  Sounds great.

21        MR. RASKIN:  Okay.  Good we understand each

22  other.  Madam reporter, would you please read back that

23  question.

24        (The requested question was read back.)

25        MR. OWENS:  I will restate our prior objection.

**Roger Dean Gillispie - November 5, 2018**

133

1            THE WITNESS:  I don't know.

2     BY MR. RASKIN:

3         Q.   Did you and Miss Strohman have sex with one

4     another near Bear Creek on -- by Farmersville-West

5     Carrollton Road?

6         A.   Not that I --

7         Q.   -- when you were dating -- when you were dating?

8         A.   Not that I know of.

9         Q.   Okay.  Are you telling me that didn't happen or

10    you just don't remember?

11        A.   I didn't know the area.  I don't know that it

12    happened.

13        Q.   Once again, are you telling me it didn't happen

14    or you don't remember if it happened or not?

15        A.   I don't recall.

16        Q.   Okay, fair enough.  Did you and Miss Strohman

17    have sex with one another back behind the North Dixie

18    Plaza while the two of you were dating?

19        A.   No.

20        Q.   That, you know for sure?

21        A.   Correct.

22        Q.   All right.  So it would surprise you if sh--

23    if -- if she had told Detective Moore that in fact you did

24    have oral sex there and that -- and -- and -- and actually

25    drove with him and took him to that location?

**Roger Dean Gillispie - November 5, 2018**

134

1           MR. OWENS:  Objection to the form of the
2    question.

3           THE WITNESS:  Very much so.

4           MR. RASKIN:  Okay.  Are you aware that
5    Miss Strohman told Detective Moore that the only type of
6    sex you liked was oral sex?

7           MR. OWENS:  Objection to the form of the
8    question.

9           THE WITNESS:  No.

10          MR. RASKIN:  And that she believed that if
11   that's the only kind of sex you ever had, you'd be
12   satisfied?

13          MR. OWENS:  Objection to the form of the
14   question.  It's also argumentative.

15          THE WITNESS:  No.

16   BY MR. RASKIN:

17       Q.   You are aware that when presented with the photo
18   lineup, both of the sisters identified you as the
19   perpetrator?

20       A.   I was told that.

21       Q.   Okay.  Did Mr. Fritz ever tell you that he had
22   concluded you were not a viable candidate as the
23   perpetrator of the rapes?

24       A.   No.

25          MR. OWENS:  Objection.  Foundation.  Go ahead.

Roger Dean Gillispie - November 5, 2018

135

1   BY MR. RASKIN:

2        Q.   I'm sorry?

3        A.   No.

4        Q.   Was Mr. Fritz a part of your criminal defense

5   team for both criminal trials?

6        A.   I don't recall him -- his duties at the second

7   trial.

8        Q.   Okay.  But you do recall that Mr. Fritz was

9   involved with your criminal defense team as early as the

10  first trial?

11       A.   Correct.

12       Q.   Okay.  How long were you in county jail before

13  you went to trial?

14       A.   Which trial?

15       Q.   First trial.

16       A.   Two weeks approximately.

17       Q.   And were you released on bond or were you held

18  from the time of your arrest until the time of your first

19  trial?

20       A.   I was released on bond about two weeks after I

21  was arrested.

22       Q.   Okay.  And then how much longer -- well, strike

23  that.  Bad question.  From the time of your arrest until

24  the time of your first criminal trial, how long was that?

25       A.   I don't know.

**Roger Dean Gillispie - November 5, 2018**

136

1      Q.   What's your best estimate?

2      A.   Five months, six months.

3      Q.   And Mr. Fritz worked on your criminal defense

4  team that whole time as far as you know?

5      A.   I don't know when he came on.

6      Q.   You were found guilty of all of the charges

7  against you in the first criminal trial on February 12th

8  of '91, is that correct?

9      A.   Best I can remember, yes.

10     Q.   Okay.  And for all but about two weeks from the

11  time you were arrested until the time that you were

12  convicted in February 12 of 1991, you were free on bond,

13  is that right?

14     A.   No.

15     Q.   I must have misunderstood you then.  You were

16  arrested and you spent I thought you said two weeks in

17  county jail?

18     A.   Correct.

19     Q.   And then you were released on bond?

20     A.   Correct.

21     Q.   And did you remain free on bond until your

22  conviction on February 12th?

23     A.   Until my conviction on February 12th, yes,

24  correct.

25     Q.   Okay.  Now my understanding is the basis upon

**Roger Dean Gillispie - November 5, 2018**

137

1    which you sought and received a new trial had to do with

2    the existence of hair evidence, is that right?

3        A.    That was one of the requests.

4        Q.    I'm asking for the basis upon which it was

5    granted.  My understanding was it was the hair evidence.

6    Was there another basis in addition to that that you're

7    aware of?

8        A.    Ask your question again.

9        Q.    Sure.  My understanding is that the reason that

10   you received a second trial was because of hair evidence.

11       A.    Correct.

12       Q.    All right.

13       A.    I gotcha.

14       Q.    Was there any other reason for getting a new

15   trial separate and apart from the hair evidence that

16   you're aware of?

17       A.    Not that I'm aware of.

18       Q.    Okay, all right.  And in particular, am I

19   correct in understanding that there were crime lab reports

20   with regard to the analysis of the hair that was found on

21   the clothing of Bonnie and Connie Wise which did not match

22   yours?

23       A.    Correct.

24       Q.    All right.  And that evidence was presented at

25   your second trial, wasn't it?

**Roger Dean Gillispie - November 5, 2018**

138

1      A.   Correct.

2      Q.   And you were convicted once again at your second

3  trial, weren't you, in spite of that effort?

4      A.   Correct.

5      Q.   Okay.  And if I understood your earlier

6  testimony -- but please correct me if I'm wrong -- you

7  were never present to hear instructions that Mr. Lieberman

8  or any other member of your criminal defense team gave to

9  Mr. Fritz about what tasks he should undertake on your

10 behalf, is that correct?

11     A.   Correct.

12     Q.   Okay.  You -- are you aware that prior to your

13 first trial, a complete copy of the Miami Township police

14 department investigative file into the rapes was provided

15 to your defense lawyer as well as to the prosecution by

16 the Mi-- Miami Township police department?

17          MR. OWENS:  Objection to the form and the

18 foundation.  You can answer.

19          THE WITNESS:  I don't know what was turned over

20 to anybody.

21 BY MR. RASKIN:

22     Q.   Did you ever see the file?  Did you ever go

23 through it?

24     A.   Not that I recall.

25     Q.   So as you sit here today, you cannot testify of

Roger Dean Gillispie - November 5, 2018

139

1  your own knowledge what documents were provided by the

2  Miami Township police department to either your criminal

3  defense team or the prosecutor's office, comprising the

4  Mia-- the Miami Township police department investigative

5  file --

6          MR. OWENS:  Same objection.

7          MR. RASKIN:  -- right?

8          MR. OWENS:  Sorry.  Same objections.

9          THE WITNESS:  Correct.

10 BY MR. RASKIN:

11     Q.   You never reviewed that file as you sit here

12 today, is that correct?

13     A.   Not that I know of.

14     Q.   And because you don't know that you ever

15 reviewed the file, you're not prepared to tell us what its

16 contents were, are you?

17     A.   I don't know what was in the file.

18     Q.   Thank you.  Are you aware of any efforts

19 undertaken by Mr. Fritz on your behalf to interview a

20 fellow by the name of Kevin Cobb?

21     A.   No.

22     Q.   Do you know who Kevin Cobb is?

23     A.   I do now.

24     Q.   Who is he?

25     A.   He is a suspect in this case.

**Roger Dean Gillispie - November 5, 2018**

1      Q.    Well, who told you he was a suspect in this

2    case?

3      A.    We had a --

4            MR. OWENS:  Obje-- objection to the question on

5    the basis of attorney/client privilege.

6            MR. RASKIN:  Well, I don't think you can do that

7    since the post petition brief specifically names the guy.

8    Where was the privilege?

9            MR. OWENS:  I mean -- if you want to ask a

10   narrower question I think that it --

11           MR. RASKIN:  No, I want to ask the question I

12   asked.  You instruct him not to answer it, we'll ask the

13   court if your instruction's proper.

14           I don't see how you can claim privilege when his

15   lawyers made those allegations to a federal court and

16   specifically named Mr. Cobb.  Be happy to cite you to the

17   page in the brief.

18           MR. OWENS:  I underst-- I understand that the

19   lawyers made the arg-- sir, the problem is if the question

20   were more narrow as -- and had like a time frame or --

21           MR. RASKIN:  I -- I don't have to narrow it and

22   I don't have to put a time frame on it.

23           MR. OWENS:  Well -- but I'm giving you the

24   reason the -- why the question is objectionable because

25   it -- it's unclear as to which attorneys that might be

1  swept in there.
2       It -- does that include my communications?  Does
3  it include other communications that he -- where he might
4  have been made aware of it?  That's the issue so -- I'll
5  instruct you not to answer that question.
6  BY MR. RASKIN:
7       Q.  Okay.  Has Kevin Cobb ever been charged with the
8  crimes that you were charged with and convicted of?
9       A.  No.
10      Q.  Do you have any facts to share with me that
11 Kevin Cobb is the subject of an ongoing investigation with
12 respect to the crimes that you were charged with and
13 convicted of?
14      A.  No.
15      Q.  How close in time to your first trial did you
16 have sex with Miss Strohman?
17          MR. OWENS:  Objection to the form of the
18 question.
19          THE WITNESS:  I don't recall.
20 BY MR. RASKIN:
21      Q.  Can you -- can you narrow it down at all to a
22 matter -- was it during the time after you were arrested
23 but released on bond?
24      A.  I don't recall.
25      Q.  Okay.  Are you aware that Mr. Lieberman has

Roger Dean Gillispie - November 5, 2018

142

1    stated under oath in an affidavit that Miss Strohman

2    couldn't be called as a witness on your behalf because she

3    had recently had sex with you?

4        A.   That's possible.

5        Q.   Okay.  And my question was are you aware that

6    that's what he said?

7        A.   I don't recall.

8        Q.   You don't recall what he said?

9        A.   Yeah.

10       Q.   I see, okay.  Would that be true, assuming he

11   said it?

12            MR. OWENS:  Objection.  Form, foundation.  Am

13   I -- do you just want me to say objection, is that --

14            MR. RASKIN:  No, no.  No, no.

15            MR. OWENS:  Go ahead.

16   BY MR. RASKIN:

17       Q.   Assuming Mr. -- let me just ask the

18   question again.  Madam reporter, I'll withdraw that

19   question and reask it.

20            Assuming that Mr. Lieberman put in his affidavit

21   that he could not call Miss Strohman because she had

22   recently had sex with you and that would have been, in his

23   judgment, not favorable to your defense, would that be a

24   truthful statement based upon your recollection?

25       A.   Me and Strohman had a lot of sex.  I couldn't

**Roger Dean Gillispie - November 5, 2018**

143

1  tell you the dates, times.  I don't know.

2      Q.  Okay.  You don't have any reason to doubt what

3  Mr. Lieberman's --

4      A.  No.

5      Q.   -- statements are?

6      A.  Sorry.

7      Q.  Okay.  According to the sworn statement of

8  Detective Moore, he first began to investigate the rape,

9  abduction and aggravated robbery of Connie and Bonnie Wise

10  on June 18, 1990.  Do you have any facts from which to

11  conclude that that's not true?

12      A.  I don't know when he started it.

13      Q.  Okay.  According to the sworn statement of

14  Detective Moore -- former Detective Moore, in order to

15  begin his investigation, he reviewed the entire Miami

16  Township police department file, including all reports

17  authored by either former detective Sergeant Fritz or

18  former Detective Bailey.  Do you have any facts to show

19  with me that that's not true?

20      A.  No.

21      Q.  According to the sworn statement of

22  Detective Moore -- former Detective Moore, upon review of

23  the Miami Township police department file, he did not see

24  any reports authored by either detectives -- former

25  Detective Fritz or Bailey even making reference to you as

Roger Dean Gillispie - November 5, 2018

144

1    a suspect, let alone eliminating you as a suspect.  Do you

2    have any facts to share with me to the contrary?

3              MR. OWENS:  Objection to the foundation of the

4    question.  Go ahead.

5              THE WITNESS:  I don't know.

6              MR. RASKIN:  According to former

7    Detective Moore's sworn statement that during the course

8    of his investigation into the crimes committed against --

9    the two sisters, he never saw a report authored by either

10   Bailey or Fritz referring to you or eliminating you as a

11   suspect.  Do you have any facts to share with me that

12   that's not true?

13             MR. OWENS:  Objection.  Foundation.

14             THE WITNESS:  I don't know what he saw.

15   BY MR. RASKIN:

16        Q.    Okay.  So the answer's no, you have no facts?

17        A.    I have no facts.

18        Q.    Thank you.

19             MR. OWENS:  Objection to the form of the last

20   question.

21   BY MR. RASKIN:

22        Q.    You testified earlier that you received a

23   telephone call from former Detective Moore asking you to

24   speak with him down at the station and that was your first

25   contact with Detective Moore, is that right?

Roger Dean Gillispie - November 5, 2018

1      A.   Correct.

2      Q.   Prior to that telephone call, had you ever met

3   Scott Moore?

4      A.   No.

5      Q.   Had you ever met Scott Moore's father --

6      A.   No.

7      Q.   -- who was the chief of police at the time?

8           MR. OWENS:  Objection to the foundation.  The

9   police of chief at what time?  So that you know.

10  BY MR. RASKIN:

11     Q.   Did you understand my question?

12     A.   What's your question?

13     Q.   Okay.  I believe I asked you if prior to

14  receiving the telephone call from Scott Moore, you had

15  ever met him before and I think your answer was no, you

16  hadn't, is that right?

17     A.   Correct.

18     Q.   Prior to receiving the telephone call from Scott

19  Moore, had you ever met his father, who was also with the

20  Miami Township police department?

21     A.   No.

22     Q.   Thank you.  As far as you knew, did you know

23  anyone -- strike that.  Far as you knew, did you have any

24  common acquaintances with Scott Moore?

25     A.   No.

Roger Dean Gillispie - November 5, 2018

146

1          Q.    Do you have any reason to believe that

2    Scott Moore would have harbored any ill will or bad

3    feelings or animus towards you at all?

4                MR. OWENS:  Objection.  Foundation.  Go ahead.

5                THE WITNESS:  I don't know what his feelings

6    toward me were.

7    BY MR. RASKIN:

8          Q.    Well, you never met him before, right?

9          A.    Correct.

10         Q.    He never met you before, right?

11         A.    Correct, far as I know.

12         Q.    Right, so wouldn't be any reason for either one

13   of you to have any ill will or bad feelings towards the

14   other since you never met each other before, right?

15               MR. OWENS:  Objection.  Foundation.

16               THE WITNESS:  Correct.

17   BY MR. RASKIN:

18         Q.    You testified that you were initially in the

19   Warren Correctional facility; is that right?

20         A.    Correct.

21         Q.    Is that the proper name of it?

22         A.    Warren Correctional Institution.

23         Q.    Warren Correctional Institution.  And what level

24   of offenders does that institution house or did it house

25   when you were there?

**Roger Dean Gillispie - November 5, 2018**

147

1          A.    When I was there, it was a close security.

2          Q.    And how long were you in Warren?

3          A.    Approximately ten years.

4          Q.    What -- was it -- double bunk to a cell?

5          A.    Correct.

6          Q.    Were you assigned to the same cell mate during

7     the entire ten years you were there?

8          A.    No.

9          Q.    How many cell mates did you have?

10         A.    Couldn't give you a number.

11         Q.    I'm taking from that, it's a fair number?

12         A.    Quite a few.

13         Q.    Quite a few, okay.  Ever any violence between

14    you and your cell mates in Warren?

15         A.    No.

16         Q.    Were you ever -- during your approximate ten

17    years of incarceration in Warren, were you ever

18    disciplined?

19         A.    What form of discipline are you speaking on?

20         Q.    Any form of discipline.  Were you ever

21    disciplined for violating the rules and regulations of the

22    institution?

23         A.    I'm sure there was a few.  I was in there for

24    ten years.

25         Q.    Warren have a hole?

Roger Dean Gillispie - November 5, 2018

148

1      A.   Yes.

2      Q.   Were you ever sent to the hole?

3      A.   On a couple occasions.

4      Q.   For what infractions?

5      A.   I worked in the maintenance department.

6  Whenever a tool was missing, everyone went to the hole

7  until they found the tool.

8      Q.   As best as you can recall, how many times were

9  you in the hole?

10     A.   Three, maybe four.

11     Q.   What was the longest duration?

12     A.   For the day.

13     Q.   For the -- only for the day?

14     A.   Yes.

15     Q.   Were you ever in the hole for more than a day?

16     A.   In a 24-hour period.

17     Q.   If that's your definition of the day, I accept

18  that as -- that's fine.

19     A.   Correct.

20     Q.   All right.  Were you ever in the hole for more

21  than 24 hours?

22     A.   No.

23     Q.   And I assume that -- or may I assume that on

24  some of those occasions, you were in the hole for less

25  than 24 hours or wa-- was it always 24?

**Roger Dean Gillispie - November 5, 2018**

149

1      A.    It was -- it was less.  Most generally, they

2    would find the tool.

3      Q.    Is a missing tool the only reason why you were

4    in the hole when you were at Warren?

5      A.    Correct.

6      Q.    Were you ever the victim of any violence --

7    physical violence in Warren by other inmates?

8      A.    Yeah.

9      Q.    On how many occasions?

10     A.    Several.

11     Q.    I know you know what that means but I don't so

12    what are you -- what's your definition of several?

13     A.    Prison is extremely violent and you have to

14    stand your ground every day.  You want me to put a number

15    on times how many times someone came up to me and wanted

16    to try something?

17          I don't know how many times.  My daily thing was

18    about survival every day.  That's all I have to -- that's

19    all I had.

20     Q.    My question was -- and I -- and maybe it was

21    unclear.  If -- if it was, I apologize.  So let me see if

22    I can ask it a little differently.

23          On how many occasions, if any, were you

24    physically assaulted by another prisoner while you were in

25    Warren?

Roger Dean Gillispie - November 5, 2018

150

1    A.   You want a number?

2    Q.   I want your best estimate unless you know a

3  specific number.

4    A.   My best estimate would be over two or three

5  dozen times.

6    Q.   Okay.  And did any of those assaults require you

7  to receive medical care or treatment?

8    A.   No.

9    Q.   Were you assigned to the maintenance department

10  during your entire incarceration at Warren?

11    A.   No.

12    Q.   What other departments were you assigned to in

13  addition to maintenance while you were incarcerated at

14  Warren?

15    A.   Was in the horticulture program -- school.

16    Q.   What'd you do in the horticulture program?

17    A.   Studied plants.

18    Q.   So that was actually a -- a -- an educational

19  experience?

20    A.   Correct.

21    Q.   How long were you assigned to the horticulture

22  study program?

23    A.   A year.

24    Q.   And how long were you assigned to the

25  maintenance department?

Roger Dean Gillispie - November 5, 2018

151

1       A.   Five, six, seven years.

2       Q.   So you're there a total of ten.  What other

3  departments were you assigned to in addition to

4  maintenance and the horticulture schooling program?

5       A.   Community service, which also carried over to my

6  maintenance job for a period of time.

7       Q.   Help me to understand what -- how that works

8  please.

9       A.   I worked the maintenance shop and did the

10  community service through the maintenance shop.

11       Q.   What type of community service did you do?

12       A.   I had thousands of hours of community service.

13  When I was with the maintenance department, I built

14  furniture, I built cabinetry, I built props for various

15  organizations.

16            I built props for the Cincinnati flower show for

17  six years through the maintenance shop and the community

18  service program.

19       Q.   And participating in the community service

20  program, did that work towards potential for early

21  release?

22       A.   No.

23       Q.   Okay.  So that was an assignment you got rather

24  than a request you made?

25       A.   I requested to do the community service.

**Roger Dean Gillispie - November 5, 2018**

1      Q.   Why?

2      A.   Because it's something I wanted to do with my

3   time was try to make the world a better place out of the

4   hell that I was in.

5           VIDEOGRAPHER:  This will be the end of media

6   unit number four.  The time is 2:31 p.m.  We are now off

7   the record.

8           (A brief recess was taken.)

9           VIDEOGRAPHER:  This will be the beginning of

10  media unit number five.  The time is 2:37 p.m.  We are now

11  back on the record.

12  BY MR. RASKIN:

13     Q.   Mr. Gillispie, I believe you testified that

14  after approximately ten years of incarceration, you were

15  transferred out of Warren Correctional.  And where were

16  you transferred to?

17     A.   London Correctional.

18     Q.   Do you know the reason for your transfer?

19     A.   Security level drop.

20     Q.   And so what's your understanding of the security

21  level at London?

22     A.   Medium minimum.

23     Q.   Medium to minimum?

24     A.   When I was there, it was medium minimum.

25     Q.   And in terms of the effect on your daily life,

**Roger Dean Gillispie - November 5, 2018**

153

1    what was the difference between being incarcerated at

2    Warren and at London?

3        A.    Going from a two-man cell to a dormitory.

4        Q.    Any other change?

5        A.    Yeah, you was sharing a building with 500

6    people, seven toilets, 14 shower heads, 21 sinks, seven

7    urinals with approximately 500 people.  No cell to go

8    into.  You had a cubicle with another person.

9        Q.    So did you consider London Correctional to be

10   better for you or worse for you than Warren?

11       A.    You take the good with the bad.  You had a

12   little more freedom to go out onto the yard but you slept

13   in the open.

14       Q.    Where were you assigned to work while

15   incarcerated at London?

16       A.    I was assigned to the carpentry school.

17       Q.    And did that mean that you were learning the

18   carpentry trade?

19       A.    I was an instructor.

20       Q.    Was that the only assignment you had at London?

21       A.    When the -- in -- when the staff instructor

22   retired, they closed the program.  I went to the

23   recreation department as maintenance.

24       Q.    So how long were you in carpentry?

25       A.    Approximately four years, three years.

1    Q.    And how long were you in recreation?

2    A.    Until my release.

3    Q.    Help me -- how many more years was that?

4    A.    If I was there ten years, I spent three or four

5  in the school.  Then I was --

6    Q.    Approximately six?

7    A.    -- six or seven years.

8    Q.    What did -- what'd you do at recreation?

9    A.    Maintenance the equipment.

10   Q.    Were you the victim of any assaults while at

11  London?

12   A.    No different from Warren.  You have to establish

13  yourself in a new prison.

14   Q.    So how many times were you assaulted

15  approximately?

16   A.    It goes back to the -- at London, maybe eight or

17  ten approximately.

18   Q.    Any injuries requiring medical treatment?

19   A.    No.

20   Q.    Have you now described for me all of the

21  assignments that you had at both London and Warren?

22        MR. OWENS:  Objection.  Form.  It's vague.

23        THE WITNESS:  To the best of my knowledge, yeah.

24  BY MR. RASKIN:

25   Q.    Okay.  The photo array which you were questioned

**Roger Dean Gillispie - November 5, 2018**

155

1    about by Mr. Herman, you complained of the color of the

2    background of some of the photos that you had a full head

3    shot, whereas some of the other persons depicted did not

4    have a full head shot, as you called it.  There was glossy

5    versus mat finish.  You remember that -- the question that

6    you were asked and those answers that you gave?

7        A.    Yes.

8        Q.    That was all brought out at your trial, wasn't

9    it?

10       A.    Correct.

11       Q.    As a matter of fact, the -- the -- the focus

12   of -- of your defense strategy was misidentification and

13   that you never should have been a part of that photo

14   array, wasn't it?

15       A.    Yes.

16       Q.    Okay.  And the jury rejected that strategy,

17   didn't it?

18           MR. OWENS:  Objection.  Form, foundation.

19           THE WITNESS:  I assume.

20   BY MR. RASKIN:

21       Q.    Well, you got convicted?

22       A.    Correct.

23       Q.    Okay.  The hair evidence, are you aware of why

24   the hair evidence was not disclosed during your first

25   trial?

**Roger Dean Gillispie - November 5, 2018**

156

1      A.   Me personally, no.

2      Q.   Yes, sir.  Were you aware that al-- that that

3  evidence was always in the possession of the Bureau of

4  Criminal Identification?

5      A.   That was my --

6           MR. OWENS:  Objec-- objection.  Vague.

7           THE WITNESS:  That was my assumption.

8  BY MR. RASKIN:

9      Q.   Okay.  And your assumption proved to be correct,

10  didn't it?

11      A.   During the trial, there was another person who

12  was handling evidence by the name of Dias (phonetic) so,

13  you know, I don't know what their chain of command and

14  custody was.

15      Q.   Okay.  You were asked some questions ab-- by

16  Mr. Herman about the source of your income and your

17  answers were a little unclear to me.  You said you receive

18  Social Security.  Are you receiving -- is that correct?

19      A.   Yes.

20      Q.   All right.  And you're how old?

21      A.   Fifty-three.

22      Q.   Okay.  So are you receiving Social Security

23  income disability?

24      A.   I don't believe it's disability --

25      Q.   Is it --

**Roger Dean Gillispie - November 5, 2018**

157

1      A.    -- income.

2      Q.    -- SSID?

3      A.    I personally don't recall.  I don't remember

4   which one it is.  I have a problem with this SSID because

5   I'm -- I -- as far as I know, I -- my back is the issue

6   that I have.

7      Q.    Right, okay.  And did you have to go to a doctor

8   who -- who examined you and then wrote a report describing

9   whether or not you could work because of your physical --

10     A.    Correct.

11     Q.    -- condition?  And -- and was it the doctor's

12  opinion that you could not work because of your back?

13     A.    Correct.

14     Q.    And did you then apply for Social Security

15  income because you were unable to work?

16     A.    Correct.

17     Q.    And did the Social Security Administration

18  approve your application?

19     A.    They did.

20     Q.    And are you still receiving those benefits?

21     A.    Correct.

22     Q.    Okay.  And how much do you receive a month from

23  Social Security?

24     A.    620 some dollars.

25     Q.    And what would be your best estimate of the

**Roger Dean Gillispie - November 5, 2018**

158

1    amount of revenue that you earn from the speaking

2    engagements that you described in response to Mr. Herman's

3    questions on -- annually?

4        A.    Seven to $10,000.

5        Q.    Okay.  Now I understood your answers to some of

6    Mr. Herman's other question concerning your decision not

7    to apply for employment outside of the home because of

8    your desire to spend time with your parents.

9             Have you ap-- have you applied for any sedentary

10   work that you can do remotely from the home that you share

11   with your parents?

12       A.    Up until just recently, I was able to sit down

13   for -- longer than 20 minutes.  But I was also just

14   recently able to walk more than 30 yards.  Before my

15   surgery, I couldn't sit nor stand for any amount of time.

16       Q.    But now your surgery has helped and you're able

17   to sit, stand and walk for much longer periods of time

18   than before?

19       A.    Not much longer but -- more.

20       Q.    Well, you've been sitting here for -- probably a

21   couple two, three hours before --

22       A.    Right.

23       Q.    -- getting up, right?  So you're able to --

24       A.    No, I sat about a hour and then got up.

25       Q.    Well, our watches must not work the same way but

**Roger Dean Gillispie - November 5, 2018**

159

1    okay.  Is that your testimony nonetheless, that you feel

2    like you can sit for an hour and then you've got to get up

3    because of the pain?

4            MR. OWENS:  Objection to the form of the

5    question.

6            THE WITNESS:  Correct.

7    BY MR. RASKIN:

8        Q.   Okay.  So while I appreciate that answer, I

9    guess I'm still looking for an answer to my question.

10   Have you applied for any sedentary work that you can do

11   remotely from your parents' home?

12       A.   I've not applied for any employment.

13       Q.   Okay.  And do you intend to do so as long as

14   your folks are alive?

15       A.   As long as my parents are taking a breath, I

16   will be with them.

17       Q.   So is it -- is the answer to my question you do

18   not intend to apply for employment so long as your parent

19   are alive?

20       A.   At this time.

21       Q.   Since your release from prison, have you

22   reestablished any of your acquaintances or friendships

23   with the people that you were friends and acquaintances

24   with before your convictions?

