IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

ROGER DEAN GILLISPIE,         )
                                     )
             Plaintiff,        )
                                     ) No. 3:13-cv-416
             v.               )
                                   ) Judge Thomas M. Rose
MIAMI TOWNSHIP,            )
         et al.,           )
                                   )
             Defendants.   ) JURY TRIAL DEMANDED

**PLAINTIFF'S OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS
MIAMI TOWNSHIP AND MOORE'S MOTIONS FOR SUMMARY JUDGMENT**

Mike Kanovitz
David B. Owens
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

SUMMARY JUDGMENT STANDARDS .................................................................................. 1

UNDISPUTED FACTS THAT PRECLUDE SUMMARY JUDGMENT ................................. 2

    I.      Three Dayton-Area Women Are Raped in the August of 1988 ................................. 2

    II.    Wolfe Uses His Police Experience In a Failed Attempt to Implicate Gillispie ................. 3

    III.   Detective Moore Suppresses, and Likely Destroys, Material Evidence ............................ 5

    IV.   Moore Uses Undue Suggestion To Generate False and Unreliable Identifications ........... 7

          A.  Moore Created And Administered Suggestive and Biased Photo Arrays ..................... 7

          B.  The Identifications Were The Result of Suggestion and Unreliable ........................... 12

          C.  Moore Continues to Influence the Identifications After the Lineups ........................ 14

    V.    Moore Fabricates and Suppresses Additional Evidence ....................................... 15

    VI.   Gillispie is Convicted and Eventually Exonerated ............................................ 17

ARGUMENT .............................................................................................................................. 18

    I.      Plaintiff's *Brady* Claim Must Proceed To Trial ................................................... 18

Plaintiff was wrongfully convicted of crimes he did not commit, and his right to due process under *Brady v. Maryland* 373 U.S. 83 (1963), and its progeny were violated by the Defendants, who have ignored clearly established law and rest their case on ignoring the extensive evidence of a *Brady* violation in this case that led to Gillispie's conviction being overturned. *Gillispie v. Timmerman-Cooper*, 835 F. Supp. 2d 482, 487-88 (S.D. Ohio 2011). Defendants' references to Prosecutor Folfas are unavailing, particularly given that his testimony is contradicted by Defendant Moore himself. Because this testimony cannot be credited at summary judgement, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014), and because Plaintiff need not show bad faith, *Moldowan v. City of Warren,* 578 F.3d 351 (6th Cir. 2009), the motions must be denied.

          A.  The Defendants Suppressed Material Evidence ................................................... 19

          B.  Suppression of Material Evidence Prejudiced Gillispie's Defense ........................... 23

          C.  Disputes of Facts Preclude Summary Judgement .............................................. 24

              1.   *Folfas' Erroneous Testimony Is Disputed, Including by Moore Himself* ............... 24

    *2. Disputes About What Was In The File When Moore Was Assigned the Case* .................27

    *3. Disputes Concerning Whether Evidence Was "Suppressed" Preclude Summary Judgment* ....28

    *4. Disputes About Materiality Preclude Summary Judgment* ....................................................31

  D. Plaintiff Need Not Prove "Bad Faith" ...........................................................................32

II.    Moore Violated Due Process By Generating False, Unreliable Identifications ..............34

Gillispie's right to a fair trial was violated by the introduction of unreliable identification evidence that was the result of undue suggestion by Defendant Moore. Because there is no dispute that this evidence was used against Gillispie at trial, his claim is actionable under *Gregory v. Louisville*, 444 F.3d 725, 745-46 (6th Cir. 2006). In addition, Moore's motion must be denied because he used a litany of suggestive tactics before and after showing witnesses photo lineups that rendered the identifications utterly unreliable. To the extent Defendants' contend otherwise—that there was no suggestion, and the identifications were reliable—the deeply entrenched factual dispute over the evidence precludes summary judgment. Fed. R. Civ. P. 56.

  A. Due Process Prohibits Suggestively-Generated Unreliable Identifications ................34

  B. A Reasonable Jury Can Conclude Moore's Conduct Was Suggestive ........................36

  C. A Reasonable Jury Can Conclude the Identifications Were Unreliable .....................37

  D. Factual Disputes Preclude Summary Judgment ........................................................37

  E. Vacated State Court Rulings Are Entirely Irrelevant ................................................39

III.    Defendant Moore Violated Due Process By Fabricating Evidence.................................40

A tenant of law is that fabricated evidence cannot be used to influence a criminal prosecution. Doing so violates long-established notions of due process. *Gregory v. Louisville*, 444 F.3d 725, 737(6th Cir. 2006). Defendants have simply ignored the record illustrating a reasonable jury can find that Moore fabricated evidence against Gillispie, including not only the identifications but also misleading statements he put into his police reports that influenced the criminal prosecution, particularly where Moore testified about them at trial. Moore fabricated reports related to Gillispie but also Gillispie's ex-girlfriend, whom he attempted to coerce to falsely testify against Gillispie. When she refused, Moore wrote bogus inculpatory reports, corrupting the criminal process. Summary judgment cannot be granted in the face of such evidence.

IV.    Gillispie's Fourth Amendment Claim Must Be Submitted to the Jury.............................42

The Fourth Amendment prohibits detention in the absence of probable cause, or what is sometimes referred to as "malicious prosecution." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017). While a grand jury can create a presumption of probable cause, such a presumption is defeated where evidence illustrates that determination was based upon fabricated evidence or in the face of a *Brady* violation. *Manuel v. City of Joliet*, 137 S. Ct. 911, 919-20 (2017); *Jackson v. City of Cleveland*, 925 F.3d 793, 821 (6th Cir. 2019); *Harris v. Bornhorst*, 513 F.3d 503, 521 (6th Cir. 2008). Because a reasonable jury can conclude that Moore fabricated evidence, committed a *Brady* violation, or both, the presumption of probable cause is rebutted here, and the matter must be sent to the jury. *Miller*, 866 F.3d at 392.

      A.   Applicable Legal Standard ................................................................................................ 42

      B.   A Reasonable Jury Can Find An Absence of Probable Cause ..................................... 43

      C.   The Criminal Prosecuted Terminated In Plaintiff's Favor ......................................... 45

V.      A Reasonable Jury Can Conclude Defendants Destroyed Evidence ................................. 46

Due process prohibits destruction of evidence in the same way that it prohibits suppression of evidence under *Brady*. The same analysis on the prior claim precludes summary judgment on this one.

VI.      Moore Is Not Entitled to Qualified Immunity .................................................................... 47

Defendant Moore cannot obtain summary judgment because his reference to this doctrine is cursory, because the application of the doctrine is dependent entirely on whose facts to believe, *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004), and because the core constitutional rights at issue here were beyond clearly established in 1990. *Jackson v. City of Cleveland*, 925 F.3d 793, 823-25 (6th Cir. 2019); *Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999); *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989).

VII.   Miami Township's Policies, Practices, And Customs Were The Moving Force Behind The Violation of Plaintiff's Constitutional Rights .................................................................. 49

Miami Township, which is a proper defendant here, is liable for its complete failure to adopt policies that were obviously necessary, its failure to train Township officers in fundamental issues like *Brady* obligations and how to create and administer photographic identifications, as well as its failure to supervise Defendant Moore even though it had notice he was a "rouge" and "cowboy" officer. This case is analogous to *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) and *Gregory v. Louisville*, 444 F.3d 725, 737(6th Cir. 2006), where municipalities with failures like those here cannot obtain summary judgment. A reasonable jury can easily find the Township's deliberately indifferent policies, practices, and customs were the moving force behind the violation of Gillispie's constitutional rights.

      A.   The Township's Absence of Obviously-Needed Policies Was Deliberately Indifferent ................................................................................................................... 51

      B.   The Township's Failure to Train Its Detectives Was Deliberately Indifferent .......... 54

C. The Township Failed to Adequately Supervise Its Detectives .......................................56

D. The Township Ratified The *Brady* Violation Here ...........................................................58

E. A Reasonable Jury Can Find The Township's Policies and Customs Caused Plaintiff's Rights to Be Violated ...........................................................................................58

VIII. Defendants' Remaining Arguments Fail ..............................................................................59

A. The Township Is Obligated To Indemnify Moore .........................................................59

B. Miami Township is A Proper Defendant In this Action ...............................................60

CONCLUSION ...............................................................................................................................60

## TABLE OF AUTHORITIES

*Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994).................................................................... 31, 48

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ....................................................................1

*Aliakbarkhananfjeh v. Schramm*, 194 F.3d 1311 (6th Cir. 1999) ...........................................46

*Allen v. Clark*, No. 1:13CV326, 2014 WL 3016075 (S.D. Ohio July 3, 2014) .........................46

*Anderson v. Liberty Lobby*, Inc., 477 U.S. 242 (1986)................................................................1

*Arizona v. Youngblood*, 488 U.S. 51 (1988)............................................................................47

*Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998) ...........................................................52

*Army v. Collins*, 488 F. App'x 957 (6th Cir. 2012) ................................................................33

*Atkins v. Cty. of Riverside*, 151 F. App'x 501 (9th Cir. 2005)................................................23

*Avery v. Burke Cnty.*, 660 F.2d 111 (4th Cir. 1981) .............................................................. 52

*Ayers v. City of Cleveland*, 2013 WL 775359 (N.D. Ohio Feb. 25, 2013)................................46

*Barber v. City of Salem*, 953 F.2d 232 (6th Cir. 1992) .......................................................... 51

*Barnaby v. Witkowski*, 2017 WL 3701727 (6th Cir. Feb. 17, 2017)........................................40

*Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006) ...................................................................42

*Barton v. Warden,* 786 F.3d 450 (6th Cir. 2016)..............................................................22, 27

*Bd. of County Comm'rs v. Brown*, 520 U.S. 397 (1997) ........................................................ 50

*Beaven v. U.S. Dep't of Justice,* 622 F.3d 540 (6th Cir. 2010) ...............................................28

*Berene v. Nationstar Mortg. LLC*, 686 F. App'x 714 (11th Cir. 2017) ...................................40

*Bermudez v. City of New York*, 790 F.3d 368 (2d Cir. 2015)..................................................21

*Berry v. Schmitt*, 688 F.3d 290 (6th Cir. 2012) ....................................................................40

*Bies v. Sheldon*, 775 F.3d 386 (6th Cir. 2014) .....................................................................22

*Boston Firefighters Union v. Boston Police Patrolmen's Ass'n*, 468 U.S. 1206 (1984) .......................39

## TABLE OF AUTHORITIES (cont.)

*Bracy v. Gramley*, 520 U.S. 899 (1997) ................................................................................. 30

*Brady v. Maryland*, 373 U.S. 83 (1963) ......................................................................... passim

*Brown v. Mississippi*, 297 U.S. 278 (1936) ......................................................................... 49

*Buckner v. Kilgore*, 36 F.3d 536 (6th Cir. 1994) ................................................................. 48

*California v. Trombetta*, 467 U.S. 479 (1984) ..................................................................... 47

*Caminata v. Cty. of Wexford*, 664 F. App'x 496 (6th Cir. 2016) ........................................ 33

*Carrillo v. Cty. of Los Angeles*, 798 F.3d 1210 (9th Cir. 2015) ................................... 21, 49

*Carter v. Bell*, 218 F.3d 581 (6th Cir. 2000) ...................................................................... 33

*Carter v. City of Detroit,* 678 F. App'x 290 (6th Cir. 2017) ............................................... 34

*Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004) .................................. 48

*Cottrell v. Clemons*, 2014 WL 3649185 (W.D. Ky. July 23, 2014) ..................................... 30

*Crockett v. Cumberland Coll.*, 316 F.3d 571 (6th Cir. 2003) ............................................. 44

*D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014) ................................................... 33, 34

*Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016) ..................... 29

*Dodrill v. Ludt*, 764 F.2d 442 (6th Cir. 1985) .............................................................. 39, 40

*Doe v. Claiborne County*, 103 F.3d 495 (6th Cir.1996) ..................................................... 50

*Doe v. Sullivan Cnty.*, 956 F.2d 545 (6th Cir. 1992) ................................................... 50, 51

*Dominguez v. Hendley,* 545 F.3d 585 (7th Cir. 2008) ....................................................... 27

*Eakes v. Sexton*, 592 F. App'x 422 (6th Cir. 2014) ............................................................ 33

*Elkins v. Summit Cnty.,* 615 F.3d 671 (6th Cir.2010) ........................................................ 33

*Emanuel v. County of Wayne*, 652 F. App'x 417 (6th Cir. 2016) ....................................... 45

## TABLE OF AUTHORITIES (cont.)

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280 (2005) ............................................ 40

*Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002) ...................................................................... 50

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) ...................................................................... 21

*Fisher v. City of Memphis*, 234 F.3d 312 (6th Cir. 2000) ...................................................... 48

*Galloway v. United States*, 319 U.S. 372 (1943) ...................................................................... 2

*Garner v. Memphis Police Department*, 8 F.3d 358 (6th Cir. 1993) ................................ 50

*Geter v. Fortenberry*, 849 F.2d 1550 (5th Cir. 1988) .............................................................. 49

*Giglio v. United States*, 405 U.S. 150 (1972) ............................................................................ 18

*Gillispie v. Timmerman-Cooper*, 835 F. Supp. 2d 482 (S.D. Ohio 2011) ...................... 17

*Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656 (6th Cir. 2004) ............................................ 60

*Goodloe v. City and County of Denver*, 2007 WL 2697605 (D. Colo. Sept. 11, 2007) ............ 36

*Graham v. Connor*, 490 U.S. 386 (1989) ................................................................................. 43

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) .................................... passim

*Gumm v. Mitchell*, 775 F.3d 345 (6th Cir. 2014) .................................................................. 22

*Hale v. Kart*, 396 F.3d 721 (6th Cir. 2005) ........................................................................... 44

*Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007) ................................................................ 34

*Hall v. Shipley*, 932 F.2d 1147 (6th Cir. 1991) ...................................................................... 48

*Harris v. Bornhorst*, 513 F.3d 503 (6th Cir. 2008) ............................................................. 44

*Heck v. Humphrey*, 512 U.S. 477 (1994) ................................................................................. 46

*Hensley v. Carey*, 818 F.2d 646 (7th Cir. 1987) .................................................................... 36

*Hernandez-Cuevas v. Taylor*, 723 F.3d 91 (1st Cir. 2013) .............................................. 43

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) ............................................................................ 41

*Hutsell v. Sayre*, 5 F.3d 996 (6th Cir. 1993) ......................................................................... 36

*In re Siggers*, 615 F.3d 477 (6th Cir. 2010) ............................................................20

## TABLE OF AUTHORITIES (cont.)

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) ................................... passim

*Jamison v. Collins,* 291 F.3d 380, 388 (6th Cir. 2002) ............................................ 29

*Jefferson v. Lewis*, 594 F.3d 454 (6th Cir. 2010) ..............................................2, 27

*Jefferson v. United States*, 730 F.3d 537 (6th Cir. 2013) ........................................ 29

*Jimenez v. City of Chicago,* 732 F.3d 710 (7th Cir. 2013) ........................................55

*Johnson v. Rollins*, 2006 WL 2546807 (E.D. Mo. Aug. 31, 2006) ..........................36

*Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986) ...........................................52

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ...........................................20

*Kelly Servs., Inc. v. Creative Harbor, LLC,* 846 F.3d 857 (6th Cir. 2017) ..................52

*King v. Harwood*, 852 F.3d 568 (6th Cir. 2017) ...........................................43, 44, 46

*Kluppelberg v. Burge*, No. 13 C 03963, 2017 WL 3142757 (N.D. Ill. July 25, 2017)..................................20, 28

*Kogut v. County of Nassau*, 2009 WL 5033937 (E.D.N.Y. Dec. 11, 2009) ...............39

*Kyles v. Whitley,* 514 U.S. 419 (1995) ....................................................................20

*Larson v. Napier*, 700 F. App'x 609 (9th Cir. 2017) ..............................................58

*LeFever v. Ferguson*, 645 F. App'x 438 (6th Cir. 2016) ..................................... 33, 48

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) ..........................................41

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) .......................................................49

*Lisker v. City of Los Angeles*, 780 F.3d 1237 (9th Cir. 2015) ...................................41

*Manson v. Braithwaite*, 432 U.S. 98 (1977)..................................................34, 35, 38, 49

*Manuel v. City of Joliet*, 137 S. Ct. 911 (2017)........................................................47

*Marshall v. Rose*, 499 F.2d 1163 (6th Cir.1974) .....................................................56

*Matulin v. Village of Lodi*, 862 F.2d 609 (6th Cir. 1988) ........................................59

*Mayer v. Mylod,* 988 F.2d 635 (6th Cir. 1993) ............................................................... 45

**TABLE OF AUTHORITIES (cont.)**

*McNeill v. Bagley*, 2018 WL 3348876 (N.D. Ohio July 9, 2018) ................................... 22

*Miller v. Calhoun Cnty.*, 408 F.3d 803 (6th Cir. 2005) ................................................ 54

*Miller v. Maddox*, 866 F.3d 386 (6th Cir. 2017) ............................................ 42, 43, 44, 46

*Miller v. Pate*, 386 U.S. 1 (1967) .................................................................................. 49

*Moldowan v. City of Warren,* 578 F.3d 351 (6th Cir. 2009) .................................... passim

*Mooney v. Holohan*, 294 U.S. 103 (1935) ................................................................ 48, 49

*Moore v. Rees*, 2007 WL 1035013 (E.D. Ky. Mar. 30, 2007) ...................................... 45

*Napue v. Illinois*, 360 U.S. 264 (1959) ..................................................................... 33, 49

