## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

ROGER DEAN GILLISPIE,         :
                                       :

        Plaintiff,         :    Case No. 3:13-cv-416
                                       :

        v.                :    Judge Thomas M. Rose
                                       :

THE CITY OF MIAMI TOWNSHIP, *et al.*,  :
                                       :

        Defendants.        :
                                       :

---

**ENTRY AND ORDER (1) GRANTING, IN PART, AND DENYING, IN PART, DEFENDANT RICHARD WOLFE'S MOTION FOR SUMMARY JUDGMENT (DOC. 171); (2) GRANTING, IN PART, AND DENYING, IN PART, DEFENDANT MATTHEW SCOTT MOORE'S MOTION FOR SUMMARY JUDGMENT (DOC. 257); (3) GRANTING, IN PART, AND DENYING, IN PART, DEFENDANT MIAMI TOWNSHIP OHIO'S MOTION FOR SUMMARY JUDGMENT (DOC. 260); AND (4) DENYING PLAINTIFF'S MOTION TO STRIKE NEW SUMMARY JUDGMENT MATERIALS FILED FOR THE FIRST TIME IN REPLY (DOC. 284)**

---

Pending before the Court are several motions.  First is a Motion for Summary Judgment (the "Wolfe Motion") filed by Defendant Richard Wolfe ("Wolfe").  (Doc. 171.)  Second is a Motion for Summary Judgment (the "Moore Motion") filed by Defendant Matthew Scott Moore ("Moore").  (Doc. 257.)  Third is a Motion for Summary Judgment (the "Township Motion") filed by Defendant Miami Township, Ohio ("Township").  (Doc. 260.)  Fourth is a Motion to Strike New Summary Judgment Materials Filed for the First Time in Reply (the "Motion to Strike") filed by Plaintiff Roger Dean Gillispie ("Gillispie").  (Doc. 284.)

In response to each of the motions, the opposing party filed a response brief.  (*See* Docs. 239, 278, 286, 289.)  This includes that Gillispie filed an omnibus response brief in opposition to the Moore Motion and the Township Motion (the "Omnibus Response").   (Doc. 278.)

Additionally, in support of each of the motions, the party that filed the motion filed a reply brief. (*See* Docs. 248, 281, 282, 290.)  Each of the motions are fully briefed and ripe for review.

For the reasons discussed below, the Court: 1) **DENIES** the Motion to Strike (Doc. 284); 2) **GRANTS, IN PART, AND DENIES, IN PART,** the Moore Motion; 3) **GRANTS, IN PART, AND DENIES, IN PART,** the Township Motion; and 4) **GRANTS, IN PART, AND DENIES, IN PART,** the Wolfe Motion.  Given the Court's decisions in this Order, no claim will remain pending against the Township or Wolfe in this case.

## I. <u>BACKGROUND</u>

The background for Gillispie's claims is extensive, and the Court will not trudge through all of it in this Order.  *See, e.g., State v. Gillispie*, 65 N.E.3d 791, 793-99, 2016-Ohio-7688 (Ohio Ct. App. 2016) (setting forth multipage factual and procedural history of Gillispie's criminal and *habeas corpus* cases).  In his Amended Complaint, Gillispie brings nine counts:

1. Violation of 42 U.S.C. § 1983 for Suppression of Exculpatory Material

2. Violation of 42 U.S.C. § 1983 for Suggestive Identification

3. Violation of 42 U.S.C. § 1983 for Fabricated Evidence

4. Violation of 42 U.S.C. § 1983 for Malicious Prosecution

5. Violation of 42 U.S.C. § 1983 for Destruction of Exculpatory Evidence

6. Malicious Prosecution under Ohio State Law

7. Infliction of Emotional Distress under Ohio State Law

8. Spoliation of Evidence under Ohio State Law

9. Indemnification under Ohio State Law

(Doc. 18.)  As is appropriate at this stage, the Court recites relevant facts in the light most favorable to Gillispie, drawing reasonable inferences in his favor.  *Jackson v. City of Cleveland*, 925 F.3d 793, 803 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 855, 2020 U.S. LEXIS 148 (Jan. 13, 2020).

2

### A. **Three Women are Raped in August 1988 in the Dayton Area**

On August 20, 1988, twin sisters, B.W. and C.W., were abducted at gunpoint from the parking lot of the Best Products store in Miami Township, Ohio, taken to a remote area, and forced to perform oral sex on the perpetrator (the "8/20 Rapes"). Another woman, S.C., later reported being forced to perform oral sex at gunpoint on August 5, 1988 under circumstances similar to the 8/20 Rapes, although that crime fell outside the jurisdiction of the Miami Township Police Department.

### B. **Detective Gary Bailey and Sergeant Steven Fritz Investigate the 8/20 Rapes**

Detective Sergeant Steven Fritz ("Fritz") assigned Detective Gary Bailey ("Bailey") of the Township's police department to investigate the 8/20 Rapes. Bailey interviewed B.W. and C.W., and he created a handwritten report based on his interviews. B.W. and C.W. were shown books of photographs of potential suspects, none of whom were identified. Together, B.W. and C.W. created a composite image of their perpetrator. One (or both) of the twins provided the Township's police department (at least Bailey) with the perpetrator's pants size, which she had observed. Bailey recorded this information in a supplemental report. Additionally, S.C. viewed photographs at the Sheriff's Office and made no identification of her perpetrator, although she created a composite image of him.

Bailey investigated numerous tips and leads regarding the 8/20 Rapes. From time to time, Fritz and Bailey would get together to brainstorm about the case. Fritz would keep up on the case with Bailey and review the reports. Fritz (possibly together with Bailey) developed a profile of the perpetrator. Eventually, however, all of the good leads on the case ran out.

At the time of the rapes, Plaintiff Gillispie worked as a supplemental security officer at General Motors ("GM"), where he had been employed since 1984. There was tension and animosity between Gillispie and his superiors at GM, including Defendant Wolfe. Wolfe had

previously worked for the Township's police department as a part-time volunteer from approximately 1974 to 1985, including a portion of time when Defendant Moore's father served as the Township's police chief. Wolfe knew Moore's father. Wolfe's time working for the Township's police department also included a six-month stint as a full-time police officer in 1978, at the end of which Wolfe was hired by GM.

In mid- to late-1989, while Bailey was still a detective for the Township, Wolfe contacted the Township police department, bringing with him a copy of Gillispie's employee identification photo. Prior to this, one of Wolfe's employees at GM had come to Wolfe and informed him that one of that employee's subordinates felt that a composite he had seen of the 8/20 Rapes suspect resembled Gillispie. After looking at the composite, Wolfe agreed. Gillispie had recently been fired from GM. Part of the reason that Wolfe went to the Township's police department was because he previously worked there. Wolfe eventually had a meeting with then-police chief Thomas Angel ("Angel"), Captain Marvin Scothorn ("Scothorn"), Fritz, and Bailey. Bailey and Fritz wrote reports documenting this meeting. At the meeting, Wolfe showed a single GM identification card bearing Gillispie's photo and suggested that Gillispie become a suspect in the 8/20 Rapes. Bailey and Fritz were skeptical, thinking that Wolfe might be being vindictive. Chief Angel ordered Bailey and Fritz to investigate Gillispie as a suspect, and Bailey conducted that work under Fritz's supervision.

Eventually, Bailey and Fritz concluded that Gillispie should be eliminated as a suspect. They informed Chief Angel, who agreed, and they memorialized the elimination in supplemental reports. Some of the reasons why Bailey and Fritz eliminated Gillispie as a suspect included: (1) Gillispie was too large to have the pants size of the perpetrator that B.W and/or C.W. had indicated; (2) Gillispie's lack of any criminal history, while the perpetrator's crimes were brazen—suggesting

4

an extensive criminal history; (3) the perpetrator, who told the victims his name was "Roger," most likely would not have provided his real name; (4) Wolfe's (and other GM employees') apparent animosity toward Gillispie; (5) in their opinion, the picture of Gillispie that Wolfe brought did not match the composite; and (6) the long delay between when the police department had shared the composite of the perpetrator with GM and when Wolfe had suggested Gillispie as a suspect. However, Bailey and Fritz cannot recall all of the reasons why they eliminated Gillispie as a suspect. There were more reasons and details provided in the supplemental reports that they wrote. Bailey submitted all of the supplemental reports to Fritz, and they were placed into two files: the Records Division File and the Working File housed in the Detectives' Section.

Wolfe would call Fritz on occasion, asking about whether the Township police department was going to do anything about Gillispie. Fritz eventually told Wolfe that they were not going to bring charges against Gillispie and that Gillispie was not considered a good suspect.

In early November 1989, Bailey was assigned out of the Detectives' Section. In mid-June 1990, Fritz left the Township's police department. Shortly before Fritz left the department, Wolfe showed up at the police department claiming that he had additional information and providing an envelope with photos in it, which were given to Fritz.

Fritz informed Chief Angel and Captain Scothorn that Defendant Moore would be the best one to assign to the 8/20 Rapes investigation, so long as Moore had supervision. Fritz believed that Moore was tenacious and had the qualities of being a good investigator. However, at the time, Moore was relatively new to the force, and Fritz believed that Moore could be overzealous and had a tendency to go "rogue," sometimes continuing to pursue cases even when he lacked evidence.

### C. **Moore is Assigned the Investigation in June 1990**

On June 18, 1990, Moore was assigned the investigation of the 8/20 Rapes. He received

all of the supplemental reports that pre-dated his involvement in the investigation, including the supplemental reports detailing the first meeting with Wolfe and the elimination of Gillispie as a suspect (and the reasoning for doing so). However, those reports were not turned over to the prosecutor or to Gillispie's defense attorney. Moore's ex-wife testified in an affidavit that the supplemental report concerning the previous elimination of Gillispie as a suspect frustrated and angered Moore.

In line with this, Moore wrote his own supplemental reports that do not reference Wolfe's initial meeting at the Township's police department or the circumstances concerning the elimination of Gillispie as a suspect. Instead, in his first written report (dated June 18, 1990), Moore wrote that, "[d]ue to new information received in th[e] case," he would be continuing the investigation. (Doc. 230-5 at PAGEID # 6106.) Moore later testified at a hearing in state court that, at the time he was assigned to the case (i.e., June 18, 1990), "Rick Wolf[e] from GM security who is the security manager had brought me some security identification cards and the composite of Roger Dean Gillespie [sic]," and that Gillispie was not a suspect prior to that point in time.[1] (Doc. 231-3 at PAGEID # 6332-33.) Moore's first written report also includes the following:

> At this time I Det. M.S. Moore will be starting my investigation in this case. The newest lead in this case was brought to our attention by and [sic] ex-police officer who now is employed with General Motors as a Security Manager [i.e., Wolfe]. He had one of our composite drawings posted at there [sic] plant. He states that they had recently terminated and [sic] employee named Roger D. Gillispie. Upon comparing the composite drawing and the photograph from the General Motors Security Identification Card, it was found that there was a definite resemblance between the two.
>
> While the newest suspect's name is Roger D. Gillispie, I read over the statements made by my victims in August 1988 and found that the suspect at the time of the offense identified himself as Roger. I further found that in this case he identified himself to the victims as a Security Officer for Best Products. It should be noted

---

[1] Paul Folfas ("Folfas"), who was the prosecutor in Gillispie's criminal trials, testified at his deposition that Moore told him in one of their first meetings together that Fritz and Bailey had eliminated Gillispie as a suspect. (Doc. 252 at PAGEID # 7254, 7287-88, 7357.)

that Roger D. Gillispie was a Security Officer for General Motors and that may be the reason he identifies with a Security Position. Further there is a definite comparison with the composite and the Security Picture Identification Card that was given to me by Rick Wolfe/Security Manger. Upon obtaining this suspect[']s Social Security Number … I made a check through NCIC/LEADS, I found no prior Criminal History, however I did get back a physical description from the drivers license issued to Roger D. Gillispie on May 04, 1990. … It should be noted that the description given by the victims in this case match [sic] the only photograph we have of Roger D. Gillispie.

Also checked for us by Security Manager Rick Wolfe was weather [sic] or not Roger D. Gillispie had been working the date of the offense. It was found that he did not work either 08/20/88 or 8/21/88.

At this time there's no further information available.

(Doc. 230-5 at PAGEID # 6107.)

Consistent with Township practice and custom, unlike earlier handwritten reports, Moore's supplemental reports were electronic files over which he had control. Moore was able to edit and write supplemental reports after the fact. Additionally, Township officers were not required to turn in supplemental reports to supervisors at any particular time or contemporaneous with them being written; officers could wait until the conclusion of their investigation to submit them. Moore typically did not submit contemporaneous reports, but instead waited until an investigation was closed to turn them in.

### D. Moore Creates Photo Lineups

Each of the three victims (B.W., C.W., and S.C.) had looked at the perpetrator's face during the rapes. During the encounter with B.W. and C.W., the perpetrator had worn sunglasses and had B.W. and C.W. place a bandana over their eyes, thus blindfolding them, for a portion of the encounter.

Each of the three victims identified Gillispie as the perpetrator during subsequent photo lineup procedures, all of which were administered by Moore roughly two years after the crimes. Moore had created the photo lineups used for the identifications. Moore and each victim,

individually and separately, were the only ones present during those photo lineup procedures. Moore was the officer investigating the case, he knew who the suspect was, and he indicated in a written report that he hoped the victims would identify Gillispie.

The photo lineups consisted of six photographs, one being of Gillispie. The photograph of Gillispie was from a GM identification badge. Moore did not know how old the picture was, but the identification badge indicated that it was issued on January 27, 1989. Moore made at least three different photo lineups; he placed the photo of Gillispie in a different location for each of the three victims' lineup procedure. He did not contemporaneously make a copy of the photo lineups that he showed to the victims, despite the "PHOTOGRAPHIC IDENTIFICATION GENERAL GUIDELINES" used by Moore and the Township's police department stating: "ALSO RUN A COPY OF THE PHOTO SPREAD USED!" (Doc. 170-4; *see also* Doc. 170 at PAGEID # 3576-78.)

Moore told each of the victims, before conducting the lineups, that he had a possible suspect for the crimes. C.W. conducted a lineup procedure with Moore first. The next day, when B.W. conducted a lineup procedure with Moore, C.W. came with her and waited in the lobby of the police department. Moore's report states that he had told C.W. not to speak with her sister about the lineup. After B.W.'s lineup, Moore informed the sisters that they had picked out the same suspect, that the suspect used to be a security guard at GM but was fired, that the suspect's name was Roger Gillispie, and that Roger Gillispie was the suspect that he (Moore) thought might be the one who committed the crimes. (Again, the perpetrator had told the victims that he was with security for the Best Products store and that his name was "Roger.") After S.C.'s lineup, Moore told S.C. that she had identified the person that he believed was the perpetrator.

The picture of Gillispie used in the lineups appears to be different from the pictures of the

five men used as fillers in the lineups.  For example, Gillispie's face appears to be wider than the faces of the fillers in the lineup photos.  (Testimony from the victims described the perpetrator as having a wide face.)  His face is closer and larger than the faces of the others.  Unlike the fillers, Gillispie's photo had been changed from its original size by the Montgomery Valley Regional Crime Lab, at Moore's request.  Also, Gillispie's photo had a different finish than the other photos in the lineups.  Moore admitted that there was a difference in quality between Gillispie's photo and the photos of the fillers, and that Gillispie's photo seemed to be "slightly duller."  Additionally, two of the filler photos used were of Township officers.

Moore had meetings with B.W. and C.W. between the time of the lineup and when they were asked to identify Gillispie in court.  The sisters were made aware that Gillispie had a right to face his accusers and would be in the courtroom.  Moore also testified that he had "indicated to [B.W. and C.W.] that [Gillispie] has trimmed his hair back since [Moore had] talked to him and that [Gillispie] has tried to change his appearance."  (Doc. 231-3 at PAGEID # 6358.)  All three victims identified Gillispie as the perpetrator in court.  Three photo lineups were introduced into evidence at both of Gillispie's criminal trials, and Moore testified about those lineups at each trial.

### E.  Gillispie is Arrested, Indicted, Tried (Twice), and Convicted (Twice)

Following the lineup procedures with B.W. and C.W., Moore interviewed Gillispie at the police station on or around August 8, 1990.  According to Gillispie, prior to charging him for the 8/20 Rapes, Moore refused to tell Gillispie why Moore wanted to speak with him and what Moore was investigating.  However, Moore's report indicates that he told Gillispie the investigation was about the 8/20 Rapes.  On or around August 31, 1990, Moore met with the prosecutor to provide the initial case against Gillispie, he presented the case to the prosecutor, and charges were initiated.  On September 5, 1990, Gillispie was arrested at his residence.

According to his reports, Moore interviewed Gillispie's ex-girlfriend, Torrie Mitchell

9

("Ms. Mitchell"), on September 19 and 27, 1990. Moore's reports indicate that he taped their conversations, although some statements were made prior to his decision to tape the conversations so those were not recorded. One report states that Ms. Mitchell told Moore that, at one time, Gillispie had a gold chain with an emblem. (At least one of the victims had told the police that the perpetrator was wearing a gold chain with an unknown object attached to it.) However, Ms. Mitchell testified by way of an affidavit that she never told Moore that Gillispie wore a gold chain with an emblem. (*See* Doc. 276-7 at PAGEID # 9865.) Ms. Mitchell also testified in that affidavit that Moore's report contains falsehoods and that a transcript of her conversation with Moore contained things that she did not say. For example, Moore's report indicates that Ms. Mitchell affirmed that she and Gillispie had sex near or at the rape sites and, thus, Gillispie had taken the victims to areas he had been with Ms. Mitchell (and therefore were familiar to him). Ms. Mitchell testified in her affidavit that the places she went with Gillispie were not where the rapes occurred.

After Gillispie had retained Dennis Lieberman ("Lieberman") as his defense attorney, Lieberman hired a company called Area Wide Investigations to perform some investigation. Area Wide Investigations assigned Fritz to be Lieberman's investigator.[2] Lieberman testified that Fritz worked in a limited capacity for him on the Gillispie case, performing specific tasks on an *ad hoc* basis, and that Fritz did not perform "big picture" analysis or strategy.

One of Fritz's tasks was to meet with Gillispie and get his story. Another task was to obtain records from Twin Knob Campground at Cave Run Lake in Kentucky. (Gillispie asserted that he could not have committed the 8/20 Rapes because he was at Cave Run Lake in Kentucky with

---

[2] This was after Fritz had left the Township's police department. Fritz testified that he had, for a period of time, worked for Area Wide Investigations part-time while he was also working for the Township. Fritz would typically work on, for example, insurance fraud, domestic violence, and workers' compensation cases (including performing surveillance and serving subpoenas). He started working for Area Wide Investigations again at some point after he left the Township's police department. He worked on a number of assignments for Area Wide Investigators, including a hit-and-run case and others prior to his work for Mr. Lieberman on the Gillispie case. (*See* Doc. 221 at PAGEID # 4540-42.)

some friends at the time.) Fritz went to Twin Knob Campground and found the records there to be in disarray. Additionally, the records for August 1988 had less than half the amount of the records for June or July of 1988, and there were very few records for the weekend of the 8/20 Rapes (despite the weather that weekend being hot and sunny). Moore had received some records from the campground, but Gillispie alleges that he and his friends were there far more often than indicated in the records that Moore received.

On October 4, 1990, the Montgomery County Grand Jury returned an indictment charging Gillispie with nine counts of rape, three counts of kidnapping, three counts of gross sexual imposition, and one count of aggravated robbery. Moore had testified before the grand jury. Gillispie pleaded not guilty to all counts. Gillispie's criminal defense attorney filed motion(s) to produce *Brady* material. Gillispie was tried in February 1991 and then again in June 1991 after being granted a new trial. Both Moore and Wolfe testified against Gillispie each time, and Gillispie was found guilty each time.

### F. **Decisions by Judge Merz in 2011 and by the Ohio Court of Appeals in 2016**

While incarcerated, Gillispie fought his conviction by filing numerous motions for relief both in Ohio state court and federal court. On February 13, 2008, Gillispie filed in state court a second petition for post-conviction relief or, in the alternative, a motion for a new trial. Upon its review of the trial court's denial of that petition and motion, an Ohio court of appeals concluded that the trial court did not err in finding no *Brady* violations by the State, but did conclude that additional evidence regarding an alternative suspect required a hearing on whether a new trial was warranted. *See State v. Gillispie*, 2009 Ohio App. LEXIS 3107, 2009 WL 2197052, 2009-Ohio-3640 (Ohio Ct. App. 2009). In 2010, the state trial court held the hearing and subsequently denied the motion; Gillispie appealed that decision.

While that appeal was pending, Magistrate Judge Michael R. Merz issued a "Decision and

Order Granting Conditional Writ of Habeas Corpus" on December 15, 2011 in federal court. *Gillispie v. Timmerman-Cooper*, 835 F. Supp. 2d 482 (S.D. Ohio 2011).  In the decision, Judge Merz found that the State had violated Gillispie's right to due process and made the following conclusion:

> [T]he Court finds that Mr. Gillispie was denied his right to due process pursuant to the Fourteenth Amendment as interpreted in *Brady*, to be apprised of all material exculpatory and impeachment information which the State holds.
>
> Accordingly, the Petition for Writ of Habeas Corpus is granted. The State of Ohio is ordered to release Petitioner from custody unless he is again convicted at a trial commencing not later than July 1, 2012.

*Id.* at 510.  The State appealed Judge Merz's decision to the Sixth Circuit Court of Appeals.

Back in Ohio state court, the state appeals court considered the appeal of Gillispie's motion for a new trial following the hearing that it had ordered.  On April 13, 2012, based on the alternative suspect, it reversed the trial court's ruling.  *State v. Gillispie*, 2012 Ohio App. LEXIS 1453, 2012 WL 1264496, 2012-Ohio-1656 (Ohio Ct. App. 2012), *amended on reconsideration by State v. Gillispie*, 985 N.E.2d 145, 2012-Ohio-2942 (Ohio Ct. App. 2012) (deleting paragraph 45 from original opinion).[3]  The Ohio appeals court vacated Gillispie's conviction and sentence and remanded for a new trial.  *Gillispie*, 2012 Ohio App. LEXIS 1453, at *32 ("the order of the trial court denying Gillispie's motion for a new trial is Reversed.  Gillispie's conviction and sentences are Vacated, and this cause is Remanded for a new trial").  On November 7, 2012, the Ohio Supreme Court denied the State leave to appeal that decision.  *State v. Gillispie*, 977 N.E.2d 694, 2012-Ohio-5149 (table).

