**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| ROGER DEAN GILLISPIE, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:13-cv-416 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| THE CITY OF MIAMI TOWNSHIP, *et al.*, | : | |
| | : | |
| Defendants. | : | |

---

**ENTRY AND ORDER DENYING INTERVENOR MIAMI TOWNSHIP BOARD
OF TRUSTEES' MOTION FOR JUDGMENT AS A MATTER OF LAW AND,
IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL (DOC. NO. 481);
DENYING INTERVENOR MIAMI TOWNSHIP BOARD OF TRUSTEES'
MOTION TO ALTER OR AMEND JUDGMENT (DOC. NO. 482); AND
DENYING DEFENDANT MATTHEW SCOTT MOORE'S MOTION TO
ALTER OR AMEND THE JUDGMENT (DOC. NO. 485)**

---

Presently before the Court are three motions: (1) a motion for judgment as a matter of law and, in the alternative, for a new trial, filed by Intervenor Miami Township Board of Trustees ("Intervenor") (Doc. No. 481); (2) a motion to alter or amend the judgment, filed by the Intervenor (Doc. No. 482); and (3) a motion to alter or amend judgment, filed by Defendant Matthew Scott Moore ("Moore" or "Defendant") (Doc. No. 485). Given their overlapping background, issues, and briefing, the Court decides all three motions in this single order. The three motions are post-trial motions relating to a trial that took place between November 7 and November 21, 2022.

For the reasons discussed below, the Court **DENIES** the Intervenor's Motion for Judgment as a Matter of Law and, in the Alternative, Motion for a New Trial (Doc. No. 481); **DENIES** the Intervenor's Motion to Alter or Amend Judgment (Doc. No. 482); and **DENIES** Moore's Motion to Alter or Amend the Judgment (Doc. No. 485).

1

## I.     BACKGROUND

This section provides only some of the very lengthy background for this case, which has been pending for nearly a decade.  For additional background see, for example, Document Numbers 298, 322, and 379.

### A.  Case Commencement and Motions for Summary Judgment

Plaintiff Roger Dean Gillispie ("Gillispie" or "Plaintiff") commenced this case on December 13, 2013.  (Doc. No. 1.)  Shortly thereafter, he filed his First Amended Complaint (the "Complaint"), which remains the operative complaint for his claims.  (Doc. No. 18.)  In the Complaint, Gillispie brought several claims against numerous defendants.   Among those defendants was Miami Township, Ohio ("Miami Township"), erroneously designated in the Complaint as the City of Miami Township.  (Doc. No. 18; Doc. No. 36.)  Miami Township operates the Miami Township Police Department.  (Doc. No. 397 at PageID 13758; Doc. No. 451 at PageID 15429.)

As a broad overview of Gillispie's claims, he alleged that Defendant Moore—who was a police detective for the Miami Township Police Department at the relevant times—engaged in various acts of police misconduct that "framed [Gillispie] for a series of sexual assaults that he did not commit," resulting in Gillispie being "deprived of his right to a fair trial," "wrongfully convict[ed]," and spending "over 20 years incarcerated as an innocent man."  (Doc. No. 18 at PageID 77, 94-96, 98.)

Regarding the underlying circumstances of the crimes for which Gillispie was convicted, as well as Gillispie's criminal trials, incarceration, and certain subsequent court proceedings, the following facts were uncontroverted at trial and included as stipulations of fact in the jury instructions:

On August 20, 1988, two twin sisters, B.W. and C.W. were sexually assaulted after

2

being abducted at gunpoint by a stranger in the parking lot of the Best Products Store in Dayton, Ohio. … After seeing news about the Best Products assaults, another woman, S.C., reported being assaulted on August 5, 1988 in a similar manner in a store parking lot in Montgomery County. …

On September 5, 1990, Gillispie was arrested and then prosecuted for the Best Products crimes and those related to S.C. Gillispie was convicted at a criminal trial in February 1991 and then granted a new trial. Gillispie was convicted again in June of 1991 for the Best Products crimes involving B.W. and C.W. as well as crimes against S.C. Gillispie was confined for approximately two weeks after his arrest and on bond until his first trial in February 1991. Gillispie was continuously incarcerated between February 5, 1991 and December 22, 2011.

Gillispie was released following a federal court's order to vacate the convictions and requiring a new trial on the basis of the claim that exculpatory evidence was not produced to Gillispie during the criminal prosecution. In 2012, a separate Ohio court vacated Gillispie's conviction and ordered a new trial due to the existence of new evidence about an alternative suspect. Following an order by a judge in the Montgomery County Court of Common Pleas, which became final on July 26, 2017, the charges against Gillispie were dismissed with prejudice. On November 19, 2021, Gillispie was declared to be a wrongfully imprisoned individual pursuant to Ohio law by a judge in the Montgomery County Court of Common [P]leas.

(Doc. No. 405 at PageID 13873-74; Doc. No. 472 at PageID 15537.)

On September 16, 2019, Miami Township moved for summary judgment on all claims against it. (Doc. No. 260.) On September 21, 2020, the Court issued an order ruling on Miami Township's motion for summary judgment and on several other motions. (Doc. No. 298.) In that order, the Court granted summary judgment to Miami Township on eight of the nine counts and dismissed the remaining count without prejudice. (*Id.* at PageID 10932-33.) The Court's ruling was based on the legal standards for determining a motion for summary judgment, the claims at issue, the evidence presented to the Court at the time (which obviously did not include the evidence presented more than two years later at the trial), and the arguments made to the Court at the time. (Doc. No. 298.)

Ultimately, based on that summary judgment order and the unopposed dismissal of some defendants (*see, e.g.,* Doc. No. 302), this case proceeded to trial against only one defendant

3

(Moore) on five claims—all of which were claims brought pursuant to 42 U.S.C. § 1983 ("Section 1983").  (*See* Doc. No. 18; Doc. No. 298; Doc. No. 392 at PageID 13687.)  Gillispie titled those claims in his Complaint:  Suppression of Exculpatory Material; Suggestive Identification; Fabricated Evidence; Malicious Prosecution; and Destruction of Exculpatory Evidence.  (Doc. No. 18 at PageID 94-97.)  In those claims, Gillispie alleged that he "suffered actual damages, pain and suffering, lost wages, and other damages as a direct and proximate result" of each of the alleged Section 1983 violations.  (*Id.* at PageID 94-98.)

### B.  <u>The Intervenor's Intervention in this Case</u>

Political subdivisions in Ohio, such as Miami Township, sometimes have a duty to defend and/or a duty to indemnify their employees.  (Doc. No. 397 at PageID 13761; Doc. No. 451 at PageID 15429.)  The state statute Ohio Rev. Code § 2744.07 sets forth circumstances when a political subdivision has a duty to defend one of its employees and when a political subdivision has a duty to indemnify one of its employees.

On September 23, 2022, "former Defendant Miami Township … (previously erroneously designated as The City of Miami Township)" filed a motion to intervene in this case (the "Motion to Intervene").[1]  (Doc. No. 370.)  In the Motion to Intervene, the Intervenor explained that it was moving to intervene "for limited participation in the trial of this matter."  (Doc. No. 370 at PageID 12694.)  The Intervenor clarified that it was seeking to intervene "for the limited purpose of questioning, argument, and submission of proposed jury instructions and interrogatories on the discreet issues of lack of good faith and scope of employment consistent with [Ohio Rev. Code §]

---

[1] The Intervenor filed its Motion to Intervene less than three weeks before the Final Pretrial Conference and 45 days prior to the scheduled start of trial.  (Doc. No. 322 at PageID 11349.)  However, in its Motion to Intervene, the Intervenor explained that, "[u]ntil 2020 [when the Court granted its motion for summary judgment], [it] actively participated in all phases of litigation, including discovery" and it "had limited participation in follow up depositions conducted in 2022, as well as the proceedings in the state court involving the disclosure of grand jury testimony." (Doc. No. 370 at PageID 12699.)

2744.07." (*Id.* at PageID 12697; *see also id.* at PageID 12706 (the Intervenor "requests intervention only for the limited purpose of submitting jury instructions interrogatories and participation at trial related to the factual issue[s] that go to a claim for indemnity of Moore").) It specified in its reply brief that it was "not seeking to be a participant in all aspects of the trial." (Doc. No. 381 at PageID 12824.) The Intervenor argued that allowing it to intervene would enhance judicial economy, it had "common claims and defenses that shared with the main action a common question of law or fact," and allowing it to intervene would "not prejudice any other party or delay the proceedings." (Doc. No. 370 at PageID 12704, 12706.)

On October 11, 2022, the Court granted the Motion to Intervene. (Doc. No. 392.) Without addressing the Intervenor's arguments for intervention pursuant to Federal Rule of Civil Procedure 24(a)(2), the Court found that the Intervenor "should be permitted to intervene pursuant to Federal Rule of Civil Procedure 24(b)." (Doc. No. 392 at PageID 13689.) The Court's order also provided clarification regarding limitations on the Intervenor's participation pre-trial and at the trial. (*Id.* at PageID 13693-94.) Those limitations corresponded with the Intervenor's own requested scope of intervention. (Doc. No. 392 at PageID 13693-94.) Specifically, the Court allowed the Intervenor to intervene at trial for the purpose of questioning, argument, and submitting proposed jury instructions and interrogatories on the discrete issues of lack of good faith and scope of employment consistent with Ohio Rev. Code § 2744.07. (*Id.*)

On October 13, 2022, the Intervenor filed its Intervenor Complaint for Declaratory Judgment and Relief (the "Intervenor Complaint"). (Doc. No. 397.) The Intervenor Complaint contains a single count, which seeks a declaration by this Court that it has no duty to defend or indemnify Moore for claims made against him in the underlying action, pursuant to Ohio Revised Code § 2744.07. (*Id.* at PageID 13763.) The Intervenor Complaint alleges that "[t]he alleged acts

and/or omissions which serve as the basis for the claims against Matthew Scott Moore in the Underlying Action, if proven, were not taken in good faith" and also "were not taken by Matthew Scott Moore in the scope of his employment or official responsibilities," so "[a]ccordingly, pursuant to [Ohio Rev. Code §] 2744.07, the [Intervenor] seeks a declaration by this Court that it has no duty to defend or indemnify Matthew Scott Moore for claims made against him in the Underlying Action." (*Id.* at PageID 13763.)

After the Court denied Moore's motion to dismiss the Intervenor Complaint, Moore filed an Answer to the Intervenor Complaint on November 4, 2022. (Doc. No. 451.) Neither the Intervenor Complaint nor the Answer to the Intervenor Complaint included a jury demand. (Doc. No. 397; Doc. No. 451.)

### C. **Pre-Trial and Trial**

Prior to trial, the parties filed a host of motions in limine. (*See* Doc. Nos. 324, 325, 326, 327, 335, 336, 337, 338, 339, 340, 341, 342, 343, 375.) Topics addressed in those motions included, for example: expert testimony; articles relating to Gillispie's incarceration; testimony regarding the state court's determination that Gillispie was wrongfully imprisoned pursuant to Ohio Rev. Code § 2743.48; certain testimony from lay witnesses; reference to whether Moore would be able to pay for a damages award and to the jurors' interests as taxpayers; affirmative defenses; and rulings by the trial court in the underlying criminal cases. (*Id.*) The Court ruled on those motions prior to trial. (Doc. Nos. 379, 393, 407, 428, 445.) Additionally, the Final Pretrial Order contained various uncontroverted facts established by admissions in the pleadings or by stipulations of counsel. (Doc. No. 405 at PageID 13873-74.)

The parties also filed a host of proposed jury instructions, both prior to the trial and during the trial. (Doc. No. 399, 403, 404, 411, 413, 420, 439, 440, 441, 470.) The Intervenor submitted proposed jury instructions and interrogatories, which included instructions on "actions or

omissions not in good faith" and on "scope of employment" and three questions for the jury to answer regarding whether Moore's acts or omissions occurred while he was acting in good faith and within the scope of his employment or official duties with Miami Township. (Doc. No. 399.)

Trial began on November 7, 2022. (Doc. No. 455.) The parties questioned the prospective jurors during the *voir dire* process, and a jury was selected that same day. (*Id.*) The trial included several full days of evidence, which included testimony from 21 witnesses (plus one witness's testimony through a prior deposition) and numerous exhibits (45 of which were admitted into evidence and submitted to the jurors). (Doc. Nos. 455, 456, 457, 462, 463, 465, 466, 471, 473.)

During the trial, the Intervenor was allowed to question witnesses on the issues of good faith and scope of employment, in accordance with the Court's order granting its motion to intervene. (Doc. No. 392 at PageID 13693.) While the Intervenor did not end up calling any of its own witnesses, it did question a number of witnesses.[2] (*See, e.g.,* Doc. No. 489 at PageID 15990-16000 (questioning Moore); Doc. No. 491 at PageID 16228-36 (questioning Fritz); Doc. No. 493 at PageID 16297-98 (questioning Dr. Scott); Doc. No. 507 at PageID 17647-49 (questioning Monheim); Doc. No. 509 at PageID 17846-62 (questioning Lieberman); Doc. No. 510 at PageID 17949-52 (questioning Godsey).) This included, but was not limited to, questioning Moore—whose actions are the ones at issue in the Intervenor's Complaint concerning lack of good faith and scope of employment. (*Id.*) The Intervenor also responded to a motion to trifurcate the trial; objected to designations of deposition testimony and submitted counter-designations of deposition testimony; participated in voir dire (including asking questions to the prospective jurors); was permitted to make challenges for cause, but not peremptory challenges; made opening statements; objected to certain testimony; made motions; and made closing arguments. (*See, e.g.,*

---

[2] The Intervenor also successfully quashed a subpoena for Ronald Hess—who had served as the Township's Rule 30(b)(6) designee—to testify at the trial. (Doc. No. 447; Doc. No. 454.)

Doc. No. 399 (proposed jury instructions and jury interrogatories); Doc. No. 414 (response in opposition to motion to trifurcate); Doc. No. 436 and Doc. No. 437 (objections to proposed deposition designations); Doc. No. 438 (counter-designations of deposition testimony); Doc. No. 489 at PageID 15990-16000 (questioning Moore); Doc. No. 500 at PageID 16698 (objection to Gillispie's testimony); Doc. No. 511 at PageID 17973-80 (asking questions to prospective jurors); Doc. No. 511 at PageID 17982-87 (permission to make challenges in jury selection for cause, but not peremptory challenges); Doc. No. 497 at PageID 16557-60 (opening statement); Doc. No. 507 at PageID 17760 (moving for a directed verdict); Doc. No. 498 at PageID 16449-55 (closing argument).) Also, while the Intervenor did not end up affirmatively seeking admission of any exhibits, it did object to the admission of certain exhibits. (*See, e.g.,* Doc. No. 507 at PageID 17728-29, 17733 (objection to Gillispie's request for admission of certain exhibits); *id.* at PageID 17754 (upon being asked by the Court if "there are any other exhibits" requested to be admitted, the Intervenor said that there were not).

Also during the trial, Gillispie filed stipulations through which he dropped three of his five Section 1983 claims against Moore. (Doc. No. 464; 11/15/2022 Notation Order; Doc. No. 469; 11/18/2022 Notation Order.) This left him with two pending Section 1983 claims against Moore that went to the jury: (1) violation of his constitutional right to due process of law and a fair trial through identification evidence; and (2) violation of his constitutional right to a fair trial by failing to disclose exculpatory and/or impeachment evidence that was material to his defense in a criminal case. (*Id.*; *see also* Doc. No. 472 at PageID 15544-46 (jury instructions).)

Prior to closing arguments, Moore moved for a directed verdict on the allegation that he had suppressed or destroyed documents. (Doc. No. 507 at PageID 17743-47.) The Court denied that motion. (*Id.*) Additionally, Gillispie moved for judgment as a matter of law (Doc. No. 467),

to which the Intervenor filed an opposition and the Court heard argument from all parties. (Doc. No. 467; Doc. No. 468; Doc. No. 507 at PageID 17754-63.) The Court denied that motion. (Doc. No. 507 at PageID 17763, 17765-66.) And, the Intervenor moved for judgment as a matter of law regarding the issues of good faith and scope of employment in the context of Ohio Rev. Code § 2744.07. (Doc. No. 507 at PageID 17760-63.) The Court denied that motion as well. (*Id.* at PageID 17765.)

Following closing arguments by the parties, the Court gave the jury instructions. (Doc. No. 472; Doc. No. 473; Doc. No. 498.) The Court's instructions to the jury included the following jury instruction (Instruction No. 29) relating to the Intervenor's potential duty to defend and/or duty to indemnify Moore:

### ADDITIONAL ISSUE IF THE JURY FINDS IN FAVOR OF PLAINTIFF ON ANY OF HIS CLAIMS

If, and only if, you find in favor of Plaintiff Gillispie and against Defendant Moore on one or more of Plaintiff's claims, then there is another issue that you must decide. You must determine whether, at the time of Defendant Moore's act or omission that deprived Plaintiff Gillispie of his Constitutional right, Defendant Moore was not acting in good faith, was acting manifestly outside the scope of his employment or official responsibilities, or was not acting within the scope of his employment or official responsibilities.

This issue does not involve any element of Plaintiff Gillispie's claims, and Plaintiff Gillispie has no burden of proof whatsoever regarding this issue one way or the other.

In the event that you find that Defendant Moore violated the constitutional rights of Plaintiff Gillispie with respect to one or more of Plaintiff's claims, then separately for each of those claims only you must determine whether:

(1) An act of Defendant Moore was not taken in good faith;
(2) Defendant Moore was acting manifestly outside the scope of his employment or official responsibilities when he took the act; and
(3) Defendant Moore was not acting within the scope of his employment or official responsibilities when he took the act.

For purposes of this issue, one does not act in good faith when his conduct evinces a dishonest purpose, conscious wrongdoing, or the breach of a known duty through some ulterior motive. Bad faith is the opposite of good faith, generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive, or ill will partaking of the nature of fraud. Conduct that is reckless may still be in good faith.

Scope of employment means the employee is engaged in an activity that is logically related to the business of the employer. The determination of whether conduct is within the scope of employment necessarily turns on the perception of whether the employee acted, or believed himself to have acted, at least in part, in his employer's interests. However, if an employee's actions are self-serving or have no relationship to the employer's business, then the conduct is manifestly outside the scope of employment. Manifestly is defined as plainly or obviously.

(Doc. No. 472 at PageID 15551; Doc. No. 498 at PageID 16490-92.)

### D. **Verdict and Judgment**

After receiving the jury instructions from the Court, the jury started its deliberations at approximately 3:05 p.m. on the afternoon of Friday, November 18, 2022 and recessed that day at approximately 4:50 p.m.  (Doc. Nos. 471, 473, 498.)  After the weekend, the jury continued its deliberations on Monday, November 21, 2022 starting at 9:00 a.m. and delivered its verdict at 1:20 p.m. that day.  (Doc. No. 474.)  The jury found for Gillispie on both of his claims that were submitted to them:  Due Process/Fair Trial (Unreliable Identification) and Due Process Fair Trial (Suppression of Evidence).  (Doc. No. 475.)  The jury then assessed damages in the amount of $45,000,000.  (*Id.*)

Having found Moore liable on both claims, the jury then answered a series of questions for each of the two claims, in accordance with Instruction No. 29 (quoted above).  (Doc. No. 475 at PageID 15564-65.)  Those questions were: (1) "was it proven by a preponderance of the evidence that Matthew Scott Moore was not acting in good faith?"; (2) "was it proven by a preponderance

10

of the evidence that Matthew Scott Moore was acting manifestly outside the scope of his employment or official responsibilities as a police officer with Miami Township?"; and (3) "was it proven by a preponderance of the evidence that Matthew Scott Moore was not acting within the scope of his employment or official responsibilities as a police officer with Miami Township?" (*Id.*)  Thus, those questions related to the Intervenor's claim for declaratory judgment in its Intervenor Complaint and tracked the language in Ohio Rev. Code § 2744.07 regarding exceptions to a political subdivision's duty to defend and duty to indemnify.  *See* Ohio Rev. Code § 2744.07(A)(2)(a), (A)(2)(b), (B)(2)(a), (B)(2)(b).  The jury answered "No" to all six questions— three for each of the two claims.  (Doc. No. 475 at PageID 15564-65.)

Finally, the Court entered a Judgment on November 29, 2022 ("Judgment").  (Doc. No. 479.)  In accordance with the jury's verdict, the Court entered judgment in the amount of $45,000,000.00 for Gillispie and against Moore on the Section 1983 claims that went to the jury. (*Id.*)  The Judgment did not address the claim in the Intervenor Complaint.  (*Id.*)

### E.  **The Pending Motions**

On December 19, 2022, the Intervenor filed its Motion for Judgment as a Matter of Law and in the Alternative, Motion for a New Trial (the "JMOL/New Trial Motion").  (Doc. No. 481.) The same day, the Intervenor filed its Motion to Alter or Amend Judgment (the "Intervenor Alter/Amend Judgment Motion").  (Doc. No. 482.)  On December 27, 2022, Moore filed his Motion to Alter or Amend the Judgment (the "Moore Alter/Amend Judgment Motion").  (Doc. No. 485.)

Gillispie filed an opposition to the JMOL/New Trial Motion.[3]  (Doc. No. 502.)  He also

---

[3] In its reply in support of the JMOL/New Trial Motion, the Intervenor clarified that it "is not disputing the jury's verdict finding that … Moore … violated … Gillispie's … constitutional rights," but instead the question is whether the Intervenor is entitled to judgment in its favor as a matter of law pursuant to Rule 50 or a new trial pursuant to Rule 59 "on the issues of good faith and scope of employment or official responsibilities under R.C. 2744.07."  (Doc. No.

filed an omnibus response to both the Intervenor Alter/Amend Judgment Motion and the Moore Alter/Amend Judgment Motion. (Doc. No. 503.) The Intervenor filed replies in support of its JMOL/New Trial Motion (Doc. No. 515) and its Intervenor Alter/Amend Judgment Motion (Doc. No. 516). Finally, Moore filed a reply in support of the Moore Alter/Amend Judgment Motion. (Doc. No. 517.) The three motions are ripe for review and decision.

## II.  <u>ANALYSIS</u>

The Court will first address the JMOL/New Trial Motion and then jointly address the Intervenor Alter/Amend Judgment Motion and Moore Alter/Amend Judgment Motion.

---

515 at PageID 18008.) The Intervenor then argued that, "[b]ecause [the JMOL/New Trial Motion] goes only to issues pertaining to the [Intervenor's] declaratory judgment action against [Moore], the Motion **is not** [Gillispie's] to oppose"; Moore "is the sole party with standing to oppose the Motion, and he did not"; and, "[a]s such, the Motion is unopposed and should be granted." (*Id.* at PageID 18009 (emphasis in original).) The Court will not grant the JMOL/New Trial Motion simply because Moore did not file a memorandum in opposition. First, the Intervenor cites no legal authority for its argument that the JMOL/New Trial Motion should be granted simply because Moore did not file a memorandum in opposition. Second, the rules do not mandate such an outcome. *See* S.D. Ohio Civ. R. 7.2(a)(2) ("Failure to file a memorandum in opposition may result in the granting of any motion that would not result directly in entry of final judgment or an award of attorneys' fees"); Fed. R. Civ. P. 50(b) (in ruling on the motion "the court *may*" direct the entry of judgment as a matter of law) (emphasis added); Fed. R. Civ. P. 59(a)(1) ("[t]he court may, on motion, grant a new trial on all or some of the issues….") (emphasis added). Third, caselaw runs counter to that argument. *See, e.g., Wheaton v. N. Oakland Med. Ctr.*, 130 F. App'x 773, 788-90 (6th Cir. 2005) (where the district court had denied a party's motion for judgment as a matter of law or for a new trial despite the fact that the non-movant filed no opposition to the motion, "the district court's decision was correct" in denying the motion where the record provided ample evidence to support the jury's verdict; finding that the effect of the non-movant's failure to file an opposition was that it waived its right to challenge an apparent procedural violation by the movant in filing the motion); *EMI Music Mktg. v. Avatar Records, Inc.*, 364 F. Supp. 2d 337, 342 (S.D.N.Y. 2005) (although the non-movant did not file a written opposition to the movant's Rule 50(b) motion, the district court addressed the motion on its merits and found that the evidence at trial was insufficient to support the jury's finding); *see also* Fed. R. Civ. P. 1 (the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the <u>just</u>, speedy, and inexpensive determination of every action and proceeding" (emphasis added)); *Bailey v. Dep't of Veterans Affairs*, No. 94-55092, 33 F.3d 58 (Table), 1994 U.S. App. LEXIS 31611, 1994 WL 417423, at *2 (9th Cir. Aug. 10, 1994) (rejecting the argument that the district court had erred by not granting a Rule 59(e) motion to amend the judgment despite the other party's failure to file opposition papers as required by the local rules, where the language of the local rules was "discretionary" in providing "that the failure to file a timely opposition to a motion and failure to appear at a hearing on a motion *may* be deemed consent to the granting of the motion") (internal quotation marks omitted; emphasis added). The JMOL/New Trial Motion is not an agreed or joint motion. Additionally, the Court does not believe that the JMOL/New Trial Motion necessarily "goes only to issues pertaining to the [Intervenor's] declaratory judgment action against" Moore—as the Intervenor asserts—or, at the least, it does not clearly go only to those issues. For example, the JMOL/New Trial Motion attacks the damages award to Gillispie. (Doc. No. 481 at PageID 15609 (arguing that "the damages award against Defendant Moore was excessive" and "the jury verdict shocks the conscious and was excessive").) As another example, the Intervenor addresses jury instructions involving Gillispie's claims against Moore. (Doc. No. 481 at PageID 15602.) However, in perhaps an abundance of caution, the Court will address the JMOL/New Trial Motion while <u>not</u> relying on Gillispie's response in opposition to that motion (Doc. No. 502).

