```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF OHIO
 2                              AT DAYTON

 3   _____
                                         )
     ROGER DEAN GILLISPIE,               )
 4                                       )
                        Plaintiff,       ) CASE NO. 3:13-cv-416-TMR
 5                                       )
                     -vs-                )
 6                                       )
     THE CITY OF MIAMI TOWNSHIP, ET AL.,) JURY TRIAL
 7                                       )
                        Defendants.      ) VOLUME II
 8   _____)
                       TRANSCRIPT OF PROCEEDINGS
 9               THE HONORABLE THOMAS M. ROSE,
             UNITED STATES DISTRICT JUDGE, PRESIDING
10                 MONDAY, NOVEMBER 7, 2022
                          DAYTON, OH
11
     For the Plaintiff:      MICHAEL KANOVITZ, ESQ.
12                           DAVID B. OWENS, ESQ.
                             MEGAN C. PORTER, ESQ.
13                           Loevy & Loevy
                             311 N. Aberdeen Street
14                           3rd Floor
                             Chicago, IL  60607
15
     For the Defendant       JOHN T. McLANDRICH, ESQ.
16   Matthew Scott Moore:     DAVID J. SIPUSIC, ESQ.
                             Mazanec, Raskin & Ryder Co., LPA
17                           3305 Solon Road
                             100 Franklin's Row
18                           Cleveland, OH  44139

19   For the Intervenor      DAWN M. FRICK ESQ.
     Miami Township:          CHRISTOPHER T. HERMAN, ESQ.
20                           Surdyk, Down & Turner Co., LLP
                             8163 Old Yankee Street
21                           Suite C
                             Dayton, OH  45458
22
         Proceedings recorded by mechanical stenography,
23   transcript produced by computer.
                     Mary A. Schweinhagen, RDR, CRR
24               Federal Official Court Reporter
                     200 West Second Street
25                    Dayton, OH  45402
                      *** *** *** ***
```

1    Courtroom Deputy:  Elizabeth Penski

2    Law Clerks:  Michael Mayer, Callum Morris
                  Caitlin Doles, extern
3
     Also Present:  Roger Dean Gillispie, plaintiff; Valerie
4    Barajas, paralegal; Matt Thibodeau, paralegal; Jeff Weber, IT

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              P-R-O-C-E-E-D-I-N-G-S                    2:00 P.M.

2         (Jury in at 2:08 p.m.)

3         (In open court at 2:09 p.m.)

4              THE COURT:  Ladies and gentlemen, welcome back.

5         As I did previously, as we started the case, I want to

6    make one further announcement before I address the jury.

7         There will be no audio or video recordings of any

8    proceedings in this court over -- Rule 83.2 prohibits the use

9    of any device to make any audio or visual recordings on any

10   floor of the United States Courthouse where judicial

11   proceedings are being conducted, or within courtrooms,

12   chambers, or otherwise.

13        The order will be enforced if it seems to be violated.

14        All right.  Now, ladies and gentlemen, welcome back from

15   your lunch hour.  Before we begin, which I believe I explained

16   to you, it will be the opening statements of counsel.

17        I want to explain to you some of the general procedures

18   that the Court will be following.  The structure of the trial

19   will be as follows:  Counsel for both sides will be making --

20   for all sides will be making their opening statements to you.

21   These statements are not evidence; they are just a preview,

22   rather, a preview, a roadmap of what they believe the evidence

23   will show, a roadmap to help you follow the evidence as it is

24   presented.

25        Now, after opening statements, the plaintiff will begin
```

1    the presentation of his case.  Then the defendant will present

2    evidence of his case once the plaintiff has concluded, if he

3    wishes.  If the defendant presents evidence, the plaintiff may

4    then present what is called rebuttal evidence.  The trial will

5    conclude then with the arguments of counsel and my

6    instructions to you on the law in the case.

7         Now, with the opening statements and closing arguments,

8    again, those are not evidence.  They are what the counsel

9    believes will be shown by the evidence, and then the argument

10   will be counsel arguing to you what they believe the evidence

11   has shown.

12        And then, of course, after the Court gives you the

13   instructions of law, you will retire to deliberate on your

14   verdict.

15        In this case, the Township, the intervenor, also may ask

16   some questions, witness questions, and make some arguments

17   during the trial.

18        Now, from time to time during the trial, as may already

19   be evident, I may call recess for certain reasons that aren't

20   apparent to you.  Also, sometimes it will be necessary for the

21   attorneys to make an argument here at the bench outside of

22   your hearing.  None of these things are done to prolong or

23   delay the trial or to prevent you from understanding what is

24   going on.  The law does require that some matters not be heard

25   by the jury in order to assure that both sides get a fair

1    trial.

2          It is important that you be attentive to all the

3    testimony and keep an open mind throughout this trial.  It is

4    not likely that this case will attract any or some attention

5    of the press; but if it does, as I indicated to you

6    previously, you are not to read, listen, or watch any reports,

7    or listen to anyone else discuss the case.

8          Now, because of the length of the trial and the number of

9    witnesses, the Court will be providing you notepads allowing

10   you to take notes if you so wish.  The notes are for your

11   personal use only.  And you are not required to take them.

12   But no but one -- no one but you, the juror taking the notes,

13   will review them.  They will be destroyed at the end of this

14   case.

15         You will be given the notebook to use for your notes, and

16   you should leave it face down on your chairs during the

17   breaks.  And at the end of each day, they will be collected.

18         I also believe it would be helpful for you to have some

19   preliminary instructions to follow in listening to and

20   considering the evidence which you will hear in this case.

21         Later, after you have heard all of the evidence and the

22   closing arguments of counsel, I'll give you further

23   instructions covering the law which you are to follow in the

24   case.  It is your -- it is the duty of the judge to instruct

25   you in the law, and it is your duty to follow the law as I

1    state it to you both now and at the conclusion of the

2    evidence.

3        First of all, it is your exclusive duty to decide all

4    questions of fact submitted to you.  In connection with that

5    duty, you must determine the effect and the value of the

6    evidence.  You must not be influenced by your decision -- you

7    must not be influenced in your decision by sympathy,

8    prejudice, passion toward any party, witness, or attorney in

9    the case.

10       The attorneys for the parties will, of course, have

11   active roles in the trial.  They will make opening statements,

12   which is about to happen, question witnesses, and make

13   objections, and, finally, will argue the case as the last step

14   before you hear the final instructions and start your

15   deliberations.

16       Remember that the attorneys are not witnesses.  Since it

17   is your duty to decide the case solely on the evidence

18   presented by the witnesses, you must not consider as evidence

19   any statement made by one of the attorneys during this trial.

20       If a question is asked and an answer is -- asked and an

21   objection to the question is sustained by me, you will not

22   hear -- then hear the answer and you must not guess what that

23   answer might have been.  Or what the reason for the objection.

24       If any answer is given to a question and the Court then

25   grants a motion to strike out that answer, you are to

1    completely disregard the question and the answer and not

2    consider them for any purpose.

3         Now, as jurors, you will have the sole and exclusive duty

4    to decide the credibility of the witnesses who will testify in

5    the case, which simply means that it is you who must decide

6    whether to believe or disbelieve a particular witness and how

7    much weight, if any, to give to the testimony of any witness.

8         In determining credibility and the weight of evidence,

9    you will apply the tests of truthfulness and credibility that

10   you apply in your daily lives.  Now, these tests include the

11   appearance of each witness on the stand, his or her manner of

12   testifying, the reasonableness of their testimony which is

13   given, the opportunity of -- the opportunity or lack of

14   opportunity which the witness had to see, hear, or know the

15   things about which the witness is testifying; the witness's

16   accuracy of memory; the witness's frankness or lack of it; the

17   witness's intelligence; and whether the witness has any bias

18   or any interest in the outcome of the case; and all other

19   facts and circumstances surrounding the testimony.

20        Ladies and gentlemen, applying these tests, you will

21   assign to the testimony of each witness the weight you think

22   is proper.  You are not required to believe the testimony of

23   any witness simply because it was given under oath.  You may

24   believe or disbelieve all or any part of the testimony of any

25   witness.

