```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE SOUTHERN DISTRICT OF OHIO
 2                                 AT DAYTON

 3     _____
                                           )
       ROGER DEAN GILLISPIE,               )
 4                                         )
                          Plaintiff,       ) CASE NO. 3:13-cv-416-TMR
 5                                         )
                       -vs-                )
 6                                         )
       THE CITY OF MIAMI TOWNSHIP, ET AL.,) JURY TRIAL
 7                                         )
                          Defendants.      ) VOLUME III
 8     _____)
                           TRANSCRIPT OF PROCEEDINGS
 9                    THE HONORABLE THOMAS M. ROSE,
               UNITED STATES DISTRICT JUDGE, PRESIDING
10                    TUESDAY, NOVEMBER 8, 2022
                             DAYTON, OH
11
       For the Plaintiff:       MICHAEL KANOVITZ, ESQ.
12                              DAVID B. OWENS, ESQ.
                                MEGAN C. PORTER, ESQ.
13                              Loevy & Loevy
                                311 N. Aberdeen Street
14                              3rd Floor
                                Chicago, IL  60607
15
       For the Defendant        JOHN T. McLANDRICH, ESQ.
16     Matthew Scott Moore:     DAVID J. SIPUSIC, ESQ.
                                Mazanec, Raskin & Ryder Co., LPA
17                              3305 Solon Road
                                100 Franklin's Row
18                              Cleveland, OH  44139

19     For the Intervenor       DAWN M. FRICK ESQ.
       Miami Township:          CHRISTOPHER T. HERMAN, ESQ.
20                              Surdyk, Down & Turner Co., LLP
                                8163 Old Yankee Street
21                              Suite C
                                Dayton, OH  45458
22
             Proceedings recorded by mechanical stenography,
23     transcript produced by computer.
                        Mary A. Schweinhagen, RDR, CRR
24                      Federal Official Court Reporter
                           200 West Second Street
25                            Dayton, OH  45402
                          *** *** *** ***
```

1    Courtroom Deputy:  Elizabeth Penski

2    Law Clerks:  Michael Mayer, Callum Morris

3    Also Present:  Roger Dean Gillispie, plaintiff; Valerie
     Barajas, paralegal; Matt Thibodeau, paralegal; Jeff Weber, IT
4

5

6                        **INDEX OF WITNESSES**

7                     TUESDAY, NOVEMBER 8, 2022

8    **PLAINTIFF'S WITNESSES**

9    **R. DEAN GILLISPIE**
          Direct Examination by Mr. Owens             188, 334
10         Cross-Examination by Mr. McLandrich         335

11   **D. MARIE LILLY**
          Direct Examination by Mr. Kanovitz          316
12         Cross-Examination by Mr. McLandrich         333
          Redirect Examination by Mr. Kanovitz        334
13
                      *     *     *     *     *
14

15

16

17

18

19

20

21

22

23

24

25

```
 1          P-R-O-C-E-E-D-I-N-G-S                    9:00 A.M.

 2          (Jury in at 9:01 a.m.)

 3          (In open court at 9:03 a.m.)

 4          THE COURT:  Ladies and gentlemen, welcome back.

 5   Hopefully, you had a restful evening and were able to enjoy

 6   some of your evening, had some rest, and are ready to go here

 7   this morning.

 8       I guess I do need to ask you one question.  Were you able

 9   to abide by my admonition not to discuss the case with

10   anybody?

11          RESPONSE BY ALL:  Yes, Your Honor.

12          THE COURT:  Anybody that wasn't?

13       (No verbal response.)

14          THE COURT:  Good.  There is one additional

15   instruction I'd like to give you.  It's very short.  And then

16   we will move onto the evidence presentation by the parties.

17       But as you experienced yesterday, the lawyers for all

18   parties do object to some of the things that are said or done,

19   and this will continue most likely throughout the trial.  Do

20   not hold those objections against any party.  The lawyers from

21   both sides, all sides, have a duty to object whenever they

22   think that something is not permitted by the rules of

23   evidence.  And those rules are designed to make sure that all

24   parties receive a fair trial.

25       And the only other thing I would ask you to do, do not
```

1　interpret my rulings to their objections as any indication of

2　how I think the case should be decided.  My rulings are

3　totally based on the rules of evidence and not on how I feel

4　about the case.  Remember that your decision, your decision

5　must be based only on the evidence that you saw and heard here

6　in the courtroom.

7　　　　All right.  As I indicated to you, ladies and gentlemen,

8　yesterday you heard the opening statements of counsel.  We

9　selected a jury.  And as I told you yesterday, none of that is

10　evidence.  We are now to move on to the evidence presentation.

11　　　　And I outlined for you the structure of the trial.  The

12　trial starts with evidence or witnesses to be presented by the

13　plaintiff, then the defendant, and then possibly the

14　intervenor.

15　　　　So the first thing I want to deal with before plaintiff

16　starts calling their witnesses is read to you stipulations, or

17　agreements, between both sides that certain facts in this case

18　are true.

19　　　　The parties have stipulated, or agreed, to the following:

20　　　　On August the 20th, 1988, two twin sisters, B.W. and

21　C.W., were sexually assaulted after being abducted at gunpoint

22　by a stranger in a parking lot of the Best Buy -- Best

23　Products store in Dayton, Ohio.  These crimes were

24　investigated by the Miami Township Police Department.

25　　　　After seeing news about the Best Products assaults,

1    another woman, S.C., reported being assaulted on August the

2    5th of 1988 in a similar manner in a store parking lot in

3    Montgomery County.  This crime was investigated by the

4    Montgomery County Sheriff's Office.

5         On September the 5th, 1990, Mr. Gillispie was arrested

6    and then prosecuted for the Best Products crimes and those

7    related to S.C.

8         Gillispie was convicted at a criminal trial in February

9    of 1991 and then granted a new trial.  Gillispie was convicted

10   again in June of 1991 for the Best Products crimes involving

11   B.W. and C.W., as well as crimes against S.C.

12        Gillispie was continuously incarcerated between September

13   the 5th, 1990, and December the 22nd of 2011.  Gillispie was

14   released following a federal court's order to vacate the

15   convictions and requiring a new trial on the basis of the

16   claim that exculpatory evidence was not produced to Gillispie

17   during the criminal prosecution.

18        In 2012, a separate Ohio court vacated Gillispie's

19   conviction and ordered a new trial due to the existence of new

20   evidence about an alternative suspect.

21        Following an order by a judge in Montgomery County Court

22   of Common Pleas, which became final on July the 26th, 2017,

23   the charges against Gillispie were dismissed with prejudice.

24        On November the 19th, 2021, Gillispie was declared to be

25   a wrongfully imprisoned individual pursuant to Ohio law by a

1    judge in the Montgomery County Common Pleas -- I'm sorry --

2    Montgomery County Court of Common Pleas.

3         Ladies and gentlemen, those are the stipulations between

4    the parties to which the parties have agreed to and will --

5    are now -- they will be before you, and we will provide you

6    those stipulations during your deliberations as agreed to by

7    the parties.

8         Counsel, anything else on that?  On the stipulations?

9              MR. OWENS:  Not right now, Your Honor.  Thank you.

10             MR. McLANDRICH:  No, sir, Your Honor.

11             MS. FRICK:  No, sir.

12             MR. HERMAN:  No, Your Honor.

13             THE COURT:  Not right now?  Am I expecting something

14   later?  Or we have agreed to the stipulations, right?

15             MR. OWENS:  We have agreed to them.

16             THE COURT:  All right.  As I indicated, ladies and

17   gentlemen, we're ready for the presentation of evidence.

18   Please give your attention to counsel as they present their

19   case.

20        Counsel.

21             MR. OWENS:  Your Honor, we'll call plaintiff, Dean

22   Gillispie.

23             THE COURT:  All right.  Mr. Gillispie.

24             MR. McLANDRICH:  Your Honor, not knowing who's in

25   the gallery, we just want to make sure we have a separation of

```
1    witnesses.
2              THE COURT:  Is there a motion for separation of
3    witnesses?
4              MR. McLANDRICH:  Yes, sir.
5              THE COURT:  All right.  The Court is going to grant
6    the motion for separation of witnesses.  The Court is going to
7    put the obligation upon the attorneys for all parties to make
8    sure that none of their witnesses or prospective witnesses are
9    in this courtroom during the presentation of any other
10   witness.  Failure to comply with that will result in possibly
11   excluding that witness from testimony.
12      We'll give you an opportunity to take a look and make
13   sure we are not in violation.
14             MR. McLANDRICH:  Thank you, Your Honor.
15             ROGER DEAN GILLISPIE, PLAINTIFF, SWORN
16             THE COURT:  Mr. Gillispie, if you will, please --
17   have a seat.  Have a seat.  If you will, during your testimony
18   in response to the questions that are posed to you, if you can
19   keep your voice up.  Now, we have a microphone there for you,
20   and the microphone does assist if you don't get it too close
21   to you or it doesn't get too far away from you.  If you get it
22   too close, it's going to muffle you; if you get too far away,
23   it won't pick you up.  One way to deal with that is keep your
24   voice up in a strong voice so that everyone in the courtroom,
25   including the people in the very back, back row of the jury,
```

R. DEAN GILLISPIE - DIRECT (Owens)                    188

```
 1    can hear your responses.

 2                 THE WITNESS:  I will do my best.

 3                 THE COURT:  Thank you.

 4          You may proceed.

 5                 MR. OWENS:  Thank you, Your Honor.

 6                     DIRECT EXAMINATION

 7    BY MR. OWENS:

 8    Q.    Good morning.  Dean, could you please just introduce

 9    yourself to the jury and provide your name?

10    A.    My name is Dean Gillispie.

11    Q.    Where do you live?

12    A.    Fairborn, Ohio.

13    Q.    And who do you live with?

14    A.    My beautiful girlfriend, Pam, sitting in the back

15    there.

16    Q.    Do you want to point her out?

17    A.    Yeah, right here, front row (indicating).

18    Q.    How long have you been with Pam?

19    A.    Going on nine years.

20    Q.    And who is Pam to you in life?

21    A.    It's my rock.

22    Q.    Where do y'all live?

23    A.    In Fairborn.

24    Q.    Do you own a house?

25    A.    Yes.
```

R. DEAN GILLISPIE - DIRECT (Owens)                    189

1   **Q.**   You all right?

2   **A.**   Yeah, yeah.

3   **Q.**   I think you said you own a house in Fairborn; is that

4   right?

5   **A.**   Yes, yes.

6   **Q.**   Is it new or old?

7   **A.**   It's 122 years old.

8   **Q.**   Does that require you to do anything?

9   **A.**   It's never-ending maintenance, yeah.

10  **Q.**   Do you enjoy that kind of work?

11  **A.**   Yes, yes, I do.

12  **Q.**   So you live in Fairborn now, but can you tell us where

13  you grew up?

14  **A.**   In Fairborn.

15  **Q.**   What high school did you go to?

16  **A.**   Fairborn High School.

17  **Q.**   Did you complete any education at all after high school?

18  **A.**   Yeah, I went to the Sinclair Community College.

19  **Q.**   And what did you study while you were at Sinclair?

20  **A.**   Fire science technology.

21  **Q.**   Did you get a degree?

22  **A.**   It wasn't a degree, no.  It wasn't -- at that time it

23  wasn't a degreeable subject.

24  **Q.**   And how old are you today, sir?

25  **A.**   57.

R. DEAN GILLISPIE - DIRECT (Owens)                    190

1   **Q.**   So what year were you born?  You don't need to provide

2   the date, but just the year.

3   **A.**   1965.

4   **Q.**   What are your parents' names?

5   **A.**   Juana and Roger.

6   **Q.**   And where are they originally from?

7   **A.**   Paintsville, Kentucky, area.

8   **Q.**   And could you just describe that area of Kentucky where

9   they came from?

10  **A.**   Just rural eastern Kentucky.

11  **Q.**   Not a big city like Lexington or Louisville?

12  **A.**   If Paintsville's big, then Fairborn's giant.

13  **Q.**   What sort of work did your mom do growing up?

14  **A.**   She was a beautician.

15  **Q.**   Did she have any other things that were significant in

16  her life that impacted the way you were raised?

17  **A.**   Oh, yeah, she was definitely a Sunday school teacher,

18  which kept us in church all day Sunday, Wednesday for

19  church, Thursday for visitations, so the nursing homes and

20  things, and choir practice and everything else, they had to

21  go to the church.

22  **Q.**   Is your dad the same?

23  **A.**   No.

24  **Q.**   What did he do for work?

25  **A.**   He was a barber when he come from Kentucky, and then he

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

R. DEAN GILLISPIE - DIRECT (Owens)                    191

```
 1    ended up getting a job at General Motors.

 2    Q.    How long did your dad work at General Motors?

 3    A.    Thirty-some years.

 4    Q.    Outside of work, was he -- if he wasn't at church, what

 5    sort of things was he doing?

 6    A.    We were hunting or fishing or going to flea markets.

 7    Q.    And you said "we."  Would that be stuff that you would do

 8    with him?

 9    A.    Yeah.  Me and my dad, yeah.  Some of his buddies.

10    Q.    You got any siblings?

11    A.    Yes, I do.

12    Q.    Would you just tell the jury about who your siblings are?

13    A.    I have a sister Jodi, under me; then my brother, James;

14    and my little sister Zandra.

15    Q.    And any of your siblings still live in Ohio today?

16    A.    No.

17    Q.    Do you maintain relationships with them, though?

18    A.    Yeah.

19    Q.    Any of your siblings got children?

20    A.    Yes.

21    Q.    Which ones?

22    A.    My brother, James, has my nephew, Nicholas, and my

23    little sister Zandra has my niece, Natalie.

24    Q.    And you mentioned Nicholas; is that right?

25    A.    Correct.
```

R. DEAN GILLISPIE - DIRECT (Owens)                    192

1    **Q.**   Are you close with Nicholas?

2    **A.**   Yeah.  Close as I can be.

3    **Q.**   And does Nicholas have a daughter?

4    **A.**   Yeah.

5    **Q.**   Who is she to you?

6    **A.**   Oh, shit.  She's the closest thing -- I'm sorry.

7         She's the closest thing to a grandchild that I will

8    ever have.  I just got to talk to her last night.  That's

9    the problem I've got now is she's everything in the world to

10   me.  Actually, I have a picture of her in my pocket.

11   **Q.**   How are you feeling right now, Dean?

12   **A.**   Just -- we got to get through it.

13           THE COURT:  Let's try to move on, counsel.

14   BY MR. OWENS:

15   **Q.**   Do you have a full-time job right now?

16   **A.**   I don't punch a clock, but I do a lot of other things.

17   **Q.**   What are some of the other things that you do?

18   **A.**   What I tell everybody what I do is work on junk 24

19   hours a day.  I work on old cars.  I try to mess around with

20   antique furniture still.  Working on this house.  Building a

21   car right now.  I travel all over the world speaking.  And

22   I'm busy all day every day.

23   **Q.**   I want to talk a little bit about some of the things that

24   you said there.  The first thing you said, you work on cars;

25   is that right?

R. DEAN GILLISPIE - DIRECT (Owens)                    193

1   **A.**   Yeah.  I work on old cars, race cars with my buddies,

2   my buddies' friends that I grew up with that I didn't get to

3   see them grow up till just now.  And I'm hanging out with

4   those guys now that -- you know, I've known these guys my

5   whole life.  They have children, and they didn't know me

6   till I got home, and I'm trying to live every minute with

7   them.  They're the age that I was when I was kidnapped by

8   the State of Ohio.

9   **Q.**   Have you -- what are you working on right now?

10  **A.**   A 1953 Chevy wagon.

11  **Q.**   Have you completed any sort of restoration projects?

12  **A.**   Yeah.  I also built a 1963 Airstream camper.  From the

13  ground up.

14  **Q.**   How long did that take?

15  **A.**   It took a lot longer than I expected.  I thought I

16  could do it in about 60 days.  It took a year because I had

17  to build everything inside of it, you know, one off, custom.

18  **Q.**   Sure.  And so --

19             MR. OWENS:  If you could pull up page 3 of Exhibit

20  200.

21             THE COURT:  What is that, Counsel?

22             MR. OWENS:  It's a photograph of the --

23             THE COURT:  Is it marked as an exhibit?

24             MR. OWENS:  Yes, Your Honor.

25             THE COURT:  Can we make a reference instead of page

R. DEAN GILLISPIE - DIRECT (Owens)                    194

1    3 or something, don't we have an exhibit number?

2              MR. OWENS:  Page 3 of Exhibit 200.  I apologize,

3    Your Honor.

4              THE COURT:  Do you have any objection to that being

5    published, counsel?

6              MR. McLANDRICH:  Let me take a quick peek, Your

7    Honor.

8              THE COURT:  And it would be helpful, counsel, at a

9    break, if you have not done this before, talk with opposing

10   counsel, whether it's plaintiff or defendant, about the

11   exhibits that you'll be wanting to publish because I will not

12   let them publish unless I make a ruling or it's agreed upon.

13             MR. OWENS:  Absolutely.

14             THE COURTROOM DEPUTY:  Counsel, I don't have that

15   binder.

16             MR. OWENS:  I think our staff is having trouble

17   getting into the room.  I don't know --

18             THE COURTROOM DEPUTY:  Do you know what binder it's

19   in?

20             MR. OWENS:  I don't.  I am just happy for him to

21   just look at the screen in front of him.  That's what I was

22   anticipating.

23             THE COURT:  Are you okay with that?

24             MR. McLANDRICH:  Yeah.

25        Can we approach for a second, Your Honor?

R. DEAN GILLISPIE - DIRECT (Owens)                          195

1              THE COURT:  Surely.

2         (At sidebar.)

3              THE COURT:  It's my understanding that this page of

4    which you are going to is part of an article that I barred,

5    correct?

6              MR. OWENS:  It's just a picture.  So the articles

7    are separate exhibits.  This is not that.  This is just an

8    exhibit that is just a picture of Mr. Gillispie and the

9    Airstream.  There's no article.

10             THE COURT:  That was Mr. Owens.

11             MR. OWENS:  I apologize, Your Honor.

12             MR. McLANDRICH:  Yes.  So, Your Honor, John

13   McLandrich.  I don't have a particular problem with the

14   picture, but at the bottom of the picture is still a dialog

15   from the article.  So if that can get clipped off or scrolled

16   off so that you don't see the language from the bottom of the

17   article, you just see Mr. Gillispie and the Airstream, then I

18   don't have a problem with the photograph itself.

19             MR. HERMAN:  Same, same.

20             THE COURT:  The photo may be published but nothing

21   at the bottom.  I've ruled.

22        I've ruled.  The photo.  He can talk about it.

23             MR. OWENS:  Sure.

24        (In open court.)

25   BY MR. OWENS:

R. DEAN GILLISPIE - DIRECT (Owens)                          196

1   **Q.**   So I now want to -- while they are grabbing that, I am

2   just going to ask you a couple more questions while we get the

3   picture ready.

4       Mr. Gillispie, you said you restored an Airstream, just

5   to reorient us; is that right?

6   **A.**   Yeah, 1963 vintage Airstream.

7   **Q.**   After you finished restoring that Airstream, did you let

8   anybody know about what you did to restore it?

9   **A.**   Yeah, yeah.  There was -- yeah, I was telling the

10  world.  You know, I was pretty proud of that consummate.  It

11  turned out exactly the way I dreamed it would, and talking

12  to a few people and ended up actually getting the Airstream

13  in the *Airstream Life* magazine when it was done.

14  **Q.**   All right.  I want to show you a page 3 of Exhibit Number

15  200.  With that document reader.

16          THE COURT:  Which is basically the photo?

17          MR. OWENS:  Correct, Your Honor.

18          THE COURT:  It may be published.

19          MR. OWENS:  Thank you, Judge.

20      (Exhibit displayed.)

21  BY MR. OWENS:

22  **Q.**   All right, Mr. Gillispie.  Can you please just tell us

23  what this is a picture of?

24  **A.**   That's the picture of the Airstream after I got it

25  done, and was a photo shoot for the *Airstream Life* magazine.

1    **Q.**    And I'm going to try to bring it into better focus, but

2    do you see the people sitting in the chairs?

3    **A.**    Yeah.  That's my mom and dad.

4    **Q.**    And so this was -- you mentioned this was in *Airstream*

5    *Life* magazine?

6    **A.**    Correct.

7    **Q.**    Was there any -- anything else that was a part of getting

8    this into *Airstream Life* magazine that was significant to you?

9    **A.**    Yeah.  When I got it done -- when I was actually

10   building the Airstream, it was gutted to the frame.  I had

11   to fix a lot of the frame.  And while I was working on it, I

12   had this great idea that I have a song that I listened to

13   while I was in prison and to get me through every day called

14   *Soulshine* by the Allman Brothers.  And I told my girlfriend,

15   I said, "We are going to name this thing *Soulshine*, and we

16   are going to find Warren Haynes, the guy who wrote the song,

17   and have him sign this camper," which is a fool's dream, in

18   my opinion, when you start thinking about it:  I am going to

19   go hunt a rock and roll legend down and have him hang out

20   with me and sign my camper.

21             MR. OWENS:  Can we bring up page number 5 of Exhibit

22   200?

23        And, Your Honor, I showed this to counsel.  I believe

24   there is no objection.

25             THE COURT:  He believes there is no objection.

1            MR. McLANDRICH:  Correct, Your Honor.

2            THE COURT:  It may be published.

3            MR. OWENS:  On the computer, thank you.

4      (Exhibit displayed.)

5  BY MR. OWENS:

6  **Q.**   All right.  Dean, tell us what's going on in this

7  picture.

8  **A.**   I actually -- that's a picture of me with Warren

9  Haynes.

10  **Q.**   Which one --

11  **A.**   And my friend Jen; my girlfriend, Pam; and my friend

12  Rob.

13  **Q.**   All right.

14  **A.**   And that was the second day, after I met Warren Haynes

15  the first day before and talked to him about my camper and

16  told him I wanted him to sign it, and he asked me where it

17  was at.  I said, "It's not here, but it's a couple minutes

18  down the road if you want to come to my house."

19        And he said, "No, but if our paths ever cross again,

20  I'll sign this camper for you."

21        And I said, "Well, Warren, I'm not doing nothing

22  tomorrow night.  I can come to your show tomorrow night."

23  And he told his road manager to set it up, and that was the

24  next day, in Nussiaville [phonetic], Indiana.  And meeting

25  that guy was unbelievable.

R. DEAN GILLISPIE - DIRECT (Owens)                    199

1    **Q.**   All right.  And I apologize.  I don't listen to Allman

2    Brothers that much, but can you just let the jury know -- you

3    said who is who.  I think we can tell who you are, but can you

4    just go from left to right and tell us who's in the picture?

5    **A.**   I got Rob Daganhardt, a friend of mine I grew up with;

6    my girlfriend, Pam; Jen Kopus, a friend of mine; and the

7    legendary Warren Haynes; and me.

8    **Q.**   Warren Haynes is the guy in the black shirt that says

9    "Legends"; is that right?

10   **A.**   That's correct.

11   **Q.**   All right.  So just going back a couple minutes, you

12   mention that you work on cars and you also speak -- travel for

13   speaking engagements; is that right?

14   **A.**   Yeah.

15   **Q.**   What do you speak about?

16   **A.**   Well, it's funny.  We talked about the Allman Brothers,

17   and most of the people I speak to don't even have a clue who

18   they are.  So, you know, they are one of the greatest bands

19   out of the '70s, in my opinion.

20        But I go to colleges, universities, all different type

21   of events speaking about wrongful convictions.  I have been

22   to four different countries, three tours of the United

23   States.  I was just at Brown University last month speaking

24   about wrongful convictions, and my artwork actually, both at

25   the same time.

R. DEAN GILLISPIE - DIRECT (Owens)                    200

1   **Q.**   Down at -- we'll talk about your art in a minute, but

2   when you say you speak about wrongful convictions, what are

3   you talking about?

4   **A.**   I talk about people who went to prison for crimes they

5   didn't commit.

6              MR. McLANDRICH:  Objection, Your Honor.

7              THE COURT:  Where we going with this?

8              MR. OWENS:  Your Honor, I am just trying to

9   introduce --

10             THE COURT:  Well, he's indicated that he speaks

11  to -- he speaks to people about people who are wrongfully

12  convicted.  I don't -- we're not going to tread into anything

13  that specifically deals with any of this case.

14             MR. OWENS:  I'm sorry.  I don't understand.  I was

15  just trying to introduce him to the jury to tell him what he

16  does with his life right now.

17             THE COURT:  I think -- you may proceed.  But we're

18  not -- I don't want him to go into the subject matter of his

19  speeches.

20             MR. OWENS:  Okay.

21  BY MR. OWENS:

22  **Q.**   Why is it that you give speeches on behalf or related to

23  the Ohio Innocence Project?

24  **A.**   Because the Ohio Innocence Project got me out of prison

25  for a crime I had nothing to do with.  I owe my life to

1    those folks, and I will do anything they ask me to do,

2    proudly.

3    Q.   In your life right now, are you on the boards of any

4    organizations?

5    A.   Yes, I am.  I'm on the board of the organization called

6    After Innocence.  It's for exonerees.  When you get out and

7    you need to navigate the system, which most of us were in

8    before the computers were invented.  Don't know anything

9    about navigating the computer and the Internet and all that.

10   So we help guys get their drive's license, file for

11   insurance, you know, apply for jobs, you know, dental work,

12   healthcare.  Anything that they could possibly need, we try

13   to help them obtain it.  And this is a nationwide program

14   based out of California run by Jon Eldan.

15        And I also am on the board of the Ohio Innocence

16   Project.  Probably the proudest moment of my life, to be

17   asked to be on the board of the organization that saved my

18   life for future decision-making.

19   Q.   You also mention that you talk about art, right?

20   A.   Correct.

21   Q.   Can you tell us about what sort of art you do?

22   A.   While I was in prison, I had to figure out, you know,

23   what I was going to do with my time in there because I was

24   losing my mind.  And I started doing art, making art out of

25   trash that -- any kind of found objects I could use to make

1    art out of.

2    **Q.**   And what sorts of things would you build?

3    **A.**   I started on building little, small, miniature

4    buildings.  The first thing I made was out of manilla

5    folders, just file folders, and I built a little, small

6    house out of that.  And it got confiscated.  And I built

7    another one, and they confiscated it, because at that time

8    we were only allowed to use colored pencils and graphite

9    pencils to do artwork, and I was just trying to push the

10   boundaries of being allowed to do more, different styles of

11   art.

12        So I started building these buildings, and the staff

13   started letting us do more.  We started a art program in the

14   prison, me and a couple friends of mine, and I was actually

15   able to really start building these buildings.  So I started

16   a series on Route 66, building different buildings in my

17   mind, just designs out of my head that I felt like you might

18   see if you was traveling down Route 66 through America.

19   **Q.**   Would that include an Airstream?

20   **A.**   Yes.  I did a small Airstream in 1995 that I felt that,

21   you know, in my mind, that I would hook my Airstream up and

22   start traveling around and selling hamburgers.

23             MR. OWENS:  Can you pull up -- this is page 1 of

24   Exhibit 200.

25             MR. McLANDRICH:  No objection, Your Honor.

R. DEAN GILLISPIE - DIRECT (Owens)                    203

```
 1              THE COURT:  All right.  It may be -- are there any
 2    objections?
 3              MR. HERMAN:  None.
 4              THE COURT:  It may be published.
 5         (Exhibit displayed.)
 6    BY MR. OWENS:
 7    Q.   Do you see that all right?
 8    A.   It seems out of range, but I can see it over here
 9    (indicating).
10              THE COURT:  Hold on.
11              MR. OWENS:  I can go over here.
12              THE COURT:  What's that?
13              MR. OWENS:  I can go over there.
14              THE COURT:  Why don't you do that.  We are trying to
15    remedy this.
16              MR. OWENS:  No problem.
17              THE COURT:  How's that?
18         Oh, that's you.
19              MR. OWENS:  That's me.
20              THE COURT:  That's good then.
21              MR. OWENS:  Thank you, Judge.
22    BY MR. OWENS:
23    Q.   All right.  Dean, what's this a picture of?
24    A.   That's the Airstream that started the whole Airstream
25    dream right there.  It's a little dinette that I made in
```

1    '95 -- that's made out of the back of writing tablets.  I

2    think everybody in this room has one -- the foil from the

3    cigarette packs that they smoked in there -- and stickpins,

4    and just the curtain is a tea bag.  Just little things I got

5    out of the trash to throw this together with.

