369

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF OHIO
 2                            AT DAYTON

 3   _____
                                        )
     ROGER DEAN GILLISPIE,              )
 4                                      )
                     Plaintiff,         ) CASE NO. 3:13-cv-416-TMR
 5                                      )
                   -vs-                 )
 6                                      )
     THE CITY OF MIAMI TOWNSHIP, ET AL.,) JURY TRIAL
 7                                      )
                     Defendants.        ) VOLUME IV
 8   _____)
                      TRANSCRIPT OF PROCEEDINGS
 9             THE HONORABLE THOMAS M. ROSE,
           UNITED STATES DISTRICT JUDGE, PRESIDING
10              WEDNESDAY, NOVEMBER 9, 2022
                        DAYTON, OH
11
     For the Plaintiff:      MICHAEL KANOVITZ, ESQ.
12                           DAVID B. OWENS, ESQ.
                             MEGAN C. PORTER, ESQ.
13                           Loevy & Loevy
                             311 N. Aberdeen Street
14                           3rd Floor
                             Chicago, IL  60607
15
     For the Defendant       JOHN T. McLANDRICH, ESQ.
16   Matthew Scott Moore:    DAVID J. SIPUSIC, ESQ.
                             Mazanec, Raskin & Ryder Co., LPA
17                           3305 Solon Road
                             100 Franklin's Row
18                           Cleveland, OH  44139

19   For the Intervenor      DAWN M. FRICK ESQ.
     Miami Township:         CHRISTOPHER T. HERMAN, ESQ.
20                           Surdyk, Down & Turner Co., LLP
                             8163 Old Yankee Street
21                           Suite C
                             Dayton, OH  45458
22
          Proceedings recorded by mechanical stenography,
23   transcript produced by computer.
                     Mary A. Schweinhagen, RDR, CRR
24               Federal Official Court Reporter
                     200 West Second Street
25                     Dayton, OH  45402
                     *** *** *** ***
```

1    Courtroom Deputy:  Elizabeth Penski

2    Law Clerks:  Michael Mayer, Callum Morris

3    Also Present:  Roger Dean Gillispie, plaintiff; Valerie
     Barajas, paralegal; Matt Thibodeau, paralegal; Jeff Weber, IT
4

5
                          **INDEX OF WITNESSES**
6
                          November 9, 2022
7

8    **PLAINTIFF'S WITNESSES**

     **R. DEAN GILLISPIE**
9        Direct Examination by Mr. Owens              373
         Cross-Examination by Mr. McLandrich          394
10

11   **JAMES PETRO**
         Direct Examination by Mr. Kanovitz           397
12
     **SCOTT BOWLING**
13       Direct Examination by Mr. Owens              408

14   **JERRY FYFFE**
         Direct Examination by Mr. Kanovitz           415
         Cross-Examination by Mr. McLandrich          431
15

16   **JENNIFER DYSART**
         Direct Examination by Mr. Owens              438
         Cross-Examination by Mr. McLandrich          508
17       Redirect Examination by Mr. Owens            535
         Cross-Examination by Mr. McLandrich          544
18       Further Redirect Examination by Mr. Owens    551

19   **LISA SCHRECK**
         Direct Examination by Mr. Owens              553
20       Cross-Examination by Mr. McLandrich          562
         Redirect Examination by Mr. Owens            564
21

22

23

24                    *     *     *     *     *

25

```
 1              P-R-O-C-E-E-D-I-N-G-S                    8:52 A.M.

 2                    (In chambers at 8:52 a.m.)

 3           THE COURT:  First I wasn't going to meet with you,

 4      and then I thought I am.  And I thought I'd give you some

 5      direction here on the record with regard to the proposed

 6      witness.

 7           The Court has heard the arguments -- well, first this is

 8      being conducted in the conference outside the presence of the

 9      jury with counsel.

10           The Court has heard the arguments of counsel.  The Court

11      has, of course, by its order on the motion in limine basically

12      found Dr. Dysart to be qualified as an expert.  I do

13      recognize -- I also recognize the scientific validity of such

14      a study and the aid it does provide to the jury as long as

15      testimony does not include the specific facts of the case,

16      including any credibility of any witnesses and/or the best

17      practices of police or appropriate policies or procedures with

18      regard to lineups, questions of law, or in any way infringe

19      upon the jury's role.

20           Said another way, testimony is limited to the general

21      principles of eyewitness identification and contamination by

22      third persons, and that includes testifying about something

23      being suggestive or negatively affecting the reliability of an

24      identification simply because that something may be

25      permissible under Ohio law.  So she can testify regardless of
```

```
 1    the -- she's not barred from testifying.

 2              MR. OWENS:  Thank you, Judge.

 3              THE COURT:  Okay with it -- I am not saying okay

 4    with you, but everybody understand?

 5              MR. McLANDRICH:  Understand it, yeah.  Not

 6    particularly okay with it, just for the record.

 7              THE COURT:  I understand.  No, no.  Do whatever you

 8    need do with the record, that's fine.

 9         The only other thing I wanted to bring up is that -- I

10    think we settled this yesterday.  If for any reason -- it's my

11    understanding that no one is going to tread in that direction,

12    but if anybody in any way, shape, or form contemplates going

13    toward any kind of an award by the State or that process, you

14    need to bring that to my attention before we tread into that.

15    I'm not saying you are, and I thought I was fairly secure that

16    no one was, but if you are going to do it, I need to know

17    about it before.

18         Was I clear enough?

19              MR. MAYER:  I think so, Judge.

20              MR. OWENS:  There is only one answer to that

21    question.

22              THE COURT:  No, there's not.  Maybe some judges work

23    that way.  I don't.  See you in there.

24         (Conference concluded at 8:55 a.m.)

25         (Jury in at 9:03 a.m.)
```

R. DEAN GILLISPIE - CROSS (McLandrich)                 373

```
 1           (In open court at 9:05 a.m.)

 2               THE COURT:  Good morning, everyone.  Hopefully,

 3     everyone had a restful evening and didn't stay up too late

 4     watching the election results or whatever.

 5         As always, my first question to you is, were you able to

 6     abide by the court's admonition?  Anybody that was not?

 7         (No verbal response.)

 8               THE COURT:  Counsel ready to proceed?

 9               MR. OWENS:  Yes, Your Honor.

10               MR. McLANDRICH:  Yes, Your Honor.

11               MR. HERMAN:  Yes, Your Honor.

12               THE COURT:  All right.  Counsel.

13               MR. McLANDRICH:  Thank you, Your Honor.

14               THE COURT:  Mr. Gillispie, you are still under oath.

15          ROGER DEAN GILLISPIE, PLAINTIFF, PREVIOUSLY SWORN

16                          CROSS-EXAMINATION

17     BY MR. McLANDRICH:

18     Q.   Good morning, Mr. Gillispie.

19     A.   How you doing?

20     Q.   Good.

21         We've never met before, have we?  I wasn't at your

22     deposition?

23     A.   I don't think so.

24     Q.   Your full name is Roger Dean Gillispie, sir?

25     A.   That's what's on my birth certificate, yes.
```

R. DEAN GILLISPIE - CROSS (McLandrich)                 374

1   **Q.**   But you've always gone by Dean because your dad's name is

2   also Roger?

3   **A.**   Correct.

4   **Q.**   And yesterday you testified with respect to your work

5   schedule on the days of the sexual assaults, correct?

6   **A.**   Yes.

7   **Q.**   And you testified that you were at work on August 5th,

8   correct?

9   **A.**   I would have to look, but, yes, I believe that's what I

10  said.

11  **Q.**   Yes, sir.  And in that regard --

12          MR. McLANDRICH:  Jeff, would you please bring up

13  exhibit -- Defendant's Exhibit 15, please.

14          THE COURT:  Is this one that's been shown?

15          MR. McLANDRICH:  Yes.  We --

16          MR. OWENS:  No objection.

17          MR. McLANDRICH:  -- showed them all this morning to

18  counsel, and I think we are in agreement.

19          THE COURT:  Do you anticipate any objections to any

20  of the ones they want to display?

21          MR. OWENS:  No, Your Honor.

22          THE COURT:  Thank you.  I appreciate it.

23      (Exhibit displayed.)

24  BY MR. McLANDRICH:

25  **Q.**   Showing what's been marked as Defendant's Exhibit 15,

R. DEAN GILLISPIE - CROSS (McLandrich)                    375

1    this is a letter that was sent from General Motors by

2    Mr. Wolfe to Detective Moore.  And you notice we've

3    highlighted the day of August 5th, that Friday, and it shows

4    that you were off work.

5            MR. McLANDRICH:  Jeff, would you go to the next

6    page, please.

7        (Exhibit published.)

8    BY MR. McLANDRICH:

9    Q.   And this is the same copy of the schedule that

10   plaintiff's counsel reviewed with you yesterday, and you can

11   see for the Friday, August 5th, the 0 or circle that means,

12   according to the key at the bottom, day off.  Do you see that?

13   A.   Yes.

14   Q.   And does that, in fact, refresh your recollection that

15   you were not working on the 5th?  In fact, you were on a day

16   off that day?

17   A.   Correct.

18   Q.   So when you said yesterday that you were working on the

19   5th, you misspoke, incorrect?

20   A.   Yes.  The way this is set up, I didn't notice the dates

21   at the top.  I mean the days of the week.

22   Q.   With respect to August 20th, it's your testimony

23   yesterday that you believe you were in Kentucky with your

24   friends at Cave Lake, correct?

25   A.   Correct.

R. DEAN GILLISPIE - CROSS (McLandrich)                    376

1    **Q.**   And as I understand your testimony and prior testimony,

2    that belief is predicated on the calendar of Homer Fyffe

3    showing that his dogs had had pups on or about that date,

4    correct?

5    **A.**   Correct.

6    **Q.**   All right.  And I believe your prior testimony has been

7    that without that calendar date you would have no way of

8    remembering whether you were or weren't in Kentucky on that

9    particular date, correct?

10   **A.**   Correct.

11   **Q.**   Now, that calendar took some time to be found; isn't that

12   right?

13   **A.**   Yes.

14   **Q.**   And then it's my understanding it went missing again for

15   a period of time and then was found again; is that correct?

16   **A.**   That's the way I understand it.

17   **Q.**   And you never had custody and control of that calendar,

18   correct?

19   **A.**   No.

20   **Q.**   You can't testify to the accuracy of that calendar,

21   correct?

22   **A.**   Correct.

23   **Q.**   And with respect to your whereabouts on the days of the

24   sexual assaults, these are the same explanations, alibis,

25   alleged alibis that were offered at your two criminal trials,

R. DEAN GILLISPIE - CROSS (McLandrich)                    377

1    correct?

2    **A.**    Correct.

3    **Q.**    And notwithstanding those two alibis, those two juries

4    found you guilty, correct?

5    **A.**    Correct.

6    **Q.**    And you testified yesterday to a number of other things

7    with respect to yourself in contrast to the descriptions of

8    the perpetrator described by the two ladies.  In other words,

9    that you don't smoke, and there was some indication that the

10   perpetrator had smoked a cigarette.  Do you recall that?

11   **A.**    Repeat the question.

12   **Q.**    Sure, sure.  Let me just reask it a little differently.

13          So one of the things that had been indicated by the

14   ladies who were the subject of these assaults was that, for

15   B.W. and C.W., that the individual had asked for a cigarette

16   and stolen a pack of cigarettes from them.  Do you recall

17   that?

18   **A.**    Yes.

19   **Q.**    And then I believe with S.C., while she is sitting in the

20   car with the perpetrator, that the perpetrator had smoked a

21   cigarette.  Do you recall that?

22          And if you don't, that's fine.  I mean --

23   **A.**    I mean, this was something that happened at the trial,

24   so I would have to see -- I don't remember these questions

25   from yesterday.

R. DEAN GILLISPIE - CROSS (McLandrich)                    378

1   **Q.**   All right.  No, that's fine.  If you don't recall, you

2   don't recall.  That's fair enough.

3       In any event, you testified yesterday, and you would have

4   testified at the criminal trial, that you are a non-smoker and

5   don't like being around cigarette smoke?

6   **A.**   Correct.  I do not like it at all.

7   **Q.**   And likewise testified that, don't wear a gold chain with

8   a gold medallion and didn't at that time?

9   **A.**   No.

10  **Q.**   And notwithstanding that testimony, again was found

11  guilty at the two criminal trials, correct?

12  **A.**   Correct.

13  **Q.**   Now, with respect to Detective Moore, you don't have any

14  personal information that indicates to you that he was ever in

15  possession of any reports that he suppressed or destroyed,

16  correct?

17          MR. OWENS:  Objection to the extent it calls for

18  information that's held by counsel.

19          THE COURT:  I think his question was do you have any

20  information to that.  If he doesn't, then he doesn't.  I mean,

21  if he doesn't know, he doesn't know.  Is that your objection?

22          MR. OWENS:  I hate to interrupt.  Can we just -- can

23  I address the Court on sidebar on this?

24          THE COURT:  Sure.

25      (At sidebar.)

1           THE COURT:  Counsel.

2           MR. OWENS:  This is David Owens on behalf of

3   plaintiff.  My concern is just that the question is, so, for

4   example, there are grand jury transcripts in which, you know,

5   Moore talks about I have the camping receipts, got them for

6   the month before he was down there a few days later.  If I

7   discussed that with Mr. Gillispie hypothetically, it seems

8   like your question is, you know, are you asking him about that

9   or are you just saying --

10          MR. McLANDRICH:  Well, my question was does he have

11  any personal knowledge of reports written by Fritz and Bailey

12  that were suppressed and destroyed by Gillispie.

13          MR. OWENS:  You asked him about the alibis.

14          MR. McLANDRICH:  Not in that question.

15          THE COURT:  The question before the Court was to the

16  effect of do you have any information or do you know,

17  personally know, whether or not Moore ever possessed the

18  reports.  Reports.  I think that was the question.

19          MR. OWENS:  I thought you said the camping receipts.

20          MR. McLANDRICH:  No, no.

21          MR. OWENS:  I misheard you.  No problem.

22     (In open court.)

23          THE COURT:  I'm not sure, counsel, was that an

24  objection?

25          MR. OWENS:  I withdraw the objection.  Thank you.

R. DEAN GILLISPIE - CROSS (McLandrich)                    380

1              THE COURT:  You can reask the question.

2              MR. McLANDRICH:  Yes, sir.

3       BY MR. McLANDRICH:

4       Q.   Mr. Gillispie, you're aware that there is an allegation

5       in this case that there were certain reports allegedly written

6       by Detective Bailey and approved by Detective Fritz that were

7       destroyed or suppressed by Detective Moore, correct?

8       A.   Yes, I know that now, yes.

9       Q.   And do you have any personal information that would

10      indicate to you or indicate to the jury that Detective Moore

11      was in possession of those reports and suppressed or destroyed

12      them?

13      A.   I wouldn't have knowledge of that.

14      Q.   Thank you.  With respect to the campground receipts, do

15      you recall the testimony that's been offered that you and

16      Mr. Fyffe would go to Kentucky, down to Cave Run, and

17      Mr. Fyffe would register, since he had the boat and the truck,

18      he would register, and then a receipt for that registration

19      would be created by the campground, correct?

20      A.   Correct.

21      Q.   All right.  And it was always Mr. Fyffe, in fact, that

22      would sign in and not yourself, correct?

23      A.   Correct.

24      Q.   So if someone was to try and find receipts that were

25      pertinent to the circumstance, they would be looking for

R. DEAN GILLISPIE - CROSS (McLandrich)                    381

1    Mr. Fyffe's name and not your name, correct?

2    **A.**   I don't know what they would look for.

3    **Q.**   Well, if we were going to look for receipts, I think we

4    agree that the receipts would have Mr. Fyffe's name on them

5    and not yours.  That's all I am asking.

6    **A.**   There was receipts with my name on them.  I went down

7    myself also.

8    **Q.**   Okay.  And, in fact, you went down with Mr. Fritz,

9    correct?

10   **A.**   At a -- yes, at a point.

11   **Q.**   And when you and Mr. Fyffe would drive from essentially

12   Fairborn to Morehead, Kentucky, how long a drive is that?  How

13   long does that take?

14   **A.**   It's about three and a half hours.

15   **Q.**   All right.  And so when you and Mr. Fritz drove to

16   Morehead, it would have been about the same three and a half

17   hours?

18   **A.**   Been the same route.

19   **Q.**   Right.  And so three and a half hours down, however long

20   at the campground to look at receipts, and three and a half

21   hours back, correct?

22   **A.**   Approximate.

23   **Q.**   So you are together, let's say, seven to seven and a

24   half/eight hours for that particular day?

25   **A.**   Are you referring to me and Fyffe or Fritz?

R. DEAN GILLISPIE - CROSS (McLandrich)                    382

1   **Q.**   You and Fritz.  I'm sorry.

2   **A.**   That would be approximately the -- yes.

3   **Q.**   And so Mr. Fritz, presumably since he signed this report

4   allegedly written by Mr. Bailey, would have knowledge of its

5   existence, correct?

6              MR. OWENS:  Objection; foundation.

7              THE COURT:  Sustained.

8   BY MR. McLANDRICH:

9   **Q.**   If, in fact, there was a report authored by Mr. Fritz --

10  I'm sorry -- by Mr. Bailey that Mr. Fritz signed off on, he

11  would be aware of what he signed, no?

12             MR. OWENS:  Objection; foundation.

13             MR. McLANDRICH:  It's a hypothetical question.

14             THE COURT:  If he knows, he can answer.

15             THE WITNESS:  I would not know.

16  BY MR. McLANDRICH:

17  **Q.**   All right.  In any event, we know the allegation in this

18  case is that there was this report that excluded you as a

19  suspect authored by Mr. Bailey and signed off on by Mr. Fritz

20  as his supervisor.  We've already agreed to that, correct?

21  **A.**   You will have to ask that a different way.

22  **Q.**   Okay.  So it's my understanding, and perhaps you are not

23  aware, but it's my understanding that there is an allegation

24  in this case that Detective Bailey authored a report that said

25  you weren't a good suspect, and the allegation is that

1    Detective Moore somehow prevented that from being supplied to

2    your defense counsel.  Are you aware of that allegation?

3    **A.**    I'm aware of it through the trial.

4    **Q.**    Through whatever means --

5    **A.**    Okay.

6    **Q.**    -- you're aware, right?

7    **A.**    Right.  I knew nothing beforehand.

8    **Q.**    I understand.

9    **A.**    Through the -- yeah.

10   **Q.**    I understand.

11   **A.**    Okay.

12   **Q.**    And my question is very simple, though.  In the seven and

13   a half to eight hours that you and Mr. Fritz are together, at

14   no time does he say to you, "Mr. Gillispie, there's a report

15   that excluded you as a suspect that Detective Bailey wrote,"

16   correct?

17   **A.**    Not that I recall.

18   **Q.**    All right.  And, in fact, he was functioning as the

19   criminal investigator for your defense team during this time

20   that you are going to Morehead, Kentucky, with him, correct?

21   **A.**    Correct.

22   **Q.**    And I think that everyone would agree, and you would

23   agree, would you not, that that report, if it existed, would

24   be an important piece of information, correct?

25   **A.**    I would have to agree, yes.

R. DEAN GILLISPIE - CROSS (McLandrich)                    384

1   **Q.** All right. Because, in fact, it's one of the primary

2   reasons that we're here with this case and the reason that

3   your conviction was vacated, correct?

4   **A.** Correct.

5   **Q.** All right. And so if he was in possession of this

6   particularly important piece of information and he was working

7   for you, wouldn't you presume that he would convey that

8   information to you?

9           MR. OWENS: Objection; foundation.

10          MR. McLANDRICH: Again, it's hypothetical.

11          MR. OWENS: It seems like he's asking the wrong

12   witness.

13          THE COURT: Sustained.

14   BY MR. McLANDRICH:

15   **Q.** In any event, no time during that seven and a half or

16   eight hours did he convey that information to you?

17   **A.** No.

18   **Q.** All right. And, in fact, not during any other

19   conversation that you ever had with Mr. Fritz did he convey

20   that information to you?

21   **A.** No.

22   **Q.** And as far as you know, he never conveyed that

23   information to your defense team at any time before or during

24   either of your two criminal trials?

25   **A.** His conveyance to someone else, I have no idea.

R. DEAN GILLISPIE - CROSS (McLandrich)                    385

1    **Q.**   All right.  Now, you have no reason to believe that

2    Detective Moore bore you any particular ill will, correct?

3    **A.**   At that time I didn't know who he was.

4    **Q.**   All right.  And, therefore, presumably has no basis to

5    presume that he bore you any ill will, correct?

6             MR. OWENS:  Objection, Your Honor.

7             THE COURT:  Sustained.  He didn't know who he was.

8    BY MR. McLANDRICH:

9    **Q.**   And as far as you know, he didn't know who you were

10   before this case, correct?

11            MR. OWENS:  Objection, Your Honor.

12            THE COURT:  Sustained.

13   BY MR. McLANDRICH:

14   **Q.**   You testified yesterday that you were at the Warren

15   Correctional Institute, correct?

16   **A.**   Yes.

17   **Q.**   And at some point you were transferred from that facility

18   to a lower security facility?

19   **A.**   Yes.

20   **Q.**   And that was, what, ten years into your sentence?

21   **A.**   Approximately.

22            MR. McLANDRICH:  Jeff, would you bring up

23   Plaintiff's 54, page 80.

24            MR. OWENS:  Did you say 54?

25            MR. McLANDRICH:  Yes.

R. DEAN GILLISPIE - CROSS (McLandrich)                    386

```
 1            (Exhibit published.)

 2     BY MR. McLANDRICH:

 3     Q.   So, Mr. Gillispie, this is a photograph that you were

 4     asked about yesterday by your counsel, and I believe you

 5     indicated that you were at your brother, James's house,

 6     correct?

 7     A.   Correct.

 8     Q.   All right.  And do you see the tan line on your right

 9     arm?  Do you see where it's white just below the shirt and

10     then lower down it's much darker?

11     A.   I don't see a tan line, no.  I -- no.

12     Q.   All right.

13            MR. McLANDRICH:  Jeff, would you bring up 284-4 of

14     Plaintiff's, please.

15            (Exhibit displayed.)

16     BY MR. McLANDRICH:

17     Q.   Showing you Plaintiff's Exhibit 284, this is you and

18     another gentleman.  Who's the other gentleman?

