```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF OHIO
 2                            AT DAYTON

 3   _____
                                         )
     ROGER DEAN GILLISPIE,               )
 4                                       )
                       Plaintiff,        ) CASE NO. 3:13-cv-416-TMR
 5                                       )
                      -vs-               )
 6                                       )
     THE CITY OF MIAMI TOWNSHIP, ET AL.,) JURY TRIAL
 7                                       )
                       Defendants.       ) VOLUME V
 8   _____)
                      TRANSCRIPT OF PROCEEDINGS
 9               THE HONORABLE THOMAS M. ROSE,
             UNITED STATES DISTRICT JUDGE, PRESIDING
10                THURSDAY, NOVEMBER 10, 2022
                          DAYTON, OH
11
     For the Plaintiff:       MICHAEL KANOVITZ, ESQ.
12                            DAVID B. OWENS, ESQ.
                              MEGAN C. PORTER, ESQ.
13                            Loevy & Loevy
                              311 N. Aberdeen Street
14                            3rd Floor
                              Chicago, IL  60607
15
     For the Defendant        JOHN T. McLANDRICH, ESQ.
16   Matthew Scott Moore:     DAVID J. SIPUSIC, ESQ.
                              Mazanec, Raskin & Ryder Co., LPA
17                            3305 Solon Road
                              100 Franklin's Row
18                            Cleveland, OH  44139

19   For the Intervenor       DAWN M. FRICK ESQ.
     Miami Township:          CHRISTOPHER T. HERMAN, ESQ.
20                            Surdyk, Down & Turner Co., LLP
                              8163 Old Yankee Street
21                            Suite C
                              Dayton, OH  45458
22
            Proceedings recorded by mechanical stenography,
23   transcript produced by computer.
                    Mary A. Schweinhagen, RDR, CRR
24               Federal Official Court Reporter
                      200 West Second Street
25                    Dayton, OH  45402
                    *** *** *** ***
```

1    Courtroom Deputy:  Elizabeth Penski

2    Law Clerks:  Michael Mayer, Callum Morris

3    Also Present:  Roger Dean Gillispie, plaintiff; Valerie
     Barajas, paralegal; Matt Thibodeau, paralegal; Jeff Weber, IT
4

5

6                         **INDEX OF WITNESSES**

7                         November 10, 2022

8    **PLAINTIFF'S WITNESSES**

9    **MATTHEW SCOTT MOORE**
           Cross Examination by Mr. Kanovitz          571
10         Cross-Examination by Ms. Frick             751

11   **BENJAMIN MILLER**
           Direct Examination by Mr. Owens            724
12         Cross-Examination by Mr. McLandrich        743
           Redirect Examination by Mr. Owens          749
13

14   **DEFENDANT MOORE WITNESSES**

15   **MATTHEW SCOTT MOORE**
           Direct Examination by Mr. McLandrich       761

16

17                    *     *     *     *     *

18

19

20

21

22

23

24

25

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
 1          P-R-O-C-E-E-D-I-N-G-S                    8:52 A.M.

 2          (Jury in at 9:03 a.m.)

 3          (In open court at 9:4 a.m.)

 4              THE COURT:  Good morning, everyone.

 5              RESPONSE BY ALL:  Good morning.

 6              THE COURT:  Hopefully, you had a good evening.

 7      Everybody got a little rest.  And I'm assuming -- correct me

 8      if I'm wrong -- that you were able to abide by the Court's

 9      admonitions.  Anybody that was not?

10          (No verbal response.)

11              THE COURT:  All right.  Counsel ready to proceed?

12              MR. KANOVITZ:  We are.

13              MR. McLANDRICH:  Yes, sir.

14              THE COURT:  All right.  Next witness.

15              MR. KANOVITZ:  Your Honor, at this time plaintiffs

16      call Detective Moore.

17          MATTHEW SCOTT MOORE, PLAINTIFF'S WITNESS, SWORN

18              THE COURT:  Detective, you've heard -- you've heard

19      the problem we have here in the courtroom sometimes about able

20      to be hearing -- ability to hear a witness.  So please try to

21      keep your voice up so that we can all -- we can all hear your

22      responses, all right?

23              THE WITNESS:  Yes, sir.

24              THE COURT:  All right.  You may inquire.

25                        CROSS-EXAMINATION
```

 1    BY MR. KANOVITZ:

 2    **Q.**    Morning.

 3           Please state and spell your name for the record.

 4    **A.**    My name is Matthew Scott Moore, M-A-T-T-H-E-W

 5    S-C-O-T-T  M-O-O-R-E.

 6    **Q.**    And you go by Scott, correct?

 7    **A.**    That's correct, sir.

 8    **Q.**    And you are a former employee of the Miami Township

 9    Police Department?

10    **A.**    That's correct, sir.

11    **Q.**    What were your dates of employment?

12    **A.**    I don't remember the exact dates.  I know that I was

13    hired in mid 1985, and I left the department, I believe, in

14    mid 2012.

15    **Q.**    And your father was the chief of police of that

16    department, correct?

17    **A.**    At one point he had been, yes, sir.

18    **Q.**    He was chief of police when you came on, correct?

19    **A.**    I believe so, yes.

20    **Q.**    And in November of 1989, you were promoted from patrol to

21    detective, correct?

22    **A.**    Yes, early November.

23    **Q.**    Okay.  And how old would you have been at that time?

24    **A.**    I at this point have no idea.

25    **Q.**    Well, what year were you born?

MOORE - CROSS (Kanovitz)                                    572

1    A.    1959.

2    Q.    And, let's see, in January of '95, you were reduced in

3    rank back to patrol, correct?

4           MR. McLANDRICH:  Objection.  So detective is not a

5    promotion; it's a duty assignment.  Returning to patrol is not

6    a demotion.

7           THE COURT:  Rephrase.

8    BY MR. KANOVITZ:

9    Q.    Sir, immediately prior to January 1995, you had the rank

10   of corporal, did you not?

11   A.    Yes.

12   Q.    And corporal is a higher rank than patrolman, correct?

13   A.    Yes.

14   Q.    And then in January of 1995, you were reduced back to

15   patrolman, correct?

16   A.    Well, exactly not the way that you are wording.  It

17   actually was a choice.

18   Q.    Okay.  So you chose to reduce your rank back to

19   patrolman?

20   A.    Yes.

21   Q.    So you served as a detective for approximately how many

22   years?

23   A.    Probably about 23 to 24 years out of my career of 27

24   years.

25   Q.    And when you were pursuing the Best Products case, you

1    were a fresh, new detective, correct?

2    **A.**   I believe I had been -- I had been on the department at

3    that time for about five years, and I had been in the

4    detective section about a year and three months.

5    **Q.**   Well, sir --

6    **A.**   I think that's the period of time.

7    **Q.**   Let me see if I can refresh your recollection.  So you

8    become a detective -- you get transferred to being a detective

9    in November of 1989, right?

10   **A.**   Yes.

11   **Q.**   And you start to be assigned to the rape investigations

12   in spring or early summer of 1990, correct?

13   **A.**   So the question is, is that you are asking when I got

14   involved with this case?

15   **Q.**   I am just trying to figure out -- isn't it true, sir,

16   that you had been a detective for about six or seven months at

17   the time that you became involved?

18   **A.**   Yeah, about six, probably a little over.

19   **Q.**   And you became the detective that drove the prosecution

20   against Mr. Gillispie?

21              MR. McLANDRICH:  Objection.

22              THE WITNESS:  I --

23              THE COURT:  Well --

24              MR. McLANDRICH:  Just the characterization.

25              THE COURT:  Just use a different term than "drove."

MOORE - CROSS (Kanovitz)                                    574

1   BY MR. KANOVITZ:

2   **Q.**   Okay.  You are the detective who participated in the

3   prosecution of Mr. Gillispie on behalf of the Miami Township

4   Police Department, correct?

5   **A.**   I'm the detective that conducted the investigation on

6   Roger.

7   **Q.**   And is it also true that you worked with the prosecutors?

8   **A.**   That would be true.

9   **Q.**   Sir, you just called him Roger.  Why did you call him

10  Roger?

11  **A.**   Because his name is Roger Dean Gillispie.

12  **Q.**   Well, you have sat through this whole trial, haven't you?

13  **A.**   I have been in this trial.

14  **Q.**   And you know that he likes to go by the name Dean, right?

15  **A.**   I know that he goes by the name Dean with his friends.

16  **Q.**   Well, but, basically, we didn't hear from a single person

17  who didn't know him as Dean, correct?

18  **A.**   Well, I think everybody that has testified thus far

19  were people that were on your side of the testimony.

20         THE COURT:  Counsel, I think it's evident that he

21  likes to go by Dean, and the witness has answered the reason

22  he called him Roger is because that's his name.  So let's move

23  on.

24         MR. KANOVITZ:  Okay.

25  BY MR. KANOVITZ:

1   Q.   And when you were assisting in -- when you were doing the

2   investigation and assisting in the prosecution of

3   Mr. Gillispie, you believed in your heart that Mr. Gillispie

4   was the perpetrator of the rapes you were investigating,

5   correct?

6   A.   I didn't know whether he was going to end up being the

7   suspect or not at that time, or I'm not sure that's the

8   right term, but I didn't know that that would end up

9   occurring up until that point where we get that first

10  identification.

11  Q.   Okay.  Following the identifications, you went to the

12  prosecutors, and you said, words to the effect, "I'd like to

13  start a prosecution against Mr. Gillispie," correct?

14  A.   That would be false.

15  Q.   Well, did you not meet with the prosecutors for purposes

16  of getting charges against Mr. Gillispie?

17  A.   That is -- that is later on.  I started the

18  investigation.  We went through the process.  I got to a

19  point in my investigation where we were ready to talk with

20  the prosecutor's office to see if we could get charges

21  through the Montgomery County Prosecutor's Office because

22  they are the ones that make the choice as to what charge

23  needs to be filed.

24  Q.   So there came a time where you went to the prosecutor's

25  office to seek charges against Mr. Gillispie, correct?

1    **A.**    Yes, that time did come.

2    **Q.**    And when that time came, you believed in your heart that

3    Mr. Gillispie was the perpetrator of the rapes you were

4    investigating?

5    **A.**    At that point, I would have believed that he was the

6    perpetrator of these offenses, yes.

7    **Q.**    Whatever -- did?

8    **A.**    Did.

9    **Q.**    And you believed in your heart that the victims had

10   correctly identified Dean as the perpetrator?

11   **A.**    Yes, I did.

12   **Q.**    And the actions that you took in the investigation were

13   motivated by that belief?

14   **A.**    That's true.

15   **Q.**    And the decisions that you made in the investigation were

16   motivated by that belief?

17   **A.**    Yes, sir.

18   **Q.**    And you continued to believe in your heart that Dean was

19   guilty right up until the trial of this case began?

20          MR. McLANDRICH:  Objection, Your Honor.  His

21   personal belief is irrelevant.

22          THE COURT:  Well, I'll allow him to answer.

23          THE WITNESS:  I did believe that he is -- he is the

24   person that committed these crimes, yes.

25   BY MR. KANOVITZ:

MOORE - CROSS (Kanovitz)                                    577

1    Q.    And --

2    A.    And I said did, and I actually do.

3    Q.    And that's my question, sir.  Having sat through the

4    trial and seeing all the evidence we've seen so far, you still

5    assert that Mr. Gillispie is guilty, right?

6    A.    Yes, sir.

7    Q.    Now, let's talk about your involvement in the case.

8    There came a time where you assumed responsibility for the

9    B.W. and C.W. investigation, correct?

10   A.    Yes, sir.

11   Q.    And sometimes that's called the Best Products

12   investigation?

13   A.    Yes, sir.

14   Q.    And I believe we established at that time you had been a

15   detective for about six or seven months?

16   A.    Yes, sir.

17   Q.    And it's fair to say that this rape case was the biggest

18   case you had had thus far as a detective?

19   A.    I don't remember whether that's the case or not.

20   Q.    Well, it was the most serious case you had handled to

21   date.

22   A.    I don't remember all the cases that I handled back

23   then.

24   Q.    Okay.  Sir, would it refresh your recollection to see

25   your deposition that you gave in November of 2018, November

MOORE - CROSS (Kanovitz)                                578

1    6th of 2018?

2    **A.**   I would imagine that it would, yes, sir.

3            MR. KANOVITZ:  Could we display -- actually, I'll

4    just read it.

5    BY MR. KANOVITZ:

6    **Q.**   Were you asked these questions, and did you give these

7    answers:

8            "Can you think of a more serious investigation" -- this

9    is page 47, line 19, through page 48, line 2.

10           "Can you think of a more serious investigation that you

11   worked on as a detective in the Miami Township Police

12   Department before the Best Products rape investigation?"

13           And then there is an objection.  Your counsel says, "Go

14   ahead and answer."

15           And you said, "I don't -- I can't right offhand remember,

16   no."

17   **A.**   I can't what?

18   **Q.**   "Right offhand remember, no."

19   **A.**   That is a possibility, yes.  I don't independently

20   remember that.

21   **Q.**   Okay.  Sitting here today, you can't think of a bigger

22   case that you had worked on in your six or seven months as

23   detective when you got assigned the Best Products rape case,

24   correct?

25   **A.**   Based on what the deposition is saying there, yes.

MOORE - CROSS (Kanovitz)                          579

1   **Q.**   And the Best Products rape case was one of those cases

2   that the department gets that receives media attention, right?

3   **A.**   I believe that it had.

4   **Q.**   And it continued to, did it not?

5   **A.**   Throughout the years, yes.

6   **Q.**   And you received the case because Detective Fritz was

7   leaving the department, right?

8   **A.**   I did what?

9   **Q.**   You received the case because Detective Fritz was leaving

10  the department?

11  **A.**   Yes, sir.  June 15th.

12  **Q.**   And Fritz had been the custodian of the file before you?

13  **A.**   Yes, sir.

14  **Q.**   And Fritz was a seasoned detective at that point in time,

15  correct?

16  **A.**   Yes.

17  **Q.**   Far more experience than you had at that time?

18  **A.**   Yes.

19  **Q.**   And he was your supervisor?

20  **A.**   Yes.

21  **Q.**   Did you look up to Fritz?

22  **A.**   Did I what?

23  **Q.**   Did you look up to him?

24  **A.**   I would say that initially, yes, I did.

25  **Q.**   You found him to be a very able detective?

MOORE - CROSS (Kanovitz)                                    580

1    **A.**   I actually felt that he was an able detective.  And

2    when I went back to the detective section, I actually wanted

3    to learn under him.

4    **Q.**   And you saw him to be a person of integrity?

5    **A.**   I did, but you also hear other things throughout the

6    department, yes.

7    **Q.**   Well, I --

8    **A.**   My personal feeling was yes.

9    **Q.**   And I don't want to talk about rumors, okay?

10   **A.**   Yes.

11   **Q.**   I want to talk about you.

12       And you do believe him to be an honest person, do you

13   not?

14   **A.**   Then?  Yes.

15   **Q.**   Now.

16   **A.**   Now, I'm not so sure.

17   **Q.**   Okay.  You said you don't really know one way or the

18   other if he's an honest person?

19   **A.**   I actually have lost touch with him, and I have no idea

20   how he is now.

21   **Q.**   Okay.  So you have no basis to have any opinion about

22   whether he is truthful or not, correct?

23   **A.**   No.

24   **Q.**   And what about Detective Bailey, did you look up to him?

25   **A.**   He was a good guy.

MOORE - CROSS (Kanovitz)                                           581

1    **Q.**   And he was far more seasoned than you at that time?

2    **A.**   Yes.  He had been in the detective section before me.

3    **Q.**   But for quite a while, correct?

4    **A.**   I'm not sure how long he had been in there.

5    **Q.**   Okay.  And you found him to be a truthful person too,

6    correct?

7    **A.**   For the most part.

8    **Q.**   And you still consider him to be a truthful person?

9    **A.**   I have no idea how he is now.

10   **Q.**   Okay.  So --

11   **A.**   There is so much time in between.  I don't know how

12   these -- how their lives progressed, I don't know what goes

13   on in their lives.  So I can't tell you whether someone is

14   truthful or not.

15   **Q.**   So you have no basis from which to conclude whether

16   Detective Bailey is a truthful person or not a truthful

17   person, correct?

18   **A.**   That would be a true statement.

19   **Q.**   Okay, sir.  We're turning to June of 1990, approximately

20   when you took over the case from Fritz.

21        You received the complete file at the time you were

22   assigned the case, correct?

23   **A.**   I received a file from Detective Steve Fritz.

24   **Q.**   You received the complete file, correct?

25   **A.**   I received the file that he provided to me, yes.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - CROSS (Kanovitz)                                    582

1   **Q.**   And that file was the complete file of the documents that

2   the MTPD had, correct?

3   **A.**   That is the file that he provided.

4   **Q.**   Please focus on my question, sir.  That file was the

5   complete file of the documents that the MTPD had?

6   **A.**   I guess so, yes.  I mean, I received a file.

7   **Q.**   Do you endorse the proposition that that file was the

8   complete file that the MTPD had?

9          MR. McLANDRICH:  Objection; asked and answered.

10          THE COURT:  Counsel, he basically says he received a

11   file.  He doesn't know whether it was complete or not.

12          MR. KANOVITZ:  Okay.  Understood, Judge.

13   BY MR. KANOVITZ:

14   **Q.**   Okay, sir.  Do you recall testifying at the second trial

15   against Mr. Gillispie?

16   **A.**   I know that I testified at that trial.  I can't tell

17   you what all the testimony was of everybody there or myself.

18          MR. KANOVITZ:  And, counsel, this will be PX9 at

19   270, 16-22.

20   BY MR. KANOVITZ:

21   **Q.**   You were under oath when you testified against

22   Mr. Gillispie at the second trial, correct?

23   **A.**   Yes, sir.

24   **Q.**   And were you asked these questions and did you give these

25   answers --

1           MR. McLANDRICH:  I'm sorry.  What page are you on?

2           MR. KANOVITZ:  270 -- the transcript page 270.  It's

3    PX9, page 15.

4           MR. McLANDRICH:  Give me a second to get there.

5           MR. KANOVITZ:  Yes, sir.

6           MR. McLANDRICH:  Go ahead.

7    BY MR. KANOVITZ:

8    Q.   Were you asked these questions under oath and did you

9    give these answers:

10          "Question:  Did you have the complete file turned over to

11   you at that time?"

12          "Answer:  Yes, sir, I did."

13          "Question:  Did you take any steps to review it?  Had you

14   taken any steps to review it between June 15th and June 18th?"

15          "Answer:  Yes, I had."

16          So it is fair to say that you had the complete file --

17   you received the complete file at the time that you were

18   assigned the Best Products case, correct?

19   A.   Yes, sir.

20   Q.   And that file included the work that Detective Fritz and

21   Detective Bailey had done up until that time, correct?

22   A.   Yes, sir.

23   Q.   And you started your investigation where Fritz and Bailey

24   left off, correct?

25   A.   Yes, sir.

MOORE - CROSS (Kanovitz)                                    584

1    **Q.**   And switching topics, would you agree that whoever

2    committed the Best Products rape case was a serial rapist?

3    **A.**   I don't remember whether I ever looked at it as being a

4    serial rapist.

5    **Q.**   Well, you had at least two rape events, correct?

6    **A.**   Yeah, and then -- yes.

7    **Q.**   And that person was a kidnapper, correct?

8    **A.**   Yes.

9    **Q.**   And that was a person who abducts women in broad

10   daylight?

11   **A.**   Well, you can abduct a person whether it be daylight or

12   night, but, yes, in this case it was daylight.

13   **Q.**   Well, if you abduct someone in daylight, it's arguably a

14   more brazen crime than if you wait until there is no one

15   around at night, correct?

16   **A.**   Everything can be argued.

17   **Q.**   All right.  Whoever committed this was a very dangerous

18   man.  Yes?

19   **A.**   I felt that, yes.  I mean, you're talking rape,

20   kidnapping, robbery.

21   **Q.**   And when you were pursuing Dean for this -- for these

22   crimes, you believed that the man who committed those crimes

23   was still at large?

24   **A.**   Repeat that question.

25   **Q.**   When you were pursuing your investigation against Dean,

MOORE - CROSS (Kanovitz)                                    585

1    you believed that the man who committed those rapes was still

2    at large?

3    A.   I can't recall what my belief at that time was now.  I

4    mean, we're talking 30 years later.  I don't know what my

5    belief was, and I may not even be understanding your

6    question.

7    Q.   Fair enough.  You believe Dean committed the rapes,

8    correct?

9    A.   That would be correct.

10   Q.   And you did not have Dean in custody?

11   A.   I did not.

12   Q.   So isn't it true that you believed that the man who

13   committed these rapes was still at large?

14   A.   I didn't know one way or another.

15   Q.   Well, if --

16   A.   I was -- I was looking at Dean, or Roger, as being the

17   suspect at that time based on some information that we had

18   received at the police department.

19   Q.   And, therefore, you believed that the person that did

20   those rapes was not yet in custody, correct?

21   A.   I did not have him in custody.

22   Q.   Okay.  And if the person who committed the rapes was not

23   in custody, then the women of your community are still at

24   risk?

25   A.   That would be correct.

MOORE - CROSS (Kanovitz)                                    586

1    **Q.**   And as a person who's investigating a rape case, wouldn't

2    it be prudent to check to see if similar crimes had been

3    committed in the last two years?

4    **A.**   Well, we actually did have another offense that had

5    occurred within that period of time.

6    **Q.**   Well, you are referring to the S.C. rape case, right?

7    **A.**   Yes.

8    **Q.**   And that was August 5th of '88?

9    **A.**   That's correct.

10   **Q.**   And the Best Products rape case was August 20th of '88?

11   **A.**   And that's correct.

12   **Q.**   And my question to you is, in the two years between

13   August 20 of '88 and when you became assigned to the file,

14   that's a period of time where the person that you believed did

15   it is at large and could have committed other similar rapes,

16   right?

17   **A.**   There could have been, but I don't remember ever seeing

18   anything come across concerning that.

19   **Q.**   Well, my question to you is, did you look?

20   **A.**   No.

21   **Q.**   And that would have been a prudent thing to do, right?

22   **A.**   I -- if you are trying to guess about that, yes.

23   **Q.**   Well, I mean, investigators are in the business of not

24   guessing, right?

25   **A.**   Well, I think as an investigator, you have to try to

MOORE - CROSS (Kanovitz)                                    587

1    guess at what direction you are going to end up going with

2    something or a piece of information --

3    Q.   Well, is an investigator --

4    A.   -- or how something is going to be applied.

5    Q.   Sorry for cutting you off.

6         As an investigator, you have tools at your disposal so

7    that you can look into the facts, right?

8    A.   What tools are you talking about?

9    Q.   For example, you can go out and look and see if there is

10   similar crimes that have been committed in the last two years.

11   A.   Well, I guess you could.  I am not sure exactly how you

12   would end up doing that.  I know that we would receive

13   teletypes that were put out by other departments.  So you

14   would review the teletypes, and if something happened to

15   come across at that time, yes, you would probably look at

16   that.

17   Q.   And you could call other police departments in the area,

18   right?

19   A.   You could.

20   Q.   In fact, you could have called the Montgomery Sheriff's

21   Department that had the S.C. rape case, correct?

22   A.   I actually had talked with Patty Matheny at Montgomery

23   County Sheriff's Office about that rape case.

24   Q.   And did you ask if there had been any similar crimes

25   committed in the last two years?

MOORE - CROSS (Kanovitz)                                            588

1   **A.**   No, because at that point I was looking at her -- the

2   case that she presently had.

3   **Q.**   There was nothing preventing you from finding out if the

4   person that was at --

5            MR. KANOVITZ:  Actually, I'll move on, Judge.

6   BY MR. KANOVITZ:

7   **Q.**   Okay.  At any rate, from the time that you started your

8   investigation, the sole suspect that you had was Dean,

9   correct?

10  **A.**   That would be a true statement.

11  **Q.**   And you had his work ID from Mr. Wolfe?

12  **A.**   Yes, I did.

13  **Q.**   And you had the composite also that Mr. Wolfe brought

14  you, correct?

15  **A.**   He had brought it in, yes.

16  **Q.**   Okay.  And the composite that you had was the one with

17  the sunglasses?

18  **A.**   Yes.

19  **Q.**   Okay.  And the work ID --

20           MR. KANOVITZ:  Actually, Your Honor, could we

21  display Plaintiff's 285, page 9, which should be the work ID?

22           THE COURT:  That's already been?

23           MR. McLANDRICH:  Yes.

24           THE COURT:  No objection?

25           MR. McLANDRICH:  No.

MOORE - CROSS (Kanovitz)                                    589

```
 1              THE COURT:  It may.
 2              MR. KANOVITZ:  May I confer?
 3         Go ahead and display it.
 4         (Exhibit displayed.)
 5  BY MR. KANOVITZ:
 6  Q.    And this is the ID that you had?
 7  A.    Yes.
 8  Q.    And this picture of the whole ID has pretty good detail
 9  of Dean's hair, right?
10  A.    I can see his hair, yes.
11  Q.    It's dark?
12  A.    It is.
13  Q.    And you see that he's graying at the temples?
14  A.    I -- I see that there is some lightness around that
15  area, yes.
16  Q.    Okay.  And you --
17  A.    I mean, it could be lighting.  I don't know.
18  Q.    Well, you've seen -- you've lived long enough to see
19  people go gray?
20  A.    Actually, I did at a very young age.
21  Q.    And people go gray around the temples in the way that
22  this picture appears, correct?
23  A.    I do see some lightness around the temple area, yes.
24  Q.    Okay.  And this picture was taken in January of 1989,
25  correct?
```

MOORE - CROSS (Kanovitz)                                    590

1    **A.**    January 27, 1989.

2    **Q.**    Okay.

3           MR. KANOVITZ:  Your Honor, could we now display

4    Plaintiff's 247, which is the composite?

5           THE COURT:  Any objection?

6           MR. McLANDRICH:  No, sir.

7           THE COURT:  Okay.  It may be.

8           MR. KANOVITZ:  Thank you.

9       (Exhibit displayed.)

10          MR. KANOVITZ:  Zoom in on the face, please.

11   BY MR. KANOVITZ:

12   **Q.**    You also had this composite, correct?

13   **A.**    Correct.

14   **Q.**    And so you developed Dean as your suspect by comparing

15   the work ID that we just saw to this composite, correct?

16   **A.**    I felt that there were some similarities.

17   **Q.**    Actually, you felt that Dean was a very good match based

18   upon looking at the ID and the composite, correct?

19   **A.**    I just said I felt there were some similarities, yes.

20   **Q.**    Well, I mean, you felt there was very strongly similar,

21   right?

22   **A.**    Those are the words that you're using.  I don't

23   remember using them.  I mean, but right now, as far as I

24   know, it was -- they were very similar at the time.

25   **Q.**    Now, composites are in black and white, correct?

MOORE - CROSS (Kanovitz)                              591

1   **A.**   Yes, they are.

2   **Q.**   So you could not see -- so -- but you also had

3   descriptions of the perpetrator's hair color, correct?

4   **A.**   Yes, the -- B.W. and C.W. had provided descriptions.

5   **Q.**   Well, and S.C., right?

6   **A.**   And S.C.

7   **Q.**   And S.C. had said that the man that did this to her had

8   light blondish hair, correct?

9   **A.**   I believe so.

10  **Q.**   And it's fair --

11         MR. KANOVITZ:  Can I have PX85 at 9.  I am sorry.

12  285.

13       (Exhibit displayed.)

14  BY MR. KANOVITZ:

15  **Q.**   It's fair to say that Dean did not have light blondish

16  hair, correct?

17  **A.**   That's correct.

18  **Q.**   His was dark brown?

19  **A.**   His hair is brown.

20  **Q.**   Dark brown?

21  **A.**   Okay, if you want to use the term "dark brown."

22  **Q.**   Now, B.W. said that the man that attacked her had

23  orangish-brown hair, right?

24  **A.**   I think so, yes.

25  **Q.**   And C.W. actually said that he had red hair with a brown

1    tint?

2              MR. McLANDRICH:  I think it's the opposite.

3              MR. KANOVITZ:  I don't think I do.

4              THE WITNESS:  I believe that -- I know it was a

5    reddish tint, brown hair that she had said, yeah.

6    BY MR. KANOVITZ:

7    Q.   Actually --

8    A.   I don't know what the exact words are.  We are dealing

9    30 years now, and I don't remember the exact words.

10   Q.   Isn't it true that C.W. said he had brownish-red hair?

11   A.   Yes.

12   Q.   And those were the descriptions that the three women gave

13   back in August of 1988?

14   A.   Yes.

15   Q.   Two years before you got involved in the case?

16   A.   Yes.

17   Q.   And Dean did not -- Dean had physical characteristics

18   that contradicted that description?

19   A.   Based on what you are showing at this point, yes.

20   Q.   Well, and you had no reason to believe that Dean looked

21   any different in August of 1988, did you?

22   A.   Not -- not at that point, no.

23   Q.   Not at any point, right?

24   A.   Well, we would be jumping way ahead because there --

25   I'm not sure how to approach this, and I'm not sure if we

MOORE - CROSS (Kanovitz)                                    593

1    are going to be getting way out of where we need to be at

2    the time.

3              THE COURT:  What's the question?

4              MR. KANOVITZ:  I apologize.  Could I have it read

5    back, Judge?

6              THE COURT:  Yes.

7              MR. KANOVITZ:  Thank you.

8         (The requested portion of the record was read as follows:

9    Well, and you had no reason to believe that Dean looked any

10   different in August of 1988, did you?)

11             THE WITNESS:  I had no reason to believe that he

12   looked any different in 1988, that would be correct.

13   BY MR. KANOVITZ:

14   Q.   So the whole year of 1988?

15   A.   I didn't see him throughout all of '88, but based on

16   what we're looking at, if it remained the same, yes.

17   Q.   Okay.  And did you do any investigation at all to see if

18   it remained the same throughout 1988?

19   A.   No.

20   Q.   So you had no reason to believe that Dean looked any

21   different than his ID picture in August of 1988, correct?

22   A.   I think that I had said that, yes.

23   Q.   Now, you kept Dean as your suspect despite the difference

24   in the hair color?

25   A.   Yes.

MOORE - CROSS (Kanovitz)                                       594

1   **Q.**   And is it the case that you did not trust the description

2   that the victims had given at the time of the events in

3   question?

4   **A.**   I don't know that I was thinking that or not.  I don't

5   remember that.

6   **Q.**   So when you decided that you believe in your heart --

7           MR. KANOVITZ:  May I strike that, Judge?

8           THE COURT:  You may.

9   BY MR. KANOVITZ:

10  **Q.**   At a certain point in time, you had to focus on pursuing

11  your case against Dean solely, correct?

12  **A.**   I did pursue the case against Gillispie.

13  **Q.**   And at that time, did you believe that the victims'

14  description that they had given at the time of the events in

15  question was accurate?

16  **A.**   I believe so.

17  **Q.**   Okay.  And why --

18  **A.**   I had their statements.  So I knew what they had put in

19  their statements.

20  **Q.**   So if their description at that time -- if you believe

21  their description at the time of the events in question was

22  accurate, why did you continue to pursue a case against Dean?

23  **A.**   Well, you know, as far as giving a description at the

24  time, people tend to see things in different lighting.  And

25  hair colors, depending on your lighting at the time, could

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - CROSS (Kanovitz)                                          595

1    be -- if you are in bright sun, could look a little bit

2    different than if you are in low light.

3    Q.    Okay.  Let's break that down.  First of all, S.C. saw the

4    man in the parking lot during daylight hours, correct?

5    A.    Correct.

6    Q.    And in her car during daylight hours, correct?

7    A.    Yes.

8    Q.    Okay.  So she had both the complete sunlight condition

9    and the level of light that you have when you are sitting in

10   your car?

11   A.    Yes.

12   Q.    And she described that man as light blondish, correct?

13   A.    Yes.

14   Q.    And C.W. -- or B.W. and C.W. also saw the man in the

15   parking lot lighting condition, right?

16   A.    Yes.

17   Q.    Also saw him in a car?

18   A.    Yes.

19   Q.    And also saw him in the woods, and this all occurred in

20   daylight, correct?

21   A.    Yes.

22   Q.    So returning to my question, why did you keep Dean as

23   your suspect if their descriptions contradicted his physical

24   characteristics?

25   A.    I really -- the answer is, at that particular point, I

MOORE - CROSS (Kanovitz)                                    596

1    had a description.  As to whether that description is

2    totally accurate, you don't know.

3    **Q.**    Okay.  So you had a question in your mind as to whether

4    the witnesses had accurately described the person that did

5    this to them at the time of the events in question?

6    **A.**    I guess that would be an accurate statement.

7    **Q.**    What did you do to look into the question of whether

8    their descriptions were accurate?

9    **A.**    I took their descriptions on face value of what they

10   had provided in their written statements at the time.  I had

11   no reason to doubt what they said at that time.  But I also

12   know that in previous cases and in cases throughout the

13   years, that depending on the circumstances at the time, that

14   people can see things a little differently.  And there's a

15   lot of factors of that, and one of those is that we were

16   talking about different lighting conditions.

17        So it's -- it's also like with age.  People, when they

18   give us descriptions, they are just guessing as to -- or

19   what an age range is.  They are looking at the hair.  They

20   are guessing as to about a range of how tall somebody might

21   be.  It's not that they are trying to get -- they try to get

22   it as close as they can, but without having something there

23   to measure height to or something like that, you really

24   can't tell the actual height of an individual unless you

25   actually know it.

MOORE - CROSS (Kanovitz)                                    597

1    Q.   So fast forwarding, when you showed the photo lineup to

2    S.C., were you concerned that she could misperceive dark brown

3    hair as light blondish?

4              MR. McLANDRICH:  Objection, Your Honor.

5              THE COURT:  You can answer it if you can.

6              THE WITNESS:  I don't know what her perception would

7    be.  You are asking me to guess what someone else's perception

8    is at the time.

9    BY MR. KANOVITZ:

10   Q.   Prior to showing her the photo array of Mr. Gillispie

11   back when he had dark brown hair, did you ask her, "What do

12   you mean by light blondish hair?"

13   A.   No.

14   Q.   It's same for C.W. and B.W.; did you ask them those

15   questions?

16   A.   No.  They had already provided statements concerning

17   what description they gave at that time.

18   Q.   And you were about to show them a picture of a man that

19   had different physical characteristics, correct?

20   A.   Well, we're talking about one different physical

21   characteristic.

22   Q.   And if it's a significant characteristic, that excludes

23   him, correct?

24   A.   I --

25              MR. McLANDRICH:  Objection.

1              THE WITNESS:  -- would not necessarily say that.

2              THE COURT:  He gave his answer.

3         Overruled.

4    BY MR. KANOVITZ:

5    Q.   Another characteristic that stood out to the three women

6    at the time of the event in question was that the man was

7    white tan, correct?

8    A.   That would be a true statement.

9    Q.   And you had -- before you ever went to the prosecutor to

10   prosecute Dean, you met him in person, right?

11   A.   Yes.

12   Q.   And he was not a tan person, was he?

13   A.   I don't remember back then.

14   Q.   Okay.

15   A.   I don't remember back then whether he had a tan at that

16   point or not.

17   Q.   If he had a characteristic that matched the physical

18   description that your -- the physical description that the

19   women had given at the time of the events in question, you

20   would have noted that in your report, correct?

21   A.   I don't know that I ever even paid attention to that.

22   I was more interested in talking with Dean.

23   Q.   Okay.  So when you had the opportunity to talk to Dean,

24   you asked him questions about --

25              MR. KANOVITZ:  Actually, may I withdraw that, Judge?

MOORE - CROSS (Kanovitz)                                    599

