```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE SOUTHERN DISTRICT OF OHIO
 2                                AT DAYTON

 3     _____
                                          )
       ROGER DEAN GILLISPIE,              )
 4                                        )
                         Plaintiff,       ) CASE NO. 3:13-cv-416-TMR
 5                                        )
                         -vs-             )
 6                                        )
       THE CITY OF MIAMI TOWNSHIP, ET AL.,) JURY TRIAL
 7                                        )
                         Defendants.      ) VOLUME VI
 8     _____)
                          TRANSCRIPT OF PROCEEDINGS
 9                    THE HONORABLE THOMAS M. ROSE,
                  UNITED STATES DISTRICT JUDGE, PRESIDING
10                    MONDAY, NOVEMBER 14, 2022
                              DAYTON, OH
11
       For the Plaintiff:      MICHAEL KANOVITZ, ESQ.
12                             DAVID B. OWENS, ESQ.
                               MEGAN C. PORTER, ESQ.
13                             Loevy & Loevy
                               311 N. Aberdeen Street
14                             3rd Floor
                               Chicago, IL  60607
15
       For the Defendant       JOHN T. McLANDRICH, ESQ.
16     Matthew Scott Moore:    DAVID J. SIPUSIC, ESQ.
                               Mazanec, Raskin & Ryder Co., LPA
17                             3305 Solon Road
                               100 Franklin's Row
18                             Cleveland, OH  44139

19     For the Intervenor      DAWN M. FRICK ESQ.
       Miami Township:         CHRISTOPHER T. HERMAN, ESQ.
20                             Surdyk, Down & Turner Co., LLP
                               8163 Old Yankee Street
21                             Suite C
                               Dayton, OH  45458
22
              Proceedings recorded by mechanical stenography,
23     transcript produced by computer.
                       Mary A. Schweinhagen, RDR, CRR
24                    Federal Official Court Reporter
                          200 West Second Street
25                         Dayton, OH  45402
                          *** *** *** ***
```

```
 1   Courtroom Deputy:  Elizabeth Penski

 2   Law Clerks:  Michael Mayer, Callum Morris

 3   Also Present:  Roger Dean Gillispie, plaintiff; Valerie
     Barajas, paralegal; Matt Thibodeau, paralegal; Jeff Weber, IT
 4

 5

 6                        INDEX OF WITNESSES

 7                        November 14, 2022

 8   PLAINTIFF'S WITNESSES

 9   DENNIS LIEBERMAN
         Direct Examination by Mr. Kanovitz          809
10       Cross-Examination by Mr. McLandrich         859
         Cross-Examination by Mr. Herman             882
11       Redirect Examination by Mr. Kanovitz        898
         Recross-Examination by Mr. McLandrich       906
12
     DEFENDANT MOORE'S WITNESSES
13
     MATTHEW SCOTT MOORE
14       Direct Examination by Mr. McLandrich        909
         Cross-Examination by Mr. Kanovitz           971
15

16                   *     *     *     *     *

17

18

19

20

21

22

23

24

25
```

799

```
 1          P-R-O-C-E-E-D-I-N-G-S                    8:51 A.M.

 2          (In chambers at 8:51 a.m.)

 3          THE COURT:  We do have some bumps in the road.

 4     Juror Number 1 is ill.  Well, I shouldn't say he's ill.  He

 5     tested positive.  He did so not because of being sick.  He has

 6     a mother that's in an assisted living facility and every time

 7     he goes to visit his mom on the weekends he tests.  He tested

 8     positive.  He has no symptoms.  He actually reported here

 9     today.  We've got him isolated downstairs and set apart from

10     everybody else.

11          My thought is that, if there are no objections, based

12     upon that, the Court would find just cause to excuse him and

13     proceed with trial.

14          MR. KANOVITZ:  Some questions.  I don't know how the

15     court system is set up.  Does he have the ability to watch

16     testimony, like some courts have like a remote setup?

17          THE COURT:  No.

18     Anybody's thoughts?

19          MS. FRICK:  Which one is 1?

20          THE COURT:  Clear down at the end.  The fellow.

21          MR. McLANDRICH:  I mean, the only other option would

22     seem to be if he could be sort of isolated in the jury box far

23     enough away from everybody else.

24          THE COURT:  I am afraid that would make everybody

25     nervous.
```

800

```
 1              MS. FRICK:  Does the rest of the jury know?

 2              THE COURT:  What?

 3              MS. FRICK:  Does the rest of the jury know at this

 4    point?

 5              THE COURT:  No.  They know nothing.

 6              MR. KANOVITZ:  There is a good chance that two of

 7    them are positive and haven't even tested, just statistically.

 8              THE COURT:  We can proceed with six jurors, but, you

 9    know, this would bring us down to seven.

10              MR. KANOVITZ:  I'm trying to brainstorm a solution,

11    but it doesn't really sound like there is one.

12              THE COURT:  I mean, you know, if he tests -- he

13    doesn't have symptoms right now.  He could get symptoms, I

14    mean.  There is all sorts of stuff that could develop from

15    that, I think.

16              MR. McLANDRICH:  I mean, you know, I think it's kind

17    of like you said.  It seems like good cause.  I hate to see

18    him go.

19              THE COURT:  I hate to see any of my jurors go.

20              MR. McLANDRICH:  Right, exactly.

21              THE COURT:  The funny thing is, I tried -- how many

22    did I try during the pandemic?

23              MR. MORRIS:  Three.

24              THE COURT:  I tried three during the pandemic, all

25    lengthy trials, and never lost a juror.  And now we got
```

```
 1    supposedly through the pandemic.

 2           MR. MAYER:  We had two criminal ones with 12, 14

 3    jurors with the alternates.

 4           THE COURT:  Anything?

 5           MR. KANOVITZ:  I can't think of anything, you know.

 6           MS. FRICK:  No.

 7           THE COURT:  Well, based upon the fact that Juror

 8    Number 1 has reported as indicated and indicated or told the

 9    Court that he has tested positive, the Court finds just cause

10    that he can be excused, and we will proceed with seven jurors.

11        What I'm going to tell the jury is that I've excused him

12    for just cause.

13        (David Owens now present.)

14           MR. KANOVITZ:  Is there any chance they will confuse

15    that?  Should we just tell them that he's sick?

16           THE COURT:  Let me bring Mr. Owens up to date.  We

17    have a juror that visited Mom in the assisted living over the

18    weekend, but he tests every time he goes to visit Mom.  He

19    tested positive.  He actually reported here today, but I have

20    got him isolated downstairs.  My proposed action is the fact

21    that I am going to -- I believe that's just cause to excuse

22    him and proceed with seven jurors.

23           MR. OWENS:  I'm two for two in 2022 in this

24    happening.

25           THE COURT:  What's that?
```

```
 1              MR. OWENS:  I'm two for two in jury trials this

 2    happening.

 3              MS. FRICK:  It's your fault.

 4              THE COURT:  It is your fault because I was telling

 5    them I went through the pandemic and three fairly lengthy

 6    trials and never lost a juror.

 7         I don't know anything else to do.  I mean, we don't have

 8    the facilities to put him in some isolation booth and let him

 9    watch and participate.

10         My inclination is not -- to just say just cause.

11         The problem with going into any great detail of why I've

12    let him go, one, I don't know whether there is any kind of

13    prohibition for me telling that to the rest of the jurors or

14    not, but it gets them very nervous, I would think.

15              MR. KANOVITZ:  My concern would be that they would

16    confuse the issue, but maybe just say he is unable to continue

17    to participate.

18              THE COURT:  Let me come up with something.  I will

19    come up with something like that.

20         Any other suggestions?

21              MR. MAYER:  No, Judge.

22              THE COURT:  Callum?

23              MR. MORRIS:  No.

24              THE COURT:  The other thing, there's a little

25    scheduling hiccup.  I have got to recess right at 10:15 this
```

1    morning because I have got to walk down the hall, and they are

2    dedicating this reentry program to one of our probation

3    officers that died of melanoma several years ago, and I've got

4    to say a couple words down there.  It is not going to extend

5    the break or anything, it's just I have got to break right at

6    10:15 because Judge Rice has made provisions for me to say

7    something between 10:15 and 10:30.  I will try to go down

8    right away.  That way I won't delay the break.

9         It's also my understanding that there has been an

10   agreement to modify the stipulations?

11             MR. McLANDRICH:  The dates of incarceration.

12             THE COURT:  So what I was going to do at this point

13   in time, I was simply going to, right now, say that "The

14   parties have corrected a portion of their stipulations.  The

15   parties have removed the stipulation that Gillispie was

16   continuously incarcerated between September the 5th, 1990, and

17   December the 22nd of 2011, and corrected it so that they have

18   now stipulated or agreed that Gillispie was confined for

19   approximately two weeks after his arrest and on bond until his

20   first trial in February of 1991.  Gillispie was then

21   continuously incarcerated between February the 5th, 1991, and

22   December the 22nd of 2011.  Therefore, you must treat the

23   corrected facts as having been proven for the purpose of this

24   case.  I will include a full recitation of the parties'

25   stipulations in my final set of instructions."

```
1              MR. McLANDRICH:  Seems fair.

2              THE COURT:  My understanding, we're going to insert

3    another witness in the middle of Mr. Moore, or Detective

4    Moore?  That's Mr. Lieberman?

5              MR. KANOVITZ:  Yes.

6              THE COURT:  And then once Mr. Lieberman's done,

7    Mr. Moore goes back on, and we are going to finish him up?

8              MR. KANOVITZ:  (Nodded head.)

9              THE COURT:  Okay.

10             MR. McLANDRICH:  Was tomorrow the day that you had

11   to leave at 3:30?

12             THE COURT:  Leave at 3:30.

13             MR. OWENS:  And are we here until 4:30 today?

14             THE COURT:  We could be.  What I'm willing to do is

15   I'm willing to possibly give a little on my end between 4 and

16   4:30, to be real honest, for this week.

17             MR. OWENS:  If we need to have somebody else waiting

18   in the wings.

19             THE COURT:  Let's see how we are developing at that

20   point in time.

21             MR. OWENS:  Sure.

22             THE COURT:  I'm not sure we're able to plan a whole

23   lot, but, you know, we'll just see where we are.

24          So, counsel for plaintiff, anything?

25             MR. KANOVITZ:  Nothing further.
```

1          MR. McLANDRICH:  You know, the one question -- and

2     it doesn't have to be necessarily addressed now, but just to

3     get it on the radar screen, so to speak, there was the email

4     about withdrawing the Fourth Amendment.

5          THE COURT:  Oh, I should have brought that up.  I'm

6     sorry.  I should have brought that up.

7          MR. KANOVITZ:  So it seems like we need to file an

8     amended complaint that just excludes those claims, or can we

9     just interlineate?

10          THE COURT:  My thought is -- here's what I thought.

11     Can we -- can you -- can the parties agree to submit to me a

12     proposed agreed entry dropping those?

13          MR. McLANDRICH:  Sure.  Yeah, I would think so.

14          THE COURT:  I just don't want to -- I really

15     don't -- if there is any way to avoid an amended complaint

16     right in the middle of trial.  As a matter of fact, I

17     shouldn't admit this, but I have never done that.  I have

18     never had that done in the middle of trial.

19          MR. McLANDRICH:  I think we can avoid that.  I mean,

20     the only discussion that I think we need to have so we make

21     sure we are on the same page in terms of what claims are

22     actually going away as a result of the Fourth Amendment claim,

23     malicious prosecution would certainly seem to be one.  I just

24     don't know if there is --

25          MR. KANOVITZ:  I think that is the scope of our

1    Fourth Amendment claims, is malicious pros.

2            MR. McLANDRICH:  Well, there's been evidence put

3    on -- and this is where my brain is going -- evidence put on

4    that, well, he shouldn't have shown a photo array to the

5    victims.  That strikes me as a Fourth Amendment claim, not a

6    due process fair trial.

7            MR. KANOVITZ:  It's a due process fair trial claim

8    going into the witness identification procedure.  It's not a

9    Fourth Amendment.

10           MR. McLANDRICH:  It's a procedure issue, right?  We

11   can talk about that off the record.

12           THE COURT:  Here's -- my only hope is that whatever

13   you do, you can get it to us fairly quickly so we know --

14   because it has an effect upon our consideration of the drafts

15   of the instructions and things like that.  It just saves us --

16   I don't know how much it saves us, but it clarifies things.

17   But that's the way I would propose.  I think I would be

18   comfortable if we can get some kind of an agreed judgment

19   entry submitted to me that I could sign.  That way we don't

20   have to go through some type of process that I'm not -- not

21   that I am not familiar with all processes.

22           (Concluded at 9:02 a.m.)

23           (Jury in at 9:08 a.m.)

24           (In open court at 9:09 a.m.)

25           THE COURT:  Ladies and gentlemen, welcome back.

1    Hopefully everyone had a restful and extended weekend.

2        I'm assuming everybody was able to abide by the Court's

3    admonitions.  Anybody that wasn't?

4        (No verbal response.)

5        THE COURT:  Okay.  Well, ladies and gentlemen, I do

6    need to tell you that I have excused Juror Number 1 for just

7    cause.  He's not able to continue to participate in the trial,

8    but I am going to ask you please do not speculate or discuss

9    the reasons for the Court's finding of just cause and this

10   excusal.

11       The other thing I need to share with you this morning,

12   ladies and gentlemen, is the fact that the parties have

13   corrected a portion of their stipulations, the stipulations I

14   read to you earlier as we started the evidence presentation.

15       The parties have removed from that stipulation "that

16   Gillispie was continuously incarcerated between September the

17   5th, 1990, and December the 22nd, 2011," and corrected it so

18   that they have now stipulated or agreed "that Gillispie was

19   confined for approximately two weeks after his arrest and then

20   on bond until his first trial in February of 1991.  Gillispie

21   was continuously incarcerated between February 5th of 1991 and

22   December the 22nd of 2011.  Therefore, you must treat the

23   corrected facts as having been proven for the purpose of this

24   case."

25       The Court will include a full recitation of the parties'

1    stipulations as modified in my final set of instructions for

2    you before your deliberations.

3        All right.  It's also my understanding that we are --

4    based upon the availability of witnesses, we may be taking

5    another witness out of order.  So please bear with us.  We are

6    trying to move along as expeditiously as possible, but we have

7    to make some modifications.

8        So it's my understanding that we are going to break at

9    this time the testimony of Detective Moore to call another

10    witness for the plaintiff.

11        Counsel ready to proceed?

12            MR. KANOVITZ:  Yes.

13            THE COURT:  Counsel?

14            MR. McLANDRICH:  Yes, sir.

15            MR. HERMAN:  Yes.

16            THE COURT:  Next witness.

17            MR. KANOVITZ:  At this time, plaintiff calls Dennis

18    Lieberman.

19        **DENNIS LIEBERMAN, PLAINTIFF'S WITNESS, SWORN**

20            THE COURT:  Mr. Lieberman, if you'll please try to

21    keep your voice up.  I don't think that will be a problem for

22    you, but keep your voice up.  You have your microphone there

23    for you.  If you get it too close to you, it muffles you; if

24    you get it too far away, it loses you.  So if you keep your

25    voice up so that we can all hear your responses, that will

LIEBERMAN - DIRECT (Kanovitz)                              809

1    solve the problem.

2                THE WITNESS:  I will try, Your Honor.  Thank you.

3                THE COURT:  You may inquire.

4                MR. KANOVITZ:  Thank you, Your Honor.

5                        **DIRECT EXAMINATION**

6    BY MR. KANOVITZ:

7    **Q.**   Good morning.

8    **A.**   Good morning.

9    **Q.**   Could you introduce yourself to the jury, please?

10   **A.**   Yes.  My name is Dennis Lieberman.  It's

11   L-I-E-B-E-R-M-A-N.

12   **Q.**   Where you from, sir?

13   **A.**   Originally, I was born in South Bend, Indiana.  I went

14   to Miami University, and then University of Dayton School of

15   Law.  So I've lived in the Dayton area since 1975.

16   **Q.**   And what do you do for a living?

17   **A.**   I'm an attorney.

18   **Q.**   Are you currently a member of the Ohio Bar?

19   **A.**   I am.

20   **Q.**   When did you first become a member of the Ohio Bar?

21   **A.**   I became a member of the Ohio Bar in 1978, upon

22   graduation from Dayton School of Law.

23   **Q.**   And do you actually practice law?

24   **A.**   I do, yes.

25   **Q.**   What sort of practice do you do?

LIEBERMAN - DIRECT (Kanovitz)                                810

1    **A.**    Primarily criminal law.  It didn't start out that way,

2    but that's where it's ended up over the years.

3    **Q.**    Got it.  And do you do any teaching in addition to

4    practice?

5    **A.**    I do.  I'm an adjunct professor at the University of

6    Dayton School of Law.

7    **Q.**    And what do you teach there?

8    **A.**    I teach some criminal practice.  Mostly trial practice,

9    jury, and national mock trial.

10   **Q.**    You mentioned your educational background.  Did you

11   graduate with honors?

12   **A.**    I did.  I graduated from the school of law cum laude.

13   **Q.**    And can you quickly take us through your work background

14   since graduation?

15   **A.**    Upon graduation, I -- I had actually taken the Indiana

16   Bar my third year in law school so that I could have a

17   license and wouldn't have to wait for six months before the

18   Ohio Bar did their exam.  So I passed the Indiana Bar and

19   was hired by a firm by the name of Smith and Schnacke, which

20   no longer exists, but it used to be a very large firm of

21   about 120 lawyers.  I was on the complex litigation side of

22   that firm where we would do antitrust and securities-type

23   litigation.

24        And then from there, I -- after a couple years, I

25   realized that with that type of practice I wasn't really

LIEBERMAN - DIRECT (Kanovitz)                          811

1    going to get into the courtroom very much, and I really

2    wanted to get into the courtroom.  So I left there and

3    started my own firm of Lieberman, Landon, Garrison, Smith in

4    1980 and practiced there for about four years when we then

5    merged with another firm and became Flanagan, Lieberman,

6    Hoffmann & Swaim, which we remained until the passing of

7    three of my named partners.  And so now the name of the firm

8    is Flanagan, Lieberman & Rambo.

9    **Q.**    Thank you.  Switching topics, did there come a time where

10   you were retained to represent Dean Gillispie?

11   **A.**    Yes.

12   **Q.**    And how did -- do you know how you came to be retained?

13   How they found you?

14   **A.**    It's my recollection that I had a friend that I went to

15   law school with whose in-law recommended me to the Gillispie

16   family and that that is -- that's how they found out about

17   me, and that's how I then met them.

18   **Q.**    Do you know who you spoke to first in the family?

19   **A.**    I don't remember.

20   **Q.**    How long had you been practicing law at the time that you

21   took on the defense?

22   **A.**    It was 12 or 13 years that I had been practicing.

23   **Q.**    And in that time, did you already have experience with

24   sexual assault cases?

25   **A.**    Yes, yes.

1    **Q.**   Did you also have experience with cases that involved

2    eyewitness identifications?

3    **A.**   Absolutely, yes.

4    **Q.**   And in terms of how those cases go, what was your

5    assessment of the strength of the defense in this case?

6    **A.**   After looking at this case, you know, I had to look at

7    the weaknesses of the case and the strengths of the case, as

8    you always do.  And what this was was a case of pure

9    identification.  There was no hard evidence.  By that I mean

10   there was no DNA -- although back then that was just

11   starting to evolve -- no fingerprints, nothing, physical

12   evidence that would connect Dean to the actual charges.

13        So I looked at that, and I -- and I thought that that

14   meant that this case was purely an identification case.

15   Now, the weakness of the case was the fact that there were

16   three women who were identifying him, but two of them were

17   twins at the same incident, and so really it equated more to

18   two different situations rather than three.  But, still, you

19   have to evaluate that and say, yeah, you know, that's --

20   that's a weakness to it, that there were actually more than

21   one woman that identified him.

22   **Q.**   Did the age of the case figure into your assessment at

23   all?

24   **A.**   It did.  The original identification in the case was --

25   formed a composite.  And by a composite, that's like a

LIEBERMAN - DIRECT (Kanovitz)                            813

1    drawing that the police will do of the person who they

2    believe committed the offense.  And that was done initially,

3    as was the identification of the person.

4         And then I think it was a couple years later when the

5    case was reinvestigated, there ended up being shifts in that

6    identification.  And the shifts in the identification then

7    were more along the lines of Dean than what they were

8    earlier.  So, yeah, the -- when you have identification and

9    two years later the identification is different than what it

10   originally was, then that starts to raise question marks.

11   **Q.**   So when you say "shifts in identification," can you be

12   more specific about what you mean in terms of this case?

13   **A.**   Yeah.  So in this case, my recollection -- and you'll

14   have to excuse me.  This is over 30 years ago.  But my

15   recollection in this case is that originally the person in

16   the composite that they had identified had Dean in

17   particular -- it had the person that they believed did it

18   had a light brown or orangish-brown or kind of a blondish

19   kind of hair.  Dean had dark hair, and there was no doubt

20   about that.

21        Also, the person that was originally described as doing

22   it was described as being very tan, and Dean, as you can

23   tell right now, is not a very tan person.  And, in fact, my

24   understanding is -- and I saw it personally when he would be

25   in the sun -- he would burn very easily and never had a tan.

LIEBERMAN - DIRECT (Kanovitz)                                814

1        Those were only two of the differences.  By the end of

2   the case, I think I had identified, if my recollection is

3   correct, about 55 differences, some more minor, some more

4   substantial, between the person who these women originally

5   identified and the person that they then identified at

6   trial.  And so that's what I mean.

7   **Q.**   Understood.  Thank you.

8        So once you took on the -- agreed to take on the case,

9   did you receive what's called discovery from the prosecution?

10  **A.**   Yes, I did.

11  **Q.**   Can you tell the jury what discovery is?

12  **A.**   So discovery in criminal cases, in state criminal cases

13  at the time, was governed by Ohio Rule of Criminal Procedure

14  16.  And, of course, also by *Brady versus Maryland*, which is

15  a Supreme Court case, and other constitutional

16  considerations.

17       Discovery is supposed to be where the state provides

18  you with the evidence that they have that is against your

19  client, as well as evidence that they have which may be

20  favorable to your client.  And that's called the *Brady*

21  *versus Maryland* evidence that you are entitled to have.

22       If you stop to think about it, it makes sense, because

23  it's the State that has done the investigation.  It's the

24  law enforcement that has done all of this.  And so by the

25  time defense lawyers get it, the charges are usually --

LIEBERMAN - DIRECT (Kanovitz)                                    815

1    already have been filed.  And so we need their investigation

2    to be able to conduct our own.  So that's called discovery.

3    **Q.**   And so did you also file a motion specifically requesting

4    the whole file?

5    **A.**   I did.  I did, yes.

6    **Q.**   And did you also file what's called a Brady motion

7    requesting those materials as well?

8    **A.**   I did.

9    **Q.**   Was it your expectation that when you received discovery,

10   that it would be a complete set of everything that was known

11   to the police?

12   **A.**   Yes.  When -- when you deal in our judicial system, you

13   have to rely upon each other to provide the type of

14   information that you should have in order to try the case.

15   So, yes, I -- I had expected that I would receive the full

16   file.

17   **Q.**   Okay.  Fast forwarding, when was the first time that the

18   court convened to try Dean Gillispie, approximately?

19   **A.**   I know the year.  I can't tell you the date.  I think

20   it was 1990 or 1991.

21   **Q.**   Understood.  Would February of 1991 sound right?

22   **A.**   That sounds correct, yeah.

23   **Q.**   And at trial, did the prosecution put on evidence about

24   how Dean came to be a suspect in the case?

25   **A.**   They did.  They -- they had put on evidence that a man

LIEBERMAN - DIRECT (Kanovitz)                          816

1   by the name of Mr. Wolfe, I think it was, had been a

2   supervisor of Dean's at General Motors, and had brought to

3   the attention of Detective Moore a picture of Dean, as well

4   as a picture of some other individuals at General Motors,

5   and had suggested to General Moore -- I'm sorry -- to

6   Detective Moore that Dean was one that met, in his opinion,

7   the composite and was probably the one that was involved in

8   this offense.

9   Q.   Was there any evidence put on at trial to suggest that

10  Mr. Wolfe had made a first attempt at getting charges with

11  Detective Fritz and Detective Bailey?

12  A.   No.

13  Q.   Okay.  And was that information that had been supplied to

14  you at the time at all?

15  A.   No.

16  Q.   And turning to the victims' testimony, did all three

17  victims testify?

18  A.   Yes.

19  Q.   And did they identify Dean in court?

20  A.   They did.

21  Q.   Okay.  And that's a particular type of identification,

22  where they point to the person, you know, what we are familiar

23  with from the TV and movies, correct?

24  A.   Yes.

25  Q.   Did they -- did they testify as to how confident they

LIEBERMAN - DIRECT (Kanovitz)                            817

1    were when they made that particular type of identification?

2    **A.**    My recollection is that they were highly confident that

3    he was the -- the individual.

4    **Q.**    Did they also separately testify about making a pretrial

5    identification using the photo arrays?

6    **A.**    Yes, they did.

7    **Q.**    And what do you recall of that testimony?

8    **A.**    My recollection of that testimony is that once again

9    they were shown a photo spread which had Dean's picture in

10   it, and that all three of them selected Dean out of the

11   photo spread.

12   **Q.**    And Detective Moore, did he testify about the pretrial

13   identifications, as well?

14   **A.**    I believe he did, yes.

15   **Q.**    Okay.  And was his testimony confirmative of what the

16   victims had said?

17   **A.**    Yes.

18   **Q.**    Okay.  Now, after the prosecution puts on its case, you

19   have the opportunity to put on your own case, correct?

20   **A.**    Yes.

21   **Q.**    Okay.  And when you put on your case, did you offer

22   evidence about the fact that Dean had no criminal record?

23   **A.**    Yes.

24   **Q.**    Okay.  And why did you put on that evidence?

25   **A.**    Well, I put on that evidence because we were making an

LIEBERMAN - DIRECT (Kanovitz)                          818

1    argument that the person who we believed may have been

2    involved in these crimes was more sophisticated and also

3    would have had some experience because of some of the things

4    that he may have done during the course of conduct that

5    would suggest that he had done it before.

6    Q.    Was there -- was there any evidence to suggest that this

7    perpetrator was already familiar with DNA evidence?

8    A.    Yeah, there was some evidence to suggest that he was

9    familiar either with DNA evidence or other scientific

10   evidence.  He had asked one of -- one of the victims to spit

11   out -- I believe it was -- the semen so that it could not

12   then be traced to him.

13   Q.    And you were a criminal practitioner at the time.  Was --

14   this is the late '80s.  Was the world on notice in general

15   about DNA evidence or was that just developing?

16   A.    It was just developing, but certainly there was a lot

17   of noise about it.

18   Q.    In your profession?

19   A.    Yes.

20   Q.    And what about in the general lay world?

21   A.    In the general lay world, I really can't tell you

22   specifically.  My recollection is that it was starting to

23   develop, and that while it developed in our world, it also

24   was developing in the general lay world as this new way of

25   defining certainty.  And so DNA was certainly -- certainly

LIEBERMAN - DIRECT (Kanovitz)                              819

1    starting to become a thing.

2    **Q.**   Now, in addition, did you bring out any contradictions at

3    trial between Dean's appearance and the victims' initial

4    descriptions at the times of the events in question?

5    **A.**   Yes, I did.  You know, I want to say the number 55

6    sticks in my mind, and I think it was because that was the

7    number of differences that I had brought out not just in the

8    description but in things that would have been more evident

9    if Dean had been the one that had committed this offense,

10   some of the things they would have seen on him that they --

11   that they didn't identify.  And I think there was about 55

12   different things.  Now, you know, they weren't all

13   significant, some might have been minor, but they all added

14   up.

15   **Q.**   For example, is hair color one of the topics you went

16   into?

17   **A.**   Yeah, hair color was a big thing, because they, you

18   know -- so you have these three victims who have a gun

19   pointed at them, and you don't expect them to have great

20   detail on the appearance of the person because their

21   attention's going to be on that gun.

22        That said, one of the things that they are going to

23   see, and because of -- because of the type of offense that

24   it was, hair style's going to stick out.  And all three of

25   the victims had a much lighter-color hair style that they

1    originally identified than what Dean had.  Dean had dark

2    hair and was starting to prematurely gray on the sides of

3    his hair.

4    **Q.**    So you brought out hair color.  Did you also bring out

5    the fact that no one identified the gray hair?

6    **A.**    Yes.  No one had identified any type of gray hair on

7    the -- on Dean or on anybody else.

8    **Q.**    When they gave the description of the perpetrator at the

9    time of the incident?

10   **A.**    There was no identification of gray hair on their

11   descriptions.

12   **Q.**    You mentioned tanning already.  We don't need to go back

13   over it, but is that also something that you brought out at

14   trial?

15   **A.**    Yes, yes.

16   **Q.**    What about Dean's chest hair, was that a topic that came

17   out?

18   **A.**    It was.  Dean had a lot of chest hair, and these

19   were -- this was in August.  And assuming that there would

20   have been the ability to look at the individual who was

21   committing these offenses, his abundance of chest hair would

22   have stuck out, and nobody -- nobody said anything about

23   that.

24   **Q.**    Did you also bring out anything about smoking --

25   **A.**    Yes.

1  Q.   -- cigarettes?

2  A.   So Dean did not smoke, and the individual who committed

3  these offenses did, and had actually -- if I believe I'm

4  correct on my recollection -- had actually asked one of the

5  victims for a cigarette.  And so they -- they did testify

6  that the person was a smoker.  Dean was not a smoker.

7  Q.   Was there also evidence that he had stolen cigarettes

8  from the victims?

9  A.   Yes, yes, there was.

10 Q.   And did you -- did you talk about differences in how the

11 perpetrator was dressed and how Dean dresses?

12 A.   Yes.  There were differences, if I recall, and I can't

13 go into them specifically because I just don't remember, but

14 there were differences in the dress that was brought out,

15 also.

16 Q.   Okay.  Switching topics, did you also offer evidence of

17 problems with the photo array that was presented to the

18 victims pretrial?

19 A.   I did, yes.

20 Q.   Can you summarize what that evidence was?

21 A.   When you show a photo spread to a victim in a case, you

22 want to make sure that you do it in the -- in the best way

23 possible so that you are not being suggestive in how it's

24 done.