25       A.   I never lost them.

**Roger Dean Gillispie - November 5, 2018**

160

1        Q.    Okay.  So every one who was your friend before

2    you were convicted, continues to be your friend today?

3        A.    That's correct.

4              MR. OWENS:  Objection.  Form.  Go ahead.

5              THE WITNESS:  That's correct.

6    BY MR. RASKIN:

7        Q.    Before you were convicted, did you belong to any

8    organizations, churches, fraternal organizations, anything

9    like that?

10       A.    Not that I recall.

11       Q.    Since your release from prison, have you joined

12   any.

13       A.    No.

14       Q.    Have you attempted to join any that declined to

15   have you be a member?

16       A.    I haven't applied.

17       Q.    Okay.  So no church organization of any kind or

18   organization of any type has said to you we don't want you

19   become a part of our group?

20       A.    I haven't applied for any.

21       Q.    Okay.  Did Miss Strohman ever give you a gold

22   chain as a gift?

23       A.    I don't recall.

24       Q.    Okay.  If she told Detective Moore that she did,

25   would you have any facts to share with us that that's

Roger Dean Gillispie - November 5, 2018

161

1    untrue or incorrect?

2        A.   At some point, she has probably tried to give me

3    jewelry and I -- I don't wear it.

4        Q.   Well, I see you got a ring on.

5        A.   Yeah.

6        Q.   What's -- what's -- is there some significance

7    to the ring?

8        A.   There's extreme significance to this ring.  This

9    is a ring for an exoneree you get when you are exonerated.

10       Q.   Well, when the --

11       A.   The court does not have to say you've been

12   exonerated.  There's a brotherhood through this

13   exoneration ring.

14       Q.   But that --

15       A.   And I will wear this ring anywhere I go.

16       Q.   May I see it?

17       A.   Absolutely.  And I will explain it to you if you

18   would like me to.

19            MR. OWENS:  Just --

20            MR. RASKIN:  Sure.

21            MR. OWENS:  Answer his questions.

22   BY MR. RASKIN:

23       Q.   So -- I would like you to.  So why don't you go

24   ahead and explain to me what the -- what the significance

25   of the ring is and where you got it and what it means to

**Roger Dean Gillispie - November 5, 2018**

162

1   you.  Okay?

2        A.   This is a gift to all exonerees from the first

3   death row DNA exoneree in America, Kirk Bloodsworth, since

4   his release, became a jeweler and is on a mission to give

5   at this time today 2,297 people an exoneree ring.

6        Q.   So when you say he, tell me who he is.

7        A.   Kirk Bloodsworth.

8        Q.   Kirk Bloodsworth.  And you're saying he was the

9   first person released from prison through the use of DNA

10  evidence as you understand it?

11       A.   From death row.

12       Q.   The first person released from death row?

13       A.   Correct.

14       Q.   And so -- I didn't mean to inter-- interrupt

15  you.  Go ahead.  So Kirk has now become a jeweler, is that

16  right?

17       A.   Correct.

18       Q.   And so did -- did he send you that ring?

19       A.   Yes, he did.

20       Q.   And does -- do all of the rings look the same?

21       A.   The only difference is death row exoneree or

22  exoneree.

23       Q.   Got it.  Okay.  And was Mr. Bloodsworth declared

24  innocent by a court?

25       A.   I don't know what his final outcome was.

**Roger Dean Gillispie - November 5, 2018**

163

1      Q.   Okay.  What impact, if any, did DNA evidence
2  have on your case?
3      A.   The DN-- the -- the evidence ended up being
4  missing.
5      Q.   I'm sorry?  I --
6      A.   The evidence was missing.
7      Q.   No, no.  That wasn't my question.  My question
8  is what impact, if any, did DNA have on your case?
9      A.   None.
10     Q.   That's what I thought.  Okay.  Okay.  You had
11 testified that once your house sold, you used some of the
12 proceeds to pay for your defense costs but I didn't hear
13 how much that was.  Do you know?
14     A.   When my house sold, I gave the money to my
15 parents to do with what they felt was right.
16     Q.   Okay.  So how much money did you give your
17 parents?
18     A.   I bought the house for 42.  I sold the house for
19 54.
20     Q.   Was there a mortgage against it?
21     A.   Yeah.
22     Q.   How much was the mortgage?
23     A.   Don't recall.
24     Q.   How much was the net?
25     A.   Approximately ten grand.

**Roger Dean Gillispie - November 5, 2018**

164

1      Q.   Okay.  And that approximate $10,000, you gave to

2  your parents to do what they thought -- what they wanted

3  to?

4      A.   Correct.

5      Q.   Okay.  Do you know what the kotal-- total cost

6  of your criminal defense was?

7      A.   No.

8      Q.   How many houses did you flip before you went to

9  jail?

10      A.   Me personally?

11      Q.   Yeah.

12      A.   The one I bought when I was 21 and the one I

13  sold when I was locked up.  Me --

14      Q.   That's --

15      A.   -- personally.

16      Q.   That's the one that you just --

17      A.   Correct.

18      Q.   -- told me about where you -- where you netted

19  approximately $10,000?

20      A.   Correct.

21      Q.   All right.  That's the only house that you

22  flipped?

23      A.   No.

24      Q.   I thought you just told me that you personally

25  flipped that house and that was the only house you

Roger Dean Gillispie - November 5, 2018

165

1  flipped.

2       A.   I bought a house when I was 21 years old.

3       Q.   Yes, sir.

4       A.   Fixed it.  Sold it.

5       Q.   When?

6       A.   I was 21.  So -- what year would that be?

7       Q.   No, I mean did you fix it and sell it in the

8  same year.

9       A.   No.

10      Q.   So --

11      A.   It was about a year and a half.

12      Q.   Okay.

13      A.   From the purchase.

14      Q.   And how much money did you make on that

15 transaction?

16      A.   About approximately $10,000.

17      Q.   Okay.  And what did you do with that money?

18      A.   Started seeking out another house.

19      Q.   And did you buy another -- a second house?

20      A.   That's correct.

21      Q.   And did you fix that up and flip it?

22      A.   Correct.

23      Q.   And how much did you make off that sale of the

24 second house?

25      A.   $10,000 approximately.

**Roger Dean Gillispie - November 5, 2018**

166

1      Q.   So did you get your first 10,000 back or did you

2  now have 20,000 that you had netted, ten from each house?

3      A.   Approximately 20,000.

4      Q.   Okay.  And what'd you do with that?

5      A.   With?

6      Q.   The 20.

7      A.   Well, between the first ten that I got and into

8  the next, it was -- I didn't put the 20 -- the 10,000 into

9  the house total from what I had.  It was spent --

10      Q.   Okay.

11      A.   -- living.

12      Q.   Because you were -- you were actually earning a

13  living, at least in part, flipping houses?

14      A.   It was a hobby.

15      Q.   I see.  So were you making about 10,000 a year

16  doing that?

17      A.   No.

18      Q.   How much --

19      A.   Not a year.

20      Q.   -- would you make in a year?

21      A.   Flipping houses?

22      Q.   Yeah.

23      A.   I flipped two houses.  Took a year and a half

24  approximately to flip the house so, no, it was not a

25  annual --

Roger Dean Gillispie - November 5, 2018

1     Q.   So you're --

2     A.   -- income.

3     Q.   So it -- so it would have taken you

4  approximately three years to flip two houses?

5     A.   Will say yes.

6     Q.   And you made about 10,000 on each flip?

7     A.   Correct.

8     Q.   Okay.  Now in addition to that, were you also

9  working at GM at that point?

10    A.   Correct.

11    Q.   Okay, all right.  How much were you making at

12 GM?

13    A.   When I started, I was making 14.50 an hour,

14 1984.

15    Q.   And how about when you left?

16    A.   When I left, they had cut us to $7.50.

17    Q.   'Cause GM was having some financial problems?

18    A.   They were going through changes.  I don't know

19 what their status was.

20    Q.   Okay.  Did you have any other source of income

21 apart from the job that you had at GM and however much you

22 earned from flipping houses up until the time of your

23 conviction?

24    A.   I was doing remodeling for real estate companies

25 in town.

**Roger Dean Gillispie - November 5, 2018**

168

1    Q.    Okay.  And how much were you earning doing that?

2    A.    It was just odd jobs.

3    Q.    So if -- if somebody needed you and you were

4    available, you'd pick up the work?

5    A.    Correct.

6    Q.    So on average, what would you say you earned

7    doing that per year?

8    A.    A couple thousand dollars a year.

9    Q.    Have we now talked about all of the sources of

10   your income during the period of time leading up to your

11   arrest and incarceration?

12   A.    No.

13   Q.    Okay.  What else?

14   A.    Union carpenter apprentice.

15   Q.    And when -- during what year were -- year or

16   years were you a union carpenter apprentice?

17   A.    After I left General Motors.

18   Q.    Okay.  When -- let -- I guess I ought to be a

19   little bit more -- organized.  In what year did you leave

20   General Motors?

21   A.    I don't recall what year it was.

22   Q.    Okay.  Well, how long had you been gone from

23   General Motors before you got arrested?

24   A.    Maybe three months.  Four months.

25   Q.    And was that when you were a carpenter's

**Roger Dean Gillispie - November 5, 2018**

169

1  apprentice?

2      A.    Correct.

3      Q.    And how much did you earn doing that?

4      A.    They start you at 7.50.  You get a quarterly --

5  or a -- a -- every six months, you got a 50-cent raise.

6      Q.    Okay.  But you weren't there for six months?

7      A.    No.

8      Q.    Okay.  All right.  Did Mr. Wolfe have anything

9  to do with your leaving General Motors that you're aware

10  of?

11      A.    The day I left, no, I'm not aware of any.

12      Q.    Okay.  Were you terminated or did you resign?

13      A.    The situation at hand was I was the low man on

14  the totem pole.  A two-hour overtime occurred every day

15  during the deconstruction of a building.  So I was the guy

16  who was assigned to that.

17            The job was a two-hour gig, 3:00 to 5:00 after

18  your shift.  Most of the other guys didn't want it because

19  it was two hours.  They wanted four.

20            So six, eight weeks of this deconstruction,

21  every day, I am on the job down there when they're dis--

22  dismantling the building.

23            I had my work from my rehab jobs.  I had my

24  checks from GM, couldn't cash, because this was before the

25  banks did computer stuff.

**Roger Dean Gillispie - November 5, 2018**

170

1          Told the guys we need to quit a little early

2     today.  They said that's great.  And we quit.  When I came

3     back to work they said who do you think you are shutting

4     the job down.

5          At that point, I didn't care who they thought I

6     was.  I handed my stuff and said I'm done and they said

7     you're fired.

8          Q.   So at least as far as GM told you it was

9     concerned, you were terminated because you had shut a job

10    down early without permission to do so?

11         A.   Correct.

12         Q.   I don't believe I have any further questions at

13    this time.  Thank you, sir.

14              MR. DETERS:  Mr. Gillispie, my name is Jon

15    Deters.  I represent Thomas Angel, John DiPietro and Steve

16    Gray. I do not have any questions right now but I may have

17    some at the very end.

18                   CROSS-EXAMINATION

19    BY MS. KEETON:

20         Q.   Sir, my name is Anne Keeton and I represent

21    Robert Miller.  I do have a few questions for you.  It's

22    my understanding you knew Robert Miller in a professional

23    capacity, is that correct?

24         A.   Correct.

25         Q.   Okay.  Did you know him in any other capacity or

Roger Dean Gillispie - November 5, 2018

171

1    have any other relationship with him?

2         A.    No.

3         Q.    Okay.

4              MR. OWENS:  I'm sorry, is my computer in the

5    screen, sir?

6              VIDEOGRAPHER:  A little bit.

7              MR. OWENS:  Sorry.

8    BY MS. KEETON:

9         Q.    How would you describe your professional

10   relationship with Mr. Miller?

11        A.    He was my supervisor.

12        Q.    Was it a positive supervisor/employee

13   relationship?

14        A.    I tried to keep it that way.  I was trying to

15   get employed.

16        Q.    Okay.  Did he keep it that way as well?

17        A.    Most of the time, yeah.

18        Q.    Okay.  Any times that you can think of where you

19   didn't feel like it was a good relationship?

20        A.    There could have been issues.  I -- I don't

21   recall any right offhand.

22        Q.    Okay.  Was there any -- to sort of echo

23   Mr. Raskin -- any ill will or bad blood that you're aware

24   of between you and Mr. Miller during your employment at

25   GM?

**Roger Dean Gillispie - November 5, 2018**

172

```
 1              MR. OWENS:  Objection to the form of the
 2    question.  Go ahead.
 3              THE WITNESS:  Ask the question again.
 4    BY MS. KEETON:
 5         Q.   Sure.  Was there any ill will or bad blood
 6    between you and Mr. Miller during your employment at GM of
 7    which you're aware?
 8         A.   Not that I was aware of at that time.
 9         Q.   Okay.  Did you file any employment grievances or
10    complaints involving Mr. Miller while you were employed
11    with GM?
12         A.   I didn't have that option.
13         Q.   Okay.  Did you want to pursue that option?
14         A.   It wasn't an option I had.
15         Q.   Okay.  Was there ever an occasion where you
16    wanted to pursue a complaint or grievance against
17    Mr. Miller?
18         A.   I don't recall any.
19         Q.   Okay.  And it's my understanding, in fact, when
20    he would provide you with reviews -- let me back up.  He
21    provided you with employment reviews, is that correct?
22         A.   I would assume he did.
23         Q.   Okay.  And when he did provide you with those
24    employment reviews, they were overall good reviews,
25    weren't they?
```

**Roger Dean Gillispie - November 5, 2018**

173

1      A.   I don't recall ever getting them.

2      Q.   Okay.  Were you ever made aware that you had

3  received poor performance evaluations?

4      A.   Neither way.

5      Q.   Okay.  Who was it at GM who actually fired you?

6      A.   Stapleton.

7      Q.   Okay.  Do you claim that Mr. Miller had any

8  involvement in your conviction?

9           MR. OWENS:  Objection.  Form.  Go ahead.

10          THE WITNESS:  I don't know.

11          MS. KEETON:  Do you have any knowledge,

12  information or evidence that Mr. Miller met with or spoke

13  with Miami Township police personnel?

14          MR. OWENS:  Objection.  Form.  Go ahead.

15          THE WITNESS:  I don't know.

16          MS. KEETON:  Well, you -- the question was do

17  you have any knowledge, information or evidence and your

18  response is I don't know, which would then be I don't know

19  if I have any knowledge, information or evidence or are

20  you saying no, I have no knowledge, information or

21  evidence?

22          THE WITNESS:  No --

23          MR. OWENS:  Objection.

24          THE WITNESS:  -- I have no knowledge.  Sorry.

25          MS. KEETON:  You're fine.

**Roger Dean Gillispie - November 5, 2018**

174

1           MR. OWENS:  Objection to the form of the

2    question.

3           MS. KEETON:  Do you have any knowledge,

4    information or evidence that Robert Miller had any

5    connection with the Miami Township police department?

6           MR. OWENS:  You mean his personal knowledge,

7    right?

8           MS. KEETON:  Right.  Does --

9           MR. OWENS:  Okay.

10          MS. KEETON:  -- he have any personal knowledge,

11    information or evidence?

12          THE WITNESS:  No.

13   BY MS. KEETON:

14       Q.   Okay.  I think I heard that you told Mr. Herman

15    that you had not filed a wrongful imprisonment claim with

16    the Court of Claims, is that correct?

17       A.   Correct.

18       Q.   Have you sought a wrongful imprisonment

19    determination from the Common Pleas Court?

20       A.   Not at this time.

21       Q.   Okay.  Are you familiar with what those things

22    are?

23       A.   I -- I believe I am.

24       Q.   Okay.  So are you familiar and aware then that

25    if you obtain a wrongful imprisonment determination from

**Roger Dean Gillispie - November 5, 2018**

175

1    the Common Pleas Court and you file a claim with the Court

2    of Claims, you are -- in fact, can be reimbursed and, in

3    part, I assume you would pass it on to your parents but

4    you could be reimbursed for your attorney's fees, and

5    expenses as well as receive some compensation for your

6    time of incarceration, were you aware of that?

7        A.   Compensation for my time incarcerated?

8        Q.   Yes, sir.

9        A.   There's no compensation for 20 years that's

10    lost.

11        Q.   Sir --

12        MR. OWENS:  Just answer the question.

13    BY MS. KEETON:

14        Q.   -- were you aware that you can file a claim with

15    the Court of Claims and receive some monetary compensation

16    for your time of incarceration?

17        A.   Yes.

18        Q.   Okay.  And you've chosen not to do that, is that

19    correct?

20        A.   Yes.

21        Q.   Okay.  Do you have any knowledge, information or

22    evidence that Mr. Miller entered into an agreement with

23    anyone either at Miami Township police department or with

24    anyone at GM in any way respecting your arrest or

25    conviction?

Roger Dean Gillispie - November 5, 2018

176

1              MR. OWENS:  Objection.  Form.

2              THE WITNESS:  No.

3              MS. KEETON:  Okay.  I don't have any other

4    questions.

5                        CROSS-EXAMINATION

6    BY MR. SCHULTZ:

7        Q.   Mr. Gillispie, my name's Matt Schultz.  I'm

8    representing Rick Wolfe.  I have a few questions for you

9    also.

10             You mentioned that you did not file a grievance

11   as part of your termination because that was not an

12   option, is that correct?

13       A.   Correct.

14       Q.   Okay.  Was that because of your status as a

15   non-permanent employee?

16       A.   Correct.

17       Q.   During your time as an employee of GM, did you

18   ever interact directly with Rick Wolfe?

19       A.   On occasion when he would come to the various

20   plants.

21       Q.   Explain to me what the average occasion like

22   that -- how would -- that would work?

23       A.   He was a person who was able to drive into the

24   plant so you would register their vehicle as someone

25   entering the plant.

**Roger Dean Gillispie - November 5, 2018**

177

1       Q.   And that was the extent of your interaction with
2    Mr. Wolfe during your employment?
3       A.   He was the head supervisor of everything.  I'm
4    sure we had general conversations about the day or
5    whatever.
6       Q.   Is there any particular incident that -- that
7    you recall?
8       A.   No.
9       Q.   Okay.  Do you have any personal knowledge that
10   leads you to believe that Mr. Wolfe was involved in
11   choosing the photos that were used in the photo array?
12      A.   No.
13      Q.   I apologize, I'm trying not to ask questions
14   that you've already answered.  I'd like to direct your
15   attention to your first amended complaint.  Does he still
16   have a copy of that in front him?
17           MR. OWENS:  He never had a copy.
18           THE WITNESS:  I never --
19           MR. SCHULTZ:  He never --
20           THE WITNESS:  -- had a copy.
21           MR. SCHULTZ:  -- had a copy?  Okay.  In that
22   case, I will read you the relevant portions.
23           MR. OWENS:  Would you like me to put a copy in
24   front of him?
25           MR. SCHULTZ:  If you've got one.  That might

**Roger Dean Gillispie - November 5, 2018**

1  make it easier on him.

2          MR. OWENS:  Where you at?

3          MR. SCHULTZ:  I'm at page 19, count one.

4          MR. OWENS:  One second.  I'm actually -- this is

5  -- that was the first time attempt and it failed.  Is your

6  copy clean?  It's not?

7          MR. HERMAN:  It's not.

8          MR. SCHULTZ:  I can just read it to him.

9          MR. OWENS:  Go ahead.

10          MR. SCHULTZ:  I can read -- okay.  So paragraph

11  77 of your first amended complaint, under count one,

12  suppression of exculpatory material, asserts that the

13  defendant officers, GM defendants, county defendants -- to

14  the -- defendants acting individually and in conspiracy

15  with each other, destroyed, failed to disclose or

16  otherwise withheld and/or suppressed exculpatory

17  information and material from the prosecution, and thus

18  from plaintiff.

19          Do you have any personal knowledge that

20  Mr. Wolfe did anything in furtherance of such a

21  conspiracy?

22          MR. OWENS:  Objection to the form of the

23  question.

24          THE WITNESS:  No.

25  BY MR. SCHULTZ:

**Roger Dean Gillispie - November 5, 2018**

179

1      Q.   Okay.  And David, I'm not sure if this helps but

2   I'm flipping forward to the next page.  And I'm looking at

3   page 20, paragraph 84, under count two, suggestive

4   identification.

5           It says Defendants Moore and Wilson, acting

6   individually and in conspiracy with each other, GM

7   defendants, used improper and suggestive procedures to

8   cause plaintiff to be misidentified as the perpetrator.

9           Do you have any personal knowledge about

10  anything that Mr. Wolfe might have done in affirm--

11  furtherance of that sort of conspiracy?

12      A.   No.

13      Q.   Okay.  Thank you.  Flipping to -- to page 21,

14  count three, fabricated evidence, specifically paragraph

15  91, which says Defendants Moore and Wolfe, acting in cos--

16  conspiracy with the remaining defendant officers and GM

17  defendants fabricated evidence, including without

18  limitation false police reports, fabricated statements

19  attributed to wit-- attributed to witnesses and their own

20  fabricated testimony offered at both trials.

21          Once again, do you have any personal knowledge

22  of anything Mr. Wolfe might have done in furtherance of

23  that conspiracy?

24      A.   No.

25      Q.   Thank you.  Then the next page under count

180

1 four -- I think it's supposed to read -- malicious

2 prosecution, paragraph 98 on page 22, says Defendants

3 Moore, Wilson, Angel, Scothorn, DiPietro, other identified

4 members of the Miami Township police department acting in

5 conspiracy with GM defendants Stapleton, Miller, D. Burke,

6 R. Brook-- R. Burke and other identified persons

7 instigated and continued the prosecution of plaintiff

8 without probable cause and acting out of bounds.

9          Again, do you have any personal knowledge of

10 anything Mr. Wolfe might have done in order to further

11 that prosecution?

12      A.   No.

13      Q.   Thank you.  I think as far as count five goes,

14 you already answered that question.  And six.  And eight.

15 Do you have any personal knowledge of when exactly

16 Mr. Wolfe worked for the Miami Township police department?

17      A.   No.

18      Q.   Okay.  Do you have any personal knowledge

19 regarding any personal relationships Mr. Wolfe may have

20 had with employees of the police department?

21      A.   Ask it again.

22      Q.   Do you have any personal knowledge regarding any

23 personal relationships that Mr. Wolfe may have had with

24 members of the police department?

25      A.   I don't know.

Roger Dean Gillispie - November 5, 2018

181

1      Q.   Okay.  Meaning you don't know if you do or

2   there's nothing that leaps to mind?

3      A.   Nothing that mo-- comes to mind.

4      Q.   Okay.  I'm going to represent to you that other

5   witnesses ha-- witnesses have testified that your title,

6   while an employee of GM, was supplemental security

7   officer.  Does that sound correct to you?

8      A.   I don't recall what the official title was.

9      Q.   Okay.  I don't think I have any more questions.

10  Thank you.

11                      CROSS-EXAMINATION

12  BY MR. KASSON:

13     Q.   Hi, I'm Pat Kasson.  I represent Mr. Wilson and

14  Mr. Scothorn.  Have you ever met either of those folks

15  before?

16     A.   Not to my knowledge.

17     Q.   As we sit here today, do you know who they are?

18     A.   No.

19     Q.   Okay.  Now, you -- you testified earlier that at

20  some point in time, you just got tired of receiving

21  information on your appeals and you just wanted it to

22  stop, is that right?

23     A.   Correct.

24     Q.   Was that after your second conviction?

25     A.   It was during my incarceration.

**Roger Dean Gillispie - November 5, 2018**

1    Q.   Okay.  So once you were incarcerated after you'd

2   been convicted a second time, is that right?

3    A.   Correct.

4    Q.   I imagine though initially you were engaged in

5   your defense, is that fair?

6         MR. OWENS:  Objection to form.

7         THE WITNESS:  Correct.

8         MR. KASSON:  You know, initially you were

9   looking at the evidence, you were considering it, you were

10  involved in your defense, fair?

11        MR. OWENS:  Objection to the form of the

12  question.  Go ahead.

13        THE WITNESS:  It was -- no, not really.

14        MR. KASSON:  Okay.  I mean I would imagine it

15  would be somewhat consuming in your life that you would be

16  wanting to see the evidence, wanting to see what was out

17  there against you?

18        MR. OWENS:  Objection.

19        MR. KASSON:  Is that -- is that not true?

20        MR. OWENS:  Objection to form.  Go ahead.

21        THE WITNESS:  I didn't really understand what

22  was happening to me at that time.

23  BY MR. KASSON:

24    Q.   You sat through both trials?

25    A.   Correct.

**Roger Dean Gillispie - November 5, 2018**

183

1        Q.    You paid attention to all the witnesses?

2        A.    Correct.

3        Q.    Did you testify?

4        A.    Yes.

5        Q.    Both times?

6        A.    Yes.

7        Q.    All right.  And then -- then quite a bit later,

8    this issue came up with these reports that hadn't been

9    over-- handed over to you that we've talked about today,

10   you understand that, right?

11       A.    Yes.

12       Q.    And you understand that those reports were

13   instrumental in -- in a habeas petition being granted?

14       A.    Correct.

15       Q.    And -- and those -- the issue of that -- of

16   the -- those reports came up quite a bit later after your

17   second conviction, fair?

18       A.    Absolutely.

19       Q.    And it -- it arose -- the issue of these

20   additional reports arose from a member of your defense

21   team, fair?

22            MR. OWENS:  Objection.  Form.  Go ahead.

23            THE WITNESS:  Yes.

24   BY MR. KASSON:

25       Q.    And the te-- testimony that these reports

184

1    existed came from someone who was on your defense team --

2         A.    Yes.

3         Q.    -- fair?  And the testimony came from a member

4    of your defense team years after your trial, right?

5         A.    Yes.

6         Q.    And it came years after your trial from someone

7    who was on your defense team during your trial, fair?

8         A.    Yes.

9         Q.    Okay.  Did you ever ask anybody on your defense

10   team, you know, why am I first hearing about these missing

11   reports after I've been in jail quite a while, why wasn't

12   this presented at my -- in my first trial?

13              MR. OWENS:  Objection to the form of the

14   question.  It's privileged.  I'm going to instruct you not

15   to answer.

16              MR. KASSON:  Let -- let me get this straight,

17   David.  I mean we're talking about a member of a defense

18   team testifying at -- in -- in a habeas petition and

19   frankly, in this case, and you're telling me I can't

20   inquire as to why that wa-- hadn't been brought up

21   earlier?

22              I mean we're talking about -- I mean the

23   accusation is, you know, he spent time in jail because

24   these reports were -- were not produced and you're telling

25   me I can't find out why the defense team didn't bring it

**Roger Dean Gillispie - November 5, 2018**

185

 1   up earlier?  I mean it goes straight to a credibility

 2   issue.

 3           MR. OWENS:  I think that the scope of the

 4   privilege waiver in a Brady situation like this is that

 5   you're asking him about his knowledge of -- of the

 6   allegedly withheld material like when he found out about

 7   it, about -- a question that he might have had with --

 8   amongst other defense attorneys about well, why didn't I

 9   find about this later or something like that that goes

10   beyond the knowledge of the Brady material unless I'm

11   missing something.

12           MR. KASSON:  I mean it goes straight to the

13   credibility of the person providing the Brady material.  I

14   mean I -- you're telling -- you're telling me

15   realistically there was a conversation between him and --

16   and one of these folks as to why this took so long to come

17   up and I can't get at that?

18           MR. OWENS:  Well, I -- I think that if -- well,

19   it depends who -- what you mean by one of those folks,

20   right?

21           So if -- if he had a conversation with me or

22   Mark Godsey about why didn't this -- how did this happen,

23   when did the -- what did you do -- what --

24   blah-blah-blah-blah, I think that that's absolutely

25   privileged.

1             MR. KASSON:  I -- I didn't --

2             MR. OWENS:  It's --

3             MR. KASSON:  I didn't mean to imply that.

4             MR. OWENS:  Okay.

5             MR. KASSON:  All right?  When I'm talking your

6    defense team, I'm talking about your original defense team

7    Dennis Lieberman, Fritz and those folks, okay?

8             MR. OWENS:  Right, but I also -- well -- so --

9    the specific question was did you ever have a

10   conversations-- conversation with essentially Lieberman or

11   Fritz about why this didn't come up earlier, is that

12   essentially the question?