*Neil v. Biggers*, 409 U.S. 188, 199 (1972) ............................................................ 34, 35, 49

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir.2001) ................................................. 21, 49

*Obrycka v. City of Chicago*, 2012 WL 601810 (N.D. Ill. Feb. 23, 2012) ....................... 59

*Ohnemus v. Thompson*, 594 F. App'x 864 (6th Cir. 2014) ......................................... 46

*Owen v. City of Independence*, 445 U.S. 622 (1980) .................................................... 51

*Pace v. City of Des Moines*, 201 F.3d 1050 (8th Cir.2000) ............................................ 36

*Parker v. City of Detroit*, No. 16-CV-13036, 2018 WL 4206968 (E.D. Mich. Sept. 4, 2018) .................. 48

*Paterek v. Vill. of Armada, Michigan*, 801 F.3d 630 (6th Cir. 2015) ............................ 58

*Peterson v. Heymes*, 931 F.3d 546 (6th Cir. 2019) ................................................. 39, 40

*Pippenger v. McQuik's Oilube, Inc.*, 854 F.Supp. 1411 (S.D. Ind. 1994) ....................... 30

*Poe v. Haydon*, 853 F.2d 418 (6th Cir. 1988) .............................................................. 48

*Provience v. City of Detroit*, 529 F. App'x 661 (6th Cir. 2013) ................................. 22, 33

*Pyle v. Kansas*, 317 U.S. 213 (1942) ...................................................................... 48, 49

*Richko v. Wayne Cnty.*, 819 F.3d 907 (6th Cir. 2016) ................................................... 51

## TABLE OF AUTHORITIES (cont.)

*Rivera v. Guevara*, 319 F.Supp.3d 1004 (N.D. Ill. 2018) ............................................................28

*S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553 (6th Cir. 2007) ................................ 47, 60

*Sanders v. Jones,* 845 F.3d 721 (6th Cir. 2017) ...........................................................46

*Selective Insurance*, 706 F. App'x at 266 ...........................................................44

*Simmons v. United States*, 390 U.S. 377 (1968) ...................................................... 34, 56

*Slinger v. Pendaform Co.,* 2019 WL 3035589 (6th Cir. July 11, 2019) .........................................2

*Smiles v. Royster*, No. 18-1440, 2018 WL 4998196 (6th Cir. Oct. 1, 2018) ....................................40

*Smith v. Hudson*, 600 F.2d 60 (6th Cir. 1979) ...........................................................53

*Spurlock v. Satterfield,* 167 F.3d 995 (6th Cir. 1999) ............................................... 48, 49

*State v. Gillispie*, 2012-Ohio-1656 ...........................................................18

*Stovall v. Denno*, 388 U.S. 293 (1967) ...........................................................34

*Strickler v. Greene*, 527 U.S. 263 (1999) ...............................................19, 23, 29, 33

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) ...............................................42, 43, 46

*Taylor v. City of Chicago,* 2019 WL 4597383 (N.D. Ill. Sept. 23, 2019) .....................................30, 42

*Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir.2005) ...........................................50

*Thomas v. Cook County Sheriff's Department*, 604 F.3d 293 (7th Cir. 2010) ....................................51

*Tolan v. Cotton*, 572 U.S. 650 (2014) ........................................................... 1, 2, 24

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) ...........................................52

*United Sates v. McComb*, 249 F. App'x 429 (6th Cir. 2007) ...........................................39

*United Sates v. Warshak*, 631 F.3d 266 (6th Cir. 2010) ...........................................2, 27

*United States v. Agurs*, 427 U.S. 97 (2009) ........................................................... 23, 33

*United States v. Bagley*, 473 U.S. 667 (1976) ........................................................... 19, 30

*United States v. Diebold, Inc.,* 369 U.S. 654 (1962) ...........................................26

## TABLE OF AUTHORITIES (cont.)

*United States v. Lochmondy*, 890 F.2d 817 (6th Cir.1989) ............................................................................48

*United States v. Sanchez*, 24 F.3d 1259 (10th Cir.1994) ............................................................................35

*United States v. Stewart*, 628 F.3d 246 (6th Cir. 2010) ....................................................... 28, 60

*United States v. Wade*, 388 U.S. 218 (1967) ............................................................................56

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) ............................................................................23

*Weber v. Seterus*, Inc., 2018 WL 1519163 (N.D. Ill. Mar. 28, 2018) ................................................ 30

*Wheatt v. City of E. Cleveland,* 2017 WL 5187780 (N.D. Ohio Nov. 9, 2017) ....................................35, 39

*Wheatt v. City of E. Cleveland*, No. 1:17-CV-00377, 2017 WL 3174285 (N.D. Ohio July 26, 2017) ......46

*Willis v. Jones*, 329 F. App'x 7 (6th Cir. 2009) ............................................................................29

*Wray v. Johnson*, 202 F.3d 515 (2nd Cir.2000) ............................................................................36

*Youngblood v. West Virginia*, 547 U.S. 867 (2006) ............................................................... 18, 47

## STATUTES AND OTHER AUTHORITIES

28 U.S.C. § 2254 ............................................................................23, 46

Fed. R. Civ. P. 30(b)(6) ............................................................................52, 60

FED. R. CIV. P. 56(a) ............................................................................1

## INTRODUCTION

This case presents a profound tragedy: Plaintiff Dean Gillispie was wrongfully convicted of sexual assaults he did not commit. Meanwhile, the victims of those sexual assaults have been denied the justice they are due because the wrong man sat in prison for decades. This tragedy was no accident; it was the result of the concerted efforts of Defendant Scott Moore, acting pursuant to the practices, policies, and customs of Defendant Miami Township, which also violated Gillispie's constitutional rights. At summary judgement, Defendants must accept Plaintiff's facts—namely, that Gillispie is innocent and it is extremely unlikely that he would be wrongfully identified as the perpetrator of the assaults absent suggestion from Moore. Defendants must also accept the fact that supplementary exculpating Gillispie reports written by two other Township officers exist and that they were not disclosed, in violation of due process. Defendants must further accept that many issues are disputed and that, at summary judgment, they cannot simply ask the Court to ignore evidence that contradicts their account. But, Defendants do not accept Plaintiff's facts, and they do not acknowledge pervasive factual disputes. Instead, Defendants construe disputed facts *against* Gillispie. Courts may not resolve disputes of fact in favor of the party seeking summary judgment. Instead, Gillispie is entitled to have the jury adjudicate his well-supported constitutional claims.[1]

## SUMMARY JUDGMENT STANDARDS

Summary judgment is warranted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). "In making that determination, a court must view the evidence '"in the light most favorable to the opposing party."'" *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). As a consequence, this Court

---

[1] Plaintiff will voluntarily dismiss his state-law claims for (1) spoliation, (2) malicious prosecution, and (3) intentional infliction of emotional distress against Moore and the Township.

1

may not blindly accept Defendants' denials as it concerns liability; it "must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story" *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010) (citation omitted); *see Slinger v. Pendaform Co.,* 2019 WL 3035589, at *3 (6th Cir. July 11, 2019) (noting that a defendant's "subjective belief cannot overcome a dispute of material fact in the face of a reasonable inference to the contrary in the non-movant's favor" because [c]rediting the movant's gloss on or subjective belief about the facts does not satisfy Rule 56.") (citing *Tolan*, 572 U.S. at 659) ("Considered together, these facts lead to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion.")).

A plaintiff can prove her case with both direct and circumstantial evidence, *United Sates v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010), as "a jury is 'allowed to make reasonable inferences from facts proven in evidence having a reasonable tendency to sustain them.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 814 (6th Cir. 2019) (quoting *Galloway v. United States*, 319 U.S. 372, 396 (1943)).

## UNDISPUTED FACTS THAT PRECLUDE SUMMARY JUDGMENT

The facts are set out in the light most favorable to Gillispie. Plaintiff also cites and incorporates his Statement of Facts ("SOF") in response to Wolfe's motion for summary judgment as appropriate. Doc. 239, P.ID7159-66.

### I. Three Dayton-Area Women Are Raped in the August of 1988

1. On August 20, 1988, two twin sisters, B.W. and C.W., were forced to perform oral sex after being abducted at gunpoint from the parking lot of the Best Products store in Dayton (the 8/20 Rapes). Doc.230-5, P.ID6106. After seeing news about the 8/20 Rapes, another woman, S.C., reported being forced at gunpoint to perform oral sex on August 5th, though this crime fell within the jurisdiction of the Montgomery County Sherriff's Office. Doc.233-1, P.ID6750.

2.      Detective Gary Bailey investigated the 8/20 Rapes. Doc.222, P.ID4786. Detective Sergeant Steven Fritz supervised Bailey and met with him regarding strategies for the investigation. *Id.* P.ID4846. Bailey interviewed B.W. and C.W., accompanied them to the scene of the crimes, Doc.231-1, P.ID6227, 6233, and noted his interviews. Doc.222, P.ID4848. B.W. and C.W. were shown books of photographs of potential suspects, none of whom were identified. Doc.231-3, P.ID6368, 6410. Together, B.W. and C.W. created a composite image. Doc.219, P.ID4214; Doc.231-3, P.ID6391.One of the twins called MTPD and reported the perpetrator's pants size, which she had observed. Doc.222, P.ID4798. Bailey recorded this information in a supplemental report. *Id.* P.ID4800, 48128-29. S.C. viewed photographs at the Sheriff's Office and made no identification, Doc.163-1, P.ID2552, though she also created a composite. Doc.220, P.ID4299.

3.      Bailey investigated numerous tips and leads regarding the 8/20 Rapes. (Doc 231-1, P.ID6238. Fritz also fielded some calls. Together, Fritz and Bailey developed a profile of the suspect. Doc.221, P.ID4386. In the end, Bailey investigated more than twenty suspects and leads, and had piles of documents concerning these suspects. Doc. 233-3, P.ID6881-6889; Doc.231-1, P.ID6238-39. Eventually, "all the good leads ran out." *Id.* P.ID6231.

4.      Gillispie is innocent of the rapes, and could not have committed them because he was in Kentucky on 8/20 and with a group of friends on 8/5. Doc.231-2, P.ID6270-73, 79-80. Gillispie was traumatized by over 20 years of wrongful incarceration Doc. 168, P.ID3201, 3212-15.

## II.      Wolfe Uses His Police Experience In a Failed Attempt to Implicate Gillispie

5.      At the time of the rapes, Gillispie worked as a supplemental security officer at GM, where he had been employed since 1984. Doc.168, P.ID3144-55, 3147. There, tension and animosity between Gillispie and superiors at GM, including Defendant Wolfe, was well understood and continued after his discharge in 1989. Wolfe SOF, ¶¶6-12, Doc. 239, P.ID7160-61.

6.      In late-1989, over a year after the rapes, and while Bailey was still an MTPD Detective, Wolfe contacted MTPD, claiming Gillispie should be investigated and prosecuted as a suspect. Doc.166, P.ID2997; Doc.221, P.ID4373. Gillispie had been fired from GM shortly before this happened. *Id.* P.ID4571; Doc.168, P.ID3157.

7.      Wolfe had a meeting with then-Chief Thomas Angel, Captain Marvin Scothorn, Fritz, and Bailey. Doc.222, P.ID4880; Doc.221, P.ID4373. Therein, Wolfe showed a single GM ID card bearing Gillispie's photo and claiming it matched a composite from the 8/20 rapes. Doc.163-5, P.ID2580. Bailey and Fritz recognized that, given the labor dispute and unusual behavior for Wolfe, his actions were suspect. Wolfe SOF, ¶¶10-12, Doc. 239, P.ID7160-61. Bailey and Fritz wrote reports documenting this meeting. Doc.222, P.ID4867-68; Doc.221, P.ID4559-60. Chief Angel ordered Bailey and Fritz to investigate Gillispie as a suspect, and Bailey conducted this work under Fritz's supervision. Doc.221, P.ID4384; Doc.221-5, P.ID4696-97; Doc.222, P.ID4883.

8.      Eventually, Bailey and Fritz concluded that Gillispie should be eliminated as a suspect. Doc.222, P.ID4883. Today, Bailey and Fritz are unable to list *all* of the reasons they eliminated Gillispie as a suspect, and the reports they wrote detailing their reasons remain secreted, if not destroyed. *Id.* P.ID4859. Some of the reasons Gillispie was eliminated as a suspect include: (1) Gillispie was too large to have the pants size of the perpetrator and other physical descriptors; (2) Gillispie's lack of any criminal history, while the perpetrator's brazenness strongly suggested extensive criminal history; (3) the perpetrator, who told the victims his name was "Roger," most likely would not have provided his real name; and (4) Wolfe's animosity toward Gillispie from his termination at GM. *Id.* P.ID4798, 4800, 4858-59, 4894-95; Doc.221, P.ID4376, 4571; Doc. 221-5, at P.ID4649-53. Fritz and Bailey are unable to describe all the reasons Gillispie was eliminated because the reports that might refresh their recollection have not been produced.

9. Fritz relayed his findings to Chief Angel, who agreed with Fritz and Bailey. Doc.221, P.ID4525, 4546. Fritz and Bailey also wrote supplemental reports memorializing their work and elimination of Gillispie. *Id.* P.ID4546; Doc., 231-1, P.ID6233; Doc.222, P.ID4856. Bailey submitted all of these supplemental reports to Fritz, and they were placed into two files—the Records Division file, and the "Working File," housed in the Detectives' section. Doc. 222, P.ID4802-03, 4808-09, 4856. Bailey recalls these supplements being in the Detective's working file, is confident that Fritz put the original in the Records Division file, *id.*, and Fritz testified the these reports were sent to records "with the original case file." Doc. 221-5, at P.ID4649.

### III. Detective Moore Suppresses, and Likely Destroys, Material Evidence

10. Bailey was assigned out of the detective division in November 1989. Doc. 233-6, P.ID6950. The rape investigation was then inactive. Doc. 222, P.ID4812. Fritz left the department mid-June of 1990. Doc.221 P.ID4406. Before assigning the 8/20 rape investigation to Moore, Fritz informed the Chief Angel and Captain Scothorn that Moore needed supervision on the matter, due to the fact that he can be overzealous, go "rouge," and continue pursuing cases even when he lacked evidence. Doc. 221, P.ID#4561-62, 64-65. Moore's reputation as a rogue "cowboy cop" was well known at MTPD. *Id.* In fact, Scothorn advocated against Moore being hired, expressing to others he believed Moore was too arrogant. Doc. 270, P.ID8788. At another point, Moore was also kicked off of an inter-agency task force due to his refusal to operate within the command structure and continued "independence." Doc. 271, P.ID9001-03.

11. Nonetheless, on June 18, 1990, Moore was assigned the 8/20 rape case. Doc.170, P.ID3619; Doc.221, P.ID4363. Moore received all of the supplemental reports from the detectives section and permanent records that predated his involvement in the investigation, including the reports detailing the first meeting with Wolfe and the elimination of Gillispie as a suspect. Doc.170, P.ID3488; Doc.222, P.ID4803, 4861; Doc. 270, P.ID8828 (describing reports being filed

consistently); Doc. 276-13, P.ID10008 ("Fritz evidently laid the case on my desk."); *id.* 10155-56 (Moore testifying Fritz gave him the file, including 5 GM badges); SOF, ¶9. As Moore's ex-wife explained, the existence of the Fritz/Bailey reports frustrated Moore. Doc. 229-5, P.ID5700. However, pursuant to the Township's customs and practices, Moore had the ability to remove the Working File and Records File out of MTPD without any tracking. Doc. 222, P.ID4884, 4923-24. Moore also stored a file related the 8/20 rape investigation in his garage, which he never produced and has been destroyed. Doc. 170, P.ID3401.

12.     Moore then suppressed handwritten notes and typed reports concerning: (1) the initial meeting with Wolfe; (2) the pants size of the perpetrator; (3) Bailey's report eliminating Gillispie as a suspect approved by Fritz; and (4) Fritz's report to Chief Angel about elimination of Gillispie as a suspect. Doc.222, P.ID4798, 4800-01, 4859, 4867-68; Doc.221, P.ID4559-60; Doc.230-5, P.ID6106-25. These reports were not produced to the prosecutor or Gillispie's defense attorney, and have not been produced in this civil case. Doc.224, P.ID5130.

13.     To complement his suppression, Moore wrote his own supplemental reports omitting Wolfe's initial meeting at MTPD and the entire circumstances concerning elimination of Gillispie as a suspect. Doc. No. 230-5, P.ID #6106. Instead, Moore fabricated that Gillispie was a "new" suspect when he took over in June 1990 even though he knew it to be false. *Id.*; Doc.170, P.ID3589. Consistent with Township practice and custom, unlike prior handwritten reports from 1988 and 1989, Moore's "supplements" were electronic and consist of a single electronic file over which he had exclusive control. Moore was able to therefore edit and write "supplements" after-the-fact and without them having ever been reviewed. Doc. 170, P.ID#3647-52. This was consistent with the fact that Township officers were not required to turn in supplements to supervisors at any particular time or contemporaneous with them being written but could wait until the conclusion of

the investigation to submit them. Doc. 273, P.ID9455, 9459; Doc. 275, P.ID9663-64, 9672-73. Moore followed this practice and did not submit contemporaneous reports. Doc. 170, P.ID3435.

14.     Moore met with Wolfe the day he was assigned to investigate the rapes, and continued to do so repeatedly thereafter. Wolfe SOF, ¶¶26-34, Doc. 239, P.ID7164-65. To give the impression Wolfe had not previously brought a single-ID badge to MTPD, Moore's reports document only the additional GM ID badges Wolfe brought to the Township after Gillispie had been eliminated by Fritz and Bailey. Doc. 231-3, at P.ID6332-34.