The State then moved to dismiss its federal appeal of Judge Merz's December 15, 2011

---

[3] The Ohio Appeals Court's opinion states that an alternative suspect (Kevin Cobb) allegedly had a "physical description [that] resembles the composites and the descriptions given by the rape victims in Gillispie's case – a tall, young, darkly tanned man with light brown or dark blonde hair with a reddish tint, blue eyes, acne along the jaw line, and who was often seen wearing a gold chain and medallion in the late 1980's." *Gillispie*, 2012 Ohio App. LEXIS 1453, at *25.

decision. The appeal was dismissed on November 27, 2012. (Doc. 93 in *Gillispie v. Warden*, Case No. 3:09-cv-471.)

On January 18, 2013, Gillispie filed a motion in the state trial court to compel discovery of the supplemental police reports created by Bailey and Fritz or to dismiss the indictment with prejudice (Doc. 230-2). *See Gillispie*, 65 N.E.3d at 797. On November 30, 2015, the trial court granted the motion to dismiss the indictment due to the State not having provided the supplemental reports to Gillispie (Doc. 230-3).[4] *Id.* at 798, 800. On appeal, the Ohio appellate court made the following conclusion:

> [T]he [federal] district court clarified … that Gillispie could not be constitutionally convicted of the offenses without production of the supplemental police reports themselves … The trial court properly afforded the clarification preclusive effect. In light of the State's statement that it cannot produce the supplemental police reports, as required by the [federal] district court, the trial court did not abuse its discretion in dismissing the indictment against Gillispie.

*Id.* at 808.

According to Gillispie, he is innocent of the rapes and could not have committed them because he was with a group of friends on August 5, 1988 and in Kentucky on August 20, 1988. He asserts that he was traumatized by over 20 years of wrongful incarceration.

## II.   ANALYSIS FOR GILLISPIE'S MOTION TO STRIKE

In his Motion to Strike, Gillispie argues that "both Moore and the Township have raised entirely new materials and evidence for the first time in reply, which is patently improper." (Doc. 284 at PAGEID # 10690.) He identifies in four bullet points the items that he argues are "new materials and evidence." (*Id.* at PAGEID # 10691-92.)

The Court disagrees with Gillispie's argument that the items should be stricken. It finds

---

[4] There is a dispute between the parties regarding whether those supplemental reports ever existed. (*See, e.g.*, Doc. 257 at PAGEID # 8109.)

13

that none of the items are new arguments first raised in a reply brief. *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("arguments made for the first time in a reply brief are waived"); *Ross v. Choice Hotels Int'l, Inc.*, 882 F. Supp. 2d 951, 958 (S.D. Ohio 2012). Instead, the Court finds that each of the items is used in rebuttal, responding to an argument that Gillispie made in his Omnibus Opposition. S.D. Ohio Civ. R. 7.2(d) ("Evidence used to support a reply memorandum shall be limited to that needed to rebut the positions argued in memoranda in opposition"); *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 476 (6th Cir. 2002) ("reply affidavits that respond only to the opposing party's brief are properly filed with the reply brief"). Therefore, the Court denies the Motion to Strike and will not strike those items.

The Court notes that much of the Motion to Strike is an improper sur-reply filed without leave of Court. Most of that motion (and nearly all of the reply in support of that motion) has nothing to do with whether parts of Moore's or the Township's reply brief should be stricken, but instead consists of unsanctioned additional argument concerning the merits of the summary judgment motions. The Court warns counsel that it will not tolerate such a tactic and that failure to obey this warning in the future may lead to sanctions.

## III.    LEGAL STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either

party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S Ct. 2505, 91 L. Ed. 2d 202 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The burden then shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

"[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Id.* at 255; *Matsushita*, 475 U.S. at 587. However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

15

The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). The Court relies on the Rule 56 evidence called to its attention by the parties. *See* Fed. R. Civ. P. 56(c), (e).

## IV. ANALYSIS FOR MOORE'S MOTION FOR SUMMARY JUDGMENT

Gillispie's first five claims are for violations of 42 U.S.C. § 1983. "A § 1983 claim must satisfy two elements: 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995). The first element is the one at issue in Moore's motion for summary judgment, not the second element. Moore argues that Gillispie's § 1983 claims fail as a matter of law based on the evidence and because qualified immunity protects him from those claims.

### A. Count 1 Against Moore (Suppression of Exculpatory Material Under § 1983)

In his first claim, Gillispie alleges that he was deprived of his right to a fair trial and was falsely convicted for a crime of which he was innocent because Moore (acting individually and in conspiracy with Wolfe) destroyed, failed to disclose, and otherwise withheld or suppressed exculpatory evidence and material from the prosecution (and, thus, from Gillispie). (Doc. 18 at PAGEID # 94.) Gillispie argues that the Defendants suppressed eight items that were material and favorable to Gillispie's defense. (Doc. 278 at PAGEID # 10480.) The first three of those items

16

are what the parties have referred to as the supplemental reports written by Fritz or Bailey.[5]  It is Gillispie's position that Moore suppressed those supplemental reports, which were not produced to the prosecutor or to Gillispie's defense attorney.   (*See id.* at PAGEID # 10467, 10480-81.)

"In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Jackson v. City of Cleveland*, 925 F.3d 793, 813-14 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 855, 2020 U.S. LEXIS 148 (Jan. 13, 2020).   If there are several pieces of favorable evidence that were not turned over, then the materiality inquiry focuses on the cumulative effect of the unsuppressed evidence on the jury's verdict.[6]  *Gumm v. Mitchell*, 775 F.3d 345, 370 (6th Cir. 2014) (citing *Kyles v. Whitley*, 514 U.S. 419, 436-37, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)).   "*Brady* claims have three elements: [1] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Jackson*, 925 F.3d at 814.

The ultimate concern from the Supreme Court's *Brady* decision—i.e., that criminal defendants receive a fundamentally fair trial—"demands that *Brady's* protections also extend to actions of other law enforcement officers such as investigating officers." *Moldowan v. City of*

---

[5] Specifically, these are alleged to be: "(1) the supplementary police reports concerning Wolfe's initial meeting with Fritz, Bailey, Chief Angel, and others where he implicated Gillispie in the rapes; (2) the report authored by Detective Bailey and approved by Sgt. Fritz, detailing the steps Bailey took in investigating and eliminating Gillispie as a suspect (including the pant size of the perpetrator and other profile information); [and] (3) the report Sgt. Fritz wrote to Chief Angel approving Bailey's work and confirming that they did not believe Gillispie should have been a suspect."  (Doc. 278 at PAGEID # 10480.)
[6] Additionally, "inadmissible material might nonetheless be considered material under *Brady* if it would lead directly to admissible evidence." *Barton v. Warden, Southern Ohio Corr. Facility*, 786 F.3d 450, 465-66 (6th Cir. 2015) (finding that, although certain unrecorded statements might have been inadmissible hearsay, disclosure of the substance of the statements might have led directly to admissible evidence).

*Warren*, 578 F.3d 351, 378 (6th Cir. 2009) (internal quotation marks omitted). Therefore, the Sixth Circuit has found that "police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Id.* at 379; *Elkins v. Summit Cnty.*, 615 F.3d 671, 676 (6th Cir. 2010) (plaintiff "had a constitutional right to have favorable evidence disclosed to the prosecution and court" by defendant police officers).

Police officers and detectives bear a "*Brady*-derived responsibility to turn over potentially exculpatory evidence to the prosecutor's office." *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) (internal quotation marks omitted). "[P]olice officers fulfill their *Brady* obligations as long as they inform the prosecutor about evidence that undermines the state's preferred theory of the crime." *Id.* (internal quotation marks and modification omitted).

The Sixth Circuit in *Moldowan* explained that "police actions taken in bad faith are not the only species of police conduct that can deprive criminal defendants of the due process guaranteed by the Constitution." *Moldowan*, 578 F.3d at 383. "Where the exculpatory value of a piece of evidence is 'apparent,' the police have an *unwavering* constitutional duty to preserve and ultimately disclose that evidence" to the prosecutor, regardless of whether it can be shown that the evidence was destroyed or concealed in bad faith. *Id.* at 388 (emphasis in original). The exculpatory value of evidence is "apparent" "when the officer is aware that the evidence could form a basis for exonerating the defendant." *D'Ambrosio*, 747 F.3d at 389-90.

The Court finds that, as to Gillispie's § 1983 claim for suppression of exculpatory material (Count 1), there are genuine issues of material fact that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Hancock*, 958 F.2d at 1374. As in *Jackson*, "although a jury might ultimately find that [Moore] did not suppress evidence, it would not be unreasonable in finding that he had." *Jackson*, 925 F.3d at 814. For

18

example, assuming as true the evidence of Gillispie and drawing all reasonable inferences in his favor, a reasonable jury could find that the supplemental reports written by Bailey or Fritz existed, that those reports could form a basis for exonerating Gillispie (they were exculpatory), that Moore had those reports in his possession and knew their exculpatory value, and that the prosecutor did not know about those reports—including because Moore did not disclose them to him. *Anderson*, 477 U.S. at 255; *Moldowan*, 578 F.3d at 388; *Jackson*, 925 F.3d at 815. In such circumstances, a reasonable jury could likewise find the three elements of a *Brady* claim: (1) the evidence at issue was favorable to Gillispie because it is exculpatory; (2) the evidence was suppressed by Moore; and (3) prejudice ensued, including "that there is a reasonable probability[7] that the suppressed evidence would have produced a different verdict." *Jackson*, 925 F.3d at 814-15; *see also Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1044-47 (N.D. Ill. 2018) (denying summary judgment on *Brady* claim against officer for suppressing exculpatory evidence because genuine factual disputes had to be resolved by the jury).

One of Moore's main arguments against Count 1 is that there is no evidence that he ever possessed those supplemental reports and, even if he had, that there is no evidence such reports were exculpatory. (*See, e.g.,* Doc. 281 at PAGEID # 10554.) The Sixth Circuit addressed a similar situation in *Elkins*, where the defendant officers claimed that the plaintiff "has not presented sufficient evidence demonstrating that the officers actually received the … memorandum and that, had they received it, [plaintiff] cannot show that the memorandum was apparently exculpatory." *Elkins*, 615 F.3d at 675. In *Elkins*, the court denied summary judgment as to the officers' liability on a § 1983 claim for suppression of exculpatory evidence. That case supports the same outcome

---

[7] "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) (citing *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)).

here.

There is evidence that Bailey and Fritz created the supplemental reports.[8] Bailey and Fritz testified to their existence.[9] (*See, e.g.,* Doc. 221 at PAGEID # 4545-46, 4559-60; Doc. 222 at PAGEID # 4856-57, 4867-68, 4883; Doc. 221-5 at PAGEID # 4648-53.) They also testified that the supplemental reports contained details supporting their elimination of Gillispie as a suspect, and they now cannot recall all of the reasons for doing so. (Doc. 221-5 at PAGEID # 4649-53; Doc. 222 at PAGEID # 4798, 4800, 4858-59, 4894-95.)

Additionally, it is reasonable to infer—in line with testimony from Bailey, Fritz, and Moore's ex-wife—that a detective, like Fritz, would place such reports in the proper case file and that Moore—having received the file when he was assigned the case—would have read those supplemental reports (*see, e.g.,* Doc. 170 at PAGEID # 3487-88; Doc. 221-5 at PAGEID # 4648-49; Doc. 222 at PAGEID # 4802-03, 4809, 4856-57; Doc. 229-5; Doc. 230-5 at PAGEID # 6106-07). *Elkins*, 615 F.3d at 676 ("the Court must assume that the … memo was delivered to the officers working the Elkins case, according to police policy and custom, and also assume that having read the memo, the officers withheld it, never divulging it to the prosecution, thereby preventing it from being disclosed to the defense"); *Jackson*, 925 F.3d at 814 ("a jury is 'allowed to make reasonable inferences from facts proven in evidence having a reasonable tendency to sustain them'") (quoting *Galloway v. United States*, 319 U.S. 372, 396, 63 S Ct. 1077, 87 L. Ed. 1458 (1943)).

---

[8] The Court emphasizes that, at this stage, it is not to weigh the evidence or make credibility determinations. *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 515 (6th Cir. 2019) ("When deciding a motion for summary judgment, we do not engage in 'jury functions' such as making credibility determinations and weighing the evidence. If there remain any material factual disagreements as to a particular legal claim, that claim must be submitted to a jury") (internal citation omitted).

[9] On the other hand, Moore testified that the supplemental reports did not exist. (*See, e.g.,* Doc. 170 at PAGEID # 3397 ("Q. … Those [supplemental] reports never existed? A. No. Q. And when you say no, you mean that those – you mean yes, those reports actually didn't exist? That's your testimony? A. Gary Bailey and Steve Fritz never generated a report concerning Roger Dean Gillispie.").)

Additionally, unlike in *D'Ambrosio*, there is evidence "regarding the nature of these [supplemental reports] [and] what information they contained," which the Court finds could be exculpatory.[10] *D'Ambrosio*, 747 F.3d at 390-91. For example, again, Bailey and Fritz testified that the reports included reasoning for why they eliminated Gillispie as a suspect and that they cannot now recall all of the reasons listed in the reports. (*See, e.g.,* Doc. 221-5 at PAGEID # 4649-53; Doc. 222 at PAGEID # 4798, 2800, 4858-59, 4894-95.) Such reasoning, and the reports themselves, "could form a basis for exonerating" Gillispie and also constitute "evidence that undermines the state's preferred theory of the crime": that Gillispie was the perpetrator of the 8/20 Rapes. *D'Ambrosio*, 747 F.3d at 389-90. As the Sixth Circuit has explained, the question for the Court "is whether the exculpatory value of the [supplemental reports] would have been apparent to [Moore] given the state of the case at the time." *Elkins*, 615 F.3d at 677. Drawing all reasonable inferences in Gillispie's favor, the Court finds that it would have.

As indicated above, there is at least circumstantial evidence that the supplemental reports were in the case file when Moore took over the investigation and that Moore read the case file at that time. There is also evidence that Moore met and/or communicated with Wolfe shortly after he took over the investigation and that Moore's investigation started with looking at Gillispie as a suspect. (*See, e.g.,* Doc. 170 at PAGEID # 3487-88, 3591; Doc. 230-5 at PAGEID # 6106-07.) The exculpatory value of the supplemental reports (which Bailey and Fritz testified included information about their reasons for eliminating Gillispie as a suspect) would have been readily apparent to Moore. *Moldowan*, 578 F.3d at 388; *D'Ambrosio*, 747 F.3d at 389-90. This is further supported by the 2011 affidavit from Moore's ex-wife in which she testified: "Scott [Moore]

---

[10] Moore also relies on *United States v. Driscoll*, 970 F.2d 1472, 1482 (6th Cir. 1992) to support his argument that Gillispie is merely relying on speculation. (Doc. 281 at PAGEID # 10556-57.) The Court disagrees with Moore's argument, and *Driscoll* is distinguishable. *Driscoll*, 970 F.2d at 1482 ("Mr. Driscoll offered <u>no support</u> for his contention that personnel files might contain information important to his case") (emphasis added).

complained about the report that Steve Fritz had done previously that eliminated Gillispie as a suspect. … Scott had the report in his hand at one point when talking about it, and it was 2 pages long.  Scott's anger about this report was something that came up a lot early on."  (Doc. 229-5 at PAGEID # 5699.[11])  Additionally, where the evidence at issue is the police department's own report eliminating a person as a suspect and providing support for doing so, it qualifies as a situation where "the police themselves by their conduct indicate that the evidence could form a basis for exonerating" the suspect.  *Moldowan*, 578 F.3d at 388 n.14 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)).

There is also a genuine issue of material fact regarding whether Moore told the prosecutor that Gillispie had been eliminated as a suspect.  On the one hand, Moore testified at a hearing in state court that Gillispie was <u>not</u> a suspect prior to the time when he became involved in the investigation (June 18, 1990).  (Doc. 231-3 at PAGEID # 6332-33.)  On the other hand, Folfas (the prosecutor) testified at his deposition that Moore told him in one of their first meetings together that Fritz and Bailey had eliminated Gillispie as a suspect (Doc. 252 at PAGEID # 7287-88, 7357).  *See Cottrell v. Clemons*, No. 4:13-cv-00073, 2014 U.S. Dist. LEXIS 100149, at *7-9, 2014 WL 3649185 (W.D. Ky. July 23, 2014) (denying defendant sheriff's motion for summary judgment on § 1983 *Brady* violation claim because of conflicting accounts regarding what the prosecution was aware of concerning the exculpatory evidence).

Moreover, based on the testimony of Bailey and Fritz concerning the content of the

---

[11] The Court acknowledges that Moore's ex-wife also made a sworn statement in 2019 in which she takes issue with some of the items in her own 2011 affidavit.  (Doc. 281-1.)  As set forth above, it is not the Court's function at the summary judgment stage to weigh the evidence and determine a witness's credibility.  *Anderson*, 477 U.S. at 249.  And, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party.  *Id.* at 255; *Matsushita*, 475 U.S. at 587.  *See also Wheatt v. City of East Cleveland*, Nos. 1:17-cv-377, 1:17-cv-611, 2017 U.S. Dist. LEXIS 186224, at *39, 2017 WL 5187780 (N.D. Ohio Nov. 9, 2017) (denying motion for summary judgment on claim because there were disputed facts, including conflicting testimony from a witness; finding that "[a]lthough Harris later recanted this testimony, it is the jury's, and not the Court's, role to determine how to weigh her competing statements").

supplemental reports, even if Moore told prosecutor Folfas that Gillispie had previously been eliminated as a suspect, Moore also would have been required to provide Folfas with a copy of the supplemental reports or all of the relevant details from those reports—including the reasoning for the previous elimination of Gillispie as a suspect. *See Barton*, 786 F.3d at 468 ("*Brady* requires the State to turn over *all* material exculpatory and impeachment evidence to the defense. It does not require the State simply to turn over *some* evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs.") (emphasis in original); *Moldowan*, 578 F.3d at 379; *Elkins*, 615 F.3d at 676; *D'Ambrosio*, 747 F.3d at 389-90. The information contained within the supplemental reports forms part of why the supplemental reports would be exculpatory. Yet Prosecutor Folfas testified that Moore did <u>not</u> provide him with any supplemental reports or documents that indicated Gillispie had previously been eliminated as a suspect.[12] (Doc. 252 at PAGEID # 7291-92.)

It is reasonable to believe that knowing all of the reasoning behind the initial investigators' elimination of Gillispie as a suspect in the supplemental reports would have been significant evidence to have had during discovery and could have led to a different outcome at a trial where the jury struggled to find Gillispie guilty. *See State v. Gillespie [sic]*, Nos. 12941, 13585, 1993 Ohio App. LEXIS 203, at *8-9, 1993 WL 10927 (Ohio Ct. App. Jan. 21, 1993) (the "jury appeared to be deadlocked eight in favor of acquittal and four in favor of conviction" of Gillispie); *Gillispie*, 2012 Ohio App. LEXIS 1453, at *19 ("[t]his case does not involve overwhelming evidence of Gillispie's guilt. … The record further reveals that the jury deliberated long and hard, twice advising the trial court on the second day of deliberations that it was deadlocked, with eight of the twelve jurors in favor of acquittal. Only after a jury charge pursuant to *Allan v. United States* … ,

---

[12] Gillispie's attorney, Lieberman, testified that, although he had received a discovery packet from the prosecution, he did not receive the supplemental reports. (*See, e.g.,* Doc. 224-2 at PAGEID # 5248.)

and several more hours of deliberation, did the jurors unanimously decide to convict Gillispie").

This also includes not having been able to use the details in the supplemental reports to impeach

the quality and reliability of Moore's investigation of the 8/20 Rapes and of Gillispie.

Thus, the Township's argument that Gillispie should have known the information

contained in the allegedly suppressed materials because, "[a]ccording to Assistant Prosecuting

Attorney Paul Folfas, Moore told him that Bailey had eliminated Gillispie as a suspect" fails.  (Doc.

260 at PAGEID # 8438 (citing *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) (there is no

constitutional violation "if the defendant knew or should have known the essential facts permitting

him to take advantage of the information in question, or if the information was available to him

from another source")).)[13]   There also are genuine issues of material fact that impact whether

Gillispie knew or should have known of all of the relevant content within the supplemental reports

due to Fritz being his attorney's investigator and Fritz conducting some tasks for his attorney

(another argument raised by the Township).[14]

### B.  Count 2 Against Moore (Suggestive Identification Under § 1983)

In his second claim, Gillispie alleges that he was deprived of his right to a fair trial and was

falsely convicted for a crime of which he was innocent because Moore (acting individually and in

conspiracy with Wolfe) used improper and suggestive procedures to cause Gillispie to be

misidentified as the perpetrator.  (Doc. 18 at PAGEID # 95.)  Gillispie more specifically argues in

his briefing that the claim relates to the photo lineups and to the steps that Moore took thereafter

to continue to (allegedly) implicate Gillispie—including things that he told the victims

---

[13] The Court notes that the principle from *Carter* also applies in cases involving § 1983 claims for suppression of exculpatory evidence against police officers or detectives.  *See Army v. Collins*, 488 F. App'x 957, 962 (6th Cir. 2012).

[14] The Township also argues that Moore did not need to disclose evidence directly to Gillispie or his criminal defense attorney.  (Doc. 282 at PAGEID # 10588.)  However, Gillispie does not argue that Moore needed to do so.

immediately after the lineup procedures and his other meetings with the victims before their identifications were made in court. (Doc. 278 at PAGEID # 10497.) Thus, Gillispie alleges that the photo lineup identification and the in-court identifications deprived him of a fair trial.

In response, Moore argues that, "even assuming" that a suggestive identification creates a cause of action, Gillispie's claim "nonetheless fails because there is no evidence that the photo line-up created by Det. Moore was, in fact, unduly suggestive such that it would implicate the Plaintiff's right to due process." (Doc. 257 at PAGEID # 8096.)