In the JMOL/New Trial Motion, the Intervenor moves the Court, "pursuant to Rule 50(b) and Rule 59 of the Federal Rules of Civil Procedure, for judgment as a matter of law on the jury issues not decided by verdict related to the jury interrogatories concerning defense and indemnification under Ohio Revised Code 2744.07." (Doc. No. 481 at PageID 15597.) The Intervenor states that it "renews its Rule 50 Motion for Judgment as a Matter of Law on the issues of whether Defendant Moore was acting in good faith or outside of the scope of his employment or official responsibilities." (*Id.* at PageID 15600.) "In the alternative, the [Intervenor] … requests a new trial on the basis that the jury's findings on those issues were against the weight of the evidence and the trial being unfair to the" Intervenor. (*Id.* at PageID 15597-98.) This alternative request is made pursuant to Federal Rule of Civil Procedure 59(a). (*Id.* at PageID 15608-13.) The Intervenor also explains that its "grounds for seeking a judgment as a matter of law and for a new trial are the same." (*Id.* at PageID 15601.)

In the Intervenor Alter/Amend Judgment Motion and Moore Alter/Amend Judgment Motion, both movants ask the Court to alter or amend the Judgment, pursuant to Rule 59(e). (Doc. No. 482; Doc. No. 485.) More specifically, the Intervenor[4] asks the Court "to reduce the jury damages award of $45,000,000.00" against Moore because "[t]he award is so greatly excessive so as to shock the conscience, thereby requiring a remittitur by this Court." (Doc. No. 482 at PageID 15614.) Moore asks the Court to "reduce the jury award against" him because it "is excessive [and] it shocks the conscience and therefore is required to be reduced." (Doc. No. 485 at PageID 15710.)

### A.  The Intervenor's Request for a New Trial in the JMOL/New Trial Motion

The Court will first address the Intervenor's request for a new trial pursuant to Rule 59(a)

---

[4] The Court will assume, for purposes of this order, that the Intervenor has standing to challenge the Judgment's damages award.

and then address the Intervenor's request for judgment as a matter of law pursuant to Rule 50(b).

Contrasting Rule 59 with Rule 50, generally, "motions made pursuant to Rule 50 … claim there is

<u>insufficient evidence</u> to send a case to a jury … [while] Rule 59 motions … claim that the jury

verdict was against the <u>weight of the evidence</u>." *Hillside Prods., Inc. v. Cnty. of Macomb*, 389 F.

App'x 449, 456 (6th Cir. 2010) (emphasis in original). Thus, "granting a judgment as a matter of

law is governed by a higher showing" than granting a new trial. *Denhof v. City of Grand Rapids*,

494 F.3d 534, 543 (6th Cir. 2007). Because the Intervenor has stated that its grounds for seeking

judgment as a matter of law and a new trial are the same (Doc. No. 481 at PageID 15601), if the

Intervenor is not entitled to a new trial pursuant to Rule 59(a), then it cannot be entitled to judgment

as a matter of law pursuant to Rule 50(b) and the Court will not need to fully analyze that request

separately.[5] *Id.*; *McLaughlin v. G2 Eng'g & Mgmt., Inc.*, No. 3:15-CV-537-TAV-DCP, 2018 U.S.

Dist. LEXIS 221352, 2018 WL 4945219, at *5 (E.D. Tenn. Sept. 18, 2018) ("[g]iven that the Court

has concluded … that a new trial is accordingly improper, the Court necessarily finds that

defendants are not entitled to judgment as a matter of law").

     Rule 59(a) of the Federal Rules of Civil Procedure allows a party to request a new trial.

Specifically, Rule 59(a)(1) states:

> The court may, on motion, grant a new trial on all or some of the issues--and to
> any party--as follows:
>
> > (A) after a jury trial, for any reason for which a new trial has heretofore been
> > granted in an action at law in federal court; or
> >
> > (B) after a nonjury trial, for any reason for which a rehearing has heretofore
> > been granted in a suit in equity in federal court.

Fed. R. Civ. P. 59(a)(1). "Generally, a court may grant a new trial under Rule 59 if the verdict is

---

[5] The Intervenor recognized this when it stated in the JMOL/New Trial Motion: "The Court may grant a motion for a new trial based on the weight of the evidence upon a lower showing than that required for granting a motion for judgment as a matter of law." (Doc. No. 481 at PageID 15601 (citing *Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC*, 277 F. Supp. 3d 932, 947 (E.D. Tenn. 2017) and *Denhof*, 494 F.3d at 543).)

against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000). "Generally, motions for a new trial are committed to the discretion of the district court." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

> **1) The Intervenor's argument that the jury's findings (on the issues of whether Moore was acting in good faith or outside the scope of his employment or official responsibilities) were against the weight of the evidence**

This argument by the Intervenor (a political subdivision) relates to findings by the jury concerning a political subdivision's duty to defend or duty to indemnify its employees, which are at issue in the Intervenor Complaint. Political subdivisions in Ohio, such as Miami Township, sometimes have a duty to defend and/or a duty to indemnify its employees. For example, Ohio Rev. Code § 2744.07 states, in part:

> (A)(1) <u>Except as otherwise provided in division (A)(2) of this section, a political subdivision shall provide for the defense of an employee</u>, in any state or federal court, in any civil action or proceeding which contains an allegation for damages for injury, death, or loss to person or property caused by an act or omission of the employee in connection with a governmental or proprietary function. Amounts expended by a political subdivision in the defense of its employees shall be from funds appropriated for this purpose or from proceeds of insurance.
>
> (2) A political subdivision does not have the duty to provide for the defense of an employee under division (A)(1) of this section if any of the following apply:
> (a) The act or omission occurred while the employee was not acting in good faith.
> (b) The act or omission occurred while the employee was acting manifestly outside the scope of the employee's employment or official responsibilities.
>
> …
>
> (B)(1) <u>Except as otherwise provided in division (B)(2) of this section, a political subdivision shall indemnify and hold harmless an employee</u> in the amount of any judgment, other than a judgment for punitive or exemplary damages, that is obtained against the employee in a state or federal court or as a result of a law of a foreign jurisdiction and that is for damages for injury, death, or loss to person or

property caused by an act or omission in connection with a governmental or proprietary function.

(2) A political subdivision is not required to indemnify and hold harmless an employee under division (B)(1) of this section if any of the following apply:
    (a) At the time of the act or omission, the employee was not acting in good faith.
    (b) At the time of the act or omission, the employee was not acting within the scope of the employee's employment or official responsibilities.

….

Ohio Rev. Code §§ 2744.07(A)(1), (A)(2)(a), (A)(2)(b), (B)(1), (B)(2)(a), (B)(2)(b) (emphasis added). Thus, among other exceptions, a political subdivision is <u>not</u> required to provide for its employee's defense or indemnify the employee if (a) at the time of the act or omission, the employee was not acting in good faith, or (b) at the time of the act or omission, the employee was acting outside (or, for purposes of the duty to defend, "manifestly outside") the scope of the employee's employment or official responsibilities. Ohio Rev. Code §§ 2744.07(A)(2), (B)(2).

### i. Jury's role and findings

The Intervenor's arguments raise a threshold question: what was the jury's role at the trial regarding the claim in the Intervenor's Complaint? The Intervenor argues that the jury was an advisory jury (and the jury interrogatories are not binding) with respect to the "findings of the jury in the interrogatories addressing the issues of whether Defendant Moore acted in good faith or outside the scope of his employment or official responsibilities." (Doc. No. 481 at PageID 15607-08; Doc. No. 515 at PageID 18024-27.) The Court disagrees.

### a. Jury trial on the issues of whether Moore acted in good faith or outside the scope of his employment or official responsibilities

As set forth above, ultimately the jury decided it was <u>not</u> proven by a preponderance of the evidence that (1) Moore was not acting in good faith; (2) Moore was acting manifestly outside of the scope of his employment or official responsibilities; or (3) Moore was not acting within the

scope of his employment or official responsibilities as a police officer with Miami Township. (Doc. No. 475 at PageID 15564-65 (completed verdict form).) The jury made these findings with respect to both of Gillispie's claims against Moore. (*Id.*)

The jury was not an advisory jury. It decided factual issues regarding whether Moore was acting in good faith or outside the scope of his employment or official responsibilities, for purposes of the Court ruling on the Intervenor's declaratory judgment action. This is shown through the actions of the parties and the Court.

On September 23, 2022, the Intervenor filed its Motion to Intervene. (Doc. No. 370.) In that motion, the Intervenor stated that it "requests this Court grant the [Motion to Intervene] for the limited purpose of questioning, argument, and submission of proposed jury instructions and interrogatories on the discreet issues of lack of good faith and scope of employment consistent with [Ohio Rev. Code §] 2744.07." (*Id.* at PageID 12697.) The Intervenor also explained that "a determination of whether Moore acted outside the scope of his official responsibilities or whether he acted in bad faith … are factual matters which are central to the claims at issue against Moore which will be addressed at trial." (*Id.* at PageID 12702.) In its reply in support of the motion to intervene, the Intervenor acknowledged that Gillispie "is requesting that the Court require the [Intervenor] to propose special interrogatories and/or jury instructions on the [same] timeline as other jury instructions," and the Intervenor said that it would not oppose that request from Gillispie—assuming that the Court had ruled on the Motion to Intervene and the Intervenor had some time to prepare such interrogatories and instructions. (Doc. No. 381 at PageID 12828.) The Intervenor's proposed intervenor complaint sought a declaratory judgment. (Doc. No. 381-1.) On October 11, 2022, the Court granted the Motion to Intervene. (Doc. No. 392.) Nowhere in the briefing papers or the Court's order was there mention of the jury or its findings being advisory.

(Doc. Nos. 370, 377, 381, 391, 392.)

On October 13, 2022, the Intervenor filed its Intervenor Complaint. (Doc. No. 397.) It did not contain a jury demand. (*Id.*) The Intervenor stated in its Intervenor Complaint that, "pursuant to [Ohio Rev. Code §] 2744.07, [it] seeks a declaration by this Court that it has no duty to defend or indemnify Matthew Scott Moore for claims made against him in the Underlying Action." (*Id.* at PageID 13763 (¶ 27).) On November 4, 2022, Moore answered the Intervenor Complaint. (Doc. No. 451.) His answer did not contain a jury demand. (*Id.*)

Also on October 13, 2022, the Court issued a scheduling order (the "Scheduling Order") that set a schedule for submitting proposed jury instructions, verdict forms, and jury interrogatories, as the Court had "indicated at the Final Pretrial Conference" that had taken place earlier that day. (Doc. No. 398.) The Scheduling Order required the Intervenor to file "its proposed jury instructions and interrogatories (which must be only on the discreet issues of lack of good faith and scope of employment consistent with Ohio Revised Code § 2744.07)" on or before October 14, 2022. (*Id.* at PageID 13765.)

On October 14, 2022, the Intervenor—in accordance with the Scheduling Order—filed its proposed jury instructions and jury interrogatories. (Doc. No. 399.) The Intervenor's proposed jury instructions and interrogatories included a proposed statement of the case, instructions on "acts or omissions not in good faith" and on "scope of employment," and three questions for the jury to answer. The Intervenor's proposed jury instructions and interrogatories also contained the following statement, with citations to law: "Whether an employee acted within the scope of employment generally is a question of fact to be decided by the jury." (*Id.* at PageID 13770.) The three proposed questions for the jury to answer either "Yes" or "No" were the following:

- "Was it proven, by the preponderance or greater weight of the evidence, that any of the acts or omissions of Matthew Scott Moore occurred while he was not

acting in good faith";

- "Was it proven, by the preponderance or greater weight of the evidence, that any of the acts or omissions of Matthew Scott Moore occurred while Moore was acting manifestly outside the scope of his employment or official duties with Miami Township"; and

- "Was it proven, by the preponderance or greater weight of the evidence, that any of the acts or omissions of Matthew Scott Moore occurred while Moore was not acting within the scope of his employment or official duties with Miami Township."

(*Id.* at PageID 13771-73.) Those three questions were very similar to the questions actually posed to—and answered by—the jury at trial regarding the issues of lack of good faith and scope of employment or official responsibilities. (*Compare* Doc. No. 399 at PageID 13771-73 *to* Doc. No. 472 at PageID 15555-56.)

Nowhere in any of these filings was there any mention of the jury being advisory. And, the Court never said that the jury was advisory. In the actual instructions given to the jury on November 18, 2022, the Court told the jury:

If, and only if, you find in favor of Plaintiff Gillispie and against Defendant Moore on one or more of Plaintiff's claims, then there is **another issue that you must decide**. You must determine whether, at the time of Defendant Moore's act or omission that deprived Plaintiff Gillispie of his Constitutional right, Defendant Moore was not acting in good faith, was acting manifestly outside the scope of his employment or official responsibilities, or was not acting within the scope of his employment or official responsibilities. ….

(Doc. No. 498 at PageID 16490; Doc. No. 472 at PageID 15551 (emphasis added).)

Following the trial, the Court entered judgment in favor of Gillispie and against Moore. (Doc. No. 479.) The Court did not enter judgment with respect to the Intervenor Complaint. Weeks later, on December 19, 2022, the Intervenor filed the motions at issue in this order, raising the idea that the jury was merely an advisory jury with respect to the issues of lack of good faith and scope of employment or official responsibilities. (Doc. No. 481; Doc. No. 482.) The Intervenor now asserts that, "in reality, the jury interrogatories as to good faith/bad faith, and scope

of employment and scope of official responsibilities are of no consequence" and that "[t]he only issues properly before the jury were those related to Defendant's liability, if any, for Plaintiff's Section 1983 claims."  (Doc. No. 515 at PageID 18024, 18025.)

The Intervenor is mistaken.  The Intervenor's request and representations in its Motion to Intervene (set forth above), the lack of a jury demand in its Intervenor Complaint, the request in the Intervenor Complaint that the Court declare that the Intervenor has no duty to defend or indemnify Moore, the parties' submissions of jury interrogatories and verdict forms regarding the factual issues (lack of good faith and scope of employment) in accordance with the Scheduling Order, and the Intervenor's statement that "[w]hether an employee acted within the scope of employment generally is a question of fact to be decided by the jury"—coupled with no indication by the Intervenor that any of the jury's decisions would be advisory—indicated that the Intervenor wanted the jury to decide the issues of whether Moore acted in good faith or outside the scope of his employment or official responsibilities but the Court to decide the claim itself while following the findings by the jury regarding those issues.  This is exactly how the Court is handling the situation: the jury decided the factual issues of good faith and scope of employment or official responsibilities, and the Court will be deciding the declaratory judgment action itself while following those factual determinations by the jury.  The Court never announced that the jury's findings would be advisory, and it was never the Court's intent that the jury's findings would be advisory.[6]

---

[6] In its reply brief, the Intervenor references that, "[a]t trial, this Court expressly stated that the jury "[was] not being asked to decide the intervenor's complaint."  (Doc. No. 515 at PageID 18024 (emphasis and alteration in original).)  In addition to confirming that the Court never announced that the jury was advisory, the statement also directly aligns with the situation:  the jury decided the factual issues of good faith and scope of employment or official responsibilities, and the Court will be deciding the declaratory judgment action itself while following those factual findings by the jury.

Furthermore, as shown below, the situation here corresponded with a jury trial on those factual issues in accordance with Rule 39(b) or, if the issues actually were "not triable of right by a jury," in accordance with Rule 39(c)(2). The Court did not order a trial by jury on those issues on its own initiative, and the situation did not correspond with using an advisory jury in accordance with Rule 39(c)(1).

### b. Rule 39(b)

Federal Rule of Civil Procedure 57 addresses "Declaratory Judgment." Under that rule, the Federal Rules of Civil Procedure "govern the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201"—which is the statutory section the Intervenor relies on for its declaratory judgment action (Doc. No. 397 at PageID 13758)—and "Rules 38 and 39 govern a demand for a jury trial." Fed. R. Civ. P. 57.

Rule 39 concerns "Trial by Jury or by the Court." Fed. R. Civ. P. 39. Subsection (a) of that rule applies when a jury trial has been demanded under Rule 38. Fed. R. Civ. P. 39(a) ("When a jury trial has been demanded under Rule 38, the action must be designated on the docket as a jury action"). However, here, none of the parties expressly demanded a jury in the Intervenor's action. Yet, Rule 39(b) states the following:

> (b) When No Demand Is Made. Issues on which a jury trial is not properly demanded are to be tried by the court. But the court may, on motion, order a jury trial on any issue for which a jury might have been demanded.

Fed. R. Civ. P. 39(b). Thus, Rule 39(b) may apply when an issue is one for which a jury was not, but might have been, demanded.

Looking first to whether "a jury might have been demanded" on the issues of good faith and scope of employment or responsibilities in the Intervenor's action, Rule 38(a) states that "[t]he right of trial by jury as declared by the Seventh Amendment to the Constitution—or as provided by a federal statute—is preserved to the parties inviolate." Fed. R. Civ. P. 38(a). "Suits for

declaratory judgment are a statutory creation enacted by Congress in the Declaratory Judgment Act." *Gulf Life Ins. Co. v. Arnold*, 809 F.2d 1520, 1523 (11th Cir. 1987). The "Declaratory Judgment Act does not itself create a right to a jury trial," so courts look to the Seventh Amendment to determine if there is a right to a jury trial in a declaratory judgment action. *GeoVera Specialty Ins. Co. v. Small*, No. 1:10-00641-KD-N, 2011 U.S. Dist. LEXIS 74466, 2011 WL 2681289, at *2 (S.D. Ala. July 11, 2011). "The Seventh Amendment provides that '[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved.'" *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564 (1990) (quoting U.S. CONST. amend. VII). "[T]he phrase 'Suits at common law' refers to suits in which *legal* rights are to be ascertained and determined, in contradistinction to those where equitable rights alone are recognized, and equitable remedies are administered," and "[t]he right [to a jury trial] extends to causes of action created by Congress." *Id.* at 564-65 (internal quotation marks omitted; emphasis in original; alterations adopted).

Yet, "[a]ctions for declaratory judgments are neither legal nor equitable." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988); *see also Great Northern Life Ins. Co. v. Vince*, 118 F.2d 232, 233-34 (6th Cir. 1941) ("[t]he nature of an action for declaratory relief under the [Federal Declaratory Judgment Act] is said to be neither legal nor equitable, but sui generis") (internal quotation marks omitted). Thus, "[a] litigant is not deprived of a jury trial merely because the action is one for declaratory relief." 9 CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2313 (4th ed. 2022); *Johnson v. Fidelity & Cas. Co. of N.Y.*, 238 F.2d 322, 325 (8th Cir. 1956) ("[t]he fact that only a declaration is sought does not deprive the defendants of the right to have those issues determined in a jury trial"). Instead, "courts have therefore had to look to the kind of action that would have been brought had Congress

not provided the declaratory judgment remedy." *Gulfstream Aerospace*, 485 U.S. at 284.  In other words, "to determine whether there is a jury trial right in a declaratory judgment action, it is first necessary to determine in what kind of an action the issue would have come to the court if there were no declaratory procedure."  9 CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2313 (4th ed. 2022); *see also Gulf Life Ins. Co.*, 809 F.2d at 1523 ("[w]hen determining whether a declaratory judgment action is legal or equitable, courts have examined the basic nature of the issues involved to determine how they would have arisen had Congress not enacted the Declaratory Judgment Act") (internal quotation marks omitted); *Mut. of New York v. Shaya*, 970 F. Supp. 1226, 1226 (E.D. Mich. 1997) ("[i]f the right to a jury trial would exist on the issue if it had arisen in an action other than for a declaratory judgment, the issue must be tried to a jury in the declaratory action").  The Sixth Circuit has further explained that, "when a declaration of right involves the determination of issues of fact triable by a jury, such issues may be submitted to the jury in the form of interrogatories, with proper instructions by the court, whether a general verdict be required or not."  *Great Northern Ins. Co.*, 118 F.2d at 234.

Here, the issues tried to the jury in the Intervenor's action were issues "for which a jury might have been demanded."  Fed. R. Civ. P. 39(b).  First, this is supported by numerous cases dealing with similar situations.  *See, e.g., Johnson*, 238 F.2d at 323-26 (while an underlying negligence lawsuit remained pending against an insured, the declaratory judgment action brought by the insurance company seeking a declaration that the accident in which its insured was involved came within one of the policy's exclusions was an action presenting factual issues for which a jury could be demanded to decide); *Lumber Mut. Cas. Ins. Co. of N.Y. v. Stukes*, 164 F.2d 571, 572-73 (4th Cir. 1947) (where an injured party had brought an underlying action for damages against an insured defendant, the insurance company's declaratory judgment action that involved whether

liability under the policy was excluded because the injured party was an employee (and, therefore, whether an exclusion clause of the policy applied), "it was a question for the jury whether [the injured party] was [an employee] and within the exclusion clause of the policy for that reason"); *Allstate Ins. Co. v. Cross*, 2 F.R.D. 120 (E.D. Penn. 1941) (party had a right to a jury trial—thus, a jury trial could have been demanded—in a declaratory judgment action by an insurer to determine its liability under its policy, for purposes of determining whether the insurer would have to pay on an underlying negligence claim); *see also Kelly's Auto Parts, No. 1, Inc. v. Boughton*, 809 F.2d 1247, 1251-52 (6th Cir. 1987) (citing, with approval, a case from the Third Circuit Court of Appeals in which "the insurer filed a declaratory judgment action, tried to a jury, seeking a declaration that it was not liable under its insurance policy with the insured").