```
 1          Now, in this case, testimony may be presented by a
 2    witness from the witness stand in the courtroom or through
 3    live videoconference or through a deposition.  Regardless of
 4    which of these methods is used to present testimony in this
 5    trial, you must give the witnesses' testimony the same
 6    consideration.  Deposition testimony and testimony through
 7    live videoconference is entitled to the same consideration as
 8    live testimony, and you must judge it in the same way as if
 9    the witness was testifying from the witness stand in the
10    courtroom.
11          Those are the preliminary instructions I'm going to give
12    you.  As we go through the trial, there may be other
13    instructions that the Court makes or gives you, but at this
14    point in time those are the instructions that will start us
15    out.  And then, as I indicated, when the case ends, when all
16    the evidence has been presented and the counsel has argued
17    what they believe the evidence has shown, I will give you the
18    final instructions of the law that you will follow in your
19    deliberations.
20          So, ladies and gentlemen, without further ado, we will
21    turn this over to the counsel to make their opening
22    statements, understanding, of course, counsel understands that
23    they are not to be arguing law in this opening statement.
24    These opening statements are what they believe the evidence
25    that will be presented to you will show.  It's that roadmap.
```

1      Counsel.

2          MR. KANOVITZ:  Thank you, Your Honor.  May it please

3   the Court, counsel.

4      Ladies and gentlemen, good afternoon.  Let me reintroduce

5   myself to you again.  My name is Mike Kanovitz.  My fellow

6   counsel in this case is David Owens, Megan Porter, and we have

7   paralegals Valerie Barajas and Matt Thibodeau here to help us

8   out and try to make the trial go smoothly.

9      We are the team that represents Dean Gillispie, a man who

10  spent two decades behind bars for crimes he did not commit.

11  Those crimes were committed by another man, and Dean was

12  misidentified.  As you heard during voir dire, over the course

13  of 20 years, it took that much time, but his conviction was

14  vacated.  Last year, he was declared to be a wrongfully

15  imprisoned person officially by the State of Ohio.

16     And I am going to talk to you about the whole course of

17  those 20 years this afternoon and summarize it and tell you

18  what I expect the evidence is going to show, but before I do

19  that, I do want to stop and thank you for your service as

20  jurors.  You know, Judge Rose told you that next to military

21  service serving as jurors is one of the most important things

22  you can do to defend our American democracy.  And the fact of

23  the matter is, in most countries, there is no jury.

24  Government officials hold the power to decide the rights of

25  individual citizens.  And when the founders of this country

1    were putting together our Constitution, they were fresh off of

2    the American Revolution.  They had lived under a tyrant, and

3    they did not trust government officials to hold that power,

4    and so they put the jury system into the Constitution so that

5    the power to decide a citizen's rights ultimately rests in the

6    hands of the people, a cross-section of the community like

7    yourselves.

8        It's particularly important that a case like this case

9    gets decided by a jury because this is a case about the right

10   to a fair trial itself.  It's a right in the Constitution.

11   You don't hear about it very often.  You know, the big ones

12   like free speech and the right to bear arms and life, liberty,

13   and property, those are the ones you are probably familiar

14   with, but the right to a fair trial is arguably the most

15   important of all of those rights because it protects the other

16   rights that I just mentioned.

17             THE COURT:  Counsel, we are getting into a little

18   bit of argument here.

19             MR. KANOVITZ:  Okay.  Sorry, Your Honor.

20       If there is a criminal conviction, then one can lose

21   rights, and that's why it's important that there be a fair

22   trial.

23       So what is a fair trial?  A fair trial is a trial where

24   the risk of a wrongful conviction is minimized.  There is no

25   guarantees in this life.  Innocent people do get convicted,

1    but the government, under the Constitution, has a

2    responsibility to do its best to prevent wrongful convictions

3    from happening.

4        And in this case, the government acted through a

5    government official -- it's the defendant, Matthew Scott

6    Moore, employee of the Miami Township Police Department.  And

7    through him, the government violated Dean's right to a fair

8    trial.

9        There's two aspects of relevance --

10           MR. McLANDRICH:  Your Honor, this is argument.

11           THE COURT:  It is argument -- well, go on.  Counsel,

12   you are mixing what you believe the evidence is going to show

13   with your argument.  Argument comes at the end of the case.

14           MR. KANOVITZ:  Understood.  There is two aspects to

15   the right to fair trial.  I just want to explain what they

16   are.

17           THE COURT:  Isn't that argument?

18           MR. KANOVITZ:  I don't think so.  I guess I don't

19   intend to be arguing.  I just tend to tell them what to tune

20   into.

21           THE COURT:  Well, that's what the opening

22   statement's for, telling them what to tune into and what to

23   consider.  But then I would agree with counsel, you are

24   arguing.  I have tried to give you a little latitude here, but

25   you are arguing -- you can argue that maybe what the evidence

1    has shown at the end of the case equates to what you are

2    arguing right now, but you are arguing right now about fair

3    trial and things such as that.

4            MR. KANOVITZ:  Okay.  I will do my best, Your Honor.

5    I apologize.

6            THE COURT:  All right.

7            MR. KANOVITZ:  The evidence in this case is going to

8    show -- we believe it will show two violations of the right to

9    a fair trial.  The first aspect of it is that if the

10   government possesses evidence that could help you prove that

11   you were innocent, it has to give it to you.  The general idea

12   is, you know, everybody wins if guilty people are convicted,

13   and everybody wins if innocent people go free.

14       So if the government possesses evidence and it wants to

15   prosecute you --

16           MR. McLANDRICH:  This is all argument.

17           THE COURT:  Counsel, you are arguing.

18           MR. KANOVITZ:  I apologize.

19       The other aspect that we believe that the evidence will

20   show is that unreliable evidence was used to convict

21   Mr. Gillispie.  And the unreliable evidence in this case has

22   to do with witness identification procedures that I will be

23   talking to you about this afternoon.

24       Before I get there, though, I do want to introduce you to

25   Dean.  Dean is 57 years old.  He's a lifelong resident of

1    Ohio.  He lives in Fairborn with his girlfriend, Pam, just a

2    few blocks from where he grew up.  He's a member of a

3    five-person family.  He is lucky that both of his parents are

4    still with us and he is able to have time with them now that

5    he is released from prison.

6        He is an artist.  He creates sculptures of slices of

7    Americana -- gas stations, diners, things that people would

8    have seen in the 1950s driving down Route 66.  He's also a

9    mechanic.  He works with old cars, restoring them, both

10   esthetically and mechanically, to their original state.  He's

11   happy that he gets to do this working with the younger

12   generation.  He learns from them; they learn from him.

13       He's also an outdoorsman.  He likes to fish, he likes to

14   camp, and he hunts the occasional squirrel.

15       Dean also, since he has been released from prison, has

16   been active with an organization called the Ohio Innocence

17   Project, which is an organization run out of the University of

18   Cincinnati.

19           MR. McLANDRICH:  Objection, Your Honor.  This is not

20   facts of the case.

21           THE COURT:  Well, I'm giving a little leeway.

22       Counsel, paint the picture that you are painting with

23   regard to Mr. Gillispie at this point in time, but you need to

24   get back to what you believe the evidence is going to show

25   with regard to the issues before the Court.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1          MR. KANOVITZ:  Okay.  So Dean is active in that

2     organization.

3          So the case starts basically in 1990.  Dean is in his

4     early 20s.  He is working as a security officer at the GM

5     plant.  And it's a good job.  It's a union job.  He's making a

6     nice wage.  And he is also out there trying to create his

7     future.  He's rehabbing houses and trying to flip them.  He

8     buys antiques, fixes them up and sells them.  And so even

9     though he has this really good job, his head is not completely

10    in it.

11         The other people who work that job with him are by and

12    large older and retired police officers who put in their time

13    and got this good job.  Dean got the job because his dad

14    worked there.  And so he did not earn that job in the way that

15    the other people there earned it.

16         Dean is an informal person.  He -- you will see that he

17    is not a tie-wearing person.  There was a uniform.  He had to

18    have it buttoned up, wear a tie.  And Dean would often end up

19    in scuffles with his superiors.  Like I said, Dean's informal,

20    and it's a union job.  So he didn't really have to be formal

21    because he wasn't going to get fired.

22         A time comes when Dean decides that he has a lot of

23    things going on outside of work that he's trying to create,

24    and he shuts down a worksite a little early so that he could

25    go attend to them.  When that happened, there was nothing that

1     the union could do at that point.  The superiors who didn't

2     like him wanted him fired.  It got heated.  Insults were

3     exchanged.  And depending upon who you ask, the supervisors

4     say we fired him; he says I told them, your know, take this

5     job and you know what you can do with it, but Dean ceases to

6     work there.

7          Shortly thereafter, the head of security, a guy named

8     Rick Wolfe, comes to Miami Township Police Department.  And

9     Rick Wolfe used to be a police officer at the Miami Township

10    Police Department.  And he says -- he meets with the chief,

11    and he says, "You remember those rapes that happened about two

12    years ago?"  So this is August of 1988.  "Remember those

13    rapes?  I think Dean Gillispie, and some of the boys also at

14    work think Dean Gillispie looks like the composite, and you

15    should investigate him."

16         So a fellow police officer comes and makes a referral

17    like that.  It's taken seriously.  The chief assigns two very

18    seasoned detectives, a man named Bailey and a man named Fritz.

19    And those two men actually also participated in investigating

20    the rapes back in 1988 when they happened.  So they were

21    thoroughly familiar with the case.  And they understood, you

22    know, the chief assigns this to you.  Another member of law

23    enforcement is making the referral.  They investigated it

24    thoroughly.  They dotted their i's; they crossed their t's.

25    And at the end of the investigation, they decided that Dean

1    was not a good suspect, and they excluded him.

2         And they did what police do:  They wrote their findings

3    down in police reports, and they put them in the file.

4         Now, we don't -- part of this case is going to be about

5    the fact that that file, those reports ultimately disappeared.

6    So we don't know everything that was in them, but we do know

7    that seasoned detectives documented their reasons why they

8    were excluding Dean as a suspect.  We know some of the reasons

9    that can be recalled.

10        The first reason was that Dean had no criminal record

11   whatsoever.  None.  And the man who committed these crimes was

12   clearly a hardened, methodical criminal.  I'll tell you --

13   I'll tell you the two events.  The first event happened on

14   August 5th of 1988.  A woman leaves a store -- this is broad

15   daylight in the afternoon -- leaves a store, gets into her

16   car, and a man comes up to her window, says, "I'm a security

17   guard at the store that you just left.  I need to see what's

18   in your purse."  You know, essentially accusing her of

19   shoplifting.

20        In the confusion that he creates, he slips into the car.

21   He pulls out a silver, you know, short semiautomatic handgun,

22   and he kidnaps her.  He makes her drive to an access road

23   behind the shopping area where she was, and he makes her

24   perform fellatio on him.  At the end of it, he has her spit

25   the ejaculate into a bag so that he leaves no DNA in the car,

1    and he leaves with the bag.

2         The second rape or rape event happens about two weeks

3    later, on August 20th.  Same thing essentially happens.  It's

4    broad daylight.  Two sisters, who we'll refer to as B.W. and

5    C.W. in this case, get into their car.  A man comes up to them

6    and basically does the same thing:  Says I am store security,

7    demands to see their purse, slips in, kidnaps them.  This time

8    he has them drive out into the woods and he, with the gun,

9    requires both of them to perform fellatio on him.  And when it

10   was over, the ejaculate was required to be spit out in the

11   dirt.  He blindfolds them, leaves them out in the woods where

12   they won't be able to tell where they were before, and returns

13   back to the parking lot.

14        So the person that committed this is brazen, is

15   experienced, and is methodical.  Dean had no criminal record.

16   These very experienced detectives were saying this doesn't

17   match.  That's the first thing.

18        The second thing is the descriptions that the women had

19   given of the perpetrator back in 1988 were not a good match

20   for Dean.  I'll show you -- may I approach, Judge?

21             THE COURT:  Well, you can put it there on

22   the (indicating).

23        Counsel, have you seen this?

24             MR. McLANDRICH:  Yes, I saw it.

25             THE COURT:  I'm assuming, counsel, that when we're