6         And I would -- I was actually building that thing when

7    a buddy of mine brung the cassette tape over for me to

8    listen to, the new cassette by the Allman Brothers which had

9    the *Soulshine* song on it, which started a lifelong love of a

10   song.

11   **Q.**   Has your art, like this or other pieces, been featured

12   anywhere?

13   **A.**   Yeah.  This -- so I've got a very huge amount of this

14   art that I've done, and it somehow -- someone had seen it

15   somewhere, and some pictures of it, and contacted me about

16   being in an art show at Rutgers University.

17        So I -- okay.  They came out.  They looked at the

18   pieces they wanted to take.  We took them to Rutgers.  They

19   had me go to Rutgers and speak.  I spoke on a couple of

20   panels with artists that run the show, a couple galleries.

21   And that was that.

22        And come home, and a couple years later I get another

23   call from this lady.  She's going to do another show in New

24   York, and she wanted to know if I could put some pieces in

25   it.  And I knew her from before.  And I'm like, whatever you

R. DEAN GILLISPIE - DIRECT (Owens)                              205

1    want to do.  You know, I don't care.  So she came back out,

2    looked at some more pieces, and started putting the show

3    together for that.

4         In the meantime, someone else had seen the art,

5    contacted me, from HBO.  HBO contacted me and wanted to use

6    a piece that they had seen in a movie premiere in Chelsea,

7    New York.  They were doing a movie premier of a show that

8    was coming out on HBO.  They had me and a few of the artists

9    from that first show there.  So I got to go to that.  And

10   introduced a bunch of gallery people that, you know, never

11   in my life would dreamed of meeting these people who ran

12   these very prestigious art museums and stuff and talking

13   about your -- you'll have a show; you'll have a show.

14        And I'm not pursuing the art dream.  I'm pursuing

15   building cars with my friends' kids.  And it didn't register

16   with me as a, you know, a thing, you know.

17        I come back home, and the people on the board with the

18   Innocence Project were --

19   Q.   Can I stop you right there, Dean?  So just -- so you

20   mentioned something about having this art published in a

21   gallery or museum?

22   A.   Yeah.

23   Q.   Where was it published?  Just tell us the name.

24   A.   Well, I was getting to that.  So I -- after the Chelsea

25   show, we -- she called me with -- we were working in getting

R. DEAN GILLISPIE - DIRECT (Owens)                    206

1    this other show together, and she told me that --

2              THE COURT:  Mr. Gillispie, the question that your

3    counsel asked is where did you do it at?  Not what people told

4    you or what people talked to you about.  Where?

5              THE WITNESS:  I'm trying to get there right now.

6              THE COURT:  Well, the answer is where.

7              THE WITNESS:  I got to display my art at the -- I

8    got to display my art at MOMA, the most prestigious

9    contemporary art museum in the world.

10        That's why it's hard.  It's hard for me to imagine that

11   from the hell this was created in, that this art was seen by

12   people who understand art, for it to go to MOMA, the Museum of

13   Modern Art, in New York.  I still can't wrap my head around

14   it.

15        In one month, in December, when this show was going on, I

16   was in the *New York Times* twice, I was in the *Atlantic*

17   magazine, I was in the *New Yorker*, I was in *Forbes*, and I was

18   in every magazine that possibly had an art column in it with

19   this art show.

20        I didn't understand what that was about until --

21             THE COURT:  Counsel, counsel, counsel.  I understand

22   what he's saying.  I don't have any real problem, but this is

23   not in response to any questions you asked of him.

24             MR. OWENS:  Sure.

25             THE COURT:  He is just talking.  So I have no

R. DEAN GILLISPIE - DIRECT (Owens)                    207

```
 1   problem --
 2           MR. OWENS:  I got it.
 3           THE COURT:  There has to be a question to which he
 4   answers, not him --
 5           MR. OWENS:  Yes, Judge.
 6           THE COURT:  -- narrating something.
 7           MR. OWENS:  Absolutely.
 8   BY MR. OWENS:
 9   Q.   So, Dean, just listen to my question.  We'll get there,
10   okay?
11        I want to just -- we have a good understanding of what's
12   going on in your life now -- art, cars, and the importance it
13   is to you.
14        I want to rewind a little bit and take you back to your
15   young adult years, which sort of precede the case and a lot of
16   things for why we are here today, okay?  You with me?
17   A.   Yeah.
18   Q.   All right.  What year did you graduate Fairborn High?
19   A.   1984.
20   Q.   As a young adult in the 1980s, what sorts of things would
21   you do for hobbies?  Just brief.
22   A.   I was hunting and fishing and messing with antiques.
23   Q.   What kind of things did you fish for?
24   A.   At that time I was catfishing.
25   Q.   Did you say you were hunting?
```

1   **A.**    Yeah, squirrel hunting.

2   **Q.**    Big game?

3   **A.**    No, just squirrels.

4   **Q.**    And why did you hunt squirrels?

5   **A.**    It's a pretty good challenge to hunt a little, small --

6   a city squirrel and a squirrel in the woods are two

7   different things.  People have two different concepts of

8   squirrels.  You know, hunting in the woods, a small game,

9   very small game in the trees of the woods is a nice skill

10  that I like to practice.

11  **Q.**    And I don't mean to get too personal, but what sorts of

12  grades did you get in high school?

13  **A.**    I was average, C student.

14  **Q.**    Did you participate in any clubs while you were in high

15  school, like chess, debate, things like that?

16  **A.**    No, did not.

17  **Q.**    Did you play any sports in high school?

18  **A.**    No, did not.

19  **Q.**    Were you super political?

20  **A.**    No, didn't care about politics.  Still don't.

21  **Q.**    Were you big into fashion?

22  **A.**    No.  No.

23  **Q.**    Would you wear jewelry, like gold medallions?

24  **A.**    No, not at all.

25  **Q.**    While you were in high school or as a -- strike that.

R. DEAN GILLISPIE - DIRECT (Owens)                    209

1   Sorry, Dean.

2       As a young adult, would you ever dye your hair?

3   **A.**   No.

4   **Q.**   Now, can you describe for the jury what your hair looked

5   like when you're in your 18-to-20 age?

6   **A.**   It was dark brown with gray.

7   **Q.**   Where was it gray?

8   **A.**   On my temples, both sides of my temples.

9   **Q.**   When did you start going gray?

10  **A.**   The tenth grade, around the tenth grade.

11          MR. OWENS:  And, Your Honor, what I'd like to do is

12  pull up a picture, have him -- ask him a few questions about

13  it and then to lay the foundation, and see if there is an

14  objection before it's published.  Is that all right?

15          THE COURT:  You'd like to show him a picture.  Is

16  the picture marked as an exhibit?

17          MR. OWENS:  It is, Your Honor.

18          THE COURT:  And what's the exhibit?

19          MR. OWENS:  It would be page 80 of Exhibit Number

20  54.

21          THE COURT:  All right.  Let's do this --

22          MR. OWENS:  I can show him a physical copy.  I just

23  didn't know if it might be easier for everyone to have it

24  unpublished and then have him talk about it, and then publish

25  it after that.

R. DEAN GILLISPIE - DIRECT (Owens)                    210

1          THE COURT:  I mean, yes, unless they have no

2     objection to it to begin with.

3        Have they seen that?

4          MR. OWENS:  They have seen it, Your Honor.

5          THE COURT:  Counsel, are you looking at the picture?

6          MR. McLANDRICH:  I'm getting there, Your Honor.

7     Sorry.  My computer's being a little bit slow.

8          MR. OWENS:  And I apologize, Your Honor.  I do it a

9     little differently where I'm from.

10         THE COURT:  Is that the same picture that you

11    published in the opening statement?  No?

12         MR. OWENS:  I don't believe -- yes, it is.

13         MR. KANOVITZ:  Yes.

14         THE COURT:  Did you say 80?

15         MR. McLANDRICH:  No objection, Your Honor.

16         THE COURT:  Okay, there is no objection.

17         MR. OWENS:  Excuse me.  I am sorry.  Page 80 of 54.

18    Thank you so much.

19        He's got it on there.  If it's on the screen, it's all

20    right.

21         THE COURTROOM DEPUTY:  It is not on the screen.

22         THE COURT:  Counsel, there is no objection to it

23    being published.  Let Mr. Gillispie take a look at it.  He's

24    got it there in front of him, right?

25         THE WITNESS:  No.  What I have got is just a case

R. DEAN GILLISPIE - DIRECT (Owens)                              211

1   number and a name.

2                    MR. OWENS:  May I approach, Your Honor?

3                    THE COURT:  Well, yes.  What are you --

4                    MR. OWENS:  Just to flip to the right page.

5                    THE COURT:  It's not my procedure to be approaching

6   the witness, but go ahead.

7             And you are showing him what?

8                    MR. OWENS:  This is page 80 of Exhibit 54.

9                    THE COURT:  And, counsel, you have seen that

10  picture, and there is no objection?

11                   MR. HERMAN:  No objection.

12                   MR. McLANDRICH:  No objection, Your Honor.

13                   THE COURT:  If you want to -- do you have a copy of

14  it?

15                   MR. OWENS:  So I had planned on doing all of this

16  digitally, Your Honor, which is why I don't have the physical

17  copies, but I am working on getting them pulled right now.

18            So if the computer isn't working, I can --

19                   THE COURT:  Have him identify it and say what he is

20  going to say, and then if you want to publish it, you can take

21  it and put it on the -- whatever that is.

22                   MR. OWENS:  Yes, sir.

23  BY MR. OWENS:

24  **Q.**  Mr. Gillispie, would you please identify what this is a

25  picture of?

R. DEAN GILLISPIE - DIRECT (Owens)                    212

```
 1    A.    A picture of me.

 2    Q.    And where were you when this picture was taken?

 3    A.    I was at my brother's in Nebraska.  He was in the Air

 4    Force.  I went out to visit him.

 5    Q.    Without -- do you know the specific date that this was

 6    taken?

 7    A.    No, I do not.

 8          (Exhibit displayed.)

 9             THE COURT:  It's working now.

10          Can you folks see it?  All right, thank you.

11             MR. OWENS:  Thank you so much.

12    BY MR. OWENS:

13    Q.    All right.  Mr. Gillispie, now that we can all see it,

14    let's -- where were you at when this picture was taken?

15    A.    I went to visit my brother in Nebraska.  He was in the

16    Air Force.  That was taken while I was out there.

17    Q.    All right.  And does this reflect how your hair looked

18    before you were arrested?

19    A.    Yeah.  That's the basic style when I had -- when I had

20    hair.

21    Q.    And would that have been how you appeared in 1988 as

22    well?

23    A.    Yeah, yeah.

24    Q.    Tell me about your tattoos.

25    A.    I don't have any tattoos.  No tattoos.
```

R. DEAN GILLISPIE - DIRECT (Owens)                          213

1    **Q.**   Even to this day?

2    **A.**   No.

3            THE COURT:  We can take that picture down.

4            MR. OWENS:  Thank you.

5    BY MR. OWENS:

6    **Q.**   Did you work in high school?

7    **A.**   Yeah, I started working with one of my dad's friends

8    when I was about 15.

9    **Q.**   What was his name?

10   **A.**   Jim Osborne.

11   **Q.**   What was your relationship like with Mr. Osborne?

12   **A.**   Jim's been a mentor to me pretty much my whole life.

13   **Q.**   What sort of work would you do with Mr. Osborne?

14   **A.**   He was in the construction of homes and flipping homes

15   and home repair.

16   **Q.**   Any other jobs while you were in high school?

17   **A.**   Yeah.  He had a contract with a shopping center that

18   just got built up by the house, and to vacuum and sweep the

19   lot and hired me to do that in the mornings before I went to

20   school.

21   **Q.**   All right.  So you graduated in 1984.  Where did you get

22   work after that?

23   **A.**   I started working at General Motors.  My dad worked

24   there and got me an internship right after high school.

25   **Q.**   And how was your dad -- strike that.  Where did you work?

R. DEAN GILLISPIE - DIRECT (Owens)                        214

1   **A.**   I started at Inland in Dayton.  I did a four, four and

2   a half, five months of internship there at Inland.

3   **Q.**   Where did you work after your time at Inland?

4   **A.**   I was going to Sinclair for the fire science and got a

5   call to do an interview at General Motors and Harrison

6   Radiator in Dayton and Moraine and subsequently got hired on

7   there.

8   **Q.**   And what was your job?

9   **A.**   It was security, plant protection.

10  **Q.**   And what were your duties working at GM plant protection?

11  **A.**   Well, you work a gate or you were basically a fireman.

12  You are basically a fireman at General Motors.  You had to

13  write permits for welding whenever welding was going on,

14  cutting torches were being used, men were going into pits or

15  overhead.  You had to test the air quality of the pits and

16  all that.  So that was the reason for the fire science that

17  I went through.  You got to rebuild risers, sprinkler

18  systems, things like that.

19  **Q.**   So I know when you just said a minute ago, it was

20  security/plant protection; is that right?

21  **A.**   Correct.

22  **Q.**   Were you doing things like trying to arrest people or

23  things like that?

24  **A.**   No, no.  It was just basically fire protection and

25  safety, public safety.

R. DEAN GILLISPIE - DIRECT (Owens)                    215

1    **Q.**    Were you armed with weapons?

2    **A.**    No, no.  You was armed with tools.

3    **Q.**    Do you have powers to arrest people?

4    **A.**    No.

5    **Q.**    So you said that you would work the gate sometimes and

6    then work, did you describe it as fire, the fire manager some

7    other times?  Could you describe that?

8    **A.**    So you would work -- you would go in and if you -- your

9    regular shift would be, you would work Gate 1 for a couple

10   hours.  You would get a relief.  You could get on a little

11   scooter.  You would go through the plant hitting fireboxes

12   to turn a key that would send a signal that that area has

13   been cleared, safety has been checked.

14        Go to the next one, do the same thing, going back and

15   forth on like a zigzag through the plant to check safety,

16   make sure aisleways are clear.

17        And then other duties were once every certain amount of

18   time through the year, you would be charged with being a

19   fireman, which your full-time job would be to go in and

20   service sprinkler systems, fire extinguishers, any of the

21   safety equipment that was on the floor in the factory.

22   **Q.**    How did it work that you might rotate from the gate job

23   to the fireman job?

24   **A.**    It was -- so many months out of the year you had to do

25   that job.  You would go through the, you know, three or four

R. DEAN GILLISPIE - DIRECT (Owens)                    216

1   months, and then you would have to do the fireman's job.

2   And then that went for a week long period.  You had to take

3   that job for the week.  Then you'd go back to rotating the

4   gates.

5   Q.   Did you have a preference between gate and fire?

6   A.   Yeah, I loved the fire part of it.  I loved being in

7   the plant.  I loved, you know, working on the stuff and

8   that, you know, it worked out that that was almost my

9   permanent job.

10  Q.   Now, were there some people who didn't have the same

11  preference of you and didn't like doing the fire work?

12  A.   Oh, absolutely.  That was the reason it started to

13  become my permanent job, because they would take vacation

14  the week that they had to be the fireman because they didn't

15  want to do the dirty work.  And being the low guy on the

16  seniority totem pole, I had to fill in for them that week of

17  their vacation.  So it worked out that everyone just wanted

18  to be off on the fireman's week.

19       There was a couple guys that would do it, but not many.

20  They didn't like the dirty work of it.

21  Q.   All right, Mr. Gillispie.  I am going to show you what's

22  been marked as page 4 of Exhibit Number 54.

23            MR. McLANDRICH:  No objection.

24            MR. HERMAN:  No objection.

25            THE COURT:  It can be published.

R. DEAN GILLISPIE - DIRECT (Owens)                          217

1          (Exhibit displayed.)

2     BY MR. OWENS:

3     Q.   Are you able to see that all right?

4     A.   Yes.

5     Q.   All right.

6     A.   Yes.

7     Q.   Mr. Gillispie, can you just identify what this document

8     is?

9     A.   That would be a shift assignment for the week.  It

10    looks like 8-21 of '88.

11    Q.   And what shift were you working that week?

12    A.   It says third shift.

13    Q.   Did you often work third shift?

14    A.   Quite a bit.

15    Q.   And I see the other names on the left are typed and yours

16    is written in pencil.  Do you see that?

17    A.   Correct.

18    Q.   Do you know why that is?

19    A.   Because it was -- I was the fill-in for the guy.  I was

20    the fill-in for Nace that week.  And Nace definitely didn't

21    want to be a fireman ever.

22    Q.   What do you remember about Mr. Nace, real quick?

23    A.   Nace was a very clean-cut guy.  Very, very sanitary,

24    was very worried about getting dirty all the time.  And he

25    did not want to be no part of the -- I really remember him

R. DEAN GILLISPIE - DIRECT (Owens)                    218

1    because he had a toupee and was always interesting.

2    **Q.**   So --

3    **A.**   He was an interesting guy.

4    **Q.**   So for this week, the week that ended in 8-21, your days

5    off would have been Saturday and Sunday; is that right?

6    **A.**   Correct.

7    **Q.**   And then just so I can round this out, do you see that

8    circle right there, Mr. Gillispie, where it says "40" and then

9    has Mr. Nace's name written in there?

10   **A.**   Correct, correct.  That would be the way that they

11   would write it, and that would be who I was filling in for.

12   **Q.**   All right.  Thank you.

13        And I want to show you page 3 of Exhibit Number 54.

14            MR. McLANDRICH:  No objection.

15            MR. HERMAN:  No objection.

16            THE COURT:  Thank you.

17        (Exhibit displayed.)

18   BY MR. OWENS:

19   **Q.**   Now, Mr. Gillispie, what is this document?

20   **A.**   That's the same type of document, shift assignments.

21   **Q.**   And what is -- what's this week?

22   **A.**   It says first for 8-7 of '88.

23   **Q.**   And this indicates -- I guess, just tell us what days you

24   worked the week ending in 8-7-88.

25   **A.**   I worked Monday, Tuesday, Wednesday, Thursday, off

R. DEAN GILLISPIE - DIRECT (Owens)                    219

```
 1   Friday, worked Saturday, off Sunday.
 2   Q.   And, I'm sorry.  I apologize.  I didn't ask you this
 3   before.  So this -- this indicates you worked first shift that
 4   week; is that right?
 5   A.   Correct, first shift on this one.
 6   Q.   What were the hours of first shift?
 7   A.   First shift was 7 to 3.
 8   Q.   And the --
 9   A.   A.m.
10   Q.   Sorry, sir.
11   A.   7 to 3 a.m., 7 a.m. in the morning-3 p.m.
12   Q.   Thank you.  And the last one before that was the week of
13   August, that ended in August 21st, you worked the third shift.
14   What were the hours on that?
15   A.   It was 11 p.m. to 7 a.m.
16   Q.   Some people call third shift graveyard?
17   A.   Yes.
18              MR. OWENS:  You can take that down.  Thank you.
19   BY MR. OWENS:
20   Q.   So while you were working at General Motors as a young
21   adult in the late '80s, were you doing other work outside of
22   General Motors?
23   A.   Yeah.  I was -- I was working with Jim.  I was also
24   working with two Realtors in town, Zimmerman Realty and Roth
25   Realty, helping them rehab rental properties whenever
```

R. DEAN GILLISPIE - DIRECT (Owens)                    220

1   someone would move out -- paint work, you know, wall

2   repairs, things like that.  Still messing with antiques.

3   That's something I've carried -- I've always messed with

4   antiques.

5   Q.    What do you mean when you say you messed with antiques?

6   What does that mean?

7   A.    I always loved antiques.  My aunt, you know, had an

8   antique shop, and I would always see her at auctions and

9   buy, sell, trade, deal antique furniture.  Back then it was

10  kind of a good, lucrative business.

11  Q.    You also mention that you worked with some real estate;

12  is that right?

13  A.    Yeah.  Two Realtors in town, yeah.

14  Q.    And did you buy a house at all when you were a young

15  adult?

16  A.    Yeah, I bought my first house when I was 21.  I bought

17  my second house when I was 24.

18  Q.    Where did you buy that first house when you were 21?

19  A.    Dayton, Ohio.

20  Q.    Do you remember where in town it was located?

21  A.    It was 1925 Shaftesbury.

22  Q.    How would you describe your personality as a young adult?

23  A.    I was a happy, outgoing guy.

24  Q.    Did you have lots of friends or stick to yourself?

25  A.    Oh, I'm rich in friends, that's for sure.  I am very

R. DEAN GILLISPIE - DIRECT (Owens)                    221

1    fortunate to have lifelong friends.

2    **Q.**    Who's Brian Poulter?

3    **A.**    One of my dear friends.  Very, very close friend.

4    **Q.**    How did you meet Mr. Poulter?

5    **A.**    He grew up in my neighborhood.

6    **Q.**    Are you friends with him today?

7    **A.**    Absolutely.

8    **Q.**    Do you know an individual by the name of Jerry Fyffe?

9    **A.**    Yes, sir.

10   **Q.**    Who's that?

11   **A.**    He's another friend of mine.

12   **Q.**    How'd you meet Mr. Fyffe?

13   **A.**    I met Jerry in town.  Jerry's ten years older than us,

14   eight or ten years older than us.  And we used to cruise

15   town.  And we had a spot we would park and hang out.  And he

16   came through town with another friend, Dennis Fulton, in

17   their big four-wheel drive trucks, and all of us are in the

18   cars and stuff, and flagged him down.  And he pulled over,

19   and we just started talking and formed a lifelong, lifetime

20   friendship with them.

21   **Q.**    Now, when you said just a minute ago that they'd hang out

22   in town, what town were you referring to?

23   **A.**    Fairborn.

24   **Q.**    So was Mr. Fyffe from somewhere else?

25   **A.**    He was from Fairborn.

R. DEAN GILLISPIE - DIRECT (Owens)                    222

1   **Q.**   Do you know an individual named -- or back when you were

2   a young adult, did you have a friend named Lisa Glasser?

3   **A.**   Yes.  Dear, dear friend.

4   **Q.**   Who's she?

5   **A.**   Another friend that I was in high school with, grew up

6   with.

7   **Q.**   So I know that you mentioned that you do hunting and

8   fishing and antiquing.  Did you have any other outdoor

9   activities that you did when you were a young adult?

10  **A.**   We -- well, when we came, met Jerry, Jerry actually

11  bought a boat, and we used to go skiing and fishing and just

12  having a blast in Kentucky with him.  So we did a lot of

13  boating.  Four-wheeling, I had a four-wheeler.  I used to

14  ride it quite a bit.

15  **Q.**   And when you weren't out doing the outdoor stuff, would

16  you hang out with people in town, around town?

17  **A.**   All the time.  When I wasn't working.

18  **Q.**   Did you ever go to any bars?

19  **A.**   Yeah, we would go to bars.

20  **Q.**   Describe your relationship with alcohol as a young adult.

21  **A.**   I didn't drink a lot.  A lot of my friends were

22  drinkers, and I ended up basically being the DD all the time

23  because I didn't -- you know, wasn't a drinker.

24  **Q.**   Were you a smoker?

25  **A.**   Oh, absolutely not.

R. DEAN GILLISPIE - DIRECT (Owens)                    223

1    **Q.**   Did you let people that you knew -- sorry.  Bad question.

2    How did you let people know -- around you know that you didn't

3    like to smoke -- didn't like smoking?

4    **A.**   Everyone knew that I didn't like smoking.  There was no

5    doubt about that.  I had -- actually, in my truck, I had a

6    sign on the cigarette ashtray, no smoking in my vehicle,

7    so --

8    **Q.**   And did you enforce that?

9    **A.**   Oh, absolutely, yeah, yeah.

10   **Q.**   Any of your friends try to push the issue on that?

11   **A.**   Yeah.  Yeah, I had a friend, Scott Bowling, who fired

12   one up in my truck, and I just pulled over, and I said, "If

13   you are going to smoke that, you will get out of here."

14        So he got out.  And he is a hardheaded guy, about like

15   me.  And he got out and started walking, and I drove off.  I

16   went around the block, come back, and he was still walking

17   and still smoking very proudly.  And I just drove past him.

18        And when he got done with his cigarette, I came back

19   around, and we had a little talk, and he got back in the

20   truck.

21   **Q.**   All right.

22   **A.**   He didn't do that again.

23   **Q.**   And so just to -- how long did you ultimately end up

24   working at General Motors?

25   **A.**   About five years.

R. DEAN GILLISPIE - DIRECT (Owens)                    224

1    Q.    So if my math is correct and you started right after high

2    school in 1984, would that be into early 1990?

3    A.    Correct.

4    Q.    All right.  It's got to come up, it was talked about in

5    opening, so let's just -- would you just tell the jury about

6    how you came to stop being employed at General Motors?

7    A.    Yeah.  So I had bought my second house.  I had bought

8    my third new vehicle.  I'm working massive amounts of hours

9    at General Motors because of the time of year it was.  GM

10   was tearing a building down at the Dayton plant, had

11   contractors in.  The contractors was working over two hours

12   past shift.  They were working till 5.  And I got assigned

13   to that job, that two-hour overtime every day, because the

14   other guys on shift didn't want to work two hours of -- if

15   they were going to work overtime, they wanted the four-hour

16   overtime slot.  And so I got assigned to that every day.

17        Now, this is before computers.  This is before cell

18   phones.  This was before you did everything without having

19   to go to the bank.  And I could not get to the bank to cash

20   any of my checks because I had to work those two hours every

21   day.  And I was tired of that stuff.  I was tired of General

22   Motors.  It was not the kind of work that I really wanted to

23   do.  I wanted to be in the construction.

24        And I had gotten behind on bills because I couldn't

25   cash my checks.  I had plenty of money to pay anything that

R. DEAN GILLISPIE - DIRECT (Owens)                    225

1    I needed to pay, but I couldn't cash my checks.  So I told

2    the guys working the job I said, "Look, we are going to shut

3    down early today 'cause I got a lot of stuff, you know, I

4    got to get caught up on."  And they understood it.

5    Everybody shut down.  We left.

6        I come into work the next day, get called into the

7    office.  You know, screamed and yelled at me who I thought I

8    was shutting jobs down and all this.  And by this time I was

9    just fed up.  I told them they could stick the job up their

10   hind end.  And they said, "Well, no.  We are going to fire

11   you."

12       And I said, "That's fine with me.  I will collect

13   unemployment.  Thank you."

14       And that was the end of General Motors.

15   **Q.**   Did you have trouble finding a job after you left General

16   Motors?

17   **A.**   I have never had trouble getting a job in my life.

18   **Q.**   Did you have trouble finding a job after you left General

19   Motors?

20   **A.**   No, I did not.

21   **Q.**   What did you do after that?

22   **A.**   I went back working with Jim, working on houses.  I had

23   my two Realtors that I was doing work for quite

24   consistently.  And still messing with the antiques.

25   **Q.**   And when you said Jim, was that Jim Osborne?

R. DEAN GILLISPIE - DIRECT (Owens)                    226

1    **A.**    Correct, Jim Osborne, yes.

2    **Q.**    And did you say something about doing carpentry stuff?

3    Did I hear --

4    **A.**    Yeah, yeah, Jim -- that's what we were doing.  We were

5    just basically -- at that time, we were building houses.

6    And Jim had a friend who was big in the carpenters union and

7    told me to go down and sign up at the carpenters hall, and I

8    went down to Local 104 and signed up.

9    **Q.**    And just in case some of us don't have background in what

10   it means to be in the carpenters union, were you just cutting

11   wood or what kind of things were you doing?

12   **A.**    Oh, no.  It was -- the union hall, you were sent out on

13   commercial jobs where you are doing metal stud work.  You

14   are really not cutting a lot of lumber.  You are doing

15   commercial construction, which is, you know, drywall, drop

16   ceilings, various things like that -- out of the union

17   hall.

18   **Q.**    You mentioned a second house that you had bought.  And

19   did you have that house in 1990?

20   **A.**    Yes.  Yes, I did.

21   **Q.**    Where was that house?

22   **A.**    In Fairborn.

23   **Q.**    And where were you living in the summer of 1990?

24   **A.**    In that house.

25   **Q.**    On Spruce Street?

1   **A.**   Yeah, 312 Spruce.

2   **Q.**   Did you live with anybody there for any of that time?

3   **A.**   Yeah.  I had -- one of my girlfriends at the time was

4   living with me there.

5   **Q.**   What was her name?

6   **A.**   Andrea.

7   **Q.**   Do you remember her last name?

8   **A.**   Andrea McAdams.

9   **Q.**   And how far was the Spruce Street house from your

10  parents' place?

11  **A.**   It was across town.  It was about a mile and a half.

12  **Q.**   And so across town means how far?  How many minutes would

13  you put driving?

14  **A.**   Oh, it's a five-minute drive.

15  **Q.**   And what street was your parents' house on?