19     A.   That's my friend Brian Poulter.

20     Q.   All right.  And do you know when this picture was taken?

21     A.   I have no idea.

22     Q.   And does your face appear to be tanned in that picture?

23     A.   No.

24            MR. McLANDRICH:  Take it down.

25     BY MR. McLANDRICH:
```

R. DEAN GILLISPIE - CROSS (McLandrich)                387

1    **Q.**   Now, there's been testimony that Mr. Wolfe, who used to

2    also work at GM, brought some GM identification badges to the

3    Miami Township Police Department.  Do you recall that?

4    **A.**   During the trial, yes.

5    **Q.**   All right.  And you didn't have any particular

6    relationship with Mr. Wolfe during your employment at GM,

7    correct?

8    **A.**   You'll have to -- I don't know what you mean by

9    "relationship."

10   **Q.**   Well, he was not your direct supervisor, correct?

11   **A.**   Correct.

12   **Q.**   Didn't have any run-ins with him where he expressed any

13   animosity towards you?

14   **A.**   Several.

15   **Q.**   Okay.  Tell me about those.

16   **A.**   You want me to tell you about?

17   **Q.**   Your interaction with Wolfe.

18   **A.**   Wolfe was the head of several GM plants' security at

19   GM.  So he came on site frequently.

20   **Q.**   I understand.  But did you have personal interaction with

21   him?

22   **A.**   Yes.

23   **Q.**   And it's your allegation that during those interactions

24   you had some sort of expressed animosity between you?

25   **A.**   Yes.  He had animosity, yes.

R. DEAN GILLISPIE - CROSS (McLandrich)                388

1  **Q.**   Do you recall being asked about that at your deposition?

2          MR. OWENS:  Can you clarify?  About what?

3  BY MR. McLANDRICH:

4  **Q.**   About whether you had any interaction with Wolfe that

5  expressed animosity between you?

6  **A.**   I was questioned, yes.

7          MR. McLANDRICH:  Would you bring up Exhibit

8  Defendant's 45, please, page 176.

9          (Exhibit displayed.)

10 BY MR. McLANDRICH:

11 **Q.**   And you were asked the question, "Explain to me what the

12 average occasion like -- how would -- that would work."

13         And your answer was, "He was a person who would be able

14 to drive into the plant.  So you would register their vehicle

15 as someone entering the plant."

16         MR. McLANDRICH:  Next page, please.

17 BY MR. McLANDRICH:

18 **Q.**   And then you were asked the question at line 6, "Is there

19 any particular incident that you recall?"

20         Answer, "No."

21         Next question, "Okay.  Do you have any personal knowledge

22 that leads you to believe --" I'm sorry.  That's not -- strike

23 that.

24         That's all, thank you.

25         So during your deposition, there were no particular

1    incidents that you testified to, correct?

2    **A.**    I need to look at this here again.  I need to see this

3    again.

4         Is that okay, sir?

5              THE COURT:  If it's going to --

6              MR. McLANDRICH:  I'm done with it.

7              THE COURT:  Well --

8              MR. McLANDRICH:  You want to see it again?

9              THE COURT:  -- let him see the last page.

10             MR. McLANDRICH:  Sure.

11        (Exhibit displayed.)

12             THE COURT:  I assume that's what he wants to see.

13             THE WITNESS:  Yes.

14   BY MR. McLANDRICH:

15   **Q.**    So you were asked the question, "And what was the extent

16   of your interaction with Mr. Wolfe during your employment?"

17        And your answer, "He was the head of supervision.  I am

18   sure we had general conversations about the day or whatever."

19        "Question:  Is there any particular incident that you

20   recall?"

21        "Answer:  No."

22   **A.**    Yeah, there was a whole thing that was missing when you

23   were speaking there.  I just wanted to make sure that was --

24   okay.

25   **Q.**    He was the head?

R. DEAN GILLISPIE - CROSS (McLandrich)                    390

1   **A.**   Right, right.

2   **Q.**   And your answer when asked at your deposition whether

3   there were any particular incidents between you, you answered

4   "No."

5   **A.**   Okay.

6   **Q.**   And was that a correct answer when you gave it on

7   November 5, 2018?

8   **A.**   That was the answer on that deposition there.

9   **Q.**   But today you'd like to give us a different answer?

10          MR. OWENS:  Objection; argumentative.

11          THE COURT:  Well, do you wish to give a different

12  answer to that?

13          THE WITNESS:  No.  I'm just -- I needed to see that.

14          THE COURT:  You can take that transcript down.

15  BY MR. McLANDRICH:

16  **Q.**   With respect to the campground in Kentucky, were there

17  other campsites that you and your friends would go to where

18  you didn't, in fact, have to sign in and register?

19  **A.**   There was a campground on the other side of the lake

20  that we may have went to once or twice.

21  **Q.**   And whenever you went to this other campground, whatever

22  occasions those were, on those occasions there would be no

23  receipt because there would be no registration required,

24  correct?

25  **A.**   This was a man who had a house with four spots you

R. DEAN GILLISPIE - CROSS (McLandrich)                    391

1   could camp on.

2   **Q.**   My question was a little different.  My question was,

3   when you went to the alternate campsite, you didn't have to

4   register with the park rangers.  So there would be no receipt,

5   correct?

6   **A.**   It was not a campground.  It was a camping spot.

7           THE COURT:  I think the question was did you have to

8   register.

9           THE WITNESS:  No.

10  BY MR. McLANDRICH:

11  **Q.**   Since your release, have you received any mental health

12  treatment?

13  **A.**   Extensively.

14          MR. McLANDRICH:  Would you again pull up Deposition

15  45?  Page 84, please.

16      (Exhibit displayed.)

17  BY MR. McLANDRICH:

18  **Q.**   You were asked this question at line 12.  "Question:

19  Have you seen a mental health professional since your release

20  from prison?"

21      "Answer:  No."

22  **A.**   At that time.

23  **Q.**   And so what you're saying is that since November 5, 2018,

24  you've been seeking mental health treatment?

25  **A.**   As soon as this deposition was over.

R. DEAN GILLISPIE - CROSS (McLandrich)                    392

1   **Q.**   And who's that with?

2   **A.**   Donna Mayerson.

3   **Q.**   Now, do you recall a man named Mr. Miller who also was a

4   supervisor at GM?

5   **A.**   Yes.

6   **Q.**   And was he a more direct supervisor of you?

7   **A.**   Correct.

8   **Q.**   And did you have a mostly positive relationship with

9   Mr. Miller?

10  **A.**   I felt it was.

11  **Q.**   When you initially met with Detective Moore at the police

12  department, it's correct that you didn't recall where you were

13  on August 5th or August 20th, correct?

14  **A.**   That was two years before I was in there, yes.

15  **Q.**   And then as you testified yesterday, spent some time

16  trying to figure out where, in fact, you were?

17  **A.**   Correct.

18  **Q.**   And then eventually your friend Jerry and/or his father

19  locate the calendar which we've talked about with respect to

20  August 20th?

21  **A.**   Correct.

22  **Q.**   And with respect to August 5th, we don't have any

23  documentation as to where you were, correct?

24  **A.**   Correct.

25  **Q.**   You testified yesterday with respect to the time where

R. DEAN GILLISPIE - CROSS (McLandrich)                 393

1    you were going to school at Sinclair College.  Do you recall

2    that?

3    A.    Yes.

4    Q.    Either as a part of that schooling or otherwise, did you

5    take a 120-hour police course?

6    A.    That was separate from the Sinclair.

7    Q.    All right.  But you took such a course?

8    A.    Correct.

9    Q.    With respect to your severance of employment from General

10   Motors, you did, in fact, shut down the worksite without

11   authorization, correct?

12   A.    Correct.

13   Q.    So it wasn't GM just firing you for no reason, correct?

14   A.    When I was on the site, I was the -- in charge of that

15   site.

16   Q.    Be that as it may, they didn't authorize you to shut the

17   site down.  You took that into your own authority; regardless

18   of whether you had the authority or not, you shut it down,

19   correct?

20   A.    Correct.

21   Q.    So they didn't just make up something to fire you.  You

22   shut the site down.  They didn't feel that was appropriate,

23   and they let you go?

24             MR. OWENS:  Objection; foundation.

25             THE COURT:  Sustained.

R. DEAN GILLISPIE - REDIRECT (Owens)                    394

1          If you want to rephrase, you can.

2              MR. McLANDRICH:  All right.

3    BY MR. McLANDRICH:

4    **Q.**   They didn't make up a story of you shutting down the

5    worksite.  You did that, correct?

6    **A.**   Correct.

7    **Q.**   And then when challenged about it, you said I quit and

8    they said you're fired.  That was your testimony yesterday,

9    correct?

10   **A.**   Correct.

11             MR. McLANDRICH:  That's all I have for you,

12   Mr. Gillispie.  Thank you for your time.

13             THE COURT:  Thank you, counsel.

14        Questions with regard to anything that was covered on

15   cross.

16             MR. OWENS:  Yes, Your Honor.  Just a few.

17                    **REDIRECT EXAMINATION**

18   BY MR. OWENS:

19   **Q.**   You were asked a couple questions about being transferred

20   to London Correctional Facility after being at Warren for a

21   while.  Do you remember that?

22   **A.**   Yes.

23   **Q.**   And that was a -- was that a lower, technically, security

24   classification facility?

25   **A.**   Yes.  That was medium/minimum.

R. DEAN GILLISPIE - REDIRECT (Owens)                    395

1   **Q.**   Was everything about that -- strike that.

2        Was that a -- were there still -- were you still in

3   prison when you were at London?

4   **A.**   Oh, absolutely.

5   **Q.**   Were the sleeping arrangements better or worse than being

6   at Warren?

7   **A.**   Worse.

8   **Q.**   How so?

9   **A.**   I went from a two-man --

10       MR. McLANDRICH:  Objection, Your Honor.  This is

11  outside the scope of what was asked.

12       THE COURT:  Well, you led into the transfer.  I am

13  going to allow it to some degree.

14       Go ahead.  You can answer.

15       THE WITNESS:  I went from a two-man cell to an open

16  dorm, where it's headboard to headboard, side by side, wide-

17  open living.

18  BY MR. OWENS:

19  **Q.**   Did that impact your sleep?

20  **A.**   You don't get sleep.

21  **Q.**   You mentioned that you started seeking mental health

22  treatment after your deposition in 2018; is that right?

23  **A.**   Yes.

24  **Q.**   And was your deposition itself the -- part of the reason

25  why you started getting mental health treatment at that point?

1    **A.**    Yeah, absolutely.  That was the worst day of my entire

2    life at that point.  Violently ill after that and needed to

3    know why.

4              MR. OWENS:  That's it.  Thank you.

5              MR. McLANDRICH:  Nothing further, Your Honor.

6              THE COURT:  Is this witness excused?

7              MR. OWENS:  Yes, Your Honor.

8              THE COURT:  Thank you very much, Mr. Gillispie.

9         Counsel, do you have another witness there?

10             MR. KANOVITZ:  Just a moment, Your Honor.  We were

11   expecting 10 a.m.

12             THE COURT:  If there is going to be a necessity of a

13   break, I don't want to keep the jury sitting here.  Five

14   minutes or what?

15             MR. KANOVITZ:  I think it probably makes sense to

16   let the jury have a little break.

17             THE COURT:  Let's break for about ten minutes, and

18   then we will hopefully reconvene at that time.

19             THE COURTROOM DEPUTY:  All rise.  This court stands

20   in recess.

21        (Jury out at 9:40 a.m.)

22        (Recess at 9:40 a.m.)

23        (Jury in at 9:57 a.m.)

24        (In open court at 9:58 a.m.)

25             THE COURT:  We are back on the record.  Counsel

PETRO - DIRECT (Kanovitz)                                397

1   ready to proceed?

2           MR. KANOVITZ:  We are, Your Honor.

3           MR. McLANDRICH:  Yes, sir.

4           MR. HERMAN:  Yes, Your Honor.

5           THE COURT:  Next witness.

6           MR. KANOVITZ:  At this time plaintiff calls Jim

7   Petro.

8           THE COURT:  All right.

9           **JAMES M. PETRO, PLAINTIFF'S WITNESS, SWORN**

10          THE COURT:  Mr. Petro, we have -- sometimes we have

11  a little difficulty in everyone at the back of the courtroom

12  hearing everyone.  And we have the microphone there for you.

13  If it gets too close, it will muffle you; if it gets too far

14  away, it won't pick you up.

15          THE WITNESS:  Okay.

16          THE COURT:  So what I need you to do is try to keep

17  your voice up so that hopefully no one will have a problem,

18  all right?

19          THE WITNESS:  Yes.  Thank you, Your Honor.

20                    **DIRECT EXAMINATION**

21  BY MR. KANOVITZ:

22  **Q.**   Good morning.

23  **A.**   Good morning.

24  **Q.**   Could you state and spell your name for the record,

25  please?

PETRO - DIRECT (Kanovitz)                                      398

1   **A.**    My name is James, middle initial M., Petro, P as in

2   "Paul," -E-T-R-O.

3   **Q.**    And do you go by Jim?

4   **A.**    Yes.

5   **Q.**    And where are you from, sir?

6   **A.**    I'm originally from Brooklyn, Ohio.  We raised our

7   family in Rocky River, Ohio.  I had part of my career in

8   Columbus, Ohio.  I'm from Ohio.

9   **Q.**    And where do you live currently?

10  **A.**    Currently, we live in Naples, Florida, and we have a

11  home near our daughter for the summertime in New England.

12  **Q.**    And did you travel to be here today?

13  **A.**    Yes, we did.

14  **Q.**    How did you get here?

15  **A.**    By car.

16  **Q.**    And are you working or retired?

17  **A.**    I'm retired.

18  **Q.**    And during the course of your career prior to retirement,

19  did you hold public office?

20  **A.**    I did.

21  **Q.**    Can you tell us some examples of public offices that you

22  held?

23  **A.**    My last public office, I was Chancellor of Ohio's

24  public universities.  Prior to that I was the Attorney

25  General of Ohio.  I was the auditor of the State of Ohio.  I

PETRO - DIRECT (Kanovitz)                          399

1   was a member of the Ohio General Assembly.  God, there are

2   more, and I can't think of them all.

3   Q.   Fair enough.

4   A.   But I did -- largely, I am a practicing lawyer.  But I

5   largely was in public life in addition to a private law

6   practice.  I was a partner in several large law firms.

7   Q.   Understood.  At a certain point in time, did you also

8   work as a prosecuting attorney?

9   A.   I did.

10  Q.   And did you try criminal cases when you were a

11  prosecuting attorney?

12  A.   I did.

13  Q.   And did any of your cases involve sexual assaults?

14  A.   They did.

15  Q.   And did they involve issues of eyewitness

16  identifications?

17  A.   Yes.

18  Q.   And in the course of your work as a prosecutor, did you

19  come to have a good understanding of the limits of eyewitness

20  evidence?

21  A.   I certainly did.

22  Q.   And moving forward, when you were Attorney General, did

23  you enjoy serving in that role?

24  A.   I did.  It was a very interesting job.

25  Q.   Can you tell the jury a little bit about what the

PETRO - DIRECT (Kanovitz)                          400

1  responsibilities of your office was?

2  **A.**   The Attorney General is the chief legal officer in the

3  State of Ohio.  The Attorney General's Office deals with

4  litigation, but it deals with many, many other things --

5  providing legal services across the state for local

6  governments, handling from a standpoint of providing lawyers

7  and law services to all of the elements of state government.

8      I had an organization of about 13 or 1,400 people, and

9  we functioned with about six offices.  There is an Attorney

10 General's Office right in Cincinnati.  There was one right

11 in Dayton.  We had offices around the state.

12 **Q.**   Thank you.  And after you left public life, did you have

13 occasion to publish anything on the topic of wrongful

14 convictions?

15 **A.**   I did.  Along with my wife, we published a book

16 called --

17          MR. McLANDRICH:  Objection, Your Honor.  What's the

18 relevance of this?

19          THE COURT:  Counsel?

20          MR. KANOVITZ:  He's establishing some expertise.

21          THE COURT:  Hold on.

22          MR. McLANDRICH:  This is not an expert witness, Your

23 Honor.

24          THE COURT:  Counsel approach.

25      (At sidebar.)

1          MR. McLANDRICH:  Your Honor, I'd raised this concern

2   at the final pretrial.  They have listed these individuals,

3   Mr. Godsey and Mr. Petro, as expert witnesses.  I mean, a

4   certain amount of, you know, gilding the lily in terms of his

5   background I understand, but this is not an expert witness.

6   And it seems to me that we are headed for trying to solicit

7   opinion testimony, you know, does his knowledge of eyewitness

8   identifications and so forth and so on.  I don't think he gets

9   to testify to any of that.  There's been no report provided.

10  And I just think it's improper.

11         MR. KANOVITZ:  Rule 26 distinguishes between

12  retained experts and people who have a connection to the

13  underlying case but who, nevertheless, have expertise that may

14  in the form of testimony that they are going to give that is

15  directly related to their involvement in the underlying case.

16  Mr. Petro is that sort of expert.  This is a two-question

17  establishment of the fact that he has the expertise to then

18  talk credibly about habeas.

19         MR. McLANDRICH:  And even assuming that was true,

20  which I don't agree to, he is not like a treating physician.

21  The fact that he writes a book about wrongful conviction has

22  nothing to do with anything other than just additional sort of

23  gilding of the lily with respect to the opinion testimony that

24  seems to be the direction that we're headed.

25         THE COURT:  Where are you going with this?

 1              MR. KANOVITZ:  Basically, he wrote the book.

 2              THE COURT:  I got that he wrote the book.

 3              MR. KANOVITZ:  I am not going deeper into the book.

 4              THE COURT:  No, no, I am not talking about the book.

 5     Where are you going with the testimony?

 6              MR. KANOVITZ:  I am going to his involvement as a

 7     habeas attorney, explain to the jury what a habeas is:  You

 8     participated in the petition.  It was preempted.  And you got

 9     to know Dean through that process, and you are friends with

10     Dean.  And not much more than that.  I don't remember, but

11     that's pretty much the scope.

12              MR. McLANDRICH:  So we've already stipulated to the

13     fact that a habeas petition was filed.  I don't think that

14     anybody other than the judge gets to talk about what the law

15     is in terms of what a habeas is.  And we already stipulated

16     that the habeas was granted.  So we don't need this witness to

17     testify to that either.

18              THE COURT:  And there is -- the Court has limited

19     and basically said that we're not going to get into these

20     decisions.

21              MR. KANOVITZ:  I was just going to see what relief

22     he asked for, and the relief was granted.

23              MR. McLANDRICH:  That's already been stipulated to.

24              THE COURT:  Hasn't that been stipulated?

25              MR. McLANDRICH:  That's the point of stipulations,

1   you don't put on evidence to something that's been stipulated

2   to.

3            MR. KANOVITZ:  I would like to ask him about

4   participating; that he was at a number of hearings; that he

5   got to know Dean; and that, you know, he signed the petition

6   on behalf of Dean.  I would like to get that far into the

7   habeas stuff.

8            MR. McLANDRICH:  And, again, so what this is is an

9   effort to, you know, buttress the credibility of it by showing

10  that we've got the former Attorney General that signed onto

11  the habeas petition.  This is all just gilding of the lily

12  that's unnecessary.

13    He can certainly testify he met Dean and that he's come

14  to know Dean.  That's not objectionable testimony.  But I

15  think this effort to buttress the validity of the habeas

16  petition and therefore the underlying reason for the habeas

17  when we've stipulated --

18           THE COURT:  No.  He didn't say anything about -- you

19  are not going to do the underlying reason, are you?

20           MR. KANOVITZ:  No.  I am just going to talk about

21  the fact that he participated.

22           MR. McLANDRICH:  I understand he is not --

23           THE COURT:  I understand.  But they are calling him

24  for a witness.  And they are saying that basically he became

25  involved in the case.  He went through the habeas matter.  The

PETRO - DIRECT (Kanovitz)                                404

```
 1    habeas was granted, and he got to know Dean.
 2                MR. KANOVITZ:  Yeah.
 3                MR. McLANDRICH:  That -- that part I can choke down.
 4                MS. FRICK:  To the extent he would -- Dawn Frick --
 5    that I would want to go into, at least with his expertise as a
 6    prosecutor, in the case of legal officer.
 7                THE COURT:  No, no.  We are not going there.  We are
 8    just not going there.
 9                MS. FRICK:  Okay.
10                THE COURT:  Because his expertise would -- I am not
11    necessarily contesting his expertise at whatever, whatever,
12    but what I am contesting is the fact that the stipulations are
13    on.  It tells what the story is.  Now, if he wants to say he
14    came on board -- I signed the petition.  The habeas was
15    granted, and I got to know Dean," and he'll choke that down.
16                MR. McLANDRICH:  And as long as he is not saying the
17    reason I signed the petition was to right this injustice and
18    stop --
19                THE COURT:  No, no argument.
20                MR. KANOVITZ:  If he starts on that, I will step on
21    it.
22                THE COURT:  I will too.
23                MR. McLANDRICH:  Thank you.
24         (In open court.)
25                THE COURT:  All right.  The objection is overruled
```

PETRO - DIRECT (Kanovitz)                                      405

```
 1   in the parameters that the Court has laid out to counsel.
 2            MR. KANOVITZ:  Thank you, Your Honor.  May I
 3   proceed?
 4            THE COURT:  You may.
 5   BY MR. KANOVITZ:
 6   Q.   Switching topics, sir.  Did you eventually participate in
 7   filing a habeas petition on Dean's behalf?
 8   A.   Yes, I did.
 9   Q.   And was the relief requested to free Dean from
10   incarceration?
11   A.   Yes, it was.
12   Q.   And without going into the details of how a habeas
13   proceeding works, was there a formal document that was filed
14   in order to have those proceedings go forward?
15   A.   Yes.
16   Q.   And did you personally sign that document?
17   A.   I did.
18   Q.   And would you have done that if you didn't have a genuine
19   belief that there was --
20            MR. KANOVITZ:  Actually, may I withdraw that?
21            THE COURT:  You may.
22            MR. KANOVITZ:  Thank you.
23   BY MR. KANOVITZ:
24   Q.   Did the Court ultimately grant the petition?
25   A.   Yes.
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

PETRO - DIRECT (Kanovitz)                                    406

1   **Q.**   And in terms of the process of reaching the conclusion,

2   were there multiple court hearings?

3   **A.**   Yes.

4   **Q.**   And did you participate in them?

5   **A.**   I did.

6   **Q.**   Did you develop a friendship with Dean in that process?

7   **A.**   I did.

8   **Q.**   And has your friendship continued since his release?

9   **A.**   It has, yes.

10  **Q.**   How would you characterize that friendship?

11  **A.**   We don't see each other often, but I have respect for

12  Dean and an understanding of what he went through.  And I

13  respect his family.  His mother and dad are salt-of-the-

14  earth folks.  I came to know the family and enjoy knowing

15  them.

16  **Q.**   And is that a friendship you hope will continue into the

17  future?

18  **A.**   Yes.

19          MR. KANOVITZ:  No further questions.

20          THE COURT:  Nothing?

21          MR. McLANDRICH:  No, sir, Your Honor.  Thank you.

22          THE COURT:  Anything back there?

23          MS. FRICK:  No, Your Honor.

24          THE COURT:  Thank you.  Is this witness excused?

25          MR. KANOVITZ:  Yes.

PETRO - DIRECT (Kanovitz)                                    407

1            THE COURT:  Mr. Petro, thank you very much.

2            MR. KANOVITZ:  Your Honor, may I go outside real

3  quick?

4            THE COURT:  Surely.

5            MR. KANOVITZ:  Your Honor, the next witness is in

6  the elevator.  So he will be here momentarily.

7            THE COURT:  All right.

8            MR. KANOVITZ:  Thank you.

9            THE COURT:  Counsel, do you have somebody out there

10  that when he comes off the elevator he knows what to do?

11            MR. KANOVITZ:  I think I put the fear into him.  Let

12  me just make sure.

13            THE COURT:  All right.

14            MR. KANOVITZ:  He's out there now.

15            THE COURT:  All right.  Next witness.

16            MR. OWENS:  Our next witness is Scott Bowling, Your

17  Honor, B-O-W-L-I-N-G.

18            THE COURT:  All right.

19            **SCOTT BOWLING, PLAINTIFF'S WITNESS, SWORN**

20            THE COURT:  Mr. Bowling, please try to keep your

21  voice up so we can all hear your responses to the inquiries.

22  You have a microphone there.  And you can use it as you need.

23  If it gets too close, it muffles you; if it gets too far away,

24  it won't pick you up.

25            THE WITNESS:  Okay.

1           THE COURT:  So if you keep your voice up, that

2    solves the problem to a great extent, okay?

3           THE WITNESS:  Sure.

4           THE COURT:  You may inquire.

5           MR. OWENS:  Thank you, Your Honor.

6                    **DIRECT EXAMINATION**

7    BY MR. OWENS:

8    **Q.**   Good morning, sir.

9    **A.**   Hello.

10   **Q.**   Could you just please introduce yourself to the jury?

11   What's your name?

12   **A.**   My name is Scott Bowling.

13   **Q.**   And where did you grow up?

14   **A.**   In the big City of Fairborn, Ohio.

15   **Q.**   And what year did you graduate high school?

16   **A.**   1985.

17   **Q.**   And did you graduate high school with any -- did you go

18   to high school with anybody in this room?

19   **A.**   I sure did, yes.

20   **Q.**   Who is that?

21   **A.**   Mr. Dean Gillispie.

22   **Q.**   And how did you know Dean in high school?

23   **A.**   We all ran in the same circle of friends, spent a lot

24   of time, you know, from like 16 years of age on up through

25   until we kind of parted ways and went about our own

1    separate, you know, marriage and all that type stuff.

2    **Q.**   Got it.  And did you hang out with him in the years after

3    high school as young adults?

4    **A.**   Yes.

5    **Q.**   What kind of things did y'all get into?

6    **A.**   Well, early on I'd hang out with him when we worked.

7    First thing -- I recall first thing we did together was

8    tried to rehab a house that he had purchased.

9    **Q.**   And did you have experience in that or --

10   **A.**   I do now, yes, sir.  Yes, sir.

11   **Q.**   At the time?

12   **A.**   At the time I did not.  I was just basically a grunt.

13   **Q.**   And was it just you and Dean, or did you work with some

14   other folks?

15   **A.**   If I remember right, I think some people, other friends

16   played a part in trying to help him get established.

17   **Q.**   Got it.  And was there -- just, can you just -- I'm

18   sorry.  I jumped ahead a little bit.  Can you just let us know

19   where you started to work after high school?

20   **A.**   After high school, I started in a car wash and then

21   went straight from that to what I thought I would spend the

22   rest of my days.  And then I went to work for Delco

23   Products, which is now -- used to be Delphi, and then I

24   spent 18 years there.  And they filed for bankruptcy in

25   2006.

BOWLING - DIRECT (OWENS)                                410

1    **Q.**   All right.  And so Delco Products, was that one of the

2    smaller places under the banner of General Motors generally?

3    **A.**   Well, it was a parts supplier.  Did really well,

4    though.  It was a big operation.  I think it was over 2,000

5    employees.

6    **Q.**   Okay.  And did you -- you know where Dean worked right

7    after high school?

8    **A.**   I did, yeah.

9    **Q.**   Where was that?

10   **A.**   Well, I am not exactly sure where he went straight out

11   of high school, but I do know the first job that he had that

12   was pretty substantial was working as a security guard at

13   the GM plant.

14   **Q.**   Just to be clear, did you ever work with him there in any

15   way?

16   **A.**   No.  No, I did not.

17   **Q.**   Okay.  Now, back when y'all were young adults -- sorry.

18   Strike that.

19       After you worked at Delco for a while, what was your next

20   job?

21   **A.**   Spent a couple -- shortly after bankruptcy, I took

22   advantage of their school reimbursement, and I worked two

23   part-time jobs there at the Wright-Patterson Air Force Base

24   mowing grass.  And from then on after -- I took advantage of

25   their school, and I decided I wanted to be a police officer,

1    and at 40 years old I went through the police academy.

2    **Q.**   Sounds fun.  Where were you a police officer?

3    **A.**   In the City of Urbana.

4    **Q.**   And how long were you a police officer in Urbana?

5    **A.**   Six years.

6    **Q.**   What did you do after you left that?

7    **A.**   I left there and went to work for a glass company out

8    of China as a supervisor, Fuyao.  Helped them incorporate

9    everything into the area, first 40 employees in the door.

10   **Q.**   Got it.  And over the course and -- sorry.  And what do

11   you sort of do for work these days?

12   **A.**   I do a home remodeling business.  I own my own

13   business.

14   **Q.**   Great.  Now, over the course of those years between, say,

15   1990 and to this time, was -- have you maintained a friendship

16   with Mr. Gillispie?

17   **A.**   To some level, yes.  Whatever I could do, yes.

18   **Q.**   Now, were there any difficulties in maintaining a

19   friendship with Mr. Gillispie during any of that period of

20   time?

21   **A.**   Oh, absolutely, compared to my other friends, yes.

22   **Q.**   And what was the difficulty that you had with staying

23   close with Dean as opposed to your other friends?

24   **A.**   When he became incarcerated.

25   **Q.**   And did you ever visit Mr. Gillispie in prison?

BOWLING - DIRECT (OWENS)                                    412

1    **A.**    I did a couple times, yes, sir.

2    **Q.**    And did you have the opportunity to view and see how it

3    made -- what kind of impact it had on your friend?

4    **A.**    Oh, absolutely, yes, sir.

5    **Q.**    And what was that?

6    **A.**    Just probably a broken person.

7    **Q.**    Was it difficult for you to see him in that situation?

8    **A.**    Yes.

9    **Q.**    And why was that?

10   **A.**    Well, you take someone that you've known and you know

11   their potential, and you kind of see that -- sorry.

12   **Q.**    You're all right.  Just take as much time as you need.

13   We're all right.

14   **A.**    So much I want to say, but you won't understand me.  It

15   was just tough seeing someone that you knew and that you had

16   hung out with so much lose that opportunity to do what I,

17   you know, what I ended up doing.  Whether he ended up

18   getting married or having children like I did or whatever,

19   he did not have that opportunity.

20   **Q.**    Thank you.  Sir, just a couple more questions.

21   **A.**    Sure.

22   **Q.**    And I don't mean to pry or talk about -- get too

23   personal.

24        In high school and as a young adult, did you smoke?

25   **A.**    Yes.  Yes, heavily.

BOWLING - DIRECT (OWENS)                                        413

1    **Q.**   All right.  And did you smoke pretty regularly?

2    **A.**   I do not anymore.  2004 I quit.

3    **Q.**   Congratulations.

4    **A.**   Thank you.

5    **Q.**   But back in the day, you were a smoker; is that right?

6    **A.**   Correct.

7    **Q.**   Did -- did Dean, did he like smoking?

8    **A.**   He did not.  He couldn't -- he didn't want anything to

9    do with it.  He didn't like being around it.

10   **Q.**   Did you ever ride around with Dean in his truck?

11   **A.**   Oh, yes, sir.  Yes.

12   **Q.**   Did you ever try to smoke in his truck?

13   **A.**   Well, I knew it wasn't allowed.  So I tested the theory

14   in one of our adventures out driving around.  And I was

15   headstrong, and so was he at the time.  And so I got out of

16   the truck and smoked my cigarette while he drove along

17   beside me.  And after I was finished with my cigarette -- we

18   live in a pretty small town.  And once he picked me up after

19   that, I'm sure I didn't smoke the whole thing, but it was

20   more of a point for me to do that.

21   **Q.**   You wanted to smoke a cigarette, and he didn't want you

22   in the truck?

23   **A.**   That is correct.

24   **Q.**   And you guys couldn't reach an agreement in that moment?

25   **A.**   That is correct, yes.

BOWLING - DIRECT (OWENS)                                        414

1    **Q.**   Those are all the questions I have.  Thank you for your

2    time, Mr. Bowling.

3              THE COURT:  All right.  Counsel?

4              MR. McLANDRICH:  No questions, Your Honor.

5              THE COURT:  Counsel?

6              MR. HERMAN:  No questions.

7              THE COURT:  Can Mr. Bowling be excused?

8              MR. OWENS:  Yes, Your Honor.

9              THE COURT:  Thank you, Mr. Bowling.

10             THE WITNESS:  Thank you very much.

11             THE COURT:  Next witness.

12             MR. KANOVITZ:  Your Honor, at this time plaintiff

13   calls Jerry Fyffe.

14             THE COURT:  Counsel, for your planning purposes, as

15   soon as Mr. Fyffe is over, we're going to take a break.  I'm

16   assuming that -- or we are going to take a break at a quarter

17   till 11, whichever occurs first.

18        **JERRY MICHAEL FYFFE, PLAINTIFF'S WITNESS, SWORN**

19             THE COURT:  Mr. Fyffe, please try to keep your voice

20   up so we can all hear your responses to the inquiries.  You

21   have a microphone there.  If you get too close, it muffles

22   you; if you get too far away, it loses you.  So if you keep

23   your voice up so that we can all hear you, that will help

24   solve the problem, all right?

25             THE WITNESS:  Yes.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

FYFFE - DIRECT (KANOVITZ)                                    415

```
 1              THE COURT:  You may inquire.

 2              MR. KANOVITZ:  Thank you, Your Honor.

 3                    DIRECT EXAMINATION

 4    BY MR. KANOVITZ:

 5    Q.   Good morning.

 6    A.   Good morning.

 7    Q.   Could you introduce yourself to the jury, please?

 8    A.   I am Jerry Michael Fyffe.

 9    Q.   Where are you from, Mr. Fyffe?

10    A.   Sabina, Ohio.

11    Q.   And is Sabina near Fairborn?

12    A.   Probably about a hour, yeah.

13    Q.   And are you married?

14    A.   Yes, sir.

15    Q.   Do you have children?

16    A.   Yes, sir.

17    Q.   And what do you do for a living?

18    A.   Well, I'm a retired GM union representative.  I farm

19    and I pastor a church.

20    Q.   And what were the years you were working at GM?

21    A.   I hired in in 1976, retired in 1998.

22    Q.   And you mentioned that presently you are farming?

23    A.   Yes, sir.

24    Q.   What do you farm?

25    A.   Corn and soybeans.
```

FYFFE - DIRECT (KANOVITZ)                                    416

1    **Q.**    And how big is your farm?

2    **A.**    I live on 112 acres.

3    **Q.**    Is that -- is that located in Sabina?

4    **A.**    Yes, sir.

5    **Q.**    And you also mentioned you are a pastor.  Could you tell

6    us about that, please?

7    **A.**    Yeah.  I was called into ministry in 1995 in Hillsboro,

8    Samantha Free Will Baptist Church, and the Lord led me to

9    start a church over by the fairgrounds in Hillsboro.  And we

10   built it, and now we're up to about 150 people.  And -- and

11   still there.

12   **Q.**    Very good.  Switching topics, do you know Dean Gillispie?

13   **A.**    Yes, sir.

14   **Q.**    And how do you know him?

15   **A.**    I met him back when he was a -- a young guy just

16   getting out of high school.  And I farmed with my dad in

17   Fairborn at that time.  We lived over there.  And I would

18   always go in town, me and my best friend, Dennis Fulton, and

19   eat -- on Friday night and eat our supper and stuff and just

20   kind of hang out.

21          And Dean and his buddies was over there at the gas

22   station, and we pulled in.  They liked my truck.  So we got

23   to talking.  And next weekend got to see them again.  And

24   then about every weekend we'd either go in town or they'd --

25   him and some of his buddies, Otis and them boys, would come

FYFFE - DIRECT (KANOVITZ)                                           417

```
 1    out to the farm and kind of watch us farm, and they kind of
 2    had a thing of who was going to drive my big truck.
 3    Q.   What was it that they liked about your truck?
 4    A.   Oh, it was -- back in them days, it was -- I had
 5    42-inch tires under it, and it was lift off the ground real
 6    high.  And, you know, that was the day of the Big Foot, but
 7    mine was a Chevy.
 8    Q.   It was something that would grab people's attention?
 9    A.   Yeah.  Oh, it would.
10    Q.   And you mentioned Dean liked to come to the farm?
11    A.   Yeah.
12    Q.   What did he like to do when he was out at the farm?
13    A.   Just watch us work or, you know, he just come out for a
14    few minutes and see what's going on.  He liked the country,
15    you know.  He lived in town all the time.
16    Q.   Got you.  And what sorts of things would you all do
17    together once you became friends?
18    A.   Well, just go out to eat or just really sit many hours
19    just in the parking lot talking, uh-huh.
20    Q.   Is that what kids did back then?
21    A.   Yeah.
22    Q.   How often would you see Dean in the time frame from when
23    you became friends with him until his conviction?
24    A.   Well, if I wasn't real busy, about every weekend, yeah.
25    Q.   And who were -- who all was in the friend group?
```

1    **A.**   Okay.  Dean's friends that I can really recall, there

2    was a group of them, and it was Dean -- we called him Spiz;

3    his dad always called him Spiz.  But his -- Otis, I guess

4    his name Brian Poulter.  I know he's Brian, but we called

5    him Otis.  But then John Coppock and Gilbert Lures, and once

6    in a while a guy named Richie Winters would be with him, but

7    not very -- I didn't see him very often.