```
1              THE COURT:  You may.
2    BY MR. KANOVITZ:
3    Q.   At the time that you met with him, you were looking to
4    prove your case against him, right?
5    A.   I was looking at a lot of different things to either
6    prove or disprove the case against him.
7    Q.   Okay.  And if he had a tan like the women described, that
8    would have helped you prove the case against him?
9    A.   Well, not necessarily.  I mean, at that particular
10   point, you don't know what changes were between 1988 and
11   1990.  I can't tell you whether he was out in the sun in
12   1988 versus 1990.
13   Q.   Okay.  Well, this was August of 1990, correct?
14   A.   I -- yeah.
15   Q.   And the events in question occurred in August of 1988 --
16   I'm sorry.  Yes, 1988.
17   A.   The what?  The incidents?
18   Q.   Yes, the incidents.
19   A.   The incidents occurred on August 5th and August 20th of
20   1988.
21   Q.   Okay.  Now, switching topics, another common feature
22   between the two rape events was the involvement of cigarettes,
23   correct?
24   A.   Yes.
25   Q.   S.C. reported that the man smoked a cigarette in her car,
```

1    correct?

2    **A.**    Yes.

3    **Q.**    And she actually named a brand, correct?

4    **A.**    I believe so.

5    **Q.**    She said, "smoked cigarettes, possibly Winston's"?

6    **A.**    Yes.

7    **Q.**    And then B.W. and C.W. said that the man stole their pack

8    of cigarettes and a lighter from them, correct?

9    **A.**    Yes.  And there was another thing that they had stated

10   at that time.

11   **Q.**    Well, is it relevant to the cigarettes?

12   **A.**    Yes.  And that statement was, is that he had asked for

13   a cigarette, but they never did smell smoke.

14   **Q.**    Right.  When he was walking them through the woods, he

15   asked for a cigarette, and he asked her to light it?

16   **A.**    I don't remember that part.  I do remember that he had

17   asked for a cigarette, and they never did smell smoke.

18   **Q.**    And she wasn't sure if she was able to light it or not

19   and didn't remember smelling smoke, right?

20   **A.**    That's correct.

21   **Q.**    Okay.

22   **A.**    I don't remember the lighter specifically, but, yes.

23   **Q.**    Okay.  So the man both asked for a cigarette and stole a

24   pack of cigarettes, correct?

25   **A.**    That would be correct.

1   **Q.**   Okay.  And you knew that Dean was a nonsmoker?

2   **A.**   Actually, I don't know whether I knew that at the time

3   or not.  I know that throughout time there was testimony

4   concerning that matter.

5   **Q.**   Well, let's rewind back to before you went to the

6   prosecutor and sought charges.

7   **A.**   I actually -- well, I had asked him questions about

8   being a smoker, and he had told me no.

9   **Q.**   And you asked him questions about being a smoker because

10  you believed that was an important feature for whether you

11  were going to prove a crime against him or exonerate him,

12  correct?

13  **A.**   Yes.

14  **Q.**   And, now, another feature that led you to pursue your

15  case against Dean was the fact that the man who committed

16  these crimes used the name Roger, correct?

17  **A.**   Yes.

18  **Q.**   And in this case, S.C. actually asked him his name,

19  right?

20  **A.**   I don't remember that specifically.  I do know that she

21  stated that she had the name of Roger.

22  **Q.**   Would it refresh your recollection to see the report?

23  **A.**   Sure.

24          MR. KANOVITZ:  Your Honor, could plaintiff's display

25  Plaintiff's Exhibit 138 at page 4?

1              THE COURT:  You are talking about refreshing

2    recollection here, right?

3              MR. KANOVITZ:  Yes.

4              THE COURT:  Is there any objection to displaying

5    what he wishes to display?  Otherwise, he needs to be shown

6    it, let him read it, and then he will tell you whether or not

7    it refreshes it.

8              MR. KANOVITZ:  That would be fine, Judge.

9              THE COURT:  It doesn't make any difference to me.  I

10   just want to make sure counsel is okay with it.

11             MR. McLANDRICH:  What was the number again?

12             MR. KANOVITZ:  138, page 4.

13             MR. McLANDRICH:  My computer is slow today.  I

14   apologize.

15        That's fine.  No objection.

16             THE COURT:  It may be.

17             MR. KANOVITZ:  Thank you.

18        (Exhibit displayed.)

19             MR. KANOVITZ:  Could you enlarge the second full

20   paragraph, please.  One down.

21   BY MR. KANOVITZ:

22   **Q**.   Okay.  I'll just read this.

23        "The complainant continued to say that while the suspect

24   was in her vehicle she asked his name and he told her it was

25   Roger.  He further stated that he wanted her to take him to

MOORE - CROSS (Kanovitz)                                    603

1    Columbus, and then said something about a security guard, and

2    then said something about his childhood," correct?

3    A.   Yes, sir.

4    Q.   So does that refresh your recollection that she asked him

5    his name, and he gave her the name Roger?

6    A.   Yes, sir.

7    Q.   And would you agree with me that it's pretty common for

8    criminals to use fake names?

9    A.   I would agree with that.

10   Q.   Okay.  And, nevertheless, you operated under the

11   assumption that the criminal was actually giving his real name

12   and that his real name was Roger Dean Gillispie?

13   A.   I don't know that I was operating under the assumption.

14   I felt that it was odd that you end up having somebody

15   brought to your attention that has the name of Roger and

16   that the name of Roger is being used by the suspect in the

17   case.

18   Q.   So did you assume that the person who committed these

19   crimes was giving the victim his real name?

20   A.   Did I assume that?  I didn't know one way or another

21   whether he was giving her the real name.  I don't know what

22   the suspect -- what was in the suspect's mind at that time.

23   I don't know whether the suspect would have slipped up at

24   that time.

25   Q.   So one of your operating hypotheses was that maybe he

MOORE - CROSS (Kanovitz)                                604

1    told her his name by accident; is that correct?

2    **A.**    I'm just saying that that is a possibility.

3    **Q.**    Okay.  Now, the man also gave the name Roger to C.W. and

4    B.W.

5    **A.**    That would be correct.

6    **Q.**    He told it to them in the car while he was giving him --

7    giving them the whole story about his background, right?

8    **A.**    I believe that's where it was at, yes.

9    **Q.**    He told them his name was Roger, that he is from Texas,

10   that he is a hit man, and that he gets paid $1,000 to kill

11   people, correct?

12   **A.**    All of those statements were made.

13   **Q.**    And then, after the whole thing was over and as he was

14   exiting the vehicle, he told them again, he reminded them his

15   name was Roger, correct?

16   **A.**    I believe so.

17   **Q.**    And Roger is a pretty popular name?

18   **A.**    Yeah, I've known a lot of Rogers.

19   **Q.**    And so was it your assumption that your suspect was

20   named -- actually named Roger, or that your suspect was using

21   Roger as a fake name?

22   **A.**    Your -- repeat that question.

23   **Q.**    Was it your assumption that your suspect was actually

24   named Roger or that he was giving Roger as a fake name?

25            MR. McLANDRICH:  Objection; asked and answered.

MOORE - CROSS (Kanovitz)                                        605

1              THE COURT:  I'll let him answer.

2              THE WITNESS:  You are asking about an assumption.  I

3    didn't know one way or another whether he was giving a real

4    name or a fake name.

5              THE COURT:  There you go.

6    BY MR. KANOVITZ:

7    Q.   Part of the job of investigators is to formulate

8    hypotheses and then look into whether they are true or not,

9    correct?

10   A.   And in this case -- yes.

11   Q.   And another feature that caused you to pursue your case

12   against Dean was that the man said he was a security guard,

13   right?

14   A.   And that would be a true statement.

15   Q.   Okay.  And what the man would do is he would approach

16   these women in parking lots after they left the store, right?

17   A.   That's correct.

18   Q.   And he would tell them, "I'm a security guard for the

19   store.  I need to look in your purse," correct?

20   A.   I know he identified himself as security.  I don't

21   remember the specific statements.  It's been 30 years.  I do

22   know that he identified himself to all of the girls as being

23   security.

24   Q.   So maybe you don't remember the specific words, but you

25   remember that his MO was to approach women in a parking lot,

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    claim to be a security guard, and then slip into their cars,

2    correct?

3              THE COURT:  Counsel, I think he answered that.

4              MR. KANOVITZ:  Okay.  I apologize.  I should listen

5    better.

6              THE COURT:  Well, no.  I'm just saying I think he

7    answered that.  He says he remembers that the person

8    represented himself as a security guard in all those

9    instances.

10             MR. KANOVITZ:  Okay.  Thank you.

11   BY MR. KANOVITZ:

12   Q.   You understood that he was using the claim of being a

13   security guard in order to slip into the lady's cars, correct?

14   A.   I know that there were statements made about the fact

15   that he was security, yes.

16   Q.   Okay.  Did you, when you were conducting your

17   investigation, assume that he was claiming to be a security

18   guard because he wanted the women to know what he did for a

19   living or that he was claiming to be a security guard so that

20   he could slip into their cars?

21   A.   I am not going to assume as to why he was doing that.

22   Q.   Well, if both -- so you had no -- you never considered

23   the question of whether he was using security guard -- strike

24   that.

25             You never bothered to consider whether he was

```
1   impersonating a security guard or really was a security guard,

2   correct?

3   A.   I never really what again?

4   Q.   You never considered whether he was impersonating a

5   security guard or was actually a security guard?

6   A.   I'm not sure what I considered then.  I just know that

7   that was one of the descriptors that was given at the times

8   of the offenses.

9   Q.   And the man who claimed to be a security guard did not

10  display any kind of badge to the women, right?

11  A.   I do not believe so.

12  Q.   Did not give them -- show them, here's my security guard

13  ID.  Didn't do that, right?

14  A.   I do not believe that that happened.

15  Q.   And the man was not wearing a uniform of any kind,

16  correct?

17  A.   That would be correct.

18  Q.   So literally anybody could have claimed to be a security

19  guard under those circumstances without having to actually be

20  a security guard, correct?

21  A.   Yes.

22  Q.   Okay.  And so then why -- actually, strike that.

23       Okay.  Switching topics, sir.  It is -- it is true --

24  well, is it the case that you are an employee of the Miami

25  Township Police Department or that you are employed by the
```

MOORE - CROSS (Kanovitz)                                    608

1   government of the Miami Township itself?

2            MR. McLANDRICH:  Objection, Your Honor.

3            THE COURT:  Right now?

4            MR. KANOVITZ:  May I withdraw?

5            THE COURT:  Okay.

6   BY MR. KANOVITZ:

7   Q.  Would you agree with me that in your capacity as a Miami

8   Township Police Department detective you were a government

9   agent?

10           MR. McLANDRICH:  Your Honor, this has all been

11  stipulated to.

12           MR. KANOVITZ:  I'll withdraw.

13           THE COURT:  I think he's already testified, and I

14  think it's been stipulated to, and I think he testified that

15  he was an employee of the Miami Township.

16           MR. McLANDRICH:  We stipulate to color of law.

17           MR. OWENS:  It wasn't in the stipulation.

18           THE COURT:  Were you an employee of Miami Township?

19           THE WITNESS:  I was an employee of Miami Township.

20  BY MR. KANOVITZ:

21  Q.  Okay.  Sir, switching topics, was Miami Township Police

22  Department a busy department?

23  A.  Yes.

24  Q.  And were you busy when you worked there?

25  A.  Very.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    **Q.**    Approximately how many arrests would you make a year?

2    **A.**    I can't tell you --

3              MR. McLANDRICH:  You know, can we have a time frame?

4              THE WITNESS:  I can't tell you.

5              THE COURT:  Hold on.

6              MR. McLANDRICH:  I just wanted a time frame, Your

7    Honor.  Is he talking about as a patrolman? as a detective?

8    What he is talking about?

9    BY MR. KANOVITZ:

10   **Q.**    All right.  In the late 1980s, how many arrests would you

11   make a year?

12   **A.**    I can't give you a number.  I made quite a few.

13   **Q.**    More than a hundred a year?

14   **A.**    I can't give you a number, but it was high.

15   **Q.**    How about what is the -- what's your best estimate of the

16   number of arrests that the Miami Township Police Department

17   would make per year in that time frame?

18   **A.**    I have no idea.

19   **Q.**    More than a hundred, less than a hundred?

20             MR. McLANDRICH:  Objection.

21             THE WITNESS:  Are you talking about the whole

22   department?

23   BY MR. KANOVITZ:

24   **Q.**    Yes, I am.

25             MR. McLANDRICH:  Objection.

MOORE - CROSS (Kanovitz)                                      610

1           THE COURT:  Hold on.  He indicated he had no idea.

2       Do you have any idea about the number of arrests that

3   were made by the Miami Township Police Department?

4           THE WITNESS:  I don't know the exact number, no.  I

5   know that there -- as a whole, for the whole police

6   department, there would have been a lot more than 100.

7   BY MR. KANOVITZ:

8   Q.   Okay.  More than 500?  Per year.

9           MR. McLANDRICH:  Objection; relevance.

10          THE COURT:  Sustained.

11  BY MR. KANOVITZ:

12  Q.   And when people would get arrested, they'd be brought to

13  the station and booked, correct?

14  A.   Yes.

15  Q.   And how many police officers were there -- actually,

16  strike that.

17      How many detectives were there in the Miami Township

18  Police Department in the late 1980s?

19          MR. McLANDRICH:  Objection; relevance.

20          THE COURT:  I am going to let him answer if he

21  knows.

22          THE WITNESS:  I don't know the exact number.  It was

23  not a lot.

24  BY MR. KANOVITZ:

25  Q.   Was it --

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - CROSS (Kanovitz)                                        611

1   **A.**   It would be probably -- I think there was three to four

2   maybe.  I don't remember exactly, though.

3   **Q.**   And did that continue to be the approximate size when you

4   were working on the Best Products rape investigation?

5   **A.**   I believe so.

6   **Q.**   Okay, sir, switching topics.

7        Early on in your investigation, you called Dean on the

8   telephone, right?

9   **A.**   Yes.

10  **Q.**   And when you spoke to him on the phone, he asked why you

11  were trying to contact him, right?

12  **A.**   I believe so, yes.

13  **Q.**   And you told him you didn't really want to talk on the

14  phone about why you were contacting him.  You wanted to meet

15  in person, correct?

16  **A.**   Yes.

17  **Q.**   And that's -- that's a normal investigatory thing to do,

18  correct?

19  **A.**   Yes.

20  **Q.**   And he offered to call you back in a few days to set up

21  an appointment to meet in person, correct?

22  **A.**   Okay.  This is the conversation on June 19th.

23  **Q.**   Actually -- that sounds about right.

24  **A.**   Yeah.  And your question again was?

25  **Q.**   After you said, no, I'd like to meet in person, he

1  offered to call you back and set up an appointment in a couple

2  days?

3  A.   He wanted, I believe it was, in a few days or three

4  days.  He put it off, and then he ends up making a statement

5  to me about him being busy for the next two weeks.  And I

6  was still trying to get him to come to the police

7  department.  And he -- I forget exactly what the statement

8  was back and forth, but he ended up hanging up on me.

9  Q.   Let's break it down.  I want to go step by step in this

10  conversation.

11      After you said, "No, I want to meet in person," he said,

12  "I'll call you back in a couple days to make an appointment,"

13  right?

14  A.   I believe so.

15  Q.   And you said, "No, I want to make an appointment now,"

16  correct?

17  A.   Well, I don't know that I used that inflection in my

18  voice, but, yes.

19  Q.   But that is the information you communicated to him?

20  A.   That would be a true statement.

21  Q.   Okay.  And he said, "I'm busy."

22  A.   He did say that.

23  Q.   And then you threatened him?

24  A.   I never threatened him.  I don't consider it a threat.

25  Q.   Do you recall what you said to him after that?

MOORE - CROSS (Kanovitz)                                    613

1    **A.**   Not exactly.  I have looked over the reports.  I can't

2    remember everything in the reports even after looking at

3    them from 30 years ago.

4    **Q.**   So what you responded to Mr. Gillispie with is you said,

5    "I told him, 'Well, you handle it the way you want, and I will

6    handle this situation in whatever way it takes, but it will

7    get cleared up,'" correct?

8    **A.**   I -- what was said before that, though.

9    **Q.**   "Gillispie stated, 'I will call you in a few days to set

10   up a meeting.'  I then stated, 'Well, let's set it up now.'

11   He said, 'Man, I don't have time.  I'm tied up for the next

12   two weeks.  I'll be busy.'  At this point I told him I wanted

13   to get it set up sooner.  He said -- he stated, 'Well, I'm

14   busy.'  And you said -- 'I told him, Well, you handle it the

15   way you want, and I will handle the situation in whatever way

16   it takes, but it will get cleared up.'"

17   **A.**   Yes.

18   **Q.**   And --

19   **A.**   Again, we're dealing with your inflection in your voice

20   as to trying to make it sound as if it's really strong.

21   **Q.**   Okay.

22   **A.**   I don't know that that occurred.

23   **Q.**   So you think you didn't say what I just read in a strong

24   voice?

25   **A.**   Oh, no, I'm not saying that.  I'm saying --

1          THE COURT:  He's agreed -- he agreed he said what

2      you read in the statement.  He is --

3          Detective, you need to just answer the questions, and

4      then if your counsel wishes to go back and talk about certain

5      answers that you made, you can do that.

6          But he's answered the question.

7          MR. KANOVITZ:  Okay.  Thank you, Judge.

8      BY MR. KANOVITZ:

9      **Q.**   When you said those words, what did you intend for Dean

10     to think?

11     **A.**   I cannot tell you what Dean would think.

12         THE COURT:  The question is what did you intend him

13     to think.

14         THE WITNESS:  That I would get this resolved one way

15     or another.

16         THE COURT:  Next question.

17     BY MR. KANOVITZ:

18     **Q.**   Would you agree that it would have been unprofessional to

19     threaten Dean when he asked for two weeks before meeting with

20     you?

21         MR. McLANDRICH:  Objection.

22         THE COURT:  He's testified, Counsel, that he didn't

23     threaten him.

24         MR. KANOVITZ:  I'm just -- well, I believe that's a

25     subject for the jury to decide.

MOORE - CROSS (Kanovitz)                                    615

1              THE COURT:  Not for him to decide.

2              MR. KANOVITZ:  Fair enough.

3              THE COURT:  He's indicated he did not threaten.

4     You've got the conversation.

5              MR. KANOVITZ:  Okay.  May I rephrase with one last

6     question on that topic?

7              THE COURT:  You may.

8              MR. KANOVITZ:  Okay.

9     BY MR. KANOVITZ:

10    **Q.**  Sir, if he perceived your words as a threat, it would

11    have been natural for him to hang up, correct?

12             MR. McLANDRICH:  Objection.

13             THE COURT:  You can answer that question.

14             THE WITNESS:  I can't assume as to what he

15    perceives.

16    BY MR. KANOVITZ:

17    **Q.**  Okay, sir.  Why wouldn't you just wait the two weeks?

18    **A.**  I'm trying to keep the investigation moving along.

19    **Q.**  The case was already two years old at that point.

20    **A.**  I agree with that.

21    **Q.**  And you didn't even jump on the case when you first

22    received it, right?

23    **A.**  That's because I had other cases going at that time.

24    **Q.**  Right.  You glanced at the file, and you threw it in a

25    drawer?

MOORE - CROSS (Kanovitz)                                         616

1    **A.**    That's correct.

2    **Q.**    So why didn't you give another two weeks for Dean to, you

3    know, make his appointment?

4    **A.**    I have no idea at this point.

5    **Q.**    Okay.  If you had waited the two weeks, then you could

6    have taken a picture of Dean instead of using his work ID in

7    the photo array, correct?

8    **A.**    At that -- I'm not -- at that particular point, I had a

9    conversation with him on 6-19.  He had hung up on me.  It

10   was obvious that he wasn't going to be coming in.  I'm

11   trying to move my case along.  So I end up sending his work

12   ID to the Miami Valley Regional Crime Lab two days later.

13   **Q.**    You had a choice to say, during the conversation, "Okay,

14   let's schedule it for two weeks out," right?

15            MR. McLANDRICH:  Objection, Your Honor.

16            THE COURT:  I think, Counsel, he's indicated that he

17   didn't want to wait two weeks because he wanted to keep the

18   case going.

19        Detective, did you have a choice to say something else?

20            THE WITNESS:  Can you repeat the question again?

21   BY MR. KANOVITZ:

22   **Q.**    Sure.  If you had waited the two weeks, you could have

23   taken a picture of Dean instead of using his work ID, correct?

24   **A.**    I could not assume at that particular point that he was

25   going to come into the police department.  So at that point

MOORE - CROSS (Kanovitz)                                       617

1    I wanted to continue the movement of the case forward.

2    **Q.**    Okay.

3    **A.**    You keep asking me to make assumptions and perceptions,

4    and I don't know what is in somebody's minds at that time.

5    **Q.**    Okay.

6    **A.**    I mean, after 30 years, I don't even remember a lot of

7    time what was in my mind.

8    **Q.**    Eventually, Dean did come to see you at the police

9    department, right?

10   **A.**    Yes, he did.

11   **Q.**    And he let you take pictures of him when he came in?

12   **A.**    Now, we -- I believe we are talking about the 8-8 --

13   **Q.**    That sounds about right.

14   **A.**    -- '90?

15   **Q.**    That sounds about right.

16   **A.**    Yes.

17   **Q.**    And he didn't have to let you take pictures of him when

18   he came in, did he?

19   **A.**    No.

20   **Q.**    You took pictures of his torso and his face?

21   **A.**    I believe so.

22   **Q.**    And then you took pictures of his -- whole length of his

23   body, right?

24   **A.**    I believe so.

25   **Q.**    Now, at a certain point in time, you sent Dean's employee

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    ID off so that the picture of his face could get blown up,

2    correct?

3    **A.**    I sent his security ID card to the Miami Valley

4    Regional Crime Laboratory on June 21st of 1990.

5    **Q.**    And you asked them to blow up his face?

6    **A.**    I asked them to make me a -- mugshot size photos.

7         I believe that in the trial's transcript --

8              THE COURT:  There is no question in front of you.

9              MR. KANOVITZ:  Counsel, this is PX1, page 72, lines

10   11 through 22.

11             THE COURT:  What are we doing with this, Counsel?

12             MR. KANOVITZ:  Impeachment.

13             MR. McLANDRICH:  I'm sorry.  Page?

14             MR. KANOVITZ:  72.

15        (Exhibit displayed.)

16   BY MR. KANOVITZ:

17   **Q.**    Sir, you testified at a preliminary hearing in Dean's

18   case on -- on December 7th of 1990, correct?  Do you recall

19   that?

20   **A.**    I -- a preliminary hearing?  I am not sure what the

21   date was.  I think there might have been a preliminary

22   hearing.

23   **Q.**    Okay.  You participated in a hearing prior to trial to

24   talk about the eyewitness identifications, correct?

25   **A.**    I believe so, yes.

MOORE - CROSS (Kanovitz)                                    619

1    **Q.**   And that was approximately December 7th of 1990, correct?

2    Do you recall that?

3    **A.**   I don't recall the date.

4    **Q.**   Do you recall being under oath at that hearing, though?

5    **A.**   I would imagine that if I was in any hearing within a

6    court, that I would at some point be placed under oath, yes.

7    **Q.**   And were you asked these questions, and did you give

8    these answers:

9         "Question:  Sir, let me just simply ask this to make sure

10   we're talking about the same thing.  I thought you had stated

11   in your direct examination and previously on cross-examination

12   that you took the photograph from Defendant's Exhibit A, which

13   was on his security card, and then you had that blown up and

14   then placed into State's Exhibit 1; is that correct?"

15        "Answer:  Yes, I had that blown up from the security

16   identification card if that's the term you're using it in."

17        "Question:  So the term 'blown-up' is not misleading in

18   any manner.  It's the term you used; is that correct?"

19        "Answer:  Yes, sir."

20        Were you asked those questions, and did you give those

21   answers?

22   **A.**   Yes, sir.

23   **Q.**   So you sent Dean's photo off to have his face blown up?

24   **A.**   Actually, if we pull the Miami Valley Regional Crime

25   Lab sheet, I believe that I wrote on there that it was

MOORE - CROSS (Kanovitz)                                    620

1    mugshot size.  But in this statement here, yes, the term

2    "blown-up" is being used.

3    Q.   And you knew that when you sent the picture off to the

4    Miami Valley Regional Crime Lab they were going to blow up his

5    face?

6              MR. McLANDRICH:  Objection.

7              THE COURT:  Did you know anything -- did you know?

8              THE WITNESS:  I just knew they were going to make

9    pictures for me.

10   BY MR. KANOVITZ:

11   Q.   Okay.  Sir, you testified at Dean's second criminal

12   trial, correct?

13   A.   Yes.

14   Q.   You were under oath at that time, correct?

15   A.   Yes.

16             MR. KANOVITZ:  Counsel, this is page 271, lines --

17             MR. McLANDRICH:  Of what?

18             MR. KANOVITZ:  I am sorry.  PX9.

19             MR. McLANDRICH:  Page 271?

20             MR. KANOVITZ:  Page 271, line 20, through 272, line

21   7.  I'm sorry.  Let's go through line 10.

22             MR. McLANDRICH:  What line?

23             MR. KANOVITZ:  271, line 20, through 272, line 10.

24             MR. McLANDRICH:  I'm there.

25             (Exhibit displayed.)

1    BY MR. KANOVITZ:

2    **Q.**   Sir, when you were under oath, were you asked these

3    questions and did you give these answers:

4        "Question:  When you sent the security ID cards to the

5    Miami Valley Regional Crime Lab, which card or cards did you

6    send?"

7        "Answer:  I sent State's Exhibit 19, security ID card

8    depicting Roger Dean Gillispie."

9        "Question:  And what was the purpose in seeking an

10   enlargement of that particular ID card?"

11       "I wanted to obtain a photograph of Roger Dean Gillispie

12   to place in a photo lineup."

13       "Question:  Were you able to" -- sorry.

14       "Question:  Were you able to obtain an enlargement of the

15   card in question?"

16       "Answer:  Yes."

17       "Okay.  And approximately how long did that take to

18   receive that particular enlargement?"

19       "Answer:  I think it was between 18 and 30 days."

20       Were you asked those questions, and did you give those

21   answers?

22   **A.**   Yes, sir.

23   **Q.**   And so isn't it true that you understood that you were

24   sending off the picture to be enlarged by the Miami Valley

25   Regional Crime Lab?

1    **A.**    That's the wording that's being used.

2            MR. KANOVITZ:  Your Honor, at this time, we'd like

3    to publish Plaintiff's Exhibit 285, page 7.

4            THE COURT:  And this is for the purpose of?

5            MR. KANOVITZ:  To question him on the photo array.

6            MR. McLANDRICH:  Is that what it is?

7            MR. KANOVITZ:  Yeah.

8            MR. McLANDRICH:  No objection.

9            THE COURT:  That is the photo array?

10           MR. KANOVITZ:  Yes.

11           THE COURT:  Okay.

12           MS. FRICK:  No objection.

13        (Exhibit displayed.)

14   BY MR. KANOVITZ:

15   **Q.**   Okay.  Sir, please tell the jury which of these pictures

16   is the one that you had blown up.

17   **A.**   The picture that I had made from the crime lab was

18   Photo Number 6.

19   **Q.**   And did you have any of the other pictures that you were

20   displaying in this photo array blown up?

21   **A.**   No.

22   **Q.**   And just quickly, you see the ruler running along the

23   bottom there?

24   **A.**   Yes, the orange ruler.

25   **Q.**   Does that accurately depict the approximate size of the

MOORE - CROSS (Kanovitz)                                          623

1    photo array as the witnesses would have viewed it?

2    **A.**   I -- I believe so, I mean.

3    **Q.**   Okay.  And showing you this demonstrative, is that

4    basically the size of the photo array (indicating)?

5    **A.**   Yes, sir.

6              THE COURT:  What are you referring to, Counsel?

7              MR. KANOVITZ:  I am holding a demonstrative which is

8    marked as State's Exhibit 1 and State's Exhibit 26.

9              THE COURT:  Isn't that the same --

10             MR. KANOVITZ:  It is.

11             THE COURT:  -- that's on the screen?

12             MR. KANOVITZ:  I am just trying to show its actual,

13   real-life size, what it looked like.

14             THE COURT:  Okay.

15   BY MR. KANOVITZ:

16   **Q.**   Okay.  Now, when you chose to enlarge the picture of

17   Dean's face, were you hoping that the victims would pick him

18   out?

19             MR. McLANDRICH:  Objection.

20             THE COURT:  Well, were you hoping?

21             THE WITNESS:  I cannot hope what somebody is going

22   to do.  I think that I did make a statement concerning that in

23   my report, from what I remember after reviewing it here

24   recently.

25   BY MR. KANOVITZ:

MOORE - CROSS (Kanovitz)                                    624

1   **Q.**   And did the statement in your report reflect your actual

2   intentions at the time that you presented the photo arrays?

3   **A.**   Repeat that question, how you are wording it.

4   **Q.**   Did the statement in your report accurately reflect your

5   intentions at the time that you presented the photo arrays?

6   **A.**   Any time that I showed a photo array, you are hoping

7   that a victim or a witness can identify the individual.  It

8   does not mean that that's what they are going to do.

9   **Q.**   As an investigator, you are supposed to be neutral, are

10  you not?

11  **A.**   Yes.  And that's why you end up asking the question, or

12  telling them during your instructions that that individual

13  may or may not be in that lineup.

14  **Q.**   Understood.  But I am talking about your intentions and

15  hopes.

16      Okay, you are supposed to be neutral, correct?

17  **A.**   Yes.

18  **Q.**   And being neutral means that if a person is innocent, you

19  hope that the participants do not identify that person,

20  correct?

21  **A.**   I don't know what would be in that individual's mind at

22  that time, and I can't assume what they -- what their

23  beliefs are at that time.

24      MR. KANOVITZ:  Counsel -- Your Honor, I'd like to

25  display Plaintiff's 104, page 3.

```
 1              THE COURT:  What is it?

 2              MR. KANOVITZ:  It's his report.

 3              MR. McLANDRICH:  That's fine if it's his report.  No

 4     objection if it's his --

 5              THE COURT:  All right.

 6         (Exhibit displayed.)