25      And in the photo array in this case, one of the

LIEBERMAN - DIRECT (Kanovitz)                              822

```
1    problems that I had noticed with it in my mind was the fact

2    that Dean's face was bigger than anybody else's and that it

3    was kind of, use the term "blown-up," so that it was a

4    closer look at Dean than some of the other individuals.

5         Also, a photo spread is supposed to be done --

6              MR. McLANDRICH:  Objection, Your Honor.  The jury

7    can see the photo spread for themselves and make whatever

8    observations they make.  His observations are no better, no

9    worse than theirs.

10             THE COURT:  Well, I think the question was whether

11   or not -- what his observations were or what his thoughts were

12   at the time.  I'm going to allow it.

13        Overruled.

14             THE WITNESS:  In addition, you're supposed to

15   have -- and today it's codified as law in the State of Ohio --

16   back then --

17             MR. McLANDRICH:  Objection, Your Honor.

18             THE WITNESS:  -- best practices --

19             THE COURT:  As to law, sustained.

20             THE WITNESS:  Okay.

21             THE COURT:  We won't go into the law.

22             THE WITNESS:  So best practices and back then --

23             MR. McLANDRICH:  Objection, Your Honor.  He's

24   testified to what, police best practices?

25             THE COURT:  I didn't hear him say that.  Rephrase
```

LIEBERMAN - DIRECT (Kanovitz)                                    823

```
 1    your question.
 2              MR. KANOVITZ:  Sure.
 3    BY MR. KANOVITZ:
 4    Q.   So we've been talking about evidence that you brought up
 5    at the criminal trial regarding what you challenged as
 6    problems with the photo array, correct?
 7    A.   Yes.
 8    Q.   Okay.  And one thing you mentioned was the size of the
 9    head?
10    A.   Yeah, one was the size of the head.  The other
11    challenges that I made relating to it was that it was
12    Detective Moore who had shown the photos to the individual
13    victims instead of a third party who didn't know anything
14    about the case.  And that way if Detective Moore was doing
15    it, there is an opportunity for it to be more suggestive.
16         One of the other things then was the fact that, of the
17    six, two of them were police officers within Miami Township
18    who were dressed in suits and ties, and none of the other
19    people there were.
20    Q.   Was there any -- did you raise any evidence about
21    differences in the backgrounds of the picture?
22    A.   Yes.  And certainly if the jury has it they can see
23    that themselves, but Dean's background was different than
24    anybody else's.
25    Q.   And did you also call an eyewitness identification expert
```

LIEBERMAN - DIRECT (Kanovitz)                                    824

1    to present evidence about the topics that you just told the

2    jury about?

3    A.   I did, yes.

4    Q.   Can you tell the jury a little about that, please?

5    A.   So an identification expert was -- was chosen by me to

6    testify to the jury about --

7              MR. McLANDRICH:  Objection.

8              THE COURT:  Overruled so far.

9              THE WITNESS:  About identification in general and

10   about some of the issues that you can have when dealing with

11   identification -- time from the event until the actual

12   identification, any other things that might be suggestive and

13   taint that identification.

14   BY MR. KANOVITZ:

15   Q.   And did the expert make clear that that, in that era, so

16   late '80s, early '90s, that it was understood that you

17   shouldn't be doing things to single out a suspect?

18   A.   Yes.

19   Q.   All right.  At any point in time prior to trial, had you

20   come to learn that Detective Moore had told the victims that

21   Dean had died his hair?

22   A.   Yes.  I did discover that, and I had learned it

23   actually from one of the victims, I think in their

24   testimony.

25   Q.   So that fact came out through one of the victims, not

1   through Detective Moore, correct?

2   **A.**   Yes.

3   **Q.**   And did you bring that fact out at trial?

4   **A.**   I did.

5   **Q.**   And switching topic slightly, did you also put on

6   evidence that Dean was with other people at the time that

7   these rapes occurred?

8   **A.**   I did, yes.

9   **Q.**   And can you explain, please.

10  **A.**   Yes.  So there were two -- three victims but two -- two

11  events at two different times.  One was, I believe, August

12  5th, and the other one was August 20th.  And on August 5th,

13  if my recollection is correct, we put on the evidence of

14  Dean being with some of his friends driving around during

15  the course of the time when the victim on August 5th would

16  have been experiencing what they experienced.

17      And then on August 20th, we put on evidence that Dean

18  was at a park in the state of Kentucky.  Again, with some

19  friends.  A park that he would go to during the course of

20  that summer several times.  And on this particular day, was

21  at that park.

22  **Q.**   Did Detective Moore testify at the trial in a way that

23  suggested that it would be -- that it would undermine Dean's

24  claim of having been in Kentucky on 8-20?

25  **A.**   Yes.

LIEBERMAN - DIRECT (Kanovitz)                                    826

1    **Q.**    Can you explain, please?

2    **A.**    So when you go to this particular park they went to,

3    you had to sign in on a little card, and so my recollection

4    is that Detective Moore had testified that he went down and

5    to look for cards.  There were cards found for several

6    months before August 20th, but there were no cards found for

7    August 20th.

8    **Q.**    And that's the testimony that he gave at the criminal

9    trial, correct?

10   **A.**    Yes.

11   **Q.**    And by the way, did you have copies of the grand jury

12   testimony when you defended this case?

13   **A.**    No, I did not.

14   **Q.**    And is it -- is it -- is that common or uncommon for

15   criminal defense lawyers to have the grand jury testimony?

16   **A.**    It is uncommon for criminal defense lawyers to have

17   grand jury testimony.

18   **Q.**    Why is that?

19   **A.**    Because the law doesn't provide for us to have that.

20   They are considered secret.  And you have to be able to

21   articulate a particular need for that and a particularized

22   reason why you should get it.

23   **Q.**    And did you have any information that would have allowed

24   you to satisfy that standard in this case at the time that you

25   defended the case?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

LIEBERMAN - DIRECT (Kanovitz)                                    827

1    **A.**    Not at that time, no.

2    **Q.**    Okay.  And in general, are sexual assault cases with a

3    victim ID difficult to defend?

4    **A.**    Yes.

5    **Q.**    Did you feel that you had enough evidence given

6    everything you just testified to to make this a defensible

7    case?

8    **A.**    I did, yes.

9    **Q.**    Why?

10   **A.**    I did because the time lapse between the actual event

11   and the subsequent identifications; the differences in those

12   identifications, so that I would be able to argue to the

13   jury that these individuals actually began to formulate

14   their identification of Dean not based upon what they may

15   have actually seen but because of the lapse of time, the

16   need to have a conviction, perhaps whatever other suggestive

17   things I could argue at that trial that I believe was

18   improper; and that these defenses then should have been able

19   to put enough reasonable doubt in the minds of the jury for

20   them to have found him not guilty.

21   **Q.**    Now, during the course of the trial, did the prosecution

22   communicate to you a plea bargain for Dean?

23   **A.**    Yes.

24   **Q.**    And what was that?

25   **A.**    My recollection is that -- and I don't remember how we

LIEBERMAN - DIRECT (Kanovitz)                     828

1    would get there -- but my recollection is that they had

2    offered for Dean to do 30 days in jail.

3    Q.    Okay.  And did you communicate that offer to Dean?

4    A.    I did.

5    Q.    What happened?

6    A.    Dean rejected the offer.

7    Q.    Was that surprising to you?

8    A.    Yes.

9    Q.    Why?

10   A.    Because Dean was looking at an enormous amount of time,

11   my recollection is over 50 years, if he was convicted.

12   Q.    And fast forwarding a little bit, after Dean turned down

13   the offer, did the jury reach a verdict?

14   A.    They did.

15   Q.    And what was it?

16   A.    Guilty.

17   Q.    What was Dean's reaction when the verdict came down?

18   A.    My recollection is that Dean was in shock, that he did

19   not know how they could come to such a verdict, and that he

20   was extremely disappointed and sad.

21   Q.    Was his family in the courtroom when the verdict came

22   down?

23   A.    They were.

24   Q.    Was he able to talk to them after the verdict?

25   A.    Not at that time.  They immediately put him in

1    handcuffs and took him to Montgomery County Jail.

2    Q.   Did you have the opportunity to come see him in

3    Montgomery County Jail after the first conviction?

4    A.   I did.

5    Q.   Can you tell the jury how Dean was doing?

6    A.   Dean was not doing well.  Jail -- jail is not a good

7    place to be, and he was not doing well.  He -- he did not

8    know how it was that he got there, why he was there.  He was

9    usually, pretrial and during the course of the trial, a guy

10   that was always smiling, a guy that was always very polite

11   and seemed to be very happy, and that was not the Dean I saw

12   in jail.

13   Q.   Now, Dean had been out on bond for most of the time

14   following his arrest up until the first trial, correct?

15   A.   Yes.

16   Q.   Was a bond set for him following the second trial --

17   following the first trial?

18   A.   It was.  So Dean had been out, if my memory serves, on

19   a $50,000/10 percent bond before the first trial.  And what

20   that is, that means that after the trial is over, whoever

21   posted the bond can go to the clerk of courts and they can

22   get the bond back, less 10 percent of it.  So if they gave

23   the Court $5,000, they could get back $4,500.

24        After the conviction in the first trial, the judge

25   eliminated the 10 percent portion of that, so that now

1    whoever posted the $5,000, you had to go to a bondsman and

2    you had to pay that bondsman.  And usually paying the

3    bondsman would consist of $5,000, which you would not get

4    back.  The bondsman would then post the bond.  So it made a

5    big difference to this family.  They were not able to afford

6    to do that.

7    Q.  And following the first conviction, did there fairly

8    quickly come information to you that suggested that there

9    should be -- the conviction should be vacated and a new trial

10   had?

11   A.  Yes.

12   Q.  And what was that evidence?

13   A.  It came to my attention that the state had several

14   pubic hairs and head air that was combed off of the victims'

15   sweaters that they were wearing, or clothing -- sweaters

16   might not be correct -- clothing that they were wearing

17   during these events, and that that hair was found at the

18   Miami Valley Laboratory and had never been produced in

19   discovery to me.  And, in fact, the state had never had them

20   examined either.

21   Q.  After you found out that that hair evidence existed, did

22   you communicate that to Dean?

23   A.  I did, yes.

24   Q.  And what did he want to do?

25   A.  Dean wanted me to apply for a new trial, which I did.

1  **Q.**   Did you have to get permission to take hair samples from

2  Dean?

3  **A.**   I did, yes.

4  **Q.**   And Dean -- and Dean wanted the hair samples?

5  **A.**   Yes.  Knowing -- yeah, Dean wanted the hair samples.

6  **Q.**   Okay.  And I take it at the time that -- at the time, he

7  hadn't been sentenced yet, correct?

8  **A.**   Correct.

9  **Q.**   And at the time, he also had appeals that were available

10 to him?

11 **A.**   Correct.

12 **Q.**   If the hair sample had gone bad for him, how would it

13 have affected those remaining procedures?

14 **A.**   If the hair samples had gone bad for him, by that,

15 meaning had the experts that examined them found that they

16 matched his hair, then we would not have been able to get a

17 new trial and it would have -- it would have devastated --

18 been a devastating impact on the case.

19 **Q.**   In terms of the appeals and the sentencing?

20 **A.**   Yes.

21 **Q.**   And Dean was aware of that?

22 **A.**   Yes.

23 **Q.**   And he -- and he wanted to do the hair sampling anyway,

24 correct?

25 **A.**   Yes.

LIEBERMAN - DIRECT (Kanovitz)                              832

1    **Q.**    Okay.  And what were the results of the hair sampling?

2    **A.**    The results of the hair samplings is that none of them

3    matched Dean, nor did they match the victims in the case.

4    So they came from a third party.

5    **Q.**    Well, just to be clear, some of the -- none of the hairs

6    matched Dean, correct?

7    **A.**    Correct.

8    **Q.**    And isn't it true that some of the hairs matched the

9    women but other hairs on there did not?

10   **A.**    Some of the head hairs matched the women, but not the

11   pubic hairs.

12   **Q.**    Well, I think you might have it -- well, isn't it true

13   that some of the head hairs were a light brown color?

14   **A.**    Yes.

15   **Q.**    And those did not match Dean?

16   **A.**    That's true too.

17   **Q.**    And you are not a -- you are not a scientist, but what is

18   your understanding of what the scientists do in a hair match?

19   Is it, do they just look at color, or do they look at other

20   factors?

21   **A.**    No, they -- they look at other factors.  Today they can

22   do DNA on it, but they look at -- back then, I don't recall

23   that they did DNA.  I think it was more where they do a

24   microscopic examination of the hair follicles themselves to

25   determine whether there is any matches, as well as color.

LIEBERMAN - DIRECT (Kanovitz)                                833

1   Color is always a significant factor.  They look to see

2   whether there had been any dye or anything of that nature

3   involved in the hair.

4   **Q.**   And was dye found?

5   **A.**   No.

6   **Q.**   And so armed with that evidence, did you -- were you able

7   to get a second trial?

8   **A.**   Yes.

9   **Q.**   And approximately when did that second trial take place?

10  **A.**   Three or four months later, I think.

11  **Q.**   In terms of the testimony that we've already discussed,

12  was there any substantial difference between the first trial

13  and the second trial?

14  **A.**   There were -- you know, we had made some efforts to

15  work more on the area of where he was, to try to come up

16  with some better evidence as to where he might have been

17  during the course of this.  But I don't recall anything

18  substantially different.

19       Because I had lost the first trial for Dean, I did ask

20  that my law partner, Lou Hoffmann, join me in the second

21  trial so that I could double check my work and that Lou

22  could examine the victims in the case in a manner different

23  than my style so that maybe that would be helpful too.

24  **Q.**   But in terms of the substance, though, the victims gave

25  essentially the same accounts, correct?

LIEBERMAN - DIRECT (Kanovitz)                              834

1    **A.**    Yes.

2    **Q.**    And Detective Moore gave essentially the same accounts?

3    **A.**    Yes.

4    **Q.**    And then the people who had testified that Dean was with

5    them at the time of the events in question, they gave the same

6    accounts?

7    **A.**    Yes.

8    **Q.**    Okay.  Were there also two additional witnesses who knew

9    Dean from the lake called?

10   **A.**    Yes, yes.  They were witnesses that, if my recollection

11   is correct, which had actually been at the lake and had, I

12   think, served Dean lunch or something of that nature and

13   knew Dean because of his frequency down there.

14   **Q.**    So they were waitresses, correct?

15   **A.**    Yes.

16   **Q.**    And then the hair evidence was offered, correct?

17   **A.**    Yes.

18   **Q.**    How did you get the hair evidence before the jury?

19   **A.**    I called the experts that did the examination, and they

20   testified to the jury that the hair did not match Dean's.

21   And while some of it matched the victims, that the -- there

22   was also hair on there that matched neither the victim nor

23   Dean's.

24   **Q.**    And did you also hire a private expert to come in for

25   Dean specifically that didn't work for the state to discuss

LIEBERMAN - DIRECT (Kanovitz)                                    835

1    the evidence?

2    **A.**    I did.  Not necessarily to discuss the evidence.  I

3    hired Area Wide, but as I mentioned, Dean's family didn't

4    have much money.

5    **Q.**    Let's talk about the experts for now.

6    **A.**    Okay.

7    **Q.**    We will get to that.

8    **A.**    I'm sorry.  The experts.  I thought -- I apologize.

9    **Q.**    So a hair microscopist --

10   **A.**    Yes.

11   **Q.**    -- if that's how you say that word -- expert, you hired

12   one of those?

13   **A.**    Yes.

14   **Q.**    Was that expensive?

15   **A.**    Yeah.  My recollection is that generally an expert

16   along those lines costs several thousand dollars.

17   **Q.**    I forgot to ask you about the eyewitness identification

18   expert.  Was that expert expensive?

19   **A.**    That expert again would have been several thousand

20   dollars.

21   **Q.**    And how long did the jury deliberate in the second trial?

22   **A.**    My recollection is that they deliberated a very long

23   time.  Would have been days, I think, as opposed to hours.

24   And finally came back at one point in time after several

25   days and had indicated to the judge that they were hung,

LIEBERMAN - DIRECT (Kanovitz)                              836

1    eight for acquittal, four for conviction.

2    Q.   And did you see, personally see a note that they sent to

3    the judge?

4    A.   Yes.

5    Q.   And that's how you had that information?

6    A.   Yes.

7    Q.   And did you communicate that information to Dean?

8    A.   I did.

9    Q.   What did the Court do following the note about being hung

10   8-4?

11   A.   The Court gave what was commonly known back then as a

12   dynamite instruction.  And --

13        MR. McLANDRICH:  Objection, Your Honor.  To the

14   colloquialism of the instruction.

15        THE COURT:  Do you have another term, Mr. Lieberman?

16        THE WITNESS:  Your Honor, that's what I have always

17   called it.  It's --

18        THE COURT:  Can you --

19        THE WITNESS:  I can describe it if --

20        THE COURT:  Describe it.

21        THE WITNESS:  So it's an instruction given by the

22   judge when you have a hung jury.  And what the judge does is

23   tells the jury, hey, we're not -- we're never going to get a

24   better jury than you are.  We need you to go back and work

25   hard, listen to each other.  Go back in with an open mind and

LIEBERMAN - DIRECT (Kanovitz)                           837

```
1    come back with a verdict because we really need you to do that
2    if it's at all possible.
3        I'm paraphrasing, but that's -- that's the essence of it.
4    BY MR. KANOVITZ:
5    Q.   So is it fair to say that following these days of
6    deliberation and the jury wanting to declare themselves hung,
7    the judge said go back and keep deliberating?
8    A.   Yes.
9    Q.   And how was Dean feeling about how the trial went while
10   the jury was deliberating?
11   A.   I think Dean felt that the trial was going well, that
12   he would be released from jail and he'd be going home.
13   Q.   After the jury got that instruction about hung juries,
14   what happened next?
15   A.   They went back, they deliberated, and then several
16   hours later they came back with a conviction.
17   Q.   Describe Dean's reaction, please.
18   A.   Again, shock.  I would say he was horrified at the
19   prospect of having to stay in jail; that he was extremely
20   despondent and was crying.
21   Q.   Had you seen him cry before?
22   A.   I saw him cry in jail after the first verdict.
23   Q.   Prior to -- prior to the --
24   A.   No, no.
25   Q.   Now, when there's a conviction, does the judge
```

LIEBERMAN - DIRECT (Kanovitz)                                    838

1    immediately sentence the defendant?

2    **A.**    No.  When there is a conviction, in state court they do

3    what's called a presentence investigation report, where the

4    probation department will go over and talk to the defendant,

5    talk to his family and get background to the judge and then

6    make a recommendation on sentencing.

7    **Q.**    Now, as a defense lawyer, is it -- is it usually the case

8    that if a defendant expresses remorse at sentencing, that

9    that's helpful to them?

10   **A.**    It's very helpful.  One of the things that you do as a

11   defence lawyer is if your client enters a plea of guilty or

12   is found guilty at trial, that you -- you try to emphasize

13   the remorse that they feel for doing what it was that they

14   were convicted of.

15        I didn't have that in this case because Dean continued

16   to deny that he did it.

17   **Q.**    Assert his innocence?

18   **A.**    Yes.

19   **Q.**    And so what was your strategy given that Dean continued

20   to assert his innocence?

21   **A.**    I could only do what we had left, and that was that

22   Dean came from a good family, that his record was clean,

23   that he was certainly a hard-working individual, and that

24   in -- that he was not going to admit to doing something that

25   he did not do, and that's why he could not express remorse.

LIEBERMAN - DIRECT (Kanovitz)                                839

1    **Q.**   Did you explain to Dean the potential consequences in

2    terms of sentencing of his maintaining his innocence?

3    **A.**   Yeah, I did.

4    **Q.**   And he wanted to maintain his innocence regardless?

5    **A.**   He did.

6    **Q.**   After the judge heard the sentencing evidence that you

7    put on, what was the sentence?

8    **A.**   I don't remember the numbers, to be honest with you.

9    It's something that I prefer to put out of my mind, I guess.

10   It was a very long sentence.

11   **Q.**   In terms of the range of what a judge could do, was it at

12   the high end, the middle, or the low end?

13   **A.**   It was at the high end.

14   **Q.**   And was it more than -- potentially, more than five

15   decades?

16   **A.**   Yeah.

17   **Q.**   Okay, sir.  Switching topics, I'd like to talk to you

18   about some categories of evidence and understand if this -- if

19   you had information along these lines when you were defending

20   Dean, okay?

21   **A.**   Okay.

22   **Q.**   First category -- we touched on this already -- was there

23   ever any evidence given to you that Mr. Wolfe had approached

24   Detective Fritz and Detective Bailey about getting charges

25   against Dean before he ever had a conversation with Moore?

LIEBERMAN - DIRECT (Kanovitz)                                    840

1    **A.**   No.

2    **Q.**   And did it -- along the same lines, were you ever told

3    that Detective Fritz and Detective Bailey had excluded Dean as

4    a suspect?

5    **A.**   No.

6    **Q.**   Would a fact like that have been helpful to you in

7    defending the case?

8    **A.**   Yes, absolutely.

9    **Q.**   Can you explain why, please?

10   **A.**   Well, I probably would have put Detective Bailey and

11   Detective Fritz on the stand to testify why it was that they

12   excluded Dean and why they did not give that tip any

13   credence.

14   **Q.**   Could that information have been used to impeach

15   witnesses that the prosecution put on?

16   **A.**   Yes.

17   **Q.**   Could it have been used to impeach Mr. Wolfe?

18   **A.**   Yes.

19   **Q.**   Could it have been used to impeach Mr. Moore?

20   **A.**   Yes.

21   **Q.**   And was Mr. -- Detective Moore's credibility and the

22   believability of his testimony important to this trial?

23   **A.**   It was.  So we had -- we had three identification

24   witnesses with no supporting physical evidence to support

25   their testimony.  That means that Detective Moore's

LIEBERMAN - DIRECT (Kanovitz)                                    841

1    testimony now became more important than what it usually

2    would for a detective.

3    Q.   Did you receive any information that Detective Fritz had

4    written reports and that Detective Bailey had written reports

5    about why Dean was excluded as a suspect?

6    A.   At what time?

7    Q.   Prior to the first trial.

8    A.   No.

9    Q.   Okay.  And actually, at any time while you were actually

10   defending the case, did you get information along those lines?

11   A.   No.

12   Q.   Okay.  So I take it from your testimony that, fast

13   forwarding years later, you did receive information along

14   those lines?

15   A.   Yes, after the Innocence Project became involved.

16   Q.   Okay.  We'll get there then.

17        If you had had these reports, would those have been

18   admissible at trial?

19   A.   I think they would have been usable.  There may have

20   been some objections to their admissibility as such, but I

21   think those are things that we -- we could have gotten

22   around and certainly at least use them for impeachment

23   purposes.

24   Q.   Okay.  And we are using the term "impeachment."  Can you

25   just tell the jury what impeachment entails?

LIEBERMAN - DIRECT (Kanovitz)                           842

1   **A.**   Impeachment is a device where as an attorney you are

2   examining a witness and you are saying to that witness that

3   what they are testifying to today is different or

4   inconsistent with what they testified to earlier.  That's

5   called impeachment.

6   **Q.**   If the reports had contained information about the

7   eyewitnesses remembering a pants size that was too small for

8   Dean, is that information that you could have used in his

9   defense?

10  **A.**   Oh, yes, absolutely.

11  **Q.**   How could you have done that?

12  **A.**   Well, you would have been able to bring that out

13  through the witnesses at trial, that they originally had

14  identified a pants size and what that pants size was, and

15  then I would have produced Dean's pants size, which,

16  frankly, would have been significantly larger.

17  **Q.**   He was heavyset --

18  **A.**   Yes.

19  **Q.**   -- at all times, okay.

20      And what was the name of the prosecutor who prosecuted

21  Dean?

22  **A.**   Mr. Folfas.

23  **Q.**   And did you ever have a conversation with Mr. Folfas

24  where you said to him, "I'd like to see the reports that Fritz

25  and Bailey wrote excluding Dean"?

LIEBERMAN - DIRECT (Kanovitz)                              843

1   **A.**    No, not -- I certainly don't recall any -- anything

2   like that during the course of these two trials.  No,

3   nothing like that.

4   **Q.**    And, similarly, did he ever have a conversation with you

5   where he said to you, "Yeah, I understand that Fritz and

6   Bailey had excluded Dean"?

7   **A.**    No.

8   **Q.**    All right.  Next area.  Were you ever provided

9   information that one of the victims recalled seeing arm

10  tattoos on the perpetrator?

11  **A.**    I -- I don't recall ever seeing that.

12  **Q.**    Okay.  Is that a piece of information that you could have

13  used in Dean's defense?

14  **A.**    Yes, yeah, absolutely.

15  **Q.**    Please explain.

16  **A.**    Well, Dean doesn't have tattoos and didn't have

17  tattoos, and my recollection of the science back then is if

18  you had tattoos, removing them would have been a very

19  painful process if -- if available at all.

20       So, yeah, I would have had Dean show his arms where he

21  has no tattoos.

22  **Q.**    And you could also have called witnesses who knew him and

23  knew --

24  **A.**    Yes.

25  **Q.**    -- his arms to testify they never saw a tattoo?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

LIEBERMAN - DIRECT (Kanovitz)                                   844

1    **A.**    Right.  I would have done that, yeah.

2    **Q.**    Another piece of evidence, sir, when you were challenging

3    the photo arrays, you mentioned that two of the people in the

4    photo arrays were actually detectives that worked at the Miami

5    Township Police Department.

6    **A.**    Yes.

7    **Q.**    Was it ever disclosed to you that one or more of those

8    detectives was on duty at the time that one or more of the

9    victims viewed the photo array?

10   **A.**    No, not to my recollection.

11   **Q.**    If that had been disclosed to you, would that have been a

12   fact you could have used in Dean's defense?

13   **A.**    Absolutely.

14   **Q.**    Could you explain why, please?

15   **A.**    Well, if one of the victims is going into the police

16   station and sees a police officer and knows that he's a

17   police officer that works there and then subsequently sees

18   him in the photo spread, they are going to eliminate that

19   person as the potential person who committed the crime.  And

20   so that now reduces your array to maybe four people that you

21   are choosing it from.

22   **Q.**    Turning to the issue of the August 20 event, did you ever

23   receive information that Detective Moore obtained camping

24   receipts for the month of August?

25   **A.**    For the month of August, no.

LIEBERMAN - DIRECT (Kanovitz)                          845

1    **Q.**   Okay.  If you had received that information, could you

2    have used that in Dean's defense?

3    **A.**   Absolutely, yeah.

4    **Q.**   Please explain.

5    **A.**   Well, Dean had said that we -- he was in this

6    campgrounds in Kentucky on that particular date.  And, you

7    know, we sent an investigator down there to try to get some

8    evidence that he was down there.  That's how, you know, we

9    were able to get ahold of the waitresses.

10        But the cards would have been significant because it

11   would have identified either Dean or his automobile as

12   being -- as being there on that day.  They were there for

13   the months prior to that, there were times when he had gone

14   down there.

15   **Q.**   So -- so did Detective Moore testify at trial that he had

16   cards for the previous months but not cards for August?

17   **A.**   Yes.

18   **Q.**   And if, in fact, you had information that he did receive

19   cards for August, could you have used that to impeach him?

20   **A.**   Yes.

21   **Q.**   And would that have been important to the trial?

22   **A.**   Oh, yes, extremely important, in my mind.

23   **Q.**   And if you had, in fact, received the cards for August,

24   you could have used those, correct?

25   **A.**   Yes.

LIEBERMAN - DIRECT (Kanovitz)                              846

**Q.** And did you ever receive information that Mr. Moore gave false information at the grand jury?

**A.** Not during the course of the trial, because I didn't have the grand jury testimony during the course of the trial.

**Q.** At either trial, correct?

**A.** Correct.

**Q.** Okay. And if you had information that Detective Moore had given false information to the grand jury, is that something you could have used in Dean's defense?

**A.** Yes.

**Q.** Please explain.

**A.** Well, if he gave information again at the grand jury which was inconsistent with what he said under oath during his testimony at trial, then, again, you can use that grand jury proceeding to impeach him because he would have been under oath on both of those occasions. And if it would have been something significant, then I think it would have made a huge difference in the trial.

**Q.** Okay. Now, switching categories again, you testified that the witnesses testified at trial about the process of making identifications from the photo array, correct?

**A.** Yes.

**Q.** And Detective Moore also testified to that process?

**A.** Yes.

LIEBERMAN - DIRECT (Kanovitz)                           847

1    **Q.**   At any point in time, was information disclosed to you

2    that the -- that the victim C.W. was not able to make an

3    identification when she was looking at the array?

4    **A.**   That was never disclosed to me, no.

5    **Q.**   And would that fact have been important in Dean's

6    defense?

7    **A.**   Oh, yes, yes.

8    **Q.**   Please explain why.

9    **A.**   Well, if one of the witnesses cannot make an

10   identification right away or at all, then that information

11   should be given to the jury so that they can judge the

12   strength of that identification in light of everything else.

13        MR. KANOVITZ:  Your Honor, at this time we'd like to

14   publish Plaintiff's 58, page 1 which has previously been shown

15   to the jury.

16        THE COURT:  You may.

17        MR. KANOVITZ:  Thank you.

18     (Exhibit displayed.)

19   BY MR. KANOVITZ:

20   **Q.**   Okay, sir, showing you Plaintiff's 15 -- 58, page 1, is

21   this a document that you would have received in discovery?

22   **A.**   It is something I should have received in discovery.  I

23   don't recall whether I did or not.

24   **Q.**   Okay.  But in the course of defending eyewitness cases,

25   did you receive documents that talk about what's supposed to

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

LIEBERMAN - DIRECT (Kanovitz)                                    848

1    be read to the eyewitnesses?

2    **A.**    Yes.

3    **Q.**    And showing you down here at the bottom, do you see the

4    sentence that says, "If a witness cannot make an

5    identification, he may then be read the following?"

6    **A.**    Yes.

7    **Q.**    And if you -- if it had been disclosed to you that

8    Detective Moore had to read that sentence to C.W. before she

9    was willing to point anyone out, would that have been useful

10   information for Dean's defense?

11   **A.**    Yes.

12   **Q.**    Explain, please.

13   **A.**    Well, if -- if they had to read that information, then,

14   again, that's something you point out to the jury, that

15   there was not an immediate identification without that

16   paragraph having to have been read.  And then once that

17   paragraph is read, there becomes an identification, and it

18   again adds another argument to the identification that the

19   identification is not a strong one.

20   **Q.**    So in terms of cases that involve eyewitness

21   identification and the prosecution having to prove guilt

22   beyond a reasonable doubt, is there an important difference

23   between saying someone is the perpetrator and someone

24   resembles the perpetrator?

25   **A.**    You know, I don't know that there is a significant

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

LIEBERMAN - DIRECT (Kanovitz)                              849

1    difference there.  If they resemble the perpetrator, then

2    you're pretty much saying they are the perpetrator.