13            MR. KASSON:  Yes.

14            MR. OWENS:  Right, so -- okay.  So that's the

15   question like why didn't you talk to these specific people

16   about whether or not they knew about this at that

17   particular time.  I think that's probably fine.

18            MR. KASSON:  Okay.

19            MR. OWENS:  But it was -- the -- the way it was

20   initia-- originally asked was I think a little bit

21   unclear.

22            MR. KASSON:  Right.  And -- and just so we're

23   clear, I'm not talking about -- when I talk about your

24   defense team, I don't mean -- once you got involved in the

25   Innocence Project.  I want to talk about Lieberman,

**Roger Dean Gillispie - November 5, 2018**

187

1   Hoffman and Fritz.

2          Did you ever bring up to those folks, you know,

3   hey, why did it take so long for one of my defense team

4   members, Fritz, to bring up this issue of these documents?

5          MR. OWENS:  Objection to the form of the

6   question.  Go ahead.

7          THE WITNESS:  I started getting real help when

8   the Innocence Project took my case in 2003.  And by that

9   time, I was pretty much done with knowing what their

10  individual battles were and what the arguments were going

11  to be, due to the extreme emotional toll it had on me, and

12  requested not to know.

13         MR. OWENS:  Could we take a break?  Sorry.

14         MR. KASSON:  Sure.

15         VIDEOGRAPHER:  This will be the end of media

16  unit number five.  The time is 15:26 hours.  We are now

17  off the record.

18         (A brief recess was taken.)

19         VIDEOGRAPHER:  This will be the beginning of

20  media unit number six.  The time is 3:34 p.m.  We are now

21  back on the record.

22  BY MR. KASSON:

23     Q.   You -- you certainly thought about the delay in

24  Fritz's testimony about clearing you as a suspect and

25  these reports, haven't you?

**Roger Dean Gillispie - November 5, 2018**

188

1       A.   No.

2       Q.   Did Fritz testify at either one of your cases

3   that he had cleared you as a suspect?

4            MR. OWENS:  Objection to the form of the

5   question.  What do you mean by either one of the cases?

6   BY MR. KASSON:

7       Q.   Did Fritz testify at either one of your trials

8   that he had cleared you as a suspect?

9       A.   I don't know.

10      Q.   Knowing now that Fritz claims he had cleared you

11  as a suspect, have you thought about why -- why that

12  didn't occur?

13      A.   No.

14      Q.   Did -- did Fritz testify at either one of your

15  trials that there was this document out there documenting

16  that you'd been cleared as a suspect?

17      A.   No.

18      Q.   Have you thought about why Fritz hadn't done

19  that at those first two trials and you had to wait all

20  that time for -- for him to -- to speak on that issue?

21           MR. OWENS:  Objection.  Asked and answered.  Go

22  ahead.

23           THE WITNESS:  No.

24           MR. KASSON:  I mean are you critical of your

25  initial defense team that this testimony from Fritz was

**Roger Dean Gillispie - November 5, 2018**

189

1   not presented at your first trial?

2            MR. OWENS:  Objection.  Form.  Argumentative.

3   Go ahead.

4            THE WITNESS:  No.

5            MR. KASSON:  Are you aware of any reason why

6   Fritz could not have testified at your first trial that

7   he, while a police officer, cleared you as a suspect?

8            MR. OWENS:  Objection.  Foundation.  Go ahead.

9            THE WITNESS:  No.

10           MR. KASSON:  Do you know any reason why Fritz

11  could not have testified at your first trial that he, as

12  an officer, knew of a memo documenting that you had been

13  cleared as a suspect?

14           MR. OWENS:  Same objection.

15           THE WITNESS:  No.

16           MR. KASSON:  Do you have any -- any explanation

17  for the delay in Fritz coming forward with this -- this

18  testimony about this document showing that you'd been

19  cleared as a suspect?

20           MR. OWENS:  Same objections.

21           THE WITNESS:  No.

22           MR. KASSON:  Knowing what you knew about your

23  defense at the time, is it -- there a -- can you even

24  think of a reason why Fritz would have delayed and not

25  testified about what he knew at your first trial?

Roger Dean Gillispie - November 5, 2018

190

1          MR. OWENS:  Objection.  Asked and answered.
2    This is harassment at this point.
3          MR. KASSON:  You can answer.
4          MR. OWENS:  Answer.
5          THE WITNESS:  No.
6          MR. KASSON:  Okay.  Certainly at your first
7    trial, every argument you were aware of at that time was
8    made to the jury, correct?
9          MR. OWENS:  Objection to the form of the
10   question and the foundation.
11   BY MR. KASSON:
12       Q.   You can answer.
13       A.   Ask it again.
14       Q.   Sure.  From your perspective and what you knew
15   of your defense, every argument in your favor that you
16   were aware of at the first trial was made to that jury?
17       A.   To the best of my knowledge.
18       Q.   And at the second trial, every argument you were
19   aware of was made to that jury, correct?
20       A.   To the best of my knowledge.
21       Q.   Okay.  Your Social Security disability
22   complaint, was there any part of that that was a
23   psychological component?
24       A.   No.
25       Q.   Talking -- on the application, your Social

**Roger Dean Gillispie - November 5, 2018**

191

1  Security disability application.  To your knowledge, it
2  was just based solely on your back?
3      A.   Correct.
4      Q.   All right.  During the investigation, do you
5  ever recall speaking to Mr. Wilson?
6      A.   No.
7      Q.   Do you recall speaking to Mr. Scothorn during
8  the investigation?
9      A.   No.
10     Q.   Do you recall anybody ever mentioning their
11 names?
12     A.   Don't recall.
13     Q.   Do you have any understanding as to what claims
14 you're bringing against Mr. Wilson?
15          MR. OWENS:  Objection.  Form.  Calls -- calls
16 for privilege.  I'm going to instruct you not to answer.
17 BY MR. KASSON:
18     Q.   Okay.  Are you aware of any facts that suggest
19 to you that Mr. Wilson had done something which resulted
20 in your incarceration?
21     A.   No.
22     Q.   Are you aware of any facts which suggest that
23 Mr. Scothorn had done something which contributed or
24 resulted in your incarceration?
25     A.   No.

**Roger Dean Gillispie - November 5, 2018**

192

```
 1        Q.   Do you know whether Mr. Wilson was involved in
 2   your photo -- in the photo spread, either one?
 3        A.   No.
 4        Q.   Do you know whether Mr. Scothorn was invi--
 5   involved in either photo spread?
 6        A.   No.
 7        Q.   Do you know whether Mr. Wilson participated in
 8   any type of conspiracy relating to you?
 9             MR. OWENS:  Objection.
10             THE WITNESS:  No.
11             MR. OWENS:  Form.  Go ahead.
12             THE WITNESS:  No.
13   BY MR. KASSON:
14        Q.   Do you know whether Mr. Scothorn participated in
15   any type of conspiracy related to you?
16        A.   No.
17        Q.   Do you know whether Mr. Wilson removed any type
18   of reports from the file -- police file?
19        A.   No.
20        Q.   Do you know whether Mr. Scothorn removed any
21   type of reports from the police file?
22        A.   No.
23        Q.   I -- I -- I got to come back to this.  Did you
24   know that the -- the payment for the tort recovery fund's
25   in excess of $50,000 a year?
```

**Roger Dean Gillispie - November 5, 2018**

193

1        A.    I don't know what that is.

2        Q.    Okay.  Did you know that you had an avenue to

3   pursue through the Common Pleas Court and Court of Claims

4   for additional out of pocket costs, you -- you would be

5   able to recover for yourself in excess of $50,000 a year

6   spent -- spent in jail?

7        A.    Yes.

8        Q.    I'm trying to understand why didn't you pursue

9   that?

10            MR. OWENS:  Objection to the form of the

11   question.  I'm going to ask him not to answer on the basis

12   of attorney/client privilege.

13            If there's a reason that you can identify that

14   doesn't involve communications with your attorneys, you

15   can, of course, answer.

16   BY MR. KASSON:

17        Q.    I'll ask -- I'll reask the question.  Is there

18   any reason that you didn't pursue it other than advice of

19   counsel?

20        A.    No.

21        Q.    That's all I have for you.  Thank you.

22            MR. HERMAN:  I don't have any follow-up

23   questions.

24            MR. RASKIN:  I don't either.

25            MR. DETERS:  I don't have any.

**Roger Dean Gillispie - November 5, 2018**

194

1          MS. KEETON:  No further questions.

2          MR. SCHULTZ:  Nothing.

3                    DIRECT EXAMINATION

4  BY MR. OWENS:

5     Q.   I think I have three questions.  Mr. Gillispie,

6  did you have any conversations with Fritz about -- have

7  you ever -- exc-- or strike that.

8          Have you ever had any conversations with

9  Mr. Lieberman about whether or not he received the entire

10  file from the Miami Township police department?

11     A.   No.

12     Q.   Have you ever had any conversations with

13  Mr. Bailey about the work he did on the investigation of

14  the Best Products rapes?

15     A.   No.

16     Q.   Have you ever had any conversations with

17  Mr. Fritz about the work he did on the Best Products rapes

18  case?

19     A.   No.

20     Q.   Have you ever had any conversation about

21  Mr. Fritz's work as it concerns eliminating you as a

22  suspect as he testified?

23     A.   No.

24     Q.   I think that was four but --

25          MR. KASSON:  I have a couple follow-up if I

**Roger Dean Gillispie - November 5, 2018**

195

1    could.

2              MR. OWENS:  Sure.

3                      RECROSS-EXAMINATION

4    BY MR. KASSON:

5         Q.   Did you have conversations with Mr. Lieberman

6    about facts he was aware of and could present to the jury

7    that would tend to show that you were innocent?

8         A.   No.

9         Q.   Okay.  You never had any conversation with

10   Mr. Lieberman about hey, we're going to present the case

11   to the jury this way and argue this type of stuff,

12   correct?

13        A.   Probably something.

14        Q.   Sure.  I mean you -- you talked to him about

15   potential alibis, right?

16        A.   Yes.

17             MR. OWENS:  Objection to the --

18             MR. KASSON:  Is that correct?

19             MR. OWENS:  So --

20             MR. KASSON:  You opened up the door.

21             MR. OWENS:  I don't think I --

22             MR. KASSON:  If you -- if you asked him did he

23   have a conversation about A, I can certainly show that

24   there were ten conversations about that topic and it

25   didn't come up.  You -- you can't walk that line.

**Roger Dean Gillispie - November 5, 2018**

1          MR. OWENS:  I think the only line that I was

2    walking was -- was the one about the -- about the

3    exculpatory files.  Like that's it.  That's the entire

4    scope.  If I asked something broader than that about

5    Mr. Lieberman like -- let's look at --

6          MR. KASSON:  We don't have that waiver in Ohio

7    like that, first of all.  Second, and -- and I mean I

8    think you understand where I'm going with this.

9          You don't -- you don't get -- and if you

10   instruct him to answer that's fine 'cause we're going to

11   be back here a-- answering these same questions.

12         MR. OWENS:  Okay.  I don't like the threat so

13   put that away.  Let's just resolve this.  So I -- I --

14   I -- what I asked was a specific question that I actually

15   just thought was unclear from a question that I -- I

16   thought that you asked earlier that was just more vague.

17   So I -- it was actually just a more pointed version of the

18   question that you already asked.

19         So I don't think that there's any basis for

20   arguing that we've like put all of the communications he

21   had with his criminal defense attorneys about any facts in

22   the case at issue because that's I think what you're

23   saying or am I wrong?

24         MR. KASSON:  What I'm saying is you asked him

25   whether he had any conversations with Dennis about this

1    issue with Fritz, about this exculpatory evidence.

2            And that opens up the door to me asking him

3    whether he talked to Dennis about exculpatory evidence

4    generally, and by implication, if Fritz wasn't mentioned,

5    then -- then it's significant.  I don't understand how it

6    could possibly be an issue.  I mean --

7            MR. RASKIN:  There's no limited waiver in Ohio.

8    It's either you waive it or you don't.  And by virtue

9    of -- my position, quite frankly, is by virtue of the

10   affidavit that Mr. Lieberman signed in the post conviction

11   proceedings, there was already a waiver.

12           MR. OWENS:  Okay.

13           MR. RASKIN:  But -- but even apart from that,

14   the questions that you asked about Mr. Fritz and about

15   Mr. Bailey and -- and the plaintiff's conversations with

16   Mr. Lieberman about those two subjects also constitute yet

17   another waiver.

18           MR. OWENS:  Well, so the first is that we're in

19   federal court, not in Ohio.  It's like state law.  So the

20   question about whether or not a privilege applies in this

21   proceeding is con-- controlled by federal law.

22           MR. RASKIN:  No, it isn't.

23           MR. OWENS:  There are four pieces.

24           MR. RASKIN:  You are -- that is absolutely

25   100 percent incorrect.

**Roger Dean Gillispie - November 5, 2018**

198

1          MR. OWENS:  Okay.  I mean that's --

2          MR. RASKIN:  I mean it's -- because there is no

3     attorney/client privilege in federal law.  It's in state

4     law.  And so this federal law applies to the law of the

5     forum as to state law issues.

6          MR. OWENS:  I mean I -- I -- I really don't

7     think that like it's worth going down the road of

8     litigating this.  I -- I've -- I mean I've litigated it in

9     three different states --

10          MR. RASKIN:  Well --

11          MR. OWENS:  -- so and applied feder--

12          MR. RASKIN:  And --

13          MR. OWENS:  -- and applied federal law, right,

14     so there's a --

15          MR. RASKIN:  We'll just --

16          MR. OWENS:  -- so -- so --

17          MR. RASKIN:  So we'll take a run at it here.

18          MR. OWENS:  That's fine but it seems rather

19     unnecessary.  If you want to ask a specific question about

20     the facts that relate to the Brady material, great.  I --

21     I'm not trying to stop you from doing that at all.

22          But if you want to have a conversation about all

23     of the other facts in the case, then I think that there's

24     an issue there.

25          MR. KASSON:  Yeah, well, I'm going to ask my

Roger Dean Gillispie - November 5, 2018

199

1    questions and you can just instruct him not to answer if

2    you want.

3              MR. OWENS:  Sure.

4              MR. KASSON:  All right.  You had general

5    conversations with Mr. Lieberman about how he was going to

6    defend the case, correct?

7              MR. OWENS:  Objection to the question on the

8    basis of privilege.  I going to instruct you not to

9    answer.

10             MR. KASSON:  You had general conversations with

11   Mr. Lieberman about facts that he thought might be

12   exculpatory to you that you could present to the jury,

13   correct?

14             MR. OWENS:  You can answer.

15             THE WITNESS:  Ask the question again.

16   BY MR. KASSON:

17        Q.   You had general conversations with Mr. Lieberman

18   about facts that he thought would -- could persuade a jury

19   you were innocent, fair?

20        A.   Yes.

21        Q.   And in those conversations, Mr. Lieberman never

22   brought anything up about putting Mr. Fritz on the stand

23   to talk about his decision to previously clear you of the

24   crime, fair?

25        A.   No.

**Roger Dean Gillispie - November 5, 2018**

200

1      Q.   Okay, it's not fair that Mr. Lieberman did?

2      A.   He did not.

3      Q.   Okay.  Let me ask it again so the record's

4   clear.  In the general conversations you had with

5   Mr. Lieberman about stuff you would present to the jury to

6   show your innocence, did he ever indicate that he would

7   put Mr. Fritz on so Mr. Fritz could testify that he had

8   previously cleared you as a suspect?

9      A.   No.

10      Q.   Okay.  You had conversations with Fritz about

11   stuff he had investigated as part of the defense, correct?

12      A.   Yes.

13      Q.   And in those conversations, did Fritz ever

14   mention that hey, I personally have cleared you previously

15   when I was a police officer?

16      A.   No.

17      Q.   Okay.  And in those conversations with Fritz,

18   did he ever say and in fact, I know there's a document out

19   there showing that you were cleared as a suspect.  Did he

20   ever say that?

21      A.   No.

22      Q.   Okay.  Can you -- you had conversations with

23   Bailey, is that right?

24      A.   What?

25      Q.   I'm sorry, strike that.  I've had to do that --

201

1    I apologize.  The long and short of it is nobody brought

2    up anything about Fritz knowing or clearing you until well

3    after you were convicted the second time, fair?

4         A.    Fair.

5         Q.    All right.  That's all I have.

6              MR. OWENS:  All right, we'll reserve our

7    signature.

8              MR. RASKIN:  Thank you.

9              VIDEOGRAPHER:  Stand by.  All right, the date is

10   November 5th, 2018.  The time is 3:50 p.m.  This will

11   conclude the deposition of Mr. Roger Gillispie.  We are

12   now off the record.

13                              - - -

14                         _____
                            ROGER DEAN GILLISPIE
15   (mew)

16

17

18

19

20

21

22

23

24

25

202

```
 1  STATE OF OHIO           :

 2                          : ss      C-E-R-T-I-F-I-C-A-T-E

 3  COUNTY OF GREENE        :

 4          I, Mary E. Wright, a Registered Professional

 5  Reporter and Notary Public in and for the State of Ohio at

 6  Large, duly commissioned and qualified;

 7          DO HEREBY CERTIFY that the above named ROGER

 8  DEAN GILLISPIE, was by me first sworn to testify to the

 9  truth, the whole truth, and nothing but the truth; that

10  his testimony was recorded by me in stenotype and

11  thereafter reduced to typewriting; and was taken at the

12  time and place hereinabove set forth, by agreement of

13  counsel as stated.

14          I FURTHER CERTIFY that I am not a relative or

15  attorney of either party, nor in any manner interested in

16  the event of the action.

17          IN WITNESS WHEREOF I have hereunto set my hand

18  and affixed my seal of office on the 16th day of November,

19  2018.

20                              Mary E. Wright

21                              _____
                                MARY E. WRIGHT, RPR
22                              NOTARY PUBLIC, STATE OF OHIO
                                My Commission Expires 03-02-21.
23                              - - -

24

25
```

Roger Dean Gillispie v.
Miami Township, Ohio, et al.

Roger Dean Gillispie
November 5, 2018

## $

**$10,000 (5)**
158:4;164:1,19;
165:16,25
**$100 (1)**
108:14
**$50,000 (2)**
192:25;193:5
**$500 (2)**
109:24;110:1
**$7.50 (1)**
167:16

## A

**a- (3)**
16:18;109:19;
196:11
**ab- (1)**
156:15
**abduction (1)**
143:9
**ability (1)**
8:11
**able (12)**
91:11;92:19,22;
94:22;95:20;105:15;
158:12,14,16,23;
176:23;193:5
**above (13)**
39:23,24,24;40:17,
25;41:23;42:3,13;
43:4;44:23;49:5;
88:21;123:6
**absolutely (5)**
20:12;161:17;
183:18;185:24;
197:24
**accept (2)**
97:21;148:17
**According (4)**
143:7,13,21;144:6
**Accrocco (2)**
90:19;91:2
**A-C-C-R-O-C-C-O (1)**
90:22
**accurate (1)**
85:5
**accusation (1)**
184:23
**accused (2)**
101:4,7
**acknowledge (1)**
85:10
**acoustic (1)**
88:19
**acquaintances (3)**
145:24;159:22,23
**acting (6)**
81:2;178:14;179:5,
15;180:4,8

**action (2)**
5:8;97:5
**actually (14)**
24:8,9;106:12;
114:8;127:5;128:7;
129:1;133:24;150:18;
166:12;173:5;178:4;
196:14,17
**addition (4)**
137:6;150:13;
151:3;167:8
**additional (2)**
183:20;193:4
**address (6)**
8:15;9:10,14;29:6;
54:16;85:24
**adjourn (2)**
131:21;132:11
**administer (2)**
70:4;71:4
**Administration (1)**
157:17
**adult (1)**
13:6
**adults (1)**
12:13
**advice (2)**
132:17;193:18
**af- (1)**
67:11
**affect (1)**
48:24
**affected (7)**
16:16;19:25;23:4,
24;24:2,5,5
**affidavit (12)**
63:6;66:14;67:12,
14,17,20;104:24,25;
105:19;142:1,20;
197:10
**affidavits (1)**
106:10
**affiliation (1)**
4:13
**affirm- (1)**
179:10
**affirmatively (1)**
23:17
**afternoon (1)**
111:21
**again (28)**
5:12;12:6;18:24;
19:1;22:9,17;64:9;
73:19;110:2;119:8;
123:9;125:12;127:25;
129:7,19;131:20;
132:14;133:13;137:8;
138:2;142:18;172:3;
179:21;180:9,21;
190:13;199:15;200:3
**against (14)**
15:11;16:8;20:2;
31:25;70:1;71:9;75:7;

**82:10;136:7;144:8;**
**163:20;172:16;**
**182:17;191:14**
**age (6)**
5:21;95:25;96:5,14;
98:9;110:17
**aggravated (1)**
143:9
**ago (8)**
11:9;12:23;24:4;
66:20,20;67:2;91:23;
130:11
**agree (3)**
64:21;106:12,12
**agreement (2)**
109:19;175:22
**ahead (62)**
13:13;15:16;16:10;
18:1,19;19:11;20:4;
22:2,7,8,25;24:9;
33:14;44:16;45:2,15;
46:9,18;48:11;50:8;
54:5;58:6;59:1;67:22;
68:21;69:3;71:23;
80:17;83:2;84:1;
99:18;100:20;101:19;
107:15;119:20;
120:16;124:5,17;
125:6;126:11;127:11;
128:9;131:18;134:25;
142:15;144:4;146:4;
160:4;161:24;162:15;
172:2;173:9,14;
178:9;182:12,20;
183:22;187:6;188:22;
189:3,8;192:11
**al (1)**
4:5
**al- (1)**
156:2
**alibis (1)**
195:15
**alive (5)**
9:1;97:3,6;159:14,
19
**allegation (3)**
75:6;79:20;129:14
**allegations (1)**
140:15
**allege (7)**
70:3;71:8;72:15;
73:6,20;74:14;79:13
**alleged (6)**
62:15;73:2,25;
76:17;77:19;80:24
**allegedly (10)**
82:1,7;102:18;
103:4,7;106:22;
107:1,8,12;185:6
**alleging (1)**
79:23
**Allen (2)**
9:5,6

**allowed (1)**
64:6
**allowing (1)**
62:16
**alluding (1)**
107:6
**almost (3)**
9:18;124:14;125:3
**alone (3)**
83:1;116:6;144:1
**along (2)**
105:7;116:6
**although (3)**
7:2,12,13
**always (4)**
17:7;126:22;
148:25;156:3
**amended (12)**
71:7;73:13,18;74:1,
10;81:3,12;94:9,18;
102:20;177:15;
178:11
**America (1)**
162:3
**amongst (4)**
6:11;47:10;122:1;
185:8
**amount (12)**
32:18;57:9,19;
97:21;102:12;108:11,
13;109:12,18,22;
158:1,15
**amounts (1)**
102:8
**analysis (1)**
137:20
**and/or (3)**
62:4;71:10;178:16
**Andrew (1)**
4:10
**Angel (4)**
4:19,20;170:15;
180:3
**animus (1)**
146:3
**Anne (2)**
4:23;170:20
**anniversary (1)**
49:1
**annual (2)**
48:25;166:25
**annually (1)**
158:3
**answered (8)**
48:10;53:2;54:1;
110:16;177:14;
180:14;188:21;190:1
**answer's (1)**
144:16
**anticipate (1)**
103:22
**anymore (1)**
92:15

**ap- (1)**
158:9
**apart (4)**
76:25;137:15;
167:21;197:13
**apartment (1)**
8:20
**apologize (2)**
149:21;177:13
**apologized (1)**
101:21
**appeal (1)**
103:13
**appealed (1)**
101:13
**appeals (7)**
65:15;102:6;
113:21,22;114:2;
115:1;181:21
**appear (1)**
17:13
**appearance (2)**
4:13;18:3
**appears (1)**
79:7
**application (4)**
29:17;157:18;
190:25;191:1
**applied (7)**
158:9;159:10,12;
160:16,20;198:11,13
**applies (2)**
197:20;198:4
**apply (4)**
29:16;157:14;
158:7;159:18
**appointment (3)**
24:22,24;25:7
**appointments (2)**
24:20;25:2
**appreciate (1)**
159:8
**apprentice (3)**
168:14,16;169:1
**approve (2)**
72:16;157:18
**approved (1)**
102:19
**approximate (3)**
116:4;147:16;164:1
**Approximately (17)**
91:23,24;135:16;
147:3;152:14;153:7,
25;154:6,15,17;
163:25;164:19;
165:16,25;166:3,24;
167:4
**area (4)**
14:1;15:23;58:1;
133:11
**areas (3)**
28:7;30:6;88:20
**arg- (1)**

Charlene Nicholas & Associates, LLC - (937) 836-7878
www.CharleneNicholasCourtReporting.com

Roger Dean Gillispie v.
Miami Township, Ohio, et al.