**IV.     Moore Uses Undue Suggestion To Generate False and Unreliable Identifications**

15.     Each of the three victims identified Gillispie as the perpetrator during the photo lineup procedures, all of which were administered by Moore roughly two years after the rapes. Doc.230-5, P.ID6106, 6113.

### A.     Moore Created And Administered Suggestive and Biased Photo Arrays

16.     Moore was a biased administrator of the photo lineups because he was the officer investigating the case, he knew who the suspect was, and he even wrote that he *hoped* the victims would identify Gillispie. Doc. 230-5, P.ID6106-6125. Moore's bias impacted the entirety of his actions with the victims and caused him to steer the victims to identify Gillispie. Doc. 230-10, P.ID6179; Doc 233-1, P.ID6763-64. Both sides' experts agree that, on the assumption Gillispie is innocent (which must currently be presumed), "there is a very low probability that three separate eyewitnesses would select him as the perpetrator unless some suggestion (bias) and/or administrator influence occurred." Doc. 276-2P.ID#9794; Doc. 276-3, P.ID#9800.

17.     There were established police practices concerning identifications in 1990 and long before, concerning avoiding undue suggestion, creating photographic lineups, and in exercising caution with potential identification evidence. Doc. 230-10, P.ID6172-73; Doc. 276-3, P.ID9800; Doc. 233-1, P.ID6764; *id.* at P.ID6806 (describing a 1992 training key cited by experts on both sides

7

as reflective of standards also in effect in 1990); Doc. 276-12 at P.ID9979 (describing, and attaching police training keys from 1966 and 1983); Monheim Dep., Doc. 272, P.ID#9136, 9186-87, & 9292. Moore departed from these established police practices in numerous ways. *See* Doc. 233-1, P.ID6760-61, 63-66, & 6806-08; Doc. 230-10, P.ID6172-73.

18.      Moore told each of the victims that he had a possible suspect for the rapes *before* conducting the lineups. Doc. 231-3, P.ID6307-08. In making this statement, Moore encouraged the victims to make a selection, even if they did not see a photo they believed was the perpetrator. Doc. 230-10, P.ID6172. Doing so was improper. Doc. 272, P.ID9172-73.

19.      Moore also departed from accepted police practices in how he assembled the lineups. First, Moore also did not contemporaneously make a copy of the photo lineups he showed. Doc. 231-3, P.ID6299. As a consequence, we do not actually know what the photo arrays shown to the victim's look like. Three have been pointed to in discovery, but Montgomery County Prosecutor's office has produced a fourth lineup, which includes a different picture than the others. Doc. 276-1, P.ID9793. The existence of this lineup contradicts Moore's testimony he only made three lineups. Doc. 170, P.ID3469-70. There is, therefore, a question of material fact about precisely what Moore showed to the victims, which raises concerns about the administration of these lineups, Doc. 276-3, P.ID9808, and it cannot be determined whether there were any writings or marks on the front of the photo lineup that may have further steered the victims into identifying Gillispie. Doc. 256 P.ID7805-07. Moore's failure to document the lineups deviated from the form he filled out, which says "ALSO RUN A COPY OF THE PHOTO SPREAD USED!" Doc. 170-4, P.ID3822-29. Because of Moore's actions, including not producing any recordings of the identifications, there is no objective, contemporaneous record of what transpired. Doc. 170, P.ID3489-91; Doc. 229-5, P.ID5700; Doc. 276-1, P.ID9801.

20. Second, Moore intentionally composed the photo lineups in a suggestive manner, so that victims would very likely—and incorrectly—identify Gillispie's picture. Doc. 233-1, P.ID6764 ("The manner in which the photo arrays were conducted strongly supports an inference that Moore intentionally tried to construct and unfair and suggestive array."); Doc. 229-5, P.ID5699. At the time, accepted police practices required officers to select "filler" photographs that did not make the suspect stand out, but the lineup Moore created failed in this regard. Doc. 233-1, P.ID6764-66; Doc. 221, P.ID4397; Doc. 256, P.ID7817-18. The lineup was biased. Doc.256, P.ID7817-18.

21. The lineups consisted of six photographs, one being of Gillispie, and were allegedly displayed all at once. *E.g.*, Doc. 170-5, P.ID3830. The photograph of Gillispie was taken from a GM ID badge provided by Wolfe. Doc. 231-3, P.ID6334. Moore did not know how old this picture was and took no steps to determine whether it accurately reflected how Gillispie looked at the time of the rapes, roughly two years earlier. Doc. 231-3, P.ID6334-6336.

22. Moore intentionally made Gillispie's picture appear different from the fillers. Doc. 229-5, P.ID5699. For example, unlike the fillers, Gillispie's photo had been enlarged from its original size by the Montgomery Valley Regional Crime Lab, which zoomed in on Gillispie's face. Doc. 170, P.ID3683. Having a picture blown-up for a lineup was unusual; something the lab normally would not do. Doc. 274, P.ID9582. Gillispie's face occupied a far greater proportion of the space on his picture in the photo lineup than any of the other fillers' faces on their pictures; these features increased the suggestiveness of the lineups. Doc. 231-3, P.ID6335; Doc. 170-5, P.ID3830; *see also* Doc. 230-10, P.ID6169-71; Doc 233-1, P.ID6764-66.

23. Enlarging the photo also caused Gillispie's picture to stand out because his face appeared to be wider than the fillers. Doc. 231-3, P.ID6429; Doc. 170-5, P.ID3830. This is significant, in terms of suggestiveness, because the victims' descriptions of the perpetrator included

9

the description of the perpetrator as having a wide face, and the absence of other wide faces impacted the identifications Doc. 231-3, P.ID6429; Doc. 230-10, P.ID6170.

24.     Also, the perpetrator was described as being up to 250 pounds, but multiple fillers look thin. Doc. 170-5, P.ID3830. In addition, the only person pictured who appear to approximate that weight were Gillispie and the picture of Sgt. Tim Wilson, Moore's direct supervisor. Doc. 170-4, P.ID3823-30; Doc. 230-10, P.ID6171. This suggestive difference played a role in the identifications. For example, C.W. narrowed her choice to two of the men pictured, Gillispie and Wilson, because these two men had the fullest faces. Doc. 231-3, P.ID6355; 230-10, P.ID6171.

25.     Another filler was MTPD Officer John DiPietro. Including two Township officers in the photo arrays was a suggestive element and a departure from established police practices given the risk that the victims and witnesses may have seen the office in public or in photos at the police station, contaminating the array.Doc. 233-1, P.ID6760, 6805; Doc. 170, P.ID3668. Moore's claim he did not have additional photos that more closely resembled Gillispie is false (or, at best, disputed); Moore could have, instead, used pictures from the other GM security identification cards provided by Wolfe. Doc. 170, P.ID3680. Moore also could have sought photos from another agency (like the Montgomery County Sherriff's office). Moore neglected these options because wanted the lineups to be highly suggestive. Doc. 233-1, P.ID6766.

26.     The finish on Gillispie's picture was also different than the fillers. The image of Gillispie was glossy, while the fillers' were matted, a fact Moore admits. Doc. 231-3, P.ID6353; Doc. 170-5, P.ID3830. This further contributed to the suggestiveness of the array. Doc. 230-10, P.ID6169; Doc 233-1, P.ID6764. Another suggestive difference between Gillispie and the fillers is the eye color.  Despite S.C.'s description of the perpetrator as having blue eyes, only one of the five fillers had light or blue eyes—resulting in an unfair, biased lineup. Doc. 220, P.ID4298; Doc. 170-5, P.ID3830; 230-10, P.ID6164.

10

27.     Moore also claims all of the fillers appear to be white males; but, two of the people in the lineup have markedly darker skin than Gillispie, whose complexion was, and is, notably pale—they do not appear to be white men. Doc. 170-5, P.ID3830; Doc. 230-10, P.ID6170. Moore's decision to include individuals who were darker than Gillispie was intentionally suggestive. Doc. 229-5, P.ID5699. Additionally, a significant difference in in age between Gillispie and Wilson, who is thirteen years older than Gillispie, is also notable in the lineups, Doc. 170-4, P.ID3823.

28.     Once constructed, Moore's administration of the lineups was biased and departed from established police practices. (Because we have no objective record of the entire manner in which Moore, as a biased administrator hoping to get identifications interacted with the victims, though these features increased the likelihood he would influence the identifications. Doc. 230-10, P.ID6173-74.) For the twins, Moore conducted the lineups on consecutive days, and even had one sister contact the other to come to the station the next day where they arrived together. Doc. 230-5, P.ID6110-11. The sisters had an opportunity to discuss who they identified, or planned to identify, in-between the lineup procedures—something that expert Scott has called "beyond incompetent" for how far it departed from established police practices. Doc. 233-1, P.ID6765. Moore should have administered all of the lineups on the same day, or at very minimum taken steps to ensure the victims had no *contact* with one another *at all*, in an effort to avoid co-witness contamination, but did not. *Id.*; Doc. 230-10, P.ID6163. Moore then departed from established procedures concerning S.C. and took no steps to prevent contamination. Doc. 230-10, P.ID6163. As further evidence of bias and going "rouge," Moore contacted S.C. directly without involving someone from the Sheriff's Office—a "highly unusual" act. Doc. 233-1, P.ID6775. Moore's expert agrees this was atypical; jumping into another agency's case would be upsetting and "was unheard of." Doc. 272, P.ID9219.

11

### B. The Identifications Were The Result of Suggestion and Unreliable

29.     Additional factors bear upon the reliability of the identifications at issue: (1) Effects of Limited Opportunity to Observe; (2) Effects of Stress/Arousal; (3) Delay; (4) Description "accuracy"; (5) Composite creation; and (6) confidence at the time of the identifications. Doc. 230-10, P.ID6157. Each one of these, in this case, undermines the reliability of the identification. *Id.*

30.     *Opportunity.* The perpetrator had B.W. and C.W. place a bandana over their eyes for much of the encounter, and wore sunglasses during the encounter, both of which limited the opportunity for them to encode a memory of the perpetrator's identity. Doc. 230-10, P.ID6160. In addition, the perpetrator was in the backseat of B.W.'s car, while the twins were in the front during much of this encounter. All witnesses observed a chrome handgun; its presence—"weapon focus effect"—impairs memory for characteristics related to identification. Doc. 230-10, P.ID6160.

31.     *Stress/Arousal.* All of the victims experienced acute stress during the rapes, which substantially reduced victims' ability to correctly identify the perpetrator, due the stress's adverse impact on their memories. The notion stressful events, including sexual assaults, is "seared" into the brain is inaccurate. *Id.* at P.ID616-62.

32.     *Delay.* A primary and significant concern in this case is the roughly 2-year gap between in rapes and the lineup procedures strongly indicates unreliability, given the fact victims' memories of specific identifiers of the perpetrator decreased relatively quickly after rapes and over the passage of time. *Id.* P.ID6162; Scott Dec., Doc 233-1, P.ID6760.

33.     *Description Accuracy.* A "critical factor" in this case is that Gillispie did not match the description of the perpetrator, Doc. 230-10; P.ID 6165, a fact powerfully undermining reliability given Gillispie is innocent. In ignoring these differences, Moore departed from established police practices. Doc. 233-1, P.ID6772. The differences are many. For instance, the victims described the perpetrator as being very tan, but Gillispie was very pale and unable to tan; the perpetrator had

brownish red hair, but Gillispie's hair was greying; the perpetrator smelled of alcohol, but Gillispie did not drink; the perpetrator smoked cigarettes, but Gillispie not only did not smoke but despised smoking; Gillispie was too large to have been able to wear a pants the same size recalled by one of the victims; Gillispie had a drawl in his voice, which none of the victims described; Gillispie had a cleft chin, but non victim indicated the perpetrator did; and the list goes on. *See* Doc. 233-1, P.ID 6772, Doc. 2301-10, P.ID6165-68; Doc. 276-5, P.ID 9838-42, 46-49 (describing differences between Gillispie and the perpetrator). These differences are significant, regardless of more generic features like being a large white man. Doc. 2301-10, P.ID6166. Tellingly, the likely perpetrator—Kevin Cobb—does closely match the description of the perpetrator. *Id.* at 6168. *See infra*, SOF, ¶¶49-50.

34.     *Composite*. Both the process of creating and then subsequently viewing a composite can increase the likelihood of a mistaken identification, particularly where witnesses see those images both before and after a lineup, including, as here, in court proceedings. *Id.* 6168-69.

35.     *Confidence at the Time of Identification*. Witness confidence is malleable—and frequently overstated. Doc. 230-10, P.ID6175-76. In non-biased situations (which not the case here), witnesses who quickly select a photo are more reliable, while the longer it takes to make a selection indicates unreliability. *Id.* Here, despite all of the suggestion, the witnesses were still nonetheless slow to make identifications, rendering the selections unreliable. Moore indicated that C.W. took "a couple minutes" to narrow her selection to two photographs; B.W. took a minute to make a selection; and S.C. selected Gillispie in somewhere between 2 and up to 15 minutes and while looking at pictures in two locations. Doc. 170-4, P.ID3822-29; Doc. 230-10, P.ID6171. The fact that a minute or more passed before each victim identified Gillispie indicates the identifications were likely unreliable. Doc. 230-10, P.ID6171. Moore's expert, John Wixted, concedes that if, as Dr. Dysart opined, the times reflected in Moore's documents and testimony are the amount of time it took to make the identifications (the "response latency") they indicate unreliability. Doc. 277, P.ID10348-10349.

## C. Moore Continues to Influence the Identifications After the Lineups

36.     Another factor in assessing the reliability of the trial identifications is the extent to

which they were impacted by post-identification feedback. The impacts of post-identification

feedback are extremely strong, Doc. 230-10, P.ID6177After B.W. and C.W. had identified Gillispie,

Moore told them together: (1) they both had selected the same person; (2) Gillispie's name is

"Roger," which is the same name that was given to them by the perpetrator; and (3) Gillispie had

been a security guard at GM, keeping in mind that the perpetrator falsely identified himself as a

security guard. Doc. 231-3, P.ID6307, 6418; Doc. 230-5, P.ID6111. Separately, Moore told S.C. she

had identified the person he believed was the perpetrator. Doc. 170, P.ID3563; Doc. 230-5,

P.ID6113. These statements—a departure from accepted policing standards—inflated the victims'

confidence in their identifications, and further undermined the reliability of any subsequent

identifications. Doc. 230-10, P.ID6177-6178; Doc 233-1, P.ID6765. Moore's post-identification

feedback contradicted the standards of policing in the early 1990s and reflected poor training.  Doc.

230-10, P.ID6177-78; Doc. 272, P.ID9154, 9296.

37.     Moore continued to meet with the victims after the lineups and before the victims

were asked to identify Gillispie in court. Doc. 231-3, P.ID6357. At some point, Moore told the twins

that the person they identified, Gillispie, would be in court during the hearing. Doc. 231-3,

P.ID6357. Confirming that the man the victims identified in the photo lineups would be in court

was particularly troublingly because, if given the opportunity, the victims were likely to identify the

man they previously identified *regardless* of whether he was the actual perpetrator. Doc. 230-10,

P.ID6178; Doc 233-1, P.ID6765-6766.

38.     Egregiously, Moore also told the twins Gillispie did various things to try to change

his appearance before the hearing, including dying and cutting his hair. Doc. 231-3, P.ID6358.

Moore told the twins Gillispie changed his appearance in an attempt to fool the victims into not

14

identifying him in court. Doc. 229-5, P.ID5700. These statements by Moore influenced the victims' memory and contaminated and made further unreliable their in-court identifications. Doc. 230-10, P.ID6164-6165; Doc 233-1, P.ID6765-6766; Doc. 231-3, P.ID6435. These statements were also a shocking departure from established police practices. Doc 233-1, P.ID6762-6763.

39.     Unsurprisingly, all three victims incorrectly identified Gillispie as the perpetrator in court. Doc. 231-3, P.ID6375, 6416, 6446. Three of the (unknown number of) photo lineups were introduced into evidence at both of Gillispie's criminal trials, and Moore testified about these three lineups at each trial. Doc. 276-13, P.ID10020-33, 10136-43, & 10148-52.

**V.     Moore Fabricates and Suppresses Additional Evidence**

40.     Moore also contacted Gillispie and his family, and Gillispie eventually came to the police station and sat for an interview. Moore's reports concerning these interactions include deliberate falsehoods. For example, Moore refused to tell Gillispie why he wanted to speak with him and what he was investigating, Doc. 229-10, P.ID5778-79, but instead wrote in his reports he had told Gillispie the investigation was about the 8/20 Rapes, and suggested that Gillispie offered a defensive account with a guilty conscience, which was false. Doc. 230-5, P.ID6111-12. When Moore asked Gillispie vague questions about summer of 1988, to see if Gillispie might have an alibi, Gillispie did not know the significance of any of the dates at the time "or why he was being asked about those dates in particular." Doc. 229-10, P.ID5779. Moore also added information to the *Miranda* form after-the-fact. *Id.* Moore testified to the substance of these reports at trial. *E.g.,* Doc. 276-13, P.ID 10036-38, 10096-98, 10144-47, & 10170. In response, Gillispie testified about the interview in rebuttal to Moore's testimony. Doc.231-2, P.ID6267, 6270, & 6272.