As an initial matter, Gillispie does have "a due process right which includes the right to be free from unduly suggestive and unreliable identification procedures." *Gregory v. City of Louisville*, 444 F.3d 725, 746 (6th Cir. 2006) (citing *Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967)); *see also Carter*, 218 F.3d at 605 ("The Due Process Clause prohibits the use of identifications which under the totality of the circumstances are impermissibly suggestive and present an unacceptable risk of irreparable misidentification"). As the Sixth Circuit has further explained, "[c]riminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identity' that the identification's use violates due process of law." *Gregory*, 444 F.3d at 746 (quoting *Stovall*, 388 U.S. at 302); *see also Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) ("The admission of evidence derived from a suggestive identification procedure violates a defendant's right to due process if the confrontation leading to the identification was 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law'") (quoting *Stovall*, 388 U.S. at 301-02 and *Neil v. Biggers*, 409 U.S. 188, 197, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)) (alteration in original).[15]

---

[15] Although an identification procedure only violates due process rights if it produces evidence used at trial (*see Gregory*, 444 F.3d at 746-47), at the least, there is evidence that Moore testified about the lineup procedures at trial,

The Sixth Circuit has established a two-step inquiry for analyzing whether the identification procedures used violated a defendant's right to due process. *Haliym*, 492 F.3d at 704. "First, we assess whether the identification was unnecessarily suggestive." *Id.* "If so, we then consider whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure." *Id.* Thus, there is no violation if the party asserting a violation fails to show that "the identification procedures were impermissibly suggestive, or if the totality of the circumstances indicates that the identification was otherwise reliable." *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992).

Regarding the first step, "[u]nnecessary suggestiveness depends upon whether the witness's attention was directed to a suspect because of police conduct." *Haliym*, 492 F.3d at 704 (internal quotation marks omitted) (pre-trial identification was procured by an unnecessarily suggestive lineup where petitioner was the only one in the photo lineup who was bandaged or dressed in prison clothing); *see also Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001) (the first step "questions whether the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection"). The inquiry focuses on pre-identification encounters. *Wilson*, 250 F.3d at 397. In the context of photo lineup identifications, it "is a fact-specific determination, and the court may consider the size of the [photographic] array, the manner of its presentation by the officers, and the details of the photographs themselves." *United States v. McComb*, 249 F. App'x 429, 437 (6th Cir. 2007) (quoting *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994)) (alteration in original).

Regarding the second step (reliability despite impermissible suggestiveness), the Sixth Circuit has held that "reliability is judged under the totality of the circumstances." *Haliym*, 492

---

that three photo lineups were introduced into evidence at trial, and that the victims identified Gillispie in court. (*See, e.g,* Doc. 276-13 at PAGEID # 10020-33, 10136-43, 10148-52; Doc. 231-3 at PAGEID # 6375, 6416-17.)

F.3d at 706. Courts "must ask 'whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.'" *Id.* at 704 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 107, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)). The Supreme Court in *Manson v. Brathwaite* set forth "five factors for consideration in determining whether a suggestive identification was nevertheless reliable: (1) the witness' opportunity to view the suspect; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the time between the crime and the identification." *Id.* (citing *Brathwaite*, 432 U.S. at 114). However, the Sixth Circuit has held that there may be additional factors that are relevant to the inquiry where such other factors "go to the reliability of the eyewitness identification." *Id.* at 706.

Here, although a jury might ultimately find that the identification procedures were not unnecessarily suggestive or were nevertheless reliable, it would not be unreasonable to find otherwise. *See Jackson*, 925 F.3d at 814. There are genuine issues of material fact affecting Gillispie's suggestive identification claim that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Hancock*, 958 F.2d at 1374.

As to the first step of the inquiry, there is evidence from which a jury could reasonably find that the victims' "attention was directed to a suspect because of police conduct" that resulted in an impermissibly suggestive identification procedure. *Haliym*, 492 F.3d at 704; *Anderson*, 477 U.S. at 252. Such evidence includes that Moore created the six-photo lineups, Moore told each of the victims (before showing them the lineup photos) that he had a possible suspect for the crimes, and the picture of Gillispie used in the lineups appeared to be different from the pictures of the five fillers used—two of whom were Moore's fellow officers (e.g., Gillispie's face looked wider than the others following changes to the photo by the Montgomery Valley Regional Crime Lab, in line

with the victims' prior statements that the perpetrator had a wide face). *See Simmons v. United States*, 390 U.S. 377, 383, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968) (although there is always a danger that a witness may make an incorrect identification, that danger is increased if the police show the witness "the pictures of several persons among which the photograph of a single such individual … is in some way emphasized" or "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime").

The jury could make the same finding with respect to the in-court identifications, particularly given Moore's alleged statements to the victims prior to their identifications of Gillispie in court (e.g., telling B.W. and C.W. that they had picked out the same suspect, that the suspect used to be a security guard at GM but was fired, that the suspect's name was Roger Gillispie, that Roger Gillispie was the suspect that he (Moore) thought might be the one who committed the crime, and that Gillispie tried to change his appearance).[16]

As to the second step of the inquiry, there is evidence from which a jury could reasonably find that the identifications were <u>not</u> nevertheless reliable. A jury's consideration of the *Brathwaite* factors would include the relatively lengthy period of time between the crimes and the identifications (roughly two years) and Moore's alleged statements to the victims prior to their identifications. Of note is that the fourth *Brathwaite* factor (level of witness certainty at time of identification) can depend on the analysis in the first step regarding whether the identification was unnecessarily suggestive. *Haliym*, 492 F.3d at 705-06 (finding that the "suggestiveness of the line-up belies any certainty demonstrated by [the witness] because the procedure itself suggested a clear result"). A jury could reasonably find that evidence of suggestiveness here impacted the victims'

---

[16] The Township acknowledges in its Reply that Moore told the victims that Gillispie would be at the motion to suppress hearing preceding the criminal trial and that Gillispie tried to change his appearance. (Doc. 282 at PAGEID # 10594-95.)

certainty at the time of identification, both for the photo lineups and in court.

Issues of material fact affect the analysis and therefore preclude summary judgment, unless Moore is protected by qualified immunity (analyzed below). *See Wheatt v. City of East Cleveland*, Nos. 1:17-cv-377, 1:17-cv-611, 2017 U.S. Dist. LEXIS 186224, at *37-38, 2017 WL 5187780 (N.D. Ohio Nov. 9, 2017) (denying summary judgment on § 1983 suggestive identification claim where there were "sufficient disputed and material facts about both the suggestiveness of the procedure and the reliability of [witness's] identification"). For example, the record shows that there are fact issues regarding what Moore said to the victims before their identifications. There also are fact issues related to the victims' opportunity to view the perpetrator and their degree of attention, the accuracy of their prior description of the perpetrator, and their level of certainty at the time of identification (including the actual amount of time that it took each to make her identification for the photo lineups). And, there is competing evidence regarding whether Moore intended to make the lineup suggestive and whether he hoped that the victims would identify Gillispie in the photo lineups.[17]

Finally, the Township argues that Gillispie's § 1983 suggestive identification claim is "an attack on the [Ohio trial court's] 1991 decision denying his motion to suppress," and therefore is precluded by the *Rooker-Feldman* doctrine. (Doc. 260 at PAGEID # 8440-42.) Similarly, Moore and the Township bring up that both the Ohio trial court and Ohio appellate court previously determined, in Gillispie's criminal proceedings, that the identifications did not violate Gillispie's constitutional rights. (Doc. 257 at PAGEID # 8096; Doc. 281 at PAGEID # 10543-44; Doc. 282 at PAGEID # 10592.)

However, the Township and Moore ignore that those earlier state court decisions have been

---

[17] Neither Moore nor the Township identify a case where a defendant was granted summary judgment on a § 1983 suggestive identification claim with circumstances similar to those presented here.

vacated.[18] *Gillispie*, 2012 Ohio App. LEXIS 1453, at *32 (Ohio appeals court vacating Gillispie's conviction and sentence and remanding for a new trial); *Gillispie*, 65 N.E.3d at 808 (Ohio appeals court subsequently affirming the trial court's decision to dismiss the indictment against Gillispie). Therefore, they have no preclusive effect on the claim here, and the *Rooker-Feldman* doctrine is not applicable.

In *Dodrill v. Ludt*, 764 F.2d 442 (6th Cir. 1985), the plaintiff brought a lawsuit under 42 U.S.C. § 1983 against police officers and a city. The district court granted the defendants' summary judgment on the basis of collateral estoppel. *Id.* at 443. In reversing the district court, the Sixth Circuit explained:

> The issues that Dodrill [the plaintiff] now wants to litigate were fully litigated and firmly decided at the criminal trial [in Ohio state court where he was convicted by a jury]. Dodrill did not challenge the fact-findings on appeal. The conviction was reversed on grounds having no bearing on the validity of the fact-findings. <u>The reversal, however, vacates the judgment entirely, technically leaving nothing to which we may accord preclusive effect.</u> … <u>[A] judgment which is vacated, for whatever reason, is deprived of its conclusive effect as collateral estoppel.</u>

*Id.* at 444 (emphasis added). The Sixth Circuit also determined that, although plaintiff's appeal from his conviction did not specifically address certain factual determinations made at the criminal trial, when "the judgment was vacated, all such factual determinations were vacated with it, and their preclusive effect surrendered." *Id.* at 444-45. Thus, plaintiff was not estopped from litigating the issues he raised in his § 1983 claims. *Id.*

The same analysis holds true for interlocutory orders, such as the Ohio trial court's 1991 decision denying Gillispie's motion to suppress the photo lineup identifications. *Peterson v. Heymes*, 931 F.3d 546, 554-55 (6th Cir. 2019) (applying Michigan law and finding that, because

---

[18] Additionally, it appears that the state courts' focus in those since-vacated decisions was only on the photos' appearance, not Moore's alleged statements to the victims or the victims' in-court identifications. (*See* Doc. 281 at PAGEID # 10543-44.)

the criminal judgment had been vacated, the trial court's interlocutory rulings "merged with the final judgment, which means those interlocutory rulings have been vacated too"); *Navistar, Inc. v. Testa*, 39 N.E. 3d 509, 517, 2015-Ohio-3283 (Ohio 2015) (recognizing that interlocutory orders are merged into the final judgment, with the result being that an appeal from the final judgment includes all interlocutory orders merged with it); *see also Deerfield Vill. Condo. Owners Ass'n v. Steve Wittman Constr.*, 2006 Ohio App. LEXIS 4902, at *7, 2006 WL 2716555, 2006-Ohio-4961 (Ohio Ct. App. 2006) ("Once a final judgment is entered, interlocutory rulings merge into that judgment").

A similar analysis applies to the Township's argument regarding the *Rooker-Feldman* doctrine. "The *Rooker-Feldman* doctrine bars lower federal courts from conducting appellate review of final state-court judgments because 28 U.S.C. § 1257 vests sole jurisdiction to review such claims in the Supreme Court." *Berry v. Schmitt*, 688 F.3d 290, 298 (6th Cir. 2012) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005)). "The doctrine, however, does not bar federal jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Id.* (internal quotation marks omitted). "Instead, the doctrine applies only where a state-court loser initiates an action in federal district court, complaining of injury caused by a state court judgment, and seeks review and rejection of that judgment." *Id.* at 298-99.

Here, the doctrine does not apply because the applicable state court judgments were vacated; essentially, they do not exist for this Court to review and reject. *Berry*, 688 F.3d at 298; *Berene v. Nationstar Mortg., LLC*, 686 F. App'x 714, 717 (11th Cir. 2017) ("concerns of a district court reviewing a final state-court judgment are not implicated here due to the subsequent vacatur" of the state court judgment); *McCray v. City of New York*, Nos. 03 Civ. 9685 (DAB), 03 Civ. 9974

(DAB), 03 Civ. 10080 (DAB), 2007 U.S. Dist. LEXIS 90875, at *46 n.14, 2007 WL 4352748 (S.D.N.Y. Dec. 11, 2007) ("a vacated judgment followed by a dismissal of charges necessarily means any jury determination is void and nullified"). *Cf. Smiles v. Royster*, No. 18-1440, 2018 U.S. App. LEXIS 27888, at *6, 2018 WL 4998196 (6th Cir. Oct. 1, 2018) ("the *Rooker-Feldman* doctrine does not bar review because there is no state judgment to challenge—Smiles's application for leave to appeal was never docketed"). As explained by the district court in *McCray*, the *Rooker-Feldman* doctrine only applies in "cases where the judgment being challenged is extant and controlling." *McCray*, 2007 U.S. Dist. LEXIS 90875, at *43-46 (finding that "it is apparent that the *Rooker-Feldman* doctrine cannot apply" to bar plaintiff's § 1983 claims where the state court criminal convictions against plaintiff had been vacated; plaintiff was not challenging any state court determinations because such determinations were nullified and void). Therefore, the doctrine is inapplicable to Gillispie's § 1983 suggestive identification claim. *Id.*; *Berry*, 688 F.3d at 298-99.

### C. Count 3 Against Moore (Fabricated Evidence Under § 1983)

In his third claim, Gillispie alleges that he was deprived of his right to a fair trial and was falsely convicted for a crime of which he was innocent because Moore (acting individually and in conspiracy with Wolfe) fabricated evidence—including false police reports, fabricated statements attributed to witnesses, and Moore and Wolfe's own testimony offered at both criminal trials. (Doc. 18 AT PAGEID # 96.) Gillispie more specifically argues in his briefing that this claim relates to: (a) the identification evidence (at issue in Count 2), and (b) Moore's supplemental reports of the investigation, which (allegedly) include falsehoods, material omissions, and other misstatements (such as that Gillispie was a "new" suspect when Moore was assigned the case in June of 1990 and what Gillispie's ex-girlfriend, Ms. Mitchell, said in Moore's interview of her). (Doc. 278 at PAGEID # 10502-03.)

32

"It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory*, 444 F.3d at 737. Material false statements or omissions made in a police officer's investigatory notes or reports can be the basis for a fabricated evidence claim. *See, e.g., id.* at 741, 744 (involving a police officer's investigatory notes and a crime lab examiner's report); *Webb v. United States*, 789 F.3d 647, 667-670 (6th Cir. 2015) (involving a phone recording, an officer's report, and a search warrant affidavit). Such documents "comprise part of the documentary record before the prosecution and defense and affect the course of the criminal proceedings independent of any testimony to the [document's] contents." *Gregory*, 444 F.3d at 741 ("[t]he creation of the notes was a pretrial, nontestimonial act"); *see also Webb*, 789 F.3d at 670 ("even if independent evidence establishes probable cause against a suspect, it would still be unlawful for law-enforcement officers to fabricate evidence in order to strengthen the case against that suspect").

Moore argues that "[t]here is no evidence in this case that would support [Gillispie's] contention that Det. Moore fabricated any evidence that was used against [Gillispie] during either of his two trials" and, therefore, "[t]his claim fails as a matter of law." (Doc. 257 at PAGEID # 8100.) He similarly argues that "[i]t is undisputed that [Ms. Mitchell] did not testify as a witness at either of [Gillispie's] trials" and that the (alleged) misrepresented statements concerning Ms. Mitchell were "never presented to the jury." (Doc. 281 at PAGEID 10550, 10562.) But, these arguments are fundamentally flawed; the fabricated evidence does not need to be used at trial.[19]

---

[19] In addition to Moore's argument conflicting with holdings by the Sixth Circuit Court of Appeals, the two district court cases that Moore relies on do not support such an assertion and are otherwise distinguishable. *Williams v. Lucas*, No. 1:10-cv-615, 2011 U.S. Dist. LEXIS 113305, at *26-27, 2011 WL 4632883 (N.D. Ohio Sept. 30, 2011) (defendants were entitled to summary judgment on fabricated evidence claim because the case never went before a jury—the charges were dismissed); *Richardson v. Nasser*, No. 08-12951, 2009 U.S. Dist. LEXIS 114641, at *35-36, 2009 WL 4730446 (E.D. Mich. Dec. 9, 2009) (defendant was entitled to summary judgment on fabricated evidence claim because the claim was based on video-recorded statements, the court reviewed those recordings, and there was

The Sixth Circuit Court of Appeals has emphasized that "the relevant question is not whether the fabricated evidence was *shown* to the jury; it is whether the statement *affected* the decision of the jury." *Jackson*, 925 F.3d at 816 (emphasis in original). In fact, "fabricated evidence that is used as the basis for a criminal charge can form the basis for a § 1983 claim because, absent that evidence, there would have been no jury." *Id.* (internal quotation marks omitted). Thus, for example, where the fabricated evidence "would have been significant for cross-examination" or "could have affected the prosecution's willingness to continue towards trial," then it is possible to find "a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory*, 444 F.3d at 737, 741.

Gillispie's fabricated evidence claim is related to his suppression of exculpatory material, suggestive identification, and destruction of evidence claims. As discussed above in Section IV. A. regarding Count 1, a reasonable jury could find that the supplemental reports written by Bailey or Fritz existed, that those reports could form a basis for exonerating Gillispie (they were exculpatory), and that Moore had those reports in his possession and knew their exculpatory value. Likewise, again assuming as true the evidence of Gillispie and drawing reasonable inferences in his favor, a reasonable jury could find that, in connection with such a scenario, Moore knowingly fabricated evidence to support and strengthen his theory that Gillispie was the perpetrator. In other words, that Moore hid or destroyed unfavorable evidence and created favorable evidence.

A reasonable jury could also find a reasonable likelihood that the (allegedly) false evidence would have affected the criminal jury's decision, even if such evidence was not shown to the criminal jury. *Gregory*, 444 F.3d at 737. Such evidence includes, but is not necessarily limited

---

"nothing in the record to suggest that [defendant] fabricated any of the evidence presented against [plaintiff]"). Plus, among various other things, Moore testified at trial about his interview of Gillispie on or around August 8, 1990 and how he (Moore) had referred to his reports to refresh his recollection prior to testifying. (*See, e.g.,* Doc. 235-1 at PAGEID # 7008-13, 7023-25.)

to, Moore's reports, which identify Gillispie as the "newest suspect" without mentioning that he had previously been considered and eliminated as a suspect and state that Ms. Mitchell told Moore that Gillispie had a gold chain with an emblem—in line with at least one victim's description of the perpetrator—and had indicated that she and Gillispie had sex near or at the rape sites.  (Doc. 230-5 at PAGEID # 6107, 6122.)

Moore's reports were provided to the prosecutor and, in turn, to Gillispie's criminal defense attorney.  (*See, e.g.,* Doc. 170 at PAGEID # 3382-83, 3402.)  Such reports, and the alleged fabrications in them, "affect the course of the criminal proceedings independent of any testimony" as to their contents.  *Gregory*, 444 F.3d at 741.  Here, this could include the prosecution's willingness to prosecute Gillispie or continue towards trial, how to cross-examine Moore, whether to call Fritz or Ms. Mitchell as witnesses, etc.  (*See, e.g.,* Doc. 276-11 at PAGEID # 9934-36 (Gillispie's criminal defense attorney testifying that the misimpression he had, based on evidence received and Moore's testimony, affected his approach at trial).)

As with the first two counts, there are also genuine issues of material fact that properly can be resolved only by a finder of fact (the jury) because they may reasonably be resolved in favor of either party.  As one example, Moore argues that his reference "to Gillispie as a new lead … is consistent with the information that had been provided to Moore when the file was given to him."  (Doc. 281 at PAGEID # 10543.)  As shown above, a significant question in this case is what information Moore was provided when the file was given to him.  This question is material to whether the requirements for a fabricated evidence claim, set forth in *Gregory*, have been shown.  *Gregory*, 444 F.3d at 744 (agreeing with the district court that there was a question of fact for the jury on the materiality of the alleged fabricated evidence, finding that the parties disputed what the evidence shows, and finding that the jury "might reasonably infer that [defendant] fabricated her

report"); *Webb*, 789 F.3d at 668 (finding that the defendant demonstrated a genuine issue of material fact regarding the allegedly fabricated evidence).

**D. Count 4 Against Moore (Malicious Prosecution Under § 1983)**

In his fourth claim, a claim for malicious prosecution under § 1983, Gillispie alleges that he was deprived of his Fourth Amendment rights because Moore (acting individually and in conspiracy with Wolfe) instigated and continued the criminal prosecution of Gillispie without probable cause. (Doc. 18 at PAGEID # 97.) This claim is separate from Gillispie's malicious prosecution claim pursuant to state law (Count 6), which is addressed elsewhere in this Order.

As set forth above in the "Background" section (Section I), Moore presented the case against Gillispie to the prosecutor, initiating charges on or around August 31, 1990. The Montgomery County Grand Jury indicted Gillispie in 1990 (and Moore had testified before the grand jury), the trial jury found Gillispie guilty of various counts at both trials in 1991 (and Moore had testified at both trials), and Gillispie was incarcerated. Around two decades later, in 2011, Magistrate Judge Merz granted Gillispie a conditional writ of habeas corpus after finding that Gillispie had been deprived his right of due process. In 2012, the State dismissed its appeal of that order, and the Ohio appeals court vacated Gillispie's conviction and sentence and remanded for a new trial. In 2013, Gillispie filed a motion in the Ohio trial court to compel discovery of the (alleged) supplemental police reports or to dismiss the indictment with prejudice. In 2015, the Ohio trial court granted Gillispie's motion to dismiss the indictment, and the Ohio appeals court affirmed that judgment in 2016. *Gillispie*, 65 N.E.3d at 808. However, Gillispie has not actually been found innocent of the claims for which he was previously convicted.

"[A] plaintiff may bring a malicious prosecution claim under the Fourth Amendment based on a defendant officer's wrongful investigation, prosecution, conviction, and incarceration of a plaintiff." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017); *see also Sykes v. Anderson*, 625

36

F.3d 294, 308 (6th Cir. 2010). To succeed on a malicious prosecution claim under § 1983, the plaintiff must establish that (1) a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Miller*, 866 F.3d at 389; *Sykes*, 625 F.3d at 308-09. The first and third elements are not in dispute in this case.[20]

Regarding the second element (lack of probable cause for the criminal prosecution), a grand jury indictment creates a presumption of probable cause. *King v. Harwood*, 852 F.3d 568, 587-88 (6th Cir. 2017). However, that presumption is rebuttable where the following three conditions are shown:

> (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence;
>
> (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and
>
> (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury).

*Id.* Thus, *King* created an exception to the general rule that an indictment conclusively establishes probable cause. *Id.*; *Miller*, 866 F.3d at 391.

Gillispie argues that each of the *King* conditions is satisfied here or, at the least, the analysis for whether there was probable cause for his criminal prosecution involves an issue of material

---

[20] Although the Township specifically referenced the first element in its motion (*see* Doc. 260 at PAGEID # 8444-45), its argument—that "there is no evidence that Moore or any other officer from the MTPD failed to make a full and fair disclosure of all material facts from the investigation"—is more appropriately addressed in the context of the second element concerning probable cause. Based on the evidence, it cannot seriously be argued that Moore did not influence or participate in the decision to prosecute Gillispie.

fact precluding summary judgment. The Township counters by arguing that Gillispie cannot overcome the presumption of probable cause created by the grand jury indictment through the *King* exception. The Township says that Gillispie cannot point to any evidence that Moore provided false information or fabricated evidence or that any officer failed to make a full and fair disclosure of all material facts from the investigation. (Doc. 260 at PAGEID # 8444-45.) Similarly, Moore argues there is no evidence that he knowingly or recklessly made any false statements or that he falsified or fabricated evidence (and that the victims' identifications were reliable, not unduly suggestive). (Doc. 257 at PAGEID # 8101.) Moore also asserts that there was sufficient probable cause to arrest and prosecute Gillispie based on the individual identifications by the victims alone. (*Id.*) The Defendants' arguments echo arguments made with respect to Counts 1, 2, and 3.