Second, the declaratory judgment action here is akin to an inverse legal claim. "If the declaratory judgment action does not fit into one of the existing equitable patterns but is essentially an inverted law suit—an action brought by one who would have been a defendant at common law—then the parties have a right to a jury." *Reiswerg v. Great Am. Ins. Co.*, No. 1:07-cv-42-WTL-DML, 2009 U.S. Dist. LEXIS 81927, 2009 WL 2923036, at *2 (S.D. Ind. Sept. 8, 2009) (internal quotation marks omitted) (the parties had a right to a jury in the third-party plaintiff insurance company's claim against plaintiff for a declaration that the terms of the insurance policy excluded plaintiff's legal malpractice suit against defendant-policy holder, because it was an inverted lawsuit). Here, if there was no ability to seek a declaratory judgment, then the dispute would be addressed through claims by Moore against the Intervenor for breach of the duty to defend and for breach of the duty to indemnify under Ohio Rev. Code § 2744.07. *See, e.g., Rogers v. City of Youngstown*, 61 Ohio St. 3d 205, 574 N.E.2d 451, 454 (Ohio 1991) ("find[ing] that the city, pursuant to R.C. 2744.07(A)(1), did, indeed, breach a duty to defend or provide appellee with

legal counsel," so "the political subdivision must pay the attorney fees, expenses and costs incurred by the police officer"); *IMG Worldwide, Inc. v. Westchester Fire Ins. Co.*, 572 F. App'x 402, 404 (6th Cir. 2014) (upholding a jury verdict in favor of indemnitee on indemnitee's claim that indemnitor breached its contractual duty to indemnify indemnitee for a payment made to settle the underlying lawsuit, and awarding $3.9 million in damages to indemnitee). Those actions would be for damages, involving legal rights and remedies. *Id.*; *see also Allen v. Standard Oil. Co.*, 2 Ohio St. 3d 122, 443 N.E.2d 497, 497 at syllabus ¶ 2 (Ohio 1982) (indemnitor failed in its duty to defend, entitling indemnitee to recover as damages the attorney fees it incurred in defending the underlying litigation; "[w]hen an indemnitor wrongfully refuses to defend an action against an indemnitee, the indemnitor is liable for the costs, including attorney fees and expenses, incurred by the indemnitee in defending the initial action"); *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St. 3d 238, 513 N.E.2d 253, 256 (Ohio 1987) ("[i]ndemnity … is the right of a person, who has been compelled to pay what another should have paid, to require complete reimbursement"); *Ayers v. Cleveland*, 160 Ohio St. 3d 288, 156 N.E.3d 848, 2020-Ohio-1047, at ¶ 23 (Ohio 2020) (holding that the general definition of "indemnity" from *Worth* is applicable to Ohio Rev. Code § 2744.07, and explaining that "indemnification exists to 'make whole' the person who is indemnified"). Thus, this dispute would be one in which the Intervenor would be a defendant at common law on a claim for damages, and there would be a right to demand a jury. *GeoVera Specialty Ins. Co.*, 2011 WL 2681289, at *2 ("absent the federal declaratory judgment procedure utilized by [insurance company] in the present case, this action would likely have arisen as a suit by either [the policy holder] or [the person injured by the policy holder] against [the insurance company] for its refusal to pay any judgment in [the injured person's] pending civil suit"; state law allowed the injured person to seek payment of the judgment directly from insurance company, and,

"[t]herefore, this declaratory action can be characterized as an inverted lawsuit to which [injured person] has a right to a jury trial"); *Gulf Life Ins. Co.*, 809 F.2d at 1523 (without the Declaratory Judgment Act, the action would have arisen "as a suit by [employee against his former employer] to collect the severance pay he claims he is due—a legal, not equitable, action" and, therefore, the former employer's "declaratory judgment action was not a civil action seeking equitable relief") (internal quotation marks omitted); *Mut. of New York*, 970 F. Supp. at 1226-27 (finding that, but for the Declaratory Judgment Act, "this action would arise outside of the declaratory judgment context when the defendant sued plaintiff on the [disability insurance policy] upon plaintiff's termination of defendant's benefits (after 60 months)"; the defendant "would certainly be entitled to a jury trial on this coverage action if he initiated the suit following the termination of his benefits" because he "would seek monetary damages, which is considered legal, not equitable relief" and also because "a suit by defendant against plaintiff for termination of benefits would resolve the parties' legal rights under the insurance policy"; therefore, "[b]ecause the underlying issues would entitle defendant to a jury trial, he is entitled to the same under the declaratory judgment action brought by plaintiff").

Third, the issues that the jurors decided (regarding good faith and scope of employment or official responsibilities) were issues of fact within the declaratory judgment action that the jurors could decide. *See, e.g., Stevens v. Cox*, No. WD-08-020, 2009 Ohio App. LEXIS 329, 2009 WL 223897, 2009-Ohio-391, at ¶ 86 (Ohio Ct. App. 2009) ("[a] further issue of fact remains as to whether [the defendant in a Section 1983 action] acted in good faith and within the scope of her official duties, thereby entitling her to indemnification pursuant to [Ohio Rev. Code §] 2744.07"); *McCormack v. Jefferson Area Loc. Sch. Dist.*, 2018-Ohio-3744, 112 N.E.3d 338, 343 (Ohio Ct. App. 2018) (in the context of Ohio Rev. Code § 2744.07, "[w]hether an employee acted in the

scope of his employment and whether he acted in good faith are questions of fact"). The Intervenor itself said as much in its own submission of proposed jury instructions and jury interrogatories: "Whether an employee acted within the scope of employment generally is a question of fact to be decided by the jury. *Townsend v. Kettering*, 2022-Ohio-2710, ¶ 23, 194 N.E.3d 457, 465 citing *Ohio Govt Risk Mgt. Plan v. Harrison*, 115 Ohio St.3d 241, 2007-Ohio-4948, 874 N.E.2d 1155, ¶ 16." (Doc. No. 399 at PageID 13770.) Thus, the issues here were ones "for which a jury might have been demanded." Fed. R. Civ. P. 39(b).

Looking next to the phrase in Rule 39(b) that "the court may, on motion, order a jury trial" on those issues, that too was satisfied. Fed. R. Civ. P. 39(b). A formal motion and order are not required to grant relief under Rule 39(b). *Moores v. Greenberg*, 834 F.2d 1105, 1108 (1st Cir. 1987) ("[t]here are no precise formalities for a Rule 39(b) motion"; treating a request in an attorney's letter as a Rule 39(b) "motion"). As the First Circuit Court of Appeals explained: "The language and history of the rule indicate that the requirement was inserted by the draftsmen simply as a means of preventing the district court from ordering jury intervention *sua sponte* when the parties were unanimous in their preference for a bench trial." *Id.* Thus, Rule 39(b) may apply when a party who has failed to make a timely jury demand "file[s] a motion or provide[s] some similar manifestation of his or her desire to have a jury trial that the court will treat as a motion." 9 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2334 (4th ed. 2023); *see also Moores*, 834 F.2d at 1108 ("Rule 39(b) may be animated by any cognizable affirmation of one party's intent to avail himself of a jury trial"); *Fed. Deposit Ins. Corp. v. Palermo*, 815 F.2d 1329, 1333-34 (10th Cir. 1987) ("the failure to file the request as a 'motion' should not be deemed fatal"; "some similar manifestation of the desire of a party to have a jury trial will suffice") (internal quotation marks omitted). Courts have construed various filings and

statements as a "motion" and "order" under the rule. *See, e.g., Columbia Gas, Transmission Corp. v. First Congregational Church*, No. 1:07-cv-661, 2008 U.S. Dist. LEXIS 4584, 2008 WL 11378847, at *1 (N.D. Ohio Jan. 10, 2008) (construing an untimely jury demand as a Rule 39(b) motion); *E.G.O. Elektro-Geratbau GmbH v. Ceramaspeed, Inc.*, No. 3:14-cv-61-TAV-HBG, 2017 U.S. Dist. LEXIS 231758, 2017 WL 10399267, at *4 n.3 (E.D. Tenn. Dec. 18, 2018) (construing a response to a motion to strike a jury demand as a motion for jury trial under Rule 39(b)); *Fed. Deposit Ins. Corp.*, 815 F.2d at 1333-34 (construing a request in a pretrial memorandum made before trial as sufficient to invoke the trial court's discretion under Rule 39(b)); *Epstein v. Epstein*, No. 14 C 8431, 2017 U.S. Dist. LEXIS 116505, 2017 WL 3168975, at *6 (N.D. Ill. July 26, 2017) (construing a recusal motion as a motion pursuant to Rule 39(b)); *Coach Servs., Inc. v. 777 Lucky Accessories, Inc.*, No. 09-61590-CIV, 2010 U.S. Dist. LEXIS 67739, 2010 WL 2427432, at *2 (S.D. Fla. June 16, 2010) (construing arguments that plaintiff's counsel made during a calendar call in favor of a jury trial as a motion under Rule 39(b)); *see also Sofarelli Bros. v. Elgin*, 129 F.2d 785, 787 (4th Cir. 1942) (relying, in part, on Rule 39(b) in affirming the judgment of the trial court in directing a trial by jury, despite no jury demand and that opposing counsel had prepared for trial before the court rather than for trial by jury, where the plaintiff had mentioned a jury trial in a letter to the clerk, in a motion concerning a witness, and in oral argument where counsel for all parties were present).

Additionally, Rule 39(b) "gives the district judge broad discretion … to relax the jury trial demand requirements prescribed in [Rule] 38(b) to achieve substantial justice." 9 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2334 (4th ed. 2023); *see also Moody v. Pepsi-Cola Metro. Bottling Co., Inc.*, 915 F.2d 201, 207 (6th Cir. 1990) (explaining that "[a] district court has broad discretion in ruling on a Rule 39(b) motion" and "the court's

discretion should be exercised in favor of granting a jury trial where there are no compelling reasons to the contrary"; holding that the district court's scheduling order reflecting that the case was set for a non-jury trial did not deprive the district court of discretionary authority under Rule 39(b) to grant a jury trial) (internal quotation marks omitted); *Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004, 1013 (6th Cir. 1987) (recognizing a district court's "broad discretion" regarding Rule 39(b); affirming the trial court's decision to grant a jury trial "even though its actions were somewhat unorthodox"); *Columbia Gas, Transmission Corp.*, 2008 WL 11378847, at *2 (granting a request construed as a motion under Rule 39(b) where the court found that the action "involves issues best tried to a jury," there are "a number of factual issues at issue," and "[t]here are also a number of credibility determinations").

Here, the Intervenor filed a motion asking the Court to allow it to submit "proposed jury instructions and interrogatories on the discreet issues of lack of good faith and scope of employment consistent with [Ohio Rev. Code §] 2744.07" and explaining that the "determination of whether Moore acted outside the scope of his official responsibilities or whether he acted in bad faith … are factual matters." (Doc. No. 370 at PageID 12697, 12702.) The Court issued an order granting that motion and then issued the Scheduling Order for submission of proposed jury instructions, verdict forms, and jury interrogatories. (Doc. No. 392; Doc. No. 398.) This corresponds with Rule 39(b)'s instruction that "the court may, on motion, order a jury trial on any issue for which a jury might have been demanded." Fed. R. Civ. P. 39(b). Additionally, the Intervenor submitted to the Court proposed jury instructions and interrogatories that included instructions on "acts or omissions not in good faith" and on "scope of employment," as well as three questions for the jury to answer. (Doc. No. 399.) The submission also stated that "Whether an employee acted within the scope of employment generally is a question of fact to be decided

by the jury." (*Id.* at PageID 13770.)  The Court then gave the jury instructions that, among other things, told the jurors: there is "another issue that you must decide"; they "must determine whether" Moore was not acting in good faith or within the scope of his employment or official responsibilities; instructions regarding when acts or omissions are not in good faith; instructions regarding what scope of employment means; and that they must assess questions regarding those issues.  (Doc. No. 472 at PageID 15551, 15554-56.)

Thus, several filings and statements could be construed as a Rule 39(b) motion and order, whether independently or combined, to have a jury decide the issues of whether Defendant Moore acted in good faith or outside the scope of his employment or official responsibilities.  *See Fed. Deposit Ins. Corp.*, 815 F.2d at 1333-34 (holding that the district court acted appropriately within its discretion in allowing trial to a jury under Rule 39(b) where no demand for a jury trial was made, but a "request for a jury trial [was] made in a manner sufficient to bring it to the attention of the court and the other parties … in a pretrial memorandum"); *Great Northern Ins. Co.*, 118 F.2d at 234 ("when a declaration of right involves the determination of issues of fact triable by a jury, such issues may be submitted to the jury in the form of interrogatories, with proper instructions by the court, whether a general verdict be required or not"); *Moores*, 834 F.2d at 1108; *Moody*, 915 F.2d at 207; *Kitchen*, 825 F.2d at 1013.

### c. Rule 39(c)(2)

Next, even if the issues tried to the jury on the Intervenor's Complaint were not issues "for which a jury might have been demanded" under Rule 39(b), they were triable to the jury pursuant to Rule 39(c)(2).[7]  Rule 39(c) states the following:

> (c) Advisory Jury; Jury Trial by Consent.  In an action not triable of right by a jury, the court, on motion or on its own:
>
> > (1)  may try any issue with an advisory jury; or
> >
> > (2)  may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right, unless the action is against the United States and a federal statute provides for a nonjury trial.[8]

Fed. R. Civ. P. 39(c); *see also* 9 CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2334 (4th ed. 2023) ("If there was no jury trial right on a particular issue as an original matter, the court may resort to Rule 39(c) to order an advisory jury or, with the consent of all parties, a regular jury trial").

Consent under Rule 39(c)(2) need not be express.  9 CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2333 (4th ed. 2023) ("For purposes of [Rule 39(c)(2)], consent need not be express"); *Bowie v. Cheramie Glob. Marine, L.L.C.*, No. Civil 16-3464, 2018 U.S. Dist. LEXIS 120682, 2018 WL 3474706, at *2 (E.D. La. July 19, 2018) (finding that the defendant "implicitly consented to a jury trial" under Rule 39(c)(2)), such that the case would proceed to a jury).  Courts have found, for example, that when only a request for equitable relief was submitted to the jury, and it was submitted without objection by either side, the submission to the jury triggered Rule 39(c)(2).  *Whiting v. Jackson State Univ.*, 616 F.2d 116, 123

---

[7] In its motion, the Intervenor simply asserts, without citation to any legal authority, that "[b]ecause the underlying intervening declaratory judgment action is equitable in nature since no monetary damages will be awarded, there is no right to a jury trial.  Thus the findings by the jury are implicitly advisory."  (Doc. No. 481 at PageID 15607.)

[8] This is not an action against the United States.

(5th Cir. 1980) ("[b]y failing to object, the parties agreed that the jury's verdict on the claims for equitable relief was to have the same effect as if a right to a jury trial existed").

Here, the Court believed that the parties consented to try by jury the issues of whether Defendant Moore acted in good faith or outside the scope of his employment or official responsibilities. Regarding the Intervenor, the Court's recitation in the last section regarding Rule 39(b) also supports that the Intervenor consented to try these issues by jury. Regarding Moore, he was a full participant in all aspects of this case; was witness to everything in the Court's recitation in the last section, including the Intervenor's filings and statements concerning the jury deciding these issues; and, like the Intervenor, he submitted proposed jury instructions and interrogatories (which never mention "advisory"). (Doc. No. 413.) Also, as the Intervenor acknowledges in its motion, "the Court did not explicitly indicate that as to the Township's intervenor declaratory judgment action there would be an advisory jury under Fed. R. Civ. P. 39(c)(1)." (Doc. No. 481 at PageID 15599.) These actions or omissions indicated that the parties understood, and consented to, having the jury decide the issues of whether Defendant Moore acted in good faith or outside the scope of his employment or official responsibilities—even if they objected to proposed language within the jury instructions on those issues.[9] Thus, if the Intervenor's action instead was

---

[9] In its reply brief, the Intervenor states: "Despite Plaintiff's argument to the contrary (Opp. Doc. No. 502, PageID 16754), the [Intervenor's] reservation of the right to submit proposed jury interrogatories does not equal consent." (Doc. No. 515 at PageID 18025.) But the Intervenor did more than reserve the right to submit proposed jury interrogatories, including that it actually submitted them and included a statement in its submitted proposed jury interrogatories, with citations to law, that "[w]hether an employee acted within the scope of employment generally is a question of fact to be decided by the jury" (Doc. No. 399 at PageID 13770). The Intervenor then watched as the Court gave the jury instructions and interrogatories (which were quite similar to those it had proposed), with the preface that they dealt with "another issue that you must decide." (Doc. No. 498 at PageID 16490; Doc. No. 472 at PageID 15551.)

an action not triable of right by a jury, then the situation aligned with Rule 39(c)(2) to try those issues by a jury.

### d.  Rule 39(c)(1)

Conversely, the situation here does not correspond with Rule 39(c)(1), which allows the court to "try any issue with an advisory jury" in "an action not triable of right by a jury."  Fed. R. Civ. P. 39(c)(1).  Even assuming that the Intervenor's Complaint is "an action not triable of right by a jury" (which, as shown above, is likely incorrect), the Sixth Circuit has held "that Rule 39(c) does not allow the trial court to transform a jury verdict into an advisory finding after the verdict is returned."  *Thompson v. Parkes*, 963 F.2d 885, 890 (6th Cir. 1992).   Instead, Rule 39(c)(1) "requires that the court's initiative in ordering a trial to an advisory jury must occur, and the parties be made aware of it, <u>before</u> the case is submitted."  *Id.* at 888 (emphasis added).  Where the parties agree (and the court orders) that the matter be tried as a jury case, and "[n]o mention [is] made of an advisory jury during trial preparation," then, "whether or not the issues were equitable in nature, the verdict of the jury must be treated as if the right had existed and it is beyond the power of the district court to set the verdict aside on the theory it was advisory."  *Id.*

Here, the Court did not indicate that the jury's interrogatory findings would be advisory, let alone order a trial to an advisory jury.  The Court would be prohibited by *Thompson* to now declare that the jury's interrogatory findings were merely advisory.[10]   Although the situation

---

[10] The Intervenor argues that, "since it is within the discretion of the trial court to accept or reject the verdict of an advisory jury, it can by the same token disregard the jury's responses to the interrogatories."  (Doc. No. 481 at PageID 15607 (citing *Hyde Properties v. McCoy*, 507 F.2d 301, 306 (6th Cir. 1974)).  The Court acknowledges that, "[s]ince it is within the discretion of the trial court to accept or reject the verdict of an advisory jury, it can by the same token disregard the jury's responses to the interrogatories."  *Hyde Properties*, 507 F.2d at 306.  However, the Sixth Circuit in *Hyde Properties* had first found that the jury was an advisory jury.  Thus, the Sixth Circuit was explaining that the trial court can disregard an advisory jury's responses to interrogatories.  Here, as explained above, the jury was not an advisory jury, so this principle from *Hyde Properties* is inapplicable.  The Court also notes that *Hyde Properties*, which involved an interpleader action with an allegation of fraudulent conveyance and explained that an interpleader action is an equitable remedy, "conclude[d] that there is no constitutional right to a jury trial in an interpleader action when the creditor is proceeding against the fund and seeking to annul the conveyance to the transferee."  *Hyde Properties*, 507 F.2d at 306.  In short, the situation here—involving a declaratory judgment action—is also

presented here is not the same as the one in *Thompson*, the Court finds unpersuasive the Intervenor's arguments that *Thompson* is not applicable and that the Court instead should follow guidance from *Merex A.G. v. Fairchild Weston*, 29 F.3d 821, 826-28 (2d Cir. 1994) and deem the jury's responses to the interrogatories to be non-binding and advisory only. (*See* Doc. No. 515 at PageID 18025.) First and foremost, contrary to the Intervenor's assertion, the issues of whether Defendant Moore acted in good faith or outside the scope of his employment or official responsibilities <u>were</u> to be decided by the jury. Additionally, in addition to *Thompson* being binding on this Court while *Merex* is not, the *Merex* case is distinguishable in that, among other things, it involved a promissory estoppel claim and the judge announced during the trial (but after the appellant had rested its case) that "she would let [the claim] go to the jury, but only for an advisory verdict" after characterizing the claim as "equitable." *Merex*, 29 F.3d at 823. Plus, the Second Circuit in *Merex* found it "most significant" that the judge "did not wait until the verdict was returned before deciding that the verdict would be advisory." *Id.* at 827. That is not the case here.

### ii. Weight of the evidence

The Court now turns to the Intervenor's argument that "the jury's responses to the interrogatories" regarding whether Moore acted in good faith or in the scope of his employment or official responsibilities "are clearly against the weight of the evidence presented at trial." (Doc. No. 515 at PageID 18017.)

When a party moves for a new trial on the basis that the jury's verdict was against the weight of the evidence, "the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the

---

distinguishable for purposes of determining whether there was a right to a jury trial.

evidence." *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991); *see also Denhof*, 494 F.3d at 543 ("[a] motion for a new trial may be granted if a court determines that the verdict is clearly against the weight of the evidence"). "In considering a motion for a new trial on the ground that the verdict is against the weight of the evidence, the court is not to set aside the verdict simply because it believes that another outcome is more justified." *Denhof*, 494 F.3d at 543. Instead, and although the trial court has discretion in ruling on such a motion, the trial court "should deny the motion if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable." *J.C. Wyckoff & Assocs.*, 936 F.2d at 1487; *see also Denhof*, 494 F.3d at 543 ("[t]he court is to accept the jury's verdict if it is one which reasonably could have been reached") (internal quotation marks omitted).

### a. The claims and Court's instructions to the jury

As explained above, two Section 1983 claims by Gillispie against Moore went to the jury. The first was a claim that Moore violated Gillispie's constitutional right to due process of law and a fair trial through identification evidence (the "Suggestive Identification Claim"). (Doc. No. 472 at PageID 15544.) Gillispie claimed that Moore violated his right to a fair trial through unreliable identifications that were used as evidence against him in the criminal case. (*Id.* at PageID 15541.) The second was a claim that Moore violated Gillispie's right to a fair trial by failing to disclose exculpatory and/or impeachment evidence that was material to Gillispie's defense in a criminal case (the "Suppression of Material Evidence Claim"). (*Id.* at PageID 15546.) Gillispie claimed that Moore violated his right to a fair trial by suppressing material evidence. (*Id.* at PageID 15541.)

Regarding the Suggestive Identification Claim, the Court instructed the jury that one of the requirements to succeed on the claim was that Gillispie "must prove … by a preponderance of the

evidence [that] Moore knowingly <u>or recklessly</u> used unnecessarily suggestive identification procedures that resulted in one or more unreliable identifications." (Doc. No. 472 at PageID 15544 (emphasis added).) Regarding the Suppression of Material Evidence Claim, the Court instructed the jury that one of the requirements to succeed on the claim was that Gillispie "must prove … by a preponderance of the evidence [that] Moore knowingly <u>or recklessly</u> concealed from the prosecutor readily apparent exculpatory and/or impeachment evidence during the criminal case and/or during Gillispie's appeal." (*Id.* at PageID 15546 (emphasis added).) The Court also instructed the jury that "[a] person acts recklessly when that person acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."[11] (*Id.* at PageID 15547.)

The Court's Instruction No. 29 concerned an "additional issue if the jury finds in favor of Plaintiff on any of his claims." (Doc. No. 472 at PageID 15551.) This "additional issue" related to the Intervenor's claim in its Intervenor Complaint involving Ohio Rev. Code § 2744.07. The first paragraph to that instruction explained:

> If, and only if, you find in favor of Plaintiff Gillispie and against Defendant Moore on one or more of Plaintiff's claims, then there is another issue that you must decide. You must determine whether, at the time of Defendant Moore's act or omission that deprived Plaintiff Gillispie of his Constitutional right, Defendant Moore was not acting in good faith, was acting manifestly outside the scope of his

---

[11] Inclusion of the phrase "or recklessly" in these jury instructions was supported by, for example, *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 957 (8th Cir. 2001), which involved a Section 1983 claim against officers following the pardon of a murder conviction and stated that "the proper standard to judge whether the officers' conduct violates due process is recklessness," and *Tiscareno v. Anderson*, 639 F.3d 1016, 1023 (10th Cir. 2011), *vacated on other grounds by Tiscareno v. Anderson*, 421 F. App'x 842 (10th Cir. 2011), in which the Tenth Circuit Court of Appeals held that, "in a [Section] 1983 context, … an investigator must not knowingly or recklessly cause a *Brady* violation." *See also Ross v. United States*, 910 F.2d 1422, 1433 (7th Cir. 1990) (negligence is "an insufficient mental state for a constitutional violation … [b]ut intent is not always required to establish a due process violation; our precedents have accepted recklessness as a proxy for actual intent"; reversing summary judgment on a Section 1983 claim against an officer because there were sufficient facts for a jury to conclude that the officer acted in a reckless manner). The Court did not find, and was not directed by any party to, a case from the Supreme Court or the Sixth Circuit Court of Appeals that would preclude inclusion of the phrase "or recklessly." The definition of recklessly in the instructions is supported by, for example, the Supreme Court's statement in *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) that "[t]he civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."

employment or official responsibilities, or was not acting within the scope of his employment or official responsibilities.