```
1    talking about this, is this -- is what you are saying that you

2    believe that the evidence will show that these detectives are

3    going to present this?

4              MR. KANOVITZ:  These are police reports and straight

5    out of the record.  So this will be presented, and those --

6              THE COURT:  As part of evidence?

7              MR. KANOVITZ:  Yes, those police reports will come

8    into evidence.

9              THE COURT:  All right.

10             MR. KANOVITZ:  So B.W. describes the man as having

11   orangish-brown hair.  C.W. describes him as having reddish

12   hair with a brownish tint.  And S.C., the first rape event

13   victim, describes him as having light-colored/blondish hair.

14   Dean is a dark brunette.  These are descriptions that are

15   given in realtime back when the events occurred, when memories

16   were fresh.

17        At a certain point in time when these detectives were

18   investigating, they became aware that at least one of the

19   women remembered a detail of the event that she hadn't

20   remembered before, which is during the event, she saw the size

21   tag on the man's pants, and she remembered a size 35-inch

22   waist.

23        That also is not Dean.  Dean -- that also is not Dean.

24             THE COURT:  Hold on a second.

25        Was there an objection?
```

```
 1              MR. McLANDRICH:  Yeah.  I object to that.  It is

 2    nowhere in the record.

 3              MR. KANOVITZ:  The witnesses will testify to that,

 4    Judge.

 5              THE COURT:  What you are saying is that you expect

 6    the testimony to be that?

 7              MR. KANOVITZ:  Yes.

 8              THE COURT:  Counsel, if it isn't, you can remind

 9    everyone of that at some point in time.

10              MR. HERMAN:  Note the Township's objection as well,

11    please.

12              THE COURT:  What's that?

13              MR. HERMAN:  Note the Township's objections as well,

14    please.

15              THE COURT:  I will note both objections.  They are

16    overruled at this point in time.

17         Counsel, I'm going to need you to either get close to the

18    microphone or speak up a little bit more because I am not

19    quite sure I am catching your objections.

20              MR. KANOVITZ:  So Dean has not had a 35-inch waist

21    since he was a fairly young guy.  He will tell you, "I've been

22    heavyset most of my life, shopping in the husky section at

23    J.C. Penney's."  So that also didn't fit Dean.

24         Another thing that was on the detectives' minds was that

25    two years had passed.  And it is unusual to do a witness
```

```
1    identification procedure after so much time has passed.  And
2    you have to be careful because memories fade, and that's the
3    sort of circumstance where a misidentification can take place.
4              MR. McLANDRICH:  Objection, Your Honor.  This is
5    argument.
6              MR. KANOVITZ:  This will be evidence from the
7    experts.
8              THE COURT:  Wait a minute.  Are you telling what the
9    officers are going to present or not?
10             MR. KANOVITZ:  Yes.
11             THE COURT:  My understanding was, counsel, that this
12   is -- these are the things that these officers supposedly are
13   testifying to with regard to why they found this suspect.  I
14   mean, that's what my understanding was this.  Now, is that
15   true?
16             MR. KANOVITZ:  Yes, this is what will be testified
17   to.
18             THE COURT:  All right.  It would be helpful as you
19   go through your opening statement if you basically clarify
20   that what you are presenting is what is being presented and
21   who is presenting it and so that that relays the possible
22   objections that might be registered.
23             MR. KANOVITZ:  Will do, Judge.
24        So the list I just gave you is the list that Detective
25   Fritz and Detective Bailey, the seasoned detectives,
```

1    remembered from the reports that they wrote that are now

2    missing.  And I expect that you are going to hear testimony

3    from them about that.

4         So jumping ahead in the story, these were not the only

5    pieces of information that pointed away from Dean.  Another

6    thing that you will see in the police reports is that the

7    witnesses -- the victims said that the man -- each of them

8    noted the man's tan.  B.W. says the man had a wide, tan face;

9    C.W. says very tan face; and S.C. notes some tanning.

10        Dean is a very fair-skinned person.  You are going to

11   hear from the people who knew him that sun was his enemy.

12   When they would go to the lake, he would always keep his shirt

13   on.  He burns; he does not tan.

14        Another aspect of these crimes is that the man that

15   committed them was clearly a smoker.  During the S.C. event,

16   he smokes a cigarette.  In the B.W. and C.W. event, he

17   actually steals a pack of cigarettes along with a lighter from

18   the women before he exits the car.  Dean is a non-smoker.  It

19   was -- you know, '80s and '90s people smoked, but he was ahead

20   of his time.  He was always against it.  You are going to hear

21   from everybody who knows him that he had a sign in his truck

22   telling people not to smoke.  That didn't fit Dean.

23        Another thing that didn't fit Dean is the victim's

24   descriptions of the clothing.  The clothing that they describe

25   is, for lack of a better word, hip hop clothing back in that

1    time frame.  The perpetrator was wearing a gold necklace with

2    an emblem of some kind on it.  The shirt was kind of flashy.

3    And there were high tops in multiple colors.  And that's not

4    Dean.  Dean is a country guy.  He wears boots and jeans and

5    button-down shirts.

6         Another thing that points away from Dean is that Dean was

7    prematurely graying.  It is a genetic thing in his family.  It

8    happened to his mom.  It happened to his sister.  And by the

9    time he's in his early 20s, he has gray around the temples.

10             THE COURT:  Have you seen this?

11             MR. McLANDRICH:  I don't know what it is.

12             MR. KANOVITZ:  I showed it to you before.

13             MR. McLANDRICH:  No.

14             MR. KANOVITZ:  So this is Dean about in this time

15   frame.  And if you take a look, you'll see he's already

16   graying around the temples.  None of the women reported that

17   feature.

18        Another factor that pointed away from him is the voice

19   that they described was not Dean's voice.  They said no

20   accent.  Dean has a very distinct twang.

21        And yet another thing that points away from Dean is Dean

22   had an alibi for one of the events.  On the weekend of the

23   20th, August 20th, he was down at a lake in Kentucky with

24   friends who all came to testify at his trial to say he was

25   with me.  The weekend of the event on the 8th he was working

1    that weekend, not on the day when the rape event happened.  So

2    he was in town.  He wasn't down at the lake where they usually

3    like to go during the summer.  But he called friends who were

4    with him on the day before the rape and the day after the rape

5    and they were questioned:  Did his hair turn blondish in that

6    time?  Did he die his hair?  No.  He looked exactly the same.

7         So all of these factors are pointing away from Dean as

8    the suspect.

9         Fritz and Bailey, like I said, they exclude Dean as a

10   suspect, and they tell Wolfe -- Wolfe calls in every so often

11   to check on the investigation, how it's going.  And a couple

12   months later that wasn't good enough for Wolfe.  A couple

13   months later he comes back to the Miami Township Police

14   Department, and he brings with him a number of employee IDs,

15   including Dean's.  And basically the reason why he brings

16   multiple ones, I believe the testimony will be, is because he

17   expected that those IDs would get used to be shown to the

18   victims to see if they could identify Dean.

19        Fritz and Bailey had already excluded him.  Bailey -- by

20   this point in time a couple months had gone by -- is no longer

21   a detective.  He's transferred to another part of the police

22   department.  And Fritz is getting ready to leave.  He puts the

23   IDs in the file and puts the file in a drawer, and it goes

24   back to being a cold case until, when Fritz leaves, it gets

25   assigned to Mr. Moore.

1      And Mr. Moore at this time has been a detective for about

2  six months.  He's not seasoned like Fritz and Bailey.  He has

3  something in common with Dean, which is that both of them

4  worked where their fathers worked.  Mr. Moore's father had

5  been the chief of police of the Miami Township Police

6  Department.

7      And Moore decides that he's going to solve this cold

8  case.  And so he gets the file.  He gets Dean's ID out of it.

9  And then he compares the ID to the composite that the victims

10  had made from August 20th.  And I'll show those to you.

11      So here is the composite that B.W. and C.W. had created

12  at the time of the 8-20 rape event.

13      And here is Dean's picture from off of the ID that

14  Mr. Wolfe brought.  So there's Dean.  There's the composite.

15  There's Dean again.

16      As you can see, he bears a generic resemblance to the

17  composite.  Nothing that wouldn't be true of many people

18  living around the Dayton area.  But Mr. Moore looks at it, and

19  he becomes convinced that Dean is the perpetrator because he

20  becomes convinced that it's an excellent match.

21          MR. McLANDRICH:  Objection.

22          THE COURT:  What?

23          MR. McLANDRICH:  Objection.  He's talking about what

24  he becomes convinced of.  That's not facts.

25          THE COURT:  Sustained.  Just what he did.

 1          MR. KANOVITZ:  So based upon having the composite,

 2   based upon having the ID, and without the level of experience

 3   that the two detectives who preceded him had, he opens an

 4   investigation into Dean.  Now, that investigation is targeted

 5   at Dean.  It is not an investigation where, for example, you

 6   go and look to see in the last two years has somebody been

 7   committing crimes with the same MO.  That's not something that

 8   the detective does.  Instead, he focuses solely on Dean.  And

 9   he develops tunnel vision.

10      I want to show you --

11          MR. McLANDRICH:  Objection, Your Honor.

12          THE COURT:  Counsel, that's argument.

13          MR. KANOVITZ:  I apologize.

14          THE COURT:  I don't know how many times I have to

15   tell you that.  Just stay away from the argument.  Just what

16   are you going to present and what's going to be presented with

17   regard to the witnesses and the exhibits and the testimony.

18          MR. KANOVITZ:  During the trial, we expect that you

19   are going to get to see photos of an alternative suspect that

20   actually does match the definition, the descriptions the way

21   we gave -- somebody with orangish hair, somebody who can tan,

22   become very tan.  That's an unusual combination, somebody who

23   has light-colored hair and a tan.

24       The person that we believe should have been an

25   alternative suspect is a man named Kevin Cobb.  He is a serial

1    criminal.

2              MR. McLANDRICH:  Objection.

3              THE COURT:  Counsel, what you believe is an

4    argument, right?

5              MR. KANOVITZ:  Okay.

6              THE COURT:  Just what he -- if you are going to have

7    evidence to this effect about this alternative, it's got to be

8    presented by someone.

9              MR. KANOVITZ:  Okay.

10             THE COURT:  Not you.

11             MR. KANOVITZ:  So you are going to hear testimony

12   from an attorney with the innocence -- Ohio Innocence Project,

13   a man named Mark Godsey, who -- I am skipping way ahead in the

14   story -- you know, decades later gets involved to try to help

15   free Dean, and he develops evidence of an alternative suspect,

16   this man, Kevin Cobb.

17        Kevin Cobb is a serial criminal.  He was arrested in late

18   1990.

19             MR. McLANDRICH:  Objection, Your Honor.  How can

20   this man's criminal history -- now we're talking about bad

21   acts evidence to try and suggest that he's the actor.  It's

22   just improper.

23             MR. KANOVITZ:  He was investigated as the

24   alternative suspect.  He has the MO, and it's a legitimate

25   form of evidence in a case where innocence is at issue.