16  **A.**   Glendale, 1512 Glendale.

17  **Q.**   And do your parents still live there today?

18  **A.**   Yes, they do.

19  **Q.**   We talked --

20          MR. OWENS:  I don't know when the Court wants to

21  take a break.  I may be at a turning point, but I can keep

22  going until the Court tells me to stop.

23          THE COURT:  Are you telling me that you are at a

24  turning point?

25          MR. OWENS:  I just felt the time, Your Honor.

R. DEAN GILLISPIE - DIRECT (Owens)                    228

1           THE COURT:  I am wondering about your presentation.

2   Are we at a turning point for you?

3           MR. OWENS:  Yes, Judge.

4           THE COURT:  All right.  Ladies and gentlemen, we are

5   going to take a 15-minute break.  Please relax, but don't

6   discuss the case amongst yourselves or with anyone else.  We

7   will be back with you in approximately 15 minutes.  We will

8   then go almost probably close -- we're going to go close to

9   noon before we break for lunch.  So that's the plan for this

10  morning.

11      So thank you very much.  We'll stand in recess.

12          THE COURTROOM DEPUTY:  All rise.  This court stands

13  in recess.

14      (Jury out at 10:11 a.m.)

15      (Recess at 10:11 a.m.)

16      (Jury in at 10:33 a.m.)

17      (In open court at 10:34 a.m.)

18          THE COURT:  We are back on the record.

19      Counsel ready to proceed?

20          MR. OWENS:  Yes, Your Honor.

21          THE COURT:  Counsel?

22          MS. FRICK:  Yes, Your Honor.

23          MR. McLANDRICH:  Yes, Your Honor.

24          THE COURT:  You may inquire.

25  BY MR. OWENS:

R. DEAN GILLISPIE - DIRECT (Owens)                    229

1    Q.   So just to sum up, Mr. Gillispie, we talked a little bit

2    about your life as a young adult headed into 1990, and the

3    summer of 1990.

4         At that time, summer of 1990 when you were working at the

5    carpenters union, did you have goals in life?

6    A.   I absolutely had a lot of goals.

7    Q.   And what were those goals?

8    A.   Well, I was going to try to make a million dollars

9    before I was 38.  I had, by that time, bought my first three

10   new vehicles from General Motors.  I was on my second house.

11   And Jim was really helping me getting to understand this

12   house flipping thing.  You know, you are talking about in

13   the '80s.  Before it was a TV show, it was not a thing.  Jim

14   had been doing this, and I really admired what he was doing

15   and the empire that he was building.  And I wanted to do the

16   same thing.

17   Q.   And when you say Jim, do you mean Jim Osborne?

18   A.   Yes, Jim Osborne.  I'm sorry.

19   Q.   No problem.  At some point in 1990, did you hit a

20   roadblock with respect to achieving those goals?

21   A.   Yes.

22   Q.   What happened?

23   A.   I was arrested.

24   Q.   And who arrested you?

25   A.   This guy right here (indicating).  Scott Moore.

R. DEAN GILLISPIE - DIRECT (Owens)                    230

1    **Q.**    At some point, did you learn about the crimes for which

2    he was arresting you?

3    **A.**    Yes.

4    **Q.**    And did that involve a series of rapes in August of 1988?

5    **A.**    Correct.

6    **Q.**    Did you commit those crimes that had happened two years

7    before?

8    **A.**    I had nothing to do with them.

9    **Q.**    Where were you that evening of August 5, 1988?

10   **A.**    August 5th, I worked first shift at General Motors,

11   came home, changed clothes, got hold of my buddy, Brian

12   Poulter.  At that time he had bought a new convertible

13   Volkswagen, new to him.  We were cruising that around.

14        One of our friends was home from college.  Her parents

15   were out of town.  We stopped over at her house, Lisa

16   Glasser's house.

17        That evening we went over to Bourbon Street, a bar, a

18   college bar in Kettering there, Kettering/Dayton area.

19   **Q.**    Where were you the afternoon and evening of August 20,

20   1988, the day that the twins were sexually assaulted?

21   **A.**    I was in Cave Run, Kentucky, with Brian Poulter and

22   Jerry Fyffe.

23   **Q.**    Now, when you got arrested in September of 1990, some two

24   years after these crimes -- sorry.  My apologies.  Let me

25   rephrase.

R. DEAN GILLISPIE - DIRECT (Owens)                    231

```
 1        When you got arrested in 1990, in your mind, did you have
 2   any particular reason that you would have paid attention to
 3   specific days in the summer of 1988?
 4   A.   No.  I was just looking forward to the day that I had
 5   and the day -- the next day.
 6   Q.   And do you recall whether or not you had heard about the
 7   Best Products rapes?
 8   A.   No, I didn't watch the news.
 9   Q.   All right.  You said that defendant Officer Moore was the
10   one arrested you, right?
11   A.   Correct.
12   Q.   Was September 1990, the day when you were arrested, your
13   first interaction with him?
14   A.   The day that I was arrested, no.
15   Q.   And just as an aside, do you remember every word of every
16   second that happened between you and Officer Moore from 30
17   years ago?
18   A.   No, I don't have -- no.
19   Q.   Are there some things you do remember?
20   A.   Yes, absolutely.
21   Q.   All right.  Can you just tell me what you presently
22   recall about the first interaction you had with Officer Moore?
23   A.   The first time I met him in person, he had actually
24   sent a letter to my parents' house, where I was living at
25   the time, ordering me to come into the police station.
```

R. DEAN GILLISPIE - DIRECT (Owens)                          232

1    **Q.**   So had you -- you just mentioned that that was the first

2    time you had met him in person, right?

3    **A.**   Correct, in person.

4    **Q.**   Okay.  So what was your first interaction that you ever

5    had with Mr. Moore?

6    **A.**   He had called my parents' house looking for me, and he

7    actually talked to my sister.  She took notes from it.  And

8    he said that he wanted to talk to me, and left his

9    information with her.  And one of the trips coming back from

10   Kentucky, she had told me that.  And that was the first time

11   I heard his name.

12   **Q.**   And so which sister was it?

13   **A.**   Zandra.

14   **Q.**   And did you call Officer Moore back?

15   **A.**   No.  He never told her what he wanted.  He just said he

16   wanted to talk to me, and that was it.  She asked, and he

17   didn't answer, so --

18   **Q.**   Did you ever have a phone conversation with Mr. Moore?

19   **A.**   I ended up having a phone conversation for, yeah, just

20   a minute, yeah.

21   **Q.**   All right.  What do you recall about that conversation,

22   if anything?

23   **A.**   I don't recall.

24   **Q.**   Now, if Officer Moore testified that you guys talked on

25   the phone in June of 1990, do you have anything to disagree

R. DEAN GILLISPIE - DIRECT (Owens)                    233

1    about that timing?

2    **A.**    No.

3    **Q.**    All right.  So after this phone conversation, what was

4    the next interaction that you recall having with Officer

5    Moore?

6    **A.**    He sent the letter ordering me in to the police station

7    on a certain date.  I don't remember the date exactly in my

8    head right now, but he demanded me to come to the police

9    department or a warrant would be served -- would be served

10   for me.

11   **Q.**    Mr. Gillispie, I want to pull up what's Plaintiff's Trial

12   Exhibit Number 64.

13            MR. McLANDRICH:  No objection.

14            MR. HERMAN:  No objection.

15            THE COURT:  It may be published.

16            MR. OWENS:  Thank you, Judge.

17        (Exhibit displayed.)

18            MR. OWENS:  Could we zoom in a little bit.

19   BY MR. OWENS:

20   **Q.**    All right, Mr. Gillispie.  Can you identify this

21   document, please?

22   **A.**    That's the letter that was sent to me, a copy of the

23   letter that was sent to me.

24   **Q.**    And so this looks like it's dated August 4th of 1990; is

25   that right?

R. DEAN GILLISPIE - DIRECT (Owens)                    234

1    **A.**    That's what it says at the top.

2    **Q.**    And it looks like it says you are ordered into the Miami

3    Township Police Department, detective section, on August 8,

4    1990; is that right?

5    **A.**    Correct.

6    **Q.**    Okay.  In the four days -- well, did you show up to the

7    Miami Township Police Department four days later, on August 8,

8    1990?

9    **A.**    At 10 a.m., yes.

10   **Q.**    And why did you show up after you received this letter?

11   **A.**    Because at the bottom it says, "a warrant will be

12   issued for your arrest."

13   **Q.**    Were you concerned about being arrested?

14   **A.**    When someone says they are going to put a warrant out,

15   yes, I was concerned.

16   **Q.**    Did you know what it is you were going there to talk

17   about with Officer Moore?

18   **A.**    I had no idea.

19   **Q.**    So I see here it says in the middle, "A matter of great

20   importance..."  Do you see that?

21   **A.**    Yes, I do.

22   **Q.**    Do you know what that matter of great importance

23   dot-dot-dot was?

24   **A.**    No clue.

25   **Q.**    All right.  So you showed up at the police station on

R. DEAN GILLISPIE - DIRECT (Owens)                    235

1    August 8th --

2                MR. OWENS:  You can take that down, please.  Thank

3    you.

4                THE COURT:  Counsel, I don't understand the last

5    question.  Does he know what that was, and he said he had no

6    idea.  Does that mean he had no idea at the time he received

7    it or he has no idea now?

8                MR. OWENS:  All right.  Thank you, Judge.

9    BY MR. OWENS:

10   **Q.**   Did you have any idea when you received this order-in

11   letter what Detective Moore wanted to talk to you about that

12   was a matter of great importance dot-dot-dot?

13   **A.**   At that time I had no clue.

14   **Q.**   So on August 8, 1990, when you show up to the Miami

15   Township Police Department, had you ever been in that building

16   before?

17   **A.**   No.

18   **Q.**   Had you ever met Detective Moore in person before?

19   **A.**   No.

20   **Q.**   What happened when you got there?

21   **A.**   When I walked in, he was in the building, escorted me

22   back to a room back there.  Said let me see your tattoos.  I

23   don't have tattoos.  I don't have any tattoos.  Set me down

24   in a chair.  Gave me a paper to sign, and had a little tape

25   recorder.  Said he was going to start recording things.  And

R. DEAN GILLISPIE - DIRECT (Owens)                    236

1    I said okay.

2    **Q.**   All right.  So let's break that down a little bit.

3         Detective Moore asked you to see your tattoos; is that

4    right?

5    **A.**   Yes.

6    **Q.**   Did he ask for any particular area on your body where he

7    wanted to see?

8    **A.**   He said my tattoos.  I just started, you know, trying

9    to expose all the skin I had.

10   **Q.**   All right.  Did you show him your forearms?

11   **A.**   Yes.

12   **Q.**   And you mentioned a tape recording; is that right?

13   **A.**   Yes.  He had a -- he had a miniature tape recording

14   device there, which that really sticks in my head because

15   it's the first time I had ever seen that miniature style of

16   tape.  I had never seen that before.

17   **Q.**   And I think you also mentioned -- I apologize -- signing

18   a form; is that right?

19   **A.**   Correct.

20   **Q.**   And then did that have -- without asking you about any

21   legal meaning, did that have what we normally call

22   colloquially as like *Miranda* warnings on it?

23   **A.**   Yes.  That's what it was, yes.  That's what it ended up

24   being.

25   **Q.**   And did you agree to talk to Officer Moore after signing

R. DEAN GILLISPIE - DIRECT (Owens)                    237

1  that?

2  **A.**  Yes.

3  **Q.**  Now, do you recall whether or not there was any

4  conversation about August of 1988 between you and Moore at the

5  police station?

6  **A.**  Yeah.  He asked me very specific dates in '88, where

7  was I at.  We were talking about two years later.  I had no

8  clue where I was at.

9  **Q.**  Do you recall generally anything about what your response

10  was to him when he asked you about the specific dates?

11  **A.**  I have no idea where I was at.  I didn't know.

12  **Q.**  Did you say -- provide him with a best guess or estimate

13  or anything like that?

14  **A.**  I was probably at the lake, you know.  It was, you

15  know, these dates.  When were they?  They were weekend

16  dates.  I was probably at the lake.

17  **Q.**  Did -- I know you said Detective Moore had an audio

18  recording.  Did he take any other steps to document you that

19  day?

20  **A.**  He had the -- he had the tape recorder out.  I had

21  signed the paperwork.  And he took a photograph of me with

22  an Instamatic Polaroid where it comes out the bottom.

23  **Q.**  And what happened after that?

24  **A.**  He told me I better get a lawyer; I'm in deep trouble.

25  And I left.

R. DEAN GILLISPIE - DIRECT (Owens)                    238

1    **Q.**   Did you change any of your life routines after being

2    questioned by Moore in 1990?

3    **A.**   There was no difference in my days.

4    **Q.**   Now, you said a moment ago that your best guess about

5    where you would have been on dates in 1988 was the lake.  Do

6    you remember that?

7    **A.**   Yes.

8    **Q.**   What lake were you referring to?

9    **A.**   Cave Run Lake in Morehead, Kentucky.

10   **Q.**   Why was that your best guess two years later without

11   having consulted a calendar?

12   **A.**   Because if me and Brian and Jerry were off work that

13   weekend, we were at the lake.

14   **Q.**   And did you go to Cave Run Lake regularly?

15   **A.**   As often as we were off work at the same time.  We

16   would try to go every weekend we were off.

17   **Q.**   And did you go every single weekend?

18   **A.**   No, not every weekend.  My shifts would change from

19   time to time, but as much as possible.

20   **Q.**   And just, can you just -- did you all have just a general

21   routine you'd follow when you go down there?

22   **A.**   Oh, absolutely.  Most of the time we were -- Brian was

23   on third shift.  Brian Poulter was on third shift.  Jerry

24   was on third shift.  I was on third shift quite a bit.  So

25   when we were all doing the third shift thing, we would go to

R. DEAN GILLISPIE - DIRECT (Owens)                           239

1    work.  We would get off Friday morning from our Thursday

2    night shift.  Friday morning we would load the truck up, the

3    boat up, leave to Morehead, go down to the lake, and camp

4    the whole weekend.

5    **Q.**   And then, so let's just talk a little bit about that.

6    Who -- you said load up the boat.  Who's boat?

7    **A.**   That was Jerry.  Jerry bought a new boat, a ski boat.

8    **Q.**   And he let you use the boat?

9    **A.**   Jerry would -- Jerry would be the man in charge of the

10   boat.  It was -- yeah, we would load up.  Actually, Jerry

11   would charge us $20 to pay for the gas, pay for the

12   campsite, pay for everything, and he would drive his truck.

13   He would haul us down there.  And, yeah, it was all Jerry's.

14   We would always go with Jerry.

15   **Q.**   All right.  And I know you said, "We would go down

16   there."  When would you typically come back?

17   **A.**   We would come back in Sunday afternoons, you know,

18   usually mid-afternoons, because we'd like to get a little

19   rest before we went to work that night.

20   **Q.**   Did you go down to Morehead/Cave Run Lake often enough

21   that you got to know people who worked and lived down there?

22   **A.**   Yeah.  We were actually down there so much that the --

23   you were not able to call in a reservation at that time.  So

24   we were able to call and let the rangers at the station know

25   that we were on our way and ask if certain sites were open

R. DEAN GILLISPIE - DIRECT (Owens)                240

1    for us.  And they would say, yeah, they were open.  They

2    would put a little holder on them.  So when we got down

3    there, you know, we would try to get our same site every

4    time.

5        Ladies at the marina, that run the marina, we was

6    always over there eating.  We would get our breakfasts and

7    lunches there on the lake.  And, yeah, we became, you know,

8    good acquaintances.

9    Q.  Was there a particular sign-in process to get into the

10   campsites when you got down there that you became familiar

11   with?

12   A.  Yeah.  The vehicle would get a -- get signed in with

13   information.  It was Jerry's truck.  So it would be under

14   Jerry's name.  It would put how many people were there, the

15   dates, and the campsite.

16   Q.  I'd like to show you what's been -- page 6 of what's been

17   previously marked as Plaintiff's Trial Exhibit Number 205.

18            MR. McLANDRICH:  No objection.

19            MR. HERMAN:  No objection.

20            THE COURT:  It may be published.

21       (Exhibit displayed.)

22   BY MR. OWENS:

23   Q.  Are you able to make out -- is that clear enough for you?

24   A.  Yeah.

25   Q.  All right.  Mr. Gillispie, could you please just describe

R. DEAN GILLISPIE - DIRECT (Owens)                    241

1   what this is a copy of?

2   A.   That's a camp receipt from, that's for site E-2, it

3   looks like, Jerry Fyffe's name, his address, for 6-24 of

4   '88, three people.  A single campsite.  And we're paying for

5   two days.

6   Q.   Now, did you all have to fill out a form like this every

7   time you went to the lake to camp there?

8   A.   Just Jerry.  It was his vehicle.  The vehicle that

9   comes in and out of the gate at the campground.

10  Q.   And -- but did you have to fill out one of these every

11  time you went there?

12  A.   Oh, yeah, yeah, you got a camp receipt every time you

13  went in because it went onto the vehicle.

14       MR. OWENS:  You can take that down.  Thank you.

15  BY MR. OWENS:

16  Q.   Now, were you, Brian, and Jerry down at Cave Run Lake in

17  Morehead, Indiana, more than just three times the summer of

18  '88?

19  A.   Morehead, Kentucky, we were down there way more than

20  three times.

21  Q.   So as I mentioned, we were discussing, you were arrested.

22  And can you describe the situation that happened when you were

23  ultimately arrested?

24  A.   Well, I had came home from working with the carpenters

25  union.  I was sitting on the front porch.  I was --

R. DEAN GILLISPIE - DIRECT (Owens)                    242

1    actually, had a piece of antique, an antique furniture I was

2    working on the porch.  My buddies came by.  They had drove

3    by the house.  I was sitting up there, and they wanted me to

4    go get something to eat with them.  I just got off, sweaty

5    and everything.  And I said, "Nah, I'm cool.  Just go on and

6    come back."

7         So they left.  I am sitting up there still working on

8    this thing, and all of a sudden, I hear these cars with

9    mashing accelerator, and they kept coming and coming.  And I

10   lived on a dead-end street, and they were pretty much just

11   running every stop sign there between me and them.  And when

12   they ran the last stop sign, I looked down the street to see

13   what was -- where they were going, and they were going to my

14   house.

15   Q.   And you mentioned you had some friends.  Who were the

16   friends that were -- had been there?

17   A.   That was Brian Poulter and Charlie Tallent.

18   Q.   So when the police arrived, were Brian and Charlie there?

19   A.   No, they weren't there.  They were still gone.  They

20   actually pulled up after the fact, a little bit later, seen

21   all the police cars out front.

22   Q.   Okay.  So a few months -- rather, strike that.

23        So sometime after you had gone to the police station and

24   just walked off, Detective Moore arrested you.  Was he alone?

25   A.   No.  He had Fairborn police with him and he had people

R. DEAN GILLISPIE - DIRECT (Owens)                    243

1    in the car with him too.

2    **Q.**   So what happened after they arrived and you were working

3    on the piece of furniture?

4    **A.**   Yeah.

5    **Q.**   What happened?

6    **A.**   I was -- I was just sitting there, and I had a small

7    pocketknife in my hand scraping some stuff or getting ready

8    to be finished.  And they pull up, slamming on the brakes,

9    and guns blazing and "Drop the weapon.  Drop the weapon."

10        I grew up with a pocketknife in my pocket my whole

11   life.  And it's a tool.  It's not a weapon.  And I am like,

12   "What weapon?  What weapon?"  And they just kept screaming,

13   "Drop the weapon."

14        And, you know, I kind of figured out, okay, well, you

15   know.  And here they come up on the porch and, you know, the

16   whole process of getting your arms jerked behind your back

17   and thrown in handcuffs and, you know, that whole thing you

18   see.

19   **Q.**   Now, did -- did they just handcuff you and put you in the

20   car, or did anything else happen at the house that day?

21   **A.**   No, no.  They handcuffed me, stood me in my doorway,

22   went into the house.  They brought me into the house, and

23   they just started going through my house.

24   **Q.**   Did you know what they were searching for at the time?

25   **A.**   I had no clue.

R. DEAN GILLISPIE - DIRECT (Owens)                    244

1    **Q.**    What did your friends do at that time?

2    **A.**    Well, when they seen that was happening there, they

3    went up and got my mother.

4    **Q.**    And so let's just be clear.  You were arrested at the

5    Spruce Street house?

6    **A.**    312 Spruce, yes.

7    **Q.**    And when you say they got your mother, that -- was that

8    still in Fairborn at Glendale?

9    **A.**    Yes, they drove across town, picked my mother up, and

10   brought her down with them.

11   **Q.**    And what happened when your mom got there?

12   **A.**    Well, she was, you know, screaming and hollering and

13   trying to figure out what was going on.  And, you know, they

14   blocked the door on her, trying to stop her from coming in

15   the house.  And she just kept, you know, screaming and

16   yelling and pushed her way through the door and, you know,

17   asking me.  And I didn't know what was going on.  "What's

18   going on?  What's going on?"  I have no clue.

19   **Q.**    Where'd they take you after that?

20   **A.**    Took me to the -- the Miami Township Police Department,

21   I believe.

22   **Q.**    And after you went to the Miami Township Police

23   Department, where'd you go?

24   **A.**    To the Montgomery County Jail.

25   **Q.**    When you got to the Montgomery County Jail -- strike

R. DEAN GILLISPIE - DIRECT (Owens)                245

```
 1    that.
 2         Did you have an attorney before you got arrested?
 3    A.   No.
 4    Q.   Did you end up getting an attorney to represent you in
 5    your criminal case?
 6    A.   Yes.
 7    Q.   Who was that?
 8    A.   Dennis Lieberman.
 9    Q.   And how did you find Mr. Lieberman after you were
10    arrested?
11    A.   My mom and dad had talked to the next door neighbor,
12    who was actually a bailiff in Fairborn, about, you know,
13    what was going on.  And he -- his son had went to school
14    with Dennis, and they suggested Dennis.
15         So we didn't know lawyers.  We didn't have a use for
16    them.
17    Q.   And how long did you -- how long were you detained at the
18    Montgomery County Jail?
19    A.   I was at the Montgomery County Jail after I was
20    arrested for two weeks.
21    Q.   Why were you there for two weeks?
22    A.   I was waiting on a bond to get reduced enough to where
23    I could, you know, possibly get out.
24    Q.   So you are sitting in the Montgomery County Jail for two
25    weeks.  What's going through your head at this point?
```

R. DEAN GILLISPIE - DIRECT (Owens)                         246

1    **A.**    Everything.  Everything that you could possibly

2    imagine, you know, from trying to figure out what is going

3    on.  You know, you are in a place where I'm not familiar

4    with this type of environment and these type of people for

5    sure.  And just try and decipher, because, you know, he

6    kept, you know, talking about those dates:  Where was I at,

7    where was I at, where was I at.  And, you know, we're

8    talking about a long time to figure out where you were at.

9         And I was doing all that in my head and just trying to

10   figure out what -- what's happening here.

11   **Q.**    Now, at any point before you were arrested and then

12   booked into the Montgomery County Jail, did Detective Moore

13   tell you he wanted to help you prove your innocence?

14   **A.**    No.

15   **Q.**    So you said you eventually bonded out of the Montgomery

16   County Jail, right?

17   **A.**    Correct.

18   **Q.**    How were you able to afford the bond?

19   **A.**    My parents put the money up.

20   **Q.**    So you just mentioned a moment ago that you were trying

21   to think about where you were at in 1988, right?

22   **A.**    Yes.

23   **Q.**    And what steps did you take to remind yourself of where

24   you had been on August 5th and 20th of 1988?

25   **A.**    I started calling everyone I knew, every single person

R. DEAN GILLISPIE - DIRECT (Owens)                    247

1    I knew that I had hung around with, you know.  These are

2    people I have known my whole life.  So we done a lot of

3    hanging around.  And asking where were we at, where could we

4    have possibly been, how can we figure out where we were at

5    two years ago on this date, two years ago on that date.  And

6    I just continually asked everyone all the time.

7    **Q.**  Now, did you eventually find some things to help refresh

8    your memory about where you had been in August of '88?

9    **A.**  Yes, I was very fortunate to have some friends who had

10   notes.

11   **Q.**  Now, let's start with August 20, 1988, the date the twins

12   were assaulted.  How were you able to remind yourself of your

13   whereabouts that day?

14   **A.**  On the 20th --

15            MR. McLANDRICH:  Objection.

16            THE COURT:  Basis?

17            MR. McLANDRICH:  There's been no foundation laid

18   with respect to the, as I understand it, document that's going

19   to be the foundation for the testimony he's about to offer.

20            MR. HERMAN:  I would make the same objection, yes.

21            THE COURT:  Repeat your question.

22            MR. OWENS:  Sure.

23   BY MR. OWENS:

24   **Q.**  How were you able to track down your whereabouts on

25   August 20, 1988?

1   **A.**   My friend --

2           MR. McLANDRICH:  Objection.

3           THE WITNESS:  -- Marie Woods --

4           MR. OWENS:  Hold on.

5           THE COURT:  I am going to let him answer.  If there

6   is -- I have not heard about a document yet.

7           MR. OWENS:  The objection seems premature to me.  I

8   am trying to lay the foundation to avoid this type of

9   objection.

10          THE COURT:  We will see if he can.  Overruled.

11      Go ahead.

12          MR. OWENS:  Thank you, Judge.

13  BY MR. OWENS:

14  **Q.**   All right.  Let's start with August 20, 1988, the date

15  the twins were raped.  Are you with me?

16  **A.**   Yes.

17  **Q.**   All right.  What steps did you do -- sorry.  How were you

18  able to track down and remind yourself of your whereabouts

19  that day?

20  **A.**   My friend's father raised hunting dogs.  Homer Fyffe.

21  He's passed away.  He raised dogs that had paperwork with

22  them, and he had to keep track of these hunting dogs.

23      The set of pups were born while we were in Kentucky.

24  When we came home, we got to Jerry's house.  The dogs were

25  outside.  It was blazing hot.  They were worried about the

R. DEAN GILLISPIE - DIRECT (Owens)                    249

1  dogs, the fresh new pups, getting blistered in the sun, and

2  it was a hot summer.

3      So we took the dogs down to the basement of Jerry's

4  place where his dad had a place set up down there for this

5  purpose.  And, you know, that always stuck in our head that

6  we had come home to those pups being born, and Homer was

7  dealing with that.

8  **Q.**   So just tell me about what stuck in your head, okay?

9      So I want to make sure I heard you right.  You have a

10 memory of coming home from the lake and seeing some pups; is

11 that right?

12 **A.**   Correct.  The pups were born the day before, I believe

13 it was.

14 **Q.**   And who was with you when you came back from the lake and

15 saw the pups?

16 **A.**   It was me, Jerry Fyffe, and Brian Poulter.

17 **Q.**   And where were these pups that you saw, whose house?

18 **A.**   They were at Jerry's house.

19 **Q.**   Now, you mentioned another individual, Jerry's dad; is

20 that right?

21 **A.**   Correct, Homer.

22 **Q.**   And what was Homer Fyffe's involvement in the whole

23 situation?  Just clarify that for me.

24 **A.**   He raised hunting dogs, foxhounds and coonhounds.

25 **Q.**   Okay.  And so how is it that you -- why -- how is it you

R. DEAN GILLISPIE - DIRECT (Owens)                    250

1    came to refresh your memory that that was the date, that was

2    the weekend of August 20, 1988, was the same weekend when

3    y'all saw the pups?

4    **A.**    Because Homer logged --

5              MR. McLANDRICH:  Objection.

6              THE WITNESS:  -- in his calendar --

7              MR. McLANDRICH:  Objection.

8              THE COURT:  Do you have that documents?  Is that

9    your issue?

10             MR. McLANDRICH:  Yes.  Now we're talking about a

11   document.

12             THE COURT:  My assumption is that there is some

13   document there.

14             MR. OWENS:  There is, Your Honor.

15             THE COURT:  Is that going to follow this?  I'm

16   trying to anticipate their objection.

17             MR. OWENS:  Sure.

18             THE COURT:  Their objection is that there is no

19   document that is a foundation of this.  So just to make it a

20   little simpler, let's show him an exhibit, if you have one,

21   that supposedly is the exhibit that will lay the foundation.

22             MR. OWENS:  Sure.  I'm on a little bit of an audible

23   because I anticipated doing this digitally if that would be

24   fine for the Court.

25             THE COURT:  Any way you want to do it.

 1           MR. OWENS:  Sure.  Can you pull up Exhibit 54.

 2           THE COURT:  Now you have seen that exhibit, right,

 3   counsel?