8             MR. KANOVITZ:  Pardon me just a second.

9    BY MR. KANOVITZ:

10   **Q.**   And were you working at GM at that time?

11   **A.**   Yes, sir.

12   **Q.**   And also working on the farm?

13   **A.**   Yes, sir.

14   **Q.**   And did your family -- did you come from a family of

15   farmers?

16   **A.**   Yes, sir.

17   **Q.**   And tell us about that, please.

18   **A.**   Okay.  My mom and dad moved up from Kentucky.  And we

19   come up here, and Dad bought a farm.  And he was a union

20   Carpenter.  And he always lived on a farm, I mean.

21   **Q.**   Is your father still living?

22   **A.**   No, sir.

23   **Q.**   What was his name?

24   **A.**   Homer Fyffe.

25   **Q.**   Thank you.  And did there come a time where you bought a

FYFFE - DIRECT (KANOVITZ)                                    419

1    boat?

2    **A.**    Yeah.

3    **Q.**    What kind of boat was it?

4    **A.**    It was a Four Winds.

5    **Q.**    Is that a -- is that a boat that you fish off of or ski

6    off of or --

7    **A.**    Ski off of.  You can fish off of it.  We fished a few

8    times off of it, but it was really a ski boat, an open-bow

9    boat.

10   **Q.**   Got you.

11   **A.**    Twenty foot.

12   **Q.**   And did you own this boat at the time that you were

13   friends with Dean?

14   **A.**    Yeah.

15   **Q.**   Got you.  And was the boat expensive?

16   **A.**    Yeah.  Back in them days it was.

17   **Q.**   How much did it cost?

18   **A.**    Right around 10,000, 10 or $12,000.

19   **Q.**   And did the friend group like enjoying time on your boat?

20   **A.**    Yeah.

21   **Q.**   And did they chip in at all?

22   **A.**    Yeah.

23   **Q.**   Where would you all take the boat back when you were

24   friends?

25   **A.**    Back then we went to Cave Run Lake down in Morehead,

FYFFE - DIRECT (KANOVITZ)                                        420

```
 1    Kentucky.

 2    Q.   What kind of lake is that?

 3    A.   Beautiful lake.  Big, uh-huh.  Lays in between all the

 4    hills down there.

 5    Q.   So if you own a boat and you want to make use of it,

 6    that's a good place to go?

 7    A.   Yeah.  Good water, yeah.

 8    Q.   Got you.  And how long would it take to drive down there?

 9    A.   About two and a half hours.

10    Q.   Is that something you'd do as a day trip or something

11    where you'd spend time there?

12    A.   No.  We'd spend the whole weekend there.

13    Q.   Got you.

14    A.   Yeah.

15    Q.   So if you were going to go down there with the boat,

16    you'd --

17    A.   Yeah.

18    Q.   -- want to be there all weekend?

19    A.   Yeah.

20    Q.   Got you.  And how would it work?  Did you all stay in

21    hotels or did you camp?

22    A.   No.  We camped.

23    Q.   And how would it work with the camping down there?

24    A.   We went to place called Twin Knobs all the time.  A

25    real nice campground.  And we'd pull in, and you sign in,
```

FYFFE - DIRECT (KANOVITZ)                                421

 1    and then you -- at that time you didn't have to have

 2    reservations.  You'd just pull in and hunt you a spot and

 3    come back up to the park ranger station and sign in and then

 4    stay all weekend.

 5    Q.   Did you know who ran the park?

 6    A.   At that time the State did.

 7    Q.   State --

 8    A.   Now -- Thousand Trails runs it now.

 9    Q.   Got you.  But the State of Kentucky ran it?

10    A.   Yeah, State of Kentucky, um-hmm.

11    Q.   And you mentioned you'd have to sign in?

12    A.   Um-hmm.

13    Q.   Would you fill out paperwork then when you signed in?

14    A.   Yeah.

15         MR. KANOVITZ:  Your Honor, we'd like to publish

16    Plaintiff's Exhibit 204, page 6 of 7, which was previously

17    shown to the jury.

18         THE COURT:  It may be.

19    (Exhibit displayed).

20    BY MR. KANOVITZ:

21    Q.   Sir, if you could take a look at Plaintiff's Exhibit 204,

22    page 6 of 7.  We will enlarge it here.

23         Do you recognize maybe not that document but documents of

24    that type?

25    A.   Yeah.

FYFFE - DIRECT (KANOVITZ)                                    422

1    **Q.**   And is this what you would fill out when you would go to

2    the lake?

3    **A.**   Yes, sir.

4    **Q.**   And when you all would go to the lake, who would take

5    responsibility for paying for the campsite?

6    **A.**   Me.

7    **Q.**   Why is that?

8    **A.**   Because I was driver.

9    **Q.**   Got it.  And so -- yeah.  So in terms of getting the boat

10   down there, did you need a hitch?

11   **A.**   Yeah.

12   **Q.**   And did you have a hitch on your truck?

13   **A.**   Yeah.

14   **Q.**   And when you would -- when you went to campsites, did

15   everybody pitch in?

16   **A.**   Yep.

17   **Q.**   You weren't just hosting them down there?

18   **A.**   No.

19   **Q.**   But you'd be the one that would sign for it?

20   **A.**   (Nodded head.)

21         MR. KANOVITZ:  You can take it down.

22   BY MR. KANOVITZ:

23   **Q.**   And when you all were down at the campsites, what would

24   you like to do?

25   **A.**   Boat ride, water-ski, and go into town and eat.

FYFFE - DIRECT (KANOVITZ)                                    423

1    **Q.**   And did Dean like to suntan?

2    **A.**   No.  He'd burn up.  We'd all make fun of him because,

3    you know, I am all dark complected from farming and stuff.

4    And he is so white he always wore his shirt.  And we'd make

5    fun of him because he'd burn and look like a big lobster.

6    **Q.**   So even when you were out on the boat or in the big lake?

7    **A.**   (Nodded head.)

8    **Q.**   Would he swim in the shirt?

9    **A.**   All the time.

10   **Q.**   And when he wasn't in the lake, just describe for the

11   jury how Dean would usually dress back in that time frame when

12   you knew him.

13   **A.**   Just either wear a button-up shirt and jeans, and

14   that's it.

15   **Q.**   And did you ever see him wearing fancy jewelry or

16   anything like that?

17   **A.**   No.

18   **Q.**   Did Dean ever dye his hair as far as you knew?

19   **A.**   No.

20   **Q.**   And was Dean a smoker?

21   **A.**   No.

22   **Q.**   In fact, was he anti-smoking?

23   **A.**   Bad.  He -- he had a little red Chevy truck, bought it

24   brand new, and he had a sign on the dashboard, "No Smoking."

25   And he couldn't get around smoking.

1    **Q.**    Did you ever try to smoke in his car?

2    **A.**    I've never smoked in my life, a day in my life.

3    **Q.**    Okay.  So you all have that in common?

4    **A.**    Yeah.

5    **Q.**    And I think you mentioned when you would go down to the

6    lake you would stay the weekend?

7    **A.**    Yes, sir.

8    **Q.**    About what time would you all usually leave?

9    **A.**    Well, I worked third shift, and we'd usually leave

10   midafternoon on Friday, yeah.

11   **Q.**    And then what time would you leave the lake?

12   **A.**    Oh, down there?

13   **Q.**    Yeah.

14   **A.**    4 or 5 o'clock in the evening, on Sunday evening.

15   **Q.**    And why would you leave around then?

16   **A.**    Well, because I worked third shift at General Motors,

17   and I had to be to work at 11.

18   **Q.**    Got you.  Switching topics, did your dad keep a calendar,

19   Homer keep a calendar?

20   **A.**    Yes.

21          MR. KANOVITZ:  And, Your Honor, could we publish

22   Plaintiff's Exhibit 54, page 7?

23          THE COURT:  That's been previously published?

24          MR. McLANDRICH:  Previously published?

25          MR. KANOVITZ:  I don't believe it has been

FYFFE - DIRECT (KANOVITZ)                    425

```
 1    previously published.
 2         I apologize.  Yes, it has.
 3              MR. McLANDRICH:  It has.
 4              THE COURT:  Okay.  It may be.
 5              MR. KANOVITZ:  Thank you.
 6         (Exhibit displayed.)
 7    BY MR. KANOVITZ:
 8    Q.   Sir, taking a look at this, do you recognize that this is
 9    a calendar page for June of 1988?
10    A.   Yes, sir.
11    Q.   And fair to say there is not that many entries on here,
12    right?
13    A.   Right.
14              MR. KANOVITZ:  Could you zoom in on Tuesday, the
15    7th, please.
16              THE WITNESS:  Yeah.
17    BY MR. KANOVITZ:
18    Q.   Just a moment.
19         Can you tell us what's written in the entry for Tuesday,
20    the 7th?
21    A.   "Soybeans."
22    Q.   Does that appear to be your dad's handwriting?
23    A.   It is his handwriting.
24    Q.   And if you're a farmer back in that time frame, why would
25    you write "soybeans" on a particular day and a particular
```

FYFFE - DIRECT (KANOVITZ)                                426

1    month?

2    **A.**    Well, we got to keep track of when we plant our crops,

3    know what field they are in.  And like if you got crop

4    insurance or anything through the FSA office, you have to

5    report a planting date.  And then when you harvest, you give

6    your report of your bushel per acre for, you know,

7    government subsidize and stuff like that for crop insurance.

8    **Q.**    Knowing the way your dad conducted himself usually on a

9    daily basis, was there any reason that you could think of why

10   he would fill out every day in the calendar?

11   **A.**    No.  He is a pretty simple man.  He very -- if you

12   notice how he spelled beans, my dad only had an eighth grade

13   education, but he was a very smart man.

14           MR. KANOVITZ:  Could we go to the 29th.

15       (Exhibit displayed.)

16   BY MR. KANOVITZ:

17   **Q.**    And, sir, showing you the 29th, does that appear to be

18   your mom's handwriting?

19   **A.**    Yep.

20   **Q.**    And the 29th and the 30th -- actually, you see there it

21   says "Florida vacation"?

22   **A.**    Sure is.

23   **Q.**    And you got the -- or the 29th and the 30th is circled.

24   Yeah?

25   **A.**    Yes.

1          MR. KANOVITZ:  And could we go to page 9 of 85,

2    please.  And could we just blow up the three days, 18th

3    through the 20th, please.

4          (Exhibit displayed.)

5    BY MR. KANOVITZ:

6    Q.   All right, sir, showing you 18, 19, and 20 for the page

7    August 1988, can you tell us what is written on the 18th

8    there?

9    A.   Okay.  "Gale pups.  Call insurance office and check."

10   And then "Nell's pups."

11   Q.   What does "Gale pups" mean?

12   A.   My dad raised foxhounds.  You all probably don't know

13   what that is, but he liked running fox.  And he'd go down in

14   Kentucky all the time, where we're from, and there was a fox

15   pen down there, and it was all fenced in.  They'd let their

16   dogs run all night.

17          But he raised pups all the time, and it was real hot

18   that week.  And he marked on the calendar "Gale pups," and

19   Nell had pups that week, and he put them down in my

20   basement.

21   Q.   Got you.  So he had two dogs that both had pups that

22   week?

23   A.   Oh, yeah.  He had about 12 dogs.

24   Q.   And fast forwarding, did there come a time when you found

25   out that Dean had been arrested?

1    **A.**    Yeah.

2    **Q.**    And what did you do after you found out?

3    **A.**    What'd I do?

4    **Q.**    Yeah.

5    **A.**    Wasn't nothing I could do.  I mean, just, I couldn't

6    believe it.

7    **Q.**    Did there come a time where you found out like what dates

8    he was alleged to have committed crimes on?

9    **A.**    Yeah.  Then we started putting -- me and Dad and my mom

10   started putting our dates together, and we said, there ain't

11   no way.  I said, "He was with us," you know.  He was with me

12   in Kentucky.

13   **Q.**    So you found the calendar, and you saw the pups notation

14   on there?

15   **A.**    Yeah.

16   **Q.**    And did that cause you to remember that you were with

17   Dean on that weekend?

18   **A.**    Yes.

19   **Q.**    Can you explain why?

20   **A.**    Well, 'cause it was real hot that weekend, and I knew

21   we went to Kentucky.  And so Dad had the dates wrote down.

22   And he said, "Well, Spiz couldn't have done that."  He said,

23   "My dogs had these pups and when you guys got home, I put

24   them down in your basement."

25   **Q.**    And do you visually remember that happening?

FYFFE - DIRECT (KANOVITZ)                           429

1   **A.**    Oh, yeah.

2   **Q.**    And did you supply that information for Dean's defense?

3   **A.**    Yes.

4   **Q.**    And did you testify at his criminal trial about it?

5   **A.**    Yes, sir.

6   **Q.**    Do you recall if you testified at two trials?

7   **A.**    Yeah.

8   **Q.**    And did there come a time that you found out Dean got

9   convicted?

10  **A.**    Um-hmm.

11  **Q.**    And was that surprising to you?

12  **A.**    Very.

13  **Q.**    And what were your thoughts about that?

14  **A.**    I was really sad, 'cause I was raised in our judicial

15  system that, you know, hey, you're always innocent till

16  proven guilty.  My dad was a true-born American, and so I

17  still am, and I still believe in our system.  But that day

18  then, it about shot everything.  I mean, it was, to us,

19  excuse me, it was a joke.  It really was.  And I thought,

20  there ain't no way, way they described Dean.  And I set

21  there and heard everything.  The way they described him and

22  everything.

23      And I guess I was raised with four sisters, and if

24  somebody would ever rape one of them, they'd be devastated.

25  And I sat right there in that courtroom and watched them

FYFFE - DIRECT (KANOVITZ)                                    430

```
 1    girls --
 2              THE COURT:  Counsel.
 3              MR. McLANDRICH:  Objection.
 4              THE WITNESS:  Excuse me.  I'm sorry.
 5              THE COURT:  He's answered the question.  And I've
 6    allowed a lot of flexibility here.
 7              THE WITNESS:  Oh, I'm sorry.
 8              MR. KANOVITZ:  Yes, Judge.  Thank you.
 9    BY MR. KANOVITZ:
10    Q.    Okay.  Fast forwarding, sir, what's your relationship
11    like with Dean in this day and age?
12    A.    Good friends.
13    Q.    Do you see him very often?
14    A.    Then or now?
15    Q.    Now.
16    A.    No, I don't ever get to see him.  I moved away from
17    Fairborn, and I don't hardly ever get to see him at all.
18    Q.    When's the last time you saw him?
19    A.    Him and his father drove down to my farm, and right
20    after he got out of prison, they come down and visit me.
21    Q.    So that would have been back in like early 2018s?
22    A.    Yeah.
23    Q.    And do you have any reason to lie for Dean?
24    A.    No, sir.
25    Q.    Did you have any reason to lie for Dean back when you
```

FYFFE - CROSS (McLandrich)                                        431

```
 1    testified during --
 2    A.    No, sir.
 3    Q.    -- the trials?
 4              MR. KANOVITZ:  Okay.  I have no further questions.
 5              THE COURT:  Any cross?
 6              MR. McLANDRICH:  Just a couple of questions.
 7              THE COURT:  All right.
 8                        CROSS-EXAMINATION
 9    BY MR. McLANDRICH:
10    Q.    Good morning, Mr. Fyffe.
11    A.    Good morning.
12    Q.    I am John McLandrich.  I represent Officer Moore.
13          So you did, in fact, testify at the two criminal trials.
14    I think you have already said that, right?
15    A.    Um-hmm.
16    Q.    All right.  And when y'all would go down to Kentucky, I
17    believe that you had testified at the criminal case you would
18    go to Cave -- Cave Lake, but there were times when you would
19    also camp at campsites at Cave Lake or thereabouts where you
20    didn't have to register with the ranger station.  Is that --
21    A.    Yeah.  If Cave Run -- that was called Twin Knobs.  If
22    it was full, you go over there to Zilpo, and you didn't have
23    to register there.
24    Q.    And so if you went to Zilpo, there wouldn't be any
25    receipts like we saw previously?
```

FYFFE - CROSS (McLandrich)                                    432

1    **A.**    Not as I know of.

2    **Q.**    And when you worked at GM, were you always on third shift

3    or did you rotate?

4    **A.**    I'd rotate.  Well, I was always on third, but when I

5    hired in, I hired in on second.  And then I went to third,

6    and then I went to day for a little while, but third shift

7    most of my whole career.

8    **Q.**    And do you recall whether in the August of '88 time frame

9    you were on third shift?

10   **A.**    Yes, sir.

11   **Q.**    And I seem to recall from the criminal trial testimony

12   that some weekends you would have to work?

13   **A.**    Yes, sir.

14   **Q.**    And were you ever asked about your work schedule back in

15   the time of the criminal trial?  In other words, to establish

16   whether you were or weren't working that particular weekend of

17   that August 20 date?

18   **A.**    No.

19   **Q.**    And you said you would normally leave Kentucky about 4 or

20   5 on the Sunday to get back?

21   **A.**    Um-hmm.

22   **Q.**    And so sounds like you'd get back like what, 6:30, 7

23   o'clock?

24   **A.**    About, yeah.

25   **Q.**    And I think you'd also testified at the criminal trial

FYFFE - CROSS (McLandrich)                                    433

1    that without the calendar wouldn't have been able to say where

2    you were on that particular August 20th weekend, correct?

3    **A.**    Oh, I -- I knew where I was, 'cause I had, you know,

4    where I signed in.  It was fresh in my mind then.  And I

5    knew exactly where I was.  'Cause, see, when I was a union

6    representative and I had to account for all my time, 'cause

7    I was in charge of 300-some guys.  And so we'd even, like

8    during July, if they shut down, I would take off, and a lot

9    of times that would be our vacation.  I'd go down there to

10   the lake for a week.

11   **Q.**    And I understand what you've just said, but you said

12   something about you had -- did you have to sign in as a union

13   rep?

14   **A.**    No.  I clocked in.

15   **Q.**    But you said something about you knew where you were

16   'cause you had to sign in.

17   **A.**    No.  'Cause I clocked in.  Well, I call it sign in.

18   Clock in at work.

19   **Q.**    All right.  But you don't believe you clocked in for

20   that --

21   **A.**    Oh, no, sir.

22   **Q.**    Okay.  But the way you were able to remember where you

23   were on that August 20th weekend was because of your father's

24   calendar?

25   **A.**    Well, that helped.  I mean, you know, this long a

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    period.  But at that time when he was arrested, I knew

2    exactly where we was at 'cause, you know, that was our

3    really only thing we done.

4    **Q.**   Now, I believe at the criminal trial you had testified

5    that the way you were able to recall and the only way you were

6    able to recall it was because of the calendar?

7    **A.**   That's not the only way I remember, I mean.  You know,

8    that refreshed my memory.

9             MR. McLANDRICH:  Why don't we bring up, this is, I

10   believe, PX, Plaintiff's Exhibit 5.  And it's page 95 of the

11   document or 493, 494 of the transcript.

12            MR. KANOVITZ:  I'm sorry, counsel.  Which page?

13            MR. McLANDRICH:  So of the document, it's page 95.

14   In the transcript, it's 93 -- 493, 494.

15            MR. KANOVITZ:  Did you mean PX 5?

16            MR. McLANDRICH:  Yes.

17            MR. KANOVITZ:  Page?

18            MR. McLANDRICH:  95.

19            MR. KANOVITZ:  Thank you.  Okay, thank you.

20   BY MR. McLANDRICH:

21   **Q.**   Just a moment while we bring it up, please.  Thank you.

22        (Exhibit displayed.)

23   BY MR. McLANDRICH:

24   **Q.**   So you'll see on this portion of the criminal trial

25   transcript starting at line 4, you were asked, "And could you

FYFFE - CROSS (McLandrich)                                    435

1  tell us, Jerry, whether or not when you were asked if you

2  remembered where Dean was earlier, whether you were able to

3  put this all together without looking at the calendar?"

4       And then your answer was, "When I was first asked, no, I

5  wasn't.  You know, you asked me what happened two years ago to

6  the day I couldn't tell you, but when we started looking back

7  through our books and Dad found his calendar, then it hit us,

8  just like that, I knew exactly where we were."

9              MR. KANOVITZ:  Objection; not impeaching.

10             THE COURT:  What?

11             MR. KANOVITZ:  I am objecting as not impeaching.

12             THE COURT:  What's your next question?

13  BY MR. McLANDRICH:

14  Q.   Well, the question is, you had testified that you had an

15  independent memory of being in Kentucky, but back at the time

16  of the criminal trial, apparently, you didn't have an

17  independent memory of being in Kentucky.  You were able to

18  refresh that memory by reviewing your father's calendar,

19  correct?

20             THE COURT:  I am going to overrule the objection.  I

21  understand the confusion.  I mean, I guess there could be a

22  little difference there.  I'm going to let him answer.

23             MR. McLANDRICH:  Thank you.

24             THE WITNESS:  You know, on something that serious, I

25  wanted to make sure, without a shadow of doubt, I wanted to

1  make sure where Dean was.  You know, I wouldn't want no

2  confusion or anything 'cause, you know, that's a bad thing to

3  any poor lady, and I wanted to make sure.  And then when I

4  looked at that, I knew exactly.  And I probably did answer

5  like that.  I'm sorry.  I probably did answer that way.

6  BY MR. McLANDRICH:

7  **Q.**    I understand.  It's long time ago to remember.

8  **A.**    Yes, it is.

9  **Q.**    I understand completely.

10      I think that's all I have for you, thank you, sir.

11  **A.**    Thank you, sir.

12  **Q.**    Nice meeting you.

13          THE COURT:  Any other questions?

14          MR. KANOVITZ:  Nothing further from plaintiff.

15          THE COURT:  Can the witness be excused?

16          MR. KANOVITZ:  Yes.

17          THE COURT:  Counsel?

18          MR. McLANDRICH:  Yes, sir.

19          THE COURT:  Thank you, sir.

20          THE WITNESS:  Thank you, sir.

21          THE COURT:  Ladies and gentlemen, we're going to

22  take a break.  We'll take our normal break.  I know we're a

23  little later, but we'll take a normal break, but then we are

24  going to recess for the lunch hour right at noon.  Thank you.

25          THE COURTROOM DEPUTY:  All rise.  This court stands

FYFFE - CROSS (McLandrich)                    437

1    in recess.

2         (Jury out at 10:51 a.m.)

3         (Recess at 10:52 a.m.)

4         (Jury in at 11:08 a.m.)

5         (In open court at 11:08 a.m.)

6              THE COURT:  Counsel approach.

7         (At sidebar off the record.)

8              THE COURT:  We are back on the record.  Counsel

9    ready to proceed?

10             MR. OWENS:  Your Honor, the next witness on behalf

11   of plaintiff is Dr. Jennifer Dysart.

12             THE COURT:  All right.  Counsel ready to proceed?

13             MR. McLANDRICH:  Yes, sir.

14             MS. FRICK:  Yes.

15        **JENNIFER DYSART, PLAINTIFF'S WITNESS, SWORN**

16             THE COURT:  Doctor, please try to keep your voice up

17   so that we can all hear your responses.  We have the

18   microphone there for you.  If it gets too close, it muffles

19   you; if it gets too far away, it won't pick you up.  So if you

20   can keep your voice up, that solves the problem, all right?

21             THE WITNESS:  No problem.

22             THE COURT:  You may inquire.

23             THE WITNESS:  Quick question.  Does the seat go up

24   and down?  My feet aren't touching the floor.

25             THE COURT:  I have no idea.

DYSART - DIRECT (Owens)                                    438

1          You may inquire.

2               MR. OWENS:  Thank you, Your Honor.

3                    **DIRECT EXAMINATION**

4     BY MR. OWENS:

5     **Q.**   Good morning, Dr. Dysart.

6     **A.**   Good morning.

7     **Q.**   Could you just introduce yourself to the jury?

8     **A.**   Yes.  My name is Jennifer Dysart.  I am a psychology

9     professor at John Jay College of Criminal Justice in New

10    York City.

11    **Q.**   And what do you do or study as a psychology professor at

12    John Jay?

13    **A.**   Yes.  So I study eyewitness memory and eyewitness

14    identification, and I have since my undergraduate honors

15    thesis in 1997.

16    **Q.**   And how long have you been a professor at John Jay?

17    **A.**   For 16 years, since 2006.

18    **Q.**   And, I guess sort of, what are your main job -- what does

19    your job involve, I guess, outside of teaching students?

20    **A.**   Yes.  It's a very typical professor job, where we -- or

21    I -- advise students on thesis projects.  I serve on

22    committees.  We teach, do research, publish.  All those

23    aspects are part of the job.

24    **Q.**   And is the professor -- are you a tenured professor at

25    John Jay?

DYSART - DIRECT (Owens)                                              439

1    **A.**    Yes.

2    **Q.**    And when did you get your tenure there?

3    **A.**    When I was hired.  Very -- yes.  In 2006.

4    **Q.**    And I know you said your job, you work as a professor,

5    but do you also do work outside of that of being a professor?

6    **A.**    Yes, I do.

7    **Q.**    And what kind of work is that?

8    **A.**    Well, I volunteer to give lectures.  I sit on

9    committees.  For example, I was on the Third Circuit

10   committee that looked at making recommendations for

11   eyewitness identification procedures.  So I still sit on an

12   advisory board for that committee in the Third Circuit.  And

13   I also work as a consultant expert witness.

14   **Q.**    And are you here today as a consultant expert witness?

15   **A.**    Yes, I am.

16   **Q.**    And I know you probably enjoyed traveling to Dayton from

17   New York, but are you being paid to provide opinions and

18   testimony in this case?

19   **A.**    Yes, my typical rate.

20   **Q.**    And you beat me to the punch.  Are you charging

21   Mr. Gillispie a different rate than you would charge other

22   people for your consultant work?

23   **A.**    No.

24   **Q.**    And about what percentage of your overall work involves

25   being a consultant as opposed to being a professor?

DYSART - DIRECT (Owens)                                    440

1    **A.**    Very little of my work is being a consultant.  So, yes.

2    We have -- we have contractual limitations of how much we

3    can be working outside of the college.  So it's not a -- not

4    a huge part of my life.

5    **Q.**    And you mentioned a moment ago that one of the things

6    that you do as a professor is publish papers; is that right?

7    **A.**    Yes.

8    **Q.**    Now, in the field of psychology, can you just describe a

9    little bit about your field more specifically?

10   **A.**    Yes.  So the field of eyewitness identification, and

11   it's part of what we call forensic psychology, and other

12   people call it psychology in the law, forensic psychology.

13   I think the term "forensic" became really popular in recent

14   years.  So we are often referred to as forensic

15   psychologists.  But it really involves people who have

16   backgrounds in what we call the core areas of psychology.

17   So we might have clinical psychologists who are also

18   eyewitness researchers.

19       I'm a social psychologist who does eyewitness research.

20   So I am very interested in human behavior and how our

21   interactions with other people can influence, you know, how

22   we behave in decisions we make.

23       And then others are cognitive psychologists, who are

24   primarily concerned about the brain and the memory of the

25   eyewitness.

1       But as eyewitness experts, we are all somewhat familiar

2   with, you know, the various subfields of psychology.

3   Q.   And can you just describe your educational background in

4   this field?

5   A.   Yes.  I have my bachelor's degree from St. Thomas

6   University in Canada.  I come from eastern Canada.  And then

7   my master's is in brain behavior and cognitive science.  And

8   then my Ph.D. is in social psychology.  And I received those

9   two degrees in Ontario, where I studied.

10  Q.   And when did you finish your Ph.D.?

11  A.   In 2004, I believe.  2004.

12  Q.   It's been some time.

13  A.   It has.

14  Q.   And so as a social psychologist, you publish articles.

15  Are they subject to any kind of review before they're

16  published, or did you just write it and send it out?

17  A.   Yes, they are subject to what we call peer review.  And

18  that is when other experts in the field, when you submit

19  your manuscript to be published, other experts read it over.

20  And it's a blind process.  So they don't know your name;

21  they don't know who they are reviewing the article for, who

22  the authors are.  And then they will provide the editor of

23  the journal with their decision as to whether they think

24  this is psychologically and empirically sound, good

25  research, good study, and they will make a recommendation

DYSART - DIRECT (Owens)                                    442

1   for publication or rejection.

2   Q.   And have you published peer review articles in the field

3   of -- in social psychology and, more specifically, about

4   eyewitness identifications?

5   A.   Yes.

6   Q.   And can you just describe some of the papers that you

7   published that might pertain to the issues in this case?

8   A.   Yes.  So I have published work on -- generally, it's on

9   police procedures, and so one study I published was on

10  something called double-blind administration.  And that is

11  when the person, the police officer or person who is showing

12  the photographs or doing the lineup procedure with the

13  witness, when they do not know who the suspect is.