 7     BY MR. KANOVITZ:

 8     Q.   Okay, sir.  Last sentence of this paragraph, you're

 9     talking about getting the picture blown up, and you say, "Upon

10     receiving the photographs back from the lab, I will put

11     together a photo lineup for show to the victims in this case,

12     in hopes of identification," correct?

13     A.   I think that I -- I think that I said that.  That is in

14     my report.

15              MR. KANOVITZ:  Take it down.

16              THE COURT:  Counsel, you just referred him to a

17     certain portion of a report.  Can you give me a -- for the

18     purposes of the record, give me a paragraph, a line, some kind

19     of specifics with regard to what he has just testified to.

20              MR. KANOVITZ:  Yes.  I apologize about that, Your

21     Honor.

22         So this is the first full paragraph under 6-21-90 on page

23     3 of Plaintiff's Exhibit 104.  Thank you.

24              THE COURT:  And for your planning purposes, in about

25     five minutes we are going to recess.  We are going to recess
```

1   for morning break.

2           MR. KANOVITZ:  Actually, Judge, this would be a good

3   point to take a break, if we could.

4           THE COURT:  Ladies and gentlemen, we are going to

5   take our morning break, about 15, 20 minutes.  Relax.  Please

6   don't discuss the case amongst yourselves or with anyone else

7   back there -- but no one else should be back there, but please

8   don't discuss it amongst yourselves.

9           THE COURTROOM DEPUTY:  All rise.  This court stands

10  in recess.

11      (Jury out at 10:20 a.m.)

12      (Recess at 10:20 a.m.)

13      (Jury in at 10:39 a.m.)

14      (In open court at 10:40 a.m.)

15          THE COURT:  We are back on the record.

16      Counsel ready to proceed?

17          MR. KANOVITZ:  I am.

18          MR. McLANDRICH:  Yes, sir.

19          THE COURT:  You may proceed.

20  BY MR. KANOVITZ:

21  **Q.**   Okay, sir.  When we broke, we were talking about the

22  topic of the photo lineup, right?

23  **A.**   I believe so, yes.

24  **Q.**   And there's different terms that get used for the same

25  thing:  photo lineup, photo array, six-pack sometimes?

MOORE - CROSS (Kanovitz)                    627

1   **A.**   Yes, sir.

2   **Q.**   So if I use those terms interchangeably, we both know

3   what we're talking about, right?

4   **A.**   Okay.

5   **Q.**   Now, you assembled the photo lineup in the summer of

6   1990, correct?

7   **A.**   Yes.

8   **Q.**   And you would agree that in 1990 you knew that police

9   officers were not supposed to put together a photo lineup that

10  singles out a suspect in any way, correct?

11  **A.**   We are supposed to try to find images that are similar

12  to each other.

13  **Q.**   So was it your understanding that it was okay to single

14  out a suspect in 1990?

15  **A.**   I never singled out a suspect in 1990.

16  **Q.**   I am just asking for your understanding.

17  **A.**   I am not saying that.

18  **Q.**   Okay.  So was it your understanding that you are not

19  supposed to do anything to single out a suspect?

20          MR. McLANDRICH:  Objection, Your Honor.

21          THE COURT:  I think -- I think his answer to this

22  point has been -- I understand he is not saying exactly what

23  you are asking him, but his answer is that it was his duty to

24  make a lineup of what he believes is similar people.

25          Ask him again.

MOORE - CROSS (Kanovitz)                                        628

1              MR. KANOVITZ:  Thank you, Your Honor.

2      BY MR. KANOVITZ:

3      Q.   Had you received any training in doing photo lineups back

4      in 1990?

5      A.   Not that I remember, no.

6      Q.   Okay.  And did you know back in 1990 that it could be

7      suggestive to present a photo lineup where the suspect was

8      singled out?

9      A.   I -- I knew that you could have a photo lineup where

10     someone would perceive that something is suggestive.  It

11     depends on what you are looking at in a photo lineup.

12     Q.   Well, there is some common sense that just goes into

13     doing a photo lineup, right?

14     A.   Yes.

15     Q.   Okay.  And one of those common sense things is it

16     wouldn't be fair to use a picture that singled out your

17     suspect, correct?

18     A.   If you'd -- I guess if you did that or you felt that at

19     the time, but that's not how I felt about that at that time.

20     Q.   Well, I'm not asking how you felt about this photo array.

21     I am asking you, you had the common sense to know not to use a

22     photo that singled out a suspect, correct?

23     A.   That would be correct.

24     Q.   Okay.  And you knew enough to know that if you did single

25     out a suspect, you were risking a misidentification, right?

MOORE - CROSS (Kanovitz)                                    629

1    **A.**    If you do, but you have to know exactly what you're

2    looking at as far as it being singled out.  You keep using

3    that term, but what one person views as being singled out

4    may not be the view of what another person is.  I know where

5    you are going with this.

6         But, again, the way someone views something when you

7    are looking at a photo lineup, there are different factors

8    in which they have to view.  Now, when I am showing a photo

9    lineup, all I want them to do actually is just view the

10   face.

11        But all photo lineups can be argumentative when they

12   are made up.

13             THE COURT:  Detective, did you know that you were

14   not to set up a photo lineup that singled out one of the

15   individuals that appear in that lineup?

16             THE WITNESS:  Yes.

17   BY MR. KANOVITZ:

18   **Q.**    And you knew that if you did single out somebody, you

19   risked misidentification?

20   **A.**    If you do.

21   **Q.**    Yes.  And you knew that a misidentification would cause

22   an unfair trial, correct?

23   **A.**    It could.

24   **Q.**    And so let's -- let's go through your photo lineup

25   together.

1              MR. KANOVITZ:  Your Honor, could we republish

2      Plaintiff's 285 at --

3              THE COURT:  You may.

4          (Exhibit displayed.)

5      BY MR. KANOVITZ:

6      **Q.**   Okay, sir.  Looking over this array, can we agree that

7      nobody that you selected for this array has light blondish

8      hair?

9      **A.**   That's because I was trying to make all of the image --

10             THE COURT:  Sir --

11             THE WITNESS:  That would be true.

12             THE COURT:  Detective -- yes, okay.

13     BY MR. KANOVITZ:

14     **Q.**   Can we agree that none of the pictures you selected had

15     orangish-brown hair -- sorry.  Can we agree that none of the

16     pictures you selected had orangish-brown hair?

17     **A.**   Again, it's down to lighting, but there is one image

18     that I believe does.

19     **Q.**   Which image is that?

20     **A.**   1.

21     **Q.**   So 1 is your definition of orangish-brown hair?

22     **A.**   I know that there is -- I'm just saying that there is a

23     reddish tint.  It's brown, but you have a reddish tint.

24     **Q.**   Sir, your assumption was that the three victims were all

25     describing the same perpetrator, right?

1    **A.**   I don't know what I would be assuming.

2    **Q.**   Okay.  Well, you pursued Dean for all three of those

3    rapes.

4    **A.**   I don't know that I agree with the term of "pursue,"

5    but, yes, Dean, or Roger, was the person of interest in this

6    case.  And, yes, I did show photo lineups.

7    **Q.**   Sir, isn't it true that you believed that the women were

8    all describing a single perpetrator?

9    **A.**   Not just due to that factor, but, yes.

10   **Q.**   Okay.  And so you understood that the terms they used to

11   describe the hair, they were all trying to describe the same

12   guy?

13   **A.**   Yes.

14   **Q.**   Just from their different ways of describing color,

15   correct?

16   **A.**   Yes.

17   **Q.**   Okay.  And -- okay.  So let's go through these photos.

18   Tell the jury who the two gentlemen are along the left-hand

19   margin there, Number 1 and Number 4.

20   **A.**   Number 4 is Detective Sergeant Tim Wilson, and Number 4

21   is Officer John DePetrio.

22   **Q.**   Let's get that.  You used the number 4 twice.  Is 1

23   Detective Sergeant Wilson and 4 Detective DePetrio?

24   **A.**   Yes, sir.

25   **Q.**   And why are they in ties and jackets?

MOORE - CROSS (Kanovitz)                                    632

1    **A.**   Well, I see that Officer DePetrio is in a jacket.  I

2    can't see his tie.  And Tim Wilson is in a tie.  That's

3    because that's how they appeared the day that I took the

4    picture to use in the photo lineup.

5    **Q.**   What day was that?

6    **A.**   I don't -- I can't remember.

7    **Q.**   And that's how detectives in the Miami Township Police

8    Department typically dressed, right?

9    **A.**   Yes.  We wore suits and ties, but not all the time, but

10   most of the time.

11   **Q.**   Okay.  So that's how you dressed too?

12   **A.**   Yes.

13   **Q.**   And do you agree that using Miami Township police

14   officers as fillers in a lineup could be a problematic

15   procedure?  Strike that.

16          MR. KANOVITZ:  May I rephrase that, Your Honor?

17   BY MR. KANOVITZ:

18   **Q.**   Do you agree that using Miami Township Police

19   Department's department police officers as fillers could be

20   suggestive to the witness?

21   **A.**   No.  My witness doesn't know whether they are police

22   officers or not.

23   **Q.**   Well, they were dressed the exact same way you dress.

24          THE COURT:  Is that a question?

25          MR. KANOVITZ:  Sorry.  Yes.

1    BY MR. KANOVITZ:

2    **Q.**   Isn't it true that they were dressed the exact same way

3    you dressed?

4    **A.**   Yes.

5    **Q.**   And the witnesses were capable of seeing how you dressed?

6    **A.**   Yes.

7    **Q.**   Okay.  And you understood that the witnesses might be

8    able to tell that those two people were detectives?

9    **A.**   No, I did not understand that.

10   **Q.**   Okay.

11   **A.**   The --

12         THE COURT:  Okay.  You've answered the question.

13   BY MR. KANOVITZ:

14   **Q.**   Well, in addition to how they were dressed, the victims

15   might actually recognize these men from when they came to the

16   Miami Township Police Department, correct?

17   **A.**   At the time that I took those photos, no, I did not

18   believe that they could -- would know that they would be

19   officers or that they would recognize them.  Neither one of

20   these -- or neither of the victims -- or any of the victims

21   lived within this area.

22   **Q.**   Well, let's break that down, sir.  My question to you,

23   first off, was, isn't it true that you recognized that the

24   victims might recognize these people from having been at the

25   police station?

MOORE - CROSS (Kanovitz)                                    634

1    **A.**   That was not my belief.

2    **Q.**   Okay.  What did you do to check to make sure that they

3    wouldn't have recognized these two gentlemen from the police

4    station?

5    **A.**   I did nothing.  I took the photographs and placed them

6    in the lineup.  I knew that my -- or the victims in this

7    case, being C.W. and B.W., I believe at the time lived in

8    Sidney, Ohio, which is quite a ways from here, and that S.C.

9    lived in Harrison Township, clear over on the other side of

10   Dayton.

11   **Q.**   What was the basis of your belief that the victims would

12   not have recognized these two gentlemen from having been at

13   the Miami Township Police Department?

14   **A.**   I think I just answered that by saying the fact that

15   they were out of this area.  They were not within this area

16   to have known these officers.  There was --

17           THE COURT:  Okay.  That's an answer.

18      Counsel.

19   BY MR. KANOVITZ:

20   **Q.**   Isn't it true, sir, that the victims were at the police

21   station numerous times?

22   **A.**   I'm not sure about numerous, but multiple.

23   **Q.**   They were there very early, in the wee hours on August

24   21st, right?

25   **A.**   Oh, okay, yeah, going back to August of '88.

MOORE - CROSS (Kanovitz)                                                635

1    **Q.**    Of '88, yes, correct.

2    **A.**    Yes, they had been at the police department then too.

3    I was looking in my mind as to when I started my case.

4    **Q.**    I understand.  Did you do anything to check to see if

5    Wilson and/or DePetrio were on duty on 8-21?

6    **A.**    I don't know if DePetrio was --

7    **Q.**    It's a yes-or-no question.  Did you do anything to check?

8           MR. McLANDRICH:  Objection.

9           THE COURT:  It is a yes-or-no question.  If you want

10   to explain it, then you can request, and I can allow you to

11   explain it.  So it's a yes-or-no question.

12          THE WITNESS:  Ask the question again.

13   BY MR. KANOVITZ:

14   **Q.**    Sure.  Did you do anything to check if Detective Wilson

15   or Detective DePetrio were on duty on 8-21-88?

16   **A.**    No.

17          THE COURT:  Do you wish to explain that?

18          THE WITNESS:  Mr. Wilson was -- at the time of this

19   incident, was not a employee of Miami Township Police

20   Department.  He actually was an employee down in Warren

21   County, which is even further away from Sidney, Ohio, and

22   Harrison Township.

23   BY MR. KANOVITZ:

24   **Q.**    Okay.  So let's just focus on DePetrio then.  I did not

25   know that fact.

MOORE - CROSS (Kanovitz)                                              636

1    **A.**    Okay.

2    **Q.**    So did you do anything to check to see if DePetrio was on

3    duty on 8-21-88?

4    **A.**    No.

5    **Q.**    Okay.  The women came back again the morning of 8-22-88,

6    correct?

7    **A.**    I believe that they did, yes.

8    **Q.**    Did you do anything to check if DePetrio was on duty on

9    8-22-88?

10   **A.**    Well, okay.  So we're sitting here, and we're talking

11   about 1988.  I was not assigned the case in 1988.  I had

12   nothing to do --

13          THE COURT:  Detective, if you don't know, you can

14   say you don't know.

15          THE WITNESS:  Okay.  No, I had nothing to do.

16   BY MR. KANOVITZ:

17   **Q.**    Okay, sir.  You weren't there on 8-22-88 to know if they

18   were working that day, right?  Or you wouldn't remember if you

19   were, right?

20   **A.**    I guess if we're talking about 1988, no.

21   **Q.**    Okay.  But it is true that the Miami Township Police

22   Department maintains records of when people are scheduled to

23   work, correct?

24   **A.**    Yes.

25   **Q.**    And did you check those records?

1    **A.**    No.

2    **Q.**    Okay.  And the women returned again on September 28,

3    1988, correct?  Pick up the clothes?

4              THE COURT:  If you know.

5              THE WITNESS:  I know that the clothes had gotten

6    picked up, yes.

7    BY MR. KANOVITZ:

8    **Q.**    And you knew it was released to those women, right?

9    **A.**    I know after reviewing the case in 1990, yes.

10   **Q.**    Understood.

11   **A.**    Yes.

12   **Q.**    So before you presented the photo array to the women, you

13   knew that they had been there on September of 28 -- September

14   28, 1988, correct?

15   **A.**    Yes, I knew that they -- I mean, based on me reviewing

16   the report, yes, I knew that.

17   **Q.**    And did you do anything to check to see if DePetrio was

18   on duty on September 28, 1988?

19   **A.**    I think I already answered that, but, no.

20   **Q.**    And when did -- when did Detective Sergeant Wilson come

21   to work for the MTPD?

22   **A.**    He came in after Fritz was leaving.

23   **Q.**    Okay.

24   **A.**    I mean, it was like within just a short period of time.

25   I think they may have even been about one's going out the

1      door and one's coming in the door, basically.

2      **Q.**   So like late spring/early summer of '90?

3      **A.**   I believe that it was mid June.

4      **Q.**   And so Wilson could have been on duty when you presented

5      the photo array to B.W. and C.W., correct?

6      **A.**   When I presented the photo lineup?

7      **Q.**   Yes.

8      **A.**   Detective Sergeant Tim Wilson was a day detective.  So

9      I don't know that he would have been on duty at that time.

10     **Q.**   What was the hours for day shift?

11     **A.**   7 to 3.

12     **Q.**   Okay, sir.  B.W. came down to the police station to

13     review a photo array with you on July 17, 1990, at 11:07 a.m.

14            THE COURT:  Counsel, what are you doing?  What are

15     you reading?

16            MR. KANOVITZ:  I'm asking him a question.  I'm

17     not -- I'm just -- I was looking so I knew what to put into

18     the question.

19            THE COURT:  You are not putting anything into the

20     record, okay.

21            MR. KANOVITZ:  That wasn't supposed to go up.

22     Sorry.

23            THE WITNESS:  Okay, so ask the question again.

24     BY MR. KANOVITZ:

25     **Q.**   Sure.  B.W. came to the department to view a photo lineup

MOORE - CROSS (Kanovitz)                          639

1    with you at 11:07 a.m. on July 17, 1990.

2    A.    Yes.

3    Q.    Did you do anything to make sure that Wilson wasn't on

4    duty at that time?

5    A.    What day of the week was that?

6    Q.    Do you remember what days of the week Wilson worked right

7    now?

8    A.    I know that he worked Monday through Fridays, but I

9    know that we also could end up being called out at the time.

10   Q.    According to your police report, July 17, 1990, was a

11   Tuesday.

12   A.    Okay.

13   Q.    So he could very well have been at the department when

14   she arrived.

15   A.    Could have, but I don't know that he was.

16   Q.    Okay.  And you did nothing to check?

17   A.    That would be a true statement, yes.

18   Q.    Did DePetrio work days?

19   A.    DePetrio was -- I'm not sure exactly what his schedule

20   was because I didn't directly work with him.  I was -- he

21   was not in our detective section.  I know that our

22   schedules, we could potentially have different days or

23   different shifts.  And there was overtime.  So you never

24   knew when somebody would be working at that time.

25   Q.    Okay.  So before presenting the photo array, you did

MOORE - CROSS (Kanovitz)                                    640

1    nothing to check to see if the witnesses might have viewed

2    Detective DePetrio?

3    **A.**    No.

4          MR. KANOVITZ:  Can I have the photo array back up.

5          (Exhibit displayed.)

6    BY MR. KANOVITZ:

7    **Q.**    There were also pictures up in the station of the

8    detectives, correct?

9    **A.**    I don't remember.

10   **Q.**    We can ask another witness about that.

11         Okay.  Now, you testified just a few minutes ago that you

12   took Polaroids of Detective Sergeant Wilson and Detective

13   DePetrio for purposes of putting them in this photo array,

14   correct?

15   **A.**    That's correct, sir.

16   **Q.**    And you had plenty of other sources -- I'm sorry.  Strike

17   that.

18         Using the terms that you use with photo arrays, you have

19   a suspect -- right? -- is one of the pictures, correct?

20   **A.**    The person of interest, yes.

21   **Q.**    And the rest of them are called fillers, correct?

22   **A.**    I had never used that term, but I know that it has been

23   used as being that, yes.

24   **Q.**    Okay.  So when I use the term "fillers," you'll know what

25   I am talking about.

MOORE - CROSS (Kanovitz)                                    641

1    **A.**    Okay.

2    **Q.**    You had many other sources to find pictures of fillers

3    other than going and taking pictures of your colleagues,

4    correct?

5    **A.**    Yes.  And I went through them.

6    **Q.**    We'll get there.

7        So the Miami Township Police Department maintained

8    binders of all the booking photos that it took each year,

9    correct?

10   **A.**    That's correct.

11   **Q.**    And it was common to use booking photos as fillers,

12   correct?

13   **A.**    You could, but we also had a secondary file that we

14   used for lineups too.

15   **Q.**    Those were the street Polaroids, right?

16   **A.**    Those would have been street Polaroids where officers

17   had contact with individuals, took photos, and they got

18   filed --

19   **Q.**    Okay.  So --

20   **A.**    -- based on descriptors.

21   **Q.**    So now we talked about two additional sources for finding

22   fillers other than just going and taking pictures of your

23   colleagues, correct?

24   **A.**    That's correct.

25   **Q.**    Okay.  And you started to say that you checked them.

MOORE - CROSS (Kanovitz)                                        642

1   **A.**    I went through books of photos.  I also went through

2   the index file that we kept of Polaroid photos.

3   **Q.**    And why -- if you had access to all those photos and went

4   through all those photos, why did you use the pictures of

5   Wilson and DePetrio?

6   **A.**    Because everything that I was looking at at the time I

7   didn't feel was -- was images that I could use.

8   **Q.**    Why didn't you think you could use them?

9   **A.**    It's hard to say.  There was hundreds of photos that I

10  went through.  So, I mean, at -- I was trying to find people

11  in this case that are all white, all male, all had brown

12  hair, all had mustache.  And I'm not saying that there was

13  not other photos, but those photos that I had seen with

14  those descriptors were not photos that I felt would be fit

15  into this photo lineup.  So that's the reason.

16  **Q.**    Okay.  So let's do a little math here.

17          MR. KANOVITZ:  Can I have the document camera?

18  BY MR. KANOVITZ:

19  **Q.**    You said that there were three to four detectives in this

20  time frame working for the MTPD, correct?

21  **A.**    I believed that that is about the area where we were

22  at, yes.

23  **Q.**    Okay.  So let's use four in order to give you the most

24  credit.  And of those four, you picked out two, correct?

25  **A.**    Yes.

MOORE - CROSS (Kanovitz)                                      643

1    **Q.**   And then you also said there were hundreds of other

2    pictures that you looked through, correct?

3    **A.**   I went through hundreds of pictures.

4    **Q.**   Okay.  So I am just going to write "hundreds."  And of

5    those, you picked --

6             MR. KANOVITZ:  May I have the document camera?

7             THE COURT:  What do you want to display?

8             MR. KANOVITZ:  Just the math.  It's probably not

9    worth it.

10            THE COURT:  I'm not telling you.  I just don't know

11   what you are doing.

12            MR. KANOVITZ:  I'm showing the ratios.

13            THE COURT:  All right.

14       (Document displayed.)

15   BY MR. KANOVITZ:

16   **Q.**   So out of hundreds of filler pictures that you had access

17   to, you found zero that were a better match for Dean, correct?

18            MR. McLANDRICH:  Objection.  That couldn't be

19   possibly correct, right?  Because there's six people, and two

20   of them are detectives, and one of them's Gillispie.  So,

21   obviously, three of the others came out of the other hundreds

22   of photos.

23   BY MR. KANOVITZ:

24   **Q.**   Actually, the other people in that photo array did not

25   come out of the department's binders of booking photos, did

MOORE - CROSS (Kanovitz)                                              644

1    they?

2    **A.**   I would have to look at them again.

3            MR. KANOVITZ:  Okay.  Could we put it back up.

4       (Exhibit displayed.)

5    BY MR. KANOVITZ:

6    **Q.**   Okay, sir.  Number 5 was one of those street photo

7    Polaroids, right?  That's not a booking photo.

8    **A.**   I believe you're correct.

9    **Q.**   And Number 2 was a guy that you were investigating on

10   another case, and you got his photo from Dayton Police

11   Department, right?

12   **A.**   I don't remember that.  I think that was a picture that

13   was in the file.

14   **Q.**   Okay.  We can agree that he doesn't have any placard

15   hanging around his chest with a booking ID, right?

16   **A.**   I guess, unless it's hanging lower than where it shows.

17   **Q.**   I mean, you don't see --

18   **A.**   I don't see one.

19   **Q.**   Fair enough.  And then I misspoke.  Number 3 is a booking

20   photo, right?

21           THE COURT:  If you know.  Don't start guessing.

22           THE WITNESS:  Yeah.  I don't know for sure.

23   BY MR. KANOVITZ:

24   **Q.**   Okay.  Well, at any rate, either you found zero or one

25   booking photo --

1              MR. KANOVITZ:  May I have the document camera back?

2         (Document displayed.)

3    BY MR. KANOVITZ:

4    **Q.**   You either found zero photos or one booking photo that

5    were a better match for Mr. Gillispie than the two detectives,

6    correct?

7    **A.**   I'm not sure what your question is.  I'm not good at

8    the math stuff.

9              THE COURT:  I think his question is you found --

10   there were four detectives.  You found two.  There are

11   supposedly a number of booking photos, and you only found one;

12   is that correct?

13             THE WITNESS:  Yes.

14             THE COURT:  All right.

15             MR. KANOVITZ:  May I have the photo back up.  Thank

16   you.

17        (Exhibit displayed.)

18   BY MR. KANOVITZ:

19   **Q.**   Now, Detective Sergeant Wilson was actually your

20   supervisor, was he not?

21   **A.**   He was.

22   **Q.**   So he was the -- so your supervisor at the Miami Township

23   Police Department was aware of what you were doing?

24   **A.**   He knew that I was working on the case and -- yes.

25   **Q.**   He knew you were taking his picture for purposes of

MOORE - CROSS (Kanovitz)                                    646

```
 1    putting it in a photo array?

 2    A.    Yes, he did.

 3    Q.    And he would have actually reviewed your work, right?

 4    A.    I actually had taken the photo lineup in there after it

 5    had been prepared and showed it to my supervisor, and he

 6    looked at it, yes.

 7    Q.    Okay.  All right, switching topics.

 8          The pictures that you selected are people -- actually,

 9    going back to Wilson, Wilson was 38 years old at the time this

10    picture was taken, correct?

11    A.    I don't remember what his age was.

12    Q.    Would it refresh your recollection to see your testimony

13    from the first criminal trial?

14    A.    Yes, sir.

15    Q.    Okay.

16          MR. KANOVITZ:  Your Honor, I'd like to display

17    Plaintiff's Exhibit 3, page 171, lines 21 through 25.

18          THE COURT:  I am assuming, counsel -- and we've done

19    this throughout this -- there is no objection with regard to

20    these refreshing of the recollection or the impeachment that

21    those transcript parts are displayed?  We usually don't do

22    that, but we have done that in this case.

23          MR. McLANDRICH:  Yes, Your Honor.

24          THE COURT:  You have no problem?

25          MR. McLANDRICH:  No.
```

MOORE - CROSS (Kanovitz)                                    647

1              THE COURT:  Any problem back there?

2              MS. FRICK:  No, Your Honor.

3              THE COURT:  All right.

4              MR. KANOVITZ:  It's page 38 of the exhibit, page 171

5    of the transcript, starting at line 18 through the end.

6    Actually, I am sorry.  Start at line 16.

7         (Exhibit displayed.)

8    BY MR. KANOVITZ:

9    **Q.**   "Question:  Two of them are police officers, aren't

10   they?"

11        "Answer:  Yes sir, they are."

12        "Question:  One of whom is a man by the name of Sergeant

13   Wilson?"

14        "Answer:  Yes, sir."

15        "Sergeant Wilson is how old?"

16        "Answer:  Upper 30s?"

17        "Question:  37?"

18        "He's probably around there, yes.  I don't remember his

19   exact age."

20        Does that refresh your recollection, sir?

21   **A.**   Yes, sir.

22             THE COURT:  Counsel, small point, but wasn't his

23   original answer "I don't remember"?

24             MR. KANOVITZ:  Yes, but he doesn't remember today,

25   and so I am trying to refresh his recollection from back then.

MOORE - CROSS (Kanovitz)                                      648

1            THE COURT:  At which time he didn't remember either.

2            MR. KANOVITZ:  Well, he knew it was in the upper 30s

3    and was okay with the number 37.

4        I understand the Court's point.  I was close, but not

5    right on the target.

6            THE COURT:  Okay.

7    BY MR. KANOVITZ:

8    Q.   So Wilson was in his upper 30s at the time he took that

9    picture, correct?

10   A.   Yes.

11   Q.   And -- okay.

12           MR. KANOVITZ:  Can we go back to the photo array,

13   please.

14       (Exhibit displayed.)

15   BY MR. KANOVITZ:

16   Q.   Okay.  We're turning to the topic of the size of the

17   heads.

18       You chose to use pictures that, some of which were -- had

19   the head taking up a large portion of the box and some of

20   which had the heads taking up a tiny portion of the box,

21   correct?

22   A.   There are different sizes of heads in the photo lineup.

23   Q.   And whose head is the biggest?

24   A.   I would probably say that Roger's is close to at least

25   one other in there, yes.

MOORE - CROSS (Kanovitz)                                      649

1   **Q.**   By "Roger," you mean Dean, correct?

2   **A.**   Yes.

3   **Q.**   And -- okay.  Would you agree that his head is the

4   largest?

5   **A.**   If it is, it's slightly, yes.

6   **Q.**   Okay.  And would you agree that -- okay.  But -- okay,

7   it's slightly larger than Number 3, I assume is what you are

8   talking about, right?

9   **A.**   That would be correct.

10  **Q.**   Okay.  Would you agree it's a lot larger than Number 4?

11  **A.**   I would agree.

12  **Q.**   Number 5?

13  **A.**   Well, we are sitting here, and we are talking about

14  larger.  The thing that you have in the photos is depth

15  perception.

16         THE COURT:  Well, Detective, the only question is,

17  do you believe it's larger.

18         THE WITNESS:  It is.

19  BY MR. KANOVITZ:

20  **Q.**   Larger than 1?

21  **A.**   Yes.

22  **Q.**   And larger than 2?

23  **A.**   And, yes.

24  **Q.**   Now, having the largest head tended to single out

25  Mr. Gillispie, correct?

1              MR. McLANDRICH:  Objection.

2              MR. KANOVITZ:  Response?

3              THE COURT:  Basis for the objection?

4              MR. McLANDRICH:  Well, we -- I'll withdraw the

5     objection.

6              THE COURT:  Do you believe that -- do you believe

7     that the -- I guess the fact that the head's larger pointed

8     him out?

9              THE WITNESS:  No.

10    BY MR. KANOVITZ:

11    Q.   Okay.  So you would not agree with me that having the

12    largest head tended to single out Dean, correct?

13    A.   No.

14    Q.   And you could have, if you had chosen to, use pictures

15    where everybody's head was the same size as Dean's head,

16    correct?

17    A.   If I could find those.

18    Q.   Well, you had -- you had options available to you, right?

19    A.   I looked through options.

20    Q.   Okay.  Well, one option is you could have taken

21    DePetrio's picture up closer, right?

22    A.   I guess so at that point, yes.

23    Q.   Tell the jury why you chose not to do that.

24    A.   I just took a picture of him.  It's not going to make a

25    choice -- a difference as to whether it's bigger or smaller.

1    The bottom line is that they are viewing the faces at the

2    time.  They are to focus on the face.  It's -- you are not

3    looking at size.  In fact, I think our instructions even say

4    something about that.

5    **Q.**   Sir, my -- okay.  Is that your answer for why you chose

6    not to take DePetrio closer up?

7    **A.**   I don't -- I can't sit here and tell you exactly why

8    the photo was taken the way that it was back then.

9    **Q.**   You keep using the past tense, sir.

10   **A.**   I don't remember.

11   **Q.**   You're the one that took it, right?  I am sorry -- the

12   passive voice.  You're the one that took --

13           THE COURT:  Well, his response is that he can't

14   remember why he chose it back then.

15           THE WITNESS:  I just took an average free photo.

16   BY MR. KANOVITZ:

17   **Q.**   Sitting here today, could you think of any justification

18   for not taking DePetrio's photo closer up so that his head

19   matched the side of Mr. Gillispie's?

20   **A.**   Sitting here today, no.

21   **Q.**   Same question for Detective Sergeant Wilson.

22   **A.**   No.

23   **Q.**   And, now, the Photos 2, 3, and 5, those photos were

24   preexisting.  You didn't take those photos yourself or at

25   least in that time frame, correct?

1    **A.**   Correct.

2    **Q.**   But you could have sent them off to the lab to have them

3    blown up too, right?

4    **A.**   I guess that you could have, yes.

5    **Q.**   Tell the jury why you didn't do that.

6    **A.**   It was a choice.  You're not -- you keep saying that

7    they are going to -- well, I just -- I didn't do it.  I

8    didn't make that choice.

9    **Q.**   Sitting here today, can you think of any justification

10   for not sending off the rest of the photos to the crime lab to

11   be blown up?

12   **A.**   No.

13   **Q.**   Okay.  Now, in addition to having the largest head, the

14   blow-up of Dean's photo also has an orange background.  Do you

15   see that?

16   **A.**   I see the picture, and I see the background.  I don't

17   agree to the term of "orange."

18   **Q.**   Well, what color would you say it is, sir?

19   **A.**   It's a goldish color.

20   **Q.**   Okay.  We will use that term.  He has a goldish color

21   background, correct?

22   **A.**   Yes, sir.

23   **Q.**   And no one else has a background that color?

24   **A.**   Actually, they are -- all six photos have different

25   colored backgrounds.

MOORE - CROSS (Kanovitz)                                    653

1   **Q.**   Well, 5, 2, and 3 all have white backgrounds, correct?

2   **A.**   Actually, I think the Number 1 has more of like a --

3   **Q.**   That wasn't my question -- and I am sorry to step on

4   you -- but 5, 2, and 3 all have white backgrounds, do they

5   not?

6   **A.**   5, 2, and 3 have lighter backgrounds.

7   **Q.**   So light as to be called white, correct?

8           MR. McLANDRICH:  Objection.

9           THE COURT:  Are they white?

10          THE WITNESS:  They are different shades.

11  BY MR. KANOVITZ:

12  **Q.**   Of white?

13  **A.**   They are light colored.

14  **Q.**   They are different shades of white?

15  **A.**   No.  I said they are different shades.  They are all

16  light colored.

17  **Q.**   Shades of what color?

18  **A.**   Well, I know that the -- I believe it is Number 2 from

19  the other -- because, again, you know, I am looking at the

20  image on the screen.  But I know that when I looked at the

21  other lineup, there was like one of the photos was showing

22  up that looked like it had a rose-colored background, there

23  was one that looked like it was a light blue background,

24  there was the one that looks like it's close to a white

25  background, and then you have the one that has the wood door

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - CROSS (Kanovitz)                                        654

1   but has -- the way the light hits it, it gives off a lighter

2   color yellowish background.

3   Q.   Let's stick with 2, 5, and 3.  I promise you we are going

4   to get to 4.

5        2, 5, and 3, would you agree that the backgrounds of

6   those photos are far lighter than the background of

7   Mr. Gillispie's photo?

8   A.   Okay, I would agree to that.

9   Q.   Okay.  And let's go ahead and go to 4.  As you testified

10  to, it's pretty clear that DePetrio is standing in front of a

11  wood door, right?

12  A.   Yes, sir.

13  Q.   And when you say that the background is lighter, you are

14  just talking about the part where the flash hit the door,

15  right?

16  A.   That, or it's a lighting thing, yes.

17  Q.   Okay.  But just above that, we can see a dark wood door,

18  right?

19  A.   That's correct.

20  Q.   And then moving to 1, it's clear that he's not standing

21  in front of any sort of background, right?  Or sitting,

22  whatever he's doing?

23  A.   I believe that he was sitting.

24  Q.   In his office.

25  A.   There is something in the background.  I think it might

MOORE - CROSS (Kanovitz)                                    655

1   be a table.

2   **Q.**   Because he was sitting in his office, right?

3   **A.**   Yes.

4   **Q.**   And you can tell that from looking at this photo,

5   correct?

6   **A.**   I can look at the photo and see that, yes.

7   **Q.**   Now, you had other options than to chose photos with

8   substantially different backgrounds than Mr. Gillispie's

9   background, correct?

10  **A.**   All the photos have different backgrounds.

11  **Q.**   That wasn't my question.  Can you answer the question I

12  asked you?

13         THE COURT:  I think your question was, you had

14  substantial opportunity to choose other photos that had

15  different backgrounds.

16  BY MR. KANOVITZ:

17  **Q.**   My question is you had options other than to use photos

18  that had substantially different backgrounds than

19  Mr. Gillispie?

20         THE COURT:  Do you understand that question?

21         THE WITNESS:  I reviewed other photos.  I made the

22  choices to use these photos.  There was no one else involved

23  to pick and use the photos.

24  BY MR. KANOVITZ:

25  **Q.**   Well, sir, you could have taken DePetrio in front of a

MOORE - CROSS (Kanovitz)                                    656

1  golden-colored background if you chose, right?

2  **A.**  I could have taken a picture of DePetrio, I guess,

3  anywhere.  I could have taken him outside and asked him to

4  go outside.  But it's -- it's not what was done at that

5  time.

6  **Q.**  Well, you used the passive voice.  It's not what you did

7  at that time, correct?

8  **A.**  I'm not understanding that.

9  **Q.**  Okay.  You could have waited two weeks and then taken

10  Dean's picture in front of a white background, correct?

11  **A.**  At that particular time, I had no reason to believe

12  that Roger was going to be coming into the police

13  department.  He had already hung up on me.

14  **Q.**  At what particular time are you referring to, sir?

15  **A.**  On 6-19.

16  **Q.**  Okay.

17  **A.**  1990.

18  **Q.**  Fast forwarding just a little bit, on 8-8, Mr. Gillispie

19  came to the police station, and you took his picture in front

20  of a white background, correct?

21  **A.**  I do not remember where the backgrounds were.  I

22  haven't even seen the pictures.

23          THE COURT:  Do you remember taking his picture?

24          THE WITNESS:  Yes.

25  BY MR. KANOVITZ:

MOORE - CROSS (Kanovitz)                                    657

1   **Q.**   And isn't it true that there were white backgrounds you

2   could have taken it against in the police department?

3   **A.**   I don't know.

4   **Q.**   So you don't recall if there were any kind of light-

5   colored walls in the police department?

6   **A.**   Not at that time.  We had -- the police department's --

7          THE COURT:  He does not remember.

8          MR. KANOVITZ:  Okay.

9   BY MR. KANOVITZ:

10  **Q.**   Now, fast forwarding to the end of August, so about six

11  weeks after you showed this photo array to B.W., you then

12  showed a photo -- the same photo array to S.C., right?

13  **A.**   Yes.

14  **Q.**   And by that time, you actually had a Polaroid of Dean

15  that you took in the police department, correct?

16  **A.**   Yes.

17  **Q.**   And yet you chose to continue to use the color with the

18  gold background and -- I'm sorry.  You chose to continue to

19  use the photo with the gold background and the blown-up face?

20  **A.**   I kept the lineups the same instead of introducing into

21  this investigation multiple lineups.  I used the same photo

22  lineup to keep the continuity and everything within that in

23  a straight line.

24  **Q.**   Was there anything stopping you from substituting the

25  gold background with the blown-up face for the picture you

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - CROSS (Kanovitz)                                    658

```
1   took at the police station when you went and showed the photo

2   array to S.C.?