3    **Q.**    Let me say something a little different.  If the witness

4    doesn't positively identify but is willing to say, yeah, there

5    is a resemblance, that's a significant difference, correct?

6    **A.**    Yeah, yeah.  If it's not a positive identification and

7    they are saying, well, yeah, there is a resemblance, yeah,

8    yes, because there is room for doubt on that.

9    **Q.**    Thank you.  So taking all of the facts that I just went

10   over with you that you did not have as a whole, what is your

11   assessment of how that could have changed Dean's defense, the

12   totality of all of those facts?

13   **A.**    My assessment is, based upon what I know today, is that

14   there would have been a significant --

15            MR. McLANDRICH:  Objection, Your Honor.

16            THE COURT:  Well, I -- I think the question is how

17   would it have affected his defense.

18            MR. McLANDRICH:  I think he was asking him what the

19   odds of a different result were.

20            MR. KANOVITZ:  I was asking his assessment of how it

21   would have affected his defense.  If he had -- being able to

22   use all of those facts in their totality.

23            THE COURT:  So let me ask you this, Counsel:  Are

24   you asking him how it would affect his presentation of the

25   case?

1          MR. KANOVITZ:  It will be a two-part question.

2     That's the first part.

3          THE COURT:  I will let him answer that one.

4     BY MR. KANOVITZ:

5     **Q.**   Okay.

6     **A.**   So knowing what I know today and giving -- given some

7     of these things that are were not disclosed at the time, I would

8     have certainly put those on in front of a jury.  I would

9     have put on -- if I had park records, I would have put on

10    those park records; if I had known that Wolfe had gone to

11    Bailey and Fritz, the detectives, early on, and that they

12    said, no, we're eliminating Gillispie for these reasons, I

13    would have put that on.  I would have put that testimony on.

14         I would have put on any of the other of the matters

15    that we've discussed today that I may not have known about

16    because in identification testimony, when that's all you

17    have on the State side, on the defense said you want to put

18    anything that you can on which is going to lessen the

19    strength of that identification testimony.  So, yeah, I

20    would have put all of this on.

21    **Q.**   So, obviously, none of us could say what effect that

22    would have had on the jurors one way or the other, but in

23    terms of your assessment, would that have made it a

24    substantially stronger case from the defense side?

25    **A.**   Yes, I think it would have made it a substantially

LIEBERMAN - DIRECT (Kanovitz)                                  851

1    stronger case.

2    **Q.**    Switching topics, sir, I want to talk about the resources

3    that the family had available to defend the case with, okay?

4    **A.**    Yes.

5    **Q.**    How much was your fee?

6    **A.**    I honestly don't remember.

7    **Q.**    Were you able to charge your usual and customary fee or

8    did you have to cut it?

9    **A.**    No.  I -- I did not charge what I would normally charge

10   for a rape case, I remember that.  I remember that because I

11   asked Lou Hoffmann to come on and help me in the second

12   case, that I did not charge an additional fee for myself in

13   the second case.

14   **Q.**    Got it.  So you basically -- all the work you did in the

15   second case you didn't charge for, and then Lou charged for

16   his time?

17   **A.**    Yes.

18   **Q.**    And in addition to the lawyer's fees, was there other

19   money that had to be spent on the defense?

20   **A.**    Yes.  There were the experts that we talked about and

21   other miscellaneous things.  The investigator, although very

22   limited, we had to pay him for what he did.

23   **Q.**    And overall, how would you describe the family's wealth

24   that was available to pay for the defense?

25   **A.**    They did not have resources available to pay for very

LIEBERMAN - DIRECT (Kanovitz)                              852

1    much.

2    **Q.**   Do you recall if you filed a motion regarding the

3    family's indigency or Dean's indigency?

4    **A.**   I do remember that.  And I think it was after the first

5    trial in which he was convicted.  I wanted a transcript of

6    that trial where you have to pay a court reporter in order

7    to get that transcript.  So I filed with the court what's

8    called a motion of indigency saying that, you know, Dean

9    doesn't have any money and we desperately need that

10   transcript in order to try the second case.

11   **Q.**   You mentioned spending some money for a private

12   investigator?

13   **A.**   Yes.

14   **Q.**   Approximately how much money was available for that

15   service?

16   **A.**   I don't remember the numbers.  It wasn't very much.

17   **Q.**   How did you -- how did you end up hiring a private

18   investigator?

19   **A.**   My recollection is that I -- that it was the private

20   investigator who had on his own through some unrelated

21   matter found out about the hair --

22   **Q.**   Let's just talk about hiring the private investigator.

23   Did you go through a service, did you go directly to a

24   particular person?

25   **A.**   And that's kind of what --

LIEBERMAN - DIRECT (Kanovitz)                    853

1    **Q.**    I'm sorry.

2    **A.**    -- I'm explaining.  That it was Area Wide, and they had

3    told me there was a rumor that there was a hair there.  And

4    so I had hired them based upon that to try to figure out

5    whether a hair existed or not.

6    **Q.**    I got it.  And was Area Wide a service that lawyers in

7    Dayton commonly used?

8    **A.**    Some did.  This was my first time I had used them.

9              THE COURT:  Counsel, we're going to have to break.

10             MR. KANOVITZ:  We better break than move further

11   into this topic.

12             THE COURT:  Ladies and gentlemen, we're going to

13   stand in recess for approximately 15 minutes.  Please don't

14   discuss the case amongst yourselves or with anyone else.

15   Please don't formulate any opinions, draw any conclusions.

16        We'll stand in recess.  Thank you.

17             THE COURTROOM DEPUTY:  All rise.  This court stands

18   in recess.

19        (Jury out at 10:14 a.m.)

20        (Recess at 10:15 a.m.)

21        (Jury in at 10:37 a.m.)

22        (In open court at 10:38 a.m.)

23             THE COURT:  We are back on the record.

24        Mr. Lieberman, you are still under oath.

25        Counsel, you can proceed.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1              MR. KANOVITZ:  Thank you, Your Honor.

2     BY MR. KANOVITZ:

3     Q.   Sir, when we broke, we were talking about hiring a

4     private investigator and the resources that were available for

5     that.  Do you recall?

6     A.   Yes.

7     Q.   And when you hire a private investigator when you are

8     defending a case, is it like in the movies where you just see

9     the private investigator go out and solve the case, or is it

10    something different?

11    A.   No.  Most of the time you have a limited budget, and so

12    when you hire a private investigator, you have specific

13    things that you want them to do for you.  And you may not

14    even show them everything about the case.  You know, I've

15    had private investigators serve people before because we

16    couldn't find them, things like that.

17    Q.   When you say "serve," can you just explain to the jury

18    what you mean by that?

19    A.   If we wanted a witness to come into trial, needed them

20    to be served with a subpoena and we couldn't find them, we'd

21    hire a private detective to do that.

22    Q.   And you testified that you -- that after you got the call

23    about the hairs, you went ahead and used Area Wide?

24    A.   Yes.

25    Q.   Okay.  And did you -- did Area Wide choose who to assign

LIEBERMAN - DIRECT (Kanovitz)                          855

1   to the tasks that you had or did you choose who to assign to

2   the tasks?

3   A.    No.  Area Wide did that.

4   Q.    And who did Area Wide assign?

5   A.    My recollection is that they assigned Fritz to -- as

6   one of the people, one of the private investigators.

7   Q.    Okay.  And when they assigned Fritz, is that someone that

8   you knew before?

9   A.    Well, I have known him through previous cases having --

10  to have worked out at Miami Township.

11  Q.    Did you have any kind of relationship with him?

12  A.    No, not really.

13  Q.    Okay.  And when they assigned him, were you aware of his

14  involvement in excluding Dean?

15  A.    No, no, not at all.

16  Q.    And what specific assignments did you ask Mr. Fritz --

17  Detective -- well, former Detective Fritz at that point to

18  provide?

19  A.    I really don't have a clear recollection on what it

20  was.  I know there were some specific things.  My -- I want

21  to say that most of it involved the discovery of the hair

22  and the impact of the hair and what that may have meant as

23  far as its impact on the case.  So that was one thing that

24  comes to my mind.  And then I think I had them go down to

25  the park in Kentucky to look for witnesses down there.

LIEBERMAN - DIRECT (Kanovitz)                              856

1       So it would have been around the alibi and around the

2   hairs.

3   Q.   Okay.  So that was basically the specific assignments

4   that you hired Area Wide to do?

5   A.   Yeah.  I don't recall anything else.

6   Q.   Okay.  And switching topics, in the course of defending

7   this case, do you remember learning about a man named Kevin

8   Cobb?

9   A.   Yes, I do.

10  Q.   What do you recall learning?

11  A.   I remember -- I don't remember which trial it was, but

12  I remember that it was brought to my attention that there

13  was a man by the name of Kevin Cobb who was just charged

14  with rape and was a security officer at Lebanon prison, and

15  that he fit the description of the person from the

16  composite.

17  Q.   Fit the physical description?

18  A.   Yes.

19  Q.   What about the descriptions of the person's hair color,

20  et cetera?

21  A.   Yes, he fit all of that.

22  Q.   And the tanning, did he fit that?

23  A.   Yes.  And I think if my recollection is correct, he was

24  biracial.

25  Q.   And the combination of features of having both light-

LIEBERMAN - DIRECT (Kanovitz)                                    857

1   colored hair and what the witnesses described, the victims

2   described as a very dark tan, was that an unusual combination

3   to encounter?

4   A.   Yeah, I thought so.

5   Q.   And then you said that he had been charged with a rape.

6   Is it possible that was just an attempt?

7   A.   Yeah, that's possible.  Yes.

8   Q.   And do you recall the MO that he used when he was making

9   the attempt?

10  A.   I don't have a real clear recollection of that.  I do

11  know that what recollection I have is that it was similar to

12  the MO that was described by the victims.

13  Q.   And were you able to make use of that information in

14  Dean's defense?

15  A.   A little bit, but not very much.  We didn't have -- we

16  didn't have enough information about it.  We tried to get

17  into it.  The judge limited us on what we could do as it

18  related to that.  So while it was mentioned, it wasn't

19  mentioned in depth.

20  Q.   Was there money to pay for investigators to investigate

21  Mr. Cobb?

22  A.   No, not -- not enough, no.

23  Q.   Switching topics, following the second conviction, did

24  your involvement in the case come to an end?

25  A.   Yes.

LIEBERMAN - DIRECT (Kanovitz)                          858

1    **Q.**   And was there -- did a time come where you were contacted

2    by the Ohio Innocence Project about this case?

3    **A.**   Yes.

4    **Q.**   Approximately when?

5    **A.**   I want to say maybe around 2010, somewhere around in

6    there.

7    **Q.**   Okay.  So many, many years had passed since the

8    convictions?

9    **A.**   Yes.

10   **Q.**   And did they give you information that you did not know

11   when you were defending Dean?

12   **A.**   Yes.

13   **Q.**   What did they tell you?

14   **A.**   They told me --

15            MR. McLANDRICH:  Objection.

16            MS. FRICK:  Objection.

17            THE COURT:  Sustained.

18   BY MR. KANOVITZ:

19   **Q.**   Did they -- was this the first time you had heard

20   anything about information that you did not know at the time

21   you defended Dean?

22   **A.**   Yes.

23   **Q.**   Okay.  And was that information that had appeared in the

24   discovery packet at all?

25   **A.**   Not that I became aware of through them.

LIEBERMAN - CROSS (McLandrich)                    859

1    **Q.**   And after learning information from the OIP, what did you

2    do?

3    **A.**   I agreed to do -- to sign a declaration or affidavit

4    saying that I did not know about that information during the

5    trial.

6    **Q.**   Okay.  And do you recall if it was one or two eventually?

7    **A.**   I think there were two.

8    **Q.**   Okay.  And sitting here today, do you have any currently

9    existing relationship with Dean?

10   **A.**   Only to say hello when I saw him coming into court this

11   morning.

12   **Q.**   Okay.  And you continue to practice law to this day,

13   correct?

14   **A.**   Yes.

15   **Q.**   Do you have any reason why you would -- why you would lie

16   on behalf of Dean?

17   **A.**   No, no, I wouldn't do that.

18            MR. KANOVITZ:  No further questions.

19            THE COURT:  Thank you.

20        Counsel.

21            MR. McLANDRICH:  Thank you, Your Honor.

22                    **CROSS-EXAMINATION**

23   BY MR. McLANDRICH:

24   **Q.**   Morning, Mr. Lieberman.

25   **A.**   Good morning.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

LIEBERMAN - CROSS (McLandrich)                    860

1    **Q.**   My name's John McLandrich.  I represent Detective Moore.

2          So you testified earlier with respect to this report that

3    was supposedly drafted by Detective Bailey that you didn't

4    know about.  Do you recall that?

5    **A.**   I recall my testimony, yes.

6    **Q.**   Yes.  You had no personal knowledge that such a report

7    exists, correct?

8    **A.**   I have not seen that report.

9    **Q.**   What you know about the existence of such a report is

10   something that's been told to you by others, correct?

11   **A.**   Correct.

12   **Q.**   And you have no basis on which to testify that Detective

13   Moore was ever in possession of such a report, correct?

14   **A.**   I think that's incorrect.

15   **Q.**   And is the basis for that something that someone told

16   you?

17   **A.**   The basis is that I saw affidavits that were signed

18   under oath saying that he had had such a report.

19   **Q.**   And that would be an affidavit of Mr. Fritz or

20   Mr. Bailey?

21   **A.**   Yes.

22   **Q.**   All right.  And, in fact, it was your position and

23   opinion that Mr. Bailey lied during the first trial, correct?

24   **A.**   Yes.

25   **Q.**   And, in fact, Mr. Bailey was asked whether Mr. Gillispie

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

LIEBERMAN - CROSS (McLandrich)                           861

1    had been a suspect, and denied that, correct?

2    **A.**    During the course of the trial?

3    **Q.**    Yes, sir.

4    **A.**    I don't remember, but that probably is something I

5    might have asked.

6    **Q.**    Well, that was the thing that you believe he lied about

7    when he was -- Mr. Bailey was asked whether Mr. Gillispie had

8    been a suspect and he said no; and, in fact, that was the

9    thing that you believe he lied about, correct?

10   **A.**    I just really don't remember.

11   **Q.**    We can get to that then.

12   **A.**    Okay.

13   **Q.**    Do you recall testifying at a hearing on behalf of

14   Mr. Gillispie.  When you were asked about whether you thought

15   Mr. Bailey had deceived you and the jury at the criminal

16   trial, and you testified, I believe your words were, "His

17   explanation was a bunch of baloney."  Do you recall that?

18   **A.**    I do not recall those exact words.  I did testify at a

19   hearing where I was subpoenaed to testify.

20   **Q.**    And do you recall that that testimony was, in fact, about

21   whether or not Mr. Gillispie had been a suspect in the

22   investigation?

23   **A.**    I just really don't.  If you have something that can

24   refresh my recollection on it --

25   **Q.**    Yes.

*Mary A. Schweinhagen, RDR, CRR   (937) 512-1604*

LIEBERMAN - CROSS (McLandrich)                          862

1    **A.**   -- I can look at it.  I just don't remember.

2              MR. McLANDRICH:  Let's bring up Plaintiff's Exhibit

3    72.

4              THE COURT:  Has that been displayed?  Or are you

5    asking -- are you asking Mr. Lieberman to just review it for

6    the purposes of refreshing his recollection, are you asking

7    for it to be displayed?  I guess I am looking for a little

8    direction.

9              MR. McLANDRICH:  Yes, sir.  I would like to refresh

10   his recollection with it.  And I'm sorry.  I gave you have the

11   wrong number.  It's PX-80.

12             MR. KANOVITZ:  Could we have page and line?

13             MR. McLANDRICH:  Yes.  This would be transcript page

14   202-203, and I believe it is -- I'm sorry.  Just one second.

15             THE COURT:  Do you have the document?  Do we have

16   one?  Are we looking for -- what are we looking for?

17             MR. McLANDRICH:  We should have it up.

18             THE COURT:  First, counsel, do you have any problem

19   with that?

20             MS. FRICK:  We have no objection, Your Honor.

21             MR. HERMAN:  No, Your Honor.

22             MR. KANOVITZ:  For the 202-203, I have no objection.

23             THE COURT:  Is that what you are asking for,

24   Counsel?

25             MR. McLANDRICH:  Yes, sir.

 1              THE COURT:  It may.

 2         (Exhibit displayed.)

 3              MR. McLANDRICH:  I'm sorry.  Go to the next page,

 4    please.

 5         (Exhibit displayed.)

 6              THE WITNESS:  Are you asking me to --

 7    BY MR. McLANDRICH:

 8    **Q.**   Just a moment, please.

 9              THE COURT:  I am not sure we have a line for you

10    yet.

11              THE WITNESS:  Okay.

12              MR. McLANDRICH:  I've lost it.

13    BY MR. McLANDRICH:

14    **Q.**   Mr. Lieberman, directing your attention to line 15, do

15    you recall this question and your answer:

16         "Question:  Have you read Mr. Bailey's affidavit where he

17    explains that answer?"

18         And he says, "Yes, I interpret it as a tip, and tip is

19    different from lead.  I did, yes."

20         "Question:  And what is your reaction to that paragraph?"

21         "I don't want to be tongue-tied here.  I also don't

22    want -- want to be as respectful as I can.  I think that was a

23    bunch of baloney.  He was playing games with me."

24         "Question:  You feel like you were misled during the

25    trial?"

1          "Oh, yeah, absolutely."

2          Does that refresh your recollection that what you were

3     talking about as baloney was his failure to answer truthfully

4     that Mr. Gillispie had been a suspect?

5               MR. McLANDRICH:  You can take that down.

6               THE WITNESS:  Yeah.  My recollection now is that he

7     was mincing words.  So I think in my examination I used the

8     word "lead," and he felt that it wasn't a lead, it was a tip,

9     and that's why he responded the way he did.  And that's why I

10    said I thought that was a bunch of baloney.  I mean --

11    BY MR. McLANDRICH:

12    **Q.**   Because, in fact, he should have conveyed to you that

13    Mr. Gillispie was a suspect when he had been investigating the

14    case, allegedly?

15    **A.**    If he was, yes.

16    **Q.**   Right.  And if, in fact, Mr. Bailey had answered

17    truthfully and conveyed that Mr. Gillispie was a suspect, you

18    might have inquired further with respect to what investigation

19    had been done with respect to Mr. Gillispie as a suspect,

20    correct?

21    **A.**    Actually, I think it might be the inverse of that.  If

22    he had indicated that at the early stage Mr. Gillispie was

23    not a suspect, then I probably would have inquired further

24    of him for why he was not a suspect.

25    **Q.**   Yes.  And, in fact, the truthful answer would have been,

1   Mr. Gillispie was a suspect but we had eliminated him as a

2   suspect.  That would have been the truthful answer from

3   Mr. Bailey, correct?

4   **A.**   That would have been one way of saying it.  If -- I

5   don't know that he ever reached the level of suspect, but

6   that certainly would have been one way of saying it, which

7   he didn't say that either.

8   **Q.**   Okay.  And so now reaching the level of suspect is the

9   same mincing of words that you were objecting to before with

10  respect to tip versus suspect.  Is that what we have?

11  **A.**   I don't know whether that's what we have.  What we have

12  are a set of facts where, to my understanding, they did not

13  pursue him as a suspect because the -- it didn't -- the

14  description didn't match and they believed that the

15  information was fraud.  That's how I would characterize it.

16  **Q.**   That's supposedly the content of the report that Bailey

17  alleges he wrote?

18  **A.**   Right, right.

19  **Q.**   So backing up.  When you became involved in the criminal

20  defense, you retained Area Wide, correct?

21  **A.**   At one point we did, yeah.

22  **Q.**   Yes.  And do you recall previous testimony that you've

23  given where you testified that when you first hired Area Wide

24  and Mr. Fritz was assigned to the matter, that you had

25  concerns about that assignment of Mr. Fritz to the case?

LIEBERMAN - CROSS (McLandrich)                      866

1    **A.**   I -- I recall that now that you mention it, yeah.

2    **Q.**   Yes.  And, in fact, because you had concerns, you had a

3    discussion with Mr. Fritz about those concerns?

4    **A.**   That could be true.

5    **Q.**   All right.  And the reason you had concerns was because

6    he was a police officer from the very department that was

7    involved in the case that you were now defending, correct?

8    **A.**   Yeah, that would -- that would be correct.  I would

9    have been concerned whether he would have been able to give

10   me an impartial investigation on it.

11   **Q.**   And in discussing your concerns with Mr. Fritz, would it

12   not be true that one of the things you would seek to

13   understand in that dialog would be whether he had any personal

14   involvement in the case in which you were asking him to be an

15   investigator?

16   **A.**   I don't -- I don't recall that, nor do I -- nor do I

17   really recall getting into that, because if I'm correct from

18   my recollection -- I may not be -- but if I'm correct from

19   my recollection, he had already left the Miami Township at

20   the time that Moore had taken over.  And if that was the

21   case, my knowledge at the time was that it was Moore who

22   actually kind of started the investigation again.

23   **Q.**   So your recollection aside, my question is more of a

24   conceptual question.

25   **A.**   Okay.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

LIEBERMAN - CROSS (McLandrich)                    867

1    **Q.**   If you were hiring an investigator from a police

2    department that had been on -- I'm sorry.  If you were hiring

3    an investigator that worked for the police department that was

4    involved in a case that you were defending, wouldn't you, as

5    just a matter of course, want to know whether that police

6    officer had any involvement with the case that was the subject

7    matter of the criminal trial?

8    **A.**   Based upon --

9    **Q.**   Wouldn't that be prudent, something to know?

10   **A.**   Based upon the way you asked that question, yes.  But I

11   didn't know that he had really been intimately involved.

12   **Q.**   Well, and you would only know that if, in fact, you asked

13   the question, correct?

14   **A.**   Well, no.  I should have known that through the

15   discovery, I would think.

16   **Q.**   All right.  And you would certainly still want to ask

17   that question regardless of any discovery that you received:

18   Were you involved in this case in any fashion?

19          MR. KANOVITZ:  Objection to the form of the

20   question.

21          THE COURT:  Well, I think the question is whether he

22   asked the question, and did you ask the question?

23          THE WITNESS:  I don't recall asking the question.

24   BY MR. McLANDRICH:

25   **Q.**   It would be a prudent question to ask, would it not?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

LIEBERMAN - CROSS (McLandrich)                    868

1   **A.**    It may be for some people.  I don't recall.

2   **Q.**    And when you were meeting with an investigator that had

3   worked for the police department that was the subject matter

4   of the case -- and not only worked at the police department,

5   you knew that he was the supervisor of detectives before he

6   resigned, correct?

7   **A.**    I knew he was a supervisor, yeah.

8   **Q.**    All right.  And so even if you hadn't asked him, wouldn't

9   you expect this investigator to tell you, "Mr. Lieberman, you

10  need to know, I supervised this investigation while I was

11  there."  Wouldn't you expect that information to be offered to

12  you in the dialog where you are having a back and forth about

13  your concerns regarding retaining this man who was a former

14  police officer?

15         MR. KANOVITZ:  Objection.  Calls for speculation.

16         THE COURT:  Wouldn't you expect?

17         MR. KANOVITZ:  Yes.

18         THE COURT:  You can answer it if you can.

19         THE WITNESS:  I just -- I don't know how to answer

20  that.

21  BY MR. McLANDRICH:

22  **Q.**    So you --

23  **A.**    It depends on the facts, I think, and what's happened.

24  **Q.**    You wouldn't expect your investigator who you are now

25  hiring to represent your client in a rape case to offer to

LIEBERMAN - CROSS (McLandrich)                    869

1   you, "I worked on this case when I was at the police

2   department.  I just want you to know that"?

3          MR. KANOVITZ:  Objection; asked and answered.

4          THE COURT:  Well, no, it hasn't been.

5       Would you expect that, Mr. Lieberman?

6          THE WITNESS:  If there was a reason to do that,

7   yeah, I would expect him to do that.

8   BY MR. McLANDRICH:

9   Q.   All right.  And wouldn't having seen a report that

10  excluded your client as a suspect be such a reason to disclose

11  that to you?

12  A.   Not necessarily.

13  Q.   Not in your opinion anyway.

14  A.   Well, yeah, you are asking for my opinion.  Not

15  necessarily.

16  Q.   Wouldn't it be something that certainly in hindsight you

17  would have wanted to know?

18  A.   In hindsight, I would have wanted it to have been

19  disclosed in discovery, and I would have asked him about it,

20  absolutely, if I knew about it.

21  Q.   Yes.  And one of the ways you could have known about it

22  was by him telling you about it?

23  A.   Well, yeah.  I mean, I suppose that would have been one

24  way I could have known about it.  That's -- I guess, the

25  whole answer to that would be assuming that he knew I didn't

LIEBERMAN - CROSS (McLandrich)                    870

```
1    know about it, or did know about it.  I mean, he didn't know

2    what I knew at that stage.

3    Q.    If he assumed you knew about it, it would be even a

4    better reason for him to say, 'cause he would assume you

5    already knew about it, "Now you know I worked on this very

6    case, and we wrote a report that excluded Gillispie as a

7    suspect."  Wouldn't that be a natural part of that

8    conversation?

9              MR. KANOVITZ:  Objection; calls for speculation.

10             THE COURT:  Sustained.

11   BY MR. McLANDRICH:

12   Q.    All right.  So in any event, it's your memory that at no

13   time did Mr. Fritz ever say to you while he was working on

14   this case, "You know, Bailey wrote a report that excluded

15   Gillispie as a suspect."  That's your testimony?

16   A.    Yes, that's my testimony.

17   Q.    All right.  And if you had known that -- and I think

18   you've testified to this already -- you would have used

19   Mr. Fritz as a witness, right?

20   A.    Yes.

21   Q.    And so you might have not known, but Mr. Fritz knew that

22   he could be a witness in this case, right?

23             MR. KANOVITZ:  Objection; calls for speculation.

24             THE COURT:  As to what Mr. Fritz knew, sustained.

25   BY MR. McLANDRICH:
```

LIEBERMAN - CROSS (McLandrich)                          871

1   **Q.**   Mr. Fritz had information that was pertinent to your

2   defense of this case.  That's your belief?

3   **A.**   That Mr. Fritz had information that was pertinent to my

4   defense of the case.  Yeah, I think that's probably true.

5   **Q.**   All right.  And it was information that he never gave

6   you?

7   **A.**   It was information that I did not discover until the

8   Innocence Project became involved.

9   **Q.**   Because he never told you?

10  **A.**   Yeah, he never told me.

11  **Q.**   All right.  Now, wasn't one of Mr. Fritz's duties to

12  review the discovery packet?

13  **A.**   No.

14  **Q.**   And when Mr. Fritz became involved in the case, you

15  didn't know what his understanding of the case was, correct?

16  **A.**   Correct.

17  **Q.**   And so for him to be able to perform whatever services

18  you wanted him to perform -- which apparently included looking

19  for alibi witnesses, right?

20  **A.**   Specific instructions as it related to alibi witnesses,

21  yes.

22  **Q.**   And so it would be important for him to have the

23  knowledge of the allegations and the evidence that the police

24  had in order to perform his services, correct?

25  **A.**   It would -- not necessarily.  It would have required

LIEBERMAN - CROSS (McLandrich)                                    872

1   him to do would be to know the days that he allegedly was

2   involved in what he was accused of doing.  For an alibi

3   witness, that's all he would have known, is where he was on

4   those days.

5        But to further answer that, yeah, I mean, of course I

6   told him what the allegations were, that he was charged with

7   rape, and gave him a description of that.

8   Q.   Is it your testimony you didn't give him the police

9   reports in this case?

10  A.   My testimony is that I don't recall giving him the

11  discovery packet, which would have been everything, not just

12  the police reports.

13           MR. McLANDRICH:  Can we bring up PX-80, please.

14  Page 226.

15           MR. KANOVITZ:  Just a moment.

16           THE COURT:  Has that been disclosed previously?

17           MR. McLANDRICH:  I don't know.  We talked about it

18  before.  I'm not sure it has been disclosed before.  It's a

19  prior hearing transcript.

20           THE COURT:  Let's get a page and a line before we

21  publish it so that we can publish it, let him testify to it,

22  and then take it down.

23           MR. McLANDRICH:  I'm sorry.  I withdraw that for the

24  moment.

25           THE COURT:  All right.  I think the other thing I

LIEBERMAN - CROSS (McLandrich)                              873

1  would suggest, counsel, from this point forward, if we are

2  going to use transcript testimony to refresh recollection, you

3  let us know what your exhibit is and what your page and line

4  is, and we'll get him a hard copy. There is no reason for the

5  purposes of refreshing your -- refreshing recollection that we

6  display transcript pages.

7  BY MR. McLANDRICH:

8  Q.   You testified earlier that Mr. Moore went to the

9  campground to look for campground receipts. Do you recall

10 that testimony?

11 A.   That's my understanding of what Mr. Moore said, yes.

12 Q.   All right. Isn't it a fact that in the first trial you

13 objected to the campground receipts because, in fact,

14 Mr. Moore didn't go down there and get them; in fact, they

15 were mailed to him?

16 A.   I don't recall whether that would have been the

17 substance of my objection or even if I objected.

18 Q.   All right.

19       MR. McLANDRICH:  Can we go to PX-3, page 154.

20       THE COURT:  Is this refreshing or is this

21 impeachment?

22       MR. McLANDRICH:  Well, this is, I suppose,

23 refreshing since he says he really doesn't remember the reason

24 for his objection.

25       THE COURT:  Mr. Lieberman, we will get you a hard

LIEBERMAN - CROSS (McLandrich)                          874

```
1   copy.  Somewhere in those binders.
2        Does Mr. Lieberman have the page?
3            THE WITNESS:  What page and line, Your Honor?
4            THE COURT:  I don't know yet.
5            MR. McLANDRICH:  I'm sorry.  The computer is being
6   uncooperative.
7        I'm sorry.  I can't even read it, Your Honor.  I'm going
8   to see if I can pull it up one more time.  Then if not, I'll
9   move on.
10  BY MR. McLANDRICH:
11  Q.   If you would go to page 154, line 13, please.
12       "Question:  You have three cards in your --"
13           THE COURT:  I thought we were refreshing his
14  recollection.
15           MR. McLANDRICH:  Oh, that's fine.
16  BY MR. McLANDRICH:
17  Q.   So if you would read lines 13 through line 18, please.
18  A.   Okay.  I've done that.
19  Q.   Does Mr. Moore, in fact, testify that the receipts were
20  mailed to him, not that he went down there personally?
21  A.   He says that the receipts were mailed to him, but your
22  question to me was the basis of my objection.  I didn't -- I
23  didn't object to that.  My objection was previous, on line
24  10, where I say, "Objection," and the Court says, "I'll
25  sustain the objection," and it really had nothing to do with
```

LIEBERMAN - CROSS (McLandrich)                    875

1   that.