Roger Dean Gillispie
November 5, 2018

140:19

**argue (3)**
63:10;117:18;
195:11

**arguing (1)**
196:20

**argument (5)**
101:2,14;190:7,15,
18

**argumentative (5)**
22:24;83:15;
127:11;134:14;189:2

**arguments (3)**
49:9,11;187:10

**arose (2)**
183:19,20

**around (3)**
66:8;91:25;97:7

**array (9)**
78:9,13,16,21;79:3,
7;154:25;155:14;
177:11

**arrest (10)**
54:13,14,19;55:6,
24;56:2;135:18,23;
168:11;175:24

**arrested (6)**
55:17;135:21;
136:11,16;141:22;
168:23

**arresting (1)**
56:3

**arson (1)**
28:11

**as- (1)**
32:23

**Aside (2)**
94:15;96:3

**aspect (2)**
82:12,23

**assaulted (2)**
149:24;154:14

**assaults (3)**
53:8;150:6;154:10

**asserts (1)**
178:12

**assign (1)**
44:21

**assigned (15)**
29:3;44:2,6;50:6,
14;113:9;147:6;
150:9,12,21,24;151:3;
153:14,16;169:16

**assignment (3)**
113:6;151:23;
153:20

**assignments (2)**
35:21;154:21

**associated (2)**
65:11,13

**Associates (1)**
4:12

**Associate's (2)**

26:3,13

**assume (9)**
10:10;58:20;86:13;
121:4;148:23,23;
155:19;172:22;175:3

**assumed (3)**
54:6;125:17,22

**Assumes (3)**
59:16;68:4;70:12

**assuming (6)**
24:13;86:13,14;
142:10,17,20

**assumption (2)**
156:7,9

**attempt (2)**
117:16;178:5

**attempted (4)**
73:7,21;111:2;
160:14

**attempts (1)**
96:25

**attend (1)**
26:6

**attention (5)**
47:5;48:15,19;
177:15;183:1

**attorney (10)**
56:24;57:1;60:9;
61:12;63:5;65:20;
107:7;118:16;122:9,
14

**attorney/client (8)**
62:18;63:20;64:2;
74:3;102:23;140:5;
193:12;198:3

**attorney-psychotherapist (1)**
93:16

**attorneys (23)**
7:1,5;8:2;60:22;
63:4,25;64:6,15;
65:23;76:15;77:1,6;
94:5;100:15,20;
102:6;103:1,17,19;
140:25;185:8;193:14;
196:21

**attorney's (2)**
61:1;175:4

**attributed (2)**
179:19,19

**audience (1)**
110:3

**August (15)**
31:5,6;53:8,8;
124:1;125:11,14,20;
126:3,4;128:4,4,14,
14;129:11

**authored (4)**
102:18;143:17,24;
144:9

**auto (1)**
27:15

**available (1)**
168:4

**avenue (1)**
193:2

**average (2)**
168:6;176:21

**aware (46)**
34:20;50:4;58:22;
63:2;75:22;76:1;
77:17;79:5;114:24;
115:2;119:5,9,13;
126:1;129:3,8,13;
131:8;134:4,17;
137:7,16,17;138:12;
139:18;141:4,25;
142:5;155:23;156:2;
169:9,11;171:23;
172:7,8;173:2;
174:24;175:6,14;
189:5;190:7,16,19;
191:18,22;195:6

**away (5)**
99:23,24,24,25;
196:13

**awhile (1)**
40:18

**B**

**ba- (1)**
64:5

**baby (1)**
25:15

**back (58)**
14:20;18:21;21:10,
13,15;22:17;27:15;
28:8;32:3;37:1;43:21,
25;50:1;74:25;75:2;
80:19;84:22;85:3;
87:13;88:6,11,15,23;
89:3,8,10,14,15,18;
90:2,8,9;91:19,21;
92:7,15,21;93:6,6;
98:17;110:2;111:15;
118:9,11;132:22,24;
133:17;152:11;
154:16;157:5,12;
166:1;170:3;172:20;
187:21;191:2;192:23;
196:11

**background (4)**
78:8,12;79:2;155:2

**backgrounds (1)**
78:6

**bad (9)**
121:19;122:25;
123:12;135:23;146:2,
13;153:11;171:23;
172:5

**Bailey (24)**
50:5,11;62:4;64:22;
102:19;112:22,24;
113:5,9,16;114:12;
115:9;119:6,10,14;
120:2,9;121:1;

143:18,25;144:10;
194:13;197:15;
200:23

**banks (1)**
169:25

**Based (3)**
119:17;142:24;
191:2

**basis (10)**
14:19;74:2;81:17;
136:25;137:4,6;
140:5;193:11;196:19;
199:8

**battles (1)**
187:10

**Bear (1)**
133:4

**became (3)**
27:21;107:19;162:4

**become (4)**
115:2,16;160:19;
162:15

**began (3)**
58:24;68:19;143:8

**begin (1)**
143:15

**beginning (6)**
36:21;49:24;84:20;
111:13;152:9;187:19

**begins (2)**
93:9;99:1

**behalf (11)**
4:14;66:14;67:12;
73:10;107:14;128:21;
129:1,9;138:10;
139:19;142:2

**behind (1)**
133:17

**belief (4)**
81:17;83:5,21;
119:15

**belong (1)**
160:7

**benchmark (1)**
96:4

**benefit (2)**
34:16,21

**benefits (3)**
33:23;34:11;157:20

**besides (10)**
9:7;34:12;36:3;
38:15;52:22;55:13;
78:11;81:21;103:17;
110:9

**best (19)**
7:8;18:6;31:4;
116:12,17,18,19;
130:19;136:1,9;
148:8;150:2,4;
154:23;157:25;
190:17,20;194:14,17

**better (3)**
126:15;152:3;

153:10

**beyond (3)**
62:19;106:14;
185:10

**birth (1)**
6:15

**bit (12)**
86:18,20;124:18,
21,22;125:2,3;
168:19;171:6;183:7,
16;186:20

**biting (1)**
86:24

**black (1)**
88:21

**blah-blah-blah-blah (1)**
185:24

**blocks (1)**
88:20

**blood (5)**
121:19;122:25;
123:12;171:23;172:5

**Bloodsworth (4)**
162:3,7,8,23

**blue (1)**
78:6

**Bob (4)**
37:22,25;40:2,4

**bologna (1)**
86:6

**bond (6)**
135:17,20;136:12,
19,21;141:23

**Bonnie (2)**
137:21;143:9

**boots (1)**
39:19

**both (17)**
8:25;9:1;32:18;
43:24;45:23,24;46:4;
94:23;95:7;121:12;
131:9;134:18;135:5;
154:21;179:20;
182:24;183:5

**bother (2)**
48:18,22

**bottom (2)**
39:18;102:16

**bought (5)**
95:19,21;163:18;
164:12;165:2

**bounds (1)**
180:8

**Brady (7)**
62:13,15;63:24;
185:4,10,13;198:20

**brain (1)**
4:19

**brand (1)**
95:21

**bread (2)**
86:11,13

**break (7)**

Charlene Nicholas & Associates, LLC - (937) 836-7878
www.CharleneNicholasCourtReporting.com

7:25;20:9;49:19;
111:8;112:8,11;
187:13
**breath (1)**
159:15
**brief (6)**
49:23;84:19;140:7,
17;152:8;187:18
**bring (3)**
184:25;187:2,4
**bringing (1)**
191:14
**broader (3)**
106:1,14;196:4
**Brook- (1)**
180:6
**brother (7)**
10:16;14:24;15:22;
16:2,14;20:14;98:14
**brother- (1)**
25:6
**brotherhood (1)**
161:12
**brought (3)**
155:8;184:20;
199:22
**buddies (2)**
123:18;126:7
**building (4)**
95:13;153:5;
169:15,22
**built (4)**
151:13,14,14,16
**bunk (1)**
147:4
**bureau (2)**
113:6;156:3
**Burke (10)**
39:5,8,10;40:18,18,
19,23;43:4;180:5,6
**Burkes (1)**
41:17
**buy (2)**
95:20;165:19

**C**

**Ca- (1)**
28:2
**cabinetry (1)**
151:14
**calculate (1)**
68:11
**calculated (3)**
102:4,8,10
**call (13)**
17:1,1;39:19;47:18;
71:21;72:7;105:6;
132:14;142:21;
144:23;145:2,14,18
**called (8)**
32:24;51:4,6,13;
58:1;72:11;142:2;

155:4
**calls (3)**
76:11;191:15,15
**came (16)**
45:17;49:17;54:14,
19;55:5;85:3;129:23;
130:1;136:5;149:15;
170:2;183:8,16;
184:1,3,6
**camera (1)**
6:22
**camped (1)**
127:16
**campground (12)**
123:14,17;124:2;
126:5;127:4;128:6,
15;129:6,11;130:4,9,
12
**camping (11)**
123:14,18;124:1,
11,15;125:10,13,19;
126:4,7;127:17
**can (99)**
6:4,14,21;8:15,22;
9:9;10:4;13:14;14:3;
18:4,21,24,25;20:6;
25:13;29:13,24;30:9;
34:23;37:17;38:15;
39:16;41:2;43:3,22;
46:22;47:18;51:1;
57:1;61:8,18;65:18;
66:17;68:24;70:8;
71:20;72:19;74:8,22,
25;75:14,18,19;
77:24;78:24,25;79:9;
80:14;81:4;82:2,17;
83:9;86:5,15;88:10;
95:7;97:18;100:18;
103:10;106:20;108:7,
11;115:21;116:21;
117:7,11;119:18,22;
120:19,23,25;121:8;
131:15,17;136:9;
138:18;140:6,14;
141:21,21;148:8;
149:22;158:10;159:2,
10;171:18;175:2,14;
178:8,10;189:23;
190:3,12;193:13,15;
195:23;199:1,14;
200:22
**candidate (1)**
134:22
**capacities (1)**
32:14
**capacity (4)**
47:16,24;170:23,25
**care (7)**
24:21;77:5;89:15;
91:10;100:5;150:7;
170:5
**carpenter (2)**
168:14,16

**carpenter's (1)**
168:25
**carpentry (3)**
153:16,18,24
**carried (1)**
151:5
**carries (1)**
93:9
**Carrollton (1)**
133:5
**Case (88)**
4:6;13:20;15:10,11,
15;16:7,13;20:2,2;
21:4,17,17,18,22;
23:4,15,22,25;24:1,6;
31:4,7,8,10,16,21,25,
25;50:4,14,22;56:15,
24;57:3;58:5,18,19,
24;59:7,12;61:16,25;
62:5,9;64:18;65:8;
67:5,8;69:7,11;70:5;
71:5;72:12;74:21;
75:24;76:3;77:19;
79:15,23;80:3;81:6,
15;82:13,23;83:8;
84:7;87:14;94:18;
103:23;104:1;107:13,
21;108:24;119:25;
120:8;121:2;139:25;
140:2;163:2,8;
177:22;184:19;187:8;
194:18;195:10;
196:22;198:23;199:6
**case- (1)**
50:6
**cases (5)**
64:24;81:10;102:6;
188:2,5
**cash (1)**
169:24
**cause (10)**
81:2;105:16;
107:19;111:24;122:1;
128:1;167:17;179:8;
180:8;196:10
**cautioned (1)**
5:22
**Cave (3)**
53:21;54:3,6
**ceilings (2)**
88:19,21
**cell (7)**
88:20;147:4,6,9,14;
153:3,7
**certain (6)**
26:9;30:11;53:6;
65:16;124:7;128:23
**certainly (5)**
104:7;131:23;
187:23;190:6;195:23
**certificate (1)**
28:5
**certificates (1)**

27:20
**certified (2)**
28:6,7
**cetera (1)**
85:25
**chain (2)**
156:13;160:22
**change (2)**
106:25;153:4
**changes (1)**
167:18
**char- (1)**
64:23
**characterization (1)**
54:4
**charge (3)**
44:21;45:1;46:14
**charged (10)**
30:24;31:8;64:23;
112:16;113:1,11;
114:10;141:7,8,12
**charges (3)**
31:9;56:5;136:6
**Charlene (1)**
4:12
**Charles (1)**
4:7
**check (1)**
108:16
**checking (1)**
39:20
**checks (3)**
109:15,16;169:24
**chemical (1)**
41:24
**chest (1)**
78:15
**chief (2)**
145:7,9
**child (8)**
11:10,12,16,17;
13:3,4,6;96:8
**children (4)**
11:11;12:8,10,11
**cholesterol (1)**
8:10
**choosing (1)**
177:11
**chose (1)**
72:16
**chosen (1)**
175:18
**Chris (4)**
4:14;6:1;62:11;
122:14
**church (1)**
160:17
**churches (1)**
160:8
**Cincinnati (1)**
151:16
**circumstances (5)**
41:22;88:14;

114:15,21;115:9
**cite (1)**
140:16
**civil (4)**
15:11;20:2;24:1;
67:8
**claim (19)**
74:11;75:15;76:6,
24;77:12,15;80:9,16,
24;82:21;84:5,6;86:2,
5;140:14;173:7;
174:15;175:1,14
**claiming (7)**
22:22;23:1;63:18;
79:15;81:14;87:14;
89:8
**claims (10)**
15:19;62:13;82:10;
83:2;174:16;175:2,
15;188:10;191:13;
193:3
**clarification (1)**
73:12
**clarify (4)**
20:5,6;61:22;122:3
**Clark (1)**
4:10
**Class (1)**
25:25
**classes (1)**
28:3
**clean (1)**
178:6
**clear (11)**
6:4;7:17,20;27:10;
31:14;62:12,21;
63:17;186:23;199:23;
200:4
**cleared (10)**
188:3,8,10,16;
189:7,13,19;200:8,14,
19
**clearing (1)**
187:24
**clearly (1)**
105:14
**client (2)**
63:1,20
**close (6)**
48:18;105:6;118:7;
124:23;141:15;147:1
**closed (1)**
153:22
**closely (1)**
48:22
**clothing (1)**
137:21
**clubs (1)**
109:4
**clue (5)**
53:10;55:2;59:13;
71:6;84:8
**Cobb (5)**

Case: 3:13-cv-00416-TMR-SLO Doc #: 168 Filed: 02/11/19 Page: 207 of 225 PAGEID #: 3324

Roger Dean Gillispie v.                                                                    Roger Dean Gillispie
Miami Township, Ohio, et al.                                                                   November 5, 2018

139:20,22;140:16;
141:7,11
**Code (1)**
84:5
**collectively (2)**
119:7,11
**college (3)**
26:3,5,7
**color (4)**
78:8,11;79:2;155:1
**coming (3)**
22:17;69:14;189:17
**comm- (1)**
76:13
**command (1)**
156:13
**commit (1)**
99:13
**committed (2)**
124:3;144:8
**common (4)**
145:24;174:19;
175:1;193:3
**communicate (1)**
111:24
**communicated (3)**
77:1;94:7;119:14
**communication (1)**
15:7
**communications (11)**
16:24;45:25;59:21;
60:7;76:14;94:11,12;
141:2,3;193:14;
196:20
**Community (11)**
26:5,7;99:21,21;
151:5,10,11,12,17,19,
25
**companies (3)**
95:16;96:17;167:24
**company (6)**
96:7,15;97:1,13;
98:9,17
**compensation (4)**
175:5,7,9,15
**complained (1)**
155:1
**complaint (23)**
69:25;71:7;72:15,
21,23;73:2,6,13,15,
18;74:1,10;76:18;
81:3,12;84:9;94:9,18;
102:20;172:16;
177:15;178:11;
190:22
**complaints (2)**
93:6;172:10
**complete (3)**
26:17,21;138:13
**completely (3)**
20:15;99:10;132:1
**component (1)**
190:23

**compound (7)**
18:19;33:14;45:14;
50:19;55:19;69:3;
124:4
**comprising (1)**
139:3
**computer (2)**
169:25;171:4
**con- (2)**
68:16;197:21
**concerned (2)**
125:4;170:9
**concerning (5)**
64:18;81:13;93:17;
94:9;158:6
**concerns (1)**
194:21
**conclude (3)**
49:21;84:16;143:11
**concluded (1)**
134:22
**condition (2)**
25:10;157:11
**conduct (1)**
132:19
**confer (2)**
103:14;117:17
**confident (1)**
58:20
**confused (3)**
23:8;24:8,9
**confusing (1)**
102:22
**connection (5)**
74:20;82:12;83:7;
94:17;174:5
**Connie (2)**
137:21;143:9
**consider (3)**
19:14;117:20;153:9
**considering (1)**
182:9
**conspiracy (13)**
74:11,13,19;75:6;
178:14,21;179:6,11,
16,23;180:5;192:8,15
**constant (2)**
11:24;17:7
**constitute (1)**
197:16
**construction (6)**
96:6,15,25;97:13;
98:9,17
**consult (1)**
112:9
**consuming (1)**
182:15
**contact (13)**
11:3,6,25;12:20,21;
17:7;44:10,14;45:5,
12;66:18,21;144:25
**contacts (1)**
45:8

**contentious (1)**
49:12
**contents (1)**
139:16
**context (1)**
132:8
**continued (3)**
81:1,5;180:7
**continues (2)**
94:21;160:2
**continuing (1)**
89:8
**contrary (1)**
144:2
**contributed (1)**
191:23
**controlled (1)**
197:21
**conversation (22)**
49:13;51:8,12,25;
52:10;53:24;59:14;
61:14,24;70:8,13,15,
17;76:22;105:23;
185:15,21;186:10;
194:20;195:9,23;
198:22
**conversations (36)**
13:8;19:5,9;46:10;
52:12;54:11;55:23;
59:15,18,22;60:4,11;
61:5,7;62:2;65:19;
100:19;106:5;177:4;
194:6,8,12,16;195:5,
24;196:25;197:15;
199:5,10,17,21;200:4,
10,13,17,22
**conversations- (1)**
186:10
**convicted (10)**
106:3,3;136:12;
138:2;141:8,13;
155:21;160:2,7;182:2
**conviction (15)**
64:1;66:13;106:17,
17,24;107:20;128:20;
136:22,23;167:23;
173:8;175:25;181:24;
183:17;197:10
**convictions (2)**
108:5;159:24
**copy (8)**
128:19;138:13;
177:16,17,20,21,23;
178:6
**Correction (1)**
87:24
**Correctional (12)**
69:18,20,22;87:21;
88:7,17;146:19,22,23;
152:15,17;153:9
**cos- (1)**
179:15
**cost (1)**

164:5
**costs (4)**
102:4,7;163:12;
193:4
**Counsel (3)**
4:12;5:7;193:19
**counselors (1)**
93:12
**count (8)**
76:5;81:12;178:3,
11;179:3,14,25;
180:13
**county (10)**
55:21;59:25;85:22;
87:13,15,20;96:8;
135:12;136:17;
178:13
**couple (9)**
10:21;39:3;55:11;
123:20;130:11;148:3;
158:21;168:8;194:25
**course (2)**
144:7;193:15
**Court (29)**
4:6,11;5:17;6:18,
24;7:3;101:1,8,13,14,
16,20,23;112:14;
129:4,9;131:21;
140:13,15;161:11;
162:24;174:16,19;
175:1,1,15;193:3,3;
197:19
**courtesy (1)**
112:5
**courtroom (5)**
118:20,22,24,25;
119:1
**courts (2)**
102:1;108:20
**cover (3)**
73:7,21;85:19
**coverage (1)**
91:11
**covered (1)**
118:7
**covering (1)**
33:20
**cover-up (4)**
73:10,23;74:1,6
**CR (1)**
31:25
**create (1)**
76:8
**credibility (2)**
185:1,13
**credits (1)**
27:3
**Creek (1)**
133:4
**cri- (1)**
46:23
**crime (7)**
21:1;70:5;71:5;

101:4,6;137:19;
199:24
**crimes (11)**
50:7;99:11,13;
112:15;113:2,12;
114:10;128:3;141:8,
12;144:8
**criminal (78)**
13:20;15:10;20:2;
21:4;23:3,15,22,25;
30:25;31:3,7,10,21;
50:4,22;56:15,24;
57:3,11;58:5,18,24;
59:7,25;60:5;61:16;
62:5,8;63:3,5,24;64:6,
13,18,23;65:8;66:3;
67:5;69:7,11;71:9,15,
18,22;72:12;74:21;
76:3;79:15,23;80:3;
81:10,14;82:12,23;
83:7;94:18;102:6;
108:24;115:15,16;
116:2,7,22;118:16,21;
122:8,13;135:4,5,9,
24;136:3,7;138:8;
139:2;156:4;164:6;
196:21
**critical (7)**
46:16,20,23;47:1;
48:3;49:7;188:24
**CROSS-EXAMINATION (5)**
5:24;111:16;
170:18;176:5;181:11
**cubicle (1)**
153:8
**current (1)**
8:15
**currently (6)**
54:17;90:17;91:2;
93:5;108:3;110:12
**custody (1)**
156:14
**custom (2)**
76:1,17
**customs (4)**
75:17;76:8;77:10,
18
**cut (1)**
167:16

---

# D

**dad (2)**
98:3,3
**daily (2)**
149:17;152:25
**damages (5)**
86:2,5;93:17;94:22;
95:5
**dash (2)**
4:7,7
**date (8)**
6:14;30:22;49:1,1;

102:17,25;103:3,5

**dated (1)**
66:8
**dates (10)**
53:6,7,13,17,25;
57:8;91:5;124:8;
128:7;143:1
**dating (3)**
133:7,7,18
**daughter's (1)**
13:24
**David (6)**
5:6;39:5;103:21;
132:7;179:1;184:17
**day (11)**
18:6;148:12,13,15,
17;149:14,18;169:11,
14,21;177:4
**dayrooms (1)**
88:20
**days (3)**
14:22;68:18;130:11
**day's (1)**
97:24
**Dayton (18)**
4:9;14:1;15:23;
28:24;29:1,3,25;36:4,
7,9,11,18,19,24;
43:19,24;44:2,7
**dead (1)**
97:23
**Dean (12)**
4:3,4;5:4,7,20;6:6,
7,11,13;89:19,21;
91:14
**D-E-A-N (1)**
6:6
**death (4)**
162:3,11,12,21
**debate (1)**
64:10
**debilitating (1)**
92:18
**December (2)**
9:13;89:11
**decision (4)**
22:6,13;158:6;
199:23
**declared (2)**
112:15;162:23
**declined (1)**
160:14
**deconstruction (2)**
169:15,20
**defend (1)**
199:6
**Defendant (7)**
70:6;71:11;94:12,
13,15;178:13;179:16
**Defendants (17)**
5:3,8;16:9;20:3;
38:9,9;70:2;94:10;
178:13,13,14;179:5,7,

15,17;180:2,5
**defendant's (1)**
84:25
**defense (47)**
4:4;56:24;57:11;
63:3,5,25;64:6;102:5;
115:15,17;116:7,22;
117:5,22;118:16,22;
122:8,13;135:4,9;
136:3;138:8,15;
139:3;142:23;155:12;
163:12;164:6;182:5,
10;183:20;184:1,4,7,
9,17,25;185:8;186:6,
6,24;187:3;188:25;
189:23;190:15;
196:21;200:11
**define (1)**
83:1
**definitely (2)**
78:3;92:18
**definition (2)**
148:17;149:12
**degree (8)**
25:19;26:4,9,13,17,
25;27:4;48:24
**degrees (2)**
27:20;29:21
**delay (2)**
187:23;189:17
**delayed (1)**
189:24
**Dennis (14)**
56:23;57:10;58:4;
103:23,25;104:2,9,15;
105:17;107:7;118:12;
186:7;196:25;197:3
**dental (1)**
86:23
**department (75)**
4:15;6:3;50:15;
51:19;52:15;55:13,
21;56:12,14;58:23;
59:11;61:17;62:1;
70:1;71:3,8,10,14,18,
22;72:9,13,16,18;
73:7,11,20;74:7,12,
20;75:7,16,23;76:2,7;
77:11,19;79:1,14,25;
80:7,15;81:5;82:1,7,
11;83:6;88:16;94:8,
17;112:25;113:7;
114:13,19;115:5,10;
138:14,16;139:2,4;
143:16,23;145:20;
148:5;150:9,25;
151:13;153:23;174:5;
175:23;180:4,16,20,
24;194:10
**departments (2)**
150:12;151:3
**department's (1)**
70:4

**depend- (1)**
128:22
**Depended (1)**
37:7
**Depending (1)**
35:2
**Depends (3)**
24:22;108:10;
185:19
**depicted (1)**
155:3
**deposition (10)**
4:3,8;6:19,23;7:13,
23;64:19;111:19;
131:21;132:12
**describe (4)**
51:15;117:4;
121:11;171:9
**described (5)**
42:9,12;102:19;
154:20;158:2
**describing (1)**
157:8
**designed (1)**
76:8
**desire (1)**
158:8
**despite (2)**
72:16,19
**destroyed (3)**
81:14,23;178:15
**destroying (3)**
82:1,7,8
**destruction (1)**
81:13
**detective (34)**
50:5,13,23;52:8,20,
22;53:16;62:4;64:22;
70:16;113:6;124:1;
125:19;126:2;127:4,
19;128:3;129:5,10;
131:9;133:23;134:5;
143:8,14,14,17,18,22,
22,25;144:7,23,25;
160:24
**Detective- (1)**
94:15
**detectives (2)**
55:11;143:24
**determination (2)**
174:19,25
**Deters (6)**
4:18,18,22;170:14,
15;193:25
**Di- (1)**
8:8
**Dias (1)**
156:12
**diem (2)**
32:25;33:1
**difference (2)**
153:1;162:21
**different (9)**

9:4;27:22;28:6;
32:6;54:16;82:20;
115:19;154:12;198:9
**differently (1)**
149:22
**difficult (1)**
7:9
**difficulty (1)**
127:23
**dignitary (1)**
99:2
**DiPietro (7)**
4:19,20;94:10,13,
16;170:15;180:3
**diploma (2)**
26:4;29:21
**direct (9)**
44:10,13,13;45:5,
12;74:3,16;177:14;
194:3
**directly (3)**
40:12;88:23;176:18
**dis- (1)**
169:21
**disability (4)**
156:23,24;190:21;
191:1
**discipline (3)**
72:17;147:19,20
**disciplined (2)**
147:18,21
**disclose (3)**
93:17;117:3;178:15
**disclosed (1)**
155:24
**discoverable (3)**
62:16;64:8;104:7
**discovery (1)**
64:15
**discussed (2)**
103:2;117:4
**discussion (2)**
22:15;48:2
**discussions (2)**
22:11;62:7
**dismantling (1)**
169:22
**dispute (1)**
117:17
**District (4)**
4:6,6;13:22;131:22
**Division (4)**
27:9;28:22;29:10;
121:14
**divorced (2)**
10:18;12:16
**Dixie (1)**
133:17
**DN- (1)**
163:3
**DNA (4)**
162:3,9;163:1,8
**doctor (7)**

19:17,18;25:3;
89:17;90:24;91:12;
157:7
**doctors (1)**
89:14
**doctor's (3)**
24:20,24;157:11
**document (6)**
85:14;128:5,13;
188:15;189:18;
200:18
**documenting (2)**
188:15;189:12
**documents (3)**
102:3;139:1;187:4
**dollars (4)**
95:25;109:11;
157:24;168:8
**done (21)**
7:7;21:9;42:19;
81:18;84:9;85:8;
87:16;96:18;97:12,
16;101:21;102:6;
104:16;170:6;179:10,
22;180:10;187:9;
188:18;191:19,23
**door (2)**
195:20;197:2
**dormitory (1)**
153:3
**double (1)**
147:4
**doubt (1)**
143:2
**down (15)**
6:24;52:2,3;60:10;
61:11;86:24;88:4;
98:25;141:21;144:24;
158:12;169:21;170:4,
10;198:7
**dozen (1)**
150:5
**Dr (6)**
89:19,21;91:17;
92:5,14,25
**dra (2)**
20:22,23
**dream (1)**
98:5
**dreams (1)**
98:19
**Drive (5)**
8:16;24:16;25:6;
96:23;176:23
**driven (2)**
95:22,22
**driver's (2)**
19:19;24:17
**drop (1)**
152:19
**dropped (1)**
101:11
**drove (2)**

Roger Dean Gillispie v.
Miami Township, Ohio, et al.