41.     In addition, Moore's supplemental reports include purported interviews with Gillispie's ex-girlfriend, Torrie Mitchell (f/k/a Strohman), Doc. 230-5, at P.ID6122-23. Those reports include falsehoods, and reveal Moore's efforts to fabricate evidence against Gillispie by

15

making it seem like he matched the description of the perpetrator when he did not. For example, Moore wrote in report that Mitchell told him Gillispie wore a gold chain (like the one described by the twins), *id.,* but she "never told him that Dean wore a gold chain with an emblem." Doc. 276-7, P.ID9865. Instead, Moore tried to convince her Gillispie was guilty. *Id.*

42. Moore's reports also indicate that Mitchell said she and Gillispie would have sex near or at the locations of the rapes, Doc. 230-5, at P.ID6122-23, but Mitchell confirms that Moore was trying to convince her of this fact, and she told Moore repeatedly that this was not true. Doc. 276-7, P.ID9865-66. In fact, Moore was calling and harassing Mitchell, threatening her in an attempt to coerce false testimony against Gillispie. *Id.* Moore also audio recorded some of his conversations with Mitchell, but would turn the tape off and on, and subsequently wrote-up a misleading version of the "transcript" that includes things that were changed or even things that Mitchell did not say. *Id.*

43. Moore had audio recordings of conversations with witnesses from the investigation. Doc.229-5, P.ID5700; Doc.230-5, P.ID6106. No such recordings were produced to Gillispie's defense attorneys, or in this case. Doc.170, P.ID3490-3491.

44. Moore had the opportunity to attempt to undermine Gillispie's alibi for the 8/20 rapes before Gillispie knew what he was going on. Moore suppressed, and likely destroyed, evidence that Gillispie regularly went to Kentucky at the time of the crimes, as confirmed through an investigation by Fritz who had been hired to perform specific tasks for Gillispie's defense. Doc.168, P.ID3242); Doc.221, P.ID4417, 4433, 4488-89, 4509; Doc.234-1, P.ID6969; Doc.168, P.ID3248.

45. Gillispie retained experienced defense attorney Dennis Lieberman. At some later point, Lieberman hired a company called Area Wide Investigations to perform discrete tasks. Doc. 224, P.ID5172, 5174. The tasks were narrow, due to Gillispie's limited financial resources. Doc. 224, P.ID5179. Area Wide assigned Fritz for some of these tasks; Fritz did not perform "big picture" analysis or participate in strategy. Doc. 224-3, P.ID5251.

16

46.     One task was obtaining records from Cave Run Lake in Kentucky. Doc. 221, P.ID4433, 4488-89. However, when Fritz went to obtain them, the records were in disarray, indicating that somebody else had recently been to the campground searching for the same documents. *Id.,* P.ID4509. Fritz confirmed that, while there were dozens of registrations for July 1988, there were almost *none* for August 1988, despite good weather. Doc. 234-1, P.ID6969; Gillispie also learned, from a ranger, that other officers had been to the campground requesting the same cards. Doc. 168, P.ID3248. Moore admits to having obtained some Cave Run Lake registrations, Doc. 276-13, P.ID10039, but Gillispie and his friends were far more often. Doc.231-2, P.ID6267, 6270-72. Complete records documenting these trips have not been disclosed.

## VI.     Gillispie is Convicted and Eventually Exonerated

47.     Moore initiated the charges against Gillispie. Doc. 230-5, P.ID6114-15; Doc. 170, P.ID3382. At this point, and at no point thereafter, did Moore disclose the entire file for the 8/20 rape investigation, including the supplemental reports concerning Wolfe's first meeting with MTPD officers, the elimination of Gillispie of as a suspect, records from Kentucky, and the entirety of his audio recordings. Moore also did not disclose the suggestive tactics he took concerning the identifications or the misconduct he committed in fabricating reports about Wolfe, his interview with Gillispie, or his threats made to Mitchell.

48.     Moore is the only known witness to have testified before the grand jury. Doc. 170, P.ID3375. Gillispie was charged and then tried in February 1991 and, again, after a new trial was granted, in June of 1991. Gillispie was convicted each time. *Gillispie v. Timmerman-Cooper*, 835 F. Supp. 2d 482, 487-88 (S.D. Ohio 2011); Doc., 229-6, P.ID5706-07. Moore testified against Gillispie each time. Doc.231-5 P.ID6472; Doc.231-7 P.ID6499; Doc.170 P.ID3374.

49.     Gillispie maintained his innocence, and his conviction was overturned by two courts. First, a federal court granted *habeas* relief after finding Gillispie's due process rights were violated by

suppression of the Fritz/Bailey reports. *Gillispie*, 835 F. Supp. 2d at 506-09; Doc.229-6, P.ID5724-25. Second, Gillispie's conviction was overturned by the Ohio Court of Appeals on the basis of new evidence concerning an alternative suspect for the crimes, Kevin Cobb. *State v. Gillispie*, 2012-Ohio-1656, on reconsideration, 2012-Ohio-2942, ¶ 46, Docs, 229-7 & 299-8. The Court recognized: "Cobb's physical description resembles the composites and the descriptions given by the rape victims in Gillispie's case—a tall, young, darkly tanned man with light brown or dark blonde hair with a reddish tint, blue eyes, acne along the jaw line, and who was often seen wearing a gold chain and medallion in the late 1980's." *Gillispie*, 2012-Ohio-1656, ¶46, Doc. 229-7, P.ID5733.

50.    In finding that evidence of Cobb was significant enough to warrant a new trial, the Ohio court, emphasized that there was not overwhelming evidence of Gillispie's guilt, and that no physical evidence connected him to the rapes. *Id.* ¶36, P.ID5732. Moreover, the Court explained "the only evidence linking him to the crimes is the perpetrator's use of the name "Roger" and the victims' eyewitness identifications, which were made two years after the crimes were committed. The record further reveals that the jury deliberated long and hard, twice advising the trial court on the second day of deliberations that it was deadlocked, with eight of the twelve jurors in favor of acquittal." *Id.* Gillispie then moved to dismiss the indictment *with prejudice*, a motion that was granted after Ohio did not produce the reports. Doc.230-2, P.ID5802; Doc .230-3, P.ID6101, 6103.[2]

## ARGUMENT

### I.    Plaintiff's *Brady* Claim Must Proceed To Trial

Under *Brady v. Maryland* and its progeny, the prosecution's suppression of evidence favorable to the defense violates due process where that evidence is material either to guilt or to punishment *regardless* of the good faith or bad faith of the prosecution. 373 U.S. 83 (1963); *Youngblood v. West Virginia*, 547 U.S. 867 (2006) (*per curiam*); *Giglio v. United States*, 405 U.S. 150 (1972). Due Process

---

[2] Additional facts concerning Plaintiff's *Monell* claims are discussed below.

requires disclosure of impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667 (1976). As the Sixth Circuit recently reiterated, *Brady* claims have three elements: '[1] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.'" *Jackson*, 925 F.3d 793, 814 (6th Cir. 2019) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

### A. The Defendants Suppressed Material Evidence

As described above, the record indicates that Defendants suppressed the following:

(1)  the supplementary police reports concerning Wolfe's initial meeting with Fritz, Bailey, Chief Angel, and others where he implicated Gillispie in the rapes;

(2)  the report authored by Detective Bailey and approved by Sgt. Fritz, detailing the steps Bailey took in investigating and eliminating Gillispie as a suspect (including the pant size of the perpetrator and other profile information);

(3)  the report Sgt. Fritz wrote to Chief Angel approving Bailey's work, and confirming that, they did not believe Gillispie should have been a suspect;

(4)  the Detectives' Working File;

(5)  the complete Records Division File for the Best Products Rapes;

(6)  the full extent of Moore's suggestion and conduct to procure the identifications;

(7)  exculpatory records from Cave Run Lake, evidencing Gillispie's alibi; and

(8)  exculpatory audio recordings of witness interviews.

All of the foregoing was material and favorable to Gillispie's defense.

*Supplementary Reports (1), (2), & (3)*. Had the supplementary reports been disclosed, *see* SOF, ¶¶7-12, they could have been used to cross-examine Wolfe regarding his actions and motivations in claiming that Gillispie should have been a suspect. Disclosure of the supplementary reports would have also made Bailey a defense witness, both to explain how and why he, as an experienced, detective ruled Gillispie out as a suspect. Had Lieberman known about these reports, Fritz also

would have been a witness. *See infra* P.25. The suppressed reports would have also been available to impeach the integrity of Moore's investigation. *Kyles v. Whitley,* 514 U.S. 419,445-46 (1995) (with the impeachment evidence, the defense could have cross-examined the police and "so have attacked the reliability of the investigation"); *In re Siggers*, 615 F.3d 477, 480 (6th Cir. 2010) (finding *prima facie* evidence of *Brady* claim where evidence: was "exculpatory because it centers on witness statements"; provided a basis to impeach trial testimony; and illustrated "police misconduct").

*The Working File.* The MTPD has never produced the Detective's Working File in the case. Detectives Bailey and Fritz testified that they put the supplemental reports into both this file and the one maintained by the Records Division. There is no dispute this file has never been produced, in any form. Instead, a jury can infer Moore took this file home with him, and kept it for years after Gillispie was convicted. Moore now admits he had a file concerning the case he privately kept and that was destroyed in his garage. The fact that Moore never turned over this file, which contained the supplementary reports, alone demonstrates a violation of due process. *See, e.g., Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) (explaining that "the maintenance of the 'street files,' police files withheld from the state's attorney and therefore unavailable as a source of exculpatory information" violates due process, and "retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated"); *Kluppelberg v. Burge*, No. 13 C 03963, 2017 WL 3142757, at *7 (N.D. Ill. July 25, 2017) (similar).

*Entire Records Division File.* The Township has also been unable to produce the complete Records Division File for the Rapes. While the Township may contend that what it has produced is "everything" there are obvious documents missing. In addition to the Fritz/Bailey supplemental reports, the Township has not produced exculpatory evidence that *was* used at trial that was in the file and discovery, like the scores of leads Bailey reviewed and that made up a substantial part of Lieberman's cross examination. *See* SOF, ¶3. The combined absence of the entire Records Division

File and the Detectives' Working file supports a further inference that there was exculpatory and beneficial material in the file. Defendants' handling of the files is also impeachment evidence. In well run agencies, it is not routine for official files to go "missing" during the course of a serious sexual assault investigation, and where there has been nearly-continuous litigation about the case for decades. Doc. 233-1, at P.6756. The suppression of these materials thus bears upon not only the quality of Moore's investigation but also the policies, practices, and customs of the Township. *Id.*

*Moore's Suggestive and Coercive Tactics.* As detailed above, Moore set out on an intentional course to create lineups that were suggestive and to ensure, as best he could, that Gillispie would be identified. SOF¶¶15-39. Mr. Moore's ex-wife has provided new, powerful evidence of these efforts—which were ultimately successful. *E.g., id.* ¶¶20, 22, &27. This evidence, and the full extent of Moore's efforts at suggestion (which continued *after* the lineups), would have obviously been useful at trial to reveal the problems with the identifications. *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."). The same is true of the extensive and unprofessional efforts Moore took to attempt to coerce Gillispie's ex-girlfriend. All of this is *Brady* material. *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015) (permitting *Brady* claim based upon the failure of officers to disclose full nature of photo identification procedures); *Carrillo v. Cty. of Los Angeles*, 798 F.3d 1210, 1227-28 (9th Cir. 2015) (similar); *Newsome v. McCabe*, 256 F.3d 747, 749, 752 (7th Cir.2001) (under *Brady* it was "clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about … the conduct of a lineup," and holding that the "details of how" police "induced the witnesses" was "vital to probe whether manipulation occurred," and their suppression violated due process).

*Cave Run Lake.* Moore took possession of extensive records illustrating that Gillispie and his friends were regularly at Cave Run Lake in Kentucky when the 8/20 rapes occurred. Plainly, evidence of an alibi is material—it shows Gillispie's innocence directly. *McNeill v. Bagley*, 2018 WL 3348876, at *7 (N.D. Ohio July 9, 2018) (evidence of suppressed alibi evidence is material). Moore denies he had these records, but a reasonable inference from the evidence would easily permit a jury to conclude that Moore obtained these records and did not disclose them. *See* SOF, ¶¶44-46.

*Witness Interviews.* Moore failed to produce recordings of witness interviews, which would have provided contemporaneous, objective evidence of what transpired. Indeed, Miami Township has not produced *any* such recordings in this case, even though some are explicitly mentioned in Moore's supplemental reports. For example, Mitchell has averred she did not say the things Moore attributed to her, and described troubling efforts to implicate Gillispie. All of this would have been material to Gillispie's defense; it would have allowed Mitchell to be a defense witness but also would have provided immense impeachment for Moore's investigation. Doc. 224-2, at P.ID5249-50.

The materiality of this suppressed evidence must be viewed cumulatively. *Gumm v. Mitchell*, 775 F.3d 345, 370 (6th Cir. 2014) (explaining that "the prosecution fails to turn over numerous pieces of favorable evidence, the proper focus of *Brady*'s materiality inquiry is on the cumulative effect of the unsuppressed evidence on the jury's verdict"); *Bies v. Sheldon*, 775 F.3d 386, 399 (6th Cir. 2014) ("When the State fails to turn over numerous pieces of favorable evidence, as it did in this case, the proper focus of *Brady's* materiality inquiry is on the cumulative effect of the suppressed evidence on the outcome of the trial."). When such an analysis is done, there can be no doubt that a reasonable jury can conclude Moore's suppression of this wealth of evidence—police reports, field notes, the working file, *etc.*—violated due process. *E.g.*, *Barton v. Warden,* 786 F.3d 450, 465-67 (6th Cir. 2016) (finding a *Brady* violation based upon police suppression of unrecorded witness statements); *Provience v. City of Detroit*, 529 F. App'x 661, 667 (6th Cir. 2013). (handwritten notes are

22

*Brady* material); *Atkins v. Cty. of Riverside*, 151 F. App'x 501, 505 (9th Cir. 2005) (*Brady* violation for suppressing evidence that "would have cast a shadow across" the police investigation).

### B. Suppression of Material Evidence Prejudiced Gillispie's Defense

To show prejudice, Plaintiff "need not show that he 'more likely than not' would have been acquitted had the evidence been admitted. . . . He must only show that the new evidence is sufficient to 'undermine confidence' in the verdict." *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016). That is, Plaintiff need only show that there is a "reasonable probability" the jury could have reached a different result. *Strickler*, 527 U.S. at 280. In addition, when assessing whether there is a reasonable likelihood of a different verdict, less evidence is required have a potential impact when the conviction is already on shaky grounds. *See United States v. Agurs*, 427 U.S. 97, 113 (1976).

As the Court of Appeals recognized in pointing to evidence about Cobb, SOF, ¶¶49-50, the case against Gillispie stood on shaky grounds, consisting nearly entirely of the three eyewitness identifications—made nearly *two years* after the crimes, after the suggestive identification process employed by Moore (which continued after the lineups), and despite there being dozens of inconsistencies between Gillispie and the description of the perpetrator. Doc. 224, at P.ID5190-91; Doc. 276-5, P.ID 9838-42, 46-49 (describing inconsistencies supported by evidence at trial); Doc. 310-10, at P.ID6165-68 (same). No forensic or physical evidence linked Gillispie to the crimes; in fact, at the second trial, the forensic evidence available from the crime scene *excluded* him. Doc. 224, at P.ID5116. The jury obviously was not steadfast as to guilt, but was instead deadlocked in favor of *acquittal* until after the Court twice ordered them to continue deliberating. SOF, ¶50.

In sum, there is overwhelming evidence of a *Brady* violation here, and that the suppressed evidence would have likely changed the result at trial. Even the affidavits of Fritz and Bailey, alone, were powerful enough to lead to Gillispie's conviction being overturned under the strict standards of AEDPA. 28 U.S.C. § 2254; *Gillispie*, 835 F. Supp. 2d 482. As Lieberman explained, having

23

practiced criminal defense in Montgomery County for 40 years, he stridently believes that had the evidence concerning Wolfe and elimination of Gillispie been disclosed, Gillispie would have been acquitted, particularly because it "would not have taken much to have changed the verdict" in this "hotly contested case." Doc. 224-2, at P.ID5247; Doc. 224, P.ID5189-91. The comparatively low standard at summary judgment—whether there is sufficient evidence to permit a reasonable jury to find for Gillispie—is satisfied. *Gregory v. City of Louisville*, 444 F.3d 725, 744 (6th Cir. 2006).

### C. Disputes of Facts Preclude Summary Judgement

Nearly every fact concerning the *Brady* issues appear to be in dispute. In addition, Defendants have presented these facts by making inferences *against* Plaintiff. They should be prohibited from seeking summary judgment in such fashion. *Cf. Tolan*, 572 U.S. at 656-57.

#### 1. *Folfas's Erroneous Testimony Is Disputed, Including by Moore Himself*

Defendants both point to former Prosecutor Folfas's claim by that Moore told him that Gillispie had been eliminated as a suspect by Fritz and Bailey, and that this was communicated to him in a conversation with Fritz and Bailey, and then discussed in a conversation Lieberman. But, on Plaintiff's facts Folfas must be disbelieved; the supposed conversations never happened.

Folfas's testimony is in conflict with all four witnesses he claims to have spoken with, including Moore. *See* Moore Dep., Doc. 170, at P.ID 3592 -94, 3613; Doc. 233-1, at P.ID6756. Folfas' account cannot be credited at summary judgment. In fact, Moore testified at the suppression hearing Gillispie had *not* previously been a suspect before he met with Wolfe. Doc., 231-3, at P.ID6333 (Q: "Was Roger Dean Gillispie a suspect prior to that point in time?" A: "No, Sir."). Moore repeated similar claims at trial, indicating the investigation of Gillispie began in 1990, and that Gillispie had not been previously investigated and eliminated the year prior. Doc. 276-13, at P.ID10007-08; *cf.* Doc. 276-11, PG.ID9935-36 (Lieberman testifying Moore made him believe Gillispie had not been previously implicated).