The Court agrees with Gillispie that there are genuine issues of material fact precluding summary judgment on Count 4, unless qualified immunity applies (addressed below). As shown in the analysis of Counts 1, 2, 3, and 5 herein, the Court disagrees with Defendants' assertions that there is a total lack of evidence to support that Moore knowingly or recklessly made false statements or fabricated evidence or that the victims' identifications were unduly suggestive. Instead, there are several underlying questions of fact—such as whether the supplemental reports existed and whether Moore saw the supplemental reports—that affect whether Moore knowingly made false statements, fabricated evidence, made misleading omissions, etc., and, thus, affect whether there was a lack of probable cause for the criminal prosecution against Gillispie. *See, e.g., King*, 852 F.3d at 591-92 (reversing summary judgment for defendant on malicious prosecution claim because the plaintiff raised genuine issues of material fact sufficient to overcome, at least at the summary judgment stage, the presumption that plaintiff's indictment was proof of probable cause); *Miller*, 866 F.3d at 392 (6th Cir. 2017) (reversing summary judgment

38

for defendant on malicious prosecution claim because there was "at least a genuine issue of material fact regarding whether [defendant] had probable cause to arrest" plaintiff).

Regarding the fourth element (the criminal proceeding was resolved in plaintiff's favor), the Township argues that Gillispie's criminal case was not resolved in his favor for purposes of a malicious prosecution claim. In support, the Township points out that Judge Merz's decision did not establish Gillispie's innocence and, therefore, Gillispie cannot establish the fourth element. Gillispie counters by arguing that he has satisfied the element and that, while certain state law might include an innocence component to the fourth element, the applicable law for a claim under § 1983 does not.

District courts within the Sixth Circuit have addressed this issue before. For example, in *Dawson v. Monroe Cnty. Tenn.*, No. 3:13-cv-240, 2014 U.S. Dist. LEXIS 22593, 2014 WL 700400 (E.D. Tenn. Feb. 24, 2014), a defendant in the plaintiff's § 1983 malicious prosecution action argued that the plaintiff could not show that dismissal of a murder indictment against him constituted a favorable termination. *Dawson*, 2014 U.S. Dist. LEXIS 22593, at *15. The defendant, relying on state law, claimed that a plaintiff must show that the favorable disposition was based upon his innocence. *Id.* at *17. But, recognizing that the Sixth Circuit in *Sykes* had explained that claims for malicious prosecution under common law and under § 1983 have a different foundation, the district court "decline[d] to adopt such a requirement for a § 1983 action based upon malicious prosecution in violation of the Fourth Amendment." *Id.* at *16-17 (citing *Sykes*, 625 F.3d at 309). The district court found "it would be unnecessary and contrary to the well-established distinction between a § 1983 action and state tort claims for this Court to impose an additional limitation on plaintiff's statutorily derived action based upon reference to the common law of torts." *Id.* at *17.

Similarly, in *Ayers v. City of Cleveland*, No. 1:12-CV-753, 2013 U.S. Dist. LEXIS 25992, at *30-31, 2013 WL 775359 (N.D. Ohio Feb. 25, 2013), the defendants argued that the fourth element was lacking because the charges against the plaintiff were dismissed without prejudice after a court had granted the plaintiff's petition for a writ a habeas corpus. *Id.* The district court disagreed. It noted that the Sixth Circuit in *Sykes* relied on *Heck v. Humphrey*, 512 U.S. 477, 484 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994) in analyzing the fourth element. *See Sykes*, 625 F.3d at 309 (quoting *Heck*, 512 U.S. at 484 ("One element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused")).

The Supreme Court's concern in *Heck* was with collateral attacks on a conviction. *Ayers*, 2013 U.S. Dist. LEXIS 25992, at *31 (citing *Heck*, 512 U.S. at 484-87). The Supreme Court had explained that requiring "termination of the prior criminal proceeding in favor of the accused … avoids parallel litigation over the issues of probable cause and guilt … and it precludes the possibility of the claimant succeeding in the tort action [i.e., malicious prosecution] after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction." *Heck*, 512 U.S. at 484 (internal quotation marks omitted). The Supreme Court then noted that, to address this concern, a § 1983 claim for malicious prosecution may be pursued where "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87. In other words, when a judgment "would necessarily imply the invalidity of [the plaintiff's] conviction or sentence." *Id*. Thus, based on *Heck*, the district court in *Ayers* found the fourth element satisfied because the charges against the plaintiff were dismissed without prejudice following grant of a

petition for writ of habeas corpus.  *Ayers*, 2013 U.S. Dist. LEXIS 25992, at *30-31.

As stated above, Judge Merz granted Gillispie a conditional writ of habeas corpus (and the Sixth Circuit dismissed the State's appeal of that decision), the Ohio appeals court vacated Gillispie's conviction and sentence and remanded for a new trial, and the Ohio trial court subsequently dismissed the indictment against Gillispie.  Those decisions were favorable to Gillispie, Gillispie's prior criminal conviction and sentence were rendered invalid, and dismissal of the indictment was the ultimate termination or resolution of the criminal proceedings against Gillispie.[21]  *Heck*, 512 U.S. at 484, 486-87; *Ayers*, 2013 U.S. Dist. LEXIS 25992, at *30-31; *Dawson*, 2014 U.S. Dist. LEXIS 22593, at *15-18.  Therefore, the Court disagrees with the Township's argument that Gillispie cannot establish the fourth element of his § 1983 malicious prosecution claim.[22]  The Court rejects Defendants' argument for summary judgment on that basis.

### E.  Count 5 Against Moore (Destruction of Exculpatory Evidence Under § 1983)

In his fifth claim, Gillispie alleges that he was deprived of his right to a fair trial and was falsely convicted for a crime of which he was innocent because Moore (acting individually and in conspiracy with Wolfe) destroyed, or caused to be destroyed, exculpatory evidence—including

---

[21] The Township does not argue that there is any risk of inconsistent outcomes in this civil proceeding and Gillispie's criminal proceedings.

[22] The cases that the Township cites in support of its argument either involve state law or are otherwise inapposite (Doc. 260 at PAGEID # 8445-46).  *See, e.g., Aliakbarkhananfjeh v. Schramm*, Nos. 97-3675, 97-3804, 1999 U.S. App. LEXIS 24309, at *5-9, 1999 WL 801590 (6th Cir. Sept. 27, 1999) (plaintiff had pled guilty to charges; analyzing issue of collateral estoppel in subsequent civil proceeding by looking to Ohio law concerning malicious prosecution); *Ohnemus v. Thompson*, 594 F. App'x 864, 867 (6th Cir. 2014) (criminal charge against plaintiff was dismissed pursuant to a mutual agreement with the prosecutor by which plaintiff paid restitution in exchange for the dismissal; describing the situation as one in which the plaintiff had "bought peace by paying the sum alleged to have been stolen in exchange for the dismissal of criminal charges"; the case involved "state law tort claims, including a claim for malicious prosecution" and applied Kentucky law) (internal quotation marks omitted); *Washington v. Summerville*, 127 F.3d 552, 557-59 (7th Cir. 1997) (analyzing whether the *nolle prosequi* of criminal charges constitutes a favorable termination in a malicious prosecution action under Illinois law, and deciding the § 1983 malicious prosecution claim in accordance with Seventh Circuit law that required a plaintiff to demonstrate that he satisfied the requirements of a state law cause of action for malicious prosecution).  *See also Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 99 (1st Cir. 2013) (recognizing circuit split between circuits adopting a purely constitutional approach and circuits adopting a blended constitutional/common law approach that requires a plaintiff to demonstrate a Fourth Amendment violation and all the elements of a common law malicious prosecution claim).

police reports, audio recordings, alibi evidence, and crime scene evidence containing genetic material. (Doc. 18 at PAGEID # 97-98.) Gillispie contends that such evidence was materially exculpatory and its value was apparent. (Doc. 278 at PAGEID # 10508.)

The police do not have "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988). However, "the police have a constitutionally-significant 'duty' to 'preserve evidence … that might be expected to play a significant role in the suspect's defense.'" *Moldowan*, 578 F.3d at 381 (quoting *California v. Trombetta*, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)); *see also Allen v. Clark*, No. 1:13-cv-326, 2014 U.S. Dist. LEXIS 90807, at *12-13, 2014 WL 3016075 (S.D. Ohio July 3, 2014) ("a plaintiff's due process rights may indeed be violated where the police fail to preserve evidence").[23] To trigger that duty to preserve evidence, the evidence at issue must either be "material exculpatory evidence" or "potentially useful evidence." *Youngblood*, 488 U.S. at 57-58.

"Separate tests are applied to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where 'material exculpatory' evidence is not accessible versus where 'potentially useful' evidence is not accessible." *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001) (citing *Trombetta*, 467 U.S. at 489 and *Youngblood*, 488 U.S. at 58) (internal citation omitted).

Regarding the former, the duty to preserve evidence is violated if the evidence (1)

---

[23] *See also Trombetta*, 467 U.S. at 485 ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed what might loosely be called the area of constitutionally guaranteed access to evidence. Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.") (internal quotation marks and citation omitted).

"possesses an exculpatory value that was apparent before the evidence was destroyed"; and (2) was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488-89; *see also Wright*, 260 F.3d at 570-71. In such a situation, the good or bad faith of the state actor is irrelevant. *Youngblood*, 488 U.S. at 57 ("the good or bad faith of the State [is] irrelevant when the State fails to disclose to the defendant material exculpatory evidence"). This is because, "where the police have in their possession evidence that they know or should know might be expected to play a significant role in the suspect's defense, the destruction or concealment of that evidence can *never* be done in good faith and in accord with their normal practice." *Moldowan*, 578 F.3d at 388-89 (internal quotation marks and citation omitted) (emphasis in original).[24]

Regarding the latter, the duty to preserve evidence also is violated if (1) the evidence was "potentially useful"; (2) there was "bad faith on the part of the police"; and (3) the evidence was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Youngblood*, 488 U.S. at 58; *Trombetta*, 467 U.S. at 488-89; *Moldowan*, 578 F.3d at 383-84 (whether bad faith on the part of the government official is required depends on "whether the exculpatory value of the evidence is 'apparent' or not"); *see also Wright*, 260 F.3d at 571; *Allen*, 2014 U.S. Dist. LEXIS 90807, at *13-14. Thus, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve underline potentially useful underline evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58 (emphasis added).

Gillispie's § 1983 claim for destruction of exculpatory evidence (Count 5) is related to his

---

[24] The Sixth Circuit in *Moldowan* also explained that "[t]he justification for imposing an absolute duty where material and exculpatory evidence is at issue is clear enough:  the failure to preserve or disclose such evidence directly threatens the fundamental fairness of a defendant's criminal trial." *Moldowan*, 578 F.3d at 387-88 (internal quotation marks omitted).

other § 1983 claims (analyzed above), particularly suppression of exculpatory material claim (Count 1).  *See Moldowan*, 578 F.3d at 379-380 (holding that "the police inflict the same constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information," and that the Constitution "preclude[s] police officers from concealing the same evidence that they are not permitted to destroy").  Gillispie's claim includes that Moore failed to preserve the supplemental reports that, according to testimony of Bailey and Fritz, were created by police detectives, that eliminated Gillispie as a suspect, and that included information about why he was eliminated as a suspect.  In line with the analysis above regarding Count 1, the Court finds that, assuming as true the evidence of Gillispie and drawing all reasonable inferences in his favor, the supplemental reports would qualify as "material exculpatory evidence." *Trombetta*, 467 U.S. at 488-89; *Youngblood*, 488 U.S. at 57-58; *Moldowan*, 578 F.3d at 381, 383-84, 388-89.  Therefore, good faith or bad faith on the part of Moore is irrelevant.

Although a jury might ultimately find that Moore did not violate Gillispie's rights by failing to preserve evidence, it would not be unreasonable in finding that he had.  *See Jackson*, 925 F.3d at 814.  For example, a reasonable jury could find that the supplemental reports written by Bailey or Fritz existed, that the supplemental reports might be expected to play a significant role in Gillispie's defense, that Moore had those reports in his possession and knew their exculpatory value, that Moore failed to preserve (or destroyed) the supplemental reports, and that Gillispie would be unable to obtain comparable evidence by other reasonably available means.

The Court addressed the exculpatory nature of the supplemental reports in its discussion of Count 1, above in Section IV. A.  Based on Gillispie's evidence, the supplemental reports could form a basis for exonerating Gillispie that would have been readily apparent.  *Moldowan*, 578 F.3d at 386, 388; *D'Ambrosio*, 747 F.3d at 389-90.  They certainly "might be expected to play a

44

significant role in [Gillispie's] defense." *Trombetta*, 467 U.S. at 488-89; *see also Elkins*, 615 F.3d at 677 ("when police have in their possession a piece of evidence that might be expected to play a significant role in the suspect's defense, they have a constitutional duty to preserve that evidence") (internal quotation marks and citation omitted). Again, there is evidence that Moore received and read the supplemental reports. (*See, e.g.,* Doc. 170 at PAGEID # 3487-88; Doc. 221-5 at PAGEID # 4648-49; Doc. 222 at PAGEID # 4802-03, 4809, 4856-57; Doc. 229-5; Doc. 230-5 at PAGEID # 6106-07.) There even is evidence specifically showing that Moore understood the significance of the supplemental reports to his theory of the case that Gillispie was the perpetrator. (*See* Doc. 229-5 at PAGEID # 5699.)

And, in its discussion of Counts 1 and 3, above in Sections IV A. and C., the Court addressed how Gillispie would be unable to obtain comparable evidence by other reasonably available means or, at the least, there are genuine issues of material fact that impact that question. There also are other fact issues that likewise impact whether Gillispie will be able to show that Moore violated a duty to preserve evidence, including, but not limited to, whether the supplemental reports ever existed and whether Moore was in possession of the supplemental reports. *Trombetta*, 467 U.S. at 488-89; *Moldowan*, 578 F.3d at 381; *Youngblood*, 488 U.S. at 57.

### F.  Qualified Immunity

Moore argues that qualified immunity protects him from all of Gillispie's § 1983 claims (i.e., Counts 1, 2, 3, 4, and 5). Officers sued under "§ 1983 are protected from liability by the doctrine of qualified immunity insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Jackson*, 925 F.3d at 813 (internal quotation marks omitted). When a defendant raises the qualified immunity defense, the plaintiff bears the burden of showing that the defendant is not entitled to qualified immunity. *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012).

Courts "follow a two-tiered inquiry to determine if an officer is entitled to qualified immunity." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (internal quotation marks omitted).  At the summary judgment stage, the first step asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right.  *Id.*  The second step asks whether the right was clearly established at the time such that a reasonable officer would have known that his or her conduct violated it.  *Id.*; *Jackson*, 925 F.3d at 822-23.  Thus, at the summary judgment stage, "[q]ualified immunity does not apply if (1) on the plaintiff's facts, a constitutional [or statutory] violation occurred, and (2) the alleged violation was of clearly established constitutional [or statutory] rights of which a reasonable person would have known." *Jackson*, 925 F.3d at 813.

In accordance with Sections IV A. through E. above, regarding Counts 1 through 5, the Court finds that Gillispie has met his burden at this stage with respect to the first step of the analysis.  Regarding the second step, "[u]nless the law was clearly established at the time the action occurred, the government official will receive qualified immunity and be insulated from civil suit." *Jones v. Clark Cnty., Ky.*, 959 F.3d 748, 766 (6th Cir. 2020) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  Showing that the law was clearly established at the time the action occurred "does not 'require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)); *see also Jackson*, 925 F.3d at 822-23 (in examining existing precedent, courts may rely on decisions of the Supreme Court, decisions of the Sixth Circuit Court of Appeals and courts within this circuit, and, in limited instances, on decisions of other circuits).  In deciding summary judgment motions, the Court "may determine, not only the currently applicable law, but whether that law was clearly established at

46

the time an action occurred." *Jones*, 959 F.3d at 766 (quoting *Harlow*, 457 U.S. at 818).

Here, the issue is whether, in 1990, the constitutional or statutory rights allegedly violated by Moore were sufficiently clearly established to deprive him of the protection of qualified immunity. *See Jackson*, 925 F.3d at 822.  The Court finds that they were.

Regarding Counts 1 (withholding or suppressing exculpatory evidence) and 5 (destruction of exculpatory evidence), the Court finds that Gillispie has met his burden at this stage with respect to the second tier of the analysis. *Jackson*, 925 F.3d at 823-25 ("[i]n 1975 it was clearly established law that prosecutorial withholding of exculpatory evidence violates a criminal defendant's Fourteenth Amendment right to due process," and "[m]ultiple circuits had also recognized by that time that '*Brady*-derived' claims could be based on the conduct of law-enforcement officers—as distinct from prosecutors—who had allegedly withheld exculpatory evidence").  Given that, in this context, destroying exculpatory evidence is a form—the ultimate form—of withholding such evidence, the outcome of the analysis is the same for both counts. *Id.*; *Moldowan v. City of Warren*, 573 F.3d 309, 336 (6th Cir. 2009) ("police inflict the same constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information"); *see also Trombetta*, 467 U.S. at 488-89 (recognizing, in 1984, a duty to preserve evidence that might be expected to play a significant role in a suspect's defense).

Regarding Count 2 (suggestive identification), the Court finds that Gillispie has met his burden at this stage with respect to the second tier of the analysis.  By 1990, a defendant's constitutional right to be free from unduly suggestive identification procedures was clearly established. *Gregory*, 444 F.3d at 746 (citing *Stovall*, 388 U.S. at 302); *Brathwaite*, 432 U.S. at 106.

Regarding Count 3 (fabricated evidence), the Court finds that Gillispie has met his burden

at this stage with respect to the second tier of the analysis. *Jackson*, 925 F.3d at 825 ("as far back as 1935, the Supreme Court recognized that the introduction of fabricated evidence violates the fundamental conceptions of justice which lie at the base of our civil and political institutions") (internal quotation marks omitted); *id.* at 826 ("a defendant officer could not seriously contend that a reasonable police officer would not know that" his actions in fabricating evidence were inappropriate and performed in violation of an individual's constitutional rights).

Regarding Count 4 (malicious prosecution), the Court finds that Gillispie has met his burden at this stage with respect to the second tier of the analysis. *Spurlock v. Satterfield*, 167 F.3d 995, 1005-07 (6th Cir. 1999) (officer not entitled to qualified immunity on malicious prosecution claim based on actions taken in 1990 of allegedly fabricating evidence and manufacturing probable cause that led to prosecution and conviction of plaintiff); *Jackson*, 925 F.3d at 826-27 (officer not entitled to qualified immunity on malicious prosecution claims based on actions taken in 1975 of allegedly fabricating evidence and withholding exculpatory evidence, even where officer allegedly did not testify for the prosecution). Further, a reasonable police officer would have known in 1990 that initiating and participating in a criminal prosecution by fabricating evidence to create probable cause to prosecute an individual, while suppressing and/or destroying exculpatory evidence, would violate that individual's constitutional and/or statutory rights. *Spurlock*, 167 F.3d at 1005 (defendant officer "cannot seriously contend that a reasonable police officer would not know that such actions [of allegedly fabricating evidence and manufacturing probable cause] were inappropriate and performed in violation of an individual's constitutional and/or statutory rights"); *see also Jackson*, 925 F.3d at 827 ("we ask only 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted'"). Moore does not identify any caselaw that would show otherwise. He also does not

address Gillispie's cited caselaw that shows Gillispie has met his burden on the second tier of the analysis for all five § 1983 counts.

Therefore, Moore is not entitled to qualified immunity.  The Court denies Moore's motion for summary judgment on Counts 1, 2, 3, 4, and 5.

### G.  Counts 6, 7, and 8 Against Moore

In his Omnibus Response to the Moore Motion and Township Motion, Gillispie states that "Defendants' motions [for summary judgment] should be denied" "[w]ith the exception to certain state-law claims," and that he "will voluntarily dismiss his state-law claims for (1) spoliation, (2) malicious prosecution, and (3) intentional infliction of emotional distress against Moore and the Township."  (Doc. 278 at PAGEID # 10462, 10521.)  However, it does not appear that Gillispie has voluntarily dismissed those three claims.  In light of Gillispie's statements, and given that Gillispie did not address those claims substantively in the Omnibus Response, the Court grants the Moore Motion with respect to Counts 6, 7, and 8 and dismisses those claims against Moore.  *See Wheatt*, 2017 U.S. Dist. LEXIS 186224, at *48 (granting motion for summary judgment on conceded claims and dismissing such claims where plaintiffs failed to challenge defendants' motions for summary judgment regarding them).

### H.  Count 9 Against Moore

Finally, although Moore asks for summary judgment on Count 9 ("Ohio State Law – Indemnification"), a review of the Amended Complaint shows that Count 9 is not brought against Moore.  (Doc. 18 at PAGEID # 101.)

### V.  ANALYSIS FOR THE TOWNSHIP'S MOTION FOR SUMMARY JUDGMENT

The Township moves for summary judgment on all claims against it, based on several arguments.  (*See* Docs. 260, 282.)

49

### A. **Counts 1, 2, 3, 4, and 5 Against the Township**

Gillispie's five federal claims against the Township are premised on *Monell* liability. Gillispie alleges that the Township is "liable because the violation of Plaintiff's rights [in Counts 1, 2, 3, 4, and 5 was] caused by the policies, practices, customs, and/or decisions of policymakers for" the Township.  (Doc. 18 at PAGEID # 94, 95, 96, 97, and 98.)  Gillispie's overarching argument against the Township on these claims is that the Township "fail[ed] to implement adequate policies, training, supervision, or other procedural safeguards." (Doc. 278 at PAGEID # 10510.)  In his Omnibus Opposition, Gillispie specifies four theories for imposing municipal liability here:  (1) the Township's alleged lack of policies; (2) the Township's alleged failure to train; (3) the Township's alleged failure to supervise; and (4) the Township's alleged ratification of the alleged *Brady* violation.  (*See id.* at PAGEID # 10512.)