(*Id.*) The Court went on to explain in the same instruction what was meant by "good faith" for purposes of this additional issue:

> For purposes of this issue, one does not act in good faith when his conduct evinces a dishonest purpose, conscious wrongdoing, or the breach of a known duty through some ulterior motive. Bad faith is the opposite of good faith, generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive, or ill will partaking of the nature of fraud. Conduct that is reckless may still be in good faith.[12]

(*Id.*) And, the Court went on to explain in the same instruction what was meant by "[s]cope of employment" for purposes of this additional issue:

> Scope of employment means the employee is engaged in an activity that is logically related to the business of the employer. The determination of whether conduct is within the scope of employment necessarily turns on the perception of whether the employee acted, or believed himself to have acted, at least in part, in his employer's interests. However, if an employee's actions are self-serving or have no relationship

---

[12] This entire paragraph from the instruction, except for the phrase "For purposes of this issue" and the last sentence ("Conduct that is reckless may still be in good faith") comes, word-for-word, from the Intervenor's own proposed jury instructions. (Doc. No. 399 at PageID 13769.) The last sentence is supported by, for example, Ohio Rev. Code § 2744.03(A)(6)(b), which is from the same act as § 2744.07 and shows that there is a distinction between acts or omissions taken "in bad faith" and acts or omissions taken "in a wanton or reckless manner." *See also Chavalia v. City of Cleveland*, 2017-Ohio-1048, 87 N.E.3d 705, 714 n. 11 (Ohio Ct. App. 2017) (in a case involving whether the conduct of the defendant employees of a political subdivision was "reckless," highlighting that the plaintiff had not argued that the employees "acted (or failed to act) with malicious purpose or in bad faith and there is no evidence in the record to suggest that they did so"); *Strayer v. Barnett*, 2017-Ohio-5617, 94 N.E.3d 156, 164 (Ohio Ct. App. 2017) (case involving the issue of whether a political subdivision's employees' actions were wanton or reckless; there was "no allegation, or any facts to support, that the [political subdivision's employees] … acted with a malicious purpose or in bad faith"). The other portions of the paragraph are likewise supported by Ohio law. *See, e.g., McCormack v. Jefferson Area Loc. Sch. Dist.*, 2018-Ohio-3744, 112 N.E.3d 338, 344 (Ohio Ct. App. 2018) ("one does not act in good faith when his conduct evinces a dishonest purpose, conscious wrongdoing, or the breach of a known duty through some ulterior motive"); *Lowry v. Ohio State Highway Patrol*, No. 96API07-835, 1997 Ohio App. LEXIS 679, 1997 WL 84656, at *5 (Ohio Ct. App. Feb. 27, 1997) ("[t]he definition of bad faith is the opposite of good faith, generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive") (internal quotation marks omitted; alterations adopted); *Buckeye Union Ins. Co. v. New England Ins. Co.*, 1999-Ohio-67, 87 Ohio St. 3d 280, 720 N.E.2d 495, 499 (Ohio 1999) ("bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud").

to the employer's business, then the conduct is manifestly outside the scope of employment. Manifestly is defined as plainly or obviously.[13]

(*Id.*)

The jurors found for Gillispie on both claims.[14]   (Doc. No. 475 at PageID 15561-62, 15566.)  Thus, they found by a preponderance of the evidence that Moore at least "recklessly used unnecessarily suggestive identification procedures that resulted in one or more unreliable identifications" and at least "recklessly concealed from the prosecutor readily apparent exculpatory and/or impeachment evidence during the criminal case."  (*Id.* at PageID 15544, 15546, 15561-62, 15566.)  The jurors then found, through their responses to the jury interrogatories and with respect to both Section 1983 claims, that it was <u>not</u> proven by a preponderance of the evidence that Moore was (a) not acting in good faith; (b) was acting manifestly outside the scope of his employment or

---

[13] This entire paragraph from the instruction, except for the first sentence ("Scope of employment means the employee is engaged in an activity that is logically related to the business of the employer") likewise comes, word-for-word, from the Intervenor's own proposed jury instructions.  (Doc. No. 399 at PageID 13770.)  The first sentence is supported by, for example, the Ohio Supreme Court's opinion in *Theobald v. Univ. of Cincinnati*, 111 Ohio St. 3d 541, 2006-Ohio-6208, 857 N.E.2d 573, 577 (Ohio 2006), which states: "The [Ohio] Revised Code does not define 'scope of employment.'  The concept generally denotes an agency relationship in which the agent or employee is engaged in an activity that is logically related to the business of the principal or employer."  The other portions of the paragraph are likewise supported by Ohio law.  *See, e.g., McCormack*, 112 N.E.3d at 344 ("the determination of whether conduct is within the scope of employment necessarily turns on the fact finder's perception of whether the employee acted, or believed himself to have acted, at least in part, in his employer's interests") (internal quotation marks omitted; alteration adopted); *Theobald*, 857 N.E.2d at 580 ("if an employee's actions are self-serving or have no relationship to the employer's business, then the conduct is 'manifestly outside the scope of employment'"); *Whaley v. Franklin Cnty. Bd. of Comm'rs*, 2001-Ohio-1287, 92 Ohio St. 3d 574, 752 N.E.2d 267, 272 (Ohio 2001) (in a case involving Ohio Rev. Code § 2744.07, defining "manifestly" as plainly or obviously).

[14] Assuming that it even had the ability to challenge the findings of liability for Gillispie's Section 1983 claims against Moore, the Intervenor expressly states that it is "not disputing the jury's verdict finding that" Moore violated Gillispie's constitutional rights.  (Doc. No. 515 at PageID 18008.)  Again, the Intervenor argues that it is "the jury's responses to the interrogatories" regarding whether Moore acted in good faith or in the scope of his employment or official responsibilities—which are related to the Intervenor's claim in its Intervenor Complaint involving Ohio Rev. Code § 2744.07—that are allegedly "clearly against the weight of the evidence presented at trial."  (Doc. No. 515 at PageID 18017.)

official responsibilities; and (c) was not acting within the scope of his employment or official responsibilities.[15]  (*Id.* at PageID 15564-66.)

### b.  Evidence at trial

Moore, while serving as a detective for the Miami Township Police Department, presented victim C.W. with a photo lineup on July 16, 1990, nearly two years after the rapes.  (Doc. No. 472 at PageID 15537; Doc. No. 489 at PageID 15929.)  The photo used of Gillispie in the photo array had a goldish background (unlike any of the other photos) and displayed Gillispie's face closer than the other photos (thus, his face took up more of the photo).  (*See* Doc. No. 489 at PageID 15919, 15924; Doc. No. 490 at PageID 16049-50 (photo of Gillispie in photo lineup for B.W., C.W., and S.C. was the same, but its placement in the photo lineup was changed to a different spot); Plaintiff's Exhibit 285 at page 7 (showing photo of Gillispie in photo lineup in color); Doc. No. 507 at PageID 17740-41 (admitting pages 6, 7, 9 and 10 of Plaintiff's Exhibit 285).)  Moore created the photo of Gillispie used in the photo array by enlarging a photo of Gillispie from his employment identification badge.  (Doc. No. 489 at PageID 15887-89.)  Additionally, two of the other photos used in the lineup were of Miami Township officers; both were pictured in a tie and jacket, which is the exact same way that Moore was dressed.  (Doc. No. 489 at PageID 15898-99.)  During his testimony at trial, Moore conceded that he did nothing to make sure that the victims (who were at the police station multiple times) would not have recognized those two men from the police station and did nothing to ensure that neither of those men were working at the police station (where the identifications took place) at the time of the identifications.  (*Id.* at PageID 15900-03.)

Among the evidence at trial was Defendant's Exhibit 5, a composite sketch with a brief description of the perpetrator and of the rapes of B.W. and C.W.  (Def. Exh. 5; Doc. No. 489 at

---

[15] As explained above, the phrasing of the interrogatories tracked the language in Ohio Rev. Code § 2744.07.

PageID 15857, 16013; Doc. No. 507 at PageID 17749 (admitting Defendant's Exhibit 5).) B.W. and C.W. had provided the descriptions, and the description of the perpetrator in that exhibit included that he had a "wide face." (*Id.*) During the identification procedure with Moore, C.W. selected a picture from the lineup and remarked that "[h]is face is full" and she was "about 90 percent sure." (Doc. No. 490 at PageID 16064; Doc. No. 492 at PageID 16251-52; Defendant's Exhibit 18 (photo lineup materials relating to C.W. identification); Doc. No. 507 at PageID 17751 (admitting Defendant's Exhibit 18).) The picture she selected was of Gillispie. (*Id.*)

The sisters (C.W. and B.W.) had been raped at the same time. (Defendant's Exhibit 5.) Moore presented B.W. with the photo lineup on July 17, 1990 (i.e., the day after C.W. had been presented with the photo lineup and made her identification of Gillispie), and B.W. had arrived at the police station that day (July 17) with her sister, C.W. (Doc. No. 489 at PageID 15942, 15948.) Thus, C.W. had the opportunity to talk to B.W. before B.W. saw the photo array, although Moore testified that he had specifically told C.W. "not to talk about the lineup to her sister." (*Id.*) Moore admitted that he could have conducted their lineup identifications at the same time in order to avoid the potential that they could talk to one another about it. (*Id.* at PageID 15943.) B.W. selected the picture of Gillispie. (Doc. No. 489 at PageID 15943-44.)

Additionally, Moore told C.W. and B.W. prior to their testimony at a hearing (at which Moore knew Gillispie's lawyers might ask about the description the sisters had given of the perpetrator at the time of the rapes) that Gillispie had tried to change his appearance. (*Id.* at PageID 15958, 15961, 15965-66.) C.W. testified at one of Gillispie's criminal trials that Moore had told her that, in his opinion, Gillispie had dyed his hair. (Doc. No. 490 at PageID 16129-30.)

Moore testified at the trial on three different days. (Doc. Nos. 489, 490, 492.) Among the testimony was the following:

40

- Q. So there came a time where you went to the prosecutor's office to seek charges against Mr. Gillispie, correct? A. Yes, that time did come. Q. And when that time came, you believed in your heart that Mr. Gillispie was the perpetrator of the rapes you were investigating? A. At that point, I would have believed that he was the perpetrator of these offenses, yes. Q. Whatever -- did? A. Did. Q. And you believed in your heart that the victims had correctly identified [Gillispie] as the perpetrator? A. Yes, I did. Q. And the actions that you took in the investigation were motivated by that belief? A. That's true. Q. And the decisions that you made in the investigation were motivated by that belief? A. Yes, sir. … Q. … Having sat through the trial and seeing all the evidence we've seen so far, you still assert that Mr. Gillispie is guilty, right? A. Yes, sir. (Doc. No. 489 at PageID 15843.)

- Q. So was it your understanding that it was okay to single out a suspect in 1990? A. I never singled out a suspect in 1990. (*Id.* at PageID 15894.)

- THE COURT: Detective, did you know that you were not to set up a photo lineup that singled out one of the individuals that appear in that lineup? THE WITNESS: Yes. … Q. And you knew that if you did single out somebody, you risked misidentification? A. If you do. Q. Yes. And you know that a misidentification would cause an unfair trial, correct? A. It could. (*Id.* at PageID 15896.)

- Q. Do you agree that using Miami Township Police Department's department police officers as fillers could be suggestive to the witness? A. No. My witness doesn't know whether they are police officers or not. … Q. Isn't it true that they were dressed the exact same way you dressed? A. Yes. Q. And the witnesses were capable of seeing how you dressed? A. Yes. Q. Okay. And you understood that the witnesses might be able to tell that those two people [in the lineup] were detectives? A. No, I did not understand that. (*Id.* at PageID 15899.)

- Q. So the time between when you flipped over the photo array and the time that [victim C.W.] made an identification is two minutes? … A. Yes. Q. And would you also agree with me that during those two minutes she was looking back and forth between several of the photos? A. Yes. (*Id.* at PageID 15937.)

- Q. Okay, sir. Do you recall testifying at a grand jury proceeding to try to get an indictment of Mr. Gillispie? A. I remember testifying at grand jury, yes. … Q. And did you say the following: "[C.W.] narrowed it down to one person [in the photo array], and due to me using the term '100 percent positive' she became hesitant. So I went ahead and I read her the question 'Do any of the people in this lineup look similar and like?' and she said that she had picked somebody out," right? A. I believe that is how that went, yes. Q. And when you said that you read her the question, you were -- that was -- you were using shorthand for a specific question that the instructions tell you to read, correct? A. Yes. There is a one-liner at the bottom of the photographic lineup instructions. Q. And that sentence is – and, actually, the instructions tell you to read that sentence if a witness cannot make an identification, correct? A. Yes. Q. And the sentence says, 'Do any of the persons shown in the photographs resemble the person you saw?' A. That is what

it says. Q. And that's when she picked out Mr. Gillispie, correct? A. Well, yes. (*Id.* at PageID 15940-41.)

- Q. Now, after B.W. had gone through the photo array with you, you brought B.W. and C.W. together in a room, right? A. After the fact, yes. Q. And you gave them feedback about the pictures, correct? A. I believe we discussed it. … Q. It was words to the effect that they picked out the person you suspected, correct? A. Yes. Q. And you actually gave them Mr. Gillispie's last name? A. I believe that – I don't actually remember that independently, but I believe that that is a possibility. (*Id.* at PageID 15943-44.)

- Q. Okay. Now, another set of documents that were at issue here are the camping cards, correct? A. Those became an issue in the trial, yes. Q. Because those were potential pieces of evidence to confirm [Gillispie's] alibi for [August 20, 1988 when B.W. and C.W. were raped], right? A. Those -- those were evidence concerning that period of time. Q. And you came to possess some of the cards from the campground? A. Three, I believe, yes. Q. And, well, we can agree that you only gave three cards to the prosecutor, correct? A. That's because I only had three cards to give to the prosecutor. Q. But we can agree that you only gave three cards to the prosecutor? A. Yes, sir. … Q. So the three cards that you gave to the prosecutor, one is from May, one is from June, and one is from July? A. Correct. Q. Now, you also testified about receiving camping cards when you testified at the grand jury, correct? A. I believe so. … Q. Okay. Sir, you told the grand jury, "[Gillispie] tried to tell me that he was down at Twin Knobs campground down in Kentucky, camping with a friend Jerry Fyffe. I got ahold of the park rangers down there. I have the registration cards for the last few months prior to that. Roger Gillispie was down there. He was down there four days after the girls were raped." Do you see that [on the grand jury testimony transcript]? A. Yes, I just read that. Q. And did you testify to that at the grand jury? A. Well, I did. But my view is, is that I have the cards for a three-month period. It's not that I have all of them for the last few months. Q. Okay. You told the grand jury, "[Gillispie] was down there [at the campgrounds in Kentucky] four days after the girls got raped," correct? A. I believe so, yes. Yes. Q. And four days after the girls got raped was in the month of August 1988, correct? A. August 20th. Q. Yeah. A. Yeah. Q. So where is the cards [sic] for August? A. I was wrong in my statement. Q. When you told the grand jury that [Gillispie] was at the campground but wasn't there until four days after the girls got raped, that was just wrong? A. I evidently made a mistake when it came to being July or August, and I was looking at the number on the campground receipt. There was never a campground receipt for August. … Q. When's the first time you told anybody that you testified to something incorrect at the grand jury? A. I don't – I don't know if I ever had. I don't remember. … A. I never had any campground receipts for August. (*Id.* at PageID 15974-77.)

- Q. And when you became a full-time police officer with Miami Township, were you required to take an oath of office to uphold the Constitution of the United States, the State of Ohio, and the laws of the State of Ohio? A. Yes, ma'am. Q. And would you agree with me that police officer is a position of trust? A. Yes,

ma'am. (*Id.* at PageID 15990-91.)

- Q: … [H]ow would you describe, in your position as a detective with the Miami Township Police Department, what your official duties and responsibilities were? A. Well, my official duties was, is when we were assigned cases, were to investigate the cases, follow up leads, try to find suspects, talk with witnesses, and find any evidence that we could to put the case together. Q. And so, Mr. Moore, would you agree with me that as part of that, included in your official responsibilities was to turn over any exculpatory or material evidence to a prosecutor that you had in your possession when an individual was being charged with a crime? A. That would be true. (*Id.* at PageID 15991.)

- Q. … Is it fair to say that in a case or investigation that you would have, that you would turn over the entire case file that you had in your possession? A. Yes, ma'am. Q. Okay. And if a police officer knowingly failed to turn over the evidence that they had in their police – or in their investigative file, would that be sort of outside of what they are supposed to do? A. Yes, ma'am. Q. So it would be outside of their official duties; is that fair? A. Yes, ma'am. (*Id.* at PageID 15992.)

- Q. Would there be any basis for a police officer to knowingly keep or not turn over all of the evidence in their case file to a prosecutor? A. All of the evidence should be turned over to the prosecutor, and in this case, everything was turned over to the prosecutor. (*Id.* at PageID 15993.)

- Q. … [I]s there any reason if a police officer knowingly or purposely didn't turn over the entire case file and the evidence contained in there, why there -- why someone would do that? A. I can't speak to what the reasons would be for someone else. I can tell you that I know that everything needs to be turned over to the prosecutor. And that's what was done. Q. Okay. And as a Miami Township police officer, was that something that you were trained to do, to turn over all evidence to the prosecutors in an investigation? A. I believe that there had been some training in that. I know that you go through that through your academy. Q. Okay. A. That all evidence should be turned over, especially if you are going to end up going to trial or any other court hearing; that all evidence and all documents that you have in your possession should be turned over to the prosecutor in order for them, under discovery, to be given to the defense. Q. And that's part of the police officer's official duties and responsibilities, correct? A. Yes, ma'am. (*Id.* at PageID 15993-94.)

- Q. … Back in 1990 when you were a police detective, would you agree with me that as part of your responsibilities in investigating a crime, which required a identification, that one of your duties would be to provide a -- to provide as fair of an identification that you could within what was available to you? A. Yes. (*Id.* at PageID 15594-95.)

- Q. Now, with respect to the evidence in a case that you turn over to a prosecutor, would you agree with me that as part of your responsibilities and duties as a police

officer, that you're not to either destroy any evidence or to fabricate or make up any evidence? A. I would agree with that, yes. (*Id.* at PageID 15995.)

- Q. And as a police officer with the oath of office to uphold the laws of the State of Ohio, would you agree that if, in fact, evidence was destroyed or fabricated, that an officer would not be upholding their oath? A. Yes. (*Id.* at PageID 15995-96.)

- Q. And, in fact, if that was done [an officer knowingly destroying evidence], again, that would be contrary to what their official responsibilities and duties are as a police officer, correct? A. If that was done. (*Id.* at PageID 15997-98.)

- Q. In determining if there is probable cause on an investigation that is performed by a police detective, is it fair to say that a police detective cannot misstate, knowingly misstate or fabricate evidence? A. I would hope that no detective or police officer intentionally misstated -- THE COURT: Detective Moore, that's just a yes or no, and then if you want to explain it, then you can. [MOORE]: Then, no. (*Id.* at PageID 15998.)

- Q. If any evidence is not given to a prosecutor on a case that's investigated, would that be contrary to a police officer or police detective's oath of office? A. It would. (*Id.* at PageID 15999-16000.)

- Q. Had you previously said something to [victim] C.W. about [being] a hundred percent before she made her selection [in the photo lineup]? A. Yes, I had. Q. Tell us about that. A. I don't remember all of the exact words, but I know that I told her prior to showing the photo lineup that I needed her to be 100 percent sure, which at that time, hindsight, that was a mistake. And that was a mistake because now I've put pressure on her -- … Q. And did she have a reaction to you telling her she had to be a hundred percent certain? A. Well, she was identifying with an image, and I could see that by her tracking with her eyes on that image. I think that this did put pressure on her at that time, undue pressure, and she did end up making an identification. (Doc. No. 490 at PageID 16064-65.)

- Q. And as a police officer, did you understand that you had a duty to deliver all the evidence, good and bad, to the prosecutor? A. Absolutely. (*Id.* at PageID 16098.)

- Q. Does that refresh your recollection that you told [B.W. and C.W.] you had suspects for them to look – you had a suspect for them to look at when you called them and asked them to come see the photos? A. Yes. (*Id.* at PageID 16132.)

- Q. [A]t some point in time you told [B.W. and C.W.] that you believed [Gillispie] had died [sic] his hair, correct? We talked about that yesterday afternoon. A. That was probably -- yes. Q. And that was well after you turned the file over to the prosecutor, correct? A. I don't remember specifically when it was. I know that we -- there was a conversation, yes. (Doc. No. 492 at PageID 16256-57.)

Additionally, the photo lineup materials relating to C.W.'s identification (Defendant's Exhibit 18)

state, in part: "PHOTOGRAPHIC SHOW-UP INSTRUCTIONS (must be read verbatim) … If a witness cannot make an identification, he may then be read the following: 'Do any of the persons shown in the photographs resemble the person you saw?'" (Defendants Exhibit 18.) Those materials for C.W. do not indicate that Moore read her that question, although, as shown above, Moore testified that he had done so and that C.W. then selected Gillispie's photo from the lineup.[16] (*Id.*; Doc. No. 489 at PageID 15940-41.)

Other witnesses also provided testimony relevant to the issues. For example, Moore's expert witness on police practices, Dr. Anthony Monheim, testified that it is "not an identification" if a victim who is looking at a photo lineup says that the person selected by the victim out of the lineup "merely resembled the perpetrator." (Doc. No. 507 at PageID 17639-40.) Dr. Monheim repeated that "[r]esembles is not an identification, no." (*Id.*) As another example, testimony from Steven Fritz, who was a detective-sergeant at Miami Township Police Department at the time of the rapes (Doc. No. 491 at PageID 16138-40) included:

- Q. … [A] detective also has a duty to maintain evidence as well, correct? A. Yes. Q. All right. Now, when a detective is finished with his investigation, he or she will then go seek charges from a prosecutor, correct? … [A.] Okay. Yeah, if there were charges to be filed and they were felony charges, they would be brought -- to the detective would take them -- put together what we call a filing, which was a complete file for the police department, keep – complete file for the defense, and complete file for the prosecutor, and it would go to the prosecutor's office. (Doc. No. 491 at PageID 16232.)

- Q. So is it fair to say that one of the official responsibilities or duties of a police detective is to turn over evidence to a prosecutor when the individual is charged with a crime? A. It wouldn't go to the -- it would not go to the prosecutor. They would be made aware that we were holding the evidence in our property room. And then at the time of trial, or if they needed it ahead of time, we would transport it for

---

[16] During closing arguments, Gillispie's counsel highlighted this—as well as concerns with how Moore administered the photo lineups, how Moore spoke to B.W. and C.W. about his belief that Gillispie had tried to change his appearance, and how Moore did not disclose to anyone his mistake during grand jury testimony regarding when Gillispie was at the Kentucky camping grounds—for the jury. (*See, e.g.,* Doc. No. 498 at PageID 16393-16401, 16463-67.)

wherever they wanted, if they wanted to look at it. (*Id.* at PageID 16232-33.)

- Q. Mr. Fritz, you knew as a detective at the Miami Township Police Department in 1990 that you had to turn over all evidence and police reports [related to an investigation of a case] to the prosecutor, correct? … A. Oh, yes. Q. And as a detective-sergeant for the detective section at the Miami Township Police Department in 1990, you would have expected your detectives to do that, correct? A. Yes. Q. Because that was part of their duties as a detective with the Miami Township Police Department detective section in 1990, correct? A. If they a [sic] case that was going to the prosecutor's office, they had to turn in all paperwork to them. Q. And paperwork includes police reports and supplemental reports, correct? A. Yes. (*Id.* at PageID 16235-36.)

- Q. … During your time at the Miami Township Police Department in 1990, would it be inconsistent with a police officer's oath of office for that department to withhold evidence or police reports? A. Yes. (*Id.* at PageID 16236.)

Additionally, testimony from Gillispie's police practices expert, Dr. Andrew Scott, included the following:

- Q. … Would it be a deviation from accepted police practices that existed in 1990 to permit witnesses to have the opportunity to confer with one another between identification procedures? A. … You don't want witnesses conferring amongst each other, with one witness viewing the photo array and they know each other and then scheduling them to come in and view it the next day. You just don't want the possibility of collusion that, you know, they are discussing the photo array, and so that it's not an impartial viewing. Q. Is there any established police practice from 1990 of which you're aware that would sort of bless or condone giving opportunities for multiple witnesses who know each other the chance to confer over a period of a day between identification procedures? A. No, not at all. (Doc. No. 493 at PageID 16271-72.)