```
 1              THE COURT:  He was developed as an alternative

 2    suspect?

 3              MR. KANOVITZ:  Yes.

 4              THE COURT:  Move on.

 5              MR. KANOVITZ:  Okay.  So you will hear evidence

 6    about that.

 7         You are also going to hear evidence from a criminologist

 8    expert, a lady named Dr. Dysart.  She is a professor at the

 9    John Jay College of Criminal Justice, and she's an expert in

10    eyewitness identifications.  And she is going to present to

11    you testimony about what makes for a reliable identification

12    and what does not make for a reliable identification.

13         Having targeted Dean, Defendant Moore puts together a

14    photo array to present to the victims.  And I'll show it to

15    you.

16              THE COURT:  Now, counsel, have you all seen this?

17              MR. McLANDRICH:  Yes, I've seen this.

18              MS. FRICK:  (Nodded head.)

19              MR. KANOVITZ:  So here's the photo array that the

20    defendant put together to present to the witnesses.

21         The first thing you will notice about this photo array is

22    that no one --

23              MR. McLANDRICH:  Objection, Your Honor.

24              THE COURT:  Wouldn't that be argument?

25              MR. KANOVITZ:  I'm sorry.
```

1              THE COURT:  There will be plenty of time for this at

2      some point in time, but not now.

3              MR. KANOVITZ:  If you note the hair, everybody has

4      dark hair.  There is not a blond person --

5              MR. McLANDRICH:  Objection, Your Honor.

6              THE COURT:  Counsel, isn't that argument?

7              MR. KANOVITZ:  I'm sorry.  I'm missing it.

8              MR. McLANDRICH:  They can see what color the hair

9      is, Your Honor.

10             THE COURT:  Well, the evidence is here, what you are

11     saying the evidence will be, is that there is a photo lineup.

12     And you are showing them what the photo lineup was.

13             MR. KANOVITZ:  Yes, sir.

14             THE COURT:  Now, it will be up to you and the

15     evidence presented during the trial to determine what

16     significance this is, not for you to stand here right now and

17     argue to this jury who has not heard one single bit of

18     evidence yet.  That ought to be pointed out by somebody, some

19     witness, not you arguing whether or not this is a good lineup

20     or a bad lineup or whatever.

21             MR. KANOVITZ:  May I talk about what Dr. Dysart will

22     talk about?

23             THE COURT:  Can't we let Dr. Dysart do that?  I

24     mean, you can say that -- I don't know what you are going to

25     say.  I just don't know what you are going to say.

1          MR. KANOVITZ:  I'll squish it down.

2      So as I said, you are going to hear testimony from a

3  criminologist, Dr. Dysart, who has studied witness

4  identification procedures, has become an expert of it, in

5  light of people having been exonerated by DNA who had been

6  previously identified by victims.

7          MR. McLANDRICH:  Objection.

8          MR. KANOVITZ:  The science --

9          MR. McLANDRICH:  This is not a DNA case.

10          THE COURT:  Well, he's given a background for the --

11      Overrule that one.  Go ahead.

12          MR. KANOVITZ:  Thank you.

13      So the science has been able to be developed to know what

14  identifications were incorrect and to know the factors that

15  lead to those identifications.  She will talk to you about

16  this photo array and explain to you the features that lead to

17  an unreliable eyewitness identification.

18      So the detective takes the photo array to the first

19  victim.  He meets with C.W., and C.W. looks at the photo array

20  for two minutes trying to figure out who to identify.  And at

21  the end of it, he coaxes her into identifying Dean.

22          MR. McLANDRICH:  Objection.

23          MR. HERMAN:  Objection.

24          MR. KANOVITZ:  But this is what the evidence will

25  show.

148