 4           MR. McLANDRICH:  Yes.  The issue with the exhibit is

 5   that this witness can't authenticate it.  He's not the author

 6   of it.

 7           MR. OWENS:  So this is an exhibit -- he's testifying

 8   about what he used to refresh his recollection, and that's the

 9   purpose for which it's being admitted.  He testified about it

10   at the underlying criminal trial.  Mr. Fyffe, who is deceased,

11   testified about this document at the underlying criminal

12   trial.  It was admitted into evidence in the original criminal

13   proceedings.  So I think that's our response.

14           THE COURT:  And the question before the witness is

15   how did he refresh his recollection?

16           MR. OWENS:  That's correct.

17           THE COURT:  And the question is that he -- and the

18   answer is that he looked at a document?

19           MR. OWENS:  That he looked at a calendar that was

20   Homer Fyffe's calendar.

21           THE COURT:  Go ahead.

22        Overruled.

23           MR. OWENS:  Page 5 of Exhibit Number 54.

24        (Exhibit displayed.)

25           MR. OWENS:  We're on the computer.  Thank you.

R. DEAN GILLISPIE - DIRECT (Owens)                    252

1          Can you just go to the next page.

2     BY MR. OWENS:

3     Q.    And you see page 6 here.  Mr. Gillispie, are you familiar

4     with this document?

5     A.    That appears to be Homer's calendar.

6     Q.    And is that the document you used to refresh your memory

7     of your whereabouts on August 20, 1988?

8     A.    Correct.

9     Q.    All right.

10          MR. OWENS:  Can you go to the next page, please.

11          (Exhibit displayed.)

12    BY MR. OWENS:

13    Q.    And do you see here this one says June of 1988?

14    A.    Yeah, yeah, I see it at the bottom.

15          MR. OWENS:  Can you go to the next page.  And the

16    next page.

17          It's upside down.  Can we rotate it?  Thank you.

18          (Exhibit displayed.)

19    BY MR. OWENS:

20    Q.    All right, Mr. Gillispie.  Could you please identify --

21    or strike that.  Can you please describe how you used this

22    calendar to refresh your memory about your whereabouts on

23    August 20, 1988?

24    A.    On the -- on the 20th was the pups, his dogs had the

25    pups.

R. DEAN GILLISPIE - DIRECT (Owens)                    253

1    **Q.** And so when did you come back from the lake?

2    **A.** When we came back from the lake would have been that

3    Sunday.

4    **Q.** Okay. And that would have been August 21st?

5    **A.** Correct.

6         THE COURT: All right. We can take it down.

7    BY MR. OWENS:

8    **Q.** Now, when you were arrested in 1990, did you remember

9    this story and the day -- the event that when you came back

10   and saw the dogs?

11   **A.** When I was arrested, no, I had no idea.

12   **Q.** The date that it was?

13   **A.** Correct.

14   **Q.** But did you remember the event itself?

15   **A.** Oh, yeah, yeah.

16   **Q.** Now, what did you use -- sorry. Strike that.

17        Now, you had gone down to Morehead, Kentucky, and been at

18   the lake the weekend of August 20, 1988. Would you have used

19   the same routine for checking in with the camping receipts

20   that we just -- we saw earlier?

21   **A.** Yeah. Everything would be the same, yeah.

22   **Q.** Now, what document did you use to remind yourself of

23   where you were on August 5, 1988?

24   **A.** I was -- I was in contact with my friend Marie Woods

25   who had found a calendar-type diary thing she had wrote

R. DEAN GILLISPIE - DIRECT (Owens)                          254

1    things in.

2    **Q.**   And we didn't talk about Marie earlier.  So can you just

3    tell the jury a little bit about who Marie is?

4    **A.**   Marie is another girl from the school I grew up around

5    and just a dear friend.

6    **Q.**   And what was the process of getting -- how did you find

7    out that Marie had this calendar that showed dates in 1988?

8    **A.**   Well, she knew that we were trying to figure out where

9    we were at, and she started looking and knew that she had

10   kept these types of things for her personal keeps.  And she

11   started going through them and found that one.

12   **Q.**   Mr. Gillispie, I'm going to show you what's page 21 of

13   Plaintiff's Trial Exhibit Number 54.

14             MR. McLANDRICH:  No objection.

15             MR. HERMAN:  No objection.

16             THE COURT:  It may be displayed.

17             MR. OWENS:  I'll go to the camera.

18        (Exhibit displayed.)

19   BY MR. OWENS:

20   **Q.**   Are you able to see that all right?

21   **A.**   Yeah, I can see it.

22   **Q.**   Can you please identify what this is depicted here in

23   this exhibit?

24   **A.**   That's Marie's calendar.

25   **Q.**   All right.

R. DEAN GILLISPIE - DIRECT (Owens)                    255

1   **A.**   Marie Woods.

2   **Q.**   I'm going to zoom in here and focus on the weekend that

3   we're talking about, just so you can read it.  Give me one

4   second.

5       Are you able to see that first weekend of August 1988?

6   **A.**   Yeah.

7   **Q.**   And is this the document that you used to refresh your

8   recollection about your whereabouts that weekend?

9   **A.**   Correct.

10  **Q.**   And so I see a date here that says on August 4th.  Did

11  that play into your memory or calculus at all?

12  **A.**   Yeah.  She's -- she's got wrote down that we seen the

13  movie *Cocktail*.  Kellers is a college bar there by Wright

14  State.  And it was with me, Brian Poulter, and Gilbert

15  Lures, a friends of ours.

16  **Q.**   Got it.  So the document, just so we're clear for the

17  record, says, "w/Dean, Brian, and Gilbert," right?

18  **A.**   Correct.

19  **Q.**   And who is Gilbert?

20  **A.**   Gilbert Lures is another friend.

21  **Q.**   Got it.  And on the line about that it says, "Kellers,"

22  and I believe it says "Safries" or something like that.  What

23  was Kellers?

24  **A.**   Kellers was a college bar over by Wright State

25  University.

R. DEAN GILLISPIE - DIRECT (Owens)                    256

1    **Q.**   Got it.  And then on the first line it says -- what's it
2    say?
3    **A.**   That was the movie "Cocktail," with Tom Cruise, and it
4    was about a bartender.
5    **Q.**   All right.  So this calendar also has an entry on August
6    the 6th, correct?
7    **A.**   Yes.
8    **Q.**   All right.  And I think you indicated that -- well,
9    sorry.  Can you just describe what this entry refreshed your
10   recollection about in terms of your whereabouts that day?
11   **A.**   Lisa's parents were out of town, and -- that weekend,
12   and we were over at Lisa's.  She had a little party, get-
13   together party thing.  And me and Brian were over there with
14   Marie.
15   **Q.**   Now, when you say Lisa, was that Lisa Glasser?
16   **A.**   Lisa Glasser, yes.
17   **Q.**   All right.  And do you know, did Lisa live in the
18   Fairborn/Dayton area at the time of 1988?
19   **A.**   Yeah, she lived with her parents in Fairborn.  She was
20   going to Ohio State University --
21   **Q.**   Okay.
22   **A.**   -- at the time.  She was home for that weekend.
23   **Q.**   And did Lisa have parties at her house regularly?
24   **A.**   Oh, no, no.  This was a rare occasion that her parents
25   were gone.  Parents were gone, we are going to have a get-

R. DEAN GILLISPIE - DIRECT (Owens)                          257

1   together.

2   **Q.**   All right.  Is there anything that you remember

3   specifically about the get-together on August the 6th, 1988?

4   **A.**   Absolutely.  So we were at the house and, you know, we

5   was having, you know, a good time.  And Brian Poulter stood

6   up in the middle of the living room and raised his arms like

7   he was stretching and stuck it in the ceiling fan and broke

8   the blade off the ceiling fan.  So you don't forget that

9   when you are having a party, not trying to leave no trace,

10  and you have already broke the ceiling fan.

11  **Q.**   All right.  And how does this document help you -- how

12  did you, during your original criminal proceedings, use this

13  to help you refresh your recollection about your whereabouts

14  on August 5th, the day where there is no entry about Marie

15  Woods -- from Marie Woods' calendar?

16  **A.**   Right.  So that weekend, you know, once you start

17  recreating what:  Well, we did that on that, remember that.

18  The next day we did that, and then we remembered being at

19  the party.  So the day in between we knew exactly where we

20  was at, what we was doing.

21  **Q.**   And I know you testified about this earlier, and was

22  that -- do you recall whether or not you worked on Friday, the

23  5th?

24  **A.**   Yeah.  I worked first shift, 7 to 3.

25  **Q.**   Did you work Saturday, the 6th?

R. DEAN GILLISPIE - DIRECT (Owens)                          258

1    **A.**    No, I did not.

2    **Q.**    Do --

3         MR. OWENS:  You can take that down.  Thank you.

4    BY MR. OWENS:

5    **Q.**   Now, I know earlier in your testimony you mentioned

6    something about, did you say that on Friday, the 5th, you had

7    gone to Lisa's house too; is that right?

8    **A.**    On the 5th, I went to work.  We came home, changed

9    clothes.  I got with Brian, who had the convertible VW.  We

10   drove around.  We went over to Lisa's, hung out there a

11   while.  Then we went to Bourbon Street, which was a college

12   bar there in Kettering/Dayton area.

13   **Q.**   And was Bourbon Street -- was there any particular days

14   of the week that people especially hung out at Bourbon Street?

15   **A.**    Yeah, Friday night was really a big -- a big deal

16   because they had $1.50 Long Island iced teas.  And, you

17   know, it was Friday night.  It was college time.  You know,

18   it was a college bar.  So a lot of people were just going in

19   there, hanging out.  It was huge -- it was a huge bar.

20   **Q.**    Is there a reason that people liked to hang out there on

21   Fridays, though?

22   **A.**    The $1.50 Long Island iced tea.

23   **Q.**    So you used the calendars to help reconstruct your

24   whereabouts, about where you were in 1988, and that was in

25   advance of your criminal trial, right?

R. DEAN GILLISPIE - DIRECT (Owens)                    259

1   **A.**   Correct.

2   **Q.**   Did you ask anybody to lie or fabricate anything about

3   your whereabouts during those two weekends in 1988?

4   **A.**   No, there was no reason to do that.

5   **Q.**   After you were arrested -- and I know we just talked a

6   little bit about trying to locate these calendars -- did you

7   also take any steps to try to see if you could find more

8   camping receipts from Morehead, Kentucky?

9   **A.**   Yeah.  We tried everything we could to try to locate

10  the rest of the camping receipts.

11  **Q.**   And so what -- what did you do?

12  **A.**   After we figured out where I was at, that we were at

13  the lake, me and Steve Fritz drove down to the campgrounds

14  at Morehead and talked to them to see if we could get the

15  receipts from, you know, that time period.

16  **Q.**   And you just mentioned an individual, Steve Fritz; is

17  that right?

18  **A.**   Yes.

19  **Q.**   And who was he?

20  **A.**   He was a private investigator.

21  **Q.**   And what was your relationship like to Steve Fritz?

22  **A.**   He was a private investigator on, you know, helping us

23  trying to figure out where we were at.

24  **Q.**   Did you hire him or -- personally?

25  **A.**   Yeah, yes, me and my family hired -- my parents

R. DEAN GILLISPIE - DIRECT (Owens)                          260

1       actually hired him.

2       **Q.**    And who made the call about -- was that at the request of

3       your criminal defense attorney?

4       **A.**    Yes, Dennis Lieberman.

5       **Q.**    And did you give Fritz tasks to do or things like that?

6       **A.**    Yeah, yeah.  I mean between, you know, my lawyer and

7       him, yeah.

8       **Q.**    Did you personally tell Fritz what to do?

9       **A.**    No.  Me personally, no.  I -- absolutely not.

10      **Q.**    So when it came to determining what investigative task

11      Mr. Fritz would do, did you have any say in that?

12      **A.**    No, I did not.

13      **Q.**    So you went to Kentucky with Mr. Fritz; is that right?

14      **A.**    Yeah.  He called and said he was going down to the

15      campground and wanted me to ride down with him.  So I, you

16      know, went with him.

17      **Q.**    And what was the purpose of that -- what was your

18      understanding of the purpose of that trip?

19      **A.**    We were going to go get the camping receipts from that

20      time period.

21      **Q.**    What did you find when you got down there?

22      **A.**    Well, when we got there, one of the park rangers that

23      we knew -- that I knew, had told us that there was a police

24      officer/detective had come down looking for those already.

25      And when we got in there, there was very, very few camping

R. DEAN GILLISPIE - DIRECT (Owens)                    261

1    receipts of us.

2    **Q.**    And the ranger, do you recall that person's name?

3    **A.**    His name was Kegley, I believe, was Kegley, because I

4    remember him.  He had a cousin who lived in the same town

5    that I was from.

6    **Q.**    Did you trust him when he said that -- sorry.  Did you

7    continue looking after you spoke with the ranger for more

8    camping receipts elsewhere?

9    **A.**    Elsewhere, no.  We went into the facility where they

10   kept them, and we looked, and that was it.  That was the

11   only place we were camping, and that's the only place they

12   would have had the receipts.

13   **Q.**    Now, eventually your case proceeded to trial, right?

14   **A.**    Correct.

15   **Q.**    Do you recall Detective Moore testifying about photo

16   arrays that he put together?

17   **A.**    At trial, yes.

18   **Q.**    All right.  And do you recall what picture he used of you

19   in that photo array?

20   **A.**    He used the picture from my GM identification.

21   **Q.**    I'm going to show you what's been previously marked as

22   Exhibit 59, page 10.

23           THE COURT:  Any objection?

24           MR. McLANDRICH:  No objection.

25           MR. HERMAN:  No objection.

R. DEAN GILLISPIE - DIRECT (Owens)                    262

```
 1              THE COURT:  It may be published.

 2              MR. OWENS:  Can we try the computer?  Thank you.

 3        Great.

 4        (Exhibit displayed.)

 5   BY MR. OWENS:

 6   Q.   Mr. Gillispie, what does this depict?

 7   A.   That's my GM ID.

 8   Q.   And did you look basically the same at trial as you did

 9   when this ID picture was taken?

10   A.   Yeah, I would have looked the same, yes.

11              MR. OWENS:  You can take it down.

12   BY MR. OWENS:

13   Q.   And did you look basically the same in 1988?

14   A.   Yes.

15              MR. OWENS:  And can we pull up Exhibit Number 59,

16   pages 16.

17              THE COURT:  No objection?

18              MR. McLANDRICH:  No objection, Your Honor.

19              MR. HERMAN:  No objection.

20              THE COURT:  It may be published.

21              MR. OWENS:  We'll go back to the document.

22        (Exhibit displayed.)

23              MR. OWENS:  Do you mind if I use the demonstrative

24   from opening?

25              THE COURT:  The jury's having a problem.
```

R. DEAN GILLISPIE - DIRECT (Owens)                    263

1              MR. OWENS:  Any objection to just using the copy?

2              MR. McLANDRICH:  Yeah.  I just think that it's not

3    the same sort of -- I mean, I understand it's the same thing,

4    but when it blows up it gets distorted.

5              THE COURT:  Okay.  We've got it.  Counsel, counsel,

6    we've got it.

7              MR. McLANDRICH:  Thank you, Your Honor.

8    BY MR. OWENS:

9    **Q.**  All right, Mr. Gillispie.  Is this a copy of --

10   **A.**  I don't have it.

11        I've got it now.

12   **Q.**  Thanks, Dean.

13              THE COURT:  I think everybody's got it.

14              MR. OWENS:  Perfect.

15   BY MR. OWENS:

16   **Q.**  So is this sort of a copy of a version of the photo array

17   that was presented at your trial?

18   **A.**  Yes.

19              MR. OWENS:  And can we go to, if we can, on the

20   computer -- I will try to get lucky here -- page 7 of Exhibit

21   Number 285?  This is the one with the orange, the last one.

22              THE COURT:  Counsel, are you aware of where he wants

23   to go?

24              MR. McLANDRICH:  From the description, yes.  No

25   objection.

R. DEAN GILLISPIE - DIRECT (Owens)                    264

1              MR. HERMAN:  Yes.

2              THE COURT:  Okay.

3              MR. OWENS:  We'll just try it later.

4              THE COURT:  Ladies and gentlemen, the Court

5    apologizes for this equipment glitz.  This is not to be laid

6    at the feet of any of counsel here for their presentations or

7    whatever.  It's an IT problem.  I would try to explain to you

8    what it is, but I don't understand IT.  So I am not going to

9    try that.

10        But I just want you to know that that's a -- that is a --

11   it's a glitz in the system, not with the presentation of any

12   of the attorneys here.

13             MR. OWENS:  It showed up briefly here.

14             THE COURT:  Everybody got it?

15   BY MR. OWENS:

16   **Q.**  All right.  Now, Mr. Gillispie, is this, page 7 of

17   Exhibit 285, another copy of -- version of the array that was

18   submitted at your trial?

19   **A.**   Correct.

20             MR. OWENS:  You can take it down.  I appreciate it.

21   BY MR. OWENS:

22   **Q.**  In addition to evidence about the photo array being

23   presented at your trial, did the victims come to court and

24   point their finger at you and say that you were the

25   perpetrator of the crime?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

R. DEAN GILLISPIE - DIRECT (Owens)                          265

1    **A.**    Yes.

2    **Q.**    And was there any, to your knowledge, physical or

3    forensic evidence linking you to the crimes?

4    **A.**    There was nothing.

5    **Q.**    Did you put on a defense?

6    **A.**    Yes.

7    **Q.**    Did you testify?

8    **A.**    Yes.

9    **Q.**    And without giving me every word, just generally what did

10   you testify to at your criminal trial?

11   **A.**    That I was not in the area when these things happened,

12   I didn't commit these crimes, and I just kept telling

13   everybody that I knew I was innocent of this.

14   **Q.**    Then what happened?

15   **A.**    I was convicted.

16   **Q.**    What was going through your head when you were convicted

17   at that first trial?

18   **A.**    I couldn't -- I couldn't figure out how I got convicted

19   when I am sitting on the stand and the victims are

20   describing what happened to them, and my lawyer was

21   describing the different characteristics of the person who

22   attacked them, and I didn't fit none of them.  And he

23   started -- he would -- and it's -- what is so bizarre to me

24   is he would ask, "Did the person who attacked you have

25   severe acne on both sides of his jaw line?"

R. DEAN GILLISPIE - DIRECT (Owens)                    266

```
 1          "No, he did not."

 2               MR. McLANDRICH:  Objection, Your Honor.

 3               THE COURT:  Counsel, where are we going with this?

 4               MR. OWENS:  I think that the question was --

 5               THE COURT:  The question was, what was going through

 6   his head.

 7               MR. OWENS:  Right.  And I think the answer was:  I'm

 8   sitting there thinking about the evidence, in my view of what

 9   the evidence was at the trial, as an innocent person, and I'm

10   trying to make sense of it.  And I thought he was just

11   describing how he is sitting there thinking about what just

12   happened at this trial.

13               THE COURT:  Is that correct, that you couldn't

14   figure out why it happened?

15               THE WITNESS:  Correct, because I did not fit the

16   description in any way.

17               THE COURT:  Okay.  I'm going to let that.

18        Move on.

19               MR. OWENS:  Sure, Judge.

20   BY MR. OWENS:

21   Q.   At the time, in your mind, did you think that people

22   could be wrongfully convicted of crimes they didn't commit?

23   A.   Never heard of it.  Didn't know it was a possible thing

24   that happened in America.  I truly believed the system was

25   great and never dreamed anybody was in prison for something
```

R. DEAN GILLISPIE - DIRECT (Owens)                    267

1    they did not commit.

2    **Q.**   After you were convicted, did you remain out on bond?

3    **A.**   No.

4    **Q.**   Where -- where were you confined after that?

5    **A.**   Montgomery County Jail.

6    **Q.**   That would have been in February of '91?

7    **A.**   February 12th.

8    **Q.**   Were you given a second trial?

9    **A.**   Yes.

10   **Q.**   Now, without going into any of the court proceedings or

11   anything, just generally, what was your understanding of why

12   you got a second trial?

13   **A.**   There was some evidence that was lost, and it was

14   found.

15   **Q.**   And what was -- was that hair evidence?

16   **A.**   Correct.  It was hair samples.

17   **Q.**   And you had another trial, right?

18   **A.**   Correct.

19   **Q.**   And were the hair samples presented at that trial?

20   **A.**   Correct.

21   **Q.**   And did, again, the victims point you out as the

22   perpetrator?

23   **A.**   Yes.

24   **Q.**   And was the photo array evidence admitted at the second

25   trial as well?

R. DEAN GILLISPIE - DIRECT (Owens)                    268

1    **A.**    Yes.

2    **Q.**    And did you testify again as part of your defense?

3    **A.**    Yes.

4    **Q.**    Now, the second trial, just where the hairs that had been

5    presented, what was your understanding about what the hairs

6    showed?

7    **A.**    The hairs --

8                MR. McLANDRICH:  Objection, Your Honor.

9                MR. HERMAN:  Objection.

10               MR. OWENS:  What's the basis for the objection?

11               THE COURT:  I am not quite sure where you're --

12    what's his understanding of the hair's significance?

13               MR. OWENS:  Sure.

14               THE COURT:  What's that -- help me.

15               MR. OWENS:  Yeah, Judge.  So as was mentioned I

16    think by both counsel by us and by counsel for Moore at the

17    beginning of the cases was that there were hairs that were

18    found that were recovered from the crime scene, and that one

19    that were not believed to be the -- the sum of them not

20    believed to be the victim's hair.  And they took

21    Mr. Gillispie's hair samples and said it couldn't be his

22    either.  And so that was submitted.  There was evidence that

23    the hair --

24               THE COURT:  And what's the deal about his feelings

25    about that?

R. DEAN GILLISPIE - DIRECT (Owens)                    269

1              MR. OWENS:  Well, so I can rephrase to get -- to get

2    to it.

3              THE COURT:  All right.

4    BY MR. OWENS:

5    **Q.**   Mr. Gillispie, at some point during your criminal

6    proceedings, did somebody take some hair samples from you?

7    **A.**   Yeah, when I was in the county jail.

8    **Q.**   And did those hairs -- did the hair that was found that

9    led to your second trial, did it match you?

10   **A.**   None of it.

11   **Q.**   So at the conclusion of your second trial, what happened

12   when the evidence closed?

13   **A.**   I was found guilty.

14   **Q.**   Was there -- before you were found guilty, did the jury

15   deliberate for any period of time?

16   **A.**   Before I was found guilty --

17             MR. McLANDRICH:  Objection, Your Honor.

18             MR. OWENS:  I don't understand the basis for the

19   objection.

20             THE COURT:  Basis?

21             MR. McLANDRICH:  I'm anticipating that we're going

22   to get into discussion of the deliberations and the Allen

23   charge and so forth, and I don't see where that's at all

24   relevant to the proceedings.

25             MR. OWENS:  May I respond, Your Honor?

R. DEAN GILLISPIE - DIRECT (Owens)                           270

 1            THE COURT:  You may.

 2            MR. OWENS:  So one of the things on the fair trial

 3   *Brady* claim in this case has to do with the materiality of the

 4   evidence that we've alleged was not turned over to the

 5   defense.  And it's clear that if the evidence -- that might

 6   change the result on retrial.

 7        There's evidence in this case that the jury was

 8   deadlocked or couldn't reach a unanimous verdict.  That's

 9   evidence that the original conviction itself wasn't as strong

10   and so that it would take less evidence suppression to --

11            THE COURT:  So the question is does Mr. Gillispie

12   understand that initially the jury was deadlocked?

13            MR. OWENS:  Yes, sir.

14            THE COURT:  But subsequently came back with a guilty

15   verdict?

16            MR. OWENS:  He is going to testify to the whole

17   process by which that happened.

18            MR. McLANDRICH:  First off, Your Honor, materiality

19   is a question of law for the Court.  And, presumably, the

20   Court's already made that determination since we're having

21   this trial.

22            MR. OWENS:  Your Honor, I apologize.  Your clerk has

23   maybe helpful insight.

24            THE COURT:  Approach.

25        (At sidebar.)

R. DEAN GILLISPIE - DIRECT (Owens)                    271

1          THE COURT:  To go beyond, if I let them go to -- if

2     I let them go to the deadlock and subsequent guilty verdict,

3     what is he going to add?  I mean, what's his -- what is his

4     thought process or what is his reasoning with regard to that?

5     What relevance is that?

6          MR. OWENS:  So I think that -- this is David Owens

7     on behalf of Mr. Gillispie.  Was -- there is two things:  One,

8     I think that he can talk about we have the fact that it was

9     deadlocked and that the jury came back, they were still

10    deadlocked, and the jurors told them you are going to be

11    sequestered until you reach your verdict and then you can talk

12    about what happened, because I think that's significant.  And

13    he is sitting there thinking I am probably going to be

14    acquitted, I am probably going to be acquitted, and then the

15    opposite happens.  It should be a very significant thing to

16    happen to somebody.

17         MR. McLANDRICH:  So it sounds -- John McLandrich for

18    the Defendant Moore.  It sounds as if the reported reason for

19    it is some sort of a damage issue with respect to the

20    emotional impact on him as opposed to this issue of

21    materiality that we were discussing earlier.  If he wants to

22    talk about the fact that he was crestfallen when the jury came

23    back with a conviction after initially they were unable to

24    resolve the issue, that's a different matter.  And I think he

25    can testify to that limited issue, that at first the jury

R. DEAN GILLISPIE - DIRECT (Owens)                    272

1    didn't come to a decision.  Then, eventually, they did, and he

2    was crestfallen that they went from unable to decide to

3    conviction.  That's a very different issue than what we were

4    seeing in the playout in court.

5              THE COURT:  Final word.

6              MR. OWENS:  Your Honor, I think it's both.  So I

7    think that's it.  And I'll just say that there is a jury

8    instruction proposed by both of us that has a question of

9    fact.

10             THE COURT:  Don't tell them what my jury

11   instructions are.

12             MR. OWENS:  There was a --

13             THE COURT:  There was a jury was initially

14   deadlocked.  They subsequently came back with a guilty

15   verdict, and you can go into this whatever effect that has on

16   him.

17             MR. OWENS:  Sure.  Can I --

18             THE COURT:  I don't want him involved in supposing

19   or this or that or reasoning that this or that as to why.

20             MR. McLANDRICH:  Conjecture.

21             MR. OWENS:  I see.

22             THE COURT:  All of that stuff.  I think it is -- we

23   have already basically told them it was deadlocked, subsequent

24   conviction.  That's it.  It's the same line that I am going to

25   hold to, just to let you know.

R. DEAN GILLISPIE - DIRECT (Owens)                    273

1          MR. OWENS:  Sure.

2          THE COURT:  With regard to all these.  Nobody's

3  going to say anything about any judge that makes any specific

4  finding with regard to anything.

5          MR. OWENS:  Yeah, sure.  And I just want to make

6  sure that I understand the line.  I reread *Hurt* last night,

7  Your Honor.  This is David Owens again.  That's one of our

8  cases.

9          THE COURT:  There, see.

10         MR. OWENS:  But I just want to just make sure that I

11 am going to say three questions.  I am going to say, like, the

12 jury came back deadlocked; was there a poll of the jury taken;

13 they will say it was eight in favor.

14         THE COURT:  What do you need that for?  It's like a

15 deadlock.

16         MR. OWENS:  Well, because, I mean, that's -- one,

17 that's what they said.

18         THE COURT:  The jury was deadlocked.  There was not

19 a unanimous vote, bang.  And they subsequently returned a

20 verdict.

21         MR. OWENS:  It seems significantly different to me

22 if you say, yeah, there were eight people who said that they

23 were -- voted to acquit.  And, I mean, ultimately he was

24 convicted.  That's not disputed.  But the fact that now the

25 jury came back initially, I don't know that we have any other

R. DEAN GILLISPIE - DIRECT (Owens)                    274

1   form of showing data that there might be -- that the jury

2   wasn't fully convinced at the end of the evidence.

3          THE COURT:  But then, you know --

4          MR. MAYER:  Was there an actual statement made at

5   the trial that said it was 8 to 4?

6          MR. OWENS:  Would you prefer I just ask Jerry about

7   that?  We can save --

8          THE COURT:  I don't know.  I don't know about that.

9      In the trials that I have, they don't come back and tell

10  anybody on any record that there was this many and this many.

11         MR. OWENS:  Frankly, I think it was a little bit

12  different maybe in state court in 1990 because --

13         THE COURT:  It shouldn't have been.  I was on state

14  court in 1990.