14       So what we're looking at there is to see -- you know,

15  as a social psychologist, I am looking at influence, and so

16  we are looking to see whether that person who's just

17  administering the lineup can cause differences, like make

18  people change their mind, cause them to be more confident in

19  their identification.  So that's one publication.

20       And others that I've looked at are the various types of

21  photo arrays and lineups that law enforcement can use when

22  they are trying to test a witness on their memory.  So I

23  published some work on that as well.

24  Q.   Can you just -- so one of the papers I have on your list

25  of many is called *Repeated Eyewitness Identification*

DYSART - DIRECT (Owens)                          443

1    *Procedures*, with the same subject, published in the *Journal of*

2    *Applied Research in Memory and Cognition*.

3        First question is, is the *Journal of Applied Research in*

4    *Memory and Cognition*, is that one of these peer-reviewed

5    journals that you have described?

6    **A.**    Yes, it is.

7    **Q.**    And can you just -- without getting into the nitty-gritty

8    because we will do that a little bit later -- just describe

9    what that paper was about?

10   **A.**    Yes.  It was an article that I published with my

11   colleague, Nancy Steblay, from Minnesota.  She -- what we

12   essentially did was lay out for the very first time this

13   idea that researchers have been talking about for a long

14   time but had never published on, and that is that it's very

15   dangerous for witnesses to be shown the same suspect

16   multiple times for the purposes of identification.

17       And so we explain kind of generally why that's a

18   problem, because the eyewitness, when they see a person in

19   one context and then they see them again later, sometimes we

20   have difficulty remembering, like, Why is that face familiar

21   to me?  Right, you see someone at the grocery store and you

22   think, How do I know that person?  That was the general idea

23   behind telling law enforcement and prosecutors and defense

24   attorneys to be extremely cautious in cases where the

25   witness has viewed the suspect on multiple times.

DYSART - DIRECT (Owens)                                   444

1    **Q.**    And I'm not going to go through all of your papers that

2    you published, but I just want to ask you about one more.  Did

3    you publish a paper in 2003 with some other scholars called

4    *Eyewitness Accuracy Rates in Police Showup and Lineup*

5    *Presentations:  A Meta-Analytic Comparison*, in the *Journal of*

6    *Law and Human Behavior*?

7    **A.**    Yes, I did.

8    **Q.**    And before I ask you the same thing as last time, is *Law*

9    *and Human Behavior*, is that one of these peer-reviewed

10   articles or publications that you've described?

11   **A.**    Yes.

12   **Q.**    And can you sort of, without going into too much detail,

13   just describe what that paper was about?

14   **A.**    Yes.  So a meta-analysis is a paper or a study where

15   the researchers don't actually collect any new information,

16   like new data.  Instead, what we do is we go out into the

17   field and we look at all of the research that has already

18   been published or already been conducted on a particular

19   topic.

20       And then what we do is we get all of that data together

21   and we look for, like, patterns, like typically we can look

22   at overall what happens; as opposed to a specific study

23   which might be nuanced.  It might have, you know, a very

24   specific thing that they are looking at.  A meta-analysis

25   tells us, wow, over thousands and thousands of participants,

DYSART - DIRECT (Owens)                                    445

1    what do we expect to see when certain procedures are used.

2    **Q.**   And have you published any chapters in any books in your

3    field?

4    **A.**   Yes, I have.

5    **Q.**   And have you been qualified to testify an expert in state

6    or federal courts --

7    **A.**   Yes.

8    **Q.**   -- in the U.S.?

9    **A.**   Yes, I have.

10   **Q.**   I am not -- I don't want to hold you to it, but how many

11   times have you been qualified to testify as an expert in

12   federal and state courts?

13   **A.**   I think about 85 times probably, in 15 years, 16 years.

14            MR. OWENS:  Your Honor, at this time I'd move to

15   have Dr. Dysart qualified as an expert to opine on the field

16   of eyewitness identification and social psychology.

17            MR. McLANDRICH:  No objection.

18            THE COURT:  All right.  She will be qualified to

19   testify within those parameters.

20            MR. OWENS:  Thank you, Your Honor.

21   BY MR. OWENS:

22   **Q.**   So before we move on from your sort of background in all

23   this academic stuff, can you just tell us how you got into

24   this field of studying eyewitness identification and police

25   procedures and stuff like that?

DYSART - DIRECT (Owens)                                    446

1    **A.**   Yes.  When I was an undergraduate student, I went to a

2    small liberal arts college, and I had the most amazing

3    professor.  And he happened to study face memory.  And he

4    was a cognitive psychologist, and so a lot of his work was

5    on what we will call facial recognition studies.  So if you

6    were a participant in those studies, he would show you 50

7    faces and then give you a little break, and then he would

8    show you a hundred faces.  And he'd ask you, which ones are

9    new that I didn't show you -- that you hadn't seen before

10   and which ones are old.  And so that's what the participants

11   would do.  And it's really studying kind of theoretical ways

12   of how the mind works.

13        And I thought that was interesting, but I was very -- I

14   was much more interested in doing applied work.  I thought,

15   how is this going to help anyone to know these things.  And

16   so I asked him if I could work with him, but I wanted to

17   take face memory and make it more applied.  And he said,

18   okay, go see what you can find.

19        So I went to the library, and I found the field of

20   eyewitness identification.  And so I did my undergraduate

21   honors thesis with him, and then continued -- I was just in

22   love with the research, in love with the field, and so I

23   continued my education studying with one of the leading

24   researchers on identification procedures in Canada at the

25   time, and conducted my masters and Ph.D. work with him.

DYSART - DIRECT (Owens)                                447

1   **Q.**   And have you continued to focus on ways to apply your

2   work with people, members of the criminal justice system in

3   the United States since you've become a professor?

4   **A.**   Yes.  A big part of my job is education, and so I'm

5   often asked to give educational seminars to people in the

6   criminal justice system -- judges, prosecutors, police,

7   defense attorneys, even the general public.  Sometimes

8   universities will ask me to come in.  And so I volunteer my

9   time, and I go in and I provide kind of an educational

10  seminar.

11        And the interesting thing is it's the same talk no

12  matter the audience because the science is the science.

13  **Q.**   And so I just want to break that down a little bit.  You

14  said you give presentations to judges?

15  **A.**   Yes.

16  **Q.**   And would that be in state and federal courts?

17  **A.**   Yes.

18  **Q.**   And how many times have you given presentations to judges

19  about eyewitness identification issues?

20  **A.**   Over 30 times.

21  **Q.**   Did you say that you also give presentations to

22  prosecutors?

23  **A.**   Yes.

24  **Q.**   And do you have a rough estimate about how many times you

25  have given presentations on eyewitness identification issues

DYSART - DIRECT (Owens)                                   448

1    to prosecutors?

2    A.   I have a rough idea, but it's in my -- it's in my CV.

3    Most recently, it's been with conviction review and

4    conviction integrity units within prosecutors' offices.

5    Maybe ten.  I'd have to take a look at the numbers.

6    Q.   All right.  We won't hold you to the numbers.  But have

7    you also given presentations to law enforcement and police

8    agencies?

9    A.   Yes.  Yes, I have.

10   Q.   And have those presentations been around the country in

11   jurisdictions big and small?

12   A.   Yes, they have.

13   Q.   Can you just give a couple examples?

14   A.   Las Vegas; I lectured in the Michigan chiefs of police

15   associations, all the chiefs from all over Michigan; in West

16   Virginia; New York; all over.

17   Q.   So why is it that these trainings are even necessary or

18   relevant if you are giving the same talk to these different

19   audiences?

20   A.   It's my opinion that judges, prosecutors, police want

21   to get things right.  They want to avoid wrongful

22   convictions, and they want to make sure that the true

23   perpetrator is found guilty and held accountable for their

24   actions.

25        And I have knowledge and experience that can help them

DYSART - DIRECT (Owens)                                    449

1    make those decisions to avoid those wrongful convictions.

2    **Q.**    Well, and regardless of any convictions, have there been

3    mistakes made in terms of eyewitnesses in actual -- in

4    criminal prosecutions?

5    **A.**    Yes, there have.

6    **Q.**    And so how do researchers in your field -- has there been

7    theoretical research into the potential for eyewitness

8    mistakes?

9    **A.**    Yes.  In our laboratory research, certainly that's one

10   of the things that we're looking at, where we can look at

11   how often do eyewitnesses make mistakes in our laboratory

12   research.  But we also take that outside of the laboratory

13   and work with actual witnesses and police departments as

14   well.

15   **Q.**   And in your report, you decide -- excuse me -- described

16   doing archival studies where they revealed some errors in

17   eyewitness identifications.  Can you just describe that?

18   **A.**    Sure.  So the archival studies in our field, what we do

19   is we work with police, and they kind of open their doors

20   and allow us to go in and look at cases that are already

21   finished.  So no ongoing cases.  And what we can do is we

22   can look at how often are witnesses being asked to view

23   photo arrays, we can look at what types of decisions do they

24   make:  Do they pick the suspect?  How often?  Do they pick

25   one of the other people in the lineup -- we call them

1    fill-ins, stand-ins -- or do they say, No, I don't recognize

2    the person here at all?  So how often does that happen?

3        And the only way to know how often that happens in the

4    real world is to work with law enforcement to be able to

5    answer those, those questions.

6    **Q.**   So are there -- have there been, at least focusing on the

7    archival studies, have there been -- are there any errors that

8    have been noticed?

9    **A.**   (Nodded head.)

10   **Q.**   Can you give us like a sense of some rate of some errors

11   in these studies?

12   **A.**   Sure.  Over time there have been a whole bunch of

13   studies that have been conducted by police, and so there's

14   thousands of participants who were actual witnesses in real

15   cases that have been studied.  And what we find is that when

16   eyewitnesses in actual cases are shown a photo array, they

17   end up choosing from that array less than half of the time.

18   So more than half of the time they say, no, I don't see the

19   person here.

20       But when an eyewitness selects someone from the

21   identification procedure and says, you know, that's the

22   person I recognize, that's him, whatever their decision is,

23   what we know is that they are wrong and pick one of those

24   innocent fillers about a third of the time.  So three out of

25   ten witnesses who are making positive identifications in

1    cases are incorrect and making mistakes.

2    **Q.**   So is the -- so that these kind of mistakes that you have

3    seen in archival studies, does that research play out in other

4    places where you can study whether or not there is error rates

5    and mistake in identifications?

6    **A.**   Yes.  Well, there are different types of archival

7    studies.  So the ones I just described were when we worked

8    with law enforcement and, you know, they show us their

9    records and we can write down the data.

10       But the second group of actual cases that we look at

11   are DNA exoneration cases in the United States.  So these

12   are people who were convicted, and DNA testing after their

13   conviction has proven that they were innocent of the crime,

14   that they did not commit the crime.  And so we can look at

15   those as well to see whether or not eyewitness

16   identification played any role in those cases.

17   **Q.**   And so has there been, sort of for lack of a better word,

18   a well-cited study analyzing DNA exoneration cases to examine

19   rates or mistakes in the criminal justice system?

20   **A.**   Yes.  There was a book in 2011, so just over ten years

21   ago, that was published on the first 250 DNA exoneration

22   cases in the United States.  There are now 375 or more DNA

23   exoneration cases.  But a law professor named Brandon

24   Garrett looked at the first 250 cases and analyzed what

25   happened.  His book is actually called *Convicting the*

1    *Innocent: Where Criminal Prosecutions Go Wrong.* That's the

2    byline on his book.

3    **Q.** And just to be fair to Mr. Garrett, that book covers a

4    number of different issues beyond eyewitness identifications,

5    right?

6    **A.** Oh, yes. He looked at, like, everything that happened

7    in those criminal prosecutions to make an assessment from,

8    in his opinion, what the issues were, hopefully that we

9    could use that information to make changes in the system.

10   **Q.** So some of the cases discussed in his book involve false

11   confessions, some of them involve faulty science, and then

12   some of them involve identification -- misidentifications,

13   right?

14   **A.** Yes. Three-quarters of them actually had mistaken

15   identification. So he found, in the first 250 DNA

16   exoneration cases, 76 percent of those cases involved

17   eyewitness testimony. So it was the leading -- it far

18   outweighed all the other factors in the case, in terms of

19   frequency.

20   **Q.** And then do some of these cases of mistaken

21   identification, do they happen in situations even when there

22   are multiple witnesses identifying the same wrong person?

23   **A.** Yes. According to Mr. Garrett's analysis, what he

24   found when he looked at the eyewitness cases, one third of

25   those cases had more than one eyewitness. So, specifically,

1    36 percent of the eyewitness cases had two, three, four, or

2    more cases -- eyewitnesses.  I think one case had five

3    eyewitnesses that all mistakenly identified the innocent

4    defendant.

5    Q.   And so how do researchers in your field use this kind of

6    data, whether it's from archival studies or the study like

7    Brandon Garrett, to examine cases across the field even if

8    there is no DNA?

9    A.   Yes.  Well, DNA is extremely rare in criminal

10   prosecutions across the United States.  And we can look at

11   the evidence.  We can look at the case without knowing

12   whether or not there is biological evidence that happened to

13   be at the crime scene.  So that's not for our purposes

14   necessarily something relevant when we're examining the

15   police procedures, the eyewitness conditions that kind of

16   led to those wrongful selections.

17   Q.   So I guess let me ask it differently.  Did the eyewitness

18   identification issues and risks of misidentification apply as

19   equally in a case where there was DNA as they would in a case

20   involving -- not involving DNA?

21   A.   Yes.  The presence of DNA or not does not impact the

22   eyewitness identification accuracy.  The only difference is

23   that DNA testing will tell us conclusively about the mistake

24   or not.  But it does not tell us about -- it's not -- all of

25   this is not just relevant to eyewitness cases where there's

DYSART - DIRECT (Owens)                                    454

1    DNA.

2    **Q.**   Now, you're here as an expert today, and I just want to

3    make this really clear.  Are you here to provide the testimony

4    about the credibility of any witness in this case?

5    **A.**   No.

6    **Q.**   Are you here to provide any testimony about the

7    credibility, personal credibility of Detective Moore, for

8    example?

9    **A.**   No.

10   **Q.**   Are you here to provide any testimony about any of the

11   witnesses who made identifications?

12   **A.**   No.

13   **Q.**   Can witnesses be mistaken in their identifications even

14   if they are well-meaning?

15   **A.**   Yes.  That's the norm.  The expected norm is that they

16   are well-meaning and they are just mistaken.

17   **Q.**   And I am going to ask you some hypothetical questions

18   today about some of the issues that you've -- some of the

19   issues in your field.  And I just want to be really clear.  In

20   answering any of my hypothetical questions, are you telling

21   the jury here who to believe or what to think about the

22   evidence in this case?

23   **A.**   No.

24   **Q.**   In answering any of my hypothetical questions in this

25   case, are you telling this jury what to decide about any issue

DYSART - DIRECT (Owens)                                    455

1    or fact?

2    **A.**    No.

3    **Q.**    Okay.  Let's start with one part of your report and our

4    first hypothetical.  So if you made an assumption that a

5    person is innocent, what are the probabilities that somebody

6    would be selected as the perpetrator by three separate

7    eyewitnesses absent some suggestion or bias in the

8    administration or the identification procedures?

9    **A.**    It would -- it would be extremely unlikely that three

10   separate eyewitnesses would all make the same mistake and

11   choose someone under those conditions, yeah.

12   **Q.**    And what is the basis for that opinion that you think

13   would be extremely unlikely?

14   **A.**    The basis is the research, decades of research that

15   inform us about the probabilities of these kinds of

16   behaviors and choices by witnesses.

17   **Q.**    All right.  And I don't have the biggest vocabulary, but

18   I am going to try to help us get on the same page.

19        In your field, do researchers have certain terminology

20   that they use for describing the factors that can contribute

21   to the accuracy of a given witness identification?

22   **A.**    Yes, we do.

23   **Q.**    And what are those -- what's that terminology?

24   **A.**    Sure.  So researchers talk about kind of two buckets of

25   factors that can contribute to mistaken identifications.

DYSART - DIRECT (Owens)                               456

1      The first is what we call estimator variables, and

2  those are all of the things that are related to the crime

3  and the witness and the perpetrator, so the things that

4  happen related to the event and the crime itself.

5      And then we have system variables, and these are

6  choices that law enforcement make when they are collecting

7  the evidence from the eyewitness.  So what type of questions

8  are you going to ask?  What kind of photographs are you

9  going to show?  When are you going to show them?  Who's

10  going to show them?  So every step of the investigation that

11  requires some choice about identification procedures, we

12  call them system variables, for criminal justice system

13  variables.

14  **Q.**   Got it.  So if I can summarize, on one side you have

15  estimator variabilities.  Those are the things that happened

16  in the moment, during an incident; is that right?

17  **A.**   That's correct.

18  **Q.**   And then on the system side, we have things that happened

19  afterwards, when the -- in the aftermath, for lack of a better

20  word, where we start to develop identification procedures; is

21  that right?

22  **A.**   That's right.

23  **Q.**   Okay.  Now, is this system variable versus estimator

24  variable thing, is this a brand new thing that y'all just made

25  up in the last couple years?

DYSART - DIRECT (Owens)                                          457

1    **A.**   No.  It was -- this distinction was created in 1978.

2    So the field has moved forward over the last more than 40

3    years under this kind of umbrella with these two kind of

4    buckets of research.

5    **Q.**   And I appreciate your -- I am not really a name dropper,

6    but can you give us the name of the researcher who came up

7    with that distinction and how he's been perceived and done

8    work in the field?

9    **A.**   Yes.  His name is Gary Wells, and he was my Ph.D.

10   supervisor's supervisor.  So I guess you would call him my

11   academic grandfather.  That's how we refer to it in the

12   field.

13       And he has received numerous lifetime achievement

14   awards for his contributions to policies, procedures,

15   eyewitness identification procedures, and he is considered

16   the leading figure in -- in the research on eyewitness

17   identification.  He's at Iowa State now and continues to

18   publish and -- very regularly.

19   **Q.**   And the reason I sort of brought up Mr. Wells is because

20   he came up with this distinction in 1978.  Has he, with other

21   researchers, published sort of an important paper summarizing

22   the status of your field over the last couple years?

23   **A.**   Yes.  In 2020, he was a lead author in something that

24   we call a white paper on the field of eyewitness

25   identification and procedures.  So he is the lead author who

1    assembled another, you know, team of lead researchers for

2    around the country to make proposals about what is the best

3    way for law enforcement to collect this kind of evidence and

4    run their identification investigations.

5    **Q.**   Got it.  So we talked a little bit about peer review

6    earlier.  It sounds like, does the white paper have like, I

7    don't know, peer review on steroids, a more amped-up measure

8    of review; is that right?

9    **A.**   I guess that's one way to call it.  It was 18 months of

10   public review.  The paper was a subject of like an hour-long

11   conference slot at our annual conference of the American

12   Psychology Law Society.  And so they went through some

13   revision processes, and people could provide edits and

14   comments on the draft before it was ultimately published and

15   accepted.

16   **Q.**   Got it.  And just to cut to the chase, one of the

17   people -- did you contribute and make comments on the white

18   paper?

19   **A.**   Yes, I did.

20   **Q.**   And one of the witnesses we may hear from in this

21   trial -- I can't speak for the other side -- is a guy named

22   John Wixted.  Do you know who he is?

23   **A.**   Yes, I know Professor Wixted.

24   **Q.**   And was Professor Wixted -- thank you for the

25   correction -- did he also contribute to the white paper?

DYSART - DIRECT (Owens)                    459

1    **A.**   He is an author on the paper, yes.

2    **Q.**   And do you disagree with the findings and suggestions and

3    research in the white paper?

4    **A.**   No.  It's a comprehensive review and set of proposals

5    over the last 40 years culminated into this very long

6    document.  I think it's over a hundred pages, which is

7    unusual in our field to have such a long publication.

8         And so, no.  I made my comments, and edits were made,

9    and I agreed with the conclusions.  It's an excellent paper.

10   **Q.**   All right.

11        MR. OWENS:  Your Honor, I was going to just jump in

12   to start talking about these estimator variables and the

13   system variables, and the Court wanted to stop a little bit

14   early.  I'd hate to ask three questions on a new topic, but if

15   I had ten questions, I'd ask them.

16        THE COURT:  Well, it depends on how long it's going

17   to take to answer your questions.

18        MR. OWENS:  Sure.  Let's just keep going.  All

19   right.  Thank you, Judge.

20   BY MR. OWENS:

21   **Q.**   Last little bit of vocabulary so we can all have our

22   lunch and come back and then sort of digest it together.

23        When describing system variables, which come after the

24   fact, are there -- is there terminology researchers in your

25   field use to describe sort of what's going on, like whether

DYSART - DIRECT (Owens)                                    460

1    it's fair or accurate or biased?  What kind of terminology

2    should we be using from a scientific standpoint?

3    A.   Yes.  So, commonly, when we're talking about photo

4    arrays or lineups, I should say we use those terms rather

5    interchangeably as well.  It's rare for police to do a live

6    lineup.  It's usually photos.  So a photo array or live

7    lineup we will describe as being biased or unbiased

8    typically.  And what that means is that the suspect that we

9    have in that procedure stands out in some way, for whatever

10   reason, a whole host of reasons.  And if that happens, we

11   will call it a biased identification procedure.  And if they

12   don't stand out and it's a fair kind of test, we call it

13   unbiased.

14   Q.   All right.  So we have got non-biased and fair on one

15   hand and biased on the other; is that fair to say?

16   A.   Yes.

17   Q.   And just to be really clear, again going back to the

18   question I asked you about credibility, when you used the term

19   talking about a biased lineup or biased administration, are

20   you implying something about anybody's intent or credibility?

21   A.   No.  It -- it's just whether the person stands out or

22   not.  The intent is not relevant of whether or not the

23   person stands out in the procedure.

24   Q.   Okay.  So when you say this was a biased identification

25   procedure, you are not making an accusation that the

DYSART - DIRECT (Owens)                                    461

1    administrator themselves was biased personally, right?

2    **A.**    No.

3              MR. OWENS:  Is that a good place, Judge?  I can keep

4    going.

5              THE COURT:  You can keep going.

6              MR. OWENS:  All right.

7    BY MR. OWENS:

8    **Q.**   So in your report, you've identified a number of these

9    estimator and system variables.  And I've got them listed out

10   as 12 basically, just to give us a guide for our conversation.

11             MR. OWENS:  Do you mind if I could get the document

12   camera?  Thank you.

13             THE COURTROOM DEPUTY:  Counsel, has this been

14   published previously?

15             MR. OWENS:  I showed this to counsel.  It's just a

16   demonstrative, and I believe there is no objection.

17             THE COURT:  Well, what -- he believes there is no

18   objection.

19             MR. McLANDRICH:  He is correct, Your Honor.

20             MS. FRICK:  Correct.

21             THE COURT:  It may be published.

22        (Exhibit displayed.)

23   BY MR. OWENS:

24   **Q.**   All right.  We have got 12 things to discuss, a long

25   list, but we will move quickly.

1    All right.  So the first one at the top of the list says

2    opportunity to observe.  Now, is that a system variable or is

3    that an estimator variable?

4    **A.**   It's an estimator variable, because it has nothing to

5    do with police.  It has all to do with the witness and what

6    they could see at the crime.

7    **Q.**   Got it.  And so can you just describe to us sort of what

8    it means, what's involved in evaluating a witness's

9    opportunity to observe and how that might impact an

10   identification?

11   **A.**   Yes.  So in the research, when we're studying, you

12   know, how good an opportunity or poor an opportunity a

13   witness has to see something, usually what we manipulate is

14   the length of time.  So because we know that the longer you

15   have to see something, the longer you are exposed to

16   something the stronger your memory will be for that -- for

17   that item or for that thing.  And which is why I encourage

18   my students to study really hard, right.  The longer they

19   spend with the material, the longer -- the better they will

20   remember it.

21      And so when it comes to an eyewitness, if the witness

22   had a very short opportunity to see someone's face versus a

23   longer opportunity, we know that that can impact

24   identification accuracy.

25   **Q.**   Now, is it just the time being around somebody that

1    matters, or when you're studying this as a scientific

2    perspective, what do you mean when you focus on opportunity?

3    **A.**    Sure.  So to clarify, if an eyewitness is going to be

4    tested ultimately on the face of the individual -- do you

5    recognize anyone here or do you recognize this person --

6    what's really important is how long did you have to see that

7    person's face.

8         As an extreme example, if a person was kidnapped and

9    the perpetrator had a mask on and you couldn't see any of

10   the person's face, it wouldn't matter if you were with that

11   person for an hour or two weeks.  If you could never see the

12   face, it's not going to be helpful for you in being able to

13   recognize.  So it truly is the amount of time that the

14   witness has to see the face of the individual that the

15   research shows is important.

16   **Q.**    So we focus on the face, and then are there things that,

17   as it relates to this opportunity factor, about the

18   circumstances of the commission -- and we will just call it a

19   crime -- that can impact an opportunity to observe the

20   perpetrator's face, even in that moment?

21   **A.**    Yes, absolutely.  So in my example, I used like a mask,

22   you know, that the person might use.  But also the presence

23   of a weapon has been shown to affect the witness's ability

24   to be accurate later on.  Because what our research shows is

25   that when a perpetrator uses a weapon during the crime, that

1    witnesses tend to look at the weapon.  And we've shown this

2    interestingly using eye tracking software.  So we've done

3    studies where we can actually see where a person has focused

4    their eyes at any particular time.  And what we learned from

5    that is when a weapon is present, witnesses tend to look at

6    the weapon.  And so when they are doing that, they are not

7    spending the time, you know, as much time looking at the

8    witness -- the perpetrator's face in order to have a better

9    or stronger memory.

10   **Q.**   Is another --

11          THE COURT:  Two minutes.

12          MR. OWENS:  Thank you, Judge.

13   BY MR. OWENS:

14   **Q.**   Is another factor that can reduce sort of this

15   opportunity to observe disguise even less than the extreme

16   type of mask that you described?

17   **A.**   Yes.  Researchers have looked at much less extreme

18   disguises.  So if a person's wearing a hat, like a baseball

19   hat or a Tuke in the winter, sunglasses, glasses can affect

20   our ability to be accurate at an identification later on.

21   **Q.**   Okay.  Is a Tuke, is that like a beanie?

22   **A.**   Yeah, sorry.  That was very Canadian.  Yes, like a knit

23   winter hat, yes.  That's a Tuke.

24   **Q.**   All right.  Thank you.  And then would sunglasses

25   constitute a disguise?

DYSART - DIRECT (Owens)                                    465

1   **A.**   Yes.  I think I said that.  Glasses and sunglasses,

2   yes, would.

3   **Q.**   Okay.

4           MR. OWENS:  There we go.

5           THE COURT:  If you're ready.

6           MR. OWENS:  Absolutely.

7           THE COURT:  Ladies and gentlemen, we're going to

8   recess for the lunch hour.  Now, I would like -- we're going

9   to do something a little different.  If I can ask -- let me

10  see how I want to do this.

11      I'm going to ask you folks, if you would, please, just

12  retire to the jury room -- it won't take long -- retire to the

13  jury room after we recess, and then remain there until

14  Ms. Penski comes to talk to you, all right?

15      Anything else, counsel?

16          MR. OWENS:  Not for now, Your Honor.  We appreciate

17  it.

18          MR. McLANDRICH:  No, thank you.

19          MS. FRICK:  No, Your Honor.

20          THE COURT:  Thank you.  We will stand in recess.  We

21  will reconvene at 1:15.

22          THE COURTROOM DEPUTY:  All rise.  This court stands

23  in recess.

24      (Jury out at 11:49 a.m.)

25      (Recess at 11:49 a.m.)

DYSART - DIRECT (Owens)                                    466

1          (In chambers at 11:51 a.m.

2              THE COURT:  We're on the record outside the presence

3     of the jury.

4          I just feel compelled, I think this is very, very, very,

5     very, very minor.  I don't think I can say "very" too much.

6     But I felt it was necessary for me to bring it to your

7     attention and to also do a very quick voir dire of three of

8     the jurors.

9          I instructed all the jurors to -- that I was giving them

10    tablets to take notes.  I instructed all the jurors to leave

11    their tablets on their seat at the end of the day, that those

12    would not be disturbed.

13         It's come to my attention that three of the jurors, the

14    tablets were not on their seat.  I'm not quite sure where the

15    tablets were or went.  I believe one of the tablets possibly

16    was never taken out of the bag we gave them, but I don't know

17    where the others are.  They are all -- I have told and I'll --

18    I have told Ms. Penski to tell everyone that those tablets

19    need to be on those seats if they are not in that jury box.

20         They are now, I believe -- are they -- they are all on

21    the seats, but I feel it is -- I believe that I need to call

22    in and just ask a question of Jurors 2, 3, and 4.  Just, I

23    just need to ask them -- their tablets have not been on their

24    seat.  I will tell them, they need to be on their seat, but

25    have those tablets always been in their total custody and has

DYSART - DIRECT (Owens)                                    467

1    anyone had the opportunity to read or write in those, into

2    those tablets.

3         MR. OWENS:  I apologize, Your Honor.  This is David

4    Owens.  I just want to put on the record, I noticed that those

5    three were not there, and that only Juror 1 had theirs at the

6    end of the first day.  I just sort of laughed to myself, "We

7    know who the rule followers were."  But I didn't think

8    anything about it.  I didn't do anything.