3   A.   Was there anything stopping me?  No.

4   Q.   So you made a conscious choice not to do that?

5   A.   I made a conscious choice to keep the lineups the same

6   throughout my investigation.

7   Q.   Now, another thing you could have done to account for the

8   backgrounds is you could have just blocked them out, right?

9   A.   I don't know how I would have done that.

10  Q.   Well, you are allowed to place covers over the nonfacial

11  portions of the pictures so that all photos will appear alike,

12  correct?

13  A.   I didn't know that at that time.

14  Q.   Sir, I mean, that's --

15  A.   I can tell you that we did cover up, like, if there was

16  number placards or something on there, we could try to cover

17  up numbers or anything like that.

18  Q.   And so you could have used -- done the same thing to

19  cover up the backgrounds, right?

20  A.   That was just not done.

21  Q.   My question is, you could have done that?

22  A.   If you want me to assume something, I guess I could,

23  yes.

24  Q.   Well, just like you blacked out the placards, you could

25  have blacked out the backgrounds?
```

MOORE - CROSS (Kanovitz)                                          659

1    **A.**   I feel that that is argumentative, but we -- that was

2    not our practice.

3              THE COURT:  Okay.  One, he's answered he didn't know

4    how to do that; and, two, could you do that?  Do you know

5    whether or not you could do that?

6              THE WITNESS:  It was not a practice.

7              MR. KANOVITZ:  For the record, Your Honor, I don't

8    believe he answered that he didn't know how to do that.  He

9    said just, "I had never seen it done."  But he knew how to

10   black out parts of a picture.

11       May I ask that question?

12             THE COURT:  You may.

13   BY MR. KANOVITZ:

14   **Q.**   Sir, is it true you knew how to black out parts of a

15   picture for a photo array?

16   **A.**   I wouldn't have done that.

17   **Q.**   My question is, isn't it true you knew how to do it?

18   **A.**   Okay.  I guess anybody would know, so, yes.

19   **Q.**   Okay.  It's common sense, right?

20   **A.**   I guess.  I mean, we're -- everything is seeming to be

21   argumentative.

22   **Q.**   Okay.  Sir, another option that you had available to you

23   was to use other GM badges as fillers, correct?

24   **A.**   Could have.

25   **Q.**   And you actually possessed GM badges that were like and

MOORE - CROSS (Kanovitz)                                        660

1   similar to Mr. Gillispie?

2   **A.**   The images in general, they were similar.

3   **Q.**   They were like and similar, correct?

4   **A.**   If you want to use that term.

5   **Q.**   I mean, that's a term you've used, correct?

6   **A.**   I believe so.  At some point in this.

7   **Q.**   Okay.  So you would agree that the badges you had from GM

8   were like and similar to the picture you used in Number 6,

9   correct?

10  **A.**   Yes, sir.

11  **Q.**   And those were of people other than Mr. Gillispie?

12  **A.**   Yes, sir.

13  **Q.**   Okay.  Thank you.  Okay, moving forward.

14       After you created the photo array, you eventually started

15  presenting it to the victims, right?

16  **A.**   Yes.

17  **Q.**   And by the time you presented the photo array to the

18  victims, almost two weeks had passed since the events in

19  question?

20  **A.**   Yes.

21  **Q.**   Had you previously in your career ever done a photo array

22  with witnesses after so much time had past?

23  **A.**   I don't remember.

24  **Q.**   Have you ever done it since?

25  **A.**   I don't remember.

MOORE - CROSS (Kanovitz)                                    661

1   **Q.**   Okay.  You would agree that the three victims who you

2   showed the lineup to were under a very stressful situation

3   when they viewed the perpetrator, correct?

4   **A.**   At the time of the incidence, yes.

5   **Q.**   And that's the only time that they had to view the

6   perpetrator was at the time of the incident, correct?

7   **A.**   Correct.

8   **Q.**   They had a gun pointed at them?

9   **A.**   They did.

10  **Q.**   And then at times they were blindfolded?

11  **A.**   Yes, I believe so.

12  **Q.**   Okay.  And at least for the 8-20 event, the perpetrator

13  wore sunglasses that masked part of his face, correct?

14  **A.**   He wore sunglasses, yes.

15  **Q.**   And it masked part of his face, correct?

16  **A.**   I guess so, yes.

17  **Q.**   And at times the women tried to look away from the man's

18  face because they were scared?

19  **A.**   I don't remember that being stated.  In fact, I know in

20  the incident, it was completely the opposite because the

21  suspect directed them to look at him.

22  **Q.**   At a certain point in time, he said, "Look at me" --

23  **A.**   Yes.

24  **Q.**   -- right?  But at other times, when they weren't being

25  ordered to do so, they tried to look away 'cause they were

MOORE - CROSS (Kanovitz)                                    662

1     scared, correct?

2     **A.**    I can't assume to know what they were trying to do at

3     that time.  I don't remember that being said.

4             THE COURT:  He doesn't remember that.  Move on.

5     BY MR. KANOVITZ:

6     **Q.**    You sat through both of Mr. Gillispie's trials?

7     **A.**    Yes, sir.

8     **Q.**    You heard all three of the victims testify?

9     **A.**    Yes, sir.

10    **Q.**    In fact, you heard all of the witnesses testify?

11    **A.**    Yes.

12    **Q.**    And you were there in order to assist the prosecutor do

13    the prosecutor's duties?

14    **A.**    Anything that he needed or asked of me I would have

15    done.

16    **Q.**    Okay.  Well, I mean, but that was the purpose for you to

17    attend, right?

18    **A.**    My purpose was to attend to assist the prosecutor.

19    **Q.**    Okay.  And you were there on behalf of the State, like a

20    representative?

21    **A.**    I would -- yes, I sat with the prosecutor at the

22    tables.

23    **Q.**    Okay.  Now, the first victim that you presented the

24    lineup to was C.W., right?

25    **A.**    Yes, on July 16.

MOORE - CROSS (Kanovitz)                               663

1    **Q.**   Thank you.  That was my next question.  July 16, 1988.

2    **A.**   July 16 --

3    **Q.**   I'm sorry.

4    **A.**   -- 1990.

5    **Q.**   I apologize.  Yes.

6          You presented to C.W. on July 16, 1990?

7    **A.**   Yes, sir.

8    **Q.**   And this was about a month after the phone call that you

9    had with Dean where he had asked you to wait two weeks?

10   **A.**   You're talking about the June 19th telephone call?

11   **Q.**   Yes.

12   **A.**   Yes.

13   **Q.**   And, now, you had some conversation with C.W. prior to

14   her coming to the department to view the photo array, correct?

15   **A.**   I had conversation with her prior to coming to view the

16   photo?  Well, I would have had to call her to ask her to

17   come in.

18   **Q.**   So the answer is yes, you had --

19   **A.**   Yes.

20   **Q.**   -- a prior conversation.

21         And you created no report documenting your conversation

22   with her when you made that call, correct?

23   **A.**   That's true.

24   **Q.**   So we don't know if any contamination occurred during

25   that call, correct?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
 1              MR. McLANDRICH:  Objection.

 2              THE COURT:  Sustained.

 3   BY MR. KANOVITZ:

 4   Q.   We don't know what you said to her during that call,

 5   correct?

 6              MR. McLANDRICH:  Objection.

 7              THE COURT:  Counsel, if you want to know what he

 8   said, ask her -- ask him.

 9              MR. KANOVITZ:  Okay.

10   BY MR. KANOVITZ:

11   Q.   So what did you say when C.W. picked up the phone?

12   A.   I don't remember the exact wording of what was said.  I

13   know that in response to that call, that she ended up coming

14   to the police department.

15   Q.   Okay.  Well, let's not skip over the call.

16        Based on your practices, what do you expect you would

17   have said to her at the time that you placed the call and she

18   answered the phone?

19   A.   I don't remember at this time.  You are asking me for

20   an assumption.

21   Q.   Well, let me ask you some specifics.

22        Was she surprised to hear from the police after two

23   years?

24   A.   I don't know what her feeling was at the time.  I would

25   probably think that she would be.
```

MOORE - CROSS (Kanovitz)                                    665

1   **Q.**   Did she ask you if you had found someone to be a suspect?

2   **A.**   I don't remember that.

3   **Q.**   And did she ask you if the person had hurt anyone in the

4   last two years?

5   **A.**   I -- I don't remember that at this time.

6   **Q.**   Did she ask you how you determined that -- to make this

7   man a suspect?

8   **A.**   And I don't -- you are talking about the telephone

9   call, right?

10  **Q.**   Yes, yes.

11  **A.**   I don't remember that.

12  **Q.**   Did she tell you anything about how good her memory was

13  from two years ago?

14  **A.**   I don't know.

15  **Q.**   Did she talk to you at all about what happened to her

16  during the crime?

17  **A.**   I don't know what was said during that telephone call.

18  I just know as a response to the call, that she ended up

19  coming out to the police department.

20  **Q.**   Did you ask her how she was doing?

21  **A.**   It would be an assumption.

22  **Q.**   And would you also assume you would have asked how her

23  sister was doing?

24  **A.**   I don't know if I would have ever said anything about

25  her sister at that point.

MOORE - CROSS (Kanovitz)                                   666

1   **Q.**   Okay.  And did you ask her what she meant when she used

2   the term "orangish-brown"?

3   **A.**   I don't know that I ever asked that question.

4   **Q.**   Okay.  How far -- I'm sorry.  How long was it between the

5   phone call where you contacted her after it had been two years

6   and when she finally came to the police station?

7   **A.**   I don't think there was a lot of time.  Within a day or

8   two.

9   **Q.**   Okay.  So she came down quick, to the best of your

10  recollection?

11  **A.**   Yes, sir.

12  **Q.**   Okay.  And when she arrived, you took her back to the

13  detective division portion of the police department, right?

14  **A.**   I didn't take her -- or did I.  Yes, I think -- I think

15  we would have been in the old detective section at that

16  time.

17  **Q.**   And you read her what are called the photographic showup

18  instructions, right?

19  **A.**   I read her photographic lineup instructions, correct.

20  **Q.**   And then you had her sign it?

21  **A.**   She signed, dated, and timed it.

22  **Q.**   And then you flipped over the photo array and showed her

23  the pictures, right?

24  **A.**   Yes.

25  **Q.**   And then she stared at the photo array for two minutes,

MOORE - CROSS (Kanovitz)                                          667

1    right?

2    **A.**    Well, I don't know if she stared at it the whole time

3    for two minutes.  The time from when I bring her -- bring

4    her in, set her down, read the photographic lineup

5    instructions to her, she signs, dates, and times them, and

6    then I flip over the photo array, and then we have some

7    other factors which lead into that.  So the two-minute time

8    period is actually including everything from Point A to

9    Point B.

10        And I think it was documented on those documents to

11   show what time I started to what time that it ended.

12   **Q.**    Okay, sir.  You just testified to a whole bunch of steps,

13   from bringing her back there to talking to her to getting a

14   identification.  Did you say all those things occurred in two

15   minutes, correct?

16   **A.**    Those were the things that I did, yes.

17   **Q.**    That's not my question.  I'm not asking what you did.

18   **A.**    Yes.

19   **Q.**    You are saying that all of those happened in the two

20   minutes that are documented on the police report?

21        THE COURT:  I think his testimony was from the time

22   he entered with the young lady until there was an

23   identification took two minutes.

24   BY MR. KANOVITZ:

25   **Q.**    The procedure, sir, is to have them sign and put the time

MOORE - CROSS (Kanovitz)                                          668

1    on the showup instructions and then to flip over the photo

2    array so that they can now see it, correct?

3    A.   That is what happens, yes.

4    Q.   I mean, that's your procedure, right?

5    A.   Yes.

6    Q.   So the time that they put on the instructions is the time

7    right before you flip over the array, correct?

8    A.   That is correct.

9    Q.   Okay.  And then after they pick someone out, you put the

10   time when they pick the person out, right?

11   A.   I believe that is on there, yes.

12   Q.   No, no.  I'm saying, that's the practice.  That's what

13   you do.

14   A.   Yes.

15   Q.   Okay.  And C.W. signed the form at 6:20 p.m., correct?

16   A.   Without seeing the form, I don't know what time it was.

17   I know it was a short period of time.

18   Q.   Okay.  Would you like to see the form?

19   A.   Sure.

20         MR. KANOVITZ:  Your Honor, could we publish

21   Plaintiff's Exhibit 58 at page 1.

22         MR. McLANDRICH:  If it's the form, I don't have any

23   objection.

24         THE COURT:  Any?

25         MS. FRICK:  No.

MOORE - CROSS (Kanovitz)                              669

```
 1              THE COURT:  It may be.
 2         (Exhibit displayed.)
 3              MR. KANOVITZ:  If you could just focus at the --
 4    yes.
 5    BY MR. KANOVITZ:
 6    Q.   Okay.  Does that refresh your recollection that C.W. put
 7    the time down at 6:20 p.m.?
 8    A.   That's what time she put it down, yes.
 9    Q.   And that's her handwriting, not your handwriting,
10    correct?
11    A.   That's correct.
12    Q.   Okay.  And then you document the time that she made the
13    identification, correct?
14    A.   I believe that's on another form.
15    Q.   But you do document that time, right?
16    A.   Yes.
17    Q.   And isn't it true that you documented that the
18    identification occurred at 6:22?
19    A.   I believe that's accurate.
20    Q.   Okay.  And that's recorded in your handwriting, right?
21    A.   I would have to see the document.
22    Q.   Okay.
23    A.   I believe that it is.
24    Q.   Okay.  Do you want to see the document?
25    A.   Yes.  These are all prescribed documents that we use
```

MOORE - CROSS (Kanovitz)                                          670

1    through Miami Township.

2              MR. KANOVITZ:  Could we show page 2 of Plaintiff's

3    58, please.

4        (Exhibit displayed.)

5    BY MR. KANOVITZ:

6    Q.   All right, sir.  Now, we are looking at the bottom of the

7    form here.  And 1822 hours, that's your handwriting, correct?

8    A.   That's correct.

9              MR. KANOVITZ:  You can take it down.

10   BY MR. KANOVITZ:

11   Q.   So the time between when you flipped over the photo array

12   and the time that she made an identification is two minutes?

13   A.   I think that I had said that before.

14   Q.   Okay.  So you agree with me then?

15   A.   Yes.

16   Q.   And would you also agree with me that during those two

17   minutes she was looking back and forth between several of the

18   photos?

19   A.   Yes.

20   Q.   And you watch her demeanor during those two minutes,

21   right?

22   A.   Yeah.  Her eyes became watery.

23   Q.   My question is, you watched her demeanor?

24   A.   That is part of her demeanor, but, yes.

25   Q.   And where her eyes are looking?

MOORE - CROSS (Kanovitz)                                       671

1    **A.**    I seen that she was tracking, yes.

2    **Q.**    And would you also agree that two minutes is a very long

3    time to take before recognizing someone?

4    **A.**    The whole time was not spent looking at that photo

5    lineup.  You're sitting here -- we had to go through the

6    process of reading the documents, have them signed and

7    dated.  The whole time is not spent just viewing that

8    lineup.

9    **Q.**    Sir, I thought we just agreed that between the time you

10   flipped over the array and the time that she made an

11   identification was two minutes, correct?

12   **A.**    That is the full time from reading and viewing and

13   ending, yes.

14   **Q.**    So -- all right.  You're saying -- so let's go back to my

15   question without regard to what you are saying -- strike that.

16       Would you agree that two minutes is a very long time to

17   take to recognize someone?

18   **A.**    Again, I do not believe that the whole two minutes is

19   used looking at that photo lineup at that time.  You have

20   other processes in there that also take up time.

21   **Q.**    That's not my question.  My question is, do you agree

22   that two minutes is a very long time to take to recognize

23   someone?

24           MR. McLANDRICH:  Objection.

25           THE COURT:  Well, it's a simple -- it's a simple

MOORE - CROSS (Kanovitz)                                    672

1    question.  Do you believe that two minutes, if you were

2    looking at pictures, would be a long time to identify someone.

3    If you do, you do; if you don't, you don't.

4              THE WITNESS:  If we're talking in general, yes.  But

5    if you're trying to apply it to this incident here, no,

6    because there were other factors.

7              THE COURT:  All right.  Next question.

8    BY MR. KANOVITZ:

9    Q.   At a certain point in time after watching her and

10   observing her demeanor, you decided to read to her a very

11   specific question from the sign-up instructions, correct?

12   A.   Well, that -- I believe the statement was actually read

13   prior to showing the photo lineup.  The first wording I

14   believe was.

15   Q.   What do you mean "the first wording was"?

16   A.   Well, there is different statements in there, and I

17   know in the report they are kind of run together.

18        I had made a statement prior to the photo lineup, and I

19   don't remember the exact words right now, but I had made a

20   statement to her that I wanted her to be basically 100

21   percent sure if she did make an identification.

22   Q.   Sir, you -- after watching her struggle, you read her the

23   sentence --

24              MR. McLANDRICH:  Objection.

25              THE COURT:  What is this?  Is this a question, or

 1    are you reading a statement?

 2              MR. KANOVITZ:  No.  This is a question.

 3              THE COURT:  Okay.  With regard to?

 4              MR. KANOVITZ:  What he said to her during the photo

 5    array.

 6              THE COURT:  Well, what you should do is -- let's ask

 7    him again whether or not he read a statement during -- while

 8    she was looking at a photo array, and then if he remembers,

 9    whatever you have there.

10    BY MR. KANOVITZ:

11    Q.   While she was looking at the pictures, did you read her a

12    sentence from the photo showup instructions?

13    A.   I don't remember whether I did that or not.

14    Q.   Okay, sir.  Do you recall testifying at a grand jury

15    proceeding to try to get an indictment of Mr. Gillispie?

16    A.   I remember testifying at grand jury, yes.

17    Q.   And you would have been under oath at that time?

18    A.   Yes.

19    Q.   And did you say the following:

20         "She narrowed it down to one person, and due to me using

21    the term '100 percent positive' she became hesitant.  So I

22    went ahead and I read her the question 'Do any of the people

23    in this lineup look similar and like?' and she said that she

24    had picked somebody out," right?

25    A.   I believe that is how that went, yes.

MOORE - CROSS (Kanovitz)                                    674

1   **Q.**   And when you said that you read her the question, you

2   were -- that was -- you were using shorthand for a specific

3   question that the instructions tell you to read, correct?

4   **A.**   Yes.  There is a one-liner at the bottom of the

5   photographic lineup instructions.

6   **Q.**   And that sentence is -- and, actually, the instructions

7   tell you to read that sentence if a witness cannot make an

8   identification, correct?

9   **A.**   Yes.

10  **Q.**   And the sentence says, "Do any of the persons shown in

11  the photographs resemble the person you saw?"

12  **A.**   That is what it says.

13  **Q.**   And that's when she picked out Mr. Gillispie, correct?

14  **A.**   Well, yes.

15  **Q.**   By the way, you never told C.W. that she didn't have to

16  pick someone out, correct?

17  **A.**   No.

18  **Q.**   Now, after you were finished with C.W., you needed to

19  show the array to B.W., right?

20  **A.**   B.W. came after C.W., yes, on July 17.

21  **Q.**   Please answer my question.  After you showed it to C.W.,

22  you needed to show it to B.W.?

23  **A.**   Yes.

24  **Q.**   And B.W. was scheduled to come in on Saturday.

25  **A.**   I don't think that that's how that went, that she was

MOORE - CROSS (Kanovitz)                                    675

1    supposed to come in on Saturday.  I think that I had been

2    told by her -- by C.W. that she wouldn't be able to come in

3    till Saturday.  But I know that they ended up showing up at

4    the police department on July 17.

5    **Q.**    So you asked C.W. when her sister was going to come, and

6    she said, "My sister is planning to come on Saturday," fair?

7    **A.**    Yeah.  I think I just said that, yes.

8    **Q.**    Okay.  But then -- and this was on Monday, the 16th, at

9    approximately 6:15 p.m.  I'm sorry -- yeah, 6:15 p.m.

10   **A.**    That would have been, I believe -- is it C.W.?

11   **Q.**    C.W., yeah.

12   **A.**    Yeah.

13   **Q.**    That's when C.W. told you that B.W. was going to come on

14   Saturday.

15   **A.**    Yes.

16   **Q.**    And then the next morning, on Tuesday, at 10:45, C.W.

17   shows up with B.W., right?

18   **A.**    On the 17th, yes.

19   **Q.**    So, you know, middle of the next morning, much sooner

20   than Saturday?

21   **A.**    I -- I believe it was around 1100 hours.

22   **Q.**    And you had given C.W. the opportunity to talk to B.W.

23   before B.W. saw the photo array, right?

24   **A.**    She had specifically been told not to talk about the

25   lineup to her sister.

1    **Q.**    You gave her the opportunity to talk to her sister before

2    she viewed the photo array, correct?

3    **A.**    I believe that that would be an assumption that that

4    would even happen.  But the answer to the question itself

5    is, yes, there would have been a possibility.

6    **Q.**    And to your point about assumption, did you assume that

7    sisters are likely to talk to each other or not likely to talk

8    to each other?

9    **A.**    She was given specific instructions not to talk about

10   the lineup.

11   **Q.**    Now, you could have scheduled B.W. and C.W. for the same

12   day, correct?

13   **A.**    I think that there was something about one or the other

14   working, and I'm not sure which one it was at the time.  I'm

15   not sure how that all played out.

16          I don't remember that.  We're dealing 30 years ago.

17   **Q.**    At some point in time, though, there would have been a

18   day where they were both not working, correct?

19   **A.**    I would assume that, yes.

20   **Q.**    And, of course, B.W. was able to come down together with

21   C.W. on Tuesday morning?

22   **A.**    I would agree with that.

23   **Q.**    So you could have scheduled the two of them to come to

24   the police station at the same time?

25   **A.**    I don't remember exactly what the issue was as to why

MOORE - CROSS (Kanovitz)                                    677

1    they couldn't come at the same time.

2    **Q.**    That's not my question.  You could have scheduled them to

3    come at the same time?

4    **A.**    Well, you could have.

5    **Q.**    You chose not to?

6    **A.**    It's choices that I made.

7    **Q.**    Now, after B.W. had gone through the photo array with

8    you, you brought B.W. and C.W. together in a room, right?

9    **A.**    After the fact, yes.

10   **Q.**    And you gave them feedback about the pictures, correct?

11   **A.**    I believe we discussed it.

12   **Q.**    You told them, "You picked out the guy that I suspected."

13   **A.**    I don't know what the wording was and what specifically

14   was said.  I do know that there was a conversation between

15   all three of us.

16   **Q.**    It was words to the effect that they picked out the

17   person you suspected, correct?

18   **A.**    Yes.

19   **Q.**    And you actually gave them Mr. Gillispie's last name?

20   **A.**    I believe that -- I don't actually remember that

21   independently, but I believe that that is a possibility.

22   **Q.**    And you told them they verified that Mr. Gillispie was

23   the perpetrator?

24   **A.**    I don't know if that's the exact same words, but I did

25   let them know they both had identified the same individual.

MOORE - CROSS (Kanovitz)                                    678

1   **Q.**   You used the term "verified," correct?

2   **A.**   Without seeing that, I don't know.  It's 30 years

3   later.  I don't know what the exact wording is.

4   **Q.**   Okay.  Sir, you were there at plaintiff's second trial,

5   correct?

6   **A.**   Yes, sir.

7              MR. KANOVITZ:  Counsel, this is page 306 of the

8   transcript, and it's page 51 of Plaintiff's Exhibit 59.

9              THE COURT:  I assume this is being read as

10  impeachment?

11             MR. KANOVITZ:  Yes, yes.

12  BY MR. KANOVITZ:

13  **Q.**   Sir, why --

14             MR. KANOVITZ:  Counsel, you ready?

15             MR. McLANDRICH:  I mean, my computer's frozen.

16             MR. KANOVITZ:  Here, I can just show you.

17             THE COURT:  Counsel, why don't you just read it.

18  BY MR. KANOVITZ:

19  **Q.**   Sir, were you asked these questions and did you give

20  these answers:

21      "Question:  So you told them that their identification

22  verified what you thought?"

23      "Answer:  Yes.  When you say the word 'verified,' I

24  remember saying that."

25      Were you asked those questions, and did you give those

MOORE - CROSS (Kanovitz)                                    679

1   answers?

2   **A.**   I evidently did say that.  It's on the transcript.

3   **Q.**   Okay.  Did either B.W. or C.W. talk to you about the fact

4   that the man's face was partially masked by the sunglasses?

5   **A.**   I don't remember us having that discussion.

6   **Q.**   Did either of them tell you, you know, it's hard to be

7   certain because he was wearing sunglasses?

8   **A.**   I don't remember them ever saying that.

9   **Q.**   Did you ask them about why they decided to pick

10  Mr. Gillispie?

11  **A.**   I think there were some statements which would have

12  been put at the bottom of the fact sheet.

13  **Q.**   Fair enough.  So the statements that you wrote down for

14  C.W. were that "His face is full.  The hair looks the same,"

15  right?

16  **A.**   I think I remember reading that, yes.

17  **Q.**   Well, you wrote it down, right?

18  **A.**   Yeah.  I mean, without seeing the document, but I am

19  pretty sure that I would be the one that writes it down.

20  **Q.**   And for B.W., all you wrote down is "It's him, Number 6,"

21  right?

22  **A.**   Yes.

23  **Q.**   And so by the time B.W. had arrived, her sister had

24  already seen the picture of Mr. Gillispie with the face blown

25  up and the golden background, right?

MOORE - CROSS (Kanovitz)                                    680

```
 1            MR. McLANDRICH:  Objection.

 2            THE COURT:  I think that's already been asked and

 3   answered.

 4            MR. KANOVITZ:  Okay.

 5        This would be a good time to stop.

 6            THE COURT:  Ladies and gentlemen, we are going to

 7   recess for the lunch hour.  We will reconvene right around

 8   1:15.  Please remember the Court's admonitions:  Don't discuss

 9   the case amongst yourselves or with anyone else.

10        A little change, folks.  You are going to -- supposedly,

11   we need you to go to the grand jury room during the lunch

12   hour, or that will be your gathering place.  They will lead

13   you down there.  Supposedly, we have got some things going on.

14   Some kind of installation is going on in the other room.  So

15   we'll lead you to the right place.

16            THE COURTROOM DEPUTY:  All rise.  This court stands

17   in recess.

18        (Jury out at 11:56 a.m.)

19        (Recess at 11:56 a.m.)

20        (Jury in at 1:22 p.m.)

21        (In open court at 1:22 p.m.)

22            THE COURT:  Counsel approach.

23        (At sidebar off the record.)

24            THE COURT:  Ladies and gentlemen, welcome back.

25        We are back on the record.
```

1          Counsel ready to proceed?

2                MR. KANOVITZ:  Yes.

3                MR. McLANDRICH:  Yes, sir.

4                MS. FRICK:  Yes, sir.

5                THE COURT:  You may.

6                MR. KANOVITZ:  Thank you.

7     BY MR. KANOVITZ:

8     **Q.**   Sir, when we broke, we were talking about the time when

9     you showed the photo array first to C.W. and then to B.W.  Do

10    you recall that?

11    **A.**   Yes, sir.

12    **Q.**   Okay.  And I just want to clarify something on the

13    timing.  C.W. came and saw the photo array on July 16, 1990,

14    in the evening, right?

15    **A.**   I believe that's correct, yes.

16    **Q.**   And at that time, B.W. was scheduled to come on the

17    following Saturday, right?

18    **A.**   I know there is statements concerning Saturday.  I

19    don't know how that came about or whether it was -- I think

20    that's when C.W. told me that B.W. would probably be coming,

21    Saturday.

22    **Q.**   Okay.  So on the 6 -- on July 16th, the expectation was

23    that B.W. would not be coming to the police station until

24    Saturday?

25    **A.**   Yes.

MOORE - CROSS (Kanovitz)                                    682

1    **Q.**   Okay.  And then she showed up the following morning,

2    which was Tuesday, July 17th?

3    **A.**   Yes.  So I think it was around 1100 hours, 1107,

4    something like that in there.

5    **Q.**   Now, let's talk about showing the photo array to S.C.

6         We previously covered that by the time you showed the

7    photo array to S.C., you already have the Polaroids that you

8    took of Dean while he was at the police station, right?

9    **A.**   Yes.