2   **Q.**   Well, actually, I think if we went on in the transcript

3   we would see that there was subsequent dialog where the

4   receipts were excluded, and, of course, unfortunately, this

5   court didn't put the sidebars into the transcript.  So we

6   don't know the nature of what occurred at sidebar.  What we

7   have is the dialog about the receipts and the receipts being

8   excluded.

9        But in any event, the testimony reflects that the

10  receipts were mailed to Mr. Moore, not that he went down there

11  personally?

12            MR. KANOVITZ:  Objection to the narrative portion,

13  and move to strike the narrative portion.

14            THE COURT:  I agree.  It will be stricken.

15       This witness doesn't remember objecting with regard to

16  that question.

17  BY MR. McLANDRICH:

18  **Q.**   Do you see anywhere in the transcript where it reflects

19  that Mr. Moore personally went to Kentucky to get the

20  receipts?

21  **A.**   On the page that you provided to me, page 154?

22  **Q.**   Yes, sir.

23  **A.**   I see nothing there that he personally went there to

24  get the receipts.

25  **Q.**   And do you have any other basis upon which to testify

LIEBERMAN - CROSS (McLandrich)                              876

1    that Mr. Moore personally went to Kentucky?

2    **A.**   It is my understanding that I discovered that that

3    happened, but I can't tell you when or how.

4    **Q.**   Is it likely something that was just told to you that may

5    be, in fact, incorrect?

6    **A.**   I can't answer that.  What I can -- can tell you is I

7    think there may have been a discussion of it in his grand

8    jury testimony, which I didn't have available at that time,

9    about going down there.

10        And if I may, to fully answer your question, in the

11   transcript itself, he says he obtained them from Fred

12   Marriott.  "He mailed them to me."  My recollection --

13   **Q.**   You have answered my question.

14   **A.**   Okay.

15   **Q.**   Thank you.

16        What was Roger Gillispie's pant size?

17   **A.**   I don't remember.

18   **Q.**   Well, you testified it would have been much smaller than

19   whatever it is that Mr. Bailey supposedly believes he saw, but

20   you don't know what that pants size is?

21           MR. KANOVITZ:  Objection; mischaracterizes the

22   witness's testimony.  He's got it backwards.

23           THE COURT:  Okay.  The only question before

24   Mr. Lieberman, which he's answered, is what was his pants

25   size, and he doesn't remember.

LIEBERMAN - CROSS (McLandrich)                          877

1              MR. McLANDRICH:  All right.

2              THE COURT:  The rest of it is just a dialog going

3     on.

4          And based upon the objection, the Court's going to strike

5     the dialog.  Ladies and gentlemen, after the answer that he

6     doesn't remember, the rest of that is stricken.  Please don't

7     have that play any part in your considerations.

8     BY MR. McLANDRICH:

9     Q.   Do you have any personal knowledge that Mr. Moore ever

10    had receipts for the Kentucky campground from August?

11    A.   If you are asking me whether I ever saw receipts in his

12    possession, no, I did not.

13    Q.   And anything you know about that would have been told to

14    you by somebody else?

15    A.   It would have been told to me by someone else, that's

16    correct.

17    Q.   Now, you were asked some question about C.W. being unable

18    to make an identification.  In fact, C.W. made an

19    identification, correct?

20    A.   C.W. did make an identification, yes.

21    Q.   Both pretrial and at trial, correct?

22    A.   C.W. made an identification from a photo spread and

23    also at trial, which I think is what I said.

24    Q.   And anything that you know about Mr. Bailey having

25    allegedly written a report that excluded Mr. Gillispie again

*Mary A. Schweinhagen, RDR, CRR   (937) 512-1604*

LIEBERMAN - CROSS (McLandrich)                    878

1    would have been something you were told by someone else?

2    A.    Or in their affidavits, yeah.

3    Q.    Which is the same thing.  They are just telling you in

4    the affidavit?

5    A.    Well, except one's under oath.  The affidavits are

6    under oath.

7    Q.    Yes.  But not subject to cross-examination.

8              THE COURT:  Okay.  It's something that someone else

9    told him, regardless of what the form was.

10   BY MR. McLANDRICH:

11   Q.    Correct?

12   A.    Correct.

13   Q.    And the only information that you have about any

14   allegation that alleges Detective Moore would have ever been

15   in possession or not produced such a report would also be

16   something that someone else told you, correct?

17   A.    Correct, yes.

18   Q.    Did you interview Mr. Bailey prior to the first trial?

19   A.    No, I don't recall interviewing Mr. Bailey prior to the

20   first trial.

21   Q.    Didn't this issue of the hair surface between the first

22   trial and the second trial?

23   A.    Yes.

24   Q.    So all the things that you testified that you put on in

25   the defense of this case with respect to Mr. Gillispie,

1    whether it be the challenge to the photo array, whether it be

2    the tan, whether it be the smoking, the clothes, the jewelry,

3    all those things were obviously insufficient to carry the day

4    with both juries, correct?

5    **A.**    Yeah, that would be correct.  They found him guilty.

6    **Q.**    And you had the photo array before the trial and, in

7    fact, hired an eyewitness identification expert, correct?

8    **A.**    That's correct.

9    **Q.**    And that person testified to the science of eyewitness

10   identification as it existed at the time of that trial?

11   **A.**    That's correct.

12   **Q.**    And notwithstanding that testimony, the girls testified

13   that they identified -- the ladies testified that they

14   identified Mr. Gillispie.  And the jury, as you've said,

15   apparently believed that testimony, correct?

16   **A.**    I believe the jury believed the three women, yes.

17   **Q.**    And as I think you started off your testimony saying,

18   this was a case that was always going to be an eyewitness

19   identification case because there was no DNA, there were no

20   fingerprints.  So if this case was ever going to get resolved,

21   whether for conviction or acquittal, it was going to hang on

22   eyewitness identification?

23   **A.**    That's correct.

24   **Q.**    All right.  And the things that you testified with

25   respect to your challenges to the array were all presented at

LIEBERMAN - CROSS (McLandrich)                    880

1    the trial.  The size of the head, the finish of the photo, the

2    color of the background, all those things were the subject of

3    your cross-examination at that time, correct?

4    **A.**   I don't recall the specifics.  I know generally I did

5    at trial also challenge that, yes.

6    **Q.**   Well, those were things you identified to plaintiff's

7    counsel as things that you thought were inappropriate about

8    the array?

9    **A.**   Yes, correct.

10   **Q.**   And if you felt they were inappropriate about the array,

11   you certainly would have presented them at trial in challenge

12   to the array, fair?

13   **A.**   I think that's probably fair.  I just don't recall the

14   specifics.

15   **Q.**   I understand.  It's been a long time.

16   **A.**   It has.

17   **Q.**   And the expert eyewitness that you would have put on --

18   I'm sorry.  The expert in eyewitness identification that you

19   would have put on would have spoken to those sorts of things

20   during his testimony, you would expect.  I understand you

21   don't exactly remember, but --

22   **A.**   Yeah.  And I -- I don't -- it would depend on what the

23   judge would allow him to do, how specific he would allow him

24   to get.

25   **Q.**   All right.  Now, you testified earlier about the second

LIEBERMAN - CROSS (McLandrich)                          881

1    trial and that the jury was initially 8-4, and then the judge

2    gave the charge to the jury to ask them to continue to

3    deliberate, correct?

4    **A.**    Yes, I do.

5    **Q.**    And you don't know why that jury came back 12-0 for

6    guilty, correct?

7    **A.**    No, I do not.

8    **Q.**    All right.  And presumably -- well, strike that.

9         If Mr. Fritz had knowledge of a witness that was

10   impactful to your defense, would you want him to bring you

11   that information?

12   **A.**    Of course I would.

13   **Q.**    And so while you may not have been aware, certainly

14   Mr. Fritz, you now believe in retrospect, was aware of

15   Mr. Bailey and the usefulness or impact that he could have had

16   in the criminal trial, correct?

17            MR. KANOVITZ:  Objection; asked and answered

18   previous.

19            THE COURT:  Sustained.  And he is asking about

20   Mr. Bailey's feelings.  So sustained.

21   BY MR. McLANDRICH:

22   **Q.**    You have testified already that Mr. Bailey, you believe,

23   would have been an impactful witness?

24   **A.**    I thought Mr. Bailey was a witness at one point in

25   time.  So I don't understand your question.  I'm sorry.

LIEBERMAN - CROSS (Herman)                                    882

1    **Q.**   Well, my question is directed to the fact that you have

2    testified that you've subsequently come to be told that

3    Mr. Bailey had written this report that excluded

4    Mr. Gillispie, and that had you known that, you could have

5    made use of it in a substantial way at trial.  Did you not

6    testify that way?

7    **A.**   Yeah, similar to that, yes.

8    **Q.**   All right.  And so you would have wanted Mr. Fritz,

9    certainly as your investigator, to come forward and tell you

10   that, right?

11            MR. KANOVITZ:  Objection; asked and answered.

12            THE COURT:  Well, it has been asked and answered,

13   but can you answer that?  Would you want him to come forward?

14            THE WITNESS:  I -- of course I would want him to

15   come forward if he believed I did not know that information.

16   BY MR. McLANDRICH:

17   **Q.**   Thank you.  That's all I have for you.

18            THE COURT:  Counsel.

19                     **CROSS-EXAMINATION**

20   BY MR. HERMAN:

21   **Q.**   Good morning, Mr. Lieberman.

22   **A.**   Good morning.

23   **Q.**   My name is Chris Herman.  I think we have we've met

24   before.  I used to be a prosecutor in the county, but I

25   represent the Miami Township Board of Trustees in this matter.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1   **A.**    Okay.

2   **Q.**    You've been an attorney for well over 40 years, correct?

3   **A.**    44.

4   **Q.**    44 years.  Same year I was born.  I'm 44 this year.  So

5   you have been practicing for as long as I have been on this

6   earth.

7   **A.**    Thank you for that.

8   **Q.**    So 44 years ago you took an oath as an attorney to uphold

9   the Constitution, the laws of the United States, correct?

10  **A.**    I did.

11  **Q.**    You took an oath to uphold the Constitution and the laws

12  of the State of Ohio, correct?

13  **A.**    I did.

14  **Q.**    Now, in the 44 years that you have been practicing as an

15  attorney, is it fair to say you've had quite a lot of

16  experience working with police departments in Montgomery

17  County and the surrounding counties, including the detectives,

18  police officers, police chiefs, and everybody that would be

19  connected to the police department, correct?

20  **A.**    I think that's a fair statement.

21  **Q.**    Now, are you aware whether or not a police officer, when

22  they are hired by a department or when they pass whatever

23  tests are required to become a police officer, are you aware

24  of whether or not they have to take an oath of office

25  themselves?

LIEBERMAN - CROSS (Herman)                                      884

1   **A.**    It's my understanding they do, yes.

2   **Q.**    And what is your understanding as to the oath of office

3   that a police officer takes?

4   **A.**    Oh, gosh, I don't know the verbiage of it.  But

5   basically, they have to follow the Constitution and the laws

6   of the State of Ohio also.

7   **Q.**    So it would be similar to the oath that you took as an

8   attorney 44 years ago, correct?

9          MR. KANOVITZ:  Objection; calls for speculation.

10         THE COURT:  I think he's --

11         MR. HERMAN:  I can clarify.

12         THE COURT:  All right.

13  BY MR. HERMAN:

14  **Q.**    With respect to police officers swear an oath to uphold

15  the Constitution of the United States and all the laws of the

16  United States, and to also uphold the Constitution and the

17  laws of the State of Ohio, correct?

18  **A.**    That's my understanding, yes.

19  **Q.**    Now, through the course of your practicing for 44 years,

20  have you become familiar with, I'll say, police practices in

21  terms of preparing police reports?

22  **A.**    They vary, but, yeah, I think I've experience a lot of

23  that.

24  **Q.**    Okay.  And have you also become familiar with police

25  officers' investigation of cases and the creation of photo

LIEBERMAN - CROSS (Herman)                                    885

1    spreads and how they go about creating those photo spreads

2    through your work as an attorney?

3    A.    Yes, I've become familiar with that.

4    Q.    So through the course of your career as an attorney, have

5    you also been -- have you become familiar with a police

6    officer's duties or responsible -- responsibilities

7    concerning, for example, the collection of evidence in a case?

8    A.    That's kind of general.  Each officer has different

9    responsibilities when they arrive at a scene, for example.

10   So it kind of depends on what -- on what we're talking

11   about.  Yeah, I'm familiar with some of it.

12   Q.    So it's not just police officers that, let's say, for

13   example, respond to the scene of a crime and collect evidence.

14   Also, on down the line there might be other officers that

15   become involved, say, for example, detectives, that gather

16   evidence related to the investigation of a crime, correct?

17   A.    Correct.

18   Q.    Okay.  And is it your understanding through the course of

19   your career that police officers also have a duty, not only do

20   police officers, but detectives and anybody else that's

21   connected to the investigation of that case, to maintain and

22   keep that evidence that they gather and collect through the

23   course of the investigation?

24   A.    Yes.

25   Q.    And why is it important for you as a defense attorney for

1    a police officer, a police department, a detective, and

2    anybody else that's involved with the investigation of that

3    case to keep and maintain records of their investigation of

4    cases?

5    **A.**   Well, for many of the reasons that I've already

6    articulated today:  that if there is evidence that hasn't

7    been turned over, that we need to know that so that we can

8    ultimately acquire that evidence, and it could have

9    significance in the defense of a case.  That's one of the

10   reasons.  There's a myriad of other reasons, I believe.

11        There would be reasons for appeal.  There would be

12   reasons for the trial itself that they should keep and

13   maintain evidence.

14   **Q.**   And if you could share with us a little bit about your

15   knowledge as to the process of when a police department

16   investigates a crime and they want to seek charges on that

17   investigation, they will go to a prosecuting attorney and ask

18   them to review the investigation, correct?

19   **A.**   Yeah, most of the time I think that's correct.

20   **Q.**   All right.  And do you have an understanding when a

21   police officer or a detective comes and meets with the

22   prosecutor to seek charges, whether or not that officer

23   provides every piece of evidence related to that case to the

24   prosecutor for that prosecutor to evaluate the merits of the

25   investigation and what charges to charge -- what charges to

1   pursue?

2   **A.**   At what point in time?  At the initial meeting with the

3   prosecutor?

4   **Q.**   Well, let's break it down.  So, yes, at the initial

5   meeting with the prosecutor, what's your understanding of what

6   should be turned over at that time?

7   **A.**   Well, ideally, my understanding would be that they turn

8   all the evidence over that they have been able to compile so

9   that the prosecutor would be able to look at everything

10  that's involved.  That ideally would be what I would believe

11  should happen.

12  **Q.**   So if I could -- if I would use the term like the good,

13  the bad, and the ugly of the investigation, all of that,

14  whether it's helpful to the prosecution or helpful to the

15  defense, that should be turned over to the prosecutor in their

16  initial review, correct?

17  **A.**   That would be the ideal situation.  In practice, I

18  don't think that's always the case.

19  **Q.**   Now, that responsibility to provide that information to

20  the prosecutor does not cease after their initial meeting,

21  correct?  It's an ongoing duty if the case is still being

22  investigated, correct?

23  **A.**   That's correct, yes.

24  **Q.**   And let's skip ahead, okay, to the point where charges

25  have been brought by a prosecutor after a -- after a police

1    detective or a police department has presented all the good,

2    the bad, and the ugly, and now we have a charge, correct?

3        After that person is charged, that duty continues for the

4    police department and the police detective and whoever's

5    involved in that case to continue to provide whatever ongoing

6    investigation has occurred not only to the prosecutor, but

7    then also to you as the defense attorney, correct?

8    **A.**   Yes.

9    **Q.**   And you've been practicing in Montgomery County for 44

10   years, and it's my understanding that there is what's called

11   an open discovery policy with Montgomery County Prosecutor's

12   Office, correct?

13   **A.**   There is now, yes.

14   **Q.**   There is now.

15   **A.**   Yeah.

16   **Q.**   So when you started as a lawyer, there was not one in

17   place at that time, correct?

18   **A.**   When I started as a lawyer, there was Rule 16, which

19   still required the production of most everything.  But it

20   was changed later on, and without getting into the law, the

21   bottom line is they've always been in a situation in

22   Montgomery County where they are supposed to give you

23   everything.

24   **Q.**   Okay.  Let's talk about relevant to this matter in 1990-

25   1991, that time period.  Would there have been an open

LIEBERMAN - CROSS (Herman)                                    889

1    discovery policy by the Montgomery County Prosecutor's Office

2    at that time, if you recall?

3    A.   There was supposed to have been, yes.

4    Q.   And can you share with the jurors, what does it mean to

5    have an open discovery policy in Montgomery County?

6    A.   What it theoretically means is that the prosecutor will

7    show you all of the evidence that they have in the case --

8    to use your terminology, the good, the bad, and the ugly --

9    so that if there was evidence that would support the defense

10   case, they are supposed to show you that, and that's by law,

11   called *Brady versus Maryland*.

12        They are also supposed to show you police reports, and

13   they are supposed to show you other evidence -- laboratory

14   reports, physical evidence -- and that's everything that

15   they are supposed to show you.

16   Q.   Okay.  And now some of -- some evidence in a case will be

17   more important than other evidence in a case.  Is that fair?

18   A.   I think that's a fair statement, yes.

19   Q.   Okay.  You've been practicing, I know, for a while.  And

20   I wonder if you have an understanding as to what -- what is

21   material evidence and what is exculpatory evidence, in your

22   experience working as a defense attorney here for 44 years?

23   A.   Okay.  So --

24             MR. McLANDRICH:  Objection, Your Honor.

25             THE COURT:  Basis?

LIEBERMAN - CROSS (Herman)                          890

1          MR. McLANDRICH:  It's calling for a legal opinion, a

2    description of the law.

3          THE COURT:  I'll let this witness testify to his

4    understanding of those types of evidence.

5          THE WITNESS:  So material evidence, it's my

6    understanding material evidence is that evidence which

7    basically directly impacts the case or can have a direct

8    impact on a case.  It's not stuff that doesn't really matter.

9    It's not irrelevant things.  It's things that are very

10   relevant and could make something, I am going to use a legal

11   term, more probative than not.  That would be material.

12   "Probative" meaning essentially more likely to have occurred

13   than not.

14   BY MR. HERMAN:

15   Q.   And let me -- let me interject real quick.  So material

16   in that context, that could be evidence that's good for the

17   defense and it could be evidence that's bad for the defense,

18   correct?

19   A.   Correct.  That's correct, yes.

20   Q.   And it could be evidence that's good for the State, and

21   it could be evidence that's bad for the State?

22   A.   That's correct, yes.  It goes both ways.

23   Q.   So then exculpatory evidence, your understanding.

24   A.   So exculpatory evidence is that evidence which, to use

25   your terms, is good for the defense.  It is evidence that

LIEBERMAN - CROSS (Herman)                                891

1    the defendant did not commit the crime, or it's evident that

2    a crime was never committed.  That's basically what

3    exculpatory evidence is.

4    **Q.**   And you've referred to *Brady* material, correct?

5    **A.**   I have, yes.

6    **Q.**   And is *Brady* material, is that what we're talking about

7    whether we talk about exculpatory evidence or exculpatory

8    discovery material?

9    **A.**   It's a little more broad than that.  And I kind of feel

10   I'm in one of my classes here, but it's -- *Brady* encompasses

11   even a little bit more than just clearly exculpatory.  It's

12   favorable.  So that it may not be necessarily exculpatory,

13   but if it's even favorable to the defense or it could lead

14   to evidence which would be exculpatory, then it's supposed

15   to be turned over also.

16   **Q.**   So one of the issues I think in your defense of

17   Mr. Gillispie through the criminal trials and everything and

18   subsequently learning thereafter about this supplemental

19   report that was allegedly authored by Gary Bailey and Steven

20   Fritz, correct?

21   **A.**   That's my understanding, yes.

22   **Q.**   All right.  And was it your position, then, that that

23   supplemental report would have been exculpatory evidence that

24   you would have liked to have known about at both the first and

25   the second criminal trials?

1    **A.**    Yes.

2    **Q.**    And at the first trial, you did not have any knowledge

3    about that report, correct?

4    **A.**    Correct.

5    **Q.**    And you didn't have any knowledge about that report at

6    the second criminal trial either, correct?

7    **A.**    That's correct.

8    **Q.**    Prior to you being hired by Mr. Gillispie to defend him

9    in those criminal cases, have you ever defended a case

10   involving any alleged destruction of exculpatory evidence in

11   any of your criminal trials from 1990 going back to when you

12   became an attorney in 1978?

13            MR. KANOVITZ:  Your Honor, objection to the scope of

14   what is supposed to being covered with this party, as well as

15   getting to the point of undisclosed expert testimony.

16            THE COURT:  Well, first, he is cross-examining, and

17   cross-examining, the scope is wide.  And so as to that,

18   overruled.

19        I'm not quite sure I understand the other part of your

20   objection.

21            MR. KANOVITZ:  It's a 26(a) -- actually, may I

22   withdraw that and let me see where this goes?

23            THE COURT:  You may.

24            MR. KANOVITZ:  Thank you.

25            THE COURT:  Do you remember the question,

1   Mr. Lieberman?

2          THE WITNESS:  If I remember it, I think he's asking

3   me if I ever had a situation where there was an allegation of

4   the destruction of exculpatory or material evidence from the

5   day I was sworn in as a lawyer in 1978 until the date of this

6   trial?

7   BY MR. HERMAN:

8   **Q.**   That's correct, in 1990-91, yes.

9   **A.**   Okay.  So the answer to that is I have a very, very

10  vague recollection that I believe I did, but I can't even

11  tell you the case.  I know that there were some allegations

12  that I wrote some briefs on during that time period.

13  **Q.**   But in that time period, just one vague remembrance of a

14  potential issue involving that, correct?

15  **A.**   Yeah.  As I sit here right now, yeah.  I could

16  probably -- I am not going to offer to do that.  I guess

17  just as I sit here right now.

18         THE COURT:  I think you have answered it.  Go ahead.

19  BY MR. HERMAN:

20  **Q.**   Now, let's look at the time frame after the criminal

21  trials in Mr. Gillispie's case in 1991.  Had you ever, in your

22  practice as a criminal defense attorney, had cases involving

23  the later discovery of an exculpatory supplemental report, or

24  any exculpatory material in your practice?

25         MR. KANOVITZ:  Objection to undisclosed expert

1    testimony at this point.  Under 26(a).

2            THE COURT:  He is asking whether or not -- your

3    question is whether or not he's had experience with regard to

4    trials that he's been involved in which involve undisclosed

5    exculpatory evidence later?

6            MR. HERMAN:  Yes.  And maybe "experience" is not the

7    best word.  Maybe have you had a case where, and then --

8            THE COURT:  I'll let him answer that.  But I think

9    that may be where we go.  This might be it.

10           THE WITNESS:  Yes.

11   BY MR. HERMAN:

12   **Q.**   And can you share with us how many occasions have you had

13   that instance happen after Mr. Gillispie's criminal trials?

14           MR. KANOVITZ:  Objection.

15           THE COURT:  Overruled.

16           THE WITNESS:  I can give you a rough estimate of

17   maybe five.

18   BY MR. HERMAN:

19   **Q.**   So is it fair to say it doesn't happen that often?

20   **A.**   I think that's a fair statement, yes.

21           MR. KANOVITZ:  I belatedly object that that was

22   expert testimony and move to strike.

23           THE COURT:  It will stand.

24       I assume, Mr. Lieberman, that was based on, in your

25   experiences, not very often?

LIEBERMAN - CROSS (Herman)                                895

1              THE WITNESS:  That is correct, Your Honor.

2    BY MR. HERMAN:

3    Q.   Mr. Lieberman, would there be any lawful reason for a

4    police department, a detective, a police officer, or even the

5    State of Ohio, the prosecutor, to not turn over exculpatory

6    evidence in the case?

7              MR. KANOVITZ:  Objection; calls for expert opinion

8    testimony that he's not disclosed.

9              THE COURT:  Do you want to rephrase your -- I mean,

10   you are asking him to -- sustained.

11   BY MR. HERMAN:

12   Q.   Would the withholding of exculpatory evidence in a

13   criminal case be a violation of the oath of office that an

14   attorney takes?

15             MR. KANOVITZ:  Same objection.

16             THE COURT:  Can you answer that question,

17   Mr. Lieberman?

18             THE WITNESS:  Not directly, Your Honor.

19             THE COURT:  He can't answer the question.

20   BY MR. HERMAN:

21   Q.   So as an attorney, you've sworn an oath to uphold the

22   laws and the Constitution of the United States, correct?

23             MR. KANOVITZ:  Objection; asked and answered.

24             THE COURT:  Overruled.

25             THE WITNESS:  That's correct, yes.

LIEBERMAN - CROSS (Herman)                                896

1    BY MR. HERMAN:

2    **Q.**   And you've referred to a case, *Brady versus Maryland*,

3    which sets forth the requirement that all evidence, as you've

4    said earlier, is to be turned over to the defense, correct?

5    **A.**   Correct.

6    **Q.**   Now, if a prosecutor does not turn over *Brady* material to

7    a defense, would that be a violation of that attorney's oath

8    of office to uphold the laws and the Constitution of the

9    United States?

10        MR. KANOVITZ:  Objection; undisclosed expert opinion

11   testimony, and also outside the scope.

12        THE COURT:  Approach.  Approach.

13   (At sidebar.)

14        THE COURT:  First, I think this question has been

15   asked and answered about four or five times, but -- well, are

16   you saying that he's answering as an expert?

17        MR. KANOVITZ:  Yes.  When he is asking for opinion

18   about anything other than what Mr. Lieberman himself did, he

19   is asking for expert opinion testimony.

20     Also, to the extent that he's asking about the other laws

21   of issues of the lawyers, that's not even what they are

22   allowed to participate in the trial on.  They are allowed to

23   participate only about the police officer.

24        MR. HERMAN:  Mr. Herman on behalf of Miami Township.

25   The point of this is to get to, we have a very narrow --

1          THE COURT:  Right.

2          MR. HERMAN:  And it is, if it's beyond -- I'm sorry,

3    if it's not in good faith, and I don't think that

4    Mr. Lieberman can say what is good faith or bad faith on

5    behalf of an officer.

6          THE COURT:  Right.

7          MR. HERMAN:  But if it's beyond the scope of

8    employment or outside official duties -- and I've established

9    that official duties include not only for a police officer but

10   an attorney to turn over this type of material.

11         THE COURT:  Okay.

12         MR. HERMAN:  And because of that oath, I think he

13   should be able to also testify that a police officer is also

14   violating that oath if he doesn't turn that stuff over to the

15   prosecutor.

16         MR. KANOVITZ:  Again, I come back to he has not been

17   disclosed as a police practice expert.  They have a police

18   practices expert who they are going to call and that person is

19   properly disclosed.  This man has not been disclosed for that.

20         Secondly, the idea that stage one is to show what a

21   lawyer's obligation is and what a police officer's obligation

22   is, that does not follow as a matter of logic even if he had

23   been disclosed.  So I still believe I stand on my objections.

24         MR. McLANDRICH:  I would tend to agree simply

25   because the police officer's legal duty to disclose is a

LIEBERMAN - REDIRECT (Kanovitz)                    898

```
1    question of law, and I don't think it's in dispute.  I don't

2    think we need this witness to testify.

3              THE COURT:  He's already -- I think we have already

4    had testimony to that effect too.

5              MR. HERMAN:  Okay.

6              MR. KANOVITZ:  Can we address one scheduling issue

7    while we are over here?  So Mr. Lieberman has to pick a jury.

8    This estimate, I estimated for him he'd be done by lunchtime.

9    I have only five minutes or ten minutes.

10             THE COURT:  How much more do you got?

11             MR. HERMAN:  Not much longer.  I will look at my

12   notes.

13             MR. KANOVITZ:  So if we go five minutes over is that

14   okay?

15             THE COURT:  Maybe five minutes, yes.

16        (In open court.)

17             THE COURT:  Court's going to sustain the objection.

18             MR. HERMAN:  That's all I have, Your Honor.  Thank

19   you.

20             THE COURT:  Thank you.

21        Now, Counsel, redirect.  I'll give you a scope:  Within

22   the scope of those things covered on cross.

23             MR. KANOVITZ:  Will do, Judge.  Thank you.

24                      REDIRECT EXAMINATION

25   BY MR. KANOVITZ:
```

LIEBERMAN - REDIRECT (Kanovitz)                              899

1    Q.    Sir, you were asked questions about how many times you

2    have come to know that evidence was lost or destroyed in a

3    case that you personally worked on, correct?

4    A.    Correct.

5    Q.    Are you familiar with the term "proving a negative"?

6    A.    I am.

7    Q.    Okay.  Now, if evidence was lost or destroyed on a case

8    that you worked on and no one later came and told you about

9    it, would you have any way to know?

10   A.    No.

11   Q.    So, in fact, it may be that you've litigated many cases

12   where evidence was lost or destroyed?

13   A.    I guess that's possible.

14   Q.    And isn't that the sort of thing that, like, defense

15   lawyers hope doesn't happen?

16   A.    Oh, absolutely.

17   Q.    You were asked questions about a term "material

18   evidence."  Do you recall that?

19   A.    Yes.

20   Q.    That's a term that gets used in law school?

21   A.    Yes.

22   Q.    Okay.  And is there some degree of subjectivity when

23   someone is trying to determine whether evidence is material or

24   not?

25   A.    Oh, yeah, there is, yes.

LIEBERMAN - REDIRECT (Kanovitz)                          900

1    **Q.**    So two people with two different sets of assumptions

2    could disagree; is that correct?

3    **A.**    Correct.

4    **Q.**    Okay.  And is it fair to say an officer might not

5    recognize if evidence is material or not?

6    **A.**    I guess that would be fair.

7    **Q.**    Would it also be true, though, that the duty to turn it

8    over is absolute?  It doesn't matter whether the officer

9    recognized it or not, correct?

10   **A.**    That's correct.

11          MR. McLANDRICH:  Objection.

12          THE COURT:  I'll allow it.

13   BY MR. KANOVITZ:

14   **Q.**    You were asked about *Brady* evidence.  You used the term

15   "favorable" as sort of the scope of *Brady* evidence.  Is the

16   term "impeachment evidence" used when talked about with *Brady*?