Roger Dean Gillispie
November 5, 2018

131:9;133:25

**Due (5)**
32:18,18;91:10;
98:9;187:11

**duly (1)**
5:21

**duration (2)**
35:23;148:11

**During (42)**
9:17;11:2;36:15;
43:10;47:8;50:22;
51:25;56:15;57:2;
58:5;64:13;108:21;
115:1;121:18,21;
123:10;124:6,15;
125:10,14,20;126:2;
129:23,24;141:22;
144:7;147:6,16;
150:10;155:24;
156:11;168:10,15;
169:15;171:24;172:6;
176:17;177:2;181:25;
184:7;191:4,7

**duties (2)**
29:24;135:6

**duty (3)**
30:3,4;33:7

**E**

**earlier (14)**
25:8;80:5;93:19;
110:16;115:14;
117:14;122:16;138:5;
144:22;181:19;
184:21;185:1;186:11;
196:16

**early (8)**
68:16,16;90:11,12;
135:9;151:20;170:1,
10

**earn (2)**
158:1;169:3

**earned (2)**
167:22;168:6

**earning (2)**
166:12;168:1

**easier (2)**
7:3;178:1

**echo (1)**
171:22

**editorialize (1)**
132:8

**editorializing (1)**
131:24

**education (1)**
28:3

**educational (1)**
150:18

**effect (6)**
20:13;21:2,6;23:2,
3;152:25

**effort (1)**

138:3

**efforts (2)**
96:14;139:18

**eight (5)**
94:1;20;154:16;
169:20;180:14

**eighties (1)**
95:17

**either (30)**
10:22;44:6;45:17;
82:9;115:9;116:6;
119:6,10,13;120:1,9;
128:7,14;132:5,8;
139:2;143:17,24;
144:9;146:12;175:23;
181:14;188:2,5,7,14;
192:2,5;193:24;197:8

**eliminated (5)**
62:4;113:15,19;
119:7,11

**eliminating (3)**
144:1,10;194:21

**else (20)**
9:6;13:17;38:3;
51:24;52:22;53:23,
25;54:8;55:12;56:19;
75:14;78:12,16,23;
81:21;90:4;103:17;
112:3;114:4;168:13

**else- (1)**
81:21

**em- (1)**
32:14

**e-mail (1)**
15:4

**e-mailing (1)**
14:12

**emotional (3)**
93:17;99:2;187:11

**emotionally (1)**
128:24

**employed (11)**
31:23;32:5;34:1;
46:17;47:8,20;72:9;
110:12;121:12;
171:15;172:10

**employee (8)**
29:25;32:21;33:6;
56:13;58:23;176:15,
17;181:6

**employees (7)**
34:3;64:22;74:12,
20;94:17;122:19;
180:20

**employment (24)**
32:19;33:23;34:12;
36:21;47:6,10;48:12,
13,15;59:3,6;110:15,
21;111:3;122:19;
158:7;159:12,18;
171:24;172:6,9,21,24;
177:2

**enamel (1)**

88:21

**encompassed (2)**
125:20;126:3

**end (11)**
6:22,25;7:3;21:14;
75:14;109:10,12;
111:10;152:5;170:17;
187:15

**ended (1)**
163:3

**engage (1)**
132:9

**engaged (3)**
71:8;117:14;182:4

**engagement (4)**
108:12,13;109:19,
23

**engagements (4)**
108:9,21;110:10;
158:2

**engaging (1)**
132:18

**Enon (1)**
90:7

**enough (7)**
96:23;112:6,11;
113:4;114:7;129:3;
133:16

**entail (1)**
44:17

**enter (2)**
26:3;109:19

**entered (1)**
175:22

**entering (1)**
176:25

**entire (6)**
92:12;143:15;
147:7;150:10;194:9;
196:3

**entrance (2)**
32:7,8

**equal (1)**
32:18

**equipment (4)**
28:16,18;30:5;
154:9

**essentially (2)**
186:10,12

**establish (1)**
154:12

**estate (2)**
96:16;167:24

**estimate (8)**
116:12,17,18,19;
136:1;150:2,4;157:25

**et (2)**
4:5;85:25

**ev- (1)**
73:1

**evaluations (1)**
173:3

**even (7)**

70:7;71:16;132:5,6;
143:25;189:23;
197:13

**events (1)**
8:12

**eventually (1)**
53:12

**everybody (2)**
75:13;112:3

**everyone (8)**
21:2;46:19,22,23;
47:1,5;99:21;148:6

**everything's (1)**
17:6

**evidence (47)**
71:2,13,17;73:1,9,
22;74:6,18;75:15;
76:6,16;77:9,14;
79:14,14,25;80:2,9,
12;81:13,14;137:2,5,
10,15,24;155:23,24;
156:3,12;162:10;
163:1,3,6;173:12,17,
19,21;174:4,11;
175:22;179:14,17;
182:9,16;197:1,3

**exactly (1)**
180:15

**exam (1)**
71:4

**examination (3)**
70:5,7;194:3

**examined (1)**
157:8

**exc- (1)**
194:7

**excess (2)**
192:25;193:5

**exclusively (2)**
44:2,6

**Excu- (1)**
39:10

**exculpatory (17)**
75:17;76:3;81:13;
103:4,7,18;106:16,22;
107:3,8,12;178:12,16;
196:3;197:1,3;199:12

**Excuse (1)**
113:25

**excuse- (1)**
39:10

**exhibit (2)**
84:25;94:2

**ex-husband's (1)**
12:17

**existed (1)**
184:1

**existence (1)**
137:2

**existing (1)**
63:2

**exonerated (9)**
99:11,12;100:25;

101:3,17,22;102:1;
161:9,12

**exoneration (1)**
161:13

**exoneree (5)**
161:9;162:3,5,21,
22

**exonerees (1)**
162:2

**expect (1)**
101:21

**expenses (4)**
93:2;102:5,7;175:5

**experience (3)**
28:11;108:24;
150:19

**expert (2)**
57:2;93:17

**explain (7)**
46:3;83:12;95:8;
116:21;161:17,24;
176:21

**explaining (1)**
97:15

**explanation (1)**
189:16

**explicitly (2)**
51:21;112:17

**exploded (1)**
86:25

**explore (2)**
64:7;105:8

**express (1)**
22:20

**extend (2)**
62:19;120:4

**extended (3)**
21:7,23;22:23

**extent (7)**
20:5;75:19;76:11;
82:25;100:18;119:20;
177:1

**extreme (3)**
92:16;161:8;187:11

**extremely (2)**
24:2;149:13

**ex-wife (1)**
10:20

**ex-wives (1)**
11:4

**ex-wives' (1)**
10:22

**eyes (3)**
25:5;47:3;48:6

**F**

**fabricate (1)**
80:12

**fabricated (9)**
79:14,15,25;80:3,9;
179:14,17,18,20

**face (2)**

21:10;79:7
**face-to-face (3)**
49:10;60:12,15
**facilities (1)**
36:3
**facility (1)**
146:19
**fact (8)**
21:7;23:2;34:12;
133:23;155:11;
172:19;175:2;200:18
**factor (1)**
22:4
**facts (24)**
59:16;67:13,16,20;
119:5,9,13;129:13;
141:10;143:10,18;
144:2,11,16,17;
160:25;191:18,22;
195:6;196:21;198:20,
23;199:11,18
**failed (5)**
82:11,22;83:6;
178:5,15
**fair (27)**
33:11;35:14;36:20;
40:12;42:11;47:18;
80:7;86:16;97:17;
105:8;106:10;112:6,
11;113:4;114:7;
129:3;133:16;147:11;
182:5,10;183:17,21;
184:3,7;199:19,24;
200:1
**Fairborn (4)**
8:16;25:22,24;
55:10
**fairness (1)**
24:4
**fake (1)**
87:1
**fall (2)**
27:3;89:6
**falling (2)**
88:6,14
**false (1)**
179:18
**familiar (5)**
58:2;79:9;81:8;
174:21,24
**family (12)**
6:11;12:2;16:16;
20:13;21:3,7,23;
22:23;96:7;98:18;
100:14;102:9
**Family's (1)**
98:15
**far (16)**
34:6;43:14;46:11;
56:17;58:7;92:16,22;
125:4;128:13;136:4;
145:22,23;146:11;
157:5;170:8;180:13

**Farmersville-West (1)**
133:4
**fart (1)**
4:20
**father (12)**
9:7,19;17:11;19:21;
20:1;21:6;22:23;
23:15,25;24:24;
145:5,19
**father's (4)**
9:3;18:14;25:7;
95:13
**favor (1)**
190:15
**favorable (1)**
142:23
**February (6)**
58:19;60:5;136:7,
12,22,23
**fed (1)**
86:6
**feder- (1)**
198:11
**federal (7)**
112:14;140:15;
197:19,21;198:3,4,13
**fee (2)**
108:5,7
**feedback (1)**
49:3
**feel (5)**
17:22;123:2,5;
159:1;171:19
**feeling (1)**
19:16
**feelings (3)**
146:3,5,13
**fees (4)**
57:2,2,19;175:4
**fell (5)**
86:10,12;88:11,22;
90:9
**fellow (1)**
139:20
**felt (5)**
47:5;121:23,25;
122:17;163:15
**few (10)**
10:2;11:21;27:22;
85:6,19;147:12,13,23;
170:21;176:8
**fields (1)**
28:7
**Fifty-three (1)**
156:21
**fight (1)**
20:25
**figure (1)**
35:20
**fil- (1)**
63:24
**file (20)**
22:6;120:1,8;121:2;

138:14,22;139:5,11,
15,17;143:16,23;
172:9;175:1,14;
176:10;192:18,18,21;
194:10
**filed (18)**
4:5;13:22;15:11;
16:8;20:2;21:7,18,22;
31:25;32:1;67:11;
70:1;84:4,8;92:2;
128:21;129:1;174:15
**files (1)**
196:3
**filing (2)**
22:14,21
**Fill (3)**
29:17;33:3;47:19
**filler (1)**
34:5
**filling (5)**
32:19;87:3,4,25;
88:2
**fill-ins (1)**
47:18
**final (1)**
162:25
**financial (1)**
167:17
**find (3)**
149:2;184:25;185:9
**fine (8)**
41:7;77:2;117:12;
148:18;173:25;
186:17;196:10;
198:18
**finish (7)**
18:15,17;78:17,18;
79:10;126:13;155:5
**finished (1)**
111:8
**finishes (1)**
78:20
**Fire (10)**
26:11,14,17;28:10,
12,18;30:5,20;41:24;
42:8
**fired (2)**
170:7;173:5
**fireman (4)**
30:4;32:4,12;33:7
**firm (2)**
57:10,25
**first (70)**
5:21;10:23;35:3,3,
5,12;37:21;38:2,17;
40:6;42:2;50:16;51:1;
52:10,17;58:8,15;
59:9,25;68:22;72:7,
11;73:13,18;85:1,10;
90:13,15;91:8,14;
95:19,20;103:3;
105:11;107:11;
115:14,18,20,21;

116:7;124:6;135:10,
15,18,24;136:7;
138:13;141:15;143:8;
144:24;155:24;162:2,
9,12;166:1,7;177:15;
178:5,11;184:10,12;
188:19;189:1,6,11,25;
190:6,16;196:7;
197:18
**fishing (3)**
16:6;98:2,14
**five (10)**
81:12;90:13,15;
93:13;97:24;136:2;
151:1;152:10;180:13;
187:16
**fix (2)**
165:7,21
**Fixed (1)**
165:4
**flip (5)**
164:8;165:21;
166:24;167:4,6
**flipped (4)**
164:22,25;165:1;
166:23
**flipping (8)**
95:14,17;97:1;
166:13,21;167:22;
179:2,13
**Florida (4)**
16:1,20;67:3;98:14
**flower (1)**
151:16
**fluctuate (1)**
35:1
**focus (4)**
98:14,15;123:10;
155:11
**folks (10)**
44:23;47:23;49:5;
111:7;159:14;181:14;
185:16,19;186:7;
187:2
**follow- (1)**
103:9
**follows (1)**
5:22
**follow-up (4)**
97:18;103:10;
193:22;194:25
**forgot (2)**
20:16,20
**Form (72)**
13:13;15:6;17:23,
25;18:18;19:11;22:1;
23:5;28:14;31:1;
44:15;46:8;50:8;52:4;
58:25;60:16;67:21;
68:20;70:11;72:22;
74:15;76:10;82:14,
24;83:7,14;94:5;
100:17;101:18;

106:18;116:24;
120:15,20;121:7;
124:17;125:5;127:10,
20;128:8;130:17;
131:13;134:1,7,13;
138:17;141:17;
142:12;144:19;
147:19,20;154:22;
155:18;159:4;160:4;
172:1;173:9,14;
174:1;176:1;178:22;
182:6,11,20;183:22;
184:13;187:5;188:4;
189:2;190:9;191:15;
192:11;193:10
**former (11)**
112:22;113:15,19;
131:1;143:14,17,18,
22,24;144:6,23
**forth (2)**
14:21;43:25
**fortunately (1)**
9:2
**forum (1)**
198:5
**forward (2)**
179:2;189:17
**found (12)**
59:5,10;100:3,9,16;
101:4,6;102:25;
136:6;137:20;148:7;
185:6
**Foundation (22)**
25:13;44:15;45:2;
58:6;59:1;64:25;
71:23;75:18;82:2,15;
131:16;134:25;
138:18;142:12;144:3,
13;145:8;146:4,15;
155:18;189:8;190:10
**four (22)**
11:9;17:10;27:16;
36:19;37:4;47:11,23;
66:20;67:2;111:14;
116:13,14,20;148:10;
152:6;153:25;154:4;
168:24;169:19;180:1;
194:24;197:23
**frame (4)**
45:15;74:12;
140:20,22
**frankly (1)**
184:19;197:9
**fraternal (1)**
160:8
**free (2)**
136:12,21
**freedom (1)**
153:12
**frequently (1)**
14:15
**friend (4)**
95:13;100:14;

Case: 3:13-cv-00416-TMR-SLO Doc #: 168 Filed: 02/11/19 Page: 211 of 225 PAGEID #: 3328
Roger Dean Gillispie v.
Miami Township, Ohio, et al.

Roger Dean Gillispie
November 5, 2018

160:1,2
**friends (5)**
  6:11;71:10;102:9;
  124:14;159:23
**friendships (1)**
  159:22
**Fritz (73)**
  50:14,18;57:21,23;
  58:9,16,22;59:10,15,
  19,22;60:4,11;61:12,
  15,23,24,24;62:3,8;
  102:19;105:11;
  113:20;114:8,18;
  115:9,10,15,21;116:1,
  6;119:2,3,6,10,14;
  120:1,9;121:2;
  134:21;135:4,8;
  136:3;138:9;139:19;
  143:17,25;144:10;
  186:7,11;187:1,4;
  188:2,7,10,14,18,25;
  189:6,10,17,24;194:6,
  17;197:1,4,14;
  199:22;200:7,7,10,13,
  17
**Fritz's (4)**
  59:5;114:24;
  187:24;194:21
**front (2)**
  177:16,24
**full (11)**
  6:7;32:21;33:19,19;
  47:13,19,20,22;
  110:22;155:2,4
**fund's (1)**
  192:24
**furniture (1)**
  151:14
**Further (7)**
  88:4;98:25;99:1;
  102:22;170:12;
  180:10;194:1
**furtherance (3)**
  178:20;179:11,22
**future (2)**
  47:6;48:13
**Fyffe (3)**
  126:25;127:1,9
**F-Y-F-F-E (2)**
  127:2,3

**G**

**gain (1)**
  111:3
**gainful (1)**
  111:3
**game (1)**
  105:8
**Gary (4)**
  50:5,11;62:4;
  112:22
**gate (6)**

30:3;32:7,8,9,11,12
**gave (5)**
  119:2;138:8;155:6;
  163:14;164:1
**Gayheart (4)**
  38:20,20;40:6;
  43:23
**Gearhardt (2)**
  38:17,19
**General (28)**
  26:24;27:11,14,25;
  28:18,21;29:11,14;
  31:23;33:9,12;47:4,
  20;74:20;95:15,21;
  121:12;122:20;123:8;
  168:17,20,23;169:9;
  177:4;199:4,10,17;
  200:4
**generally (6)**
  62:17;64:2;109:8;
  123:7;149:1;197:4
**gift (2)**
  160:22;162:2
**gig (1)**
  169:17
**Gillispie (27)**
  4:3,4;5:5,7,20;6:1,
  6,7,17;8:24;10:7,8;
  11:7;20:10;24:11;
  50:3;63:18;64:7;70:6;
  84:24;85:8;102:24;
  111:18;152:13;
  170:14;176:7;194:5
**G-I-L-L-I-S-P-I-E (1)**
  6:6
**girlfriend (1)**
  131:1
**given (3)**
  62:13;81:4;98:8
**giving (2)**
  54:2;140:23
**Glendale (2)**
  8:16,17
**G-L-E-N-D-A-L-E (1)**
  8:19
**Glossy (2)**
  78:20;155:4
**GM (57)**
  27:6,11,19;30:21;
  31:18,19,22;32:5;
  33:23;34:1,3,6,6,8,12,
  16,24;35:15;36:21;
  39:17;40:17,24;43:4,
  5,7,10,13,17;44:11;
  45:1,6;46:17;47:9,10;
  48:4,19,25;74:12;
  75:7;121:13;167:9,
  12,17,21;169:24;
  170:8;171:25;172:6,
  11;173:5;175:24;
  176:17;178:13;179:6,
  16;180:5;181:6
**goal (1)**

98:8
**goals (6)**
  94:23;95:7,8,24;
  96:3,11
**God (1)**
  97:6
**Godsey (7)**
  63:25;107:18,21;
  128:21;129:4,8;
  185:22
**goes (5)**
  154:16;180:13;
  185:1,9,12
**gold (1)**
  160:21
**Good (7)**
  6:1;111:8;112:13;
  132:21;153:11;
  171:19;172:24
**gotcha (1)**
  137:13
**gradua- (1)**
  26:2
**graduate (1)**
  25:21
**graduation (1)**
  26:2
**grand (1)**
  163:25
**grandmother (3)**
  11:9,19,20
**granted (2)**
  137:5;183:13
**grateful (1)**
  9:2
**Gray (3)**
  4:21,22;170:16
**great (3)**
  132:20;170:2;
  198:20
**grew (1)**
  95:17
**grievance (2)**
  172:16;176:10
**grievances (1)**
  172:9
**ground (5)**
  39:20;86:10,12,14;
  149:14
**Grounds (2)**
  117:1;132:5
**group (7)**
  108:23;122:1,18;
  126:7,20;127:9;
  160:19
**guarantee (1)**
  97:25
**guard (7)**
  33:11;41:2,8,16,23;
  44:8;46:14
**guards (5)**
  41:13;42:15;44:22;
  45:1;47:10

**guess (6)**
  39:18;108:22;
  116:16;130:23;159:9;
  168:18
**Guessing (1)**
  116:15
**guilty (1)**
  136:6
**guy (4)**
  34:5;112:2;140:7;
  169:15
**guys (7)**
  33:6,8;39:19;47:18,
  19;169:18;170:1

**H**

**ha- (1)**
  74:5;99:6;181:5
**habeas (2)**
  183:13;184:18
**hair (10)**
  81:19,22;82:8;
  137:2,5,10,15,20;
  155:23,24
**half (6)**
  91:23;96:19,21;
  99:20;165:11;166:23
**halfway (1)**
  88:25
**hand (3)**
  84:24;108:16;
  169:13
**handed (2)**
  170:6;183:9
**handing (2)**
  109:15,16
**handling (1)**
  156:12
**happen (5)**
  7:19;101:22;133:9,
  13;185:22
**happened (7)**
  40:13;99:14;
  100:24;120:17,24;
  133:12,14
**happening (2)**
  83:22;182:22
**happy (2)**
  117:19;140:16
**harassment (1)**
  190:2
**harbored (1)**
  146:2
**hard (1)**
  86:18
**harms (1)**
  99:2
**Harrison (11)**
  31:6;36:5,9,24;
  37:2,13;38:4;43:19,
  24;44:2,3
**hazards (1)**

30:20
**head (6)**
  7:15;78:14;121:13;
  155:2,4;177:3
**heads (1)**
  153:6
**health (12)**
  18:2,14;19:10;
  21:24;25:10;33:23;
  34:17,20;84:12;
  91:10,11;93:20
**hear (9)**
  49:16;75:14;101:1,
  8,14;103:1;108:1;
  138:7;163:12
**heard (3)**
  62:6;115:18;174:14
**hearing (1)**
  184:10
**heavily (3)**
  121:23,25;122:18
**held (3)**
  4:8;43:12;135:17
**hell (2)**
  17:14;152:4
**Help (11)**
  33:18;67:16,19;
  76:23;116:4;124:20,
  21;126:18;151:7;
  154:3;187:7
**helped (2)**
  98:15;158:16
**helping (1)**
  67:13
**helps (1)**
  179:1
**here's (1)**
  76:22
**Herman (121)**
  4:14,14;5:25;6:2;
  13:16;15:18;16:12;
  17:24;18:10,21;19:2,
  6,8,13;20:9,17;22:5,
  10;23:3,10;24:10;
  25:16;31:2,17;33:17;
  41:21;42:21;44:19;
  45:4,11,19;46:12,21;
  48:17;49:19;50:2,10,
  21;52:6;54:7;55:3,22;
  56:20;58:8,12;59:4,
  17;60:20;61:1,10,21;
  62:20;64:12;65:1,6,
  21;67:24;68:6,8,24;
  69:5;70:14;71:25;
  72:25;73:14,16;74:5,
  10,18,25;75:4,21;
  76:13,20;77:4;79:18,
  22;80:21;81:20;82:5,
  16;83:5,11,16;84:10,
  11,23;86:8;87:11;
  92:7,10;93:23;94:25;
  95:2,4,23;97:12;98:7;
  100:23;101:24;

103:16,20;104:2,4;
106:7,9,15,21;107:2,
5,17;108:2;110:7;
122:4,5,11;155:1;
156:16;174:14;178:7;
193:22
**Herman's (3)**
122:17;158:2,6
**hey (4)**
100:16;187:3;
195:10;200:14
**Hi (1)**
181:13
**hierarchy (3)**
39:16;41:17;43:17
**high (11)**
20:14,24;25:19,23,
24;26:2,4;29:20,21;
88:24;109:12
**higher (1)**
49:6
**highest (2)**
73:8,21
**highlight (1)**
94:6
**highlighted (1)**
94:2
**himself (1)**
64:7
**hire (1)**
49:1
**hired (12)**
32:22,23;47:5,11,
16;56:23;58:5;60:6;
102:6;108:23;115:16;
122:2
**hobby (1)**
166:14
**Hoffman (4)**
63:25;104:4;122:6;
187:1
**Hoffman's (1)**
121:24
**hole (8)**
147:25;148:2,6,9,
15,20,24;149:4
**holidays (1)**
14:8
**home (7)**
8:20,21;14:10;
20:11;158:7,10;
159:11
**honestly (1)**
19:2
**hopes (1)**
98:19
**hoping (2)**
96:6,7
**horticulture (4)**
150:15,16,21;151:4
**hospital (1)**
85:24
**hour (3)**

158:24;159:2;
167:13
**hours (13)**
33:1;34:23,25;35:4,
5;84:17;111:11;
148:21,25;151:12;
158:21;169:19;
187:16
**house (25)**
9:1,7;54:15;57:6,7;
95:17,19,20;96:22;
146:24,24;163:11,14,
18,18;164:21,25,25;
165:2,18,19,24;166:2,
9,24
**houses (11)**
95:14,14,16;96:20;
97:2;164:8;166:13,
21,23;167:4,22
**Hugh (1)**
91:17
**huh-uh (1)**
7:16
**hundred (1)**
109:11
**Hunting (1)**
98:3
**husband's (1)**
10:12

# I

**i- (3)**
80:25;95:5;117:9
**idea (8)**
44:25;90:13;
119:24;120:3,4,9,12;
127:7
**identif- (1)**
80:25
**identification (5)**
76:5,9;77:12;156:4;
179:4
**identified (7)**
36:17;89:20;91:17;
131:10;134:18;180:3,
6
**identify (6)**
78:25;79:9;95:5;
102:17;130:13;
193:13
**if- (1)**
99:20
**ill (7)**
121:19;122:25;
123:12;146:2,13;
171:23;172:5
**imagine (2)**
182:4,14
**immediate (9)**
37:5,12,16;38:4;
39:2,5,9,13;45:22
**immediately (3)**

39:23,24;42:13
**impact (9)**
21:6,24;22:12,22;
23:8,9;97:16;163:1,8
**impacted (3)**
23:15,20;104:16
**impacts (1)**
104:11
**impair (1)**
8:11
**implication (1)**
197:4
**imply (1)**
186:3
**important (6)**
19:12,14;65:18;
98:6,24;111:24
**imprisonment (8)**
84:5,6;109:7,10,13;
174:15,18,25
**improper (1)**
179:7
**in- (1)**
100:19
**incarcerated (9)**
27:21;68:1,15;
69:17;150:13;153:1,
15;175:7;182:1
**incarceration (17)**
11:2;68:18;69:14;
90:14;92:13;96:14;
109:1,3;147:17;
150:10;152:14;
168:11;175:6,16;
181:25;191:20,24
**incident (7)**
41:24;46:1;51:14,
15;87:13;88:10;177:6
**incidents (1)**
45:18
**include (3)**
14:24;141:2,3
**included (2)**
125:10,14
**including (4)**
105:9,11;143:16;
179:17
**income (10)**
107:23;108:3;
110:8;156:16,23;
157:1,15;167:2,20;
168:10
**incorrect (2)**
161:1;197:25
**indicate (1)**
200:6
**indicating (1)**
127:16
**indicted (3)**
31:21;50:17;72:8
**indictments (1)**
101:11
**individual (2)**

39:23,24;42:13
53:4;187:10
**individually (5)**
46:11;119:6,10;
178:14;179:6
**industry (1)**
27:15
**informa- (1)**
64:5
**informal (1)**
7:15
**information (23)**
19:15;42:1,3,14;
45:17;57:14;64:8;
76:11,25;114:4;
129:16,17,20,21;
173:12,17,19,20;
174:4,11;175:21;
178:17;181:21
**infractions (1)**
148:4
**initia- (1)**
186:20
**initial (1)**
188:25
**initially (5)**
50:5;69:16;146:18;
182:4,8
**injections (1)**
25:5
**injur- (1)**
95:5
**injured (2)**
88:11;90:9
**injuries (2)**
95:6;154:18
**injuring (1)**
88:6
**injury (8)**
85:22;86:1,3;88:15;
89:9,15,18;90:2
**Inland (13)**
27:8;28:22,25;29:3,
10,25;36:4,18,19;
37:1,4,10,11
**inmates (1)**
149:7
**innocence (6)**
56:7;102:7;107:13;
186:25;187:8;200:6
**innocent (8)**
83:19;101:4,6;
112:15,17;162:24;
195:7;199:19
**inquire (1)**
184:20
**inside (1)**
30:4
**insist (1)**
132:10
**instances (1)**
75:22
**instead (3)**
25:3;41:3;45:12

**instigated (2)**
81:1;180:7
**Institution (7)**
69:23;87:23;88:7;
146:22,23,24;147:22
**instruct (9)**
116:25;132:13;
140:12;141:5;184:14;
191:16;196:10;199:1,
8
**instruction (3)**
117:7,8,12
**instructions (2)**
119:2;138:7
**instruction's (1)**
140:13
**instructor (2)**
153:19,21
**instrumental (1)**
183:13
**insult (1)**
122:13
**insurance (3)**
34:17,21;92:24
**intend (2)**
159:13,18
**inter- (1)**
162:14
**interact (1)**
176:18
**interaction (3)**
54:9;72:12;177:1
**interactions (1)**
7:14
**interested (2)**
117:13;122:24
**intern (2)**
27:8,16
**Internet (2)**
100:1,3
**interrogatories (2)**
85:2,12
**interrogatory (9)**
85:17,17,20;91:18;
93:8;94:1,20;102:16;
108:19
**interrupt (2)**
103:22;162:14
**interview (4)**
29:18,19;52:25;
139:19
**interviewed (3)**
52:14,18;128:3
**interviewing (1)**
69:10
**into (15)**
26:3;35:16;49:9;
112:25;113:10;114:9;
119:3;128:23;138:14;
144:8;153:8;166:7,8;
175:22;176:23
**intruding (1)**
93:15

Roger Dean Gillispie v.
Miami Township, Ohio, et al.