24

Tellingly, Moore refuses to admit that the conversation Folfas claims to have had with him actually happened. *See* RTA Responses No. 2-5, Doc. 276-6, PG.ID9854-55. In so doing, Moore has conceded that a "central *dispute* in this lawsuit" is "whether or not Sgt. Fritz and/or Detective Bailey actually 'excluded' Plaintiff as a suspect." *Id.* (emphasis added). If it is Moore's position that the prior elimination of Gillispie *never happened*, and even the *existence* of this elimination is a "central dispute" in this lawsuit, he cannot now seek summary judgment on the basis his *own* testimony and discovery responses should be disregarded. Moore's own testimony is sufficient to create a dispute of fact precluding summary judgment.

Even without Moore, Lieberman's testimony also contradicts Folfas. Lieberman did *not* know that Fritz and Bailey eliminated Gillispie as a suspect before the first criminal trial. Doc.224, PG.ID5173-74; Doc. 224-2, at P.ID5247 (explaining that, in 2007, he was made aware of new evidence "of which I was not aware at the time of trial," including information from Fritz and Bailey concerning the elimination of Gillispie as a suspect). As Lieberman explained:

> I reviewed the Prosecutor's 'discovery packet' but it did not include any of this information. I did not receive these supplemental reports; nor was I provided with this information orally or in any other form. In fact, I was given the opposite impression. At trial, the State made it appear as if the case against Gillispie originated when Wolfe, in April 1990 brought over photographs of 5 GM employees and gave them to Detective Moore. The history of Wolfe having tried earlier with a single photo of Gillispie, and of Bailey and Fritz eliminating Gillispie as a viable suspect, was not made available to me, or the jury.

Doc. 224-2, at ¶6, P.ID5248 (emphasis added). Lieberman confirmed these facts in a 2011 evidentiary hearing. *See* Doc. 276-11, P.ID9932 ("Q: Did you have any knowledge [at either of the prior trials] that Rick Wolfe had come to the police department earlier and Gillispie had been eliminated as a suspect? A: No."); *id.* P.ID9932-33 (testifying he was "absolutely not aware" of the elimination of Gillispie, the pants size, the profile developed by Fritz and Bailey, etc.). Had Lieberman known of the elimination of Gillispie as a suspect in the rapes, he would have called Fritz as a witness during Gillispie's criminal trials. Doc. 224, at P.ID5181-82.

25

The testimony of Fritz and Bailey is also incompatible with Folfas's claims that they called him on the phone and told him about the prior elimination of Gillispie as a suspect. For one, neither Fritz nor Bailey have testified that this phone call happened, and each has given several declarations, testified at the federal *habeas* proceedings, and testified in civil depositions in this matter. Doc. 221; Doc. 222; Doc. 231-1, Doc. 233-3; Doc. 233-4; Doc. 233-5; Doc. 234-1. The inference from this evidentiary gap is clear: their testimony indicates the supposed phone call with Folfas describing the elimination of Gillispie did not happen. *Cf. United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962) ("In any event both findings represent a choice of inferences to be drawn from the subsidiary facts contained in the affidavits, attached exhibits, and depositions submitted below. On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion.").

Indeed, Fritz and Bailey's prior testimony fundamentally conflicts with them having had a conversation with Folfas about eliminating Gillispie. Fritz, describing his testimony on a motion for a new trial, he has sworn that, as it relates to the elimination of Gillispie, has declared: "I *assumed* that the supplemental reports by Bailey about our original meeting with Wolfe, and how Bailey and I had eliminated Gillispie as a suspect, was known to both parties at the hearing. I *assumed* everyone knew about it, because I *assumed* that the reports in the file had been turned over to the prosecution and defense." Doc. 221-6, P.ID4771 (emphasis added); *see also* Doc. 221-5, at P.ID4677 (testifying he had no knowledge the reports had not been turned over when he testified). There would be no reason to *assume* this information had been communicated to the prosecution and defense if Fritz had already had a conversation with the prosecutor about it. Fritz was consistent on this issue, which is why he also did not ever have a conversation with Lieberman about this issue, as Lieberman declared. Doc. 221-5, at P.ID 4669. As to Bailey, he does not recall ever telling Folfas that Gillispie was eliminated as a suspect or that he wrote reports about it. Doc. 222, P.ID4827-28, 4910. After

Bailey left the Detective Division, he did not work or pay attention to the 8/20 rape investigation or have any involvement in the matter—further contradicting any notion he randomly and affirmatively called Folfas. Doc. 222-1, ¶¶5-7 PG.ID1924.

In sum, as Moore's own discovery responses indicate, there are disputed issues of fact on whether Gillispie was eliminated as a suspect by Fritz and Bailey; the fact Folfas has further muddied the water is just another reason to find disputed issues of fact preclude summary judgment.[3]

### 2. Disputes About What Was In The File When Moore Was Assigned the Case

Moore repeatedly argues that, because no one (including himself) has detailed what was in the file when he was assigned the case, Plaintiff cannot show that the supplementary reports were in there. But, this argument ignores the wealth of evidence contradicting Moore's account, including evidence that Moore inherited both the detective division Working File and the Records File directly from Sgt. Fritz. SOF, ¶¶9, 12. Plaintiff need not have direct evidence of the files as they existed when Moore took possession of them; he can point to a wealth of circumstantial evidence that would allow a reasonable jury to find that they were in the file and that Moore suppressed them. *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010); *United Sates v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010).That evidence certainly exists. SOF, ¶¶9, 12. In addition, Moore's ex-wife provided directly evidence contradicting Moore's account. *Id.* ¶¶12; *see generally* Doc. 229-5, P.ID5699-5700.

In fact, at summary judgment the inference from the absence of detailed evidence about what was in the files in the possession, custody, and control of defendants runs the other way: the

---

[3] Even assuming that a portion of Folfas's testimony were credited (that Moore told him about the elimination), there would still be a factual dispute given the suppression of the reports themselves, and whether Moore misled Folfas about the reports not existing. Defendants were not permitted "to turn over some evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs." *Barton v. Warden*, 786 F.3d 450, 468 (6th Cir. 2016). Summary judgment, therefore, cannot be granted. *Cf. Dominguez v. Hendley,* 545 F.3d 585, 589–90 (7th Cir. 2008) (denying summary judgment to officer claiming he could not be liable for a *Brady* violation by arguing some information had been provided to a prosecutor but where an actual report had been suppressed).

fact that neither Moore nor the Township have been able to identify precisely what was in the files at the time they prosecuted Gillispie is a problem of proof for *Defendants* not Gillispie. *Cf. Beaven v. U.S. Dep't of Justice,* 622 F.3d 540, 553 (6th Cir. 2010) (discussing an adverse inference where parties fail to maintain and allow destruction of evidence). The record here is also analogous to cases in which there is a dispute about whether the evidence was suppressed in "working files" maintained by the police and not turned over to the prosecutors. As here, a reasonable jury can find for plaintiff and the facts are in dispute, making summary judgment inappropriate *E.g., Rivera v. Guevara*, 319 F.Supp.3d 1004, 1046 (N.D. Ill. 2018) (denying motion for summary judgment on *Brady* claim where whether evidence was suppressed in "street files" was in dispute and a reasonable jury could find the evidence was suppressed); *Kluppelberg v. Burge*, No. 13 C 03963, 2017 WL 3142757, at *7 (N.D. Ill. July 25, 2017) (similar). In short, a reasonable jury can easily conclude: Bailey and Fritz wrote the reports; put them in the files; that the reports continued to exist until Moore took the files; that Moore saw the reports; and that, after writing his own misleading reports, Moore suppressed this evidence. SOF, ¶¶7-14. Summary judgment is thus inappropriate.

3. *Disputes Concerning Whether Evidence Was "Suppressed" Preclude Summary Judgment*

The Township, in a one-sentence argument, suggests that Plaintiff's *Brady* claim fails because the information was available "from another source"; *i.e.*, Sgt. Fritz. This unsupported, in correct assertion is so cursory as to not warrant a response. *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) ("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

In addition, the Township's argument misapplies the law and ignores the factual record. For one, the law does not permit the prosecution to suppress actual police *reports* themselves; reports that were undisputedly never produced, and that should have been. The actual reports matter, and

are qualitatively different than just knowing "about" some investigative steps. *See, e.g.*, *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 312 (3d Cir. 2016) (finding a *Brady* violation where actual reports "would have given defense counsel unique ability . . . bolster his alibi defense using objective documentary support from a disinterested party" in a way that went far beyond the limited evidence Plaintiff's defense attorneys actually had). Moore's own police-practices expert confirms the importance of police *reports*. Doc., 272, at P.ID9303-05. To be sure, as their testimony makes clear, the passage of time is crucial with respect to Fritz and Bailey's reports: they are unable to remember all of the exculpatory information in the reports, including things like the actual pant-size of the perpetrator, the things Wolfe said in their meeting with other MTPD officials, and other information pertaining to their investigation of Gillispie. SOF, ¶8. This is why the reports matter.

In addition, Lieberman filed motions for and otherwise sought production of all *Brady* material, to which he was told there was none. Doc. 224-4, P.ID5255-62. Lieberman was not required to "repeatedly to scavenge for facts that the prosecution is unconstitutionally hiding from him." *Jefferson v. United States*, 730 F.3d 537, 541 (6th Cir. 2013). The suggestion that Fritz was an otherwise available source that Lieberman was supposed to independently know to question about these issues—where he had no reason to believe or suspect Gillispie had been previously eliminated—is contrary to the law. Due process and "due diligence did not require [Lieberman] to ask the state if it had withheld *Brady* material unknown to him." *Willis v. Jones*, 329 F. App'x 7, 9 (6th Cir. 2009); *see Jamison v. Collins,* 291 F.3d 380, 388 (6th Cir. 2002) (same). Instead, "it was reasonable for trial counsel to rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials would be included in the open files tendered to defense counsel for their examination." *Strickler v. Greene*, 527 U.S. 263, 284 (1999). No reasonable defense attorney would think they should investigate whether the Defendants hid reports exculpating Gillispie, because the letters should have been

29

turned over in the first place. *Banks v. Dretke*, 540 U.S. 668, 695 (2004) (holding that police may not

play hide and seek with the evidence, as such a rule is "not tenable in a system constitutionally

bound to accord defendants due process"). It was reasonable for counsel to expect that Defendants

would not hide evidence; "[o]ridnarily, we presume that public officials have properly discharged

their official duties." *Bracy v. Gramley*, 520 U.S. 899, 908 (1997); *see also Banks*, 540 U.S. at 694

(reasonable for defense to rely upon representation of full disclosure); *United States v. Bagley,* 473 U.S.

667, 682-83 (1985) (reasonable for defense attorneys to rely upon responses to discovery, especially

where responses indicate no exculpatory material evidence exists).[4]

At core, the Township's argument about whether, and how, the *Brady* material might have

otherwise been obtained—and whether additional steps were required after Lieberman *specifically*

*requested* all *Brady* material multiple times—are quintessential jury questions, precluding summary

judgment. *Cottrell v. Clemons*, 2014 WL 3649185, at *2 (W.D. Ky. July 23, 2014) (whether defense

counsel exercised reasonable diligence is a question for the jury); *Weber v. Seterus*, Inc., 2018 WL

1519163, at *10 (N.D. Ill. Mar. 28, 2018) (similar); *Pippenger v. McQuik's Oilube, Inc.*, 854 F. Supp. 1411,

1427 (S.D. Ind. 1994) ("[G]enerally speaking, the questions of reasonable diligence and reasonable

reliance are questions of fact for the jury to decide."); *cf. Taylor v. City of Chicago,* 2019 WL 4597383, at

*11-12 (N.D. Ill. Sept. 23, 2019) (denying summary judgment to officers concerning suppressed alibi

evidence held by the police, where there was no evidence defense counsel "knew that" the documents

"existed," and the defense attorney "received nothing" in response to a subpoena).

---

[4] Defendants also ignore Lieberman's testimony about Fritz's extremely limited role as an employee
of Area Wide who was assigned by that agency to perform discrete tasks; Fritz was not informed
about strategy, did not independently have input on the case, and had few interactions with
Lieberman outside of his discrete tasks. Doc. 224-3, at P.ID5251. Lieberman had no reason to ask
Fritz about the elimination of Gillispie—he did not know it happened—and Lieberman "depended
on the good faith of the police department, as [he was] entitled to do by law, to ensure that proper
discovery was made and that the State's witnesses would not perjure themselves at trial." *Id.*

### 4. *Disputes About Materiality Preclude Summary Judgment*

Miami Township argues that the Fritz/Bailey reports are not material. Br. at 16-17. As explained above, the evidence was material, particularly given that case against Gillispie weak and the jury was in fact deadlocked in favor of acquittal. This argument is a dispute for the jury to resolve. On one hand, Plaintiff's position (as supported by the testimony of Lieberman and the federal court that vacated the conviction) is that these reports would have been significant because they could have been used: to impeach Wolfe and Moore's attempts to mislead the jury about how Gillispie's name first came up in the case; to turn Bailey into an "expert witness" and explain "why Moore's techniques and practices in this case were questionable based on the way Township detectives *should have* acted; to attack the competence of Moore's investigation itself; and to conduct additional investigation about bias against Gillispie at GM. Doc. 224-3, at P.ID5252-53; *see also* Doc. 224-2, ¶¶7-8at P.ID5249. As Lieberman put it, in light of his extensive experience and familiarity with the case, these reports would have likely "changed the outcome of the trial," because this was "extremely important and powerful information." *Id.* ¶9.

The Township's contention to the contrary simply disputes Lieberman's testimony by drawing inferences adversely to Gillispie, which is inappropriate at summary judgment. For example, Gillispie was eliminated as a suspect, in part, because the pants size were too small for a person of his size. SOF, ¶8. Defendants claim this is "refuted" by the twins' testimony that they *do not recall* calling in the pant size.[5] But, they are really asking this Court to ignore the sworn testimony of Bailey, which it may not do. *Adams v. Metiva*, 31 F.3d 375, 384 (6th Cir. 1994) ("Upon a motion for summary judgment, the . . . court is not to make credibility determinations or weigh the evidence.").

---

[5] Defendants also overstate the issue: the sisters do not recall calling in the pant size, but also do not remembers all of their interactions with officers. Doc. 219, P.ID#4242; Doc. 228, P.ID 5679.

Repeating the same mistake, the Township argues, essentially, that the pant size could not have eliminated Gillispie. Br. 16-17. But, the Township ignores that Bailey testified he could not, decades later, remember the actual pant size (which is what he said in 2001 as well); though Bailey did testify it was part of the reason he eliminated Gillispie. Doc. 222, P.ID4800-01, 4853; Doc. 222-2, P.ID4993-94. The Township's argument is based upon crediting a complete *guess* about the pant size despite the fact that Bailey said before and immediately after he did not remember; they cannot take such a positon at summary judgment. In fact, by pointing out Bailey's incomplete recall, the Township has actually confirmed the independent materiality of the *reports themselves*—had they been produced, Bailey could have referred to them directly rather than hazarding a complete guess.

### D. Plaintiff Need Not Prove "Bad Faith"

In setting out the three elements to prove a *Brady* claim—(1) suppression, (2) material evidence, and (3) prejudice—*Jackson* confirms that there is no "bad faith" requirement for proving a *Brady* claim; a plaintiff need only prove these elements. 925 F.3d at 814. The Supreme Court said as much itself in *Brady*. 373 U.S. at 87 ("The suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

The Sixth Circuit extensively discussed, and rejected imposing, a "bad faith" requirement in *Moldowan v. City of Warren,* 578 F.3d 351 (6th Cir. 2009), where the issue was squarely raised. *See id.* at 382 ("Defendants contend that, even if we were to conclude that the legal norms underlying *Brady* can support an analogous or derivative claim against a police officer, Moldowan cannot prevail on the facts presented here because he cannot show that Detective Ingles withheld these statements in 'bad faith.'"). *Moldowan* refused to impose a bad faith requirement by pointing to *Brady* and other Supreme Court authorities dictating that "the critical issue in determining whether government conduct deprived a criminal defendant of a fair trial is the nature of the evidence that was withheld;

it emphatically is not the mental state of the government official who suppressed the evidence." *Id.* at 384 (citing *United States v. Agurs*, 427 U.S. 97, 112 (2009), *Napue v. Illinois*, 360 U.S. 264, 270 (1959), *Strickler v. Greene*, 578 U.S. 263 (1999)); *see also Provience v. City of Detroit*, 529 F. App'x 661, 665 (6th Cir. 2013) (noting that *Moldowan* rejected a bad-faith requirement). As *Moldowan* explained, the "critical lesson of those decisions is that the constitutional violation arose because of the nature of the evidence, not the state of mind of the state actor." *Id.* The Sixth Circuit has repeatedly cited *Moldowan*, and the decision remains good law (and Defendants do not contend otherwise). *See, e.g.*, *Jackson*, 925 F.3d at 813-14 (relying on *Moldowan*); *Elkins v. Summit Cnty.*, 615 F.3d 671, 677 (6th Cir.2010) (quoting *Moldowan* and noting that the relevant test is "'whether the exculpatory value of the [evidence] would have been apparent to the detectives given the state of the case at the time'"); *Eakes v. Sexton*, 592 F. App'x 422, 427 (6th Cir. 2014) (citing *Moldowan* for the proposition that "due process requires the court to look at the character of the evidence rather than the character of the state actor who failed to disclose it"); *Carter v. City of Detroit*, 678 F. App'x 290, 293 (6th Cir. 2017) (citing *Brady* for the proposition that due process is violated "irrespective of the good faith or bad faith or the prosecution," and citing *Moldowan* in applying this rule to police officers); *Army v. Collins*, 488 F. App'x 957, 961 (6th Cir. 2012) (same); *LeFever v. Ferguson*, 645 F. App'x 438, 449 (6th Cir. 2016) (relying on *Moldowan* and emphasizing the Sixth Circuit has focused on the value of the evidence, not good or bad faith, when evidence is deliberately withheld).