"[M]unicipalities and other local governmental bodies are 'persons' within the meaning of § 1983." *Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).  However, "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Id.*  Additionally, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Id.* at 404.  This is because, "in enacting § 1983, Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Id.* at 400 (quoting *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)) (emphasis in original).  "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404.

Thus, under § 1983, municipal liability "attaches only under a narrow set of

circumstances." *Jackson*, 925 F.3d at 828. "[A] plaintiff must show that[,] through its deliberate conduct, the municipality was the moving force behind the injury alleged." *Id.* (internal quotation marks omitted). "A plaintiff does this by showing that the municipality had a 'policy or custom' that caused the violation of his rights." *Id.* (citing *Monell*, 436 U.S. at 694). "There are four methods of showing the municipality had such a policy or custom: the plaintiff may prove (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* (internal quotation marks omitted).

### (1) Preliminary arguments by the Township

The Court initially addresses three arguments by the Township. One, the Township argues that Gillispie provided no counterargument to the Township's motion for summary judgment on Counts 3, 4, and 5. The Court disagrees. As shown above, Counts 1 through 5 are interconnected, and Gillispie's arguments for *Monell* liability against the Township implicate all five § 1983 claims.

Two, the Township argues that Gillispie waived the ability to recover on three theories of municipal liability (failure to train, failure to supervise, and ratification) for allegedly not being specific enough in the Amended Complaint. As stated above, those theories relate to methods by which a plaintiff may show the municipality had a policy or custom that caused the violation of his rights. *Jackson*, 925 F.3d at 828; *see also Feucht v. Triad Local Schs. Bd. of Educ.*, 425 F. Supp. 3d 914, 932 (S.D. Ohio 2019) ("a municipal liability claim must adequately plead two elements: (1) that a constitutional violation occurred; and (2) that the municipality is responsible for that violation") (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505-06 (6th Cir. 1996)). The

Court disagrees with the Township's argument and finds that the allegations made in the Amended Complaint are sufficient.

Three, the Township argues that it is entitled to summary judgment on Gillispie's § 1983 claims because Moore did not violate Gillispie's constitutional rights as alleged in Counts 1 through 5. A municipal liability claim has two elements: (1) a constitutional violation occurred; and (2) the municipality is responsible for that violation. *Claiborne Cnty.*, 103 F.3d at 505-06. Thus, the Township argues that it is entitled to summary judgment on Gillispie's § 1983 claims because Gillispie cannot establish the first element. However, as demonstrated above in Sections IV. A. through E., the Court disagrees. *See Moldowan*, 578 F.3d at 393 (rebutting municipality's argument that it could not be liable because plaintiff did not establish an underlying deprivation of a constitutional right). The Court focuses now on the parties' arguments concerning the second element.

### (2) Alleged lack-of-any-policy theory

Gillispie argues that he is entitled to a jury trial against the Township due to "the Township's lack of any policy regarding (a) *Brady* obligations, file maintenance, and the production of documents to the prosecution or (b) implementation of identification procedures and avoiding undue suggestion and contamination of eyewitness identifications." (Doc. 278 at PAGEID # 10512.) However, Gillispie does not cite to any Sixth Circuit or Supreme Court cases that recognize a stand-alone "lack-of-policy" method or theory for imposing municipal liability. And, Gillispie's primary authority in support of its *Monell* claims indicates that there is no such separate method but, instead, that a lack-of-policy argument is analyzed within the context of a failure-to-train theory. *Jackson*, 925 F.3d at 828 (relied on by Gillispie); *see also Gregory*, 444 F.3d at 753-57 (relied on by Gillispie; analyzing failure-to-train theory and custom of using overly

suggestive show-ups); *Moldowan*, 578 F.3d at 392-94 (relied on by Gillispie; analyzing failure-to-train theory and, regarding allegation that a policymaker ordered the destruction of evidence, "municipal policymaker liability").

In *Jackson*, the plaintiffs argued that they provided sufficient evidence to make out a *Monell* claim under the first and third methods for showing a municipality had a policy or custom that caused the alleged constitutional violation (i.e., "the existence of an illegal official policy or legislative enactment" and "the existence of a policy of inadequate training or supervision"). *Jackson*, 925 F.3d at 828. In its analysis, the Sixth Circuit noted that the plaintiffs also argued "that they have a third *Monell* claim based on [the municipality's] failure to adopt an adequate policy to prevent *Brady* violations." *Id.* at 828 n. 20. However, the Sixth Circuit "decline[d]" to recognize or analyze a separate claim or theory that a municipality failed to adopt adequate policies. *Id.* The Sixth Circuit explained that "Plaintiffs cite no Sixth Circuit or Supreme Court case in support of their theory that they have a *Monell* claim—separate from their failure-to-train claims—based on [the municipality's allegedly] unconstitutional failure to adopt a policy." *Id.* Instead, the plaintiffs' arguments on the alleged lack-of-policy theory fell within an analysis of their failure-to-train theory. *Id.*; *see also Bryan Cnty.*, 520 U.S. at 403-04 (courts have "required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury" because "[l]ocating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality").

Thus, in accordance with *Jackson*, the Court will analyze Gillispie's "lack-of-a-policy" arguments within its analysis of Gillispie's failure-to-train theory. The Court also notes that

Gillispie's argument that the Township lacked policies regarding various items (*Brady* obligations, file maintenance, the production of documents to the prosecution, implementation of identification procedures, avoiding undue suggestion and contamination of eyewitness identifications) is akin to an argument that the Township had inadequate training by not having such policies in place to train officers in accordance with them. And, Gillispie's failure-to-train arguments are similar to his lack-of-any-policy arguments.[25]

### (3) Failure-to-train theory

"[A] plaintiff may establish municipal liability by showing a policy of inadequate training or supervision, including a policy of tolerating federal rights violations that is unwritten but nevertheless entrenched." *Moldowan*, 578 F.3d at 393 (modifications incorporated) (internal quotation marks omitted). "In order to show that a municipality is liable for a failure to train its employees, a plaintiff must establish that: 1) the [municipality's] training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the [municipality's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Jackson*, 925 F.3d at 834 (internal quotation marks omitted). Thus, although "courts recognize a systemic failure to train police officers adequately as custom or policy which can lead to [municipal] liability," it is "[o]nly when the failure to train amounts to 'deliberate indifference' on behalf of a [municipality] towards its inhabitants" that "failure to train lead[s] to [municipal] liability under § 1983." *Gregory*, 444 F.3d at 753; *see also Miller v. Calhoun Cnty.*, 408 F.3d 803, 814-15 (6th Cir. 2005) ("a municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice," and, "[f]or a custom to

---

[25] Finally, to the extent that Gillispie argues that the Township made a "deliberate choice not to" have any policy concerning *Brady* obligations or avoiding unduly suggestive photo lineups (Doc. 278 at PAGEID # 10513), the evidence does not support such an argument (as shown in the analysis below regarding the failure-to-train theory).

give rise to *Monell* liability, the custom must be so permanent and well settled as to constitute a custom or usage with the force of law") (internal quotation marks omitted).

Regarding the second requirement, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cnty.*, 520 U.S. at 410. "In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be plainly obvious." *Jackson*, 925 F.3d at 836 (internal quotation marks omitted). "A plaintiff may meet this standard by showing either (1) prior instances of unconstitutional conduct demonstrating that the [municipality] had notice that the training was deficient and likely to cause injury but ignored it or (2) evidence of a single violation of federal rights, accompanied by a showing that the [municipality] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Id.* (internal quotation marks omitted). The Supreme Court explained:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which the [municipality] may be held liable if it actually causes injury.

*City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).

In *Gregory*, the Sixth Circuit held that a "[p]laintiff can survive summary judgment under this standard by showing that officer training failed to address the handling of exculpatory materials and that such a failure has the highly predictable consequence of constitutional violations of the sort [the] Plaintiff suffered." *Gregory*, 444 F.3d at 753. Thus, "[a] custom of failing to train its officers on the handling of exculpatory materials is sufficient to establish the requisite fault on the part of the [municipality] and the causal connection to the constitutional violations experienced by" the plaintiff. *Id.* at 754. And, with respect to identification techniques, a "[p]laintiff need not

55

present evidence of other complaints if he can show that the [municipality] failed to train its officers in proper identification techniques, and that such failure to train had the obvious consequences of leading to constitutional violations of the sort experienced by" the plaintiff. *Id.* at 755. More basically, "evidence pointing to a [municipality's] failure to provide *any* training on key duties with direct impact on the constitutional rights of citizens is sufficient to survive summary judgment with a *Monell* failure to train claim." *Id.* at 754 (emphasis in original).

However, "[m]ere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability." *Miller*, 408 F.3d at 816-17 (affirming summary judgment for municipality on failure-to-train claim). The Supreme Court has further explained:

> That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipality], for the officer's shortcomings may have resulted from factors other than a faulty training program. … Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable. … In virtually every instance where a person has had his or her constitutional rights violated by a [municipality's] employee, a § 1983 plaintiff will be able to point to something the [municipality] could have done to prevent the unfortunate incident.

*City of Canton*, 489 U.S. at 390-92 (internal quotation marks omitted). The Supreme Court has mandated that rigorous standards of fault and causation remain, in an effort to avoid "*de facto respondeat superior* liability on municipalities" and "an endless exercise in second-guessing municipal employee-training programs." *Id.* at 392; *see also Bryan Cnty.*, 520 U.S. at 405 ("[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee").

56

Against this backdrop, the Court analyzes Gillispie's failure-to-train theory. Gillispie argues that he is entitled to a jury trial against the Township due to "the Township's failure to train its detectives in (a) the preservation and production of documents/*Brady* material, (b) conducting identifications in a manner that was not unduly suggestive, and (c) avoiding contamination/influence before and after administering identification procedures." (Doc. 278 at PAGEID # 10512.) Gillispie alleges that, in 1990, "the Township had no policies explaining officers' obligation to preserve or disclose exculpatory evidence under *Brady*," the Township "had no polic[i]es concerning how to conduct and document or memorialize lineups," the Township "did not provide any formal training or written training materials to new detectives," and "[d]etectives were also provided with no specific training on how to administer photo lineups or on producing evidence, including exculpatory evidence, to prosecutors for criminal proceedings." (*Id.* at PAGEID # 10513-17.) He also argues that "the Township should have adopted written directives concerning the importance of avoiding suggestive identification tactics—both before and *after* showing a lineup—and further instituted actual training for their officers that would have account[ed] for the obvious issues of eyewitness unreliability." (*Id.* (emphasis in original).)

In response, the Township alleges that Gillispie is asking this Court to make the incorrect inference that the Township did not have any policies and procedures, based merely on employees being unable to recall such policies and procedures during discovery in this case nearly 30 years later. The Township also argues, among other things, that there is no evidence of deliberate indifference to instituting policies or procedures regarding preserving and disclosing *Brady* material, conducting and administering photo lineups, influencing identifications, etc. that was the moving force behind the alleged constitutional violations against Gillispie.

Gillispie argues that summary judgment is not appropriate here because he has met the

standard set forth in *Gregory* that "evidence pointing to a [municipality's] failure to provide *any* training on key duties with direct impact on the constitutional rights of citizens is sufficient to survive summary judgment with a *Monell* failure to train claim." (Doc. 278 at PAGEID # 10515 (quoting *Gregory*, 444 F.3d at 754) (emphasis in original).) The Court disagrees.

The Township's current Police Chief, Ron Hess ("Hess"), served as its Rule 30(b)(6) representative. Hess was hired by the Township in 2013 and became its chief of police in 2014. In his deposition in 2019, Hess confirmed that, due to the Township's records retention policies and a lack of former or current employees who could specifically recall the historically relevant written policies, the Township could not confirm what those written policies were when Moore investigated the sexual assaults in 1990 or produce a copy of them. (*See, e.g.,* Doc. 227 at PAGEID # 5465-66, 5482-83, 5513-14, 5517-18.) Additionally, Hess—as the Township's Rule 30(b)(6) witness—could not, for example, state what the Township's procedure or practice was for fulfilling *Brady* obligations in 1990 and 1991 (*id.* at PAGEID # 5503). However, there is undisputed evidence indicating Township policies, procedures, customs, and training at the relevant time on the relevant topics, including *Brady* obligations, file maintenance, preserving documents, conducting lineups, and avoiding contamination of identifications.

For example, Moore testified that, based on his training through the police academy, he understood at the time of the alleged wrongdoing that any exculpatory evidence he had—in every case in which he was involved—must be given to the prosecutor and defense attorneys. Moore also understood at the time that "it would be unconstitutional for [him] to put false or misleading information in police reports" or "to fabricate or make fake evidence." (Doc. 170 at PAGEID # 3464-65, 3485.) Moore went through a police academy that was put on by the Township, run in part by Captain Scothorn, and certified through the State of Ohio. Captain Scothorn verified that

he was part of the faculty at the Miami Township Police Academy from 1981 through 1996, he was an instructor and (later on) became a commander at the academy, he organized the academy, the academy would train on the areas set forth in the state's suggested curriculum as well as on additional areas, and every law enforcement officer in the Township's police department would have to go through the academy.  (*Id.* at PAGEID # 3404; Doc. 254 at PAGEID # 7572-77.)

Concerning photo lineups, Moore testified that he was not sure if there were any written orders or written policies on how to conduct photo identifications at the time (and he did not receive specific training on how to conduct photo identifications); however, he was informed of how to conduct them, and Fritz—his direct report when he became a detective—had instructed him on how to construct a lineup.  (Doc. 170 at PAGEID # 3429, 3482-83.)  In fact, at the time of the alleged wrongdoing, the Township had written "Photographic Identification General Guidelines," as well as written "Photographic Show-Up Instructions" to be read to the witness.  (Doc. 170-4.)  They constitute a written policy concerning, at least, creating and administering photo lineups.[26]  Among other things, the guidelines provide that "[a]ll of the photos should depict similar looking suspects – size, hair, race, age, etc.," all photos should appear alike, and "[w]itnesses must not be allowed to consult with one another about their identification either before, during or after the photo spread."  (*Id.*)  The instructions provide that the officer should tell the witness, among other things, that the photo array "may or may not contain a picture of the person who committed the crime now being investigated" and "do not tell other witnesses that you have or have not identified anyone."  (*Id.*)  The instructions also state, in handwriting:  "ALSO RUN A COPY OF THE PHOTO SPREAD USED!"  (*Id.*)

---

[26] Given their presence and the fact that they were used as an exhibit during Moore's deposition, the Court finds it, at best, puzzling that Gillispie asserted in his Omnibus Opposition that the Township "had no polic[i]es concerning how to conduct and document or memorialize lineups."  (Doc. 278 at PAGEID # 10514.)

In line with Moore's testimony, Fritz confirmed that there was an OPATA-sanctioned academy at the police department and that he had trained officers. (Doc. 221 at PAGEID # 4413.) In fact, Fritz instructed on evidence procedures, among other topics. (*Id.* at PAGEID # 4414.) And, Fritz testified that, during his tenure with the Township, he never had any occasion to know of any officers fabricating evidence or destroying evidence, and that, had he seen something like that, he would have advised superiors of it. (*Id.* at PAGEID # 4549-50.) Bailey testified that Township detectives also learned through on-the-job training, watching and learning from those with more experience. (Doc. 222 at PAGEID # 4917-18, 4942.)

Former Township Detective Sergeant Tim Wilson ("Detective Sergeant Wilson") was Moore's supervisor starting in June of 1990 when the Township hired him (Wilson). (Doc. 271 at PAGEID # 8961, 8966-67.) Detective Sergeant Wilson had been hired to serve as the sergeant of the detective section and to investigate internal affairs under the supervision of Captain Scothorn. (*Id.* at 8961-63.) In his role as internal affairs investigator, Detective Sergeant Wilson would investigate any allegations against the Township's officers, including officer misconduct, and report his findings to Captain Scothorn and Police Chief Angel. (*Id.*)

Detective Sergeant Wilson testified that he understood in 1990, as supervisor of the detectives, that it was required that detectives turn over all exculpatory evidence in the file to prosecutors. (*Id.* at PAGEID # 9022.) He testified that all of the detectives "knew that they had an obligation to turn over the good, bad, and the ugly to the prosecutors." (*Id.* at PAGEID # 9060.) He also explained that the Township had a practice and procedure in place at that time where detectives (or officers) assigned to a case would provide to the prosecutor every piece of work that they accumulated or generated, including case reports and supplemental reports. (*Id.* at PAGEID # 9020-22.) Detective Sergeant Wilson required that the detectives he supervised provide

everything to the prosecutor's office, and—during the relevant time period—that was the Township's custom and practice. (*Id.* at PAGEID # 9057.)

However, there was no logging or tracking system in 1990 or 1991 that would allow a supervisor to verify specific documents had been turned over. (*Id.* at PAGEID # 9020-22.) Yet, during the eight years in which he served in the department, Detective Sergeant Wilson was never made aware that there was ever any habit or routine of detectives failing to disclose/provide exculpatory evidence to prosecutors. (*Id.* at PAGEID # 9056.) Detective Sergeant Wilson also testified to photo identification procedures used by the Township in 1990 and 1991. (*Id.* at PAGEID # 8984-86.)

Captain Scothorn, who had been with the Township for 26 years (including during the relevant period), testified that he was not aware of any officer destroying or suppressing any evidence in any case. (Doc. 254 at PAGEID # 7489-93, 7517, 7592, 7598.) Captain Scothorn also testified that he was unaware of any instances, before or after the Gillispie case, of: use of suggestive photo spreads to identify suspects; any officer being accused of fabricating evidence; any files being removed from any initial reports or supplemental reports; or, command staff approving of an officer's or employee's misconduct. (*Id.* at PAGEID # 7593-95.) He explained that, if a member of the Township's command staff discovered that an employee or officer had violated a policy or procedure, then an investigation would be initiated, and that there were procedures in place during the time period of 1988 to 1991 to conduct such an investigation. (*Id.* at PAGEID # 7595-96.) Captain Scothorn also verified that, during the 1988 to 1994 time period, there were policies and procedures in place at the Township's police department regarding investigation of cases, retention of reports, and retention of supplemental reports. (*Id.* at PAGEID # 7596-97.)

Captain Scothorn also testified that, for a period of time (including the time frame of 1988 through 1990 when paper reports were kept), he was the supervisor over the records section of the Township's police department.  (*Id.* at PAGEID # 7489-94, 7599.)  When an officer prepared a handwritten report, the officer would give it to a records clerk in the records section of the property room for filing.  (*Id.* at PAGEID # 7600.)  The records clerks were overseen by either a civilian supervisor or an active sergeant.  (*Id.* at PAGEID # 7600-01.)  The records clerk would take the report and put it into a file marked with the report year and the report number.  (*Id.* at PAGEID # 7601.)  Captain Scothorn testified that he could not recall any instance of a missing or misfiled report.  (*Id.*)

The Township's procedures included that officers and detectives would submit reports, including initial reports and supplemental reports, to the records section for logging and filing in a file cabinet in the property room.  (*Id.* at PAGEID # 7549-51.)  Detectives did not have access to the filing cabinet; only records clerks, Captain Scothorn, and the police chief had access to the filing cabinet.  (*Id.* at PAGEID # 7602.)  If a detective wanted to see a report, then he or she could request it from one of those individuals, who would provide the detective a copy of the report and place the original back in the file after photocopying it.[27]  (*Id.* at PAGEID # 7602-03.)

Captain Scothorn testified that, although it would be possible to misfile something, he was not aware of any instance of a supplemental report not being properly filed with the initial report in the property room.[28]  (*Id.* at PAGEID # 7551, 7603.)  In fact, he could not "recall any instances

---

[27] Former Township Corporal John DiPietro testified that someone would not need to gain access to an original report because copies would be maintained in the detective case file.  (Doc. 273 at PAGEID # 9456.)  However, if there was a "rare need for anybody to go back and access" the original report, then the officer or detective would go to the records section, meet with the records supervisor, inform the records supervisor that he or she wanted to inspect the report, the officer would inspect the report there in the records section (where the supervisor was present), and then the report would be put back.  (*Id.* at PAGEID # 9456-57.)

[28] Similarly, Bailey admitted that it was possible a report could be misfiled, but he was not aware of any occasion where that actually happened.  (Doc. 222 at PAGEID # 4803-04.)

where anything was misfiled." (*Id.* at PAGEID # 7603.) The Township's policy was that original files did not leave the records section. (*Id.* at PAGEID # 7617-18, 7621.) Captain Scothorn did not know of any instance in which an original supplemental report was taken out of the records section. (*Id.* at PAGEID # 7617.)

Regarding photo lineups, Captain Scothorn testified that he was not aware of any instances of a detective or officer ever making suggestive comments to victims or eyewitnesses in an effort to get him or her to identify someone as a suspect. (Doc. 254 at PAGEID # 7590.) He also testified that he was not aware of any custom or practice to create or use suggestive photo spreads. (*Id.* at PAGEID # 7591.) If he had heard of any such unethical practice or treatment, then it would have been his duty to inform his superiors or take action himself, but he did not recall either himself or anyone else ever having to take such action during his 26-year tenure at the Township. (*Id.* at PAGEID # 7591-92.) He also was unaware of any claim that the Township used suggestive photo spreads, except for this particular case involving Gillispie. (*Id.* at PAGEID # 7592-93.)

Therefore, the evidence demonstrates that the Township had policies, procedures, and/or customs concerning *Brady* obligations and concerning administering photo lineups during the relevant time period.[29] And, the evidence demonstrates that the Township trained its officers, including through an academy and learning from those who were more experienced. Additionally, there is a lack of evidence concerning a pattern of wrongdoing, particularly wrongdoing similar to the type that Gillispie alleges Moore committed. And, there is a lack of evidence concerning knowledge of any other instances of such alleged wrongdoing.

Gillispie has identified testimony that shows the Township did not have a specific policy on certain topics or did not provide "formal training" or "specific training" on certain topics (*see*

---

[29] The above recitation of evidence concerning Township policies, procedures, and customs is certainly not exhaustive.

Doc. 278 at PAGEID # 10513-16). While the evidence demonstrates that the Township did not have a written policy for a number of specific processes or situations, a municipality does not need to have—and it would be impossible to have—a written policy to address every situation that could conceivably arise or regarding every single thing that the municipality does. *See, e.g. Lamar v. Beymer*, No. 5:02-CV-289R, 2005 U.S. Dist. LEXIS 22500, at *35-36, 2005 WL 2464178 (W.D. Ky. Oct. 4, 2005) (the police department "not having a set policy for every imaginable police situation does not demonstrate a deliberate choice or conscious disregard" for the alleged wrongdoing). Besides being administratively impossible, whether there is or is not a written policy on a particular issue is not the only question in determining municipal liability, as shown in the standards set forth above.