- Q. … Dr. Scott, we were talking a little bit about photo lineups and identifications, and was it an important established practice in 1990 for officers to avoid making suggestive statements to the witness that they may have a suspect? A. Yes. It's very clear in the literature and the training that we received back in the '90s and even prior to that that you make no suggestions or identify that the suspect – we have a suspect, and we want you to see him or look for him in this photo array or what have you. Make no recommendations or suggestions. Q. And was there an understanding of why it was important to avoid doing things like that? A. If you started to lead the witness on as to, yes, there is a suspect within the photo array, the victim or the witness is going to think, well, the suspect is in the array, and, therefore, I have to make a choice. And if I don't, either I'm going to let the police officer down or, you know, I'm going to let the case down. But that's the biggest reason. Suggestion by a detective is not a good thing, and we were prohibited from doing that or cautioned not to do it. (*Id.* at PageID 16274-75.)

- Q. … Were there established practices for how police should conduct themselves while the witness has the opportunity to view a photo array? A. Yes. Show officers were required, number one, not to make any type of suggestive comments or affirmation comments. That's number one. Number two, if they are the investigating officer of the case and they are providing the photo array, you ought to document everything that the witness says relative to if they make an identification, how – you know, are they certain. And then the other thing is if they don't make an identification or they say, 'I'm pretty sure it's this guy, but I can't say a hundred percent sure that it is,' then you want to write that down in notes and put that in your report because it's extremely important later on as the case progresses and if you ultimately do arrest an individual. (*Id.* at PageID 16281.)

- Q. … Based on your experience and expertise, is it part of the duties and official responsibilities of the police officer to provide a photo lineup or to prepare a photo lineup that's not knowingly suggestive or unnecessarily suggestive of a particular suspect? A. Sure, that makes sense. Q. And so the accepted policies and practices or these best practices are guidelines to help prevent that knowingly suggestive or unnecessarily suggestive lineup, correct? A. Correct, with the understanding that a well-trained officer would know that the photo lineup is either suggestive or not. … Q. I think you just testified that you would assume that a police officer would be able to determine whether or not a lineup was knowingly or unnecessarily suggestive? A. Yes. And the caveat I used of a well-trained police officer. … Q. In your experience as a police officer and your expertise as an expert in policies and practices, should a police officer knowingly make a suggestive or an overly suggestive lineup? A. No, under no circumstances should that happen. (*Id.* at PageID 16297-98.)

### c. Application

The jurors could reasonably have found that Moore (1) acted recklessly in using unnecessarily suggestive identification procedures that resulted in one or more unreliable identifications and recklessly concealed from the prosecutor readily apparent exculpatory and/or impeachment evidence during the criminal case (for purposes of the Section 1983 claims) yet (2) acted in good faith and within the scope of his employment or official responsibilities (for purposes of Ohio Rev. Code § 2744.07).

As an initial matter, the Intervenor does not point to evidence that supports Moore committed any Section 1983 violation <u>knowingly</u>. That is not to say that a jury absolutely could not come to that conclusion from the evidence presented at trial, but instead that the evidence is

much more supportive in finding reckless conduct by Moore. While the evidence supported that Moore was an overzealous, stubborn detective when it came to his focus on Gillispie as the potential perpetrator of the rapes, it was not unreasonable for the jury to believe Moore's testimony demonstrating a lack of intent in committing a Section 1983 violation. *See Holmes v. City of Massillon*, 78 F.3d 1041, 1048 (6th Cir. 1996) (reversing the trial court's granting of a motion for new trial where it was not unreasonable for the jury to believe the plaintiff's testimony).

Regarding the Suggestive Identification Claim, the evidence supported a finding that Moore took reckless actions in creating the photo lineups, administering the photo lineups, and/or his discussions with victims B.W. and C.W. prior to their identification(s) of Gillispie. Regarding the Suppression of Material Evidence Claim, the evidence supported a finding that Moore recklessly failed to disclose to the prosecutor that (1) C.W. did not identify Gillispie during the photo lineup and (because she could not make an identification) she needed to be asked "Do any of the persons shown in the photographs <u>resemble</u> the person you saw?" before she selected Gillispie's photo and/or (2) a material portion of his testimony about when Gillispie was at the campground in Kentucky was incorrect. Evidence at this trial showed that Gillispie's criminal trial was a close call and that the jury struggled to find him guilty. (*See, e.g.,* Doc. No. 509 at PageID 17799-17801 (the criminal jury deliberated for "a very long time" (days as opposed to hours); a note disclosed to the judge and counsel indicated the jury was "hung -- 8 for acquittal, 4 for conviction"; the trial judge then gave a charge to the jury to keep deliberating; the jury deliberated several more hours and then came back with a conviction).)

Turning to the jury's interrogatory findings regarding whether Moore acted in good faith or in the scope of his employment or official responsibilities at the time,[17] the Intervenor argues

---

[17] The Court calls attention to the fact that, in accordance with the jury instructions, the jury "determine[d] whether, <u>at the time of Defendant Moore's act or omission that deprived Plaintiff Gillispie of his Constitutional right</u>, Defendant

that it is "the jury's findings [on those issues of good faith and in the scope of his employment or official responsibilities that] are clearly against the weight of the evidence." (Doc. No. 481 at PageID 15609.) The Intervenor points to some testimony from Moore, all of which is set forth in the bullet points above, as well as some testimony from other witnesses. (Doc. No. 481 at PageID 15602-07, 15609; Doc. No. 515 at PageID 18010-15, 18017.)

The Court disagrees with the Intervenor's argument. First, viewing the evidence that the Court just highlighted as supporting a finding that Moore took reckless actions resulting in liability for the Suggestive Identification Claim or the Suppression of Material Evidence Claim, a reasonable juror could answer "No" to the question: "With respect to [each of the two claims], was it proven by a preponderance of the evidence that Matthew Scott Moore was not acting in good faith?" (Doc. No. 472 at PageID 15555-56.) As stated in the jury instructions, "one does not act in good faith when his conduct evinces a dishonest purpose, conscious wrongdoing, or the breach of a known duty through some ulterior motive." (*Id.* at PageID 15551.) The jury instructions further explained that "[b]ad faith is the opposite of good faith." (*Id.*) A reasonable juror could find that the actions just highlighted by the Court did not "evince[] a dishonest purpose, conscious wrongdoing, or the breach of a known duty through some ulterior motive."[18] (*Id.* at PageID 15551.) Furthermore, the jury instructions regarding this issue informed the jury that one can act recklessly, yet not in bad faith (i.e., can still act in good faith). (*Id.*)

---

Moore was not acting in good faith, was acting manifestly outside the scope of his employment or official responsibilities, or was not acting within the scope of his employment or official responsibilities." (Doc. No. 472 at PageID 15551 (emphasis added).) This corresponds with Ohio Rev. Code § 2744.07(A) and (B). *See, e.g.*, Ohio Rev. Code § 2744.07(B) ("…a political subdivision shall indemnify and hold harmless an employee in the amount of any judgment … that is for damages for injury, death, or loss to person or property caused by an act or omission in connection with a governmental or proprietary function … [unless] [a]t the time of the act or omission, the employee was not acting in good faith [or] … [a]t the time of the act or omission, the employee was not acting within the scope of the employee's employment or official responsibilities") (emphasis added).

[18] This contrasts with, for example, the situation in *McCormack*, where the political subdivision's employee (a coach) was found to be not acting in good faith where evidence showed that he had "used his position of authority over the [high school students] to manipulate and sexually abuse them." *McCormack*, 112 N.E.3d at 344.

Second, viewing the evidence that the Court just highlighted as supporting a finding that Moore took reckless actions resulting in liability for the Suggestive Identification Claim or the Suppression of Material Evidence Claim, a reasonable juror could answer "No" to the questions: "With respect to [each of the two claims], was it proven by a preponderance of the evidence that Matthew Scott Moore was acting manifestly outside the scope of his employment or official responsibilities as a police officer with Miami Township?" and "With respect to [each of the two claims], was it proven by a preponderance of the evidence that Matthew Scott Moore was not acting within the scope of his employment or official responsibilities as a police officer with Miami Township?" (Doc. No. 472 at PageID 15555-56.) As stated in the jury instructions, "[s]cope of employment means the employee is engaged in an activity that is logically related to the business of the employer." (*Id.* at PageID 15551.) The jury instructions further explained that, "if an employee's actions are self-serving or have no relationship to the employer's business, then the conduct is manifestly outside the scope of employment." (*Id.*)

The evidence that the Court just highlighted as supporting a finding that Moore took reckless actions resulting in liability for the Suggestive Identification Claim or the Suppression of Material Evidence Claim involved: Moore creating or administering a photo lineup in the course of a criminal investigation; speaking to the victims of the crimes that he was investigating regarding the photo lineup or regarding the suspect's alleged change in appearance prior to identifying him in court; or providing testimony regarding his criminal investigation. They were all activities "logically related to the business of" the Miami Township Police Department. They were all taken in the course of Moore's work as a Miami Township police detective investigating, or assisting in prosecuting, a crime. Furthermore, the jury instructions even told the jury that the "determination of whether conduct is within the scope of employment necessarily turns on the

50

perception of whether the employee acted, <u>or believed himself to have acted</u>, <u>at least in part</u>, in his employer's interests." (*Id.* (emphasis added).)  It would be reasonable for a juror to conclude that Moore, who the Miami Township Police Department assigned to investigate the rapes of B.W. and C.W. and who thought (and still thinks) that Gillispie committed the crime, believed that he took these actions, at least in part, in the police department's interests.[19]

The Court has compared the opposing proofs and weighed the evidence.  The Court has also taken into consideration the Sixth Circuit's warnings that "the court is not to set aside the verdict simply because it believes that another outcome is more justified" (*Denhof*, 494 F.3d at 543) and that "the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable" (*J.C. Wyckoff & Assocs.*, 936 F.2d at 1487).  The Court finds that the jury's answers to the interrogatories <u>were not</u> "against the clear weight of the evidence." *J.C. Wyckoff & Assocs.*, 936 F.2d at 1487.  They <u>were</u> "one[s] which could reasonably have been reached." *Id.*; *Holmes*, 78 F.3d at 1047 ("a jury's verdict should not be overturned as being against the weight of the evidence unless that verdict was unreasonable").  Therefore, the Court denies the request for a new trial on the asserted basis that the jury's findings in the jury interrogatories relating to Ohio Rev. Code § 2744.07 were against the weight of the evidence. *Id.*

### iii. The Intervenor's assertion that the jury's findings on the issues of good faith and scope of employment were inconsistent with Sixth Circuit law

The Intervenor also asserts that "the jury's findings on the issue of Defendant Moore acting in good faith and within the scope of his employment or official responsibilities … is inconsistent

---

[19] This too contrasts with, for example, the situation in *McCormack*, where the political subdivision's employee (a coach) "could not have reasonably believed he was acting in the District's best interests when he sexually abused the [high school students] in the gym and at the newspaper offices," and, therefore, his actions "could not reasonably be considered to be in the scope of his employment." *McCormack*, 112 N.E.3d at 345.

with the law in this Circuit." (Doc. No. 481 at PageID 15609.) This assertion misses the mark from the start.

The Intervenor points to the Sixth Circuit's decision in *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) and argues that it does not support the jury interrogatories responses. (Doc. No. 515 at PageID 18015.) However, the Intervenor here confuses the federal law claims brought by Gillispie against Moore with the claim that it brings in its Intervenor Complaint that involves state law. The plaintiff in the *Moldowan* case sought "recovery under 42 U.S.C. § 1983 for various alleged violations of his constitutional rights." *Moldowan*, 578 F.3d at 376. The case concerned Section 1983 claims (i.e. federal question claims) and corresponding federal issues.[20] *Moldowan*, 578 F.3d at 379, 384 (holding that, in addition to prosecutors, "the police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material" and that, for Section 1983 suppression of evidence claims, "the critical issue in determining whether government conduct deprived a criminal defendant of a fair trial is the nature of the evidence that was withheld … not the mental state of the government official who suppressed the evidence").

In contrast, the jury interrogatory issues of whether Moore was acting in good faith and within the scope of his employment or official responsibilities involve state law, for the ultimate purpose of determining whether the Intervenor has a duty to defend or indemnify Moore pursuant to Ohio Rev. Code § 2744.07. The jury decided those jury interrogatory issues by considering the

---

[20] The Section 1983 claims in *Moldowan* included claims for failure to disclose exculpatory evidence (*Brady* claims); perjury; malicious prosecution; destruction of evidence; fabricating evidence; and conspiracy claims. The *Moldowan* case did <u>not</u> involve a Section 1983 claim for suggestive identification. The Court highlights that the jury found Moore liable for each of the two Section 1983 claims against him. (Doc. No. 475.) The Court also highlights that the Intervenor conceded in one of its filings during trial that "[t]he damages for each of the claims overlap and as such, the alleged resulting injury would be no greater than it would have been had [Gillispie] established only one claim leading to that imprisonment" and that "the injury is the same [for both claims]—wrongful imprisonment." (Doc. No. 461 at PageID 15471-72.)

definitions of "good faith" and "scope of employment" under Ohio law, as shown in the portions of the jury instructions set forth above and corresponding footnotes in this order that show those instructions involved Ohio state law. (Doc. No. 472 at PageID 15551, 15564-65.) The Sixth Circuit's opinion in *Moldowan* had nothing to do with Ohio Rev. Code § 2744.07 or indemnification or Ohio law whatsoever.

### 2) The Intervenor's argument that the trial was unfair

The Court next turns to the Intervenor's argument that "a new trial should be granted as to the issues in the Intervening Complaint" because "the trial was unfair to the" Intervenor. (Doc. No. 481 at PageID 15608.) The alleged reasons why the trial was unfair to the Intervenor are (1) allegedly confusing jury instructions; (2) denial of preemptory challenges; and (3) an alleged inability to protect its interests. (*Id.* at PageID 15609-13.)

The Supreme Court "has long held that a litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials." *McDonough Power Equip.*, 464 U.S. at 553 (internal quotation marks omitted; alteration adopted). "[A]n error, defect or other act must affect the substantial rights of the parties" in order "[t]o constitute proper grounds for granting a new trial" pursuant to Rule 59, including when the motion argues that the trial was unfair to the moving party. *Walker v. Bain*, 257 F.3d 660, 670 (6th Cir. 2001); *see also In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 739, 747 (N.D. Ohio 2022) ("[t]o obtain a new trial based on the grounds of unfairness, the moving party must identify errors that impacted the parties' substantial rights"). This corresponds with Federal Rule of Civil Procedure 61 (the harmless error rule), which states:

> Unless justice requires otherwise, no error in admitting or excluding evidence--or any other error by the court or a party--is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

Fed. R. Civ. P. 61. In fact, the Supreme Court has said that "the general rule governing motions

for a new trial in the district courts is contained in Federal Rule [of] Civil Procedure 61." *McDonough Power Equip.*, 464 U.S. at 553.

### i. Jury instructions

In its JMOL/New Trial Motion, the Intervenor asserts that it should be granted a new trial as to the issues in the Intervenor Complaint because, "viewing the instructions as a whole, the characterizations of the mental states of Defendant Moore and the explanations therefore, invited confusion which was prejudicial to the Township." (Doc. No. 481 at PageID 15611.)

Rather than reviewing jury instructions piecemeal, "[j]ury instructions are reviewed as a whole to determine whether they adequately inform the jury of the relevant considerations and provide a basis in law for the jury to reach its decision." *Kavorkian v. CSX Transp., Inc.*, 117 F.3d 953, 956 (6th Cir. 1997); *see also Kendall v. City of Canfield, Ohio*, 76 F. App'x 617, 620-21 (6th Cir. 2003). "A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or given an inadequate understanding of the law." *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003). "Jury instructions are proper if, as a whole, they fairly and adequately submitted the issues and applicable law to the jury." *Troyer v. T.JohnE. Prods., Inc.*, 526 F. App'x 522, 525 (6th Cir. 2013) (internal quotation marks omitted). Additionally, "even erroneous instructions do not require reversal, unless the instructions are confusing, misleading, and prejudicial." *Troyer*, 526 F. App'x at 525 (internal quotation marks omitted) (affirming denial of motion for new trial).

As an initial matter, the Intervenor fails to cite to any objection(s) to the jury instructions. In fact, the only reference in the Intervenor's briefing to objecting is in two footnotes, where the Intervenor acknowledges that it did not object. (Doc. No. 515 at PageID 18018 ("While the [Intervenor] did not object to Plaintiff's testimony and closing remarks…"); *id.* at PageID 18023.) The Court agrees with the Intervenor that this does not, in and of itself, doom its argument (*id.*).

Fed. R. Civ. P. 51(d); *Reynolds v. Green*, 184 F.3d 589, 594 (6th Cir. 1999) ("a litigant's failure to object to a jury instruction does not create a jurisdictional bar to review"). Instead, jury instruction to which no objection was made may still be reviewed for "plain error." *Aetna Cas. & Sur. Co. v. Leahey Constr. Co. Inc.*, 219 F.3d 519, 541 (6th Cir. 2000) (citing *Reynolds*, 184 F.3d at 594). However, "plain error is a 'very high standard.'" *Scott v. Miller*, 361 F. App'x 650, 654 (6th Cir. 2010) (quoting *Maday v. Pub. Libraries of Saginaw*, 480 F.3d 815, 820 (6th Cir. 2007)). "Plain error is an obvious and prejudicial error that requires action by the reviewing court in the interests of justice." *Reynolds*, 184 F.3d at 594 (internal quotation marks omitted); *see also Kendall*, 76 F. App'x at 621 ("[a]n instruction is not plainly erroneous unless there was an egregious error, one that directly leads to a miscarriage of justice"). The Court finds no plain error here. Indeed, the Court finds no error whatsoever.

The Intervenor argues that Instruction Number 25 (Mental State) "was confusing, misleading and prejudicial to" the Intervenor "because the definitions of knowingly, reckless and bad faith overlapped and contained similar explanations." (Doc. No. 481 at PageID 15610-11.) In its reply, the Intervenor extended its argument by pointing to Instruction Number 21 (Elements Required to Prove a Claim Under 42 U.S.C. § 1983) to complain that the phrase "color of state law" in the instruction about the elements of a Section 1983 claim was not defined.

The Court used clarifying and limiting language throughout the instructions. For example, Instruction Number 25 ("Mental State") expressly states in its introductory phrase: "For purposes of Plaintiff Gillispie's claims, …." (Doc. No. 472 at PageID 15547.) Instruction Number 29 ("Additional Issue if the Jury Find in Favor of Plaintiff on Any of His Claims"), which relates to the claim in the Intervenor Complaint, has a similar clarifying introductory phrase: "If, and only if, you find in favor of Plaintiff Gillispie and against Defendant Moore on one or more of Plaintiff's

claims, then there is another issue that you must decide." (*Id.* at PageID 15551.) That same instruction further clarified that "[t]his issue does not involve any element of Plaintiff Gillispie's claims." (*Id.*) And, the paragraph in that same instruction that explains when an act is not taken in good faith (for purposes of the "additional issue") has the introductory phrase: "For purposes of this issue, …." (*Id.*) Moreover, the only instance of "bad faith" or "good faith" in the instructions outside of Instruction Number 29 is in Instruction Number 25 when it simply clarifies that, "[f]or purposes of Plaintiff Gillispie's claims, Defendant Moore need not have acted with bad faith, malice, or ill-will toward Gillispie in order for you to find that he acted knowingly or recklessly." (*Id.* at PageID 15547.) The Court disagrees that the instructions were confusing or misleading. Additionally, the Court disagrees that the instructions were prejudicial to the Intervenor.

The Intervenor also attempts to show confusion by pointing to Gillispie's counsel's statement that a portion of the instructions were "worded funny." (Doc. No. 515 at PageID 18022.) However, the alleged funny wording was taken directly from the statute (Ohio Rev. Code § 2744.07), in part to ensure that the jury instruction was a correct statement of the law.[21] *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009) ("[t]he trial court's instruction to the jury was not ambiguous. The instruction parroted the language of the statute …."); *United States v. Davis*, 711 F. App'x 254, 257 (6th Cir. 2017) (finding that the jury instructions "properly track the

---

[21] Furthermore, as explained above, the Intervenor's proposed jury interrogatories and the given jury interrogatories are very similar, including with respect to the alleged "worded funny" language; this is not surprising given that the language in both the proposed and given jury interrogatories is taken from the Ohio statute itself. (*Compare* Doc. No. 399 at PageID 13771-73 *to* Doc. No. 472 at PageID 15555-56.) Also, to the extent that one would argue that there are double negatives (which the Intervenor does not argue), instructions that contain a double negative are not necessarily confusing. *See, e.g., Miller v. City of Nichols Hills Police Dep't*, 42 F. App'x 212, 217 (10th Cir. 2002) (affirming judgment; "[t]he 'unless … no reasonable officer' phrase used in the instruction is simply the double negative equivalent of 'a reasonable officer'"); *Mattson v. Schultz*, 145 F.3d 937, 938-39 (7th Cir. 1998) (affirming denial of motion for a new trial; disagreeing with movant's argument that it was error "to submit a special verdict question phrased as a double negative" and explaining that "the parties had ample opportunity to explain the implications of an affirmative or negative answer to the special verdict questions during closing arguments"); *Int'l Meat Traders, Inc. v. H & M Food Sys.*, 70 F.3d 836, 840-41 (5th Cir. 1995).

statute"). The Intervenor also argues that the instructions "given to the jury were not what the [Intervenor] proposed." (Doc. No. 515 at PageID 18022.) Apart from the fact that much of what the Intervenor proposed <u>was</u> given to the jury (*compare* Doc. No. 399 at PageID 13769-73 *to* Doc. No. 472 at PageID 15551, 15554-56), this argument simply does not carry the day. The Intervenor does not even identify the portion(s) of its proposed jury interrogatories that were not given to the jury, let alone attempt to explain why not giving such portion(s) was an error that affected its substantial rights. Fed. R. Civ. P. 61. Unsurprisingly, a party is not always entitled to the exact instructions that it proposes. *Morgan v. New York Life Ins. Co.*, 559 F.3d 425, 433-34 (6th Cir. 2009) ("[w]hile such [a proposed] instruction would not have been inappropriate, the district court did not abuse its discretion in declining to give it").

Viewing the jury instructions as a whole, the Court finds that "they adequately inform[ed] the jury of the relevant considerations and provide[d] a basis in law for the jury to reach its decision." *Kavorkian*, 117 F.3d at 956. The jury instructions were not erroneous, and the Intervenor does not even attempt to argue that they were erroneous. (*See, e.g.,* Doc. No. 481 at PageID 15611 (arguing that the jury instructions concerning mental state "invited confusion").) They also were neither misleading nor gave an inadequate understanding of the law. *Arban*, 345 F.3d at 404. And, they were not confusing, misleading, and prejudicial. *Kendall*, 76 F. App'x at 622 (the party moving for a new trial did "not contend that [the] instructions were legally incorrect," but instead argued that the given instructions resulted in confusion that could have been avoided by including additional instructions; affirming denial of motion for new trial and finding that the jury instructions, viewed as a whole, correctly informed the jury about the law); *Allied Erecting and Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 404 (6th Cir. 2013) ("[t]hough the district court could have clarified [in the jury instructions] that the jury

need not find that every Genesis customer would have purchased from Allied, imprecision does not justify a new trial"). The Intervenor is not entitled to a new trial based on the alleged deficiencies in the jury instructions. *Arban*, 345 F.3d at 404.

Next, grafted onto the Intervenor's "confusing, misleading and prejudicial" jury instructions argument (or brought up for the first time in its reply brief) is an argument that Gillispie or his counsel made allegedly improper arguments and remarks that allegedly prejudiced the Intervenor. (Doc. No. 481 at PageID 15610-11; Doc. No. 515 at PageID 18021-22.) The Intervenor argues that Gillispie's counsel made inappropriate arguments during closing argument and that Gillispie and his counsel "resorted to improper remarks of 'innocence' and 'wrongful conviction.'" (*Id.*)

"Misconduct by an attorney that results in prejudice may serve as a basis for a new trial." *Fuhr v. Sch. Dist. of the City of Hazel Park*, 364 F.3d 753, 759 (6th Cir. 2004) (internal quotation marks omitted). "The burden of showing prejudice rests with the party seeking the new trial, and district courts have broad discretion in deciding whether to grant a motion for a new trial." *Id.* (internal quotation marks omitted). When a party argues that counsel's statements made during closing arguments constituted misconduct by an attorney, "[i]n order to be entitled to a new trial, [the movant] must show both that the closing argument was improper and that [the movant] was prejudiced by the impropriety, that is, that there is a reasonable probability that the jury's verdict was influenced by the improper argument." *Id.* at 760. "[A]ssertions alone are not enough to establish a reasonable probability of improper influence." *Troyer*, 526 F. App'x at 525. And, "[a] jury is presumed to have followed instructions correctly." *Id.* This includes the instruction that the judge gives the jury the law and it is the jury's duty to follow the instructions. (Doc. No. 472 at PageID 15521.)