```
 1              THE COURT:  Who is -- that testimony is going to be
 2    presented by whom?
 3              MR. KANOVITZ:  Through cross-examination of the
 4    detective.
 5              THE COURT:  Leave out the terms that you are using
 6    in this about "coaxes."  I mean, she was asked to make some
 7    identification.  In two minutes, supposedly, she made some
 8    identification.
 9              MR. KANOVITZ:  Okay.  With encouragement.
10              THE COURT:  What?
11              MR. KANOVITZ:  With encouragement.
12              THE COURT:  All right.  Then move on.
13              MR. KANOVITZ:  So, anyway, two minutes in order to
14    try to identify somebody from the photos.
15         The next day her sister comes, the very next morning.
16    And the two of them should have been scheduled at the same
17    time, is what the standard police practice would have been,
18    but when B.W. comes, she's able to very quickly make an
19    identification.
20         And, as I said, Dr. Dysart will explain things that could
21    be communicated --
22              MR. McLANDRICH:  Objection.
23              THE COURT:  Overruled.
24         Move on.
25              MR. KANOVITZ:  The third victim, S.C., is -- or
```

1    the -- chronologically, the first victim, but the third victim

2    he shows it to is S.C.  And there is an important difference

3    between S.C.'s experience and the experience of the two

4    sisters.

5         The man was wearing sunglasses during the August 20th

6    with the two sisters.

7         This is the August 5th composite.  This is the one that

8    S.C. created.  So no sunglasses, and she's able to give a

9    description of the man's eyes.  She describes his eyes as

10   blue, which Dean's eyes are, but in the photo array there is

11   only one other person with blue eyes and everyone else is

12   brown.

13        So he presents it to S.C.  S.C. says there's not enough

14   light in here for me to figure this out.  So they go outside,

15   and the evidence is going to show that S.C. was trying to make

16   an identification based on who had blue eyes.  Again, you saw

17   the photo array, and you saw the hair color and the other

18   features of the people that were in it.

19        So based on these three identifications from the photo

20   array, the case proceeds to court.  And there is a pretrial

21   proceeding when the witnesses have to come to court and they

22   have to look at Dean and they have to say whether they are

23   certain it's him or not.  And that's a proceeding that's

24   important to having a fair trial, to finding out if they

25   are --

1          THE COURT:  You are arguing.  What happened?

2          MR. KANOVITZ:  Certainty is an issue that becomes

3     important in eyewitness identifications.

4          So prior to that proceeding, Detective Moore is together

5     with three witnesses, and he says, "Before you go and take the

6     stand, I want you to know that Dean has changed his appearance

7     to deceive you."  And that was not correct.  Dean did not

8     change his appearance.  He had brown hair all the way through.

9     And so before these women get on the stand and are asked in

10    this proceeding are you certain, they're told, well, Dean has

11    changed his appearance.

12         Now, we believe the evidence will show that Moore

13    genuinely believes what he is saying.  You know, but he did

14    not investigate whether Dean had changed his appearance.  He

15    did not go to GM and say, "Hey, you all worked with Dean in

16    1988.  Did he ever die his hair blond?"  Instead, because he

17    believed that Dean was the perpetrator, then he concluded,

18    well, he must have dyed his hair at some point.

19         There is two other facts --

20         MR. McLANDRICH:  This is argument.

21         THE COURT:  You are arguing.  You are arguing.  What

22    he concluded and things such as that, you are arguing it to

23    the jury.

24         MR. KANOVITZ:  There is two other facts I would like

25    to talk to you about that Mr. -- that Detective Moore relies

1   upon to implicate Dean.

2        First is, as I told you in these two rape events, the

3   perpetrator approached and told the women who he saw leaving

4   the store that he was a security guard for the store.

5   Detective Moore points to the fact that Dean worked in

6   security as being a reason to suspect him.

7        The second thing is that the man, when he is with the

8   women, gives them the name Roger.  Now, Dean's full name is

9   Roger Dean Gillispie.  He goes by Dean.  He's named after his

10  dad.  His dad is Roger.  This is the same perpetrator that

11  methodically made sure to take the DNA evidence with him.  So

12  the detective concludes that this is a way of the perpetrator

13  making a confession of some kind.

14       As a result of the -- all three women testified that they

15  are certain it was him at the pretrial proceeding, and as a

16  result, the case goes to trial.

17       And all three come to trial and once again point the

18  finger at Dean and say, "He's the one.  I'm sure of it."  And

19  Dean puts on a defense.  And as I told you, he calls alibis

20  for August 5th.  He's at a lake in Kentucky where pretty much

21  him and his friends would try to go every weekend -- I'm

22  sorry -- for August 20th.  And then he calls an alibi witness

23  for August 5th, who, again, he wasn't with that person on

24  August 5th and wasn't claiming to be, but he was with that

25  person on the 4th and on the 6th, and that person can testify

1    that his appearance did not change, his hair did not become

2    blond.

3        Dean is convicted at this trial, and he's shocked.  He

4    believed in the process before.  And he truly did not

5    anticipate that he was going to get convicted.  This was an

6    incredible blow to him.

7                THE COURT:  Counsel?

8                MR. KANOVITZ:  This is damages, Your Honor.

9                THE COURT:  Just move on.

10               MR. KANOVITZ:  That conviction did not last long.

11   Evidence was discovered at the Miami Regional Crime Lab that

12   hairs had been found on the clothing of B.W. and C.W.  And so

13   Dean's team asks to have that hair tested and provides hair

14   samples.  And the results are that there's head hairs and

15   pubic hairs found on their clothes.  Those hairs did not

16   belong to the women and they did not belong to Dean.

17       So with that, there is a second trial to hear this

18   important new evidence.  And the -- essentially, the evidence

19   goes as it had before with the women identifying Dean, Dean

20   putting on the alibi evidence, and the hair evidence coming

21   in.  And there's a hung jury, 8 to 4 in favor of acquittal.

22       And the jury struggles with this evidence --

23               MR. McLANDRICH:  Objection, Your Honor.

24               MR. HERMAN:  Objection.

25               THE COURT:  Sustained.  It will be stricken, with

1    regard to the jury verdict.

2         MR. KANOVITZ:  Eventually, there is another

3    conviction, and Dean is sent off to prison.  He turns 25

4    behind bars.  And this was not anything that he was prepared

5    for in his life.  As I said, he had no criminal record.  He

6    had never been in an environment like this.

7         And Dean's going to be our first witness, and I can't do

8    it justice.  You are going to have to hear it from his words.

9    But what I can tell you is it's every bit the jungle you

10   imagine.  Dean is constantly at risk of physical violence.

11   You don't get enough to eat.  Other people try to take your

12   food from you, and you have to fight for it.  There is no

13   peace and quiet.  There is maniacal screaming and clanging at

14   all hours.

15        Dean has to spend two decades in this environment.  He

16   watches his friends' lives go on.  He watches them have

17   children.  He watches them build careers.  And he is

18   essentially, you know, locked away.

19        He also has to struggle with what it feels like to be in

20   this jungle environment knowing that you're innocent.  It

21   doesn't make it better.  It actually makes it worse because

22   you have to live with the anger of knowing that you don't

23   belong there and the injustice of it, and that eats at you.

24        It's a testament to Dean, though, that he did not lose

25   his humanity during this time.  He turns inward, and he finds

```
1   out that he is an artist.  He starts building these -- these
2   models, sculptures, for lack of a better word really, of
3   places he would rather be.  This, this, you know, time of life
4   of the 1950s, you know, on Route 66.
5       And he builds these things expertly out of the small
6   amount of materials that are available to him in prison.  And
7   he becomes recognized because of -- you will get a chance to
8   see pictures of it.  It's very impressive artwork.
9       At a certain point in time, he is asked, while he is in
10  prison, to build sets for the Cincinnati Flower Show.  And his
11  sets become award winning.  It was the first time that the
12  prison has ever allowed anyone to be building sets or anything
13  inside of the prison.  Accommodations were made.  He wins --
14  his sets win the award --
15          THE COURT:  Counsel, this goes to what?
16          MR. KANOVITZ:  Damages.
17          THE COURT:  All right.  Okay.  Go ahead.  Proceed.
18          MR. KANOVITZ:  As I said, his sets win awards.
19      And he also starts building furniture.  And he -- his
20  furniture that he builds and the art that he makes he donates
21  to be auctioned off for children's charities.
22      He also gets a job working maintenance because he's
23  skilled at it.  He earns $24 a month in the prison.  But it
24  gives him a chance to get out.  It also gives him a chance to
25  earn the respect of the facility.  And Dean essentially
```

1    becomes not just a model prisoner but like the model for model

2    prisoners.

3         And so time goes by, and, finally, he's up for his first

4    chance of parole.  It's like ten years in.  And here he is

5    with this perfect record, you know, doing charitable work.

6    He's a very good candidate for parole except there's one

7    catch --

8              MR. McLANDRICH:  Objection.

9              MR. HERMAN:  Objection.

10             THE COURT:  Now we're going to -- he was up for

11    parole, and you can fill -- if you have evidence to that

12    effect, but, counsel, what you are doing is arguing about

13    that.  So just shorten it.

14             MR. KANOVITZ:  So for Dean to be eligible for

15    parole, he had to be willing to express remorse, which he was

16    not willing to do because that would require him to admit to

17    something that he did not do.  So despite everything, he

18    cannot get parole.

19         I neglected to mention his sentence is a sentence of 22

20    to 56 years, and he has that hanging over him the entire time.

21         His mom was always, you know, there for him and on his

22    behalf.  And throughout this time, she's looking for people

23    who can possibly help Dean.  And, eventually, she learns about

24    this guy, Mark Godsey, who is going to start this clinic at

25    the University of Cincinnati law school, the Ohio Innocence

1    Project.  And she's able to convince Mark to take the case.

2         Dean's case was the first case that Mark took.  Mark is

3    going to come in and testify, and he will be able to explain

4    the procedures by which Dean was finally able to regain his

5    freedom.

6         At a certain point in time, another lawyer joined up on

7    Dean's team, a man named Jim Petro, who that may be familiar

8    to you.  He is the former Attorney General, the highest law

9    enforcement official in the State of Ohio.  Upon leaving the

10   office, he joined Dean's team and also will be here to testify

11   to you to tell you about how they went about freeing him.

12        Dean is finally freed more than 20 years after being

13   convicted, in 2012 -- 2011.  And even though he is out,

14   though, he still has hanging over him the threat of continued

15   prosecution because the prosecution would not admit that this

16   was a wrongful -- a wrongful conviction.  So they continued in

17   the courts for years to basically try to get him back into

18   prison.  And he had to live with the fear of returning to that

19   nightmare hanging over his head for a number of years longer.

20        Last year, he finally was declared to be a wrongfully

21   imprisoned person by the state of Ohio.  Let me be clear,

22   being declared wrongfully imprisoned is not being declared

23   innocent.  In order to be declared innocent, there has to be

24   DNA data, and there was no DNA here one way or the other.

25             THE COURT:  Counsel, you don't need to go there.

1          MR. McLANDRICH:  Objection.

2          THE COURT:  Now you are arguing why -- you have

3    indicated that he has been declared a wrongfully imprisoned

4    person.

5          MR. KANOVITZ:  Yes.

6          THE COURT:  And you have clarified that that does

7    not necessarily mean he has been found to be innocent.  So --

8          MR. KANOVITZ:  So rewinding a little bit, Sergeant

9    Fritz, the guy who was part of the Fritz and Bailey team, upon

10   his retirement, he goes to work for a private detective agency

11   and is actually hired -- the detective agency is hired to try

12   to find evidence for Dean.

13        I expect that, you know, you are going to get a chance to

14   hear him testify.  You may hear from the other side that they

15   think that that's a conflict of interest, and he will explain

16   to you why he feels that he did the right thing.  Even after

17   Dean was convicted, when there was no longer any money to pay,

18   he worked pro bono for ten years developing evidence, and he

19   will tell you what that evidence was that he developed.

20        We expect the evidence to show -- and, again, this is not

21   evidence.  This is my explanation of what I expect it to show.

22   We expect that it's going to show that Detective Moore

23   committed the acts that I told you about.  However, we do not

24   think it's going to show that he is a monster who believed

25   that Dean was, in fact, guilty.  We believe it will show that

```
1    he did what he did because he mistakenly and improperly

2    thought that Dean was guilty.  And so as you hear the case,

3    understand that we're not trying to say that he is a monster,

4    but we do believe he should be liable in this case.