15         MR. OWENS:  Maybe Judge Porter was doing something

16  different.  I can't say that.

17         THE COURT:  Okay.  You can ask him a deadlock.  You

18  can ask him subsequent conviction.  You can ask him about how

19  that all affected him.  That's it.

20         MR. OWENS:  Sure.  Thank you, Judge.

21     (In open court.)

22         THE COURT:  We are back on the record.

23     Counsel?

24  BY MR. OWENS:

25  Q.  Mr. Gillispie, after the jury returned to deliberate in

R. DEAN GILLISPIE - DIRECT (Owens)                    275

```
 1    your second trial, did they immediately come back with a
 2    verdict?
 3    A.    No.
 4    Q.    At some point were they deadlocked?
 5    A.    Yes.
 6    Q.    And at some point were you also convicted?
 7    A.    They were deadlocked twice.
 8            THE COURT:  Were you ultimately convicted?  That's
 9    the question.
10            THE WITNESS:  Yes.
11    BY MR. OWENS:
12    Q.    Now, after the jury came back and was deadlocked, did you
13    believe that you were going to be acquitted?
14    A.    Yeah.
15    Q.    When that didn't happen, how'd you feel?
16    A.    It's a -- you know, it's a crushing blow to you.
17    Q.    After you were convicted and had this crushing blow, was
18    there another hearing that you attended in court where you
19    were given a sentence?
20    A.    Yeah, yeah.  They done a, what they called a pretrial
21    investigation, and a little while later they took me into a
22    courtroom and sentenced me to 22 to 56 years.
23    Q.    What did you say at the sentencing hearing?
24    A.    The same thing I have said the whole time:  I'm
25    innocent.  I'm innocent.  I'm innocent.  I did not do this.
```

R. DEAN GILLISPIE - DIRECT (Owens)                      276

1    I did not commit these crimes.

2        And I just kept saying it for 30 years.

3    Q.   Now, at trial, all three of the rape victims came to

4    court and identified you and pointed a finger at you in the

5    trial.  You testified about some of the impacts that this has

6    had on you.  But how did you feel about them as people in the

7    world?

8    A.   As far as the victims go, I have no animosity towards

9    them whatsoever.  I'm not mad at them.  I'm mad at the

10   system.  I'm mad at the prosecutor.  I'm mad at the judge.

11   I'm mad at the police officer.

12       I'm not mad at these victims.  An atrocity happened to

13   them.  There is no doubt about it.  There is no question.  I

14   was not the person who committed that crime against them.

15   Q.   So, now, you are in prison facing serious time.  And did

16   you take steps to continue to fight your conviction or just

17   give up?

18   A.   No.  I fought this and been fighting it for 33 years.

19   I fought from the minute it happened, from the minute they

20   arrested me to today.  I have been fighting this, and I did

21   not stop then, no.

22   Q.   Post conviction, did you hire any attorneys?

23   A.   We've had several attorneys, yes.

24   Q.   Were they free, pro bono attorneys?

25   A.   No.  There was nothing free about them.  They were --

R. DEAN GILLISPIE - DIRECT (Owens)                    277

1    they've all charged extreme amounts of money.  My parents

2    are buried in debt from it, from paying attorneys.  You

3    know, my brothers and sisters donated money to the cause all

4    the time.  And, yeah, it was a tremendous amount of money

5    donated to legal defense.

6    **Q.**   And did you contribute what you had too?

7    **A.**   Everything I owned.

8    **Q.**   So what happened to your house on Spruce Street?

9    **A.**   My house was sold, given to my parents to help.  And my

10   four-wheeler was sold.  Everything I had that had value to

11   it was sold.

12   **Q.**   Did you ever seek DNA testing in your case in post

13   conviction?

14   **A.**   Yeah.  When DNA was being -- started to be used in the

15   courts, my mother had read a lot about it.  And when I was

16   convicted, it was not a thing in the court system.  It was

17   not something they did.  So she had started reading about it

18   and started pushing because we knew that there was hair

19   samples from this that we had in trial.  And we were trying

20   to get someone to listen about DNA.  And at that time it was

21   new.  It was brand new science.  And she really fought to

22   try to get it done.

23   **Q.**   Was any DNA testing ultimately done in your case on post

24   conviction?

25   **A.**   No.

R. DEAN GILLISPIE - DIRECT (Owens)                    278

1    **Q.**    Had you requested it, though?

2    **A.**    We fought for several years to get it.  We finally got

3    an order to do it, yes.

4    **Q.**    And then what happened?

5    **A.**    We had a problem with the evidence.  It didn't -- I

6    don't -- it wasn't there.

7    **Q.**    Okay.  So you weren't in control of the evidence, right?

8    **A.**    No.

9    **Q.**    Okay.  It was somebody at the state lab somewhere; is

10   that right?

11   **A.**    Correct.

12   **Q.**    Okay.  So when you tried to get DNA testing, they told

13   you we don't have any evidence anymore to test; is that right?

14   **A.**    Correct.

15   **Q.**    All right.  Now, even though you had attorneys and you

16   had people that you paid for, did you talk to other people

17   beyond attorneys about trying to prove your innocence?

18   **A.**    Yeah.  I was screaming and hollering to everybody.

19   And, finally, one of my mother's friends seen an article

20   that they were going to open an Innocence Project in

21   Cincinnati, and she started trying to work with them and get

22   them to take my case, which they finally did.

23   **Q.**    So before the Innocence Project took your case -- I think

24   that was in 2003, right?

25   **A.**    Yeah, the Innocence Project didn't open till 2003.

R. DEAN GILLISPIE - DIRECT (Owens)                    279

1    **Q.**   Okay.  So before that, did you take steps outside of the

2    courts to try to prove your innocence?

3    **A.**   Oh, yeah.  I was -- I was writing and screaming,

4    yelling to everybody.  I actually even wrote a judge, you

5    know, requesting them to just look at the facts, look at the

6    facts of my case, please.

7        I had a news station out of Cincinnati who started

8    doing -- investigating my story.  Channel 9 out of

9    Cincinnati did investigative reporting.  I had a friend who

10   was sending letters out to them every month to look at this,

11   look at this, look at this, and they came on board.  And I

12   got to, you know, scream and yell at them about I was

13   innocent, and they ended up doing a couple-day story about

14   it.

15   **Q.**   And, Mr. Gillispie, I am going to show you what's been

16   marked as Plaintiff's Trial Exhibit 213.

17           MR. McLANDRICH:  No objection, Your Honor.

18           MR. HERMAN:  No objection.

19           THE COURT:  All right.  It may be displayed.

20       (Exhibit displayed.)

21   BY MR. OWENS:

22   **Q.**   Are you able to read that?  It's a little blurry for me.

23   Can you see that, Mr. Gillispie?

24   **A.**   Yes.

25   **Q.**   All right.  Now, you mentioned a moment ago that you

R. DEAN GILLISPIE - DIRECT (Owens)                    280

1  wrote a judge a letter.  Do you remember testifying about

2  that?

3  A.    Yeah.

4  Q.    Hold on.  Just listen to the question.

5         So is this that letter?

6  A.    Yes.

7  Q.    Okay.  And this is something that you wrote in 1999; is

8  that right?

9  A.    Correct.

10  Q.    Okay.  And is that your signature on the bottom?

11  A.    Yes.

12  Q.    All right.  And why did you send this letter to Honorable

13  Judge Foley?

14  A.    At the time the Channel 9 was doing the investigation,

15  we were having some sort of hearing around then, and I

16  really wanted him to, you know, try to look at this report.

17  And just screaming and yelling I am innocent, I did not

18  commit these crimes.  And I just, you know, out of

19  desperation, shot a letter to him.

20  Q.    Sir, I want to direct your attention to just one of the

21  paragraphs here.  Do you see the -- well, they all begin with

22  "Sir," but do you see the one that begins where I just put

23  that arrow (indicating)?

24  A.    Yes.

25  Q.    Can you just read that to the jury?  And then I will ask

R. DEAN GILLISPIE - DIRECT (Owens)                    281

1    you a question about it.

2    A.    It says, "Sir, I did not commit these crimes.  I have

3    done all I know to do to prove --" wait a minute.  I am

4    having a hard time seeing it myself -- "I did all that I

5    know to prove -- prove it.  I am just an average guy trying

6    to make a life for myself.  Me and my family have been

7    through a very rough time because of this nightmare, and we

8    are ready for it to end as soon as possible."

9    Q.    And so at this point, this is in January of 1999,

10   correct?

11   A.    Correct.

12   Q.    And so what were you -- why did you write this letter to

13   the courts?  Did you have an understanding about whether that

14   was proper or not?

15   A.    I didn't -- didn't know what was proper, didn't care

16   what was proper.  I was screaming and yelling "I'm innocent"

17   to anybody who looked at this case, anybody who had anything

18   to do with it.  I was trying to get everybody I could

19   possibly get's ear that I didn't commit these crimes, and I

20   was, you know, writing and sending letters to all kind of

21   people.

22   Q.    Sure.

23         MR. OWENS:  You can take it down.  Thanks.

24   BY MR. OWENS:

25   Q.    So that was in 1999, and I know you already mentioned a

R. DEAN GILLISPIE - DIRECT (Owens)                    282

1    moment ago that eventually the Ohio Innocence Project took

2    your case, right?

3    A.    Correct.

4    Q.    And did you eventually -- who represented you?  Were

5    there any attorneys at the Ohio Innocence Project?

6    A.    Yes, yes.  When it started, it was Mark Godsey and John

7    Cranley.

8    Q.    And were you eventually released from prison to the

9    efforts of your mom and the Ohio Innocence Project?

10   A.    Yeah, definitely my mom and Mark Godsey.  The Ohio

11   Innocence Project definitely was the ones who did it.

12   Q.    And when were you -- when were you released, sir?

13   A.    December 22, 2011.

14   Q.    We talked a little bit about the journey that you had of

15   getting yourself released from prison.  I want to spend a

16   couple minutes -- probably not fun -- talking about what life

17   was like in prison.

18         Where were you first sent in the Department of

19   Corrections?

20   A.    When you first are sent, you go to Orient Reception

21   Center in Orient CRC, where you are classified to your

22   parent institution.

23   Q.    And did part of your classification have to do with the

24   length of the sentence you were given?

25   A.    Yes, the length of the sentence and the type of crime.

R. DEAN GILLISPIE - DIRECT (Owens)                          283

1   **Q.**   And given the severity of the crime at issue and your

2   sentence, what type of prison were you sent to?

3   **A.**   Closed maximum security.

4   **Q.**   And, again, I rushed over it too quickly.  What was the

5   sentence that you were given?

6   **A.**   22 to 56 years.

7   **Q.**   And what was the first maximum prison that you were sent

8   to?

9   **A.**   I was sentenced to -- sent to Warren Correctional

10  Institution, which was considered your parent institution.

11  **Q.**   Describe the conditions at Warren Correctional

12  Institution when you got there in 1991.

13  **A.**   It's a closed maximum security prison.  Seventy percent

14  of the people that are there are not going home.  You know,

15  they don't care about you or anything else in life.  I had

16  never seen violence like that.  I never seen anything like

17  that in my life.  People just did not care.  They did not

18  care about people.  They didn't care about human life.  And

19  I -- you sit there and try to figure out where on this earth

20  am I at right now.

21       I'll never understand how that awful people can be.

22  **Q.**   You mentioned that there was violence that you saw in

23  prison.  Can you just describe what you meant by that?

24  **A.**   These people didn't care.  They didn't care about

25  nothing, you know.  They've got a life sentence.  They have

R. DEAN GILLISPIE - DIRECT (Owens)                    284

1   got multiple life sentences.  Killing somebody else is

2   giving them another life sentence.  They already got enough

3   of them.  They don't care, you know.

4        When you see your first person get killed, it never

5   leaves you.  And it doesn't end with the one or two.  I've

6   seen people beat so bad, the life taken right out of them.

7   I've seen people stabbed with a pencil, broke it off so they

8   can't get it out of them.  And watch them dig for it.  I

9   seen a man get hit in the head so hard that his eyeball came

10  out of his eye socket.

11       These are things you're not supposed to see in life.

12  Them beatings I've seen are unbelievable.  You can't -- you

13  can't imagine.  No one wants to imagine what my eyes have

14  seen.

15            THE COURT:  Counsel --

16            MR. OWENS:  I am.

17  BY MR. OWENS:

18  Q.   I think, you know, prison was hard.  It was violent.

19  Were you able to, in the midst of this, try to participate in

20  programs or other positive things that you could be involved

21  in?

22  A.   Yeah, I did.  I did everything I could to keep my mind

23  out of that prison every day.  I did everything I could

24  possibly do to escape mentally from that institution.

25  Q.   What types of community service opportunities did you

R. DEAN GILLISPIE - DIRECT (Owens)                    285

1    have?

2    **A.**   I -- I started in the community service program at

3    Warren where I was -- I was considered an artist, and we

4    were doing different projects for different nonprofit

5    organizations around the area.

6    **Q.**   And did you receive various certificates for the amount

7    of time and the amount of community service that you did?

8    **A.**   Yeah.  I had thousands and thousands of hours of

9    community service.  I built a lot of things for the

10   community service program at Warren.

11             MR. OWENS:  I think this is a good place to stop,

12   Your Honor.

13             THE COURT:  All right.  Ladies and gentlemen, we are

14   going to break for the lunch hour.  It's my understanding

15   that -- will we continue with him right after, or are you

16   planning to -- well, counsel approach.

17        (At sidebar off the record.)

18             THE COURT:  Ladies and gentlemen, as I promised

19   you -- I always bring it up.  If I make a promise and I am

20   able to keep it, I always bring it up.  Now, during this trial

21   if I make a promise to you and I break it, I'll never talk

22   about it.

23        So here's what we're going to do.  We are going to break

24   for the lunch hour, and we are going to ask you to be back

25   here just a little bit before 1:30 so that we can get started

R. DEAN GILLISPIE - DIRECT (Owens)                    286

1    right at 1:30.  We will continue with this witness.  Then we

2    may have a witness by video.  I guess you would call it video.

3    A witness by -- upon the TV, and I will give you an

4    instruction with regard to that again, but have a good

5    relaxing lunch hour.

6         I'd only ask you to remember my admonitions:  Don't

7    discuss the case amongst yourselves or with anyone else.

8    Don't formulate any opinions or draw any conclusions about the

9    case.  It would be totally inappropriate until you hear all

10   the evidence and listen to the arguments of counsel.

11        So with that, counsel, anything further?

12             MR. OWENS:  No, Your Honor.

13             MR. McLANDRICH:  No, thank you, Your Honor.

14             MR. HERMAN:  No, Your Honor.

15             THE COURT:  Have a wonderful lunch.

16             THE COURTROOM DEPUTY:  All rise.  This court stands

17   in recess.

18        (Jury out at 12:02 p.m.)

19        (Recess at 12:02 p.m.)

20        (In chambers at 1:18 p.m.)

21             THE COURT:  We're on the record outside the presence

22   of the jury.

23        Counsel, after analyzing and reconsidering the Court's

24   previous ruling on the jury deliberations, the deadlock, the 8

25   to 4 vote, Allen charge, and subsequent guilty verdicts, the

R. DEAN GILLISPIE - DIRECT (Owens)                    287

1    Court would believe that those matters are relevant for a

2    factual question, and they can be testified to.  However, I do

3    need to know from counsel what is the -- and what is the basis

4    or foundation for Mr. Gillispie to specifically testify to the

5    8 to 4 vote.

6         MR. OWENS:  I mean, it's -- I mean, I thought that

7    that's what they said.  I know it's on all the transcripts,

8    but I don't know if it was said in the courtroom.  I can nail

9    down more specifically.  I thought that's what he was told in

10   that moment.

11        THE COURT:  What kept my head spinning is the fact

12   that I've done this for a while.  I've never done the -- the

13   vote has never been published.  Now, the vote does go on some

14   occasions -- well, on all occasions when I'm doing it -- the

15   vote does go -- the note comes back into the judge.  The judge

16   makes a copy -- well, this judge makes a copy of the note, has

17   everyone initial it, gives them a copy of the vote, and makes

18   a decision whether or not he is going to call a mistrial or

19   give a deadlock verdict or a charge.

20        If -- I guess I'm having a problem if Mr. Gillispie finds

21   that out because Mr. Gillispie -- or Mr. Lieberman comes out

22   and tells him that.

23        MR. OWENS:  Yeah, yeah, I understand.  So let me --

24   honestly, I believe the 8 to 4 thing is in a pleading

25   somewhere.  And exactly what you are describing, the note

R. DEAN GILLISPIE - DIRECT (Owens)                    288

```
1   being transcribed and provided to the parties, seems familiar

2   to me.

3       But what I will do, in light of the Court's ruling, is

4   confer with Mr. Gillispie about the basis for his knowledge.

5   And if I am not satisfied that it's something like not hearsay

6   or something that's attorney-client privilege that he doesn't

7   have a basis for providing it, I won't go back into it.

8           THE COURT:  So what I am saying -- don't worry.  I

9   am going to let you say something.

10      What I am saying is that I guess if you need anything

11  further with regard to the length of the jury deliberation,

12  the fact that there was a deadlock, the fact that there was a

13  charge given and then a subsequent guilty verdict, it would be

14  my opinion that those things are relevant and that it could be

15  testified to by -- by Mr. Gillispie, if you wish, if there is

16  anything additional that you need.  I already let some of

17  that -- a lot of that in, but he can testify to it.  However,

18  I would need a basis for that.

19          MR. OWENS:  Sure.

20          THE COURT:  And if there isn't a basis there, then

21  you may have other witnesses that might be able to say that.

22  So I don't know.

23      Counsel, understanding the Court has kind of shifted its

24  findings on the relevance of this, any other objections?

25          MR. McLANDRICH:  No, no objection, Your Honor.  I
```

R. DEAN GILLISPIE - DIRECT (Owens)                      289

```
 1    understand what you're saying.
 2              THE COURT:  Counsel?
 3              MR. HERMAN:  No objections from the Township.
 4              MR. McLANDRICH:  Go ahead.  You go first.
 5              MR. OWENS:  We've been waiting -- no, go, go ahead.
 6              MR. McLANDRICH:  Since we're here, there is an issue
 7    that I was going to raise at some point and now seems to be an
 8    opportune time.  With respect to Dr. Dysart when she
 9    testifies, which I understand may be in the relative near
10    future.
11              THE COURT:  Whose relative near future?
12              MR. OWENS:  The next two hours.  Or maybe three.  Or
13    is that too late?
14              THE COURT:  It's getting almost too late.
15              MR. McLANDRICH:  Today or tomorrow, it sounds like.
16              MR. OWENS:  It will be probably tomorrow morning at
17    this point, in all honesty.
18              MR. McLANDRICH:  That would be my guess.  So I know
19    she doesn't get to opine on the things that were in the
20    subject of the motion in limine.  I know that it's the Court's
21    job to instruct the jury with respect to the law.  I know the
22    Court hasn't made its decision with respect to jury
23    instructions.  We had some proffered issues in the jury
24    instructions about what the law says about eyewitness
25    identifications.  A number of the things that she's going to,
```

R. DEAN GILLISPIE - DIRECT (Owens)                    290

1    I presume, opine on with respect to her thought that these are

2    inappropriate from a science standpoint doesn't correspond

3    with at least my understanding of the case law in this circuit

4    and even, frankly, the current Ohio statute.

5         So to me, the thought is troublesome that she's going to

6    indicate to the jury that these activities or attributes of

7    the array or the detective's behavior is somehow tainting,

8    causing an unreliable identification if they are not --

9              THE COURT:  Specific to this case?

10             MR. McLANDRICH:  Most absolutely, yeah.  And I can

11   give you an example, if you would --

12             THE COURT:  Okay.

13             MR. OWENS:  I don't think it's necessary.  I don't

14   mean to interrupt you, but I think you are going into stuff

15   that we thought was out.  So, I mean, unless the Court --

16             THE COURT:  I think it's out.

17             MR. OWENS:  Unless the Court's changed his --

18             THE COURT:  No, no, I don't know how -- I am not

19   going to advise, but I don't know how effective people are at

20   hypotheticals and things like that, but nobody is going to go

21   to the specific facts in this case, period.

22             MR. McLANDRICH:  If she was, for instance, to

23   testify that telling a person who picked someone from a photo

24   array that now you have picked John Doe or in this case you

25   have picked Roger Gillispie now taints the identification, you

R. DEAN GILLISPIE - DIRECT (Owens)                    291

 1    know, the Ohio statute, as we sit today, let alone back in the

 2    day, specifically provides for that.

 3         So, you know, for her to give the jury an impression that

 4    the defendant engaged in this conduct by saying, after the

 5    arrays are presented to the ladies and they are done

 6    identifying the suspect, saying you picked Mr. Roger

 7    Gillispie.

 8              THE COURT:  Oh, you mean a subsequent act?

 9              MR. McLANDRICH:  Subsequent act, post

10    identification.

11              THE COURT:  Post identification.

12              MR. McLANDRICH:  Contamination, I think it's

13    referred to.  So, you know, for that kind of testimony -- and

14    that's just an example -- to come in to me is troublesome

15    because it's, again, it's, you know, her testifying to what

16    she thinks the science is, but it's not consistent with what

17    the law is, and there is a divide between the science and the

18    law.

19              MR. OWENS:  I quite frankly don't understand.  I

20    think the Court made a ruling about what the -- Dr. Dysart's

21    allowed to testify about, and we are going to stick within the

22    Court's ruling.  She is not going to testify about the law.

23    She is not going to testify about Ohio law in federal court.

24    She is going to come in and talk about the social science of

25    memory and identification this Court said we could talk about,

R. DEAN GILLISPIE - DIRECT (Owens)                      292

1    and we are not going to talk about the facts of the case.  We

2    are not going to talk about that.  There will be some

3    hypotheticals about how do these things play out and, you

4    know, so is, you know, in science -- and this is the language

5    that Mr. Wixted uses -- the scientists used like a fair and

6    biased lineup.  So what do you consider from a scientific

7    standpoint to be a fair, unbiased lineup.  They are going to

8    say it's something that makes the suspects stick out in a

9    certain way.

10        I say, hypothetically, could the picture, the way the

11   picture is constructed, do that?  She will say yes; Wixted

12   will say no.  And then the jury will determine based upon the

13   evidence here and based upon the Court's ruling where that

14   falls.  So I don't understand really the basis.

15            MR. McLANDRICH:  I just want to make sure I

16   understand.  So what you're telling me is you are not going to

17   ask her questions like, "And could one of those things be the

18   differential between a glossy finish and a matte finish?"

19   "Could one of those things be the difference between the color

20   of the background for this suspect being different than the

21   background for the color of that suspect?"  Not going to ask

22   those questions, right?

23            MR. OWENS:  No, I didn't say that.  And I think it's

24   a bit different.

25            MR. McLANDRICH:  That's why we are having the

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

R. DEAN GILLISPIE - DIRECT (Owens)                    293

1    dialog.

2           MR. OWENS:  You mentioned something about the Ohio

3    statute.  That's why I completely lost you, because it has no

4    bearing here.

5           MR. McLANDRICH:  It's merely illustrative of the

6    fact that in her report she says things like post-

7    identification contamination reinforcing the identification

8    leading to unreliable identification, when that conduct not

9    only wasn't prohibited by law then, it's specifically allowed

10   by law even as we sit here today.

11          MR. OWENS:  Who cares.  That's my point.  I don't

12   understand why it matters.  So we're here -- she can't opine

13   about the law.  If she were here to come to tell the jury what

14   the law is, what a detective is allowed to do or not to do,

15   she can't do that as a matter of law.

16          MR. McLANDRICH:  You are missing the point.

17          MR. OWENS:  Okay.

18          MR. McLANDRICH:  You're missing the point.

19          MR. OWENS:  Probably.

20          MR. McLANDRICH:  The point is, if she testifies to

21   those things being the science of eyewitness identification,

22   that gives the jury the misimpression that if this defendant

23   engaged in that behavior, somehow he's violating the law, when

24   the law is a hundred percent opposite of the representation

25   that she would be making in terms of what the social science

R. DEAN GILLISPIE - DIRECT (Owens)                    294

 1    thinks is appropriate.  That's my issue.

 2              THE COURT:  Wait a minute.  Wait a minute.  Are you

 3    saying you are worried about him presenting evidence or making

 4    argument with regard to what the law is?

 5              MR. McLANDRICH:  No, no, Your Honor.

 6              THE COURT:  Okay.  I'm sorry.

 7              MR. McLANDRICH:  I'm sorry, too.  Maybe I am not

 8    expressing myself clearly.  So let me sort of back up and

 9    start over.

10         So the Court has indicated that she can testify to the

11    general principles and social science of eyewitness

12    identification.

13              THE COURT:  Correct.

14              MR. McLANDRICH:  Right.  And so in that body of

15    study, if you will, one of the things that they believe is

16    that when a witness who picks out a suspect -- and this is

17    just my way of example -- is told after the fact you picked

18    John Doe in our case, you picked Roger Gillispie, that now

19    that post-identification feedback reinforces that belief of

20    the witness that they have picked the right person and

21    therefore enhances the likelihood they will make the in-court

22    identification of that person at trial.  That's the belief of

23    the social scientist.  Presumably, she will testify to that.

24         Now, my problem with that is that creates the idea in the

25    mind of the jury that it would be improper to do that which

R. DEAN GILLISPIE - DIRECT (Owens)                    295

```
 1    she has just said.  You know, you're tainting the --

 2              THE COURT:  Can I -- can I -- if that is true, can

 3    I -- can I instruct to that effect?

 4              MR. McLANDRICH:  Well, and so this is why we are

 5    having the dialog, is to how do we solve this problem.  And it

 6    seems to me there is two, or potentially, I guess, three,

 7    alternatives, right?  One, she doesn't say it; two, the Court

 8    addresses it; three, I address it.  I know you don't want me

 9    speaking to --

10              THE COURT:  You don't know that.

11              MR. McLANDRICH:  -- the law.

12              THE COURT:  Oh, I don't want you going to the law,

13    no.

14              MR. McLANDRICH:  Right.  And so I won't be in the

15    position to point out "Doctor, the things you are saying are

16    inconsistent with the law not only then but as we sit here

17    today."

18         So that leaves the other two alternatives:  for him not

19    to elicit that testimony, or for the Court to address the

20    testimony, you know -- and frankly, obviously, never as good

21    as him not eliciting it -- but for the Court to say, look, the

22    fact that she says that doesn't mean that it was prohibited

23    conduct for a police officer to engage in.

24         And as I say -- and I got the statute with me, right.  I

25    mean, the statute says, even today, once the identification's
```

R. DEAN GILLISPIE - DIRECT (Owens)                    296

```
 1   made, you can -- it sort of says it in the negative, right --

 2   you are not allowed to tell the person the identity of the

 3   suspect until the eyewitness identification procedure is

 4   concluded.  Obviously, indicating that once it's concluded you

 5   can tell them who they've picked.

 6           THE COURT:  You're not -- my understanding is you're

 7   not arguing or presenting -- and I understand what your

 8   concerns are.  I do.  I'm just trying to get things --

 9           MR. McLANDRICH:  Sure.

10           THE COURT:  -- straight.  You're not arguing that

11   what he did allegedly was contrary to law, are you?

12           MR. OWENS:  I think we have a constitutional due

13   process claim, that the Court will instruct the jury on what

14   the factors are at the end of the case.

15           THE COURT:  Right.

16           MR. OWENS:  Our expert is not going to come in here

17   and say anything about Ohio law or federal law, regardless.

18   Experts can't do that.  I can't do that; he can't do that.

19           THE COURT:  That's what I am trying to confirm with

20   you.

21           MR. OWENS:  Yes, sir.

22           THE COURT:  I know what your -- I know what you are

23   pursuing.  What he's worried about is you are going to give

24   some impression -- move your claim here, and then you are

25   giving some impression that what he was doing -- or she's
```

R. DEAN GILLISPIE - DIRECT (Owens)                    297

```
1    going to give some impression that what he was doing was

2    illegal under the law.

3              MR. OWENS:  And that would be a mistake, so --

4              MR. McLANDRICH:  So that wouldn't be a -- acting in

5    a way that is not consistent with her understanding of the

6    social science is an indication that he's creating an

7    unreliable, unduly suggestive lineup, ergo, violating the law.

8              THE COURT:  Oh, I see what you are saying.

9        Go ahead.

10             MR. OWENS:  Sure.  I just don't appreciate like

11   eleventh hour attempt to relitigate the Daubert motions, but

12   the issue just seems that the scientists will come in and talk

13   about their science.  It's helpful to the jury to help them

14   understand a really fundamental thing that's very

15   counterintuitive, is how can well-meaning witnesses come to

16   court and make a mistake.  That's very counterintuitive.

17       Somebody might think a lot of things about how that

18   works, what the science of that is.  And Dr. Dysart is not

19   going to, especially with the Court's order, address anything

20   specifically about what Mr. Moore did or anything about his

21   lawfulness.

22       And there is a fifth option -- or fourth option, rather,

23   which is that they can have a rebuttal expert come and talk

24   about their view of the science.  And that's exactly what

25   happened in this case, with the example that Mr. McLandrich
```

R. DEAN GILLISPIE - DIRECT (Owens)                    298

1   has given about whether or not the color of the backgrounds of

2   the pictures matters, for example.  Dysart says, yeah, the

3   science says yes; Wixted's going to say the science says no.