9         THE COURT:  Well, we've watched them -- the back

10   row's taking notes, and the back row's tablets are on their

11   seats.  The front row, tablet 1.  2, 3, and 4 aren't there.

12    We did view a tablet for Juror Number 3 in the bag below

13   her seat.  We surmise that she's never even taken it out

14   because none of those ladies, those 2, 3, and 4, are taking

15   notes.  But I think I need to ask that question.

16        MR. McLANDRICH:  Yes.  It seems fair.  Does it make

17   any sense to also inspect the tablet as part of your --

18        THE COURT:  No, I don't think I want to inspect it.

19        MR. KANOVITZ:  We don't --

20        THE COURT:  If they say no one else has had it; that

21   they have kept it in their possession; that no one has had any

22   ability to, in any way, shape, or form, modify it, I don't

23   tend to -- I mean, because I have told them that I am not

24   going to infringe upon them.  I mean, if you want to put that

25   on the record, you can.  I don't want to get into it.

```
 1              MR. McLANDRICH:  No.  I'm just --
 2              THE COURT:  And then what that does, that just
 3     gives -- I am showing all the parties the notes that the
 4     people were taking.
 5              MR. McLANDRICH:  No, I am not interested in seeing
 6     them.  I was thinking more about the cause in the sense,
 7     because it would seem to me the concern if they are taking the
 8     tablet home with them, are they, you know, adding anything to
 9     the tablet that's extraneous from the trial.  That was the
10     only reason I raised that issue.
11              THE COURT:  Well, I will ask them that question.
12              MR. McLANDRICH:  I don't want to see the tablet.
13              THE COURT:  I don't think I want to do anything
14     else.
15          Anything?
16              MR. OWENS:  We agree the Court should not see the
17     tablets.
18              THE COURT:  Folks, any --
19              MS. FRICK:  No, Your Honor.  We are fine with it.
20              THE COURT:  Let's start --
21              THE COURTROOM DEPUTY:  Let's not start with 2,
22     please.  Start with 4.  They are laughing because she is in
23     the walker, and she will take up most of our time.  So we can
24     get 4 and 3 out of the way.
25              THE COURT:  Let's start with 4.
```

DYSART - DIRECT (Owens)                                      469

1           THE COURTROOM DEPUTY:  Do you want me to excuse the

2     others?

3           THE COURT:  No, not yet.  That's why it's important

4     we make this brief, because I want to get my juror out of

5     here.  I don't think there is anything to this, but it came to

6     my attention.

7           MR. McLANDRICH:  I believe they are blank.

8           THE COURT:  What's that?

9           MR. McLANDRICH:  I believe they are blank.

10          THE COURT:  I bet you they are too.  Especially with

11    the ones not taking any notes.  I am not quite sure that the

12    one lady ever took it out, but that's her choice.

13          MR. McLANDRICH:  The day that I saw the lady with

14    the walker had the bag on the front of the walker, she was

15    going out.  She'll probably say something.

16       (Juror Number 4 now present.)

17          THE COURTROOM DEPUTY:  Juror Number 4.

18          THE COURT:  Juror Number 4, come right in.  Please

19    don't be intimidated.

20          PROSPECTIVE JUROR:  Okay.

21          THE COURT:  We're very friendly.

22          THE JUROR:  Okay.

23          THE COURT:  But it's important that we ask you a

24    question.  As you know, the Court instructed initially that

25    the tablets that we gave you be left on your seat.  It has

DYSART - DIRECT (Owens)                           470

1    been noticed that yours wasn't always on the seat.  Can you

2    tell us where the tablet has been other than on your seat?

3              THE JUROR:  On my lap when I was sitting there.

4              THE COURT:  Like at night.

5              THE JUROR:  Oh, we took them home, several of us

6    did.

7              THE COURT:  Okay.  Did you have total control over

8    those tablets?

9              THE JUROR:  Yeah.  There's nothing in mine at all.

10             THE COURT:  But no one had the ability to get

11   control of it or write in it or do anything to it?

12             THE JUROR:  No.  I left it in my car.

13             THE COURT:  Oh, okay.  So it was in your car?

14             THE JUROR:  Yeah.

15             THE COURT:  If you could, please just leave it on

16   the seat from now on at night.

17             THE JUROR:  Okay.

18             THE COURT:  Counsel, do you have any questions?

19             MR. McLANDRICH:  No, sir.

20             MS. FRICK:  No, sir.

21             THE COURT:  That's all I need to know.  Thank you.

22             THE JUROR:  I'm sorry.

23             THE COURT:  No, no, no.  Wait.  There is no reason

24   to be sorry about anything, all right?

25             THE JUROR:  Okay.

DYSART - DIRECT (Owens)                                      471

1          THE COURT:  We're fine.

2      (Juror Number 4 excused.)

3          THE COURT:  You know, this whole process is

4   intimidating for a juror.

5          MR. OWENS:  And terrifying.

6          THE COURT:  Although she is probably just sighing a

7   big sigh of relief because she didn't know what in the heck we

8   were doing.

9          MR. OWENS:  She also snitched immediately.

10     (Juror Number 3 now present.)

11         THE COURTROOM DEPUTY:  This is Juror Number 3.

12         THE COURT:  Juror Number 3, come right in.  Please

13  do not be intimidated.  Have a seat.  Please don't be

14  intimidated.  We have to ask you a question.

15         THE JUROR:  Sure.

16         THE COURT:  At the beginning of the trial, it was

17  instructed that you were going to be given tablets and the

18  tablets need to be left on your seats.  It has been noticed

19  that your tablet has not always been on your seat when you

20  have not been in the jury box.

21         THE JUROR:  Yes.

22         THE COURT:  Can you tell me where the tablet's been?

23  Has it always been in your control or what?

24         THE JUROR:  Yes.  I haven't even wrote anything in

25  it.  It's been there right now.

DYSART - DIRECT (Owens)                                        472

 1              THE COURT:  Did you take it home?

 2              THE JUROR:  No.

 3              THE COURT:  So you've left it here?

 4              THE JUROR:  It's been in my truck.

 5              THE COURT:  Okay.  So you haven't taken it home, but

 6     you left the building with it, and you took it to your truck.

 7     But no one's had access to it?

 8              THE JUROR:  Correct.

 9              THE COURT:  Plus, there's nothing in it, right?

10              THE JUROR:  I don't carry a purse, so I put my keys

11     and phone in it.

12              THE COURT:  No problem, no problem, no problem.  If

13     you would, please, when you leave the jury box, that tablet

14     needs to be on -- what we are trying to do is trying to avoid,

15     unbeknownst to a juror, someone takes a look or whatever.

16              THE JUROR:  Sure.

17              THE COURT:  That's not right.  So we just want to

18     protect the process and you, okay?

19              THE JUROR:  And I think James let us know this

20     morning too that we could leave it.  I wasn't sure.

21              THE COURT:  But just leave it on the seat, and it

22     will be fine.  Thank you very much.  Wait a minute.  Hold on.

23        Do you guys have questions, anybody?

24              MR. McLANDRICH:  No, sir.

25              MS. FRICK:  No.

1          THE COURT:  Thank you very much.

2      (Juror Number 3 excused.)

3      (Juror Number 2 now present.)

4          THE COURT:  Hello.

5          THE JUROR:  Hello.

6          THE COURT:  Whatever's best for you, you can either

7  have a seat there or -- this will take one minute.

8          THE JUROR:  I'll stand.

9          THE COURT:  At the beginning of the trial, we

10  instructed everyone that we are giving you tablets.  Tablets

11  needed to be left on the seats.  It has been noticed that

12  several jurors have not left their tablets on the seats.  What

13  we need to know is where those tablets have been, has anyone

14  else had access to them.

15          THE JUROR:  No.

16          THE COURT:  No?  Did you take one home?

17          THE JUROR:  I took one home last night.

18          THE COURT:  But no one else has had access to them?

19          THE JUROR:  I haven't been around anybody.

20          THE COURT:  Okay.  I don't have any other questions.

21      Do you?

22      Can you just leave it on the seat.

23          THE JUROR:  It's there when they said it again.

24          THE COURT:  No problem, no problem.  There is no big

25  problem here.  It's just we need to make sure that we conform

DYSART - DIRECT (Owens)                                474

1   with our rules because we don't want somebody to get ahold of

2   one of your notebooks, and then we have a real problem.

3           THE JUROR:  Yeah.

4           THE COURT:  That's all.  Thank you.  Enjoy your

5   lunch.

6       (Juror Number 2 excused.)

7           THE COURT:  Anything else, counsel?

8           MR. OWENS:  Thank you for your time.

9           THE COURT:  No problem.  I'm sorry to bring that up.

10  I thought, well, they are not there and they are supposed to

11  be there, so I don't know where they have been.  Okay.

12      (Concluded at 12:04 p.m.)

13      (Jury in at 1:22 p.m.)

14      (In open court at 1:23 p.m.)

15          THE COURT:  Welcome back, everyone.

16      We are back on the record.

17      Counsel ready to proceed?

18          MR. OWENS:  Yes, Your Honor.

19          MR. McLANDRICH:  Yes, sir.

20          THE COURT:  You may proceed.

21  BY MR. OWENS:

22  **Q.**   Dr. Dysart, before our lunch break, we spent some time

23  talking about generally estimator variables and system

24  variables, and we were sort of just getting into the first

25  one, which is about the opportunity to observe, right?

DYSART - DIRECT (Owens)                                    475

1    **A.**    Yes.

2    **Q.**    Just to orient us so we are all on the same page.  And

3    the last thing we had discussed was how individuals wearing a

4    disguise could impact the opportunity to observe.  We on the

5    same page?

6    **A.**    Yes.

7    **Q.**    And glasses, like sunglasses, can be a form of disguise,

8    right?

9    **A.**    That's what the research shows, that it has a negative

10   impact or it can have a negative impact on accuracy.

11   **Q.**    Great.  And is the idea then that even wearing, like,

12   glasses might impact somebody's ability to record features

13   about a face, and that's why the amount of time may not be

14   sort of as significantly correlated with accuracy; is that

15   what's going on?

16   **A.**    Yes.  Well, the idea with the disguise is that -- I'm

17   not sure what's happening there.

18   **Q.**    If you speak straight into it.  They like to be straight

19   and not off to the side.

20   **A.**    There we go.

21        So the idea with the disguise is that it is obscuring

22   portions of the face, and if you are obscuring portions of

23   the face, you can't -- you can't -- I'm sorry -- you can't

24   encode that information.  So, yes, you can't remember

25   features that you never saw.

DYSART - DIRECT (Owens)                        476

1   **Q.**   Got it.  And so "disguise" in this term, sort of like we

2   discuss with bias, it doesn't necessarily mean that somebody's

3   trying to hide.  It could just be things like a hat or common

4   things like maybe a scarf -- I don't know -- that would be --

5   impact your ability to get -- record someone's face generally;

6   is that fair to say?

7   **A.**   Generally, yes.  And also a change in someone's --

8   like, for example, women, when they have their hair down or

9   in a ponytail, sometimes that has the same impact as a

10  disguise.

11  **Q.**   Sure.  So we're talking about the opportunity to observe.

12  And, obviously, the length of time, you know, that's -- our

13  common sense says the more time, and I think as you said,

14  helps us -- we have a greater opportunity to remember details.

15  But are -- some of the evidence that you have revealed in your

16  research, that witnesses can be mistaken even when they have

17  spent significant periods of time with the perpetrator?

18  **A.**   Yes, we found that.

19  **Q.**   And let me just say, when I said "significant periods of

20  time," what kind of things are you seeing in the research and

21  proven misidentifications about length of time?

22  **A.**   Sure.  So there are laboratory studies that we can do

23  where we can manipulate time so that we can make a

24  conclusion that time was the thing that made a difference.

25       And so researchers have used periods of 15, 10, 15

DYSART - DIRECT (Owens)                              477

1    minutes as an exposure time.  Typically, it's much shorter.

2    But in the DNA exoneration cases and archival studies where

3    it's actual cases and real witnesses, we can collect the

4    information to find out how much time the witness and the

5    perpetrator or the victim and perpetrator were together, and

6    those periods are hours in some cases.

7    Q.   And so am I right -- and also that they are not only

8    hours, but they are often hours of times, like in the DNA

9    exoneration cases, many of those are sexual assault cases,

10   correct?

11   A.   Correct.  Because biological evidence is left behind,

12   yes.

13   Q.   So are you saying that even if somebody in rape cases

14   with the perpetrator for like a series of hours, they can

15   still make a misidentification?

16   A.   Yes.  The majority of the DNA exoneration cases are

17   sexual assault cases, and researchers have accumulated all

18   of the information about the estimator variables, including

19   time, and we see in those cases that some are two, three,

20   four hours where the victim was with the perpetrator but

21   made a mistake and identified an innocent person.

22   Q.   Now, this is, I think, a little bit related to the idea

23   of passage of time.  Has your research gone into the idea

24   about how much, you know -- how victims or witnesses are able

25   to record like how much time, so if they said, hey, how long

DYSART - DIRECT (Owens)                                    478

1  were you with the perpetrator, was it 10 minutes, 20 minutes,

2  two hours, has your research focused on recording those types

3  of statements from victims or witnesses?

4  **A.**   Yes.  We call it time estimation.  So we -- in our

5  research, what's really critical is, because we are in

6  control of everything and we know everything that happens to

7  the witnesses in our studies, we know exactly how much time

8  a witness was exposed to someone or saw someone.  And we --

9  studies that are interested in this will ask people, How

10  long do you think that this whole thing took?  Like how long

11  was the interaction?

12      And what the research shows is generally people tend to

13  overestimate the amount of time that the interaction took

14  place.  So when you ask people about a 30-second

15  interaction, in one study on average people thought it was a

16  minute and a half, for example, so three times the length

17  than the actual interaction was.

18              MR. OWENS:  Can I get the document camera, please.

19              THE COURTROOM DEPUTY:  You haven't asked to publish

20  it.

21              MR. OWENS:  This was the same one that was up

22  earlier.

23      (Exhibit displayed.)

24  BY MR. OWENS:

25  **Q.**   All right.  So we've talked -- just our little roadmap

DYSART - DIRECT (Owens)                                    479

1    here so we are on the same page, moving right along -- talked

2    about the opportunity to observe and some things that can

3    impact that as an estimator variable.

4        The next one on the list is effects of stress and

5    arousal.  So what does that mean as an estimator variable?

6              MR. OWENS:  You can take that down.  Thank you.

7              THE WITNESS:  What that means is researchers have

8    looked at whether more stressful circumstances, more stressful

9    events, whether they are remembered better by eyewitnesses or

10   participants in our study or if they are remembered more

11   poorly.  And so that's the kind of general idea from the

12   research.  And so in an experiment, we would manipulate

13   something in the study to make -- to make it stressful for

14   some of our participants or make them afraid.

15       The arousal is like running; when we ask people to run,

16   that actually causes the same effects as when people are

17   afraid or stressed in our experiments.

18   BY MR. OWENS:

19   **Q.**   Fair to say that high levels of stress are correlated

20   with negative impacts on the reliable -- excuse me -- the

21   accuracy of an identification?

22   **A.**   Yes.  So the more stressful the event, the less

23   accurate the eyewitness identification.  That's the general

24   relationship.

25   **Q.**   So I guess I want to make sure that I understand this

DYSART - DIRECT (Owens)                                      480

1    correctly because, generally, I thought it was, you know,

2    stressful events, things like something happened that was

3    traumatic, things like that would be seared into my mind,

4    because it was a super stressful thing, I'm likely to, you

5    know, encode all the information.  Is that wrong?

6    **A.**    Unfortunately, you are wrong.  What will happen is that

7    a really stressful or traumatic event is memorable in that

8    you probably will never forget that it happened.  You know,

9    for example, posttraumatic stress disorder is being

10   researched by memory researchers now because this is the

11   issue.  People who have posttraumatic stress disorder can't

12   stop thinking about the event.  And so you are very likely

13   to remember that the event happened, but during the actual

14   experience itself, having a high degree of stress and

15   arousal does not make us better at remembering the

16   information, at encoding the information, as we would, say,

17   in the memory research.

18       Like fight or flight, right.  It's not important to

19   remember the details; it's survival.

20   **Q.**    So I guess, hypothetically, in your research, is being a

21   victim of a rape or a sexual assault considered the type of a

22   stressful situation that is likely to negatively impact the

23   accuracy of an identification?

24   **A.**    Yes.  We would say that would be a very stressful

25   event.

DYSART - DIRECT (Owens)                               481

1   **Q.**   And then from a scientific perspective, backed up in the

2   research and the things that you have seen, those are the

3   types of cases where misidentifications can occur; is that

4   right?

5           MR. McLANDRICH:  Your Honor, objection.  These are

6   all very leading questions.

7           THE COURT:  I agree.

8           MR. OWENS:  No problem.

9       So I guess I am trying to avoid -- I am trying to mind

10  the Court's rulings, so just give me a second because I don't

11  want to go afoul of that.  That's really my point.

12          THE COURT:  I appreciate that.

13          MR. OWENS:  Let me try to -- I want to stay in my

14  lane.

15  BY MR. OWENS:

16  **Q.**   I guess what I'm just really asking straightforward is

17  like, as far as the research goes, is the sexual assault, a

18  rape, the type of thing that's viewed as high stress in terms

19  of the science of identification?

20  **A.**   Yes, it would be considered high stress.

21  **Q.**   So the next sort of factor on our list -- and I won't

22  pull it up again -- is delay.  What do you mean by "delay"?

23  **A.**   So delay is the amount of time that passes between when

24  you first see the event, the critical event that you are

25  being tested on, and when your memory is ultimately tested

DYSART - DIRECT (Owens)                                    482

1    for that.  So if you, for example, witness a crime and

2    report it right away and the police come and interview you

3    right away, you know, that would be a short delay for the

4    interview.  But if you didn't report a crime for a long

5    time, then the delay would be longer, as an example.

6    Q.    And so what does the research say about the amount of

7    time that goes by and the accuracy of a potential

8    identification?

9    A.    Yes.  So researchers have studied this because it is a

10   natural phenomenon that we would expect to see in many

11   cases, and so researchers have studied delays of up to 11

12   months, where a participant in a study would be exposed to

13   either a video or a person live, a target person, and then

14   researchers would ask that person to come back many months

15   later, a couple of months -- in this one study up to 11

16   months -- to then see will this individual remember the

17   person that they interacted with.  So that would be an

18   example of one study.

19        And what researchers found is that over time false

20   identifications or mistaken identifications of innocent

21   people rose to 93 percent.  So 93 percent of people after 11

22   months when presented with some photos made a mistake and

23   picked an innocent person.

24   Q.    So if 11 months is a significant delay, is, for example,

25   hypothetically, a two-year delay between the event and an

DYSART - DIRECT (Owens)                                483

1  identification procedure, would that be significant as well?

2  **A.**   Yes.  I mean, more time that passes, it still continues

3  to be a factor.  There is no theory that says that memory

4  would suddenly just get better over longer and extended

5  periods of time.  So, yes, it would be considered a long

6  period of delay in our research.

7  **Q.**   I want to make sure I heard that right.  You said there

8  was a 93 percent after 11 months, that there were errors; is

9  that right?  I just might have misheard you.

10 **A.**   No, that was correct.  So witnesses who came back after

11 the 11 months and were shown photos, 93 percent made a

12 mistake and picked an innocent person when they were shown

13 photos where the true person that they saw wasn't there.

14 **Q.**   Got it.

15       THE COURT:  Counsel, let's all listen carefully so

16 that we don't have to repeat every answer that she gives.

17       MR. OWENS:  Thank you, Judge.

18 BY MR. OWENS:

19 **Q.**   The next on the demonstrative is the issue of

20 contamination.  What's "contamination" mean as an estimator

21 variable?

22 **A.**   So contamination is anything that happens to the

23 witness or anything the witness sees or experiences after

24 the original event, which is usually a crime.  Anything that

25 happens after that can become incorporated into the

DYSART - DIRECT (Owens)                                    484

 1    witness's memory.  And we call that contamination because

 2    when the witness is ultimately asked to describe or discuss

 3    what happened at the original event, we make mistakes

 4    sometimes and we believe that things that happened after are

 5    actually things from the original experience.

 6         And so researchers call this the contamination of

 7    memory because it's no longer this pristine kind of without

 8    influence thing that the witness is talking about.

 9    Q.   And can there be contamination from other witnesses in

10    the events themselves?

11    A.   Other witnesses, the media police reports -- I mean,

12    police, like, news reports.  There are many ways where

13    contamination can occur.

14    Q.   And is this the type of thing that just comes from people

15    talking to one another?  Is that a form, a potential form of

16    contamination after the event?

17    A.   Well, the contamination after the event, talking to

18    another person, would have to be with someone who also

19    witnessed the event or has some knowledge or information

20    about the event.

21    Q.   Can you sort of give an example of how that might happen,

22    hypothetically?

23    A.   Yes.  So in our experiments when we study

24    contamination, we'll often have maybe two participants or

25    multiple participants together watching a video that they

DYSART - DIRECT (Owens)                                        485

1    are going to be asked to talk about later or in the room

2    when some live kind of crime or event happens.

3         And then we ask those people to talk to each other.

4    You know, you are two witnesses to a crime.  Talk and see

5    what happens.  And what we can see from that is that

6    witnesses learn information from other people.  And when you

7    interview those witnesses separately, they've incorporated

8    the information that they learned from the other person into

9    their own account.

10   **Q.**   So we talked a little bit about multiple witnesses

11   talking to one another and potentially contaminating each

12   other.  Can the police or other law enforcement, can they also

13   provide a contaminant effect?

14   **A.**   Yes.  So if law enforcement provide the witness with

15   information, then that information can become incorporated

16   into -- into the memory.  It doesn't really matter the

17   source; if it's another witness or law enforcement, the

18   contamination effect is the same.

19   **Q.**   So, for example, if a law enforcement officer spoke with

20   the witnesses after the event and said something about the

21   appearance of the perpetrator, could that be a contaminating

22   effect?

23   **A.**   Yes, it could.

24   **Q.**   And does that type of contamination impact the accuracy

25   of identification from a scientific perspective?

1   **A.**   Yes, it certainly can.  If the witness learns

2   information from another witness that happens to be wrong or

3   incorrect and they incorporate incorrect information into

4   their memory, it certainly can affect how they are going to

5   perform in a photo array or in a lineup.

6   **Q.**   You, in your report -- I guess one thing I am trying to

7   understand is -- I'll move forward and maybe come back to it

8   in a minute.

9        The fifth thing on our sort of list here of estimator and

10  system variables is description accuracy.  What's meant by

11  that in your field?

12  **A.**   Yes.  So in our experiments, we always know what the

13  actual target person or criminal looks like because we've

14  typically hired them or selected them for the experiment.

15  And so we know exactly what they look like -- their age and

16  all of that as well.

17       And so then what we do is in virtually every eyewitness

18  study, we ask participants to describe the person that they

19  saw.  And then what we can do is we can look at how close

20  the witness's description was to the actual correct answers

21  that we know.  And so this information gives us, you know,

22  kind of an insight into eyewitness accuracy:  What types of

23  information would we expect to see from witnesses.  Where do

24  witnesses typically get it wrong.  These are the types of

25  things we look at in the research.

DYSART - DIRECT (Owens)                                    487

1   **Q.**   So is there any correlation between the discrepancy

2   between the description of a perpetrator and the accuracy of

3   an identification that's been shown in the studies?

4   **A.**   Yes, there is a relationship.  So when witnesses

5   provide wrong information, they get things completely wrong

6   in their description, there is a relationship to mistakes

7   that are made when they are later shown photos and asked to

8   identify the potential kind of culprit.  So the more

9   mistakes they make on the description, the less accurate

10   they will be on the identification task.

11   **Q.**   We mentioned this earlier, but the Brandon Garrett study,

12   did that report anything about a mismatch between descriptions

13   in some of the mistaken identification cases?

14   **A.**   Yes.  So in the DNA exoneration cases, what's

15   interesting is that those individuals were exonerated

16   because of DNA.  And in just over half the cases, that DNA

17   from the crime, from the case has been matched to the actual

18   perpetrator who committed the crime.

19         And so Brandon Garrett knows or was able to find out

20   what the actual perpetrator looked like in those -- in those

21   cases.  And so when you compare the person who was innocent,

22   wrongfully convicted, to what we now know the actual

23   perpetrator looked like, there is a big mismatch in many of

24   the cases -- huge difference in height and in weight and

25   age, skin tone, the whole very -- whole variety of factors

1    is what he found from those DNA cases.

2           MR. OWENS:  Can I get this back again?  Thank you.

3       (Exhibit displayed.)

4    BY MR. OWENS:

5    **Q.**  All right.  So last time since we were on this

6    demonstrative here, we have moved through a number, and we are

7    down at Number 6, which is composite/sketch, as I think you

8    had it in your report.  And can you just describe what

9    composite/sketch influence means from a scientific

10   perspective?

11   **A.**  Yes.  So researchers have looked at the impact of a

12   police procedure that's sometimes used where witnesses are

13   asked to either sit with a sketch artist and then help

14   create a sketch, which is why we call it the sketch, or a

15   system, what's called a composite system.

16       The older systems used to be a series of

17   transparencies.  They were long folders.  There would be a

18   folder of eyebrows, and there would be a folder of eyes and

19   folder with noses, like a long file folder, the shape of the

20   face, the hair, maybe ears, like mustaches, glasses.  You

21   get it.  Every element of a human face, there were multiple

22   selections for a witness to go through this little stack and

23   effectively pick out a nose and then lay it over the

24   transparency and see, does that look -- does that look good?

25   Let's try another nose, right.  So this is the process for

DYSART - DIRECT (Owens)                                489

1    long ago for composite creation.

2         So researchers have studied, because it's related to

3    face memory and face processing, What are the impacts of

4    doing that?  Is it possible that that could somehow distort

5    or affect your memory for what the perpetrator looks like?

6    And how accurate are people at doing this?  Like, do

7    composites and sketches usually turn out well?  Are they

8    good or not?  So this is what we researched for a long time

9    on this topic.

10   Q.   So, hypothetically, if a victim of a rape involved in the

11   creation of a composite, is that something -- is that another

12   form of potential contamination?

13   A.   Yes.  The research shows that that can have an impact

14   on identification accuracy, yes.

15   Q.   And, hypothetically, if a victim were involved in

16   creating a composite, is that itself like a first form of

17   identification procedure?

18   A.   Yes, a composite -- creating a composite or creating a

19   sketch with law enforcement would certainly be considered an

20   identification procedure.

21   Q.   Why is that the case?

22   A.   Because at that point in the -- when law enforcement

23   used composites, it's when they have no suspect in the case.

24   Composites are not created when there is already a suspect.

25   And so law enforcement typically used the sketch or

DYSART - DIRECT (Owens)                                    490

1    composite in a hope -- they put it out.  You might see it on

2    the paper, on the news in the hopes that someone will see

3    the sketch or composite and go, "Oh, my goodness.  I think I

4    know who that is.  I think I recognize that person."

5         So it's, in some cases, the first step in the

6    investigation to try to get some leads to who the

7    perpetrator might be.

8    Q.    And is there a risk that in a case where the victims or a

9    person has to make an identification, has created a composite,

10   that their subsequent identification refers back to the

11   composite more than their actual memory of the event itself?

12   A.    Yes.  This is a concern again with the contamination,

13   right.  So going through this whole process of creating a

14   composite or working with a sketch artist is typically a

15   longer process.  It doesn't take just a couple of minutes.

16   You know, it could take a couple of hours for the witness to

17   go through this entire process to come up with something

18   that they feel looks like or resembles the perpetrator that

19   they saw.

20        And so because they are doing this process for such a

21   long time and get to look at, you know, the compositor's

22   sketch when it's completely finished, their memory for the

23   perpetrator could actually be closer to the compositor's

24   sketch rather than the perpetrator, him or herself.

25   Q.    So I guess I should have asked you this earlier, but the

DYSART - DIRECT (Owens)                                    491

1    factors that we are going though here, do they sort of overlap

2    with one another?

3    A.   Yes.  It's not a silo of issues in most cases.  There

4    might be some exception when it comes to the police

5    procedures, but with respect to all of these estimator

6    variables, factors related to the crime and the eyewitness,

7    you have to consider all of them together to try to figure

8    out how strong is the witness's memory.  Because that's the

9    key in looking at eyewitness accuracy.

10   Q.   Great.  On to Number 7, which indicates one of the things

11   you identified in your report is lineup filler bias.

12   A.   Yes.

13   Q.   Can you describe what you mean by that?

14   A.   Yes.  So in our experiments, we often manipulate the

15   quality and difficulty of a lineup or a photo array that a

16   witness is going to see.  In a typical photo array, a

17   witness sees six people all presented at the same time.  And

18   so we equate it to like a multiple choice question on a test

19   or on a driver's exam.  And the witness looks at their

20   options in front of them and makes a selection or says no

21   one -- no one's there.

22        When we're talking about bias, what we are doing is

23   making a decision as researchers to make that test harder or

24   easier.  And when it's a really easy test, for example, we

25   only have one person who, like, really matches the

1    description or really looks like the true perpetrator, we

2    call it biased, right, because it's leaning to that

3    particular individual making that person stand out.  So

4    that's what we refer to as lineup bias.

5    Q.   Got it.  So the word I have on the demonstrative is the

6    word "filler."  I think you mentioned it briefly.  What is

7    meant by a filler when it comes to a lineup?