10   **Q.**   Okay.  And, essentially, six weeks passed from the time

11   when you showed the photo array to B.W. until you showed it to

12   S.C., correct?

13   **A.**   I believe so, yes.  That's about right.

14   **Q.**   Okay.  And when you showed it to S.C., you were wanting

15   her to strengthen your case, correct?

16   **A.**   I was trying to corroborate my case, yes.

17   **Q.**   Okay.  Well, to actually strengthen your case, correct?

18             MR. McLANDRICH:  Objection.

19             THE COURT:  He's answered the question.

20        I mean, was it to strengthen your case?

21             THE WITNESS:  It was to strengthen but also

22   corroborate.

23             THE COURT:  Okay.

24   BY MR. KANOVITZ:

25   **Q.**   And C.W. and B.W., when they observed the perpetrator,

MOORE - CROSS (Kanovitz)                                    683

1    his face was partially masked with the sunglasses, right?

2    A.    He had sunglasses on.

3    Q.    And with S.C. there was no sunglasses, right?

4    A.    That's correct.

5    Q.    So an identification by S.C. would strengthen your case

6    against Dean, correct?

7    A.    Well, I wasn't looking at that at that time, but, yeah.

8    Q.    Well, that was one of the -- one of the concerns you had

9    when you went into the photo array with S.C., right?

10   A.    I wouldn't say that I had a concern at that time,

11   because as far as I was concerned, the victims in this case,

12   when they were looking at the lineup, they are going to be

13   looking at the face.

14        You know, I know we keep going over the sunglasses as

15   being a mask.  I think she even said glasses could be a

16   mask.  So based on her statement, anybody who is wearing

17   glasses is wearing a mask.

18   Q.    Okay.  Another reason why you want -- you wanted S.C. to

19   confirm was because when two years had past, it causes doubts,

20   right?

21   A.    Repeat that question.

22   Q.    Another reason why you wanted S.C. to confirm B.W. and

23   C.W. is because when two years had past, it causes doubts?

24   A.    Well, I don't -- someone who goes through a traumatic

25   experience like that --

MOORE - CROSS (Kanovitz)                                    684

```
 1              THE COURT:  Detective, Detective, what I think is

 2    being asked is what were your feelings at that point in time.

 3    He's asking you what your feelings are.

 4              THE WITNESS:  And I --

 5              THE COURT:  And your feelings are only your

 6    feelings.  You don't have to adopt questions or anything.  You

 7    just tell him what your feelings are.

 8              THE WITNESS:  Okay.

 9              THE COURT:  If you had any feelings.

10              THE WITNESS:  At this time, I don't independently

11    remember whether -- what I felt.

12    BY MR. KANOVITZ:

13    Q.   Okay.  This is from your deposition of November 6, 2018,

14    pages 208 -- page 208, line 15.

15              MR. McLANDRICH:  Exhibit?

16              MR. KANOVITZ:  It is PX153.  And that will be 208,

17    line 15, to 209 --

18              MR. McLANDRICH:  153?  That's not what I see.

19              MR. KANOVITZ:  I'm sorry.  Yes, it's PX153.

20              MR. McLANDRICH:  Thank you.  I'm sorry.  Page again?

21              MR. KANOVITZ:  208, line 15, through 209, line 11.

22              MR. McLANDRICH:  Okay, I'm with you.  Go ahead.

23    BY MR. KANOVITZ:

24    Q.   Okay.  Were you asked these questions and did you give

25    these answers:
```

MOORE - CROSS (Kanovitz)                                    685

1          "Question:  One of the things that happened here --"

2              MR. KANOVITZ:  Are you ready to display?

3          (Exhibit displayed.)

4    BY MR. KANOVITZ:

5    Q.   "Question:  One of the things that happened here with the

6    photo lineups that you conducted was that they were just under

7    two years after the original incident, correct?"

8          "Answer:  Correct."

9          "Was that an issue of concern for you in administering

10   the lineups?"

11         Then there is an objection.

12         Then you answer, "Okay.  Was it an issue?  You always

13   have doubts when you do a lineup that has a period of time

14   from an offense to the time the identification is made, which

15   is also one of the reasons why I ended up going back to -- or

16   going to see S.C. was to pack up the existing case that I have

17   on Connie and Bonnie."

18         Were you asked those questions; did you give those

19   answers?

20   A.   Yes, sir.  I was just telling you, I don't

21   independently remember that at this time.

22   Q.   But you would agree that it's an issue of concern when

23   two years have passed?

24   A.   I think that any time you have a space of time -- my

25   objective, though, at that time was to corroborate the

1    victims in my case versus the other case.  And her also

2    being someone that is not related to the other victim in the

3    case.

4    Q.   And so you were in hopes that S.C. would pick Dean from

5    the lineup, correct?

6              MR. McLANDRICH:  Objection.

7              THE COURT:  Sustained.

8    BY MR. KANOVITZ:

9    Q.   It's been sustained.  You don't have to answer.

10        Your hope in building your investigation was that S.C.

11   would corroborate B.W. and C.W.?

12   A.   I don't know that the word "hope" was during that

13   period of time.  I know that that was initially used on the

14   other one.  But, yes, I wanted S.C. to view the photo lineup

15   and see if she could make an identification in order to

16   bolster my case involving C.W. and B.W.

17   Q.   And without regard to when you said the word "hope," I am

18   asking you, it is, in fact, the case that you were hoping she

19   would pick Dean, correct?

20             MR. McLANDRICH:  Objection.

21             THE WITNESS:  I --

22             THE COURT:  Sustained.

23   BY MR. KANOVITZ:

24   Q.   Okay.  Because Sandra saw the man without the sunglasses

25   on, she was able to see the color of his eyes, correct?

MOORE - CROSS (Kanovitz)                                    687

1    **A.**    I believe so, yes.

2    **Q.**    And she had given a description of eye color, right?

3    **A.**    I think she said blue.

4    **Q.**    Yes.

5            MR. KANOVITZ:  Could we have the photo array back

6    up.

7        (Exhibit displayed.)

8    BY MR. KANOVITZ:

9    **Q.**    Okay, sir.  Looking at the photo array, it's pretty clear

10   that Number 4, Mr. DePetrio, Detective DePetrio, has brown

11   eyes, correct?

12   **A.**    Based on the photo, it appears that way.

13   **Q.**    And that's how it would have appeared to S.C. when you

14   were presenting it, correct?

15   **A.**    Yes, sir.

16   **Q.**    Number 5, brown eyes?

17   **A.**    Yes.  When we were blowing it up and making it a little

18   bit bigger, yeah.

19   **Q.**    Well, sir, when you look at it at the size of the photo

20   array, he clearly has brown eyes, does he not?

21   **A.**    Well, yes.

22   **Q.**    Okay.  And 2 clearly has brown eyes.

23           THE COURT:  Let's move -- let's move the depiction

24   around.  I don't know whether -- do you have a -- I don't know

25   whether they have that.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - CROSS (Kanovitz)                                          688

```
1        I'm sorry.  Go ahead.  There was a picture up -- the
2   cameras take pictures of people, and there was a picture up in
3   front of my --
4   BY MR. KANOVITZ:
5   Q.    And Number 2, when you look at it, clearly has brown
6   eyes?
7   A.    I guess it appears that way, yeah.
8   Q.    Number 3, it's a little harder to tell, but they're
9   brown, right?
10  A.    Actually, Number 2 is kind of harder to tell.
11          MR. KANOVITZ:  Could you zoom in.
12          THE WITNESS:  His is also --
13  BY MR. KANOVITZ:
14  Q.    2's got brown eyes.
15          THE COURT:  Is that a question?
16          MR. KANOVITZ:  Yes.  Sorry, Your Honor.
17          THE WITNESS:  Actually, I'm seeing -- I'm not sure
18  I'm seeing -- I think I'm seeing blue around his eyes.  Again,
19  it all comes to the camera angles and stuff like that on the
20  pictures.
21  BY MR. KANOVITZ:
22  Q.    Okay.  So it's your testimony that Number 2 looks blue to
23  you?
24  A.    No.  It's Number 3 that we were talking about.
25  Q.    I'm sorry.  You're right.
```

MOORE - CROSS (Kanovitz)                                    689

1        So when you look hard, it's hard to tell, but they might

2    be blue, they might be brown; is that fair to say?

3    A.   Yeah.  I mean, even with the blowup, it's hard to tell.

4    Q.   Now, Number 1, though, looks like blue eyes, right?

5    A.   Yes.

6    Q.   And then Dean very clearly has blue eyes?

7    A.   Dean has blue eyes, or appears to be blue, yes.

8    Q.   Now -- and that's how it would have appeared at the time

9    you presented it to S.C., correct?

10   A.   Yes.

11   Q.   Okay.  Now, when you showed it to S.C., she looked at the

12   photo array for a bit, and then she said she wanted to look at

13   it in better light, correct?

14   A.   That's correct.

15   Q.   And so she took it outside so that she had better light?

16   A.   That's correct.

17   Q.   And once she had better light, she looked at it for a

18   little bit longer.  Yes?

19   A.   Yes.

20   Q.   And at that point, she picked Dean, correct?

21   A.   Actually, she was already identifying Roger in the

22   house.

23   Q.   Well, she certainly wanted to go outside and see the

24   picture in the light, right?

25   A.   That's because she wanted to get an even better look,

1    but, yes, she was already identifying him in the house.  She

2    requested more light and suggested that we go outside on the

3    porch.

4    **Q.**   Well, she didn't tell you what feature it was of his that

5    she wanted to look at in better light, did she?

6    **A.**   No.  She just wanted to look at the picture in higher

7    light.

8    **Q.**   Now, switching topics, after you completed these

9    procedures where you showed the photo lineup to the three

10   victims, there came a time where they had to come to court,

11   right?

12   **A.**   There was a time, yes.

13   **Q.**   And the court identification procedure is more formal

14   than when you were sitting with them with the photo array,

15   right?

16   **A.**   I'm not sure I understand that question.

17   **Q.**   Well, they are under oath, right?

18   **A.**   Yes.

19   **Q.**   There is a -- there's attorney's there.  There's a judge

20   there.  That's what I mean.

21   **A.**   Yes.

22   **Q.**   And you're not able to sit by them while they make an

23   identification, right?

24   **A.**   That would be correct.

25   **Q.**   Okay.  And you knew that once it was in court, they were

MOORE - CROSS (Kanovitz)                                     691

1    going to be asked questions about how certain they were of the

2    identification that they picked.  Yes?

3    A.   Prior to, I didn't know what was actually going to be

4    asked of them.  I would probably think that that might be

5    what was asked.

6    Q.   That was your expectation?

7    A.   It was what I thought might be asked, yes.

8    Q.   Okay.  And so you thought that Dean's lawyers might want

9    to ask about the fact that they described the hair as

10   blondish?

11            MR. McLANDRICH:  Objection.

12            THE COURT:  I'm assuming that -- do you have

13   previous testimony?  I mean, you are asking him specific

14   questions with regard to the description.  You haven't asked

15   him what generally he expected.

16       I will let you go ahead with this, but -- go ahead and

17   ask the question.

18            MR. KANOVITZ:  Thank you.

19   BY MR. KANOVITZ:

20   Q.   Was it your expectation that Dean's lawyers would ask the

21   women about the identification that they had made at the time

22   in question?  I'm sorry.  About the description they had given

23   of the perpetrator at the time of the events in question?

24   A.   I knew that was a possibility.

25   Q.   And so you knew, for example, they might be asked about

MOORE - CROSS (Kanovitz)                                    692

1    his hair color?

2    **A.**   I didn't know what they would ask, but I do know that

3    they would most likely do something like that, yes.

4    **Q.**   Okay.  And you met with the women before they got on the

5    stand?

6    **A.**   I can't remember whether I specifically did or whether

7    the prosecutor did.

8    **Q.**   Well, isn't it true you talked to them before they got on

9    the stand and you told them you believed that Dean had

10   purposely changed his appearance?

11   **A.**   I think that there was a statement about that.  It had

12   to do with the fact that between 8-8 and I believe 9-5, that

13   the hair had been cut and that it was appearing different to

14   me, or something like that.  I know that there was a

15   statement.

16   **Q.**   And the statement was, you were telling them, hey, before

17   you get on the stand, I just want you to know that I believe

18   Dean had changed his appearance?

19   **A.**   I don't remember if that was directly the wording, but

20   if you just read that, I would have to say that it is.

21   **Q.**   Okay.  So this is Plaintiff's Exhibit 3, 199, 19?

22              THE COURT:  And, Counsel, from now on, if you are

23   going to do that, you need to ask him whether he remembers

24   making a statement.  If he doesn't remember making a

25   statement, then you can make everyone's reference and bring

MOORE - CROSS (Kanovitz)                                      693

1   those things to his attention.

2            MR. KANOVITZ:  Okay.

3            THE COURT:  All right?

4            MR. KANOVITZ:  Fair enough.  Thanks, Judge.

5   BY MR. KANOVITZ:

6   Q.   So do you recall testifying at plaintiff's first --

7   Mr. Gillispie's first criminal trial that you told the three

8   victims that you believed the victim -- you believed that Dean

9   had died his hair?

10  A.   I know that there was some discussion --

11           THE COURT:  That's a yes or no.  Did you do that?

12           THE WITNESS:  I don't -- I mean, I -- I do know that

13  there was something that had been made.  I don't know the

14  context of it.

15  BY MR. KANOVITZ:

16  Q.   Well, putting aside the context, the gist of it was you

17  were telling them you believed Dean had died his hair?

18  A.   I don't know if that was specific like that.

19  Q.   Okay.

20           MR. KANOVITZ:  Your Honor, I'd like to read this

21  portion of his testimony as an admission by a party opponent.

22           THE COURT:  Is this an impeachment?

23           MR. KANOVITZ:  Rather than doing impeaching, I'd

24  like to admit the admission that he made.  I'd like to offer

25  the admission that he made.

MOORE - CROSS (Kanovitz)                                          694

```
 1              THE COURT:  Counsel?

 2              MR. McLANDRICH:  He's -- I don't think that's

 3   appropriate.  He's here.  He can ask him the question.  He can

 4   impeach him.

 5              THE COURT:  Ask him the question.  If he doesn't --

 6   then ask him whether or not he made that statement.

 7   BY MR. KANOVITZ:

 8   Q.   Okay.  Sir, did you tell the three women before they got

 9   on the stand that they could expect to see Dean in the

10   courtroom?

11   A.   That would have been either me or the prosecutor.  I

12   don't know who would have been talking to them at the time.

13   Q.   Okay.  This is 199, questions -- lines 1 through 5.

14              MR. McLANDRICH:  Is this the criminal trial?

15              THE COURT:  Now, for the record, you are making

16   reference to what document?

17              MR. KANOVITZ:  Plaintiff's Exhibit 3, which is the

18   first criminal trial.  I'm sorry.  Which is the -- yeah, first

19   criminal trial.

20        (Exhibit displayed.)

21   BY MR. KANOVITZ:

22   Q.   Sir, were you asked these questions, and did you give

23   these answers:

24        "Question:  You told them that they could expect to see

25   Dean in the courtroom, right?"
```

1          "Answer:  I explained to them the procedures that they

2     would have go through if they chose to pursue it through

3     court."

4          And you are referring to yourself and not the prosecutor

5     there, right?

6     A.   This -- this part seems like this was something had

7     been said prior to.  I'm not -- I don't know that it was at

8     that hearing.  That seems like something that I had -- when

9     I was going through my report, that I had seen.

10    Q.   We're missing each other.  So let me try to make it

11    clear.

12         Before they got on the stand, in court, you had a

13    conversation with them, right?  And I'm not saying you had

14    that before you testified, like immediately before you

15    testified at the trial.  I'm saying before they first took the

16    stand in a court.

17    A.   I don't independently remember that.

18    Q.   Okay.

19              MR. KANOVITZ:  Your Honor, based upon his lack of

20    recollection, may I offer his admission?

21              THE COURT:  Why aren't you going to cross-examine

22    him with regard to it?  I mean, are you meaning to admit this

23    statement that he made?

24              MR. KANOVITZ:  Well, yes.  Several question and

25    answers beyond this as well.

1          THE COURT:  Well, I don't know what any of that is

2     at this point in time.

3          MR. KANOVITZ:  Okay.  Fair enough.

4     BY MR. KANOVITZ:

5     **Q.**   After you were asked that question, isn't it true that

6     you were asked if you told them that Dean had tried to change

7     his appearance, right?

8          MR. McLANDRICH:  Could we approach, Your Honor?

9          THE COURT:  Yeah, let's approach.

10         (At sidebar.)

11         MR. KANOVITZ:  I'm sorry if I'm missing.  I brought

12    the three questions and answers.  I don't know how to do it by

13    impeachment if he says "I don't remember."  Do I impeach him

14    just from the recollection?

15         THE COURT:  Yes.

16         MR. KANOVITZ:  I am sorry.  I didn't understand.

17         MR. McLANDRICH:  Here's the issue I want to raise.

18    When you say the criminal trial, it gives the impression to

19    this jury that those things were said in the presence of the

20    criminal trial jury and potentially swaying them during the

21    criminal trial, when these things are from the suppression

22    hearing.

23         MR. KANOVITZ:  This testimony is during the criminal

24    trial.  The time that he said it to them he claims is right

25    before the suppression hearing, but his testimony here, this

MOORE - CROSS (Kanovitz)                                        697

1    is the criminal trial.

2            THE COURT:  So let's don't refer to -- you can refer

3    to the fact that you have -- was he in court on this date and

4    da, da, da, and did he testify.  You don't need to refer to it

5    as a criminal trial.  You don't need to refer to that.

6        Ask him whether he said that or remembers saying that.

7    If he says not, then bring it up and say, in this trial, in

8    this transcript --

9            MR. KANOVITZ:  Okay.

10           THE COURT:  -- this is you.

11           MR. KANOVITZ:  Thank you.

12           MR. McLANDRICH:  I think that's proper.

13           THE COURT:  I assume that's -- okay.

14           MR. KANOVITZ:  Thank you, Judge.

15       (In open court.)

16           THE COURT:  All right.  The Court's sustaining the

17   objection to the extent that the parameters that I gave you.

18           MR. KANOVITZ:  Understood.  May I proceed?

19           THE COURT:  You may.

20           MR. KANOVITZ:  Thank you.

21   BY MR. KANOVITZ:

22   **Q.**  Okay.  Sir, do you recall being under oath in court and

23   testifying about what it is that you said to the three women

24   about Mr. Gillispie's appearance?

25           THE COURT:  Counsel, let's have a specific time, an

MOORE - CROSS (Kanovitz)                                    698

1    event for that.

2    BY MR. KANOVITZ:

3    Q.    On February 5th of 1991.

4    A.    During the first trial?

5    Q.    Correct.  And were you asked these questions and did you

6    give these answers?  This is 199, lines 1 through 17.

7          "Question --"

8              MR. McLANDRICH:  I thought first you were going to

9    ask him if he remembered saying it.

10             THE COURT:  Right.

11   BY MR. KANOVITZ:

12   Q.    Do you remember at that proceeding testifying about a

13   conversation that you had with the three women?

14   A.    I do not independently remember that.

15             MR. KANOVITZ:  May I proceed?

16   BY MR. KANOVITZ:

17   Q.    Okay.  Sir, were you asked these questions and did you

18   give these answers:

19         "Question:  You also told them that they could expect to

20   see Dean in the courtroom, right?"

21         "Answer:  I explained to them the procedures that they

22   would have to go through if they chose to pursue it through

23   court."

24         "Question:  And you told them that Dean had tried to

25   change his appearance, didn't you?"

1          "Answer:  Yes, sir, I did.  That's later on, of course."

2          "Question:  And did you in preparation for their

3     testimony in the courtroom, right?"

4          I'm sorry.  "Question:  And you did that in preparation

5     for their testimony in the courtroom, right?"

6          And there were some objections.

7          And then you answer, "I wanted them to know that his

8     appearance had changed, yes.  That he made attempts to change

9     his appearance."

10         Were you asked those questions, and did you give those

11    answers?

12    A.   Based on that, what you are reading, I would have to

13    say yes.

14    Q.   Okay.  So, now, when you told them before they got on the

15    stand that you believed he changed his appearance, that is

16    what you genuinely believed, right?

17    A.   I'm still kind of confused on the point of that

18    statement you are saying is on the first trial, or if that

19    was the statement that was made to them during one of the

20    other hearings, because it's --

21    Q.   Two statements.  So you made a statement to them before

22    they got on the stand at one of the other hearings.  And then

23    what I just read to you was your testimony about making that

24    statement that you gave at the first trial.  Understood?

25    A.   Okay, yes.  And, yes.

1    **Q.**    Yes is the answer?  Okay.

2         Now, you had no basis to know whether he had changed his

3    appearance or not, correct?

4    **A.**    Other than observation.

5    **Q.**   Well, at what point in time did you personally observe

6    him in that he looked any different than he did at trial?

7    **A.**    Well, see, I'm looking at the statement, and for me it

8    seems like that was the period of time between 8-8 of '90

9    and 9-5 of '90.  And that's why I'm kind of getting confused

10   in there, because I know that there was something said

11   during that period of time.  So I'm getting kind of confused

12   on times.

13        I know that you are saying that this is in the first

14   trial and that these statements are being made --

15   **Q.**   I think I -- I think I understand what you are saying

16   right now.  And so my question is, are you claiming that when

17   you told them he changed his appearance, all you were

18   trying -- all you were saying to them, in fact, was he changed

19   his appearance after the photo array and before you saw him in

20   court?

21   **A.**    I personally don't remember what the reasoning is

22   behind it.

23   **Q.**    Okay.

24   **A.**    That's why I'm just -- I'm confused about periods of

25   time.

MOORE - CROSS (Kanovitz)                                    701

1    **Q.**   So you could have -- you could have investigated whether

2    Dean's appearance at the time of the events in question was

3    the same as his appearance at the time that the women first

4    took the stand in court, correct?

5    **A.**   We can sit here and talk about woulda, shoulda,

6    coulda --

7                THE COURT:  No, no, no, no, no.  The question is,

8    you could have investigated between the time the women --

9                MR. KANOVITZ:  Of the events in question.

10               THE COURT:  The events in question and when?

11               MR. KANOVITZ:  When they saw him in court.

12               THE COURT:  Did you investigate that?

13               THE WITNESS:  I did not.

14               THE COURT:  His appearance.

15               THE WITNESS:  No.

16   BY MR. KANOVITZ:

17   **Q.**   And you had options available to you to investigate that

18   before you told the women that he had changed his appearance,

19   correct?

20   **A.**   I don't know what options those would be.

21   **Q.**   Well, you could have gone to people at GM where Dean

22   worked at the time of the events in question and asked them

23   what was his appearance like in August of 1988, correct?

24   **A.**   Well, that would be assuming that I knew someone at GM

25   that I could go to and ask that specific question.  It also

MOORE - CROSS (Kanovitz)                                          702

1    would assume that the employees are the same at that time.

2    I would have to know somebody to go to.

3    Q.   Well, you had a contact over at GM, right?

4    A.   The person that ended up bringing us the IDs.

5    Q.   Mr. Wolfe --

6    A.   Yes.

7    Q.   -- the guy that was in charge of the security department,

8    right?

9    A.   That's correct.

10   Q.   And you called him a couple times during the course of

11   your investigation, right?

12   A.   We had conversations, yes.

13   Q.   So isn't it true that you could have called up Mr. Wolfe

14   and said, "Hey, I need to know what Dean's appearance was like

15   in August of 1988"?

16   A.   We're sitting here talking about a coulda, and the

17   coulda is --

18   Q.   That's the question, could you have?

19   A.   Yes.

20   Q.   And you did not?

21   A.   And --

22           THE COURT:  That's been asked and answered.

23   BY MR. KANOVITZ:

24   Q.   All right, sir.  I want to talk to you about some

25   potentially missing documents.

1        We previously talked about the fact that when you were

2   assigned the case you received the complete file, right?

3   **A.**   I received the file from Steve Fritz.

4   **Q.**   You used the term "complete file" when you testified,

5   right?

6   **A.**   I guess so, yes.

7   **Q.**   And we talked about the fact that whatever it was that

8   Fritz and Bailey had written at that point you would have had

9   possession of, correct?

10  **A.**   Everything that I was given, yes.

11  **Q.**   Okay.  Now, another set of documents that were at issue

12  here are the camping cards, correct?

13  **A.**   Those became an issue in the trial, yes.

14  **Q.**   Because those were potential pieces of evidence to

15  confirm Dean's alibi for 8-20, right?

16  **A.**   Those -- those were evidence concerning that period of

17  time.

18  **Q.**   And you came to possess some of the cards from the

19  campground?

20  **A.**   Three, I believe, yes.

21  **Q.**   And, well, we can agree that you only gave three cards to

22  the prosecutor, correct?

23  **A.**   That's because I only had three cards to give to the

24  prosecutor.

25  **Q.**   But we can agree that you only gave three cards to the

MOORE - CROSS (Kanovitz)                                         704

1    prosecutor?

2    **A.**    Yes, sir.

3    **Q.**    Okay.  And you filed an affidavit in 2008 where you swore

4    that those were the only three cards that you ever received,

5    right?

6    **A.**    I believe so, because that was what I received.

7    **Q.**    Okay.  I'd like to go through those three cards.

8             MR. KANOVITZ:  Your Honor, at this time we'd like to

9    publish Plaintiff's Exhibit 205, page 4.

10            THE COURT:  Any objection on those?

11            MR. McLANDRICH:  First, I have to see what it is.

12   I'm sorry, Your Honor.  I'm not sure.

13            MR. KANOVITZ:  May I approach?

14        No objection?

15            MR. McLANDRICH:  No objection.  Thank you.

16            THE COURT:  It may be.

17            MS. FRICK:  No objection.

18        (Exhibit displayed.)

19   BY MR. KANOVITZ:

20   **Q.**    So one of the three cards that you gave to the prosecutor

21   is dated May 26, 1988, right?

22   **A.**    Yes, it is.

23            MR. KANOVITZ:  Could we go to page 5, please.

24        (Exhibit displayed).

25   BY MR. KANOVITZ:

MOORE - CROSS (Kanovitz)                                    705

1    **Q.**    A second card that you gave to the prosecutor is dated

2    July 17, '88, correct?

3    **A.**    It appears to be 15.

4    **Q.**    Okay.  Fair enough.

5    **A.**    7-15-88.

6    **Q.**    So the second of the three cards that you gave to the

7    prosecutor has a date of 7-15-88, July of '88, correct?

8    **A.**    Yes, sir.

9    **Q.**    And then the third of the three cards that you gave to

10   the prosecutor -- this is page 6 -- is dated June of 88,

11   correct?

12   **A.**    June 24th of '88.

13   **Q.**    So the three cards that you gave to the prosecutor, one

14   is from May, one is from June, and one is from July?

15   **A.**    Correct.

16   **Q.**    Now, you also testified about receiving camping cards

17   when you testified at the grand jury, correct?

18   **A.**    I believe so.

19   **Q.**    And you told the grand jury that you had several months'

20   worth of cards?

21   **A.**    I have cards from three months.

22   **Q.**    You said the last few months, you had cards from the last

23   few months.  Do you recall that?

24   **A.**    I don't remember exactly what the exact wording was.  I

25   do know that I received three cards, and that's what had

MOORE - CROSS (Kanovitz)                                        706

1    been presented to the prosecutor.

2    **Q.**    You didn't tell the grand jury you received three cards.

3    You told them you had cards from the last three months,

4    correct?

5    **A.**    It's a play on words, but, yes.

6            MR. KANOVITZ:  Your Honor, at this time I'd like to

7    display Plaintiff's 316, page 24, lines 9 through 15.

8            THE COURT:  And this is a transcript, I assume.

9            MR. KANOVITZ:  Yes.

10           THE COURT:  And it's for the purposes of

11   impeachment?

12           MR. KANOVITZ:  Yes.

13           THE COURT:  All right.

14           MR. KANOVITZ:  Sorry.  It's Exhibit 131.

15           MR. McLANDRICH:  What page?

16           MR. KANOVITZ:  Page 24, lines 9 through 15.

17           MR. McLANDRICH:  He hasn't denied seeing it, though.

18           THE COURT:  He doesn't remember saying that.

19      Wait a minute.  Clarify that.  Ask your question again.

20   BY MR. KANOVITZ:

21   **Q.**    Okay.  Sir, isn't it true that you -- that you told the

22   jury, the grand jury, that you had cards from the last few

23   months?

24   **A.**    I don't remember the exact words of it, but I did

25   receive three cards over a three-month period.

```
 1              MR. KANOVITZ:  May I proceed?

 2              THE COURT:  You may.

 3              MR. KANOVITZ:  Thank you.

 4              MR. McLANDRICH:  I'm sorry.  What page?

 5              MR. KANOVITZ:  That would be page 24, lines 9

 6    through 15.

 7         (Exhibit displayed.)

 8    BY MR. KANOVITZ:

 9    Q.   Okay.  Sir, you told the grand jury, "He tried to tell me

10    that he was down at Twin Knobs campground down in Kentucky,

11    camping with a friend Jerry Fyffe.  I got ahold of the park

12    rangers down there.  I have the registration cards for the

13    last few months prior to that.  Roger Gillispie was down

14    there.  He was down there four days after the girls got

15    raped."

16         Do you see that?

17    A.   Yes, I just read that.

18    Q.   And did you testify to that at the grand jury?

19    A.   Well, I did.  But my view is, is that I have the cards

20    for a three-month period.  It's not that I have all of them

21    for the last few months.

22    Q.   Okay.  You told the grand jury, "He was down there four

23    days after the girls got raped," correct?

24    A.   I believe so, yes.  Yes.

25    Q.   And four days after the girls got raped was in the month
```

MOORE - CROSS (Kanovitz)                                    708

1    of August 1988, correct?

2    **A.**    August 20th.

3    **Q.**    Yeah.

4    **A.**    Yeah.

5    **Q.**    So where is the cards for August?

6    **A.**    I was wrong in my statement.

7    **Q.**    When you told the grand jury that Dean was at the

8    campground but wasn't there until four days after the girls

9    got raped, that was just wrong?

10   **A.**    I evidently made a mistake when it came to being July

11   or August, and I was looking at the number on the campground

12   receipt.  There never was a campground receipt for August.

13   **Q.**    Sir, which -- so you had -- you had May, you had June,

14   and you had July, right?

15   **A.**    That is correct.

16   **Q.**    Okay.  And those are the only ones you gave to the

17   prosecutors?

18   **A.**    Those are the only ones I had, and gave to the

19   prosecutors.

20   **Q.**    And July 15th of 1988 is four days after July 11th of

21   1988, correct?

22   **A.**    I'm not seeing exactly which one that we're talking

23   about here.  And I don't know that the 15th was that one.

24   There's one with a 24 on it, and that was probably the one

25   that was being discussed at the time.

MOORE - CROSS (Kanovitz)                              709

1    **Q.**   You thought -- okay.  So your testimony now is when you

2    are saying he was down there four days after the girls got

3    raped, you thought you were talking about June, not about

4    August?

5    **A.**   When I was trying to describe the campground receipts,

6    I had never had one for August to talk about.  I told you,

7    I'm -- it's mistaken.

8    **Q.**   When's the first time you told anybody that you testified

9    to something incorrect at the grand jury?

10   **A.**   I don't -- I don't know if I ever had.  I don't

11   remember.

12   **Q.**   Right before you made that mistake, isn't it true that

13   you were talking about the days that Dean worked and didn't

14   work in August of '88?

15   **A.**   I'm not seeing that on here, no.

16   **Q.**   Okay.  This is page 5 -- actually, it's still page 24.

17          THE COURT:  First, let's ask him a question.

18          MR. KANOVITZ:  Sorry.

19   BY MR. KANOVITZ:

20   **Q.**   Isn't it true that before you made the mistake and

21   confused June for August, immediately before that you were

22   telling the grand jury that you have Dean's work schedule for

23   August?

24   **A.**   I don't independently remember that.  I do know that I

25   ended up having Roger's work schedule.

MOORE - CROSS (Kanovitz)                              710

1    **Q.**   And that was for August, right?

2    **A.**   Without seeing the work schedule, I can't tell you

3    specifically how many periods of days or weeks are on that.

4             MR. KANOVITZ:  Your Honor, can I publish Plaintiff's

5    Exhibit 105, page 1, which was previously shown to the jury?

6             THE COURT:  It was previous -- what is it?

7             MR. KANOVITZ:  It is his work schedule for August.

8             THE COURT:  You may.

9    (Exhibit displayed.)

10   BY MR. KANOVITZ:

11   **Q.**   Sir, this is the document that you had, correct?

12   **A.**   It's a document that we had.

13   **Q.**   And this document reflects Dean's work schedule in

14   August?

15   **A.**   I believe it's showing from the 1st to the 7th.

16   **Q.**   So the cards that you had with his work schedule were for

17   August, not for June, correct?

18   **A.**   I never had any campground receipts for August.

19            THE COURT:  No, no, no, that wasn't the question.

20   It was the work schedule.  You had this, the cards for the

21   work schedule, in August.