17   **A.**    There has been a number of cases since *Brady*, and I do

18   believe that impeachment is one of those that you could use

19   for a *Brady* challenge, yes.

20   **Q.**    And once again, is impeachment evidence, evidence that

21   would allow you to challenge the credibility of a witness at

22   trial?

23   **A.**    Yes.

24          MR. McLANDRICH:  Your Honor, might we approach for a

25   moment?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

LIEBERMAN - REDIRECT (Kanovitz)                    901

1          THE COURT:  Surely.

2       (At sidebar.)

3          MR. McLANDRICH:  John McLandrich for Moore.  It's

4    very disturbing to me that the witness has misstated the law

5    with respect to a police officer's duty to disclose.  The law

6    is extremely clear that the officer's duty is to disclose

7    evidence that is apparent, the materiality and exculpatory

8    nature of it is apparent, not that it's this blanket duty to

9    disclose anything that someone after the fact decides is

10   material, and this witness has misstated the law in that

11   regard.  I mean, that's --

12         MR. KANOVITZ:  My -- I think that's exactly what

13   he's testified to, the *Brady* duty is absolutely.  The police

14   officer might not recognize whether something is material or

15   not.  He's still supposed to get the evidence.

16         MR. McLANDRICH:  But we're here for a *Brady* civil

17   claim, and the *Brady* civil claim is bounded by, it has to be,

18   its materiality has to be apparent to the officer.  The

19   duty -- so now we are confusing the duty to disclose in a

20   criminal case and criminal discovery from the civil liability

21   standard, and his saying that from the stand I think is

22   prejudicial to Moore with respect to the civil liability

23   standard.

24        Now, if you want to clarify to the Court what he is

25   talking about is criminal law versus the civil liability

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
1    standard, maybe that kind of clears it a little bit, but

2    that's --

3              THE COURT:  See, you guys are treading into the law,

4    and I have given you some flexibility, and I shouldn't have.

5              MR. KANOVITZ:  Obviously, I am just following up on

6    where they went, but maybe the right way to handle this is

7    just tell the jury that they are going to receive instructions

8    on the law from you and anything that they are hearing on the

9    stand is just for purposes of establishing this witness's

10   testimony.

11             THE COURT:  So you are not going any further with

12   regard to any of the law?

13             MR. KANOVITZ:  No, no.

14             MR. MAYER:  I would recommend that you give some

15   kind of limiting instructions to the jury at this time, saying

16   if there is any conflict between what you instruct them.

17             THE COURT:  All right.

18             MR. KANOVITZ:  No objection.

19        (In open court.)

20             THE COURT:  Ladies and gentlemen, you've heard some

21   questioning, some answers with regard to certain legal terms,

22   certain legal theories.  But what the Court is going to tell

23   you is that the Court at some point in time at the end of the

24   trial will be instructing you with regard to the definitions

25   of the terms that you have just heard discussed here.  If
```

LIEBERMAN - REDIRECT (Kanovitz)                          903

1   there is any kind of disagreement or if there is questions

2   raised by the different definitions or the different

3   interpretations that counsel has posed in their questions, the

4   Court -- those should be ignored and you should pay close

5   attention to what the Court instructs you with regards to

6   those terms and the law.

7        Remember when we started out, you are the trier of the

8   fact.  I will give you the law.  Not the attorneys.  Not the

9   witnesses.

10       Anything further, counsel?

11           MR. KANOVITZ:  To inquire of the witness, but not on

12   the instruction.

13           THE COURT:  I understand.  Anything about that?

14           MR. KANOVITZ:  No, Judge.

15           MR. McLANDRICH:  No, thank you, Your Honor.

16           MR. HERMAN:  No, Your Honor.

17           MR. KANOVITZ:  May I proceed?

18           THE COURT:  Yes.  It's my understanding you are

19   going to move on.

20           MR. KANOVITZ:  Yes.

21   BY MR. KANOVITZ:

22   Q.   You were asked questions about why you didn't have

23   Mr. Fritz review the whole file.  Do you recall that?

24   A.   Yeah, I recall.

25   Q.   Why didn't you just give the whole file to Mr. Fritz and

LIEBERMAN - REDIRECT (Kanovitz)                                904

1    say review this and do the investigation that you think is

2    appropriate?

3    A.   Mr. Fritz -- well, Area Wide was charging us on an

4    hourly basis.  And so to review the entire file would have

5    been a charge to the family that didn't have the money to do

6    it.  So I was very specific in what I gave them.

7    Q.   And did you utilize Mr. Fritz in the way that you

8    typically do in situations where there are limited resources?

9    A.   Yes.

10   Q.   And you testified that you do not have personal knowledge

11   about the camping receipts from August, correct?

12   A.   That's correct.

13   Q.   And if there had been evidence at the grand jury that

14   Mr. Moore possessed the cards from August, is that the sort of

15   thing that could have allowed you to seek to obtain the grand

16   jury transcript?

17   A.   Yes.

18   Q.   And then could you have used that evidence at trial?

19   A.   If the judge would have allowed it, yes.

20   Q.   Okay.  You -- you were asked questions about whether

21   using the term "suspect," and you, you said, reached the level

22   of suspect.  Can you just explain to the jury what you meant?

23   A.   Well, there's different terminology in different law

24   enforcement areas, and you can be a person of interest --

25               MR. McLANDRICH:  Objection, Your Honor.

LIEBERMAN - REDIRECT (Kanovitz)                    905

1           THE COURT:  Sustained.

2    BY MR. KANOVITZ:

3    Q.   Did -- I'll move on.

4         You were asked about some testimony where you said you

5    felt that Detective Bailey had answered the prosecutor's

6    questions with a bunch of baloney and was playing games.

7         Do you recall that?  Or maybe -- I'm sorry -- your

8    questions.

9    A.   It was my -- yeah, it was a question I had asked him at

10   trial, and I didn't -- I either used the word "lead," and he

11   responded negatively and then said he would have responded

12   affirmatively if I said "tip."  So, yeah, I thought that was

13   just playing games.

14   Q.   Is it uncommon for, when detectives are called by the

15   prosecution, for them to play word games when you try to

16   cross-examine them?

17   A.   It depends on the detective.  It really does.  It's

18   hard to tell you whether that's common or not.

19   Q.   And you were asked questions about C.W. making an

20   identification of Dean from the photo array.  Do you recall

21   that?

22   A.   I do, yes.

23   Q.   And is it the case that the information that you had

24   through discovery and at trial was that she did make an

25   identification, correct?

1    A.    Correct, yes.

2    Q.    And if you had received evidence that, in fact, she was

3    unable to make an identification, would that have been useful

4    to you at trial?

5    A.    Yes, it would have.

6    Q.    And relatedly, if you had received information that

7    during the identification procedure Detective Moore felt it

8    appropriate to read the sentence that should be read or that

9    may be read when a witness cannot make an identification, that

10   would have been useful to you as well?

11   A.    Yes.

12              MR. KANOVITZ:  No further questions.

13              THE COURT:  Counsel, anything else?

14              MR. McLANDRICH:  Yes.

15              THE COURT:  With regard to those matters.

16              MR. McLANDRICH:  Yes.  Just briefly, Your Honor,

17   assuming that I can get this to work.

18                        **RECROSS-EXAMINATION**

19   BY MR. McLANDRICH:

20   Q.    You testified just a moment ago that the question that we

21   were talking about earlier where Mr. Bailey misrepresented at

22   the first trial was asked by you, isn't the truth that that

23   question was actually asked by the prosecutor, not by

24   yourself?

25   A.    I don't think so.  But, you know, I don't recall.  I

LIEBERMAN - RECROSS (McLandrich)                    907

1    thought it was by me.

2             MR. KANOVITZ:  I believe counsel's correct, and we

3    will stipulate that it was by the prosecutor.

4             THE WITNESS:  Then I was wrong.

5             THE COURT:  Hold on.  Will a stipulation solve that?

6             MR. McLANDRICH:  Yes, sir, Your Honor.

7             THE COURT:  Give me the stipulation.

8             MR. KANOVITZ:  I was mistaken.  I stipulate that the

9    person that was asking the questions of Detective Bailey at

10   the time that we were just talking about was the prosecution,

11   not the defense.

12            THE COURT:  All right.

13   BY MR. McLANDRICH:

14   Q.   So when he misrepresented in his answer, it wasn't a

15   matter of fencing with defense counsel, it was just an out and

16   out misrepresentation, correct?

17   A.   I don't know what was in his mind.  He was certainly

18   still playing games with words.

19   Q.   And some people call playing games with words a euphemism

20   for lying; isn't that right?

21   A.   I don't know.  Some people may.  I don't know.

22   Q.   Apparently, you don't.

23            MR. KANOVITZ:  Objection; argumentative.

24            THE WITNESS:  I --

25            THE COURT:  Do you, Mr. Lieberman?

LIEBERMAN - RECROSS (McLandrich)                          908

1                    THE WITNESS:  It depends on the circumstances.

2        BY MR. McLANDRICH:

3        Q.    And at least in this circumstance, that's what you are

4        doing, right?

5        A.    That's what I'm doing?

6        Q.    Yes, sir.

7                    MR. KANOVITZ:  Objection; argumentative.

8                    THE WITNESS:  I don't understand.

9                    THE COURT:  Okay.

10                   MR. McLANDRICH:  Withdrawn.  Thank you.

11                   THE COURT:  Counsel, anything?

12                   MR. HERMAN:  Nothing further.  Thank you.

13                   THE COURT:  Can this witness be excused?

14                   MR. KANOVITZ:  Yes, Your Honor.

15                   THE COURT:  Mr. Lieberman, thank you very much.

16                   THE WITNESS:  Thank you, Your Honor.

17                   THE COURT:  Ladies and gentlemen, we're going to

18       recess for the lunch hour.  We will reconvene at approximately

19       1:15.  Please, again, don't discuss the case amongst

20       yourselves or with anyone else.  Please don't formulate any

21       opinions, draw any conclusions.  And we will see you back here

22       just a little bit before so we can start right at 1:15.

23           I will indicate to you also that we are trying hard to

24       possibly get if, not all, most of this presented, and we may

25       fluctuate some between 4 and 4:30 each day.  So please

```
 1    understand that.  We're not -- we won't keep you by 4:30, but
 2    we may go beyond what I previously indicated was our 4 o'clock
 3    recess time.  So please remember that.  Thank you very much.
 4              THE COURTROOM DEPUTY:  All rise.  This court stands
 5    in recess.
 6         (Jury out at 12:02 p.m.)
 7         (Recess at 12:02 p.m.)
 8         (Jury in at 1:28 p.m.)
 9         (In open court at 1:29 p.m.)
10              THE COURT:  We are back on the record.  Counsel
11    ready to proceed?
12              MR. KANOVITZ:  Yes, Your Honor.
13              MR. McLANDRICH:  Yes, Your Honor.
14              MR. HERMAN:  Yes, Your Honor.
15              THE COURT:  Next witness -- well, I guess we have
16    Mr. Moore, right?
17              MR. McLANDRICH:  Mr. Moore.
18              THE COURT:  Mr. Moore, you are still under oath.
19              THE WITNESS:  Yes, sir.
20        MATTHEW SCOTT MOORE, DEFENSE'S WITNESS, PREVIOUSLY SWORN
21              THE COURT:  Counsel, you may inquire.
22              MR. McLANDRICH:  Thank you, Your Honor.
23                     DIRECT EXAMINATION (CONT.)
24    BY MR. McLANDRICH:
25    Q.   So, Mr. Moore, Detective Moore, you were asked by
```

MOORE - DIRECT (McLandrich)                           910

1    plaintiff's counsel on direct whether you received the

2    complete file from the department when you were given it by

3    Mr. Fritz.  Do you recall that?

4    A.   Yes, sir.

5    Q.   And do you believe that it was the complete file?

6    A.   I had no reason to not believe it at the time.

7    Q.   So what you received, which did not include any report

8    from Detective Bailey with respect to excluding Mr. Gillispie

9    as a suspect, you believed to be the complete file, correct?

10            MR. KANOVITZ:  Objection to the leading and the

11   narrative.

12            THE COURT:  Well, it is leading.

13       Rephrase, counsel.

14            MR. McLANDRICH:  Sure.

15   BY MR. McLANDRICH:

16   Q.   When you received the file, did it include any report

17   from Mr. Bailey excluding Mr. Gillispie as a suspect?

18   A.   Absolutely not.

19   Q.   Notwithstanding that, did you believe it to be the

20   correct -- the complete file?

21   A.   Yes, I did.

22            MR. McLANDRICH:  Would you pull up Plaintiff's

23   Exhibit 56.

24       I don't think there is an objection, Mike, is there?

25            MR. KANOVITZ:  No objection, Judge.

MOORE - DIRECT (McLandrich)                          911

```
1              THE COURT:  It may be.

2         (Exhibit displayed.)

3    BY MR. McLANDRICH:

4    Q.   So showing you what's been marked as actually Plaintiff's

5    Exhibit 56, what are these, Detective?

6    A.   This is a LEADS NCIC printout checking for -- I believe

7    it was for a criminal history check on a John Hammer.

8    Q.   And what is your understanding of why this was in the

9    file?

10   A.   This was a lead or tip that had been received by the --

11   by Detective Bailey.

12   Q.   And is this, other than the redactions, how it existed in

13   the file when you received it?

14   A.   Yes.

15   Q.   And so whose name is that in the upper right-hand corner?

16   A.   That would be Fritz.

17   Q.   And that was on there when you received it?

18   A.   Yes.

19             MR. McLANDRICH:  Let's pull up the next page,

20   please.

21        (Exhibit displayed.)

22   BY MR. McLANDRICH:

23   Q.   And is this a similar document?

24   A.   Yes, this is the driver's record for John Hammer.

25   Q.   And, again, has Detective Fritz's name in the corner?
```

MOORE - DIRECT (McLandrich)                                    912

1    A.    Yes, sir, it does.

2              THE COURT:  Is that one document, Counsel?  Is that

3    one exhibit?

4              MR. McLANDRICH:  It's one exhibit, yes, Your Honor.

5    BY MR. McLANDRICH:

6    Q.    Back in this time frame, were all the LEADS runs run from

7    a central location in the police department?  In other words,

8    versus individual officers having computers and running them

9    themselves?

10   A.    No, not at that time.

11   Q.    So how was it done at that time?

12   A.    If we needed printouts ran, we would go up to the

13   dispatch center and request dispatch run the social security

14   number and/or name or date of birth to obtain information on

15   the individuals.

16   Q.    And would they then write the name of the officer on the

17   document so they knew who to route it to?

18   A.    Yes, sir.  Yeah.

19   Q.    And is that why you believe Detective's Fritz's name is

20   up in the corner of this document?

21   A.    Yes.  And it's how I received documents also back then.

22   Q.    And so when Mr. Lieberman received the file, he would

23   have received it in that same fashion, with Mr. Fritz's name

24   on there?

25   A.    Yes, he would.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - DIRECT (McLandrich)                              913

```
 1              MR. McLANDRICH:  Next page, please.
 2          (Exhibit displayed.)
 3      BY MR. McLANDRICH:
 4      Q.    Is this another document concerning Mr. Hammer?
 5      A.    No.
 6      Q.    Who is on this one?
 7      A.    On this tip or lead is a Christopher A. Crooks.
 8      Q.    And this would have been in the file when you received
 9      it?
10      A.    Yes, sir.
11              MR. McLANDRICH:  Next page, please.
12          (Exhibit displayed.)
13      BY MR. McLANDRICH:
14      Q.    And is this another similar document?
15      A.    It's similar.  This is a registration check on a Roger
16      J. Griffith.
17      Q.    It looks like there is a number of different Griffiths
18      because there is different initials; yes?  Middle initials?
19      A.    Correct.  This was a general run of that name, and this
20      is all of the Roger Griffiths that came up.
21      Q.    And that also bears a name in the upper right-hand
22      corner?
23      A.    Yes, it does.  It's Fritz.
24              MR. McLANDRICH:  Next page, please.
25          (Exhibit displayed.)
```

MOORE - DIRECT (McLandrich)                    914

1    BY MR. McLANDRICH:

2    **Q.**   What is this, sir?

3    **A.**   It's another printout for a Roger Griffin.

4            MR. McLANDRICH:  Next page.

5        (Exhibit displayed.)

6    BY MR. McLANDRICH:

7    **Q.**   And what is this, sir?

8    **A.**   This here is a registration check and a driver's

9    license check on Roger L. Griffith.

10   **Q.**   And would these have been additional tips/leads suspects

11   that were evaluated?

12   **A.**   Yes, sir.

13   **Q.**   And that would have been prior to the time you took over

14   the file?

15   **A.**   Yes, sir.

16           MR. McLANDRICH:  Next page, please.

17       (Exhibit displayed.)

18   BY MR. McLANDRICH:

19   **Q.**   And what is this?

20   **A.**   This is a driver's license check on a Roger Griffin.

21   **Q.**   Now, again, all these would have been evaluated before

22   you took over the file, correct?

23   **A.**   Yes.  They were in the file.

24   **Q.**   So we've heard discussion during the various witnesses'

25   testimony about the fact that the victims described the person

MOORE - DIRECT (McLandrich)                          915

1    who assaulted them indicating that the person had used the

2    name Roger and/or described himself as a security guard.  Do

3    you recall that?

4    A.   Yes, I do.

5    Q.   So those descriptors wouldn't indicate that someone was,

6    in fact, the suspect, right?

7    A.   They are just points that were made by the suspect at

8    the time.

9    Q.   And, likewise, they wouldn't exclude someone from being

10   the suspect, right?

11   A.   That's true.

12   Q.   So the mere fact that someone's actual name was Roger

13   wouldn't be evidence that they weren't the perpetrator,

14   correct?

15   A.   That's correct.

16   Q.   And the fact that they were actually a security guard

17   wouldn't be something that would exclude them from the

18   possibility of being the suspect, correct?

19   A.   Right.

20   Q.   You have heard a good bit of testimony, as well, about

21   the hair color of the suspect and the different descriptions

22   from the three victims, correct?

23   A.   Yes, sir.

24   Q.   And there's been testimony that S.C., her descriptor was

25   blondish, and one of the -- either B.W. or C.W., I forget

MOORE - DIRECT (McLandrich)                           916

1    which, had brownish-red and the other had orangish-brown.  Do

2    you recall that?

3    A.    That's correct.

4          MR. KANOVITZ:  Objection.  Well, sorry.  I withdraw.

5    BY MR. McLANDRICH:

6    Q.    And these three descriptions of the hair color are not

7    the same, correct?

8    A.    No, they're not.  They are various.

9    Q.    And so in your experience, do witnesses or victims

10   sometimes have descriptions that are imprecise?

11   A.    Yes, they do.

12   Q.    And with these three different descriptions of the hair,

13   did you know the actual hair color of the suspect?

14   A.    No.

15   Q.    And so when you were asked previously about why you would

16   conduct a photo array with Mr. Gillispie, who had brown hair

17   of some shade or another, as opposed to these three

18   descriptions, why was it that you felt it was appropriate to

19   perform a photo array with Mr. Gillispie if his hair wasn't

20   orangish-blond or orangish-brown or reddish -- brownish-red or

21   blondish?

22   A.    Well, at the time all I had was the photo from the work

23   ID.  Granted, from what we saw here on display, that ID was

24   taken in January.  That's during the winter months, and

25   that's also when your hair would tend to be darker, versus

MOORE - DIRECT (McLandrich)                                    917

1    as in August, July, August, or September, when people tend

2    to be outside, their hair tends to lighten and they tend to

3    tan.

4    Q.    And can a given hair color appear different under

5    different conditions?

6    A.    Yes, sir.  Depending on the lighting conditions, you

7    could have that.  You also could end up being under stress

8    at that point.

9    Q.    Now, you were asked questions on direct with respect to

10   an interview with Mr. Gillispie where you asked him certain

11   questions and with respect to whether he smoked or with

12   respect to whether he was molested, with respect to his

13   whereabouts on the dates in question, things such as that.  Do

14   you recall that?

15   A.    I believe that was on August 8th, on 8-8, of 1990.

16   Q.    Have you ever known a suspect in a case when you were

17   interviewing them to lie to you?

18   A.    Many times.

19   Q.    And is it the habit of people who are being -- who have

20   engaged in a crime and are now being investigated for a crime

21   to not want to admit to it?

22   A.    Yes, sir.

23   Q.    And to give answers in an interview that are meant to

24   avoid culpability and essentially not implicate themselves?

25   A.    I had that many times during my career.

MOORE - DIRECT (McLandrich)                                    918

1    **Q.**   So when Mr. Gillispie was being interviewed by you, you

2    had already performed the photo arrays with B.W. and C.W.,

3    correct?

4    **A.**   That would be correct.

5    **Q.**   And so at that time, based on what you knew, you believed

6    you had probable cause to both -- to believe that

7    Mr. Gillispie was the perpetrator based on those

8    identifications; is that correct?

9             MR. KANOVITZ:  Objection; leading.

10            THE COURT:  Sustained as to the probable cause.  It

11   will be stricken.

12   BY MR. McLANDRICH:

13   **Q.**   All right.  By the time you interviewed Mr. Gillispie,

14   you had already performed the photo arrays with B.W. and C.W.,

15   correct?

16   **A.**   Prior to the interview, yes.

17   **Q.**   Yes.  And each of them had made an identification during

18   that photo array presentation?

19   **A.**   Yes, they had.

20   **Q.**   And each of them had identified Mr. Gillispie as their

21   assailant?

22   **A.**   Yes, they had.

23   **Q.**   And so did that affect how you interpreted

24   Mr. Gillispie's answers when he gave you denials to the

25   questions that you were asking him in the interview?

1    **A.**   Well, knowing that suspects tend not to admit to

2    things, I at that -- I had felt after asking several

3    questions that -- and the responses -- that the interview

4    was going to most likely not produce facts that would

5    actually relate at the time.  His answers.  And so I didn't

6    expect him to tell me the truth.

7    **Q.**   Now, the theory in the case always was, and still is,

8    that all three women were assaulted by the same person; is

9    that true?

10   **A.**   That's true.

11   **Q.**   And what would that have been based upon?

12   **A.**   Well, it would be based on several factors.  For me,

13   the first thing was when I initially got the composite and

14   the work ID.  I felt that there was similarities at that

15   time.

16   **Q.**   I'm sorry.  I am asking you about why the police would

17   have believed that all three women were assaulted by the same

18   person.  What factors led the police to believe that?

19   **A.**   Well, the suspect in a case used the name of Roger in

20   both the incidents.  He identified as being security in both

21   the incidents.  And in both incidents there was a

22   description of a weapon.  And at this point I don't remember

23   the other items, but there were similar circumstances and

24   descriptors within both incidents that would lead you to

25   believe that those incidents are related.

MOORE - DIRECT (McLandrich)                                    920

1    **Q.**   All right.  And notwithstanding that these were all

2    supposedly the same person -- and certainly B.W. and C.W. were

3    together at the time of their assault?

4    **A.**   Yes, they were.

5    **Q.**   And notwithstanding that, are their descriptions exactly

6    the same?

7    **A.**   No.

8    **Q.**   You were asked during your direct testimony about the

9    photo array.  Do you recall those questions?

10   **A.**   I know I've been asked about photo array.

11   **Q.**   All right.  And one of the questions related to the

12   background color of the various photos used.  Do you recall

13   that?

14   **A.**   Yes, sir.

15   **Q.**   All right.  And you were asked about whether you could

16   have blocked out all the background around the faces.

17   **A.**   Yes, sir.

18   **Q.**   Could you have done that?

19   **A.**   I guess I could have, but I had never, ever seen that.

20   **Q.**   And how could you have done that?

21   **A.**   I guess you would have to --

22            THE COURT:  Do you know how to do that?

23            THE WITNESS:  I don't really know how you would

24   actually end up doing that, but --

25   BY MR. McLANDRICH:

MOORE - DIRECT (McLandrich)                                   921

1   **Q.**   All right.  So at that time, there wasn't any particular

2   ability to Photoshop or things that could be done today to do

3   that?

4   **A.**   I had never seen that done.

5   **Q.**   When you made up the photo arrays, what was your focus in

6   selecting the fillers to go along with the suspect?

7   **A.**   Well, obviously, I was trying to find white

8   individuals, was trying to find male individuals.  I was

9   trying to find individuals that had brown hair, individuals

10  that had mustaches, and individuals that had similar face

11  shape.  Not exactly, but close to it.

12  **Q.**   And you were asked questions also about the types of

13  photos that were used, the different characteristics of the

14  finish of the photos?

15  **A.**   Yes, sir.

16  **Q.**   Had you ever seen other photo arrays prepared at the

17  Miami Township Police Department that had similar

18  characteristics to the array that you prepared?

19  **A.**   Yes, back then you saw that quite a bit.

20  **Q.**   And did you see any such photo arrays with those

21  characteristics prepared by Mr. Fritz?

22  **A.**   I had in the past.

23  **Q.**   Had Mr. Fritz ever provided you any training with respect

24  to how to prepare a photo array?

25  **A.**   No, he did not.

MOORE - DIRECT (McLandrich)                                        922

1    Q.   Had anyone else at the Miami Township Police Department

2    provided you any training on how to prepare a photo array?

3    A.   Not that I remember at all.

4    Q.   Did you make any changes to the photo array from

5    suspect -- I'm sorry -- from witness to witness?  In other

6    words, when you showed it to B.W. to C.W. to S.C., had you

7    made any changes to it?

8    A.   Yes, I did.

9    Q.   And what changes did you make?

10   A.   For each individual that I showed the photo lineup to,

11   for security reasons, I swapped Mr. Gillispie's photo image

12   out and placed it behind a different window, specifically

13   doing that because if I have twin girls and them being

14   related, there is a potential for them talking.  Even though

15   I have given instructions that you are not to talk about

16   this at the time, I felt that it was -- probably be in my

17   best interest and for security to swap the photo image of

18   Mr. Gillispie to a different window after it initially was

19   shown to C.W.

20           MR. McLANDRICH:  I'd like to show the witness

21   Defense Exhibit 19.  It's probably just a different copy of

22   something that's been displayed before.  It's the instruction

23   sheet for the arrays.

24           MR. KANOVITZ:  No objection, Judge.

25           THE COURT:  It may be published.

_Mary A. Schweinhagen, RDR, CRR  (937) 512-1604_

MOORE - DIRECT (McLandrich)                               923

1            (Exhibit displayed.)

2       BY MR. McLANDRICH:

3       Q.   Showing what's been marked as Defendant's Exhibit 19,

4       what is this document, please?

5       A.   This is the photographic identification general

6       guidelines.

7       Q.   And to your knowledge, are there any other policies,

8       procedures, or documents that told the police officer at Miami

9       Township Police Department in 1990 how to prepare or display a

10      photo array?

11      A.   This is the only document I know of.

12      Q.   And the top half, are those guidelines directed to the

13      officer about preparation of the array?

14      A.   They are general guidelines, yes.

15      Q.   And then the bottom half, are those the instructions for

16      the witness when you are performing the array?

17      A.   Yes, they are.  That is the photographic showup

18      instructions that are read to the witness, and they are read

19      verbatim, word for word.

20      Q.   Would you please read those instructions for the record.

21      A.   It says, "I am going to show you a group of

22      photographs.  This group of photographs may or may not

23      contain a picture of the person who committed the crime now

24      being investigated.  Keep in mind that hairstyles, beards,

25      and mustaches may be easily changed.  Also, photographs may

MOORE - DIRECT (McLandrich)                                924

1    not always depict the true complexion of a person.  It may

2    be lighter or darker than shown in the photo.  Pay no

3    attention to any markings or numbers that may appear on the

4    photos or any other differences in the type or style of the

5    photographs.  When you have looked at all the photos, tell

6    me whether or not you see the person who committed the

7    crime.  Do not tell other witnesses that you have or have

8    not identified anyone."

9    **Q.**   And in these instructions that you read to the witness,

10   does it discuss the possibility of a change in appearance by

11   the suspect between the time of the crime and the time of the

12   presentation of the array?

13   **A.**   It does talk about that.

14   **Q.**   And it makes reference to several specific items in that

15   regard, correct?

16   **A.**   Yes, it does.

17   **Q.**   And what might those be?

18   **A.**   It talks about hairstyles, styles, beards, and

19   mustaches, and then it also talks about complexion.

20   **Q.**   And, again, is this because it's possible that a suspect

21   may want to change their appearance to avoid detection?

22   **A.**   Yes, sir.

23   **Q.**   And tell me about the process that you went through with

24   each of the victims when you presented the photo array to

25   them.  What did you do?

MOORE - DIRECT (McLandrich)                                    925

1              MR. KANOVITZ:  Objection; compound.

2              MR. McLANDRICH:  I can rephrase it.

3              THE COURT:  Just deal with what you want.  If there

4    is an objection, we can deal with it separately.  Thank you.

5    BY MR. McLANDRICH:

6    Q.   Please describe your conduct when you displayed the photo

7    array to each of the victims.

8    A.   First of all, I would have them -- I would escort them

9    from the lobby of the police department, take them back to

10   the office, have them have a seat.  I would read the

11   photographic lineup instructions to the individuals, and the

12   photo lineup would be face down.  I would ask them if they

13   understood the instructions, and then I would have them

14   sign, date, and time that instruction sheet.

15        Then I would flip over the photo lineup, present it to

16   them.  They would review the photo lineup, and they would

17   make whatever comments that they were going to make at the

18   time.  Those would be documented on the fact sheet.  And

19   they would tell me whether or not they did or did not see

20   the individual that had committed the crime against them.

21   Q.   And we've heard some testimony in this case about a

22   high-confidence identification under pristine conditions.  Do

23   you recall that testimony?

24   A.   Yes.

25   Q.   Were you ever trained on such a thing by Miami Township?

MOORE - DIRECT (McLandrich)                              926

1    **A.**   I have no idea.  I mean, I know that I wasn't trained

2    on it, but during that period of time, things were very

3    different.

4    **Q.**   That was not a concept that was familiar to you at that

5    time?

6    **A.**   No.

7    **Q.**   And how about this concept of latency in the

8    identification?  Was that a concept that was known to you at

9    that time?

10   **A.**   What do you mean by "latency"?

11   **Q.**   The time lapse between the array being turned over and

12   the time that the person actually picked someone out of the

13   array, is that a concept that you were trained on by Miami

14   Township?

15   **A.**   Just to make sure, you're talking about from the time

16   it's shown to the time that it ends with them?

17   **Q.**   Yes.

18   **A.**   You are not talking about the time when the incidents

19   starts to the time later on when the photo lineup is shown?

20   **Q.**   No, sir.

21   **A.**   I was never trained on that.

22   **Q.**   Was it even a concept that was in the police dialog with

23   you at that time?

24   **A.**   No.  It's just how I did the lineups.

25   **Q.**   Do you recall when Mr. Gillispie's name first surfaced

MOORE - DIRECT (McLandrich)                                    927

1    during this investigation?

2    **A.**    When his name first came --

3    **Q.**    To your attention?

4    **A.**    -- to my attention?

5    **Q.**    Yes, sir.

6    **A.**    Would have been on April 19th of 1990.

7    **Q.**    And how do you know that's the date?

8    **A.**    Well, I had reviewed my transcript from the grand jury,

9    and in there, there was information in which at the time we

10   were able to relate it to the printouts of Mr. Gillispie.

11   **Q.**    Do you mean grand jury, or do you mean the criminal

12   trial?

13   **A.**    Well, we -- actually, it was the criminal trial.  It

14   was trial number one.

15   **Q.**    And then what did you do with that photograph or

16   photographs that were brought to you by Mr. Wolfe?

17   **A.**    Well, they had been shown to me in the office and

18   handed to me by Wolfe, and I ended up giving those back to

19   Steve Fritz, and those went into the file.

20   **Q.**    And were you the assigned investigator on the case when

21   that happened?

22   **A.**    No, I wasn't.

23   **Q.**    And how much later was it before you became the assigned

24   investigator?

25   **A.**    Well, from April 19th, I get the case given to me by

MOORE - DIRECT (McLandrich)                           928

1    Steve Fritz on June 15th of 1990.

2    **Q.**   And why was it given to you on that date?

3    **A.**   That was when Steve Fritz was leaving our department --

4    employment at our department.

5    **Q.**   And I believe we reviewed this during the portion of your

6    direct the other week.  When did Mr. Bailey leave the

7    detective section?

8    **A.**   He had left November 5th of 1989, and I came into the

9    detective section on that day.

10   **Q.**   All right.  And so by the time Mr. Wolfe had delivered

11   these IDs to you, Mr. Bailey was no longer in the department?

12   **A.**   No.  He had been out of the detective section for

13   months.

14   **Q.**   And before you became the investigator -- strike that.

15         When you started to investigate any relationship

16   Mr. Gillispie might have to the crimes, what was your next

17   step to try and determine whether, in fact, Mr. Gillispie had

18   a relationship to the crimes?

19   **A.**   Starting from what point?

20   **Q.**   So just to put it in a time frame, Mr. Fritz has left.

21   You have been given the investigation.  I think we reviewed

22   last time that you went through the various reports.  And once

23   you had done that, you started to investigate the matter.

24   **A.**   Well, I went through the -- initially, when I was given

25   the case on the 15th, I just placed it in my drawer and did

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - DIRECT (McLandrich)                               929

1    nothing with it.  And that was because I had other cases

2    going.

3         On June 18th, I pulled a file from my drawer, and I go

4    through the file and review the file as to what documents

5    are in that file.

6    **Q.**   Yes.  And once you had done that and now you are starting

7    to try to ascertain whether or not Mr. Gillispie is, in fact,

8    a legitimate suspect or perhaps the perpetrator, what actions

9    did you take?  How did you go about that?

10   **A.**   Well, once I reviewed the report, you know, initially,

11   I had been given a composite and the GM work ID card.  I

12   felt that there was a similarity between the image of

13   Mr. Gillispie and that composite.

14   **Q.**   Did you call Mr. Gillispie?

15   **A.**   Not at that point.

16   **Q.**   Did there come a time when you tried to call

17   Mr. Gillispie?

18   **A.**   Yes.

19   **Q.**   And were you able to initially reach him?

20   **A.**   Well, my initial -- on the initial call, and I believe

21   that was on June 19th of 1990, I initially talked with his

22   sister.  And then seven minutes later, I got a telephone

23   call back from Mr. Gillispie.

24   **Q.**   And what did you discuss with Mr. Gillispie during that

25   call?

1   **A.**   At that point, I was trying to set up a meeting with

2   him to have him come out to the police department.

3   **Q.**   And were you successful during that call?

4   **A.**   No.

5   **Q.**   And what did he tell you in response to your request to

6   set up a call?

7   **A.**   Well, initially, we got it narrowed down to where I was

8   trying to get him within a three-day span, and then it ended

9   up going to, well, I'm going to be busy for the next two

10  weeks, and eventually ends up hanging up on me.

11  **Q.**   All right.  What was the next investigative action that

12  you took with respect to trying to confirm or refute his

13  status as a suspect?

14      Did you try to ascertain where Mr. Gillispie was on the

15  dates of the offense?

16  **A.**   Yes, I did.

17  **Q.**   And how did you go about that?

18  **A.**   Well, I at one point ended up requesting work

19  schedules.  Now, I had been told initially that

20  Mr. Gillispie had not worked on August 20th or August 21st.

21  So I knew that he had not worked during that period of time.

22  **Q.**   What did you find out about August 5th?

23  **A.**   Later on, I will find out on August 5th that -- and I

24  believe that was after -- sometime after August, late August

25  that he did not work on the 5th.

1    **Q.**   And I believe we talked about this in your direct

2    previously.  Did you have any DNA evidence?

3    **A.**   There was no DNA evidence.

4    **Q.**   Did you have any useful fingerprint evidence?

5    **A.**   There was no latent prints on the sunglasses and/or

6    photograph.

7    **Q.**   And so as I think we heard Mr. Lieberman testify, this

8    was going to be an eyewitness identification case?

9    **A.**   That was known right from the very beginning, yes.

10   **Q.**   What actions did you take with respect to the GM

11   identification photograph relative to a photo array?

12   **A.**   I believe that it was on June 21st I forwarded the GM

13   work ID card to the Miami Valley Regional Crime Lab, and I

14   made a request that they make me photos from that work ID.

15          MR. McLANDRICH:  I'd like to show the witness

16   Defendant's Exhibit 32.

17          MR. KANOVITZ:  No objection, Judge.

18          THE COURT:  It may be.

19       (Exhibit displayed.)

20          MR. HERMAN:  No objection.

21   BY MR. McLANDRICH:

22   **Q.**   Detective Moore, what is this document?

23          MR. McLANDRICH:  Can you enlarge it slightly, Jeff.

24          THE WITNESS:  This is the front -- this is the front

25   of the page for a request to have a photo made from the work

MOORE - DIRECT (McLandrich)                          932

1   ID that had been sent to Miami Valley Regional Crime

2   Laboratory, filled out by me, and it's a standard document

3   used at Miami Township.

4            MR. McLANDRICH:  And would you go to the next page,

5   please.

6        (Exhibit displayed.)

7   BY MR. McLANDRICH:

8   Q.   And then this is what, sir?

9   A.   This here would be the back of that page, listing the

10  evidence, which was the GM security ID card.

11  Q.   Okay.  And the top is for what purpose, sir?

12  A.   To give a basic narrative of what I need it for.  Or

13  the incident at hand.

14  Q.   Sure.  And did you receive then a photograph back from

15  the crime lab?

16  A.   I did receive photograph back from the crime lab.

17  Q.   And was it suitable?

18  A.   No, it wasn't.

19            MR. McLANDRICH:  I'd like to show Defendant's

20  Exhibit 33, please.

21            THE COURT:  Has that been shown before?

22            MR. KANOVITZ:  I don't believe it's been shown, but

23  no objection.

24            THE COURT:  Counsel, any objection?

25            MR. HERMAN:  No.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - DIRECT (McLandrich)                           933