Roger Dean Gillispie
November 5, 2018

**investigate (1)**
143:8

**investigated (2)**
59:11;200:11

**investigating (2)**
61:25;64:23

**investigation (14)**
28:14;50:4,6,22;
61:15;69:6;112:23;
114:9;141:11;143:15;
144:8;191:4,8;194:13

**investigations (2)**
28:11;58:1

**investigative (2)**
138:14;139:4

**investigator (5)**
57:24;58:4;59:7;
61:19;113:10

**invi- (1)**
192:4

**invitations (1)**
109:6

**invited (2)**
52:2;109:9

**involve (3)**
100:19;103:11;
193:14

**involved (8)**
17:5;107:19;135:9;
177:10;182:10;
186:24;192:1,5

**involvement (1)**
173:8

**involving (3)**
31:4;75:17;172:10

**issue (16)**
64:4;105:12,16;
108:20;141:4;157:5;
183:8,15,19;185:2;
187:4;188:20;196:22;
197:1,6;198:24

**issues (3)**
103:11;171:20;
198:5

---

**J**

**Jacob (2)**
89:21;91:14

**jail (14)**
55:18,21;59:25;
61:1;85:22;87:13,15;
96:8;135:12;136:17;
164:9;184:11,23;
193:6

**James (9)**
10:7,16;11:11;12:5;
14:24;15:22;16:3,7,
14

**J-A-M-E-S (1)**
10:7

**James's (1)**
11:3

**Jerry (3)**
126:25;127:1,9

**J-E-R-R-Y (1)**
127:2

**jeweler (2)**
162:4,15

**jewelry (1)**
161:3

**Jim (2)**
107:18,21

**job (22)**
26:22,23;27:6,24;
29:13,14,16;32:24;
44:7,18;45:16;47:4;
48:20,20;110:22;
111:1;151:6;167:21;
169:17,21;170:4,9

**jobs (2)**
168:2;169:23

**Jody (10)**
10:5,6,10;12:10;
14:1,9,10,16;15:10,14

**J-O-D-Y (1)**
10:7

**John (5)**
4:18,20;90:19;91:2;
170:15

**join (1)**
160:14

**joined (1)**
160:11

**Jon (2)**
4:18;170:14

**Juana (2)**
8:24;17:12

**J-U-A-N-A (1)**
8:24

**judge (1)**
132:12

**judgment (1)**
142:23

**July (1)**
101:12

**June (1)**
143:10

**jury (9)**
155:16;190:8,16,
19;195:6,11;199:12,
18;200:5

---

**K**

**Kasson (54)**
5:2,2;103:21,25;
104:14,19,21,24;
105:1,4,6,11,14,20;
181:12,13;182:8,14,
19,23;183:24;184:16;
185:12;186:1,3,5,13,
18,22;187:14,22;
188:6,24;189:5,10,16,
22;190:3,6,11;
191:17;192:13;

193:16;194:25;195:4,
18,20,22;196:6,24;
198:25;199:4,10,16

**keep (4)**
61:4;132:18;
171:14,16

**keeping (1)**
17:21

**Keeton (18)**
4:23,23;49:15,18;
170:19,20;171:8;
172:4;173:11,16,25;
174:3,8,10,13;175:13;
176:3;194:1

**Keith (15)**
40:21,23;41:17;
43:5;44:11,14;45:6,
21;46:5,6,13,16;48:2;
49:10,13

**Kentucky (9)**
123:17;124:8,10,
16;125:10,14,19;
126:4;130:3

**Kepperling (8)**
37:18,22,23;38:1,
16;40:2;43:20,22

**kept (1)**
127:12

**Kevin (4)**
139:20,22;141:7,11

**key (8)**
30:2,7,8,11,12,15;
32:3,12

**kidnapped (1)**
20:11

**kidnapping (1)**
31:9

**kids (1)**
17:10

**kind (7)**
56:5;105:8;111:1;
117:13;131:23;
134:11;160:17

**Kirk (4)**
162:3,7,8,15

**kits (3)**
81:16,22;82:1

**knew (16)**
22:3;43:12,14;
48:20;64:7;73:7,20;
99:21;145:22,23;
170:22;186:16;
189:12,22,25;190:14

**Knobs (11)**
123:15,19;124:2,
11,15;126:5;127:16;
128:6,15;129:6,11

**knowing (6)**
17:20;67:11;
122:24;187:9;188:10;
189:22

**knowledge (42)**
62:14,14;104:6;

112:22,23;113:5,14,
18;114:5,8;119:5,10,
17,23,25;120:5;
130:19;139:1;154:23;
173:11,17,19,20,24;
174:3,6,10;175:21;
177:9;178:19;179:9,
21;180:9,15,18,22;
181:16;185:5,10;
190:17,20;191:1

**known (2)**
64:5;121:15

**knows (2)**
15:17;76:21

**kotal- (1)**
164:5

---

**L**

**lab (1)**
137:19

**labeled (1)**
99:3

**lack (1)**
45:14

**lacking (1)**
131:16

**ladder (3)**
88:22,24,25

**ladders (1)**
88:22

**Lake (3)**
53:21;54:3,6

**land (1)**
15:6

**Lane (1)**
11:18

**Lane's (1)**
11:19

**last (17)**
6:5;11:8,21;12:19;
14:17,18;15:9;18:25;
30:21;37:19;66:10,
17,21;93:13;98:25;
101:1;144:19

**later (5)**
89:20;98:11;183:7,
16;185:9

**law (9)**
57:10;197:19,21;
198:3,4,4,4,5,13

**lawful (1)**
5:21

**lawsuit (7)**
13:21,22;22:6,14,
21;38:10;92:2

**lawyer (4)**
60:6;112:9;115:15;
138:15

**lawyers (3)**
104:1;140:15,19

**le- (1)**
39:24

**leading (1)**
114:3;116:2,7;
168:10

**leads (1)**
177:10

**leaps (1)**
181:2

**learn (4)**
43:16;106:2,15;
115:4;130:5,8

**learned (9)**
102:18;103:3;
104:17;105:15;
107:11;113:22;114:2;
115:6,13

**learning (1)**
153:17

**least (4)**
108:11;132:11;
166:13;170:8

**leave (1)**
168:19

**leaving (1)**
169:9

**left (10)**
97:1;114:12,16,18,
22;115:10;167:15,16;
168:17;169:11

**legal (3)**
101:25;102:3;114:3

**legs (1)**
112:10

**less (3)**
14:19;148:24;149:1

**level (4)**
43:16;146:23;
152:19,21

**li- (1)**
65:11

**license (2)**
19:19;24:17

**Lieberman (32)**
56:23;58:5;63:13,
18,23;104:2;105:24;
106:5;107:7;115:16;
118:12,15,19;119:2;
138:7;141:25;142:20;
186:7,10,25;194:9;
195:5,10;196:5;
197:10,16;199:5,11,
17,21;200:1,5

**Lieberman's (3)**
57:10;105:18;143:3

**lied (2)**
129:5,10

**life (13)**
21:1;69:4;88:1;
94:23;95:7,8,24;96:3,
9;98:8;102:11;
152:25;182:15

**liked (1)**
134:6

**limitation (1)**

---

179:18
**limited (1)**
197:7
**Lincoln (1)**
14:6
**line (4)**
15:6;94:21;195:25;
196:1
**lines (1)**
105:7
**lineup (3)**
78:1,5;134:18
**lineups (1)**
76:9
**list (1)**
110:23
**listed (2)**
100:4,7
**litigated (1)**
198:8
**litigating (1)**
198:8
**litigation (1)**
59:8
**little (11)**
23:8;25:8;82:20;
115:19;149:22;
153:12;156:17;
168:19;170:1;171:6;
186:20
**live (8)**
8:25;9:6;14:1,3;
15:23,25;16:19;18:4
**lived (1)**
9:19
**lives (3)**
12:22;16:20;67:3
**living (6)**
9:10;16:21;17:6;
54:17;166:11,13
**location (2)**
30:13;133:25
**locations (3)**
36:8;131:10,11
**locked (1)**
164:13
**London (11)**
69:20,22;152:17,
21;153:2,9,15,20;
154:11,16,21
**long (19)**
9:9,24;12:23;96:18;
107:22;113:9;135:12,
24;147:2;150:21,24;
153:24;154:1;159:13,
15,18;168:22;185:16;
187:3
**longer (6)**
35:23;99:5;135:22;
158:13,17,19
**longest (1)**
148:11
**look (6)**

100:1,7;104:16;
119:3;162:20;196:5
**looked (1)**
100:11
**looking (8)**
9:17;47:4,9;64:9;
122:2;159:9;179:2;
182:9
**lose (1)**
87:4
**lost (3)**
97:7;159:25;175:10
**lot (4)**
32:4,7;98:22;
142:25
**Lou (4)**
103:23,25;104:2,10
**loud (2)**
6:4;85:18
**low (2)**
109:10;169:13
**lunch (2)**
111:8,12

## M

**madam (3)**
118:10;132:22;
142:18
**maiden (1)**
130:24
**mailing (1)**
99:20
**main (2)**
30:13;98:13
**maintain (1)**
11:24
**maintaining (2)**
28:18;30:5
**maintenance (14)**
28:16;88:16;148:5;
150:9,13,25;151:4,6,
9,10,13,17;153:23;
154:9
**major (2)**
20:13;21:2
**makes (2)**
30:16;106:9
**making (9)**
17:5,11;22:13;
82:10,21;143:25;
166:15;167:11,13
**malice (1)**
81:2
**malicious (3)**
80:15,24;180:1
**man (2)**
83:19;169:13
**many (13)**
27:3;68:9;116:10,
10;147:9;148:8;
149:9,15,17,23;154:3,
14;164:8

**marathon (1)**
7:24
**Mark (7)**
12:18,20;13:4,8;
107:18,21;185:22
**marked (1)**
84:25
**Mark's (1)**
13:24
**marriage (1)**
12:12
**married (3)**
10:10,16;12:15
**Mary (1)**
4:11
**mat (2)**
78:20;155:5
**match (1)**
137:21
**mate (1)**
147:6
**material (11)**
62:15;75:17,23;
76:3;105:16;178:12,
17;185:6,10,13;
198:20
**mates (2)**
147:9,14
**Matt (2)**
4:25;176:7
**matter (6)**
4:4;13:21;30:25;
31:3;141:22;155:11
**matters (1)**
57:11
**may (12)**
22:12;53:25;62:18;
66:23;71:21;111:7;
130:5;148:23;161:16;
170:16;180:19,23
**maybe (9)**
48:25;62:11;91:25;
107:6;116:13;148:10;
149:20;154:16;
168:24
**mean (61)**
17:10,15;20:1;
21:11,15;27:24;30:9;
31:10;33:8,22;41:8;
42:23;45:24,25;60:8,
9,21;62:25;65:13;
68:17;83:12;97:17;
101:3;103:9,21;
104:14,17;105:4,6,14;
106:11;108:7;112:18;
118:1;120:13;124:11;
126:5;140:9;153:17;
162:14;165:7;174:6;
182:14;184:17,22,22;
185:1,12,14,19;186:3,
24;188:5,24;195:14;
196:7;197:6;198:1,2,
6,8

**Meaning (1)**
181:1
**means (7)**
30:10;63:8;112:3;
124:21;125:3;149:11;
161:25
**meant (3)**
31:16;61:22;122:4
**media (12)**
4:2;14:12;49:21,25;
84:16,21;111:10,14;
152:5,10;187:15,20
**medical (5)**
88:6;89:1,4;150:7;
154:18
**medication (1)**
8:8
**Medium (3)**
152:22,23,24
**meet (3)**
60:19;115:24;
117:16
**meeting (1)**
53:15
**meetings (7)**
52:11;54:11;60:4,
24;61:4,7;117:23
**member (6)**
112:24;138:8;
160:15;183:20;184:3,
17
**members (5)**
102:9;116:6;180:4,
24;187:4
**memo (1)**
189:12
**mental (2)**
84:12;93:20
**mention (1)**
200:14
**mentioned (4)**
16:25;28:10;
176:10;197:4
**mentioning (1)**
191:10
**Merive (8)**
10:13,14;12:10,11;
14:1,9;15:10,12
**M-E-R-I-V-E (1)**
10:15
**M-E-R-V (1)**
10:14
**message (1)**
66:23
**met (20)**
57:24;58:9,15;
60:12,14;111:18;
115:15,20,21;116:5,
11;145:2,5,15,19;
146:8,10,14;173:12;
181:14
**Mi- (1)**
138:16

**Mia- (1)**
139:4
**Miami (67)**
4:5,14;6:2;15:11;
16:8;50:15;52:14;
55:13,20;56:11,13;
58:23;59:10;61:17,
25;64:22;70:1;71:3,
13,17,21;72:9,13;
73:10;74:6,11,19;
75:6,16,23;76:2;
77:10,18;79:1,13,24;
80:7,14;81:5,25;82:6,
10;83:5;85:1,11;94:8,
16;102:16;112:25;
113:6;114:12,19,25;
115:10;138:13,16;
139:2,4;143:15,23;
145:20;173:13;174:5;
175:23;180:4,16;
194:10
**mid (1)**
78:15
**mid- (1)**
130:24
**middle (3)**
6:12;8:3;9:4
**might (16)**
7:15;19:16;53:20;
63:23;81:9;97:16;
129:16,20;140:25;
141:3;177:25;179:10,
22;180:10;185:7;
199:11
**mile (1)**
99:20
**military (1)**
20:15
**Miller (19)**
4:24;38:6,7,12,16;
40:4;43:22;170:21,
22;171:10,24;172:6,
10,17;173:7,12;
174:4;175:22;180:5
**million (1)**
95:24
**millionaire (1)**
95:12
**mind (3)**
54:9;181:2,3
**mine (1)**
78:6
**minimum (3)**
152:22,23,24
**minutes (2)**
97:25;158:13
**mischaracterization (1)**
24:8
**mischaracterizes (1)**
65:4
**miscommunication (1)**
128:2
**misconduct (6)**

72:18;73:8,10,21,
23;74:1
**misidentification (1)**
155:12
**misidentified (1)**
179:8
**misleading (2)**
61:8;70:12
**Miss (8)**
131:9;133:3,16;
134:5;141:16;142:1,
21;160:21
**missing (6)**
148:6;149:3;163:4,
6;184:10;185:11
**mission (1)**
162:4
**Misstates (2)**
52:5;128:9
**misunderstanding (1)**
104:12
**misunderstood (1)**
136:15
**Mitchell (4)**
66:11,19;130:22,23
**mo- (1)**
181:3
**moment (2)**
24:4;59:20
**Moncrief (3)**
91:17;92:5,25
**Moncrief's (1)**
92:14
**Monday (1)**
4:2
**Mone- (1)**
76:23
**Monell (1)**
76:23
**monetary (3)**
88:3;102:14;175:15
**money (11)**
57:9,16,18;88:2;
96:4;97:21;109:22;
163:14,16;165:14,17
**monies (1)**
102:13
**Montgomery (4)**
59:25;85:22;87:13,
15
**month (2)**
120:6,14;157:22
**months (14)**
11:9,21;36:19;37:5;
66:20,20;67:2;68:18;
136:2,2;168:24,24;
169:5,6
**Moore (61)**
4:17;50:23;51:2,9;
52:8,19,20,23;53:16,
24;54:9,12;55:6,13,
23;56:10,13,21;
69:10;70:6,9,13,16;

72:11;94:10,12,15;
111:20;119:14;120:1,
8;121:1,2;124:1;
125:19;126:2;127:4,
19;128:3;129:5,10;
130:3;131:9;133:23;
134:5;143:8,14,14,22,
22;144:23,25;145:3,
14,19,24;146:2;
160:24;179:5,15;
180:3
**Moore's (4)**
69:6;72:7;144:7;
145:5
**Moraine (7)**
36:7,13,24;43:20,
24;44:3,7
**more (41)**
7:25;14:19;17:4,5;
18:7,8;21:5,6;25:9,11,
12;32:17;33:1;41:25;
42:3;62:17;64:1;
65:17;68:12;88:25;
90:14;98:6,19,22,24;
116:2;120:25;122:23;
123:2;128:1;140:20;
148:15,20;153:12;
154:3;158:14,19;
168:19;181:9;196:16,
17
**morning (2)**
6:1;111:19
**mortgage (2)**
163:20,22
**most (12)**
7:14;33:6,8,9;
36:17;108:12;109:8,
22,25;149:1;169:18;
171:17
**Mostly (5)**
28:16;38:2,25;60:7,
8
**mother (14)**
9:7,18;17:11;18:14;
19:23;20:1,15,19;
21:6;22:22;23:15,25;
24:24;25:5
**Motors (22)**
26:24;27:11,14,25;
28:18,21;29:11,14;
31:23;33:10,12;47:4,
20;74:20;95:15,22;
121:12;122:20;
167:17,20,23;169:9
**mouth (1)**
101:23
**Mrs (1)**
115:10
**much (20)**
57:16;96:4;122:23;
134:3;135:22;157:22;
158:17,19;163:13,16,
22,24;165:14,23;

166:18;167:11,21;
168:1;169:3;187:9
**must (2)**
136:15;158:25

**N**

**name (36)**
4:10;6:1,5,5,7,12;
9:3,3,4;10:12,20;12:6,
17;13:24;37:5,19,21;
38:18;40:7;58:3;
66:10;85:23,23;
89:17;90:20;100:4,
10,16;111:18;115:18;
130:24;139:20;
146:21;156:12;
170:14,20
**named (3)**
38:10;66:7;140:16
**names (17)**
8:22;10:4,22;37:8,
12,16;39:1,3,4;46:22,
25;47:25;55:2,8,15;
140:7;191:11
**name's (1)**
176:7
**Naples (1)**
16:20
**narrow (4)**
83:1;140:20,21;
141:21
**narrower (1)**
140:10
**Natalie (1)**
13:25
**nature (12)**
16:24;24:25;27:21;
28:2,4,12;42:5;45:8;
56:2,8;64:11;88:15
**near (1)**
133:4
**Nebraska (3)**
12:22;14:4,6
**need (4)**
7:25;19:17;112:8;
170:1
**needed (7)**
45:18;46:3;51:13;
60:18;83:25;84:3;
168:3
**neither (2)**
132:11;173:4
**nephew's (1)**
11:10
**nerve (1)**
92:17
**net (1)**
163:24
**netted (2)**
164:18;166:2
**neutral (1)**
106:4

**new (5)**
95:21;128:20;
137:1,14;154:13
**next (10)**
30:15;39:7,10,14;
40:16;42:20;118:8;
166:8;179:2,25
**nice (1)**
6:4
**Niceville (1)**
16:1
**Nicholas (1)**
4:12
**Nick (3)**
11:14,15;12:7
**niece (1)**
13:15
**night (2)**
14:17,18
**nine (3)**
76:23;94:21;95:1
**nod (1)**
7:15
**nodded (1)**
23:17
**None (3)**
29:23;110:11;163:9
**nonetheless (1)**
159:1
**non-permanent (1)**
176:15
**Nor (2)**
101:21;158:15
**normally (1)**
36:1
**North (1)**
133:17
**November (5)**
4:2;99:10,14,25;
100:24
**number (30)**
4:3,6;49:21,25;
61:6,7;84:17,21;
85:17,20;91:18;93:8,
8;94:1,20;102:16;
108:8,19;111:10,14;
116:5;147:10,11;
149:14;150:1,3;
152:6,10;187:16,20

**O**

**oath (2)**
5:22;142:1
**Ob- (1)**
83:14
**Obje- (1)**
140:4
**Objec- (1)**
156:6
**object (7)**
18:18,18;41:19;
82:24;105:24;106:18;

119:19
**Objection (124)**
13:13;15:16;16:10;
17:23,25;19:11;20:4;
22:1,7,24;23:7;24:7;
25:13;31:1,14;33:14;
42:17;44:15;45:2,10,
14;46:8,18;48:10;
50:8,19;52:4;54:4;
55:19;56:16;58:6,11,
25;59:16;60:16,25;
64:25;65:3;67:21;
68:4,20;69:2;70:11;
71:23;72:22;74:2,15;
75:18;76:10;79:16;
80:17;82:2,14;83:14;
86:4;100:17;101:18;
102:21;103:9;107:4;
116:24;117:16;118:6;
120:15,20;121:7;
122:3;124:4,17;
125:5;126:9;127:10,
20;128:8;130:17;
131:13;132:25;134:1,
7,13,25;138:17;
139:6;140:4;141:17;
142:12,13;144:3,13,
19;145:8;146:4,15;
154:22;155:18;156:6;
159:4;160:4;172:1;
173:9,14,23;174:1;
176:1;178:22;182:6,
11,18,20;183:22;
184:13;187:5;188:4,
21;189:2,8,14;190:1,
9;191:15;192:9;
193:10;195:17;199:7
**objectionable (2)**
103:13;140:24
**objections (7)**
18:18;117:10,14;
131:23;132:9;139:8;
189:20
**objects (1)**
93:14
**observe (3)**
116:23;118:21,23
**observed (2)**
30:14,16
**observing (2)**
23:9;30:18
**obstruction- (1)**
117:11
**obsu- (1)**
117:11
**obtain (1)**
174:25
**obtaining (3)**
27:4;129:5,10
**obviously (7)**
10:9;62:14;63:19;
64:6;83:10,12,17
**occasion (10)**

Min-U-Script®

Charlene Nicholas & Associates, LLC - (937) 836-7878    (12) misidentification - occasion
www.CharleneNicholasCourtReporting.com

29:9;50:17,23;
59:24;64:14;116:2;
118:22;172:15;
176:19,21
**occasionally (1)**
14:11
**occasions (5)**
12:2;148:3,24;
149:9,23
**occur (2)**
60:24;188:12
**occurred (6)**
31:5;53:8;120:5;
128:4;131:10;169:14
**odd (1)**
168:2
**of- (1)**
84:2
**off (13)**
33:6;35:3,16;49:22;
84:15,17;86:14;
88:22;97:1;111:11;
152:6;165:23;187:17
**offender (9)**
99:3,4,6,19;100:2,4,
10,16;110:23
**offenders (1)**
146:24
**offer (1)**
105:7
**offered (1)**
179:20
**offers- (1)**
72:17
**offhand (1)**
171:21
**office (3)**
61:2;85:24;139:3
**officer (12)**
61:20;112:22,22;
113:15,19;114:25;
130:11,13;181:7;
189:7,12;200:15
**officers (9)**
72:17;73:8,11,22;
82:12,22;83:6;
178:13;179:16
**officers' (1)**
73:23
**official (2)**
33:12;181:8
**official's (1)**
101:23
**often (11)**
13:9;14:7,9,19,19;
16:2,18;17:3,4;32:17;
68:3
**Ohio (16)**
4:5,6;8:16;13:22;
16:22;28:23;90:7;
101:1,8,13,13;102:7;
107:13;196:6;197:7,
19

**Old (13)**
4:8;19:21,23;95:12,
19,20,22;96:8,11,12,
23;156:20;165:2
**oldest (1)**
25:17;112:2
**Omaha (1)**
14:4
**Omavi (1)**
5:4
**once (7)**
68:12;133:13;
138:2;163:11;179:21;
182:1;186:24
**one (73)**
4:3;8:10,17,19;
10:23,24;11:12,16,17;
12:5;20:24;22:15;
25:3;28:25;29:1;
32:16;35:11,23,24,24;
36:17;38:3,9;39:5,8,
12;42:11;45:12,21;
46:6;47:9;49:21;
54:12;64:22;66:13;
70:7;78:3;85:21;
95:24;103:10;111:24;
116:2,22;118:23;
122:18;126:19,21;
127:8,17;129:24;
131:12;133:3,17;
137:3;146:12;157:4;
160:1;164:12,12,16;
177:25;178:3,4,11;
185:16,19;187:3;
188:2,5,7,14;192:2;
196:2
**ones (1)**
77:22
**ongoing (1)**
141:11
**only (33)**
8:1,1;9:14,18;
16:21;43:11;47:9,9;
54:2;56:10,13;77:22;
90:1;92:19,22;
103:19;115:1;118:13,
16,21,25;119:1;
125:22;127:8;134:5,
11;148:13;149:3;
153:20;162:21;
164:21,25;196:1
**onto (5)**
86:18,20;88:23;
100:3;153:12
**op- (1)**
117:16
**open (3)**
25:11,12;153:13
**opened (1)**
195:20
**opens (2)**
105:8;197:2
**operator (1)**

30:13
**opinion (6)**
47:3;48:8,9,21;
49:14;157:12
**opinions (1)**
102:1
**opportunity (2)**
98:1;112:4
**opposed (1)**
114:4
**option (4)**
172:12,13,14;
176:12
**oral (2)**
133:24;134:6
**order (4)**
112:14,19;143:14;
180:10
**ordered (1)**
95:21
**organization (2)**
160:17,18
**organizations (3)**
151:15;160:8,8
**organized (1)**
168:19
**original (2)**
73:15;186:6
**originally (1)**
186:20
**others (6)**
39:4;63:21;118:18;
123:23;129:18,22
**otherwise (2)**
62:19;178:16
**ought (2)**
105:14;168:18
**out (35)**
9:11;29:17;30:4;
32:11;35:20,20;
36:16;54:8;59:5,10;
81:2;85:18;86:21;
88:19;98:16;99:20;
101:22;102:25;
110:18,23;112:4;
113:5;117:18;152:3,
15;153:12;155:8;
165:18;180:8;182:16;
184:25;185:6;188:15;
193:4;200:18
**outcome (1)**
162:25
**outdoors (1)**
131:4
**out-of-pocket (1)**
93:2
**outside (3)**
103:14;118:23;
158:7
**over (21)**
7:8;13:8;14:8;21:9;
42:15;52:10,12;
63:23;64:20;65:2;

70:24;93:9;94:21;
101:15;108:4;121:3;
132:13;138:19;150:4;
151:5;183:9
**over- (1)**
183:9
**overall (1)**
172:24
**overbroad (1)**
93:15
**overspoke (1)**
18:22
**overtime (2)**
47:22;169:14
**Owens (239)**
5:6,6,14,16;13:13;
15:16;16:10;17:23,
25;18:15,17,24;19:4,
7,11;20:4;22:1,7,24;
23:6;24:7;25:13;31:1,
14;33:14;41:19;
42:17;44:15;45:2,10,
14;46:8,18;48:10;
50:8,19;52:4;54:4,24;
55:19;56:16;58:6,11,
25;59:16;60:16,25;
61:3,18;62:11,21,24;
63:3,7,15,22;64:25;
65:3,18;67:21;68:4,7,
20;69:2;70:11;71:23;
72:22;73:12,15;74:2,
8,15,22;75:18;76:10,
19,21;79:16,19;
80:17;81:18;82:2,14,
24;83:9,14;84:9;86:4;
87:7,9;92:6,8;93:21;
94:24;95:1,3,10;97:9,
11,15;100:17;101:18;
103:8,24;104:3,5;
105:10,21;106:8,11,
20;107:15;110:5;
116:24;117:2,9,15,21;
118:1,3;119:17,19;
120:15,20;121:7;
122:3,6,8;124:4,17;
125:5;126:9,11,13,15;
127:10,20;128:8;
130:17;131:6,13,16,
18,25;132:3,15,20,25;
134:1,7,13,25;138:17;
139:6,8;140:4,9,18,
23;141:17;142:12,15;
144:3,13,19;145:8;
146:4,15;154:22;
155:18;156:6;159:4;
160:4;161:19,21;
171:4,7;172:1;173:9,
14,23;174:1,6,9;
175:12;176:1;177:17,
23;178:2,4,9,22;
182:6,11,18,20;
183:22;184:13;185:3,
18;186:2,4,8,14,19;

187:5,13;188:4,21;
189:2,8,14,20;190:1,
4,9;191:15;192:9,11;
193:10;194:4;195:2,
17,19,21;196:1,12;
197:12,18,23;198:1,6,
11,13,16,18;199:3,7,
14
**own (17)**
63:20;96:6,15,25;
97:13;112:23;113:4,
14,18;114:5,7;119:5,
9,17,25;139:1;179:19
**owning (1)**
98:8

## P

**page (15)**
85:4,16;93:9,9;
94:20,21;95:1;
102:15;140:17;178:3;
179:2,3,13,25;180:2
**paid (11)**
57:1,10;102:5,9,9;
108:15;109:6,12,23;
110:9;183:1
**pain (3)**
92:15,17;159:3
**painful (1)**
92:19
**paint (1)**
88:21
**painting (2)**
88:21,22
**pant (1)**
62:8
**pants (1)**
108:20
**paperwork (2)**
65:11,13
**paragraph (11)**
70:3;71:7;72:15;
73:2,6;81:3;102:19;
178:10;179:3,14;
180:2
**parent (1)**
159:18
**parentheses (1)**
71:11
**parents (36)**
8:23;14:25;15:1,4;
17:5,17,21;19:7,9;
21:23;23:4,9,21;24:3,
16;25:9;54:17;57:4,
16;67:4;97:3,6,7,22,
23;98:2,13,23;
110:17;158:8,11;
159:15;163:15,17;
164:2;175:3
**parents' (4)**
8:21;9:7;98:9;
159:11

**parking (2)**
32:4,7
**part (14)**
67:13;85:8;86:2;
87:14;94:2;115:16;
135:4;155:13;160:19;
166:13;175:3;176:11;
190:22;200:11
**partial (1)**
87:1
**participate (6)**
22:5,13;33:25;34:8,
16,21
**participated (2)**
192:7,14
**participating (1)**
151:19
**particular (5)**
37:25;126:19;
137:18;177:6;186:17
**pass (1)**
175:3
**Pat (4)**
105:18,18;106:9;
181:13
**Patrick (1)**
5:2
**patrol (1)**
113:6
**pause (1)**
87:7
**pay (6)**
57:5;87:24;88:2;
97:24;109:24;163:12
**paycheck (1)**
34:13
**paying (3)**
47:5;48:15,18
**payment (1)**
192:24
**pendency (1)**
57:3
**pending (1)**
59:25
**people (23)**
33:9;43:16;47:11;
54:20;55:1,5,8;78:15;
86:15;98:15;100:5;
108:16,24;109:14,16;
110:3;122:1;127:17;
153:6,7;159:23;
162:5;186:15
**people's (1)**
33:20
**Per (3)**
32:25;33:1;168:7
**percent (1)**
197:25
**performance (1)**
173:3
**performed (1)**
91:19
**period (8)**