However, based upon language in *D'Ambrosio v. Marino*, 747 F.3d 378, 390 (6th Cir. 2014), Defendants suggest Plaintiff must prove Defendant Moore acted in "bad faith"; *i.e.*, that *Moldowan* has been overruled. Not so. For one, *Moldowan* has not been overruled, and *D'Ambrosio*, in fact, relied upon it. The test for whether there is a disclosure obligation, *D'Ambrosio* affirmed, is whether the exculpatory value of the evidence was "apparent". *Id.*; *see also Caminata v. Cty. of Wexford*, 664 F. App'x 496, 502 (6th Cir. 2016) (citing both *Moldowan* and *D'Ambrosio*, and framing the relevant

constitutional obligation as the officer's duty to disclose evidence when its exculpatory value is apparent to the officer). In addition, *D'Ambrosio*'s passing reference to "bad faith" was *dicta*—the problem with the plaintiff's complaint in that case was that it failed to allege the exculpatory value was "apparent" only that officers were "privy too" unspecified exculpatory information that was not passed directly to the defense (rather than the prosecutor). 747 F.3d at 890. Moreover, there is no reasonable argument here that suppressing the supplemental reports written by Fritz and Bailey would not have constituted the suppression of clear and "apparent" exculpatory evidence.

## II. Moore Violated Due Process By Generating False, Unreliable Identifications

### A. Due Process Prohibits Suggestively-Generated Unreliable Identifications

Criminal defendants have a constitutional right "to be free from identification procedures "so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Gregory v. Louisville*, 444 F.3d 725, 745-46 (6th Cir. 2006) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)); *see Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000) ("The Due Process Clause prohibits the use of identifications which under the totality of the circumstances are impermissibly suggestive and present an unacceptable risk of irreparable misidentification." (citing *Manson*, 432 U.S. 98, and *Neil*, 409 U.S. 188)).

A due process claim for unduly suggestive identification involves a two-part inquiry: "First, we assess whether the identification was unnecessarily suggestive. If so, we then consider whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure." *Halym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007). Suggestiveness occurs, among other ways, when a particular person is in "some way emphasized" or the police indicate that "one of the persons pictured committed the crime." *Simmons v. United States*, 390 U.S. 377, 383-84 (1968). When considering whether there was suggestiveness, the Court considers "whether the witness's attention was directed to a suspect because of police conduct." *Id.* The court may also consider "the size of

the [photographic] array, the manner of its presentation by the officers, and the details of the photographs themselves." *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir.1994). To gauge reliability of a witness's identification, courts typically assess the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 199 (1972); *Manson v. Braithwaite*, 432 U.S. 98, 106 (1977). Evaluation of these circumstances is the subject of an extensive body of social science literature that further informs whether an identification was unreliable. Dysart, Dec. 230-10, at P.ID6207. For example, confidence at trial is *not* necessarily an independent marker of reliability due to the fact that a witness's stated confidence is malleable and can be powerfully influenced by suggestive techniques, contamination, and post-identification feedback. *Id.* at P.ID6175-78.

Defendant Moore suggests that Plaintiff cannot pursue a § 1983 claim on the basis of a due process violation related to identifications. Br. at 11-12 (citing *Gregory v. City of Louisville*, 444 F.3d 725, 747 (6th Cir. 2006)). The statements cited by Moore have to do with identifications *not* introduced at trial. By contrast, there is no dispute Gillispie's criminal proceedings were impacted by the identifications: the victims identified him at the suppression hearing and at trial. SOF, ¶¶39.

That being the case, Moore's suggestion that Gillispie cannot pursue this claim fails. Indeed, the authority he cites, *Gregory*, specifically allowed such a claim to proceed and denied qualified immunity to a police officer on a suggestive identification claim similar to Gillispie's, because identifications were made at trial. 444 F.3d at 746-77; *cf. Wheatt v. City of E. Cleveland,* 2017 WL 5187780, at *14 (N.D. Ohio Nov. 9, 2017) (ordering a trial on an § 1983 identification claim). Once the suggestively-obtained identifications are used in criminal proceedings, due process is implicated. Moore is liable because he "reasonably should have known that use of the identification would lead to a violation of Plaintiff's right to a fair trial." *Gregory*, 444 F.3d at 747.

Contrary to Moore's suggestion otherwise, the Sixth Circuit, like other courts, has recognized that such a claim is actionable under § 1983 where evidence of tainted pretrial

identifications were introduced at trial or used taint evidence presented at trial. *Id; Hutsell v. Sayre*, 5 F.3d 996 (6th Cir. 1993); *e.g., Pace v. City of Des Moines*, 201 F.3d 1050, 1055 (8th Cir.2000); *Wray v. Johnson*, 202 F.3d 515, 524 (2nd Cir.2000); *Hensley v. Carey*, 818 F.2d 646 (7th Cir. 1987); *Goodloe v. City and County of Denver*, 2007 WL 2697605, at *11 (D. Colo. Sept. 11, 2007); *Johnson v. Rollins*, 2006 WL 2546807, *6 (E.D. Mo. Aug. 31, 2006) (collecting cases and noting that "[c]ourts have recognized allegations of suggestive identification procedures as constitutional tort claims.").

As it relates to this claim, because a core trial right is implicated, the foregoing is important in the following way: Plaintiff's suggestive identification claim is *not* limited to the photo lineups but extends through the steps that Moore took even thereafter to continue to implicate Gillispie. These include the things Moore told the victims immediately after the lineup procedures as well as his other "meetings" with the victims before their identifications were made in Court. SOF, ¶¶36-38.

### B. A Reasonable Jury Can Conclude Moore's Conduct Was Suggestive

Here, Moore engaged in intentional actions to direct the victims toward Plaintiff before they eventually identified him at trial, resulting in a violation of Gillispie's right to due process. Indeed, given the fact that Gillispie is innocent, *id.*, ¶4, there is a "very low probability that three separate eyewitnesses would select him as the perpetrator unless some suggestion (bias) and/or administrator influence occurred." Dysart Dec., Doc. 230-10, at P.ID6205.

Evidence of bias and suggestion includes: Moore's statements before administering the lineups, the biased and undocumented manner in which Moore created the lineups, things Moore said during the administration of the lineups (of which we lack complete records), Moore's post-identification feedback to the victims immediately after selecting Gillispie, and Moore's shocking comments to the twins that the person they had selected was not only in court but his false contention that Gillispie tried to change his appearance to evade selection. SOF ¶¶16-28, 36-3816-

36

28. In sum, there can be no dispute that Moore used suggestive procedures. A reasonable jury could easily find that the procedures were unduly suggestive, precluding summary judgment.[6]

### C. A Reasonable Jury Can Conclude the Identifications Were Unreliable

Gillispie is innocent. SOF, ¶4. Gillispie is also not a "look alike" to the likely perpetrator Kevin Cobb—a person who closely matches the twins composite. *Id.* ¶¶49-50. Indeed, apart from identifying an innocent person, Dr. Dysart has identified *eleven factors* that have been demonstrated to impact and undermine witness accuracy and reliability. Doc. 230-10, P.ID6179. In light of this overwhelming evidence in this case Dr. Dysart concluded:

> The combination of these influences would have been obvious and obviously problematic and likely to lead to unreliable identifications that were the result of suggestion and contamination, rather than actual memory given the well-established nature of the science and as reflected in policing standards at the time. It is my opinion to a reasonable degree of certainty that absent improper suggestion, including the suggestive non-blind photo array and making post-identification confirmations to the victims, it would have been highly unlikely for all three victims to independently choose Mr. Gillispie from the photo array.

Doc. 230-10, P.ID6179. In fact, the factors in this case are so egregious that the identifications would have been reliable even if one were to assume Gillispie were guilty, given the extensive and obvious contamination, feedback, suggestion, and disregard for safeguards designed to ensure accuracy and reliability in the identifications. *Id.*

### D. Factual Disputes Preclude Summary Judgment

Defendants' discussion of the facts fails to adhere to the summary judgment standard, both because it presumes a contested version of the facts and because it takes inferences *against* Gillispie,

---

[6] Moore suggests Plaintiff's claims fail because identification expert, Dr. Jennifer Dysart, is unable to actually get inside of the head of the witnesses and quantify the impact of suggestive procedures retroactively. Br. at 14. But, that is not the touchstone of whether Dysart's testimony is helpful to the jury, and is not the sort of thing that experts typically opine on; that determination is for the jury. Moore also ignores Dysart's testimony immediately before the cited passage that she does believe that creating a biased identification procedure provided the opportunity to contaminate the identifications, and that telling the twins a suspect was in the array Moore was "setting up the expectation" the person he believed was the perpetrator would be therein. Doc. 256, P.ID 7989-91.

rather than in his favor. On one hand, Plaintiff's facts show Moore intentionally set out to create, administer, and continue to influence the witnesses before trial, all in a manner to influence the identifications at trial. These efforts were unreasonable and a departure from accepted police practices at the time. In fact, even Defendant Moore's *own expert* criticizes some of his tactics in steering the witnesses to Gillispie.[7] Plaintiff has adduced further evidence concerning the unreliability of these identifications through expert testimony indicating fundamental unreliability. In addition, when properly understood in terms of the social science the factors traditionally identified by courts—e.g. *Manson,* 432 U.S. at 106—demonstrate unreliability: (a) the witnesses' opportunity to view the perpetrator was compromised by disguise (sun glasses, bandanas), stress, and "weapon focus"; (b) the attention to the identity of the perpetrator would have been negatively impacted by the same; (c) the witnesses description of the perpetrator departed from Gillispie in profound and numerous ways; (d) the relevant level of certainty at the lineups itself demonstrated unreliability due to the slow response latency, while the witnesses' confidence in court was impacted by post-event feedback; and (f) and the length of time between the crime and the confrontation was extreme.

On the other hand, Moore denies any suggestion and further weighs these "reliability factors" differently, discounting entirely Dr. Dysart's testimony and the fact that the substantial delay between the incidents and initial identification procedures undermined the reliability of these identifications. Br. at 14-15. Because how to weight reliability factors in the totality of the evidence is disputed, Defendants cannot obtain summary judgment on this basis. *Gregory*, 444 F.3d at 746. Instead, to the extent Defendants contend "the line-up was a reasonable one in light of the

---

[7] Moore claims Dr. Dysart testified that Moore "did not violate any standard of care in place at" MTPD. Br. at 14. This is a grossly misleading statement, and in fact ignores Dr. Dysart's extensive testimony about how Moore's conduct was so far out of bounds that he failed to follow the guidelines MTPD placed on their photo identification cards. Doc. 256, PG.ID7812-15. Likewise, Moore's suggestion that there were not accepted police practices in 1990 concerning identifications, Br. at 14, is belied not only Dr. Dysart's testimony and Plaintiff's police practices' expert, Andrew Scott, but also Moore's *own* expert, Anthony Monheim. *See* SOF, ¶¶17 (collecting sources).

infirmities of the situation," the Sixth Circuit and other courts recognize that determination "is one

for the finder of fact." *Gregory*, 444 F.3d at 746; *see also, e.g.*, *Wheatt v. City of E. Cleveland*, No. 1:17-

CV-377, 2017 WL 5187780, at *15 (N.D. Ohio Nov. 9, 2017) (denying summary judgment on

suggestive identification claim where there were "disputed and material facts about both the

suggestiveness of the procedure and the reliability" of an identification).[8]

### E.  Vacated State Court Rulings Are Entirely Irrelevant

Defendants repeatedly refer to the original trial court's ruling on the suppression motion in

as if that had some sort of impact on Plaintiff's claims. The references should be disregarded.

Here, it is undisputed that Gillispie's conviction was vacated—indeed, by two Courts on two

independent bases—and that the charges against him have been completely dismissed. SOF, ¶¶49-

50. The consequences of this fact are clear: "The reversal vacated the judgment entirely, technically

leaving nothing to which we may accord preclusive effect . . . When [the plaintiff] won his appeal

and the judgment was vacated, all such factual determinations were vacated with it, and their

preclusive effects surrendered." *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985). "'[A] vacated

judgment, by definition, cannot have any preclusive effect in subsequent litigation.'" *Kogut v. County of

Nassau*, 2009 WL 5033937, at *10 (E.D.N.Y. Dec. 11, 2009) (quoting *Boston Firefighters Union v. Boston

Police Patrolmen's Ass'n*, 468 U.S. 1206, 1211 (1984)). Because the judgment was vacated, the trial

court's interlocutory suppression rulings were vacated as well and have absolutely no preclusive

effect any more. *See Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019) ("Here, the criminal

judgment has been vacated. Therefore, the trial court's interlocutory rulings—including those which

---

[8] The facts here are a far cry from authorities Moore cites, none of which are binding. Br. at 13. For example, in *United Sates v. McComb*, 249 F. App'x 429 (6th Cir. 2007), the alleged defects in the color of the lineup photos were so minor that the Court concluded they were all "essentially the same hue" (which is not true here). The same is true of the cases about the size of the headshots—the differences there were more slight. And, the Court was not presented with additional evidence, as exists here, of suggestion before and after the identification. The cases are inapposite.

the court made at the [pretrial] hearing—have merged with the final judgment, which means those interlocutory rulings have been vacated too.").

As a consequence, in addition to Defendants' references to now-vacated rulings being a distraction, the Township's invocation of the *Rooker-Feldman* doctrine falls flat.. That doctrine prevents federal review of extant state court *judgments,* and where parties seek "review and rejection of that judgment." *Berry v. Schmitt*, 688 F.3d 290, 299 (6th Cir. 2012); *see Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005) ("The *Rooker–Feldman* doctrine . . . is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court *judgments* rendered before the district court proceedings commenced and inviting district court review and rejection of those *judgments*.") (emphasis added).

Here, by contrast, this Court is not reviewing, or being asked to review, a prior judgment; there is no judgment, or interlocutory rulings that preceded that judgment, whatsoever. *Peterson*, 931 F.3d at 554; *Dodrill*, 764 F.2d at 444. In short, "the *Rooker-Feldman* doctrine does not bar review because there is no state judgment to challenge." *Smiles v. Royster*, No. 18-1440, 2018 WL 4998196, at *2 (6th Cir. Oct. 1, 2018); *see also, e.g., Berene v. Nationstar Mortg. LLC*, 686 F. App'x 714, 717 (11th Cir. 2017) (reversing application of *Rooker-Feldman* doctrine over vacated state-court judgment because the "previously final state-court judgment was no longer in effect").[9]

### III. Defendant Moore Violated Due Process By Fabricating Evidence

"It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected

---

[9] Even assuming *Rooker-Feldman* possibly applied without an extant judgment—a notion that makes little sense—the doctrine would be inapplicable because this suit not asserting "that the state-court judgment itself caused his injuries, but that the defendants' actions in procuring that state-court judgment did." *Barnaby v. Witkowski*, 2017 WL 3701727, at *2 (6th Cir. Feb. 17, 2017).

the decision of the jury." *Gregory*, 444 F.3d at 737; *see Webb*, 789 F.3d at 667-70 (false statements in reports state fabrication claim). In addition, to be actionable, fabricated evidence need not be actually admitted at trial; police reports are rarely actually *admitted* in criminal proceedings. Instead, where evidence is the result of "pretrial fabrication efforts by [the officers]," due process is implicated where the evidence "comprise[d] part of the documentary record before the prosecution and defense and affected the course of the criminal proceedings independent of any testimony to the notes' contents." *Gregory*, 444 F.3d at 741. This is the case because the "very existence" of fabricated evidence, "even if not introduced as evidence at trial," can impact a "criminal prosecution independent of the officers' testimony." *Id.* Indeed, "police investigative materials have evidentiary value wholly apart from assisting trial testimony—they comprise part of the documentary record before the prosecution and defense and affect charging decisions, plea bargaining, and cross-examination of the investigating officers." *Lisker v. City of Los Angeles*, 780 F.3d 1237, 1242 (9th Cir. 2015) (quoting *Gregory*, 444 F.3d at 741); *see Jackson*, 925 F.3d at 821-22 (holding fabricated evidence need not be admitted to implicate due process). Thus, it is well established that a fabrication of evidence claim "can be based on false police reports," even where those reports are not admitted at trial. *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018), *partially abrogated on other grounds* by *Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir. 2019).

Here, in addition to the identification evidence just discussed, Gillispie alleges that additional evidence against him was fabricated including, among other things, Moore's supplemental reports of the investigation, which include falsehoods, material omissions, and other misstatements. For example, Moore fabricated the notion that Gillispie was a *new* suspect when he was assigned the case in June of 1990 even though Gillispie had actually been brought to the attention of the department by Wolfe in 1989, when Bailey was still in the detective division. SOF, ¶13. In addition, Gillispie contends Moore's reports include falsehoods about his interactions with Gillispie, all of which were

41

designed to make it appear that Gillispie was acting with consciousness of guilt when, in fact, he was innocent and the subject of deceitful tactics employed by Defendant Moore. *Id.*¶40. Further, Moore's reports fabricate evidence from Gillispie's prior girlfriend, Mitchell, including not only the pressure that Moore applied to her but also include misstatements and misleading omissions about what she did say. *Id.*¶¶41-42. As explained, the existence of these reports impacted Gillispie's trial. The identifications were introduced at trial; the fabrications with respect to Wolfe left Lieberman with the impression that Gillispie had never been brought up previously in 1989; Moore testified, using his reports, about Gillispie at trial; Gillispie took the stand to rebut the falsehoods; and Lieberman was unable to use Mitchell as a witness due to the existence of these reports.