Even assuming Gillispie's evidence as true and drawing all reasonable inferences in his favor, the evidence does not support that any alleged inadequacy in the Township's training was the result of the Township's deliberate indifference. *Gregory*, 444 F.3d at 753 (it is "[o]nly when the failure to train amounts to 'deliberate indifference' on behalf of a [municipality] towards its inhabitants" that "failure to train lead[s] to [municipal] liability under § 1983"). The Court finds that there is no genuine issue as to any material fact concerning the deliberate indifference requirement, and the Township has shown that it is entitled to judgment as a matter of law with respect to Gillispie's failure-to-train theory of municipal liability. Fed. R. Civ. P. 56(a); *Jackson*, 925 F.3d at 834; *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464-65 (6th Cir. 2008) (affirming summary judgment for municipality on failure-to-train claim where, "[w]hile Plaintiff may have shown a genuine issue of material fact with respect to the inadequacy-of-training prong …, he failed to present probative evidence as to the question of deliberate indifference"); *Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012) (affirming summary judgment for municipality on

failure-to-train or supervise claim where plaintiff failed to present probative evidence as to the question of deliberate indifference); *Ciminillo v. Streicher*, 434 F.3d 461, 469-70 (6th Cir. 2006) (affirming summary judgment for municipality on failure-to-train claim where evidence suggested that the municipality was taking steps to train officers on particular tactic); *Harvey v. Campbell Cnty.*, 453 F. App'x 557, 567-68 (6th Cir. 2011) (holding that defendant municipality was entitled to summary judgment on failure-to-train claim where plaintiff did not provide evidence "that any inadequacy, if one indeed existed, was the result of defendants' deliberate indifference").

There is an absence of evidence on which the jury could reasonably find for Gillispie on a failure-to-train theory. *Anderson*, 477 U.S. at 252. "[D]eliberate indifference is a stringent standard of fault, for which even heightened negligence will not suffice." *Plinton*, 540 F.3d at 465 (internal citation and quotation marks omitted). To the extent that Gillispie even makes the argument, the evidence does not support a showing of "prior instances of unconstitutional conduct demonstrating that the [Township] had notice that the training was deficient and likely to cause injury but [the Township] ignored it." *Jackson*, 925 F. 3d at 836. The evidence also does not support a "showing that the [Township] had failed to train its employees to handle recurring situations presenting an obvious potential for" the alleged constitutional violations. *Id.*

This is not a case where a "failure to train had the obvious consequences of leading to constitutional violations of the sort experienced by" Gillispie. *Gregory*, 444 F.3d at 753-54 ("[w]idespread officer ignorance of the proper handling of exculpatory materials would have the highly predictable consequence of due process violations") (internal quotation marks omitted); *see also City of Canton*, 489 U.S. at 390-92; *Harvey*, 453 F. App'x at 567; *Plinton*, 540 F.3d at 464. The evidence presented does not show widespread officer ignorance on the relevant topics. The evidence presented also does not show that the Township had "[a] custom of failing to train its

officers on the handling of exculpatory materials," or on maintaining such materials, or on identification procedures. *Gregory*, 444 F.3d at 754.

Despite Gillispie's insistence otherwise, applying the legal principles from *Jackson*, *Gregory*, and *Moldowan* leads to a different conclusion than in those cases. In *Jackson*, the Sixth Circuit found that the municipality's written policy and rules could be understood to authorize officers to withhold exculpatory materials; thus, a genuine issue of material fact existed as to whether the municipality had a policy of permitting *Brady* violations. *Jackson*, 925 F.3d at 834. The Sixth Circuit also found that the plaintiff provided testimony from several officers supporting that a "reasonable jury could find that officers received no training, on-the-job or otherwise, in their *Brady* obligations generally or in their obligation to provide witness statements to prosecutors." *Id.* at 836. In *Gregory*, the plaintiff provided testimony from the municipality's chief of police that "officers were confused about their *Brady* obligations," yet he "could not recall any remedial steps or training having been taken." *Gregory*, 444 F.3d at 754 (explaining that "evidence pointing to a [municipality's] failure to provide *any* training on key duties with direct impact on the constitutional rights of citizens is sufficient to survive summary judgment with a *Monell* failure to train claim"). Also, *Gregory* involved "one-on-one show-ups," which are "inherently suggestive," not photo lineups like in this case. *Id.* at 755. In *Moldowan*, the Sixth Circuit addressed the argument by defendants that the police do not have a *Brady*-like obligation to preserve and turn potentially exculpatory evidence over to the prosecutor. *Moldowan*, 578 F.3d at 377. The municipal liability claim involved whether the defendant city was, in turn, liable for failing to adequately train its police officers (including a defendant detective) regarding such an obligation. *Id.* at 392-93. Thus, the viability of the municipal liability claim relied on the existence of such an obligation, which the Sixth Circuit found did exist. *Id.* at 377, 392-93. The district

court had denied summary judgment to the municipality, and the Sixth Circuit found that the disputed factual issues concerning evidence of inadequate training were beyond the scope of the appeal. *Id.* at 393 n.18.

Therefore, the Township is entitled to summary judgment with respect to Gillispie's municipal liability claims to the extent that they are premised on a failure to train.

### (4) Failure-to-supervise theory

Gillispie also argues that he is entitled to a jury trial against the Township due to "the Township's failure to supervise its detectives concerning (a) the preservation and production of *Brady* material and (b) in administering identification procedures, in light of the obvious need to do so." (Doc. 278 at PAGEID # 10512.)

The Sixth Circuit has mentioned that the "failure to supervise theory of municipal liability is a rare one." *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010) (internal quotation marks omitted); *Amerson v. Waterford Twp.*, 562 F. App'x 484, 491 (6th Cir. 2014) ("[f]ew published opinions thoroughly discuss the law on failure-to-supervise claims, especially as distinct from failure-to-train claims").[30] "Similar to the failure-to-train inquiry outlined above, to sustain a failure-to-supervise claim, the plaintiff must show that the [municipality] acted with deliberate indifference to the risk of the constitutional violation and that its deliberate indifference was the moving force behind the" violation. *Amerson*, 562 F. App'x at 492 (alterations adopted) (internal quotation marks omitted); *see also Mercilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012) ("[t]o prevail on a failure to train or supervise claim, the plaintiff must prove the following: (1) the

---

[30] None of Gillispie's main cited authority involved a failure-to-supervise theory of municipal liability. *Jackson*, 925 F.3d at 828 (involving a failure-to-train theory and existence of an illegal official policy theory); *Gregory*, 444 F.3d at 751-53 (involving a failure-to-train theory of municipal liability and a claim of supervisory liability against particular officers); *Moldowan*, 578 F.3d at 392 (involving a failure-to-train theory and municipal policymaker liability). Those three cases are the only ones that Gillispie cites in his argument supporting his failure-to-supervise theory. (*See* Doc. 278 at PAGEID # 10517-18.)

training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury").

"[O]pportunity alone, without reason to suspect that it will lead to a constitutional violation, does not establish deliberate indifference." *Mize*, 375 F. App'x at 501. Additionally, negligence on the part of the municipality is insufficient to support municipal liability for inadequate supervision or control of individual officers. *Hays v. Jefferson Cnty.*, 668 F.2d 869, 872 (6th Cir. 1982); *Mize*, 375 F. App'x at 501 (citing *Bryan Cnty.*, 520 U.S. at 407). However, "[a] conclusion of deliberate indifference may result from a municipality's failure to act in response to repeated complaints of constitutional violations." *H.M. v. Bd. of Educ. of the Kings Local Sch. Dist.*, 117 F. Supp. 3d 992, 1010 (S.D. Ohio 2015). In the end, the plaintiff arguing a failure-to-supervise theory "must meet the rigorous standards of culpability and causation that the Supreme Court has required when a plaintiff claims that a municipality has indirectly caused a violation of federal rights." *Mize*, 375 F. App'x at 500; *see also Jackson*, 925 F.3d at 828 ("a plaintiff must show that[,] through its deliberate conduct, the municipality was the moving force behind the injury alleged").

Here, as explained in the failure-to-train analysis, there is a lack of evidence of prior instances of unconstitutional conduct—whether by Moore or any Township employee—that would demonstrate notice to the Township. This is not a situation where Gillispie has shown that the Township had "a policy of tolerating federal rights violations [that] is unwritten but nevertheless entrenched." *Moldowan*, 578 F.3d at 393 (alteration in original) (internal quotation marks omitted); *see also Mize*, 375 F. App'x at 500-01 (finding that no reasonable jury could find that officer's superiors were deliberately indifferent to the danger that he might commit the alleged

constitutional violation where the officer had no history of such misconduct and the police department did not have a pattern of such violations).

Instead, Gillispie's argument is that the Township was on notice that Moore would need supervision if he was assigned the 8/20 Rapes and that Moore had a reputation as a "cowboy," yet did nothing to ensure that Moore was provided with supervision or prevent him from going "rogue"—which Gillispie argues Moore did here.  However, examining the basis of these arguments shows that the notice to the Township had nothing to do with prior instances of unconstitutional conduct or the type of constitutional violations alleged here.

First, regarding Moore's reputation as a "cowboy," Fritz testified that use of that term was not based on Fritz's review of any of Moore's investigative work.  It was a not phrase that Fritz used but was one that was used in the department to describe Moore.  Bailey explained that the nickname "Cowboy" was not about Moore's behavior, but instead because "he's got these weird elbows and sometimes it looked like he was walking around getting ready to draw" a gun, even though he was not.  (Doc. 222 at PAGEID # 4889.)  In other words, the "cowboy" nickname was due to how Moore's body was built, not any of his actions.

Second, regarding Moore going "rogue," Fritz testified as follows:

I felt that Scott Moore, he was tenacious.  He had a lot of – he had all the qualities of being a good investigator and a good police officer.  Um, he had a tendency to go rogue a lot and start his own investigations.  Um, and there was at certain points I would have to tell him, Scott, you've got to move on in this case.  You've got nothing.  It's going nowhere.  You're backing up.  You've got to inactivate this case.  Call the people and let them know and move on on the cases that you can get something done on.  And it was kind of funny because the guys used to kid him, say, well 'Scott, before you close that, did you call Interpol'?  So it was just – just to show him that he – I mean, he really didn't know when to let it go.

…

The one that really angered me was an incident where he went to a pharmacy that was in the Dayton mall at the time. … I was working a fraudulent prescription case.  I had a suspect. … Scott Moore had been over, had asked to see the prescription

book, and told [the manager of the pharmacy] he wanted copies of the entire prescription book. And what was – the [manager of the pharmacy] was really upset about was is he had to pay for the copies. I knew nothing about [Moore going to the pharmacy]. I hadn't assigned a case like that. … [Back at the office, Moore explained to me] that he had learned that a police officer could go in and request a pharmacy book whenever they were working on something and the pharmacy had to present it. And I explained to him what case he was working; he didn't have a case. He was basically looking for people who were getting numerous prescription drugs. And I explained to him that he didn't work his own cases; that I assigned the cases to him. And if he had a case that he thought that should be investigated by us, he had to come to me and had, you know, I had to sign off on it and assign it to him and that he couldn't go rogue.

(Doc. 221 at PAGEID # 4561-64.)  Thus, there certainly is evidence that Moore would continue investigating and keep cases active for a longer time than other detectives, and there is evidence that Moore would sometimes conduct investigations unrelated to his own assigned cases. Bailey also referenced the pharmacy incident as his basis for saying that Moore would create his own cases without authorization. (Doc. 222 at PAGEID # 4887.)  Bailey explained: "sometimes that just got in the way of other investigations. … I did not mean that [Moore] was detrimental [but that] he just had his priorities mixed up at that time. … His priorities were just off a little bit. That's all." (*Id.* at PAGEID # 4887-88.)

Finally, regarding the Township's notice that Moore would need supervision if he was assigned the 8/20 Rapes, Fritz testified that he advised both the police chief and captain about his discussion with Moore about the pharmacy incident. He "didn't write [Moore] up, and they didn't feel it was necessary to write him up for that, but they were aware of what had happened and told me to keep on him." (Doc. 221 at PAGEID # 4564.)  Fritz thought Moore would be the best person to assign the 8/20 Rapes, so long as Moore had supervision. Fritz explained: "He had the instincts. He had – you know, thought outside of the box. He would do a lot of stuff that was impressive. It was just keeping him within, you know, the realms of what he needed to do and the investigations he was assigned, and not to go off doing his own stuff." (*Id.* at PAGEID # 4565.)

But here, Moore <u>was</u> assigned to the 8/20 Rapes investigation. So, there is a disconnection between the notice that Moore needed supervision to ensure he was not conducting investigations unrelated to his case assignments and, on the other hand, the alleged constitutional violations in a case to which Moore was assigned. In short, the evidence does not show that the Township was on notice of a risk that Moore would commit a constitutional violation, let alone that he—in an effort to frame Gillispie for the 8/20 Rapes he was assigned to investigate—would take the unconstitutional actions alleged here. The alleged "red flags" concerning Moore to which Gillispie points are not particularly relevant to the unconstitutional conduct that allegedly came to be. In this situation, the evidence does not support that the potential for the alleged constitutional violations was plainly obvious.

To support his failure-to-supervise theory, Gillispie also points to testimony by Moore's supervisor (Detective Sergeant Wilson) at his 2018 deposition that Detective Sergeant Wilson: could not recall ever reviewing a detective's report until the conclusion of the investigation; could not recall ever reviewing the field notes for any detective for any investigation; did not review Moore's field notes for the 8/20 Rapes investigation; could not recall any conversation with Moore about Moore's decision to pursue Gillispie or to arrest Gillispie; would not be asked by the detectives that he supervised for prior approval in making an arrest; did not directly oversee Moore in his preparation of any photographic lineups; would not review photo lineups unless a detective asked him for assistance in constructing or presenting it (and there is no evidence Moore did that in the 8/20 Rapes investigation); did not keep track of supplemental reports for the 8/20 Rapes investigation; did not ever read the initial case reports for the 8/20 Rapes investigation; and, did not supervise Moore's production of documents or other items to the prosecutors or criminal defense attorneys concerning the 8/20 Rapes investigation. (Doc. 271 at PAGEID # 8970, 8984-

86, 8993, 9009, 9019, 9023, 9041.)  Gillispie also points to testimony by Captain Scothorn that, if there were no issues, no one was complaining, and he felt that the supervisors were doing their job, then he would not become involved in their supervision of subordinates.  (Doc. 270 at PAGEID # 8795, 8798-99.)  Gillispie also points to testimony by Moore that the deputy chief and chief of police did not have any direct supervision over him.  (Doc. 170 at PAGEID # 3449.)

Gillispie argues that, given the evidence, "the Township failed to properly supervise Moore—which contributed to the wrongful arrest and conviction of Gillispie and was inconsistent with generally accepted police practices."  (Doc. 278 at PAGEID # 10518.)  When assuming Gillispie's evidence as true and drawing all reasonable inferences in his favor, it certainly appears that Moore was not properly supervised.  However, the evidence does not support "deliberate indifference" to the risk of the alleged constitutional violations or that any such deliberate indifference was the "moving force" behind any of those violations such that a jury could reasonably find for Gillispie on the claim.  *Amerson*, 562 F. App'x at 492.  Negligence, even gross negligence, on the part of the Township in its supervision is insufficient to attach municipal liability.  *Hays*, 668 F.2d at 872; *Mize*, 375 F. App'x at 501; *Gazette v. City of Pontiac*, 41 F.3d 1061, 1067 (6th Cir. 1994) ("gross negligence" is not sufficient for Section 1983 liability).  As with the failure-to-train theory, the Court finds that Gillispie has failed to present probative evidence as to the question of deliberate indifference, or to the question of causation with respect to the alleged constitutional violations.  *Amerson*, 562 F. App'x at 492 (affirming summary judgment for municipality on failure-to-supervise theory, despite evidence showing that the municipality offered no annual or other type of review or monitoring of its officers once they completed field training, because the evidence was insufficient to show deliberate indifference in the absence of a pattern of the alleged wrongdoing, a record of officers going unpunished for the

alleged wrongdoing, or other circumstances tending to show that the municipality was aware, or could have been aware, that the officer was prone to committing the alleged wrongdoing); *Marcilis*, 693 F.3d at 605 (affirming summary judgment where plaintiffs failed to present probative evidence as to the question of deliberate indifference on their claim of inadequate training or supervision); *Campbell v. Anderson Cnty.*, 695 F. Supp. 2d 764, 775 (E.D. Tenn. 2010) (finding that the link between the municipality's alleged lack of supervision and its officer's wrongdoing was too tenuous to allow the case to proceed to trial against the municipality).

Therefore, the Township is entitled to summary judgment with respect to Gillispie's municipal liability claims to the extent that they are premised on a failure to supervise.

### (5) Ratification theory

Gillispie also argues that he is entitled to a jury trial against the Township because "the Township has ratified the *Brady* violation here." (Doc. 278 at PAGEID # 10512.) "[L]iability can be established by showing that an official with final decision making authority ratified the illegal actions." *Paterek v. Vill. of Armada*, 801 F.3d 630, 651 (6th Cir. 2015) (alteration adopted) (internal quotation marks omitted); *see also Gregory*, 444 F.3d at 752 (a municipality's custom or policy can be unconstitutional where it is "facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by [municipal] policymakers").

However, a municipal liability claim based on a ratification theory still requires the plaintiff to show the applicable degree of culpability and causation. *Bryan Cnty.*, 520 U.S. at 400, 404 ("in enacting § 1983, Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights") (quoting *Monell*, 436 U.S. at 694) (emphasis in original); *Feliciano v. City of*

*Cleveland*, 988 F.2d 649, 656 n. 6 (6th Cir. 1993) ("even if it were shown that the municipality subsequently ratified the decision, the plaintiffs would then have to prove that the ratification was a moving force in causing the constitutional violation") (internal quotation marks omitted); *see also Guglielmo v. Montgomery Cnty.*, 387 F. Supp. 3d 798, 826 (S.D. Ohio 2019) ("even if ratification was evidence of a policy of permitting the wrongdoing, plaintiffs also must show that the policy caused the wrongdoing"). "Ratification of a subordinate's action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate." *Feliciano*, 988 F.2d at 656.

Here, Gillispie fails even to identify who he alleges was the "official with final decision making authority [who] ratified the illegal actions." *Paterek*, 801 F.3d at 651. Additionally, Gillispie has not pointed to evidence showing that any alleged policymaker for the Township ratified or otherwise approved of Moore's—or any other officer's—alleged wrongdoing, or even knew of such alleged wrongdoing. *Feliciano*, 988 F.2d at 656 (affirming summary judgment for municipality); *see also St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988). The fact that the Township denies there was wrongdoing (i.e., suppression of evidence, suggestive identification, fabrication of evidence, malicious prosecution, or destruction of evidence) does not equate with such a showing. Gillispie's attempts to argue otherwise fail. *See Paterek*, 801 F.3d at 651; *St. Louis*, 485 U.S. at 127 (it is where "the authorized policymakers approve a subordinate's decision and the basis for it, [that] their ratification would be chargeable to the municipality"); *Nichols v. Clay Cnty.*, No. 7:06-CV-0196, 2008 U.S. Dist. LEXIS 43691, at *15-16, 2008 WL 2338224 (N.D. Tex. June 3, 2008) ("[t]o establish ratification … the plaintiff must prove the policymaking authority had actual knowledge of the alleged improper basis of the conduct at issue"). Therefore, Gillispie's argument for municipal liability on a ratification theory

fails, and the Township is granted summary judgment with respect to Gillispie's municipal liability claims to the extent that they are based on that theory.

### (6) Alleged frequent misfiling of reports

Gillispie also argues, in a footnote, that summary judgment should be denied because there is a disputed issue of fact: there is evidence indicating that reports were frequently misfiled at the Township. (Doc. 278 at PAGEID # 10512.) Fritz testified that, during his time working for the Township, records were inadvertently misfiled all of the time and that he experienced situations where records were in the wrong file.[31] (Doc. 221 at PAGEID # 4429-30.) This stands in stark contrast to, at least, the testimony (referenced above) of Captain Scothorn—who oversaw the records department during the relevant time period—and Bailey. Therefore, the Court agrees that there is a disputed issue of fact.

However, the evidence simply does not support that, through deliberate conduct with respect to the alleged frequent misfiling of documents, the Township was the moving force behind Gillispie's alleged deprivation of federal rights. *Jackson*, 925 F.3d at 828 (to attach municipal liability, a plaintiff must show that, "through its deliberate conduct, the municipality was the moving force behind the injury alleged"); *City of Canton*, 489 U.S. at 390-92. In short, a jury could not reasonably find for Gillispie on any of his § 1983 claims even assuming Gillispie's evidence as true. For example, Gillispie does not identify evidence showing that a Township official was aware of the alleged frequent misfiling. *Bryan Cnty.*, 520 U.S. at 403-04. Gillispie

---

[31] In support of his argument, Gillispie cites to a report by one of his experts that, in turn, references statements that the expert says a former Township employee "swore [to] in her affidavit dated June 2008." (Doc. 233-1 at PAGEID # 6740-41, 6744, 6747, 6761-62.) However, the affidavit was never signed. (Doc. 233-1 at PAGEID # 6747, 6761-62; Doc. 282-3.) Instead, it appears that, in 2008, an attorney had an unsigned, draft affidavit sent to the former employee for her review, along with a request for her to sign it if it was "acceptable," but there is no indication that the affidavit was ever signed or notarized. (*Id.*) Therefore, Gillispie failed to show that there is a sworn affidavit containing those referenced statements. The Court is concerned by the fact that Gillispie (and his expert) would base arguments on an unsigned affidavit, representing it to the Court as sworn testimony when it is not.

does not cite to testimony or documents showing that Fritz (or anyone) ever told the police chief or Captain Scothorn (or anyone) of any misfiling. And, the evidence set forth above shows that the Township put various processes in place for processing, maintaining, and safeguarding records. *Id.* at 400; *Jackson*, 925 F.3d at 828. Therefore, the issue of fact does not matter in light of other requirements necessary for municipal liability to potentially attach.

In conclusion, the Court finds that the Township is entitled to summary judgment on Counts 1, 2, 3, 4, and 5 because there is no genuine issue as to any material fact and that the Township is entitled to a judgment as a matter of law on Gillispie's municipal liability claims. Fed. R. Civ. P. 56(c).