58

The Court finds that the Intervenor has not shown both that arguments by Gillispie's counsel were improper and that the Intervenor was prejudiced by the alleged impropriety, as would be required to warrant a new trial. *Fuhr*, 364 F.3d at 759-60 (movant failed to demonstrate a reasonable probability that the jury was improperly influenced by alleged misrepresentations made by counsel during closing argument). The same is true regarding remarks of "innocence" and "wrongful conviction." Once again, the Intervenor does not cite to any objection(s) to the alleged improper arguments and rightly acknowledges that it did not object. (Doc. No. 515 at PageID 18018.) Additionally, the Intervenor simply asserts that "the jury could have easily failed to differentiate between the burden of Gillispie as to the issue of good faith or bad faith and the burden of the [Intervenor] as to good or bad faith" (Doc. No. 481 at PageID 15611; *see also* Doc. No. 515 at PageID 18024). *Allied Erecting and Dismantling Co.*, 511 F. App'x at 408 (rejecting argument for a new trial on the basis of counsel's inappropriate remarks; holding that, although "[t]he record indeed reveals counsel's inappropriate remarks," the movant "has failed to demonstrated that the jury's verdict on [the particular issue] was in any fashion influenced by these remarks"); *Troyer*, 526 F. App'x at 525 (rejecting argument for new trial based on arguments and improper comments where movant "failed to demonstrate a reasonable probability that the jury was improperly influenced by the arguments and comments by [non-movant's] counsel during the trial"). And, as shown above, the Court disagrees with the Intervenor's argument that there was "overwhelming evidence to the contrary" of the jury's interrogatory responses. (Doc. No. 515 at PageID 18021-22.) Regarding the Intervenor's argument about Gillispie and his counsel's "remarks of 'innocence' and 'wrongful conviction,'" the Court previously explained in one of its orders on a motion *in limine* that, although Gillispie did not need to prove that he is innocent of the underlying

crimes to prevail on his claims, innocence may be relevant to the issue of damages.[22] (Doc. No. 379 at PageID 12803-04; *see also id.* at PageID 12813 ("[p]leadings and briefing by both parties indicate that whether Gillispie is actually innocent of the crimes for which he was charged remains in question, and both parties acknowledge that whether Gillispie is innocent may be relevant to his damages").)

Moreover, as explained above, the jury instructions themselves provided clarification and limiting language. Plus, beyond objecting (which it did not do), the Intervenor had the opportunity in its own closing argument to clarify any alleged confusion or counter any alleged misleading statements by Gillispie's counsel, and the Intervenor had the opportunity to propose additional jury instructions or clarifying (or limiting) language in jury instructions. *See Troyer*, 526 F. App'x at 525 (explaining that the court's instructions to the jury could cure any potential prejudice from the allegedly improper comments and actions of counsel); *Mattson*, 145 F.3d at 938-39 (affirming denial of motion for a new trial; explaining that "the parties had ample opportunity to explain the implications of an affirmative or negative answer to the special verdict questions during closing arguments").

The Court rejects the Intervenor's argument that it is entitled to a new trial on the basis that the trial was unfair to the Intervenor due to allegedly confusing, misleading, and prejudicial jury instructions and/or allegedly improper arguments by Gillispie and his counsel.

### ii. Restricted participation / protection of interests / peremptory challenges

Next, the Intervenor argues that the trial was unfair because its participation at trial was restricted. (Doc. No. 481 at PageID 15609-10, 15611-13; Doc. No. 515 at PageID 18019-21.)

---

[22] The Court more comprehensively addresses the appropriateness of remarks concerning Gillispie's innocence (or lack thereof) and wrongful conviction in the section below that analyzes the Intervenor's and Moore's Requests to Alter or Amend the Judgment.

This includes its argument that, "[b]ecause the jury was charged with deciding an issue related to a substantial right of the [Intervenor], it was unfair to deny the [Intervenor] peremptory challenges," as well as its argument that it "was unable to protect its interests as to any judgment." (*Id.*)

The Court finds these arguments curious because the Intervenor was adamant in its Motion to Intervene that it only wanted to intervene "for limited participation in the trial of this matter." (Doc. No. 370 (Motion to Intervene) at PageID 12694, 12697, 12706.) The Intervenor went out of its way to restrict its own participation at trial, only seeking to intervene "for the limited purpose of questioning, argument, and submission of proposed jury instructions and interrogatories on the discreet issues of lack of good faith and scope of employment consistent with R.C. 2744.07." (Doc. No. 370 at PageID 12697 (emphasis added).) Thus, through its own request in the Motion to Intervene, the Intervenor put restrictions on itself, yet now is complaining about it.

The Court granted the Intervenor's request. (Doc. No. 392.) The limitations placed on the Intervenor corresponded with the Intervenor's own requested scope of intervention, and the Court was permitted to place such limitations on the Intervenor's participation. *Meyer Goldberg, Inc. of Lorain v. Fisher Foods, Inc.*, 823 F.2d 159, 162 (6th Cir. 1987); *ADT Servs. AG v. Brady*, No. 10-2107, 2014 U.S. Dist. LEXIS 124728, 2014 WL 4415955, at *3 (W.D. Tenn. Sept. 8, 2014) (imposing limitations on the scope of the intervenor's participation at trial); *Akron Ctr. for Reprod. Health v. City of Akron*, 604 F. Supp. 1268, 1272 (N.D. Ohio 1984) (limiting intervenors' participation at trial).

Even so, the Court expansively interpreted the language concerning the Intervenor's participation in its order granting the Motion to Intervene. Apart from not being allowed peremptory challenges and its own limitation on the scope of subject matter ("the discreet issues

of lack of good faith and scope of employment consistent with R.C. 2744.07"), the Intervenor was essentially a full participant at trial. As explained above, during the trial, the Intervenor was allowed to question witnesses on the issues of good faith and scope of employment, which included the ability to call witnesses to question them on those issues. (*See* Doc. No. 392 at PageID 13693; Doc. No. 507 at PageID 17724 (after Moore rested his case, Intervenor resting its case subject to admission of exhibits).) While the Intervenor did not end up calling any of its own witnesses, it did question a number of witnesses.[23] (*See, e.g.,* Doc. No. 489 at PageID 15990-16000 (questioning Moore); Doc. No. 491 at PageID 16228-36 (questioning Fritz); Doc. No. 493 at PageID 16297-98 (questioning Dr. Scott); Doc. No. 507 at PageID 17647-49 (questioning Monheim); Doc. No. 509 at PageID 17846-62 (questioning Lieberman); Doc. No. 510 at PageID 17949-52 (questioning Godsey).) This included, but was not limited to, questioning Moore— whose actions are the ones at issue in the Intervenor's Complaint concerning lack of good faith and scope of employment. (*Id.*) Of course, the Intervenor also submitted proposed jury instructions and interrogatories. (Doc. No. 399 (proposed jury instructions and jury interrogatories).) Additionally, the Intervenor responded to a motion to trifurcate the trial; objected to designations of deposition testimony and submitted counter-designations of deposition testimony; participated in voir dire (including asking questions to the prospective jurors); was permitted to make challenges for cause, but not peremptory challenges; made opening statements; objected to certain testimony; made motions; and made closing arguments. (*See, e.g.,* Doc. No. 414 (response in opposition to motion to trifurcate); Doc. No. 436 and Doc. No. 437 (objections to proposed deposition designations); Doc. No. 438 (counter-designations of deposition testimony); Doc. No. 489 at PageID 15990-16000 (questioning Moore); Doc. No. 500 at PageID

---

[23] The Intervenor also successfully quashed a subpoena for Ronald Hess—who had served as the Township's Rule 30(b)(6) designee—to testify at the trial. (Doc. No. 447; Doc. No. 454.)

16698 (objection to Gillispie's testimony); Doc. No. 511 at PageID 17973-80 (asking prospective jurors questions); Doc. No. 511 at PageID 17982-87 (permission to make challenges in jury selection for cause, but not peremptory challenges); Doc. No. 497 at PageID 16557-60 (opening statement); Doc. No. 507 at PageID 17760 (moving for a directed verdict); Doc. No. 498 at PageID 16449-55 (closing argument).)  Also, while the Intervenor did not end up affirmatively seeking admission of any exhibits, it did object to the admission of certain exhibits.[24]  (*See, e.g.,* Doc. No. 507 at PageID 17728-29, 17733 (objection to Gillispie's request for admission of certain exhibits); *id.* at PageID 17754 (upon being asked by the Court if "there are any other exhibits" requested to be admitted, the Intervenor said that there were not).)

In short, the Court completely disagrees with the Intervenor's argument that the trial was unfair because its participation at trial was restricted.  The Intervenor told the Court that it was seeking "limited participation in the trial of this matter" and that it was "not seeking to be a participant in all aspects of the trial."  (Doc. No. 370 at PageID 12694, 12824 (emphasis added).)  The Court granted its request and allowed it even more.  For the Intervenor now to argue that it was unable to protect its interests appears to be an argument that the Intervenor is only making now that the outcome at trial is apparently not what it had hoped.

Regarding peremptory challenges, the Intervenor relies on a misstatement to set up its argument:  "In this instance, although the court determined that the [Intervenor] could participate in all aspects of trial, and that the court was submitting certain issues to the jury affecting a substantial right of the [Intervenor], it precluded the [Intervenor] from exercising any peremptory

---

[24] In its JMOL/New Trial Motion, the Intervenor asserts that "it was denied an opportunity to be involved in stipulations which may have affected its interests."  (Doc. No. 481 at PageID 15612.)  The Court does not know what the Intervenor is referring to in this assertion; there is no citation or further explanation given.  Regardless, there is no basis for the assertion.  The Court did not bar the Intervenor from being involved in, or entering into, stipulations.  Plus, the assertion is speculative.

challenges." (Doc. No. 481 at PageID 15610 (emphasis added).) The emphasized portion of that quote is incorrect. Not surprisingly, the Intervenor fails to include any citation for that assertion. In fact, completely counter to the Intervenor's current assertion, the Intervenor even specified in its reply brief in support of the Motion to Intervene that it was "**not seeking to be a participant in all aspects of the trial**." (Doc. No. 381 at PageID 12824 (emphasis added).) Again, in line with the Intervenor's own limited request in its Motion to Intervene, the Court allowed the Intervenor to participate pre-trial and at trial for the purpose of questioning, argument, and submitting proposed jury instructions and interrogatories on the discrete issues of lack of good faith and scope of employment consistent with Ohio Rev. Code § 2744.07. (Doc. No. 392 at 13693-94.) The scope of permitted participation never mentioned peremptory challenges. The Court finds no error.

Additionally, even if the Court had errored, the Intervenor fails to show that not allowing it preemptory challenges affected its substantial rights. Fed. R. Civ. P. 61; *Walker*, 257 F.3d at 670 ("an error, defect or other act must affect the substantial rights of the parties" in order "[t]o constitute proper grounds for granting a new trial"). Again, the Intervenor asked for—and was granted—limited participation at trial, which correspondingly limited particular rights that it otherwise may have had. (Doc. No. 392.) Perhaps most importantly, the Intervenor never shows— nor even argues—that it would have exercised any peremptory challenge(s) at trial. Although it did participate in juror questioning and challenges for cause at trial, the Intervenor never indicated that it would have exercised any preemptory challenge and never identified any potential juror that it wanted to strike with a preemptory challenge. (See Doc. No. 511 at PageID 17973-90.) Even now, after trial, the Intervenor's briefing never indicates that it would have exercised any preemptory challenge or identifies any potential juror that it would have struck with a preemptory

challenge at trial. (Doc. No. 481; Doc. No. 515.) Furthermore, there is no showing that the decision not to allow the Intervenor peremptory strikes had any influence on the outcome of the trial or affected the trial at all. There also is no showing, nor argument, that any juror seated on the jury was partial. And, there is no indication that the jury as a whole was anything other than an impartial adjudicator. Thus, even assuming that the Intervenor was entitled to peremptory challenges, there is no showing that its substantial rights were affected. *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 967 (9th Cir. 2013) (explaining that "substantial rights" in this context means "rights affecting the substance of the case as opposed to the procedural right to three peremptory challenges" under Rule 47 and 28 U.S.C. § 1870). In short, the Intervenor does not show that the trial was unfair to the Intervenor. *McDonough Power Equip.*, 464 U.S. at 553 (courts should "ignore errors that do not affect the essential fairness of the trial"). Moreover, the Intervenor does not cite to any objection. (Doc. No. 481; Doc. No. 515.)

The Intervenor argues that "[s]ome courts have held that the remedy for impairment or denial of statutory right to exercise peremptory challenges is per se reversal, without any requirement of proving prejudice." (Doc. No. 481 at PageID 15610.) In support, the Intervenor cites to *Kirk v. Raymark Indus. Inc.*, 61 F.3d 147 (3d Cir. 1995). (*Id.*) In turn, the court in *Kirk* relied on *Swain v. Alabama*, 380 U.S. 202, 219 (1965), which itself relied on cases from 1892, 1895, and 1896. *Kirk*, 61 F.3d at 159 (explaining that "[t]he Supreme Court [in *Swain*] announced a general rule that '[t]he denial or impairment of the right [to exercise peremptory challenges] is reversible error without a showing of prejudice'"). However, the Supreme Court in *McDonough Power Equip.* explained that it has "come a long way from the time when all trial error was presumed prejudicial and reviewing courts were considered citadels of technicality." *McDonough Power Equip.*, 464 U.S. at 553. "The harmless error rules adopted by this Court and Congress

embody the principle that courts should exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial."  *Id.*

More specifically in the context of juror challenges, later developments demonstrate that the Supreme Court actually "disavowed" the statement from *Swain* on which *Kirk* (and the Intervenor) relies.  The Sixth Circuit Court of Appeals explained:

> [Defendant] also seeks refuge in *Swain v. Alabama*, which says that 'denial or impairment of the right [to use peremptory challenges] is reversible error without a showing of prejudice.'  380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).  But, regrettably for [Defendant], the Supreme Court has since 'disavowed this statement.'  *Rivera* [*v. Illinois*, 556 U.S. 148, 160 (2009)].

*U.S. v. Reid*, 751 F.3d 763, 767 (6th Cir. 2014) (holding that, although "[t]he trial court erred in classifying the [juror] challenge as peremptory," which resulted in the defendant losing a peremptory challenge, the error did not require reversal of the defendant's conviction).  Five years after *Kirk*, the Supreme Court said that "the oft-quoted language in *Swain* was not only unnecessary to the decision in that case … but was founded on a series of our early cases decided long before the adoption of harmless-error review."  *U.S. v. Martinez-Salazar*, 528 U.S. 304, 317 n. 4 (2000).  Indeed, directly contradicting the Intervenor's argument and the holding in *Kirk* upon which it relies, the Sixth Circuit in *Reid* explained that prejudice <u>does</u> matter; there must be a showing of prejudice.  *Id.* at 767 (defendant "claims that prejudice has nothing to do with it[, but] [h]e is doubly wrong"); *see also Martinez-Salazar*, 528 U.S. at 315 (holding that no violation of Criminal Rule 24 occurs when a defendant uses a peremptory challenge to cure a trial court's erroneous denial of a challenge for cause; *McDonough Power Equip.*, 464 U.S. at 548 (letting a jury's verdict stand even though a juror inaccurately answered a question during voir dire and even though the inaccuracy affected the litigant's exercise of peremptory challenges).  The Sixth Circuit in *Reid* also clarified that this is true both in criminal and civil cases.  *Reid*, 751 F.3d at 767.  The Sixth

Circuit is not alone in recognizing that the harmless error standard applies.[25]  *Alaska Rent-A-Car*,

738 F.3d at 966-67 ("an erroneous denial of a peremptory challenge does not require automatic

reversal"; instead, "[e]rroneous denial of a challenge is … subject to Federal Rule of Civil

Procedure 61 on harmless error, requiring us to disregard error not affecting 'substantial rights'");

*Avichail ex rel. T.A. v. St. John's Mercy Health Sys.*, 686 F.3d 548, 551-52 (8th Cir. 2012) (holding

that, "in light of *Rivera*[,] … a federal court's erroneous denial of a peremptory strike is subject to

harmless-error analysis"; where the district court may have erroneously denied a peremptory

strike, finding that, "[a]s for the potential violation of the statute and Rule 47(b), there is no basis

in the record to conclude that the change in composition of the jury substantially influenced the

verdict"); *Goldstein v. Kelleher*, 728 F.2d 32, 37-38 (1st Cir. 1984) (although "it is hard to see any

reason here for not equalizing the peremptories as between plaintiff and defendants," "[w]e think

that before a reversal is granted, the complaining party should be able to point to some convincing

indication in the record that if a further peremptory challenge had been allowed, he meant to

challenge one or more jurors"; "[i]n the absence of any indication that the jury selected was

unsatisfactory to [the party that had moved for a new trial] at the time chosen, we are unwilling to

reverse the verdict of a jury that to all appearances was disinterested, competent and suitable").

Therefore, the Court rejects the Intervenor's arguments that it is entitled to a new trial on

---

[25] Moreover, *Kirk* itself is distinguishable factually and legally on multiple fronts.  These include, for example, that *Kirk* did not involve an intervenor and the jury in *Kirk* returned a verdict on the plaintiff's claims, not just on certain issues.  In *Kirk*, the Third Circuit Court of Appeals concluded that "the district court abused its discretion in denying the defendant's challenge for cause of two jurors during voir dire."  *Kirk*, 61 F.3d at 151.  "During jury selection, [the defendant in *Kirk*] challenged for cause two prospective jurors maintaining that the prospective jurors could not be impartial because they revealed considerable potential bias against [defendant] during voir dire.  The district court refused to strike these prospective jurors for cause, and [defendant] was then compelled to utilize two of its three peremptory strikes to remove these prospective jurors."  *Id.* at 152.  The jury ended up returning a verdict against the defendant.  *Id.*  The defendant then moved for a new trial, "alleging several trial errors including: … failing to strike two prospective jurors for cause."  *Id.*  Again, those two prospective jurors, at least according to the defendant, exhibited prejudice and could not be impartial.  *Id.* at 152; *see also McDonough Power Equip.*, 464 U.S. at 554 ("[o]ne touchstone of a fair trial is an impartial trier of fact—a jury capable and willing to decide the case solely on the evidence before it") (internal quotation marks omitted).

the bases relating to restricted participation at trial.

### 3) The Intervenor's argument that the damages award was excessive

The Intervenor also argues that it is entitled to a new trial because the damages award against Moore was excessive. (Doc. No. 481 at PageID 15609; *see also* Doc. No. 516 at PageID 18031.) It maintains that, "[i]n this instance, the jury verdict shocks the conscious and was excessive, especially in light of the interrogatories of the jury finding the actions of Moore were in good faith." (*Id.*) In support of its argument, the Intervenor directs the Court to the Intervenor Alter/Amend Judgment Motion. (*Id.* ("as is set forth fully in the Township's Motion to Alter or Amend the Judgment under Fed. R. Civ. P. 59(e), which is incorporated fully herein, the damages award against Defendant Moore was excessive").)

Again, a court may grant a new trial under Rule 59 "if the damages award is excessive." *Conte*, 215 F.3d at 637. However, "[a] compensatory damage award is not excessive unless it exceeds the maximum amount that a reasonable jury could find to be compensatory" for the plaintiff's injuries. *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 362 (6th Cir. 2005) (citing *Skalka v. Fernald Env't Restoration Mgmt. Corp.*, 178 F.3d 414, 424-25 (6th Cir. 1999)). As explained in detail in the section below that addresses both the Intervenor Alter/Amend Judgment Motion and the Moore Alter/Amend Judgment Motion, the Court does not find that the damages award was excessive. *Bach*, 149 F. App'x at 356, 362-63 (affirming the district court's denial of a motion for a new trial or amendment of judgment, and affirming the district court's ruling that the compensatory damage award was not excessive). Therefore, the Court rejects the Intervenor's argument that it is entitled to a new trial because of an allegedly excessive damages award.

### 4) The Intervenor's argument that the cumulative effect of the alleged errors requires a new trial

Finally, the Intervenor argues that, "while each of the bases [for the trial allegedly being

unfair to the Intervenor] should separately support the grant [of] a new trial, the cumulative effect of these errors <u>requires</u> a new trial on the issues of good faith and scope of employment or official responsibilities." (Doc. No. 515 at PageID 18018-19 (emphasis in original).)

Although "[e]rrors that do not alone require reversal may cumulatively merit reversal for a new trial under Fed. R. Civ. P. 59," the Court disagrees with the Intervenor that a new trial is warranted here on any of the bases argued by the Intervenor—separately or cumulatively. *Kendel v. Local 17-A United Food and Commercial Workers*, 512 F. App'x 472, 485 (6th Cir. 2013) (affirming denial of a motion for new trial); *see also Cook v. Erie Ins. Co.*, No. 2:18-cv-282, 2022 U.S. Dist. LEXIS 119496, 2022 WL 2467528, at *7 (S.D. Ohio July 6, 2022) (denying motion for a new trial; finding that "most of the purported errors identified by Plaintiffs did not constitute error in the first instance, and the relatively minor errors that may have occurred were harmless, even when considered cumulatively"). In summary, the trial was <u>not</u> unfair to the Intervenor.

The Intervenor's request for a new trial is denied.

## B. <u>The Intervenor's Request for Judgment as a Matter of Law in the JMOL/New Trial Motion</u>

The Court next addresses the Intervenor's request "for judgment as a matter of law on the jury issues not decided by verdict related to the jury interrogatories concerning defense and indemnification under Ohio Revised Code 2744.07." (Doc. No. 481 at PageID 15597.)

The Federal Rules of Civil Procedure allow a party to renew, after trial, a motion for judgment as a matter of law or, alternatively, to move for a new trial. Specifically, Rule 50 states, in part:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an

alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

> (1) allow judgment on the verdict, if the jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b). A court may grant a renewed motion for judgment as a matter of law under Rule 50(b) "only if in viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1072 (6th Cir. 2014); *see also Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005) (internal quotation marks omitted) (affirming the district court's denial of a Rule 50(b) renewed motion for judgment as a matter of law). Thus, when ruling on such a motion, a court "do[es] not weigh the evidence, question the credibility of the witnesses, or substitute [its] judgment for that of the trier of fact." *Yoder & Frey Auctioneers*, 774 F.3d at 1072.

As mentioned above, "granting a judgment as a matter of law is governed by a higher showing" than granting a new trial. *Denhof*, 494 F.3d at 543. And, the Intervenor has stated that its grounds for seeking judgment as a matter of law and a new trial are the same.[26] (Doc. No. 481 at PageID 15601.) Therefore, because the Court has decided that the Intervenor is not entitled to a new trial pursuant to Rule 59(a), it is not entitled to judgment as a matter of law pursuant to Rule 50(b). *Denhof*, 494 F.3d at 543; *McLaughlin*, 2018 WL 4945219, at *5 ("[g]iven that the Court has concluded … that a new trial is accordingly improper, the Court necessarily finds that

---

[26] For example, the Intervenor argues that reasonable minds could only conclude that Moore did not act in good faith and reasonable minds could only conclude that Moore was acting outside of his official responsibilities. (Doc. No. 481 at PageID 15603-07.)

defendants are not entitled to judgment as a matter of law").  The Intervenor's request for judgment as a matter of law is denied.

**C.  <u>The Intervenor's and Moore's Requests to Alter or Amend the Judgment</u>**

Finally, the Court addresses the request of both the Intervenor and Moore that the Court, pursuant to Rule 59(e), alter or amend the judgment to reduce the jury award because it, allegedly, is so excessive that it shocks the conscience.[27]  (Doc. No. 482 at PageID 15614; Doc. No. 485 at PageID 15710.)  The Intervenor more specifically asks the Court "to reduce the jury damages award of $45,000,000.00" because "[t]he award is so greatly excessive so as to shock the conscience, thereby requiring a remittitur by this Court."  (Doc. No. 482 at PageID 15614.)  Moore more specifically asks the Court to "reduce the jury award against Defendant Moore" because it "is excessive [and] it shocks the conscience and therefore is required to be reduced."  (Doc. No. 485 at PageID 15710.)  As mentioned above, the Intervenor also argues that the Court should order a new trial, pursuant to Rule 59(a), because "the jury's award is grossly excessive."  (Doc. No. 516 at PageID 18031.)