5         So that's essentially it.  I will have a chance to

6    address you again at the end of the trial to talk to you about

7    what I believe the evidence will have proved.  I expect that

8    you are going to hold us to what we have said that we believe

9    the evidence is going to prove.

10        And if you do find that we have proven to you what I said

11   happened today, we're going to be asking you to award damages.

12   Those damages that we will ask for are going to be

13   commensurate with the nightmare that Dean lived, one of the

14   worse things that can happen to a person, and I will be

15   talking to you about how to go about thinking about that in

16   closing arguments.

17        So with that, I thank you for your attention, and I'll

18   address you again in closing.

19             THE COURT:  Thank you, Counsel.

20        Counsel, folks, are you okay going forward?  Anybody need

21   a break?

22        (No verbal response.)

23             THE COURT:  Counsel.

24             MR. McLANDRICH:  Thank you, Your Honor.

25        Good afternoon, ladies and gentlemen.  I'm sorry.  I've
```

1    been sort of hidden behind here. So I apologize that I

2    haven't been able to look you in the eye while most of this

3    has been going on.

4        I also want to thank you for your service. I agree with

5    everyone that it's one of the most important things that we

6    can do in our democracy. It's certainly important to the

7    parties and important to our society.

8        So you have heard a little bit about the evidence, but

9    you haven't really heard what the evidence is going to be.

10   What the evidence is going to show is, in fact, the two women,

11   the sisters, C.W. and B.W., are raped. They are abducted by

12   this man, taken out in the woods, as counsel indicated, forced

13   to perform oral sex on the man.

14       They do not have blindfolds on when they encounter the

15   man. He gets into their car. They drive to the woods. They

16   walk into the woods not blindfolded. When they are forced to

17   perform oral sex on this man, not blindfolded, they get a good

18   look at him. They are blindfolded on the walk out, for some

19   reason, and the drive back to where they had been, the Best

20   Products store.

21       They go home and talk to their parents, and before they

22   go home, they stop and get a pop to wash the taste out of

23   their mouth, and then they go home and talk to their parents.

24   And their parents say you got to report this.

25       So they initially, I believe, go to the Dayton Police

1    Department, and then they end up at the Miami Police
2    Department.  An officer by the name of Berling takes initial
3    statements from them, a little snippet of which you saw the
4    descriptions, and you can see the descriptions aren't really
5    exactly the same.
6        Make this composite.  You know, this composite is made by
7    putting layers of plastic film on top of each other, you know.
8    It's sort of almost like a child's game:  This nose, that eye,
9    this ear, this hair to make up this composite.
10       The composite is used by the police to try and generate
11   leads.  The composite is published out into the community.  It
12   ends up in the newspaper, ends up on the TV, so forth.
13       S.C. sees the reporting on this rape and says, you know,
14   this is very similar, if not quasi identical, to what happened
15   to me.  She then goes to the police department and is told --
16   although she comes to Miami Township, that, in fact, her event
17   happened outside the township.  So she's sent to the
18   Montgomery County Sheriff's Office, makes her report of her
19   events, of her rape.
20       At that point, the investigation is assigned to Detective
21   Bailey.  Detective Bailey investigates a number of leads, tips
22   that come in:  You know, so and so and so's named Roger, or I
23   think it looks like the composite, or I think it matches the
24   description, and these various people are excluded for various
25   reasons.

```
 1        At that point the case goes cold.  And is inactivated,

 2   okay?  And when the case is inactivated, Detective Bailey on

 3   November 5th leaves the detective bureau, the same day that

 4   Detective Moore comes into the detective bureau.  And you'll

 5   see the personnel action form that shows this.  One goes out;

 6   one comes in.  They never worked there at the same time.  So

 7   contrary to what some people might try to represent in

 8   testimony, Detective Bailey never trained Detective Moore.

 9        Detective Fritz is leaving the police department, and

10   you'll hear testimony from him that there had been a very

11   unfortunate tragic murder-suicide by a police officer, murders

12   his wife, kills himself.  Detective Fritz is in a depressive

13   state, wants out of the police department, and on his way out

14   the door, hands the file to Detective Moore and says, "Here, I

15   want you to investigate this case.  If anybody can solve it,

16   you can solve it."

17        And when he delivers that file to Detective Moore, in

18   that file are five GM photo badges, one of which you saw a

19   portion of Mr. Gillispie's badge.  Now, the badges were, in

20   fact, brought to the police department by Mr. Wolfe.

21        Now, Mr. Wolfe didn't have any vendetta, you will hear

22   the testimony, for Mr. Gillispie.  In fact, what happened was

23   another employee at GM saw the news reporting of the composite

24   and said to himself, you know, "Gee, I think this looks like

25   Roger."  He goes to his superiors at GM and says, "Hey, you
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    know, this picture in the paper and on the news I think looks

2    like Roger."

3        They report that to one of their superiors.  That

4    individual chose not to do anything with it, so that

5    information then sits.

6        A new supervisor comes in and this issue is raised with

7    the new supervisor, a man by the name of Stapleton, and at

8    that point he authorizes Wolfe to go talk to the Miami

9    Township Police Department and bring in these folks.

10        You'll hear the testimony from Mr. Fritz that he believes

11    those photos were brought in in April or May of 1990.  Well,

12    Mr. Bailey left the police department in November -- left the

13    detective department, went back to the road in November of

14    '89.  So how he would have investigated these photos I don't

15    know.

16        In any event, when Detective Moore takes over the file,

17    he starts to go through the file, and he's reading through the

18    various reports and things that are in there.  And he sees

19    that the newest lead is Mr. Gillispie, and he doesn't see any

20    reports in there.

21        So one of the claims in this case is that there were

22    these reports written by Fritz and Bailey and that they were

23    suppressed or destroyed by Detective Moore.  You'll hear

24    Detective Moore say, "I never saw those reports."  And you'll

25    hear Detective Fritz acknowledge that reports were misfiled

1    all the time at Miami Township. If the reports existed -- and

2    no one knows whether they really existed or not, right? Fritz

3    and Bailey say they existed, okay, but no one has ever seen

4    these reports, and certainly not Detective Moore. And

5    certainly Detective Moore will testify he didn't suppress or

6    destroy these reports.

7        So what does he do? The first thing he does -- and you

8    will see it in the reports and hear the testimony -- he

9    confirms that Mr. Gillispie wasn't working the days of these

10    rapes. So at least he knows that opportunity existed. He

11    doesn't have an alibi by being at work.

12        He reaches out to Mr. Gillispie to try and speak to him

13    about these allegations. Mr. Gillispie, sort of not

14    surprisingly, isn't interested in having that dialog with

15    Detective Moore and puts him off, you know, "I need you to

16    come in."

17        "Well, you know, I'm busy right now. Maybe in a couple

18    weeks."

19        So Detective Moore had hoped he would come in so he could

20    get a picture of him to do a photo array. Mr. Gillispie

21    chooses not to come in. This leaves Detective Moore with one

22    thing, the GM badge from which to get a picture.

23        Now, what you're also going to see in this case -- so

24    there were a number of things that were collected by Detective

25    Berling at the beginning. He's speaking to the gals, B.W. and

1    C.W.  "Well, he touched these sunglasses that are in my car."

2    "He touched this picture that was in my car."  "I think maybe

3    I dribbled some of the ejaculate on my clothing when he forced

4    me to perform sex on him."

5        So Detective Berling does what a good officer should do,

6    collects the sunglasses, collects the picture, collects the

7    clothes.

8        Takes the girls to the hospital to have swabs done in

9    case there is any DNA that can be collected.  And the people

10   at the hospital, you'll hear, you will see in the reports:

11   It's too late.  You drank.  It's too late.  Nothing useful

12   there.

13       The glasses go off to the crime lab.  You will see the

14   reports:  No useful fingerprints on the glasses.

15       You'll see the report with respect to the photograph:  No

16   useful fingerprints on the photograph.

17       You'll see the report with respect to the clothes:  No

18   evidence of any secretions on the clothes.

19       Now, the clothes are submitted by detectives Fritz and

20   Bailey, perhaps by Berling -- I can't remember exactly whose

21   name is on the form.  Clothes come back, picked up by

22   Detective Bailey.  The clothes are released by Officer Gray,

23   who will testify, or did testify -- unfortunately, he's passed

24   away -- that one of my superiors, Bailey or Fritz, must have

25   authorized the return of these clothes to the women.  And you

1   will see the property form signed returning those clothes to

2   the women.