4   At the end of the case, the jury's going to be asked a

5   separate legal question, like that's the question.

6        So I just think it's cross-examination at best about

7   Dysart on those issues.  It's really -- I can't see -- and it

8   would be, I think, reversible error to allow the -- the status

9   of state law to control or limit what an expert is about to

10  say in their field that's scientific because you would be

11  making a category error by equating expert testimony with

12  providing instructions about the law.

13       Now, if the Court wants to consider an additional

14  limiting instruction at the end of the evidence -- because

15  this already is in your instructions:  Recall, this is the

16  evidence, blah, blah, blah.  Only I instruct you on the law.

17  So what the attorneys say isn't law.  What the experts in the

18  case isn't law --

19            THE COURT:  Okay.  I know what I can say.  And I

20  appreciate it.  I appreciate both your positions.

21       Do you got any questions?

22            MR. MORRIS:  Can I have the Ohio statute you are

23  referring to?

24            MR. McLANDRICH:  Yes.  I don't know if I brought it

25  in with me.

1          MR. MORRIS:  You can get it later.

2          MR. MAYER:  Just to clarify, you, Mr. McLandrich,

3     are saying that they are going to have evidence that says --

4     that indicates what Moore was doing was creating a suggestive

5     lineup, and your position is but what he was doing was

6     permissible under Ohio law?

7          MR. McLANDRICH:  Yeah.

8          MR. MAYER:  Okay.

9          MR. McLANDRICH:  And that is my concern.  And here's

10    sort of the partial finer detail, if you will.  So there's two

11    aspects to the lineup with respect to this case, right.

12    There's their argument that Mr. Gillispie is innocent, and the

13    reliability/accuracy of the photo array goes to that issue of

14    whether the identifications are a sufficient basis to find him

15    guilty when they are arguing about him being innocent.

16    There's that part of it.

17         Then there is the part of it that concerns whether my

18    client acted in a way that was inconsistent with the

19    constitutional law at the time he engaged in his behavior.  I

20    understand that, you know, sort of we're not arguing the

21    qualified immunity motion, but at some point, which won't be a

22    surprise to anybody, there will be a motion for a directed

23    verdict.

24         And with respect to not only that but with respect to

25    jury instruction, the question becomes, my client isn't liable

R. DEAN GILLISPIE - DIRECT (Owens)                    300

1    for violating social science; my client's liable for violating

2    the law.  So where social science and the law diverge, at some

3    point the jury has to understand that there is a differential

4    between those two.

5         And I am highly concerned about the notion that she'll

6    get up there and say things that she thinks that the social

7    science indicates is such that it taints or creates an unduly

8    suggestive or unreliable -- pick your choice of dialog --

9    lineup, and yet the law says that's permissible.

10        And the idea that Wixted can get up there and say "I

11   don't think the social science supports what she says," you

12   know, doesn't frankly matter, because if they believe her

13   instead of Wixted, I still have the problem of their expert

14   has testified to behavior that she thinks is inappropriate

15   that's not a violation of law.  That's my problem.

16             THE COURT:  They are calling you guys out.

17        I've heard -- now, if I need more, don't you worry, we

18   will be asking.

19             MR. OWENS:  For sure.

20             THE COURT:  My understanding is we are targeting her

21   for tomorrow morning, I think, right?

22             MR. OWENS:  Depending on the rest of the day, yeah.

23   I mean, she is ready to -- she is five minutes away, and our

24   hope is to start her today or the morning.

25             THE COURT:  The other thing I just want to bring up.

R. DEAN GILLISPIE - DIRECT (Owens)                    301

1    My assumption is that nobody -- maybe -- no one's going to go

2    towards the award or the potential award from the State,

3    right?

4              MR. OWENS:  No.

5              MS. FRICK:  I think that would be a post-verdict

6    issue, wouldn't it?

7              MR. McLANDRICH:  Since you seem to be suggesting I

8    shouldn't.

9              THE COURT:  Well, you could interpret my statement

10   to say that.

11             MR. KANOVITZ:  We have an agreement about the amount

12   otherwise.

13             MR. McLANDRICH:  We have an agreement about the

14   amount.

15             MR. KANOVITZ:  And we agreed to keep that out

16   entirely.

17             MR. McLANDRICH:  Exactly.

18             MR. OWENS:  So you are going to change that now?

19             MR. McLANDRICH:  I wasn't going to bring up the

20   amount he told me, but to me that would seem to be a different

21   issue than, Mr. Gillispie, are you also in litigation with the

22   State of Ohio with respect to your finding of being wrongfully

23   exonerated, seeking a financial recovery.

24             MR. KANOVITZ:  That's what I told you to tell me

25   before you ever offered so we could raise it with the Judge.

```
 1              MR. McLANDRICH:  I thought you were referring to the

 2    amount, not that.  So if you think it's something I shouldn't

 3    do --

 4              THE COURT:  It could be a hard way to get there, you

 5    know.  I'm of the opinion that that is, at this point --

 6    although I am willing to listen, I mean, if somebody thinks

 7    they have some type of an argument, but my point right now or

 8    my position right now is that wouldn't be an appropriate

 9    avenue.

10              MR. McLANDRICH:  Then I won't do it.

11              THE COURT:  Are you feeling all right?

12              MR. OWENS:  I really don't like being ambushed with

13    stuff like this.

14              THE COURT:  Okay.  Calm down.

15              MR. OWENS:  We came prepared --

16              THE COURT:  Calm down.  Everybody is trying to

17    advocate here.

18              MR. McLANDRICH:  I don't think it should have been

19    any surprise given the jury instructions that we submitted,

20    right.

21              MR. OWENS:  No jury instruction you submitted said

22    they should follow Ohio laws.

23              MR. KANOVITZ:  Guys --

24              THE COURT:  We are off the record.

25         (Concluded at 1:41 p.m.)
```

```
 1              (Jury in at 1:46 p.m.)

 2              (In open court at 1:46 p.m.)

 3              THE COURT:  Ladies and gentlemen, welcome back.

 4     Hopefully, you had a good lunch.

 5              Counsel ready to proceed?

 6              MR. OWENS:  Yes, sir.

 7              THE COURT:  Counsel?

 8              MS. FRICK:  Yes, Your Honor.

 9              MR. McLANDRICH:  Yes, Your Honor.

10     BY MR. OWENS:

11     Q.  Mr. Gillispie, before we were -- took a break for lunch,

12     we were talking about some of the community service that you

13     did at -- while you were in the Warren Correctional Facility.

14     Do you recall that?

15     A.  Yes.

16     Q.  And I want to show you what's been previously marked as

17     Plaintiff's Trial Exhibit 177, and start on page 46.

18              THE COURT:  Anything, counsel?

19              MR. McLANDRICH:  No objection.

20              MR. HERMAN:  No objections.

21          (Exhibit displayed.)

22     BY MR. OWENS:

23     Q.  Mr. Gillispie, what's this?

24     A.  I don't have it here.  I can see it over there.  I

25     can't -- I can't read it from here.
```

 1              THE COURT:  It's not on his monitor.

 2              MR. OWENS:  There we go.

 3              THE COURT:  Wait a minute.  We have got to make sure

 4    he's got it.  It's hard to ask him about something he can't

 5    see.

 6         Ladies and gentlemen, we are making every attempt to fix

 7    this, but we are having a tough time.

 8              MR. OWENS:  I'll go old school.  Can I get the

 9    camera?

10         No worries.  I will move on to another topic.

11              THE COURT:  I don't want to -- if you feel you want

12    to present this, I don't want to deter you from that.

13    BY MR. OWENS:

14    **Q.**   Mr. Gillispie, are you familiar with records showing that

15    you've done significant community service while you were at

16    Warren Correctional Facility?

17    **A.**   Yeah, there was records kept of all the community

18    service work I did due to possibilities for presenting them

19    to parole hearings or whatever.  They always kept records of

20    the times we used.

21    **Q.**   So I'm just looking at page 46 of Exhibit 177, and there

22    is -- I don't know.  I can't count them all -- 10, 20 entries

23    here that say something about make dollhouse, and it says

24    sponsored children's service.  Do you know what that might

25    mean?

R. DEAN GILLISPIE - DIRECT (Owens)                            305

1    **A.**   It was making various items that we would use to sell

2    or raffle off to raise money for the children's home there

3    in Warren County.

4    **Q.**   All right.  And what sort of -- how would you make the

5    dollhouses?  What did that entail?

6    **A.**   It was just all -- a lot of scrap.  They would --

7    people would donate stuff, and just whatever they could come

8    up with as far as products to build the stuff out of, you

9    know, I'd use it to figure out something to make that was

10   something they could sell.

11       I never had a set -- a design of anything.  It was just

12   what materials I had to work with, I would build whatever I

13   could use that for.

14   **Q.**   Did you have any jobs while you were at Warren

15   Correctional?

16   **A.**   Yes.  I was classified as an institutional artist, and

17   I worked in the maintenance department.

18   **Q.**   What sort of work would you do in the maintenance

19   department?

20   **A.**   Maintenance was just going around maintaining different

21   parts of the prison, you know, fixing things that were

22   broke.  That was an everyday thing.  Things were broke all

23   the time.

24   **Q.**   Now, were any inmates allowed to work in maintenance, or

25   was that only some of y'all?

1    A.   That was -- you had to be a very trusted person to

2    be -- due to the fact that you were around all the tools.

3    You know, there was a strict, strict policy on tools,

4    that -- the handling of tools, the tools being out, you

5    know, under supervision, all those things.

6         You know, the staff that worked the maintenance shops

7    were very, very hypervigilant on who they were allowing to

8    work in their shop.

9    Q.   For obvious reasons, you've got to protect.  So what --

10   strike that.  I am sorry.  That is my poor question.

11        What sorts of tools would you -- were you allowed to use

12   even though you were in a maximum security prison?

13   A.   Oh, in the maintenance shop, I could use everything.

14   We had carpenter tools.  We had millwright tools.  We had

15   everything -- welder, saws.  You name it; there was every

16   tool.

17   Q.   And I believe you said you also were doing art?  You were

18   classified as something related to art; is that right?

19   A.   Yeah, I was an institutional artist.  So I also painted

20   signs in the institution.  We painted murals in different

21   locations in the institution.  In the kitchen, we painted a

22   lot of signs.  And then we just did art as the donation

23   thing to the children's home too.

24   Q.   I am just wondering, was being an institutional artist,

25   is that considered a job?

R. DEAN GILLISPIE - DIRECT (Owens)                    307

1   A.   Yeah, that was a -- that was a job classification, yes.

2   Q.   Was working in the machine shop considered a job?

3   A.   Yeah, the maintenance shop was also a job, yes.

4   Q.   So even though you were in prison, how long were you sort

5   of working a week, if you had to estimate?

6   A.   Oh, it was all day every day.  I would go to -- I would

7   get up and go to a maintenance job in the morning till 3

8   o'clock.  You know, everything shuts down for count at 4.

9   Count clears, you know, I could go up to the art room, and

10  we would start doing -- I'd just start doing my artwork in

11  the evenings up there.

12  Q.   And I assume you got paid pretty good by the prison for

13  this?

14  A.   Oh, sure.  It was $24 a month.

15  Q.   And for both jobs?

16  A.   Yes.

17  Q.   Is that what you maxed out on?

18  A.   Yeah, that was the highest pay in the institution.

19  Q.   Now, at some point did you start building models for

20  things other than to be auctioned off to charities?

21  A.   Yeah.  I would work in the art room until it closed

22  down, which was 7:30, 8 o'clock, depending on the time of

23  year it was.  But when I went to my cell, I'm working on my

24  own personal projects.

25  Q.   And did you also get involved in the horticulture program

```
1    at all?
2    A.   Yeah, I did the horticulture program when it first --
3    it was the very first run of it, that program.
4    Q.   And what did that involve?
5    A.   It was a studying of plants and, you know, planting and
6    just basic knowledge of plants.
7    Q.   And --
8              THE COURT:  Now, counsel, he has the exhibits there
9    in front of him he could identify.  He is not going to display
10   them, but if you want him to make identification of these
11   exhibits that you've been talking about, you can do that.
12             MR. OWENS:  Sure.  I guess I'd want to do that at a
13   point where I could show them to the jury.
14             THE COURT:  You can do it at any time.
15             MR. OWENS:  Thank you, Judge.  So we'll come back to
16   that.
17   BY MR. OWENS:
18   Q.   You started doing some horticulture stuff.  Is that
19   something that you knew about before you got into prison?
20   A.   No, it was just a new program they offered.
21   Q.   Okay.  Did you ever become familiar with something called
22   the Ohio Agriculture Society?
23   A.   They were -- they were part of the, you know, this
24   horticulture program.  People would come in and speak about,
25   you know, the work that the agriculture community had in the
```

1    field of horticulture.

2    **Q.**    Okay.  At some point did you start doing work to benefit

3    the Ohio -- or with the Ohio Agriculture Society?

4    **A.**    Yeah.  They ended up -- the Ohio Ag was with the county

5    fair, and we done a lot of work with the fair, signage and

6    things like that.  The warden of the prison was a big

7    proponent of doing things for the fairgrounds, and we did a

8    lot of signage and a lot of artwork for the county

9    fairgrounds.  With the ag department there.

10   **Q.**    And was that additional stuff that you made and then that

11   was donated to charity and auctioned off?

12   **A.**    That was stuff that was used for the fairgrounds.  For

13   when they had the fair, you know, we'd have sale boards that

14   they would put different, you know, sponsors' names on these

15   boards whenever they was running auction of a cow or lamb or

16   whatever it was.

17   **Q.**    Got it.  And so at some point, did you also start doing

18   work with or related to the Cincinnati Flower Show?

19   **A.**    Yes.  I got -- during the horticulture program, I had

20   made a miniature of a greenhouse that was going to be built

21   for our program, and the director of the program let me see,

22   you know, the little design of it, and I built a miniature

23   of it so when we had people coming in he could show what we

24   were -- our future program was going to start looking like,

25   with the greenhouse and all that.

R. DEAN GILLISPIE - DIRECT (Owens)                    310

1    Q.    What happened after you built that mini greenhouse?

2    A.    Well, we had a -- we had a gentleman come in doing a

3    career day-type speaking thing from Delhi Flower and Garden

4    Center who -- he came in and done his thing, and the

5    director of the program showed him this little miniature of

6    the greenhouse.  And he looked, and he's like, can you do

7    this in full scale?  And I'm like, I can do -- anything you

8    show me a picture of, I can make it.  And he said okay.  And

9    then they started talking.

10   Q.    And so without trying -- without talking to me about

11   conversations that other people may or may not have had --

12   A.    Yeah.

13   Q.    -- after you built the mini greenhouse, what happened

14   next?

15   A.    Then he come back and -- Tim Young was his name.  He

16   come back, and he had a big idea of me building props for

17   the Cincinnati Flower Show, for their big show with the

18   Cincinnati Horticulture Society.

19   Q.    Now, I'm unfamiliar with the Cincinnati Flower Show.

20   What's that?

21   A.    At the time, the Cincinnati Flower Show was basically

22   the Olympics of the flower business, where all of these

23   people come in from all over displaying -- you know, this is

24   nothing I knew about at the time.  But, you know, the flower

25   business is a huge business in weddings, you know, funerals

R. DEAN GILLISPIE - DIRECT (Owens)                    311

1    and all these other things.  And started learning all this.

2         And he asked me to build some props for him.  And come

3    in the first time, and asked me if I could do these certain

4    things.  And I knew I could do 'em, but I'm under the

5    restrictions of an institution, and it wasn't my decision to

6    be able to go forward with it, but I made it perfectly

7    clear, I can build anything.

8    Q.   So did you eventually get sort of permission to continue

9    to do work with the Cincinnati Flower Show as a result of

10   this?

11   A.   Yes.  They worked it through our -- our community

12   service program.  And it was a -- it was a large -- it was a

13   very big undertaking because then they had the staff,

14   someone with me, because I've got the tools out.  I was able

15   to get guys that I knew would work with me under these

16   guidelines and deadlines that I had, and started building

17   props for the Cincinnati Flower Show, the first one being a

18   scale of Dorothy's house from the *Wizard of Oz*.

19   Q.   Great.

20        MR. OWENS:  I know we have another witness that's

21   supposed to start right now by video.  I can stop right here

22   or ask a couple more questions, whatever the Court prefers.

23        THE COURT:  She has not joined yet.  If you want to

24   continue.

25        MR. OWENS:  Absolutely, Your Honor.

R. DEAN GILLISPIE - DIRECT (Owens)                           312

1    BY MR. OWENS:

2    **Q.**   So, Mr. Gillispie, I'm just going to have you look there

3    at -- I think you've got some exhibits in front of you.  I'm

4    looking at page 8 of Exhibit 176.

5              THE COURTROOM DEPUTY:  You said page 6?  8?

6              MR. OWENS:  Yes, 8.  Thank you so much.

7              THE WITNESS:  Do you want me to go to page 8?

8    BY MR. OWENS:

9    **Q.**   Yes, sir.  Thank you.

10   **A.**   Yep.

11   **Q.**   All right.  And just since the jury can't see this, can

12   you just identify what this document is?

13   **A.**   This is a letter from the Warden Brigano about the

14   flower show sent to me in recognition of the Oz House that

15   we produced for the Cincinnati Flower Show.  So that was

16   the --

17   **Q.**   Actually, let me just stop you right there for one

18   second.  We will get there.

19        Did you say the warden, was that B-R-I-G-A-N-O, Brigano?

20   **A.**   Yes.

21   **Q.**   All right.  And this is a letter to you dated when?

22   **A.**   June 12th of '97.

23   **Q.**   And this is a letter to the warden from June 1997,

24   correct?

25   **A.**   Yes.

R. DEAN GILLISPIE - DIRECT (Owens)                          313

1   Q.   And it's a letter to the warden from William Valentine;

2   is that right?

3   A.   Yeah.  At the bottom, yes.

4   Q.   And it's on Cincinnati Horticulture Society letterhead,

5   right?

6   A.   Correct.

7   Q.   Okay.  And the letter indicates -- just because we don't

8   have it here in front of us, I'll just -- I'll read it, and I

9   will ask you what it's about, all right?  All right.

10       So it says, quote, "The 1997 Cincinnati Flower Show was a

11   tremendous success.  I credit much of my accomplishments as

12   site director to the efforts of your staff and inmates.

13       "Inmate Gillispie, Number 246-292, was instrumental in

14   developing the Oz House.  He provided creative design input

15   and participated in the construction.  The exhibit that this

16   prop was staged in received the Royal Horticulture Society,

17   quote, Best of Show, quote, award.  He also participated in

18   the construction of other show props which are also of the

19   highest quality.  Please extend my thanks to him for a job

20   well done."

21       Do you see that?

22   A.   Yes.

23   Q.   All right.  So what is the Oz House that's referred to in

24   this letter?

25   A.   That was a -- it was to be Dorothy's house that fell

R. DEAN GILLISPIE - DIRECT (Owens)                         314

1   out of the tornado into the Land of Oz, and it was actually

2   the entrance to the show.  So part of this was the inside of

3   the house you walked through into the show, you entered the

4   show.  And when you came out the show, you was in the Land

5   of Oz, as if you came out of Dorothy's house.  And then that

6   was the main part of the show, the main entrance to the show

7   too.

8   **Q.**   All right.  Last question on this.  This says something

9   about the Royal Horticulture Society Best of Show award.  What

10  was that?

11  **A.**   That was an Olympic gold medal in the flower business.

12  That was the first time that the award was given outside of

13  England in 113 years.

14         MR. OWENS:  All right.  I think we've got to take a

15  little break from an interlude from somewhere in Europe.

16         MR. McLANDRICH:  Before we do, just for the record,

17  I don't object to this exhibit.  It wasn't asked because of

18  the way things were going in, but just to make the record.

19         THE COURT:  You do not object?

20         MR. McLANDRICH:  I do not object.

21         THE COURT:  Thank you.

22         MR. OWENS:  Thank you.

23         THE COURT:  No objection back there, right?

24         MR. HERMAN:  No.

25         THE COURT:  Thank you.

R. DEAN GILLISPIE - DIRECT (Owens)                    315

 1        Let's do this.  Mr. Gillispie, if you want to come back
 2   down to the table.
 3        Ladies and gentlemen, due to some scheduling issues, as
 4   well as location issues, the next witness will be presented by
 5   way of live video, meaning that she's live but she's on video.
 6        And so you must understand that although this witness is
 7   being presented by live video, the witness will be asked to
 8   take the same oath as the other witnesses that have testified
 9   here and will testify.  And, of course, you must give the
10   testimony of this witness the same consideration as if the
11   witness had been physically present and had testified from the
12   witness stand here in court.
13        So please, once we hook up, please give your attention to
14   counsel and his questioning; and then, of course, once
15   counsel's done questioning, counsel for the defendants would
16   be given an opportunity to cross-examine.
17        Counsel.
18             MR. KANOVITZ:  Your Honor, at this time Plaintiff
19   calls Marie Woods.
20             THE COURT:  All right.
21        (Witness via videoconference.)
22             THE COURT:  Ms. Woods, can you hear us?
23             THE WITNESS:  Yes, I can.
24             THE COURT:  All right.  If you'll just hang on here,
25   we're going to swear you in for your testimony.

D. MARIE LILLY (Kanovitz)                                          316

```
 1              THE WITNESS:  Okay.

 2              THE COURTROOM DEPUTY:  Ms. Woods, may I have you

 3    raise your right hand, please?

 4         DOROTHY MARIE LILLY, PLAINTIFF'S WITNESS, SWORN

 5              THE COURTROOM DEPUTY:  Thank you.

 6              THE COURT:  You may inquire, counsel.

 7              MR. KANOVITZ:  Thank you, Your Honor.

 8                       DIRECT EXAMINATION

 9    BY MR. KANOVITZ:

10    Q.   Ms. Woods, could you introduce yourself to the jury, and

11    tell them both your maiden name and your married name?

12    A.   Okay.  I am going to try to turn this up a little bit.

13              THE COURT:  Counsel, you might get closer.

14    BY MR. KANOVITZ:

15    Q.   Is this any better?

16    A.   Okay.  I've got it.  I think it was my part.  Sorry.

17    Q.   Okay.

18    A.   My full name?  My full name is Dorothy Marie Woods, but

19    now I've been married.  So I'm Marie Lilley, last name.

20    Q.   And where do you live, Ms. Lilley?

21    A.   I live in Auburn, Washington.

22    Q.   And how long have you lived there?

23    A.   I lived in this area for about 25 years.

24    Q.   And where are you from originally?

25    A.   I am originally from Ohio.
```

D. MARIE LILLY (Kanovitz)                                    317

1   **Q.**   What part of Ohio?

2   **A.**   Fairborn.

3   **Q.**   And you mentioned you've been married.  How long have you

4   been married?

5   **A.**   Almost 29 years in January.

6   **Q.**   And do you have children?

7   **A.**   Yep.  We have two children.  I have a daughter -- we

8   have a daughter that's 25 and married, and we have a son

9   who's 23.

10  **Q.**   Thank you.  Can you please tell the jury where you're

11  testifying from today?

12  **A.**   I'm testifying from Bruges, Belgium.

13  **Q.**   What time is it there?

14  **A.**   It's 8 o'clock local.

15  **Q.**   And what's your reason for being there?

16  **A.**   8 p.m.  I'm on vacation with my husband.

17  **Q.**   Thank you.  Taking a step back, do you know Dean

18  Gillispie?

19  **A.**   I do.

20  **Q.**   Where do you know him from?

21  **A.**   I know him from high school.

22  **Q.**   And how did you meet him?

23  **A.**   I think I met Dean the fall of 1982.  We previously had

24  gone to two different high schools in Fairborn, and our high

25  schools joined together that fall.  And I played a few

D. MARIE LILLY (Kanovitz)                                        318

1    different sports, and Dean was always an avid fan and there.

2    And I think I met him through a friend, Nora, who was a

3    volleyball player with me --

4    **Q.**   And did you --

5    **A.**   -- the fall -- the fall of that year.

6    **Q.**   Thank you.  Did you and Dean eventually become friends?

7    **A.**   Yes.

8    **Q.**   And was Dean a social person in high school?

9    **A.**   Yes, I would say Dean was very social.  Like I said, he

10   was always at all the sporting events and kind of had a

11   bigger-than-life personality.  So he knew everybody, yeah.

12   **Q.**   Were you a social person too in high school?

13   **A.**   I was pretty social, yes.  Yeah, I was involved, very

14   involved in school for sure.

15   **Q.**   What kind of student were you?

16   **A.**   Well, I was definitely -- I studied a lot.  I was

17   active.  I played, like I said, two sports, and I was in a

18   lot of extracurricular activities after school.  So I was

19   extremely involved in high school in a lot of different

20   things.

21   **Q.**   And from what you could see of Dean academically, what

22   kind of student was he in high school?

23   **A.**   You know, honestly, I don't -- I don't know that

24   because I don't remember that we ever had any classes

25   together.  So I don't -- I don't honestly know.

D. MARIE LILLY (Kanovitz)                              319

1    **Q.**    Okay.  Who were the people in the friend group that you

2    and Dean shared?

3    **A.**    So when Dean and I started, I would say, hanging out or

4    we became better friends, it was after we had graduated.

5    And, you know, I would say like Gilbert and Brian and myself

6    and there was -- I remember Jerry Fyffe kind of was in that

7    and Dennis, and just a big group, yeah.

8    **Q.**    And were there times where you and Dean hung out, just

9    the two of you separately from the group?

10   **A.**    Yes.

11   **Q.**    Were you dating or were you friends?

12   **A.**    We were always just friends, but, yeah, we did things

13   alone as well as with the group.

14   **Q.**    What sort of things would you do when it was just the two

15   of you hanging out?

16   **A.**    Boy, so this was a long time ago, but I remember like

17   sometimes just he'd come into my house and pick me up and

18   we'd ride along, just go riding around in his truck.

19   Sometimes we would -- I can remember sometimes we went with

20   a couple other people.  We'd go to a movie or go to

21   someone's house or go to his house and stop by there to do

22   something.  Or it seems like there was a lot of driving

23   around.  And, you know, I've tried to remember exactly what

24   things we did.

25       We went to different people's house.  Like when I

D. MARIE LILLY (Kanovitz)                                    320

1  mentioned Jerry, we would go to Jerry Fyffe's house once in

2  a while.  We did some different things with different

3  people, their homes and that kind of thing.

4  **Q.**  And was Dean welcome in your home, and did he get to know

5  your parents?

6  **A.**  Yeah, yep.  Yeah, he would come, and my parents

7  definitely knew him, and he would pick me up and, you know,

8  visit with them while I was getting ready or something like

9  that.  And then -- but, yeah, he knew my parents definitely.

10  **Q.**  Great.  You mentioned that you used to drive around with

11  Dean in his truck.  Did he allow people to smoke in his truck?

12  **A.**  No.  I -- no, he didn't.

13  **Q.**  Okay.  Do you --

14  **A.**  For something stands in my mind like -- there is

15  something in my mind that reminds me that he would not allow

16  it at all.  Like you were not allowed to even be in the

17  truck if you were doing that.

18  **Q.**  Do you recall if there was a sign in his truck?

19  **A.**  Okay, that's -- I was kind of thinking that he did have

20  a sign that said something about if you are smoking, you are

21  kicked out or something.  I was kind of questioning myself,

22  but I think he did have a sign that said something about

23  that.  That's how strong he felt about smoking.

24  **Q.**  And was smoking a common thing with people your age back

25  in the 1980s?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

D. MARIE LILLY (Kanovitz)                                    321

1    **A.**    I would say there were groups of people.  I mean,

2    specifically with my specific, like our friends, I don't

3    remember that, but I know there were a lot of people that,

4    you know -- in high school there was like a smoking section

5    where people could go out and smoke.  So I know there were

6    those.  But I didn't, and I don't remember that Dean ever

7    did that, yeah.