8    A.   If you think about a multiple-choice question, you

9    know, the professor will have what they believe is the right

10   answer and then you have all the wrong answers.  They are

11   like absolutely no possibility of being the perpetrator.

12   And so in a lineup we call those the fillers.  So they just

13   fill out the photo array, but they are not suspects in the

14   case.  There is only one suspect in the identification

15   procedure.

16   Q.   So when you talk about lineup filler bias, does it have

17   to do with the relationship between the suspect and the

18   pictures of the fillers?

19   A.   Yes, at how close or how similar do they look to each

20   other.  There are other elements, of course, other reasons

21   why someone could stand out, a suspect could, you know, jump

22   off the page, so to speak, to an eyewitness.  It might not

23   be how similar their faces are.  There are other aspects as

24   well.

25   Q.   So what are the types of things that might make a lineup

1    fair versus make a lineup biased when it comes to talking

2    about comparing a suspect to the fillers?

3    **A.**   So some of the things that make it fair are when all of

4    the lineup fillers somewhat resemble the suspect in the

5    case, and clearly all of the fillers in the procedure need

6    to match the witness's description.  You know, race, age,

7    gender, you know, build, you know, those kinds of -- facial

8    hair, glasses, those types of things are important that if

9    the suspect has those -- those features, then all of the

10   other options need to have those fillers as well.  Those

11   features as well.

12        And so if they do, we would say it's fair.  Those were

13   good fillers, a good lineup because the suspect doesn't

14   stand out.  But as soon as they start deviating from that,

15   then it can potentially be problematic.

16   **Q.**   Would eye color be another factor to consider?

17   **A.**   If the witness mentioned eye color, then, absolutely

18   eye color is one of those -- one of those features that you

19   would need to match on for the fillers.

20   **Q.**   Would the hair color be another feature that you would

21   examine when you are trying to determine whether a lineup's

22   fair or biased?

23   **A.**   Yes.  Again, you don't want the suspect to stand out in

24   any way.  But in particular, if a witness described hair

25   color -- which from our studies is very common that people

DYSART - DIRECT (Owens)                              494

1    mention hair color -- you want to make sure everyone in the

2    array has the hair color or would be described as having the

3    same hair color.

4    Q.   Does lineup filler bias include issues related to the

5    pictures themselves, like the sort of backgrounds or

6    circumstances of the pictures?

7    A.   Yes.

8    Q.   And how so?

9    A.   So, again, the principle is nobody should stand out in

10   the identification procedure.  And so imagine a scenario

11   where all of the fillers look good.  They all match the

12   description that the witness provided.  They look kind of

13   similar to the suspect.  But five of the pictures were taken

14   outdoors with trees behind and the suspect's photo was taken

15   indoors with a solid background.

16        Obviously, the suspect would stand out because he is

17   the only one who doesn't have trees in the background.  That

18   would be like a pretty obvious example of why the background

19   makes a difference.

20   Q.   We also -- when we talk about lineup bias, do you

21   consider age -- do you want folks to be about roughly the same

22   age?

23   A.   Yes, absolutely.  Age is important.  And it's, again,

24   one of those features that's often described by an

25   eyewitness to a crime.

DYSART - DIRECT (Owens)                                495

1   **Q.**   All right.  Let's move on to Number 8.  We are two-thirds

2   of the way there.

3        So you mentioned a pre-identification, and I aplogize for

4   the poor spelling of that word in the demonstrative.  That's

5   on me, not the doctor.  What's pre-identification information

6   or bias?

7   **A.**   Yes.  So typically we refer to this as the pre-lineup

8   instructions or warnings that are given to witnesses in a

9   case.  You know, our research participants, most have never

10  been in this experience before.  They have never been asked

11  to view someone, provide a description, and then see if they

12  could recognize them later.  And so we need to provide them

13  with some information about what's going on, like what are

14  we going to ask you to do here.  And so that is the

15  pre-identification kind of information that we are going to

16  give witnesses.

17       And research has shown for a long time that, depending

18  on the instructions that you give the witness, it can have a

19  big impact on whether they choose anyone from the

20  identification procedure.  So it's important to consider

21  those according to the research.

22  **Q.**   Would example of potential pre-instruction -- excuse

23  me -- pre-identification instruction bias include telling

24  witnesses or victims that you have a suspect?

25  **A.**   Yes.  Because it would clue witnesses in that their job

DYSART - DIRECT (Owens)                                    496

1    is to pick someone from the identification procedure.  So,

2    yes, that's -- that would be considered bias.

3    Q.    And again relating to what we discussed earlier as it

4    relates to contamination, would, hypothetically, telling

5    victims that somebody had changed their appearance or

6    something like that, would that be another form of potential

7    contamination or bias in this, when it comes to the

8    identification?

9    A.    Yes.  We would consider that a form of bias because you

10   are providing information to a witness that can influence

11   their decision at the end.  So how researchers describe this

12   is what we call their decision criterion.  So when you need

13   to make a decision about something, like, yes, this is the

14   person I recognize or, no, this is not the person I

15   recognize, each individual person is going to have some

16   threshold, some level where it has to look close enough to

17   their memory in order to say yes.

18        And when you provide instructions to witness -- to

19   witnesses that ultimately lower their criterion by saying,

20   "Don't worry, it doesn't have to match as closely as you

21   expected, doesn't have to be that close," what we show is

22   that increases identification errors.

23   Q.    So I guess is there a difference between making a choice

24   and making an identification?

25   A.    Absolutely.  This is a very critical point in the

DYSART - DIRECT (Owens)                                    497

1    research.  You know, what we know as researchers

2    definitively is that the eyewitness did some behavior.  They

3    pointed to a picture and said -- or a person and said, yes,

4    I recognize that person.  And that's all we know, is that

5    they made that choice.  We don't necessarily know why.

6         And when the term "identification" or "recognize" is

7    used, it assumes that the witness is making that choice

8    because of their memory.  But it's possible that the witness

9    is making the choice because of influence in the situation.

10   That's what social psychologists would study and find.

11   Q.   So the next one is, I have here on the demonstrative

12   blind administration of the photo array, which may sound a

13   little bit awkward.  Can you just describe what you talk about

14   when you talk about blind versus non-blind administration of a

15   identification procedure?

16   A.   Yes.  So blind administration is sometimes referred to

17   as double-blind administration.  And it's more commonly

18   known in the field of like pharmaceutical testing, for

19   example, where a pharmaceutical company wants to get a new

20   drug approved, and so they'll engage in double-blind

21   clinical trials where neither the doctor nor the patient

22   will know which condition the patient is in.  Because they

23   want to make sure that the doctor's not influencing the

24   outcome or anything in some way.  Not because we don't trust

25   doctors in these conditions, it's that humans tend to see

DYSART - DIRECT (Owens)                                    498

1    what they want to see.

2         And so the blind administration in lineups and photo

3    arrays is when the person who is actually administering the

4    identification procedure does not know who in that photo

5    array or lineup is the actual suspect.  So it's someone

6    who's not involved in the case, isn't aware of the

7    investigation.  They are the person who is the one who runs

8    the procedure with the witness.

9    Q.   So I guess what you'd want to avoid when it comes to this

10   factor is the investigator who knows who the suspect is; is

11   that right?

12   A.   Correct.  That that person should not be the person who

13   is handling the photos or running the lineup procedure.

14   Q.   And is part of the concern here that the investigator who

15   knows who the suspect is may influence or cue a witness while

16   they are conducting the identification procedure, even subtly,

17   without doing it in very explicit ways?

18   A.   Yes.  Not only subtly, it might not even be conscious.

19   Like the person might not even be aware that they are

20   smiling and nodding, you know, as the witness, you know,

21   starts to talk about maybe the person who is their suspect

22   in the case.  You know, they are these kind of unconscious

23   cues that we can give to other people, again, that they

24   might not be aware of.  But that is the concern, that the

25   witness is picking up on these things.

1    **Q.**   And it's certainly possible for there to be explicit cues

2    given by an investigator, hypothetically, who was hoping to

3    get an identification, right?

4    **A.**   Of course that's possible.

5    **Q.**   So what's "identification feedback," Number 10 here?

6    **A.**   So identification feedback is when, after the entire

7    identification procedure is finished and the witness has

8    made a selection or said, no, I don't recognize anyone here,

9    this is the information that's given to the witness after

10   that.  So is the witness told -- in our research, we've

11   manipulated, like, "Oh, good, you've identified the

12   suspect."  In my own research, I've used, "Oh, thank you.

13   You have been very helpful."

14        So that type of information is what we call feedback to

15   the witness about their identification and the accuracy.

16   **Q.**   So I guess just to break this out a little bit more, you

17   are saying after an identification procedure has been given,

18   this is about information, for example, a police officer might

19   provide to a witness about that identification that can impact

20   the accuracy at a later event; is that right?

21   **A.**   Well, there is multiple ways that it can have an

22   impact.  Certainly, it can -- if the witness is down the

23   line later asked to make another identification of the same

24   person, certainly that can influence that witness's choice.

25   They are more likely to stick to their original choice.

DYSART - DIRECT (Owens)                              500

1    When they are told, "Good job.  You got the right answer,"

2    they are more likely to commit to that.

3        But there are other aspects of the feedback that

4    researchers are concerned about, and we've -- that we've

5    seen in actual cases where researchers have conducted

6    studies with witnesses in actual criminal cases.  And that

7    is when witnesses are told, like, "Good job," like, "You got

8    'em," witnesses tend to become more confident in their

9    identification.  Like, yes, okay, I knew it, right.  We see

10   this in our research participants routinely.

11       And then when we ask them like, "Oh, by the way, I

12   forgot to ask you, like, were you paying attention and did

13   you get a good look at the person during the crime?"

14   Witnesses in the studies that are given this feedback are

15   much more likely to believe and to report that they got a

16   great view, they are really certain, their memory's very

17   strong and very clear.  So the feedback has those kind of

18   double pervasive effects according to the research.

19   Q.   So providing -- if a witness was provided feedback,

20   hypothetically, that might increase the confidence that they

21   express that they had if you asked them later, even if they

22   might not have at the original time; is that right?

23   A.   Yes, that's correct.

24   Q.   So the next point here is Number 11, relates to witness

25   confidence.  And this is going to be something we're going to

1    talk about for a minute because I think, as Mr. Wixted who may

2    testify on behalf of Mr. Moore in this case, is likely to

3    focus on this issue.  So I wanted to separate it out.

4        What do you mean by -- or what's meant in the research as

5    it relates to system and estimator variables when it comes to

6    witness confidence?

7    **A.**   Yes.  So witness confidence is probably what you

8    imagine.  When we ask a witness after they made their

9    identification decision -- and typically when I say that,

10   they have selected someone.  They have said, "Yes, that's

11   the individual."

12       It's important to find out how sure they are.  Like,

13   are they guessing?  Like, I kind of think it's this person

14   or are they like, "Absolutely, you know, this is the best

15   decision.  A hundred percent this is really the person that

16   I saw."

17       Because what the research shows clearly is that when an

18   eyewitness is asked to view, like, good procedures, fair

19   identification procedures, and all the other conditions

20   we've talked about -- double-blind administration, good

21   fillers, they were given that instruction, you know, you

22   know, careful instructions that the right answer might not

23   even be here at all, and it's their first identification

24   attempt -- when all those procedures are together,

25   confidence is really meaningful.  It's really important.

DYSART - DIRECT (Owens)                                    502

1    Because witnesses who say absolutely certain that's the

2    person, they are very likely to be accurate.  So that's why

3    we're really interested.

4         But you can't look at confidence if all those other

5    preconditions aren't met.  If they are given feedback, if

6    it's, you know, not double-blind, if the lineup isn't fair,

7    the confidence really can't be interpreted in the same way.

8    Q.   Okay.  Can you say more about that?  So when you say when

9    these pristine conditions aren't met, what impact does that

10   have on assessing a victim or witness's stated confidence?

11   A.   So I didn't say "pristine," but that's kind of the

12   group, right, that we had these like series of kind of

13   identification procedures that we've labeled "pristine" just

14   because listing out all of them every time would be

15   extraordinarily long.  So we call this kind of group of what

16   we call best practices, pristine procedures, as being

17   critically important.

18        When they are used and the eyewitness makes a positive

19   identification of someone with great certainty, there is a

20   very strong likelihood that that witness is accurate.  But

21   if they, with all the same conditions, pristine conditions

22   in place, if the witness is not certain at all, very low

23   confidence, then it's much less likely that the witness is

24   accurate in their decision.

25   Q.   I guess what I am wondering is, in the absence of

1     pristine conditions, what does confidence tell you about the

2     accuracy of a potential identification?

3     **A.**    Well, we really can't use confidence in the same way.

4     It's not something that you can rely on to try to figure out

5     if the witness was right or wrong in their identification

6     when, you know, when the identification procedures were not

7     pristine, right -- the instructions, double-blind, fair

8     procedures.

9     **Q.**    So fair to say like if there had been delay or

10    contamination or a mismatch between the description of the

11    accuracy of the perpetrator and the suspect influence through

12    a composite, an unfair lineup, things like that, that a

13    witness's stated confidence wouldn't necessarily correlate to

14    accuracy as a matter of science?

15    **A.**    Well, in the science we focus a lot on those pristine

16    procedures.  And so -- but -- we need to consider all of

17    those factors together.  So they are not in silos, right,

18    these influences.  But, again, the more factors that are

19    present that are suggestive or might be a contamination of

20    the witness's memory, the less useful witness confidence is

21    going to be, to the point of not -- not being useful at all.

22         I will give a very specific example.  There is no

23    disagreement amongst experts in my field that a witness's

24    level of confidence at trial is meaningless.  Like, it is

25    not useful at all for people to consider with respect to

1    accuracy.  Because virtually every single witness who

2    testifies at trial is certain, right, that they point in

3    court live, yes, that's the person almost universally.

4         And so at that point, when there's been all of this

5    feedback, all of this information that the witness has

6    received from the time of the identification procedure to

7    trial, at trial it really can't be used at all.

8    **Q.**   And so this gets to, I think, the last point here in

9    terms of our estimator and system variables, which is multiple

10   identification procedures and commitment effects.  And were

11   you sort of just describing that in a way?

12   **A.**   Yes.  It's often the case in actual cases that before

13   trial, when, if it's a stranger case, the eyewitness is

14   often asked to, like, look around the courtroom and "Do you

15   see the person that committed the crime?"  And they are

16   asked to make that identification.  It is very rare that

17   that is the first identification attempt.  There is almost

18   always something that happened before -- photo array, a live

19   lineup, or other identification procedures.

20        And so as the identification procedures kind of mount

21   upon each other, more and more procedures, this is what we

22   refer to as the multiple identification procedures.  The

23   concern is that the witness's memory now has become

24   contaminated by virtue of seeing the defendant's photo in

25   previous identification procedures.  So they are likely to

1    have a pretty strong memory for that individual.  They have

2    seen their photograph presented by law enforcement multiple

3    times before.  So it should not be a shock to anyone that

4    the witness can pick out the person in court that they've

5    selected from multiple identification procedures or even a

6    single identification procedure before.

7    **Q.**   So just to be sure, if there's -- hypothetically, if

8    there was initial identification procedure like creating a

9    composite, a separate array, then a separate in-person

10   hearing, you are saying that a witness's stated confidence at

11   trial is not a reliable -- strike that -- is not an accurate

12   indicator of -- does not correlate to accuracy; is that right?

13   **A.**   Yes.  It cannot -- it cannot at that point be used to

14   try to determine accuracy, that's right.

15   **Q.**   And is that true with any subsequent identification

16   procedure after the first one, whatever it is?

17   **A.**   Yes, um-hmm.

18   **Q.**   So fair to say the first identification procedure is sort

19   of make or break in terms of assessing the reliability --

20   excuse me.  Sorry.

21            THE COURT:  Because you are --

22            MR. OWENS:  I apologize, Your Honor.  It was just a

23   poor word choice.

24   BY MR. OWENS:

25   **Q.**   So let me back up.

1          So you are saying the first identification procedure,

2     sort of the make or break when it comes to assessing

3     scientifically the accuracy of an identification from a

4     scientific perspective?

5     **A.**   Absolutely.  In fact, in the label of pristine

6     identification procedures, it has to be the first

7     identification procedure.  That's -- that's the definition.

8     That's part of the definition of pristine procedures.

9     **Q.**   So we've talked about this concept, and you just

10    mentioned it now, pristine identification conditions.  Does

11    that sort of shorthand come from any particular paper or

12    research that we've discussed already today?

13    **A.**   Yes.  The label of pristine was really solidified in

14    the field in 2017 by an article that was written really

15    about eyewitness confidence, almost in its entirety, by

16    Professor Wixted and Professor Wells, Gary Wells -- we

17    talked about earlier.

18    **Q.**   And so Professor Wixted himself is one of the people who

19    forwarded this idea that confidence and accuracy are

20    correlated when you have these pristine conditions; is that

21    right?

22    **A.**   Yes, very strongly correlated.  That confidence is

23    extremely useful when the pristine conditions are used, yes.

24    **Q.**   And so your understanding of the research, if there

25    aren't those pristine conditions, is there a disagreement

1    between you and Dr. Wixted, that you perceive, as relates to

2    the relationship that confidence plays with accuracy?

3    **A.**    I don't think there is a disagreement.  I think it's an

4    excellent paper, and I agree with the conclusions, that you

5    cannot rely upon or use witness confidence if you don't have

6    pristine procedures.

7         I did a search.  The word "pristine" appears over 65

8    times in that one article.  So it's -- clearly pristine

9    conditions are a necessary element for being able to use

10   witness confidence to make any determination about accuracy.

11   **Q.**    And so are the 12 factors that we have sort of just

12   discovered -- discussed -- excuse me -- estimated variables

13   and system variables, are those the types of -- are those the

14   factors that are the basis for your general opinion we

15   discussed earlier that if you assume that the suspect is

16   innocent, that there is a very low probability that three

17   separate eyewitnesses would select him as the perpetrator

18   unless there is some suggestion by a sort of administrator

19   influence?

20   **A.**    Yes.

21             MR. McLANDRICH:  Objection.

22             THE COURT:  I'm going to allow it.  It's already

23   been answered.

24             THE WITNESS:  Yes.

25             MR. OWENS:  Those are all my questions.  Thank you.

DYSART - CROSS (McLandrich)                                    508

1              THE COURT:  Thank you.

2          Counsel, do you want to break, or do you want to go?

3              MR. McLANDRICH:  Just a moment, Your Honor.  I'd be

4      happy to go.

5              THE COURT:  All right.

6                          **CROSS-EXAMINATION**

7      BY MR. McLANDRICH:

8      **Q.**   Good afternoon, Dr. Dysart.

9      **A.**   Good afternoon.

10     **Q.**   So just to back up and cover a little bit of the ground

11     again.  Estimator variables, I believe you have testified, are

12     things that are beyond the control of law enforcement?

13     **A.**   Correct.

14     **Q.**   All right.  So, obviously, that means there is nothing

15     that law enforcement would do that would make the

16     identification more or less reliable because these things are

17     outside of their control?

18     **A.**   Right.  They cannot influence the estimator variables,

19     that's correct.

20     **Q.**   And are you aware of various studies that Dr. Wixted and

21     others have done with respect to some of these estimator

22     variables, starting off, let's just say, with the issue of

23     delay?

24     **A.**   Yes.

25     **Q.**   And aren't there, in fact, studies that show that while

DYSART - CROSS (McLandrich)                                    509

1    delay reduces the likelihood that someone will make a correct,

2    high-confidence identification, that if, in fact, they still

3    make that high-confidence identification under the proper

4    conditions, that that's still an accurate identification?

5    **A.**    Yes.  It's not likely to happen, but it can happen,

6    yes.

7    **Q.**    Right.  So when we talk about the effective delay and the

8    eroding memory, it's reducing the number of high-confidence

9    identifications we'll get, but those high-confidence

10   identifications that we do get are still highly accurate?

11   **A.**    If pristine conditions are used, that's correct.

12   **Q.**    And when you talk about pristine conditions, those, you

13   are really talking about laboratory conditions, correct?

14   **A.**    No.  The pristine conditions are that it has to be the

15   first identification of the suspect; the pre-lineup warnings

16   must be used; it has to be a fair, unbiased identification

17   procedure; a double-blind administration; and the witness

18   confidence has to be recorded immediately after.  It's those

19   five elements make up the term "pristine."

20   **Q.**    And those elements of a pristine identification, the

21   science of eyewitness identification, like all science, has

22   evolved over time, correct?

23   **A.**    Science evolves over time, and we do too, yes.

24   **Q.**    And so these identifications that were done in 1988 would

25   have been done under the standards of 1988 as opposed to the

DYSART - CROSS (McLandrich)                                    510

1    current science of today?

2    **A.**   Are you talking generally about police investigations

3    in 1988?  Is that what --

4    **Q.**   I am talking generally about the science that may have

5    trickled its way down to the police.  In other words, the

6    police couldn't be held accountable for science that didn't

7    exist when they did their identification in 1988?

8              THE COURT:  Hold on.

9              MR. OWENS:  Objection, Your Honor.  This was

10   excluded about the Court's ruling on the motion --

11             THE COURT:  Well, he is talking about science.

12   That's what he is saying.

13             MR. OWENS:  I thought he said something about

14   trickled down to what would be an enforceable --

15             MR. McLANDRICH:  I'll reask the question.

16             THE COURT:  Thank you.

17             MR. McLANDRICH:  Thank you.

18   BY MR. McLANDRICH:

19   **Q.**   Putting the police aside, no one can be held accountable

20   in 1988 for science that hadn't yet developed, correct?

21   **A.**   Well, it's not my role to decide who's accountable.  If

22   the information didn't exist, then people couldn't have

23   known the information if it didn't exist.

24   **Q.**   It's just a truism?

25   **A.**   I would say so, yes.

DYSART - CROSS (McLandrich)                    511

1   **Q.**   All right.  And are you also aware of studies with

2   respect to whether double-blind administration is impactful

3   depending on whether it's a sequential presentation of photos

4   as opposed to all the photos being presented in what's

5   colloquially referred to as a six-pack?

6   **A.**   Yes.

7   **Q.**   Doesn't -- don't those studies show that the impact of

8   double-blind administration is much more impactful in a

9   sequential lineup where the photos are put down one at a time

10  like a deck of cards as opposed to presented all at once in a

11  six-pack?

12  **A.**   There is actually an interaction between lineup

13  instructions and the manner in which the photos are shown

14  all at one time or one -- all at the same time or one at a

15  time.  So there is an interaction that happens, depending on

16  the instructions.

17  **Q.**   I was asking about blind versus double-blind.  We will

18  get to instructions in a moment.

19  **A.**   Sorry, yes.  As a scientist, as a researcher, it's not

20  appropriate to talk about what we call main effects when we

21  know there are significant interactions.  And so I just

22  wanted to say that I -- certainly the question, but the

23  answer is it depends, and it depends on what the

24  instructions were with respect to simultaneous and

25  sequential.

DYSART - CROSS (McLandrich)                                512

1    **Q.**   And the instructions are oftentimes, like, say, even in

2    the research, a preprinted form that is read to somebody?

3    **A.**   Yes.  Or we will verbally give the instructions to a

4    witness, yes, those two options.

5    **Q.**   Now, when you talked about the importance of the first

6    identification by the witness of the potential suspect, and I

7    think you said that you agree with Dr. Wixted and essentially

8    the body of social scientists agree that that's the critical

9    identification, is that first initial identification, correct?

10   **A.**   Yes, I agree.

11   **Q.**   All right.  And so when the officer presents the photo

12   array, if this is the first array this witness has been shown,

13   that is, in fact, that first identification that you are

14   referring to?

15   **A.**   Yes.

16   **Q.**   And if that witness makes a high-confidence

17   identification in that photo array, then, you know, putting

18   aside everything else for a moment, that's the critical

19   identification so that if they make a high-confidence

20   identification in that array, assuming the other conditions

21   are proper, then there is a high degree of accuracy to that

22   identification, correct?

23   **A.**   Yes.  By -- if you mean proper, you mean pristine, yes.

24   If pristine procedures are used, then a high-confident

25   witness tends very likely to be accurate.

DYSART - CROSS (McLandrich)                          513

1   **Q.**   And as you say, when that first identification is made,

2   we want to record the level of confidence that that witness

3   expresses when they make that identification?

4   **A.**   Yes.  That's actually one of the elements of pristine,

5   because it has the five elements of it.  And it has to be

6   immediately after, before the witness is given any of the

7   feedback, like "good job" or something of that.

8   **Q.**   Sure.  Understood.  And so if that witness makes that

9   identification as you've just described, it's got a high

10  degree of accuracy?

11  **A.**   Under pristine conditions, yes.

12  **Q.**   And notwithstanding that there might have been some delay

13  between -- even a significant period of delay -- between the

14  event that's at issue and that identification that that

15  witness is making?

16  **A.**   That's -- I think there is one research study that has

17  looked at that, and that's what the conclusions were.  So I

18  tentatively support that.  As a scientist, I would like to

19  have, you know, more information than just one experiment on

20  it, but the research from that one paper is supportive of

21  that.

22  **Q.**   Yes.  And you talked earlier about the DNA cases and the

23  number of misidentifications that were made in the DNA cases.

24  Do you recall that?

25  **A.**   Yes, I do.

DYSART - CROSS (McLandrich)                                    514

1    **Q.**   All right.  And isn't it true that the individuals that

2    made those misidentifications, in fact, when the

3    identifications were evaluated, they were actually low-

4    confidence identifications?

5    **A.**   Actually, we don't know is the answer to that.  So in

6    Brandon Garrett's book, where he looked at the first 250,

7    all he looked at were trial transcripts.  He didn't have

8    available to him original police reports and all of those

9    other types of information that might be useful.  And what

10   he found is when he looked at the trial transcripts and the

11   witnesses or victims were testifying, they mentioned -- 57

12   percent of them mentioned that they were initially

13   uncertain.

14        But we have no information about the other 43 percent

15   of witnesses.  So we have no idea if they were absolutely

16   certain at the beginning or not because, you know, from that

17   source, we just don't have the information.

18   **Q.**   All right.  But for those that expressed that they were

19   initially uncertain, that would be a low-confidence

20   identification that the science has now shown would not be

21   deemed reliable, would have a low degree of accuracy, correct?

22   **A.**   For the 57 percent that we have information on.  And,

23   again, this is their recollection at trial.  What we really

24   want to look at would be the police reports, any

25   contemporaneous notes that police make.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

DYSART - CROSS (McLandrich)                                    515

1          And, again, this has to be from pristine procedures.

2     That's the other key.  It's not -- it's not useful to be

3     talking about confidence and how to interpret confidence and

4     what it means if we don't have the pristine procedures.  So

5     that's a critical element to consider.

6     **Q.**    Yes, okay.  And that would certainly be true with a high-

7     confidence ID.  But someone who's got a low-confidence ID and

8     the conditions aren't pristine, that would be even more

9     indicative that it was a bad identification, correct?

10    **A.**    Well, we don't know from a scientific perspective.  We

11    don't -- we don't have research on that.

12    **Q.**    All right.  And so you talked a little bit earlier, as

13    well, about the identification at trial.  And I think

14    Dr. Wixted and you and basically the social scientists are in

15    agreement on this, where it's sort of referred to as the

16    in-court identification now is the theater piece, if you will,

17    where now they are simply reiterating the identification they

18    have previously made, correct?

19    **A.**    Correct.

20    **Q.**    And that's why the focus is on this initial

21    identification, and so that has been sort of testified to as

22    the one that matters.  And so if we have the high-confidence,

23    quality identification under the right conditions, then that's

24    highly accurate and the trial is simply a reiteration of that?

25    **A.**    Yes.  What do you mean by "quality identification"?

DYSART - CROSS (McLandrich)                          516

1    There is some elements -- I don't want to answer incorrectly

2    if I am not sure I understand your question.

3    Q.   Yes.  So I understand that you predicate your -- your

4    answer, your prior answer on pristine conditions,

5    quote-unquote.

6    A.   I do.  Dr. Wixted does, Dr. Wells, others in the field,

7    yes.  We all use pristine conditions to -- that has to be

8    the precursor to be talking about the usefulness of

9    confidence.

10   Q.   And so the high-confidence identification under pristine

11   conditions is highly accurate.  In the trial, we are simply

12   replaying or reiterating that previous high-confidence

13   identification?

14   A.   Quite likely, yes, um-hmm.

15   Q.   And aren't there, in fact, studies that Dr. Wixted and

16   others have done to show that a number of these variables

17   don't impact the accuracy of a high-confidence identification?

18   And I will get to specifics.

19        So isn't it true that the studies show that the presence

20   of a weapon doesn't render a high-confidence identification

21   inaccurate?  It's sort of like delay; it may reduce the number

22   of high-confidence identifications we get, but it doesn't

23   change the accuracy of those identifications -- high-

24   confidence identifications that we get?

25   A.   I think there is one study that has looked at that,

DYSART - CROSS (McLandrich)                               517

1    and, again, that's the conclusion from the one study.  As

2    researchers, we like to see replication and extension.  So

3    that is the conclusion from that article, yes.

4    **Q.**    And when we talk about opportunity to observe, there's a

5    number of factors that sort of -- or attributes that fall

6    under that umbrella of opportunity to observe.

7    **A.**    I agree, yes.

8    **Q.**    All right.  And one of them is the length of time I get

9    to observe the person?