22            THE WITNESS:  We had the schedule for August.

23   BY MR. KANOVITZ:

24   **Q.**   And you did not have the schedule for June; you had the

25   schedule for August, correct?

MOORE - CROSS (Kanovitz)                                    711

1    **A.**    Based on this.

2    **Q.**    Okay.  And you actually had reached out to Rick Wolfe,

3    the manager over -- the security manager over at GM, and

4    specifically had asked him for these records, correct?

5    **A.**    Yes.  There had been a request.

6    **Q.**    And he wrote you back a letter that you put in the file?

7    **A.**    I believe that there was, yes.

8    **Q.**    And he said that -- here's the records for August 1st

9    through August 7th and for August 15th through August 21st,

10   1988, correct?

11   **A.**    I believe I did receive those records.

12   **Q.**    And, of course, that was the month that you were

13   interested in.  You didn't worry about June, right?

14   **A.**    No, I would specifically be focusing at that time on

15   the two specific dates that were involved in this incident,

16   being August 5th and August 20th.

17   **Q.**    All right.  And at any rate, you did not give the

18   prosecutor any campground cards from August of 1988, correct?

19   **A.**    August -- no.

20   **Q.**    All right.  Now, you kept a copy of the Dean Gillispie

21   file in your garage, correct?

22   **A.**    I had made multiple copies for prosecutors -- the

23   answer to your question is yes.

24   **Q.**    And you kept it past the time when he got convicted,

25   right?

1    **A.**    Yes.

2    **Q.**    And it stayed in your garage until there was some

3    flooding?

4    **A.**    Yes.

5    **Q.**    And after that, it got mildewy.  So you threw it away?

6    **A.**    I did not throw it away.

7    **Q.**    Your wife at the time threw it away?

8    **A.**    My ex had contacted somebody and had some people come

9    out, and they loaded up a whole bunch of stuff.

10   **Q.**    Okay.  And is it fair to say that was like in late 1990s?

11   **A.**    I don't remember exactly when it was.  It could have

12   even been later than that.  I don't remember the exact time.

13   It was just an extra copy that I had made to keep in case

14   some day I ended up writing a book or something like that

15   concerning the cases that I had worked through my career.

16   **Q.**    So you were considering writing a book about the Best

17   Products rape case?

18   **A.**    Just all cases in general that I may have had over my

19   career.  It was -- it was something that I had thought

20   about.

21   **Q.**    And when you were considering how to make a book that

22   would attract readers, did you believe it would be more

23   interesting if the cases were solved?

24   **A.**    I don't know what I was thinking specifically at the

25   time.  I was just thinking that, you know, at some point

MOORE - CROSS (Kanovitz)                                      713

```
 1    maybe down the road in life and after my career that I may
 2    put together some of the cases that I had done.
 3    Q.   A couple more -- a couple more areas, and then we're
 4    done, sir.
 5         Rewinding back to August 8th of 1990, you interviewed
 6    Dean, correct?
 7    A.   On 8-8, yes.
 8    Q.   That's the one where you took the Polaroids?
 9    A.   Yes.
10    Q.   But you put nothing in your report about taking Polaroids
11    of him, correct?
12    A.   That's correct.
13    Q.   And why?
14    A.   I must have just forgot it at the time.  I don't know.
15    Q.   And when you saw him --
16    A.   I know there was testimony about it.
17    Q.   When you saw him at the interview, you noticed he had
18    gray hair?
19    A.   I what?
20    Q.   When you saw him at the interview, you saw that he had
21    gray hair, correct?
22    A.   I don't remember that independently.
23    Q.   Okay.
24    A.   Gray hair?
25    Q.   Around the temples?
```

MOORE - CROSS (Kanovitz)                                          714

1    **A.**   I don't remember that.

2    **Q.**   Okay.  At any rate, you didn't put anything in your

3    report about what his hair looked like, correct?

4    **A.**   I don't know why I would have.

5    **Q.**   And Dean asked you at that time if he could take a

6    polygraph, prove himself to you?

7    **A.**   I don't know.  I've heard this before.  I do not know

8    that that ever happened.  I've never specifically been asked

9    about a polygraph.  I know that Folfas had said something

10   about a polygraph, and I had been told that that's not

11   something that we were going to offer.

12        I can also tell you that with Miami Township, that was

13   not a standard practice.

14   **Q.**   It happened, though, didn't it?

15   **A.**   I'm not saying that it didn't.  I'm saying I was never

16   specifically asked about that.

17   **Q.**   And there's -- okay.  Let me draw a distinction.  One

18   thing is actually giving a suspect a polygraph, right?  And

19   then another thing is just asking a suspect, are you willing

20   to take a polygraph.  Two different things, understand?

21             MR. McLANDRICH:  Objection.

22             THE COURT:  Well, I don't know where this is going,

23   but are those two different things?

24             THE WITNESS:  I guess, but I never got asked about a

25   polygraph.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
 1              THE COURT:  Next.
 2    BY MR. KANOVITZ:
 3    Q.    And asking a suspect to take a polygraph is a law
 4    enforcement tool to gauge the sincerity of what you were being
 5    told by the suspect, correct?
 6              MR. McLANDRICH:  Objection.
 7              THE COURT:  If he knows.
 8         Overruled.  If he knows.
 9              THE WITNESS:  It's my understanding that polygraphs
10    are not that reliable.
11    BY MR. KANOVITZ:
12    Q.    Now, if the topic -- if you -- you had a tape recorder
13    right by your side during the interview, correct?
14              THE COURT:  Counsel, do me a favor.
15              MR. KANOVITZ:  I'm sorry.
16              THE COURT:  Phrase everything as a question.  Just
17    don't make a statement.
18              MR. KANOVITZ:  Sorry, Judge.  It's the style that I
19    will work on.
20              THE COURT:  I understand.
21    BY MR. KANOVITZ:
22    Q.    And, sir, isn't it true that you had a tape recorder
23    right by your side when you were interviewing Dean?
24    A.    I believe that there was a tape recorder there.
25    Q.    And so you had the option of tape recording him but chose
```

MOORE - CROSS (Kanovitz)                                    716

1    not to?

2    **A.**    It's my choice, yes.

3    **Q.**    Why did you choose not to?

4    **A.**    I don't remember at this time.

5    **Q.**    Okay.  And you also -- during the interview, you also

6    asked Dean to see his tattoos?

7    **A.**    See, that's one thing I definitely don't remember.  I

8    mean, at that point there would have not been any reason to

9    ask about that because I don't remember any of the -- I

10   don't remember it coming up with any of the victims at this

11   point.

12        I know that we do ask about tattoos --

13             THE COURT:  All right.  You answered the question.

14   BY MR. KANOVITZ:

15   **Q.**    Isn't it true that you asked specifically to see his

16   forearm tattoos?

17   **A.**    I just told you I don't remember.

18   **Q.**    Isn't it true that C.W. or B.W. later remembered that he

19   had tattoos -- that the perpetrator had arm tattoos, forearm

20   tattoos?

21   **A.**    I do not remember that.

22   **Q.**    Now, Dean was being cooperative with you during the

23   interview, right?

24   **A.**    He was answering some questions.

25   **Q.**    He answered every question you asked him?

MOORE - CROSS (Kanovitz)                                            717

1    **A.**   I believe from -- based on my report, yes, till I ended

2    the interview.

3    **Q.**   Well, and his answers were consistent, we know, because

4    you were asking him about things that the perpetrator would

5    have done, right?

6             MR. KANOVITZ:  I'm sorry.  May I rephrase that?

7             THE COURT:  You may.  Make it into a question.

8    BY MR. KANOVITZ:

9    **Q.**   For example, you asked Mr. Gillispie if he smoked, and he

10   told you no.

11            MR. McLANDRICH:  Objection.

12            THE COURT:  Okay.  Ask him that.  Ask a question.

13   Just don't make a statement.

14            MR. KANOVITZ:  I'm sorry.  I'm sorry.

15   BY MR. KANOVITZ:

16   **Q.**   Isn't it true that you asked Mr. Gillispie if he smoked,

17   and he told you no?

18   **A.**   That would be true.

19   **Q.**   Then you asked him if he had family problems.  He told

20   you no.

21   **A.**   Yes.

22   **Q.**   You asked him if he had problems with his grandfather.

23   He said his grandparents are dead.

24        And you asked if he had a grandfather living.  He said

25   yes, but the family does not associate with him because of

MOORE - CROSS (Kanovitz)                              718

1    family problems, correct?

2    **A.**   Yes.

3    **Q.**   And then you asked him if -- then isn't it true that you

4    asked him to tell you what those problems might be, and he

5    said he didn't want to do that; they are just family problems,

6    right?

7    **A.**   I agree with that.

8    **Q.**   Then you asked him if he had ever been molested by his

9    grandfather, and he said no.

10   **A.**   That's true.

11   **Q.**   And then, isn't it true, you asked him if he had heard

12   about the Best Products rape prior to you calling him, and he

13   replied no?

14   **A.**   That's true.

15   **Q.**   And because he was replying no, you said that the

16   questioning was going nowhere, correct?

17   **A.**   I did make that statement.

18   **Q.**   And, in fact, you were learning information about any

19   question you asked Dean he was happy to answer, correct?

20   **A.**   He answered the questions that I had at the time, and I

21   did feel that that was going nowhere at that time because I

22   also knew that on the side, I had already had him identified

23   by two of the victims.  So looking at the questions that I

24   am getting at the time, my feeling at the time, that this

25   was going to end up being a questioning session where

MOORE - CROSS (Kanovitz)                                          719

1    everything was no, no, no, no.

2    **Q.**   Sir, you knew -- isn't it true that you knew at the time

3    that you interviewed him that eyewitnesses can make mistakes?

4    **A.**   I actually know that eyewitnesses can make mistakes.

5    **Q.**   Yeah.  And so -- okay.  At any rate, you're the one that

6    terminated the interview, correct?

7    **A.**   In that case, yes.

8    **Q.**   And then you noted that having terminated the interview,

9    you were going to be showing the photo array to S.C., correct?

10            THE COURT:  Is that a question, counsel?

11            MR. KANOVITZ:  I was ending it with "correct," but I

12   will ask it differently, Your Honor.

13   BY MR. KANOVITZ:

14   **Q.**   Isn't it true that after terminating the interview, you

15   wrote that you were then going to be showing the photo array

16   to S.C.?

17   **A.**   If that's the context as you are reading it from the

18   report, yes.

19   **Q.**   So you perceived Dean as being uncooperative with you; is

20   that correct?

21   **A.**   I don't know that I perceived at that time that he was

22   being uncooperative.  I just think that the questioning at

23   that time, it was just straight across the board that it

24   was -- he was going to continue to say no, and basically

25   meaning no knowledge.

1    Q.    Okay.  Sir, do you recall the women's description of the

2    clothes that the perpetrator wore?

3    A.    I don't remember what their description was.

4    Q.    Do you recall whether they described a gold necklace with

5    a medallion?

6    A.    I do remember that there was something about a gold

7    necklace.

8    Q.    Do you recall that they mentioned brightly colored,

9    high-top tennis shoes?

10   A.    I don't independently remember that.

11   Q.    Okay.  Do you recall that they mentioned a bright,

12   multicolored short-sleeved shirt?

13   A.    I know that there was something said about a shirt, but

14   I don't know -- remember that wording.

15   Q.    And --

16   A.    We're talking about what somebody else said, right?

17   Q.    Yes, but you had the reports of what they said, correct?

18   A.    Yes.

19   Q.    And do you recall that they both mentioned a silver-

20   colored small handgun?

21   A.    I know that that was stated, I believe by all victims.

22   Q.    Now, there came a time where you got a search warrant to

23   search Dean's house, correct?

24   A.    At the direction of the Montgomery County Prosecutor's

25   Office requesting that I do so, I did get a search warrant.

MOORE - CROSS (Kanovitz)                                        721

1    **Q.**    And you personally served that search warrant, correct?

2    **A.**    I was present.

3    **Q.**    Well, you were there --

4    **A.**    Yes, and served --

5    **Q.**    -- and entered his house and participated in the search,

6    correct?

7    **A.**    Yes, sir.

8    **Q.**    And Dean had no warning that you were about to come,

9    correct?

10   **A.**    No.

11   **Q.**    Okay.  And when you searched his house, you found -- you

12   found some, like, rifles used for like squirrel hunting-type

13   stuff, right?

14   **A.**    I believe so.

15   **Q.**    Okay.  You found no handgun?

16   **A.**    No.

17   **Q.**    You found no cigarettes?

18   **A.**    I can't remember that I specifically looked for

19   cigarettes at that time.

20   **Q.**    Well, you knew that cigarettes were a significant feature

21   of this investigation, correct?

22   **A.**    That would be correct.

23   **Q.**    So given your usual practices, do you believe that you

24   would have looked for cigarettes?

25   **A.**    I believe that there probably were.  I had multiple

MOORE - CROSS (Kanovitz)                                        722

1    people there, other than myself, looking.

2    **Q.**   And nobody saw any packs of cigarettes as far as you

3    know, correct?

4    **A.**   As far as I know.

5    **Q.**   Okay.  And did you see any ashtrays?

6    **A.**   I don't remember.

7    **Q.**   Okay.  If you had seen ashtrays, would you have noted

8    that and taken them into evidence?

9          THE COURT:  Counsel, isn't that getting a little

10   speculative here?  I mean, if he had seen -- he didn't see any

11   ashtrays.

12         MR. KANOVITZ:  Okay.  Thank you, Your Honor.

13   BY MR. KANOVITZ:

14   **Q.**   Another feature that the women described was that the man

15   wore cologne, very strong cologne.  Do you recall that?

16   **A.**   Yeah, I do seem to remember reading that.

17   **Q.**   Did you find any cologne during the search?

18   **A.**   No.

19   **Q.**   Did you find any gold chain-type necklace?

20   **A.**   I thought we went through that, but, no.

21   **Q.**   And did you find any high-tops?

22   **A.**   I don't remember.

23         MR. KANOVITZ:  May I confer, Your Honor?

24         (Pause.)

25         MR. KANOVITZ:  No further questions, Your Honor.

MOORE - CROSS (Kanovitz)                                    723

1          THE COURT:  I think this would probably be a good

2    time to break for 15 minutes, and then we will be ready for

3    direct exam -- or cross-exam by the Township.

4          THE COURTROOM DEPUTY:  All rise.  This court stands

5    in recess.

6          (Jury out at 2:24 p.m.)

7          (Recess at 2:24 p.m.)

8          (Jury in at 2:42 p.m.)

9          (In open court at 2:43 p.m.)

10         THE COURT:  We are back on the record.

11    Ladies and gentlemen, we're again, as we did previously

12    once in this trial, we are going to take a witness out of

13    order during the examination of Detective Moore.

14    Again, that's just for the purposes of trying to get as

15    many people on and off as we can to keep the matter moving

16    along.

17    I will also tell you that the Court's schedule is

18    modified just a little today.  We are going to be going until

19    4:30.

20    Counsel ready to proceed?

21         MR. OWENS:  Yes, Your Honor.  Our next witness out

22    of order is Dr. Benjamin Miller.

23         **BENJAMIN MILLER, PLAINTIFF'S WITNESS, SWORN**

24         THE COURT:  Dr. Miller, please try to keep your

25    voice up so we can all hear your responses to the inquiries.

MILLER - DIRECT (Owens)                                          724

1    You can utilize the microphone as you wish, but if you get too

2    close, it will muffle you; if you get away, it won't pick you

3    up.  So if you keep your voice up, that pretty much solves the

4    problem, all right?

5              THE WITNESS:  Will do.

6              THE COURT:  You may inquire.

7              MR. OWENS:  Thank you, Your Honor.

8                        **DIRECT EXAMINATION**

9    BY MR. OWENS:

10   **Q.**   Can you please just state and spell your name for the

11   record?

12   **A.**   Benjamin Miller, B-E-N-J-A-M-I-N  M-I-L-L-E-R.

13   **Q.**   And, Dr. Miller, where are you employed?

14   **A.**   I have a private practice in Beatrice, Ohio.

15   **Q.**   And what field do you work in?

16   **A.**   I have a license in clinical psychology.

17   **Q.**   And can you just describe for us your educational

18   background?

19   **A.**   Sure.  I got my bachelor's in 2006, my master's in

20   2008.  Bachelor's in psychology, master's in clinical

21   psychology, and then my Ph.D. in clinical psychology in

22   2014.

23   **Q.**   And do you work as part of a group of psychologists doing

24   any specific subfield in psychology?

25   **A.**   Right now it's still me, still just me, but I do

MILLER - DIRECT (Owens)                                          725

1    clinical and also work a lot in the forensic field as well.

2    Q.   Got it.  So when you say you work in clinical and

3    forensic field, what does your sort of day-to-day work

4    involve?

5    A.   Day to day is typically seeing clients for a variety of

6    psychological ailments, doing diagnostic assessment on them,

7    then treating them.

8         I also do, intermittently, forensic evaluation as

9    requested by different attorneys typically.  Sometimes court

10   ordered on a variety of forensic areas, including sex

11   offender, various just general diagnoses -- fitness for

12   duties, custody, parenting, anything that sort of relates to

13   the legal field.

14   Q.   So just to make sure it's clear, so when you talk about

15   doing forensic diagnosis work, what does that mean?

16   A.   It's very similar to typical diagnostic work in the

17   clinical, you know, psychological field.  But generally

18   there is sort of a legal aspect to it.  Sometimes it deals

19   with incarceration.  Sometimes it deals with other various

20   legal factors.  Sometimes there would be a presentencing,

21   sometimes, evaluation.  There will be something that many

22   times my reports are submitted to the courts.  Sometimes

23   they are directly submitted to the judges and/or attorneys

24   on a variety of areas, just depending on what's, you know,

25   requested.

MILLER - DIRECT (Owens)                                          726

1    **Q.**    And how long have you been practicing as a psychologist?

2    **A.**    I was licensed in 20 -- let's see here.  I completed my

3    Ph.D. in 2014.  I worked under various licensed

4    professionals for a couple years after that.  And I was

5    first independently licensed in 2019 when I opened my own

6    practice.

7    **Q.**    Okay.  So basically since 2014, so basically like the

8    last six or seven years or so?

9    **A.**    About eight, yeah, I have been practicing clinically.

10   And before that internship, various externships, but that

11   was pre -- pre Ph.D.  So using my master's, I practiced for

12   a number of years while in school, and then I completed my

13   Ph.D. in 2014, began working in the clinical field, and

14   became independently licensed in 2019.

15   **Q.**    Got it.  And as part of your work, do you do

16   diagnostic -- or the forensic work, do you do consultations of

17   people for different types of psychological issues in a

18   setting where you aren't going to be seeing them as their

19   therapist or ongoing mental health counselor?

20   **A.**    Correct.  I see them specifically for the referral

21   diagnosis.  That's -- my only interaction with them will be

22   for that diagnostic request and typically a report as well.

23   And that's submitted to whoever the referral was, either the

24   attorney, the individual, or the courts.  And I submit that

25   report, and then it's typically the last I see of that

MILLER - DIRECT (Owens)                                           727

1    individual.

2    Q.   Got it.  And so you kind of got to my next question,

3    which is, for when you do these forensic psychological

4    evaluations, you usually see a person once, maybe twice, but

5    it's not an ongoing relationship; is that right?

6    A.   That's correct.  I typically try and wrap it up in one

7    especially if they have traveled a distance to see me.  But,

8    you know, I can stretch it over a couple sessions if

9    necessary, do a little bit of diagnostic testing as well,

10   personality inventories, things of that nature that are

11   helpful to assist me in my diagnosis.  And, yeah, typically

12   it's a one-shot deal.

13   Q.   And are you familiar with the forensic tools used to

14   evaluate things like trauma?

15   A.   Yes.  Again, the primary method to do that is the

16   clinical interview, the semi-structured clinical interview.

17   But I do administer the MMPI typically as well, being a

18   fairly peer-reviewed objective measure of personality

19   inventory.

20   Q.   And how many times -- and I think you said the MMPI.  Let

21   me just -- is that the Minnesota Multiphasic Personality

22   Inventory?

23   A.   Yes, it is.

24   Q.   Okay.  What is the MMPI?

25   A.   It's a -- it's a 500, I believe, -87 questions,

MILLER - DIRECT (Owens)                                      728

1    possibly -78 questions, true/false, and it's a variety --

2    it's been normed over various populations and diagnoses.

3    And by administering that, again, the person takes it

4    themselves.  They read the questions and answer true/false.

5    It's now digitized.  And since COVID, it's actually -- we

6    can actually just send a link, and they can do it

7    themselves, wherever they'd like to do it, but I believe we

8    did it in my office setting.

9         They do that, and it can help me gauge diagnostically,

10   give some general ideas about personality characteristics.

11   You know, they would say something along the lines of people

12   with similar results might have this and this personality

13   trait.  And I usually can form my diagnostic opinion.

14   **Q.**   In the last --

15              THE COURT:  Doctor, could you just slow down a

16   little bit.

17              THE WITNESS:  Yes.

18              THE COURT:  All right.  Thank you.

19              THE WITNESS:  My apology.

20   BY MR. OWENS:

21   **Q.**   So in the last seven to eight years of practice, how many

22   times have you done forensic evaluations or administered the

23   MMPI?  If you had to estimate.  Don't worry --

24   **A.**   Yeah, sure.  I'd say at least 75, probably a hundred

25   times.

MILLER - DIRECT (Owens)                                729

1           MR. OWENS:  Your Honor, at this time I'd ask that

2    Dr. Miller be qualified as an expert to provide opinion

3    testimony in the field of forensic psychology.

4           THE COURT:  Objection?

5           MR. McLANDRICH:  No objection.

6           MS. FRICK:  No, Your Honor.

7           THE COURT:  You may.

8    BY MR. OWENS:

9    Q.   All right, Dr. Miller.  So in this case -- and I think

10   you referred to it a little bit here -- did you do a forensic

11   evaluation of Mr. Dean Gillispie?

12   A.   I did.

13   Q.   And can you just -- I think you sort of hinted at the

14   process for that, but can you just describe how that works?

15   A.   I met with him at my office.  I believe it was

16   approximately three hours.  This was on May 6, 2019.  And we

17   also -- at that time he also completed the MMPI, Minnesota

18   Multiphasic Personality Inventory, at that time.  I set him

19   up in the waiting room to complete that, I believe on his

20   phone.

21   Q.   And in addition to doing that interview, did you also

22   review documents about Mr. Gillispie's background?

23   A.   I did.  I had a series of documents.  Would you like me

24   to tell you what those were?

25   Q.   No.  I'm just going to ask you about a couple of them.

MILLER - DIRECT (Owens)                                              730

1    **A.**   Okay.

2    **Q.**   So were you aware you received -- just because there are

3    certain parameters that apply here in court.

4         So did you read court decisions overturning

5    Mr. Gillispie's conviction?

6    **A.**   I did.

7    **Q.**   And we're not going to talk about the details of those.

8         Did you review documents related to Mr. Gillispie's

9    evaluation and administration of the MMPI while he was in

10   prison?

11   **A.**   I did.

12   **Q.**   And was that forensic psychological evaluation by a

13   doctor named Susan Dyer?

14   **A.**   Yes, it was.

15   **Q.**   Got it.

16        MR. OWENS:  And just for the record, Your Honor, I'd

17   like to publish Plaintiff's Exhibit -- Trial Exhibit Number

18   254, which is that test which I just mentioned.

19        Any objection?  I mean, this is where we exchanged them

20   in advance.

21        MR. McLANDRICH:  It's fine, Your Honor.  No

22   objection.

23        MR. HERMAN:  No objection.

24        MR. OWENS:  Plaintiff's Trial Exhibit 254.

25        (Exhibit displayed.)

 1    BY MR. OWENS:

 2    Q.   All right.  Dr. Miller, is this a forensic psychiatry

 3    report from June of 2000 that you reviewed when conducting

 4    your analysis?

 5    A.   Yes.

 6         MR. OWENS:  You can take it down.  Thank you.

 7    BY MR. OWENS:

 8    Q.   So as part of your structured interview with

 9    Mr. Gillispie, what sorts of things did you find out about

10    him?

11    A.   I got a full background history -- how he was raised,

12    where he was raised; family history -- siblings, things of

13    that nature; where he went to school.  Again, educational

14    history, work history, some of his relationship history, as

15    well as obviously very focused, his legal history, again

16    prior to incarceration.  Drug and alcohol history, things of

17    that nature.  And obviously, his symptoms following his

18    incarceration.

19    Q.   Got it.  And so I just want to draw your attention to --

20    and I know you have some documents up there.  Is that a copy

21    of your report in this case?

22    A.   It is.

23    Q.   And if it would assist you in testifying or answering any

24    of these questions, feel free to reference it, okay?

25    A.   Thank you.

MILLER - DIRECT (Owens)                                    732

1   **Q.**   As far as conducting a mental health history, can you

2   just sort of summarize what that was?

3   **A.**   Sure.  Conduct a semi-structured clinical interview,

4   which is a psychosocial history, a person's background,

5   their upbringing, their family life.  Questions asked as

6   necessary regarding different things -- if there was family

7   discord, domestic violence, any divorce, things of that

8   nature.  Siblings, relationships with those siblings.

9        Then going on through educational history, work

10  history, relationship histories.

11       And then we discuss a variety of other areas of life

12  functioning, such as legal history, physical health, mental

13  health, whether there is any mental health treatment,

14  substance use, both legal and illegal, and history therein.

15       And then we ultimately come to mental health symptoms,

16  both throughout the life span and the present time, to

17  achieve a, you know, diagnostic history and current

18  diagnoses, if any.

19  **Q.**   Sure.  So did part of your mental health history analysis

20  of Mr. Gillispie involve discussion with him about being

21  required to participate in sex offender evaluation while he

22  was in prison?

23  **A.**   Yes.  And I believe -- he reported as being a long

24  battle.  And this is actually something that came up in the

25  report by Dr. Dyer, Dr. Susan Perry Dyer that you put up on

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MILLER - DIRECT (Owens)                                    733

1    the screen a minute ago, that she noted that -- should I

2    read from my report or should I paraphrase?

3    **Q.**   If you are going to refer to Dr. Dyer's report, I'll just

4    show it to you.  I think I know what you were going to refer

5    to, but why don't we all be on the same page.

6           MR. OWENS:  So get page 8 of Exhibit Number 254.

7    Thank you.  I'm focusing on the bottom paragraph.

8        (Exhibit displayed.)

9    BY MR. OWENS:

10   **Q.**   Is that where you are going to start reading?

11   **A.**   Correct.

12   **Q.**   Okay.  And I'll just read it.

13          THE COURT:  Counsel, can I see you?

14       (At sidebar off the record.)

15          THE COURT:  Sorry for the interruption.  Counsel,

16   you may inquire.

17          (Exhibit displayed.)

18   BY MR. OWENS:

19   **Q.**   Ms. Dyer -- I'm sorry.  Dr. Miller.

20       Dr. Miller, we were just looking at page 8, and then we

21   will go on to page 9 of Dr. Dyer's report.  And I will just

22   read this.

23       And this is something that you relied on as part of your

24   assessment, correct?

25   **A.**   Yes.

MILLER - DIRECT (Owens)                                  734

1    **Q.**   It says, "Also of concern is the fact that Mr. Gillispie

2    continues to proclaim his innocence.  This situation appears

3    to be a catch 22.  If indeed Mr. Gillispie should later be

4    found innocent, his behavior would be entirely consistent with

5    that finding.  If, on the other hand, his conviction stands

6    through appeal" -- go onto the next page, perfect -- "his

7    behavior would demonstrate massive denial about his rape

8    behavior and would not bode well for future recidivism.  His

9    denial would likely prevent him from seeking treatment for sex

10   offender behavior, and it is known that successful treatment

11   can mediate against future recidivism."

12       Is that something you relied on?

13   **A.**   Yes.  And this is actually something that I see in my

14   work doing sex offender treatment.  As then Mr. Gillispie

15   told me, he was punished repeatedly and placed in solitary

16   confinement due to his refusal to admit guilt and therefore

17   his inability to participate in sex offender treatment,

18   which required, as a prerequisite to enter that treatment,

19   admission of guilt of having committed the rapes.

20   **Q.**   And he refused to do that?

21   **A.**   He refused to admit guilt, correct, and therefore was

22   not allowed to complete those treatments.

23   **Q.**   So in addition -- basically cutting to the chase, as a

24   result of your forensic interview and looking at this report

25   and other documents, did you make a diagnostic conclusion with

MILLER - DIRECT (Owens)                                    735

1    respect to Mr. Gillispie?

2    **A.**    I did.

3    **Q.**    And what was that?

4    **A.**    A diagnosis of posttraumatic stress disorder.

5    **Q.**    And was that as a result of any particular stressor?

6    **A.**    Yes.  It appeared proximal to the stressor of

7    incarceration.

8    **Q.**    Over the, approximately, course of 20 years?

9    **A.**    Correct.

10   **Q.**    Now, is that diagnosis generally called PTSD?

11   **A.**    Yes, it is.

12   **Q.**    And is that a clinical diagnosis from the literature?

13   **A.**    Yes, it is.

14   **Q.**    And are there specific criteria you used to reach that

15   conclusion?

16   **A.**    Yes, there are.

17   **Q.**    And what I'd like to do is, I know there are a number of

18   them.  I am just going to ask you about different diagnostic

19   criteria, okay?

20   **A.**    Sounds good.

21   **Q.**    So is one diagnostic criteria exposure to actual or

22   threatened death, serious injury, or sexual violence in a

23   number of ways?

24   **A.**    Correct.  It has to be in one or more of four possible

25   ways.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MILLER - DIRECT (Owens)                                    736

1    **Q.**    What are those ways?

2    **A.**    The four possible ways that the person could have

3    exposure to actual or threatened death, serious injury, or

4    sexual violence would be:  number one, directly experiencing

5    the traumatic events; number two, witnessing in person the

6    events as it occurred to others; number three, learning the

7    traumatic events occurred to a close family member or close

8    friend.  In the case of actual or threatened death of a

9    family member or friend, the events must have been violent

10   or accidental.  And the fourth one would be experiencing

11   repeated or extreme exposure to aversive details of the

12   traumatic event.  Example, first responding, selecting human

13   remains, police officers repeatedly exposed to details of --

14   **Q.**    Can I just ask you -- you got to slow down, Doctor.

15   **A.**    I apologize.

16   **Q.**    And just -- you don't have to read it from your report

17   directly.  We are just going to have a conversation about the

18   work that you did, okay?

19   **A.**    Sounds good.

20   **Q.**    All right.  So I will take it back, all right?  So just

21   focus right here.

22        So were there -- was there evidence that you saw with

23   Mr. Gillispie that met the criteria for exposure to actual or

24   threatened death or other violence?

25   **A.**    Yes, there was.

MILLER - DIRECT (Owens)                                    737

1  **Q.**   And just very briefly, can you describe what you relied

2  upon in reaching your conclusion as it relates to that

3  criterion?

4  **A.**   He reported seeing, you know, actual or threatened

5  death every day, was the quote that he said.  He had a

6  number of examples of where he saw people violently maimed

7  or murdered in front of him.  And he felt the threat both to

8  himself and experienced it by seeing it occur to others.

9  **Q.**   All right.  What's the second -- what's the next criteria

10 that you use in evaluating somebody for PTSD?

11 **A.**   This one is the presence of intrusive symptoms

12 following the event.

13 **Q.**   And could that include memories, nightmares, things like

14 that?

15 **A.**   Yes, recurrent distressing dreams would be one of them.

16 **Q.**   All right.  Did you see any evidence that supported this

17 criterion in your analysis?

18 **A.**   Yes, he did report having repeated recurrent

19 distressing dreams regarding his experience.  Nightmares he

20 reported.  He reported that they come and go, so they were

21 intermittent, and that it got to him.  That was his quote.

22       In addition, another intrusive symptom that he

23 displayed which meets diagnostic criterion was a

24 physiological reaction to external cues.

25 **Q.**   What do you mean by that?

MILLER - DIRECT (Owens)                                738

1    **A.**   So when something that would remind him of the

2    traumatic events or experiences, one of them would be that

3    anyone in uniform, whenever he would see someone dressed in

4    any type of uniform, that would upset him greatly.  It would

5    remind him of his period during incarceration and would

6    evoke a response from him.

7    **Q.**   And then the next criterion that I believe you use in the

8    literature is the persistent avoidance of stimuli associated

9    with the traumatic events before, during, or after, right?

10   **A.**   That is correct.

11   **Q.**   Okay.  Did you see any evidence of this criterion in your

12   evaluation of Mr. Gillispie?

13   **A.**   Yes, I did.

14   **Q.**   And just very briefly, can you just summarize what that

15   was?

16   **A.**   So, interestingly, the first sign of this, which I

17   didn't -- didn't call forward until later, was as I was

18   escorting him from my waiting room into my office, I

19   politely offered him to walk in front of me, and he refused

20   adamantly, that he would not walk in front of me and I had

21   to walk in front of him.

22        It was only later when I asked him about that, he

23   informed me that he had -- he had extreme difficulty with

24   allowing people behind him.  So when he walks down the

25   street, if anyone were to walk behind him, he would be

MILLER - DIRECT (Owens)                              739

1    afraid that he would be attacked, and it would evoke a fear

2    response.

3         Similar, being in crowds, things of that nature were

4    very, very difficult for him.

5         In restaurants, he'd have to face the door.  He

6    wouldn't allow anyone to sit behind him, again, out of fear

7    of being attacked.

8    Q.   So the next criterion that you've got -- and we are on

9    Criterion D.  I think there are six, so we are halfway

10   there -- are negative alterations in cognitions and mood

11   associated with the traumatic events.  And which have two or

12   more additional criteria; is that right?

13   A.   That is correct.

14   Q.   And what are those two or more additional criteria as it

15   relates to negative alterations and mood associations and

16   cognitive ability?

17   A.   Correct.  So one that he met criterion for was negative

18   emotional state.  Again, it was these symptoms would cause

19   extreme emotional states.

20        In addition, marked diminished interest or

21   participation in significant activities.  Again, he

22   curtailed multiple activities.  He said he took trips.  I

23   believe it was New York he had been to, but those trips were

24   affected very negatively and were very painful for him

25   because of -- because of his symptoms.

MILLER - DIRECT (Owens)                                    740

1      In addition, an interesting one was a persistent and

2  exaggerated negative belief or expectation about oneself,

3  others, or the world.  And this one also came about, you

4  know, during -- you know, casually and was not called forth

5  from -- during the evaluation.  It was when I offered him

6  some coffee in between our interview sessions, and he, you

7  know, politely said no.

8      And then later on I offered him again as he was, you

9  know, leaving, if he would like a cup of coffee, that he had

10  a long drive, and he was very adamant that he would refuse

11  to drink anything with any kind of stimulant.  I believe he

12  referred to it as control designed by the government.  And

13  he said, "There is nothing that's ever going to have hold of

14  me or that I can't function without having."  And,

15  therefore, he refused anything with any stimulant such as

16  caffeine in it.

17 **Q.**   As far as the next criterion, which is marked alterations

18  in arousal and reactivity associated with the traumatic event.

19  And does that include things like hypervigilance and

20  exaggerated startle response?

21 **A.**   Correct.  In addition to things such as sleep

22  disturbance, irritable behavior, anger outbursts, problems

23  with concentration, et cetera.

24 **Q.**   And then based upon your interview, the MMPI, and your

25  own interactions with Mr. Gillispie, did you see evidence that

MILLER - DIRECT (Owens)                                    741

1    would support this criterion?

2    A.    Again, per his report and the evaluation, he reported

3    numerous scenarios where he would have an overreactive --

4    overreaction that would -- would not necessarily be called

5    for based on the input, based on the external event, which

6    clearly relates back to his time during incarceration --

7    extreme anger outbursts; difficulty sleeping, which he

8    directly connected to, again, painful memories of his time

9    during incarceration; difficulty with concentration, that's

10   a little bit harder to pinpoint exactly a direct

11   correlation, but, again, it required two criterion, and he

12   met multiple criterion in that category.

13   Q.    Got it.  So the next criterion's probably the easy one,

14   is the duration of the triggering event lasts more than a

15   year.  That was -- obviously, evidence of that here, right?

16   A.    Just a correction.  The disturbance itself lasts more

17   than a month.  The triggering event can be a one-time event.

18   In this case, it appears it was a very extended event,

19   obviously, during most if not all of his time during

20   incarceration, as well as periods in solitary confinement,

21   which, as we referred to earlier, he reported being as a

22   punishment for refusal to admit committing rapes.

23   Q.    And so I got it.  So it's not just the -- it's not the

24   length of incarceration, but it's the fact that he's reporting

25   the other criteria of, whether it's sleep, nightmares,

MILLER - DIRECT (Owens)                                          742

1    hypervigilance, things like that for longer than a month; is

2    that right?

3    A.   That's correct.

4    Q.   Okay.  And then the next criterion is that the

5    disturbance causes clinically significant distress or

6    impairment in social, occupational, or other settings, right?

7    A.   That's correct.

8    Q.   Did you see evidence that would support this criterion as

9    well?

10   A.   Yes.  He reported it across settings.  And, again, it

11   only actually requires one setting.  So, for example, even

12   though he was not employed, and therefore didn't cause

13   occupational employment, it caused social/emotional distress

14   and therefore met criterion.

15   Q.   Got it.  And then just the last thing, you know, when

16   you're making a PTSD diagnosis, you want to make sure that

17   it's not related to substance or alcohol abuse or anything

18   like that, right?

19   A.   That is correct.

20   Q.   Did you see any evidence that Mr. Gillispie's trauma or

21   trauma responses or disturbance were related to any kind of

22   alcohol or substance abuse?

23   A.   No.

24   Q.   So at the end of the day, what was your diagnosis of

25   Mr. Gillispie?

1    **A.**   My diagnosis was posttraumatic stress disorder, PTSD,

2    and again the proximal cause being his incarceration.

3    **Q.**   Those are all my questions.  Thank you, Dr. Miller.

4    **A.**   You're welcome.

5            THE COURT:  Counsel, anything?

6            MR. McLANDRICH:  Yes, Your Honor.  Just give me one

7    second.

8            THE COURT:  No problem.

9                        **CROSS-EXAMINATION**

10   BY MR. McLANDRICH:

11   **Q.**   Hello, Doctor.

12   **A.**   Hello.

13   **Q.**   I'm John McLandrich.  I represent Detective Moore.  Just

14   a few questions about your report, sir.

15           So we don't have any of the actual data that underlies

16   your report.  We don't have the MMPI that you did.  We don't

17   have your clinical notes of the interview; is that correct?

18   **A.**   That is correct.

19   **Q.**   With -- with respect to the MMPI, aren't there aspects of

20   the MMPI that are designed to identify whether it's a valid

21   test, whether the person is accurately reporting, things that

22   might -- might go to whether, in fact, that MMPI can be relied

23   upon?

24   **A.**   Yes, there are.

25   **Q.**   And we don't have any of that, that data, to review with

MILLER - CROSS (McLandrich)                                    744

1    you, do we?

2    **A.**   I was not asked to provide that.

3    **Q.**   And this evaluation that you did, you saw him just on the

4    occasions of this one particular evaluation, correct?

5    **A.**   That is correct.

6    **Q.**   All right.  And so it's sort of a point-in-time

7    diagnosis, right?

8    **A.**   Yes, it is.

9    **Q.**   So you can't opine on Mr. Gillispie's current mental

10   state, correct?

11   **A.**   No, I cannot.

12   **Q.**   And with respect to these various indicia that you've

13   been describing to meet the diagnostic criteria, these are by

14   and large, if not exclusively, self-reported items, correct?

15   **A.**   Primarily so, yes.

16   **Q.**   All right.  And so we have to rely upon the presumed

17   veracity of those self reports to meet the diagnostic

18   criteria, correct?

19   **A.**   Although self report is the primary means for me to

20   assess somebody during an interview, my clinical judgment

21   and my assessment skills, as well as the MMPI, all

22   contribute to the ultimate diagnosis.

23   **Q.**   Yes.  And as a clinician, when you perform your

24   assessment, you, in fact, take as true what the patient tells

25   you, correct?  You take them at their word?

MILLER - CROSS (McLandrich)                              745

1    **A.**    Typically, yes.

2    **Q.**    All right.  And isn't one of the features that should be

3    evaluated in performing this sort of assessment that you did

4    here whether there's a financial motive that might underlie

5    the condition that's being represented and the underlying

6    features that might support the condition?

7    **A.**    No.

8    **Q.**    No, you've never seen that?

9    **A.**    Can you rephrase that?

10   **Q.**    Sure.  It's -- isn't it typical in the field of

11   psychology when you're performing an assessment of an

12   individual who's got a matter in litigation to evaluate as

13   part of that process, that diagnostic process, to take into

14   consideration the fact that they have a monetary incentive to

15   get that diagnosis?

16   **A.**    Yes, take into consideration, but not to evaluate.

17   That would not change my evaluative process in how I reach

18   my diagnosis.  However, it is obviously something that I

19   consider when assessing the individual and considering the

20   veracity of the reporting.

21   **Q.**    And how is it that you took it into consideration in this

22   case?

23   **A.**    It informed my clinical diagnostic impressions.  It

24   allowed me to -- guided my questions.

25   **Q.**    Did it impact any of your efforts to determine the

MILLER - CROSS (McLandrich)                            746

1   veracity of the statements that were being made?

2   **A.**   Can you rephrase that question?

3           MR. McLANDRICH:  Could you read it back.

4       (The requested portion of the record was read.)

5           THE WITNESS:  Any clinical interview and evaluative

6   process seeks to get to the truth and understands that people

7   have motivations to say different things, and part of the

8   process is to assess the truthfulness of the individual.

9   BY MR. McLANDRICH:

10  **Q.**   And, again, without your clinical notes, there is no way

11  for the defense side of this case to probe whether there were

12  any things said during that consultation that might reflect on

13  that issue; isn't that correct?

14          MR. OWENS:  Objection, Your Honor.

15          THE COURT:  Well, if he can answer it, I'll let him.

16  BY MR. McLANDRICH:

17  **Q.**   Go ahead.

18  **A.**   My understanding of the way this works is that those

19  could have been subpoenaed and requested, but they were not,

20  and therefore, I have not provided them.

21  **Q.**   All right.  Well, thank you, and that might be a question

22  that someone might ask, but it's not the question that I

23  asked.

24          MR. McLANDRICH:  Would you read back the question

25  that I asked, please.

1         (The requested portion of the record was read as follows:

2    And, again, without your clinical notes, there is no way for

3    the defense side of this case to probe whether there were any

4    things said during that consultation that might reflect on

5    that issue; isn't that correct?)

6              MR. OWENS:  Objection; foundation, as to what his

7    notes would provide to the defense for their case.

8              THE COURT:  Overruled.

9         You may answer.

10             THE WITNESS:  Can you rephrase the question, please?

11   BY MR. McLANDRICH:

12   **Q.**   Was there something that you didn't understand about it?

13             THE COURT:  Well, rephrase it, Counsel.

14   BY MR. McLANDRICH:

15   **Q.**   All right.  Well, so, in your notes, you're reflecting --

16   in my experience, when a clinician's taking notes, they are

17   taking notes to reflect the various things the patient's

18   saying, correct?

19   **A.**   That's correct.

20   **Q.**   And some of the things the patient's saying might support

21   the diagnostic conclusion that you reached and some of the

22   things that the patient's saying conceivably could tend to

23   undermine the conclusion that you reach, correct?

24   **A.**   Conceivably.  So, yes.

25   **Q.**   And without those notes, there is no way for the defense

MILLER - CROSS (McLandrich)                          748

1    to know whether, in fact, there are statements in there that

2    undermine the conclusion or whether there is only statements

3    that support the conclusion?

4              MR. OWENS:  Objection; foundation.

5              MR. McLANDRICH:  It's a hypothetical.  I don't know

6    how a hypothetical needs foundation.

7              MR. OWENS:  Is the -- I apologize, Your Honor.

8              THE COURT:  Excuse me?

9              MR. OWENS:  I apologize.

10             THE COURT:  You don't need to apologize.

11        Can you answer that question, Doctor?

12             THE WITNESS:  Yes, I can.

13             THE COURT:  Okay.

14             THE WITNESS:  That is true.

15             THE COURT:  I am overruling that objection.

16             MR. OWENS:  Got it.

17   BY MR. McLANDRICH:

18   Q.   Can PTSD be treated?

19   A.   Yes, it can.

20   Q.   And you don't know whether, in fact, Mr. Gillispie sought

21   treatment after leaving your evaluation or not?

22   A.   I had no further contact with him following my

23   evaluation.

24   Q.   And so, again, I think as we have already established, as

25   we sit here today, can't speak to what his mental health is or

MILLER - REDIRECT (Owens)                                    749

1    is not?

2    **A.**    That is correct.

3    **Q.**    Now, would it be -- well, strike that.

4            Thank you, Doctor.  That's all I have for you.

5                THE COURT:  Redirect, within the scope of the cross.

6                MR. OWENS:  Very briefly, Your Honor.

7                        **REDIRECT EXAMINATION**

8    BY MR. OWENS:

9    **Q.**    Dr. Miller, did anybody from Defendant Moore's office

10   ever send you a subpoena for your notes in this case?

11   **A.**    No, they did not.

12   **Q.**    Now, in your clinical diagnosis, is there a concept

13   called malingering?

14   **A.**    Yes, there is.

15   **Q.**    And is that the concept that's used to diagnose or a

16   concept that you use to -- that you would indicate whether or

17   not you think somebody's not giving you honest information?

18   **A.**    Yes, that's the term we use.

19   **Q.**    And do you use that term and have criteria that you use

20   to evaluate whether or not you think the people are providing

21   a false diagnosis, or false symptoms?

22   **A.**    Not specific delineated criterion, but, yes.

23   **Q.**    And at any rate, you -- is there anything noted in your

24   report about any potential malingering by Mr. Gillispie?

25   **A.**    No.

1    **Q.**   If you believe that he had been malingering, would you

2    have noted that in your report?

3    **A.**   I would have, yes.

4    **Q.**   And just by the way, I think you said you do forensic

5    evaluations of people involved in litigation?

6    **A.**   I do.

7    **Q.**   Is that something you regularly do?

8    **A.**   On occasion, yes.

9    **Q.**   Okay.  Last question.  Did you have any reason to

10   distrust what Dean reported to you about the things that he

11   saw and witnessed in prison?

12   **A.**   I did not.

13            MR. OWENS:  That's it, Your Honor.

14            THE COURT:  Anything?

15            MR. McLANDRICH:  Nothing further.  Thank you, Your

16   Honor.

17            THE COURT:  Can this witness be excused?

18            MR. OWENS:  Yes, Judge.

19            THE COURT:  Thank you very much, Doctor.

20        I believe we are back with Detective Moore.  And cross by

21   the plaintiff has been completed, and the Court will now allow

22   the Township, within the parameters previously indicated in

23   its directives, to question.

24            MS. FRICK:  Thank you, Your Honor.

25            THE COURT:  You may inquire.

1    **MATTHEW SCOTT MOORE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

2                      **CROSS-EXAMINATION**

3    BY MS. FRICK:

4    **Q.**   Good afternoon, Mr. Moore.

5         I think you previously testified -- correct? -- that

6    your -- that your father was a police officer; is that

7    accurate?

8    **A.**   Well, that's how he started out.  He ended up being the

9    police chief.

10   **Q.**   So is it fair to say that you grew up around police

11   officers?

12   **A.**   Oh, absolutely.

13   **Q.**   And you yourself, is it -- am I correct, were a police

14   officer for 27 years; is that accurate?

15   **A.**   27 years and 23 days.

16   **Q.**   And was your first position as a police officer with

17   Miami Township?

18   **A.**   Yes, ma'am.

19   **Q.**   And when you became a full-time police officer with Miami

20   Township, were you required to take an oath of office to

21   uphold the Constitution of the United States, the State of

22   Ohio, and the laws of the State of Ohio?

23   **A.**   Yes, ma'am.

24   **Q.**   And would you agree with me that police officer is a

25   position of trust?

MOORE - CROSS (Frick)                                        752

1   **A.**   Yes, ma'am.

2   **Q.**   And just very briefly, what -- how would you describe, in

3   your position as a detective with the Miami Township Police

4   Department, what your official duties and responsibilities

5   were?

6   **A.**   Well, my official duties was, is when we were assigned

7   cases, were to investigate the cases, follow up leads, try

8   to find suspects, talk with witnesses, and find any evidence

9   that we could to put the case together.

10  **Q.**   And so, Mr. Moore, would you agree with me that as part

11  of that, included in your official responsibilities was to

12  turn over any exculpatory or material evidence to a prosecutor

13  that you had in your possession when an individual was being

14  charged with a crime?

15  **A.**   That would be true.

16  **Q.**   Okay.  And so just briefly, as a former police officer

17  and detective, how would you define "exculpatory evidence"?

18          MR. McLANDRICH:  Objection.

19          THE COURT:  I'm going to let him, if he knows.  Can

20  you do that?

21          THE WITNESS:  I'm not sure of the term

22  "exculpatory."

23  BY MS. FRICK:

24  **Q.**   Okay.  How -- how would you personally, if you had this

25  obligation, sort of define what's material evidence that you

MOORE - CROSS (Frick)                                      753

1    were to turn over?

2            MR. McLANDRICH:  Objection.

3            THE COURT:  Let him do it.

4        You can answer.

5            THE WITNESS:  I'm still not sure of what you're

6    asking.  I mean, as far as in what relevance to evidence?

7    BY MS. FRICK:

8    Q.   Well, let me ask it a different way then, Mr. Moore.

9        Is it fair to say that in a case or investigation that

10   you would have, that you would turn over the entire case file

11   that you had in your possession?

12   A.   Yes, ma'am.

13   Q.   Okay.  And if a police officer knowingly failed to turn

14   over the evidence that they had in their police -- or in their

15   investigative file, would that be sort of outside of what they

16   are supposed to do?

17   A.   Yes, ma'am.

18   Q.   So it would be outside of their official duties; is that

19   fair?

20   A.   Yes, ma'am.

21   Q.   Okay.  And if a police officer knowingly didn't turn over

22   all of the evidence that they had in a file, is it fair to say

23   that if they did that on purpose, that that would not be done

24   in good faith?

25           MR. KANOVITZ:  Objection.

MOORE - CROSS (Frick)                                    754

 1              MS. FRICK:  I think there was an objection, Your

 2    Honor.

 3              MR. KANOVITZ:  No, we do not object.

 4              MR. McLANDRICH:  I would.  I object.

 5              MS. FRICK:  I can rephrase, Your Honor.

 6              THE COURT:  Rephrase.  I don't know whether the

 7    witness is having problems with the words.

 8              MS. FRICK:  Okay.

 9    BY MS. FRICK:

10    Q.   Would there be any basis for a police officer to

11    knowingly keep or not turn over all of the evidence in their

12    case file to a prosecutor?

13    A.   All of the evidence should be turned over to the

14    prosecutor, and in this case, everything was turned over to

15    the prosecutor.

16    Q.   But if there was a situation in which everything was not

17    turned over to a prosecutor and that was done purposefully or

18    knowingly, would there be any reason that that would be done,

19    that you can think of as an officer of 27 years?

20    A.   That's a hypothetical, but I don't -- repeat that

21    question again.

22    Q.   Sure.  Can you -- is there any reason if a police officer

23    knowingly or purposely didn't turn over the entire case file

24    and the evidence contained in there, why there -- why someone

25    would do that?

MOORE - CROSS (Frick)                                    755

1    **A.**    I can't speak to what the reasons would be for someone

2    else.  I can tell you that I know that everything needs to

3    be turned over to the prosecutor.  And that's what was done.

4    **Q.**    Okay.  And as a Miami Township police officer, was that

5    something that you were trained to do, to turn over all

6    evidence to the prosecutors in an investigation?

7    **A.**    I believe that there had been some training in that.  I

8    know that you go through that through your academy.

9    **Q.**    Okay.

10   **A.**    That all evidence should be turned over, especially if

11   you are going to end up going to trial or any other court

12   hearing; that all evidence and all documents that you have

13   in your possession should be turned over to the prosecutor

14   in order for them, under discovery, to be given to the

15   defense.

16   **Q.**    And that's part of the police officer's official duties

17   and responsibilities, correct?

18   **A.**    Yes, ma'am.

19   **Q.**    Okay.  Now, there's been a lot of discussion about

20   identification procedures, photo arrays, that sort of thing.

21       Back in 1990 when you were a police detective, would you

22   agree with me that as part of your responsibilities in

23   investigating a crime, which required a identification, that

24   one of your duties would be to provide a -- to provide as fair

25   of an identification that you could within what was available

MOORE - CROSS (Frick)                                        756

1    to you?

2    **A.**    Yes.

3              MR. McLANDRICH:  Objection.

4              THE COURT:  Overruled.

5         You can answer.

6              You guys got to object a little bit louder.

7              MR. McLANDRICH:  I missed the turn.  Sorry.

8              THE COURT:  No problem.

9    BY MS. FRICK:

10   **Q.**    Now, with respect to the evidence in a case that you turn

11   over to a prosecutor, would you agree with me that as part of

12   your responsibilities and duties as a police officer, that

13   you're not to either destroy any evidence or to fabricate or

14   make up any evidence?

15   **A.**    I would agree with that, yes.

16   **Q.**    And, in fact, if that occurred in any situation, that

17   could potentially even be a crime in and of itself; is that

18   correct?

19   **A.**    I believe so.

20   **Q.**    And as a police officer with the oath of office to uphold

21   the laws of the State of Ohio, would you agree that if, in

22   fact, evidence was destroyed or fabricated, that an officer

23   would not be upholding their oath?

24   **A.**    Yes.

25   **Q.**    And would there be any good faith basis for an officer to

1    destroy or fabricate evidence?

2             MR. KANOVITZ:  Objection; incomplete hypothetical.

3             THE COURT:  Objection, what?

4             MR. KANOVITZ:  Incomplete hypothetical.

5        Objection; incomplete hypothetical.

6             THE COURT:  Response.

7             MS. FRICK:  I can rephrase, Your Honor.

8             THE COURT:  Thank you.

9    BY MS. FRICK:

10   Q.   If a detective had investigated a case and was ready to

11   turn the case over to a prosecutor, would there be any good

12   faith basis for that detective to turn over the case if

13   evidence had been destroyed?

14            MR. KANOVITZ:  Objection; incomplete hypothetical as

15   to the intent.

16            THE COURT:  Overruled.

17        He can answer the question.

18            THE WITNESS:  Repeat that question.

19   BY MS. FRICK:

20   Q.   When a detective turns over a case -- or when a detective

21   investigates a case, if that detective knowingly destroys

22   evidence --

23   A.   I got you.

24   Q.   -- in your experience as a police officer for 27 years

25   and as a detective for 23 to 24 years of that, would there be

MOORE - CROSS (Frick)                                            758