```
1              THE COURT:  All right.
2    BY MR. McLANDRICH:
3    Q.   And what is this document, sir?
4    A.   This is another Miami Valley Regional Crime Lab report
5    that -- or request form that I filled out.
6    Q.   And why was this request form filled out?
7    A.   This was filled out because I needed a smaller version
8    of the photo that they had originally made and sent to me,
9    and I needed that smaller version to be used in a photo
10   lineup.
11   Q.   Did you tell the crime lab how big or small to make the
12   head of Mr. Gillispie?
13   A.   Yes, I did.
14   Q.   And what did you ask in that regard?
15   A.   It says, "I need a smaller version of this suspect's
16   head.  The picture you sent back last will not fit in a
17   photo lineup" - I believe that's "folder."
18              MR. McLANDRICH:  And let's go to the second page,
19   please.
20        (Exhibit displayed.)
21              THE WITNESS:  This is the reverse side of that page.
22              MR. McLANDRICH:  Could you make it a little bit
23   bigger, Jeff.
24   BY MR. McLANDRICH:
25   Q.   Did you return the original to them?  That they had sent
```

MOORE - DIRECT (McLandrich)                                    934

1   you the first time?

2   A.   Yes, sir.

3   Q.   And --

4   A.   I also sent the negatives.

5   Q.   And the request then was for what, sir?

6   A.   I was requesting a smaller version of the picture.

7   Q.   And then --

8        MR. McLANDRICH:  Scroll down if you would, Jeff.

9   BY MR. McLANDRICH:

10  Q.   What is the -- what is the purpose of that box on the

11  page?

12  A.   I had drawn a sample square.  I had used the photo

13  lineup plastic case, and I drew a square on it to show them

14  the in-general size of what I was needing a photo to fit in.

15  Q.   All right.  And the photo that you got back was -- was

16  that the one you ended up using in the array?

17  A.   Yes, sir.

18       MR. McLANDRICH:  I'd like to go back to Defendant's

19  18, please.

20       Let's go to the second page, please.

21       (Exhibit displayed.)

22       MR. McLANDRICH:  I'm sorry.  Let's go to the first

23  page for a moment, please.

24       (Exhibit displayed.)

25  BY MR. McLANDRICH:

MOORE - DIRECT (McLandrich)                              935

1    **Q.**   So on the first page, which of the victims was this array

2    with respect to?

3    **A.**   On 7-16, I believe that was Connie -- or C.W.

4            MR. McLANDRICH:  Going to the next page, please.

5            (Exhibit displayed.)

6    BY MR. McLANDRICH:

7    **Q.**   And then describe how this sheet was utilized during the

8    presentation of the photo array.

9    **A.**   Well, this actually is a photo lineup fact sheet.  This

10   is just where I identify the individuals that are going to

11   be placed behind the window by number.  And then it has a

12   place for the photo number in which the witness identifies.

13   And then it has remarks in which the witness would have made

14   at the time of showing.

15   **Q.**   Is the top portion filled out ahead of time?

16   **A.**   Yes, it is.

17   **Q.**   And then the bottom portion is utilized during the

18   presentation itself?

19   **A.**   Yes.

20   **Q.**   And so I believe you had previously testified on cross

21   that after you read the instructions which we reviewed from

22   the first page of Exhibit 18, you then turned over the photo

23   array, correct?

24   **A.**   Correct.

25   **Q.**   All right.  And then tell me what would have -- what

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - DIRECT (McLandrich)                               936

1   occurred from there relative to this document.

2   **A.**   Well, the individual would review it, make a photo

3   selection.  I would write down that photo selection that

4   they identified and then anything that they said at that

5   time.

6   **Q.**   And did C.W., in fact, do what you have just described?

7   **A.**   Yes.

8   **Q.**   Okay.  And then did you then record onto this document

9   those events?

10  **A.**   Well, I did, but I'm thinking that the fact sheet here,

11  it may be for one of the other girls.  I'm not sure.  'Cause

12  this has photo selected, Number 2.

13  **Q.**   Do you think it got switched with B.W.?

14  **A.**   Yes, I think so.  'Cause I -- I mean, without seeing my

15  report, but I believe that 6 was C.W., 2 was B.W., and 5 was

16  S.C.

17  **Q.**   I'm looking at your report, and it looks like C.W. picks

18  Number 2.

19  **A.**   Okay.  Then that is C.W.'s.

20  **Q.**   And, now, with respect to C.W., would you read under

21  "Remarks" what you have written there?

22  **A.**   It says, "Number 2.  That's him.  His face is full.

23  The hair looks the same.  His build is about right.  I'm

24  about 90 percent sure.  He looks better than the composite

25  you guys put out.  It's him."

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - DIRECT (McLandrich)                                937

1    **Q.**    Had you previously said something to C.W. about a hundred

2    percent before she made her selection?

3    **A.**    Yes, I had.

4    **Q.**    Tell us about that.

5    **A.**    I don't remember all of the exact words, but I know

6    that I told her prior to showing the photo lineup that I

7    needed her to be 100 percent sure, which at that time,

8    hindsight, that was a mistake.  And that was a mistake

9    because now I've put pressure on her --

10           THE COURT:  Counsel, I think the question has been

11   answered.

12   BY MR. McLANDRICH:

13   **Q.**    And did she have a reaction to you telling her she had to

14   be a hundred percent certain?

15   **A.**    Well, she was identifying with an image, and I could

16   see that by her tracking with her eyes on that image.  I

17   think that this did put pressure on her at that time, undue

18   pressure, and she did end up making an identification.

19   **Q.**    All right.  And when she made the identification, did she

20   make the remarks that you recorded on this fact sheet?

21   **A.**    Yes, sir.

22   **Q.**    And did you, in fact, record in your report this issue of

23   telling her about being a hundred percent sure?

24   **A.**    Yes, sir.

25   **Q.**    So you weren't trying to conceal that from anyone?

MOORE - DIRECT (McLandrich)                          938

1   A.    Absolutely not.

2   Q.    And, likewise, recorded the statements that are reflected

3   on this sheet?

4   A.    Yes, sir.

5   Q.    And did you put those statements into your report as

6   well?

7   A.    I believe so.

8   Q.    Did you perform a similar procedure with B.W.?

9   A.    Yes, I did.

10          MR. McLANDRICH:  Can we have DX19.

11          THE COURT:  That's been previously published?

12          MR. McLANDRICH:  I think it may well have been.  I

13   mean, their version.

14       Let me just show it to him real quick.  I apologize, Your

15   Honor.

16          MR. KANOVITZ:  No objection.

17          THE COURT:  Counsel, have you seen it?

18          MR. HERMAN:  No objection.

19          THE COURT:  It can be published.

20       (Exhibit displayed.)

21   BY MR. McLANDRICH:

22   Q.    Showing you what's been marked as Defendant's Exhibit 19,

23   is this the document, the copy of the instructions with

24   respect to B.W.?

25   A.    Yes, it is.

MOORE - DIRECT (McLandrich)                                     939

1   **Q.**   And what's the date on this document?

2   **A.**   July 17, 1990.

3   **Q.**   And what's the timing of that in relation to B.W.?  From

4   date.

5   **A.**   Oh, from C.W. to B.W.?

6   **Q.**   Yes, sir.

7   **A.**   C.W. I saw on the 16th of July, and B.W. would have

8   been on the 17th of July, the day.

9   **Q.**   And why is it that they weren't done at the same time on

10  the same day?

11  **A.**   I don't remember exactly.  I think it had something to

12  do with work for one of the girls, or for B.C. [sic].

13  **Q.**   Now, when someone's asked to come down and view a photo

14  array, do they know why they are coming down?

15  **A.**   Well, they would know that they are coming to look at

16  some pictures.

17  **Q.**   And do they know what the purpose of looking at pictures

18  is?

19  **A.**   I would have to say that most likely, yes.

20  **Q.**   Is it your -- well, let me ask it this way:  Do you know

21  whether B.W. and C.W. looked at any books of photographs prior

22  to your involvement with the investigation?

23  **A.**   I don't know that, no.

24         MR. McLANDRICH:  All right.  Let's go to the second

25  page, please.

MOORE - DIRECT (McLandrich)                                940

1          (Exhibit displayed.)

2    BY MR. McLANDRICH:

3    Q.   Is this the fact sheet for B.W.?

4    A.   Yes, it is.

5    Q.   And did she, in fact, make this selection?

6    A.   Yes, sir, she did, Number 6.

7    Q.   And that's in contrast to the Number 2 that C.W.

8    selected?

9    A.   Yes, it is.

10   Q.   But those are both photographs of Mr. Gillispie?

11   A.   Yes, they are.

12   Q.   And what did you record under "Remarks"?

13   A.   "It's him, Number 6."

14   Q.   And is that what she told you on that date?

15   A.   Yes, sir.

16   Q.   Subsequent to these identifications, were you able to

17   arrange an interview with Mr. Gillispie?

18   A.   I believe that he ended up coming in on August 8, 1990.

19   Q.   And that's when you had the dialog with him that we

20   discussed earlier, where you asked him the various questions

21   about smoking and so forth and so on?

22   A.   Yes, sir.

23   Q.   And then subsequent to that interview, did you have an

24   occasion to present an array to S.C.?

25   A.   Yes, I did.

MOORE - DIRECT (McLandrich)                    941

```
 1              MR. McLANDRICH:  I'd like to show Defendant's 22.

 2   It's just the S.C. version of the same documents.

 3              MR. KANOVITZ:  No objection.

 4              MR. HERMAN:  No objection.

 5              THE COURT:  It may be.

 6         (Exhibit displayed.)

 7   BY MR. McLANDRICH:

 8   Q.   Showing Defendant's Exhibit 22, this is another copy of

 9   the instructions, but this one for S.C.?

10   A.   Yes, sir.

11   Q.   And the date on this document?

12   A.   Is 8-28 of 1990.

13   Q.   And would you have read the same instructions that are at

14   the bottom?

15   A.   Yes, sir, I would have, verbatim.

16              MR. McLANDRICH:  Turning to the next page, please.

17         (Exhibit displayed.)

18   BY MR. McLANDRICH:

19   Q.   This fact sheet relates to S.C.?

20   A.   Yes, it does.

21   Q.   And did she make a photo selection?

22   A.   Yes, she did.

23              THE COURT:  Can counsel approach, please.

24         (At sidebar off the record.)

25              THE COURT:  Ladies and gentlemen, we're going to
```

MOORE - DIRECT (McLandrich)                                     942