68:14;125:10,14,
20;126:3;148:16;
151:6;168:10
**periods (1)**
158:17
**permanent (4)**
47:7,9;48:13;
122:19
**permanently (3)**
9:23;47:4;122:2
**permission (1)**
170:10
**permit (3)**
70:6;131:22,23
**perpetrator (3)**
134:19,23;179:8
**person (17)**
20:13;42:13;43:12;
48:14;56:10;90:1;
99:11;109:20;126:21,
22;127:8;153:8;
156:11;162:9,12;
176:23;185:13
**personal (14)**
60:10;99:2;174:6,
10;177:9;178:19;
179:9,21;180:9,15,18,
19,22,23
**personally (11)**
59:23;94:23;95:7;
100:10;129:15;156:1;
157:3;164:10,15,24;
200:14
**personnel (2)**
33:3;173:13
**persons (4)**
71:9;80:25;155:3;
180:6
**person's (1)**
79:7
**perspective (1)**
190:14
**persuade (1)**
199:18
**pertain (1)**
53:7
**pertained (3)**
51:20,22;53:10
**petition (4)**
128:20;140:7;
183:13;184:18
**Petro (5)**
107:19,21;128:21;
129:4,8
**P-F-Y- (1)**
127:1
**phone (3)**
14:11;16:5;72:11
**phonetic (7)**
32:24;37:18;38:17,
20;50:14;66:8;156:12
**photo (16)**
76:9;78:8,13,14,16,

17,21;79:3,7;134:17;
154:25;155:13;
177:11;192:2,2,5
**photographs (1)**
79:11
**photos (3)**
79:11;155:2;177:11
**phrase (1)**
86:4
**physical (3)**
90:25;149:7;157:9
**physically (2)**
115:22;149:24
**physician (2)**
85:24;91:1
**pick (4)**
86:15;97:1;130:3;
168:4
**pieces (1)**
197:23
**pinched (1)**
92:16
**pla- (1)**
39:24
**place (2)**
59:15;152:3
**places (1)**
131:11
**plaintiff (10)**
63:13;81:1;88:5;
93:14,16,18;99:1;
178:18;179:8;180:7
**plaintiff's (1)**
197:15
**plaintiff's- (1)**
88:5
**plan (4)**
34:7,9,16,21
**planning (1)**
5:9
**plant (30)**
26:24;27:7;28:24;
29:4,15,25;30:1,5,11,
16,17,19;32:14;
33:15;34:15,24;36:2,
4,11,13,16;39:19,20;
41:3,9;44:3,3;46:1;
176:24,25
**plants (5)**
28:25;43:24;44:7;
150:17;176:20
**played (2)**
80:15;81:5
**Plaza (1)**
133:18
**pleadings (1)**
66:13
**Pleas (3)**
174:19;175:1;193:3
**please (17)**
6:4,14;8:23;9:9;
10:4;18:21;75:1;95:8;
111:23;112:3;116:5;

118:9;123:21;124:22;
132:22;138:6;151:8
**ployee (1)**
32:16
**plugged (1)**
35:16
**Plus (2)**
47:22;64:20
**pm (5)**
84:21;111:14;
152:6,10;187:20
**pocket (1)**
193:4
**point (16)**
7:24;22:16;30:11;
65:16;67:25;85:21;
92:19;103:2;106:10;
125:16;128:23;161:2;
167:9;170:5;181:20;
190:2
**pointed (1)**
196:17
**pole (1)**
169:14
**police (85)**
4:15;6:2;50:15;
51:14,19;52:2,7,15;
55:10,13,21;56:11,14;
58:23;59:11;61:17,
20;62:1;64:14,17;
65:1,5,7,9;66:2;70:1;
71:3,14,18,22;72:9,
13;73:11;74:6,12,19;
75:7,16,23;76:2,7;
77:11,19;79:1,13,24;
80:7,15;81:5;82:1,7,
11;83:6;94:8,17;
112:25;113:7;114:13,
19,25;115:5,10;
124:7;138:13,16;
139:2,4;143:16,23;
145:7,9,20;173:13;
174:5;175:23;179:18;
180:4,16,20,24;189:7;
192:18,21;194:10;
200:15
**policies (16)**
75:16;76:7,16;
77:10,16,17,20;79:5,
10;80:6,8,10;81:8,11;
82:18;83:3
**policy (6)**
71:6;78:25;79:4,8,
12;80:11
**politics (1)**
34:22
**polygraph (6)**
70:5,7,10,16,18;
71:4
**poor (1)**
173:3
**portion (1)**
132:11

**portions (1)**
177:22
**position (5)**
43:11,12;48:12;
104:6;197:9
**positive (2)**
17:13;171:12
**possession (1)**
156:3
**possible (1)**
142:4
**Possibly (2)**
104:5;197:6
**post (5)**
64:1;66:13;128:20;
140:7;197:10
**potential (6)**
30:20;113:15,19;
117:17;151:20;
195:15
**practice (4)**
70:4;71:3;76:1;
78:25
**practiced (1)**
77:24
**practices (7)**
75:16;76:7,17;
77:10,18;80:6,8
**practicing (1)**
77:22
**practitioner (1)**
85:25
**pre- (1)**
103:15
**pre-diem (1)**
32:24
**prejudice (1)**
101:12
**preparation (1)**
64:18
**prepare (3)**
67:13,16,19
**prepared (1)**
139:15
**present (11)**
5:10;52:18,22;
116:23;119:1;128:15;
138:7;195:6,10;
199:12;200:5
**presentation (1)**
109:20
**presented (4)**
134:17;137:24;
184:12;189:1
**presently (2)**
9:10,11
**preserve (1)**
103:15
**pretty (2)**
27:14;187:9
**prevent (1)**
83:21
**previous (3)**

Case: 3:13-cv-00416-TMR-SLO Doc #: 168 Filed: 02/11/19 Page: 218 of 225  PAGEID #: 3335
Roger Dean Gillispie v.                                                                    Roger Dean Gillispie
Miami Township, Ohio, et al.                                                                  November 5, 2018

**12:11;59:2,6**
**previously (3)**
199:23;200:8,14
**primarily (1)**
35:12
**primary (1)**
113:10
**Prime (2)**
96:9,9
**prior (9)**
54:5;76:15;104:1;
128:9;132:25;138:12;
145:2,13,18
**prison (27)**
9:11,15;12:25;21:1,
5;69:1,16;83:19;
84:13;87:19;89:4,11,
24;91:9;96:10,24;
97:14;110:15,18,24;
111:4;114:3;149:13;
154:13;159:21;
160:11;162:9
**prisoner (1)**
149:24
**prisonment (1)**
84:4
**prisons (1)**
69:15
**private (2)**
57:24;58:4
**privilege (28)**
63:1,12,17,17,20,
22;74:3;93:16;
102:23;103:11,15;
104:13,19;105:2,3,5;
117:2,6;118:7;140:5,
8,14;185:4;191:16;
193:12;197:20;198:3;
199:8
**privileged (4)**
74:16;79:17;
184:14;185:25
**privileges (4)**
62:18,23;63:2;64:3
**probable (2)**
81:2;180:8
**probably (16)**
11:8,8;12:21;22:3;
53:21;86:10;104:9;
107:16;112:2;124:8,
10;128:22;158:20;
161:2;186:17;195:13
**problem (5)**
61:3;103:8;131:25;
140:19;157:4
**problems (4)**
71:12;87:12;93:6;
167:17
**procedure (5)**
70:4;71:4;78:5;
79:1;80:12
**procedures (13)**
76:8,17;77:10,18,

21,23,25;79:6,10;
80:6,9;81:9;179:7
**proceed (1)**
46:3
**proceeding (2)**
132:8;197:21
**proceedings (1)**
197:11
**proceeds (1)**
163:12
**process (9)**
22:13;29:19;71:8,
14;113:21,22;114:2,
3;115:1
**produced (1)**
184:24
**Product (4)**
32:11;62:18;63:22;
64:3
**Products (3)**
31:4;194:14,17
**profess (1)**
56:7
**professional (5)**
84:12;88:7;89:2;
170:22;171:9
**professionally (2)**
94:23;95:7
**professionals (1)**
93:20
**program (7)**
150:15,16,22;
151:4,18,20;153:22
**programs (1)**
28:5
**Project (4)**
102:8;107:13;
186:25;187:8
**pronounce (1)**
90:20
**proper (2)**
140:13;146:21
**props (2)**
151:14,16
**proseca- (1)**
81:6
**prosecuting (1)**
81:10
**prosecution (9)**
80:15,24;81:1,6;
138:15;178:17;180:2,
7,11
**prosecutions (4)**
71:9,15,18,22
**prosecutor (2)**
101:2,12
**prosecutor's (1)**
139:3
**protection (13)**
26:24;27:7;29:15,
25;32:14;33:15;
34:15,25;36:3,16;
39:19;41:3,9

**proved (1)**
156:9
**provide (3)**
42:3;172:20,23
**provided (10)**
64:15;120:1,8,13,
14;121:2;128:19;
138:14;139:1;172:21
**providing (1)**
185:13
**psychiatrists (1)**
93:11
**psychological (1)**
190:23
**psychologists (1)**
93:11
**purchase (1)**
165:13
**purpose (2)**
30:18;67:1
**pursue (10)**
27:20;94:23;95:6;
96:11;98:23;172:13,
16;193:3,8,18
**pursuing (5)**
26:10,14,25;98:2,5
**put (15)**
21:1;30:12;85:18;
86:10,13,15;99:19;
140:22;142:20;
149:14;166:8;177:23;
196:13,20;200:7
**putting (4)**
7:6;64:4;109:20;
199:22

## Q

**quarterly (1)**
169:4
**quit (2)**
170:1,2
**Quite (11)**
124:18,20,22;
125:2,3;147:12,13;
183:7,16;184:11;
197:9
**quote (2)**
71:10;88:5

## R

**race (1)**
7:23
**Radiator (10)**
36:5,9,24;37:2,13;
38:5;43:19,24;44:2,3
**raise (1)**
169:5
**raised (2)**
105:12;108:20
**raises (1)**
102:21

**raising (1)**
15:20
**ranger (2)**
130:9,10
**ranking (2)**
73:8,22
**rape (7)**
31:4,5,9;81:16,21;
82:1;143:8
**rapes (13)**
53:13;112:25;
113:10;114:9;119:7,
11,16;124:3;131:10;
134:23;138:14;
194:14,17
**rare (1)**
13:10
**Raskin (96)**
4:16,16,21;62:22,
25;63:5,9,16;64:9;
104:18,20,23,25;
105:3,5,13,18;106:18,
25;107:3;111:17,18;
117:1,3,10,19,24;
118:2,9,14;119:18,21;
120:18,22;121:10;
122:5,7,10,12;124:9,
19;125:8;126:10,17;
127:14,22;128:11;
130:21;131:8,15,17,
19;132:2,4,17,21;
133:2;134:4,10,16;
135:1;138:21;139:7,
10;140:6,11,21;141:6,
20;142:14,16;144:6,
15,21;145:10;146:7,
17;152:12;154:24;
155:20;156:8;159:7;
160:6;161:20,22;
171:23;193:24;197:7,
13,22,24;198:2,10,12,
15,17
**rather (3)**
72:17;151:23;
198:18
**re- (4)**
59:18;70:22;89:5;
122:4
**reaching (1)**
117:18
**reactions (1)**
24:6
**read (24)**
18:21;64:17;65:1,5,
7,11,12,15,17;73:19;
74:23,25;75:2;80:19;
85:17;118:9,11;
129:1;132:22,24;
177:22;178:8,10;
180:1
**reading (2)**
65:9;66:2
**real (3)**

**96:16;167:24;187:7**
**realistically (1)**
185:15
**really (3)**
182:13,21;198:6
**realty (1)**
95:16
**reask (2)**
142:19;193:17
**reason (18)**
26:20;34:19;45:20;
69:13;110:14;137:9,
14;140:24;143:2;
146:1,12;149:3;
152:18;189:5,10,24;
193:13,18
**reassigned (3)**
36:23;37:2;113:5
**recall (121)**
10:22,24;12:19;
15:13;27:5;28:2,9;
30:21,24;31:19,22;
37:5,8,12;38:3,21,25;
39:1,3;40:6,23;41:1;
43:7;20;44:10,24;
45:3,8;46:10,15;48:5;
49:8,9;51:1,8,10;52:1,
11,13,14;54:21;
55:15;56:9,10,14,17,
21;57:12;58:3,8,
15,17;59:9,18;60:2,3;
61:9,11,13,14,23;
62:2,3,7;64:16;65:9;
66:2,6,16,17,25;69:8,
9,12,21;70:23;71:1;
80:4;81:24;88:11,24;
89:23;91:6,7,16;93:4;
94:13,14,16;102:3;
107:10,11;115:23;
127:18,21;129:25;
130:14;133:15;135:6,
8;138:24;141:19,24;
142:7,8;148:8;157:3;
160:10,23;163:23;
168:21;171:21;
172:18;173:1;177:7;
181:8;191:5,7,10,12
**receipts (1)**
130:3
**receive (7)**
49:4;89:5;150:7;
156:17;157:22;175:5,
15
**received (10)**
34:11,12;108:12,
13;109:25;137:1,10;
144:22;173:3;194:9
**receiving (7)**
110:2;145:14,18;
156:18,22;157:20;
181:20
**recent (1)**
100:13

Case: 3:13-cv-00416-TMR-SLO Doc #: 168 Filed: 02/11/19 Page: 219 of 225  PAGEID #: 3336
Roger Dean Gillispie v.
Miami Township, Ohio, et al.

Roger Dean Gillispie
November 5, 2018

recently (5)
    11:6;142:3,22;
    158:12,14
recess (5)
    49:23;84:19;
    111:12;152:8;187:18
recollection (2)
    62:10;142:24
record (25)
    4:1,13;5:11;6:5;
    7:17,20;27:10;49:22;
    50:1;62:13;84:15,18,
    22;85:4,10,18;111:11,
    15;122:4;127:5,13;
    152:7,11;187:17,21
recording (1)
    6:25
recordkeeping (1)
    127:7
records (3)
    129:6,11;130:12
record's (1)
    200:3
recover (1)
    193:5
recovery (1)
    192:24
recreation (3)
    153:23;154:1,8
RECROSS-EXAMINATION (1)
    195:3
reestablished (1)
    159:22
refer (2)
    77:2;79:20
reference (1)
    143:25
referred (1)
    91:14
referring (5)
    17:16;27:11;31:7;
    72:20;144:10
reflecting (1)
    128:15
refused (4)
    70:6;101:1,8,14
regard (2)
    121:4;137:20
regarding (3)
    79:1;180:19,22
regardless (2)
    37:9,14
regards (1)
    51:16
register (1)
    176:24
registries (2)
    99:4;100:10
registry (4)
    99:19,22;100:4,16
regular (2)
    11:24;110:21
regularly (1)

124:14
regulations (1)
    147:21
Rehab (11)
    90:5,6,16,17,22,24;
    91:1,3,6,15;169:23
reimbursed (2)
    175:2,4
rejected (1)
    155:16
relate (2)
    73:17;198:20
related (13)
    27:24;28:12;66:2;
    77:11;80:9;84:6;
    87:14;89:18;90:2;
    94:22;99:5;103:2;
    192:15
relating (1)
    192:8
relation (1)
    69:11
relationship (6)
    118:4;121:11;
    171:1,10,13,19
relationships (2)
    180:19,23
release (9)
    9:15;12:25;84:13;
    91:9;97:16;99:4;
    110:15;111:3;114:3;
    151:21;154:2;159:21;
    160:11;162:4
released (11)
    89:11,24;96:10,24;
    97:14;135:17,20;
    136:19;141:23;162:9,
    12
relevant (2)
    131:5;177:22
relief (1)
    128:20
relive (1)
    21:14
remain (1)
    136:21
remaining (1)
    179:16
remember (40)
    8:12;15:9;19:3;
    29:6;37:25;38:12,14,
    15,18;39:4;40:10;
    44:5;48:1;51:11;
    52:17,25;53:3,17,19,
    23;54:2;55:12;57:8,9;
    59:21;66:7;87:7;
    88:13,14;90:8,10;
    91:21;94:19;103:5,6;
    133:10,14;136:9;
    155:5;157:3
remodeling (4)
    95:16;96:16;97:2;
    167:24

remodeling/flipping (1)
    96:20
remotely (2)
    158:10;159:11
removed (2)
    192:17,20
repaired (1)
    87:18
repeat (2)
    80:18;111:23
rephrase (3)
    24:12;111:23;
    122:15
report (8)
    41:13,16;42:18;
    45:17;66:2;99:6;
    144:9;157:8
reported (1)
    40:12
reporter (12)
    4:11;5:17;6:24;7:3;
    18:22,25;49:17;
    107:24;108:1;118:10;
    132:22;142:18
reporting (1)
    41:23
reports (35)
    49:6;64:14,17;65:1,
    5,7,9;102:18,25;
    103:2,4,7,18;104:6;
    105:24;106:5,16,24;
    107:8,9,12;137:19;
    143:16,24;179:18;
    183:8,12,16,20,25;
    184:11,24;187:25;
    192:18,21
represent (8)
    6:2;84:25;94:4;
    111:20;170:15,20;
    181:4,13
represented (3)
    64:1;129:4,9
representing (8)
    4:16,18,23,25;5:2,4,
    6;176:8
request (3)
    70:9;93:15;151:24
requested (8)
    70:7;75:2;80:19;
    118:11;128:22;
    132:24;151:25;
    187:12
requesting (1)
    130:12
requests (1)
    137:3
require (2)
    8:1;150:6
required (2)
    41:25;99:6
requirement (1)
    29:20
requirements (2)

27:22,24
requiring (1)
    154:18
researched (1)
    100:22
reservations (1)
    22:21
resided (1)
    9:23
residence (1)
    9:19
resign (1)
    169:12
resolve (2)
    117:17;196:13
respect (11)
    31:15;50:16;79:6,
    10;81:9;82:22;86:4,
    24;95:4;104:11;
    141:12
respecting (1)
    175:24
responded (1)
    23:22
responding (1)
    23:25
response (9)
    51:18;56:4,5;91:18;
    93:18;108:19;121:24;
    158:2;173:18
responses (4)
    7:1;85:1,5,11
rest (4)
    17:4;78:15;123:3,6
restate (1)
    132:25
restroom (1)
    112:10
result (2)
    89:6;113:23
resulted (5)
    113:1,11;114:10;
    191:19,24
retained (1)
    93:17
retired (1)
    153:22
retirement (2)
    34:7,9
revenue (1)
    158:1
review (2)
    64:14;143:22
reviewed (3)
    139:11,15;143:15
reviews (6)
    48:25;49:6;172:20,
    21,24,24
Revised (1)
    84:5
Richard (1)
    4:25
Rick (10)

39:12;43:6,7,11,11,
    16;49:5;121:11;
    176:8,18
rigged (2)
    71:18,22
rigging (2)
    71:9,15
right (87)
    5:14;6:10;8:6;9:25;
    10:2;14:7,23;19:6,6,
    21;10,13;27:14;
    28:23;44:9;48:14;
    49:20;59:20;62:11;
    63:7;72:24;81:24;
    85:9;86:16;91:16,19;
    92:1;96:1;98:1,5,13;
    104:7;106:8;111:9;
    112:13;117:23;
    120:12;121:6;123:25;
    125:1;126:8;130:15,
    19;131:19;132:7;
    133:22;136:13;137:2,
    12,18,24;139:7;
    144:25;145:16;146:8,
    10,12,14,19;148:20;
    156:20;157:7;158:22,
    23;162:16;163:15;
    164:21;167:11;169:8;
    170:16;171:21;174:7,
    8;181:22;182:2;
    183:7,10;184:4;
    185:20;186:5,8,14,22;
    191:4;195:15;198:13;
    199:4;200:23
ring (9)
    161:4,7,8,9,13,15,
    25;162:5,18
rings (1)
    162:20
Ripie (1)
    10:5
R-I-P-I-E (1)
    10:5
risks (1)
    30:20
road (3)
    113:6;133:5;198:7
robbery (1)
    143:9
Robert (13)
    4:23;38:7,12;39:8,
    10;40:18,19,23;
    41:17;43:4;170:21,
    22;174:4
rock (4)
    86:7,20,21,24
rocks (1)
    86:14
Roger (9)
    4:3,4;5:20;6:7;
    8:24;9:3,4;17:12;
    19:21
role (4)

80:14;81:4,25;82:6

**roles (1)**
32:6
**room (5)**
7:5;61:12;75:14;
98:20;112:2
**room's (1)**
97:23
**Rotary (1)**
109:4
**roughly (1)**
68:22
**round (6)**
30:2,7,11,15;32:4,
12
**rounds (1)**
30:8
**row (4)**
162:3,11,12,21
**rules (1)**
147:21
**ruling (2)**
101:9,11
**Run (4)**
53:21;54:3,6;
198:17

# S

**s- (1)**
40:1
**safe (1)**
39:21
**safety (1)**
28:18
**sale (1)**
165:23
**Same (24)**
16:4;43:1,2,25;
45:23,25;47:16,24;
87:10;89:10;110:4;
112:5;117:13;121:5;
126:22;139:6,8;
147:6;158:25;162:20;
165:8;189:14,20;
196:11
**sandwich (3)**
86:6,16,19
**sat (2)**
158:24;182:24
**satisfied (1)**
134:12
**save (1)**
21:1
**saw (8)**
88:6;89:1,4;90:1,
24;91:14;144:9,14
**saying (12)**
7:10;21:8;61:4;
63:12;79:20;80:25;
98:18;121:25;162:8;
173:20;196:23,24
**scene (6)**

42:6;46:2,4;81:19,
22;82:8
**schedule (1)**
35:1,17,19;44:21;
47:22
**scheduled (3)**
30:2,3;35:24
**scheduling (2)**
45:1;46:14
**school (14)**
20:14,24;25:19,21,
23,24;26:2,4,22;
29:21,22;150:15;
153:16;154:5
**schooling (1)**
151:4
**Schultz (12)**
4:25,25;176:6,7;
177:19,21,25;178:3,8,
10,25;194:2
**science (5)**
26:11,14,18;28:10,
13
**scope (4)**
83:1;85:23;185:3;
196:4
**Scothorn (8)**
5:3;180:3;181:14;
191:7,23;192:4,14,20
**Scott (29)**
4:16;50:23;51:2,9;
52:8,20,23;53:24;
54:9,12;55:5,13,23;
56:10,13,21;69:6,10;
70:9;72:7,11;111:20;
119:14;145:3,5,14,18,
24;146:2
**screen (1)**
171:5
**scrutinization (1)**
123:6
**scrutinized (5)**
48:14;121:23;
122:1,18;123:2
**seat (1)**
98:18
**second (18)**
35:7,12;43:21;54:9,
12;98:25;135:6;
137:10,25;138:2;
165:19,24;178:4;
181:24;182:2;183:17;
190:18;196:7
**section (2)**
76:6;80:16
**security (45)**
29:15,25;32:14;
33:3,11,15;34:15,24;
36:2,16;39:18,24;
40:17;41:2,2,3,8,9,13,
16,18,22;42:14;43:4,
17;44:7,21;45:1;46:7,
14;47:10;108:4;

110:9;121:14;147:1;
152:19,20;156:18,22;
157:14,17,23;181:6;
190:21;191:1
**sedentary (2)**
158:9;159:10
**seeing (3)**
23:20;91:2;93:20
**seeking (2)**
122:19;165:18
**seems (3)**
104:14;118:3;
198:18
**sell (2)**
57:7;165:7
**senators (1)**
109:5
**send (3)**
65:17;128:23;
162:18
**sent (4)**
66:23;83:19;90:5;
148:2
**sentence (1)**
99:1
**separate (2)**
36:8;137:15
**sergeant (5)**
40:13;42:2,12;
50:13;143:17
**sergeants (15)**
40:1,10,17,25;
41:14;42:4,7,16,23;
43:1;44:1,23,23;
45:13,22
**sergeants/shift (1)**
43:23
**series (1)**
53:1
**serve (2)**
32:5;36:2
**served (2)**
36:15;59:6
**service (7)**
151:5,10,11,12,18,
19,25
**set (2)**
35:1;85:2
**setting (2)**
7:15;96:4
**sev- (1)**
93:8
**seven (10)**
9:18;93:9,10;94:21;
110:18;151:1;153:6,
6;154:7;158:4
**Seventy-three (1)**
19:22
**several (5)**
31:9;54:20;55:1;
149:10,12
**sex (22)**
70:5;71:5;99:3,3,6,

19;100:1,10,16;
110:23;131:3,11;
133:3,17,24;134:6,6,
11;141:16;142:3,22,
25
**sexual (2)**
53:7;100:4
**sh- (2)**
42:15;133:22
**shaid- (1)**
42:22
**shake (1)**
7:15
**shape (2)**
23:4;83:7
**share (9)**
18:11;19:8;25:10;
77:24;141:10;144:2,
11;158:10;160:25
**shared (3)**
25:8;40:24;95:25
**sharing (2)**
19:7;153:5
**Shelly (7)**
10:23;11:5,7,11,19,
25;12:5
**shift (36)**
35:3,4,5,7,9;37:7,9,
14,25;38:12,21;40:1,
10,13,17,24;41:13;
42:2,4,7,12,16,19,22,
23;43:1,1,23;44:1,22,
23;45:13,21;46:1;
49:4;169:18
**shifts (2)**
35:11;44:22
**shipping (2)**
32:11,11
**shop (3)**
151:9,10,17
**short (1)**
27:3
**shortly (1)**
68:18
**shot (2)**
155:3,4
**show (7)**
95:18;128:6;
143:18;151:16;195:7,
23;200:6
**shower (1)**
153:6
**showing (2)**
189:18;200:19
**Shukur (2)**
5:4,4
**shut (1)**
170:9
**shutting (1)**
170:3
**sibling (1)**
16:21
**siblings (6)**

9:20;10:1,2,9;
23:16,21
**sic (2)**
60:5;123:6
**sift- (1)**
40:13
**sign (4)**
126:20,20;127:9,15
**signals (1)**
30:12
**signed (8)**
63:6;66:14;67:11;
85:4;127:12;128:5,
14;197:10
**significance (3)**
161:6,8,24
**significant (1)**
197:5
**signing (1)**
127:5
**simply (2)**
35:15,19
**Sinclair (7)**
26:5,6,10,14,21;
27:1,4
**single (1)**
20:13
**sinks (1)**
153:6
**sister (8)**
12:15;14:16,24;
15:13;20:14,16,20;
25:9
**sisters (2)**
134:18;144:9
**sit (13)**
60:10;71:2;89:9;
91:13;115:8;128:25;
138:25;139:11;
158:12,15,17;159:2;
181:17
**sites (1)**
43:19
**sitting (2)**
61:11;158:20
**situation (3)**
46:3;169:13;185:4
**situations (1)**
42:12
**six (16)**
85:16,17,20;91:18;
93:9;94:21;136:2;
151:1,17;154:6,7;
169:5,6,20;180:14;
187:20
**size (3)**
62:8;79:6;108:20
**skipped (1)**
42:15
**slept (1)**
153:12
**slower (1)**
112:3

Roger Dean Gillispie v.
Miami Township, Ohio, et al.