This is sufficient for a reasonable jury to conclude that Moore's fabrications deprived Gillispie of his liberty in some way and thus violated due process. *Gregory*, 444 F.3d at 741

## IV. Gillispie's Fourth Amendment Claim Must Be Submitted to the Jury

### A. Applicable Legal Standard

Under the Fourth Amendment, to succeed on a "malicious prosecution" claim, Gillispie must establish: (1) Defendants influenced or participated in the decision to initiate a criminal prosecution against him; (2) there was no probable cause to support the charges; (3) as a result of the prosecution, Gillispie suffered a deprivation of liberty following his initial arrest; and (4) the criminal proceedings ended in his favor. *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017).

Importantly, a Fourth Amendment malicious prosecution claim is not simply the same thing as a common law or state-law "malicious prosecution" action. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir. 2006)) ("A better name [for a constitutional malicious prosecution claim] that would perhaps grasp the essence of this cause of action…might be 'unreasonable prosecutorial seizure.'") (citations omitted)); *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013) ("The rights guaranteed by the Fourth Amendment are not

superseded by the common law, and we see no principled reason why plaintiffs alleging a constitutional injury should be entitled to relief only if they can demonstrate that their claim meets all the elements of a common law claim."). For example, malice is not an element of a federal Fourth Amendment claim concerning wrongful prosecution, in part, because the notion of subjective intent or malice is inconsistent with the Fourth Amendment. *Sykes*, 625 F.3d at 309-10; *Graham v. Connor*, 490 U.S. 386, 398 (1989) (rejecting reference inquiry of malice under the Fourth Amendment).

It is undisputed that Gillispie suffered a deprivation of liberty during his twenty-plus years of incarceration, and that Moore was responsible for instituting the criminal charges against Gillispie.[10]

### B. A Reasonable Jury Can Find An Absence of Probable Cause

There is no dispute that Plaintiff was indicted following a grand jury. Moore is the only known witness who testified therein. A grand jury indictment can either create a conclusive presumption of probable clause (eliminating the claim) or a rebuttable presumption of probable cause (which requires further examination of the facts). *Miller*, 866 F.3d at 391. The presumption is rebuttable, where:

(1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence;

(2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and

(3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony

*King*, 852 F.3d at 587-88; *see also Miller*, 866 F.3d at 391.

Here, the record indicates that each of the conditions for finding the presumption is rebuttable is satisfied. First, as described above, the evidence illustrates that Moore fabricated

---

[10] The Township cites the requirement of personal influence, Br. at 21-22, but is actually making an argument that Moore disclosed all material facts to the prosecutor—an issue that goes to whether there was probable cause. Moore undoubtedly set the prosecution of Gillispie in motion.

evidence, not only through his police reports but also through intentionally manufacturing identification evidence against Plaintiff as a result of his suggestion and influence. In addition, Moore committed a *Brady* violation in suppressing the reports concerning Wolfe's first trip to MTPD and the elimination of Gillispie as a suspect. This is sufficient to create an issue of fact for the jury. Second, the identification evidence and reports about Gillispie's interaction with Moore are material to the prosecution; all of them were part of Gillispie's criminal trials. Third, these fabrications do not consist solely of grand jury testimony.

All of this is sufficient to deny summary judgment, and find that the presumption of probable cause has been rebutted. *See Miller*, 866 F.3d at 392 (finding disputes of material fact concerning the rebuttability of the presumption precluded summary judgment); *King*, 852 F.3d at 591 (same); *see also Manuel v. City of Joliet*, 137 S. Ct. 911, 919-20 (2017) (holding that probable cause cannot be based upon fabricated evidence); *Jackson v. City of Cleveland*, 925 F.3d 793, 821 (6th Cir. 2019) (summary judgment improper on malicious prosecution claim where record illustrated evidence, including an identification, was fabricated); *Harris v. Bornhorst*, 513 F.3d 503, 521 (6th Cir. 2008) (*Brady* violation can rebut the presumption of probable cause).

Summary judgement is also particularly inappropriate here for two additional reasons. First, in a § 1983 action, the existence of probable cause is a question of fact. *Gregory*, 444 F.3d 725. Where the facts underlying probable cause are in dispute, they question must be sent to the jury. *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005); *see Selective Insurance*, 706 F. App'x at 266 (citing *Crockett v. Cumberland Coll.*, 316 F.3d 571, 581 (6th Cir. 2003) (noting that the "existence of probable cause is often a question for a fact-finder").

Second, as the Township points out, Plaintiff sought, but has not been given access to the grand jury minutes. This Court directed Plaintiff to proceed in State Court, and that tribunal has recently ordered that the transcripts be prepared. Defendants have opposed Plaintiff's efforts to get

these transcripts. Having succeeded in depriving Plaintiff of important evidence (at least for the time being), Defendants cannot rely on this evidentiary gap to affirmatively seek summary judgment. Moreover, none of the Sixth Circuit's recent cases on this issue *require,* as a prerequisite to rebutting the presumption of probable cause, a plaintiff to obtain the grand jury transcripts. If that were the case, denial of a request for those transcripts would become a default judgment for defendants; a result certainly not contemplated by these cases or consistent with the Federal Rules of Civil Procedure. *Cf. Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir. 1993) (fundamental tenant of the Federal Rules is to "allow cases to be decide on the merits"); *Moore v. Rees*, 2007 WL 1035013, at *12 (E.D. Ky. Mar. 30, 2007) ("[T]he Federal Rules do not require the creation of the best evidence, nor does the absence of the 'best evidence' inhibit this Court's jurisdiction to decide this case on the merits.").

That being the case, the Court should evaluate the record as it stands now: that record would easily enable a jury to conclude (1) Moore was the only witness who testified at the grand jury (none of the victims did), (2) that Moore gave testimony consistent with the reports he authored and disclosed in this case, and (3), as he has elsewhere, Moore did not disclose the *Brady* material or disclose the fact that he set out to intentionally fabricate the identifications and other evidence against Gillispie.. Summary judgment should be denied.

## C. The Criminal Prosecuted Terminated In Plaintiff's Favor

The criminal charges against Plaintiff had been dismissed with prejudice. SOF, ¶50. He can never be prosecuted again for the rapes Indeed, *two* Courts overturned Gillispie's criminal conviction—one because of the *Brady* violation described above, and the other because of powerful evidence of an alternative perpetrator, Kevin Cobb. Given this posture, there should be no dispute that Plaintiff has satisfied the favorable termination requirement under the Fourth Amendment. *See Emanuel v. County of Wayne*, 652 F. App'x 417, 428 (6th Cir. 2016) (plaintiff satisfied favorable termination requirement where charges were dismissed even *without* prejudice); *Wheatt v. City of E.*

45

*Cleveland*, No. 1:17-CV-00377, 2017 WL 3174285, at *6 (N.D. Ohio July 26, 2017) (same); *Ayers v. City of Cleveland*, 2013 WL 775359, at *10 (N.D. Ohio Feb. 25, 2013) (same).

Miami Township, however, contends that Plaintiff needs to additionally prove that the criminal proceedings terminated in a manner "indicative of innocence." Br. at 22-23. The Township is mistaken. Instead, while the favorable termination requirement as a matter of state law might include an innocence component, the same is not true under the Fourth Amendment, and the Sixth Circuit's myriad authorities, drawing on the Supreme Court's teachings, have never required this requirement. *See Sykes v. Anderson*, 625 F.3d 294, 309 (6th Cir. 2010) (citing *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)). Instead, a plaintiff need only establish that the proceedings "ended in" their "favor." *Miller*, 866 F.3d at 389; s*ee Sanders v. Jones,* 845 F.3d 721, 728 (6th Cir. 2017) (using the same language and not requiring a showing of termination indicative of innocence); *King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017) (same). *Heck*, upon which *Sykes* relied, defined "favorable termination" in the federal context as follows: "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." 512 U.S. at 485. The cases cited by the Township concern references to state law and are otherwise inapposite. *See, e.g., Aliakbarkhananfjeh v. Schramm,* 194 F.3d 1311 (6th Cir. 1999) (evaluating Ohio law and finding no favorable termination following a guilty plea to a lesser-included offense); *Ohnemus v. Thompson*, 594 F. App'x 864, 866 (6th Cir. 2014) (applying Kentucky law).[11]

## V.   A Reasonable Jury Can Conclude Defendants Destroyed Evidence

A criminal defendant's due process rights are violated where the police destroy exculpatory evidence. *Allen v. Clark*, No. 1:13CV326, 2014 WL 3016075, at *4 (S.D. Ohio July 3, 2014) (citing

---

[11] Even assuming *arguendo* federal favorable termination involved "innocence," a reasonable jury could easily find that standard satisfied, particularly given the combined effect of the courts' decisions—one pointing to exculpatory evidence and the other to a likely perpetrator.

*Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)). The due process principle is rooted in the same cases that led to *Brady* and a claim based upon the destruction of evidence is a corollary to the same core principles. *Id.* As with the *Brady* claim, the law "does not impose a bad faith requirement on any and all due process claims brought against police officers" *Moldowan*, 578 F.3d at 384. Instead, courts distinguish between evidence that is "potentially useful" and "materially exculpatory." *Id.* (citations omitted). If evidence is merely "potentially useful," bad faith must be shown, *Youngblood*, 488 U.S. 51, 58, but no bad-faith is required for evidence that is "materially exculpatory" when such value is "apparent." *Moldowan*, 578 F.3d at 388.

Here, Plaintiff contends that Defendant Moore had the opportunity to destroy the evidence he suppressed, as discussed above and incorporated by reference. This evidence was materially exculpatory and its value was apparent—no showing of bad faith is necessary. As above, the jury must be permitted to determine where the chips fall. *Jackson*, 925 F.3d at 814.

## VI. Moore Is Not Entitled to Qualified Immunity

Moore makes brief reference to qualified immunity. Br. 19-20. This effort fails. First, Moore's reference to qualified immunity—which does not address specific constitutional claims—is so vague and cursory that it should not require a response. *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 564-65 (6th Cir. 2007) (cursory arguments will not be considered). Though it is true Plaintiff must demonstrate that qualified immunity is unavailable when properly raised, Moore's arguments do nothing more than cite abstract immunity standards, fail to discuss the constitutional claims, and merely reassert Moore's denials of wrongdoing.

Second, Moore's reference to qualified immunity simply reiterates his erroneous claim that a reasonable jury could not find he violated Plaintiff's constitutional rights. But, as explained, Moore has ignored the myriad factual disputes concerning Plaintiff's claims illustrating that a reasonable jury could easily find in Gillispie's favor. It is well settled that summary judgment based on qualified

immunity may not be granted when "'[t]he legal question of immunity is completely dependent upon which view of the facts is accepted by the jury.'" *Parker v. City of Detroit*, No. 16-CV-13036, 2018 WL 4206968, at *3 (E.D. Mich. Sept. 4, 2018) (quoting *Adams*, 31 F.3d at 387, and citing *Poe v. Haydon*, 853 F.2d 418, 425 (6th Cir. 1988); *Buckner v. Kilgore*, 36 F.3d 536, 539 (6th Cir. 1994), and *Fisher v. City of Memphis*, 234 F.3d 312, 317 (6th Cir. 2000)); *see Adam*, 387 F.3d at 387 (denying summary judgment). Thus, "where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quotation marks and citations omitted); *see Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991) (same).

Third, there can be no doubt that the claims involved here—suppression of evidence, fabrication of evidence (including the identifications), and detention in the absence of probable cause—were clearly established in 1990. *See, e.g.*, *Jackson v. City of Cleveland*, 925 F.3d 793, 823-25 (6th Cir. 2019) (pointing to case law going back to the 1950s illustrating the police officers who withhold exculpatory evidence violate due process and concluding the *Brady* obligations were clearly established in 1975); *id.* at 825-26 (recognizing that the it was clearly established in 1975, and in fact going as far back as 1935, that fabrication of evidence for use in a criminal case violates due process) (citing, among other authorities, *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), and *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)); *id.* (discussing the fact that it was clearly established in 1975 that "maliciously prosecuting" someone violated the constitution (citing *Spurlock v. Satterfield,* 167 F.3d 995, 1006 (6th Cir. 1999)); *see also Supurlock*, 167 F.3d at 1005-07 (citing authorities from 1988 and 1990, in concluding that malicious prosecution violates the constitution, concerning an investigation that began in 1990)); *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989) (holding that knowingly fabricating evidence against of which there is a reasonable likelihood that it could have affected the judgment of the jury violates due process); *LeFever v. Ferguson*, 645 F. App'x 438, 449 (6th Cir. 2016)

("Here, LeFever's trial took place in 1990, and our cases dictate that her right to disclosure of favorable evidence by the defendants—subject to the relevant standards—was clearly established.").

These authorities also establish that Moore is not entitled to qualified immunity for fabricating the identification evidence. *See Spurlock*, 167 F.3d at 1007. Long before 1990, the Supreme Court indicated that generating unreliable identification evidence introduced at trial violates due process, *Manson v. Brathwaite*, 432 U.S. 98 (1977), *Neil v. Biggers*, 409 U.S. 188, 199 (1972), and this is merely a different form of fabricated evidence, of which the intentional creation has long been prohibited in the line of cases like *Mooney* and *Pyle. See also Miller v. Pate*, 386 U.S. 1, 7 (1967); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Brown v. Mississippi*, 297 U.S. 278, 286 (1936); *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004). "[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit."); *Carrillo v. Cty. of Los Angeles*, 798 F.3d 1210, 1227–28 (9th Cir. 2015) (the law in 1991 clearly established that evidence impeaching the credibility of a government witness was required to be disclosed under *Brady*, including evidence concerning the manner in which an identification was made); *Newsome*, 256 F.3d at 749, 752 (under *Brady* it was "clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about . . . the conduct of a lineup"); *Geter*, 849 F.2d 1550, 1559-60 (5th Cir. 1988) (holding in 1988 that, under *Brady*, an officer violates clearly established law by failing to disclose identification procedures). Qualified immunity is unavailable.

## VII. Miami Township's Policies, Practices, And Customs Were The Moving Force Behind The Violation of Plaintiff's Constitutional Rights

Municipalities that fail to implement adequate policies, training, supervision, or other procedural safeguards, cannot obtain summary judgment in spite of these choices. The Sixth Circuit has addressed three similar cases involving *Monell* claims for failing to adopt policies or training on officers' *Brady* obligations, and concluded each time that such cases are inappropriate for summary

judgment. *Jackson*, 925 F.3d at 837; *Gregory*, 444 F.3d at 752-57 (concerning both *Brady* obligations and flawed identifications); *Moldowan*, 578 F.3d at 393-94. The same result is mandated here.

The Township can be liable where it has policies, practices, or customs that are "implemented to result in constitutional violations with explicit or implicit ratification by city policymakers" *Gregory*, 444 F.3d at 752. Plaintiff must also illustrate deliberate indifference to known or obvious consequences of the Township's policies, practices, or customs; *i.e.*, the "risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be 'plainly obvious.'" *Id.* (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)). The courts recognize a systematic failure to train police officers adequately as custom or policy which can lead to liability. *Gregory*, 444 F.3d at 753. As a consequence, the Sixth Circuit has "consistently has recognized that a plaintiff may establish municipal liability by showing 'a policy of inadequate training or supervision,' including 'a policy of tolerating federal rights violations [that] is unwritten but nevertheless entrenched.'" *Moldowan*, 578 F.3d at 393 (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005) (citing *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir.1996)).

Notably, while it is true that a jury must find Plaintiff's constitutional rights were *violated* in order for the Township to be liable, it need not find *Moore* responsible in order to reach such a conclusion. *See, e.g.*, *Garner v. Memphis Police Department*, 8 F.3d 358, 365 (6th Cir. 1993) (where the Sixth Circuit rejected the city's argument that because the only defendant officer in the case had been dismissed by the district court, the city should also be dismissed); *Doe v. Sullivan Cty.*, 956 F.2d 545, 554 (6th Cir 1992) (same); *Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to liability under § 1983."). For example, if an officer were entitled to qualified immunity (which is not the case here), a municipality—which does not enjoy that immunity—may "nevertheless be liable if the actions complained of rise to the level of

50

constitutional violations in light of present law." *Barber v. City of Salem*, 953 F.2d 232, 237 (6th Cir. 1992) (citing *Owen v. City of Independence*, 445 U.S. 622, 657-58 (1980)); *see also Richko v. Wayne Cnty.*, 819 F.3d 907, 920 (6th Cir. 2016); *Doe v. Sullivan Cnty.*, 956 F.2d 545, 553–54 (6th Cir. 1992). Or, as the Seventh Circuit noted in *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 305 (7th Cir. 2010), a municipality can be liable due to its deficient policies and practices concerning the preservation and production of *Brady* material even if the fault did not lie with a particular named officer and perhaps by an officer that might be unknown.[12]

Plaintiff is entitled to a jury trial against the Township in the following ways: (1) the Township's lack of any policy regarding (a) *Brady* obligations, file maintenance, and the production of documents to the prosecution or (b) implementation of identification procedures and avoiding undue suggestion and contamination of eyewitness identifications; (2) the Township's failure to train its detectives in (a) the preservation and production of documents/*Brady* material, (b) conducting identifications in a manner that was not unduly suggestive, and (c) avoiding contamination/influence before and after administering identification procedures; and (3) the Township's failure to supervise its detectives concerning (a) the preservation and production of *Brady* material and (b) in administering identification procedures, in light of the obvious need to do so; and (4) the Township has ratified the *Brady* violation here.