### B. Counts 6, 7, and 8 Against the Township

As stated above, in his Omnibus Response to the Moore Motion and Township Motion, Gillispie states that "Defendants' motions [for summary judgment] should be denied" "[w]ith the exception to certain state-law claims," and that he "will voluntarily dismiss his state-law claims for (1) spoliation, (2) malicious prosecution, and (3) intentional infliction of emotional distress against Moore and the Township." (Doc. 278 at PAGEID # 10462, 10521.) However, it does not appear that Gillispie has voluntarily dismissed those three claims. In light of Gillispie's statements, and given that Gillispie did not address those claims substantively in the Omnibus Response, the Court grants the Township Motion with respect to Counts 6, 7, and 8 and dismisses those claims against the Township. *See Wheatt*, 2017 U.S. Dist. LEXIS 186224, at *48 (granting motion for summary judgment on conceded claims and dismissing such claims where plaintiffs failed to challenge defendants' motions for summary judgment regarding them).

### C. Count 9 Against the Township

Count 9 is a claim for indemnification under Ohio law. Specifically, Gillispie alleges that, "pursuant to Ohio Revised Code, § 1729.031," the Township has "a statutory duty to indemnify

[its] current and/or former employees for any judgment entered against them personally in this action for their conduct taken while they were employed by" the Township. (Doc. 18 at PAGEID # 101.) Gillispie previously acknowledged that he is advancing the indemnification claim to "ensur[e] that [he] is compensated for the wrongs [allegedly] caused by the Defendant Officers." (Doc. 139 at PAGEID # 2333.) He also acknowledged that his citation to O.R.C. § 1729.031 was a typographical error, and the parties previously agreed that O.R.C. § 2744.07 governs a political subdivision's duty to indemnify employees. (*See* Doc. 139 at PAGEID # 2333; Doc. 191 at PAGEID # 4060.) As the Ohio Supreme Court recently recognized, "pursuant to [O.]R.C. 2744.07, political subdivisions are required to indemnify employees in certain instances." *Ayers v. City of Cleveland*, 2020 Ohio LEXIS 731, at *7, 2020 WL 1445287, 2020-Ohio-1047 (Ohio 2020).[32]

The Township argues that it is entitled to summary judgment on Gillispie's claim for state law indemnification. The Court looks first to the ripeness doctrine, which may be raised by the Court *sua sponte*. *Bigelow v. Michigan Dep't of Natural Res.*, 970 F.2d 154, 157 (6th Cir. 1992); *Ky. Press Ass'n v. Kentucky*, 454 F.3d 505, 508 (6th Cir. 2006). In the Omnibus Opposition, Gillispie argues that, in its order denying the Township's motion for partial judgment on the pleadings, "this Court already recognized that *Jackson* holds that it would be error to enter judgment as a matter of law on this claim, at this preliminary juncture." (Doc. 278 at PAGEID # 10520.)

"Ripeness is a justiciability doctrine designed to prevent the courts, through premature

---

[32] O.R.C. § 2744.07 was amended effective 2018 such that the provisions relevant to this case are now set forth in O.R.C. § 2744.07(B), instead of O.R.C. § 2744.07(A)(2). The amendment did not affect the issues presented here. *See Ayers*, 2020 Ohio LEXIS 731, at *2 n.1, 8 (quoting text from earlier version of O.R.C. § 2744.07(A)(2) and noting that "[t]his provision in R.C. 2744.07 has since been amended, but, as relevant to this case, the current version of the statute contains no significant differences").

adjudication, from entangling themselves in abstract disagreements." *Ky. Press Ass'n*, 454 F.3d at 509 (internal quotation marks omitted). "[T]he ripeness doctrine is discretionary." *Jackson*, 925 F.3d at 808. "Application of this doctrine requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances." *Id.* at 807 (internal quotation marks omitted). "A claim is unripe when it is anchored in future events that may not occur as anticipated, or at all." *Id.* (internal quotation marks omitted). That is the case here.

As shown in the Amended Complaint and text of the relevant statute, Gillispie's claim for indemnification is anchored to him obtaining a judgment against "an employee" of the Township—a future event that may not occur as anticipated, or at all. *Id.*; O.R.C. § 2744.07 (unless an exception applies, "a political subdivision shall indemnify and hold harmless an employee in the amount of any judgment … that is obtained against the employee in a state or federal court …."); *Ayers*, 2020 Ohio LEXIS 731, at *10 ("[i]n reviewing the plain language of R.C. 2744.07(A)(2), it is clear that a political subdivision must indemnify an employee in the amount of any judgment qualifying under the statute"); *Jackson*, 925 F.3d at 807 (explaining that indemnification claims typically depend on the favorable adjudication of underlying claims); *see also Ayers v. City of Cleveland*, 99 N.E.3d 1269, 1276, 2017-Ohio-8571 (Ohio Ct. App. 2017) (the statute "suggests that the political subdivision's duty to indemnify and hold harmless attaches immediately upon the issuance of the judgment against the employee"). Thus, his indemnification claim is premature and, at this point, it is speculative whether the alleged harm that is the basis for the indemnification claim will ever come to pass.

Weighing the factors to be considered in determining whether to apply the ripeness

doctrine,[33] the Court finds that the claim is unripe and exercises its discretion to dismiss, without prejudice, Gillispie's claim against the Township for indemnification under Ohio law, which is the sole remaining claim against the Township.[34] *Peters v. Fair*, 427 F.3d 1035, 1038 (6th Cir. 2005) (the unripe claim "should have been dismissed without prejudice, thereby allowing the plaintiff to reassert" the claim "should it become ripe in the future"); *Wheatt*, 2017 U.S. Dist. LEXIS 186224, at *48 (dismissing plaintiff's indemnification claim without prejudice because the claim was not yet ripe).  Therefore, the Township Motion is denied with respect to Count 9, but Count 9 is dismissed without prejudice.

### D.  Other Arguments by the Township

In light of the above analysis and its conclusion that no claims remain pending against the Township, the Court does not reach certain of the Township's additional arguments in support of the Township Motion, including that the Township is not liable for punitive damages, Gillispie failed to file suit against the real party in interest, and the Miami Township Police Department is not *sui juris*.

### VI.    ANALYSIS FOR WOLFE'S MOTION FOR SUMMARY JUDGMENT

Wolfe moves for summary judgment on all claims against him.  (*See* Docs. 171, 248.)

---

[33] *See Ky. Press Ass'n*, 454 F.3d at 509; *Jackson*, 925 F.3d at 807.

[34] Although the parties direct the Court's attention to what was then the Ohio Supreme Court's impending decision (now actual decision) in *Ayers*, the Court declines to wade into whether that decision extinguished any potential viability of a state law claim for indemnification under the facts presented here.  *Ayers*, 2020 Ohio LEXIS 731, at *9, 14 ("hold[ing] that a judgment creditor may not proceed directly against a political subdivision under O.R.C. § 2744.07(A)(2), "emphasiz[ing] the limited nature of the precise issue before the court," and stating that the plaintiff's "third-party-standing argument is not properly before the court in this appeal"); *see also Jackson*, 925 F.3d at 808 (the general rule is that a claim for indemnification for damages that may be awarded on an underlying tort claim should not be adjudicated on the merits until the underlying claim is adjudicated, and while courts sometimes apply an exception "for indemnification claims that have no possibility of success, regardless of the merits of the underlying claims," the Sixth Circuit Court of Appeals "has not analyzed the propriety of this exception").  Gillispie has argued that "Ohio law affords third-parties standing in circumstances likely to be present here."  (Doc. 139 at PAGEID # 2332.)

### A. **Counts 1, 2, 3, 4, and 5 Against Wolfe**

As set forth above, a claim under § 1983 "must satisfy two elements: 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Ellison*, 48 F.3d at 194. Unlike with Moore, the second element is at issue in the Wolfe Motion. Wolfe argues that he was not a state actor or otherwise acting under color of state law under § 1983. In response, Gillispie argues that his five federal claims against Wolfe are premised on co-conspirator liability. More specifically, Gillispie argues that, while not a police officer at the time, Wolfe acted under color of law for purposes of § 1983 because he was a private person who was jointly engaged with state officials in a deprivation of Gillispie's civil rights.

Generally, "[a] plaintiff may not proceed under § 1983 against a private party 'no matter how discriminatory or wrongful' the party's conduct." *Tahfs v. Proctor*, 316 F.3d 584, 590 (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999)). However, "there are circumstances under which private persons may, by their actions, become 'state actors' for § 1983 purposes." *Id.* One of those circumstances is that, "[i]f a private party has conspired with state officials to violate constitutional rights, then that party qualifies as a state actor and may be held liable pursuant to § 1983." *Cooper v. Parrish*, 203 F.3d 937, 952 n.2 (6th Cir. 2000); *see also Moore v. City of Paducah,* 890 F.2d 831, 834 (6th Cir. 1989) ("a private party may conspire with the state and be liable under § 1983"); *Dennis v. Sparks*, 449 U.S. 24, 28, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980) ("[p]rivate persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions"); *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004) ("[p]rivate persons may be held liable under § 1983 if they willfully participate in joint action with state agents"). If found to be a conspirator, then "the citizen is liable, in civil as

in criminal law, for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002) (statement made in context of a § 1983 claim against a private citizen); *see also Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 272 (6th Cir. 2010) (in a civil conspiracy, a conspirator is held "liable for the acts of a co-conspirator in furtherance of the conspiracy").

Over three decades ago, the Sixth Circuit set forth the standard for proving a civil conspiracy:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action.  Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.  Each conspirator need not have known all of the details of the illegal plan or all of the participants involved.  All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985).  Thus, to be successful in claiming a conspiracy to violate the plaintiff's constitutional rights, the plaintiff "must show that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiff[] of [his or her] constitutional rights [or federal statutory rights], and (3) an overt act was committed in furtherance of the conspiracy that caused the injury" to the plaintiff.  *Jackson*, 925 F.3d at 817 (internal quotation marks omitted); *see also Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).

"Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire; thus, circumstantial evidence may provide adequate proof of conspiracy." *Bazzi*, 658 F.3d at 606 (alterations adopted) (internal quotation marks omitted).  Also, "a jury is allowed to make reasonable inferences from facts proven in evidence having a reasonable tendency to sustain them."  *Jackson*, 925 F.3d at 814.  However, where "[o]nly vague and conclusory allegations unsupported by material facts are offered to suggest that" the defendant was

involved in the conspiracy, then summary judgment is appropriate for the defendant on that claim. *Bazzi*, 658 F.3d at 603 (finding, with respect to one alleged conspiracy, that "there is no evidence from which a reasonable jury could infer that [defendant] agreed to the general conspiratorial objective of violating [plaintiff's] constitutional rights through the issuance of the false police report," but finding, with respect to another alleged conspiracy, that "there are specific facts from which a jury could infer that [defendant] ultimately agreed to" the plan to stop plaintiff without a lawful basis).

The Sixth Circuit has held that "[p]roviding information to the police, responding to questions about a crime, and offering witness testimony at a criminal trial does not expose a private individual to liability for actions taken 'under color of law.'" *Moldowan*, 578 F.3d at 399; *see also Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir. 1983) ("The mere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under §§ 1983 or 1985") (cited with approval in *Moldowan*). "[A]s the Supreme Court has noted, it is 'the right and privilege' of individuals 'to aid in the execution of the laws of his country by giving information to the proper authorities of violations of those laws,' and that right 'may properly be said to be secured by the Constitution and laws of the United States.'" *Moldowan*, 578 F.3d at 373 (quoting *Motes v. United States*, 178 U.S. 458, 462-63, 20 S. Ct. 993, 44 L. Ed. 1150 (1900)). Additionally, "asking police to arrest someone" is not "enough to constitute a conspiracy between the private and state actors." *Dressler v. Rice*, 739 F. App'x 814, 823 n. 6 (6th Cir. 2018).

Here, Gillispie argues that a reasonable jury could conclude that Wolfe was jointly engaged with state officials such that Wolfe—as a private person—acted under color of law for purposes of § 1983. According to Gillispie, "Wolfe and Moore had a plan and singular

objective: to prosecute and convict Gillispie for the rapes."  (Doc. 239 at PAGEID # 7167.)  In support of that assertion, Gillispie states:  "Stemming from his dislike of Gillispie at GM, Wolfe's commitment to this objective began before Moore was ever assigned to the 8/20 Rapes, and continued, undeterred, even after his efforts to convince Fritz and Bailey to prosecute Gillispie failed, and even after Gillispie was arrested."  (*Id.*)  He then specifically points to seven allegations of "overt acts in furtherance of this objective."  (*Id.* at PAGEID # 7168.)

First, Gillispie points to evidence that Wolfe brought Gillispie's GM identification card to the Township's police department and had a meeting with, among others, Angel, Fritz, and Bailey where Wolfe suggested that Gillispie become a suspect in the 8/20 Rapes.  Second, Gillispie points to evidence that Wolfe would check in on the investigation, Wolfe would ask if the Township was going to do anything about Gillispie, and Fritz informed Wolfe that they were not going to be bringing charges against Gillispie and did not consider Gillispie to be a good suspect.  Third, Gillispie points to evidence that suggests Wolfe subsequently spoke with Moore on or about June 18, 1990—the date that Moore was assigned the investigation of the 8/20 Rapes and the date of Moore's first written report.  As shown in the quoted portions of that written report in the Background section (above at I.), Moore wrote that Wolfe had told him that Gillispie had recently been terminated from GM and that Wolfe brought Gillispie to the police department's attention as a potential suspect.

Fourth, Gillispie asserts that Wolfe obtained composite images from Moore, took them to GM, and "interview[ed] potential witnesses, including Robert Miller (who eventually testified at Gillispie's trials)."  (Doc. 239 at PAGEID # 7168.)  Gillispie's cited evidence supports that Wolfe obtained composite images from Moore and took them to GM.  Regarding Wolfe allegedly "interviewing potential witnesses," it is true that Moore's reports do not indicate that

Moore interviewed potential witnesses from GM. The evidence shows that, initially, one or two of Wolfe's subordinate employees at GM (Keith Stapleton and Robert Miller) had come to Wolfe and informed him that they felt a composite they had seen resembled Gillispie. (*See* Doc. 166-2 at PAGEID # 3103-06; Doc. 166 at PAGEID # 2909-11; Doc. 231-6 at PAGEID # 6486-89; Doc. 230-5 at PAGEID # 6106-25.) Wolfe then went to the Township's police department, where he asked for, and received, copies of two composites. (*Id.*) (According to Wolfe's testimony, he received them from Moore. (*Id.*)) Wolfe then showed the composites to one or both of the employees at GM who had initially come to him. (*Id.*) Wolfe testified that they came to the conclusion that the composites looked like Gillispie, which Wolfe reported to the Township officer in charge of the 8/20 Rapes investigation. (*Id.*) Apparently these discussions between Wolfe and his co-workers are the alleged "interview[s]" of potential witnesses by Wolfe. (Doc. 239 at PAGEID # 7168.)

Fifth, Gillispie asserts that Wolfe "us[ed] his police training to select and deliver several GM ID badges (including Gillispie's a second time) in an effort to create his own photographic line-up at MTPD even though Gillispie had been eliminated as a suspect." (Doc. 239 at PAGEID # 7168.) However, only a portion of this assertion is supported by Gillispie's cited evidence. The evidence shows that, after Wolfe and the other GM employees looked at the composites Wolfe received, Wolfe pulled the GM ID badges of Gillispie and a few other men and delivered them to the Township police department—acting, according to Wolfe's testimony, consistently with his prior training as a police department officer in selecting photos that he thought would be similar enough to Gillispie's photo in case the Township's police department wanted to use them for a lineup. (*See* Doc. 166 at PAGEID # 2912-14, 3004-05; Doc. 230-7 at

PAGEID # 6127.)  There is no indication that Wolfe was creating, or attempting to create, "his own photographic line-up at [the Township police department]."  (*Id.*)

Sixth, Gillispie points to evidence that Wolfe checked GM payroll records multiple times to examine Gillispie's work schedule, and ultimately delivered such records to the Township police department at Moore's request.  The evidence shows that Wolfe did so, at Moore's request, in order to determine whether Gillispie had been working on the days that the rapes had occurred.  (*See, e.g.,* Doc. 230-5 at PAGEID # 6107 ("Also checked for us by Security Manager Rick Wolfe was weather [sic] or not Roger D. Gillispie had been working the date of the offense. It was found that he did not work either 8/20/88 or 8/21/88."); *id.* at PAGEID # 6113 ("I [Moore] called Rick Wolfe with G.M. security.  The reason for this call was to find out if Roger Gillispie worked security on 08/05/90.").)

Seventh, Gillispie asserts that Wolfe "conduct[ed] his own 'investigation' of Gillispie at GM and twice report[ed] to Moore the false claim Gillispie committed sexual misconduct in Morehead, Kentucky."  (Doc. 239 at PAGEID # 7168.)  The evidence cited in support is Moore's written reports.  Those reports include the following:

> On 09/10/90 … Rick Wolfe of G.M. security called an [sic] advised LT. Williams that he was told that Gillispie may have spent time in jail in Morehead, Kentucky for harassment of females at the Morehead State University about 4 years ago.
>
> …
>
> On 09/15/90, I called the Morehead Police Dept. in Morehead, Kentucky. … I was told that they could find no records of Roger Gillispie having been arrested by there [sic] department. …  [Moore also checked with Morehead County Jail and the Morehead State University Police, but found no such records either.]
>
> On 09/19/90, I received a call from Rick Wolfe of General Motors Security.  I was told by Wolfe that his investigator named Bob was told by Roger Gillispie about 4 years ago that he had gotten in trouble in Morehead Kentucky for harassing females, that he was told not to come back to that area again and was arrested for something.  He states that the details are sketchy.  However Roger did tell Bob that he had gotten in trouble for the harassment of females. …  [Moore then checked

> with two local courts, but found no supporting records.  Moore then also had a
> dispatcher run computer checks for any criminal history for Gillispie in Kentucky
> and nationwide.]  The check was made and no criminal history background was
> found in Kentucky or nationwide.

(Doc. 230-5 at PAGEID # 6121-22.)  Wolfe's deposition testimony clarifies that the

"investigator named Bob" was Bob Burke—a GM employee who was the "investigations

manager" for GM and whose role was to perform investigations and serve as a liaison between

GM and law enforcement agencies.  (Doc. 166 at PAGEID # 2962-63, 2966.)  Thus, the

evidence supports that GM conducted an investigation into Gillispie's background (perhaps at

Wolfe's direction), Wolfe passed along to Moore information that Wolfe had been told, and

Moore conducted his own investigation of that information.

The Court finds that, even when assuming as true the evidence of the non-moving party

(Gillispie) and drawing reasonable inferences in his favor, Wolfe is entitled to summary

judgment on the § 1983 claims against him.  *Moldowan*, 578 F.3d at 399 (defendant private

citizen entitled to summary judgment on § 1983 claim alleging that she conspired to violate the

plaintiff's constitutional rights by fabricating evidence or withholding exculpatory evidence);

*Weser v. Goodson*, 965 F.3d 507, 516-17 (6th Cir. 2020) (affirming summary judgment for

defendant private citizen on § 1983 claim alleging violation of plaintiff's constitutional rights

through false arrest, false imprisonment, and malicious prosecution); *Dressler*, 739 F. App'x at

823.  There is no genuine issue of material fact regarding the existence of "an agreement

between" Wolfe and Moore "to injure [Gillispie] by unlawful action."  *Hooks*, 771 F.2d at 943-

44 (emphasis added).  There is no such evidence beyond speculation and conjecture.  *Moore*, 890

F.2d at 834 (affirming directed verdict for defendant private party on § 1983 claim because "no

jury could properly find that a conspiracy existed" where, although the plaintiff had presented

"some circumstantial evidence," there was no evidence beyond mere conjecture and speculation

86

that an agreement existed to deprive plaintiff of his constitutional rights, thus precluding a finding of a conspiracy); *compare Bazzi*, 658 F.3d at 606 (sufficient circumstantial evidence for limited conspiracy to conduct traffic stop without reasonable suspicion or probable cause); *Jackson*, 925 F.3d at 814-15, 817-18 (prior to holding that the intracorporate conspiracy doctrine barred the claim, evidence supported a reasonable jury finding that the defendants agreed to draft a false statement and coerce a witness into signing that statement). In terms of the elements set forth in *Jackson*, there is a dearth of support for finding that Wolfe and Moore "shared a conspiratorial objective to deprive [Gillispie] of [his] constitutional rights"—even after assuming Gillispie's evidence as true and drawing reasonable inferences in his favor. *Jackson*, 925 F.3d at 817.

A reasonable jury would not be able to find that this is a circumstance where "a private party has conspired with state officials <u>to violate constitutional rights</u>." *Cooper*, 203 F.3d at 952 n.2 (emphasis added). More specifically, a reasonable jury would not be able to find that Wolfe agreed with Moore to prosecute and convict Gillispie for the rapes <u>by way of violating Gillispie's constitutional rights</u>. *Bazzi*, 658 F.3d at 603 (finding that "there is no evidence from which a reasonable jury could infer that [defendant] agreed to the general conspiratorial objective of violating [plaintiff's] constitutional rights through the issuance of the false police report"). Again, the alleged constitutional violations here include suppression of exculpatory material (Count 1), suggestive identification (Count 2), fabricated evidence (Count 3), malicious prosecution (Count 4), and destruction of exculpatory evidence (Count 5). The "web of inferences is too weak on the alleged facts to permit" finding such an agreement. *Id.*

All in all, the evidence would support that: Wolfe disliked Gillispie and there was tension and animosity between them; Wolfe believed that Gillispie likely committed the rapes;

87

Wolfe wanted the police—with whom he had connections—to consider Gillispie as a suspect and thoroughly investigate him, even after Fritz and Bailey informed him that they had eliminated Gillispie as a suspect; Wolfe was eager to help the police in their investigation; Wolfe provided information to the police (including at their request); Wolfe provided GM ID badges of Gillispie and a few other men to the Township's police department; Wolfe presumably wanted Gillispie to be arrested, prosecuted, and convicted; and Wolfe testified at Gillispie's criminal trials. However, that would not expose Wolfe, as a private individual, to liability under § 1983. *Moldowan*, 578 F.3d at 399 ("[p]roviding information to the police, responding to questions about a crime, and offering witness testimony at a criminal trial does not expose a private individual to liability for actions taken 'under color of law'"); *Motes*, 178 U.S. at 462-63; *Moore*, 890 F.2d at 832, 834-35 (affirming directed verdict for defendant private citizen on § 1983 claim despite evidence of conflict between plaintiff and the private citizen and the private citizen having an established relationship with municipality officials); *Dressler*, 739 F. App'x at 823 (after plaintiff had been found not guilty at his criminal trial, affirming summary judgment for defendant private party on § 1983 claim involving alleged conspiracy where the private party had called the police for assistance in removing plaintiff from premises, provided information to officers about plaintiff's conduct, and told officers that he wanted plaintiff arrested); *Weser*, 965 F.3d at 516-17 (affirming summary judgment on § 1983 claim of false arrest, false imprisonment, and malicious prosecution under conspiracy theory because, "[e]ven if [defendant private citizen] lied in her statements about [plaintiff], that would not show that her conduct was fairly attributable to the state or that she was participating in a joint action with state agents"); *Lockhead v. Weinstein*, 24 F. App'x 805, 806-07 (9th Cir. 2001) (affirming summary judgment for defendant private party on § 1983 claim for conspiracy to falsely arrest and prosecute

plaintiff—who was acquitted of the charges stemming from private party's complaint—where the private party furnished information about incident, urged plaintiff's arrest, and knew the city attorney and local law enforcement); *see also Conz v. Lady*, No. 1:98-cv-52, 2000 U.S. Dist. LEXIS 22137, at *29-31 (W.D. Mich. Jan. 25, 2000) (finding a lack of evidence of an agreement between the defendant private citizens and a detective, despite the private citizens providing information to the detective that was arguably false and that was included in police reports), *report and recommendation adopted by* 2000 U.S. Dist. LEXIS 22138 (W.D. Mich. Feb. 29, 2000). Therefore, Wolfe's motion for summary judgment on Counts 1, 2, 3, 4, and 5 is granted.