Gillispie opposes these motions, arguing that "[t]his verdict is particularly sound—the damages testimony at trial was extensive; the court's jury instructions [regarding damages] are not challenged; and the jury did not even award what Plaintiff [Gillispie] suggested."  (Doc. No. 503 at PageID 17290.)  Gillispie maintains that he "presented exceptional evidence of damages, including of his innocence, lack of criminal background, prospects as a young man, violence he witnessed in prison, his emotional and mental suffering, a PTSD diagnosis, being forced to register

---

[27] Gillispie raises a "threshold question as to whether the [Intervenor] can even contest the amount of damages awarded in this action." (Doc. No. 503 at PageID 17299-300.)  The Court will assume that it can and will consider its arguments.  As Gillispie notes, Moore's arguments and the Intervenor's arguments with respect to these motions to alter or amend the judgment "are so entwined (with Moore even incorporating the [Intervenor's] motion by reference)."  (*Id.*)  Ultimately, the answer to this threshold question would not change the Court's ruling on the Intervenor Alter/Amend Judgment Motion or the Moore Alter/Amend Judgment Motion.

as a sex offender, the fear and trauma of being threatened with going back to prison for years after his release, the harm he had to witness and reciprocally suffered in his relationships with his family and friends, how he lost the opportunity to have a family (which haunts him to this day), how he lost the opportunity to work and be a productive member of society, and the list goes on." (*Id.* at PageID 17289.) Gillispie also contends that "the jury's verdict in this case is well within the range of verdicts reached in other wrongful prosecution cases." (*Id.* at PageID 17290.)

### 1) Evidence, damages instructions, and verdict

The stipulations at trial included that "Gillispie was confined for approximately two weeks after his arrest and on bond until his first trial in February 1991," as well as that he "was continuously incarcerated between February 5, 1991 and December 22, 2011"—therefore more than twenty years. (Doc. No. 498 at PageID 16479-80; *see also* Doc. No. 472 at PageID 15537.) Additionally, the stipulations included that Gillispie's conviction was vacated and a new trial was ordered in 2012, but not until July 26, 2017—more than five-and-a-half years after he was released from prison—were "the charges against Gillispie … dismissed with prejudice." (*Id.*) The stipulations also included that, "on November the 19th, 2021, Gillispie was declared to be a wrongfully imprisoned individual pursuant to Ohio law by a judge in the Montgomery County Court of Common Pleas." (*Id.*; *see also* Doc. No. 500 at PageID 16706-08.)

Several witnesses provided testimony at trial relevant to the issue of damages. Not surprisingly, chief among those witnesses was Gillispie himself, who testified in front of the jury on two days and whose testimony included the following:

- Q. At some point, did you learn about the crimes for which [Moore] was arresting you? A. Yes. Q. And did that involve a series of rapes in August of 1988? A. Correct. Q. Did you commit those crimes that had happened two years before? A. I had nothing to do with them. (Doc. No. 500 at PageID 16610.)

- Q. In addition to evidence about the photo array being presented at your trial, did the victims come to court and point their finger at you and say that you were the

perpetrator of the crime? A. Yes. Q. And was there any, to your knowledge, physical or forensic evidence linking you to the crimes? A. There was nothing. (*Id.* at PageID 16645.)

- Q. Now, after the jury came back [in the second criminal trial] and was deadlocked, did you believe that you were going to be acquitted? A. Yeah. Q. When that didn't happen, how'd you feel? A. It's a – you know, it's a crushing blow to you. Q. After you were convicted and had this crushing blow, was there another hearing that you attended in court where you were given a sentence? A. Yeah, yeah. They done a, what they called a pretrial investigation, and a little while later they took me into a courtroom and sentenced me to 22 to 56 years. Q. What did you say at the sentencing hearing? A. The same thing I have said the whole time: I'm innocent. I'm innocent. I'm innocent. I did not do this. I did not commit these crimes. And I just kept saying it for 30 years. (*Id.* at PageID 16655-56.)

- Q. And given the severity of the crime at issue and your sentence, what type of prison were you sent to? A. Closed maximum security. (*Id.* at PageID 16663.)

- Q. Describe the conditions at Warren Correctional Institution when you got there in 1991. A. It's a closed maximum security prison. Seventy percent of the people that are there are not going home. You know, they don't care about you or anything else in life. I had never seen violence like that. I never seen anything like that in my life. People just did not care. They did not care about people. They didn't care about human life. And I – you sit there and try to figure out where on this earth am I at right now. I'll never understand how that awful [sic] people can be. (*Id.* at PageID 16663-64.)

- Q. You mentioned that there was violence that you saw in prison. Can you just describe what you meant by that? A. These people didn't care. They didn't care about nothing, you know. They've got a life sentence. They have got multiple life sentences. Killing somebody else is giving them another life sentence. They already got enough of them. They don't care, you know. When you see your first person get killed, it never leaves you. And it doesn't end with the one or two. I've seen people beat so bad, the life taken right out of them. I've seen people stabbed with a pencil, broke it off so they can't get it out of them. And watch them dig for it. I seen a man get hit in the head so hard that his eyeball came out of his eye socket. These are things you're not supposed to see in life. Them beatings I've seen are unbelievable. You can't – you can't imagine. No one wants to imagine what my eyes have seen. … I did everything I could to keep my mind out of that prison every day. I did everything I could possibly do to escape mentally from that institution. (*Id.* at PageID 16664-65.)

- Q. … [W]e have gone over a number of letters, accomplishments, and things that you were able to achieve and receive while you were in prison. Despite all of that, did being in prison during that time have an impact on you and your family? A. Yeah. It was still miserable. Every day was miserable. You know, you'd call home every few days, because the phone calls were so expensive you couldn't call

every day, hoping to god no one died or nothing bad had happened since the last time you called home or checked with your family. You know, me doing this work [at the prison] doesn't change the violence in that prison. That was just me trying to stay away from it. Nothing changed in that prison even though I was doing this type of work, as far as the day-to-day living in the bowels of society. (*Id.* at PageID 16689-90.)

- Q. And at some point you were transferred from that [maximum security] facility to a lower security facility? A. Yes. Q. And that was, what, ten years into your sentence? A. Approximately. … Q. And that was a – was that a lower, technically, security classification facility? A. Yes. That was medium/minimum. Q. … [W]ere you still in prison when you were [there]? A. Oh, absolutely. Q. Were the sleeping arrangements better or worse than being at [the maximum security facility]? A. Worse. Q. How so? … A. I went from a two-man cell to an open dorm, where it's headboard to headboard, side by side, wide-open living. Q. Did that impact your sleep? A. You don't get sleep. (Doc. No. 501 at PageID 16729, 16738-39.)

- Q. … [D]o you see that this [exhibit] is an order from the Montgomery [County] Court of Common Pleas that was entered in June of 2000? A. Yes. Q. … [I]t says … that it is ordered that you be declared a sexual predator. Do you see that? A. Oh, yeah. … Q. Do you see at the top where it says 'Explanation of duties to register as a sex offender'? A. Yes. … Q. … And how did it impact you having to go back to court in 2000 and walk out – well, not walk out – but have a court enter this order and require you to sign this form? A. This was in 2000. So nine years I am screaming and hollering I didn't commit this crime. I go back to court. Not only am I smacked in the face for going to prison for a crime I didn't commit, now I am classified as the highest-tier of sex offender that you can be in the State of Ohio. It wasn't a good feeling then. It's not a good dealing [sic] today. Q. And we all know you are out today. Does this issue – the sexual offender classification, is that stuff, does it still impact you in any way today? A. It's a part of my life that doesn't go away. That doesn't go away. I've been labeled a sex offender. That doesn't go away. You know, it was sent around the neighborhood when I got home. After I was out a while, they sent this around the neighborhood. And I grew up in the neighborhood, you know. Everyone knew me. They knew it was a bunch of malarky. And they started coming by the house. But the fact that they were notified, you know, the fact that this is on websites everywhere, you know, when I come home, that doesn't go away. It does not – it doesn't go away. You can punch me up somewhere, and there will be something about me being a sex offender or a registered sex offender at a certain point in time in my life, or there is something about it. It doesn't go away. (Doc. No. 500 at PageID 16692-94; *see also* Doc. No. 507 at PageID 17738 (admitting into evidence the exhibit—an order requiring Gillispie to register as a sex offender).)

- Q. … Did you ever appear before a parole board? A. Yeah, I seen the parole board two times during my 20 years. Q. And what happened when you appeared before the parole board the first time? A. I had 16 years in. I went to the parole board.

They asked you, tell us what happened that night. I don't have a clue. I was not there. They consider me combative, bring an officer in the room. And then they proceed to read off the charges that were there. I said 'You can say it a thousand times. I didn't do it.' So they said, 'Mr. Gillispie, these are the charges against you, and we are going to give you four more years, and come and see us after you got 20 years in.' Q. So did you – did you have a understanding that if you went to the parole board and professed your innocence, what the chances of you getting parole were? A. If I was still seeing the parole board, I'd never get out till 56 years, because if you don't show remorse – you don't admit to the crime, you don't show remorse, how do you show remorse for something you didn't do? How do you do that? So when I am in front of the parole board, I don't have no reason to show remorse for something I didn't do, I wasn't there, I don't know anything about. So me not showing remorse is an automatic check against me. Me not admitting guilt is an automatic check against you. (Doc. No. 500 at PageID 16694-95.)

- Q. Was there ever an offer made, plea offer made to you during the course of your criminal proceedings? A. Yes. My lawyer came to me and said they are offering 30 days. Q. And did you take that – that – that was during the course of your first criminal trial? A. Correct. Q. So that was February '91? A. Correct. Q. Why didn't you take the deal? A. I told him 30 days, 30 minutes, 30 years, I didn't commit this crime. I am not going to say I did. I'm not taking your 30-day deal.[28] (*Id.* at PageID 16696-67.)

- Q. … [W]hat was happening with you in terms of this criminal prosecution during that five-year period [from when you were released from prison in 2011 until 2017 when the criminal charges were dismissed with prejudice]? A. When I left prison December 22, 2011, I was on an ankle monitor. … Once I got off the ankle monitor, I had to go register at the courthouse under pretrial services, which was basically, I was on parole now. I should have been free, but I was on parole and had to go check in, go pee in a cup, go get permission to leave the state, for five years. Q. This lawsuit was filed in 2013, as Mr. Moore's counsel just pointed out to me, and we're going to trial here in November of 2022. Has the fact of this lawsuit impacted your day-to-day life? A. Yeah. Yeah, it's – it's impacted every day of my life for going on 33 years. It's impacted my life to – yeah. I've got severe PTSD from it. Yeah, it's impacted my life. Q. Now, did you sit for a deposition in this case where you previously answered questions under oath? A. Yeah. Yes, I did. … That was probably, to this day, the sickest I have ever been in my entire life. I threw up four times during the process. I had severe diarrhea. … (*Id.* at PageID 16700-01.)

- Q. Since your release, have you received any mental health treatment? A.

---

[28] At the trial, Gillispie's criminal trial attorney, Dennis Lieberman, corroborated this testimony with his own: "Q. Now, during the course of the trial, did the prosecution communicate to you a plea bargain for [Gillispie]? A. Yes. Q. And what was that? A. My recollection is that – and I don't remember how we would get there – but my recollection is that they had offered for [Gillispie] to do 30 days in jail. Q. Okay. And did you communicate that offer to [Gillispie]? A. I did. Q. What happened? A. [Gillispie] rejected the offer. Q. Was that surprising to you? A. Yes. Q. Why? A. Because [Gillispie] was looking at an enormous amount of time – my recollection is over 50 years – if he was convicted." (Doc. No. 509 at PageID 17791-92.)

Extensively.  (Doc. No. 501 at PageID 16735.)

The testimony at trial also included that Gillispie did not have any criminal history.  (Doc. No. 491 at PageID 16156.)  Additionally, Gillispie, who was approximately 25 years old when he was arrested, testified about how his nephew's daughter is "the closest thing to a grandchild that I will ever have."  (Doc. No. 500 at PageID 16570, 16572, 16611.)  Mr. Marc Godsey ("Godsey"), who was Gillispie's attorney for a period of time (including while Gillispie was still in prison), testified about a painting that Gillispie had made:  "It was a toilet that was a prison cell toilet or truck stop toilet, you know, very dirty toilet, and it had all his things important to him in his life swirling around and going down the toilet:  It was children and his family who had been born, relatives who had died, people who had got married, friends who had gotten married and had children, you know, all the things that he wished he was there for."  (Doc. No. 510 at PageID 17935-36, 17938.)  Godsey also testified about an incident at the prison that demonstrated to Godsey how incarceration had impacted Gillispie:

> There was one time I went to visit him where I had been – I was really tired.  So I had little kids, and I had been running around all weekend at soccer, basketball, and all that kind of stuff.  And then a kid was sick and kept me up all night.  So in the morning, I had to go visit [Gillispie].  So they bring me into the attorney visiting room, and it took them a while to go get [Gillispie] and bring him, and I fell asleep. … And so [Gillispie] came in and woke me up.  And I was real apologetic; I felt bad.  I just said, 'Man, you know, the kids are kicking my butt.  You know, I've been up all night and I'm really sorry.  Damn soccer games all weekend, and I am just beat I'm really sorry.'  And he said, 'Man, I would die to have a kid keep me up sick all night.  I would die to be able to take my kids around soccer games. …'

(*Id.* at PageID 17936-37.)

During closing arguments, Gillispie's counsel suggested a benchmark of awarding Gillispie three million dollars for each year that he was incarcerated, resulting in a total requested verdict of $60 million.  (Doc. No. 498 at PageID 16407.)  His counsel argued that figure was still a conservative estimate, leaving out "the nightmares of the ten years hanging over [Gillispie's]

head even after he got out [of prison], the fear of going back, the debt he owes to people, the humiliation, the PTSD," as well as other items.[29] (*Id.* at PageID 16408.)

The Court instructed the jury regarding damages. (Doc. No. 472.) As noted by Gillispie in his opposition brief, neither the Intervenor nor Moore challenges the Court's jury instructions regarding damages. (Doc. No. 503 at PageID 17290.) Gillispie did not ask the jury for punitive damages, and the jury was not instructed on the idea of punitive damages in any way. (Doc. No. 472.) Regarding compensatory damages, the Court instructed the jury as follows:

> If you find in favor of Plaintiff on one or more of Plaintiff's claims, then you must determine the amount of money that will fairly compensate Plaintiff Gillispie for any injury that you find he sustained as a result of Defendant Moore's conduct as well as any injury he is reasonable [sic] certain to sustain in the future. This is called 'compensatory damages.'
>
> Plaintiff must prove his damages by a preponderance of the evidence. Your award of damages must be based on evidence and not speculation or guesswork. This does not mean, however, that compensatory damages are restricted to the actual loss of money; they include both the mental and emotional aspects of injury, even if they are not easy to measure. Compensatory damages include but are not limited to:
>
> - The physical, mental, and emotional pain and suffering Plaintiff has experienced
>
> - The physical, mental, and emotional pain and suffering Plaintiff is reasonably certain to experience in the future
>
> - The loss of enjoyment of life Plaintiff has experienced
>
> - The loss of enjoyment of life Plaintiff is reasonably certain to experience in the future
>
> No evidence of the dollar value of physical, mental, or emotional pain and suffering or loss of a normal life has been or needs to be introduced. There is no exact standard for setting the damages to be awarded on account of these factors. You are

---

[29] Moore's counsel argued during his closing: "Plaintiff asked you for, I don't know, $60 million. You know, I don't know if Mr. Gillispie's innocent. I just know he was convicted twice, that 24 people unanimously agreed, based on the same evidence that you've heard, that the man was guilty. I'm not here to tell you how much somebody's life is worth, how much the time in prison is worth. That's not for me to judge. That's for you to judge." (Doc. No. 498 at PageID 16446.)

to determine an amount that will fairly compensate Plaintiff for any injury he has sustained.

Present value is the proper measure for all aspects of any damages award.

(Doc. No. 472 at PageID 15548.)  The Court also instructed the jury regarding the avoidance of a double recovery:

> You must not award damages more than once for the same injury. If you find Defendant Moore violated more than one of Plaintiff Gillispie's rights, Gillispie is entitled to be compensated only for the injuries he actually suffered. Thus, if Defendant Moore violated more than one of Gillispie's rights, but the resulting injury was no greater than it would have been had Defendant Moore violated one of those rights, you should award an amount of compensatory damages no greater than you would award if Defendant Moore had violated only one of Gillispie's rights.

(*Id.* at PageID 15549.)  Additionally, the Court specifically instructed the jury to perform its duties fairly and not to "let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way."  (Doc. No. 472 at PageID 15521.)

After finding for Gillispie and against Moore on Gillispie's claims, the jury assessed damages in the amount of $45,000,000.  (Doc. No. 475.)

### 2)  Rule 59(e) principles

The Federal Rules of Civil Procedure allow a party to request that a judgment be altered or amended.  Fed. R. Civ. P. 59(e) ("[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment").  "A court may grant a Rule 59(e) motion to alter or amend if there is: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice."  *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005).  It is apparent that the parties here do not base their Rule 59(e) motions on any newly discovered evidence or intervening change in controlling law.

The movants seek a remittitur, asking that the jury's award of compensatory damages be reduced because it is (allegedly) excessive.  (Doc. No. 482 at PageID 15616; Doc. No. 485 at

PageID 15712.)  "A remittitur is defined as '[t]he procedural process by which an excessive verdict of the jury is reduced.'"  *Hill v. Marshall*, 962 F.2d 1209, 1216 (6th Cir. 1992) (quoting Black's Law Dictionary, 1295 (6th Ed. 1990)).  When a trial court determines that a compensatory damages award should be remitted to a specific amount, the court must provide the plaintiff with "the option of accepting this reduced compensatory award or electing a new trial."  *Denhof*, 494 F.3d at 547; *see also Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1396 (6th Cir. 1990) (explaining that, "even if remittitur had been appropriate here, a forced remittitur without the offer of the option of a new trial on the issue of damages constitutes error").

A trial court "is sharply limited in its ability to remit a jury verdict."  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004).  "A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court."  *Wallace v. FedEx Corp.*, 764 F.3d 574, 593 (6th Cir. 2014) (alterations adopted; internal quotation marks omitted).  Thus, "[a] jury's damages award must stand unless it is (1) beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a mistake."  *Id.* (internal quotation marks omitted).

In determining whether an award is excessive, the standard is <u>not</u> whether the award is one that would be considered "generous."  *Slayton v. Ohio Dept. of Youth Servs.*, 206 F.3d 669, 679 (6th Cir. 2000) (citing *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 34 (1st Cir. 1999) (remittitur was not appropriate simply because the award was "extremely generous")).  Instead, "a jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss."  *Wallace*, 764 F.3d at

593 (internal quotation marks omitted); *see also Slayton*, 206 F.3d at 679 (a trial court "should reduce a jury's verdict only when the judgment clearly exceeds the maximum amount of compensatory damages a jury could reasonably award") (internal quotation marks omitted).

The Sixth Circuit has also stated that a trial court "abuses its discretion in ordering either a remittitur or new trial when the amount of the verdict turns upon conflicting evidence and the credibility of witnesses." *Farber*, 917 F.2d at 1395. "The trial court may not substitute its judgment or credibility determinations for those of the jury." *Id.*; *see also Tennant v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35 (1944) ("[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable").

### 3) The argument that the award is statistically excessive

Both the Intervenor and Moore rely on an article written by Mark A. Cohen titled "Pain, Suffering and Jury Awards: A Study of the Cost of Wrongful Convictions" (the "Cohen Article") to argue that the jury's award is "beyond the range supported by proof and is so excessive that it shocks the conscience." (Doc. No. 482 at PageID 15618; *see also* Doc. No. 482-1 (Cohen Article); Doc. No. 485 at PageID 15712-14; Doc. No. 516 at PageID 18030 ("the exorbitant jury award is a significant outlier when viewed against the statistics of similar cases involving wrongful imprisonment").) The Intervenor argues that the Court "should enter a remittitur commensurate to the average" set forth in the Cohen Article, which the Intervenor indicates "would be $352,050 per year, yielding an award of $7,041,000.00 for twenty years of incarceration" endured by Gillispie. (Doc. No. 482 at PageID 15620, 15622.)

To set up this argument, the Intervenor cites several cases from the Second Circuit Court of Appeals (or district courts within that circuit) for the proposition that a court should look to awards in comparable cases in deciding a Rule 59(e) motion. (Doc. No. 482 at PageID 15616-17

(also arguing that, "[i]n cases of wrongful conviction, there is no better tool to compare the jury's award than" the Cohen Article).) However, while not prohibiting or taking a wholly negative stance toward considering awards in comparable cases, the Sixth Circuit Court of Appeals does not appear to be as reliant on the practice. *See, e.g., Champion*, 380 F.3d at 906; *Thompson v. Nat'l R.R. Passenger Corp.*, 621 F.2d 814, 827 (6th Cir. 1980) ("cases involving similar injuries are in no sense controlling"). In fact, at least in cases that involve intangible losses like the case here[30], the Sixth Circuit has explained that "[e]ndeavoring to compare awards is difficult and often unfruitful, because the factual circumstances of each case differ so widely and because it places reviewing courts in the position of making awkward assessments of pain and suffering better left to a jury." *Champion*, 380 F.3d at 906-07. Thus, in determining if an award is "so excessive as to shock the conscience," a court may look to awards in comparable cases but should be cognizant of factual and procedural differences that may exist in the cases and consider the types of damages that are being compared. *Id.*; *see also Bach*, 149 F. App'x at 363 (affirming the district court's decision not to grant a new trial or a remittitur due to the jury's award of damages, despite the defendant citing a number of similar cases where the compensatory damage award was significantly lower than the amount the jury had awarded).

Importantly, in addition to tangible losses, "humiliation, mental suffering and the intangible loss of civil rights may also be compensated under § 1983." *Green v. Francis*, 705 F.2d 846, 850 (6th Cir. 1983) (finding the award to be reasonable, not excessive). The exact value of such losses may be difficult, if not impossible, to determine. *Bickel v. Korean Air Lines Co., Ltd.*, 96 F.3d 151, 156 (6th Cir. 1996) (explaining that "[i]t is impossible to determine the exact value

---

[30] The Intervenor acknowledged the intangible nature of Gillispie's injuries: "The jury, it appears, awarded Plaintiff [Gillispie] for past mental and emotional pain and suffering, mental and emotional pain and suffering reasonably certain to occur in the future, and past loss of enjoyment of life. These damages are all intangible." (Doc. No. 516 at PageID 18037.)

of the pain and suffering which the decedents may have endured" and "[o]ne simply cannot quantify the mental and physical pain and suffering such an experience would cause, and thus we cannot conclude that the evidence does not support the awards"); *Bach*, 149 F. App'x at 362-63 ("quantifying pain and suffering is a nearly impossible exercise"). In fact, in *Champion* (a Section 1983 case), the Sixth Circuit said that the defendant-officers were asking for the court "to make an impossible comparison between Champion's pain and the pain of others" and that the comparisons with a couple of other identified Sixth Circuit cases "are impossible and improper, because one cannot so mechanistically measure pain and suffering." *Champion*, 380 F.3d and 907.

In addition to the concern with relying too heavily on other cases or the Cohen Article based on the Sixth Circuit's guidance in *Champion*, the article itself acknowledges limitations in its analysis that are relevant for purposes of deciding the present motions. For example, the Cohen Article acknowledges that, "[w]hile we know a lot about the number of individuals who have been exonerated for crimes they did not commit -- and the compensation they have received for this injustice, little is known about the impact on their lives and the lives of their families." (Doc. No. 482-1 at PageID 15668.) Yet that information—the information regarding how the particular plaintiff's life has been impacted—is incredibly important when assessing whether the damages awarded to that particular plaintiff are excessive. (Doc. No. 472 at PageID 15548 (instructing the jury to "determine the amount of money that will fairly compensate Plaintiff Gillispie for any injury that you find he sustained as a result of Defendant Moore's conduct as well as any injury he is reasonabl[y] certain to sustain in the future").) In other words, the facts of each individual case matter, especially when assessing the jury's award in a particular case.