3       That all happens.  Those clothes get returned in

4   September of 1988.  Moore's not even on the case yet.  But

5   when he takes the case over, here's what you have now:  You

6   have no fingerprint evidence.  You have no DNA evidence.  So

7   if this case was ever going to get solved, it was only ever

8   going to get solved one way, and that was through an

9   eyewitness identification.

10      Now, keep in mind, this is 1988.  This isn't nowadays

11  where you can change photographs and pull things off of the

12  Internet, what have you.  So what did Detective Moore do?  He

13  took the GM ID badge, he took it to the Miami Valley Crime

14  Lab.  He didn't make up the pictures.  He takes them to the

15  crime lab.  They make a photograph out of the ID badge so he

16  can put it in the photo array block that you saw counsel put

17  up.

18      And he gets it and he says, you know, this is the wrong

19  size.  I can't use this.  So what's he do?  He sends it back

20  to the crime lab.  They make another photo from it.  Takes the

21  only photo he has, gets people that he believes are like and

22  similar -- and you will hear testimony that that's the

23  standard.  You get people that are like and similar.  They

24  don't have to be identical.  You are not looking for twins --

25  and you put it into the array.

1    And then he reaches out to the first victim. And he

2    presents the array. And what you'll see is there's -- on the

3    back of this board, this photo array board -- you will see

4    it -- there is a set of instructions that the person's

5    supposed to read and then they sign, which they did.

6    And then you turn over the array, and they viewed the

7    array, and they date and time the instructions. And then they

8    turn over the array and they pick someone, if, in fact, they

9    do, and they then date and time what's called a fact sheet,

10   which lists the individuals that are in that array. And they

11   indicate the person that they saw and the degree of confidence

12   with which they identified that person: You know, I'm a

13   hundred percent sure, I'm 90 percent sure, and sometimes it's

14   just, it's him kind, of level of certainty. So that's the

15   first person.

16   Sister's not available to come in that day. Sister comes

17   back the next morning. She's presented the array, and I

18   believe her time is within a minute. She does that same

19   process, signs the instructions, turns it over, identifies

20   him.

21   And by the way, Detective Moore, he's not out to railroad

22   anybody, right?

23           MR. KANOVITZ: Objection.

24           THE COURT: Sustained.

25           MR. McLANDRICH: So he -- to try and ensure that the

1    array's fair, he takes the photo array, and he changes what

2    cell Mr. Gillispie's photo is in.  You know, he instructed the

3    sisters not to talk about anything that happened, but just in

4    case somebody doesn't follow that instruction, he doesn't want

5    Gillispie in the same block.  So he changes him around.

6        Next sister picks out Mr. Gillispie.  So then he has a

7    conversation with Mr. Gillispie, and Mr. Gillispie, in fact,

8    comes in.  And he tells him, you know, hey, I didn't do this.

9    B, I go to Kentucky every weekend, you know.  I have been

10   there 32 weekends in a row, or 32 weekends, and so I didn't do

11   this.

12       Detective Moore can try and corroborate the

13   identification he's gotten from the two sisters, then goes to

14   S.C. and presents the array, as you heard counsel describe.

15   And her house is dark, and she says, "Can I take it outside

16   where the light's better?"  Takes it outside, picks out

17   Mr. Gillispie.  That's on August 28th.

18       August 31st, so what does Detective Moore do?  He doesn't

19   just sign the criminal complaint against Mr. Gillispie.

20   Pursuant to the policy at the police department, he takes his

21   file, he goes and meets with the prosecutor, and the

22   prosecutor reviews what he has.  The prosecutor then

23   authorizes -- and you'll see the form, felony approval sheet I

24   believe it's called -- and authorizes the charges that are, in

25   fact, filed against Mr. Gillispie.

1          It's at that time a criminal complaint is sworn out,

2     August 31st.  Mr. Gillispie's subsequently arrested.

3          The case then goes to grand jury where Mr. Moore

4     testifies, the three ladies testify, and the grand jury

5     indicts.  The case then goes towards trial.

6          Now there's a different prosecutor on the case.  And you

7     are going to hear essentially three different versions of this

8     issue with respect to the missing/destroyed report.

9          First off, I have already told you, Detective Moore is

10    going to say, "I never saw a report.  If I had seen a report,

11    I would have produced it.  Never saw a report."

12         You are going to hear the prosecutor say, you know, after

13    a pretrial scheduling conference, I come out of the court,

14    there's me, Mr. Lieberman, who is Mr. Gillispie's criminal

15    defense lawyer at the time, and Detective Moore, and we're

16    having a conversation by the elevator.  And Mr. Lieberman says

17    something to him to the effect of, you know, you got the wrong

18    guy.  There is this report that excludes my guy, and you got

19    the wrong guy.

20         And so Mr. -- I am sorry -- Prosecutor Folfas is expected

21    to testify.  He then tells Moore, well, go find this report

22    he's talking about.  Folfas also says, or may well say, that

23    Detective Moore had already told him about this report.

24    Detective Moore comes back and says, "I can't find any

25    report."

1       Well, if, in fact, that conversation happened, then this

2   missing report is no mystery to anybody.  It was known about

3   back in the day.  And as you've already heard, Detective

4   Fritz, once he leaves the police department, goes to work for

5   this detective agency, Area Wide Investigations.  He, in fact,

6   becomes the criminal investigator for Mr. Lieberman, of all

7   things.

8       You will hear testimony that both Mr. Lieberman and

9   Mr. Fritz had mutual concerns about the fact that he was a

10  police officer at the police department investigating this

11  very case that he's now asking to be a criminal investigator

12  on.

13      You will also hear testimony that somehow Mr. Fritz never

14  tells Mr. Lieberman, you know, Detective Bailey evaluated

15  Gillispie as a suspect and eliminated him, and there should be

16  a report that says that.  And he never says to Mr. Fritz, "You

17  know, I was the sergeant.  I approved that report.  There is a

18  report that Bailey wrote that excluded Gillispie as a

19  suspect."

20      I expect Fritz to testify, "Oh, yeah, I knew about that.

21  And, in fact, I told Bill Riley, my boss, about the report."

22  Bill Riley's, unfortunately, dead and that's what happens when

23  you have a file that's this -- this old.

24      It's inconceivable that Riley wouldn't tell Lieberman,

25  but that's a mystery no one knows.  In any event, Fritz is

1    going to say, "I never told Lieberman."  Case goes to trial.

2        Now, Mr. Lieberman is taking the -- Detective Bailey

3    through the various suspects that were looked at and evaluated

4    during this investigation.  And he goes through all these

5    people.  And then he finally says to Mr. Bailey, "Well, was

6    there ever a suspect by the name of Roger Gillispie?"

7        "No."

8        Subsequently, Mr. Lieberman will testify, that he thought

9    that answer in retrospect was complete baloney and that

10   Detective Bailey was lying to him.

11       If, in fact, this report ever existed -- and, you know,

12   we all take the oath when we get on the witness stand to tell

13   the truth, the whole truth, and nothing but the truth, right?

14           MR. KANOVITZ:  Objection.

15           THE COURT:  Counsel, we're going to argue here?

16           MR. McLANDRICH:  I'm sorry.  I apologize.

17           THE COURT:  Thank you.

18           MR. McLANDRICH:  Stand corrected.

19       Detective Bailey keeps his mouth shut and never says

20   anything about the report, the very report on which plaintiff

21   hangs his case.

22       These alibis were presented in that criminal trial.  They

23   were rejected.  He was convicted.  The alibi about Kentucky,

24   they've all, you know, testified, including Mr. Gillispie, I

25   have no idea when he was down there.  But for Homer Fyffe, who

1    was the father of Jerry Fyffe, one of Mr. Gillispie's

2    friends -- and, unfortunately, Mr. Homer Fyffe has passed

3    away -- had a calendar. On one page of this calendar, he

4    writes something about his dog having pups. And that calendar

5    entry has apparently served as the anchor for the belief that,

6    "Oh, yeah. I know we came back from Kentucky. The pups were

7    outside in the hot sun. We took them, we put them in the

8    basement. And I know it was that day because Homer wrote that

9    date in his calendar."

10        Now, there is a bunch of dates, you know, blank. There

11   is very few things in this calendar but this entry by

12   Mr. Fyffe.

13        Obviously, the jury did not credit that story

14   sufficiently. Otherwise, there never --

15            MR. KANOVITZ: Objection.

16            THE COURT: Sustained. We don't know what the jury

17   necessarily did credit or not credit.

18            MR. McLANDRICH: Thank you.

19        At trial, the three women all identified Mr. Gillispie.

20   Not withstanding any alibi evidence that was put on, he was

21   convicted.

22        There was, in fact, a motion for a new trial. There was,

23   in fact, a second trial. There was, in fact, this issue of

24   the hairs.

25        I differ with one thing: I believe the pubic hair will

1    be shown to have come back to one of the girls and not to some

2    unknown third party.  But I will acknowledge the hairs did not

3    match Mr. Gillispie.  We don't know who they matched.  Some of

4    them may have, in fact, also matched the girls.

5         Second trial.  Same alibi evidence is put on.  Again,

6    Bailey and Fritz are sitting on their hands, don't offer any

7    of this evidence that they supposedly know.  Again, we have a

8    conviction.