8    **Q.**    Switching topics, what year did you graduate high school?

9    **A.**    We graduated in 1984.

10   **Q.**    And did you go on to college?

11   **A.**    I did.

12   **Q.**    Where'd you go?

13   **A.**    I went to a small school called Gordon College.  It's

14   up on the north shore, north of Boston.  It's in

15   Massachusetts.

16   **Q.**    Got it.  And what was your major?

17   **A.**    I majored in psychology with a minor in special

18   education.

19   **Q.**    And did you and Dean stay in touch while you were away in

20   college?

21   **A.**    We did.  We did stay in touch, yeah.

22   **Q.**    And did you -- did you -- I'm sorry.  Go ahead.

23   **A.**    No.  I don't think I was going to -- yeah, just, we

24   did.  I mean, loosely, the world was not like today with

25   emails and texting, but, yes, we stayed in touch.

D. MARIE LILLY (Kanovitz)                                          322

1    **Q.**    Understood.  And when you would come home in the summers,

2    would you see Dean?

3    **A.**    Yes.

4    **Q.**    And did you continue your friendship and continue to

5    socialize during the summers in college?

6    **A.**    Yeah.  In summers, and I usually only came home once

7    during the school year.  I'd come home at Christmas, and I

8    probably saw him then too, yeah.

9    **Q.**    Okay.  Fast forwarding or switching topics, are you the

10   sort of person that keeps a personal calendar?

11   **A.**    Yes.  I keep a calendar to this day, my paper calendar,

12   yes.

13   **Q.**    Tell the jury, please, about your calendar-keeping

14   practices.

15   **A.**    So that's just been a thing for me.  I'm still a very

16   paper part -- paper/pencil person, pen.  And I keep a record

17   even to this day on -- and my husband and I do.  I mean,

18   he's kind of just like I am.  We have it on the wall.  We

19   have for years.  We write who we're having dinner with, what

20   time games are, who's coming over to dinner.

21        I would say we probably write more things down than we

22   almost need to.  And then we keep them.  And I was telling

23   you, I think I've been married -- will be married 29 years,

24   and we probably have almost a calendar for every year.  We

25   save them in a cabinet in our office.

D. MARIE LILLY (Kanovitz)                                          323

1   **Q.**   Thank you.

2          MR. KANOVITZ:  Your Honor, will it be possible to

3   display some exhibits to the witness even if the jury can't

4   see it?

5          THE COURT:  Yes.

6          MR. KANOVITZ:  Thank you.

7          MR. McLANDRICH:  No objection to these he's about to

8   show, Your Honor.

9          THE COURT:  Okay.

10  BY MR. KANOVITZ:

11  **Q.**   Okay.  Ms. Lilley, I'd like to show you what's been

12  marked as Plaintiff's Exhibit 54, and it's page 14.  Page 14.

13         (Exhibit displayed.)

14         MR. KANOVITZ:  Thank you.

15  BY MR. KANOVITZ:

16  **Q.**   Ms. Lilley, can you see the document that's being

17  displayed?

18  **A.**   Yes.

19  **Q.**   And could you tell the jury what this is, please?

20  **A.**   That's my calendar from 1988.

21  **Q.**   Okay.  And I notice on the -- as I am looking on it, the

22  left-hand side, there is a piece of paper that's stuck into

23  like a pocket.  Do you see that?

24  **A.**   Right.

25  **Q.**   Do you --

D. MARIE LILLY (Kanovitz)                                       324

1   **A.**    I can see it.  It's not very big.  But it looks like my

2   school schedule.

3   **Q.**    Got it, okay.  Then I think that's good enough.  Thank

4   you.

5        So would you have kept that with your calendar when you

6   were in college?

7   **A.**    Oh, yeah, um-hmm.  And I can see Bromley.  That was the

8   hall I was in my senior year.

9   **Q.**    Got it.  Thank you.

10        Did you keep this calendar in realtime?

11  **A.**    You mean at the time of 1988?

12  **Q.**    Yes, exactly.

13  **A.**    Yeah.  Well, I probably bought it in 1987 getting ready

14  for 1988, but, yes, I would have brought it probably in the

15  December beforehand.

16  **Q.**    Got it.  Understood.

17            MR. KANOVITZ:  Page 18 --

18            THE COURT:  Counsel, what was that last page?

19            MR. KANOVITZ:  The one we just showed, Your Honor,

20  was page 14.

21            THE COURT:  All right.

22            MR. KANOVITZ:  We are going to move to page 18.

23            THE COURT:  All right.  Thank you.

24        (Exhibit displayed.)

25  BY MR. KANOVITZ:

D. MARIE LILLY (Kanovitz)                                    325

1    **Q.**   Okay, ma'am, showing you page 18, is this the page for

2    April of 1988?

3    **A.**   Yes.

4    **Q.**   And I just want to ask you about a couple of examples

5    here.

6              MR. KANOVITZ:  Could you focus in on the 15th,

7    please.

8         Great.  Thank you.

9    BY MR. KANOVITZ:

10   **Q.**   So looking at the 15th, it appears that you've got

11   entries written in blue pen, entries written in red pen, and

12   an entry in pencil.  Do you see that?

13   **A.**   Yes.

14   **Q.**   Why would that be?

15   **A.**   Because I kind of keep my calendars like a diary in

16   that I write things that are happening in the future.  I

17   also write things -- I go back and add things to them

18   because of, like I said, instead of keeping a diary, I kind

19   of use this to remember back.

20        And so it looks like I had something planned and I can

21   see -- that's my phone.  Sorry.

22        And I can see, the bottom would be probably an

23   assignment maybe in red.  I'm just guessing.  But, yeah,

24   they are just different -- I'd write in it not at one time.

25   I not only write before things happen, I add comments after.

D. MARIE LILLY (Kanovitz)                                                326

1    I might add who I did things with later.  That's the best I

2    can say.

3    Q.   So is it fair to say like a journal, at the end of the

4    day you might add stuff that you wanted to remind yourself

5    about what happened that day?

6    A.   Absolutely.  Maybe not even a day.  It could be at the

7    end of the month.  Before I would flip the month, I look

8    back.  And that's still kind of how we are, even -- my

9    husband and I.  We treat it the same way.

10   Q.   Got it.

11        MR. KANOVITZ:  And could we show, this would be,

12   Your Honor, page 19 of Exhibit 54?

13        (Exhibit displayed.)

14   BY MR. KANOVITZ:

15   Q.   Ma'am, showing you the page from May of 1988, it looks

16   like towards the middle of the month you kind of stop making

17   entries.  Do you see that?

18   A.   Um-hmm.  Um-hmm.

19   Q.   Can you explain why that is?

20   A.   Well, I know I worked full-time the two weeks, and then

21   I left for Europe in May, I think May 29th, it says.  And I

22   don't really know why I didn't write any of those two weeks

23   except I am assuming I was very busy working full time and

24   saving every penny, and probably didn't do a whole lot of

25   social stuff.  I'm just taking a guess.

D. MARIE LILLY (Kanovitz)                                          327

1        But I do know as of May 29th I flew to Europe for eight

2   weeks.  So that was an organized program through my school

3   called European Seminar.  And it was actually for English,

4   history, and art credit.  So we did studying and reading on

5   the road, and we traveled eight countries in eight weeks.

6   So actually that was the last time I was here.

7        And so that would be like why that week is blank there.

8   I just wrote that we are leaving that day and someone's

9   birthday on the 29th.  That's it.

10  **Q.**  Got it.  Okay.

11       MR. KANOVITZ:  So, Your Honor, this will be page 21

12  of Exhibit 54.  Could we pull up the month of August, please.

13       (Exhibit displayed.)

14  BY MR. KANOVITZ:

15  **Q.**  So going into the month of August, you've graduated, and

16  you are just now, I take it, coming back from Europe?

17  **A.**  Yes.  I think we returned to, of course, Boston,

18  because I flew out of Boston.  That's where I went to

19  school.

20       The very end of July, and it looks like August 1, it

21  says "Leave for Ohio," and that means probably me driving my

22  car home from Boston.

23       MR. KANOVITZ:  Could we focus in on August 4th,

24  please.

25       (Exhibit displayed.)

D. MARIE LILLY (Kanovitz)                                    328

1    BY MR. KANOVITZ:

2    Q.    Okay.  Showing you the entry for August 4th, can you tell

3    us what the calendar shows you did on that day?

4    A.    It says, "Movie Cocktail," and then "Kellers" and

5    "Safaris with Dean, Brian, and Gilbert."

6    Q.    Got it.  And did Dean look any different to you on that

7    day than he usually did?

8    A.    No.

9    Q.    Was his hair the same color as it always is?

10   A.    Yes.

11          MR. KANOVITZ:  And then could we move to the 6th,

12   please.

13        (Exhibit displayed.)

14   BY MR. KANOVITZ:

15   Q.    Looking at the entry for Saturday, the 6th, could you

16   tell us what you did that day?

17   A.    It's "At Lisa Glasser's house with Brian and Dean."

18   Q.    And who is Lisa Glasser?

19   A.    So Lisa Glasser was -- she was younger than the three

20   of us, but she went to school with us forever.  Actually,

21   she went to the same elementary I went to.  She is just

22   maybe a year or two younger.  I think just a year younger

23   than I was, or we were.

24   Q.    And do you recall being at the party?

25   A.    I have a brief memory of being at that party, yes.

D. MARIE LILLY (Kanovitz)                                    329

1   **Q.**   And there is a notation here that you were with Brian and

2   Dean as well?

3   **A.**   Yep.

4   **Q.**   Briefly, who is Brian?

5   **A.**   Brian Poulter.  He was also a classmate of ours.  And I

6   met Brian probably I think the same time, although we had a

7   common friend we went to church with.  So I may have met

8   Brian before our high schools combined in '82.  So I may

9   have met him a little bit earlier than that.  But he's a

10  classmate that I went to school with at Fairborn High

11  School.

12  **Q.**   And when you were with Dean on the 6th at the party, had

13  his appearance changed at all between the 4th and the 6th?

14  **A.**   No.

15  **Q.**   His hair was still the same color it always is?

16  **A.**   Yes.

17  **Q.**   And what did his hair look back like in that time frame?

18  **A.**   Well, Dean always kind of wore it longer in the back

19  than I remember, a little bit longer in the back, and he had

20  dark hair.  And a little graying in front.

21  **Q.**   Got it.  And -- okay, so fast forwarding.  Did there come

22  a time where you learned that Dean had been arrested?

23  **A.**   Yes.

24  **Q.**   Please tell us what happened.

25  **A.**   I can't honestly cannot remember exactly who told me,

D. MARIE LILLY (Kanovitz)                                    330

 1   but someone told me that he was arrested for a crime that

 2   had happened the beginning of August in '88.  And I think it

 3   was like -- this was two years later, I think.  It could be

 4   maybe a year later.  I can't remember.

 5        And I was in shock.  And when I knew I was home -- and

 6   that's exactly what I did, I went to my calendar for like my

 7   memory of where was I and what was I doing.  And that's when

 8   I pulled up the calendar, and I think I told Dean, "Hey, I

 9   have this.  I don't know if it's any help, but it kind of

10   says that I was with you around that time."

11   Q.   And so you provided that to -- did you provide it to

12   Dean, or did you provide it to his attorneys, or do you

13   recall?

14   A.   I honestly don't recall.

15   Q.   Okay.  And did there come a time where you came to

16   testify at Mr. Gillispie's trial?

17   A.   Yes, I did.

18   Q.   And did you testify about the calendar and basically tell

19   that jury what you've told this jury?

20   A.   Yes, I did.

21   Q.   And do you recall if you testified at two trials or one

22   trial, if you remember?

23   A.   I only -- I can only really remember the one.

24   Q.   Okay.  All right.  Did there come a time where you

25   learned that Dean had been convicted?

D. MARIE LILLY (Kanovitz)                                          331

1    **A.**    Yes.  But -- yes.

2    **Q.**    And what was your reaction?

3    **A.**    Shock, shock.  I attended several days of it, and it

4    just -- yeah.  I was in shock.  That was -- I did not think

5    he did it.  In my personal, I did not --

6              MR. McLANDRICH:  Objection.

7              THE WITNESS:  -- think he had done it.

8              THE COURT:  Sustained, counsel.

9         We are going to strike what she thought.

10             MR. KANOVITZ:  So how about just through "shocked,"

11   and we can move on?

12             THE COURT:  Correct.

13   BY MR. KANOVITZ:

14   **Q.**    So --

15             THE COURT:  Ladies and gentlemen, you are to

16   disregard that.

17   BY MR. KANOVITZ:

18   **Q.**    So after that time that you learned that Dean had been

19   convicted, did you stay in touch with him?

20   **A.**    I don't -- I don't think I did.  I think I moved to the

21   West Coast shortly after that.

22   **Q.**    Back in -- back in that time frame, so the early '90s,

23   was it easy to stay in touch with somebody when you were

24   across the country?

25   **A.**    Not really.  And I moved January of '92.  And to be

D. MARIE LILLY (Kanovitz)                                              332

```
 1   quite fair, I'm not very good at keeping in touch with

 2   people.

 3   Q.   Fair enough.

 4   A.   And I kind of just started a whole new -- whole new

 5   looking for new job, working on my master's.  A whole new

 6   life kind of, yeah.

 7   Q.   Understood.  How would you describe your relationship to

 8   Dean today?

 9   A.   Well, I mean, I have not talked to him lately.  We're

10   basically -- I see him on Facebook, and I think we kind of

11   comment on different things once in a while possibly.  But I

12   haven't talked to him.  So I would say we're still friends,

13   but friends that haven't been in touch in a long time.

14   Q.   When's the last time you were actually physically in each

15   other's presence?

16   A.   I think it was the last trial.

17   Q.   So over 30 years ago?

18   A.   Yes, yeah.  Yeah, I've been on the West Coast since,

19   yeah, before that.

20   Q.   Do you have any reason to lie for Dean today?

21   A.   No.

22   Q.   Did you have any --

23   A.   Not at all.

24   Q.   -- reason to lie for Dean back in the timeframe when you

25   testified for the criminal trials?
```

D. MARIE LILLY - CROSS (McLandrich)                    333

1    **A.**    Absolutely not.

2    **Q.**    Why are you taking the time out of your vacation to

3    testify here today?

4    **A.**    Because when I was asked about this, it was my natural

5    reaction that I stand behind what I said then.  I'm a

6    truthful person.  I didn't want that to be questioned.  I

7    always do my best to be fair, and I told the truth to the

8    best of my ability then.  And I wanted to do that again for

9    him.

10   **Q.**    Thank you.  No further questions.

11           THE COURT:  All right.  Thank you, counsel.

12        Ma'am, you're --

13           MR. McLANDRICH:  I have just a couple.

14           THE COURT:  Counsel for the defendant has a couple

15   of questions for you, please.

16           THE WITNESS:  Okay.

17                    **CROSS-EXAMINATION**

18   BY MR. McLANDRICH:

19   **Q.**    Hello, Mrs. Lilley.  My name is John McLandrich.  I

20   represent Detective Moore in this case.  I just have one or

21   two questions for you.

22   **A.**    Okay.

23   **Q.**    So I noticed on your calendar that you didn't have any

24   entries for August 5, 1988; isn't that correct?

25   **A.**    That is correct.

D. MARIE LILLY - REDIRECT (Kanovitz)                          334

1    **Q.**   And at the criminal trial, I believe your testimony was

2    you didn't have any memory of being with Dean on August 5,

3    1988; is that correct?

4    **A.**   If that's what I said, that's the truth.  And I would

5    have nothing to go by -- only my calendar.  So I would say

6    that's correct.

7    **Q.**   At least today, you don't have any memory of being

8    with -- with Roger Dean Gillispie on August 5, 1988?

9    **A.**   No.

10          MR. McLANDRICH:  Thank you, ma'am.  That's all.  I

11   appreciate your time.

12          THE WITNESS:  Okay.

13          MR. KANOVITZ:  One question, Judge?

14          THE COURT:  All right.

15                    **REDIRECT EXAMINATION**

16   BY MR. KANOVITZ:

17   **Q.**   Counsel for the defendants just referred to your friend

18   Dean as Roger Dean Gillispie.  Is that how Dean would refer to

19   himself at the times that you knew him?

20   **A.**   Never.  I -- I've always thought his first and full

21   name was Dean.

22          MR. KANOVITZ:  Thank you.  No further questions.

23          THE COURT:  Counsel?

24          MR. McLANDRICH:  Nothing further, Your Honor.

25          THE COURT:  All right.  Ma'am, I want to thank you

R. DEAN GILLISPIE - DIRECT (Owens)                    335

```
 1    for making yourself available.  We appreciate -- we appreciate

 2    your effort, and your testimony has concluded.

 3             THE WITNESS:  Okay.  Thank you.

 4             THE COURT:  Thank you.

 5             THE WITNESS:  And I can sign out then?

 6             THE COURT:  You can sign out.

 7             THE WITNESS:  Okay.  Thank you.

 8             THE COURT:  Mr. Gillispie, do you want to take the

 9    stand.

10        ROGER DEAN GILLISPIE, PLAINTIFF, PREVIOUSLY SWORN

11             THE COURT:  Mr. Gillispie, you are still under oath.

12        Counsel.

13             MR. OWENS:  Thank you, Your Honor.

14                    DIRECT EXAMINATION (CONT.)

15    BY MR. OWENS:

16    Q.  I want to go back.

17             THE COURT:  We're trying.

18             MR. OWENS:  All right.  I didn't know if having the

19    zoom in the wings.

20        Could we get Exhibit 176 at page 8.

21             THE COURT:  Can you use the ELMO?

22             MR. OWENS:  I tried earlier.  It wasn't working

23    either.

24        There we go.

25    BY MR. OWENS:
```

1    **Q.**   Mr. Gillispie, we also -- we were just, before our brief

2    little break with Ms. Lilley there, I was talking to you -- or

3    we were talking about the Cincinnati Horticulture Society and

4    the flower show and props that you were building.  And you

5    said you were building -- you just described building

6    something sort of derived after the Wizard of Oz.  Do you

7    recall that?

8    **A.**   Correct.

9    **Q.**   I just want to get a sense for the size of the props that

10   you were building.  Are these like little miniature things

11   that you could hold in your hand or how -- what kind of scale

12   are we talking?

13   **A.**   Oh, they were half, three-quarter scaled buildings.

14   They were actual structures.  Very large.

15   **Q.**   And did you -- how many years did you participate in

16   doing stuff for the Cincinnati Horticulture Society and the

17   Cincinnati Flower Show?

18   **A.**   I worked with the horticulture society and the

19   Cincinnati Flower Show for ten years.

20   **Q.**   And did you also -- all right.

21        I'm going to show you what's been previously marked and

22   that you've previously described as Plaintiff's Exhibit Number

23   176.  This is page 8 of that.

24        (Exhibit displayed.)

25   BY MR. OWENS:

R. DEAN GILLISPIE - DIRECT (Owens)                    337

1   **Q.**   And, Mr. Gillispie, is this the copy of the letter that

2   we sort of went through earlier that described the House of

3   Oz?

4   **A.**   Yes, correct.

5   **Q.**   And is this the letter that we described earlier -- that

6   discussed earlier that described the Best of Show award?

7   **A.**   Yeah, that's correct.  That was the -- yeah, the big

8   award.

9   **Q.**   All right.  And that was in June of 1997?

10  **A.**   Correct.

11  **Q.**   Sorry to take you backwards, but I wanted to show you

12  page 27 of Exhibit 61.  It is another letter.

13          MR. OWENS:  And just so the record is clear, this is

14  page 27 of Exhibit 177, Your Honor.

15          THE COURT:  All right.

16          MR. McLANDRICH:  No objection.

17          THE COURT:  Thank you.

18      (Exhibit displayed.)

19          THE WITNESS:  Do you want me to find it in here?

20  BY MR. OWENS:

21  **Q.**   No.  You should be able to look on your screen there.

22  **A.**   I don't have a screen.

23  **Q.**   Do you have that right in front of you?

24  **A.**   I've got this (indicating).

25  **Q.**   Yes, that's it.  It's on your thumb.

R. DEAN GILLISPIE - DIRECT (Owens)                    338

1  **A.**    Okay.  It's page 9?

2  **Q.**    Yep.  Now, is this a letter from June 27, 1995?

3  **A.**    Yes.

4  **Q.**    And do you see the name William Valentine?

5  **A.**    Correct.

6  **Q.**    Who is that?

7  **A.**    He was the director of the Cincinnati Horticulture

8  Society.

9  **Q.**    Okay.  And this is a letter to you directly; is that

10  right?

11  **A.**    Correct.

12  **Q.**    Okay.  And do you see the note written in the bottom?

13  **A.**    Yes.

14  **Q.**    Did you have a relationship with Mr. Valentine, the

15  director of operations, directly?

16  **A.**    Just through the institution, him coming in and out for

17  these projects.

18  **Q.**    Would you work with him specifically?

19  **A.**    Yeah, when we were doing these projects for them, yeah.

20  He would come in, you know, set up what type of things they

21  wanted, the type of props they wanted.  And he may have

22  someone come after he came a couple times to finish up the

23  process, to make sure everything was right.

24  **Q.**    Okay.  And we discussed earlier the fact that when you

25  would work in the tool shop or -- excuse me -- doing

R. DEAN GILLISPIE - DIRECT (Owens)                        339

1    maintenance that you had access to tools, right?

2    **A.**   Correct.

3    **Q.**   And did there ever come a time when the institution,

4    folks from the institution asked you to do a project for them

5    that required their trust in you?

6    **A.**   Yeah.  They -- yeah, I had a project that turned out to

7    be a pretty big -- it was a very major event to even be

8    allowed to do this project for them.

9    **Q.**   Okay.  And I'm going to show you what's been previously

10   marked as Plaintiff's Trial Exhibit 177.  And this is page 25

11   from 177.

12        (Exhibit displayed.)

13   BY MR. OWENS:

14   **Q.**   Page 25?

15   **A.**   Yep.

16   **Q.**   Thank you.

17   **A.**   Yep.

18   **Q.**   All right.  Now, Mr. Gillispie, this is a letter that's

19   to you from Stephen L. Bowman, the Deputy Warden of

20   Operations, right?

21   **A.**   Correct.

22   **Q.**   Who was Mr. Bowman?

23   **A.**   He was the second man in charge of the prison.

24   **Q.**   Okay.

25   **A.**   Under the warden.

R. DEAN GILLISPIE - DIRECT (Owens)                                  340

1    **Q.**   Now looking at this letter, it says, quote, "Recently,

2    you assisted with the development of a project for this

3    department.  It is obvious you take pride in your work.  The

4    finished project was exemplary.  Your attention to detail and

5    willingness to undertake and complete this project is

6    appreciated."

7         Do you see that?

8    **A.**   Yes.

9    **Q.**   What is this referring to?

10   **A.**   So my art through my small buildings and everything was

11   pretty well-known throughout the institution, and they

12   wanted a model of the prison to put in their war room up

13   front so whenever they had their meetings and if an event

14   jumped off in the prison they were able to look at these --

15   this map, basically, it was a 3D map of the institution.

16        All the buildings, all the security detail, all the

17   fences, everything on that prison was on a 4-by-4 sheet of

18   plywood, and they asked me to -- I had a lot of -- I didn't

19   want to do this project because a gentleman before me done a

20   project and got shipped out as soon as it was done.  They

21   assured me that wouldn't happen to me, and I took a chance

22   and went ahead and built this -- this thing for them.  That

23   was a major issue.  That was a major deal to build that

24   thing.

25   **Q.**   Now, just one more sort of letter in this vein of things

R. DEAN GILLISPIE - DIRECT (Owens)                    341

```
1    that you received while you were in prison.
2        Do you remember an individual named David Boggs?
3    A.   Dave Boggs was my boss at the maintenance shop at
4    Warren.  One of my bosses.
5    Q.   And did you have a way in which you referred to the
6    maintenance shop?  Was it called something?
7    A.   It was the MR-3, maintenance repair worker.
8    Q.   And did you occasionally get evaluated by Mr. Boggs?
9    A.   Yeah.  There were certain periods of time would go by
10   that they would evaluate your -- your institutional record
11   to eventually drop your security after you had so much time
12   in and they would do these reviews, put them in your file
13   for whenever that time came.
14   Q.   All right.  Mr. Gillispie, I want you to turn to page 19
15   there on Exhibit Number 177.  It will be pages 19 and 20 I am
16   going to ask you about.
17       Are you there?
18   A.   Yep.  19.
19       (Exhibit displayed.)
20   BY MR. OWENS:
21   Q.   All right.  Mr. Gillispie, can you please just describe
22   for the jury what Exhibit Number 19 is -- excuse me -- page 19
23   of Exhibit Number 177 is.
24   A.   That would be Dave Boggs' evaluation of me and
25   basically under his employment with working with him with
```

R. DEAN GILLISPIE - DIRECT (Owens)                    342

1    institutional stuff and community service.

2    **Q.**   So this was 1997, right?

3    **A.**   April 9th of '97.

4    **Q.**   If you will go to the next page on page 20.  Do you see

5    that, Mr. Gillispie?

6    **A.**   Yep.

7    **Q.**   All right.  So do you see at the narrative part in the

8    middle of the document here, where it says "Evaluator

9    Comments"?

10   **A.**   Um-hmm.

11   **Q.**   It says, quote, "IN," which I assume stands for inmate,

12   right?

13   **A.**   Yes.

14   **Q.**   "Inmate Gillispie is an outstanding worker.  He is very

15   reliable and performs, always does the jobs with a positive

16   attitude, and takes great pride in a job well done."

17        Do you see that?

18   **A.**   Yes.

19   **Q.**   Well, if Mr. Boggs felt so highly of you, why'd he only

20   give you a 9 out of 10 on all of the categories?

21   **A.**   Nobody got 10s.  Ever.

22   **Q.**   All right.  Thank you.

23        So, Mr. Gillispie, before -- right before lunch and since

24   you resumed now twice after lunch, we have gone over a number

25   of letters, accomplishments, and things that you were able to

R. DEAN GILLISPIE - DIRECT (Owens)                    343

1   achieve and receive while you were in prison.  Despite all of

2   that, did being in prison during that time have an impact on

3   you and your family?

4   A.   Yeah.  It was still miserable.  Every day was

5   miserable.  You know, you'd call home every few days,

6   because the phone calls were so expensive you couldn't call

7   every day, hoping to god no one died or nothing bad had

8   happened since the last time you called home or checked with

9   your family.

10       You know, me doing this work doesn't change the

11  violence in that prison.  That was just me trying to stay

12  away from it.  Nothing changed in that prison even though I

13  was doing this type of work, as far as the day-to-day living

14  in the bowels of society.

15  Q.   Now, at some point -- and we just looked at a number of

16  things from the mid to late '90s.  In the earlier -- early

17  2000s, do you recall any changes to your sentence or

18  circumstances of your criminal conviction that stand out to

19  you?

20  A.   Yeah.  The laws changed from the time I was locked up

21  to that time on the classification of sex offenders.

22  Q.   And, obviously, you can't come in here and talk to the

23  jury about the law, but can you just describe what happened to

24  you when these new sort of sex offender statutes went into

25  place?

1    **A.**    They started transporting sex offenders back -- me

2    being one -- to the county jail to go through an examination

3    to classify us as these different classes of sex offenders.

4    **Q.**    And so did you -- I think you said you had to go

5    somewhere for that; is that right?

6    **A.**    Yeah, they transported us back to the county jail.

7    **Q.**    Okay.  And when you were transported from Warren

8    Correctional back to the county jail, how did you get there?

9    **A.**    Through a -- you know, they sent the sheriff out to

10   pick you up.

11   **Q.**    Did you go in a tunnel?  Did you walk?  How did you get

12   there?

13   **A.**    They put you in a van.  They handcuff, shackle you, you

14   know, the whole belly chains and everything, put you in a

15   van and drive you -- if there was more people to pick up, he

16   would pick three or four people up, and then we would all go

17   down to the county jail till the end of the day.

18   **Q.**    Had you been in a car or outside the premises of Warren

19   Correctional Facility until you went back to the Montgomery

20   County Jail to be tested for the sex offender classification?

21   **A.**    No, that was the first time I was out of the

22   institution and in a vehicle.

23   **Q.**    Now, Mr. Gillispie, I want to show you what's -- if you

24   can turn to, and if you have it in front of you -- Trial

25   Exhibit Number 215.  I'm just going to ask you about pages 1

R. DEAN GILLISPIE - DIRECT (Owens)                    345

1    and 2.

2    **A.**   Is that in the book I got?