10   **A.**    Yes.

11   **Q.**    One of them would be the quality of that observation?  In

12   other words, if I'm a hundred yards away, obviously, my

13   opportunity is much less than if I am sitting next to them in

14   a car?

15   **A.**    Distance is a critical factor to consider in eyewitness

16   accuracy.

17   **Q.**    And also, I would imagine, perspective.  In other words,

18   if I'm seeing them walking away from me as opposed to if I am

19   seeing them face to face or seeing them, you know, profile and

20   face to face, I'm getting a better imprint into my mind; is

21   that fair?

22   **A.**    You are getting a better opportunity to observe, yes.

23   **Q.**    All right.  Now, you talked a little bit earlier about --

24   and I'm not entirely sure of the context of this, but you said

25   something about 93 percent of the people being mistaken when

1    there is a delay.

2    **A.**    Yes.  That was a particular study that was done, I

3    think, in the 1970s that looked -- it's the one experiment

4    that we have that has looked at the longest amount of delay,

5    up to 11 months.

6        And in our experiments, what's really critical is that

7    we have conditions where we have a photo array where the

8    true perpetrator or culprit is in there.  He's present.

9        And then we also want to test, though, are witnesses

10   able to recognize that the answer might be none of the

11   above.  So if it's an innocent suspect in that person's

12   place, does a witness make a mistake and pick that innocent

13   person who might happen to look similar.

14       So in that particular experiment, after 11 months, when

15   participants were shown the photo array that did not have

16   the perpetrator, 93 percent, like, mistakenly chose from

17   that identification procedure someone who was not the

18   perpetrator, and he was not there.

19   **Q.**    All right.  But notwithstanding that, what we also know

20   today, though, is if we have a high-confidence identification

21   notwithstanding that delay, under pristine conditions, while

22   we are going to have fewer of those identifications, the

23   identifications we do get are still going to be highly

24   accurate?

25   **A.**    Yes.  As I said earlier, I think there is one study

DYSART - CROSS (McLandrich)                          519

1    that's found that, and that would be a fairly recent study.

2    So researchers are continuing to explore, you know, how long

3    does that hold up for, how many weeks or months does that

4    relationship still continue to exist.

5    **Q.**   And once upon a time it was sort of the generally

6    accepted view of social science, if I'm not mistaken, that as

7    a body, eyewitness identifications were, quote-unquote,

8    inherently unreliable?

9    **A.**   I don't think that's the general view of the field.

10   Based upon our own research, that's not true from the data.

11   So I don't believe that was the general held -- generally

12   held view in my field.

13   **Q.**   Okay.  And if it was ever the generally held view, it's

14   certainly not anymore?

15   **A.**   Well, we much better understand the conditions under

16   which witnesses are inherently unreliable.  And so we're

17   much more nuanced about when that actually happens.

18   **Q.**   And so with respect to things that the officers or any

19   officer would have no control over, that obviously includes

20   the opportunity to observe?

21   **A.**   Yes.

22   **Q.**   That would include whether there was any stressful

23   arousal element to the event?

24   **A.**   Yes.

25   **Q.**   That would include the factor of delay?

DYSART - CROSS (McLandrich)                              520

1    **A.**    Yes.

2    **Q.**    That would include contamination that happens with

3    respect to interaction with other witnesses, people in the

4    public, other -- other people who might have some information

5    about the event outside of law enforcement?

6    **A.**    Perhaps.  If law enforcement put information to the

7    media, they would be the source of the information; and so,

8    therefore, they could be the source of the contamination.

9    **Q.**    Understood.  And, also, they have no control over the

10   description accuracy in terms of what the witness is able to

11   convey?

12   **A.**    To some degree, because if a witness provides a vague

13   description, law enforcement -- for example, they forget to

14   mention like the race or ethnicity.  You know, we can't

15   leave that as a question mark.  We have to follow up, right,

16   and ask that specific question.

17        So it's a little bit of a give and take.  A witness

18   provides what they can remember, and then law enforcement

19   asks some follow-up questions to get more details.

20   **Q.**    Sure.  But notwithstanding that, the ability or quality

21   of the witness to give a description as to height or age or

22   weight or the tone of a hair color are all in the control of

23   the witness's memory and perception and their ability to

24   convey that to -- to law enforcement or to anyone else?

25   **A.**    Yes.  Again, for the most part.  There are different

DYSART - CROSS (McLandrich)                              521

1    ways that that kind of information can be obtained by

2    witnesses.  So it comes to the way in which witnesses are

3    interviewed.  So it's widely known that witnesses might make

4    a mistake on the height of an inch or two or weight because

5    it's hard sometimes to, you know, to discern.  So you can

6    say, well, was the person like my height?  Or taller than

7    this person?  Are they about my size?  Is the hair color

8    like mine?  In trial transcripts, I often see skin tone,

9    like, was it like my skin tone or someone else's.

10         So there are ways law enforcement can use tools to get

11   more accurate information from witnesses.  It's not the

12   witness's fault if bad questions or inappropriate questions

13   were asked of them trying to get that information.

14   **Q.**   Understood.  But notwithstanding the appropriate question

15   being asked, the person may or may not have an accurate memory

16   or be able to accurately correlate it to my height, your

17   height, my skin tone, your skin tone, the questions that you

18   just suggested?

19   **A.**   That's correct.  A witness -- a witness might have a

20   poor memory or a weak memory or inaccurate memory if they

21   perceived something incorrectly, and then they are going to

22   report that with the right questioning, yeah.

23   **Q.**   And with respect to the composite sketch effect.  Now,

24   these are things that are routinely done by police departments

25   throughout the world?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    **A.**    Yes.  They are not that common as a form of evidence

2    collection, but, yes, they are used around the world.

3    **Q.**    And probably less common in today's world than in the

4    historical world; is that fair?

5            MR. OWENS:  Objection; vague.

6            MR. McLANDRICH:  I will withdraw it.

7            THE COURT:  Okay.

8            MR. McLANDRICH:  It's not important.

9            THE COURT:  It's withdrawn.

10   BY MR. McLANDRICH:

11   **Q.**    Now, with respect to lineup filler bias.  The science,

12   correct me if I'm wrong, shows that the critical aspect of the

13   filler is that their facial image, their persona, resemble the

14   suspect who's the subject of the lineup, correct?

15   **A.**    Well, it's certainly one element to take into

16   consideration.  Because I discussed earlier how backgrounds

17   and other features might impact, or one person's smiling and

18   no one else is.  Like, there are other ways that the lineup

19   can be biased or suggestive.

20       But clearly, what the individuals actually look like,

21   their appearance, that is certainly one thing to take into

22   consideration.

23   **Q.**    Are you aware of studies that have been done that show

24   that things such as the color of the background, if the facial

25   features are sufficiently similar, don't impede the accuracy

DYSART - CROSS (McLandrich)                          523

1    of the identification?  Are you aware of those studies?

2    **A.**    On false identification of innocent people, I -- I'm

3    not certain, actually.  My opinion comes from multiple

4    sources, including the new white paper that -- which is the

5    position, best practices/policy recommendations procedure

6    that we talked about earlier.  That has a very specific

7    section on how backgrounds and other portions of the -- of

8    the images or the photographs are very important to take

9    into consideration.

10        So -- so the lead scientists who made that

11   recommendation were basing that on their understanding of

12   the research literature.

13   **Q.**    So if Dr. Wixted was to testify that the -- it's the

14   facial features and not the background color which is

15   important to assuring the accuracy of the identification, you

16   would disagree with him?

17   **A.**    I think he disagrees with himself if he were to testify

18   to that because he is one of the authors of that best

19   practices document that says backgrounds are important and

20   should be considered.  So I would be, I think -- he would be

21   disagreeing with his own writings if he did testify to that.

22             THE COURT:  Doctor, I think the question is do you

23   disagree with it.

24             MR. McLANDRICH:  Yes, sir.

25             THE WITNESS:  If he were to testify that that was

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

DYSART - CROSS (McLandrich)                                    524

1    the case, yes, I would disagree, based on reading his

2    writings.

3    BY MR. McLANDRICH:

4    Q.    And the same would be true if the head of one suspect is

5    tilted or more in the foreground than the face of another

6    suspect in the photo array pictures; is that correct?

7              MR. OWENS:  Objection; vague.

8              THE COURT:  Overruled.

9              THE WITNESS:  So the principle is any way that

10   someone stands out from the others.  So there is a litany of

11   ways that you can imagine that someone's photograph might

12   stand out.  And if the suspect's head was tilted in a

13   different way than all of the fillers, all of the other

14   options, then that would make the person stand out, and that

15   would be considered biased.

16   BY MR. McLANDRICH:

17   Q.    And, again, if Dr. Wixted was to testify that it's the

18   facial features that are the elements that drives accuracy and

19   not the size of the head or the tilt of the head, you would

20   disagree with him?

21   A.    If he testifies to that, I would disagree with that,

22   yes.

23   Q.    Yes.  And are you aware of studies that would indicate

24   that even though a witness may give an inaccurate description

25   of a suspect, that they can still make an accurate high-

DYSART - CROSS (McLandrich)                                        525

1   confidence identification of a photo, or a suspect in a photo

2   lineup?

3   **A.**   I'm not aware of a study that looks at description

4   accuracy and high confidence.  I'm not aware of a published

5   study on that.

6   **Q.**   Are you aware of the Meissner, Sporer, and Susa 2008

7   study that indicated that there was no significant

8   relationship between description accuracy and identification

9   accuracy?

10  **A.**   Their conclusions that there is no relationship?  No,

11  that's not my understanding of that.  I think it's a book

12  chapter.

13  **Q.**   No significant relationship.

14  **A.**   Yeah, that's not my -- that's not my understanding of

15  that book chapter.

16  **Q.**   Not your understanding, all right.

17       And the social science that you are testifying about

18  essentially regards the eyewitness identification as a memory

19  test; isn't that fair?

20  **A.**   Well, actually, there's been a lot of discussion in the

21  field in the last probably two years that is changing the

22  way that we talk about this evidence.  So it's not only

23  eyewitness memory, but it's also eyewitness behavior.  So

24  the choosing.

25       And so a social psychologist like myself, we -- for a

1    while, we were the researchers who were kind of leading the

2    field.  And then more cognitive psychologists became

3    involved.  And now social psychologists are like, wait a

4    minute.  What happened to social influence?  We've kind of

5    ignored -- the research field has ignored that for a while.

6        And it's been a big discussion because there are

7    wrongful conviction cases where we now know that the witness

8    who testified at trial, who identified or selected the

9    defendant from a procedure never saw the crime at all.  And

10   so clearly that witness cannot be making an identification

11   decision based on memory.  It had to be something else.

12       So the conversation in the field is really evolving

13   to -- to discuss, yes, eyewitness memory is clearly a

14   component, but eyewitness behavior -- their choosing, the

15   reactions, et cetera -- are also things that are very

16   important to consider.

17   **Q.**   And maybe I was not listening carefully enough, but did

18   you say that there's witnesses that are identifying suspects

19   that didn't see the crime?

20   **A.**   Correct.  Wrongful conviction cases where we learn

21   after the fact in the part of the re-investigation -- we

22   being, you know, individuals, conviction review units,

23   conviction integrity units held in prosecutors' offices --

24   when they reinvestigate a crime, the witness recants and

25   said, "You know what?  I was a young kid.  I was a young

1    punk.  They, you know, told me I should make this

2    identification; I did it.  And so I made the selection.  I

3    testified in trial and, you know, I'm sorry," or whatever

4    they say in their recantation.  So we know that those exist.

5         So for the field to pretend that this is only a memory

6    issue is incorrect, because we know that there are people

7    who testify at trial who are testifying to things that they

8    themselves did not witness.

9    **Q.**   All right.  So that's something sort of completely

10   unrelated to what we've been talking about heretofore about an

11   eyewitness's ability to make an accurate identification.

12   Because that person's not even an eyewitness.  They may be

13   pretending to be an eyewitness, but they are not even an

14   eyewitness.

15            MR. OWENS:  Objection, Your Honor.  It's

16   argumentative.

17   BY MR. McLANDRICH:

18   **Q.**   Right?  I mean if they are --

19            THE COURT:  No, no, I don't think it is

20   argumentative, but get to your question.

21            MR. McLANDRICH:  Well, that is my question.

22   BY MR. McLANDRICH:

23   **Q.**   That person that you are describing in this behavioral

24   aspect of it, they are not even an eyewitness because now you

25   say they are testifying with respect to a suspect for an event

DYSART - CROSS (McLandrich)                              528

1    they didn't even see?

2    **A.**    Well, we've learned, usually decades later, that they

3    are not an eyewitness.  The police report reflects that they

4    are an eyewitness.  The trial testimony reflects that they

5    were an eyewitness.

6         And so all I'm saying is some -- the vast majority of

7    eyewitnesses I believe and many in our field believe are

8    just mistaken people.  They've made a mistake when mistaken

9    identifications happen.  It's not motivated.  It's not

10   vengeful.  It's they've just made a mistake.  And we

11   understand a lot about why that happens.

12        But there are other aspects about the witness testimony

13   that are related to things beyond memory.  Double-blind

14   administration has nothing to do with memory.

15   **Q.**   Right, right.

16   **A.**   Right?

17   **Q.**   And somebody can just be flat out and out lying --

18   right? -- pretending they saw someone that they never really

19   saw just because they want to say they saw them?

20   **A.**    Certainly there are going to be those cases.  And,

21   again, that's not the majority, vast majority of cases --

22   **Q.**    Right.

23   **A.**    -- that we are talking about.

24   **Q.**    That's kind of like your example, where someone's, again,

25   identifying someone in a crime they never saw, whether it's

DYSART - CROSS (McLandrich)                    529

1    because they have some animosity to them, whether it's because

2    someone's paying them to do it, for whatever their motivation

3    may be.  But that's separate from what we've been talking when

4    we talk about eyewitness identification and a high-confidence

5    identification, because those people have no memory.  They are

6    just pretending to have one.

7    **A.**    In that particular case, yes.  But your question was

8    about, is the field about memory, and the answer's no.  The

9    field's about more than that.  It's not just about memory.

10   **Q.**    I understand.  I just wanted to segregate those two parts

11   of the field so that I understand and everyone else hopefully

12   understands what we're talking about.

13              MR. OWENS:  Objection, Your Honor.

14         If you could let the witness finish her answer.

15              THE COURT:  Do you need to say anything else?

16              THE WITNESS:  I would like to if that's okay.

17         So the other aspect about memory is that it's on a

18   continuum.  And so there clearly are individuals in cases that

19   we know who in the police report have said "I barely saw the

20   person.  I don't think I am going to be able to make an

21   identification.  I only saw the side of the person's face as

22   they were running away.  I saw the back of the face" -- or

23   "back of the head --" excuse me.  And yet those individuals

24   are shown identification procedures, select the suspect from

25   the identification procedures, and testify at trial.

DYSART - CROSS (McLandrich)                                    530

1          And so the difference between a witness who wasn't there

2     and a witness who saw the back of the head from a memory

3     perspective is irrelevant.  So it's the quality of the

4     witness's memory, their opportunity to observe that's really

5     critical than helping to explain their behavior, which is

6     whether they selected the suspect.

7     BY MR. McLANDRICH:

8     **Q.**    Understood.  Understood.  And that, as you just

9     described, goes back to what we talked about at the beginning,

10    the opportunity to observe the person.  If we saw the back of

11    the head, running away from 40 yards away, our ability to make

12    an accurate identification, much different than if we are

13    sitting in the car next to the person for some period of time

14    looking them dead in the face?

15    **A.**    In that hypothetical, yes.  And, obviously, the

16    opportunity to observe is better in the latter example.

17    **Q.**    Yes.  Thank you.

18         Now, when we talk about identification feedback, so now

19    we have a circumstance where the identification procedure has

20    occurred and a person has been identified to the officer in

21    the identification procedure, and that's complete.  And now

22    the officer says, "Okay, understand, the case is going to go

23    to trial, and Mr. Jones is going to be up on the stand, and

24    you are going to have to identify him."  Is that the kind of

25    post-identification feedback that you're talking about?

DYSART - CROSS (McLandrich)                    531

1    **A.**    That would be one example, yes.

2    **Q.**    All right.  Now, there is really no way to avoid having

3    the witness who's identified the potential perpetrator know

4    that they are going to see Mr. Jones in the courtroom and be

5    asked to identify him, unless you just don't ask to identify

6    him and don't have the witness come, correct?

7    **A.**    Can you repeat the beginning part of your question?  I

8    am not sure I -- I am not sure I understood the question.

9    **Q.**    Sure.  Maybe it wasn't a very good question.  So I

10   apologize.

11          But, you know, in the world in which we live, once I've

12   identified somebody, if I'm going to continue to prosecute

13   them, there is going to be a day where that person is going to

14   be in the courtroom and everyone, including that witness, is

15   going to know who that person is, and they are going to be

16   asked to say:  Is this the person that assaulted you, robbed

17   you, whatever the case might be, correct?

18   **A.**    That's the typical procedure in most states but no

19   longer in some states.  They just don't -- they avoid the

20   theater, as you mentioned.

21   **Q.**    So they just skip that step, and in the courtroom, they

22   talk about what happened in the eyewitness identification

23   procedure and simply rely on that and skip the final step?

24   **A.**    Correct.

25   **Q.**    All right.  But that's more the exception to the rule as

DYSART - CROSS (McLandrich)                          532

1   we sit here today?

2   A.   That's my understanding, yes.

3   Q.   All right.  And so when someone is making their

4   high-confidence identification, I presume the people use

5   different words to express their -- their confidence.  And it

6   could be "I'm a hundred percent certain," or it could be

7   "that's him," or "I know it's him," or similar words that

8   express to them and to the officer that they are expressing

9   certainty that the person they are identifying is that

10  perpetrator, correct?

11  A.   Yes.  I can't presume to know what a witness means when

12  they say certain things, but I agree that humans use

13  different terminologies or words to express their feelings.

14         THE COURT:  Counsel, I'm not trying to limit you,

15  but do you know how -- I was going to --

16         MR. McLANDRICH:  I'm just a moment or two from

17  completion, Your Honor.

18         THE COURT:  All right.

19         MR. McLANDRICH:  Thank you.

20  BY MR. McLANDRICH:

21  Q.   And the last factor that you had talked about in the 12

22  points was the multiple ID procedures commitment effect, and

23  that's what we really just talked about now in terms of the

24  in-court identification versus the presentation of the photo

25  lineup?

DYSART - CROSS (McLandrich)                                    533

1    **A.**    Yes.  You know, after the first identification

2    procedure that contains the suspect, anything else after

3    that would be considered the repeated identification

4    procedure and is not recommended, yes.

5    **Q.**    And so you were asked that sort of final question that if

6    the person's innocent it would be very unlikely that three

7    different people would pick that person out of a photo array

8    absent some sort of biassing in the process.  And I probably

9    didn't say it quite as well.

10   **A.**    I think it's close enough and, yes, I still agree.

11   **Q.**    All right.  And so the corollary to that would be if the

12   person's guilty and three people picked them out, then there

13   doesn't have to be any bias, right?  Three people have picked

14   out the guilty person, and that's what happened?

15   **A.**    That's right, there doesn't have to be bias for a

16   witness to select the correct answer, that's true.

17   **Q.**    And if three people select that same person without bias

18   being present, then there's a high likelihood that that's, in

19   fact, the perpetrator?

20   **A.**    In that general kind of sense, ignoring estimator

21   variables, yes, I would agree.

22            MR. McLANDRICH:  Thank you, Doctor.

23            THE WITNESS:  You're welcome.

24            THE COURT:  Let me see counsel just a second.

25       (At sidebar off the record.)

DYSART - CROSS (McLandrich)                           534

1              THE COURT:  Ladies and gentlemen, we're going to

2     take a ten-minute recess, and then we are going to come back

3     in.  I believe there are several more questions on redirect by

4     counsel for plaintiff.  There might be another witness; I

5     don't know whether that's all.  But we're going to finish up

6     this witness, and then there could be another witness, but I

7     will tell you, at 4 o'clock, we're done.

8          Relax back there.  I'll see you in ten minutes.

9              THE COURTROOM DEPUTY:  All rise.  This court stands

10    in recess.

11         (Jury out at is 2:54 p.m.)

12         (Recess at 2:55 p.m.)

13         (Jury in at 3:08 p.m.)

14         (In open court at 3:09 p.m.)

15             THE COURT:  We are back on the record.

16         Counsel ready to proceed?

17             MR. OWENS:  Yes, Your Honor.

18             MR. McLANDRICH:  Yes, Your Honor.

19             THE COURT:  You may inquire.

20             MR. OWENS:  Thank you.

21             THE COURT:  With regard to matters covered on cross.

22             MR. OWENS:  I will be as brief as I can, Your Honor.

23             THE COURT:  I am not telling you to be brief.

24    That's all you can ask about.

25             MR. OWENS:  I'll be brief anyways.

1                        **REDIRECT EXAMINATION**

2       BY MR. OWENS:

3       Q.    So I wanted to start off where counsel began and sort of

4       ended when he was asking you some question about police

5       estimator variables, like opportunity to observe, right?  Do

6       you recall that?

7       A.    Yes.

8       Q.    Now, even if police officers can't control what happens

9       during an event, from a system side, the officers can't

10      control what they do afterwards in response to that

11      information, right?

12      A.    Correct.

13      Q.    So, for example, in the cases, some of the examples you

14      gave where maybe somebody didn't get a good look at the face

15      or it had been a couple years later, the police officers still

16      have a decision about what to do in those situations, right?

17              MR. McLANDRICH:  Objection.

18              THE COURT:  You can answer it.  Can they make a

19      decision what to do?

20              THE WITNESS:  Yes, that's what the system variables

21      are.  They are the choices law enforcement make when they are

22      collecting evidence from the eyewitness, right, about their

23      memory, um-hmm.

24      BY MR. OWENS:

25      Q.    So you were asked -- I am going to try to go in the order

1    that counsel did so we are all sort of being parallel.

2         You were asked a couple questions about a high-confidence

3    hypothetical, a hypothetical about a first array and being

4    high confident and pristine conditions, and that being a good

5    indicator of accuracy.

6         In a situation in which there was a photo array and then

7    some subsequent court proceedings but the photo array was

8    preceded by a composite, in your opinion, what's the first

9    identification procedure that's relevant for assessing

10   accuracy?

11   **A.**   Well, for assessing overall accuracy, it would be the

12   composite because that is where a witness gives an extremely

13   detailed description of the -- of the person that they saw.

14        In a composite, again, you are going through these,

15   like, long, you know, file drawers of noses and various

16   aspects of that person's face.  And it's, you know, not to

17   simplify it too much, but it's like Mr. Potato Head.  You

18   are like literally building a face.  You are constructing it

19   from nothing.

20        That is an identification procedure, and if that's what

21   happens first, that's the first one.

22   **Q.**   And counsel next asked you a few questions about Brandon

23   Garrett's study in the DNA cases, and I think prestaging so

24   there is no -- everyone knows, in Professor Wixted's report he

25   says that many of the DNA exonerations, that there was --

DYSART - REDIRECT (Owens)                    537

1    sorry, Your Honor.

2         He says that a number of the DNA exonerations, that the

3    witnesses had low confidence.  Do you recall that in

4    Mr. Wixted's report?

5    A.   Yes, I do.

6    Q.   And he was describing Mr. Garrett's study, right?

7    A.   Yes, he referenced that study for his sources.

8    Q.   And do you disagree with Dr. Wixted's interpretation of

9    Mr. Garrett's study?

10   A.   Yes.  Well, it's not -- yes, I disagree with it because

11   that's not what the study says.  He's very clear -- Brandon

12   Garrett is very clear that they had -- 57 percent of the

13   cases that he looked at, the witnesses testified at trial

14   that they had initially not been certain when they made

15   their identification.  That's it.  That's all it says.

16        It makes no conclusions or inferences at all about the

17   other 43 percent of victims and witnesses who testified at

18   trial who didn't mention anything about their initial

19   confidence.

20   Q.   Now, after you saw Professor Wixted -- or, excuse me --

21   Dr. Wixted's report that you disagreed with his interpretation

22   of Mr. Garrett's study, did you reach out to Mr. Garrett?

23   A.   Yes, I did.

24   Q.   And what did he say about what Dr. Wixted had to say

25   about his own study?

DYSART - REDIRECT (Owens)                                538

1    **A.**   He said that it is not possible to conclude from his

2    own work that none of the witnesses in the DNA exoneration

3    cases made their identification with -- with high

4    confidence.  So he doesn't know.  He's like, from the

5    information I have, and data, you cannot make that

6    conclusion based on what I've written.

7    **Q.**   It's your change that Doctor -- excuse me -- that

8    Mr. Garrett also disagrees with Dr. Wixted's interpretation of

9    his own study?

10   **A.**   Yes, that's -- that's what he said.

11   **Q.**   You were asked a couple questions about -- I think that

12   relate to the -- your field and sort of some of the social

13   science you have described as evolving and new.  Do you recall

14   those questions?

15   **A.**   Yes.

16   **Q.**   Has the field of social science and identification and

17   many of the variables that we have discussed today, did those

18   exist long before 1988?

19   **A.**   Yes.

20   **Q.**   And do those include the sort of factors that we've

21   discussed today?

22            MR. McLANDRICH:  Objection.

23            MR. OWENS:  I can rephrase.  I will withdraw it.

24   BY MR. OWENS:

25   **Q.**   Can you please tell us the origin or sort of the

DYSART - REDIRECT (Owens)                                    539

1    historical view of the research in your field that you are

2    opining about today as it precedes 1988?

3              MR. McLANDRICH:  Objection.

4              THE COURT:  And the basis?

5              MR. McLANDRICH:  It's completely nondescript.  I am

6    not even sure what it's asking.

7              MR. OWENS:  Your Honor, I am trying to do two

8    things.  One, I am trying to avoid leading the witness; and,

9    two, I am responding to counsel's specific line of questions

10   about what was things like in 1988.  And so that's where this

11   is directed at.

12       I can rephrase.

13             THE COURT:  All right.  Try to rephrase and then

14   we'll see.

15             MR. OWENS:  Sure.

16   BY MR. OWENS:

17   **Q.**   Your field, eyewitness identification, the social science

18   that relates to it, the factors that we discussed today, can

19   you describe how that appeared in the literature before 1988?

20   **A.**   Yes.  There's actually just one excellent source for a

21   lot of the information, and that's in 1987, a professor

22   named Elizabeth Loftus, who is widely considered the world's

23   leading expert in memory research, she published a book

24   called *Eyewitness Testimony:  Civil and Criminal*, with an

25   attorney, and that was published in 1987.  It's over 400

DYSART - REDIRECT (Owens)                                    540

1    pages of these exact kind of issues, right, related to

2    estimator variables and system variables.

3         That book is now in its sixth iteration, and I've been

4    a co-author for the last three iterations, so from 2007

5    until -- until today.  So its sixth edition.  So there was a

6    good deal of research on this, enough to accumulate into

7    this large book, and she was pulling from research going

8    back into clearly the 1960s that were being done in

9    eyewitness identification, and a lot of her own work as well

10   in the 1970s.

11   **Q.**   You were asked a few questions also about lineup filler

12   bias, and do you recall that?

13   **A.**   Yes.

14   **Q.**   All right.  So I want to just make sure that I understand

15   what your opinion is about, whether or not a fair lineup.

16   What is it being used to match the description to?  So what

17   should we be looking to?  What's our comparator?  Does that

18   make sense?

19   **A.**   I think so.  So when we're picking the fillers, that's

20   what you are referring to?

21   **Q.**   Yes.

22   **A.**   Yes.  So when you are picking the lineup fillers, so,

23   again, if you think about like a multiple choice question,

24   so when you write a multiple-choice question, the person

25   writing it has their answer, the thing they believe to be

1    the correct answer.  In a police lineup, that's the suspect.

2    And now we have to come up with the other options.

3         And in an eyewitness identification scenario, law

4    enforcement -- the research shows law enforcement should use

5    the witness's description, and every single element that the

6    witness mentions in their description should be used to

7    select the other options, the fillers in the -- in the

8    identification procedure.

9         Typically, witness descriptions are not extremely

10   lengthy.  Maybe seven to nine items.  So there is not a lot

11   of -- there is not a lot that has to be done in terms of

12   matching, you know, finding people who look similar.

13        And then what needs to -- what you have to make sure is

14   that the suspect still doesn't stand out for whatever

15   reason.  So if the witness didn't mention anything about

16   facial hair and the suspect has, you know, a beard, then you

17   have to make sure that all of the other fillers also have a

18   beard even though the witness didn't mention it at all

19   because that person, the suspect, would stand out being so

20   different than all the others.

21        So it's the combination of look at the description;

22   everyone in the identification procedure has to match, at a

23   minimum, all of the features that the witness mentioned.

24   And then when you step back from it, ask, Does anyone stand

25   out here?  And if it's the suspect, you got to go back and

DYSART - REDIRECT (Owens)                                    542

1    make sure that, you know, you, you know, pick some different

2    fillers and make some different choices so that the person

3    doesn't stand out.

4    **Q.**    And so one of those things would, of course, be the hair

5    color of the suspect matching the other people in the lineup.

6    Fair to say?

7    **A.**    Yes, that's correct.

8    **Q.**    Do you recall being asked on cross-examination about

9    different vocabulary words individuals might be -- use to

10   express levels of confidence?

11   **A.**    Yes.