```
1    any good faith basis for a detective to have destroyed

2    evidence?

3    A.   I don't think that detectives should be destroying

4    evidence.  Everything needs to be turned over either during

5    the course of your reference to records and/or you need to

6    turn it into the property room.  And then after that, you

7    don't know what ends up happening to it.

8              THE COURT:  Detective Moore, I think the question

9    is, is there any good reason that an officer would do that.

10             THE WITNESS:  I don't know of any reason that they

11   would do something like that.

12   BY MS. FRICK:

13   Q.   And would there be any good faith basis for an officer to

14   knowingly do that?

15   A.   Are you saying that would it be right if they did that,

16   withheld evidence?

17   Q.   Would there be any good reason for an officer to

18   knowingly do that, to destroy evidence?

19   A.   I don't think that detectives and/or officers should be

20   destroying evidence.

21   Q.   And, in fact, if that was done, again, that would be

22   contrary to what their official responsibilities and duties

23   are as a police officer, correct?

24   A.   If that was done.

25   Q.   Okay.  And as a police officer investigating a crime, is
```

1    it part of your duties and official responsibilities to

2    determine if there's probable cause that a crime was

3    committed?

4    A.   You need to establish probable cause that a crime was

5    committed in order to charge.

6    Q.   And when a police officer turns over a file to the

7    prosecutor, am I correct in saying at that point the police

8    officer or detective should have made a determination that

9    there was probable cause?

10             MR. McLANDRICH:  Objection.

11             MR. KANOVITZ:  I'll join that objection, Your Honor.

12             THE COURT:  Sustained.

13   BY MS. FRICK:

14   Q.   In determining if there is probable cause on an

15   investigation that is performed by a police detective, is it

16   fair to say that a police detective cannot misstate, knowingly

17   misstate or fabricate evidence?

18   A.   I would hope that no detective or police officer

19   intentionally misstated --

20             THE COURT:  Detective Moore, that's just a yes or

21   no, and then if you want to explain it, then you can.

22             THE WITNESS:  Then, no.

23   BY MS. FRICK:

24   Q.   In fact, it's part of your official duties and

25   responsibilities to, as a police detective, to provide to the

1    prosecutors in a case that you have investigated actual

2    evidence that exists and actual statements that have been made

3    in a case, not to create any such evidence or statements; is

4    that fair?

5              MR. McLANDRICH:  Objection; asked and answered.

6              THE COURT:  I think -- I think it was asked whether

7    or not it was -- there would be a good faith reason to create

8    testimony.  I think that -- I think there was testimony to

9    that effect.  Is that what your question is?

10             MS. FRICK:  I'll withdraw the question, Your Honor.

11   BY MS. FRICK:

12   Q.  Just one last question, Mr. Moore.  If any evidence is

13   not given to the prosecutor on a case that's been investigated

14   by the detective, would you agree with me that that would be

15   contrary to their oath of office?

16             MR. McLANDRICH:  Objection; asked and answered.

17             THE COURT:  I'll let him answer it.

18             THE WITNESS:  Repeat it again.

19   BY MS. FRICK:

20   Q.  Sure.  If any evidence is not given to a prosecutor on a

21   case that's investigated, would that be contrary to a police

22   officer or police detective's oath of office?

23   A.  It would.

24   Q.  Thank you.

25             THE COURT:  Now counsel for Defendant Moore will

1    inquire.

2                    **DIRECT EXAMINATION**

3    BY MR. McLANDRICH:

4    **Q.**   All right.  Detective Moore, as you know, I'm your

5    counsel.  I am going to ask you some questions about the

6    events that surround the investigation concerning

7    Mr. Gillispie, all right?

8    **A.**   Yes, sir.

9    **Q.**   All right.  Now, I believe you testified earlier that you

10   had been a police officer for about five years and a detective

11   for about six months when you got this case, is that correct?

12   **A.**   Yes, sir.

13           MR. McLANDRICH:  And I was giving him an opportunity

14   to check the exhibits.

15           MR. KANOVITZ:  That's all right.

16   BY MR. McLANDRICH:

17   **Q.**   And when you were assigned this investigation, you

18   started your investigation by reviewing the file?

19   **A.**   Yes, sir.

20   **Q.**   And that would have started with the existing offense

21   reports?

22   **A.**   With the existing reports that I was provided.

23           MR. McLANDRICH:  And let's bring up Defendant's 1,

24   please.

25           THE COURT:  Are these exhibits that have been agreed

MOORE - DIRECT (McLandrich)                                762

1    to or they have been --

2            MR. KANOVITZ:  Defendant's 1 has not been shown yet,

3    but when he says a page number, I can say whether I object or

4    not.

5            THE COURT:  Well, do you have a page number?

6            MR. McLANDRICH:  Well, I was going to pull up all

7    the page numbers that are in Exhibit 1 and sort of go through

8    them with the detective.

9            MR. KANOVITZ:  Just a moment, Your Honor.

10        No objection on Exhibit 1.

11           MS. FRICK:  No, Your Honor, no objection.

12           THE COURT:  Thank you.

13        (Exhibit displayed.)

14   BY MR. McLANDRICH:

15   **Q.**   Now, unfortunately, this is a very poor quality copy.

16   Can you read any of that?

17           THE COURT:  We can get him a hard copy.

18           MR. McLANDRICH:  Thank you.  Thank you, Your Honor.

19   BY MR. McLANDRICH:

20   **Q.**   Looking at Defendant's Exhibit 1, do you recognize this

21   as one of the initial reports or the initial report that you

22   would have reviewed when you started your review of the case

23   file that you received?

24   **A.**   Yes, sir.  This is the cover sheet of the report that I

25   was provided.

MOORE - DIRECT (McLandrich)                            763

1   **Q.**   And who's the officer at the bottom of this report that

2   took this initial report?

3   **A.**   The initial report was taken by Patrolman Burling.

4   **Q.**   And this particular report also seems to have the

5   signature of one of the complaining witnesses at that time?

6   **A.**   It actually has both of the complaining witnesses'

7   signatures on it side by side.

8   **Q.**   And then for the description of the event, he is

9   referring to, as it says right above, "see supplement,"

10  correct?

11  **A.**   Yes, sir.

12          MR. McLANDRICH:  So let's have the next page,

13  please.

14      (Exhibit displayed.)

15  BY MR. McLANDRICH:

16  **Q.**   This report also reflects who prepared it, correct?

17  **A.**   Yes, sir, it does.

18  **Q.**   And who is that?

19  **A.**   That would be Patrolman R. E. Burling.

20  **Q.**   And what was the date that he prepared this report?

21  **A.**   The date is August 21st of 1988.

22  **Q.**   And does this report relate to the, as has been referred

23  to, the Best Products rapes?

24  **A.**   Yes, sir, it does.

25  **Q.**   Does it contain a description of the events?

MOORE - DIRECT (McLandrich)                                    764

1    **A.**    Yes, the whole report would.

2    **Q.**    And I know it's difficult to read, but does this page

3    contain any description of the suspect?

4    **A.**    Yes, sir.

5    **Q.**    And would you just read that description that's given?

6    **A.**    It is, "Approximately 23 to 25 years of age."

7    **Q.**    Back up a few words.

8    **A.**    Okay.  "When the complainant was attempting to start

9    the vehicle, a white male, approximately 23 to 25 years of

10   age, 6 foot 3, 250 pounds, short brown hair with a red tint,

11   very dark tan, wearing whitewashed green pants, a short-

12   sleeved, pattern design, possibly blue and black colors, and

13   sunglasses approached --"

14   **Q.**    You can stop there.

15        And so the hair color that was just recited in there was

16   what?

17   **A.**    Brown hair with a red tint.

18   **Q.**    All right.  Thank you.

19        MR. McLANDRICH:  Let's go to the next page, please.

20        (Exhibit displayed.)

21   BY MR. McLANDRICH:

22   **Q.**    And this page again continues to describe the course of

23   the events surrounding the assault, correct?

24   **A.**    Yes, it does.

25        MR. McLANDRICH:  Let's go to the next page if there

MOORE - DIRECT (McLandrich)                                765

1    is one in this exhibit.

2            (Exhibit displayed.)

3    BY MR. McLANDRICH:

4    **Q.**    And then who signs off on this report?

5    **A.**    Bob -- Patrolman R. E. Burling.

6    **Q.**    And again the date?

7    **A.**    It is on 8-21 of 1988.

8                MR. McLANDRICH:  Exhibit 2, please.

9                MR. KANOVITZ:  Page, counsel?

10               MR. McLANDRICH:  I'm going to again walk him through

11   the document.

12               MR. KANOVITZ:  No objection.

13               MS. FRICK:  No objection, Your Honor.

14               THE COURT:  It may be.

15           (Exhibit displayed.)

16   BY MR. McLANDRICH:

17   **Q.**    Would this have been the next report that was in the file

18   you received?

19   **A.**    This is a witness statement?

20   **Q.**    Yes.

21   **A.**    And, yes.

22   **Q.**    And who was the officer that took the statement?

23   **A.**    Patrolman R. E. Burling.

24   **Q.**    And the date?

25   **A.**    On 8-21 of 1988.

MOORE - DIRECT (McLandrich)                                  766

1   **Q.**   And who prepares the narrative in a statement such as

2   this?

3   **A.**   You mean who makes the statement?

4   **Q.**   Yes.

5   **A.**   That would be the victim, in this case Connie Wise.

6   **Q.**   And then let's go to the next page, please.

7        (Exhibit displayed.)

8   BY MR. McLANDRICH:

9   **Q.**   And, again, on this page, she's continuing her

10  description of the assault events?

11  **A.**   Yes, sir, she is.

12        MR. McLANDRICH:  Next page, please.

13        (Exhibit displayed.)

14  BY MR. McLANDRICH:

15  **Q.**   And, again, on this page, continuing her description of

16  the events of the assault?

17  **A.**   Yes, marked page 3.

18        MR. McLANDRICH:  Next page, please.

19        (Exhibit displayed.)

20  BY MR. McLANDRICH:

21  **Q.**   And on this page also?

22  **A.**   Yes, marked page 4.

23        MR. McLANDRICH:  Next page, please.

24        (Exhibit displayed.)

25  BY MR. McLANDRICH:

MOORE - DIRECT (McLandrich)                          767

1    **Q.**   And, again, now she's continuing her discussion of the

2    assault events?

3    **A.**   On page 5, yes.

4            MR. McLANDRICH:  Next page, please.

5        (Exhibit displayed.)

6    BY MR. McLANDRICH:

7    **Q.**   Continuing her description?

8    **A.**   On page 6, yes.

9            MR. McLANDRICH:  Next page, please.

10       (Exhibit displayed.)

11   BY MR. McLANDRICH:

12   **Q.**   And, again, she's talking about the various events; yes?

13   **A.**   Yes, and that is marked page 7.

14   **Q.**   All right.  And on this page, does she make any reference

15   to things that the suspect might have touched?

16       Direct your attention to four lines down.

17   **A.**   It was, I believe, cash.

18   **Q.**   Are you on --

19   **A.**   I'm on page 8.

20   **Q.**   I'm sorry.  You're a page ahead of me.

21   **A.**   Okay.

22   **Q.**   Are you back to page 7?

23   **A.**   I am on page 7.

24   **Q.**   All right.  Directing your attention four lines down,

25   does he make reference to -- or does she, rather, make

MOORE - DIRECT (McLandrich)                              768

1    reference to something that the suspect touched?

2    **A.**   It's actually -- starts at line five, a Polaroid

3    picture.

4    **Q.**   Okay.

5    **A.**   And goes to line six.

6          MR. McLANDRICH:  Let's go to page 8, please.

7          (Exhibit displayed.)

8    BY MR. McLANDRICH:

9    **Q.**   And, again, she's continuing her description of the

10   assault events, correct?

11   **A.**   On page 8, yes.

12         MR. McLANDRICH:  Please proceed to the next page.

13         (Exhibit displayed.)

14   BY MR. McLANDRICH:

15   **Q.**   Again, continuing on her description of the assault; yes?

16   **A.**   Yes, on page 9.

17         MR. McLANDRICH:  Proceed to the next page.

18         (Exhibit displayed.)

19   BY MR. McLANDRICH:

20   **Q.**   And, again, continuing her description?

21   **A.**   Yes, on page 10.

22   **Q.**   And here's where we see the reference to the cigarettes

23   and lighter that were taken, correct?  Four lines -- five

24   lines up from the bottom?

25   **A.**   That and cash.

MOORE - DIRECT (McLandrich)                    769

```
 1              MR. McLANDRICH:  All right.  Next page if there is

 2    one.