```
 1    take a break.  Let's maybe about a ten-minute break, but ten
 2    to fifteen minutes, and then we will get back on the record.
 3    Please remember the Court's admonitions.  Thank you.
 4              THE COURTROOM DEPUTY:  All rise.  This court stands
 5    in recess.
 6         (Jury out at 2:23 p.m.)
 7         (Recess at 2:23 p.m.)
 8         (Jury in at 2:39 p.m.)
 9         (In open court at 2:39 p.m.)
10         THE COURT:  We are back on the record.
11    Counsel ready to proceed?
12              MR. McLANDRICH:  Yes, sir, Your Honor.
13         THE COURT:  You may inquire.
14              MR. McLANDRICH:  If I could have the document
15    viewer, please.  It's the same document, just a different
16    copy.
17              THE COURT:  All right.
18         (Exhibit displayed.)
19    BY MR. McLANDRICH:
20    Q.    Detective, this is page 2 of the exhibit we were looking
21    at previously, and this has the "Remarks" section.  Would you
22    just tell us what S.C. put in the "Remarks" section, please.
23    A.    I wrote this as she was saying this.  "I'm looking at
24    this one, pointing at Number 5, but the hair was lighter.
25    The face is right.  I need light.  Can I go outside and look
```

MOORE - DIRECT (McLandrich)                                      943

1   at this?  Do you have any other photographs of him?  It's

2   Number 5.  Yeah, it's Number 5.  I never thought I would see

3   him again.  I will testify if needed."

4   **Q.**   And so some of those comments sounds like they were made

5   inside and some of them sound like they were made outside; is

6   that correct?

7   **A.**   That would be correct.

8   **Q.**   And which portion is which?

9   **A.**   Well, when she says, "I'm looking at this one, pointing

10  at Number 5, but the hair was lighter and the face is

11  right," and that's -- at that point is then when she asked

12  to go outside, and we did go outside.

13  **Q.**   And so the comments about needing lighting, going

14  outside, that would have also been inside?

15  **A.**   Well, it says, "I need light.  Can I go outside and

16  look at this?"  So, yes.

17  **Q.**   And then is the remainder inside or outside?

18  **A.**   Outside, on the front porch.

19  **Q.**   Thank you.  Now, I'd like to ask you about the alibis

20  that Mr. Gillispie described to you.  Do you recall asking

21  Mr. Gillispie whether he had any alibis?

22  **A.**   I know that I had asked that.

23  **Q.**   And do you recall what he told you in that regard?

24  **A.**   Independently, no.  I know that there was a statement

25  about being at the campgrounds for 32 straight weekends in a

MOORE - DIRECT (McLandrich)                                    944

1     row.

2     Q.   And did you try to investigate whether Mr. Gillispie was,

3     in fact, at the campground on the dates in question?

4     A.   I did.  I would need to do so in order to either prove

5     or disprove that alibi.

6     Q.   And what did you do in an effort to either prove or

7     disprove that alibi?

8     A.   I made contact with the Twin Knobs campground, talked

9     with a lady by the name of Laura.

10    Q.   And after you talked to Laura, what did you learn?

11    A.   That she informed me that they only keep records for 30

12    days, and then everything is sent to Winchester, Kentucky.

13    And that I should contact a gentleman by the name of Bob --

14    Bob Strossnyder.

15    Q.   And did you contact that person?

16    A.   I did contact him.

17    Q.   And what did you learn from him?

18    A.   That he did not have records for 1988, and he told me

19    to contact Fred Mariott.

20    Q.   And how did you contact Mr. Mariott?

21    A.   With a telephone number provided by Bob Strossnyder.

22    Q.   And what did you discuss with Mr. Mariott?

23    A.   I told him that I needed to check to see if he could

24    check receipts for the names of Roger Gillispie and Jerry

25    Fyffe to see if he could locate campground receipts or

MOORE - DIRECT (McLandrich)                                         945

1    cards, I believe for the months -- month of August.

2    **Q.**    And did you receive any?

3    **A.**    I did receive some cards, yes.

4    **Q.**    How did you receive them?

5    **A.**    I received those cards through the mail.

6    **Q.**    And did you preserve those cards?

7    **A.**    Yes, I did.

8    **Q.**    Did you also preserve the envelope they came in?

9    **A.**    Yes, I did.

10   **Q.**    Did you supply all that to Mr. Folfas?

11   **A.**    I provided that to both prosecution and defense in the

12   form of copies of those, and it was placed in their files.

13   **Q.**    Did you ever go to Kentucky in person to look for

14   campground receipts.

15   **A.**    I have never been to Kentucky to Cave Lake or to Twin

16   Knobs campgrounds.

17           MR. McLANDRICH:  I'd like to show Defendant's 28,

18   which are the police reports.

19           THE COURT:  Have those been published?

20           MR. McLANDRICH:  I don't think they have, but we

21   discussed those.

22           MR. KANOVITZ:  What are those?

23           MR. McLANDRICH:  The supplements, his supplements.

24           MR. KANOVITZ:  No objection.

25           MR. HERMAN:  No objection.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - DIRECT (McLandrich)                              946

1              THE COURT:  They may be.

2              MR. McLANDRICH:  It may have been published last

3     week, but my memory is weak.

4         (Exhibit displayed.)

5     BY MR. McLANDRICH:

6     Q.   I want to move through some of this fairly quickly to get

7     to the part that I'm particularly interested in, but since we

8     have it up.

9         So on 6-18, briefly, would you tell me what the purpose

10    of that entry is?

11    A.   This is placing a header onto the start of my

12    investigative supplementary report or investigation.  It

13    also lists the start of or the synopsis of the facts of the

14    case from documents that had previously been provided from

15    Detective Fritz and Bailey's reports.

16    Q.   Would you just read the first paragraph into the record,

17    please.

18    A.   "On 6-18-90, Monday, I, Detective M.S. Moore, was

19    assigned a rape, abduction, ag robbery case involving twin

20    sisters, being C.W. and B.W.  The reason for this case being

21    assigned to this detective was due to Detective-Sergeant

22    Fritz discontinuing his employment with Miami Township

23    Police Department.  Due to new information received in this

24    case, I will be continuing the investigation.  For past

25    details involving this case, see older report forms.  The

1    case printed on this computer printout will be starting with

2    Detective M.S. Moore's investigation only, starting where

3    Detective-Sergeant Fritz and Detective G. Bailey left off."

4    **Q.**   Now, with respect to that paragraph, what's the -- what's

5    the new information that's causing you to continue work on the

6    file?

7    **A.**   The new information was the -- information had been

8    brought forth concerning Roger Gillispie.

9    **Q.**   And when you refer to the older report forms, what were

10   the forms of the older reports as opposed to what you are

11   doing here?

12   **A.**   Well, the old report forms became antiquated, and they

13   had installed a new computer system within the police

14   department to where we now could enter reports on the

15   computer.

16   **Q.**   And were the old forms on a separate computer system or

17   were they hard copy?

18   **A.**   They were hard copy, paper form, in cabinets.

19   **Q.**   And as you've already testified, you got what you thought

20   was the complete file; yes?

21   **A.**   Yes, sir.

22   **Q.**   Skipping through your synopsis, then at the bottom of the

23   third page, the entry of 6-19-90, just generally, what's that

24   entry about?  It's the bottom of the second page.

25   **A.**   Okay.  So --

MOORE - DIRECT (McLandrich)                              948

1           MR. McLANDRICH:  And you are going to have to give

2    him the third page, as well, for it to mean anything.

3           (Exhibit displayed).

4           THE WITNESS:  Which part are you asking about here?

5    BY MR. McLANDRICH:

6    Q.   I'm asking about the entry on 6-19-90.  What step were

7    you taking in your investigation at that point?

8    A.   At that -- at that point, I'm trying to get hold of

9    Roger Gillispie to have him come to the police department.

10   Q.   All right.  And that first call, is that the one where

11   you speak to the sister?

12   A.   Yes, it is.

13   Q.   All right.  And then you have a second entry on 6-19.

14   What's the basic substance of that?

15          MR. McLANDRICH:  Why don't you make that a little

16   bit bigger so he can read it, Jeff.

17   BY MR. McLANDRICH:

18   Q.   Go ahead, sir.

19   A.   It's a second call that I received seven minutes later,

20   after talking with the sister, from Roger Gillispie, and it

21   was us trying to get together on a meeting to have him come

22   to the police department.  And --

23   Q.   I -- go ahead.

24   A.   Go ahead.

25   Q.   This is the one basically where he tells you, "I'm busy.

MOORE - DIRECT (McLandrich)                          949

1    Maybe in a couple weeks," and the phone call's discontinued

2    cause he hangs up?

3    **A.**    Yes, sir.

4    **Q.**    Let's go to the bottom of that page, the entry on 6-21.

5    That's your initial effort to get a larger copy of the ID

6    badge?

7    **A.**    Yes, it is.

8    **Q.**    Let's progress to the next entry on 7-7.  Here you end up

9    speaking with Mrs. Gillispie, his mother?

10   **A.**    Yes, I did.

11   **Q.**    And what, just -- what kind of -- what were you trying to

12   obtain there?  What was the effort being made there?

13   **A.**    Well, I was trying to make contact with Roger Gillispie

14   to have him come out to the police department, since our

15   other call just didn't go quite well.

16   **Q.**    And then moving ahead to 7-16, what is this segment of

17   your report describing?

18   **A.**    This would describe the circumstances in which I showed

19   the photo lineup to C.W.

20   **Q.**    And does it contain the dialog we had earlier about the a

21   hundred percent and then the 90 percent?

22   **A.**    Yes, it does.

23   **Q.**    Then the 7-17 entry, does that relate to Bonnie?  I'm

24   sorry -- B.W.?

25   **A.**    It does relate to B.W.

**Q.** And what happens in the next entry on 8-8?
**A.** This is when Roger Gillispie came to the police department, only after he had spoken with an attorney now.
**Q.** And this is the -- this is the portion of the investigation where you have the interview where you asked him the various questions about smoking or drinking beer or family problems and so forth?
**A.** Yes, it is.
**Q.** The entry on 8-27-90, does this relate to the photo array with S.C.?
**A.** This was my call to her to set up a meeting.
**Q.** All right. And you are telling her what in this dialog?
**A.** Do you want me to read the paragraphs?
**Q.** No. Just read it to yourself, and then give us the substance.
**A.** Okay.
**Q.** And what was the purpose of this entry?
**A.** Well, this entry was to detail the fact that I had called her, was trying to set a meeting with her. I also knew at that time that back when the incident occurred she had been under a lot of stress. There had been some difficulties between her and her husband. And I asked her if she'd be willing to look over a photo lineup, and she agreed to do so.
**Q.** Notwithstanding the marital problems she was having?

MOORE - DIRECT (McLandrich)                           951

1    A.   Yes.  But at that point, we're dealing in -- she had

2    time to -- for everything to get worked out.

3    Q.   And did she express any confidence in her ability that

4    she would recognize the suspect?

5    A.   Yes, she did.  Do you want me to expand on that?

6              THE COURT:  No.  I think you've answered the

7    question.

8              THE WITNESS:  Okay.

9    BY MR. McLANDRICH:

10   Q.   And then the next entry on 8-28, is that where you

11   actually presented the array to her?

12   A.   Yes, sir, it is.

13   Q.   And it reflects the dialog we've already discussed about

14   that?

15   A.   Yes, sir, it does.

16   Q.   What else happened on the 28th?  The bottom of the page,

17   please.

18   A.   After meeting with S.C., I then go back to the police

19   department and I contacted Rick Wolfe.

20   Q.   And what was the purpose for that?

21   A.   Was to verify as to whether or not Roger Gillispie was

22   working at GM.

23   Q.   On which date?

24   A.   On August 5th of 1988.

25   Q.   Had you already confirmed whether he was working on

MOORE - DIRECT (McLandrich)                                952

1    August 20th?

2    **A.**    Yes, that information had been provided by Rick Wolfe

3    earlier.

4    **Q.**    All right.  Did there come a time where you went to the

5    prosecutor's office to review the findings of your

6    investigation?

7    **A.**    Yes.

8    **Q.**    And what did you take with you when you went to review

9    that with them?

10   **A.**    The case files.

11   **Q.**    And did you take the entire case file?

12   **A.**    I had made copies for both prosecution and for defense

13   of everything that I had on the case.

14   **Q.**    And that was in anticipation that charges might, in fact,

15   be approved or authorized by the prosecutor's office?

16   **A.**    Yes, sir.

17   **Q.**    And who did you meet with on that occasion?

18   **A.**    I met with Linda Holland, who was an assistant

19   Montgomery County prosecutor.

20   **Q.**    And would it have included, among other things, the

21   reports that we have reviewed together today?

22   **A.**    It would have reviewed -- it would have been everything

23   that I had.

24   **Q.**    Right.  I understand everything.  But part of everything

25   would have been some of the reports we're reading as we speak?

MOORE - DIRECT (McLandrich)                                953

1    A.    That's correct.

2    Q.    All right.

3    A.    Yes.

4    Q.    Plus the documents that we reviewed last week with you?

5    A.    Correct.

6    Q.    And yet others.  I understand.  All right.

7          And did Ms. Holland review those materials?

8    A.    Yes, she did.

9    Q.    And did she have discussion with you about those

10   materials?

11   A.    We talked about the case, and we talked about the

12   identifications.

13   Q.    And what decision, if any, did she make?

14   A.    That a warrant would be issued on only one charge

15   concerning Bonnie Wise for rape, and that the rest of the

16   charges would go direct to the Montgomery County Grand Jury.

17   And she added some things to the felony filing sheet.

18   Q.    And as a result of her approving that charge, was a

19   criminal complaint then prepared?

20   A.    Yes, it was.

21   Q.    And that resulted in the arrest of Mr. Gillispie?

22   A.    Eventually, yes.

23   Q.    And turning to the entry of 9-1-90, did there come a time

24   where you obtained a search warrant?

25   A.    Yes, there did.  But on 9-1 is when I actually drove

MOORE - DIRECT (McLandrich)                                    954

1    out to his residence to get a description of the residence

2    to be placed into the body of the search warrant.  It's one

3    of the things that you need.

4    Q.   All right.  And did you have a conversation with

5    Mr. Gillispie on 9-1?

6    A.   I believe it was after I got back to the police

7    department after getting the description, there was a

8    telephone call.

9    Q.   Okay.  And that telephone call, was that Mr. Gillispie?

10   A.   The telephone call was made to Roger Gillispie.

11   Q.   All right.  And tell me about the discussion that you had

12   with Mr. Gillispie during that telephone call.

13   A.   Well, it basically had to do with I was trying to find

14   something that could either be used to prove or disprove his

15   whereabouts at the time.  And in this particular case, I was

16   trying to find out if he had any checkings account, savings

17   accounts, any receipts, anything that would show where he

18   may have been on August 5th or August 20th that would have

19   assisted me in my investigation.

20        We talked about a Visa card, which he had actually

21   obtained in 1989, which, therefore, would not have been of

22   any use at that time because that is actually after the fact

23   of when the incidents occurred in 1988.  And he told me that

24   he did not have any checkings or savings accounts in 1988.

25   Q.   And did you tell him the reason that you wanted this

MOORE - DIRECT (McLandrich)                                    955

1    information?

2    A.    Yes, I did.

3    Q.    And what was that reason?

4    A.    That I needed to either prove or disprove his innocence

5    here.

6    Q.    And did the issue of Cave Run Lake in Morehead, Kentucky,

7    come up as a part of that discussion?

8    A.    Yes, it did.

9    Q.    And tell me about that, please.

10   A.    This is where he ends up stating to me that he was at

11   Twin Knobs campgrounds, and that he had been down there for

12   32 straight weekends in a row.

13   Q.    And did he tell you anything about Mr. Fyffe at that

14   time?

15   A.    I believe that it was just that he would go down there

16   with him.  He did provide me with a telephone number for the

17   campgrounds.

18   Q.    And is that the number you reached out to to try and find

19   campground receipts?

20   A.    Yes.

21          MR. McLANDRICH:  Scroll down a little more Jeff,

22   please.

23   BY MR. McLANDRICH:

24   Q.    And, in fact, you then record that initial effort to

25   reach out to Twin Knobs?

MOORE - DIRECT (McLandrich)                    956

1    **A.**   Yes, I did.  And at that time, I talked to a female by

2    the name of Laura.

3    **Q.**   Let's go to the entry of 9-4, please.  And what does that

4    relate to, sir?

5             MR. McLANDRICH:  Blow it up a little, Jeff, please.

6    BY MR. McLANDRICH:

7    **Q.**   Is this what you described earlier in terms of your

8    ongoing efforts to obtain the campground receipts?

9    **A.**   Yes, sir, it is.  Based on my conversation with Laura,

10   she told me to contact Bob Strossnyder.

11            MR. McLANDRICH:  Next entry, please.

12        (Exhibit displayed.)

13   BY MR. McLANDRICH:

14   **Q.**   Next entry relates to the search warrant and the

15   execution of the search warrant; is that true?

16   **A.**   That would have been on September 5th.

17   **Q.**   And during that search of the home, is it true that you

18   did not obtain any evidence that implicated Mr. Gillispie's

19   guilt?

20   **A.**   I did not obtain any -- yes, that's correct.

21   **Q.**   And you accurately recorded that fact, did you not?

22   **A.**   There was an inventory and receipt made up, which is

23   part of a search warrant.

24            MR. McLANDRICH:  9-6, please.

25        (Exhibit displayed.)

MOORE - DIRECT (McLandrich)                                   957

1    BY MR. McLANDRICH:

2    **Q.**   What is 9-6 about, sir?

3    **A.**   This is where I receive a call back from Fred Mariott

4    from down in Kentucky, and he tells me that he did not find

5    anything for August and that he did find campground

6    receipts, I believe it was for May, June, and July.

7    **Q.**   And those are the receipts that were mailed to you?

8    **A.**   Yes, sir.

9            MR. McLANDRICH:   That's all for this document.

10   Thank you.

11   BY MR. McLANDRICH:

12   **Q.**   Detective Moore, have you ever had an occasion where an

13   eyewitness identification turned out to be inaccurate?

14   **A.**   Yes, I have.

15   **Q.**   Please tell us about that.

16   **A.**   I had a bank robbery case.  I had put together a photo

17   lineup.  The teller identified the wrong individual, and I

18   ended up proving that through the use of finding out that he

19   was down in Cincinnati, Ohio, at the time when this bank

20   robbery had occurred locally.  And I actually recovered

21   videotape to show that he was actually in that bank when the

22   robbery was taking place here, so I knew that photo

23   identification was no good.

24   **Q.**   And you knew to look there because the individual had

25   told you to look there?

MOORE - DIRECT (McLandrich)                                    958

1    **A.**    That's correct.

2    **Q.**    And then I assume that individual was not prosecuted?

3    **A.**    That's correct.

4    **Q.**    At all times with respect to your investigation

5    concerning Mr. Gillispie, did you make your best efforts to

6    create truthful, accurate documents?

7    **A.**    Yes, sir.

8    **Q.**    At any time with respect to your investigation of

9    Mr. Gillispie, did you do anything to suppress, destroy, or

10   otherwise not produce to the prosecutor and the defense

11   attorney documents you felt would be helpful to Mr. Gillispie?

12   **A.**    I would never do that.

13   **Q.**    And that includes the preparation and presentation of the

14   photo arrays, correct?

15   **A.**    Yes.

16   **Q.**    Did any of the suspect -- I'm sorry.  Did any of the

17   victims ever say anything to you about tattoos?

18   **A.**    Not that I remember.

19   **Q.**    If they had, would you have recorded that into your

20   reports?

21   **A.**    I would have.

22   **Q.**    And is that true if it would have helped to identify the

23   perpetrator?

24   **A.**    It could.

25   **Q.**    And when you -- did you personally book Mr. Gillispie

MOORE - DIRECT (McLandrich)                                        959

1    after his arrest?

2    **A.**    I had another officer do it.  I was there, in and out.

3    **Q.**    Would it be normal during a booking to try and inventory

4    any unique aspects of an individual?

5    **A.**    Yes, there are sections on the print cards in which you

6    try to identify tattoos and/or scars or marks.

7    **Q.**    Other than that reference to tattoos, any other reference

8    that came to your ears?  From the victims, I mean.

9    **A.**    No.

10   **Q.**    If you had convinced yourself that Mr. Gillispie was

11   innocent, would you have continued to make any effort to

12   prosecute him?

13   **A.**    Absolutely not.

14   **Q.**    Were you ever able to establish as a factual matter

15   Mr. Gillispie's innocence?

16   **A.**    Was I able to establish his innocence?

17   **Q.**    Yes, sir.

18   **A.**    No.

19   **Q.**    And to the contrary, the evidence you had suggested that

20   he was or could be the perpetrator?

21   **A.**    Based on the identifications that I had, yes.

22   **Q.**    And at that point, the matter's out of a policeman's

23   hands; no?

24   **A.**    Once I get the filing, it's now in the prosecutor's

25   hands.

MOORE - DIRECT (McLandrich)                           960

1              MR. McLANDRICH:  Let's bring up just for the witness

2    at this point Plaintiff's 119.

3              THE COURT:  Has this been --

4              MR. McLANDRICH:  He wants me to lay a foundation

5    before it's displayed to the jury.  So I will do so.

6    BY MR. McLANDRICH:

7    Q.   Detective, can you see Plaintiff's 119?  It's not up yet.

8              THE COURT:  We're not putting it up.

9              MR. McLANDRICH:  We are just going to show him, got

10   it.  Thank you.

11             THE WITNESS:  This is a photo lineup.

12   BY MR. McLANDRICH:

13   Q.   And does that particular photo lineup have any exhibit

14   stickers on it?

15   A.   It has State's Exhibit 1 and State's Exhibit 26.

16   Q.   And have you seen that photo lineup before?

17   A.   Yes.

18   Q.   Is that the photo lineup that you prepared?

19   A.   Yes.

20   Q.   Is it a fair representation of the lineup that was

21   presented to the various victims, recognizing that the

22   sequence of the photos was changed with each victim?

23   A.   From what I remember, yes.

24             MR. McLANDRICH:  Any objection?

25             MR. KANOVITZ:  Yes, I will object to foundation.

MOORE - DIRECT (McLandrich)                    961

1              THE COURT:  Counsel approach.

2          (At sidebar.)

3              THE COURT:  Your objection?

4              MR. KANOVITZ:  My objection --

5              THE COURT:  Your name first.

6              MR. KANOVITZ:  Mike Kavovitz for the plaintiff.

7      Here's what he wants to show, okay (indicating).  This is a

8      picture of him.  That's on the other side.  So that's

9      basically like a booking photo; you can see both front and

10     side.  The only foundation that he's laid that this was, in

11     fact, shown is that it says State's Exhibit 1, State's Exhibit

12     26.  Well, so does the one that's been used.  And the fact of

13     the matter is that what happened here is these can slide

14     around and, in fact, this was all newly constructed.  So this

15     is not the actual thing that he showed.

16             MR. McLANDRICH:  How do we know that this one is the

17     actual thing you showed and not this one and this isn't the

18     reconstructed (indicating)?

19             MR. KANOVITZ:  First of all, he's already endorsed

20     that on direct.  And, secondly, I mean, there can't be a

21     foundation that this is it if they both have the exact same

22     basis for the foundation.

23             THE COURT:  So are you saying these are the same

24     photo lineups?

25             MR. KANOVITZ:  So basically what happened at the

MOORE - DIRECT (McLandrich)                                    962

1    trial is that the State used the sleeve that you put these

2    things in, and it had Moore reconstructed.  And so this is

3    what was shown at the criminal trial.

4        You can move the pictures around.  The sleeve was marked,

5    and still the sleeve -- the only foundation that's been laid

6    is that this is the sleeve, not that the pictures were as is

7    depicted here.

8            THE COURT:  I'm not sure I still understand.

9            MR. McLANDRICH:  So what's happened over time --

10   John McLandrich.  What's happened over time is that if you

11   pull the cover off --

12           THE COURT:  All right.

13           MR. McLANDRICH:  -- this guy's got two pictures;

14   one's a front shot because it's a booking photo, and the

15   other's the profile view.  And so what we don't know is which

16   one of these existed at the time of trial.  And the fact that

17   he endorsed it means, frankly, absolutely nothing 'cause he,

18   I'm sure, probably doesn't know.

19           THE COURT:  Can -- well, my suggestion is you have

20   him -- don't display it.  You have him testify to it.  And

21   then I'll make a decision what comes in in exhibits, admitted

22   into evidence.

23           MR. KANOVITZ:  Okay.  Depending upon how it comes

24   out, I may need to actually cross on it, in which case --

25           THE COURT:  You can cross on it.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - DIRECT (McLandrich)                                    963

1          MR. KANOVITZ:  Okay.  Thanks.

2          THE COURT:  If there is a -- if -- I've got to hear

3   about this.

4          MR. KANOVITZ:  Okay.

5          THE COURT:  If there's testimony that this was the

6   photo lineup that was used, there's testimony to that effect,

7   you're going to present testimony that this --

8          MR. McLANDRICH:  I've got another way to address it.

9   I've got the black-and-white photo copies of the arrays that

10  were made, and I just wasn't going to use them because they

11  are ugly black-and-whites that were made with the fact sheets

12  and the general instructions.  So those would have been

13  contemporaneous documents when the arrays were presented.  So

14  I'll just show those.

15         MR. KANOVITZ:  I don't know what the foundation for

16  those is but --

17         THE COURT:  You see what I'm saying.  The damage, if

18  any, at this point would be if these are displayed to the

19  jury.  So my thought is if you've got them marked, you can

20  have him -- you can ask your questions with regard to these.

21  And then the Court will have to determine whether or not --

22         MR. McLANDRICH:  I think if I go through the

23  black-and-whites, it may well lay the missing piece of

24  foundation or at least make it easier for you to decide later.

25         MR. MORRIS:  Were these photocopies made at the time

MOORE - DIRECT (McLandrich)                                964

1    of the array or after the trial?

2              MR. HERMAN:  This is Chris Herman.  At the time that

3    they were shown to the victims.

4              THE COURT:  Do you understand?

5              MR. MAYER:  I understand in the sense that they are

6    pictures that are different between these two.

7              THE COURT:  Right.

8              MR. MAYER:  I mean, this guy's also slid down.  And,

9    obviously, the sticker is on the black portion, which isn't

10   going to move.

11             THE COURT:  Right.

12             MR. MAYER:  And so if you say it's difficult to say

13   this is what was shown at trial for what was shown to the

14   victims but then also say this was what was shown at trial to

15   the victims, because they are not, obviously, the same thing.

16             MR. McLANDRICH:  And based on the other testimony,

17   it seems like the critical time is when they are shown in the

18   photo array presentation unless a trial --

19             MR. MORRIS:  Is the argument -- are you saying that

20   these were shown separately to the same victim, or these were

21   shown to two separate victims?

22             MR. McLANDRICH:  I think what happened at trial

23   was -- well, obviously, we have a disagreement, but as I

24   understand it, this one was shown at trial.  Mike thinks this

25   one was shown at trial and actually has the same exhibit

MOORE - DIRECT (McLandrich)                                965

1    numbers.

2        So what has obviously happened -- we just don't know

3    which is the correct one -- is that the photos have been, you

4    know, in some cases jostled around, and in this guy's case,

5    you know, frontal view versus profile.

6            MR. KANOVITZ:  So -- Mike Kanovitz.  So the witness

7    has unequivocally testified that Plaintiff's Exhibit 285, page

8    6, is what was shown to the jury at trial.  Clearly, clearly

9    both of them have the sleeve marked with the same exhibit

10   stickers in the same place; and, therefore, there is no

11   foundation for 119 having been shown to the jury in the

12   criminal trials.

13           MR. McLANDRICH:  Except, Mike, that, A, he can

14   change his testimony; B, this was taken at -- not at trial.

15   This was taken at a document inspection by your office, and

16   there's other photos which show the cover being taken off.

17   And so I don't know whether this photo was taken after the

18   cover was put back on and it was reconstructed improperly or

19   not.  We don't know that that is the representation of what

20   happened at trial.

21           MR. KANOVITZ:  For the record, 119, there is no

22   foundation that this is a picture of what was taken at trial.

23   And this is how it looked when the inspection -- I'm sorry.

24   So Plaintiff's 285, page 6, is how it looked when the

25   inspection took place.

1           MR. McLANDRICH:  Well, and this --

2           THE COURT:  So the --

3           MR. McLANDRICH:  -- is from a prior inspection.

4           THE COURT:  So the difference between these two is

5    that these guys are switched?

6           MR. KANOVITZ:  They are switched, and the one who is

7    in Number 3 position on 285 is clearly forward facing booking

8    photo, when on 119, it appears to show the, you know, "turn to

9    the left" booking photo.  So the side view.

10          THE COURT:  Okay.

11          MR. KANOVITZ:  And my objection is there is no

12   foundation for the idea that the witnesses were ever shown one

13   person in a side view and the rest of them forward.  There

14   just -- there is nothing to support that.  And the -- what has

15   been put on so far doesn't establish that foundation, and we

16   know that the pictures move around.

17          THE COURT:  I'm trying to -- we're going to have to

18   break.  We are going to have to go back here on record.

19       (In open court.)

20          THE COURT:  Ladies and gentlemen, I apologize, but

21   it's going to be necessary for the Court to recess for a few

22   moments to make some determinations that it needs to make

23   outside of your presence.  So please be patient.  And that

24   doesn't necessarily extend the day past 4:30.  So don't worry

25   about that.  But we'll be back with you as soon as we can.

```
1        Thank you.

2               THE COURTROOM DEPUTY:  All rise.  This court stands

3        in recess.

4             (Jury out at 3:19 p.m.)

5             (Jury in at 3:24 p.m.)

6             (In open court at 3:25 p.m.)

7               THE COURT:  Sorry, ladies and gentlemen, but as I

8        have told you -- we haven't had to do too much -- every once

9        in a while I need to -- I need to consider and make some

10       decisions or go in a certain direction outside of your

11       presence.  So please understand that.  Don't lay that at

12       anyone's feet other than the fact that the Court needs to do

13       those things in order to give everyone a fair opportunity to

14       be heard, all right?  Thank you.

15            Counsel.

16              MR. McLANDRICH:  Thank you, Your Honor.

17            I'd like to pull up Defendant's 18 again, please.

18            (Exhibit displayed.)

19       BY MR. McLANDRICH:

20       Q.   Detective Moore, Defendant's 18, again, this is the

21       instructions for S.C., correct?  The photo array instructions?

22       A.   Yes, it is.

23              MR. McLANDRICH:  Let's go to the third page, please.

24            (Exhibit displayed.)

25       BY MR. McLANDRICH:
```

MOORE - DIRECT (McLandrich)                                968

Q.   Is this a photocopy of the lineup that you utilized with
C.W.?

A.   This appears to be a photo lineup, yes.

Q.   And do you have some reason to doubt whether this is the
one you used with C.W.?

A.   I had received a picture of the lineup, I believe it
was, back on November 8th of 2019, from --

        MR. KANOVITZ:  Objection; non-responsive and
relevance.

        THE COURT:  Is there a reason you don't believe this
is it?  This is your -- I think that's your question.  Do you
want it --

        MR. McLANDRICH:  Let me rephrase the question, Your
Honor.  That's probably the easiest step.

BY MR. McLANDRICH:

Q.   So, Detective, when you would perform the photo array,
would you make a copy of the array that you used on that day
with that witness?

A.   Yes, you would.

Q.   And is this the copy that you made for C.W.?

A.   I believe so but I, again, with this issue and --

        MR. McLANDRICH:  Let's bring up Defendant's 19
again, please.

        (Exhibit displayed.)

BY MR. McLANDRICH:

MOORE - DIRECT (McLandrich)                                969

1    **Q.**    Are these the instructions you used with B.W.?

2    **A.**    Yes, they are.

3              MR. McLANDRICH:  Let's go to the third page.

4        (Exhibit displayed.)

5    BY MR. McLANDRICH:

6    **Q.**    Does this appear to be a photocopy of the array that you

7    would have used with B.W.?

8    **A.**    Yes.

9    **Q.**    Let's go to Defendant's 22, please.

10       (Exhibit displayed.)

11   BY MR. McLANDRICH:

12   **Q.**    Is this a copy of the instructions you used with S.C.?

13   **A.**    Yes.

14             MR. McLANDRICH:  Let's go to the third page.

15       (Exhibit displayed.)

16   BY MR. McLANDRICH:

17   **Q.**    Does this appear to be a poor black-and-white copy of the

18   photo array that you would have used with S.C.?

19   **A.**    Yes.

20   **Q.**    Now, I understand these are all black-and-white copies I

21   have shown you, but they all would have been color in real

22   life, correct?

23   **A.**    Yes.

24             MR. McLANDRICH:  Would you bring that back up for a

25   minute, Jeff.

MOORE - DIRECT (McLandrich)                          970

1           (Exhibit displayed.)

2    BY MR. McLANDRICH:

3    Q.    And in these photos, primarily the head of the various

4    individuals that are shown?

5    A.    Yes.

6    Q.    And was that true for all three?  I could bring the

7    others back up if you need to see them again.

8    A.    No, that was true for all three.

9    Q.    When was the first time, if you recall, that you ever

10   heard about this report that Mr. Bailey reportedly created,

11   that excluded Mr. Gillispie?

12   A.    It's been a while ago.  I don't remember exactly when.

13   Q.    Many years later?

14   A.    Oh, yes, it definitely would have been many years

15   later.

16   Q.    And as a police officer, did you understand you had a

17   duty to deliver all the evidence, good and bad, to the

18   prosecutor?

19   A.    Absolutely.

20   Q.    And you did that in this case?

21   A.    Yes, I did.

22   Q.    Has there ever been an allegation that you failed to do

23   that in any other case?

24   A.    Never.

25   Q.    Thank you.  That's all I have for you, Detective.

MOORE - CROSS (Kanovitz)                                971

1                        **CROSS-EXAMINATION**

2       BY MR. KANOVITZ:

3       **Q.**   Good afternoon.

4       **A.**   Good afternoon.

5       **Q.**   So just moments ago we were looking at black-and-white

6       photo copies of photo arrays that you used with the three

7       victims --

8       **A.**   Yes, sir.

9       **Q.**   -- do you recall that?

10          And were those photocopies that you made

11      contemporaneously or did you reconstruct the photos in the

12      positions that you have used them and then make photocopies of

13      that?

14      **A.**   Actually, after showing the photo lineup to the

15      individual, I would then go make a photocopy of it at that

16      time.

17      **Q.**   And the way that the sleeve -- I'm sorry.  The way that

18      the folder worked, was it possible for photos to shift a

19      little bit in the box?

20      **A.**   Well, except for the fact I taped them on in their

21      spots so they wouldn't slip.

22      **Q.**   Okay.  So the way that you chose to tape them in the box

23      is exactly as they appeared in those three photocopies,

24      correct?

25      **A.**   Yes.

MOORE - CROSS (Kanovitz)                                        972

1   **Q.**   You were asked questions about showing the photo array to

2   C.W.  Do you recall that?

3   **A.**   Yes.

4   **Q.**   And you read from the "Remarks" that you wrote down on

5   the photo lineup fact sheet, correct?

6   **A.**   I believe that's what we did.

7   **Q.**   And to be clear, what was on that fact sheet was not the

8   witness writing down her remarks, it was you writing down your

9   recitation of the witness's remarks, correct?

10  **A.**   They were written down at the time I was with them,

11  yes.

12  **Q.**   So like you were taking notes basically as you went?

13  **A.**   I guess that would be it.

14  **Q.**   Okay.  Why didn't you write down that you had to read

15  C.W. the question regarding when a witness cannot make an

16  identification?

17  **A.**   After reviewing my report, I'm not sure exactly that's

18  how that went.

19  **Q.**   Well, we saw the -- we saw the testimony that you gave to

20  the grand jury, correct?

21  **A.**   I believe so.

22  **Q.**   And you told the grand jury that you read her the

23  sentence, right?

24  **A.**   I independently don't remember that right now.

25  **Q.**   Okay.  Would it refresh your recollection to see it?  Do

MOORE - CROSS (Kanovitz)                                      973

1    you need to see it or do you recall at least from Thursday

2    that that's what we went over?

3    A.   I believe that we had went over something, yes.

4    Q.   We specifically -- it's not just something.  We

5    specifically went over the fact that in the grand jury

6    testimony you told the grand jury that you read C.W. the

7    sentence, right?

8    A.   I believe so.

9    Q.   Now, you told this jury today that with C.W. she had,

10   quote-unquote, narrowed it down to one.  Do you recall that?

11   A.   Yes.

12   Q.   And that's when you did the a hundred percent sure thing?

13   A.   Actually, I had made the 100 percent sure thing prior

14   to any statements.

15   Q.   Okay.  Isn't it true that you told the grand jury that

16   she actually hadn't narrowed it down to one, she had narrowed

17   it down to a couple?

18   A.   I don't remember that.  But it is possible.

19        THE COURT:  Counsel, are you going to refresh his

20   recollection?  Is that what you're about to do?

21        MR. KANOVITZ:  I suppose it is in a posture of

22   refreshing the recollection.

23        THE COURT:  Give us the exhibit, please.

24        MR. KANOVITZ:  It's Exhibit 131.

25        THE COURT:  And the page number?