Roger Dean Gillispie
November 5, 2018

**small (3)**
8:10;108:5,7
**social (11)**
14:12;93:12;108:4;
110:9;156:18,22;
157:14,17,23;190:21,
25
**sold (6)**
57:6;163:11,14,18;
164:13;165:4
**solely (2)**
6:13;191:2
**somebody (6)**
18:4;35:15;57:15;
103:17;114:4;168:3
**somehow (1)**
83:1
**someone (5)**
35:25;149:15;
176:24;184:1,6
**somewhat (1)**
182:15
**somewhere (1)**
100:1
**son (1)**
12:5
**sorry (38)**
4:19,20,22;14:6;
17:25;18:22;19:1,22;
23:6;49:15;61:16,18;
65:18;69:2;70:24;
72:1;73:4,17;84:1;
92:8;104:5;107:24,
25;114:1;122:7,10,
14;126:11;127:3;
135:2;139:8;143:6;
163:5;171:4,7;
173:24;187:13;
200:25
**sort (6)**
25:2;34:23;88:2;
89:5;171:22;179:11
**sought (4)**
110:14,21;137:1;
174:18
**sound (2)**
58:1;181:7
**sounds (3)**
21:4;30:6;132:20
**source (3)**
110:8;156:16;
167:20
**sources (4)**
107:23;108:3;
110:8;168:9
**Southern (2)**
4:6;13:22
**span (2)**
9:17;36:1
**speak (18)**
8:12;13:17;15:21;
16:2;17:4;50:17,23;
51:19;108:4,23,25;

109:2,7,10,11,13;
144:24;188:20
**speaking (24)**
56:14;94:16;108:8,
10,12,13,15,21;
109:19,23;110:9;
117:10,13,15;123:7;
125:16,18;131:22;
132:5,9;147:19;
158:1;191:5,7
**specialists (1)**
89:14
**specialty (1)**
85:24
**specific (8)**
102:17;122:23;
128:1;150:3;186:9,
15;196:14;198:19
**specifically (9)**
79:21;101:16;
105:23;120:25;123:1,
12;140:7,16;179:14
**spell (5)**
6:5;8:17;10:6;
37:23;123:21
**spend (2)**
97:22;158:8
**spending (2)**
57:18;110:17
**spent (8)**
21:5;57:17;136:16;
154:4;166:9;184:23;
193:6,6
**spills (1)**
41:25
**spit (1)**
86:21
**spite (1)**
138:3
**spoke (6)**
42:5;51:2;56:18;
70:24;119:23;173:12
**spoken (1)**
109:17
**spots (2)**
32:20;35:16
**spread (2)**
192:2,5
**square (1)**
78:14
**SSID (2)**
157:2,4
**staff (2)**
89:4;153:21
**staggered (1)**
35:4
**Stand (8)**
49:20;111:9;117:8,
11;149:14;158:15,17;
199:22
**Stapleton (15)**
40:20,21;44:11,14;
45:6,21;46:6,6,13,16;

48:3;49:10,13;173:6;
180:5
**Stapletons (2)**
41:17;43:5
**Stapleton's (1)**
40:23
**start (5)**
96:14,25;97:13;
132:13;169:4
**started (16)**
27:8,16,19;28:21;
29:14;31:18;89:19;
95:11;96:16,22;
107:21;111:19;
143:12;165:18;
167:13;187:7
**state (6)**
4:12;91:18;112:14;
197:19;198:3,5
**stated (3)**
56:3;130:2;142:1
**statement (7)**
70:12;80:7;142:24;
143:7,13,21;144:7
**statements (2)**
143:5;179:18
**states (4)**
88:5;99:1,12;198:9
**station (5)**
51:14;52:3,7;124:7;
144:24
**status (3)**
34:18;167:19;
176:14
**stay (1)**
9:21
**step (5)**
39:7,10,14;40:16;
106:11
**steps (2)**
39:15;41:23
**Steve (5)**
4:21,22;50:18;
59:19;170:15
**Steven (17)**
50:14;57:21,23;
58:9,16,22;59:5,10,
15,22;60:4;61:12,15,
23,24;62:3,7
**sticks (1)**
54:8
**still (15)**
8:25;9:1;16:21;
31:22;42:13;90:16;
91:2;92:17,19;97:6;
99:17,22;157:20;
159:9;177:15
**stipulate (1)**
77:2
**stop (2)**
181:22;198:21
**stopped (3)**
31:19;57:18;69:14

**straight (4)**
42:16;184:16;
185:1,12
**strategy (2)**
155:12,16
**Street (3)**
4:8;29:6;109:15
**stretch (1)**
112:10
**strike (7)**
56:12;122:14;
126:1;135:22;145:23;
194:7;200:25
**Strohman (15)**
66:8;18;67:25;
130:23,23,24;131:9;
133:3,16;134:5;
141:16;142:1,21,25;
160:21
**strong (1)**
17:13
**structure (2)**
43:4;117:22
**Studied (1)**
150:17
**study (1)**
150:22
**stuff (5)**
169:25;170:6;
195:11;200:5,11
**subject (5)**
10:1;13:21;129:17,
21;141:11
**subjects (1)**
197:16
**substantial (1)**
27:15
**successful (2)**
92:14,16
**suffered (3)**
85:22;92:12;99:2
**suggest (2)**
191:18,22
**suggestive (10)**
76:5,8;77:11;78:1,
4,9,12,19;179:3,7
**suit (1)**
21:8
**Suite (1)**
4:9
**summer (4)**
123:15,19;124:15;
127:6
**sup- (1)**
107:8
**supervisor (14)**
37:6;38:1,13,24;
39:1,2;42:16,19,22;
45:22;46:2;121:13;
171:11;177:3
**supervisor/employee (1)**
171:12
**supervisors (17)**

37:9,13,17;38:4,4,
15;39:6,9,13,17;40:9;
42:3;43:2,23;46:7;
49:4,5
**supplement (1)**
93:18
**supplemental (10)**
102:18,25;103:4,7,
18;106:16;107:8,9,
12;181:6
**support (5)**
75:5,15;76:20;
77:14;129:14
**supposed (2)**
79:2;180:1
**suppress (1)**
76:2
**suppressed (2)**
75:23;178:16
**suppression (2)**
75:17;178:12
**Supreme (4)**
101:1,8,13,13
**sure (24)**
7:8,20;17:5,11;
18:7;39:21;41:20;
48:14;75:13;105:10;
117:6;119:9;133:20;
137:9;147:23;161:20;
172:5;177:4;179:1;
187:14;190:14;195:2,
14;199:3
**surgery (11)**
89:2;91:19,22;92:7,
8,14,21,25;93:3;
158:15,16
**surprise (1)**
133:22
**survival (1)**
149:18
**suspect (25)**
62:5,8;70:5;71:4;
113:15,19;119:7,11,
15;139:25;140:1;
144:1,1,1,11;187:24;
188:3,8,11,16;189:7,
13,19;194:22;200:8,
19
**swear (1)**
5:17
**swept (1)**
141:1
**sworn (5)**
5:22;143:7,13,21;
144:7
**systematic (2)**
71:8,14

**T**

**table (2)**
6:22,25;7:4
**talk (27)**

7:8;13:11,20;14:7,
11;16:5,7,18;21:22;
39:15;50:3;51:13;
52:7;65:19,22;67:5,8;
68:25;69:6;88:4;
97:24;108:19,21;
186:15,23,25;199:23
**talked (15)**
15:10,12,14,19;
16:13;50:11;51:25;
53:24;65:23;77:6;
94:11;168:9;183:9;
195:14;197:3
**talking (25)**
7:10;15:13;26:12;
27:11;31:4;37:10;
43:10;53:14;56:11;
62:25;67:1;69:9;
73:13;77:25;87:9;
94:19;95:9;109:14,
16;184:17,22;186:5,6,
23;190:25
**tasked (1)**
28:17
**tasks (1)**
138:9
**te- (2)**
69:9;183:25
**team (25)**
115:17;116:7,22;
117:5,5,23;118:13,22;
135:5,9;136:4;138:8;
139:3;183:21;184:1,
4,7,10,18,25;186:6,6,
24;187:3;188:25
**technology (3)**
26:11,15,18
**teenager (1)**
96:13
**teeth (1)**
87:12
**Telephone (14)**
12:21;13:9;14:8,14,
15;51:3,9;52:11,12;
72:7;144:23;145:2,
14,18
**telling (9)**
62:3;69:9;132:18;
133:9,13;184:19,24;
185:14,14
**temporally (1)**
90:13
**temporary (1)**
122:19
**ten (16)**
68:22;69:13;92:20;
94:20;147:3,7,16,24;
151:2;152:14;154:4,
17;163:25;166:2,7;
195:24
**tend (1)**
195:7
**term (5)**

9:24;41:2,8;48:7;
95:18
**terminated (2)**
169:12;170:9
**termination (1)**
176:11
**terms (4)**
19:14;24:19;40:17;
152:25
**testified (16)**
5:22;6:17,18;61:6;
129:5,10;144:22;
146:18;152:13;
163:11;181:5,19;
189:6,11,25;194:22
**testify (11)**
71:21;103:23,25;
105:15,17;138:25;
183:3;188:2,7,14;
200:7
**testifying (1)**
184:18
**testimony (16)**
52:5;54:5;65:4;
66:1;82:25;105:7;
118:15;128:9;138:6;
159:1;179:20;183:25;
184:3;187:24;188:25;
189:18
**texters (1)**
15:1
**texting (2)**
14:17;16:5
**thanks (2)**
43:3;107:6
**therapist (1)**
90:25
**therefore (1)**
124:2
**thinking (2)**
62:12;124:21
**think's (1)**
62:16
**thir- (1)**
99:16
**third (4)**
35:3,9,12;38:25
**Thomas (3)**
4:19,20;170:15
**though (6)**
33:2;70:3,7;97:8;
115:24;182:4
**thought (19)**
31:15;53:18,20;
117:16,21;125:24;
127:8;136:16;163:10;
164:2,24;170:5;
187:23;188:11,18;
196:15,16;199:11,18
**thousand (1)**
168:8
**thousands (1)**
151:12

**thread (5)**
14:20,23;16:4,5,25
**threat (1)**
196:12
**three (26)**
5:7;10:9;11:9;
14:10;30:6;32:5,13;
35:11;36:16;66:20;
84:21;103:9;111:10;
116:13,14,20;148:10;
150:4;153:25;154:4;
158:21;167:4;168:24;
179:14;194:5;198:9
**throughout (7)**
14:21,22;30:16;
65:16;68:14,22;
123:18
**thus (1)**
178:17
**tied (1)**
33:23
**till (2)**
96:10;107:22
**times (20)**
14:10;24:23;68:9;
109:9;116:5,10,11,13,
14,20;123:20;143:1;
148:8;149:15,15,17;
150:5;154:14;171:18;
183:5
**tired (1)**
181:20
**title (6)**
29:14;33:12;40:25;
43:7;181:5,8
**titles (1)**
40:24
**to- (1)**
101:14
**today (18)**
5:10;6:23;8:12;
15:15;71:2;89:9;
99:24;115:8,14;
117:14;128:25;
138:25;139:12;160:2;
162:5;170:2;181:17;
183:9
**today's (1)**
64:18
**Todd (2)**
4:16;111:18
**together (7)**
7:10;11:11;117:25;
121:16,19,21;123:11
**toilets (1)**
153:6
**told (21)**
23:14;48:6;53:18,
19;76:22;103:6;
107:7;123:25;126:2;
127:8;130:15;133:23;
134:5,20;140:1;
160:24;164:18,24;

170:1,8;174:14
**toll (1)**
22:22;102:10;
187:11
**took (14)**
20:15;35:25;55:20;
59:15;67:12;82:1,7;
91:11;107:13;131:9;
133:25;166:23;
185:16;187:8
**tool (4)**
148:6,7;149:2,3
**tooth (8)**
85:22;86:1,3,25;
87:1,5,16,18
**top (1)**
94:22
**topic (2)**
130:16;195:24
**Tori (6)**
66:7,10,18;67:25;
130:22,23
**tort (1)**
192:24
**total (4)**
102:4;151:2;164:5;
166:9
**total- (1)**
106:12
**totally (1)**
106:12
**totem (1)**
169:14
**toward (1)**
146:6
**towards (3)**
146:3,13;151:20
**town (3)**
95:16;96:17;167:25
**Township (69)**
4:5,15;6:2;15:11;
16:8;20:3;31:6;50:15;
52:15;55:13,20;
56:11,14;58:23;
59:11;61:17;62:1;
64:22;70:1;71:3,14,
17,21;72:9,13;73:10;
74:6,12,19;75:7,16,
23;76:2,7;77:11,18;
79:1,13,24;80:7,14;
81:5,25;82:6,11,22;
83:6;94:8,17;102:16;
112:25;113:7;114:13,
19,25;115:10;138:13,
16;139:2,4;143:16,
23;145:20;173:13;
174:5;175:23;180:4,
16;194:10
**Township's (2)**
85:1,11
**trade (1)**
153:18
**traffic (3)**

30:3;32:9,12
**train (3)**
82:11,22;83:6
**training (5)**
82:18;83:18,20,23;
84:2
**transaction (1)**
165:15
**transfer (2)**
69:22;152:18
**Transferred (1)**
69:15,19;152:15,16
**treated (1)**
93:12
**treating (1)**
93:5
**treatment (6)**
89:5,15;91:5,8;
150:7;154:18
**trial (37)**
58:19;60:1,5;
103:12;116:2,7;
128:20;129:23;135:7,
10,13,14,15,19,24;
136:7;137:1,10,15,25;
138:3,13;141:15;
155:8,25;156:11;
184:4,6,7,12;189:1,6,
11,25;190:7,16,18
**trials (9)**
64:13;66:3;129:24;
135:5;179:20;182:24;
188:7,15,19
**tried (2)**
161:2;171:14
**true (12)**
85:5;114:5;115:17;
130:6;131:18;132:6,
7;142:10;143:11,19;
144:12;182:19
**truthful (1)**
142:24
**truthfully (1)**
8:12
**try (8)**
7:9;18:7;21:1;26:3;
126:15;128:1;149:16;
152:3
**trying (6)**
82:25;106:11;
171:14;177:13;193:8;
198:21
**trype (1)**
84:2
**turn (3)**
30:12;69:25;85:16;
102:15
**turned (1)**
96:8;121:3;138:19
**turning (2)**
93:8;94:1
**Tuttle (8)**
90:5,6,17,22,24;

91:3,6,14
**TV (1)**
95:18
**Twin (11)**
123:15,19;124:2,
11,15;126:5;127:16;
128:6,15;129:6,11
**two (39)**
8:17;9:21;10:22;
14:10;28:25;36:8;
41:23;43:19;49:25;
51:24;67:1;76:5;
84:17;91:9,23;95:16;
96:8,16;121:15,18,20;
123:12;128:7;129:24;
131:3;133:18;135:16,
20;136:10,16;144:9;
150:4;158:21;166:23;
167:4;169:19;179:3;
188:19;197:16
**two-hour (2)**
169:14,17
**two-man (1)**
153:3
**two-week (1)**
35:25
**two-year (1)**
26:25
**Tylenol (1)**
89:7
**type (20)**
7:18;12:3;13:11;
14:12;17:21;24:20;
28:5,7;33:4;49:3;
83:23;84:2;134:5;
151:11;160:18;192:8,
15,17,21;195:11
**typically (1)**
62:24

**U**

**ultimately (3)**
113:1,11;114:9
**unable (2)**
95:6;157:15
**unclear (6)**
111:23;140:25;
149:21;156:17;
186:21;196:15
**under (12)**
47:16;56:2;76:6;
80:16;84:5;114:15,
21;115:9;142:1;
178:11;179:3,25
**under- (1)**
30:10
**unders- (2)**
105:21;124:20
**underst- (1)**
140:18
**understood (6)**
22:18;23:11;34:6;

79:21;138:5;158:5
**undertake (1)**
138:9
**undertaken (1)**
139:19
**undertook (1)**
112:24
**unfair (2)**
68:7;132:1
**unidentified (1)**
80:25
**Union (2)**
168:14,16
**unit (10)**
4:3;49:21,25;84:21;
111:10,14;152:6,10;
187:16,20
**United (1)**
99:12
**universities (1)**
109:24
**unless (3)**
104:12;150:2;
185:10
**unlike (1)**
7:14
**unnecessary (1)**
198:19
**unquote (2)**
71:10;88:5
**unrelated (1)**
63:23
**unto (1)**
113:21
**untrue (1)**
161:1
**up (64)**
21:1,10,13,15;
22:17;28:22;29:10;
31:5;39:7,11,14;
40:16;41:5;43:21;
45:17;46:3;49:6,17;
73:7,21;78:15;86:15;
88:24,25;90:8;97:1;
98:8,10;100:1;105:8;
107:13,19;108:16;
113:21;114:3;116:2,
7;129:23;130:1,3;
149:15;158:12,23,24;
159:2;163:3;164:13;
165:21;167:22;168:4,
10;172:20;183:8,16;
184:20;185:1,17;
186:11;187:2,4;
195:20,25;197:2;
199:22
**upbeat (1)**
17:14
**upon (7)**
55:24;102:17;
119:17;136:25;137:4;
142:24;143:22
**urinals (1)**

153:7
**use (4)**
41:2,8;112:10;
162:9
**used (7)**
48:7;78:20;79:2,11;
163:11;177:11;179:7
**usually (8)**
32:19;33:5;42:6,18;
45:23,24;46:2,4

**V**

**vacation (6)**
9:21;32:20;33:3,4;
34:5;35:25
**vacations (1)**
33:20
**Vague (20)**
15:16;16:10;20:4;
22:8;23:7;31:15;
42:17;45:14;46:18;
56:16;59:1;69:2;
80:17;102:22;119:20;
124:4;127:20;154:22;
156:6;196:16
**vaguely (3)**
51:10;55:7,9
**value (1)**
102:14
**Vandalia (3)**
28:23;29:1,10
**variety (1)**
113:1
**various (3)**
88:20;151:14;
176:19
**vehicle (3)**
30:3;95:21;176:24
**verbalize (1)**
7:18
**verification (1)**
85:4
**verified (1)**
72:23
**verifying (1)**
85:5
**version (1)**
196:17
**versus (2)**
4:5;155:5
**viable (2)**
119:15;134:22
**victim (2)**
149:6;154:10
**Victor (1)**
4:7
**vid- (1)**
6:22
**video (2)**
6:21;7:2
**VIDEOGRAPHER (14)**
4:1,10;5:17;49:20,

24;84:16,20;111:9,
13;152:5,9;171:6;
187:15,19
**videotaped (2)**
6:23;7:13
**violating (1)**
147:21
**violence (3)**
147:13;149:6,7
**violent (1)**
149:13
**virtue (2)**
197:8,9
**visit (8)**
59:24;67:25;68:3,9,
17,25;69:14;98:14
**visiting (1)**
69:21
**vitamins (1)**
8:10
**voice (1)**
6:4

**W**

**wa- (3)**
28:3;148:25;184:20
**wait (4)**
7:6;94:24;132:4;
188:19
**waive (1)**
197:8
**waived (3)**
104:19;105:3,4
**waiver (5)**
185:4;196:6;197:7,
11,17
**waiving (5)**
62:17;63:14,19,19;
64:2
**walk (4)**
92:20,22;108:16;
158:14,17;195:25
**walking (1)**
196:2
**warned (2)**
72:16,20
**warning (2)**
72:20;73:2
**Warren (26)**
69:18,19,22;87:20,
21,22;88:7,16;90:9;
146:19,22,23;147:2,
14,17,25;149:4,7,25;
150:10,14;152:15;
153:2,10;154:12,21
**watches (1)**
158:25
**watching (2)**
47:6;48:23
**way (21)**
21:9;23:4,21,21,24,
24;30:16;44:5,20;

79:19;83:7;103:16;
104:15;106:4;158:25;
171:14,16;173:4;
175:24;186:19;
195:11
**wear (2)**
161:3,15
**week (11)**
9:21;14:21;33:1,7;
34:25;35:2,20,21,23,
24,24
**weekend (6)**
124:14,23,25;
125:3;127:5,16
**weekends (2)**
53:22;54:3
**weekly (2)**
14:19;35:17
**weeks (5)**
135:16,20;136:10,
16;169:20
**weigh (1)**
104:15
**welcome (1)**
7:25
**well-being (1)**
21:25
**weren't (7)**
24:5;33:19;44:1,6;
138:3;169:6;172:25
**wha- (1)**
120:13
**What'd (3)**
150:16;154:8;166:4
**whatnot (4)**
24:6;25:10;33:20;
44:22
**what's (16)**
10:20;13:24;28:4;
30:17,18,18;81:17;
84:24;89:17;109:22;
136:1;145:12;149:12;
152:20;161:6,6
**Whenever (2)**
60:18;148:6
**whereas (1)**
155:3
**wherever (2)**
28:19;35:15
**Whitfield (4)**
12:18,20;13:8,12
**whole (5)**
16:16;36:1;78:14;
87:4;136:4
**who's (3)**
39:24;89:20;109:20
**Wide (1)**
58:1
**widespread (1)**
72:18
**wife (2)**
114:24;115:5
**Wilson (10)**

5:3;179:5;180:3;
181:13;191:5,14,19;
192:1,7,17
**Wise (2)**
137:21;143:9
**wit- (1)**
179:19
**withdraw (3)**
107:3;118:6;142:18
**withheld (2)**
178:16;185:6
**within (3)**
11:21;90:13;99:20
**without (4)**
81:2;170:10;
179:17;180:8
**witness (120)**
5:18,21;13:15;
15:17;16:11;18:2,16,
20;19:12;20:8,11;
22:3,9;23:1,17;25:15;
33:15;41:20;42:18;
44:17;45:3,16;46:10,
19;48:12;50:9,20;
54:6;55:1,20;56:17;
57:2;58:7,10;59:2;
60:18;61:9;67:23;
68:22;69:4;71:24;
74:4,9,23;75:3,20;
80:18,20;81:19;82:4;
83:3,10;86:6;87:8;
92:9;93:22;95:11;
97:10,20;100:21;
101:20;103:19;
107:16,25;118:12;
120:17;121:9;124:6,
18;125:7;126:12,14;
127:12,21;128:10;
130:19;131:7;132:1,
15;133:1;134:3,9,15;
138:19;139:9;141:19;
142:2;144:5,14;
146:5,16;154:23;
155:19;156:7;159:6;
160:5;172:3;173:10,
15,22,24;174:12;
176:2;177:18,20;
178:24;182:7,13,21;
183:23;187:7;188:23;
189:4,9,15,21;190:5;
192:10,12;199:15
**witnesses (8)**
71:20;72:5;75:5,9;
179:19;181:5,5;183:1
**Wolfe (28)**
5:1,11,12,13,15;
39:12;43:6,11;49:6;
71:11;121:12,15;
122:25;123:7,11;
169:8;176:8,18;
177:2,10;178:20;
179:10,15,22;180:10,
16,19,23

**Wolfe's (3)**
43:7,11,17
**woman (1)**
66:7
**wondering (3)**
6:18;67:12;94:12
**word (2)**
8:19;101:22
**words (1)**
8:18
**work (39)**
26:17;29:10;30:21;
31:18;33:19;35:3,17;
36:17;37:1;43:20;
45:20;46:14,17,20,24;
47:2;48:3,19;49:7;
58:24;62:18;63:22;
64:2;86:23;151:20;
153:14;157:9,12,15;
158:10,25;159:10;
168:4;169:23;170:3;
176:22;194:13,17,21
**worked (26)**
32:13;33:1,9;35:4,
12;36:19;38:12;
43:13;45:6;61:25;
88:16;115:5;116:22;
117:5,25;118:18,23;
121:16,18,21;123:11;
126:18;136:3;148:5;
151:9;180:16
**workers (1)**
93:12
**working (22)**
27:6,16,19;28:19;
29:11;31:19,22;
34:24;35:2;37:4,13;
38:22;43:8,10;44:11;
57:25;59:10;95:11,
13,15;96:22;167:9
**works (1)**
151:7
**world (2)**
108:5;152:3
**worse (1)**
153:10
**worth (1)**
198:7
**Wright (1)**
4:11
**write (1)**
94:9
**wrong (6)**
31:24;83:10,13,17;
138:6;196:23
**wrongful (10)**
84:4;108:5,25;
109:3,7,10,13;174:15,
18,25
**wrote (3)**
45:17;93:14;157:8

**Y**

**Yankee (1)**
4:8
**yard (1)**
153:12
**yards (2)**
92:20;158:14
**year (30)**
14:10;27:6;88:12,
13;90:9,10;91:8,21;
96:19,19,21,21;120:6,
13;150:23;165:6,8,
11;166:15,19,20,23;
168:7,8,15,15,19,21;
192:25;193:5
**years (40)**
9:18;26:6;59:8;
64:20;65:2,16;68:18,
23;69:13;90:14,15;
91:23;93:13;95:12,
19,20,22;96:8,11,12;
97:7;110:18;147:3,7,
17,24;151:1,17;
152:14;153:25,25;
154:3,4,7;165:2;
167:4;168:16;175:9;
184:4,6
**yellow (1)**
78:7
**yesterday (1)**
99:25
**youngest (1)**
17:8
**your- (1)**
57:10

**Z**

**Zan- (1)**
20:20,21
**Zandra (14)**
10:7;12:15;13:4,24;
14:24;16:18,19,25;
17:8;18:11;19:5,8;
25:9,12
**Z-A-N-D-R-A (1)**
10:8
**Zelpo (1)**
123:20
**Z-E-L-P-O (1)**
123:22

**0**

**03 (1)**
107:21

**1**

**1 (2)**
84:25;94:2

**1:32 (1)**
111:14
**10,000 (4)**
166:1,8,15;167:6
**10:42 (1)**
49:22
**10:54 (1)**
49:25
**100 (1)**
197:25
**11:00 (2)**
35:8,10
**11:46 (1)**
84:17
**12 (2)**
102:15;136:12
**12:04 (1)**
84:21
**12:42 (1)**
111:11
**12th (3)**
136:7,22,23
**14 (1)**
153:6
**14.50 (1)**
167:13
**15 (2)**
92:20;95:11
**15:26 (1)**
187:16
**1512 (1)**
8:16
**16 (1)**
102:16
**17 (1)**
95:22
**18 (1)**
143:10
**19 (1)**
178:3
**1980s (1)**
27:15
**1983 (2)**
76:6;80:16
**1984 (7)**
27:19;28:8,21;
31:18;32:22,23;
167:14
**1985 (1)**
27:16
**1987 (1)**
66:8
**1988 (17)**
31:5,6;53:9;66:8;
123:15;124:1,15;
125:11,15,21;126:3,4;
127:6;128:4,4,14;
129:11
**1989 (4)**
99:12;120:5,19;
121:2
**1990 (7)**
31:25;32:1;60:5;

120:6,19;121:5;
143:10
**1991 (3)**
58:19;68:15;136:12

**2**

**2,076th (1)**
99:11
**2,297 (1)**
162:5
**2:31 (1)**
152:6
**2:37 (1)**
152:10
**20 (10)**
59:8;64:20;65:2;
97:7;101:12;158:13;
166:6,8;175:9;179:3
**20,000 (2)**
166:2,3
**2003 (1)**
187:8
**2011 (4)**
9:13;68:15;89:12;
96:24
**2013 (1)**
92:3
**2015 (1)**
91:25
**2017 (3)**
99:10;100:24;
101:12
**2018 (1)**
4:2
**20th (6)**
31:5;53:8;125:20;
126:4;128:4,14
**21 (7)**
95:19,20;153:6;
164:12;165:2,6;
179:13
**22 (1)**
180:2
**22nd (1)**
9:13
**24 (4)**
108:19;148:21,25,
25
**24-hour (1)**
148:16
**25 (2)**
96:8,14
**2667 (1)**
31:25
**2743.48 (1)**
84:5

**3**

**3:00 (3)**
35:6,8;169:17
**3:13 (1)**

4:7
**3:34 (1)**
  187:20
**30 (1)**
  158:14
**30th (3)**
  99:10,25;100:24
**38 (3)**
  95:13,25;96:5

---

## 4

**4/10/65 (1)**
  6:16
**40 (2)**
  33:1;34:25
**401k (1)**
  33:25
**416 (1)**
  4:7
**42 (1)**
  163:18
**45 (1)**
  96:10
**45458 (1)**
  4:9
**49 (1)**
  102:19

---

## 5

**5 (1)**
  4:2
**5:00 (1)**
  169:17
**500 (2)**
  153:5,7
**50-cent (1)**
  169:5
**53 (1)**
  96:12
**54 (1)**
  163:19
**5th (7)**
  31:6;53:8;125:11,
  14;126:3;128:4,14

---

## 6

**61 (1)**
  70:3
**620 (1)**
  157:24

---

## 7

**7.50 (1)**
  169:4
**7:00 (2)**
  35:6,10
**73 (1)**
  19:24
**74 (4)**

---

19:22;71:7;72:15;
  73:2
**75 (1)**
  73:6
**77 (1)**
  178:11

---

## 8

**8163 (1)**
  4:8
**84 (3)**
  26:1;27:8;179:3
**85 (3)**
  26:8,8,13
**86 (2)**
  26:8,13
**8-foot (1)**
  88:25

---

## 9

**9:42 (1)**
  4:2
**91 (2)**
  136:8;179:15
**98 (2)**
  81:3;180:2