---

[12] Another reason to deny summary judgment is the fact that Moore has raised an issue that creates a disputed issue of fact on the *Monell* claim: evidence indicating reports were frequently misfiled at the Township. Plaintiff has produced additional evidence on this score. Doc. 233-1, P.ID6761-62. As a consequence, as contemplated by *Thomas*, even assuming a jury were to find *Moore* was not responsible for suppressing material evidence, it was always fundamentally the Township's responsibility to ensure that all exculpatory material was turned over. If, as some evidence indicates, the Township frequently had documents in major criminal cases misfiled and therefore not disclosed to criminal defendants, that is precisely the sort of policy, practice, and custom that a reasonable jury could find to be the "moving force" behind a constitutional violation.

## A. The Township's Absence of Obviously-Needed Policies Was Deliberately Indifferent

The Township can be liable for its deliberate choice not to have a policy when one is called for. Liability occurs in "a situation that demands a policy," where the failure to implement a policy "ignored a plainly obvious danger." *Armstrong v. Squadrito*, 152 F.3d 564, 577–78 (7th Cir. 1998); *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) ("In situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."); *Avery v. Burke Cnty.*, 660 F.2d 111, 114 (4th Cir. 1981) ("Official policy may be established by the omissions of supervisory officials as well as from their affirmative acts."); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143-44 (9th Cir. 2012) (failure to implement procedural safeguards where they are obviously needed creates *Monell* liability).

In 1990, according to the Township's 30(b)(6) designee, the Township had no policies explaining officers' obligation to preserve or disclose exculpatory evidence under *Brady*. Doc. 227, at P.ID5503.[13] The Township did not index or track supplemental reports, had no policy requiring retention of Detectives' handwritten note (which detectives were permitted to destroy), and it admits handwritten notes and tape recordings from the rape investigation have been destroyed. *Id.*, at P.ID5478; Township RTA. No. 10, Doc. 276-9, PG.ID9882; Township Supp. Rog. No. 2, Doc. 276-8, P.ID9868-69; Doc. 270, P.ID8836, 8838; Doc. 275, P.ID9677; Doc. 273, P.ID9462-63.

The Township had no manuals or standard operating procedures governing the creation or retention of police reports. Doc. 271, P.ID9041-42; Doc. 270, P.ID8832, 8835. Nor can the Township identify a written policy concerning submitting documents to the records division in effect during 1990 and 1991, when Gillispie was prosecuted. Doc. 227, at P.ID5478-79. The Township also lacked safeguards for file maintenance; instead detectives were able to access and

---

[13] Chief Ron Hess was designated by the Township to testify about the City's policies, practices, and training in the 1990, including who was the final policymaker. Doc. 227-1 (Rule 30(b)(6) Dep. Notice); Doc. 227 (deposition). The Township may not attempt to contradict his testimony. Fed. R. Civ. P. 30(b)(6); *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 867 (6th Cir. 2017).

inspect *original* initial and supplemental reports (as opposed to copies thereof) after they were submitted to the Records Section. Doc. 273, P.ID9456-9458. And, MTPD lacked any system or tracking whether and which detectives accessed original files in the Records Section. *Id.* P.ID9459. The Township also had no system to track or identify if and when detectives produced evidence to prosecutors what, if anything, had been disclosed. Doc. 271, 9022; Doc. 270, PG.ID8824, 8830-31.

As it concerns identifications, the Township's failures are the same: it had no polices concerning how to conduct and document or memorialize lineups. Doc. 227, at P.ID5486-87; Doc. 227-2, at P.ID5584; Doc. 270, PG.ID8794, 8830; Doc. 170, P.ID3482-83. Instead, officers were given wide discretion in how to construct and administer identifications. Doc. 221, PG.ID4395-96.

The Township has failed to carry its burden, as the movant at summary judgment, to illustrate that no dispute of material fact exists; it has not, and cannot, identify any actual policies in when Gillispie was investigated. *Smith v. Hudson*, 600 F.2d 60, 64 (6th Cir. 1979) ("the burden of establishing the nonexistence of a material factual dispute always rests with the movant").

Even assuming the Township had carried its burden, the record here is beyond sufficient to permit a reasonable jury to conclude that the Township failed to "provide comprehensive written policies and procedures to members of the Miami Township Police Department," which is "inconsistent with generally accepted police practices and procedures and contributed to the arrest, conviction and imprisonment of Mr. Roger Dean Gillespie." Doc. 233-1, P.ID6769. In addition to the foregoing, evidence of the Township's deliberate indifference to the importance of retaining and preserving exculpatory evidence is the fact that a supervisor in the property room authorized the return of the twins' clothes worn during the sexual assaults, which very likely contained the perpetrators' semen and pubic hair follicle. *Id.* P.ID6759. Releasing this sort of important, forensic

evidence was inconsistent with established police practices and obviously could lead to the degradation of important evidence in a criminal case. *Id.* This is more than sufficient.[14]

### B. The Township's Failure to Train Its Detectives Was Deliberately Indifferent

There is no question that "police have a duty to preserve and turn over to the prosecutor evidence that the police recognize as having exculpatory value or where the exculpatory value of the evidence is apparent." *Moldowan*, 578 F.3d at 393. As a consequence, the Township has a corresponding obligation to adequately train its officers in that regard. *Id.*; *Gregory*, 444 F.3d at 753. Given the obligation to turn over exculpatory materials is a "significant constitutional component of police duties with obvious consequences for criminal defendants," the Sixth Circuit "has held that evidence pointing to a City's failure to provide *any* training on key duties with direct impact on the constitutional rights of citizens is sufficient to survive summary judgment with a *Monell* failure to train claim. *Gregory*, 444 F.3d at 754 (citation omitted). This standard is satisfied.

The Township did not provide any formal training or written training materials to new detectives. Doc. 221, PG.ID4539; Doc. 270, PG.ID8854; Doc. 222, PG.ID4942. Detectives were also provided with no specific training on how to administer photo lineups or on producing evidence, including exculpatory evidence, to prosecutors for criminal proceedings. Doc. 170, PG.ID3482; Doc. 273, PG.ID9430. Instead of a formal training program, new MTPD detectives were trained, if at all, by shadowing other detectives. Doc. 273, PG.ID9433-34; Doc. 222, PG.ID4917-18. Some MTPD detectives, however, never shadowed others Doc. 273, PG.ID9476.

Moore was no different: he was not provided any training when he joined the MTPD detective section. Doc. 170, P.ID#3427. In addition, Moore did not receive training on how to conduct a photo array, or considerations related to eyewitness issues, such as the adverse impact

---

[14] To the extent the Township suggests multiple incidents is required, it is mistaken. Plaintiff need not prove a pattern of conduct to prevail on a theory concerning the failure to adopt a policy where the need for policy is obvious. *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 816-17 (6th Cir. 2005).

viewing a composite prior to viewing a photo lineup has on the reliability of a witness's

identification. *Id.* at P.ID3482-83, 3571; Doc. 276-3, PG.ID9804. The Township has produced no

training records for Moore. Doc. 227, P.ID5453, 5465. To make matters worse, the Township did

not provide adequate training to supervisors either, including Sgt. Wilson, Moore's direct supervisor

at the time he investigated the 8/20 rapes. Doc. 271, P.ID9019-20. In review of this, police practices

expert Andrew Scott, has opined that the Township failed to properly train Moore and other

members of the department; that these failures contributed to Gillispie's conviction; and that these

failures were inconsistent with generally accepted police practices and procedures. Doc. 233-1, at

P.ID6766-67. Indeed, the Commission on the Accreditation for Law Enforcement Agencies has

emphasized training as "one of the most important responsibilities of any law enforcement

agencies," *id.* The departure from accepted standards supports an inference of indifference. *See*

*Jimenez v. City of Chicago,* 732 F.3d 710, 721-22 (7th Cir. 2013) ("Expert testimony regarding relevant

professional standards can give a jury a baseline to help evaluate whether a defendant's deviations

from those standards were merely negligent or were so severe or persistent as to support an

inference of intentional or reckless conduct that violated a plaintiff's constitutional rights.").

 *Jackson* and *Gregory* require the Township's motion be denied. In both instances the Sixth

Circuit denied a municipality's motion for summary judgment where, as here, there was insufficient

training as it concerns *Brady* and the production of exculpatory evidence. In *Gregory*, the Court

reversed a grant of summary judgment to the municipality, holding that a "custom of failing to train

its officers on the handling of exculpatory materials is sufficient to establish the requisite fault on the

part of the [municipality]" for a deliberate-indifference claim. 444 F.3d at 754. Then, in *Jackson*, the

Court re-affirmed *Gregory* while rejecting the municipality's argument that disputed evidence about

"on the job" training was sufficient to grant summary judgment. 925 F.3d at 837. This Court should

reach the same conclusion as *Jackson:* Plaintiff has "provided testimony sufficient for a jury to find

that [Miami Township] did not in fact train its officers in their disclosure obligations," meaning "*Gregory* therefore controls"; *i.e.*, there is "sufficient evidence for a reasonable jury to find that the [Township] was deliberately indifferent to the risk of *Brady* violations." *Id.*

The same rationale that applies to the duty to preserve and produce material evidence applies with equal force to the conduct of lineups. For decades before the rape investigation, the Supreme Court recognized that the manner in which police conduct identifications may "cause witnesses to err in identifying criminals." *Simmons*, 390 U.S. at 388; *see also Marshall v. Rose*, 499 F.2d 1163, 1165 (6th Cir.1974) ("[T]he danger inherent in eyewitness identification has long been a subject of grave concern."). Indeed, the Court has recognized that the "vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification"; and that the "identification of strangers is proverbially untrustworthy." *United States v. Wade*, 388 U.S. 218, 228-29 (1967). "A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *Id.* Further, eyewitness "identifications are recurring situations in criminal investigations." *Gregory*, 444 F.3d at 756. Accordingly, given these and other authorities, there should be no doubt that the Township should have adopted written directives concerning the importance of avoiding suggestive identification tactics—both before and *after* showing a lineup—and further instituted actual training for their officers that would have account for the obvious issues of eyewitness unreliability. *See id.*

## C. The Township Failed to Adequately Supervise Its Detectives

The law above—*e.g.*, *Jackson*, *Gregory, and Moldowan*—provides the same legal framework for assessing the Township's failure to supervise its Detectives, and is incorporated by reference. Again, the facts are compelling: Despite being on notice that Moore would need supervision if assigned the 8/20 rapes, and despite his reputation as a "cowboy," the Township did *absolutely nothing* to ensure

Moore was provided with supervision or prevent him from going "rogue." Doc. 233-1, at P.ID6773-75 (describing failures to supervise Moore and "red flags" the department was aware of). And, Moore went "rouge" in this case. Moore's direct supervisor, Sgt. Tim Wilson did not review Moore's supplemental notes until the conclusion of the investigation, if at all, and would never review a detective's handwritten notes. Doc. 271, PG.ID 8970, 9041. Wilson never had a conversation with Moore about arresting Gillispie, or how the investigation was being conducted. *Id.* P.ID9019. Wilson never reviewed the administration of photo lineups unless a detective flagged an issue, which Moore did not do during the rape investigation. *Id.* P.ID8984-86. Wilson did not keep track of the supplemental reports produced by Bailey, Fritz or Moore regarding the investigation. *Id.* P.ID8993. In fact, Wilson never read the Gillispie reports during his time as detective sergeant. *Id.* P.ID9009. Nor did Wilson supervise Moore's production of the reports concerning the rape investigation to the prosecutor. *Id.* P.ID9023. In the same vein, Captain Scothorn, did not take any role in detectives' individual investigations. Doc. 270, P.ID8795, 8798-99. Nor did Scothorn actively supervise the Lieutenant's charged with supervising Wilson. As a result, Moore and other detectives were not directly supervised. Doc. 170, PG.ID3449; Doc. 273, PG.ID9422-23.

Given this evidence, the Township failed to properly supervise Moore—which contributed to the wrongful arrest and conviction of Gillispie and was inconsistent with generally accepted police practices. Doc. 233-1, P.ID6773. A reasonable jury can find these failures amount to deliberate indifference because law enforcement agencies recognize that without "providing supervision to properly guide, remediate, or discipline a police officer, a police officer may behave in a manner inconsistent with generally accepted police practices and procedures and to the detriment of the police department and . . . the public." *Id.*

### D. The Township Ratified The *Brady* Violation Here

The Township can also be liable upon a showing that "an official with final decision making authority ratified [the] illegal actions. *Paterek v. Vill. of Armada, Michigan*, 801 F.3d 630, 651 (6th Cir. 2015) (quotes and citation omitted)). Here, it is undisputed that both the Township and Moore contend Moore (and other MTPD officers) never acted inconsistently the Township's policies, practices, and customs, and thus approve of the manner in which Moore treated Gillispie. Doc. 227-2, P.ID5582; Doc. 227, P.ID5533; Doc. 170, P.ID3694). The Township has gone to such great lengths to ratify the *Brady* violation, it takes the position that two of its officers— Fritz and Bailey— are either lying or completely mistaken because the reports they say they wrote, as the Township contends the reports "never existed." Doc. 227, at P.ID5529-30. A reasonable jury can conclude the Township ratified Moore's actions, making it liable under *Monell. Paterek*, 801 F.3d at 651; *see also Larson v. Napier*, 700 F. App'x 609, 611 (9th Cir. 2017) (affirming judgment against municipality where it admitted "deputies complied with the department's policy").

### E. A Reasonable Jury Can Find The Township's Policies and Customs Caused Plaintiff's Rights to Be Violated

As it relates to the absence of written directives, it takes little to see how failure to have rules governing police conduct concerning producing *Brady* material and identification evidence can allow a wrongful conviction like Plaintiff's. *See* Doc. 233-1, P.ID6769-70. These failures are only magnified by the failures to train and supervise. As it relates to training, this Case is on all fours with *Gregory* and is stronger than *Jackson* (where the municipality at least had *some* written policies concerning the production of material evidence to criminal defendants, and was able to actually identify *some* training provided to its officers). As in those cases, the evidence is sufficient to allow a reasonable jury to find that the Township's deficient policies were the moving force behind both the *Brady* violation here and for the allowing Moore unfettered and unsupervised discretion in intentionally creating suggestive identification procedures and then continuing to influence victim-witnesses ever after the fact. As it relates to supervision, particularly with the Township's policy makers being on

notice, allowing Moore to go "rouge" as he had before would have obviously permitted unconstitutional conduct like that seen here.

Finally, causation is a quintessential jury question, and the evidence submitted here is sufficient to send this issue to the trier of fact. *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988) ("The matter of causation is an issue of fact which must be decided by the jury."); *Obrycka v. City of Chicago*, 2012 WL 601810, at *9 (N.D. Ill. Feb. 23, 2012) (evidence, including expert testimony, created dispute of material fact on causation). Summary judgment must be denied.

## VIII.   Defendants' Remaining Arguments Fail.[15]

### A.  The Township Is Obligated To Indemnify Moore

The Township argues that it is entitled to summary judgment on Plaintiff's indemnification for two reasons. First, the Township re-asserts its prior arguments from the pleading phase. Br. 25. But, this Court already recognized that *Jackson* holds that it would be error to enter judgment as a matter of law on this claim, at this preliminary juncture. Nothing has changed the law in this regard. Second, the Township argues that a finding against Moore on the *Brady* claim necessarily means he acted in "bad faith." As explained above, this argument is mistaken. *Moldowan*—cited by the Township—specifically held bad faith is *not* required to prove a *Brady* violation. The Township's argument has also ignored the fact that there are other claims in this case not implicated by the *Brady* rule whatsoever; like Plaintiff's Fourth Amendment claim where subjective inquiry is prohibited. The Township cannot prove it is entitled to judgment as a matter of law.

### B.  Miami Township is A Proper Defendant In this Action

Citing no authority, the Township seeks dismissal, because the words "City of" precede "Miami Township" in the case caption. This argument is meritless. The Township accepted service,

---

[15] The Township's arguments about punitive damages and intracorporate conspiracy are unavailing; it is Moore and Wolfe at risk of punitive damages, and only Moore sued as Township officer.

Doc. 21, P.ID176, appeared in this case, participated in extensive discovery (including producing a 30(b)(6) designee), has filed numerous motions, and actively participated in this case. The Township is a proper defendant and, most important, the Township's interests in this litigation have been fully and adequately represented. To the extent the Township seeks a clerical change to the caption of the case—removing the words "City of"— Plaintiff has no objection. To dismiss it entirely would be improper and the Township provides no authority for such an extreme, unwarranted outcome. In addition, to the extent the Township makes a passing reference to Rule 19, it has *not* moved to join any party or even cited the Sixth Circuit's three-part test under that rule, *see Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 666 (6th Cir. 2004), precluding consideration of this argument and summary judgment. *S.H.A.R.K.*, 499 F.3d at 564-65; *Stewart*, 628 F.3d at 256

## CONCLUSION

With exception to certain state-law claims, Defendants' motions should be denied. Respectfully submitted,

 /s/ David B. Owens
Mike Kanovitz
David B. Owens
LOEVY & LOEVY
311 North Aberdeen St. 3FL
Chicago, IL 60607
(312) 243-5900
david@loevy.com

60

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 28, 2019, a copy of the foregoing was filed using the Clerk

of Court's CM/ECF filing system which will send Notification of such to all counsel of record.


Respectfully submitted,


<u>/s/ David B. Owens</u>
Mike Kanovitz
David B. Owens
LOEVY & LOEVY
311 N. Aberdeen St., 3FL
Chicago, IL 60607
(312) 243-5900
david@loevy.com