### B. Count 6 Against Wolfe

In his sixth claim, a claim for malicious prosecution under Ohio state law, Gillispie alleges that Moore (and others), acting in conspiracy with Wolfe (and others), instigated and continued the prosecution of Gillispie without probable cause and acted out of malice, resulting in Gillispie being falsely convicted for a crime of which he was innocent. (Doc. 18 at PAGEID # 99.) Wolfe argues that he is entitled to summary judgment on the claim for three separate reasons: because Gillispie cannot prove that Wolfe played any role in the decision to prosecute him, or that Gillispie was prosecuted without probable cause, or that the prosecution was terminated in Gillispie's favor.

As an initial matter, Gillispie argues that Wolfe's (alleged) conspiracy with Moore precludes summary judgment on Gillispie's claims under Ohio state law. (Doc. 239 at PAGEID # 7173.) However, there is no genuine issue of material fact regarding the (non-)existence of a conspiracy between Wolfe and Moore under Ohio law, for the same reasons as set forth above concerning his § 1983 federal law claims against Wolfe. *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868, 83 Ohio St. 3d 464 (Ohio 1998) ("[t]he tort of civil conspiracy is a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages") (internal quotation marks omitted); *Halberstam v. Welch*, 705

F.2d 472, 477 (D.C. Cir. 1983) (cited in *Williams* as setting forth the elements of civil conspiracy, and stating that "[a] list of the separate elements of civil conspiracy includes: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme"); *see also Kerr v. Hurd*, 694 F. Supp. 2d 817, 833 (S.D. Ohio 2010) (under Ohio law, "the agreement must be to do a wrongful act"). Therefore, a conspiracy theory of liability for Wolfe is likewise precluded for Gillispie's state law claims against Wolfe.

Under Ohio law, the elements of a malicious criminal prosecution claim are: (1) malice in instituting or continuing the prosecution; (2) lack of probable cause; and (3) termination of the prosecution in favor of the accused. *Trussell v. Gen. Motors Corp.*, 559 N.E.2d 732, 735, 53 Ohio St. 3d 142 (Ohio 1990). Thus, the requirements are different from a malicious prosecution claim under § 1983 (such as Count 4 in Gillispie's amended complaint) set forth above in Section IV. D. Also, as shown below, the elements that are facially similar under both federal and Ohio state law are not necessarily interpreted in the same way. "Suits for malicious prosecution are not favored by Ohio courts." *Skarbinski v. Henry H. Krause Co.*, 378 F.2d 656, 658 (6th Cir. 1967).

Regarding the third element, the Ohio Supreme Court held that "[a] proceeding is terminated in favor of the accused only when its final disposition indicates that the accused is innocent." *Ash v. Ash*, 651 N.E.2d 945, 947, 72 Ohio St. 3d 520 (Ohio 1995); *see also* RESTATEMENT (SECOND) OF TORTS § 658 (Am. Law Inst. 1977) ("To subject a person to liability for malicious prosecution, the criminal proceedings must have terminated in favor of the accused"); *id.* at § 660 cmt. a ("Proceedings are 'terminated in favor of the accused,' as that phrase is used … throughout this Topic [including in § 658], only when their final disposition is such as

to indicate the innocence of the accused") (relied upon in *Ash*); *Day v. DeLong*, 358 F. Supp. 3d 687, 707 (S.D. Ohio 2019) ("Because no aspect of the dismissal established that Plaintiff was innocent, the proceedings were not terminated in his favor, as required to state a claim for malicious prosecution" under Ohio state law).

Here, Gillispie's criminal proceedings did not end in a "final disposition indicat[ing] that the accused [i.e., Gillispie] is innocent." *Ash*, 651 N.E.2d at 522.  They also did not end because of prosecutorial abandonment.  *Id.*  Instead, as set forth above, Gillispie filed a motion in the Ohio trial court to compel discovery of the (alleged) supplemental police reports created by Bailey and Fritz or to dismiss the indictment with prejudice (Doc. 230-2).  *See Gillispie*, 65 N.E.3d at 797. The State told the Ohio trial court that it could not produce the supplemental reports.  *Id.* at 808. The Ohio trial court granted Gillispie's motion to dismiss the indictment due to the State not having provided the supplemental reports to Gillispie (Doc. 230-3).  *Id.* at 798, 800.

Gillispie does not argue otherwise.  In fact, Gillispie even acknowledged at his deposition that no order from any court has declared him innocent of the crimes with which he was charged. (Doc. 168 at PAGEID # 3230.)  While the Court understands that Gillispie maintains that he is innocent of the 8/20 Rapes, that does not satisfy the third element of his malicious prosecution claim under Ohio law.[35]  As in *Day*, no aspect of the Ohio trial court's dismissal established that he actually is innocent.  *Day*, 358 F. Supp. 3d at 707 (criminal charges against plaintiff had been

---

[35] In *Ash*, the Ohio Supreme Court explained that, in that case, the plaintiffs' decision to enter into a compromise with the prosecutor in the earlier criminal proceedings "avoid[ed] a determination on the merits and le[ft] open the question of the accused's guilt or innocence."  *Ash*, 651 N.E.2d at 949.  The court further explained that, "[a]lthough the plaintiffs may not have been aware of the legal effect of their agreements of compromise, the legal effect exists nonetheless and bars their malicious prosecution actions."  *Id.*  The same is true here.  Gillispie's decision to move to dismiss the indictment for the State's failure to produce the (alleged) supplemental reports to Gillispie, and the Ohio trial court's decision to grant the motion on that basis, avoided a determination on the merits.  In line with *Ash*, although Gillispie may not have been aware that his strategic procedural decision in his criminal proceedings would prevent him from later bringing an Ohio state law claim for malicious prosecution, the legal effect exists nonetheless.

dismissed based on compliance with his speedy trial rights). None of Gillispie's cited cases show

otherwise. *See, e.g., Wheatt*, 2017 U.S. Dist. LEXIS 186224, at *45-46 (never analyzing the third

element of the malicious prosecution claim, but instead finding a genuine dispute of material fact

on the issue of probable cause (i.e., the claim's second element)); *Ayers*, 2013 U.S. Dist. LEXIS

25992, at *45-46 (simply relying on its analysis of plaintiff's § 1983 federal malicious prosecution

claim for purposes of determining whether third element of plaintiff's separate claim for malicious

prosecution under Ohio law had been met; failing to analyze whether the criminal proceeding's

final disposition indicated that the accused is innocent). And, while Gillispie argues that, "[a]t

absolute minimum, there is a dispute issue of material fact here," he fails to identify any such

issue—at least with respect to the claim's third element—and the Court finds none. *Ash*, 651

N.E.2d at 947-48 ("it is the function of the court and not the jury to determine whether the criminal

proceedings were terminated in favor of the plaintiff[]").

Therefore, as a matter of law, Gillispie cannot establish the third element of his claim

against Wolfe for malicious prosecution under Ohio state law. *Ash*, 651 N.E.2d at 947-48; *Day*,

358 F. Supp. 3d at 707. The Court need not address the parties' arguments concerning the claim's

other elements. Wolfe is entitled to summary judgment on Count 6.

### C. Count 7 Against Wolfe

In his seventh claim, a claim for intentional infliction of emotional distress under Ohio

state law, Gillispie alleges Wolfe (acting individually and in conspiracy with others) intentionally

and/or recklessly engaged in extreme and outrageous conduct that caused him severe emotional

distress and also bodily harm from his distress.[36] (Doc. 18 at PAGEID # 99-100.) Gillispie argues

---

[36] As mentioned above in Section VI. B. concerning Count 6, the Court finds that a conspiracy theory of liability for Wolfe is precluded for Gillispie's state law claims against Wolfe. *Williams*, 700 N.E.2d at 868; *Halberstam*, 705 F.2d at 477; *Kerr*, 694 F. Supp. 2d at 833.

that the Court should find that Wolfe may be held liable for (allegedly) seeking Gillispie's wrongful conviction. In response, Wolfe argues that he is entitled to summary judgment on the claim because there is no evidence that he ever acted with an intention to cause Gillispie any emotional distress or because there is no evidence that Wolfe's actions were extreme or outrageous.

Under Ohio law, the elements of a claim for intentional infliction of emotional distress ("IIED") are: (1) the defendant intended to cause emotional distress or knew or should have known that his conduct would result in serious emotional distress to the plaintiff; (2) defendant's conduct was outrageous and extreme and beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) defendant's conduct was the proximate cause of plaintiff's psychic injury; and (4) plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1110 (6th Cir. 2008) (citing *Ekunsumi v. Cincinnati Restoration, Inc.*, 698 N.E.2d 503 (Ohio Ct. App. 1997) and *Yeager v. Local Union 20*, 453 N.E.2d 666, 6 Ohio St. 3d 369 (Ohio 1983), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051, 1054-55, 113 Ohio St. 3d 464 (Ohio 2007)).[37]

Regarding the second element, "to say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement." *Baab v. AMR Servs. Corp.*, 811 F. Supp. 1246, 1269 (N.D. Ohio 1993). The Ohio Supreme Court explained:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme

---

[37] Although *Yeager* was abrogated in part by *Welling*, it did not do so regarding anything concerning intentional infliction of emotional distress claims, but instead did so regarding whether Ohio would recognize the tort of false-light invasion of privacy. *Welling*, 866 N.E.2d at 1054-55, 1059.

in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Yeager*, 453 N.E.2d at 671 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (Am. Law Inst. 1965)); *see also Tuleta v. Med. Mut. of Ohio*, 6 N.E.3d 106, 118, 2014-Ohio-396 (Ohio Ct. App. 2014) ("Only the most extreme wrongs, which do gross violence to the norms of a civilized society, will rise to the level of outrageous conduct") (internal quotation marks omitted).

A legally sanctioned act cannot give rise to the tort of IIED. *Scott v. Spearman*, 684 N.E.2d 708, 712 (Ohio Ct. App. 1996). Although a person's conduct might otherwise be extreme and outrageous, that person cannot be liable for IIED "where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." *Foster v. McDevitt*, 511 N.E.2d 403, 406 (Ohio Ct. App. 1986) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. g (Am. Law Inst. 1965)). Again, the U.S. Supreme Court has noted that "it is 'the right and privilege' of individuals 'to aid in the execution of the laws of his country by giving information to the proper authorities of violations of those laws.'" *Moldowan*, 578 F.3d at 373 (quoting *Motes*, 178 U.S. at 462-63). Additionally, the Ohio Supreme Court has recognized that the State has an interest in encouraging citizens to report criminal activity and aid in the proper investigation of criminal activity. *M.J. DiCorpo, Inc. v. Sweeney*, 634 N.E.2d 203, 209, 69 Ohio St. 3d 497 (Ohio 1994) (extending doctrine of absolute privilege for statements made in judicial proceedings to an affidavit or statement submitted to a prosecutor for purposes of reporting the commission of a crime). Thus, properly reporting suspected criminal activity, giving information to the police regarding suspected violations of the law, and testifying in judicial proceedings do not support an IIED claim. *Scott*, 684 N.E.2d at 712; *Foster*, 511 N.E.2d at 406; *Motes*, 178 U.S. at 462-63; *M.J. DiCorpo*, 634 N.E.2d at 209.

However, on the other hand, knowingly making a false report of criminal activity,

knowingly giving false information to the police, and committing perjury are not protected actions and may support a viable IIED claim. *See, e.g., Ayers*, 2013 U.S. Dist. LEXIS 25992, at *8, 27, 46-50 (denying motion for summary judgment on IIED claim where plaintiff presented evidence that defendant housing authority officer lied to detectives, and that lie led to the decision to prosecute the plaintiff; finding that, "[a]rguably, these defendants misrepresented key facts, as well as potentially coerced witnesses to utter falsehoods under oath"); *LeFever v. Ferguson*, Nos. 2:11-cv-935, 2:12-cv-664, 2013 U.S. Dist. LEXIS 98344, at *2-3, 2013 WL 3742530 (S.D. Ohio July 15, 2013), *rev'd in part on other grounds*, 567 F. App'x 426 (6th Cir. 2014) (denying motion for summary judgment on IIED claim where criminal court had vacated plaintiff's murder conviction on the basis that defendant forensic toxicologist who examined the victim's body had lied at the trial; finding that plaintiff "has established a genuine issue of material fact with respect to whether [defendant] fabricated key scientific evidence that led to her conviction"); *see also O'Donnell v. Yezzo*, No. 3:17CV2657, 2018 U.S. Dist. LEXIS 199651, at *25-29, 2018 WL 6169283 (N.D. Ohio Nov. 26, 2018) (addressing proximate cause element of IIED claim, and denying <u>motion to dismiss</u> IIED claim where plaintiff—whose conviction for murdering his wife had been vacated— alleged that defendant detective "conducted a wholly flawed investigation, including altering decade-old evidence and discarding evidence bags," engaged with a forensic scientist with a "reputation for misconstruing test results," and allowed that forensic scientist to test the wrong evidence and produce false reports); *c.f. Bazzi*, 658 F.3d at 601 (involving testimony by detective that he and a private citizen wrote a false police report together); *Bazzi v. City of Dearborn*, No. 09-CV-10114, 2012 U.S. Dist. LEXIS 207109, at *3 n.3 (E.D. Mich. Jan. 26, 2012) (private citizen likewise testified that he and detective concocted a story about plaintiff and wrote a false police report about the invented incident). Yet, here, Gillispie has not identified evidence that would

support Wolfe has done any of those things (beyond mere speculation and conjecture) or would otherwise establish a genuine issue of material fact precluding summary judgment on the IIED claim against Wolfe.[38]

As explained above in the Court's analysis of Gillispie's § 1983 claims against Wolfe, assuming Gillispie's evidence as true and drawing reasonable inferences in his favor, Gillispie could show that:  Wolfe disliked Gillispie and there was tension and animosity between them; Wolfe believed that Gillispie likely committed the rapes; Wolfe wanted the police—with whom he had connections—to consider Gillispie as a suspect and thoroughly investigate him, even after Fritz and Bailey informed him that they had eliminated Gillispie as a suspect; Wolfe was eager to help the police in their investigation; Wolfe provided information to the police (including at their request); Wolfe provided GM ID badges of Gillispie and a few other men to the Township's police department; Wolfe presumably wanted Gillispie to be arrested, prosecuted, and convicted; and Wolfe testified at Gillispie's criminal trials.  However, this and the rest of Gillispie's evidence is still insufficient for a reasonable jury to find for Gillispie on the second element of his claim under Ohio law:  that Wolfe's conduct was "outrageous and extreme and beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community." *Talley*, 542 F.3d at 1110 (affirming summary judgment for defendant where, even when viewing the evidence in the light most favorable to the plaintiff, the alleged conduct did "not constitute the sort of extremely atrocious and outrageous behavior that is utterly intolerable in a civilized community") (internal quotation marks omitted); *see also Yeager*, 453 N.E.2d at 671; *Roe v. Heap*,

---

[38] Beyond that being true with respect to Gillispie's assertion that Wolfe "conduct[ed] his own 'investigation' of Gillispie at GM and twice report[ed] to Moore the false claim Gillispie committed sexual misconduct in Morehead, Kentucky" (Doc. 239 at PAGEID # 7168) as shown above, Gillispie also does not point to any evidence showing the information Wolfe passed along regarding alleged conduct in Morehead, Kentucky was ever brought up during any of Gillispie's trials, used by the prosecution, or even factored into any decision to arrest and/or prosecute Gillispie.

No. 03AP-586, 2004 Ohio App. LEXIS 2093, at *78-80, 2004 WL 1109849, 2004-Ohio-2504 (Ohio Ct. App. 2004) (affirming summary judgment on IIED claim where male juvenile was falsely accused of being a convicted sex offender by parents of other diving team members); *Treinen v. Vill. of Greenhills*, No. 1:05-cv-448, 2006 U.S. Dist. LEXIS 44340, at *20-21, 2006 WL 1805941 (S.D. Ohio June 29, 2006) (granting officer's motion for judgment on the pleadings regarding IIED claim because the allegations did not rise to the level of extreme and outrageous conduct required, despite allegations that the officer "acted wrongfully by arresting [plaintiff] without probable cause" and the officer "inquired about [plaintiff's] medical condition").

The Ohio Supreme Court has held that even if Wolfe acted with bad intent and wanted to inflict emotional distress on Gillispie, that is insufficient to support an IIED claim. *Yeager*, 453 N.E.2d at 671. And, to the extent that Wolfe's conduct is not specifically sanctioned conduct (e.g., properly giving information to the police regarding suspected violations of the law and testifying in judicial proceedings), the Court finds that it simply does not rise to the level necessary to support an IIED claim. *See Hanly v. Riverside Methodist Hosps.*, 603 N.E.2d 1126, 1132, 78 Ohio App. 3d 73 (Ohio Ct. App. 1991) ("to the extent that defendant's conduct … was not merely an exercise of defendant's legal rights, such conduct was not so extreme and outrageous to support a claim for intentional infliction of emotional distress").

Therefore, as a matter of law, Gillispie cannot establish the second element of his claim against Wolfe for intentional infliction of emotional distress under Ohio state law. *Talley*, 542 F.3d at 1110; *Yeager*, 453 N.E.2d at 671. The Court need not address the parties' arguments concerning the claim's other elements. Wolfe is entitled to summary judgment on Count 7.

### D. Count 8 Against Wolfe

Although Wolfe asks for summary judgment on Count 8 ("Spoliation of Evidence under Ohio State Law"), the Court previously found that "Gillispie does not allege that Wolfe is liable

for spoliation of evidence under Ohio law." (Doc. 217 at PAGEID # 4194 (citing Doc. 191 at PAGEID # 4055; Doc. 18 at PAGEID # 100).)

**E. Count 9 Against Wolfe**

Finally, as with Moore, although Wolfe asks for summary judgment on Count 9 ("Ohio State Law – Indemnification"), a review of the Amended Complaint shows that Count 9 is not brought against Wolfe. (Doc. 18 at PAGEID # 101.)

## VII. CONCLUSION

For the reasons stated above, the Court:

A. **DENIES** Gillispie's Motion to Strike New Summary Judgment Materials Filed for the First Time in Reply (Doc. 284);

B. **DENIES** Moore's Motion for Summary Judgment (Doc. 257) with respect to Counts 1, 2, 3, 4, and 5 of the Amended Complaint (Doc. 18);

C. **GRANTS** Moore's Motion for Summary Judgment (Doc. 257) with respect to Counts 6, 7, and 8, and **DISMISSES** Counts 6, 7, and 8 of the Amended Complaint (Doc. 18) against Moore;

D. **DENIES** Moore's Motion for Summary Judgment (Doc. 257) with respect to Count 9 of the Amended Complaint (Doc. 18) because that claim is not brought against Moore;

E. **GRANTS** the Township's Motion for Summary Judgment (Doc. 260) with respect to Counts 1, 2, 3, 4, and 5 of the Amended Complaint (Doc. 18);

F. **GRANTS** the Township's Motion for Summary Judgment (Doc. 260) with respect to Counts 6, 7, and 8, and **DISMISSES** Counts 6, 7, and 8 of the Amended Complaint (Doc. 18) against the Township;

G. **DISMISSES, WITHOUT PREJUDICE,** Count 9 of the Amended Complaint

98

(Doc. 18);

H. **DENIES** the Township's Motion for Summary Judgment (Doc. 260) with respect to Count 9 of the Amended Complaint (Doc. 18);

I. **GRANTS** Wolfe's Motion for Summary Judgment (Doc. 171) with respect to Counts 1, 2, 3, 4, and 5 of the Amended Complaint (Doc. 18);

J. **GRANTS** Wolfe's Motion for Summary Judgment (Doc. 171) with respect to Counts 6 and 7 of the Amended Complaint (Doc. 18); and,

K. **DENIES** Wolfe's Motion for Summary Judgment (Doc. 171) with respect to Counts 8 and 9 of the Amended Complaint (Doc. 18) because those claims are not brought against Wolfe.

Finally, the Court will contact the parties to schedule a call for purposes of setting a final pre-trial and trial schedule. As the parties are aware, the Court previously vacated the dates on the case schedule and stated that, if appropriate after ruling on the motions for summary judgment, the Court will issue a new case schedule—including a new trial date.[39] (Doc. 285.)

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, September 21, 2020.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

---

[39] While the motions addressed in this Order were pending, Magistrate Judge Sharon Ovington ruled on Plaintiff's Motion for Leave to Disclose Additional Expert Report (Doc. 283). (*See* Doc. 294.) Magistrate Judge Ovington's Order references that, "because Dr. Miller [the expert at issue in that motion] is a damages witness, his testimony was not integral to any issue related to liability which was briefed at summary judgment." (*Id.* at PAGEID # 10824.) Magistrate Judge Ovington granted that motion and ruled that "[t]he deadline for discovery related to Dr. Miller's report and any rebuttal expert witness is extended to May 27, 2020." (*Id.* at PAGEID # 10826.)