As Gillispie points out in his response brief, the Intervenor and Moore did "not even cite a single specific jury verdict [in their motions] that they believe sets an appropriate marker for

comparison in this case" and "have, instead, relied on aggregated data from verdicts and settlements in Professor Cohen's study." (Doc. No. 503 at PageID 17304.) Nevertheless, in deciding the motions, the Court has also considered the cases subsequently referenced by the parties in the movants' reply briefs and in Gillispie's response brief as being similar to this case, while recognizing that jury awards in other cases are instructive but not controlling. *Champion*, 380 F.3d at 906; *Layne v. Wal-Mart Stores, Inc.*, 24 F. App'x 364, 368 (6th Cir. 2001) ("comparable decisions are instructive but not controlling") (internal quotation marks omitted).

For example, the Intervenor cites to a case in which the plaintiff (a police officer) sued his employer and other officials for discriminating and retaliating against him. *Lentz v. City of Cleveland*, 333 F. App'x 42, 43 (6th Cir. 2009). However, the circumstances of that case are quite different from the one here. In *Lentz*, the jury awarded $800,000 in damages to the plaintiff, including $707,367.32 in emotional harm for discrimination and retaliation. *Id.* at 49-50. The Sixth Circuit found that the trial court erred in denying a remittitur. *Id.* The district court had rested its denial on the failure to propose interrogatories to test the jury verdict, rather than evaluating the evidence supporting the jury award. *Id.* The Sixth Circuit analyzed the plaintiff's citations to comparable cases of large awards to other discrimination plaintiffs for emotional harm. *Id.* It distinguished those cases, explaining that, "[u]nlike those plaintiffs, [the] emotional problems [of the plaintiff in *Lentz*] ended, and he did not lose his job, pay, benefits, or position. For that matter, his award is much higher than plaintiffs that suffered more emotional harm." *Id.* The appellate court "view[ed] the jury's award as excessively compensating [the plaintiff] for temporary emotional harm." *Id.*

The Intervenor also argues in its reply brief that Gillispise's case "is nearly identical to" *Wheatt v. City of E. Cleveland*, Nos. 1:17-cv-377 & 1:17-cv-611, 2019 U.S. Dist. LEXIS 147551,

2019 WL 4071646 (N.D. Ohio Aug. 29, 2019). In *Wheatt*, a Section 1983 case, three plaintiffs sued two officers for violating their constitutional rights by using an unnecessarily suggestive photo identification procedure, pressuring a witness to identify one of the plaintiffs as the shooter, and withholding exculpatory evidence. *Wheatt*, 2019 WL 4071646, at *1. The plaintiffs alleged that the violations resulted in their wrongful murder convictions and twenty-year incarceration.[31] *Id*. The case went to trial, at which a witness who had identified one of the plaintiffs as the shooter testified that one of the defendant officers had pressured her to identify that plaintiff as the culprit. *Id*. Evidence also showed that exculpatory evidence had not been provided to defense counsel before the criminal trial. *Id*. The jury returned a $15 million verdict for the plaintiffs. *Id*. The court stated that the plaintiffs "testified—at times emotionally—about the damages caused by their lengthy incarceration." *Id*. at *4. The court also said that "the relatively limited damages testimony described no damage that would be unexpected after a wrongful nineteen-year incarceration." *Id*. The Intervenor argues that, "where the three *Wheatt* plaintiffs received $15,000,000 total (rendered against two defendants), [Gillispie] advances that substantially similar facts support an award of $45 million just for himself," but that "[j]ust as the facts do not support the jury's award, neither does caselaw." (Doc. No. 516 at PageID 18041.)

In his reply brief, Moore cites to the First Circuit Court of Appeals' opinion in *Limone v. U.S.*, 579 F.3d 79 (1st Cir. 2009). In that case, four individuals were framed for murder. *Id*. at 83. By the time the information came to light that they had been framed, two of the individuals had died in prison and one had been paroled. *Id*. Eventually, the convictions were vacated and the individuals (or their estates) "brought suit against the United States advancing claims under the

---

[31] The opinion does not indicate that the plaintiffs in *Wheatt* were required to register as sex offenders (which is not surprising, given that the underlying crime in *Wheatt* was murder, not a sex crime), spent any time on parole, or suffered from PTSD.

Federal Tort Claims Act." *Id.* The case was tried to the bench, not a jury, and the judge set a baseline of $1,000,000 in damages per year for each year of wrongful incarceration. *Id.* at 104. This resulted in damages awards against the United States in the following amounts for each of the four individuals (or their estates): $28,000,000; $26,000,000; $29,000,000; and $13,000,000. *Id.* at 109.

The First Circuit in *Limone* concluded on appeal that, "[i]nsofar as the awards embody damages for wrongful incarceration, they are considerably higher than any one of us, if sitting on the trial court bench, would have ordered," but "[w]e nonetheless affirm the awards." *Id.* at 84. The appellate court explained that the individuals "suffered all the hardships customarily associated with prolonged prison confinement," and "[t]hese hardships were magnified by their knowledge that they had been framed." *Id.* at 103-04. Moore focuses on the court's statements that "[t]he $1,000,000 per year baseline is extremely generous" and that "the district court's awards are at the outer edge of the universe of permissible awards." *Id.* at 106-07. However, the court added that, "[s]till and all, the awards are by no means unprecedented, and the 'shock-the-conscience' test cannot be administered in a vacuum. What is shocking under one set of facts may be acceptable (even if only marginally so) under different circumstances." *Id.* The court also said:

> [D]ollars are at best a rough and awkward proxy for time spent in the throes of wrongful incarceration. In the final analysis, it is for the trier of fact to resolve the difficult questions of quantification and monetization that lurk in the penumbra of cases such as this. … [T]here is no scientific formula or measuring device which can be applied to place a precise dollar value on matters such as restraint of freedom, fright, anxiety, loss of face, or emotional scarring. The wisdom of that statement is evident here: placing a dollar value on the emotional pain incident to wrongful incarceration, the dreary sameness of life behind bars for years on end, and the loss of freedom, relationships, and hope cries out for approximation. Moreover, the difficulty inherent in monetization of those injuries is itself a reason for deference to the front-line judgment of the trial court.

*Id.* at 105-06 (internal quotation marks and citations omitted).

In his opposition brief, Gillispie cites to a Section 1983 case in which the plaintiff was

awarded $14 million because an officer suppressed, and conspired to suppress, evidence relating to the molestation of the plaintiff's adopted daughter. *White v. McKinley*, No. 05-0203-CV-W-NKL, 2009 U.S. Dist. LEXIS 24556, 2009 WL 813001, at *1, 4 (W.D. Mo. Mar. 26, 2009), *aff'd*, 605 F.3d 525 (8th Cir. 2010). The plaintiff was acquitted of the crime at his third criminal trial, although he had fled the country before being sentenced after being found guilty at the first trial. *Id*. The plaintiff had spent five-and-a-half years in prison. *White*, 605 F.3d at 536. At trial, the plaintiff had argued for $1.6 million in economic damages plus $3 million per year of incarceration; the evidence showed that the plaintiff suffered financial and emotional losses and physical abuse in prison.[32] *White*, 2009 WL 813001, at *22. Gillispie also cites to a Section 1983 case where the plaintiff, a fifteen-year-old boy tried as an adult for a home invasion and sexual assault, was awarded $9,063,000 by a jury after DNA evidence proved that he did not commit the crimes. *Dominguez v. Hendley*, 545 F.3d 585, 587-88 (7th Cir. 2008). The plaintiff had spent four years incarcerated before being paroled and, through the process and the period following his release, he maintained his innocence and worked to exonerate himself. *Id.* Gillispie also cites to a case (*Johnson v. Guevara*) where the plaintiff was awarded $21 million dollars in 2009 for spending 12 years in prison for a murder that he was acquitted of after a retrial, where it was revealed that two of the original witnesses were coerced into falsely identifying the plaintiff as a participant in the murder. (Doc. No. 503 at PageID 17305; Doc. No. 503-5 at PageID 17529; Doc. No. 516 at PageID 18040.) Gillispie argues that these three cases—which awarded approximately $3.549 million per year of incarceration (*White*), $2.25 million per year of incarceration (*Dominguez*), and $2.408 million per year of incarceration (*Johnson*), respectively, in today's dollars—are similar to this case. (Doc. No. 503 at PageID 17305; Doc. No. 503-6 at PageID

---

[32] Unlike in *White*, Gillispie does not point to any evidence that he suffered physical abuse while incarcerated.

17528-29.) Gillispie indicates that, to arrive at its verdict of $45 million in this case, "[t]he jury could have simply found 2.25 [million dollars] per year [of incarceration] at 20 years, which would be in the same ballpark as *Johnson* and *lower* than in *Dominguez* and *White*."[33] (Doc. No. 503 at PageID 17305 (emphasis in original).)

The Court also considers the evidence presented to the jury. At trial, Gillispie put forth extensive damages evidence regarding how his life has been severely impacted by Moore's actions. The compensatory damage award could "include both the mental and emotional aspects of injury" (as the Court instructed the jury) (Doc. No. 472 at PageID 15548), and there was strong evidence at trial that Gillispie endured—and continues to endure and is reasonably certain to experience in the future—physical, mental, and/or emotional pain and suffering as a result of Moore's conduct. *Smith v. LexisNexis Screening Sols., Inc.*, 837 F.3d 604, 611 (6th Cir. 2016) (plaintiff elicited enough evidence for a reasonable jury to conclude he suffered emotional distress and was accordingly due damages; affirming denial of motion to remit compensatory damages award). Gillispie's evidence at trial demonstrated that he essentially lived through a nightmare for years on end. For example, Gillispie testified that, as an innocent man, he was locked up with people who "didn't care about human life," who killed people in front of him, who beat people so bad that "the life [was] taken right out of them," and who hit a man "in the head so hard that his eyeball came out of his eye socket." (Doc. No. 500 at PageID 16663-65.) He testified that he spent his days in prison "trying to stay away from" the violence. (*Id.* at PageID 16689-90.) Not only was he imprisoned for more than twenty years where "[e]very day was miserable," he also was "classified as the highest-tier sex offender that you can be in the State of Ohio." (*Id.* at PageID 16689-90, 16692-94.) Gillispie testified that being "labeled a sex offender" is something that

---

[33] The Intervenor argues in its reply brief that these three cases cited by Gillispie "are distinguishable because Plaintiff [Gillispie] was never acquitted or found to be innocent." (Doc. No. 516 at PageID 18041.)

"doesn't go away," it "is on websites everywhere," and "it's still a part of my life." (*Id.*) He also "was on parole … for five years" after being released from prison, restricting his movement and requiring him to comply with various conditions. (*Id.* at PageID 16700-01.) Gillispie also testified that his life has been impacted every day for "going on 33 years," he has "severe PTSD from it," has suffered adverse physical effects, and has had to receive extensive mental health treatment. (*See, e.g., id.* at PageID 16700-01; Doc. No. 501 at PageID 16735.) Likewise, there was strong evidence at trial that Gillispie experienced the loss of enjoyment of life while imprisoned. This included, for example, missing out on raising a family, weddings, and funerals, as well as the loss of his liberty and other civil rights while being subject to the horrors of prison for more than 7,500 days during the prime of his life. (*See, e.g.,* Doc. No. 500 at PageID 16570, 16572, 16611; Doc. No. 510 at PageID 17936-38.)

The Court has considered the Cohen Article, the cases that the parties argue are comparable to this case, and the evidence presented (which, again, must be viewed by the Court in the light most favorable to Gillispie for purposes of ruling on these motions to alter or amend the verdict (*Wallace*, 764 F.3d at 593)). Although the jury's award here is larger than the individual awards in the *Limone* case and the similar *Wheatt* case and is statistically large according to the Cohen Article, the jury's award is not too out of line with the awards in other similar wrongful imprisonment cases that are cited by Gillispie. *Bach*, 149 F. App'x at 362-63 (affirming the district court's decision that the compensatory damage award was not excessive, despite citation to several similar cases where "the compensatory damage award was significantly lower than the amount awarded here"). "[T]he factual circumstances of each case differ so widely" (*Champion*, 380 F.3d and 907) and, based on the evidence presented to the jury, the award here is not "beyond the

maximum damages that the jury reasonably could find to be compensatory for" Gillispie's losses.[34]
*Wallace*, 764 F.3d at 593; *see also Knight v. Metro. Gov't of Nashville and Davidson, Cnty., Tenn.*,
136 F. App'x 755, 762 (6th Cir. 2005) (affirming the district court's decision to deny a motion for
remittitur, based on the plaintiff's testimony at trial and how "other circuits have upheld
comparable amounts awarded to plaintiffs alleging a violation of the [federal statute at issue] under
similar circumstances").  Therefore, the Court cannot set aside or reduce the award.  *Wallace*, 764
F.3d at 593; *Slayton*, 206 F.3d at 679.

Gillispie's intangible losses—including the loss of liberty and enjoyment of life while
imprisoned for more than twenty years as an innocent man[35], the shame and humiliation from
being falsely labeled a sex offender, and the mental and emotional trauma and anguish that he
endured while suffering in frightening prison conditions and that continues—are substantial.
"[J]uries have broad discretion to set damages amounts" (*Smith*, 837 F.3d at 612), and the value
of such intangible losses is difficult to measure.  *Bickel*, 96 F.3d at 156; *Bach*, 149 F. App'x at
362-63.  Regardless of whether or not the Court feels that another amount would be "more
reasonable" (*Tennant*, 321 U.S. at 35), the jury's award is not "beyond the maximum damages that
the jury could find to be compensatory for" Gillispie's losses, and the Court does not find the jury's
award to be beyond the range supportable by proof or so excessive that it shocks the conscience,

---

[34] Additionally, for what it is worth and based only on the information in the Cohen Article itself, the jury's award is
within the range of outcomes identified in the Cohen Article, both on a total basis and a per-day-incarcerated basis;
applying the largest outcome on a per-day-incarcerated basis to the 7,625 days that Gillispie was continuously
incarcerated would lead to an award of $381,250,000—more than eight times the jury's award.  (Doc. No. 482-1 at
PageID 15646 (according to the Cohen Article, the largest total was $56.8 million, while the largest per-day-
incarcerated settlement was $50,000 in current dollars as of the 2021 article).)  This demonstrates how one should be
extremely cautious when relying on individual figures, especially when they are provided without context.  The Court
also notes that nothing required (or prohibited) the jury to make a per-year-incarcerated calculation in determining its
award.
[35] Again, for purposes of resolving these motions, the Court must review "all evidence in the light most favorable to"
Gillispie, and, in doing so, the evidence at trial supported that Gillispie is innocent of the underlying crimes for which
he served more than 20 years in prison.  *Wallace*, 764 F.3d at 593.

particularly given the nature of the injuries that Gillispie has suffered and continues to endure. *Wallace*, 764 F.3d at 593; *see also Bickel*, 96 F.3d at 156 (declining to remit the jury's damage awards because they did not "shock our conscience").  The jury's damages award must stand. *Wallace*, 764 F.3d at 593.

> ### 4) The argument that the award is not supported by the evidence presented at trial, but instead is punitive and resulted from bias, passion, and prejudice

The Intervenor and Moore also argue that the jury's $45 million award is not supported by the evidence presented at trial.  (*See* Doc. No. 482 at PageID 15618 (Intervenor arguing that Gillispie did not submit any evidence with respect to certain categories of damages); Doc. No. 485 at PageID 15712 (Moore arguing that the award was manifestly outside the weight of evidence) and at PageID 15714 (Moore arguing that "[t]he lack of evidence produced at Trial mixed with the excessive verdict by the jury clearly shocks the conscience"); Doc. No. 516 at PageID 18035).) However, as shown above, the Court "cannot conclude that the evidence does not support the award." *Bickel*, 96 F.3d at 156.

Additionally, the Intervenor and Moore argue that the "jury's award most certainly appears to be punitive to the core" and "supports the inference of bias, passion and prejudice."  (Doc. No. 482 at PageID 15618, 15620; *see also* Doc. No. 485 at PageID 15713-14; Doc. No. 516 at PageID 18035.)  It is true that "[a]n excessive award of damages can support an inference of bias, passion and prejudice."  *Bach*, 149 F. App'x at 367.  However, as shown above, the Court does not find the jury's award to be excessive.  There also is no evidence of bias, passion, or prejudice by the jury.  Moreover, the Court specifically instructed the jury: "Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way." (Doc. No. 472 at PageID 15521.)  In the absence of indications to the contrary, the Court must presume that the jurors followed its instructions. *Barnes v. Owens-Corning Fiberglas Corp.*, 201

F.3d 815, 822 (6th Cir. 2000) ("[f]ederal courts generally presume the jury will follow the instructions correctly as given").

The Intervenor also says that "[t]he jury's $45,000,000.00 award is akin to a punitive damages award, which suggests that they misunderstood the interrogatories." (Doc. No. 482 at PageID 15620.) Gillispie responds by saying that this "is a self-serving position based on nothing but frivolous speculation … [that amounts to] asking this Court to grossly speculate that the jury went rouge and somehow ignored the Court's repeated instructions on damages (and make an inference that contradicts the interrogatory answers)." (Doc. No. 503 at PageID 17307.) Again, in the absence of indications to the contrary, the Court presumes that the jurors followed its instructions. *Barnes*, 201 F.3d at 822. Not only does the Court disagree with the Intervenor's suggestion, but it ignores the Intervenor's own recognition that "[t]he jury's verdict, of course, was for compensatory damages as defined in Instruction No. 26 of the Jury Instructions" and that the jury "awarded [Gillispie] $45,000,000.00 for, apparently, pain and suffering, lost quality of life, and the value of lost freedom from his wrongful incarceration." (Doc. No. 482 (Intervenor's Alter/Amend Judgment Motion) at PageID 15619, 15623.) As set forth above, Gillispie sustained substantial intangible injuries, which are difficult to measure and for which juries may award significant compensatory damages depending on the circumstances and evidence presented. *See Champion*, 380 F.3d at 907; *Bach*, 149 F. App'x at 362-63 ("quantifying pain and suffering is a nearly impossible exercise"; affirming the district court's decision not to grant a new trial or a remittitur due to the jury's award of damages); *White*, 2009 WL 813001, at *22 (awarding compensatory damages that included what would amount to $3 million per year of incarceration to a man eventually acquitted of a sexual crime); *Armstrong v. Shirvell*, 596 F. App'x 433, 455-56 (6th Cir. 2015) (upholding an award of $1.75 million for emotional distress suffered by the plaintiff

because of the defendant's "online and in-person 'campaign' against" him; explaining that plaintiff "testified that he felt frustrated, furious, and low," "believed he was going through a period of depression," "suffered a loss of confidence," and he felt the emotional effects would continue).

Finally, in their replies, both the Intervenor and Moore support their argument that the award is punitive by arguing that the jury relied on Gillispie's representations of innocence when considering the amount to award as damages. (Doc. No. 516 at PageID 18031, 18036; Doc. No. 517 at PageID 18045, 18049 (Moore arguing that "the Jury's intent was to punish Defendant Moore because they were incorrectly focused on whether Plaintiff was innocent instead of considering the actual damages, or lack thereof, presented").) The Intervenor asserts that Gillispie's "culpability for the underlying crimes, whether he was or was not 'innocent' of those crimes, is not properly an issue in this case." (Doc. No. 516 at PageID 18030.)

However, evidence regarding Gillispie's innocence (or lack thereof) was relevant at trial, as this Court explained before the trial started. (Doc. No. 379 at PageID 12813 ("[p]leadings and briefing by both parties indicate that whether Gillispie is actually innocent of the crimes for which he was charged remains in question, and both parties acknowledge that whether Gillispie is innocent may be relevant to his damages").) In fact, although innocence was not an element of Gillispie's claims, such evidence was specifically relevant to his damages. *Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014) (explaining that "evidence concerning [plaintiff's] innocence is also relevant to the issue of damages," in a Section 1983 case where the plaintiff had spent 12 years in prison on a conviction that was later overturned); *Dominguez*, 545 F.3d at 594 (holding that the district court "had no reason to exclude" evidence that the plaintiff's attorney elicited about plaintiff's innocence because the information was relevant to damages, in a Section 1983 wrongful imprisonment case). The Seventh Circuit Court of Appeals explained the rationale

behind the relevance of innocence to the issue of damages in cases where the plaintiff was imprisoned but his conviction was later overturned: "[a] jury that believed the plaintiff was guilty of the crime would award lower damages because the imprisonment is attributable to the person's own actions as well as the civil defendants' misbehavior and even a fair prosecution and trial may well have resulted in the person's imprisonment." *Parish v. City of Elkhart*, 702 F.3d 997, 999 (7th Cir. 2012); *see also Kluppelberg v. Burge*, 84 F. Supp. 3d 741, 745 (N.D. Ill. 2015) ("evidence that [plaintiff] did not commit the crime may also be admitted because it may be necessary for the jury to decide whether [plaintiff] likely committed the crime in order to decide whether the alleged wrongdoing of the defendant caused him injury and, if so, the extent of damages"). The Intervenor's and Moore's reliance on Gillispie's representations of innocence—or any evidence concerning Gillispie's innocence or lack thereof—to support their argument that the award is punitive and resulted from bias, passion, and prejudice fails.[36] *Bach*, 149 F. App'x at 367-68 (affirming district court's rejection of defendant's argument that the jury's award was the product of passion or prejudice, where the defendant's argument relied on the jury's exposure to certain evidence but the district court had found such evidence was relevant to an issue in the case).

Having instructed the jury to "determine the amount of money that will fairly compensate Plaintiff Gillispie for any injury that you find he sustained as a result of Defendant Moore's conduct as well as any injury he is reasonabl[y] certain to sustain in the future" (Doc. No. 472 at

---

[36] In its reply brief, the Intervenor points out that "[t]he Court is certainly aware of this contention [by Gillispie that he is innocent of the underlying crimes] as it felt compelled to correct [Gillispie's] assertion that he was wrongfully convicted." (Doc. No. 516 at PageID 18036.) It appears that the Intervenor missed the point of the Court's correction during trial. Of course the Court was aware of Gillispie's contention that he is innocent. Prior to trial, the Court issued a 25-page order ruling on three motions in limine that, in part, related to Gillispie's assertion of innocence, how an Ohio appeals court had vacated Gillispie's conviction and sentence and remanded for a new trial, how "Ohio has a 'wrongful-imprisonment statute'" (Ohio Rev. Code § 2743.48), and how an Ohio court order had declared Gillispie a "wrongfully imprisoned individual" in accordance with Ohio's "wrongful imprisonment statute." (Doc. No. 379.) The Court's correction at trial was to help ensure that the evidence corresponded with the correct terminology used under the relevant Ohio law and the Ohio court order, "wrongfully imprisoned" not "wrongfully convicted." The Court's correction was not to bar evidence regarding whether Gillispie is innocent of the underlying crimes.

PageID 15548), and viewing the evidence in the light most favorable to Gillispie, the Court is <u>not</u> "convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court." *Wallace*, 764 F.3d at 593 (alterations adopted; internal quotation marks omitted); *see also Knight*, 136 F. App'x at 762 (finding "no basis to conclude that the award was 'clearly excessive'" where the defendant did "not quarrel with the district court's instruction that the jury could award compensatory damages for" emotional pain, suffering, and loss of enjoyment of life and the plaintiff had testified at trial regarding his emotional distress, financial hardship, and reduced standard of living resulting from defendant's actions); *Champion*, 380 F.3d at 907 ("[t]he award granted here by the jury, which was capable of judging credibility and actually heard live testimony regarding the incident as opposed to the written record before us, is not unreasonable, excessive, or conscience-shocking").

Therefore, the Court will not set aside or reduce the jury's award. The Court denies the Intervenor Alter/Amend Judgment Motion and the Moore Alter/Amend Judgment Motion.

## III. <u>CONCLUSION</u>

For the reasons stated above, the Court **DENIES** Intervenor Miami Township Board of Trustees' Motion for Judgment as a Matter of Law and, in the Alternative, Motion for a New Trial (Doc. No. 481); **DENIES** Intervenor Miami Township Board of Trustees' Motion to Alter or Amend Judgment (Doc. No. 482); and **DENIES** Defendant Matthew Scott Moore's Motion to Alter or Amend the Judgment (Doc. No. 485).

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, July 31, 2023.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

94