9         That's 1991.  It's not until 2007, 2007 that you'll see

10   an affidavit, or at least hear testimony with respect to this

11   affidavit, drafted by Mr. Godsey at the Ohio Innocence Project

12   that now purports to recite a conversation that he and Fritz

13   had where Fritz has the epiphany that, oh, my god --

14             MR. KANOVITZ:  Objection.

15             MR. McLANDRICH:  -- there was this report --

16             THE COURT:  Well, no.  I think -- maybe you can use

17   a different word than "epiphany."  I think he is saying what

18   Godsey -- my understanding is he believes the evidence will

19   show that Godsey talked to Fritz and Fritz -- I mean, he is

20   saying what the evidence is going to show.

21             MR. KANOVITZ:  It was just the argument, not the

22   facts.

23             MR. McLANDRICH:  I withdraw the word "epiphany."

24             THE COURT:  Thank you.

25             MR. McLANDRICH:  Excuse me.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    Not until 2007 will there be any testimony or evidence or

2    suggestion that there was a missing report that was destroyed,

3    suppressed, otherwise not produced by Detective Moore.  There

4    is not going to be a single witness who's going to put that

5    report in Moore's hands.

6    Now the photo array.  Detective Moore made the photo

7    array with the only picture of Gillispie that he had.

8    Nothing's perfect in this world.  People aren't perfect.  This

9    is 1988.  He used what was available to him.  He will testify

10   to the amount of effort that he made to find people that were

11   like and similar and that he found the best people he could to

12   put in that array.

13   Yes, their expert's going to testify about differences in

14   the pictures, perhaps.

15   You are also going to hear testimony from our expert.

16   And our expert's going to testify that those kinds of things

17   don't reduce the accuracy of the eyewitness identification.

18   What matters is if it's a high confidence identification, it's

19   accurate as long as it's the first opportunity that they have

20   to see this suspect, either live or in photo.

21   This photo array was the first time they had seen the

22   picture of Roger Gillispie.  All three women picked it out.

23   As a matter of fact, their own expert is going to testify that

24   it would be highly, highly unlikely that three women would

25   independently pick the same person out of an array if they

```
1    were innocent.

2        So what we have here is a circumstance where there is no

3    evidence that Detective Moore had this report other than Fritz

4    and Bailey who allegedly reportedly knew about it --

5             MR. KANOVITZ:  Objection.

6             THE COURT:  Well, I'm going to let -- I think this

7    is a sum-up, right?

8             MR. McLANDRICH:  This is a sum-up.

9             THE COURT:  I am going to let him sum up his

10   position.  Go ahead.

11            MR. McLANDRICH:  They are going to testify that he

12   knew about this report.  They are going to testify that they

13   didn't tell anybody about it.  They are going to testify that

14   not until 2007 did he realize that this report wasn't in the

15   possession of the other side and the possession of the

16   criminal defense lawyer, and the photo array is going to speak

17   for itself.

18       And I just think at the end of the day the evidence is

19   not going to carry the fact that Detective Moore deprived

20   Mr. Gillispie of a fair trial.  Thank you.

21            THE COURT:  Thank you, Counsel.

22       It's my understanding that the Township has a short

23   opening, right?

24            MR. HERMAN:  This is true, Your Honor.

25            THE COURT:  All right.
```

1          MR. HERMAN:  Good afternoon, ladies and gentlemen.

2     My name is Chris Herman, and together with my co-counsel, Dawn

3     Frick, we represent the Miami Township Board of Trustees.

4          There are two things that attorneys oftentimes do:

5     Sometimes in deposition settings, they will say I only have

6     one more question, and that sometimes tends to not be true

7     because that question always leads to other questions; and

8     they will oftentimes say I'll be brief.

9          I will be brief, I can assure you of that.

10         The Township has a police department, which is led by the

11    chief of police, and there is a command staff of lieutenants,

12    sergeants, corporals, detectives, and police officers.

13         Now, during the time of the events that served as the

14    basis for the criminal investigation against Mr. Gillispie,

15    Scott Moore was a police officer with the department.

16         Now, later on Mr. Moore, as you heard from counsel, was

17    assigned to the detective section.  And he took over the rape

18    investigation of the three victims, S.C., B.W., and C.W., from

19    Detective-Sergeant Steve Fritz and Detective-Corporal Gary

20    Bailey.

21         Now, after Mr. Moore did some investigation, he developed

22    Mr. Gillispie as a suspect.  And after completing that, he

23    turned that whole investigation over to the Montgomery County

24    Prosecutor's Office, who has the responsibility to review all

25    evidence, present facts to a jury -- excuse me -- a grand

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    jury, who then decides whether or not to return charges.  That

2    happened in this case as a result of Mr. Moore investigating

3    the rapes of B.C. -- I'm sorry -- S.C., B.W., and C.W.

4        As you heard from counsel and the Court, the claims in

5    this base -- in this case are based on Mr. Moore's

6    investigation while he was a police detective with the Miami

7    Township Police Department.  To be clear, there are no claims

8    against Miami Township.

9        However, although the Township does not have as active as

10   a role as Mr. Gillispie and Mr. Moore and their respective

11   counsel, the Township, nevertheless, has an interest in the

12   outcome of this trial, specifically, the determination whether

13   Mr. Moore's actions were in good faith or in the scope of his

14   employment or official duties.

15       Now, we believe that the evidence will show that a police

16   officer takes an oath, and that oath of office is to uphold

17   the laws and the Constitution of the United States and the

18   State of Ohio.  Now, if the evidence shows that an officer

19   acts contrary to that oath and those laws, he is not acting in

20   good faith, and he is not acting in the scope of his

21   employment or his official duties.

22       So at the end of this trial, if you believe

23   Mr. Gillispie's account of this case, you will be asked to

24   determine whether Mr. Moore's actions were in good faith or in

25   the scope of his employment or official duties.

1   On behalf of the Township, we appreciate you for your

2 time here, and we look forward to your determination on the

3 merits of this case.

4     THE COURT:  Thank you, Counsel.

5     MR. HERMAN:  Thank you.

6     THE COURT:  Counsel approach a second.

7   (Sidebar off the record.)

8     THE COURT:  Ladies and gentlemen, 3:45.  We're going

9 to be done for the day.  You heard -- we've selected you as

10 our jury, and you have now heard the opening statements of

11 counsel.  I'll remind you that opening statement was just a

12 preview of what they believe the evidence will show.  The

13 evidence will be presented and start tomorrow morning.  So I'm

14 going to ask you to be back here so that we can start right at

15 9, and we'll try to keep a regular schedule tomorrow.  We will

16 try to give you a little, maybe a little more time for lunch,

17 and we'll do our breaks.  So we need you to be here so that we

18 can get started right at, right at 9 o'clock.

19   The other thing, of course, I would remind you, you just

20 heard opening statements, which are not evidence, but it would

21 be inappropriate even at this early stage to start discussing

22 the case with anyone, formulate any opinions, or draw any

23 conclusions.  Ask your family to abide with you on that.

24   Once this case is over, you are going to be able to talk

25 as much as you want to anybody you want, but right now, even

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    your family, you shouldn't be discussing or talking about your

2    case to them.  And, again, it's simply because we don't want

3    you starting to formulate these conclusions or -- or drawing

4    any opinions or forming any conclusions before you get all the

5    evidence in front of you and you get the arguments of counsel,

6    you get the instructions of law, and you can talk with each

7    other with regard to what has been presented and what has been

8    argued.

9         So, please, abide by those admonitions.  The other

10   admonition, as I indicated -- I indicated it several times --

11   I don't know whether there would be any type of publicity on

12   this at all, but if there is, you have the -- you have the

13   ringside seat right now.  You are the ones that know what's

14   being presented, you are the ones that know what's going on

15   more than anyone else, including any media.  So please don't

16   read, don't watch, or don't listen to any reports with regard

17   to this.

18        But with that, anything further, counsel?

19            MR. McLANDRICH:  Not at this time.

20            MR. KANOVITZ:  Not from plaintiff.

21            MS. FRICK:  No, Your Honor.

22            MR. HERMAN:  No, Your Honor.

23            THE COURT:  Ladies and gentlemen, have a good

24   evening.  So I think it's still nice out.  So have a good

25   evening.  Hopefully we are letting you out here so you can

1    enjoy a little bit of the sunshine before it turns darker.

2         Thank you much for your time, your patience.  The Court

3    always appreciates that.  So with that, I will see you back

4    here tomorrow morning at a little bit before 9 so we can get

5    started right away.  Thank you.

6              THE COURTROOM DEPUTY:  All rise.  This court stands

7    in recess.

8         (Jury out at 3:47 p.m.)

9         (Court adjourned at 3:47 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF REPORTER

2

3          I, Mary A. Schweinhagen, Federal Official Realtime

4     Court Reporter, in and for the United States District Court

5     for the Southern District of Ohio, do hereby certify that

6     pursuant to Section 753, Title 28, United States Code that the

7     foregoing is a true and correct transcript of the

8     stenographically reported proceedings held in the

9     above-entitled matter and that the transcript page format is

10    in conformance with the regulations of the Judicial Conference

11    of the United States.

12

13    s/Mary A. Schweinhagen

14    _____  18th of December, 2023

15    MARY A. SCHWEINHAGEN, RDR, CRR
      FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25