3           THE COURTROOM DEPUTY:  It is not.

4           MR. McLANDRICH:  No objection, Your Honor.

5           MR. HERMAN:  No, Your Honor, no objection.

6           THE COURT:  Mr. Owens, did you --

7           MR. OWENS:  I have a concern, Your Honor.  So this

8    exhibit is an entry and order from a court adjudicating --

9    making a finding that Mr. Gillispie was a sexual predator.  I

10   don't want to run afoul of the Court's orders.  I don't think

11   this falls into that general category.  It's just a one-page

12   document that says that.  But I just realized, thanks to the

13   help from counsel here for the Township.

14          THE COURT:  It may be displayed.

15          MR. OWENS:  Thank you, Your Honor.

16       (Exhibit displayed.)

17   BY MR. OWENS:

18   **Q.**   All right.  Mr. Gillispie, do you have this in front of

19   you?

20   **A.**   Yes.

21   **Q.**   I will sort of zoom in.  The copy's a little vague.  But

22   do you see that this is an order from the Montgomery Court of

23   Common Pleas that was entered in June of 2000?

24   **A.**   Yes.

25   **Q.**   Okay.  And that this -- it says, ignoring all of the sort

R. DEAN GILLISPIE - DIRECT (Owens)                    346

1    of legalese, that it is ordered that you be declared a sexual

2    predator.  Do you see that?

3    **A.**    Oh, yeah.

4    **Q.**    And do you go to the next page, Mr. Gillispie.

5         (Exhibit displayed.)

6    BY MR. OWENS:

7    **Q.**    Are you familiar with this document?

8    **A.**    That's upside down here.

9         I guess it was not upside down.  I'm having a hard time

10   seeing it but --

11   **Q.**    Do you see at the top where it says "Explanation of

12   duties to register as a sex offender"?

13   **A.**    Yes.

14   **Q.**    And your signature's on sort of towards the bottom there?

15   **A.**    Yes.

16   **Q.**    So this was entered, both of these, were entered in 2000.

17   And how did it impact you having to go back to court in 2000

18   and walk out -- well, not walk out -- but have a court enter

19   this order and require you to sign this form?

20   **A.**    This was in 2000.  So nine years I am screaming and

21   hollering I didn't commit this crime.  I go back to court.

22   Not only am I smacked in the face for going to prison for a

23   crime I didn't commit, now I am classified as the highest-

24   tier of sex offender that you can be in the State of Ohio.

25   It wasn't a good feeling then.  It's not a good dealing

R. DEAN GILLISPIE - DIRECT (Owens)                          347

1    today.

2    **Q.**    And we all know you are out today.  Does this issue --

3    the sexual offender classification, is that stuff, does it

4    still impact you in any way today?

5    **A.**    It's a part of my life that doesn't go away.  That

6    doesn't go away.  I've been labeled a sex offender.  That

7    doesn't go away.

8         You know, it was sent around the neighborhood when I

9    got home.  After I was out a while, they sent this around

10   the neighborhood.  And I grew up in the neighborhood, you

11   know.  Everyone knew me.  They knew it was a bunch of

12   malarky.  And they started coming by the house.

13        But the fact that they were notified, you know, the

14   fact that this is on websites everywhere, you know, when I

15   come home, that doesn't go away.  It does not -- it doesn't

16   go away.  You can punch me up somewhere, and there will be

17   something about me being a sex offender or a registered sex

18   offender at a certain point in time in my life, or there is

19   something about it.  It don't go away.

20        Even though I was found wrongfully convicted, this

21   still does not go away.  It's still a part of my life.

22   **Q.**    So I want to ask you just a couple more questions.  We

23   are almost through here.  Just about -- this order was entered

24   in 2000, and I believe you testified you were released in

25   2011; is that right?

R. DEAN GILLISPIE - DIRECT (Owens)                      348

1    **A.**   Correct.

2    **Q.**   Did you take any other steps at that time -- and I am

3    just going to ask you about opportunities that you tried to

4    avail yourself of to try to get out of prison.  Did you ever

5    appear before a parole board?

6    **A.**   Yeah, I seen the parole board two times during my 20

7    years.

8    **Q.**   And what happened when you appeared before the parole

9    board the first time?

10   **A.**   I had 16 years in.  I went to the parole board.  They

11   asked you, tell us what happened that night.  I don't have a

12   clue.  I was not there.  They consider me combative, bring

13   an officer in the room.  And then they proceed to read off

14   the charges that were there.

15       I said, "You can say it a thousand times.  I didn't do

16   it."

17       So they said, "Mr. Gillispie, these are the charges

18   against you, and we are going to give you four more years,

19   and come and see us after you got 20 years in."

20   **Q.**   So did you -- did you have a understanding that if you

21   went to the parole board and professed your innocence, what

22   the chances of you getting parole were?

23   **A.**   If I was still seeing the parole board, I'd never get

24   out till 56 years, because if you don't show remorse -- you

25   don't admit to the crime, you don't show remorse, how do you

```
1    show remorse for something you didn't do?  How do you do

2    that?

3         So when I am in front of the parole board, I don't have

4    no reason to show remorse for something I didn't do, I

5    wasn't there, I don't know anything about.  So me not

6    showing remorse is an automatic check against me.  Me not

7    admitting guilt is an automatic check against you.

8              THE COURT:  Mr. Gillispie, I think the question was,

9    did you understand what -- if you admitted, right?

10             MR. OWENS:  Yeah.

11             THE COURT:  Accepted admission, what the parole

12   board would do?  Did you have a belief what the parole board

13   would do if you said -- made an admission?  I'm not saying you

14   could do it.  That's the question.  The question is, did you

15   have a belief what would happen if you made an admission to

16   the parole board?

17             THE WITNESS:  I never believed in the parole board

18   to start with.

19             THE COURT:  All right.  Well, he's answered.

20             MR. OWENS:  Thank you, Judge.

21   BY MR. OWENS:

22   Q.   So just jumping back, during your criminal trial, did you

23   have the opportunity at some point to avoid spending 20 --

24   more than 20 years in prison during the course of your first

25   criminal trial?
```

R. DEAN GILLISPIE - DIRECT (Owens)                    350

 1   **A.**    Yes, I did.

 2   **Q.**    What happened?

 3   **A.**    We put our case on, and the prosecutor had a

 4   conversation with my lawyer, I assume, and came to me and

 5   said they are offering you 30 days.

 6              MR. McLANDRICH:  Objection to the hearsay.

 7              THE COURT:  Sustained.

 8              MR. OWENS:  Without telling --

 9              THE COURT:  It will be stricken.

10              MR. OWENS:  Sure.

11   BY MR. OWENS:

12   **Q.**    Was there ever an offer made, plea offer made to you

13   during the course of your criminal proceedings?

14   **A.**    Yes.  My lawyer came to me and said they are offering

15   30 days.

16   **Q.**    And did you take that -- that -- that was during the

17   course of your first criminal trial?

18   **A.**    Correct.

19   **Q.**    So that was February '91?

20   **A.**    Correct.

21   **Q.**    Why didn't you take the deal?

22   **A.**    I told him 30 days, 30 minutes, 30 years, I didn't

23   commit this crime.  I am not going to say I did.  I'm not

24   taking your 30-day deal.

25   **Q.**    I believe you testified about this a little bit earlier.

1    After your release in 2011, and then I think as you heard the

2    judge read in the stipulations this morning there was a

3    separate court that vacated your conviction in 2012.  Did the

4    criminal process with the State of Ohio end then in 2011 or

5    2012?

6    **A.**    No.  It went completely under appeal, and they was

7    appealing it the whole -- yeah, for a long time.

8    **Q.**    All right.  And do you remember when sort of the criminal

9    process finally came to an end?

10   **A.**    The whole thing or when the -- because I had two

11   separate endings.

12   **Q.**    Sure.  Let's talk about the earlier separate ending.

13   **A.**    Yes.  The federal court ended up throwing the

14   conviction out with prejudice --

15         MS. FRICK:  Objection.

16   BY MR. OWENS:

17   **Q.**    So let me just stop you there.

18         THE COURT:  Let's back it up.

19         Sustained.  It will be stricken.

20         Reask.

21   BY MR. OWENS:

22   **Q.**    Let me ask a more specific question.

23         After the federal court overturned your conviction in

24   2011 and then after the --

25         MR. OWENS:  Your Honor, can I just lead for a second

R. DEAN GILLISPIE - DIRECT (Owens)                    352

1    just to get to the point to avoid the objection?  I think it's

2    based upon the stipulated facts that you read earlier.

3             THE COURT:  As long as it's based on the stipulated

4    facts that I read, you may.

5             MR. OWENS:  Sure.

6             THE COURT:  And I can note an objection if you want.

7             MR. McLANDRICH:  I am just wondering what -- if it's

8    already stipulated to, why it needs to be elicited.

9             THE COURT:  I think he says he wants to go a step

10   further than that.  I don't know.

11            MR. OWENS:  That's correct.

12            THE COURT:  Well, go ahead and ask your question.

13       And then, Mr. Gillispie, don't answer until I tell you

14   you can.

15            MR. OWENS:  All right.

16   BY MR. OWENS:

17   **Q.**   After the federal court overturned your conviction in

18   2011 and then the state court overturned your conviction in

19   2012, and then the charges with you were completely dismissed

20   in 2017 -- does that sound familiar?

21            THE COURT:  You can answer.

22            MR. McLANDRICH:  You misspoke.  It was -- you don't

23   want me to talk to him.

24            MR. OWENS:  2017.

25            MR. McLANDRICH:  You said they were completely

R. DEAN GILLISPIE - DIRECT (Owens)                    353

```
 1    dismissed in 2017.
 2              MR. OWENS:  Yes.
 3              MR. McLANDRICH:  That couldn't be true.  The lawsuit
 4    started in 2013.
 5              MR. OWENS:  That's what happened.  The lawsuit was
 6    stayed for four years.
 7              MR. McLANDRICH:  I apologize.
 8              THE COURT:  You can answer, Mr. Gillispie, if you
 9    understood the question.
10              THE WITNESS:  I don't remember it now.
11    BY MR. OWENS:
12    Q.   Let's just get the time frame.  After you were released
13    from prison between 2011 and then until 2017 when things
14    finished at the Ohio Supreme Court when the charges were
15    dismissed with prejudice, you don't remember that five-year
16    period of time?
17    A.   Oh, yeah.
18    Q.   Okay.  How did that fact that you were -- what was
19    happening with you in terms of this criminal prosecution
20    during that five-year period?
21    A.   When I left prison December 22, 2011, I was on an ankle
22    monitor.  The federal court had dismissed the case.
23              THE COURT:  All right.  Let's don't go there.
24              THE WITNESS:  Okay.  That's fine.
25              THE COURT:  He's already gone over that.
```

R. DEAN GILLISPIE - DIRECT (Owens)                              354

1              THE WITNESS:  Then the state court overturned --

2    BY MR. OWENS:

3    Q.   So, Mr. Gillispie, just talk about what was happening

4    with you and not what was going on in the courts.

5    A.   I got off the ankle monitor.  Once I got off the ankle

6    monitor, I had to go register at the courthouse under

7    pretrial services, which was basically, I was on parole now.

8    I should have been free, but I was on parole and had to go

9    check in, go pee in a cup, go get permission to leave the

10   state, for five years.

11   Q.   This lawsuit was filed in 2013, as Mr. Moore's counsel

12   just pointed out to me, and we're going to trial here in

13   November of 2022.  Has the fact of this lawsuit impacted your

14   day-to-day life?

15   A.   Yeah.  Yeah, it's -- it's impacted every day of my life

16   for going on 33 years.  It's impacted my life to -- yeah.

17   I've got severe PTSD from it.  Yeah, it's impacted my life.

18   Q.   Now, did you sit for a deposition in this case where you

19   previously answered questions under oath?

20   A.   Yeah.  Yes, I did.

21   Q.   How would you describe that day?  How would you describe

22   that event for you personally, without getting into any

23   questions that were asked or answered?

24   A.   That was probably, to this day, the sickest day I have

25   ever been in my entire life.  I threw up four times during

R. DEAN GILLISPIE - DIRECT (Owens)                            355

1    the process.  I had severe diarrhea.  I had to get on a

2    airplane for a international flight to Spain the next day

3    with this same condition.  It was -- in my opinion, it was

4    worse than the trial.  It was worse than the trial.  I've

5    never been that sick in my life.

6    **Q.**   Now, when your deposition was taken a few years ago, did

7    you understand what was happening with you, what was making

8    you so sick?

9    **A.**   At that time I had no idea.

10   **Q.**   Do you have an understanding now what was going on?

11   **A.**   Yeah, yeah.  Oh, I definitely do.

12   **Q.**   And can you just sort of try to explain that for the

13   jury?

14   **A.**   It's the -- it's the PTSD that --

15            MR. McLANDRICH:  Objection.

16            MR. OWENS:  What's the basis, Your Honor?

17            THE COURT:  Well, if he wants to explain what he's

18   going through and things such as that, I mean -- well,

19   approach.

20        (At sidebar.)

21            THE COURT:  I don't have a problem with the telling

22   about how he's feeling and all of the symptoms and all of that

23   stuff, but the -- I don't know the diagnosis.  Are you having

24   someone coming in with the diagnosis?

25            MR. OWENS:  This is David Owens for Dean Gillispie.

1    Yes, we do, Your Honor.  Dr. Benjamin Miller should be here on

2    Thursday, and I think -- I understand the Rule 701 issue.  We

3    filed a Rule 701 motion in this case.  I think whenever this

4    comes to individuals describing their own understanding of

5    their medical conditions, that they're presenting it in a way

6    that they can.  I don't think he is making a medical

7    diagnosis, but there is someone coming on Thursday.

8            MR. McLANDRICH:  So it's my understanding at his

9    deposition he testified he's never had any mental health

10   treatment.  I'm not -- I guess I have seen this Miller report.

11   I believe I have.  I'm not aware of any diagnosis, but I don't

12   think he gets to testify to causation between diagnosis and

13   symptom.  I mean, he can testify to what symptoms he's got,

14   but he doesn't get to link them to a diagnosis.  He's not

15   competent to do that.

16           MR. OWENS:  I understand the concern.  The next

17   question is just going to be like have you seen a mental

18   health professional since your deposition, and then I was

19   going to move on completely.  I think he said it at this

20   point.  So I am not going to go into it further anyways.

21           THE COURT:  Okay.  Well, you are saying that this

22   doctor is coming?

23           MR. OWENS:  Yes, Your Honor.

24       And I want to be real clear just so the Court's not

25   surprised.  There was a doctor that was hired in this case

R. DEAN GILLISPIE - DIRECT (Owens)                    357

1    that gave the diagnosis.  That's not the person he's been

2    seeing on a regular basis since then.  That's not the person

3    he was seeing.  I don't want you to think that was the same.

4           MR. McLANDRICH:  Do we have the records of this

5    person that he's been seeing?

6           THE COURT:  Yes, am I going to hear anyone say,

7    basically to confirm what he's just told us?

8           MR. OWENS:  Dr. Miller, the one who examined him, I

9    think it was a month or two after his deposition, is the

10   person that you will hear --

11          THE COURT:  Say that --

12          MR. OWENS:  -- that he has PTSD, and also talked

13   about how that impacted him at his deposition because the

14   expert discovery took place soon after the depositions were

15   completed, as you'd expect.  And so that's -- but I can have

16   Dr. Miller say.  We don't need to spend too much time on this.

17          MR. McLANDRICH:  So this goes back, as I recall, to

18   a motion in limine that we filed with respect to the medical

19   records never being produced to us.  They were produced to the

20   Township, but never produced to us.

21          MR. OWENS:  The problem is that they never requested

22   them.  We're not -- I am not in here waiving around any

23   medical records dealing with medical records that were --

24          THE COURT:  How about this doctor that's coming in?

25          MR. McLANDRICH:  He's got an expert report from

R. DEAN GILLISPIE - DIRECT (Owens)                    358

```
1    Dr. Miller?  I don't think so.
2            MR. OWENS:  Yeah, there is.  We had a whole lot of
3    litigation after him because his dad died in 2019.
4            MR. HERMAN:  There is.
5            MR. McLANDRICH:  I stand corrected.
6            THE COURT:  Move on.
7            MR. OWENS:  Sure.
8            THE COURT:  I won't strike it, but, obviously, you
9    will have the opportunity to cross-examine this doctor as to
10   whatever --
11           MR. McLANDRICH:  Sure.
12           THE COURT:  -- he's going to diagnose.
13           MR. HERMAN:  Nothing further.
14           MR. MAYER:  No.
15       (In open court.)
16           THE COURT:  Counsel, I do need to ask you, however,
17   where are we?  I've got a jury that's sitting here.  I need to
18   take a break.
19           MR. OWENS:  That would be perfect, Your Honor.
20           THE COURT:  You are not done yet?
21           MR. OWENS:  This is how much that's left
22   (indicating).
23           THE COURT:  Ladies and gentlemen, we're going to
24   take a break.  We'll break for about 15 minutes, and we'll
25   reconvene.  But, obviously, it's election day.  I am going to
```

R. DEAN GILLISPIE - DIRECT (Owens)                    359

```
 1    let you go at 4 o'clock.  Not 4:01, 4 o'clock.

 2            THE COURTROOM DEPUTY:  All rise.  This court stands

 3    in recess.

 4        (Jury out at 3:10 p.m.)

 5        (Recess at 3:10 p.m.)

 6        (Jury in at 3:30 p.m.)

 7        (In open court at 3:31 p.m.)

 8            THE COURT:  We're back on the record.

 9        Counsel ready to proceed?

10            MR. OWENS:  Yes, Your Honor.

11            THE COURT:  Counsel ready to proceed?

12            MR. McLANDRICH:  Yes, Your Honor.

13            THE COURT:  We're going to try to finish up

14    Mr. Gillispie hopefully, at least on direct.

15            MR. OWENS:  Yes, sir.

16            THE COURT:  I am going to give you, counsel, the

17    option as to whether or not you want to start cross or not

18    once they are done, because we are getting to that point.

19            MR. McLANDRICH:  Yes, sir.  Thank you.

20    BY MR. OWENS:

21    Q.   All right, Mr. Gillispie.  Just before the break, we were

22    sort of discussing the period of time between 2011-2012 and

23    2017.  With me?

24    A.   Yes.

25    Q.   All right.  And so was there -- last winter, was there a
```

R. DEAN GILLISPIE - DIRECT (Owens)                      360

1    significant legal development for your case?

2    **A.**    Yes.

3    **Q.**    Okay.  And without going into any details about what any

4    court said or in terms of substance, can you just tell us what

5    happened.

6          So you can say what happened, but don't say anything

7    about what the judge said.  Does that make sense?

8    **A.**    I'll try.

9    **Q.**    All right.

10   **A.**    December 9th, I was in court and declared a wrongfully

11   convicted person.

12   **Q.**    And was that in a court in the State of Ohio?

13   **A.**    Yeah, Montgomery County.

14   **Q.**    And can we pull up -- I think we got the computer

15   working.  The fifth time's a charm, I think -- Plaintiff's

16   Exhibit Number 200, page 6.

17             THE COURT:  I'm sorry.  Are there objections?

18             MR. McLANDRICH:  No objection.  I'm sorry.

19             MR. HERMAN:  No.

20             MR. OWENS:  Thank you, Judge.

21             THE COURT:  You're welcome.

22             MR. OWENS:  Page 4 of Exhibit 200 -- excuse me.

23   Page 6 of Exhibit 200.

24   BY MR. OWENS:

25   **Q.**    Mr. Gillispie, what's that in your hand there?  In that

R. DEAN GILLISPIE - DIRECT (Owens)                    361

1    picture.

2    **A.**    That's the ruling from the Court.  That's the ruling of

3    my wrongful conviction.

4    **Q.**    Now, why was this a significant day for you?

5    **A.**    That was the end of the -- that was the end of the

6    legal battles with the Montgomery County court system to

7    finalize this deal that I, after 31 years, proved that I was

8    wrongfully convicted.  It was a very big day for me.

9           THE COURT:  Counsel, I do need to clarify,

10   Mr. Gillispie has mentioned several times that he was found

11   wrongfully convicted.

12          MR. OWENS:  The order --

13          THE COURT:  My understanding is that the order does

14   not say that.

15   BY MR. OWENS:

16   **Q.**    Does the order, Mr. Gillispie, say it's a wrongful

17   imprisonment order?  Is that the language used in the statute?

18   **A.**    I haven't seen it in a little bit, but, yeah, that's

19   probably what it said.  I can't say for a definite fact

20   which way it went --

21   **Q.**    Okay.

22   **A.**    -- at this point now.

23   **Q.**    That's the way you took it without using legalese?

24   **A.**    Okay.  I -- what the proper terminology was, I don't

25   remember.

R. DEAN GILLISPIE - DIRECT (Owens)                      362

1    Q.   But for you that was the day where you just said, I got

2    closure and this is over for this proceeding?

3    A.   For that, correct.

4         THE COURT:  Right.  I truly believe that the record

5    needs to reflect what that -- if you are going to ask what

6    that document did, it needs to reflect what that document did.

7         MR. OWENS:  Sure, Your Honor.  This is where I ran

8    into a problem.  I was going to offer it up as an exhibit, but

9    I thought the Court would not allow me to offer it up as an

10   exhibit.  So that's where we ran into this problem.

11        THE COURT:  Well, I think that may be -- I think

12   that is in the stipulations.

13        MR. OWENS:  That is.

14   BY MR. OWENS:

15   Q.   So in December of last year, you were declared to be a

16   wrongfully imprisoned person under Ohio law, correct?

17   A.   Correct.

18        MR. OWENS:  And if we could go to page 4 of Exhibit

19   Number 200.

20        (Exhibit displayed.)

21   BY MR. OWENS:

22   Q.   Mr. Gillispie, is this the same day that we were

23   describing?

24   A.   Yes.

25   Q.   All right.  You can tell it's last winter 'cause people

R. DEAN GILLISPIE - DIRECT (Owens)                    363

 1   got masks on.  So can you just tell us what's going on in this

 2   moment and who the people are in the picture?

 3   A.    That's my -- that's my great niece there at the bottom

 4   trying to give me a hug.  The courtroom is all my friends

 5   and family who have been with me through all this.  That was

 6   after we got the order right there.

 7   Q.    And who's the woman in the gray shirt to your left in the

 8   picture?

 9   A.    That's my beautiful girlfriend, Pam.

10   Q.    And who's the, what looks like, an older gentleman behind

11   Lane?

12   A.    That's my dad.

13   Q.    To the right of him?

14   A.    That's my mom.

15   Q.    And who's the guy in the suit with the kind of twirling

16   tie?

17   A.    That's my dear friend Richie Winters.

18   Q.    And to the right of him?

19   A.    Brian Poulter.

20   Q.    To the right of him?

21   A.    Scott Bowling.

22   Q.    And who's the guy in the yellow shirt?

23   A.    Tony Rice.

24   Q.    Do you know that kid sitting with the gray hoodie onto

25   the left of Richie Winters?

R. DEAN GILLISPIE - DIRECT (Owens)                          364

1   **A.**    Yeah.

2   **Q.**    Who's that?

3   **A.**    That's one of the boys, one of the young guys that I'm

4   hanging out with trying to catch up.

5   **Q.**    Working on cars?

6   **A.**    Yes.  Good kids.

7   **Q.**    Now, your parents were here this day, and one of the

8   first pictures we looked at earlier today with the Airstream

9   also had your pictures in it -- or your parents in it.  Do you

10  remember that?

11  **A.**    Yes.

12  **Q.**    Now, I believe you testified earlier that your parents

13  spent some money for your legal defense?

14  **A.**    Every dime my dad ever earned went to this stuff.

15  **Q.**    And you can't talk about how this impacted their life.

16  That's for them to say.  But can you tell me how it impacted

17  you seeing your parents have to spend money, mortgage their

18  home, things like that?

19  **A.**    It's -- it's -- it's a debt that is because of me and

20  it's a burden on me.  It's a burden on me that they have

21  spent their life's fortune helping me defend this case, and

22  it's a debt that I owe to them.

23  **Q.**    And in this case, over the course of the past 30 years,

24  you've had opportunities -- strike that.

25          We talked about earlier how you had been seeking DNA

1    testing, other things like that, right?

2    **A.**    Yes.

3    **Q.**    In your interactions with Detective Moore, do you

4    remember when I asked you whether or not he ever said he was

5    going to -- said something about helping you prove your

6    innocence?

7    **A.**    I never heard him say that.  I tried everything in my

8    power to -- I hollered for polygraphs.  I've hollered for

9    any test that they could possibly have to test me on at

10   those times.

11   **Q.**    Did you ever say anything to Detective Moore about a

12   polygraph?

13   **A.**    I said it to everybody who came in my contact.  Yeah,

14   give me a polygraph, yes.

15   **Q.**    So just I want to be really specific.  Do you have a

16   memory of saying it to Detective Moore when you interacted

17   with him at some point back in 1990?

18   **A.**    Yes.

19   **Q.**    And just, last question here.  When you're sitting at the

20   second trial -- actually, never mind.

21       I guess, Mr. Gillispie, is you wrote the Court.  You

22   said -- you indicated that this had a big toll on you, had a

23   big toll on your family.  At any point did you ever consider

24   or were you willing to come and give up and say, I could make

25   this end shorter by just walking away from all of this?

R. DEAN GILLISPIE - DIRECT (Owens)                    366

1    **A.**   I was never going to walk away from it until it was

2    done.  Till that day right there (indicating), until I was

3    declared a wrongfully convicted person.  I was not ever

4    going to give up, ever.

5    **Q.**   And just for the record, that order declares you a

6    wrongfully imprisoned person, correct?

7    **A.**   Correct.

8    **Q.**   And that was from the State of Ohio just last year?

9    **A.**   December 9th.

10          MR. OWENS:  Those are all my questions for now, Your

11   Honor.

12          THE COURT:  All right.  Counsel, I'm not going to

13   put you in that bind unless you want to be put in that bind,

14   but if you can start if you want or we can go on till 4 -- or

15   we can start early in the morning, or first thing in the

16   morning.

17          MR. McLANDRICH:  Your Honor, if we're going to stop

18   at 4, I would just as soon defer till tomorrow.

19          THE COURT:  So what we'll do, Mr. Gillispie, we're

20   going to recess for the day, and, of course, there will be

21   some questions for you under cross-examination tomorrow

22   morning.

23      Ladies and gentlemen, we've come to a point in time where

24   it's been a fairly long day, a lot of testimony's been

25   presented.  I know you're tired.  For those of you who haven't

R. DEAN GILLISPIE - DIRECT (Owens)                              367

1    voted or want to vote, I am going to let you go.  You still

2    got some time.  And we'll see you back here at just a little

3    bit before 9 so we can get started right away.

4        Again, please don't -- you have heard more -- now you

5    have heard some evidence.  Now you have heard some testimony,

6    but please remember the Court's admonitions:  Don't discuss

7    the case amongst yourselves or with anyone else.  Don't

8    formulate any opinions, draw any conclusions with regard to

9    this.  Obviously, you still have much evidence to hear.  You

10   have arguments of counsel.  You have instructions of law.  To

11   do anything at this point in time would be unfair to all

12   parties concerned.

13       So, counsel, is there anything further to come before the

14   court?

15           MR. OWENS:  Not from us right now, Your Honor.

16           THE COURT:  Counsel?

17           MR. McLANDRICH:  No, Your Honor.

18           THE COURT:  Counsel?

19           MR. HERMAN:  No, Your Honor.  Thank you.

20           THE COURT:  We'll stand in recess, but I would like

21   to talk -- as soon as everyone's gone, I'd like to talk to

22   counsel just for a few moments about scheduling, all right?

23   Thank you.

24           THE COURTROOM DEPUTY:  All rise.  This court stands

25   in recess.

R. DEAN GILLISPIE - DIRECT (Owens)                    368

1          (Jury out at 3:44 p.m.)

2          (Court adjourned at 3:44 p.m.)

3

4

5                      CERTIFICATE OF REPORTER

6

7          I, Mary A. Schweinhagen, Federal Official Realtime

8   Court Reporter, in and for the United States District Court

9   for the Southern District of Ohio, do hereby certify that

10  pursuant to Section 753, Title 28, United States Code that the

11  foregoing is a true and correct transcript of the

12  stenographically reported proceedings held in the

13  above-entitled matter and that the transcript page format is

14  in conformance with the regulations of the Judicial Conference

15  of the United States.

16

17  s/Mary A. Schweinhagen

18  _____ 20th of December, 2023

19  MARY A. SCHWEINHAGEN, RDR, CRR
    FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25