12   **Q.**    All right.  So when assessing confidence at the time an

13   identification is made, is there something -- do you assess

14   only the words that a person says or also their behavior?

15   **A.**    Well, depending on the research study, when we're --

16   sometimes we videotape participants, and we can go back and

17   look at their behavior as well.  But there's -- you know,

18   there's one clear element that's really important, and

19   that's the decision time.  Like, how long did the witness --

20   that's another behavior.  How long did it take for the

21   witness from the time the photos were shown until they made

22   their identification decision?  The amount of time that

23   passes is extremely telling with respect to identification

24   accuracy.  And that early research showed that if a witness

25   makes a quick decision, within 10, 15 seconds makes an

DYSART - REDIRECT (Owens)                                    543

1    identification, it's very likely to be accurate.  Because

2    recognition is a quick process.  When we see someone we

3    recognize, you know, it doesn't take like a long period of

4    time.  Otherwise, social interactions would be very awkward.

5         So when the researchers looked at periods of 45 seconds

6    to a minute and looked at, okay, finally, when a witness

7    made a selection after 45 seconds to a minute, how often

8    were they right and how often were they wrong.  And they

9    found that -- the complete opposite.  So about 90 percent of

10   the time witnesses were wrong when the witness took 45

11   seconds to a minute to make their decision.

12        So -- so that's the other behavior, I guess you would

13   say, we look at in identification accuracy.

14   Q.   And so hypothetically if it took a witness, you know,

15   more than a minute to make an identification, would that be an

16   indicator that it's less likely to be accurate?

17   A.   From the research, yes, that's what it would suggest.

18   Q.   Same thing for two minutes?

19   A.   Yes.  The longer -- the longer it is, the, you know,

20   the more problematic, I would imagine, it would be.

21   Q.   And is there a special term to use this factor that you

22   have just described in the research?

23   A.   Yes.  We call it response latency.  So how long does it

24   take them to respond, essentially.

25   Q.   All right.

DYSART - RECROSS (McLandrich)                          544

1              MR. OWENS:  Those are all the questions I have, Your

2    Honor.

3              THE COURT:  Thank you.

4         Recross?

5              MR. McLANDRICH:  Thank you, Your Honor.

6              THE COURT:  Counsel, we've narrowed it down to

7    anything that was covered by -- on redirect.

8              MR. McLANDRICH:  Yes, sir, Your Honor.

9                        **RECROSS-EXAMINATION**

10   BY MR. McLANDRICH:

11   **Q.**   Doctor, so you were asked about the composite --

12   composite.  I'm sorry.

13   **A.**   Yes.

14   **Q.**   And you indicated that the composite's an extremely

15   detailed description of the suspect, or words to that effect,

16   right?

17   **A.**   Correct.

18   **Q.**   And the ability to create something of a composite that

19   would qualify as this, quote-unquote, extremely detailed

20   description is a function of those various, in that era, mylar

21   overlays to make up, as you call them, Mr. Potato Head?

22   **A.**   Correct.  Called Identi-Kit, was the name of the tool.

23   **Q.**   And might there not be circumstances where their

24   composite that is created with those mylar overlays isn't

25   really an accurate depiction of the suspect?

DYSART - RECROSS (McLandrich)                                545

1    **A.**    Just to clarify, you said accurate or inaccurate?   I

2    couldn't hear.

3    **Q.**    Accurate, might not be an accurate depiction of the

4    suspect?

5    **A.**    Yes, yes, that's correct.

6    **Q.**    And one indicator of that could be if the witness said,

7    you know, I really am not satisfied, really not happy with the

8    image this composite -- composite is creating, correct?

9    **A.**    Yes, that would be an indicator that it was probably a

10   difficult task.  As we know, creating these composites is

11   extraordinarily difficult for witnesses to do.

12   **Q.**    And so in a circumstance like that, even though the

13   creation of the composite is the first effort to create some

14   sort of image of this suspect, certainly no prohibition on

15   doing a later photo array once we have identified a suspect,

16   correct?

17   **A.**    Correct.

18             MR. OWENS:  Objection.

19             THE WITNESS:  Sorry.

20             THE COURT:  Rephrase, because I don't understand

21   your word -- I don't know whether we're treading over into

22   something that I have ordered not to -- prohibited.

23             MR. McLANDRICH:  Oh, I see.  Thank you.

24   BY MR. McLANDRICH:

25   **Q.**    So even if we've had an opportunity to create a

1    composite, we are still going to do a photo array when we have

2    an actual suspect, correct?

3              MR. OWENS:  Objection to the form of the question.

4    Or objection.  It sounds like police procedures.  I don't

5    know.

6              THE COURT:  Clarify.

7    BY MR. McLANDRICH:

8    **Q.**   So even though we have made an effort to create an image

9    through a composite, we're still potentially -- once we have a

10   suspect, we are not going to rely on the composite.  We're

11   going to do a photo array to try and ascertain whether the

12   memory of the witness matches the image of the suspect who

13   we've now identified, correct?

14             MR. OWENS:  Objection; vague.  I don't know who the

15   "we" is.

16             THE COURT:  Counsel, I think if you include -- if

17   you are asking her about social science --

18             MR. McLANDRICH:  Let me rephrase.  Thank you, Your

19   Honor.  I get the point.

20   BY MR. McLANDRICH:

21   **Q.**   In social science, we try and create a composite as some

22   indicator of what the person might look like based on the

23   description.  Yes?

24   **A.**   Researchers have studied how well people can create a

25   composite, how much it looks like the person it was intended

DYSART - RECROSS (McLandrich)                                    547

1    to represent, yes.  We -- we study that, and we use that as

2    a technique in our experiments.

3    Q.    All right.  And that ability to recreate that, that image

4    that's in the witness's mind, is going to be limited by the

5    options of mylar overlays and the ability of the witness to

6    amalgamate those into an image, correct?

7    A.    Yes, that's certainly -- and the quality of the

8    witness's memory, as well.  So if you're being asked to

9    create a composite or sketch of a stranger versus a famous

10   person, which a lot of the studies have done, will make a

11   difference as well.

12   Q.    And are you aware of any studies that would indicate that

13   a high-confidence identification made under the, quote-

14   unquote, pristine conditions is going to be inaccurate simply

15   because a witness participated in the creation of a composite?

16   A.    I think the creation of the composite violates the

17   conditions of pristine condition because it's not the first

18   identification procedure.  And so to that point I think

19   it -- that it's not a possibility.

20        But I don't know of any studies that have done the

21   composite and then also looked only at high-confidence

22   identifications from a subsequent photo array.  I don't

23   think that research has been done.

24        But it violates the -- the definition of pristine.

25   Q.    All right.  So while it might not meet the definition of

DYSART - RECROSS (McLandrich)                                    548

1    pristine, to suggest that a creation of a composite would make

2    a high-confidence identification inaccurate, at this point, at

3    least in terms of scientific studies, would be speculative?

4    A.    I would agree with that, yes.

5    Q.    Now, when you were asked about the DNA exonerations and

6    the 57 percent who had expressed that at trial, that they were

7    initially uncertain, and the 43 percent who didn't express a

8    confident statement, we will call that, so for the 57 that

9    expressed low confidence, that would be an indicator that they

10   did not make a high-confidence identification, correct?

11   A.    Initially, yes, that's correct.

12   Q.    All right.  And since they didn't make a high-confidence

13   identification, that would be more indicative of a

14   misidentification than would have been a high-confidence

15   identification?

16              MR. OWENS:  Objection; scope and asked and answered.

17              THE COURT:  Well, but you questioned her about this

18   whole -- about the 57/43.

19        Overruled.

20              THE WITNESS:  Sorry.  Can you repeat -- I've lost

21   track of the question.  I'm sorry.

22   BY MR. McLANDRICH:

23   Q.    I can try.  Sometimes I can only do it once, but I am

24   going to try.

25        So we were talking about the 57 percent of people that

DYSART - RECROSS (McLandrich)                    549

1    had expressed low confidence.  I think we agreed that that

2    would be more indicative of someone -- strike that.  Let me

3    start over.

4         We talked about the 57 percent that expressed low

5    confidence, that would be more indicative of someone who's not

6    making a high-confidence identification and therefore more

7    likely to be inaccurate?

8    A.   Yes.  They say that they initially were uncertain at

9    the time of the identification.  Yes, that's what it means.

10   Q.   With respect to the 43 percent, the only point is, we

11   just don't know; we don't have any data to judge the nature of

12   the initial identification they made, whether they expressed

13   high confidence or low confidence?

14   A.   Correct.  We don't have any of the -- as I stated

15   earlier, what we really would need to do is go back to the

16   original police reports.  But, unfortunately, due to the

17   timeline of when these cases took place, the decades that

18   individuals were wrongfully incarcerated, pristine

19   procedures were not the norm, and so even to go back and

20   look at the confidence at the time of the initial

21   identification would likely violate the pristine condition

22   requirement.

23   Q.   And then with respect to the, I think you called it,

24   response latency --

25   A.   Yes.

1   Q.    -- it sounds to me, and correct me if I'm wrong, that we

2   are on the continuum.  So the quicker that the witness says,

3   yes, that's the person, then the more confident we feel in

4   that identification?

5   A.    Well, the research actually has divided it into -- into

6   like the finite numbers.  In fact, it used to be called the

7   10-to-12-second rule initially.  And then researchers

8   explored that it might be 15 seconds instead of 12.  And so

9   there's a paper called *The Unruly 10-to-12-Second Rule.*

10       So it's -- the general concept is, you know, with

11  around 15 seconds that it takes a witness to look at six

12  faces and decide is the perpetrator here, that's kind of the

13  key.

14       And then they look at 45 seconds and longer and made

15  the decision that it's about 90 percent of the time those

16  selections are wrong when it takes a long time for a witness

17  to make that decision.

18  Q.    Yeah.  And in the research, we're going to have, I

19  presume, some sort of person there with a stopwatch or a video

20  that we then go back and stopwatch to say, here's when my 10

21  seconds or 15 seconds, or whatever it might be, starts?

22  A.    We try to be as methodical as possible.  If we are

23  studying that factor, then we are going to measure that

24  factor, because we know it's important.

25  Q.    And in the real world, at least in the real world,

1    stopwatches generally aren't present, at least historically?

2              MR. OWENS:  Objection.  Objection.

3              THE COURT:  If she knows.

4              THE WITNESS:  What his -- I don't know the

5    development of stopwatches.

6              THE COURT:  In the real world, are they using a

7    stopwatch?

8              THE WITNESS:  Probably not a stopwatch, but a watch.

9    You know, I'm sure they can look at their watch or a clock in

10   the room and see how long the witness is taking to make their

11   identification decision.

12             MR. McLANDRICH:  Thank you.  That's all, Your Honor.

13             THE COURT:  All right.  One question.

14             MR. OWENS:  Literally one.

15             THE COURT:  All right.

16                   **FURTHER REDIRECT EXAMINATION**

17   BY MR. OWENS:

18   **Q**.  With respect to response latency, fair to say it's more

19   like falling a cliff -- off a cliff than a continuum?

20             MR. McLANDRICH:  Objection, Your Honor.

21             THE COURT:  Wait a minute.  I don't understand the

22   question yet.

23             MR. OWENS:  I'll rephrase.

24             THE COURT:  Thank you.

25   BY MR. OWENS:

1  **Q.**   You were just asked some questions about response latency

2  and the period of time by which it takes to make a decision.

3  **A.**   Yes.

4  **Q.**   And I think that you rejected the idea that it was sort

5  of on a continuum, sort of more like falling off a cliff; like

6  once you get to a certain point, the accuracy drops

7  dramatically.  Is that right?

8  **A.**   I never thought of that analogy, but that makes sense

9  to me given the fact that the research says at 45 seconds

10 and longer, you know, or a minute or longer, then it's very

11 unlikely that a selection's going to be accurate.

12              MR. OWENS:  That's all, Your Honor.

13              THE COURT:  Any reason this witness cannot be

14 excused?

15              MR. OWENS:  No.

16              THE COURT:  Counsel, anything?

17              MR. McLANDRICH:  No.  Thank you, Your Honor.

18              THE COURT:  Doctor, thank you very much.  Have a

19 safe trip back.

20              THE WITNESS:  Thank you very much.

21              THE COURT:  Do you want to call someone?

22              MR. OWENS:  Yes, Your Honor.  The next witness is

23 Lisa Glasser.  Pittman, sorry.

24      **LISA GLASSER SCHRECK, PLAINTIFF'S WITNESS, SWORN**

25              THE COURT:  It's Ms. Glasser, is that right?

SCHRECK - DIRECT (Owens)                                        553

```
 1              THE WITNESS:  It's actually Schreck now.
 2              THE COURT:  Schreck, okay.  Ms. Schreck, please try
 3   to keep your voice up so we can -- it sounds like you are
 4   going to be able to do that, but keep your voice up so we can
 5   all hear your responses to the questions.  The microphone's
 6   there for you.  If you get too close, it will muffle you; if
 7   you get too far away, it won't pick you up.  But if you keep
 8   your voice up, that solves the problem, all right?
 9              THE WITNESS:  Yes, sir.
10              THE COURT:  You may inquire.
11              MR. OWENS:  All right.
12                      **DIRECT EXAMINATION**
13   BY MR. OWENS:
14   **Q.**   Good afternoon.
15   **A.**   Hi.
16   **Q.**   Can you just state and spell your last name so we have it
17   for the record?
18   **A.**   Yes.  It's Schreck, S-C-H-R-E-C-K.
19   **Q.**   First name Lisa?
20   **A.**   Lisa, L-I-S-A.
21   **Q.**   And did you have a -- what was your maiden name?
22   **A.**   Glasser.
23   **Q.**   Do you have a middle name in --
24   **A.**   Lynn.
25   **Q.**   Okay.  And did you also have a different last name before
```

SCHRECK - DIRECT (Owens)                                        554

1   it was Schreck for a while?

2   **A.**   Yes.  It was Pittman before.

3   **Q.**   And at the time you testified -- you testified in

4   Mr. Gillispie's previous proceedings, right?

5   **A.**   Yes.  I'm divorced now.

6   **Q.**   And it was Pittman at that time?

7   **A.**   Yes.

8   **Q.**   All right.  Thank you.

9        And I'll just cut to the chase.  Do you know Dean

10  Gillispie here?

11  **A.**   Yes.

12  **Q.**   And how do you know Mr. Gillispie?

13  **A.**   I have known Dean since high school.  We were very good

14  friends in school and outside of school.

15  **Q.**   And what high school did you go to?

16  **A.**   We went to Fairborn High School.

17  **Q.**   What year did you graduate?

18  **A.**   I graduated in '85, and he was at Park Hills.  And then

19  the schools went together, and then Baker and Park Hills

20  went together, and then we -- my sophomore year.

21  **Q.**   Got it.  It sounds like there were two schools in

22  Fairborn that got combined into a --

23  **A.**   Correct.

24  **Q.**   -- bigger high school?

25  **A.**   Um-hmm.

SCHRECK - DIRECT (Owens)                                    555

1   **Q.**   All right.  And did you -- how did you know Mr. Gillispie

2   outside of school?

3   **A.**   Well, we hung out a lot.  We went out.  Not as

4   boyfriend and girlfriend.  We were friends.  Good -- very,

5   very good friends, and we went out.  We went shopping.  We

6   went to the mall.  We went to parties.  We went to different

7   establishments, like bars, a couple bars that we went to,

8   one, Bourbon Street that I talk about that we used to go to

9   back in the day.

10   **Q.**   Sure.  And after you've graduated high school together,

11   did you go off to college or stay in town?

12   **A.**   After -- I went to Ohio State.  I was there for three

13   years and came home and finished at Wright State.

14   **Q.**   Got it.  When did you -- when you were at Ohio State, did

15   you come home for the summer?

16   **A.**   Every summer.  I worked in -- yes, I came home every

17   summer.

18   **Q.**   And when you'd come home from college for the summers

19   before you transferred to Wright State, would you hang out

20   with Mr. Gillispie?

21   **A.**   Um-hmm, yes.

22   **Q.**   Were you aware of his appearance back in high school and

23   then in the late '80s?

24   **A.**   Yes.

25   **Q.**   Could you describe what his hair was like?

1    **A.**   He always had dark hair with gray in it.  In school he

2    had gray hair all in his hair.  Tall, big man.  That's

3    pretty much it.

4    **Q.**   No problem.  And did Mr. Gillispie smoke?

5    **A.**   No.  He never smoked.

6    **Q.**   Did he have opinions on smoking?

7    **A.**   He hated smoking.  He hated that I smoked.  I quit

8    seven years ago, thank you.

9    **Q.**   Thank you.

10   **A.**   But he hated it, and I smoked all the time.

11   **Q.**   And I just want to stop you for one second.  It's really

12   important that you let me try to finish my question for our

13   court reporter.

14   **A.**   Sorry.

15   **Q.**   I know.  It's been a while.  So let me just try for our

16   court reporter that we each talk one at a time, okay?

17   **A.**   Yes, sir.

18   **Q.**   Thank you.

19        After you -- sorry.  Strike that.

20        Did you keep up with Dean over the years?

21   **A.**   We kept up at first.  Then we stopped.

22   **Q.**   Okay.  And why did you stop?

23   **A.**   Well, it wasn't -- well, it was because I got married.

24   And my husband had never met Dean, 'cause Dean was in jail.

25   And he wasn't very comfortable with me visiting Dean in jail

SCHRECK - DIRECT (Owens)                                         557

 1    or being friends with somebody that was in jail at that

 2    time.  Even though Dean was wonderful, and we knew it, but

 3    he didn't know him.  So life kind of took that turn, and I

 4    didn't talk to him much anymore.

 5         Occasionally, he'd call.  He used to write me.  But

 6    later part of it, we didn't talk as much till he's gotten

 7    out.

 8    Q.   Okay.  And have you been able to sort of reacquaint with

 9    Dean over the last ten years since he's been released?

10    A.   A couple times.  I lived in Indiana.  So I moved back

11    from Indiana a few years back.  So I wasn't here for all of

12    that but -- to hang out with him or see him.  But I've been

13    to his -- he's had a couple get-togethers that I've been to.

14    Q.   Now, how would you describe Dean's personality back in

15    the late '80s and early 1990s when you knew him?

16    A.   He was the best guy in the whole wide world.  It's

17    going to make me cry that he was gone so long.  He would do

18    anything for anybody.  He was very kind.  He was very good

19    to me.  We did a lot of things together, friends.  He was

20    there.  My father adored him.  He always felt safe when I

21    was with Dean, and Dean always took care of me when we were

22    out.

23    Q.   And can you think of a time -- so you just mentioned your

24    father, right?

25    A.   Um-hmm.

SCHRECK - DIRECT (Owens)                                      558

1   **Q.**   And I want to just sort of take you back to 1988.  Were

2   you in college at that time?

3   **A.**   I was going to be going to Wright State at that time.

4   Yes, I was enrolled for Wright State.  I had come home from

5   Ohio State.

6   **Q.**   Now, when you say you had come home from Ohio State, we

7   are talking about the summer of 1988?

8   **A.**   Yes.  That was for good.  And I started going to Wright

9   State then at that time.

10  **Q.**   Got it.  And did you -- where did you live when you came

11  back?

12  **A.**   At my mom and dad's house.

13  **Q.**   And now, were your parents the kind of parents that --

14  did you have friends over regularly?

15  **A.**   I would have some friends over.  My friends, my

16  girlfriends would come over, and Dean came over.  Not a ton

17  of people, but my friends would come by like normally.

18  **Q.**   Did you ever have a party at your house in 1988?

19  **A.**   I did.

20  **Q.**   Does that -- was that a regular thing that you would do?

21  **A.**   No.

22  **Q.**   And why not?

23  **A.**   Because my dad would kill me.  I mean, not that -- he

24  was a wonderful man, but I was disciplined, and I wanted to

25  make sure I followed all the rules.  And when I didn't, I

SCHRECK - DIRECT (Owens)                              559

1    would get in trouble.

2    **Q.**    Got it.

3    **A.**    Pretty simple.

4    **Q.**    And so did you have -- sorry.  Strike that.

5         What do you remember about the party that you had in

6    1988?

7    **A.**    Well, I don't really remember much about the party

8    other than what I do remember is that my father and mom's

9    ceiling fan got broken.  And I remember I thought I was just

10   going to be in so much trouble.  He was going to find out I

11   had a party.  And the ceiling fan blade broke.  Brian put

12   his arm into it.  And so I had this blade that I had to show

13   my parents when they got home, and they wanted to know how

14   and blah, blah, blah.  But that's probably why it -- that's

15   why it sticks in my head, because of that moment, you know.

16   **Q.**    Right.  And when you mentioned Brian, who is that?

17   **A.**    Brian Poulter.  He was also a friend of ours that we

18   hung out with, all of us, that went to school with us.

19   **Q.**    And was Mr. Gillispie at that same party?

20   **A.**    Yes.  On Saturday?

21   **Q.**    Yes.

22   **A.**    Yes.

23   **Q.**    And do you know if you saw Dean at all earlier in the

24   weekend on Friday before you had that party?

25   **A.**    I did.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

SCHRECK - DIRECT (Owens)                                        560

1    **Q.**    And what do you remember about that?

2    **A.**    Well, I don't remember all of it.  It's been 30 years.

3    It's been a while.  But I did look at the testimony, and I

4    do remember Dean and Brian coming over.  Dean and Brian,

5    they hung out for a while.  And I remember that my friend

6    from Ohio State was coming, Sandra, and Dean adored Sandra.

7    We always all had fun.  Dean had come to Ohio State a couple

8    times.

9          And she was late, and it was getting dark.  And she was

10   not -- she would not drive at dark.  So I just remember

11   that's why that sticks out, that ceiling fan that Saturday

12   and then Dean and Brian coming over and they hang out.  And

13   they were hanging out, and they had to go.  And I was like

14   worried about my friend Sandra, and I remembered it was

15   almost dark and she wasn't there.  I don't know why I

16   remember that, but I remember it.

17   **Q.**    Now, were you tight with somebody named Marie Woods?

18   **A.**    Not really.  We knew each other in school, but we

19   weren't like best friends.  At all.

20   **Q.**    Okay.

21   **A.**    I mean, we were friends, though.  I was friends with a

22   lot of different people in school, but it wasn't one of my

23   core group friends.

24   **Q.**    Was she closer to Dean?

25   **A.**    Yes.

SCHRECK - DIRECT (Owens)                                    561

1    **Q.**   And I know you just mentioned it a minute ago.  Before

2    you testified -- you are testifying here today -- you reread

3    your testimony from the original trial; is that right?

4    **A.**   Yes.

5    **Q.**   Okay.  And is that what you are referring to a minute ago

6    when you said "I read it in testimony"?

7    **A.**   Yes.  I'm sorry, yes.

8    **Q.**   You're good.

9    **A.**   Yes.

10   **Q.**   And do you remember there came a time after this weekend

11   when you had that party where you looked at Marie Woods's

12   calendar?

13   **A.**   It was shown to me.

14   **Q.**   Okay.

15   **A.**   When I think -- I don't know which trial.  In one of

16   the first ones, the attorney showed it to me in the office.

17   That's how I saw it.  I never even really knew about the

18   calendar until the trial stuff.

19   **Q.**   Got it.  Did you have any reason to doubt it or did it

20   conflict with your memory at all --

21   **A.**   No.

22   **Q.**   I'll ask a new question.

23   **A.**   Sorry.

24   **Q.**   No problem.  Did you have any reason to doubt or did it

25   conflict with your memory at all back in 1990 that that was

SCHRECK - CROSS (McLandrich)                              562

1    the weekend that you had the party at your parents' house?

2    **A.**   I didn't have any doubts about that.

3    **Q.**   Did you ever have any other parties at your parents'

4    house after Brian broke the ceiling fan?

5    **A.**   No, never again.  I might have had a couple girlfriends

6    over, but never had a party with people coming in and out.

7              MR. OWENS:  Those are my questions, Your Honor.

8              THE COURT:  All right.  Cross?

9              MR. McLANDRICH:  Yes, just briefly, Your Honor.

10                     **CROSS-EXAMINATION**

11   BY MR. McLANDRICH:

12   **Q.**   Good afternoon, Miss.

13   **A.**   Hi.

14   **Q.**   Hi.  Really just one or two questions.

15        I reviewed the testimony from back in the day as well,

16   and so this would have been August 6th -- I'm sorry -- 26th --

17   no, 6th, the party you had, right?

18   **A.**   Yes, I think so.  I don't -- I think that was the date.

19   **Q.**   Yes.

20   **A.**   I'm not sure.

21   **Q.**   And at the trial, you testified that Dean, Mr. Gillispie,

22   got there about 7 o'clock and left about 9 or 9:30.  Does that

23   comport with your memory?

24   **A.**   Well, honestly, that jogged my memory when I read it.

25   I didn't remember the exact time, 7.  I don't know.  Back

SCHRECK - CROSS (McLandrich)                          563

1    then I must have remembered 7 being the time.  I just

2    remember that it was dusk when he was leaving.

3            THE COURT:  I guess, Counsel, probably the best way

4    to approach this is ask her what she remembers.  And if she

5    doesn't remember, then you can refer her to the transcript.

6            MR. McLANDRICH:  Thank you.

7    BY MR. McLANDRICH:

8    Q.   So do you remember independently the time that

9    Mr. Gillispie came to your house and left on the 6th?

10   A.   Not necessarily.  I just remember that he came.  They

11   stayed a while, a few hours, and they left when it was

12   getting dark and I was worried about my friend.  That's just

13   the part that I remember.  I can't tell you what time it

14   was.

15           MR. McLANDRICH:  Jeff, would you bring up

16   Plaintiff's 5?  And it's document page 134, transcript page

17   532.

18       (Exhibit displayed.)

19   BY MR. McLANDRICH:

20   Q.   If you go to line 5 you are asked the question, "The

21   first time you saw him on that particular day was when Brian

22   and he came to your home?"

23       "Witness nodding head in the affirmative" was the answer.

24       And then, "Question:  And that was about two hours before

25   they left for Bourbon Street at 9 o'clock?"

SCHRECK - REDIRECT (Owens)                                    564

1          And, again, "Nodding head in the affirmative."

2          Does that refresh your recollection?

3    A.    Yes.

4    Q.    And so the first time you would have seen Mr. Gillispie

5    would have been around 7 o'clock, and he would have left a

6    couple hours later, 9, maybe 9:30?

7    A.    That's what I remember.

8          MR. McLANDRICH:  All right.  Thank you, Miss.

9    That's all I have for you.

10         THE COURT:  Anything with regard to that?

11         MR. OWENS:  Just one question with regard to that.

12         THE COURT:  All right.

13                    **REDIRECT EXAMINATION**

14   BY MR. OWENS:

15   Q.    Was there a reason you all liked to hang out at Bourbon

16   Street on Friday nights?

17   A.    I think they had -- if I remember correct, they had

18   Long Island Iced Tea for like $1.

19         MR. OWENS:  That's it.

20         THE COURT:  You want to follow that up?

21         MR. McLANDRICH:  No, Your Honor.  Thank you.

22         MR. OWENS:  That's all we have for this witness,

23   Your Honor.

24         THE COURT:  Any reason this witness cannot be

25   excused?

```
 1          MR. McLANDRICH:  No, sir.

 2          THE COURT:  Thank you, ma'am.

 3      I'm going to make an assumption that we are not going to

 4  be able to get another witness on in ten minutes.  Is that

 5  right?

 6          MR. OWENS:  That would be a correct assumption, Your

 7  Honor.

 8      I mean, can we have one moment to confer, Your Honor?

 9          THE COURT:  Sure.

10          MR. OWENS:  Have a great night.

11          THE COURT:  Ladies and gentlemen of the jury, we're

12  done today.  I want to thank you for your patience, your

13  attention.  It's been another long day, but we're getting

14  through a lot of -- a lot of witnesses, a lot of testimony, a

15  lot of evidence.

16      As far as we've gotten, though, however, it wouldn't be

17  right for you to start discussing the case with anyone or

18  formulating any opinions or drawing any conclusions.  So tell

19  your family to be patient.  Once this case is over, then you

20  can tell them everything.  You can just bend their ear, but

21  until then, please don't do that.

22      So hopefully you will have a wonderful evening.  We'll

23  recess for the day.  And if I could ask you to just make sure

24  your tablets are on your seats.

25          Anything further, counsel?
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1          MR. OWENS:  No.  Thank you, Judge.

2          THE COURT:  Counsel?

3          MR. McLANDRICH:  No.  Thank you, Your Honor.

4          THE COURT:  Counsel?

5          MR. HERMAN:  No, Your Honor.

6          THE COURT:  I might see counsel for like 30 seconds

7     in chambers.

8          THE COURTROOM DEPUTY:  All rise.  This court stands

9     in recess.

10        (Jury out at 3:51 p.m.)

11        (Court adjourned at 3:51 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         CERTIFICATE OF REPORTER

2

3        I, Mary A. Schweinhagen, Federal Official Realtime

4  Court Reporter, in and for the United States District Court

5  for the Southern District of Ohio, do hereby certify that

6  pursuant to Section 753, Title 28, United States Code that the

7  foregoing is a true and correct transcript of the

8  stenographically reported proceedings held in the

9  above-entitled matter and that the transcript page format is

10  in conformance with the regulations of the Judicial Conference

11  of the United States.

12

13  s/Mary A. Schweinhagen

14  _____ 20th of December, 2023

15  MARY A. SCHWEINHAGEN, RDR, CRR
     FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25