 3         (Exhibit displayed.)

 4              THE WITNESS:  It's page 11, continuing.

 5    BY MR. McLANDRICH:

 6    Q.   And, again, she's continuing now talking about the, at

 7    some point, post-assault events, correct?

 8    A.   Yes.

 9              MR. McLANDRICH:  Please proceed to the next page.

10         (Exhibit displayed.)

11    BY MR. McLANDRICH:

12    Q.   Here again is a mix of now she's back to talking about

13    assault events, correct?

14    A.   Yes, sir.

15    Q.   And these would have all been things that you reviewed as

16    you started to familiarize yourself with the investigation.

17    Correct?

18    A.   Yes, I would have reviewed this document.

19              MR. McLANDRICH:  Next page.

20         (Exhibit displayed.)

21    BY MR. McLANDRICH:

22    Q.   Again, more description of the events, correct?

23    A.   Yes, sir.  And it's page 13.

24    Q.   Yes, sir.

25              MR. McLANDRICH:  Next page.
```

MOORE - DIRECT (McLandrich)                                    770

1              (Exhibit displayed.)

2    BY MR. McLANDRICH:

3    Q.    And here she's concluding her statement with respect to

4    describing the events, correct?

5    A.    Yes.  And it would be page 14.

6    Q.    And so this was all background information that you would

7    have reviewed and started to learn as you began your

8    investigation?

9    A.    Yes, sir.

10             MR. McLANDRICH:  Next exhibit, please, 3.

11             (Exhibit displayed.)

12   BY MR. McLANDRICH:

13   Q.    And this is the sisters' statements, similar to the one

14   we just reviewed?

15   A.    Yes.  This would be page 1, starting with Bonnie

16   Wise -- I mean B.W.  Sorry.

17             THE COURT:  There is no objection to this, right?

18             MR. KANOVITZ:  I'm just checking to make sure all

19   the pages are there, but I don't have any objection other than

20   that.

21             MS. FRICK:  No, Your Honor, no objection.

22             MR. McLANDRICH:  Let's proceed to the next page.

23   Next page, please.

24             (Exhibit displayed.)

25             THE WITNESS:  It's page 2.

MOORE - DIRECT (McLandrich)                                771

```
 1              MR. McLANDRICH:  All right.  Let's go to 3.
 2         (Exhibit displayed.)
 3              THE WITNESS:  Page 3.
 4              MR. McLANDRICH:  Just trying to spare everyone the
 5    agony of going through all these like I was.
 6         But next page, please.
 7         (Exhibit displayed.)
 8              THE WITNESS:  There is page 4.
 9              MR. McLANDRICH:  Next page, please.
10         (Exhibit displayed.)
11              THE WITNESS:  Then there is page 5.
12    BY MR. McLANDRICH:
13    Q.   All right.  And this is all still her statement of the
14    events, correct?
15    A.   They are all B.W.'s statement, yes.
16              MR. McLANDRICH:  Please proceed.
17         (Exhibit displayed.)
18              THE WITNESS:  Page 7.
19    BY MR. McLANDRICH:
20    Q.   Okay.
21    A.   Page 8.
22    Q.   Let's stop at 7.  He's catching up here.
23              MR. McLANDRICH:  Go to 8, please.
24         (Exhibit displayed.)
25              MR. McLANDRICH:  Go ahead to 9.
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - DIRECT (McLandrich)                                772

```
 1        (Exhibit displayed.)

 2            MR. McLANDRICH:  Let's go to 10.

 3        (Exhibit displayed.)

 4            MR. McLANDRICH:  11.

 5        (Exhibit displayed.)

 6            MR. McLANDRICH:  Next page, please.

 7        (Exhibit displayed.)

 8            MR. McLANDRICH:  Go ahead, next page.

 9        (Exhibit displayed.)

10   BY MR. McLANDRICH:

11   Q.   And that concludes her statement.

12   A.   There is page 12 and page 13.

13            MR. McLANDRICH:  Let's go back to 1 for a moment if

14   we could, page 1 of this exhibit.

15        (Exhibit displayed.)

16            MR. McLANDRICH:  That's all for that exhibit.  Thank

17   you.

18        Let's pull up DX4.  This has previously been shown by

19   plaintiff.

20   BY MR. McLANDRICH:

21   Q.   So this is the composite that was one of the items you

22   would have found in the file, correct?

23   A.   That's correct.

24   Q.   Now, does this composite relate to the S.C. rape event or

25   does it relate to the B.W./C.W. rape event?
```

MOORE - DIRECT (McLandrich)                              773

1    **A.**    This is S.C.'s rape event.

2    **Q.**    And we know that in part how?

3    **A.**    It says that the location is in Harrison Township, and

4    that the events was on 8-5 of '88 at 1630.  One of the other

5    identifiers at that time given was blue eyes.

6    **Q.**    And, also, does this particular individual have

7    sunglasses on?

8    **A.**    No, he does not.

9    **Q.**    And S.C.'s assailant, did he have sunglasses on?

10   **A.**    S.C.'s?

11   **Q.**    Yes, sir.

12   **A.**    S.C.'s assailant did not have sunglasses on.

13   **Q.**    All right.  Which would be another indicator this was the

14   S.C. composite?

15   **A.**    That's true.

16   **Q.**    And the description of the hair on this composite?

17   **A.**    It says reddish-brown, thinning hair.

18   **Q.**    And then down below, we have two brief descriptors of

19   both crimes, correct?

20   **A.**    Yes.

21   **Q.**    And this would again have been something that you

22   reviewed as you took over the file and started to familiarize

23   yourself?

24   **A.**    Yes, sir.

25             MR. McLANDRICH:  All right.  Exhibit 5 is the other

MOORE - DIRECT (McLandrich)                                    774

1    composite.  It's been previously shown.

2         (Exhibit displayed.)

3    BY MR. McLANDRICH:

4    Q.   Defendant's Exhibit 5, is this the composite relating to

5    C.W. and B.W.?

6    A.   Yes, sir, it is.

7    Q.   And below, it has a brief description of the crime, and

8    again a description of the suspect, correct?

9    A.   Correct.

10   Q.   And the description of the suspect that's recited in this

11   composite is what?

12   A.   It is, suspect is a 6 foot 3, 250 pounds, reddish-

13   brown, thinning hair, well-tanned, wide face, bushy

14   eyebrows, mustache, last seen wearing light-colored, short-

15   sleeved shirt with a multi-colored print, gray pleated

16   slacks, white Reebok with gold and black trim, dark

17   sunglasses.

18        Do you want me to read the whole thing?

19   Q.   No, that's, I think, sufficient.

20        Is an individual of that size common or uncommon?  If you

21   know.

22   A.   I -- there's lots of sizes.  I mean, you --

23   Q.   That's fine.

24            MR. McLANDRICH:  Let's pull up Defendant's Exhibit

25   6, which is the -- can you rotate that at all?

MOORE - DIRECT (McLandrich)                                  775

1            THE COURT:  Has this been shown?

2            MR. McLANDRICH:  No.  Exhibit 6 has not been shown.

3            MR. KANOVITZ:  No objection.

4            THE COURT:  Any objection?

5            MS. FRICK:  No, Your Honor.

6            MR. KANOVITZ:  I apologize, Your Honor.  I thought

7     the thing that was up was what he was referring to.

8            THE COURT:  No, that was 15.  This is 6.  Hold on.

9            MR. McLANDRICH:  It's technology at its best.

10    That's all right.

11           MR. KANOVITZ:  No objection when he does get back to

12    6.

13           MR. McLANDRICH:  That's all right.  Don't worry

14    about rotating it.  Just bring it up then.

15        (Exhibit displayed.)

16    BY MR. McLANDRICH:

17    Q.    Detective, you can see this in your book, correct?

18    A.    Yes.

19    Q.    I know it's sort of hard for everyone to look at it

20    sideways.

21        This is what's referred to in police parlance as a BOLO,

22    correct?

23    A.    Yes, sir.

24    Q.    And BOLO's an acronym for what?

25    A.    Be on the lookout.

MOORE - DIRECT (McLandrich)                              776

1    **Q.**    And this document was -- well, strike that.  Let me ask

2    it this way:  What is the purpose of a BOLO?

3    **A.**    To put out information to all of the local departments

4    detailing an offense and the fact that they're looking for a

5    suspect, to let all departments within the area and outer

6    lying areas to be on the lookout for the individual that may

7    have committed these acts.

8    **Q.**    All right.  And would another purpose of a BOLO also be

9    to elicit information with respect to whether other

10   departments had a similar crime?

11   **A.**    It could.  You would -- you put this out, and if

12   anybody has anything that is probably remotely close, they

13   then would, in turn, contact our department.

14   **Q.**    And so this is an effort to generate leads and

15   information?

16   **A.**    Yes, sir, it is.

17   **Q.**    Can you read the date on this particular BOLO?

18   **A.**    It was on 8-21 of 1988, and it was put out by Patrolman

19   R. E. Burling.

20   **Q.**    So this is something that was done essentially

21   immediately?

22   **A.**    Yes.

23   **Q.**    And does this BOLO also contain a description of the

24   suspect?

25   **A.**    Yes.

MOORE - DIRECT (McLandrich)                    777

1   **Q.**    Would you read that, please?

2   **A.**    "Suspect will be a white male, 6-3, 250, brown hair,"

3   it says, "with brown tint.  Hair short on top and cut short

4   above the ears.  Suspect was wearing sunglasses at time of

5   occurrence.  Subject was extremely tan, wearing gray

6   prewashed jeans with light, short-collared shirt, and

7   possibly blue and black in color, possible pattern shirt."

8   **Q.**    And this is something you also would have reviewed as you

9   familiarized yourself with the file?

10  **A.**    This would have been in the file, yes.

11          MR. McLANDRICH:  Let's go to Defendant's Exhibit 7,

12  please.

13          THE COURT:  Objection?

14          MR. KANOVITZ:  Sorry, Your Honor.  No objection.

15          MS. FRICK:  No objection.

16          THE COURT:  It may be published.

17      (Exhibit displayed.)

18  BY MR. McLANDRICH:

19  **Q.**    What is Exhibit 7, please?

20  **A.**    This is a Miami Valley Regional Crime Laboratory form

21  that we used to send evidence down to the Miami Valley

22  Regional Crime Lab.

23  **Q.**    And what was sent on this occasion?

24  **A.**    I believe it was sunglasses, one pair of sunglasses.

25          MR. McLANDRICH:  Let's go to Defendant's Exhibit --

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
 1    I'm sorry.  Is there a second page to this one?  I think there

 2    is; yes?

 3         Bring up the next page if you can.

 4         (Exhibit displayed.)

 5    BY MR. McLANDRICH:

 6    Q.   And there we see what, in fact, is being submitted?

 7    A.   Yes, sir.

 8    Q.   And the purpose for which it's being submitted?

 9    A.   Yes, sir.

10         MR. McLANDRICH:  Let's go to Defendant's Exhibits 8,

11    please.

12         MS. FRICK:  No objection here, Your Honor.

13         THE COURT:  Thank you.

14         MR. KANOVITZ:  I'm sorry.  No objection.  It's

15    getting late.

16         (Exhibit displayed.)

17         MR. McLANDRICH:  Next page, please.

18         (Exhibit displayed.)

19    BY MR. McLANDRICH:

20    Q.   And what is this, Detective?

21    A.   This is the supplementary offense report with the

22    Montgomery County Sheriff's Office.

23    Q.   And so this relates to S.C.?

24    A.   Correct.

25         MR. McLANDRICH:  Let's go to the next page.
```

MOORE - DIRECT (McLandrich)                    779

1          (Exhibit displayed.)

2              THE WITNESS:  Again, it's the supplementary offense

3     report with the Montgomery County Sheriff's Office.

4     BY MR. McLANDRICH:

5     Q.   And, again, this would have been a document that you

6     reviewed as part of your initial familiarization with the

7     file?

8     A.   Yes, sir.  And I also actually believe that these

9     documents are the same.

10    Q.   The next page?

11    A.   Yeah, these two pages that we're looking at here are --

12    have the same wording.  They are duplicated.

13             MR. McLANDRICH:  All right.  Let's just move ahead

14    then to Defendant's Exhibit 9.

15             MS. FRICK:  No objection, Your Honor.

16             MR. KANOVITZ:  No objection.

17             THE COURT:  Thank you.

18          (Exhibit displayed.)

19    BY MR. McLANDRICH:

20    Q.   And who is the author of this particular document.

21    A.   This is a supplementary report filed by Detective G. L.

22    Bailey.

23    Q.   And the date?

24    A.   8-22 of 1988.

25    Q.   And so this is the first document that we've seen with

MOORE - DIRECT (McLandrich)                           780

```
 1    Detective Bailey, correct?

 2    A.    Yes.

 3    Q.    And this --

 4          MR. KANOVITZ:  Objection; that lacks foundation

 5    and -- yeah.

 6          MR. McLANDRICH:  I'll ask it differently.

 7    BY MR. McLANDRICH:

 8    Q.    Do you recall seeing a prior report with Detective Bailey

 9    as the author?

10    A.    Yes, sir.

11    Q.    And which one was that?

12    A.    I saw supplementary reports filed by Bailey and also

13    Fritz.

14    Q.    Prior to this date?

15    A.    Prior to today.

16    Q.    Oh, no, I'm sorry.  I meant in the sequence of the

17    documents we have reviewed here this afternoon, you and I.  Is

18    this -- strike it.  It's not that important.  We will just

19    move on.

20          And so this purports to be what?

21    A.    It is a supplementary report concerning Bonnie and

22    Connie -- B.W. and C.W.

23    Q.    And, again, in this report, he's covering the events of

24    the assaults with the girls?

25    A.    Yes, sir.
```

MOORE - DIRECT (McLandrich)                    781

1            MR. McLANDRICH:  Let's move on to the next page.

2        (Exhibit displayed.)

3   BY MR. McLANDRICH:

4   Q.    And so here we have in the middle of the page

5   descriptions, correct?

6   A.    Yes, sir.

7   Q.    And, in fact, the two descriptions are not identical,

8   correct?

9   A.    That would be correct.

10  Q.    And so Bonnie has what with respect to hair color?

11  A.    Who?

12  Q.    Bonnie.  Under the name "Bonnie," what's the description

13  of the hair color?

14  A.    It is white male, 20 to 25 years of age, 6-3, 250

15  pounds, white tanned face, wore dark sunglasses entire time,

16  orangish-brown hair.

17  Q.    And you can stop there.  I was really just asking about

18  hair color.

19            THE COURT:  Let's use initials.

20            MR. McLANDRICH:  I'm sorry.  Yes, sir.

21  BY MR. McLANDRICH:

22  Q.    With respect to C.W., what is the hair color referenced

23  in her description on that page?

24  A.    Is a white male, 23 years of age, 6-3, 250 pounds,

25  wide, very tanned face, thin brownish red-hair, straight

MOORE - DIRECT (McLandrich)                           782

```
 1   cut, curled at the collar, mustache, bushy eyebrows, wore

 2   dark sunglasses the whole time.

 3   Q.   That's it.  Thank you.

 4        MR. McLANDRICH:  Let's go to the next page, please.

 5        (Exhibit displayed.)

 6   BY MR. McLANDRICH:

 7   Q.   And, again, we're retracing the events in this report,

 8   correct?

 9   A.   Yes, sir.

10   Q.   All right.

11   A.   And this is page 3 of Detective Bailey's supplementary

12   report.

13        MR. McLANDRICH:  Let's move ahead then to Exhibit

14   10.

15        MS. FRICK:  No objection.

16        THE COURT:  Thank you.

17        MR. KANOVITZ:  No objection.

18        THE COURT:  Thank you.

19        It may be published.

20        (Exhibit displayed.)

21   BY MR. McLANDRICH:

22   Q.   What is Exhibit 10, please?

23   A.   This is another Miami Valley Regional Crime Laboratory

24   request form.

25        MR. McLANDRICH:  And let's go to the next page.
```

MOORE - DIRECT (McLandrich)                                    783

1            (Exhibit displayed.)

2    BY MR. McLANDRICH:

3    Q.   And what is being submitted to the crime lab with respect

4    to this report?

5    A.   There is the clothing and bandanas and a white envelope

6    containing a photograph.

7    Q.   All right.  And then next to that indicates what is to be

8    requested of the crime lab?

9    A.   Correct.

10   Q.   And what is it for the clothes, and what is it for the

11   photograph?

12   A.   For the -- for Bag Number 1, it says to check for

13   semen, attention on the gray T-shirt, and to check for hairs

14   and fibers.

15           On Bag Number 2, it says to check for hairs and fibers,

16   or fibers and hair.

17           And bag -- no.  White envelope containing photographs

18   says check for latent fingerprints.

19           MR. McLANDRICH:  Let's proceed to Exhibit 11,

20   please.

21           MR. KANOVITZ:  No objection.

22           MS. FRICK:  No objection.

23           THE COURT:  Thank you.

24           (Exhibit displayed.)

25   BY MR. McLANDRICH:

MOORE - DIRECT (McLandrich)                                        784

1   **Q.**   And what is Exhibit 11, please?

2   **A.**   This is the Miami Valley Regional Crime Lab report

3   concerning the black sunglasses with red trim that had been

4   sent to them with the results.

5   **Q.**   And the results were what in substance?

6   **A.**   The latent prints on the sunglasses in Exhibit 1, being

7   the sunglasses, they were evaluated and found to have no

8   value for identification purposes.

9   **Q.**   And the date of this document?

10  **A.**   It's dated August 26, 1988.

11  **Q.**   And sent to whom?

12  **A.**   Sent to the crime lab and then on to the latent print

13  examiner.

14  **Q.**   I am sorry.  The letter is directed to whom?  The letter

15  in front of you.  Top of the letter.

16  **A.**   Oh, it's to Detective G. L. Bailey, Miami Township PD.

17          MR. McLANDRICH:  Let's move on to Exhibit 12,

18  please.

19          MS. FRICK:  No objection.

20          MR. KANOVITZ:  No objection, Your Honor.

21          THE COURT:  It may be published.

22      (Exhibit displayed.)

23  BY MR. McLANDRICH:

24  **Q.**   And is Exhibit 12 another such letter from the Miami

25  Valley Crime Lab?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - DIRECT (McLandrich)                                785

1    **A.**   Yes, sir, it is.

2    **Q.**   And this one is with respect to the Polaroid?

3    **A.**   Yes, sir, it is.

4    **Q.**   And what does it indicate with respect to the evidentiary

5    value of the Polaroids?

6    **A.**   It says that the latent prints developed on the photo

7    in Exhibit Number 1 were evaluated and found to have no

8    value for identification purposes.

9    **Q.**   And the date on this document?

10   **A.**   September 21, 1988.

11   **Q.**   And this is before your involvement in the case, correct?

12   **A.**   All of this is, yes.

13          MR. McLANDRICH:  And moving on to Exhibit 14,

14   please.

15          MR. KANOVITZ:  No objection.

16          MS. FRICK:  14?

17          MR. McLANDRICH:  I am sorry.  13.

18          MR. KANOVITZ:  No objection to that one either.

19          MS. FRICK:  No objection, Your Honor.

20          THE COURT:  All right.

21       (Exhibit displayed.)

22   BY MR. McLANDRICH:

23   **Q.**   Is Exhibit 13 another such letter from the Miami Valley

24   Regional Crime Lab?

25   **A.**   Yes, sir, it is.

MOORE - DIRECT (McLandrich)                              786

1    **Q.**    And is this one with respect to the two bags of clothes?

2    **A.**    Yes, sir, it is.

3    **Q.**    And what was the conclusion of the crime lab with respect

4    to the evidentiary value of the clothes?

5    **A.**    Serological analysis of Exhibit 1A, which is the gray

6    T-shirt, failed to reveal the presence of seminal fluid.

7    **Q.**    And then with respect to hairs and fibers, they did find

8    some hairs and fibers, correct?

9    **A.**    Examination of Exhibit 1, clothing, B -- B.W. revealed

10   the presence of light lavender and orange synthetic fibers;

11   white, blue, red, and black cotton fibers; and two light

12   brown Caucasian head hair.

13   **Q.**    And with respect to Bag 2?

14   **A.**    Examination of Exhibit 2, clothing, C.W., revealed the

15   presence of blue cotton and light lavender synthetic fibers,

16   Caucasian pubic hair, and light brown Caucasian head hair.

17           MR. McLANDRICH:  Next page, please.

18       (Exhibit displayed.)

19           MR. McLANDRICH:  So nothing further.

20       Proceed to Exhibit 14, please.

21           MS. FRICK:  No objection, Your Honor.

22           MR. KANOVITZ:  No objection.

23           THE COURT:  It can be displayed.

24       (Exhibit displayed.)

25   BY MR. McLANDRICH:

MOORE - DIRECT (McLandrich)                              787

1    **Q.**    What is Exhibit 14, please?

2    **A.**    This is the prescribed Miami Township document.  It is

3    a property release form.

4    **Q.**    All right.  And what is being released?

5    **A.**    In this case, two bags of clothes and one pair of

6    sunglasses, and picture.

7    **Q.**    And the date on this?

8    **A.**    9-28 of 1988.

9    **Q.**    And this would have been prior to your involvement?

10   **A.**    Yes, sir, it would.

11          MR. McLANDRICH:  All right.  You can take that down.

12   BY MR. McLANDRICH:

13   **Q.**    So these would have all been things that comprised the

14   file when you received it.  Yes?

15   **A.**    Yes.  And then there were some printouts.  But, yes,

16   this is most of it.

17   **Q.**    And so then, Detective, did there come a time when you

18   came into the possession of certain GM identification badges?

19   **A.**    Yes, sir.

20   **Q.**    And when was that?

21   **A.**    Well, initially would have received them on April 19th.

22   **Q.**    And were you assigned to the case on April 19, 1990?

23   **A.**    Yes, 1990, yes.  No, I was not assigned to the case at

24   that point.

25   **Q.**    And what did you do with those photographs when they came

MOORE - DIRECT (McLandrich)                                        788

1    into your possession?

2    A.    They were given back to Steve Fritz.

3    Q.    And do you know what Detective Fritz did with those

4    photographs?

5    A.    As far as I know, put them in the file at that time.

6    Q.    All right.  But in any event, you had no involvement with

7    them at that time?

8    A.    No.

9    Q.    Did you take any other action with respect to the --

10   strike that question.

11         Did you understand at that time, on April 19, 1990, that

12   the reason you were receiving the GM ID badges or the police

13   department was receiving the GM ID badges related to

14   Mr. Gillispie?

15   A.    Did I understand what part of that?

16   Q.    That the reason that your -- that the police department

17   was being given these ID badges was because someone thought

18   Mr. Gillispie might be a suspect in the Best Product rapes.

19   Is that something you were aware of at that time?

20   A.    I mean, I knew that Mr. Wolfe had come in and presented

21   those items concerning this case.

22   Q.    And was there any investigative activity that you engaged

23   on on April 19, 1990?

24   A.    No.

25   Q.    And so there came a time when you were placed into the

MOORE - DIRECT (McLandrich)                          789

1    detective bureau, correct?

2    A.   I believe that we've established that I went in there

3    on November 5th of 1989.

4         MR. McLANDRICH:  Can we pull up -- could we pull up

5    Defendant's Exhibit 31, please.

6         MS. FRICK:  No objection, Your Honor.

7         THE COURT:  Thank you.

8         MR. KANOVITZ:  No objection.

9         THE COURT:  You may display.

10        (Exhibit displayed.)

11   BY MR. McLANDRICH:

12   Q.   What is Defendant's Exhibit 31, please?

13   A.   This is a personnel order through Miami Township Police

14   Department.

15   Q.   And the date of issue and the effective date, please?

16   A.   Date of issue is November 2, 1989, and effective date

17   is November 5, 1989.

18   Q.   And what does this document do?  Is this essentially the

19   assignment of you to the detective bureau?

20   A.   Yes, sir.

21   Q.   So you went into the detective bureau on November 5,

22   1989?

23        MR. KANOVITZ:  Objection; asked and answered.

24        THE COURT:  I'm allowing it.

25        THE WITNESS:  It shows that Corporal Bailey is

MOORE - DIRECT (McLandrich)                                    790

1    leaving the detective section, and I am going into the

2    detective section.

3    BY MR. McLANDRICH:

4    **Q.**   All right.  And so on that date you're going in, he's

5    going out?

6    **A.**   Yeah.

7    **Q.**   All right.  And you were not assigned the base -- the

8    Best Products rape case on that date, were you?

9    **A.**   No, I was not.

10   **Q.**   When were you assigned the Best Products rape case?

11   **A.**   It was laid on my desk on June 15th of 1990.

12   **Q.**   And why was that?

13   **A.**   Detective Sergeant Steve Fritz was leaving the police

14   department, and he gave the case to me.

15          MR. McLANDRICH:  Can we bring up Defendant's 17,

16   please.

17          MS. FRICK:  No objection, Your Honor.

18          MR. KANOVITZ:  Just a moment, please.

19       No objection.

20          THE COURT:  It may be published.

21       (Exhibit displayed.)

22   BY MR. McLANDRICH:

23   **Q.**   And what is Defendant's Exhibit 17?

24   **A.**   This is -- this is a personnel order through Miami

25   Township Police Department.

1    **Q.**   Okay.  And does this document reflect Mr. Fritz leaving

2    the department effective June 15th of '90 and Detective

3    Sergeant Wilson entering the detective section on that date?

4    **A.**   Yes, sir, it does.

5    **Q.**   And so then, you are now assigned the file.  Did you

6    start working it on that very day?

7    **A.**   No, sir.  I stuck that into my drawer.

8    **Q.**   And then, when did you start working the file?

9    **A.**   I believe that I pulled it out several days later, on

10   June 18, 1990.

11   **Q.**   And what would you have done on June 18, 1990?

12   **A.**   We had went to a new computer reporting system.  As you

13   saw from the previous reports, they were all handwritten.

14   We had a new computer reporting system, and I entered the

15   start of my report and my investigation into the computer.

16   **Q.**   So what you're saying is after that date, when you

17   started making reports, they were all computerized reports?

18   **A.**   Yes, sir.

19   **Q.**   And prior to that time, were the reports some sort of

20   multi-part form?

21   **A.**   There were different screens that produced separate

22   documents.

23   **Q.**   Okay.  My question was prior to your starting in the

24   computer, the old forms, were the old forms some sort of a

25   multi-part form that made multiple copies at once when the

MOORE - DIRECT (McLandrich)                                    792

1    detective filled it out?  If you know.

2    **A.**    If you're talking about carbon, yes.

3    **Q.**    Yes.  And so when you did start working on the file on

4    June 18th, what you would have done would have been reviewed

5    the documents that we went through, essentially Exhibits 1

6    through 14, plus whatever other papers you referred to?

7    **A.**    Yes, sir.

8    **Q.**    In that file at that time, were there any reports from

9    Detective Bailey signed off on by Detective Fritz that

10   purported to exclude Mr. Gillispie as a suspect?

11   **A.**    Absolutely not.

12   **Q.**    Have you ever seen such reports?

13               THE COURT:  Five minutes, counsel.

14               THE WITNESS:  I have never seen any reports like

15   that.

16   BY MR. McLANDRICH:

17   **Q.**    And had you seen such reports, would you have destroyed

18   them or suppressed them?

19   **A.**    Absolutely not.

20   **Q.**    And if you had seen such reports, would you have stopped

21   investigating Mr. Gillispie because of such a report?

22   **A.**    I would have to say that that would probably stop me

23   from starting an investigation.

24   **Q.**    All right.  And because you didn't see such reports, you

25   continued an investigation with respect to Mr. Gillispie?

MOORE - DIRECT (McLandrich)                                    793

1    **A.**    That's true.

2    **Q.**    And along with the reports we have discussed, you had

3    certain GM identification badges, correct?

4    **A.**    Correct.

5         MR. McLANDRICH:  Would you go to Plaintiff's 285,

6    please.  It's the one with the GM identification badges.

7         So this is Plaintiff's Exhibit 285, page 10.

8         MS. FRICK:  No objection, Your Honor.

9         MR. KANOVITZ:  No objection.

10        THE COURT:  All right.

11        (Exhibit displayed.)

12   BY MR. McLANDRICH:

13   **Q.**    So in addition to the composite, we have four GM

14   identification badges; is that correct?

15   **A.**    Four different, yes.

16   **Q.**    And were those the badges that were in the file when it

17   was delivered to you?

18   **A.**    I believe so.

19        MR. McLANDRICH:  And can you focus on those four and

20   blow it up, please.

21   BY MR. McLANDRICH:

22   **Q.**    Now, you were asked earlier on direct whether these

23   individuals that were in the other GM badges were like and

24   similar to Mr. Gillispie.  And now having an opportunity to

25   see those badges, do you consider those individuals like and

MOORE - DIRECT (McLandrich)                    794

```
 1    similar to the description of the suspect and to

 2    Mr. Gillispie?

 3              MR. KANOVITZ:  Objection to the form of the

 4    question.

 5              THE COURT:  Overruled.

 6        You can answer, if you can.

 7              THE WITNESS:  The documents themselves are like and

 8    similar.  The individuals are not.

 9    BY MR. McLANDRICH:

10    Q.   And I'm not talking about the document.  I'm talking

11    about the faces.

12              THE COURT:  I think he answered, Counsel.

13              MR. McLANDRICH:  Yes, thank you, Your Honor.

14              THE COURT:  And I think we're done.

15              MR. McLANDRICH:  You can take it down.  We're done.

16              THE COURT:  Ladies and gentlemen, we've come to a

17    point in time where we're going to recess for the day.  As a

18    matter of fact, we're going to recess until Monday.  So please

19    have a wonderful weekend.  Get a lot of rest.

20        We have -- we've covered a lot of territory.  We've had

21    long days, and I appreciate your attention and patience for

22    the Court and for the parties.

23        Again, I'm going to remind you, and it might be

24    especially difficult on a weekend, but please remember my

25    admonitions:  Don't discuss the case amongst yourselves or
```

1    with anyone else and don't formulate any opinions or

2    conclusions.  It would be totally improper at this point in

3    time.  Even though you have heard a good bit of evidence, you

4    have not heard all the evidence, nor have you heard the

5    arguments of counsel or the instructions of the law.

6         So we're going to recess.  If you'll please be back here

7    approximately -- just a little bit before 9 so we can get

8    started, and we'll do our best to keep things moving and work

9    within the parameters, I hope, or we talked about at the

10   beginning.  No guarantees, but we'll try.

11        So anything further to come before the Court, counsel?

12             MR. KANOVITZ:  Not at this time, Your Honor.

13             MR. McLANDRICH:  No, thank you, Your Honor.

14             MR. HERMAN:  No, Your Honor.

15             THE COURT:  Counsel, as I indicated to you

16   previously in pretrial or a conference, you do need -- we need

17   a couple minutes, or my staff attorneys need a couple minutes

18   with you here at the end of the day before you leave, but

19   everyone have a safe trip home.

20             THE COURTROOM DEPUTY:  All rise.  This court stands

21   in recess.

22        (Jury out at 4:33 p.m.)

23        (Court adjourned at 4:33 p.m.)

24

25

796

1                    CERTIFICATE OF REPORTER

2

3           I, Mary A. Schweinhagen, Federal Official Realtime

4   Court Reporter, in and for the United States District Court

5   for the Southern District of Ohio, do hereby certify that

6   pursuant to Section 753, Title 28, United States Code that the

7   foregoing is a true and correct transcript of the

8   stenographically reported proceedings held in the

9   above-entitled matter and that the transcript page format is

10  in conformance with the regulations of the Judicial Conference

11  of the United States.

12

13  s/Mary A. Schweinhagen

14  _____ 21st of December, 2023

15  MARY A. SCHWEINHAGEN, RDR, CRR
    FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25