```
1              MR. KANOVITZ:  Just a moment, Your Honor.
2         Page number 6.
3              THE COURT:  Line?  Or lines?
4              MR. KANOVITZ:  It will be line --
5              THE COURT:  Or that you want him to --
6              MR. KANOVITZ:  I'm sorry.  I'm in the wrong exhibit.
7    I apologize.
8         It should be PX1.
9         May I reask the question, Your Honor?
10             THE COURT:  You may.
11             MR. KANOVITZ:  Thank you.  So I will withdraw that.
12   BY MR. KANOVITZ:
13   Q.   Isn't it true that you testified in court in front of a
14   judge at a hearing that occurred before trial that when you
15   were observing C.W. she looked over the photographs, and
16   within a couple of minutes, you could tell that she had
17   visually narrowed her pics down to, quote-unquote, a couple
18   photographs.  Do you recall that?
19   A.   There's a lot I don't recall after 30 years.  I mean,
20   it's possible.  If you are reading that from a document,
21   then, yes.
22   Q.   Would it refresh your recollection to look at the
23   document?
24   A.   Yes, sir.
25             MR. KANOVITZ:  It's PX1, page 18.
```

MOORE - CROSS (Kanovitz)                                    975

1              THE COURTROOM DEPUTY:  I'm sorry, Counsel.  Page?

2              MR. KANOVITZ:  Page 18.  And the answer runs from

3      line 12 to line 19.

4              THE COURT:  So it's PX1, page 18, lines?

5              MR. KANOVITZ:  12 through 19.

6              THE COURT:  12 through 19.

7          I am going to ask you, Mr. Moore, please review that,

8      read that to yourself, and then bring it to our attention when

9      you're done.

10             THE WITNESS:  Okay.

11     BY MR. KANOVITZ:

12     **Q.**   Okay.  And isn't --

13             THE COURT:  Go ahead.

14             MR. KANOVITZ:  Thank you, Your Honor.

15     BY MR. KANOVITZ:

16     **Q.**   And isn't it true that what you told the judge was that

17     C.W. looked over the photographs for a couple minutes and then

18     you could visually tell that she had narrowed her pick down to

19     a couple photographs, correct?

20     **A.**   Yes.

21     **Q.**   Thank you.  And you did not record that fact either in

22     the photo lineup fact sheet, correct?

23     **A.**   I don't believe so.

24     **Q.**   And I was referencing the photo lineup fact sheet for

25     C.W.  You understood that, right?

MOORE - CROSS (Kanovitz)                                        976

1    **A.**    Yes.

2    **Q.**    Now, you testified on direct about a portion of your

3    police report, the supp reports, where you documented a phone

4    call that you had with S.C.  Do you recall that?

5    **A.**    Yes.

6    **Q.**    And she told you, "Yeah, I think my memory's good enough

7    that I can make an identification."  That's what you wrote in

8    the report, right?

9    **A.**    Without seeing that, I don't independently remember,

10   but I do remember we had a conversation about that.

11   **Q.**    You don't recall that when you were -- when it was up

12   there, something to the effect of, she still remembers the

13   suspect and will have no problem picking him out?

14   **A.**    She did make that statement.

15   **Q.**    And you wrote that in your report?

16   **A.**    It's in my report.

17   **Q.**    Why do we not have a similar documentation of the phone

18   calls with C.W. and B.W. before you showed the photo lineups

19   to them?

20   **A.**    One of them I had ended up showing the lineup to, and I

21   requested that she contact her sister to see about having

22   her come in.

23   **Q.**    Well, actually, didn't she tell the jury that you had

24   talked to both of them and there was some issue with getting

25   off work?

MOORE - CROSS (Kanovitz)                                977

1   **A.**   I don't remember all that independently.  I know that

2   there is something about that.

3   **Q.**   Okay.  Well, then at least as to C.W., why don't we have

4   a record of your phone call with her when you were asking her

5   if she could come view the lineup?

6   **A.**   I guess I didn't document it.

7   **Q.**   That was a choice you made?

8   **A.**   That was a choice I made, but she got there somehow.

9   **Q.**   I'm not talking about how she got to the police station.

10  I'm talking about --

11              THE COURT:  All right.  Next question.

12              MR. KANOVITZ:  Thank you, Judge.

13  BY MR. KANOVITZ:

14  **Q.**   The entire police report, the supp report that you typed

15  up that we looked at, that's done on essentially like a word

16  processer, right?

17  **A.**   It's done on a computer.

18  **Q.**   But it's like with a word processing system?

19  **A.**   I don't know what kind of system it was.  I just know

20  it was done on a computer.

21  **Q.**   You type it in, and then you have the ability to make

22  changes later, right?

23  **A.**   Yes, you could.

24  **Q.**   Okay.  So do we know if you ever made any changes to this

25  report after you initially typed the reports?

MOORE - CROSS (Kanovitz)                          978

1    **A.**    I have no idea.

2    **Q.**    So that's --

3    **A.**    It's 30 years.

4    **Q.**    And there would be no record in the police department of

5    whether you edited these reports, correct?

6    **A.**    Again, I have no idea.  It's 30 years.  You're asking

7    me to remember something that's a long time ago.

8              THE COURT:  You've answered the question.

9              MR. KANOVITZ:  Your Honor, I'd like to publish

10   Plaintiff's Exhibit 104, page 11.  This page was shown to the

11   jury under a defendant's exhibit, but it's the same page.

12             THE COURT:  Wait.  Hold on a second.

13             MR. McLANDRICH:  I don't know what page it is.

14             MR. KANOVITZ:  May I confer?

15             THE COURT:  I'm not so worried about letting it be

16   published.  I just want to let everybody see where we are

17   going.

18             MR. McLANDRICH:  Yes, thank you.  I just wanted to

19   know what it was.

20             THE COURT:  All right.  You can.

21        (Exhibit displayed.)

22             MR. KANOVITZ:  Could you focus in on the second full

23   paragraph, please.  So this is the second full paragraph on

24   page 11 of Plaintiff's Exhibit 104.

25   BY MR. KANOVITZ:

MOORE - CROSS (Kanovitz)                                    979

1   **Q.**   Do you see towards the bottom there the sentence that

2   says, "He then said that the campsite was rented by my friend

3   Jerry Fyte," F-Y-T-E?

4   **A.**   Yes.

5   **Q.**   And you note that you are not sure that that's the

6   correct spelling, right?

7   **A.**   Yes.

8           MR. KANOVITZ:  Now, could we show page 12, please.

9           (Exhibit displayed.)

10  BY MR. KANOVITZ:

11  **Q.**   And that was on 9-1-90, correct?

12  **A.**   Yes.

13  **Q.**   Thank you.

14          MR. KANOVITZ:  Can we show -- let's look at the

15  entry for 9-4-90, and could you enlarge -- that's fine.

16  BY MR. KANOVITZ:

17  **Q.**   So if we look at the last paragraph there, you are

18  suddenly spelling Jerry Fyffe correctly, F-Y-F-F-E, correct?

19  **A.**   Yes.  I believe that's several days later.

20  **Q.**   Right.  But there's no entry in your report in between

21  those two dates at all, right?  There is no investigation that

22  you documented in here, correct?

23  **A.**   I don't believe so.  I'm just --

24  **Q.**   So how did you learn in that -- in that particular

25  interval of time, how did you learn the proper way to spell

MOORE - CROSS (Kanovitz)                                          980

1    Mr. Fyffe's name?

2    **A.**   I don't recall.

3    **Q.**   Is it possible that you learned how to spell his name

4    after the fact and then went back and edited the report?

5    **A.**   I don't recall.

6    **Q.**   Okay.  On -- well, actually, before we leave that, you

7    testified about talking to a man named Mariott about sending

8    you -- sending you the cards?  From the campground?

9    **A.**   Yes, I did.

10   **Q.**   And the letter that you got didn't actually come from

11   Marriott, did it?

12   **A.**   He was who I talked to about them, and I take it that I

13   received them from him.

14   **Q.**   Okay.  Would it refresh your recollection to see the

15   letter?

16   **A.**   Yes.

17          MR. KANOVITZ:  May the witness be shown for purposes

18   of refreshing his recollection Plaintiff's Exhibit 205, page

19   3?

20          THE COURT:  Sure.

21          MR. KANOVITZ:  Thank you.

22   BY MR. KANOVITZ:

23   **Q.**   Have you had chance to refresh your recollection?

24   **A.**   I've looked it over.  I independently don't remember.

25          THE COURT:  Your question.

1              MR. KANOVITZ:  Your Honor, at this time I'd like to

2      publish Plaintiff's Exhibit 205, page 3 of 7.

3          I'm sorry.  Let me ask the predicate question.

4      BY MR. KANOVITZ:

5      Q.   Do you have any reason to believe that the letter that

6      you just looked at is not a true and accurate copy of the

7      letter that you received from the Park Service?

8      A.   I don't -- like I said, I don't remember it

9      independently.

10     Q.   Well, let me ask it this way:  Do you, in fact, have any

11     letters from Mr. Mariott?

12     A.   I independently don't remember that.  It's been 30

13     years.

14             THE COURT:  Hold on a second.

15         Counsel, are you objecting to this?  This display of this

16     letter?

17             MR. McLANDRICH:  Not to that letter, no.

18             THE COURT:  Counsel, it can be displayed.

19         This is part of your official record at least.

20             THE WITNESS:  I just don't remember it.

21             THE COURT:  This is part of your police department

22     record --

23             THE WITNESS:  Okay.

24             THE COURT:  -- is that correct?

25             THE WITNESS:  I believe so.  I believe they would

MOORE - CROSS (Kanovitz)                                    982

1    send me a letter with copies of the receipts, yes.

2              THE COURT:  Go ahead.  It's not objected to.

3         (Exhibit displayed.)

4    BY MR. KANOVITZ:

5    Q.    And, in fact, we talked about this Thursday, but you

6    filed an affidavit in 2008 regarding the camping receipts.  Do

7    you recall that?

8    A.    No.

9    Q.    Isn't it true that the person that sent the letter to you

10   inclosing campground records is a man named James Manner, not

11   Mr. Mariott, correct?

12   A.    That's correct.

13   Q.    And the letter doesn't document how many camping receipts

14   you received, correct?

15   A.    That's correct.

16   Q.    And it does not document which camping records you

17   requested, correct?

18   A.    It says that the campground records are for Twin Knobs.

19   Q.    I see.  But it doesn't document what date range, whose

20   names, any of that, correct?

21   A.    That's correct.

22   Q.    All right.  On Thursday, do you recall counsel showing

23   you some composites and talking about how the hair description

24   on the composite was brown with reddish tint?  Does that ring

25   a bell?

MOORE - CROSS (Kanovitz)                                      983

1    **A.**    I remember that was a description that had been given.

2    **Q.**    Well, does it ring a bell that that is the description

3    that appeared on the composite?

4    **A.**    I believe that it does.

5          MR. KANOVITZ:  And could we publish DX5, which was

6    previously shown, Your Honor?

7          THE COURT:  All right.

8       (Exhibit displayed.)

9          MR. KANOVITZ:  Please focus in on the second

10   paragraph.

11   BY MR. KANOVITZ:

12   **Q.**    Do you know what?  I'll do this orally.

13         We talked about the fact that on the first composite the

14   man with the sunglasses, that was a description typed in that

15   said reddish-brown hair, correct?

16   **A.**    Yes, sir.

17   **Q.**    And then your counsel also showed you the version without

18   the sunglasses, right?

19   **A.**    Yes.

20   **Q.**    And the version without the sunglasses is the one that

21   S.C. created, right?

22   **A.**    Yes.

23   **Q.**    And he said, "Oh, look, there again, reddish-brown hair,"

24   being the description, right?

25   **A.**    Without seeing it, I don't know what it says.

MOORE - CROSS (Kanovitz)                               984

1   **Q.**   Isn't it true that the reddish-brown was carried over

2   from one composite to the other and did not actually reflect

3   S.C.'s description?

4               MR. McLANDRICH:  Objection.

5               THE COURT:  Sustained.

6        What are we talking about right now?

7               MR. KANOVITZ:  We're talking about the two

8   composites.

9               THE COURT:  Shouldn't you show him that?

10              MR. KANOVITZ:  I was just worried about the stuff

11  not coming up on the screen.

12  BY MR. KANOVITZ:

13  **Q.**   If you could take a look, please --

14              MR. KANOVITZ:  Could he be shown Defendant's Exhibit

15  4?

16              THE COURT:  All right.  For the record, I am

17  sustaining those objections.

18       Start over.

19  BY MR. KANOVITZ:

20  **Q.**   Let me know when you've had --

21              THE COURT:  Let him look.

22              THE WITNESS:  Okay.

23              THE COURT:  You're looking at Exhibit 4?

24              THE WITNESS:  I am looking at DX4, yes.

25  BY MR. KANOVITZ:

MOORE - CROSS (Kanovitz)                                      985

1   **Q.**   And DX4 is the composite that S.C. created, correct?

2   **A.**   I believe so, yes.

3   **Q.**   Okay.  And it has the hair, reddish-brown color, right?

4   **A.**   That is what it says.

5   **Q.**   And, in fact, S.C. said that the hair was light blondish,

6   right?

7   **A.**   I believe in her statement, yes.

8   **Q.**   Okay.  So do you agree that the description of

9   reddish-brown was carried over to the S.C. composite from the

10  one that had the sunglasses?

11  **A.**   Yes, and that would have been done by the person who

12  prepared this.

13  **Q.**   Understood.  Long before you got involved in the case,

14  right?

15  **A.**   Oh, yes.

16  **Q.**   And, actually, the description of reddish-brown was not

17  what the -- B.W. and C.W. told to the detective when the

18  detective first interviewed them, correct?

19  **A.**   C.W. and B.W.?

20  **Q.**   Yes.

21  **A.**   I thought one of them had said that it was brown with a

22  reddish tint, and the other one said it was an orangish

23  tint.

24          THE COURT:  First, first, this was a conversation

25  between who?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - CROSS (Kanovitz)                                    986

1                MR. KANOVITZ:  Detective Bailey and C.W. and B.W.

2                THE COURT:  And you are asking this officer what was

3        said during that?

4                MR. KANOVITZ:  Yes.  Well, just the specific

5        descriptions that they gave.

6                THE COURT:  Do you know?

7                THE WITNESS:  Just based on documents.  I mean, I

8        wasn't privy to their conversations.

9                MR. KANOVITZ:  Could the witness be shown

10       Plaintiff's Exhibit 281, page 2 of 2?

11       BY MR. KANOVITZ:

12       Q.   Please take a look at Plaintiff's Exhibit 281.  You can

13       look at pages 1 and 2 and tell us what type of document this

14       is, please.

15       A.   This is a supplementary report filled out by Detective

16       G. L. Bailey.

17       Q.   On what date?

18       A.   August 22, 1988.

19       Q.   And is this the sort of document that gets kept by the

20       police department and prepared in the ordinary course of

21       business?

22       A.   Yes.

23       Q.   Now, turning to page 2, did Detective Bailey record the

24       description of hair color that B.W. gave?

25       A.   Yes.

MOORE - CROSS (Kanovitz)                                987

1    **Q.**    And what did he record?

2    **A.**    Orangish-brown hair.

3    **Q.**    And did Detective Bailey also record C.W.'s description

4    of the color?

5    **A.**    Yes.

6    **Q.**    Okay.  And what did he record as the color that C.W.

7    gave?

8    **A.**    He recorded brownish-red hair.

9    **Q.**    Okay.  He did not record brown hair with a red tint,

10   correct?

11   **A.**    That is not what is recorded in this written statement.

12   **Q.**    And then on the night that the victims -- well, the wee

13   hours of the morning when the victims came to the police

14   station after the event, would they have been interviewed?

15           THE COURT:  If you know.

16           THE WITNESS:  Could you repeat the question again?

17   BY MR. KANOVITZ:

18   **Q.**    Would the victims have been interviewed when they came to

19   the police station, to the Miami Township Police Department

20   following the event?

21   **A.**    They would have been interviewed, yes.

22   **Q.**    Okay.  And I believe this is Defendant's --

23           MR. KANOVITZ:  Could the witness be shown

24   Defendant's Exhibit 1, please.

25   BY MR. KANOVITZ:

```
1    Q.   Please take a look at Defendant's Exhibit 1 and tell us

2    what type of document this is.

3    A.   This is a cover sheet for a report.

4    Q.   And who is that -- at what time and date was that report

5    prepared?

6    A.   On August 21, 1988, at 0134 hours.

7    Q.   So the wee hours of the morning following the event when

8    the women were at the police station, correct?

9    A.   Yes.

10   Q.   Okay.  And does -- and who is it prepared by?

11   A.   R. E. Burling.

12   Q.   And Mr. Burling is the patrolman, right?

13   A.   He is the patrol officer that took the initial report,

14   yes.

15   Q.   And that's different than the detective that gets

16   assigned to the case, right?

17   A.   And that's correct.

18   Q.   And isn't it -- well, didn't Mr. Burling purport to

19   prepare a statement that was jointly for both women at the

20   same time?  Look at the bottom left.

21   A.   Oh, you mean under the signatures?  Where both names

22   are written?

23   Q.   Yes, correct.

24   A.   Yes.

25   Q.   Okay.  And then in that report, he gives a description of
```

MOORE - CROSS (Kanovitz)                                    989

1    the hair color on page 2, correct?

2    **A.**    Yes.

3    **Q.**    And that is -- he doesn't attribute it to one or the

4    other of the sisters, correct?

5    **A.**    No, he doesn't.

6    **Q.**    And isn't it true that that's the source of the

7    description brown with a red tint?

8    **A.**    Yes.

9    **Q.**    Okay.  In the course of your involvement in the case, did

10   you receive the report from the Miami Valley Crime Lab

11   regarding the hairs?

12   **A.**    The hairs and the fibers?

13   **Q.**    Yes.

14   **A.**    I believe that we had that in the packet.

15   **Q.**    Okay.  And those hairs that were found from the -- from

16   the victims' clothing, the head hairs were light brown,

17   correct?

18   **A.**    I think there was some testimony to that effect.

19            THE COURT:  If you know.  Do you know?

20            THE WITNESS:  I independently don't remember.  This

21   became an issue, and --

22            THE COURT:  All right.

23   BY MR. KANOVITZ:

24   **Q.**    Would it refresh your recollection to see the Miami

25   Valley Regional Crime Lab report?

MOORE - CROSS (Kanovitz)                                      990

1    **A.**   Yes, sir.

2           MR. KANOVITZ:  Could the witness be shown

3    Defendant's Exhibit 13, please.

4    BY MR. KANOVITZ:

5    **Q.**   If you look on page 1, towards the bottom, it has Exhibit

6    1, which is B.W.'s clothes, and Exhibit 2, which is C.W.'s

7    clothes.  And what color were the head hairs found on those

8    clothes?

9    **A.**   On Exhibit 1 on this document, it says that there was

10   two light brown Caucasian head hair.

11   **Q.**   And what about, what was the color of the head hair on

12   Exhibit 2?

13   **A.**   It says that there was a light brown Caucasian head

14   hair.

15   **Q.**   Rewinding, you were asked some questions on Thursday by

16   counsel for Miami Township.  Do you recall those questions?

17   **A.**   I know that he asked questions, yes.

18   **Q.**   Do you recall them using the term "bad faith" when

19   questioning you?

20   **A.**   I had heard that term, yes.

21   **Q.**   And when you answered those questions, were you using a

22   legal definition or were you using the way you understand

23   those words not as a lawyer?

24   **A.**   I don't remember.

25   **Q.**   As you use the term "bad faith," would it be bad faith to

MOORE - CROSS (Kanovitz)                                    991

1   do something your supervisor had given the okay to?

2   **A.**   Would it be bad faith to do something that my

3   supervisor told me to do?

4   **Q.**   Or at least given the okay to.

5   **A.**   If my supervisor directs me to do something, I'm going

6   to do it.

7   **Q.**   Or if your supervisor knows you are going to do it and

8   says it's okay to do it, would it be the same answer?

9   **A.**   If he knows that I'm going to do something and he is

10  okay with it, yes.

11  **Q.**   In that case, would you believe doing that would be bad

12  faith toward your employer?

13  **A.**   Do I think it would be bad faith?  No.

14  **Q.**   As you use that term.

15  **A.**   No.  I have my --

16            THE COURT:  Okay.  He's answered it.

17  BY MR. KANOVITZ:

18  **Q.**   And back in this time frame, Detective-Sergeant Wilson

19  was your supervisor --

20            MR. KANOVITZ?  Actually, may I rephrase, Your Honor?

21            THE COURT:  Rephrase what?

22            MR. KANOVITZ:  The question.

23            THE COURT:  The one that he answered?

24            MR. KANOVITZ:  No.  The one I'm about to -- the one

25  I was saying.  I just want to strike it.

MOORE - CROSS (Kanovitz)                                              992

```
1              THE COURT:  He has only testified to the name right
2   now.
3   BY MR. KANOVITZ:
4   Q.   At the time you were showing the victims the photo array,
5   your supervisor was Detective-Sergeant Wilson, correct?
6   A.   Correct.
7   Q.   And he was the person as far as -- well, was he the
8   person at Miami Township authorized to look over your
9   shoulder?
10  A.   Look over my shoulder, I don't know about that, but he
11  was my supervisor.
12  Q.   Okay.  And was he also one of the detective pictures that
13  you put into the photo array?
14  A.   Yes.
15  Q.   So is it fair to say that he knew that you were putting
16  his picture in the photo array?
17  A.   Absolutely.
18  Q.   And he got a chance to see the photo array, correct?
19  A.   Yes, he did.
20  Q.   And did he ever tell you that he believed you were not
21  acting in good faith?
22  A.   No.  He had no issues with it.
23  Q.   Did any official of Miami Township ever tell you that?
24  A.   No.
25  Q.   Did any official at Miami Township ever tell you they
```

MOORE - CROSS (Kanovitz)                                      993

1    believed you were not acting within the scope of your

2    employment?

3    A.    Never.

4    Q.    Now, as you use the term, would it be bad faith to do

5    something that your employer praised you for?

6          MS. FRICK:  Objection, Your Honor.  Foundation for

7    what this is.

8          THE COURT:  Sustained.

9    BY MR. KANOVITZ:

10   Q.    Well, sir, Miami Township ran a training academy for

11   officers from smaller police departments, right?

12   A.    They did at one time, yes.

13   Q.    Okay.  And isn't it true that when they ran that training

14   academy, they used your photo array as an example of what to

15   do?

16         MS. FRICK:  Objection.

17   BY MR. KANOVITZ:

18   Q.    The Gillispie photo array.

19         MS. FRICK:  Objection.

20         THE WITNESS:  I do not remember that at all.  And I

21   wouldn't have had anything to do with the academy.

22   BY MR. KANOVITZ:

23   Q.    Okay.  So you had no knowledge of that?

24   A.    No.

25   Q.    Switching topics, do you recall Miami Township's lawyers

MOORE - CROSS (Kanovitz)                                    994

1   asking you about the Fritz and Bailey reports?

2   **A.**   Ask that again.

3   **Q.**   Do you recall the lawyers asking you about the Fritz and

4   Bailey reports?

5   **A.**   I believe they had, yes.

6   **Q.**   And they asked you hypothetically, if you didn't turn

7   over those reports, would that be good faith or bad faith,

8   questions to that effect?

9   **A.**   I believe that was the question.

10  **Q.**   Okay.  Now, was the file management practices inside of

11  Miami Township perfect?

12          MS. FRICK:  Objection, Your Honor.  I think we are

13  going beyond the scope of --

14          THE COURT:  I think we are, Counsel.

15          MR. KANOVITZ:  If I may, I will ask the following

16  question:

17  BY MR. KANOVITZ:

18  **Q.**   Wasn't it the case that reports would get lost from time

19  to time?

20          MS. FRICK:  Objection, Your Honor.

21          THE COURT:  I'll allow it.

22          THE WITNESS:  It's okay to answer?

23          THE COURT:  Yes.  If you know.

24          THE WITNESS:  From experience of dealing with the

25  reporting department within Miami Township, I knew that

MOORE - CROSS (Kanovitz)                                        995

1    reports would be misfiled.

2    BY MR. KANOVITZ:

3    **Q.**   And did Miami Township ever communicate to you that there

4    could be a constitutional violation if reports were misfiled

5    or lost?

6    **A.**   No.

7    **Q.**   And I believe you testified you had no training on how to

8    prepare a photo array from Miami Township?

9    **A.**   From what I remember.

10   **Q.**   And previously, a few minutes ago, I asked you about the

11   ability to alter your reports after you had typed them up.  Do

12   you recall that?

13   **A.**   Yes, you did.

14   **Q.**   And you were permitted to do that as well, correct?

15   **A.**   You could, yes.

16   **Q.**   And did you receive any training from Miami Township on

17   the subject of tunnel vision?

18   **A.**   No.

19   **Q.**   Do you know what tunnel vision is?

20   **A.**   I believe that it is where you get something, you focus

21   on one thing at the time.

22   **Q.**   And then other things you don't even see while you are

23   focusing on the one thing, right?

24   **A.**   If we're dealing with the definition, yes.

25   **Q.**   And were you ever taught that that's a hazard that

1    detectives can face?

2            MS. FRICK:  Objection, Your Honor.

3            THE COURT:  Sustained.

4    BY MR. KANOVITZ:

5    Q.   You were asked questions by Miami Township about the

6    concept of, quote-unquote, exculpatory evidence.  Do you

7    recall being asked that question?

8    A.   Vaguely.

9            THE COURT:  Counsel, we are not going to get into

10   exculpatory evidence or any of the definitions.  I've already

11   instructed the jury that I will be instructing on what that

12   means.

13           MR. KANOVITZ:  Absolutely.  I am not going to talk

14   about the definition.

15           THE COURT:  All right.

16   BY MR. KANOVITZ:

17   Q.   And isn't it true that you said that that's not a concept

18   that you were taught?

19   A.   I don't remember what my answer was at the time.

20   Q.   It's not a word you knew when you were asked the

21   question, correct?

22   A.   I have heard that term before.  I independently can't

23   tell you the definition of it.

24   Q.   Okay.  Now, the allegations about causing -- your

25   involvement in causing Mr. Gillispie an unfair trial had been

MOORE - CROSS (Kanovitz)                                          997

1    around for over ten years, have they not?

2    **A.**    Could you ask the question again?

3    **Q.**    Yeah.  For over ten years, there's been litigation that

4    you had either involvement in or were questioned about

5    regarding your involvement in causing Mr. Gillispie an unfair

6    trial.

7    **A.**    I don't believe he was caused an unfair trial.

8    **Q.**    I understand that, but you understood that those were the

9    allegations?

10   **A.**    There have been many allegations throughout these

11   years.

12   **Q.**    And did you understand that for over ten years there's

13   been allegations that you were involved in causing an unfair

14   trial to Mr. Gillispie?

15   **A.**    I don't think that anything I did had ever been found

16   to be caused by me.

17   **Q.**    I am not asking you what was found.  Just that there were

18   public allegations made that you caused an unfair trial.  I am

19   not saying that you did cause an unfair trial; I am just

20   saying that there were public allegations made that you caused

21   an unfair trial.

22   **A.**    There have been statements over a period of years.

23   **Q.**    Well more than a decade, correct?

24              THE COURT:  If you know.

25              THE WITNESS:  I don't independently recall.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - CROSS (Kanovitz)                                998

1    BY MR. KANOVITZ:

2    **Q.**   Well, in all of those years, did any official from Miami

3    Township come and ask you questions about the allegations?

4              MS. FRICK:  Objection, Your Honor.

5              MR. KANOVITZ:  It goes to, I believe, good faith.

6              THE COURT:  Sustained.

7    BY MR. KANOVITZ:

8    **Q.**   On Thursday, you were shown pictures of five badges from

9    GM.  Do you recall that?

10   **A.**   I believe so, yes.

11   **Q.**   And counsel asked you if you thought they were like and

12   similar, and you basically said, "I don't think so"?

13   **A.**   I don't remember what I said.

14   **Q.**   Okay.  Isn't it true that the term "like and similar"

15   originated from you, not from me?

16   **A.**   I would -- I would probably believe so on that, yes.

17   **Q.**   And isn't it true that you previously told a judge that

18   you believed that the GM badges were like and similar?

19   **A.**   In the fact that they are all GM identification cards.

20             MR. KANOVITZ:  This will be PX1, page 53, line 18

21   through 21, read for purposes of impeachment.

22             THE COURT:  Well, then, what you should do, Counsel,

23   is ask him the question.

24   BY MR. KANOVITZ:

25   **Q.**   Isn't it true that what you said to the judge is that the

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - CROSS (Kanovitz)                                    999

1    people in the picture, in the IDs themselves, were like and

2    similar?

3    **A.**   I don't independently remember that, but if you're

4    reading that, then I would have to take it at its face.

5    **Q.**   Is it fair to say that's the sort of terminology you

6    would have used?

7    **A.**   It sounds like something I would say, but I do not

8    independently remember that.

9    **Q.**   Did you ever go to GM to try to find other badges -- I'm

10   sorry -- other employee IDs that you could use for a photo

11   array?

12   **A.**   No.

13              MR. McLANDRICH:  Objection; asked and answered.

14              THE COURT:  It has been, Counsel.  I think -- yes.

15   BY MR. KANOVITZ:

16   **Q.**   Now, you testified that when you met with the victims you

17   read them the showup instructions on the form, right?

18   **A.**   Yes, I read the photographic lineup instructions.

19   **Q.**   And isn't it true that you said more to them than just

20   quoting that form?

21   **A.**   I would say that there were probably other statements,

22   yes.

23   **Q.**   Isn't it true that you said to them, "We have a suspect"?

24   **A.**   I don't know the exact words without seeing the report.

25   **Q.**   Well, was it words to the effect of "We have a suspect we

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - CROSS (Kanovitz)                                    1000

1    want you to look at"?

2            THE COURT:  If you remember.

3            THE WITNESS:  I don't remember independently.

4    BY MR. KANOVITZ:

5    Q.    I'll come back to that.

6          And isn't it true that in addition to that paragraph, at

7    a later point in time, you told the victims that Dean had died

8    his hair?

9    A.    Again, independently, I don't remember that.  I know

10   that there were -- something that came up on that.

11   Q.    Would it refresh your recollection to see your testimony

12   from the second trial?

13   A.    Yes, sir.

14           MR. KANOVITZ:  Could the witness be shown

15   Plaintiff's Exhibit 9, page 320, lines 5 through 14?

16           THE COURTROOM DEPUTY:  Counsel, can you repeat those

17   pages.

18   BY MR. KANOVITZ:

19   Q.    It's Plaintiff's Exhibit Number 9, transcript page 320,

20   which is Exhibit page 65, lines 5 through 14.

21   A.    Okay.  What are the lines?

22   Q.    I think it was 5 through 14.  Actually, you know what?

23   Go back to 319 and start at line 23, the question that starts

24   23 on 319.

25         Have you had a chance to read it?

1   **A.**    I'm still going through it.

2              THE COURT:  Just raise your head when you are done.

3              THE WITNESS:  And you wanted me to go to page 320 to

4   what line?

5   BY MR. KANOVITZ:

6   **Q.**    14.

7   **A.**    Okay.

8   **Q.**    Does that refresh your recollection that you did talk to

9   the women about your opinion that Dean had died his hair?

10  **A.**    According to this.  I remember us getting into a

11  discussion of coloring hair.

12             THE COURT:  Well, the answer is do you remember --

13  state your question, Counsel.

14  BY MR. KANOVITZ:

15  **Q.**    Does that refresh your recollection that you had a

16  discussion with the victims where you told them that in your

17  opinion Dean had died his hair?

18             THE COURT:  The question is, did you state that in

19  your opinion Dean had died his hair?

20             THE WITNESS:  That's not exactly what was said, no.

21  BY MR. KANOVITZ:

22  **Q.**    You sat through the criminal trials; is that correct?

23  **A.**    Yes.

24  **Q.**    And you had a chance to hear all the victims testify,

25  right?

1    **A.**    Yes.

2    **Q.**    And -- and isn't it true that C.W. testified that she had

3    a conversation with you where you talked about Dean having

4    died his hair?

5              THE COURT:  If you remember.

6              THE WITNESS:  I don't remember a conversation.

7              MR. KANOVITZ:  Okay.  Could the witness be shown --

8    BY MR. KANOVITZ:

9    **Q.**    Would it refresh your recollection to see the trial

10   testimony?

11   **A.**    Are we done with this testimony?

12   **Q.**    For the moment.

13   **A.**    Yes.

14             MR. KANOVITZ:  Could the witness be shown

15   Plaintiff's Exhibit 10, transcript page 421, exhibit page 27?

16             THE WITNESS:  Page?

17   BY MR. KANOVITZ:

18   **Q.**    421, lines 12 through 17.  I'm sorry.  Start at line 3

19   through 17.

20   **A.**    Whose testimony is this?

21   **Q.**    I believe it is C.W.'s.

22   **A.**    So I'm going to testify to what somebody else said?

23   **Q.**    I am asking you, does that refresh your recollection that

24   C.W. said that you told her that Dean may have died his hair?

25   **A.**    What line do you want me to go to?

MOORE - CROSS (Kanovitz)                                              1003

1    **Q.**    Line 3 through 17.

2    **A.**    Okay.

3    **Q.**    And does that refresh your recollection that C.W.

4    testified that you had told her that in your opinion Dean had

5    died his hair?

6    **A.**    Yes.

7    **Q.**    Okay.  And you sat through the trial.  So you would have

8    heard her testify to that, correct?

9    **A.**    Yes.

10   **Q.**    Did you ever tell the prosecutor that that's not true and

11   that the testimony needed to be corrected?

12   **A.**    I don't independently remember what would have been

13   said.

14            MR. KANOVITZ:  Sorry, Your Honor.  Just a moment.

15   BY MR. KANOVITZ:

16   **Q.**    Do you still have Exhibit 9 in front of you?

17        Okay.  On the topic that we were discussing about you

18   mentioning that you had a suspect before showing the arrays,

19   do you recall that questioning a few minutes ago?

20   **A.**    Yes.

21   **Q.**    I believe you testified it would refresh your

22   recollection to see the trial testimony?

23   **A.**    I believe so, yes.

24   **Q.**    Okay.  Could you take a look at Plaintiff's Exhibit 9,

25   lines 12 through --

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MOORE - CROSS (Kanovitz)                                    1004

1            MR. McLANDRICH:  Page?

2    BY MR. KANOVITZ:

3    **Q.**   I am sorry.  Plaintiff's Exhibit 9, transcript page 303,

4    Exhibit page 48, lines 12 through 18 -- I am sorry -- lines 12

5    through 17?

6    **A.**   Page 303?

7    **Q.**   Yes.

8            THE COURT:  Counsel, after your next question, we're

9    done for the day.

10           MR. KANOVITZ:  Okay.

11           THE COURT:  I'm sorry.  After his answer, we're done

12   for the day.

13           THE WITNESS:  And the lines again?

14   BY MR. KANOVITZ:

15   **Q.**   It's lines 12-17, lines 12 through 17.

16   **A.**   Okay.

17   **Q.**   Does that refresh your recollection that you told them

18   you had suspects for them to look -- you had a suspect for

19   them to look at when you called them and asked them to come

20   see the photos?

21   **A.**   Yes.

22           THE COURT:  All right.  Ladies and gentlemen, we're

23   done for the day.  It's been a long day, a lot of testimony.

24   Appreciate your patience, your attention.  Hopefully, you will

25   have a good evening.  Please remember the Court's admonitions:

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1005

1    Don't discuss the case amongst yourselves or with anyone else.

2    Please ask the family and friends to abide with you for a

3    little while longer.

4        I think that's about it.  Anything else, counsel?

5            MR. KANOVITZ:  Not at the present time.

6            MR. McLANDRICH:  No.  Thank you, Your Honor.

7            MS. FRICK:  No.  Thank you, Your Honor.

8            THE COURT:  Ladies and gentlemen, have a great

9    evening.

10       Same time tomorrow.

11           THE COURTROOM DEPUTY:  All rise.  This court stands

12   in recess.

13       (Jury out at 4:27 p.m.)

14       (Court adjourned at 4:27 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                     CERTIFICATE OF REPORTER

2

3          I, Mary A. Schweinhagen, Federal Official Realtime

4   Court Reporter, in and for the United States District Court

5   for the Southern District of Ohio, do hereby certify that

6   pursuant to Section 753, Title 28, United States Code that the

7   foregoing is a true and correct transcript of the

8   stenographically reported proceedings held in the

9   above-entitled matter and that the transcript page format is

10  in conformance with the regulations of the Judicial Conference

11  of the United States.

12

13  s/Mary A. Schweinhagen

14  _____ 21st of December, 2023

15  MARY A. SCHWEINHAGEN, RDR, CRR
      FEDERAL OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25