```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
 2                        AT DAYTON

 3   _____
                                        )
     ROGER DEAN GILLISPIE,              )
 4                                      )
                    Plaintiff,          ) CASE NO. 3:13-cv-416-TMR
 5                                      )
                    -vs-                )
 6                                      )
     THE CITY OF MIAMI TOWNSHIP, ET AL.,) JURY TRIAL
 7                                      )
                    Defendants.         ) VOLUME VII
 8   _____    )
                    TRANSCRIPT OF PROCEEDINGS
 9             THE HONORABLE THOMAS M. ROSE,
           UNITED STATES DISTRICT JUDGE, PRESIDING
10             TUESDAY, NOVEMBER 15, 2022
                        DAYTON, OH
11
     For the Plaintiff:      MICHAEL KANOVITZ, ESQ.
12                           DAVID B. OWENS, ESQ.
                             MEGAN C. PORTER, ESQ.
13                           Loevy & Loevy
                             311 N. Aberdeen Street
14                           3rd Floor
                             Chicago, IL  60607
15
     For the Defendant       JOHN T. McLANDRICH, ESQ.
16   Matthew Scott Moore:    DAVID J. SIPUSIC, ESQ.
                             Mazanec, Raskin & Ryder Co., LPA
17                           3305 Solon Road
                             100 Franklin's Row
18                           Cleveland, OH  44139

19   For the Intervenor      DAWN M. FRICK ESQ.
     Miami Township:         CHRISTOPHER T. HERMAN, ESQ.
20                           Surdyk, Down & Turner Co., LLP
                             8163 Old Yankee Street
21                           Suite C
                             Dayton, OH  45458
22
          Proceedings recorded by mechanical stenography,
23   transcript produced by computer.
                    Mary A. Schweinhagen, RDR, CRR
24              Federal Official Court Reporter
                     200 West Second Street
25                    Dayton, OH  45402
                    *** *** *** ***
```

1   Courtroom Deputy: Elizabeth Penski

2   Law Clerks: Michael Mayer, Callum Morris

3   Also Present: Roger Dean Gillispie, plaintiff; Valerie
    Barajas, paralegal; Matt Thibodeau, paralegal; Jeff Weber, IT

4

5

6                          **INDEX OF WITNESSES**

7                          November 15, 2022

8   **PLAINTIFF'S WITNESSES**

9   **STEVEN FRITZ**
          Direct Examination by Mr. Owens              1017
10        Cross-Examination by Mr. McLandrich          1073
          Cross-Examination by Mr. Herman              1109
11        Redirect Examination by Mr. Owens            1118
          Recross-Examination by Mr. McLandrich        1125
12
    **RICHARD WINTERS, II**
13        Direct Examination by Ms. Porter             1128

14  **RICK WOLFE**
          Direct Examination by Mr. Kanovitz           1136
15
    **KENNETH BETZ**
16        Direct Examination by Mr. Owens              1144

17  **ANDREW SCOTT, III**
          Direct Examination by Mr. Owens              1147
18        Cross-Examination by Mr. McLandrich          1172
          Cross-Examination by Ms. Frick               1183
19        Redirect Examination by Mr. Owens            1185

20  **ROGER D. GILLISPIE**
          Direct Examination by Mr. Owens              1187
21

22  **DEFENDANT MOORE'S WITNESSES**

23  **MATTHEW SCOTT MOORE**
          Cross-Examination by Mr. Kanovitz            1009
24

25                 *     *     *     *     *

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
 1          P-R-O-C-E-E-D-I-N-G-S                    9:00 A.M.

 2                     (Jury in at 9:00 a.m.)

 3                  (In open court at 9:01 a.m.)

 4          THE COURT:  Ladies and gentlemen, good morning.

 5  Hopefully everyone had a restful evening and was able to abide

 6  by my admonitions, right?  Anybody not?

 7       (No verbal response.)

 8          THE COURT:  Great.  Just before we get started, I

 9  would indicate, remember, this is the day that we will be -- I

10  know we've taken you a little later, but we will be recessing

11  earlier today, at 3:30, for your planning purposes.

12  Otherwise, the schedule of the court will be, for the most

13  part, the same.

14       Okay.  We're on the record.  Counsel ready to proceed?

15          MR. KANOVITZ:  Yes, Your Honor.

16          THE COURT:  Counsel?

17          MR. McLANDRICH:  Yes, Your Honor.

18          MS. FRICK:  Yes, Your Honor.

19          THE COURT:  You may inquire.

20          MR. KANOVITZ:  Thank you.

21        MATTHEW SCOTT MOORE, DEFENSE WITNESS, SWORN

22                  CROSS-EXAMINATION (CONT.)

23  BY MR. KANOVITZ:

24  Q.   Good morning.  I have just a few more questions for you.

25          MR. KANOVITZ:  May I have the document camera?
```

MOORE - CROSS (Kanovitz)                                    1010

1              THE COURT:  You might in a minute.

2              MR. KANOVITZ:  I'll come back to it.

3    BY MR. KANOVITZ:

4    **Q.**    Sir, you testified that you did not become involved in

5    this case until June 15th of 1990.  Do you recall that

6    testimony?

7    **A.**    Yes.

8    **Q.**    And isn't it true that in April of 1990 Mr. Wolfe came to

9    the police station and handed you the five GM IDs?

10   **A.**    Yes.

11   **Q.**    And so, in your understanding, he would not have done

12   that unless you were, in fact, already involved in the case,

13   right?

14   **A.**    No, that's not the case.

15   **Q.**    Well, okay.  And, in fact, when you threw the file in

16   your drawer, it was several months before you returned to it,

17   correct?

18   **A.**    When I received the file on June 15th, I stuck it in

19   the drawer.

20   **Q.**    Well, you said that you stuck it in a drawer until mid

21   June, did you not?

22   **A.**    I actually ended up -- I don't remember exactly what I

23   said.  I know that on the 18th is when I actually initiated

24   in the computer the report.

25   **Q.**    All right.  Switching topics, you testified about

1   Defendant's Exhibit 18, which was the array that you did with

2   C.W., correct?

3   **A.**   That was done on the 28th.

4   **Q.**   Well, I am not asking you what day it was done.  And

5   also, for the record, wasn't it done on July 16th?

6   **A.**   July 16th was one of the Wise --

7   **Q.**   I thought I said C.W.  Did I say S.C.?

8   **A.**   I thought you said S.C.

9   **Q.**   We're talking about C.W. then.  And that was July 16th,

10   correct?

11   **A.**   On July 16th, yes.

12        (Exhibit displayed.)

13   BY MR. KANOVITZ:

14   **Q.**   And so there's page 1.  You had her sign it, and that

15   shows July 16th, right?

16   **A.**   Yes, sir.

17        (Exhibit displayed.)

18   BY MR. KANOVITZ:

19   **Q.**   And then you have your description, which was

20   contemporaneous, correct?

21   **A.**   Yes.

22        (Exhibit displayed.)

23   BY MR. KANOVITZ:

24   **Q.**   And then you have the photocopy of the exact array that

25   you showed her, right?

1   A.   Yes.

2   Q.   And Dean is in Number 2?

3   A.   Yes.

4   Q.   And you can't see anything but his head, right?

5   A.   Yes.

6        (Exhibit displayed.)

7   BY MR. KANOVITZ:

8   Q.   Now, the narrative that you wrote down for C.W., she

9   says --

10       THE COURT:  Counsel, if you are referring to an

11  exhibit, for the purposes of the record --

12       MR. KANOVITZ:  This is Defendant's 18, second page.

13  BY MR. KANOVITZ:

14  Q.   She says, "That's him.  His face is full.  Hair looks the

15  same.  His build is about right."

16       How did she know what his build looked like, sir?

17  A.   That's the statement that she made.  I don't know what

18  her reasoning was about that.  I can only imagine that it

19  has to do with the fact --

20       THE COURT:  Well, don't imagine.

21  BY MR. KANOVITZ:

22  Q.   Did you give her any additional information than you have

23  testified to already in this trial before you showed her the

24  photo array?

25  A.   I don't remember.

1    **Q.**   You testified about sending Dean's photo off to get blown

2    up.  Do you recall that?

3    **A.**   I sent it to the crime lab, yes.

4    **Q.**   And it came back, and it was too big?

5    **A.**   True.

6    **Q.**   Like you couldn't even fit it in the square, right?

7    **A.**   That's true.

8    **Q.**   So you sent another request to the crime lab?

9    **A.**   Yes, I did.

10   **Q.**   And this is Plaintiff's 246, which is the plaintiff's

11   version of the defense document that you looked at previously.

12          MR. KANOVITZ:  Actually, no.  I'll use Defendant's

13   33, Your Honor.

14          (Exhibit displayed.)

15   BY MR. KANOVITZ:

16   **Q.**   So showing you Defendant's 33, this is the one where you

17   said you needed a smaller version, right?

18   **A.**   Yes, sir.

19          (Exhibit displayed.)

20   BY MR. KANOVITZ:

21   **Q.**   And then on the second page, you gave them a sample of

22   the square that you wanted?

23   **A.**   Yes, sir.

24   **Q.**   And that's the size you wanted him to blow his head up

25   to, right?

MOORE - CROSS (Kanovitz)                                    1014

1    **A.**    That's the size that I wanted the photo made to fit

2    into that square.  Yes, I needed a photo that would fit in

3    that square.

4    **Q.**    Okay.  So you conveyed to the lab, make his head that

5    big?

6              MR. McLANDRICH:  Objection.

7              THE COURT:  Sustained.

8              THE WITNESS:  That's not what happened.

9              THE COURT:  I think that mischaracterizes what he

10   said.

11   BY MR. KANOVITZ:

12   **Q.**    Okay.  Isn't it true that you provided the lab this size

13   square when you asked them to amend the size of the

14   photograph?

15   **A.**    This is -- I wrote the square on the page to give them

16   an idea of the fact that I needed the image of Roger

17   Gillispie to fit in that square.

18   **Q.**    And did you have the other images in the lineup available

19   to you at that time?

20   **A.**    Did I have what?

21   **Q.**    Did you have the other images that you used in the

22   lineup -- strike that.

23        You testified about how at the time that you started

24   using the computer the department was switching over from the

25   written forms to the computer forms?

1    **A.**    That's correct.

2    **Q.**    And isn't it true that some of the detectives during that

3    time continued to use the written forms before they learned

4    how to use the computer?

5    **A.**    I don't know what other detectives did.

6    **Q.**    You testified that Dean hung up on you when you had the

7    phone call with him?

8    **A.**    Yes, on June 19th.

9    **Q.**    And isn't it true that that only occurred after he asked

10    for more time; you said no; and then you said the sentence

11    about, well, we'll handle it in whatever way I see fit,

12    correct?

13             MR. McLANDRICH:  Objection; asked and answered.

14             THE COURT:  I'll let him answer.

15             THE WITNESS:  There was some back and forth between

16    me and Roger Gillispie as far as setting up a time.  Started

17    out trying to get him in immediately, went to a few days, then

18    he ends up telling me that he's going to be busy for the next

19    two weeks, and it ends up -- we end up hanging up.

20        There was the comment that you just made, though.

21    BY MR. KANOVITZ:

22    **Q.**    You chose to see him as evasive, correct?

23    **A.**    I did see him as evasive there.

24    **Q.**    And you would agree that reasonable minds could differ?

25             MR. McLANDRICH:  Objection.

 1              THE COURT:  Sustained.

 2     BY MR. KANOVITZ:

 3     Q.   So you testified that once you turned the file over to

 4     the prosecutor, the case was out of your hands, correct?

 5     A.   They make the decisions from that point on.

 6     Q.   Well, your quote was, "The case was out of my hands."

 7     A.   Yes.

 8     Q.   And isn't it true that you continued to talk to the

 9     victims even after you turned it over to the prosecutor?

10     A.   I don't know how much contact I had after that.  I know

11     that during the course of prep, that a lot of times in cases

12     I would be present when the prosecutors would prep

13     witnesses.

14     Q.   Well, and at some point in time you told them that you

15     believed Dean had died his hair, correct?  We talked about

16     that yesterday afternoon.

17     A.   That was probably -- yes.

18     Q.   And that was well after you turned the file over to the

19     prosecutor, correct?

20     A.   I don't remember specifically when it was.  I know that

21     we -- there was a conversation, yes.

22              MR. KANOVITZ:  Okay.  No further questions.

23              THE COURT:  Anything?

24              MS. FRICK:  No, Your Honor.

25              THE COURT:  Anything?

FRITZ - DIRECT (Owens)                                                    1017

```
 1              MR. McLANDRICH:  No, sir.  Thank you.

 2              THE COURT:  Can this witness be excused?

 3              MR. KANOVITZ:  Yes, Your Honor.

 4              THE COURT:  All right.  Mr. Moore, thank you very

 5     much.

 6         Next witness.

 7              MR. OWENS:  Your Honor, we will call Steve Fritz.

 8          STEVEN FRITZ, PLAINTIFF'S WITNESS, SWORN

 9              THE COURT:  Mr. Fritz, I need you to keep your voice

10     up so we can all hear your responses to the questions that are

11     going to be posed to you.  You have the microphone there.

12     Please feel free to move it and use it as you deem

13     appropriate.  If you get too close, it does muffle you; if you

14     get far away, it won't pick you up.  So if you can keep your

15     voice up, that to a great extent resolves the problem, all

16     right?

17              THE WITNESS:  Yes, sir, Your Honor.

18              THE COURT:  All right.  You may inquire.

19                     DIRECT EXAMINATION

20     BY MR. OWENS:

21     Q.   Good morning, sir.

22     A.   Good morning.

23     Q.   Could you please state and spell your name.

24     A.   Steven R. Fritz, F-R-I-T-Z.

25     Q.   And how old are you?
```

1   **A.**    69.  I had to think about it for a moment.

2   **Q.**    And where do you live?

3   **A.**    In Coal Canyon, Arizona.

4   **Q.**    Did you at one time live in the Dayton area?

5   **A.**    Yes, I did.

6   **Q.**    And you still have family here?

7   **A.**    Yes.

8   **Q.**    And who still lives here that you're related to?

9   **A.**    There are four of my sons and my sister and my aunt.

10  **Q.**    What's your current occupation?

11  **A.**    I am a insurance investigator.

12  **Q.**    And what sorts of things do you investigate as an

13  insurance investigator?

14  **A.**    Insurance fraud, workers' comp fraud, disability.

15  **Q.**    Can you just give us a sense of your educational

16  background?

17  **A.**    Went to school here in Dayton, Belmont High School,

18  graduated.  To the police academy, got numerous courses, law

19  enforcement-related courses.  I've got a associate degree --

20  when I left and went to Arizona, got an associate degree in

21  culinary arts.  Worked as a -- kitchens for a while and was

22  a chef until my knees went out.  Went back and got a

23  bachelor's degree in management.

24  **Q.**    You mentioned that you took some classes in policing.

25  When did you first become a police officer?

1    **A.**    I think 1976.

2    **Q.**    And where did you first work as a police officer?

3    **A.**    My first work was volunteer work.  I was working at

4    Randolph and Sugar Creek townships.  I started working as a

5    ranger with Montgomery County Park Districts, which is now

6    Five Metro Parks.  And then from there I got offered a job

7    at Butler Township.  I was a police officer there.  And then

8    they sent me to evidence school; so I became an evidence

9    technician.  And then went down to Miami Township.

10   **Q.**    And how long were you a police officer at Miami Township

11   Police Department?

12   **A.**    Would have been right around maybe ten or eleven years.

13   **Q.**    And without giving us every single thing that you did,

14   could you just give us a overview of what your positions were

15   at Miami Township Police Department in that ten years,

16   briefly?

17   **A.**    Started off as a patrol officer.  I was also a crime

18   scene technician.  Had training in doing the photo lab.  We

19   had our own photo lab.  So I would do the photos that were

20   taken by our officers.  Crime prevention.  I did some --

21   when I was injured, I worked in records and property.  Was

22   promoted to detective, and then to detective-sergeant.

23   **Q.**    And when you left the department, were you a

24   detective-sergeant?

25   **A.**    Yes.

FRITZ - DIRECT (Owens)                                        1020

1    **Q.**    Now, did you receive any awards or commendations

2    concerning your police work while you were at Miami Township?

3    **A.**    Yes, there were quite a few commendations.  I was

4    police officer of the year in Montgomery County for a

5    homicide investigation, Mary Perrine [phonetic]

6    investigation that I ran.

7        I also received an award from the Optimist Club.  I

8    started the child fingerprint program that went for years

9    here.

10       Several accommodations for assisting other agencies,

11   solving some pretty difficult rapes and child abuse cases,

12   that type of thing.

13   **Q.**    Were you ever an instructor in the academy that Miami

14   Township would host?

15   **A.**    Yes.  I was an instructor -- like nine or ten academies

16   I was an instructor.

17   **Q.**    Did you ever receive any awards related to your

18   instruction in the police academy?

19   **A.**    Yes.  I received four awards for top instructor, which

20   is voted on by the class.

21   **Q.**    And do you recall the years that you received those

22   awards?

23   **A.**    No.  It was a long time ago.  Maybe '87 through '90,

24   something like that.

25   **Q.**    At a time where you had had some experience in the

FRITZ - DIRECT (Owens)                                    1021

1    department; fair to say?

2    **A.**    Yes.

3    **Q.**    And were a detective-sergeant at the time?

4    **A.**    Yes.

5    **Q.**    Now, at the police academy where you got some top teacher

6    awards, did you teach about how to investigate sexual assault

7    cases?

8    **A.**    Yes.

9    **Q.**    And did you have any experience by the time you got to

10   1988, 1990, that area, of investigating and working in sex

11   crimes?

12   **A.**    Yes.

13   **Q.**    And could you just describe a little bit about what that

14   experience was?

15   **A.**    When I become a detective, when I was first made

16   detective, you get kind of the bad checks and credit cards.

17   One day a child sexual abuse case came in by the mother.  No

18   other detectives were there.  I worked it, got a confession.

19   And then from then on I was working mostly -- I did most of

20   the sex crimes that came in and child abuse cases.

21        There were, I mean, numerous.  Some of them were

22   pretty -- pretty prominent.  Had a kidnapping and rape of a

23   little girl and a kidnapping and rape of a young lady that

24   were both solved.

25   **Q.**    So by the time of 1988, if you had to estimate, do you

1    know about how many sex crimes investigations you had worked

2    at Miami Township?

3    **A.**   I -- maybe 25, 30 cases I worked.

4    **Q.**   And so I just want to -- I know you spent a decade there,

5    roughly.  I want to fast forward and ask you a few questions

6    about 1988, and specifically when you were a detective-

7    sergeant, okay?

8    **A.**   Yes.

9    **Q.**   How many detectives were in the department at that time,

10   if you can recall?

11   **A.**   At that time there were five, including -- and that's

12   not including myself.

13   **Q.**   Got it.  A fairly small department then?

14   **A.**   Yes.

15   **Q.**   And where was the sort of physical building of the police

16   department located?

17   **A.**   2700 Lyons Road in Miami Township.

18   **Q.**   Is that near the mall?

19   **A.**   Yes.

20   **Q.**   And if I just want to get a sense for the structure of

21   the building, if you were going to meet with witnesses, where

22   would that take place at the department at that time?

23   **A.**   In 1988, it would have taken place in -- well, we had

24   our detective section, which was at the back of the

25   building.  There were also some interview rooms you could go

FRITZ - DIRECT (Owens)                                          1023

1    to.

2    **Q.**    If somebody were walking in from the front of the

3    building to the back where the detective section is, would

4    they have passed any pictures of police officers on the wall?

5    **A.**    To get back to the detective section back then, there

6    was photos of all the officers that was on -- as you were

7    walking down the hallway, they would have been to the right.

8    **Q.**    And did you know a guy back in 1988 named Gary Bailey?

9    **A.**    Yes.

10   **Q.**    And who was he?

11   **A.**    He was a corporal, detective-corporal in the detective

12   section.

13   **Q.**    And had you had some experience at all working with

14   Detective Bailey?

15   **A.**    Oh, yes, a lot.

16   **Q.**    Did you know an individual named Jim Moore?

17   **A.**    Yes.

18   **Q.**    And who is that?

19   **A.**    That was the chief, or that was our chief of police --

20   I can't remember if in 1988 he was still the chief, but he

21   was the chief that brought me on, hired me.

22   **Q.**    Got it.  And did he have a son who became a police

23   officer?

24   **A.**    Yes.

25   **Q.**    And is that Scott Moore?

1    **A.**   Yes.

2    **Q.**   And what was your relationship like with Jim Moore -- or

3    excuse me.  Let me just clarify.  What was your relationship

4    like with Chief Moore while you were in the department when he

5    was the chief?

6    **A.**   We had a good relationship.  He worked a lot with me.

7    He was the one that recommended that I put in for a

8    detective.  In fact, he made it real clear he wanted me in

9    the detective section.

10        We were in a bowling league together one night a week,

11   and he would pick me up and take me there.

12        He also assisted me -- I went to him with the child

13   fingerprint program when we went to the Optimist Club.  He

14   was real good at helping me get that through and get it

15   going.

16        And we had a -- there were times we would butt heads,

17   but the one thing about the chief was is once he was upset

18   and jumped you about something, it was over and you never

19   heard about it again.

20   **Q.**   And I know I asked -- focused you on 1988, but before

21   1988 did you become acquainted with an individual name of Rick

22   Wolfe?

23   **A.**   Oh, yes, yes.

24   **Q.**   And who was he?

25   **A.**   When I came on, Rick Wolfe was one of the -- he was a

FRITZ - DIRECT (Owens)                                           1025

1    reserve or an auxiliary police officer and had been there

2    for a long time.  His full-time job was at General Motors,

3    ran security there.  But I knew him from -- I worked on his

4    shift with several of the other auxiliary or part-time

5    officers.  At that time we didn't have that many full-time

6    officer.

7    Q.    By 1988 was Mr. Wolfe still in the department?

8    A.    No.

9    Q.    You said he worked at General Motors?

10   A.    Yes.

11   Q.    Was it important for you as a detective-sergeant at Miami

12   Township Police Department to maintain any type of a

13   relationship with somebody like Mr. Wolfe at GM?

14   A.    Well, not only GM, but really all of our businesses in

15   the mall area and stuff, it was important for me to -- to

16   keep a good relationship so they would trust us.  They would

17   come to us if they had a problem.  I gave several talks to

18   the businesses over at the mall at Christmastime on what to

19   do with thefts, bad credit cards, that type of thing.

20         Being that GM was one of the big employers in the area

21   and we had that contact with Rick there, we maintained a

22   very good relationship with them.

23   Q.    And did you have a good relationship with Mr. Wolfe in

24   1988?

25   A.    Oh, yes.

FRITZ - DIRECT (Owens)                                              1026

1    **Q.**   And I want to sort of fast forward to a point in August

2    of 1988 when what we've referred to, I think, as the Best

3    Products rapes.  Do you recall when that call came in?

4    **A.**   Yes.

5    **Q.**   How does that stick out in your memory?

6    **A.**   The day -- the evening before that I had been called

7    out on the kidnapping and rape of a nine-year-old little

8    girl from the Day's Inn on Springboro Pike.  They were from

9    Minnesota.  They came into town.  Dad was going to the NCR

10   training center.  He was going to take the little girl to

11   Kings Island.  Mom sent her out to get pillows, and she

12   looked out the window, she seen a guy grab her and drag her

13   around the building.  So I was called out on that.

14        We were working it at the Days Inn when one of our

15   officers found her wandering around the mall.  So being a

16   nine-year-old kidnapped from one of our hotels, this was a

17   priority case for me.

18        So the next day when I got the phone call stating we've

19   got two rapes and they wanted to call me out on it, I said,

20   "I'm really tied up with this case here.  Give that to

21   Corporal Bailey."

22   **Q.**   And why did you assign it to Corporal Bailey?

23   **A.**   Bailey was a competent detective.  I trusted with what

24   he did.  And he was kind of the second in command, and I

25   knew that he would handle the case.

1    **Q.**   Now, when you assigned the case to Corporal Bailey, did

2    you supervise him at all?

3    **A.**   I supervised all the detectives.  All the work that

4    came in, work product, reports, I read them.  In fact, any

5    felony case that would come in on any of the patrol shifts

6    came back to me, and I would look them over and then assign

7    them appropriately to the detectives.

8    **Q.**   During the course of the investigation, would you do

9    brainstorms with Corporal Bailey about what he was working on?

10   **A.**   Yes.  His desk was across from mine.  So there were

11   times he would throw things out to me and say what do you

12   think about this.  But that was common of all the

13   detectives.  They ran a lot -- we worked really tight back

14   there so --

15   **Q.**   Is there a particular reason why you would want to

16   brainstorm with a detective like Bailey working on a case?

17   **A.**   It's easy when you get involved in a case like that,

18   you kind of get tunnel vision.  You get so zeroed in on

19   something, you don't see the stuff on the peripherals.

20        And, also, everybody had different areas of expertise

21   and experience.  So sometimes something you may not be

22   seeing, somebody else may be seeing a pattern or something.

23   So it's just a way of opening it up to everybody.  You are

24   kind of getting more than just one set of eyes on a case

25   like that.

FRITZ - DIRECT (Owens)                                        1028

1    **Q.**    Now, as a detective-sergeant, can you just briefly

2    describe the process for reviewing reports that would come in

3    that would be written by the detectives?

4    **A.**    Detectives' reports would go to me.  I would read them

5    over and sign off on the bottom.  The originals went up to

6    records, and records would file them with the case file.

7    The original case file was kept in records.

8    **Q.**    And, now, how would you describe generally your practices

9    for report writing while you were a sergeant -- a

10   detective-sergeant?

11   **A.**    For the most part, unless it was a case that some guy

12   had been working on for 15 or 16 hours or so, reports had to

13   be done before they went home.  It was something that was

14   always trained to me, and then I passed it on.  Heaven

15   forbid if something should happen to you when you go home --

16   you die, you get in an accident, you can't work it.  Another

17   detective should be able to come in, pick up right where you

18   left off without wasting time.

19        And, also, you look stupid when you're going back and

20   say I need to interview you when a guy just interviewed me

21   the other day.

22        So you want to be able -- if another detective should

23   pick up the case, you should be able to pick up right where

24   that detective left off and continue forward.

25   **Q.**    So is that why it was important for -- strike that.

1       Now, at some point after the Best Products rapes, which

2   took place in August of 1988, did Dean Gillispie's name get

3   raised as a person of interest in some way in the

4   investigation?

5   **A.**   The name came up.  The timeline -- like I said, it's

6   been 33 years -- but I believe it was like '89, is when the

7   name came into us.

8   **Q.**   Some significant period of time --

9   **A.**   Yes.

10  **Q.**   -- afterwards?

11  **A.**   Yes.

12  **Q.**   And how did that name come to y'all?

13  **A.**   Rick Wolfe had come to the police department with

14  someone else, which I can't remember his name, from GM, said

15  he had a suspect for us.  I remember we all met in one of

16  the interview rooms.  There was Rick and this other person

17  from GM, Chief Tom Angel and Captain Marvin Scott and myself

18  and Corporal Bailey, and it was at that point that Rick

19  started telling the story of why they felt that Roger Dean

20  Gillispie was a suspect in these rapes.

21  **Q.**   And I just want to be clear, was this a meeting that

22  happened at the Miami Township Police Department?

23  **A.**   Yes, it was at Miami Township Police Department.

24  **Q.**   And so by this time, the chief of police was Tom Angel;

25  is that right?

FRITZ - DIRECT (Owens)                                    1030

1   **A.**    Tom Angel, yes.

2   **Q.**    And did Mr. Wolfe have anything with him when he came in

3   and mentioned Dean's name?

4   **A.**    He produced a photograph of who he said was Roger Dean

5   Gillispie.  It was not a good photograph, and he told us

6   that he had taken a picture of Mr. Gillispie's GM

7   identification card, so that's why it didn't have the

8   quality.  And he stated -- I don't remember everything that

9   he said, but you could tell there was some kind of animosity

10  towards --

11          MR. McLANDRICH:  Objection.

12          THE WITNESS:  -- towards Mr. Gillispie.

13          THE COURT:  Sustained.  Not responsive to the

14  question.

15          MR. OWENS:  Sure.

16  BY MR. OWENS:

17  **Q.**    So you said -- you mentioned that Mr. Wolfe had a picture

18  of Mr. Gillispie's GM identification?

19  **A.**    Yes.

20  **Q.**    You indicated that -- you said it wasn't a good quality.

21  What did you mean by that?

22  **A.**    It was kind of fuzzy.  It's like if you take a picture

23  of a picture.  I guess not now.  You take a picture of a

24  picture now, it's pretty clear.

25          But back then the details were fuzzy.  Couldn't

FRITZ - DIRECT (Owens)                                          1031

1    really -- I mean, pictures were tough anyway because they

2    are one dimensional, but this, you couldn't tell a lot

3    about -- the figures were distorted.  It looked like

4    somebody took a Polaroid of a picture.

5    **Q.**   Okay.  Now, is there anything else that you can recall

6    that happened at this meeting where Mr. Wolfe indicated that

7    Mr. Gillispie should be considered a suspect in the Best

8    Products rapes?

9    **A.**   Yes.  After discussing it, Chief Angel gave me an order

10   and said look into Roger Dean Gillispie, for which I turned

11   around and looked at Bailey and said look into Roger Dean

12   Gillispie.

13   **Q.**   Did you write any reports documenting this meeting when

14   Mr. Wolfe came to the police station and Chief Angel and

15   others were there?

16   **A.**   Yes.

17   **Q.**   Why'd you do that?

18   **A.**   Well, I had a direct order from the chief.  So that was

19   going to become part of the file.  So I wrote up the fact

20   that the meeting took place, who was at the meeting, and

21   that Chief Angel had given me the order, and that I had

22   passed that order on to Bailey.

23   **Q.**   And was it within your discretion as a detective-sergeant

24   to assign Detective Bailey to do the primary investigation?

25   **A.**   Yes.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    **Q.**    Is that sort of part of the chain of command?

2    **A.**    Yes.  Plus he was on it from the beginning.  So no one

3    knew the case better than him.

4    **Q.**    Now, what happened with the tip that Mr. Wolfe provided

5    implicating Mr. Gillispie?

6    **A.**    After several weeks, I asked Detective Bailey what the

7    status -- what the status was.  He had stated that --

8              MR. McLANDRICH:  Objection.

9              THE COURT:  Sustained.

10             MR. OWENS:  Your Honor, I think it goes to -- may I

11   respond, Your Honor?

12             THE COURT:  You may.

13             MR. OWENS:  What was that?

14             THE COURT:  You may.

15             MR. OWENS:  Thank you.  I think this goes to the

16   course of his actions and subsequent -- the impact on the

17   listener would be what this is being offered for given that he

18   is going to talk about the things that he did after this.

19             THE COURT:  Sustained.

20             MR. OWENS:  Sure.

21   BY MR. OWENS:

22   **Q.**    Did you ever have a conversation with Detective Bailey

23   about how the investigation was going?

24   **A.**    Yes.

25   **Q.**    And following that conversation, did Detective Bailey

FRITZ - DIRECT (Owens)                                          1033

1    ever provide you with any information about his investigation?

2    **A.**   Yes.

3    **Q.**   And how did he do that?

4    **A.**   Written report.

5    **Q.**   Okay.  Did you -- and what was the conclusion of that

6    report?

7    **A.**   The conclusion of that report was Roger Dean Gillispie

8    was not a good suspect in this case.

9    **Q.**   And so after Mr. Bailey provided you that report, did you

10   have any discussions with him about the substance of that

11   investigation?

12   **A.**   Yes.  'Cause I knew I would receive questions.

13   **Q.**   And did you familiarize yourself with the reasoning that

14   was in that report for eliminating Gillispie as a suspect?

15   **A.**   I don't recall all the reasons.  Some of the reasons I

16   recall was --

17              THE COURT:  Now, wait a minute.  He recalls some of

18   the reasons.

19              MR. OWENS:  Sure.

20   BY MR. OWENS:

21   **Q.**   And I think I asked you a different question.  So we will

22   get there --

23   **A.**   Okay.

24   **Q.**   -- which is, did you familiarize yourself, did you read

25   the report and understand what the reasons were at the time?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

FRITZ - DIRECT (Owens)                                    1034

1   **A.**   Yes.

2   **Q.**   And did you discuss what those reasons were with

3   Mr. Bailey at the time?

4   **A.**   Yes.

5   **Q.**   And did you agree with Mr. Bailey's assessment that was

6   the result of your conversations about Mr. Gillispie being

7   eliminated as a suspect?

8   **A.**   Yes.

9   **Q.**   Did you yourself create any further documentation about

10  the elimination of Mr. Gillispie as a suspect?

11  **A.**   Yes.

12  **Q.**   And what was that?

13  **A.**   I basically wrote up what we had -- what Corporal

14  Bailey and I had discussed, and that we had eliminated Roger

15  Dean Gillispie as a suspect.  And that was passed on to

16  Chief Moore -- or Chief Angel.

17  **Q.**   And so -- and also, am I right that you had to physically

18  sign off on Detective Bailey's report eliminating Gillispie as

19  a suspect?

20  **A.**   Yes.

21  **Q.**   Now, do you recall all of the steps that were taken in

22  the investigation that resulted in Mr. Gillispie being

23  eliminated as a suspect?

24  **A.**   Not all of them, no.

25  **Q.**   Is there something that would help you be able to

FRITZ - DIRECT (Owens)                                          1035

```
1   remember all of the things that happened in the investigation?

2   A.   Bailey's report.

3   Q.   Would there be information in the reports you wrote as

4   well?

5   A.   Yes.

6   Q.   And sitting here today, what are some of the reasons you

7   remember why you thought that Mr. Gillispie should be

8   eliminated as a suspect?

9   A.   Well, the description was greatly different from what

10  the victims had provided.  The complexion of Mr. Gillispie,

11  even with that photo, was -- appeared to be a fair

12  complexion, which differed with what the suspects had

13  provided.

14       One thing that stood out was they remembered the pant

15  size.  When the suspect had his pants down and was raping

16  the women, they seen the pants size of the guy's pants, and

17  it was -- we came to a conclusion that those pants would

18  have never fit Roger Dean Gillispie.

19  Q.   And that was because they would have been too small?

20            MR. McLANDRICH:  Objection.

21            THE WITNESS:  Too small.

22            THE COURT:  I'll allow it.

23  BY MR. OWENS:

24  Q.   So you mentioned -- did y'all ever develop a profile as

25  it relates to what you thought the perpetrator of the Best
```

FRITZ - DIRECT (Owens)                                                    1036

1    Products rape might fit into?

2    **A.**    Yes.

3    **Q.**    And what was that profile?

4    **A.**    I had never had one person rape two women at the same

5    time.  In fact, I had never even heard of that.  So a lot of

6    sex crimes are about control.  So I figured this is a guy

7    that's not afraid of controlling a lot of people, just

8    himself.

9          Also, he -- the control, the authoritative voice.  He

10   was very authoritative, very stern about what he wanted

11   done.  So I figured between that and the being able to

12   control two women at the same time, this wasn't his first --

13   first time doing anything like this.  He had worked up to

14   this.

15   **Q.**    And just to be clear, that's part of the profile that you

16   and Detective Bailey --

17   **A.**    Yes, yes.

18   **Q.**    Sorry.  Let me finish.

19   **A.**    I'm sorry.  Yes.

20   **Q.**    That's part of the profile that you and Detective Bailey

21   developed based upon your experience investigating these --

22   **A.**    Yes.

23   **Q.**    -- types of cases?

24          Were there other things about the nature of the crime

25   that factored into this sort of general profile?

1    **A.**    He had the victim spit the semen in a bag, which led me

2    to believe this guy is either some law enforcement

3    connections, or later on I developed it, or he could have

4    been in prison for this because I had another rape case

5    where the guy had studied evidence procedures and, when he

6    got out, started raping again.

7    **Q.**    And so let's just focus on sort of what you can recall at

8    the time, all right?

9    **A.**    Um-hmm.

10   **Q.**    And so at the time, why did it stand out to you that he

11   had had at least one of the victims spit semen into a bag?

12   **A.**    He had the presence of mind to take the evidence with

13   him, which is unusual.

14   **Q.**    And, now, fair to say that you thought that the person

15   who committed -- likely committed the Best Products rapes had

16   a prior criminal background?

17   **A.**    Yes.

18           MR. McLANDRICH:  Objection.  These are all leading

19   questions, Your Honor.

20           THE COURT:  I'm going to allow it.  Some of what he

21   felt that -- I don't know whether his testimony needs to be

22   summed up.

23           MR. OWENS:  I was just trying to direct him back to

24   it to move us forward.

25   BY MR. OWENS:

FRITZ - DIRECT (Owens)                                    1038

1    **Q.**   So did you learn anything about whether Mr. Gillispie had

2    a criminal background?

3    **A.**   Yes.  He did not have one.

4    **Q.**   Now, you mentioned that you knew Mr. Wolfe pretty well,

5    right?

6    **A.**   Yes, yes.

7    **Q.**   Was there anything about the way in which Gillispie's

8    name came up to you-all that factored in your -- the reasons

9    why you eliminated him as a suspect?

10   **A.**   Well, originally, it came across as a vendetta.  He was

11   upset with an old employee, and they didn't get along, so --

12   **Q.**   And let me just back up there.  When you said it came

13   across as a vendetta from a former employee, can you just

14   describe what you mean?

15   **A.**   The way Mr. Wolfe described the relationship between

16   him, GM, and Roger Dean Gillispie, he just came across as

17   this --

18           MR. McLANDRICH:  Objection.

19           THE WITNESS:  -- there was no love lost.

20           THE COURT:  Sustained.

21           MR. OWENS:  May I respond, Your Honor?

22           THE COURT:  You may.

23           MR. OWENS:  So in this context here, this is about

24   his impressions about why he wrote reports and documented --

25           THE COURT:  I'm fine with his impressions.  I'm not

FRITZ - DIRECT (Owens)                                        1039

1    fine with repeating what supposedly this gentleman said.

2            MR. OWENS:  Absolutely.  Understand.

3    BY MR. OWENS:

4    Q.   And what were your impressions from the manner in which

5    Mr. Wolfe acted without describing things that he said?

6    A.   My impressions were that he did not like Roger Dean

7    Gillispie; there was a lot of issues with him at work.

8    Q.   And based upon your experience, were your impressions --

9    did this seem like usual behavior from Mr. Wolfe?

10           MR. McLANDRICH:  Objection.

11           MR. HERMAN:  Objection.

12           THE COURT:  Sustained.  Foundation.

13       What -- you are asking him from his experience?  What's

14   his -- what?  At work?

15           MR. OWENS:  So I can rephrase, Your Honor.

16           THE COURT:  All right.

17   BY MR. OWENS:

18   Q.   You had spent a significant amount of time over the years

19   working with and interacting with Mr. Wolfe, correct?

20   A.   Yes.

21   Q.   Was the manner in which he was acting in this meeting

22   where he was implicating Mr. Gillispie typical of how he

23   normally acted?

24   A.   No.

25   Q.   And what were your impressions as to why?

FRITZ - DIRECT (Owens)                                          1040

1    **A.**   That he didn't care for Roger Dean Gillispie.  And

2    that's why he was bringing him forward as a suspect.

3    **Q.**   Based upon your experience, was that a usual way for

4    Mr. Wolfe to act with respect to people in the world?

5    **A.**   No.

6    **Q.**   Now, you mentioned that there were some reports written,

7    the one documenting the meeting, the one Bailey wrote, and the

8    one that you wrote after that.  Where did those reports go?

9    **A.**   Well, the copies would have went to Bailey's file; the

10   original would have went to records.

11   **Q.**   Do you have any reason to believe that those reports

12   weren't properly filed?

13            MR. McLANDRICH:  Objection.

14            THE COURT:  I'll let him answer.  You can

15   cross-examine him.

16            THE WITNESS:  No.

17   BY MR. OWENS:

18   **Q.**   Now, eventually -- sorry.  At this first meeting, and I

19   think that you said maybe in '89, early '90, did Mr. Wolfe

20   have -- strike that.

21        How many pictures did Mr. Wolfe have at the time?

22   **A.**   Just the one.

23   **Q.**   Now, eventually, did you leave the Miami Township Police

24   Department?

25   **A.**   Yes.

FRITZ - DIRECT (Owens)                                    1041

1    **Q.**   And do you know when that was?

2    **A.**   June of 1990.

3    **Q.**   And before you left the department, did Mr. Wolfe come

4    back a second time?

5    **A.**   Yes.

6    **Q.**   And what do you recall about a time that Mr. Wolfe came

7    back a second time?

8    **A.**   He left an envelope, and it was regarding the rape

9    case.  And being that I was leaving, I went to the chief,

10   Chief Angel, and told him that being that I was leaving, it

11   should be forwarded to another detective to look into.

12   **Q.**   And do you know what was in that envelope?

13   **A.**   I don't recall I even looked in it.  He had pretty much

14   told me it was about the rape case, and I didn't want to get

15   wrapped in since I was leaving.

16   **Q.**   Okay.  Do you recall -- did you convene another meeting

17   when Mr. Wolfe dropped off this envelope with the chief and

18   other people like had happened before?

19   **A.**   No.

20   **Q.**   Did you pay much attention to it?

21   **A.**   No.

22   **Q.**   Why did you leave the Miami Township Police Department?

23   **A.**   I was extremely upset and disillusioned by events that

24   occurred over the past six months to a year.

25   **Q.**   And, now, before you left the department, did you

FRITZ - DIRECT (Owens)                                                    1042

1    supervise Scott Moore?

2    **A.**    Yes.

3    **Q.**    Did you have any bad blood against Mr. Moore?

4    **A.**    No.

5    **Q.**    Where did you go after you left the Miami Township Police

6    Department?

7    **A.**    Drove to -- we went to Arizona, to Phoenix.  I had set

8    up a couple interviews out there.  So left there -- we went

9    out there in June, end of June of 1990.

10   **Q.**    Did you eventually make your way back to Ohio?

11   **A.**    Yes.

12   **Q.**    And do you know roughly how long you were in Arizona

13   before coming back?

14   **A.**    I believe we returned in September of 1990.

15   **Q.**    Where'd you get a job after that?

16   **A.**    Area Wide Investigations.

17   **Q.**    And what was Area Wide Investigations?

18   **A.**    They did investigations for attorneys and insurance

19   companies.  They also had a polygraph service there that

20   they would offer.

21   **Q.**    And were you in charge of Area Wide Investigations?

22   **A.**    No.

23   **Q.**    Do you recall the individual who was?

24   **A.**    Yes.  Bill Riley, William Riley.

25   **Q.**    And I'm sorry to ask, is Mr. Riley alive today?

FRITZ - DIRECT (Owens)                                          1043

1    **A.**   No.

2    **Q.**   Now, what were your duties working at Area Wide?

3    **A.**   I was a private investigator.  I would be handed cases

4    from either attorneys that would come in and see Mr. Riley

5    or insurance companies or whatever that would need stuff

6    done, then it would come back to me.

7    **Q.**   Did you have control over your assignments?

8    **A.**   No.

9    **Q.**   Who did?

10   **A.**   Bill Riley.

11   **Q.**   Did you eventually receive an assignment that involved

12   Mr. Gillispie?

13   **A.**   Yes.

14   **Q.**   Do you recall -- what do you remember about how that went

15   down?

16   **A.**   I was pulled into Mr. Riley's office and explained that

17   they had a defense case they wanted me to work.  And it

18   involved Miami Township Police Department.

19   **Q.**   Did you have any reservations about working on a case

20   involving Miami Township Police Department?

21   **A.**   Oh, yeah.

22   **Q.**   Did you express any of those reservations at the time?

23   **A.**   Very strongly.  Told them that I did not want to have

24   anything to do with anything from my old police department.

25   **Q.**   Okay.  And without getting into anything that somebody

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

FRITZ - DIRECT (Owens)                                    1044

1    told you, what was the general response?

2    **A.**   It was either take the assignment or go home.

3    **Q.**   And --

4    **A.**   I took the assignment.

5    **Q.**   Could you afford to not have a job at that time?

6    **A.**   No.

7            MR. McLANDRICH:  Objection.

8            MR. OWENS:  What's the basis?

9            THE COURT:  I'll allow it.  I'll allow it.

10       Go ahead.  Next question.

11           MR. OWENS:  Did you get the answer?  I didn't hear

12   it.

13           MR. McLANDRICH:  He said no.

14           THE COURT:  No, no.

15   BY MR. OWENS:

16   **Q.**   Do you recall the name of Mr. -- all right.

17       So you were assigned to work on the Gillispie case.  What

18   was your relationship like with the attorney on the case?

19   Strike that?

20   **A.**   Dennis Lieberman.

21   **Q.**   Do you recall the attorney's name?

22   **A.**   Yes, it was Dennis Lieberman.

23   **Q.**   And what was your relationship like with Mr. Lieberman?

24   **A.**   Really, I only met with him, I believe, one time.  All

25   the orders that he wanted or things he wanted done went

FRITZ - DIRECT (Owens)                                          1045

1    through Bill Riley and then came to me.

2    **Q.**   Did you have any control over Mr. Lieberman's defense or

3    strategy?

4    **A.**   No.

5    **Q.**   Did you have any control over the amount of time that you

6    were allowed to work on Mr. Gillispie's defense?

7    **A.**   Yes.  I was told to try to minimize as much as I could

8    because there was not a lot of money on this.

9    **Q.**   Do you know whether or not -- not you-all -- how Area

10   Wide charged for its services?

11   **A.**   No.

12   **Q.**   Did Mr. Lieberman ever seek your advice --

13   **A.**   No.

14   **Q.**   -- about strategy?

15   **A.**   No.

16   **Q.**   Did you ever receive the complete file that had been

17   produced to Mr. Lieberman?

18   **A.**   I received a file.  Whether it was complete, I don't

19   know.  I didn't see a complete file.

20   **Q.**   Did you have any conversations with Mr. Riley about the

21   documents that you would receive as part of your work?

22   **A.**   Yes.

23   **Q.**   And what was your understanding about the documents that

24   you would receive as part of your work?

25   **A.**   I went to him and felt there was a lot of documents

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

FRITZ - DIRECT (Owens)                                              1046

1    missing from what I was given.

2    **Q.**   And what was the response to that?

3    **A.**   Work with what I was given.  Basically, I was told,

4    "You do what Mr. Lieberman or I tell you to do, and we'll

5    get you whatever we feel you need."

6    **Q.**   At some point did you meet Mr. Gillispie?

7    **A.**   Yes.

8    **Q.**   And what was your attitude towards Dean during that

9    meeting?

10   **A.**   Well, I wouldn't say it was the best.  I kind of come

11   in stirring.  I was wanting to see what his reaction would

12   be.

13   **Q.**   And what did you tell him?

14   **A.**   Basically told him that I really didn't want to be

15   here, that I was a victim's advocate; and because I was

16   here, I was going to require him to do things, and that if

17   he refused to do what I asked him to do, told me a lie, or

18   withheld things, that I was walking.  And that if I found

19   out he was guilty, I'd march over to his attorney's office

20   and say you better make this guy a deal.

21   **Q.**   Did Mr. Gillispie -- how did he respond to that?

22   **A.**   Well, he responded in kind.  He was pretty stern back

23   with me, saying fine, he was -- you know, straight up just

24   said, you know, whatever you want.

25   **Q.**   All right.  At some point, was one of the tasks that you

1    were assigned to perform by Area Wide to investigate Dean's

2    innocence and his not being in Montgomery area related to the

3    dates that the crimes happened?

4    **A.**    Yes.

5    **Q.**    And so what did you do relative to that aspect of the

6    case?

7    **A.**    Dean and I drove to Kentucky to Cave Run Lake.  That

8    had been the alibi where he had supposedly been that

9    weekend.  And, in fact, him and his two friends had been

10   down there throughout the summer and got a campsite.

11   **Q.**    And what happened once you got down there to Cave Run

12   Lake?

13   **A.**    Went to the ranger station, and I asked the rangers for

14   the registrations that they sign.  When you get a

15   campground, he has to sign for the campground so they know

16   who's there.  The ranger brought out a large box with cards

17   in it, and the cards were all messed up.  And I remember

18   looking at him going, "Was someone here before us?"

19        He didn't say anything.  He just kind of looked at

20   me -- well, he just looked at me and set the cards down.  So

21   I asked for a table where we could sort the cards out by

22   month so that I could try to see if I could find

23   Mr. Gillispie's name or the names of his two friends.

24   **Q.**    And what did you find once you organized the cards?

25   **A.**    Nothing.  Found nothing in the name of Roger Dean

FRITZ - DIRECT (Owens)                                          1048

1    Gillispie or the other two guys that were there, and he was

2    very adamant that they were there almost every weekend.

3    **Q.**   And so do you recall whether or not you saw any camping

4    receipts for the summer of 1988 when you were down there?

5    **A.**   None -- none in their name.

6    **Q.**   Do you recall whether or not you saw whether or not there

7    were more or less for any particular month that summer?

8            MR. HERMAN:  Objection.

9            THE COURT:  I think he's testified he didn't find

10   any.  So how would it be more or less?

11           MR. OWENS:  He indicated -- sorry.  I can clarify.

12           THE COURT:  All right.

13   BY MR. OWENS:

14   **Q.**   You found -- there were camping receipts that you found

15   for the summer months, correct?

16   **A.**   Oh, yeah, yes.

17   **Q.**   And you didn't find any with Mr. Gillispie's name or his

18   friends' name on them; is that right?

19   **A.**   No, I did not.

20   **Q.**   And just turning to camping receipts generally,

21   regardless of whose name was on them, were there more or less

22   for any of the particular months of that summer that you can

23   recall?

24           MR. McLANDRICH:  Objection.

25           THE COURT:  Can you answer that question?

1              THE WITNESS:  I don't recall.

2              THE COURT:  He doesn't recall.

3              MR. OWENS:  Your Honor, if I may show the witness a

4    document and ask him if it refreshes his recollection.

5              THE COURT:  You may.

6              MR. OWENS:  All right.  Can the witness be shown

7    Plaintiff's Trial Exhibit 71?

8              MR. McLANDRICH:  Objection, Your Honor.  Can we

9    approach?

10        (At sidebar.)

11             MR. McLANDRICH:  So this is one of his hearsay

12   affidavits that he's executed.

13             MR. OWENS:  Do you want to put your name on the

14   record?

15             MR. McLANDRICH:  John McLandrich for Mr. Moore.  So

16   this is one of Mr. Fritz's hearsay affidavits.  I don't see

17   how this affidavit is a proper document to refresh his

18   recollection when the affidavit represents his own

19   recollection that was, frankly, not written by him but written

20   by the Innocence Project.

21             MR. OWENS:  Your Honor, this is David Owens on

22   behalf of Dean Gillispie.  You can refresh with any document

23   in the universe.  I don't think there is any requirement that

24   I can ask him whether -- show him this, ask him whether it

25   refreshes his recollection.  That's how it works.

1              MR. McLANDRICH:  Yeah, but now we are essentially

2     going to put into the record the hearsay affidavit that isn't

3     subject to cross-examination and make it his testimony when he

4     says he doesn't remember.

5              MR. OWENS:  He can answer the question.  You can

6     cross-examine him.  This is basic trial --

7              THE COURT:  Anything?

8              MR. HERMAN:  I have nothing to add.

9              THE COURT:  He can refresh his recollection.

10        (In open court.)

11             THE COURT:  Now, sir, you are being shown a

12    document.  You are to read it as directed by counsel, and then

13    counsel will ask you questions.

14        So what do you want him to look at?

15             MR. OWENS:  Yes, sir.

16    BY MR. OWENS:

17    **Q.**  Mr. Fritz, could you take a look at page number 7,

18    paragraph 8, and just read that paragraph, and then look up

19    once you've done that?

20             THE COURT:  Read it to yourself, please.

21             THE WITNESS:  Yes, sir.

22             THE COURT:  Question.

23    BY MR. OWENS:

24    **Q.**  Does that refresh your recollection about whether or not

25    you saw camping receipts generally with respect to the summer

FRITZ - DIRECT (Owens)                                                   1051

1    of 1988 and whether there were more or less over certain

2    months?

3    **A.**    Yes.

4    **Q.**    And what's that?

5    **A.**    There were less cards in the month of August when the

6    crime took place, and particularly on the weekend when that

7    crime took place.

8    **Q.**    And there were more, I take it, than some other months?

9    **A.**    Yes.  The rest of the months, yeah, there were a lot

10   more.

11   **Q.**    Now, you indicated that you drove down to Cave Run Lake

12   in Kentucky with Mr. Gillispie, right?

13   **A.**    Yes.

14   **Q.**    What was your relationship like with him at that point?

15   **A.**    I was still trying to figure out where it was heading,

16   where we're -- whether he was guilty of this or whether he

17   was innocent.  I was kind of compiling, you know, the facts

18   as we were going along.

19        We didn't talk about it much going down.  It was more

20   just light talk.  I kind of wanted to keep him away from a

21   lot of that until we got down there, and then we could -- he

22   could kind of take me to where he needed to take me.

23   **Q.**    Fair to say you were still testing out whether or not --

24   **A.**    Yes.

25   **Q.**    -- you could trust Mr. Gillispie?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1   **A.**   Yes.

2   **Q.**   Just let me finish.

3   **A.**   Okay.

4   **Q.**   Did anything happen down there that, from your

5   perspective, shed light on whether or not you could trust

6   Mr. Gillispie when he told you he was innocent?

7   **A.**   Yes.

8   **Q.**   What was that?

9   **A.**   When we came up with no cards for the whole summer for

10  any of those three gentlemen, I remembered Mr. Gillispie

11  explaining to me he had been to a restaurant down on the

12  lake.  So I had him take me to the restaurant on the lake.

13  He had said they had eaten in there quite a bit.

14        I went into the restaurant, to the waitresses that were

15  there, and I don't recall their names, but they remembered

16  all three of them as being down there almost every weekend.

17  **Q.**   And so how did that impact your assessment of how to

18  interact with Mr. Gillispie?

19  **A.**   We had two waitresses at a restaurant who knew them by

20  name well enough that they had been in there, obviously, a

21  lot, and had said they were here almost every weekend.

22  **Q.**   Now, you made it back to the Dayton area --

23  **A.**   Yes.

24  **Q.**   -- from Cave Run Lake, right?

25  **A.**   Yes.

FRITZ - DIRECT (Owens)                                              1053

1    **Q.**   And just fast forwarding a little bit, Mr. Gillispie was

2    eventually convicted in February of 1991, right?

3    **A.**   Yes.

4    **Q.**   Now, between the time that you went to Cave Run Lake and

5    submitted your stuff, did you have any sit-down, substantive

6    conversations with Mr. Lieberman?

7    **A.**   I called Mr. Lieberman and explained to him what we had

8    not found at Cave Run Lake.

9    **Q.**   Got it.  Other than discussing -- other than letting

10   Mr. Lieberman know the results of the investigation that you

11   performed, did he ever sit down with you after that and have a

12   big strategy session or anything?

13   **A.**   No.

14   **Q.**   Did you testify at those trials?

15   **A.**   No.

16   **Q.**   Sorry.  I jumped ahead there.

17         You know Mr. Gillispie had two trials, right?

18   **A.**   Yes.

19   **Q.**   Did you testify at either of them?

20   **A.**   No.

21   **Q.**   Did you sit in and watch the evidence as it happened

22   during them?

23   **A.**   No.  I was told they didn't want to pay me for sitting

24   in on the trials.

25   **Q.**   Do you have any idea whether or not reports that you had

FRITZ - DIRECT (Owens)                                    1054

1    written eliminating Gillispie as a suspect had been provided

2    to Mr. Lieberman?

3    **A.**   No.

4    **Q.**   Now, after Mr. Gillispie was convicted, did you at some

5    point come to continue to do work for him?

6    **A.**   Convicted the first time or the second time?

7    **Q.**   Sorry.  Thank you.  Now, after Gillispie was convicted

8    the first time, you were still at Area Wide, right?

9    **A.**   Yes, yes.

10   **Q.**   And you testified at a hearing in between the trials,

11   correct?

12   **A.**   Yes.

13   **Q.**   And that testimony was about the hairs that were

14   recovered?

15   **A.**   Yes.

16   **Q.**   And Mr. Gillispie was convicted a second time?

17   **A.**   Yes.

18   **Q.**   Now, after Mr. Gillispie was convicted, was Area Wide

19   still working on the defense?

20   **A.**   No.  After the guilty verdicts, when I got back to the

21   office, I was told there was no more money and we were not

22   doing anymore work on it.

23   **Q.**   All right.  So at some point, did you continue to do work

24   on behalf of Mr. Gillispie without getting paid?

25   **A.**   Yes.

FRITZ - DIRECT (Owens)                                        1055

1    **Q.**   Was that related to Area Wide?

2    **A.**   No.

3    **Q.**   And when did that begin?

4    **A.**   Almost right away.

5    **Q.**   And how did that start?

6    **A.**   When I got back to the offices, I was kind of upset

7    because how could we -- with everything that we had found

8    out, how could we just walk away from this.  And I was told

9    it was all about the money.

10        And I had spoken to Mr. Gillispie's mother, who just

11   kind of asked me, "Can you please keep looking into this.

12   You're the only one that believes my son."

13   **Q.**   And so -- and Mr. Gillispie's mother, that's Juana

14   Gillispie?

15   **A.**   Juana Gillispie, yes.

16   **Q.**   And so what did you -- how did you respond to

17   Ms. Gillispie when she asked you to continue working -- work

18   on the case pro bono?

19   **A.**   I told her I would.  And my reasoning was is I would

20   like to think that if one of my sons had something like this

21   happen to him or even myself, someone would step up and keep

22   looking into this instead of just letting it go.

23   **Q.**   Now, how long did you sort of do pro bono investigative

24   work relative to Mr. Gillispie?

25   **A.**   After the first trial, it was quite a bit.  I mean, it

FRITZ - DIRECT (Owens)                                          1056

```
 1    wasn't like I was working full time, but I was following

 2    leads of my own, talking to people.

 3        I -- an alternative suspect had been developed.  I was

 4    looking into that.

 5              MR. McLANDRICH:  Objection.  There is no question.

 6    He's just --

 7              MR. OWENS:  I can ask a more specific question.

 8              THE COURT:  I'll sustain it.

 9        Do you want to ask the question?

10              MR. OWENS:  Sure.

11    BY MR. OWENS:

12    Q.  So after you left Area Wide, after the second trial,

13    there was a period which is sort of in the early to mid '90s,

14    right?

15    A.  Yes.

16    Q.  Did you continue to do work between the early to mid '90s

17    and the early 2000s relative to Mr. Gillispie?

18    A.  Yes.

19    Q.  And what sorts of things did you do during that period of

20    time?

21    A.  I was interviewing, meeting with people, getting

22    statements, working on the alter -- the alternative suspect

23    that I had been given a name of.  And at one point, it had

24    gotten to the point where I had developed all that I could.

25    I didn't have a badge.  I wasn't -- I didn't have my private
```

1     investigators license that I could use for this.  So when I

2     would meet people, I would just tell them, "I'm a citizen.

3     I am looking into this.  I feel there is something wrong.

4     Could you help me?"  And most people did.

5          But at a certain point, in 2002, I had moved to Arizona

6     by then.  I was still talking with Mrs. Gillispie over the

7     telephone.  We had reached a point:  She was frustrated.  I

8     was frustrated.  No one was listening to us.  And I told her

9     we needed to somehow turn what we had over to someone

10    legally that could take it in from there to the courts

11    'cause I didn't have that experience to do.  I wasn't an

12    attorney.

13    Q.   All right.  So let's back up a little bit.  You said that

14    you investigated a potential alternative suspect; is that

15    right?

16    A.   Yes, yes.

17    Q.   What was that person's name?

18    A.   Kevin Cobb.

19    Q.   And what sorts of things did you do to investigate Kevin

20    Cobb as an alternative suspect?

21    A.   Checked his past criminal record.  I spoke to Hamilton

22    Police Department, who had arrested him before.  Went out

23    and spoke to his mother, his father-in-law.  Tried to get

24    into -- he was a correctional guard at Lebanon Correctional

25    Institute.  I tried to get in there to talk to them, but

FRITZ - DIRECT (Owens)                                           1058

1    that never materialized.

2    **Q.**   Why is it that you pursued Mr. Cobb as an alternative

3    suspect?

4    **A.**   After the first trial, I returned to my office.  About

5    a day later, when it was in all the newspapers, I get a

6    phone call from a gentleman who said I can't give you my

7    name because I can't get tied up in all the union stuff

8    that's involved, but he says the guy you need is Kevin --

9              MR. McLANDRICH:  Objection.

10             THE COURT:  Sustained as to the statements.

11             MR. OWENS:  Sure.

12   BY MR. OWENS:

13   **Q.**   So you can't tell me anything that somebody said to you,

14   okay?  So just tell me what happened, all right?

15        So you received a phone call, correct?

16   **A.**   Yes.

17   **Q.**   That phone call, as a result of that, indicated that

18   Mr. Cobb might be a suspect?

19   **A.**   Yes.

20   **Q.**   And when -- after you received that call, did you do any

21   preliminary looking to see whether or not there was some

22   potential, at least in your mind, that Mr. Cobb might have

23   been a potential perpetrator?

24   **A.**   Yes.

25   **Q.**   And so once you did an -- were there things about

FRITZ - DIRECT (Owens)                                          1059

1    Mr. Cobb himself that made you think that he could be a

2    potential perpetrator?

3    A.   Yes.

4    Q.   What was that?

5    A.   After I obtained his physical -- physical

6    characteristics and the past crime that he had --

7              MR. McLANDRICH:  Objection.  This is essentially

8    impermissible character evidence, you know, acting in

9    conformity with past conduct.

10             THE COURT:  Overruled.

11        I'm going to let him.

12   BY MR. OWENS:

13   Q.   Go ahead.

14   A.   Okay.  And looked into the past crime that he had

15   committed and spoke to detectives there.  I realized that

16   the physical description that they had and gave of him was

17   the exact same as given by the two victims.

18   Q.   And what were the things that during the course of your

19   investigation stood out to you as similar to the perpetrator

20   of the Best Products rapes, between Kevin Cobb?

21   A.   The light hair with the orangish tint, thick neck, the

22   authoritative voice.  The one that tipped me, though, was

23   whether he was black or white.  And he told me, he said,

24   "We've had him arrested here twice, as a black man and a

25   white man, because he looks like a white man with a real

FRITZ - DIRECT (Owens)                                        1060

1   good tan."

2   **Q.**   And was that something that was consistent with how the

3   perpetrator of the Best Products rapes had been described?

4   **A.**   Oh, yes, yes.

5   **Q.**   All right.  I believe you -- did you obtain any police

6   reports about arrests related to Mr. Cobb?

7   **A.**   I received information about the arrest that was

8   similar to this.

9   **Q.**   And do you recall whether or not you eventually obtained

10  a number of police reports from various agencies relative to

11  times that Mr. Cobb had been arrested?

12  **A.**   Yes.

13  **Q.**   Do you remember all the agencies that -- well, do you

14  remember what some of those agencies were that had arrested

15  Mr. Cobb?

16  **A.**   City of Hamilton was the one I remember the most.

17  **Q.**   Any other agencies?

18  **A.**   I don't remember the name of the agency.  It was from

19  the one that he was in prison at that time that they put him

20  in there for checks.

21  **Q.**   Does Fairfield sound familiar?

22  **A.**   Yes.

23  **Q.**   And do you recall whether or not Mr. Cobb had also been

24  arrested or investigated by Bellevue PD?

25  **A.**   Kentucky?

FRITZ - DIRECT (Owens)                                          1061

1   **Q.**   Yes, sir.

2   **A.**   Yes.

3   **Q.**   What stands out to you about that?

4   **A.**   The fact that the complainant in that case was a former

5   girlfriend, and he attempted to sexually assault her.  And

6   she filed a police report on it.

7   **Q.**   Do you remember the former girlfriend of Ms. Cobb, what

8   her name was?

9   **A.**   I remember Stephanie, but I can't remember her last

10  name.

11  **Q.**   Does Walters sound right?

12              MR. McLANDRICH:  Object.

13              THE WITNESS:  Yes.  Stephanie Walters.

14              THE COURT:  Sustained.  I'm not sure as -- as to the

15  Walters.  You've got the testimony to what he's investigated.

16              MR. OWENS:  Sure.

17              THE COURT:  You can't tell him what the answers are.

18              MR. OWENS:  Sure.

19  BY MR. OWENS:

20  **Q.**   Did you speak with Ms. Walters?

21  **A.**   Yes.

22  **Q.**   And what did she relate to you?

23              MR. McLANDRICH:  Objection.

24              THE COURT:  Sustained.

25  BY MR. OWENS:

FRITZ - DIRECT (Owens)                                          1062

1    **Q.**   Did she confirm the allegations that you were

2    investigating related to Mr. Cobb?

3            MR. McLANDRICH:  Objection.

4            MR. HERMAN:  Objection.

5            THE COURT:  Sustained.

6    BY MR. OWENS:

7    **Q.**   At some point, did you also come to learn what Mr. Cobb

8    looked like?

9    **A.**   Yes.

10           MR. OWENS:  Your Honor, if we could display PX54 at

11   page 72.

12           THE COURT:  Has that been displayed?

13           MR. OWENS:  No, it hasn't, Your Honor.

14       Any objection?

15           MR. McLANDRICH:  I'm working through it.  Just one

16   second.

17           MR. KANOVITZ:  That's fine.  No objection, Your

18   Honor.

19           MR. HERMAN:  No objection.

20           THE COURT:  It may be.

21           MR. OWENS:  Can you just focus in on the picture.

22       (Exhibit displayed.)

23   BY MR. OWENS:

24   **Q.**   Mr. Fritz, who is the -- who is this person?

25   **A.**   Kevin Cobb.

FRITZ - DIRECT (Owens)                                         1063

1              MR. OWENS:  You can take it down.

2    BY MR. OWENS:

3    Q.   Now, Mr. Fritz, did you, in the course of your work,

4    obtain yourself additional pictures of Mr. Cobb?

5    A.   Yes.

6              MR. OWENS:  Your Honor, I'd like to show the witness

7    PX59 -- excuse me -- PX54 at 79.

8              MR. McLANDRICH:  I object.

9              THE COURT:  Did you say you object?

10             MR. McLANDRICH:  Yes, sir.

11             MR. HERMAN:  Likewise, objection.

12             THE COURT:  What's that?

13             MR. HERMAN:  Objection.

14             THE COURT:  I don't know what it is.  So we're going

15   to have to approach.

16        (At sidebar.)

17             THE COURT:  I need to see.  I don't know what you're

18   talking about.

19             MR. OWENS:  Can I explain?

20             THE COURT:  First, let's do the objection.

21             MR. McLANDRICH:  Well, first off, it's cumulative.

22             THE COURT:  Name, please.

23             MR. McLANDRICH:  I'm sorry.  John McLandrich for

24   Moore.  It's cumulative.  It's prejudicial, and you already

25   put up a picture of Cobb.  You know, it's got this various

FRITZ - DIRECT (Owens)                                        1064

1   narrative that he can testify to or already has testified to

2   by and large, and I just don't think that it's relevant to any

3   of the claims in the case.

4          MR. HERMAN:  Chris Herman.  I wouldn't have anything

5   else to add to that other than we don't know what this

6   extraneous black type is here and who the source of that is

7   and the foundation for all of that.

8          MR. OWENS:  Sure.  I mean, I'm happy to ask him a

9   few questions about foundation.  Mr. Fritz, I believe, will

10  testify that he's the one who wrote all this stuff on here.  I

11  am going to ask him what the basis for that was, why he put it

12  on there, and it will be those three questions.  And then the

13  next thing will be like, "What did you do with all this

14  information?"  "I gave it to Mr. Godsey."  That's it.

15         THE COURT:  Sustained.

16      (In open court.)

17         THE COURT:  Let's go, gentlemen.

18  BY MR. OWENS:

19  **Q.**   Did you obtain pictures of Mr. Cobb during the course of

20  your investigation?

21  **A.**   Yes.

22  **Q.**   And did you prepare a document that had writing on the

23  pictures?

24  **A.**   Yes.

25  **Q.**   Did you prepare a document -- what sort of things did you

FRITZ - DIRECT (Owens)                                              1065

1   put on that picture?

2   **A.**   Just basic things about his description that were

3   similar to what the victims had said.

4   **Q.**   Based upon the investigation --

5   **A.**   Yes, based on the investigation.

6   **Q.**   Sorry.  You just got to let me finish.

7        Based upon the investigation you had done over the course

8   of the years, you put things that you thought were similar

9   between Mr. Cobb and the perpetrator?

10  **A.**   Yes.

11  **Q.**   All right.  And do you recall where the picture was from

12  that you sort of wrote those things on?

13  **A.**   No, I don't.

14            MR. OWENS:  Your Honor, if I could show the witness

15  PX54 at 79?  He just testified he didn't recall what the

16  picture was that he had written on.  I'd like to show him.

17            THE COURT:  All right.

18  BY MR. OWENS:

19  **Q.**   Just take a glance, and once you have had a chance to

20  look at it, look over here.

21  **A.**   Yes.

22  **Q.**   All right.  Does that refresh your recollection as to

23  where the picture was from that you obtained?

24  **A.**   Fairfield Police Department.

25            MR. OWENS:  Your Honor, at this point I'd like to

FRITZ - DIRECT (Owens)                                    1066

1    show -- to publish to the jury PX54 at 79.

2              MR. McLANDRICH:  Object.  I thought we just --

3              MR. HERMAN:  Same objection.

4              THE COURT:  Sustained.

5              MR. OWENS:  Just to clarify so I can move us forward

6    quickly, is the basis for the objection and the Court's ruling

7    something other than foundation?  Because I was trying to lay

8    a foundation for it.

9              THE COURT:  The basis is the fact that we have

10   gotten into redundancy.  We have already shown a picture of

11   him.  He's testified as to what he said on the picture.  So,

12   therefore, the Court is going to sustain the objection.

13             MR. OWENS:  Thank you, Your Honor.

14   BY MR. OWENS:

15   Q.   Let's fast forward to 2002, 2003.  I think you mentioned

16   that you reached out to other people beyond what you could do

17   on your own; is that right?

18   A.   Yes.

19   Q.   And who did you reach out to looking for additional help?

20   A.   One of the -- one of the places I called was Harvard

21   Law School, just looking for some direction, how do I get

22   help, legal type, to take this over.

23        I also called the Innocence Project in Cincinnati -- or

24   in New York City.  I spoke to them at great length, and they

25   took my number.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1      I remember I spoke to a woman who was an expert in

2  eyewitness testimony.  We spoke.  Another one was a woman

3  who had been -- who had wrongfully selected a guy in a rape

4  case -- and I get them mixed up.  One of them was named

5  Jennifer but -- and then later it was found out that she had

6  selected the wrong guy.

7      And then I reached out to news shows and anyone that

8  would kind of bring this whole thing to light.

9  **Q.**   And you mentioned Jennifer.  Do you recall her last name?

10 **A.**   No.

11 **Q.**   Why would you reach out to a rape victim who had selected

12 the wrong person?

13 **A.**   One of the things that I always took into consideration

14 too was the stuff that I was finding out was that there were

15 rape victims out there that might have to be dealing with

16 the fact that they have chosen to put the wrong person in

17 prison.  Somebody who's been through that --

18         MR. McLANDRICH:  Objection, Your Honor.  This is not

19 relevant to anything.

20         THE COURT:  Counsel?

21         MR. OWENS:  This is about the reasons, the efforts

22 that Mr. Fritz took to pursue Mr. Gillispie's innocence.

23         THE COURT:  I think Mr. Fritz has testified the fact

24 of why he called this lady, what her importance was, but going

25 into what they discussed or what -- the things that they

FRITZ - DIRECT (Owens)                                          1068

1    discussed and talked about, sustained.

2          MR. OWENS:  No problem.  Absolutely.

3    BY MR. OWENS:

4    Q.   Okay.  So, eventually, did you get ahold of somebody who

5    could provide legal representation in Ohio?

6    A.   Yes.

7    Q.   And who was that?

8    A.   The Innocence Project was starting at the University of

9    Cincinnati, and was Mark Godsey.

10   Q.   Now, after the Ohio Innocence Project and Mark Godsey got

11   involved in representing Mr. Gillispie, did your involvement

12   in the case change?

13   A.   Yes.

14   Q.   And how so?

15   A.   Once everything was turned over, I basically -- every

16   now and then he would call and ask me a question about

17   something that he -- that came up.  But other than that, it

18   was just more call and ask me questions:  How'd this go?

19   How'd you find out that?

20   Q.   Got it.  At some point, did you sign what's called an

21   affidavit in the case?

22   A.   Yes.

23   Q.   And is that something that Mr. Godsey prepared?

24   A.   Yes.

25   Q.   And do you recall when the first affidavit you signed

FRITZ - DIRECT (Owens)                                          1069

1    was?

2    **A.**    February of 2007.

3    **Q.**    And had you had conversations with Mr. Godsey about the

4    substance of that affidavit?

5    **A.**    He called me after that, yes.

6    **Q.**    And did he call you before that too?

7    **A.**    Well, he called me before to let me know it was coming.

8    **Q.**    And did that affidavit mention anything about eliminating

9    Gillispie as a suspect?

10   **A.**    No.

11   **Q.**    Do you recall everything that's in that affidavit?

12   **A.**    The first affidavit?

13   **Q.**    Yes, sir.

14   **A.**    Just that it kind of sets the background for my

15   background and education.  And that was -- that and how the

16   case started.

17   **Q.**    Do you remember whether or not that affidavit includes

18   mention of any reports that you wrote excluding Gillispie as a

19   suspect?

20   **A.**    No, it didn't.

21   **Q.**    Did you write -- did you eventually sign another

22   affidavit?

23   **A.**    Yes.

24   **Q.**    When was that?

25   **A.**    Would have been, I think, November 2007.

FRITZ - DIRECT (Owens)                                          1070

1   **Q.**   And does that affidavit include the fact that you wrote

2   reports excluding Gillispie as a suspect?

3   **A.**   Yes.

4   **Q.**   Do you have an understanding of why -- excuse me.  Do you

5   have any conversations about the reports that you wrote

6   excluding Gillispie as a suspect with Mr. Godsey before you

7   wrote the second affidavit?

8   **A.**   Yes.

9   **Q.**   And can you describe the nature of that conversation?

10  **A.**   Received a phone call from Mr. Godsey.  Was going --

11          MR. McLANDRICH:  Objection.

12          THE COURT:  Counsel?

13          MR. OWENS:  Yes, Your Honor.

14          THE COURT:  Describe the conversation.  Sustained.

15          MR. OWENS:  Sure.

16          THE COURT:  If you want to ask something else, but

17  we are not going to get into conversations.

18          MR. OWENS:  Absolutely.

19  BY MR. OWENS:

20  **Q.**   Before you had this conversation with Mr. Godsey, do you

21  recall at what point it was?

22  **A.**   It would have been between the first two affidavits.

23  **Q.**   At some point in 2007?

24  **A.**   Some point in 2007.

25  **Q.**   Before that, were you aware of any accusation or

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

FRITZ - DIRECT (Owens)                                          1071

1    allegation that Mr. Godsey or his defense didn't have the

2    reports that you and Mr. Bailey authored eliminating

3    Mr. Gillispie as a suspect?

4    **A.**   No.

5    **Q.**   And is the first time that you found -- when was the

6    first time that you found out that that was in an allegation

7    in the world?

8    **A.**   When he called me between the first affidavit and the

9    second affidavit.

10   **Q.**   Now, between 1992 and today, have you received any

11   compensation for the work you've done in trying to assert

12   Mr. Gillispie's innocence?

13   **A.**   No.

14   **Q.**   Has it cost you anything?

15   **A.**   Yes.

16   **Q.**   What has it cost you?

17           MR. McLANDRICH:  Objection.

18           THE COURT:  Sustained.

19   BY MR. OWENS:

20   **Q.**   Has it been easy for you to continue to do work on behalf

21   of Mr. Gillispie pro bono?

22           MR. McLANDRICH:  Objection.

23           MR. HERMAN:  Objection.

24           THE COURT:  Sustained.

25           MR. OWENS:  Your Honor, if I could --

1          THE COURT:  What's the relevance?

2          MR. OWENS:  The witness's credibility.  I believe in

3    openings and in some of Mr. Moore's testimony there was

4    suggestion that this was all made up for the first time in

5    2007.  And the fact that he's going to testify what he did --

6          THE COURT:  What does that have to do with whether

7    or not this has been difficult or whether he was paid?

8          MR. OWENS:  This has not been easy for him to

9    maintain what he believes is his truth, that Mr. Gillispie is

10   innocent and he wrote these reports.  I mean, it's my --

11         THE COURT:  If you want to ask him that question,

12   has it been innocent -- has it been he easy for him, I will

13   let you ask him that question.

14         MR. OWENS:  Sure.

15   BY MR. OWENS:

16   **Q.**   Has it been easy for you to do this work on behalf of

17   Mr. Gillispie?

18   **A.**   No.

19   **Q.**   And just while I'm at it, are you personally friends with

20   Dean?

21   **A.**   No.

22   **Q.**   Do you hang out with him?

23   **A.**   No.

24   **Q.**   Do you talk to him regularly?

25   **A.**   No.

1          MR. OWENS:  Those are all the questions I have for

2    now, Your Honor.

3          THE COURT:  All right.  Ladies and gentlemen, we are

4    going to break for the morning, about 15 minutes.  Then we

5    will get back on the record.  Please remember the Court's

6    admonitions.  Thank you.

7          THE COURTROOM DEPUTY:  All rise.  This court stands

8    in recess.

9          (Jury out at 10:29 a.m.)

10         (Recess at 10:29 a.m.)

11         (Jury in at 10:49 a.m.)

12         (In open court at 10:50 a.m.)

13         THE COURT:  We're back on the record.

14    Counsel ready to proceed?

15         MR. McLANDRICH:  Yes, Your Honor.

16         THE COURT:  Counsel.  Is everybody else ready to

17    proceed?

18         MR. OWENS:  Oh, yes, Judge.

19         MR. HERMAN:  Yes, Your Honor.

20         THE COURT:  You may inquire.

21         MR. McLANDRICH:  Thank you, Your Honor.

22                    **CROSS-EXAMINATION**

23    BY MR. McLANDRICH:

24    **Q.**  Good morning, Mr. Fritz.

25    **A.**  Good morning.

FRITZ - CROSS (McLandrich)                                    1074

1    **Q.**    I represent Detective Moore.

2    **A.**    Yes.

3    **Q.**    When was it that Mr. Wolfe brought the first copy, as you

4    call it, of the Gillispie GM security badge to the police

5    department?

6    **A.**    I believe it was either in late '89 or early '90.

7    **Q.**    And what does late '89 mean, sir?

8    **A.**    Like maybe September, October, November, December.  It

9    was a long time.  I don't remember the exact date.

10   **Q.**    So it could have been as early as September and as late

11   as December?

12   **A.**    Well, that's what I consider late.

13   **Q.**    Do you have any specific recollection of when he came in

14   and brought that one ID?

15   **A.**    Which one?

16   **Q.**    The GM ID, when Mr. Wolfe came in and brought the first

17   singular GM ID.  Do you have a more specific recollection of

18   when he brought it in?

19   **A.**    The date, no.  I remember the meeting.

20   **Q.**    And so the best you can narrow it is late '89 to early

21   '90?

22   **A.**    That's the best I can remember for that long ago.

23   **Q.**    All right.  And would you agree that if it was after

24   November 5, 1989, that Mr. Bailey would no longer have been in

25   the detective bureau?

FRITZ - CROSS (McLandrich)                                    1075

1    **A.**   Yes.  I think he transitioned back to the road.

2    **Q.**   So if in your time frame it's any time after November 5,

3    1989, Mr. Bailey would not have been in the detective bureau

4    to be part of the meeting you referred to, correct?

5    **A.**   Correct.

6    **Q.**   All right.  And then you testified that Mr. Bailey

7    investigated this lead that was brought in by Mr. Wolfe and

8    determined, in his opinion, that Mr. Gillispie was not a good

9    suspect, correct?

10   **A.**   Correct.

11   **Q.**   And at that point or subsequently thereafter, Mr. Bailey

12   came to you and indicated that he wanted to inactivate the

13   case, correct?

14   **A.**   I don't remember "inactivate the case."

15   **Q.**   Assuming that the case was inactivated -- let me see if I

16   can find you the reference.  I'll come back to that.

17          So when you were at the Miami Valley -- or Miami Township

18   Police Department, you had some involvement with this case

19   with Mr. Bailey, correct?

20   **A.**   Mostly from a supervisory aspect.

21   **Q.**   All right.  And, in fact, didn't really have much

22   involvement with Mr. Bailey even in terms of discussion on

23   this case; isn't that correct?

24          MR. OWENS:  Objection; vague with respect to time

25   frame.

FRITZ - CROSS (McLandrich)                                    1076

1              THE COURT:  Well, I think we've narrowed it down to

2    a time frame.  Overruled.

3    BY MR. McLANDRICH:

4    Q.   So --

5              THE COURT:  If you can answer that.  Do you

6    understand the question?

7              THE WITNESS:  No.  I'll have him ask it again.

8              THE COURT:  All right.

9    BY MR. McLANDRICH:

10   Q.   So we know that the rapes happened in August, August 20th

11   of 1988, correct?

12   A.   Yes.

13   Q.   And then we know that Mr. Bailey became involved in the

14   case in the few days after that, correct?

15   A.   Would have been the same day during the callout, yes.

16   Q.   Well, do you recall that the initial reports were not

17   taken by Mr. Bailey, were taken by another officer?

18   A.   There would have been a patrol officer that would have

19   taken the initial reports.

20   Q.   Yes.  And then the next day or so when Detective Bailey

21   comes on duty, he becomes involved in the case once you assign

22   it to him, right?

23   A.   The exact dates I don't know.  Usually, the way it

24   worked was I got a call, the callout right then.  When a

25   serious crime like that happened and I couldn't take it and

FRITZ - CROSS (McLandrich)                                    1077

1    I told them to give it to Bailey.  So he could have come out

2    the next day.  I don't know.

3    **Q.**   All right.  But isn't it true that you had very little

4    discussion with Mr. Bailey between the time he became involved

5    in late August and the time that he left the detective section

6    in November of 1989, about this particular case?

7    **A.**   We didn't have extensive conversations, but we

8    discussed it frequently.  I mean, he would ask me questions

9    or ask for my opinion.

10   **Q.**   Now, do you recall reviewing the file that you received

11   from Mr. Lieberman?  You said you got the complete file?

12        MR. OWENS:  Objection.

13        THE COURT:  Sustained.  I don't think he said that.

14   BY MR. McLANDRICH:

15   **Q.**   Among the reports that you received from Mr. Lieberman,

16   did you receive the Miami Valley Crime Lab reports?

17   **A.**   Yes, I believe I did.

18   **Q.**   And would your name have been on several of those reports

19   as submitting things to the crime lab?

20   **A.**   They could have been if I transported them down there,

21   yes.

22   **Q.**   And you received those Miami Valley Crime Lab reports

23   from Mr. Lieberman or from Bill Riley, but from Mr. Lieberman

24   through Bill Riley, correct?

25   **A.**   Yes.

FRITZ - CROSS (McLandrich)                                    1078

1    **Q.**   And so if Mr. Lieberman had these Miami Valley Crime Lab

2    reports with your name on them, he would have known that you

3    were involved in this particular case during your time at

4    Miami Valley -- Township Police Department?

5              MR. OWENS:  Objection; foundation.

6              THE COURT:  Sustained as to what he knows.

7    BY MR. McLANDRICH:

8    **Q.**   If he had reviewed those reports, he would have seen your

9    name on them, correct?

10             MR. OWENS:  Objection.

11             THE COURT:  Overruled.

12             THE WITNESS:  Yes.

13   BY MR. McLANDRICH:

14   **Q.**   Now, you testified to having, I believe, one face-to-face

15   meeting with Mr. Lieberman?

16   **A.**   Yes.

17   **Q.**   And I believe you testified that you had concerns and

18   were very reticent to becoming involved in this particular

19   case because of your employment at Miami Township, correct?

20   **A.**   Yes.

21   **Q.**   And you discussed that with Mr. Lieberman, didn't you?

22   **A.**   I discussed it with Bill Riley.

23   **Q.**   You never discussed it with Mr. Lieberman?

24   **A.**   No.

25   **Q.**   And did Mr. Riley express to you that Mr. Lieberman had

1    concerns about you working on the case since you had been at

2    Miami Township?

3    **A.**    No.

4    **Q.**    And when you discussed this with Bill Riley, did you

5    disclose to Mr. Riley that not only had you been a police

6    officer at Miami Township, but that you had had involvement in

7    this particular case?

8    **A.**    Yes.

9    **Q.**    And isn't it true that you disclosed to Mr. Riley that

10   you realized that there were reports that you believed that

11   Mr. Bailey had written and you had written which excluded

12   Mr. Gillispie as a suspect?

13   **A.**    Not quite like that.  I stated that the reports didn't

14   look complete, that the discovery file that I got didn't

15   look like it was a complete file.

16   **Q.**    So it's your testimony today that you never told Bill

17   Riley that Mr. Gillispie had been excluded as a suspect?

18   **A.**    Yes.

19   **Q.**    Do you recall being asked this question at deposition and

20   being given this -- and giving this answer --

21            MR. OWENS:  Can we --

22            THE COURT:  Hold on.

23            MR. OWENS:  Can we get the page?

24            MR. McLANDRICH:  This is page 82 of his deposition

25   at line 10.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

FRITZ - CROSS (McLandrich)                                    1080

1           MR. OWENS:  Can we get the purpose for which it is

2      being offered?

3           THE COURT:  Is this impeachment?

4           MR. McLANDRICH:  This is impeachment.

5           THE COURT:  And the impeachment of the last question

6      and answer?

7           MR. McLANDRICH:  Yes, sir.

8           THE COURT:  All right.  Can I have the last question

9      and answer, please?

10          (The requested portion of the record was read as follows:

11     **Q.**  So it's your testimony today that you never told Bill

12     Riley that Mr. Gillispie had been excluded as a suspect?

13     **A.**  Yes.)

14     BY MR. McLANDRICH:

15     **Q.**  Do you recall being asked this question and giving this

16     answer:

17          "So between mid October and mid November of 1990 and

18     February 5th of 1991 when Gillispie's first criminal trial

19     started, you disclosed to Bill Riley that while you worked for

20     Miami Township, Gillispie was eliminated as a suspect?"

21          "Answer:  Yes."

22          Do you recall that question and that answer?

23     **A.**  No.  Which trial was that?  The second one?

24     **Q.**  I can read it again if you'd like.

25     **A.**  Well, there were two trials.  And I didn't testify at

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

FRITZ - CROSS (McLandrich)                              1081

1    either trial.  It would have been an evidentiary hearing.

2    **Q.**   This is before the first trial, and this is not at the

3    trial.  I'll read it again to you.  Perhaps it will help clear

4    up your confusion.

5        "So between mid October and mid November of 1990" -- let

6    me ask you this, and then we'll come back to it.

7        You were assigned this matter by Area Wide in October to

8    November of 1990, correct?

9    **A.**   Yes.

10   **Q.**   And the first trial of Mr. Gillispie was in February of

11   1991, correct?

12   **A.**   Yes.

13   **Q.**   All right.  So we'll try it again.

14       "So between mid October to mid November of 1990 and

15   February 5th of 1991, when Mr. Gillispie's first criminal

16   trial started, you disclosed to Bill Riley that while you

17   worked for Miami Township, Gillispie was eliminated as a

18   suspect?"

19       "Answer:  Yes."

20           MR. OWENS:  Well, I object because you didn't read

21   the question as it was asked.

22           MR. McLANDRICH:  I sure thought I did.  I will be

23   happy to read it again.

24           MR. OWENS:  It wasn't clear that you were reading a

25   question from -- the objection is the foundation, the date and

1    time of what document he's reading from.

2            THE COURT:  Whoa, whoa, whoa, whoa, whoa.  The

3    witness was asked a questions.  The witness gave an answer.

4    He has referred him to his deposition and is going to read a

5    copy of his deposition to him for the purposes of impeachment

6    with regard to that question and that answer.

7        Now, are you saying that counsel did not read it right?

8            MR. OWENS:  I'm saying two things.  One, he didn't

9    read it right.  I didn't realize he was reading it a second

10   time to the witness.  That was the objection.

11           THE COURT:  Do you want him to read it again?

12           MR. OWENS:  No, Your Honor.

13   BY MR. McLANDRICH:

14   **Q.**   So, Mr. Fritz --

15   **A.**   Yes.

16   **Q.**   -- do you recall that question and that answer at your

17   deposition, which was December 3rd of 2018?

18   **A.**   I don't recall the question, but using the timeline

19   that you give me, it would have been yes.

20   **Q.**   So the answer to the question would have been, yes, you

21   did tell Bill Riley that Mr. Gillispie had been eliminated as

22   a suspect by Miami Township Police Department prior to his

23   first trial?

24   **A.**   Yes.

25   **Q.**   And did that discussion include the fact that there would

FRITZ - CROSS (McLandrich)                                  1083

1    be reports reflecting that?

2    **A.**   No.

3    **Q.**   Well, you certainly knew there would be reports

4    reflecting that based on your prior testimony, which is, such

5    a thing would always go into a police report?

6    **A.**   Yes.

7    **Q.**   And was Mr. Riley also an ex-policeman?

8    **A.**   Yes.

9    **Q.**   And so notwithstanding that, your testimony is you didn't

10   have any dialog about the fact that -- that would have been in

11   a police report?

12   **A.**   I am sorry.  I didn't understand.

13   **Q.**   Sure.  Notwithstanding the fact that Mr. Riley was an ex-

14   police officer and you were an ex-police officer, there was no

15   discussion between you when you brought up the fact that

16   Mr. Gillispie had been eliminated by the suspect, that that

17   very information would be contained in a police report?

18   **A.**   No, nothing was brought up.

19   **Q.**   And do you know whether he communicated that information

20   to Mr. Lieberman?

21   **A.**   No, I don't.

22   **Q.**   And, apparently, you and Mr. Lieberman never had any

23   conversation about that fact?

24   **A.**   No.

25   **Q.**   All right.  Now, isn't it true that, based on your

FRITZ - CROSS (McLandrich)                                    1084

1   personal knowledge, you don't have any basis upon which to

2   testify that Detective Moore ever had copies of any reports

3   excluding Mr. Gillispie that either you or Detective Bailey

4   authored?

5   A.   I have no knowledge.

6   Q.   And isn't it true that it was not uncommon, in fact not

7   infrequent, that reports were misfiled at Miami Township

8   Police Department?

9   A.   Yes.

10  Q.   And during this particular time frame, correct?

11  A.   Yes.

12  Q.   You testified during your direct examination that you

13  assigned these Best Products rapes to Detective Bailey because

14  you were involved in this kidnapping and rape of a nine-year-

15  old girl that had just recently occurred?

16  A.   Yes.

17  Q.   And was that crime solved?

18  A.   Yes.

19  Q.   And when did you close that case?  When did you solve it?

20  A.   Several months had passed before it was closed, before

21  the arrests were made.

22  Q.   So it would have taken you into at least late 1988, it

23  sounds like?

24  A.   Yes.

25  Q.   And when you talked during your direct about being

1    disillusioned in leaving the police department at Miami

2    Township, was not one of the reasons for that that there had

3    been a murder-suicide involving a police officer where he had

4    killed his wife and then killed himself?

5    **A.**   Yes.

6    **Q.**   And isn't it true that that affected your own mental

7    state substantially?

8    **A.**   Yes.

9    **Q.**   And that at the time you left the Miami Township Police

10   Department you were focused on getting out of there and, as I

11   think you've characterized it in the past, in a very depressed

12   mental state?

13   **A.**   Yes.

14   **Q.**   And so when Mr. Wolfe comes back in April of '90 with

15   this envelope of GM ID badges, you had some dialog with him,

16   correct?

17   **A.**   Yes.

18   **Q.**   And you had sufficient dialog that you knew that what he

19   had in the envelope were GM ID badges, and it related to the

20   idea of Mr. Gillispie as a suspect, correct?

21   **A.**   To be honest, I wouldn't have remembered

22   Mr. Gillispie's name, but I figured it was along the same

23   line that when he came in the last time.

24   **Q.**   And you knew that the line upon which he came in the last

25   time was related to a GM worker, i.e., Mr. Gillispie, being a

FRITZ - CROSS (McLandrich)                                    1086

1    suspect in the Best Products rapes?

2    **A.**    Yes.

3    **Q.**    And so what you seem to be suggesting is while you

4    remembered all that, you may have not necessarily put it

5    together with the name Gillispie?

6    **A.**    I dealt with a thousand names -- I had my own case

7    files I was working, and I also reviewed all felony cases, I

8    reviewed every detectives' reports and suspects.  So unless

9    that name would have been something that would have been a

10   positive, you know, on a report, something that would have

11   highlighted it, I would have never remembered a name Roger

12   Dean Gillispie.

13   **Q.**    Well, I think your testimony was that you took this

14   envelope and you threw it into the detective file regarding

15   the Best Products rapes; is that correct?

16   **A.**    Yes.

17   **Q.**    So, obviously, you had to have enough information to be

18   able to link the envelope to the case?

19   **A.**    Well, yes, just by the mere fact that Rick Wolfe came

20   over with another file.

21   **Q.**    And so you made the connection in your mind that the

22   envelope, Rick Wolfe, and the Best Products rapes were

23   correlated?

24          MR. OWENS:  Objection.  This is the third time.

25          THE COURT:  It is getting over-redundant now.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1           MR. McLANDRICH:  I didn't think it was that clear,

2     but if it is that clear, I will be happy to move on.

3           THE COURT:  Thank you.

4     BY MR. McLANDRICH:

5     Q.   And so at that point it seems that you don't recall

6     whether the file was an active file or an inactive file,

7     correct?

8     A.   No, I do not.

9     Q.   All right.  And are inactive files reassigned?

10    A.   No.  Well, it would depend on if that detective was

11    still in the detective section.

12    Q.   Well, by this time Detective Bailey is out of the

13    detective section --

14    A.   Yes.

15    Q.   -- correct?

16         And so then as you're getting ready to leave the

17    detective bureau, you do assign the file to Detective Moore,

18    correct?

19    A.    Initially, I discussed it with the chief and the

20    captain.  All open cases that I had or open cases in there,

21    I didn't know who they were going to be bringing in to run

22    the detective section.  And being that this was a case where

23    new information had come in, being at that time Detective

24    Moore was available to work it, they suggested, "Do you

25    think Scott can handle it?"

FRITZ - CROSS (McLandrich)                    1088

1      I said, "Go ahead and give it to him."

2  Q.   So long story short, then, with the authorization from

3  your supervisors, you assigned the case to Detective Moore on

4  your way out the door because new information had come in?

5  A.   Yes.

6  Q.   And the new information was that envelope of GM ID badges

7  from Mr. Wolfe?

8  A.   Yes.

9  Q.   And because it was new information, you would expect the

10 detective assigned to that matter to investigate that new

11 information, correct?

12 A.   Yes.

13         MR. OWENS:  Objection.

14         THE COURT:  Overruled.

15 BY MR. McLANDRICH:

16 Q.   And when you were involved in the case, do you recall the

17 materials that were submitted to the crime lab?

18 A.   Not all of them.  I don't know what all was submitted.

19 Q.   All right.  Do you recall that there was no DNA that was

20 found -- or, actually, no seminal fluid found on the clothes

21 of the girls when they were submitted to the crime lab.  Do

22 you recall that?

23 A.   No.  It was my understanding there was semen on a

24 sweater, but that's the last I heard.  Or a sweatshirt.

25 Q.   Well, let's review a couple notes then.

1          MR. McLANDRICH:  Can we bring up Defendant's 13?

2    This has been previously shown to the jury.

3          MR. OWENS:  I don't understand the relevance, but no

4    objection to this document.

5       (Exhibit displayed.)

6    BY MR. McLANDRICH:

7    Q.   So, Mr. Fritz, showing you what's Defendant's 13, this is

8    a report from the Miami Valley Regional Crime Lab from Denise

9    Rankin directed to yourself, correct?

10   A.   Yes.

11   Q.   All right.  So anybody reviewing this file would see your

12   name on this report if they looked, correct?

13   A.   Yes.

14   Q.   And down below the description of what was submitted --

15         MR. McLANDRICH:  If you would go up a little bit,

16   Jeff -- I'm sorry.  I meant down.

17   BY MR. McLANDRICH:

18   Q.   So do you see where it says in the serological analysis?

19   A.   Yes.

20   Q.   And so for Exhibit 1A, failed to reveal the presence of

21   seminal fluid, correct?

22   A.   Yes.

23   Q.   And then talks about fibers, correct?

24   A.   Yes.

25   Q.   All right.

FRITZ - CROSS (McLandrich)                                    1090

1            MR. McLANDRICH:  Scroll down, please.

2        Go back up.

3    BY MR. McLANDRICH:

4    Q.    So this report would reflect that there was no seminal

5    fluid found on the items submitted, correct?

6    A.    Yes.

7    Q.    All right.  And as an investigator, this would be the

8    kind of material that an investigator would review?  In other

9    words, it's important to know whether there is any seminal

10   fluid on the clothing that might identify a perpetrator,

11   correct?

12   A.    Yes, an investigator would do that.

13   Q.    And that would be something that a defense lawyer would

14   want to know as well, correct?

15            MR. OWENS:  Objection.

16            THE COURT:  Well, I'm going to allow it.  I'm not

17   sure where we're going here, but go ahead.

18            MR. McLANDRICH:  That's all right.  I'm going to

19   move on, Your Honor.

20   BY MR. McLANDRICH:

21   Q.    So just to refresh your -- well, to impeach, I suppose,

22   or refresh your recollection with respect to a prior question.

23   When you were asked at -- earlier about whether the file was

24   inactivated, you couldn't recall.  But at your deposition in

25   December, you were asked this at page 35 --

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

FRITZ - CROSS (McLandrich)                                    1091

1            THE COURT:  I tell you what, Counsel.  Let's first

2      confirm that that's what his testimony is now.

3            MR. McLANDRICH:  All right.  I'm sorry.

4      BY MR. McLANDRICH:

5      **Q.**   So do you recall, as we sit here now, whether or not the

6      file was inactivated after Detective Bailey exhausted what he

7      had in terms of leads?

8      **A.**   No, I don't remember.

9      **Q.**   Do you recall being asked this question and giving this

10     answer at your deposition --

11           THE COURT:  Do you have a cite for that?

12           MR. McLANDRICH:  Yes, sir.  I am going to give it

13     right now.  This is page 35.  Question starts at line 22.  It

14     spills over to page 36 through line 3 with the answer.

15           MR. OWENS:  Your Honor, I don't think you can

16     impeach a witness when he just answered he didn't recall.

17           MR. McLANDRICH:  I can refresh his recollection.

18           THE COURT:  I mean, if that's what you wish to do.

19           MR. McLANDRICH:  That's what I wish to do, Your

20     Honor.

21           THE COURT:  Then let's let him -- show him the

22     exhibit, let him read it, and then see if that refreshes his

23     recollection.

24           MR. McLANDRICH:  His deposition is Exhibit 46,

25     Defendant's 46.

FRITZ - CROSS (McLandrich)                          1092

1              THE COURT:  Counsel, do you have a certain area on

2       the exhibit that you want him to read?

3              MR. McLANDRICH:  Yes, sir.  If he would go to page

4       35.

5              THE COURT:  Lines?

6              MR. McLANDRICH:  And direct his attention to line

7       22, the question.  And then through page 36, line 3.

8              THE COURT:  Sir, once you are done reading, just

9       raise your head, please.

10             THE WITNESS:  Go ahead.

11      BY MR. McLANDRICH:

12      Q.   Having read that testimony, Mr. Fritz, does that refresh

13      your recollection with respect to whether the case had been

14      inactivated after Mr. Bailey exhausted the leads that he had?

15      A.   My memory, no, but the fact that I testified to that,

16      that at that time I must have remembered that.

17      Q.   And so, in any event, once the new information came in

18      from Mr. Wolfe, the file was reassigned to Detective Moore,

19      and I presume was reactivated, correct?

20             MR. OWENS:  Objection; foundation.  He had --

21             MR. McLANDRICH:  It's a simple question.  I am

22      asking him --

23             THE COURT:  He can answer.

24          Overruled.

25          Do you know whether it was reactivated or not?

1          THE WITNESS:  No.

2    BY MR. McLANDRICH:

3    **Q.**  So whether it was reactivated or not, the purpose of

4    giving the file to Mr. Moore was because there was new

5    information, being the envelope of GM IDs Mr. Wolfe brought

6    in?

7    **A.**  Yes.

8    **Q.**  And it would be appropriate for Mr. Moore to investigate

9    that new information, correct?

10   **A.**  Yes.

11   **Q.**  And the mere fact that someone has been eliminated as a

12   suspect by one detective during the life of a case doesn't

13   mean that suspect shouldn't be re-examined later on, correct?

14   **A.**  Correct.

15   **Q.**  Now, Mr. Gillispie met the general physical description

16   of the suspect, did he not?

17   **A.**  I can't remember what the exact physical description

18   was, but I remember there was -- that he did, yes.

19   **Q.**  And you don't know what investigation Mr. Bailey did to

20   come to the conclusion that he didn't think Mr. Gillispie was

21   a good suspect, do you?

22   **A.**  I don't remember everything.  I just remember reading

23   his report and signing off on it.

24   **Q.**  Someone having an authoritative voice is not some sort of

25   indicia of criminality, correct?

FRITZ - CROSS (McLandrich)                                    1094

1    **A.**   Oh, no.

2    **Q.**   Have you ever discussed this matter with Mr. Bailey?

3    **A.**   Which matter?

4    **Q.**   The Best Products rapes.  I'm sorry.  That was a poor

5    question.  Let me rephrase.

6          After you left Miami Valley Police Department, while you

7    were an investigator for Mr. Lieberman, did you ever discuss

8    the Best Products rapes with Mr. Bailey?

9              THE COURT:  Let's first correct the question.  It's

10   Miami Township.  Is that what you meant?

11             MR. McLANDRICH:  Yes.  Did I misstate it?  I

12   apologize.

13             THE COURT:  You said Miami Valley.

14   BY MR. McLANDRICH:

15   **Q.**   Miami Township.  I apologize.

16   **A.**   No.

17   **Q.**   Now, wouldn't you have thought of him as a good source of

18   information for the work that you were doing?

19   **A.**   Which work was I doing?

20   **Q.**   Work for Mr. Lieberman in defense of Mr. Gillispie.

21   **A.**   No, in the fact that I had received information that

22   witnesses were being told not to talk to me.  So I backed

23   away from all that.

24   **Q.**   What was the scope of your assignment from Mr. Lieberman?

25             MR. OWENS:  Objection; mischaracterizes the

FRITZ - CROSS (McLandrich)                                    1095

1   testimony.

2          MR. McLANDRICH:  It's not characterizing the

3   testimony.  It's simply asking him what the scope of his

4   assignment was from Mr. Lieberman.

5          MR. OWENS:  He testified it was from Area Wide and

6   Bill Riley repeatedly.

7          THE COURT:  Correct your -- or, or who gave him the

8   scope, who told him about it.  I mean, let's lay that basis.

9          MR. McLANDRICH:  Sure, sure.  Thank you, Your Honor.

10  BY MR. McLANDRICH:

11  **Q.**   So when you were assigned this matter by Area Wide, at

12  some point in time you had to come to an understanding of the

13  scope of the work that you were to engage in, correct?

14  **A.**   Yes.

15  **Q.**   And it sounds like from your prior testimony most of that

16  conversation initially came between yourself and Bill Riley?

17  **A.**   Yes.

18  **Q.**   And were there times where you had direct conversation

19  with Mr. Lieberman as to the scope of your undertaking?

20  **A.**   No.

21  **Q.**   All right.  And with respect to the scope of your

22  assignment that you received through Mr. Riley, what was that

23  scope?

24  **A.**   Was to meet with Mr. Gillispie, get his side of the

25  story, and follow up to see what I could verify of his story

FRITZ - CROSS (McLandrich)                                  1096

1    and what wasn't verifiable. And that, in the end, my

2    opinion of whether he was guilty of this or not.

3    **Q.** And to develop things that might be useful in the

4    defense?

5    **A.** Yes.

6    **Q.** All right. And given that you knew that Mr. Gillispie

7    had been eliminated as a suspect and, in fact, conveyed that

8    to Mr. Riley, wouldn't one of the things to develop be

9    Mr. Bailey as a witness to that effect?

10   **A.** I am trying to figure out how to put this.

11   Mr. Riley -- when I mentioned this to Mr. Riley that he had

12   been eliminated, it was after I had already spoken to

13   Mr. Gillispie and he started telling me his story and I

14   realized who he was.

15       My approaching Mr. Riley on this was to say I really

16   don't want anything to do with this case, and I said,

17   besides, he had been exonerated, and I was basically told to

18   go back to work on the case if I wanted to keep my job.

19   **Q.** Okay. Well, that's sort of a different question, right?

20   So my question was, once you realized it was Mr. Gillispie and

21   you knew that Detective Bailey had excluded him and that you

22   had approved that exclusion, you knew that Mr. Bailey was a

23   potential witness and that you were a potential witness?

24   **A.** I thought Bailey would be because of the reports, but I

25   didn't think about myself being a potential witness.

1    **Q.**   And did you think that your conflict or potential

2    conflict had ripened into an actual conflict at that point?

3              MR. OWENS:  Objection; vague.

4              THE COURT:  Overruled.  He can answer if he can.

5              THE WITNESS:  I felt my conflict was just because I

6    was a police officer and a supervisor on the Miami Township

7    Police Department.

8    BY MR. McLANDRICH:

9    **Q.**   Well, isn't that conflict more crystalized if you had

10   actual involvement in the case at issue as opposed to just

11   merely working at the police department?

12             MR. OWENS:  Objection.

13             THE COURT:  Counsel, I -- we're looking at the

14   definition of a term here.  Can you rephrase?

15             MR. McLANDRICH:  Sure.

16   BY MR. McLANDRICH:

17   **Q.**   You testified earlier that you were concerned about

18   working on this case because you were a former police officer

19   at the police department that was involved, correct?

20   **A.**   Yes.

21   **Q.**   Now, wouldn't that concern be even more heightened given

22   the fact that you worked on the actual case at issue?

23   **A.**   I was more -- I didn't work on the case.  My

24   involvement in the case was supervisory.

25   **Q.**   It was at least sufficiently in depth to review Detective

FRITZ - CROSS (McLandrich)                                    1098

1    Bailey's report, discuss with him the fact that you thought

2    his work was sufficient to exclude Mr. Gillispie, to write a

3    report on it, to take it up to the chief of police, to review

4    that report with the chief of police and get his concurrence

5    that he also thought Detective Bailey's report was sufficient

6    to exclude Mr. Gillispie as a suspect, correct?

7         That was your testimony earlier, was it not?

8              MR. OWENS:  Objection.  He didn't get to answer --

9              THE COURT:  Let's let him answer the first question.

10             THE WITNESS:  I looked at it as my -- and I brought

11   this to the attention of my trying to get out of it was my

12   supervisory position.

13        I cannot assume or know whether they read the reports,

14   whether the reports were in the file.  I mean, I don't know

15   that, and that was not brought up.  It was my fact that I

16   supervised Bailey and other detectives over all their cases,

17   and my concern was there was a conflict.  It was looked into,

18   and I was told it wasn't a conflict.  So I reluctantly at that

19   point stayed on.

20   BY MR. McLANDRICH:

21   Q.   The testimony you've just given, I believe, if I recall

22   your testimony correctly, was before you realized that

23   Mr. Gillispie was someone whose case you had worked on --

24   A.   Right.

25   Q.   -- at the police department.

FRITZ - CROSS (McLandrich)                                    1099

1       Okay.  And so my question is different.  My question is

2   after you realized that you had, in fact, participated in the

3   case to the extent of reviewing Bailey's report, making an

4   independent determination that Bailey's report was sufficient

5   to exclude Mr. Gillispie, approving that exclusion, writing a

6   report to cover the basis, taking it to the chief of police,

7   having a discussion with him about Bailey's report and getting

8   his affirmation that Bailey's report was sufficient to exclude

9   Mr. Gillispie, didn't that cause you to now realize that your

10  conflict that you were concerned about was, in reality, an

11  actual conflict?

12  **A.**   No.

13  **Q.**   Is "discovery packet" a term of art?

14          MR. OWENS:  Objection.  It's asking for a legal

15  conclusion.

16          THE COURT:  Counsel?

17          MR. OWENS:  I don't think it's a legal conclusion at

18  all.  It's a factual question.

19          THE COURT:  Do you understand what -- that question?

20  Do you understand that question?

21          THE WITNESS:  I know what "discovery."  I don't know

22  what "art" is.

23          THE COURT:  Can you explain that.

24          MR. McLANDRICH:  Oh, sure.  Let me rephrase.

25  BY MR. McLANDRICH:

FRITZ - CROSS (McLandrich)                                      1100

1    **Q.**   Is "discovery packet" a term that is used between police

2    officers and prosecutors to describe the materials that are

3    produced from the police department to the prosecutor and then

4    ultimately to the criminal defense lawyer?

5    **A.**   Yes.

6    **Q.**   And so if you said that you reviewed the discovery

7    packet, that would be an indicator that you reviewed the

8    material that had been supplied by the police to the

9    prosecutor to the defense lawyer?

10   **A.**   In the term in which you are talking about, I termed

11   what was given to me, what went through Dennis Lieberman to

12   Bill Riley then handed to me, was discovery.  To me, if I

13   had been given just the lab reports that came from the

14   packet that had been given Mr. Lieberman, I would have

15   termed that discovery.  So the paperwork that I got and was

16   told to follow through with, I considered that discovery

17   because it came from that packet from Mr. Lieberman.

18   **Q.**   And so within the discovery packet, which would be the

19   totality, correct?  Yes?

20   **A.**   Of what I had.

21   **Q.**   Well, the discovery packet, I think as we have already

22   described, I thought we agreed upon, would have been the

23   material that the police gave to the prosecutor and the

24   prosecutor gave to the defense lawyer, correct?

25   **A.**   Yes.

FRITZ - CROSS (McLandrich)                                          1101

1   **Q.**   All right.  And so given that that's the discovery

2   packet, that's the entirety, the individual pieces within that

3   would be pieces of discovery?

4   **A.**   Yes.

5   **Q.**   All right.  And so when you use the term or if you used

6   the term "I reviewed the discovery packet," one would read

7   that as the entire whole, as opposed to what you are saying

8   now, the individual pieces of, quote-unquote, discovery,

9   right?

10          MR. OWENS:  Objection as to what one would read.

11          THE COURT:  Do you understand the question?

12          THE WITNESS:  Yes.

13          THE COURT:  Answer it.

14     Overruled.

15          THE WITNESS:  Now I forgot the question.  But --

16  BY MR. McLANDRICH:

17  **Q.**   I can ask it again if it would be helpful.

18  **A.**   I termed anything I got from the discovery from the

19  defense attorney as discovery.  Whether if he had gave me

20  four pages, my terminology was that was discovery because --

21  it's like if I asked for a Kleenex, Kleenex is a brand, but

22  there is all kinds of different tissues.  That's the way I

23  looked at this.  Discovery was anything that came from the

24  packet that was sent to the police department -- or the

25  police department made for the prosecutor that was sent to

FRITZ - CROSS (McLandrich)                                    1102

1    the defense.

2        So, I mean, I didn't say pieces of discovery.  To me it

3    was just discovery.

4    **Q.**   I understand.  But it would be the difference between a

5    Kleenex and a box of Kleenex, right?

6    **A.**   Well, sure, yes.

7    **Q.**   And if you said you received the discovery packet, you'd

8    be saying I got the whole box of Kleenex?

9    **A.**   Well, that's not what I would have been thinking when I

10   said it.

11   **Q.**   Did you say you got the whole discovery packet?

12   **A.**   No.

13           MR. McLANDRICH:  So I'd like to read a portion of

14   his deposition.  This would be --

15           MR. OWENS:  Can we get the line and page.

16           MR. McLANDRICH:  I am giving it to you right now.

17           THE COURT:  Is this for impeachment?

18           MR. McLANDRICH:  This is for impeachment, given that

19   he said he didn't say it.

20       Let's just start on page 91 at line 21 through page 92,

21   line 2.

22           MR. OWENS:  Object.  This is not impeaching.

23           THE COURT:  What's that?

24           MR. OWENS:  This is not impeaching.

25           THE COURT:  And why is that?

FRITZ - CROSS (McLandrich)                                    1103

 1           MR. OWENS:  Well, because it doesn't impeach -- he

 2    says that -- well --

 3           THE COURT:  Hold on.  What is the question and

 4    answer that you wish to get?

 5           MR. McLANDRICH:  It's a little bit of a colloquy,

 6    but eventually he says, "What was sent to me was what I

 7    thought was the whole discovery packet."

 8           THE COURT:  "What I thought was the whole discovery

 9    packet."

10        And what's your cite?

11           MR. McLANDRICH:  That particular line, or what I'd

12    like to read?

13           THE COURT:  Well, bring it forth.  Come forth.

14           MR. McLANDRICH:  Sure.

15        (At sidebar.)

16           MR. McLANDRICH:  John McLandrich, Your Honor.  So I

17    was going to start that "When you used the phrase 'discovery

18    packet,' does that mean the entire investigative file?"

19        "Yes."

20        "And you looked at it and reviewed it?"

21        "Well, no, I didn't look at that.  What I thought was

22    what Lieberman -- what was sent to me was what I thought was

23    the whole discovery packet."

24           THE COURT:  Isn't that basically what he just said?

25           MR. McLANDRICH:  I don't think so.  He denied he

FRITZ - CROSS (McLandrich)                                    1104

```
1    ever got the discovery packet.  He said he got pieces of

2    discovery.

3             THE COURT:  Well, I think where we're at is I

4    understand you want him to say that he got the whole discovery

5    packet.  I think what his testimony was that in this trial, as

6    well as what I think that testimony is, he got a discovery

7    packet and he believed that to be the discovery packet.  But I

8    think he's testified subsequently where he doesn't know it was

9    the whole packet.

10            MR. McLANDRICH:  Yeah, okay.  I see what you are

11   saying.  I'll move on.

12            THE COURT:  All right.

13         (In open court.)

14            THE COURT:  Sustained.

15   BY MR. McLANDRICH:

16   Q.  Sir, you testified on direct about a trip down to

17   Kentucky to look for campground receipts.  Do you recall that?

18   A.  Yes.

19   Q.  And I believe your testimony was that on the drive down

20   you were still a little bit cool with Mr. Gillispie because

21   you hadn't made your mind up about him?

22   A.  Yes.

23   Q.  And then you looked at the receipts, and then you went

24   and you talked to the ladies at the restaurant?

25   A.  Yes.
```

FRITZ - CROSS (McLandrich)                                    1105

1   **Q.**   And once you talked to the ladies at the restaurant, you

2   decided that you now believed Mr. Gillispie and you thought he

3   was innocent?

4   **A.**   No.  It was leading me that direction.

5   **Q.**   All right.  But in any event, I think you said you warmed

6   up to him, and your attitude toward him changed?

7   **A.**   I wouldn't say "warmed up."  I always treated everyone

8   with respect.  I'm always friendly with them.  But -- and it

9   also helped him open up more to me and tell me more about

10  his life and things that I would want to look into.

11        So it wasn't like I was nasty with him in the car.  It

12  wasn't that at all.  I don't do that.

13  **Q.**   And whatever reluctance or hesitancy you may have had

14  about Mr. Gillispie, you were still in his employ, right?

15  Indirectly.  I understand you worked for Area Wide, but Area

16  Wide had been hired to work for Mr. Gillispie?

17  **A.**   Yes, they had been hired to work for Mr. Gillispie and

18  were going to go with whatever findings or whatever

19  recommendations I made, or findings.

20  **Q.**   And so whatever hesitancy you might have had, it wasn't

21  going to cause you to prejudice the work you were doing for

22  Mr. Gillispie or withhold things from him that you thought

23  would be helpful to his defense?

24  **A.**   I would never do that, no.

25  **Q.**   Right.  And so on that -- strike that.  Let me start

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

FRITZ - CROSS (McLandrich)                                  1106

1    over.

2         The drive from Ohio to Cave Creek and back, what is that,

3    about five hours round trip?

4    **A.**   I don't think it -- it was that far or that long.  I

5    know it was a good two and a half, maybe three hours when we

6    went through Morehead, the university that's there.

7    **Q.**   Two and a half, three each way?

8    **A.**   Yeah, I'm saying two and half -- oh, if you were saying

9    cumulative, maybe about six hours.

10   **Q.**   Yes, sir, I meant round trip.

11   **A.**   Yes.

12   **Q.**   So five to six hours round trip, five and a half to six

13   hours round trip.  At no time during that conversation did you

14   ever convey to Mr. Gillispie that he had been evaluated by

15   Mr. Bailey, and that you had signed off on it, and that he had

16   been excluded as a suspect in the Best Products rapes?

17   **A.**   Not that I remember.

18   **Q.**   All right.  And, frankly, at no other time did you ever

19   convey to Mr. Gillispie that Detective Bailey had written a

20   report excluding him, and that you had approved that report,

21   correct?

22   **A.**   That's correct.

23   **Q.**   And, frankly, it wasn't -- notwithstanding all the

24   efforts that you made in this case on his behalf, both before

25   trial and after trial, at no time until 2007, as a result of

FRITZ - CROSS (McLandrich)                                    1107

1    some conversation with Mr. Godsey, did you all of a sudden

2    realize that there was a report that excluded Mr. Gillispie

3    that had been written by Detective Bailey, approved by

4    yourself, that apparently had not been produced or allegedly

5    not produced to people, correct?

6    A.    It wasn't suddenly remembered.  It was Mr. Godsey

7    questioning me about things that brought it up.

8    Q.    Well, him questioning you about things that caused you to

9    remember something that you had never conveyed to anyone in

10   this case during its entire life from 1998 to 2007?

11              MR. OWENS:  Objection; argumentative.

12              THE COURT:  Well, no, it's not.

13         Overruled.

14              THE WITNESS:  I -- I never mentioned it until

15   Mr. Godsey spoke to me because when I was running down the

16   whole case and he said -- in fact, all he said was, "My god,

17   Fritz, why didn't you and Bailey write reports."

18         And I said, "We did."

19         And that's when he did the second affidavit.

20   BY MR. McLANDRICH:

21   Q.    So -- I'm sorry.  I was distracted.  So the answer is at

22   no time from 1988 when you were involved in the case at the

23   police department until 2007 did you ever tell anyone on the

24   defense side of Mr. Gillispie's case that there had been a

25   report authored that excluded Mr. Gillispie as a suspect,

FRITZ - CROSS (McLandrich)                                    1108

1    correct?

2    **A.**    I never told anyone anything like that.

3    **Q.**    And it was only this conversation with Mr. Godsey that

4    triggered this memory causing you to then disclose it to him?

5    **A.**    Well, yes.  He -- yeah, yes.

6    **Q.**    Now, isn't it true that this name of Kevin Cobb was known

7    to you and became a topic prior to the first criminal trial?

8    **A.**    No.

9    **Q.**    And you testified earlier that this name came to your

10   attention as a result of a phone call out of the blue?

11   **A.**    Yes.

12   **Q.**    We'll come back to that.

13           So when you were trying to get various people involved in

14   this investigation to try and get Mr. Gillispie out of jail,

15   you wrote a variety of narratives and summaries of the events,

16   correct?

17   **A.**    Yes.

18   **Q.**    And, also, did not include in any of those summaries this

19   dialog about the supposedly missing report, correct?

20   **A.**    The missing reports?

21   **Q.**    Yes, sir.

22   **A.**    Are you talking about when Bailey eliminated him as --

23   **Q.**    Yes, sir.

24   **A.**    -- as a suspect?  Okay.  I didn't know anything about

25   missing reports.

FRITZ - CROSS (Herman)                                        1109

1           No, I didn't.  I assumed it was all in the discovery

2      that Mr. Lieberman had.

3      Q.   I take it you never looked at the materials that were in

4      the envelope you received from Mr. Wolfe?

5      A.   I don't remember that I did.  When you mentioned

6      badges, I seem to remember something about ID badges, but I

7      didn't go through it 'cause I didn't want to get involved.

8      Q.   All right.  That's all I have for you.  Thank you.

9                THE COURT:  Counsel, anything?

10               MR. HERMAN:  I'm prepared to go, yes, Your Honor.

11               THE COURT:  Go ahead.

12          And for your purposes of -- for your scheduling purposes,

13     you've got about ten minutes.

14                        **CROSS-EXAMINATION**

15     BY MR. HERMAN:

16     Q.   Good morning, Mr. Fritz.

17     A.   Good morning.

18     Q.   My name is Chris Herman, and I represent the Miami

19     Township Board of Trustees, all right?

20     A.   Yes.

21     Q.   Can you -- can you tell us again, when did you become a

22     sworn police officer in the State of Ohio?

23     A.   Maybe -- it's so long ago -- like '78 maybe, something

24     like that.

25     Q.   Around 1978?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

FRITZ - CROSS (Herman)                                    1110

1    **A.**    I'm guessing, yeah.  It was with the Park District.

2    **Q.**    So when you became a police officer, you had to go

3    through an academy or something of that nature --

4    **A.**    Yes.

5    **Q.**    -- correct?

6    **A.**    Yes.

7    **Q.**    And once you completed the academy then, as a police

8    officer, you took an oath of officer.  You were sworn in as a

9    police officer --

10   **A.**    Yes.

11   **Q.**    -- correct?

12         Do you recall that oath of office that you took as a

13   police officer all those many years ago?

14   **A.**    I mean, word for word, no.

15   **Q.**    Is it fair to say that the oath included that you will

16   uphold and enforce the laws of -- the laws and Constitution of

17   the United States?

18   **A.**    Yes.

19   **Q.**    And you would also enforce and uphold the laws and the

20   Constitution of the State of Ohio?

21   **A.**    Yes.

22   **Q.**    Okay.  Now, can you share with us, at Miami Township,

23   what are some of the responsibilities of a police officer and

24   what are some of the responsibilities of a detective in the

25   detective section, and if there is any differences in those at

FRITZ - CROSS (Herman)                                      1111

1    all.

2    **A.**    Yes.  The officers -- the police officers assigned --

3          THE COURT:  Counsel, let's put a parameter around

4    that since he is not with Miami Township anymore.

5    BY MR. HERMAN:

6    **Q.**    And we're talking about from the time period 1988 until

7    you left the department in 1990.

8    **A.**    You mean 1978?

9    **Q.**    Yes, 1978 until you left the department in 1990.

10   **A.**    As a police officer, I was assigned a patrol car.  I

11   answered calls, took police reports, traffic, wrote

12   citations, warnings, made arrests when it was deemed

13   necessary, testified in court, the proper collection of

14   evidence, maintaining a chain of custody, that type of

15   thing.

16       Detectives don't patrol.  They -- all felony cases came

17   to the detective section and were assigned to the detective

18   that worked that specific crime.  He would do follow-ups, go

19   out and interview people, follow leads and tips that came

20   in, write search warrants, do surveillance if it needed,

21   make arrests when the time came, testify in court.

22   **Q.**    So as a patrolman, would part of your responsibilities

23   also be to write reports?

24   **A.**    Yes.

25   **Q.**    Okay.  And as a detective, you would also have that same

FRITZ - CROSS (Herman)                                    1112

1    responsibility?

2    **A.**    Yes.

3    **Q.**    When a case is finished by a patrol officer and maybe it

4    involves some further investigation, the detective takes over

5    and then prepares supplemental reports, correct?

6    **A.**    Yes.

7    **Q.**    And then you also said that as a patrolman, you would

8    collect evidence and keep the chain of custody, correct?

9    **A.**    Yes.

10   **Q.**    So if you can share with the jury, what do you mean

11   collect evidence and chain of custody in that regard?

12           MR. OWENS:  Objection; relevance.

13           THE COURT:  Well, I've listened to two parties

14   examine.  I'll give him some time to show me some relevance.

15       So overruled.

16           THE WITNESS:  If you're on the scene of a particular

17   crime, say a burglary, you would preserve evidence if you

18   could collect it.  I mean, lift fingerprints, collect trace

19   evidence, like broken glass from a window.

20       When I first started, we didn't have specific officers

21   that were trained in evidence technicians except myself.  I

22   was trained at Butler Township.  But you would preserve the

23   evidence.  If you called an evidence collection crew, they

24   would show up.  They could collect the evidence.

25       And then it would be the chain of custody is to make sure

1    it never leaves the chain of custody from the crime scene to

2    our department and then to the crime lab.  You have to

3    maintain, so that it's not tampered with at all.

4    BY MR. HERMAN:

5    **Q.**   Okay.  And then a detective also has a duty to maintain

6    evidence as well, correct?

7    **A.**   Yes.

8    **Q.**   All right.  Now, when a detective is finished with his

9    investigation, he or she will then go seek charges from a

10   prosecutor, correct?

11          MR. OWENS:  Objection.  This is undisclosed expert

12   testimony.

13          MR. HERMAN:  Your Honor, I'm just asking about the

14   process for a police officer in the whole course and scope of

15   an investigation, what they do and what those duties and

16   responsibilities are.

17          THE COURT:  Overruled.

18          THE WITNESS:  Okay.  Yeah, if there were charges to

19   be filed and they were felony charges, they would be

20   brought -- to the detective would take them -- put together

21   what we call a filing, which was a complete file for the

22   police department, keep -- complete file for the defense, and

23   complete file for the prosecutor, and it would go to the

24   prosecutor's office.

25   BY MR. HERMAN:

FRITZ - CROSS (Herman)                                1114

1    Q.   So is it fair to say that one of the official

2    responsibilities or duties of a police detective is to turn

3    over evidence to a prosecutor when the individual is charged

4    with a crime?

5    A.   It wouldn't go to the -- it would not go to the

6    prosecutor.  They would be made aware that we were holding

7    the evidence in our property room.  And then at the time of

8    trial, or if they needed it ahead of time, we would

9    transport it for wherever they wanted, if they wanted to

10   look at it.

11   Q.   Is there a distinction then between a police report

12   versus evidence?  So you wouldn't necessarily hand original

13   police reports to the prosecutor, correct?  You would give

14   them copies of police reports?

15   A.   They would get copies.

16        THE COURT:  Counsel, let's preface all of your

17   questions based on his experience and his knowledge of the

18   township and how it operated during the time period he was

19   there.

20        MR. HERMAN:  Thank you, Your Honor.

21   BY MR. HERMAN:

22   Q.   And we're talking about the time frame for when you -- I

23   don't recall when you began working at Miami Township.  Do you

24   recall when that was?

25   A.   I was thinking it was around 1978 or '79, somewhere in

FRITZ - CROSS (Herman)                                      1115

1     there.

2     **Q.**    Okay.  So the time frame we're talking about is from when

3     you were employed as a police officer and a detective with the

4     Miami Township Police Department relative to the investigation

5     of Roger Dean Gillispie and the Best Products rapes, okay?

6     **A.**    Right.

7     **Q.**    Now, if -- if a detective or a police officer fails to

8     turn over evidence to a prosecutor and also the defense

9     attorneys in a case, would that be outside the scope of that

10    police -- of your official duties as a police officer or a

11    detective with Miami Township?

12                MR. OWENS:  Objection.

13                MR. McLANDRICH:  Objection.

14                THE COURT:  All right.  We're going to break.  We'll

15    stand in recess.

16        Ladies and gentlemen.  We're going to recess for the

17    lunch hour.  Please remember the Court's admonitions during

18    the lunch hour.  We will try to reconvene right at 1:15, okay?

19        Anything further to come before the Court?

20                MR. OWENS:  No.  Thank you, Your Honor.

21                MR. HERMAN:  No, Your Honor.

22                MR. McLANDRICH:  No, sir.

23                THE COURTROOM DEPUTY:  All rise.  This court stands

24    in recess.

25          (Jury out at 11:57 a.m.)

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

FRITZ - CROSS (Herman)                                    1116

 1              (Recess at 11:57 a.m.)

 2              (Jury in at 1:20 p.m.)

 3              (In open court at 1:21 p.m.)

 4                  THE COURT:  We are back on the record.

 5          Counsel ready to proceed?

 6                  MR. OWENS:  Yes, Your Honor.

 7                  MR. McLANDRICH:  Yes, Your Honor.

 8                  MR. HERMAN:  Yes, Your Honor.

 9                  THE COURT:  The Court is -- there was a question on

10      the floor when the Court adjourned court.  The objection to

11      that question has been sustained.

12                  MR. HERMAN:  May I proceed?

13                  THE COURT:  You may.

14                  MR. HERMAN:  Thank you.

15      BY MR. HERMAN:

16      Q.   Mr. Fritz, you knew as a detective at the Miami Township

17      Police Department in 1990 that you had to turn over all

18      evidence and police reports to the prosecutor, correct?

19      A.   I'm afraid I don't understand.  All reports for what?

20      Q.   All police reports related to an investigation of a case.

21      A.   Oh, yes.

22      Q.   And as the detective-sergeant for the detective section

23      at the Miami Township Police Department in 1990, you would

24      have expected your detectives to do that, correct?

25      A.   Yes.

1    Q.   Because that was part of their duties as a detective with

2    the Miami Township Police Department detective section in

3    1990, correct?

4    A.   If they a case that was going to the prosecutor's

5    office, they had to turn in all paperwork to them.

6    Q.   And paperwork includes police reports and supplemental

7    reports, correct?

8    A.   Yes.

9    Q.   All right.  Now, during your time as a Miami Township

10   police officer in 1990, would it be inconsistent with your

11   oath as a police officer for the Miami Township Police

12   Department to withhold evidence or police reports?

13           MR. OWENS:  Objection.  This is opinion testimony.

14           THE COURT:  You can answer the question.

15       Overruled.

16           THE WITNESS:  Sir, go ahead and repeat it.

17   BY MR. HERMAN:

18   Q.   Sure.  During your time at the Miami Township Police

19   Department in 1990, would it be inconsistent with a police

20   officer's oath of office for that department to withhold

21   evidence or police reports?

22   A.   Yes.

23           MR. HERMAN:  That's all the questions I have, Your

24   Honor.

25           THE COURT:  Thank you.

1              MR. OWENS:  Very briefly, Your Honor.

2              THE COURT:  Um-hmm.

3              MR. OWENS:  Am I next?

4              THE COURT:  You are next.

5                      **REDIRECT EXAMINATION**

6    BY MR. OWENS:

7    **Q.**   Thank you for your time, Mr. Bailey.

8    **A.**   Fritz.

9    **Q.**   Excuse me -- Mr. Fritz.  Do you recall when Mr. Moore's

10   attorney was asking you questions about the Miami Valley

11   Regional Crime Laboratory that was addressed to Sergeant

12   Fritz?

13   **A.**   Yes.

14   **Q.**   And at the time were reports routinely issued to you even

15   if you weren't working on a particular case?

16   **A.**   Yes.

17   **Q.**   Why was that?

18   **A.**   I was in charge of the detective section, and sometimes

19   to alleviate the detective from driving down to the crime

20   lab and dropping the stuff off, if he was busy on something,

21   I would do it.  I would fill out the reports or fill out the

22   crime lab sheets and take them down there and drop them off.

23   **Q.**   In 1988 at the Miami Township Police Department, did all

24   of the detectives have access to the LEADS system?

25   **A.**   Well, I had to go through dispatch.  You have to

FRITZ - REDIRECT (Owens)                                    1119

1   have -- at least then you had to have training to get the

2   LEADS system, but you could put in requests through the

3   dispatchers that had it.

4   Q.   Did you have that training in 1988?

5   A.   Yes.

6   Q.   Did all of the detectives in 1988 at the department have

7   that training?

8   A.   No.

9   Q.   And would there be times that LEADS reports would be sent

10  to you even if you weren't actively working on a case?

11  A.   Yes.

12  Q.   You were asked some questions about whether, for example,

13  an authoritative voice might be a reason to eliminate somebody

14  as a suspect.  Do you recall that?

15  A.   Yes.

16  Q.   Was the profile that you and Mr. Bailey developed about

17  the perpetrator of the Best Products rape, was that related to

18  solely the authoritative voice?

19  A.   No.

20  Q.   What was it related to?

21  A.   It was just part of the overall descriptions that we

22  had had from the victims and putting it into reference to

23  who we thought would fit this type of crime.  I mean,

24  obviously, like I said, a man committing two rapes at the

25  same time is -- is kind of unusual.  I've never had it

1    happen before.

2    **Q.**   Did you look at the totality of the facts?

3    **A.**   Yes.

4    **Q.**   Now, you indicated that after you left Miami Township

5    Police Department, that when you went to work for Area Wide,

6    you gave some -- a bunch of testimony about that.

7    **A.**   Yes.

8    **Q.**   Did you feel any pressure by anybody about your

9    involvement at Area Wide from other law enforcement agencies?

10          MR. McLANDRICH:  Objection; beyond the scope of

11   cross.

12          MR. OWENS:  I think that, Your Honor, Mr. McLandrich

13   specifically asked Mr. Fritz about this whole conflict, that

14   whole dialog about a conflict and how he felt at the time, and

15   Mr. Fritz mentioned that it was part of his calculus.  So I

16   was just actually basing it off of the cross.

17          THE COURT:  You can answer the question.  Were you

18   being pressured by any law enforcement?

19          MR. OWENS:  Could I rephrase, Your Honor?  It was

20   slightly different than that.  I apologize.

21          THE COURT:  All right.

22   BY MR. OWENS:

23   **Q.**   Did you feel pressure from other people in law

24   enforcement about your involvement at Area Wide working on a

25   former Miami Township case?

1    **A.**    Yes.

2              THE COURT:  Do you want to renew your objection?

3              MR. McLANDRICH:  Yes, I do.

4              THE COURT:  Overruled.  Go.

5         Ahead.

6              THE WITNESS:  Yes.

7    BY MR. OWENS:

8    **Q.**    Why was that?

9    **A.**    There was a lot of officers that I have worked with

10   that would no longer talk to me because they felt that I had

11   violated some code about going against the police

12   department.

13   **Q.**    And switching topics, do you recall that you gave some

14   testimony about the fact that you didn't realize the

15   supplementary reports hadn't been disclosed to the defense and

16   the conversation you had with Mr. Godsey in 2007?  Do you

17   remember that topic?

18   **A.**    Yes.

19   **Q.**    All right.  Did you prepare an affidavit in February of

20   2007?

21   **A.**    Yes.

22   **Q.**    Does that affidavit mention the fact that Mr. Gillispie

23   was eliminated as a suspect?

24   **A.**    Yes.

25   **Q.**    Does that affidavit specifically delineate that there

FRITZ - REDIRECT (Owens)                                    1122

1    were reports separately created about that?  Does the

2    affidavit --

3    A.    No, no.

4    Q.    Now, when you were working on Mr. Gillispie's behalf pro

5    bono in 2002, 2003, did you write emails or prepare other

6    documents about the case?

7    A.    Yes.

8    Q.    And do you recall writing an email on February 8, 2003,

9    to the Truth and Justice Project?

10   A.    No.

11          MR. OWENS:  Your Honor, this is -- if I could see if

12   this refreshes the witness's recollection.

13          THE COURT:  Is this beyond the scope?  I have never

14   heard about this.

15          MR. McLANDRICH:  I don't know what it's related to

16   so --

17          MR. OWENS:  Your Honor, there are emails -- these

18   are defense exhibits, actually, of Mr. Fritz wrote from 2002

19   and 2003 that pertain to him writing to other people that

20   Gillispie had been eliminated as a suspect that don't

21   specifically delineate that there were reports that were

22   withheld.  It's meant to respond to the cross-examination.

23          MR. McLANDRICH:  I don't see how that responds to

24   it.  The testimony was that he didn't mention the missing

25   report till 2007.  So it's consistent with it.

FRITZ - REDIRECT (Owens)                                        1123

```
 1              THE COURT:  Where are we going here?  I mean, how

 2    far are go going?

 3              MR. OWENS:  I just got two exhibits that are

 4    documents that Mr. Fritz wrote that say Mr. Gillispie was

 5    eliminated that don't delineate the report, and it's to rebut

 6    the inference of --

 7              THE COURT:  Are you using those to refresh his

 8    recollection, is that what you're doing?

 9              MR. OWENS:  Well, he didn't specifically remember

10    it.  I was going to ask him about the documents themselves,

11    and then when he said he didn't remember, I was going to show

12    it to him.

13         I can do it another way, Your Honor.

14              THE COURT:  All right.

15    BY MR. OWENS:

16    Q.   Did you write documents in 2002 that indicated Gillispie

17    had been eliminated as a suspect?

18    A.   Yes, I wrote my own reports.

19    Q.   And did any of those reports, that you can recall,

20    specifically delineate out that there had been separate

21    reports that hadn't been produced to the defense?

22    A.   Yes.

23    Q.   And did you know in 2000 -- do you remember writing an

24    email, something called "What Do You Do and No One Listens"?

25    Does that sound familiar?
```

FRITZ - REDIRECT (Owens)                                1124

1    **A.**    It sounds familiar.

2    **Q.**    Would that have been from November of 2003?  Does that

3    sound right?

4    **A.**    I -- I don't remember writing the -- the title sounds

5    familiar, but I don't remember whether I did it.

6    **Q.**    Okay.  Do you remember whether or not that document from

7    January of 2003 mentions whether or not Gillispie was

8    eliminated as a suspect?

9    **A.**    I don't know.  I'd have to see the document.

10          MR. OWENS:  Your Honor, can I show the witness

11   Defense Exhibit Number 41?

12          THE COURT:  Anything?

13          MR. McLANDRICH:  No objection.

14          MR. HERMAN:  No objection.

15          THE COURT:  We're doing this for the purposes of

16   refreshing his recollection.

17          MR. OWENS:  Correct, Your Honor.

18          THE WITNESS:  Yes, now I remember this.

19   BY MR. OWENS:

20   **Q.**    Okay.  Sir, just look up.  There is not a question

21   pending.

22   **A.**    Oh, okay.

23   **Q.**    Thank you.  Does looking at that refresh your

24   recollection as to whether or not that email that you wrote

25   from 2003 mentions eliminating Gillispie as a suspect?

FRITZ - RECROSS (McLandrich)                              1125

1    **A.**   Yes.

2    **Q.**   Does it mention specifically that there were reports

3    written about it?

4    **A.**   No.

5    **Q.**   Why is that?

6    **A.**   In 2003, I made an assumption that that was part of the

7    discovery that everybody had already.  And it wasn't

8    anything -- when I wrote this, this was to try to get

9    assistance, legal assistance with this case 'cause I --

10   there was nothing more I could do.

11   **Q.**   Just as a completion, I know you testified that you never

12   had any conversations with Mr. Gillispie about him being

13   eliminated as a suspect, right?

14   **A.**   No.

15   **Q.**   Did you ever have any conversations with Mr. Folfas

16   before the trial about that topic?

17   **A.**   No.

18           MR. OWENS:  That's all I got, Your Honor.

19           THE COURT:  All right.  Anything with regard to

20   those few questions, counsel, at all?

21           MR. McLANDRICH:  Yes, just one or two.

22           THE COURT:  All right.

23                      **RECROSS-EXAMINATION**

24   BY MR. McLANDRICH:

25   **Q.**   So, Mr. Fritz, in 2003, I believe you just testified that

FRITZ - RECROSS (McLandrich)                                    1126

1   you wrote in one of your reports or documents that you would

2   send to people to solicit help that you were aware that

3   Mr. Gillispie had been eliminated as a suspect, correct?

4   **A.**   I was aware, yes.

5   **Q.**   Yes.  And so then you said but you also didn't include

6   the fact that there was a report that would have said that,

7   right?

8   **A.**   Right.

9   **Q.**   And it would have been equally as important for people to

10  know that there was a report.  The people you were writing to,

11  they didn't have the file.  They weren't acquainted with the

12  file, correct?

13           MR. OWENS:  Objection.

14           THE COURT:  Well, there are several questions there.

15  So sustained.

16  BY MR. McLANDRICH:

17  **Q.**   Let me ask it separately.  This document that you were

18  just reviewing was something that you weren't sending to the

19  prosecutor, correct?

20  **A.**   No, it wasn't to the prosecutor.

21  **Q.**   You weren't sending to Mr. Lieberman, correct?

22  **A.**   No.

23  **Q.**   You were sending it to people who weren't familiar with

24  Mr. Gillispie's case seeking to elicit help?

25  **A.**   Yes.

FRITZ - RECROSS (McLandrich)                    1127

1   **Q.**   And so it would be important for them to know not only

2   that Mr. Gillispie had been eliminated as a suspect, but that

3   there was a report indicating that he had been eliminated as a

4   suspect, right?

5           MR. OWENS:  Objection as to what would be important

6   for other people to know.

7           THE COURT:  Sustained as to that.

8   BY MR. McLANDRICH:

9   **Q.**   In any event, when you're seeking this help and you are

10  writing to people about him being eliminated as a suspect, you

11  didn't bother to include the fact that there would be a report

12  documenting that?

13  **A.**   No.

14  **Q.**   And when you are trying to convey information to people,

15  you are trying to give them the full picture, right?

16  **A.**   Yes.

17  **Q.**   And so it would be prudent in that context to include the

18  fact that there was a report documenting this?

19  **A.**   No, not from my way I looked at it.

20          MR. McLANDRICH:  That's all.

21          THE COURT:  All right.  Nothing?

22          MR. HERMAN:  Nothing, Your Honor.

23          MR. OWENS:  This witness can be excused, Your Honor.

24          THE COURT:  Thank you very much.

25       Next witness.

WINTERS - DIRECT (Porter)                                    1128

1              MS. PORTER:  Your Honor, the plaintiff would like to

2      call Richie Winters to the stand.

3          **RICHARD A. WINTERS, II, PLAINTIFF'S WITNESS, SWORN**

4              THE COURT:  Mr. Winters, please try to keep your

5      voice up so we can all hear your responses.  You have the

6      microphone there.  Utilize it as you wish.  If you get too

7      close, it muffles; if you get too far away, it won't pick you

8      up.  So if you keep your voice up, that for the most part

9      solves the problem, all right?

10             THE WITNESS:  Yes.

11             THE COURT:  All right.  You may inquire.

12                      **DIRECT EXAMINATION**

13     BY MS. PORTER:

14     **Q.**   Good afternoon.  Can you state and spell your name for

15     the record?

16     **A.**   Richard A. Winters, II, W-I-N-T-E-R-S.

17     **Q.**   Mr. Winters, where are you from?

18     **A.**   Dayton, Ohio.

19     **Q.**   Did you grow up there?

20     **A.**   Yes, in Fairborn.

21     **Q.**   And where do you live now?

22     **A.**   Centerville, Ohio.

23     **Q.**   And where are you currently employed?

24     **A.**   A mortgage lending company.  Prime Lending is the name

25     of the company.

WINTERS - DIRECT (Porter)                                    1129

1    **Q.**    Could you give us a brief recap of your employment

2    history?

3    **A.**    From January of 1990 through December of 1993, I was a

4    real estate agent.  From December of 1993 through May of

5    1994, I was with a mortgage company called Republic Bank.

6    From May -- excuse me -- GMAC Mortgage.  From May of 1994

7    through September 2006, I was employed with Republic Bank.

8    From November of 2006 to December 2010, I was employed with

9    Bank of America.  And then from December of 2010 to present,

10   I've been employed with Prime Lending.

11   **Q.**    Thank you.  And are you married?

12   **A.**    Yes.

13   **Q.**    Do you have any children?

14   **A.**    Yes, two children.

15   **Q.**    And how do you know Dean Gillispie?

16   **A.**    Dean and I are childhood friends.  We grew up in the

17   same neighborhood, went to the same junior high and high

18   school.

19   **Q.**    And what was your relationship like when you were growing

20   up?

21   **A.**    Dean and I have become friends, closer and closer

22   friends as we progressed through high school and then after

23   high school, while I went and attended college at Ohio

24   State, and have been friends since.

25   **Q.**    And earlier you said you were a mortgage lender

WINTERS - DIRECT (Porter)                                    1130

1    currently --

2    **A.**    Yes.

3    **Q.**    -- correct?  How did you -- how did you originally get

4    into that business?

5    **A.**    Through a mortgage lending partner while I was selling

6    real estate.  He encouraged me to come work with him, and I

7    accepted that opportunity.  I've been employed as a mortgage

8    lender since.

9    **Q.**    And did you and Dean ever work together?

10   **A.**    Professionally, once.  When I was selling real estate I

11   helped him with the sale of one of the properties he

12   purchased.

13   **Q.**    And did you hope to make that sort of partnership a

14   long-time arrangement?

15   **A.**    Yes.  That was -- that was the intent.  With my family

16   background in real estate and his skills in fixing up real

17   estate, it was our intent to continue that activity where I

18   would help find and help him buy and eventually sell real

19   estate, and he would be fixing them up and selling them.

20   **Q.**    And what happened to that plan when Dean went to prison?

21   **A.**    Well, that plan obviously stopped.

22   **Q.**    And directing your attention to when Dean was arrested in

23   1990, what was your response when you found that out, that he

24   was arrested?

25   **A.**    Just disbelief, quite frankly.  Must have been a

WINTERS - DIRECT (Porter)                                    1131

1    mistake, a bad one.

2              MR. McLANDRICH:  Objection.

3              THE WITNESS:  Excuse me.  A mistake that --

4              THE COURT:  Well --

5              THE WITNESS:  Beg your pardon.

6              MR. McLANDRICH:  This is just sort of opinion

7    evidence about the quality of the conviction.

8              THE COURT:  I'm going to allow the answer up to this

9    point in time to stand.  Further, beyond that, it's stricken.

10        So he was shocked.  Is that correct?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Okay.

13   BY MR. PORTER:

14   Q.   And what was your response when Dean was convicted?

15   A.   Again, disbelief that somehow the wrong person must

16   have been selected, and we had no idea that could happen to

17   one of us.

18   Q.   Did you ever visit him while he was in prison?

19   A.   Yes, frequently.

20   Q.   What do you mean by "frequently"?

21   A.   Throughout most of the 20-plus years, I'd say we --

22   myself and other childhood friends -- visited Dean at least

23   once a month; when possible, twice a month.

24   Q.   And were you there so often that you knew his inmate

25   number?

WINTERS - DIRECT (Porter)                                         1132

1    A.    246-292.

2    Q.    What were those visits like?

3    A.    For us, I think it was an attempt to suspend reality

4    and just pretend as if we weren't where we were, and just

5    continue our conversations as if we were home in Fairborn,

6    as we always did.

7    Q.    Did you ever send Dean any letters?

8    A.    Not letters, no.  But soon after his conviction, I

9    began to send Dean photos from my life activities, whether

10   it was travel, friends' weddings, children, parties,

11   anything to keep him a part of our lives as best we could.

12   Q.    And why did you send him those photos?

13   A.    That's just what friends do.

14   Q.    And did you ever take your children to visit Dean?

15   A.    Yes, both.  They actually enjoyed those trips.

16   Q.    How often did you take them?

17   A.    Since the visitations or the number of visitors were

18   limited, neither child went as frequently as I did, but at

19   least, I would guess, two to three times a year each of

20   them.

21   Q.    And how old were your children when you started taking

22   them?

23   A.    I don't remember exactly, but if I had to guess,

24   Olivia, our oldest, when she was perhaps three or four; and

25   the youngest, Trey, he was born in 2007, so I would suspect

WINTERS - DIRECT (Porter)                                1133

1    maybe only a few times before his release.

2    **Q.**   And are there any visits with your children and Dean that

3    stand out to you?

4    **A.**   No.  Each one was just as fun as the other for us.

5    Again, suspending reality and trying to make the best visit

6    we could for our friend.

7    **Q.**   Do you remember anything your children said to Dean

8    during those visits?

9    **A.**   Not during the visits, no.  Our daughter,

10   coincidentally, asked for Dean's release as a Christmas

11   present in 2011, and it was a good year for her to ask for

12   that present.

13   **Q.**   Why was that a good year?

14   **A.**   That was the year Dean was released.

15   **Q.**   Do you remember what day Dean was released?

16   **A.**   December 22nd.

17   **Q.**   And when you found out Dean was going to be released,

18   what did you do?

19   **A.**   Well, after a lot of crying and celebrating, we made

20   preparations for a good welcome home and made sure everyone

21   Dean hasn't seen those 20 years was there to greet him when

22   he came home that night.

23   **Q.**   How did Dean get home?

24   **A.**   Myself and others made arrangements for a private

25   motorcoach to bring us home so that we could all ride home

WINTERS - DIRECT (Porter)                                      1134

1    together as a group, and glad we did.  That was a fun ride

2    home.

3    Q.   What was it like meeting -- bringing the motorcade or

4    bringing the private vehicle to meet Dean?  What do you

5    remember about that meeting?

6    A.   When he was released?

7    Q.   Yes.

8    A.   Well, we had the private motorcoach there, the bowling

9    alley near London Correctional Institution.  It was the

10   alternate site selected to release Dean.  And, thankfully,

11   we had that motorcoach because there was quite a large

12   crowd.  Aside from the regular patrons of the bowling alley,

13   friends and supporters of Dean were there, and it created a

14   rather crowded atmosphere.

15        The officials that brought Dean were a bit

16   uncomfortable with the crowded atmosphere, and Mr. Godsey of

17   the Innocence Project suggested that the vehicle be used as

18   a secure environment for the law enforcement officials to, I

19   believe, install the ankle bracelet and release Dean at the

20   location.

21   Q.   And how did Dean seem on the ride home?

22   A.   Somber.  It was meant to be a fun atmosphere, similar

23   to our many visits, but at some point we realized that

24   Dean's mom and dad were the most eager to see their son.

25   And so we invited them to join us on the bus ride home, and

1    that was when we realized that this would be more of a

2    somber moment driving -- riding home rather than an

3    exciting, jubilant one, because his parents were a bit

4    overwhelmed with the events that night.

5    Q.    Do you remember when Dean was declared a wrongfully

6    imprisoned person?

7    A.    Yes, I do.

8    Q.    Can you -- what was that like?  What happened?

9    A.    That was another emotional day for those of us that

10   have been around Dean and supporting Dean since the

11   beginning.  It was a day everyone, of course, was looking

12   forward to.  Yet at the same time, it was a harsh reminder

13   and a summary of what Dean had endured up to that point.

14   And to hear Dean verbalize all of his emotions in a two- or

15   three-minute statement to the Court was, again, a bit

16   overwhelming for most of us.

17   Q.    Is Dean normally an emotional person?

18   A.    No.

19           MS. PORTER:  That's all, Your Honor.

20           MR. McLANDRICH:  No questions, Your Honor.

21           MR. HERMAN:  No questions, Your Honor.

22           THE COURT:  Can this witness be excused?

23           MR. OWENS:  Yes, Judge.

24           MS. PORTER:  Yes.

25           THE COURT:  Thank you very much.

WOLFE - DIRECT (Kanovitz)                                    1136

1          Next witness.

2               MR. OWENS:  Plaintiff will call Rick Wolfe, Your

3     Honor.

4          **RICK WOLFE, PLAINTIFF'S WITNESS, SWORN**

5                    **DIRECT EXAMINATION**

6     BY MR. KANOVITZ:

7     **Q.**   Good afternoon.  Could you state and spell your name for

8     the record, please.

9     **A.**   Rick Wolfe.

10              THE COURT:  I'm sorry.

11              MR. KANOVITZ:  Sorry, Judge.  I jumped the gun.

12              THE COURT:  Mr. Wolfe, please try to keep your voice

13    up in response to the questions so that we can all hear your

14    responses.  You have the microphone there.  You can utilize it

15    as you wish.  If you get too close, it muffles; if you get too

16    far away, it loses you.  So if you keep your voice up, that

17    will solve the problem for us, all right?

18              THE WITNESS:  All right.

19              THE COURT:  Thank you.  You may inquire.

20    BY MR. KANOVITZ:

21    **Q.**   Could you state and spell your name for the record,

22    please.

23    **A.**   Richard Wolfe, R-I-C-H-A-R-D  W-O-L-F-E.

24    **Q.**   And were you once upon a time an officer with the Miami

25    Township Police Department?

WOLFE - DIRECT (Kanovitz)                                1137

1   **A.**   Yes.

2   **Q.**   For what years?

3   **A.**   From '74 to '84.

4   **Q.**   And during that time, did you overlap with having a job

5   at General Motors?

6   **A.**   Yes.

7   **Q.**   What years was that?

8   **A.**   From '78 to '84.

9   **Q.**   And then did you eventually retire from General Motors?

10  **A.**   Yes.

11  **Q.**   How long were you in total at General Motors?

12  **A.**   My credit service is 26 years.

13  **Q.**   Did you eventually become a district manager in charge of

14  the security department at General Motors?

15  **A.**   District manager for part, yes.  Not the whole

16  department there in Dayton, but it was a section I had

17  responsibilities -- responsibilities for.

18  **Q.**   Got it.  When did you -- when did you become district

19  manager?

20  **A.**   In the '80s.  I can't remember exactly when.  Early

21  '80s.

22  **Q.**   Fair enough.  And you mentioned you were only over part

23  of the operations in Dayton.  Approximately, how many -- how

24  many sites were you in charge of?

25  **A.**   Let me do a quick count here.  Five.

WOLFE - DIRECT (Kanovitz)                                    1138

1    **Q.**   And in total, like how many people worked at those sites?

2    **A.**   A hundred.

3    **Q.**   Not just -- not just security people, like how many

4    people worked at all of those factories?

5    **A.**   Oh, I don't know.  I mean, it's -- you're talking

6    thousands.

7    **Q.**   Okay.  And during the time that you were with the Miami

8    Township Police Department, did you know Detective Moore's

9    father?

10   **A.**   Yes.

11   **Q.**   And did you know him when he became chief of police?

12   **A.**   He was chief of police when -- yes, I did know him when

13   he became chief of police.

14   **Q.**   And did you also know Mr. Angel?

15   **A.**   Tom Angel?

16   **Q.**   Yes.

17   **A.**   Yes.

18   **Q.**   And did you know him when he became chief of police?

19   **A.**   Yes, but I wasn't working there.

20   **Q.**   Okay.  When you did work there, did you know Detective

21   Fritz and Detective Bailey?

22   **A.**   Yes.

23   **Q.**   And to be clear, during the period of time that you

24   worked at the Miami Township Police Department, did you ever

25   know Mr. Moore or meet Mr. Moore?

WOLFE - DIRECT (Kanovitz)                                          1139

1    **A.**   No.  You're talking Scott Moore, right?

2    **Q.**   I'm talking Detective, yes.

3         And then after leaving Miami Township Police Department,

4    would you stop back and visit from time to time?

5    **A.**   Yes.

6    **Q.**   A couple times a year?

7    **A.**   Yes.

8    **Q.**   And would you visit with Chief Angel?

9    **A.**   On one occasion I know I did.

10   **Q.**   But is it fair to say you would visit with people that

11   you knew from back when you worked there?

12   **A.**   Yes.

13   **Q.**   Okay.  And eventually, did there come a time where you

14   came to the Miami Township Police Department with a copy of

15   Dean Gillispie's work ID?

16   **A.**   Yes.

17   **Q.**   Okay.  And at the time that you came there, did you give

18   that ID to Detective Fritz?

19   **A.**   Yes.

20   **Q.**   And at the point in time where you gave the ID to

21   Detective Fritz, you still hadn't ever met Detective Moore; is

22   that correct?

23   **A.**   That's correct.

24   **Q.**   And then some time passes before you take your next step,

25   correct?

WOLFE - DIRECT (Kanovitz)                                    1140

1    **A.**    Yes.

2    **Q.**    Okay.  And, eventually, you come back with five or six

3    other employee IDs, correct?

4    **A.**    Yes.

5    **Q.**    And is that because you received a phone call from

6    somebody at Miami Township Police Department requesting that

7    you do that?

8    **A.**    No.

9    **Q.**    You did that on your own?

10   **A.**    Yes.

11   **Q.**    Sir, do you recall at a prior point in time in this case

12   answering some questions, written questions under oath?

13   **A.**    Yes.

14   **Q.**    Okay.  And are you certain sitting here today that you,

15   on your own, decided to bring out the cards as opposed to

16   receiving a request?

17   **A.**    Let me put it this way, I am not totally certain.

18   **Q.**    Okay.  Would it refresh your recollection to see the

19   answers you gave to the written questions under oath?

20   **A.**    Yes.

21          MR. KANOVITZ:  Your Honor, could the witness please

22   be shown Plaintiff's Exhibit 163, page 207?

23          THE COURT:  Mr. Wolfe, you will be shown this page,

24   and you will be directed to read to yourself a certain portion

25   of it.  And then when you're done reading, if you will just

WOLFE - DIRECT (Kanovitz)                                1141

1    please look up, there will be a question.

2              THE WITNESS:  Okay.

3              THE COURT:  If we can find it.

4         What's the exhibit?

5              MR. KANOVITZ:  Plaintiff's 163.

6    BY MR. KANOVITZ:

7    **Q.**  If you'd take a look at, you will see there is a page 207

8    at the bottom right hand.

9              THE COURTROOM DEPUTY:  Counsel, can I have the

10   number again?

11             MR. KANOVITZ:  It's page 207, 207 of 233, bottom

12   right.  It's an exhibit, not transcript page.

13             THE COURTROOM DEPUTY:  I'm sorry, counsel.  I may

14   have the wrong one.  Did you say 163?

15             MR. KANOVITZ:  Yes, 163.  There are exhibits at the

16   end of the deposition.  So it would be page 207 of 233 if you

17   look at the Bates numbers at the bottom.

18             THE COURTROOM DEPUTY:  He might have trouble reading

19   this.  It is not very dark in this copy.

20             MR. KANOVITZ:  Your Honor, may I approach with my

21   copy?

22             THE COURT:  You can retrieve the copy.

23             THE COURTROOM DEPUTY:  It's not any better.

24             THE WITNESS:  We will see what we can do.

25             MR. McLANDRICH:  What's your question?

WOLFE - DIRECT (Kanovitz)                              1142

1    BY MR. KANOVITZ:

2    **Q.**   If you take a look at the third paragraph, sir.

3    **A.**   On page 207?

4    **Q.**   Yes.

5             THE COURT:  And you are asking him to read the third

6    paragraph?

7             MR. KANOVITZ:  Yes, to refresh his recollection.

8             THE COURT:  All right.

9             THE WITNESS:  Okay.

10   BY MR. KANOVITZ:

11   **Q.**   Does that refresh your recollection about how it is that

12   you came to bring the IDs out to Miami Township?

13   **A.**   Well, it's there, I guess if it happened that way.

14   Really, I don't remember, totally being honest.

15   **Q.**   Fair enough.  So is it fair to say, at least when you

16   answered the written questions under oath, your account was

17   that you brought the IDs because you received a phone call

18   requesting them?

19   **A.**   As best as I can recollect.  I can't totally recollect

20   everything.

21   **Q.**   Fair enough.  That's fine.  You can put it down.

22            Now, when you brought the five IDs, that was the -- is it

23   the case that that was the first time you met Detective Moore?

24   **A.**   Yes.

25   **Q.**   And you gave the IDs to him, correct?

WOLFE - DIRECT (Kanovitz)                                    1143

1    **A.**    First I was going to give them to Fritz, and then he

2    introduced me to Moore.

3    **Q.**    I got it.  And the time between when you first brought

4    out the one ID and the time that you returned with the five

5    IDs was a pretty long period of time, correct?

6    **A.**    A fair amount of time, I think.

7    **Q.**    It could have been as much as a year, certainly many

8    months?

9    **A.**    Yeah, many months.

10   **Q.**    And at the time that you brought those IDs out there,

11   your understanding was that the department was already doing

12   the investigation of Mr. Gillispie, correct?

13   **A.**    Yes.

14           MR. KANOVITZ:  No further questions.

15           THE COURT:  All right.  Counsel?

16           MR. McLANDRICH:  No questions.

17           THE COURT:  Counsel?

18           MR. HERMAN:  No questions.

19           THE COURT:  Can this witness be excused?

20           MR. KANOVITZ:  Yes.

21           THE COURT:  Thank you very much, sir.

22        Next witness.

23           MR. OWENS:  Your Honor, our next witness is Kenneth

24   Betz, B-E-T-Z.

25           THE COURT:  All right.

1              **KENNETH BETZ, PLAINTIFF'S WITNESS, SWORN**

2              THE COURT:  Mr. Betz, please try to keep your voice

3   up so that we can all hear your responses to the inquiries.

4   You have a microphone there.  Utilize it as you wish.  If you

5   get it too close, it muffles you; if you get too far away, it

6   loses you.  So keeping your voice up in a loud voice solves

7   the problem for us, all right?

8              THE WITNESS:  I do not think that will be an issue.

9              THE COURT:  It doesn't sound like it.  Go ahead.

10                     **DIRECT EXAMINATION**

11  BY MR. OWENS:

12  **Q.**   All right, sir.  Could you please just introduce yourself

13  for the jury.

14  **A.**   My name is Ken, last name Betz, B-E-T-Z.

15  **Q.**   And are you retired?

16  **A.**   I am indeed.

17  **Q.**   Congratulations.

18  **A.**   Thank you.

19  **Q.**   Where did you work before then?

20  **A.**   I was the director of the Montgomery County Coroner's

21  Office and the Miami Valley Regional Crime Laboratory for 44

22  years.

23  **Q.**   And what were your duties as the director of the Miami

24  Valley Regional Crime Lab?

25  **A.**   I was responsible for the personnel in the -- both

BETZ - DIRECT (Owens)                                        1145

1    offices, or approximately 68 employees, make sure the

2    supervisors were responsible for their actions, and carried

3    out the wishes of the elected official.

4    **Q.**   And just, what generally did the Miami Valley Regional

5    Crime Lab do as a general matter?

6    **A.**   The crime laboratory was responsible for processing

7    evidence submitted by police agencies at a time where we

8    probably did evidence for probably 40 or 50 police agencies

9    in southwest Ohio.  We had a full-scale laboratory, which is

10   chemistry, firearms, fingerprints, DNA, photography.  So it

11   was a full-scale forensic laboratory.

12   **Q.**   Now, just to be totally clear, so is the Miami Valley

13   Regional Crime Laboratory an independent organization apart

14   from the law enforcement agencies that you described?

15   **A.**   That is correct.

16   **Q.**   All right.  So just going back to the period of 1988-

17   1990, were you at the lab at the time?

18   **A.**   Yes, I was.

19   **Q.**   And in that period of time, did the Miami Valley Regional

20   Crime Lab, would it prepare pictures for law enforcement, law

21   enforcement agencies?

22   **A.**   During 19 -- based on my recollection?

23   **Q.**   Yes, sir.

24   **A.**   1988, I believe we were on South Patterson Boulevard,

25   and we did limited photography.  We merged crime lab and

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

BETZ - DIRECT (Owens)                                    1146

1    coroner's office, I believe, in probably '88 and '89ish, and

2    at that point we had a larger photography department.  But

3    we did develop photographs that were submitted to us.

4    Q.   Okay.  Outside of sort of developing photographs that

5    were submitted to you, can you think of any instance where law

6    enforcement officers submitted a picture to you and said they

7    wanted the picture to be larger or smaller because they wanted

8    to use it in a lineup?

9    A.   I can't answer for what the dark room was responsible

10   for.  I had supervisors over there.  But I believe we had

11   the capabilities of taking photographs and making them

12   larger or making them smaller.  Generally, there would be a

13   request from a law enforcement agency to do whatever --

14   develop film or print film -- but that was the

15   responsibility of the dark room personnel.

16   Q.   Isn't it true, sir, that that's not something that the

17   Miami Valley Regional Crime Lab would typically do?

18   A.   Typically, we would not do any type of lineup

19   photographs, if that's what you're referring to.

20   Q.   And do you recall a situation ever in which, in that

21   period of time, the Miami Regional Valley Crime Lab developed

22   pictures for use in a photographic lineup?

23   A.   I can't answer ever, but it was not -- it was not

24   something that I was aware that we would do, and we did not.

25   Most police agencies had their own collection of photographs

SCOTT - DIRECT (Owens)                                         1147

1    and put their own lineups together.

2    **Q.**    Sure.  And so just to be clear, you can't think of a

3    specific instance where you're aware of that off the top of

4    your head; is that right?

5    **A.**    I am not personally aware of it, no, sir.

6                MR. OWENS:  Those are my questions.

7                MR. McLANDRICH:  No questions.

8                MR. HERMAN:  No questions.

9                THE COURT:  Can this witness be excused?

10               MR. OWENS:  Yes, Your Honor.

11               THE COURT:  Thank you very much, Mr. Betz.

12               THE WITNESS:  Thank you, Your Honor.

13               MR. OWENS:  We've got Andy Scott.

14        **ANDREW J. SCOTT, III, PLAINTIFF'S WITNESS, SWORN**

15               THE COURT:  Mr. Scott, please try to keep your voice

16   up so that we can all hear your responses to the inquiries.

17   Utilize the microphone as you wish.  If you get too close, it

18   gets muffled; if you get too far away, it loses you.  But if

19   you keep your voice up, that fairly solves the problem, all

20   right?

21               THE WITNESS:  Thank you, Your Honor.  I will.

22               THE COURT:  You may inquire.

23                          **DIRECT EXAMINATION**

24   BY MR. OWENS:

25   **Q.**    Afternoon, Mr. Scott.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

SCOTT - DIRECT (Owens)                                        1148

1   **A.**   Good afternoon.

2   **Q.**   Could you please just state and spell your name for the

3   record?

4   **A.**   Sure.  Dr. Andrew J. Scott, III.  A-N-D-R-E-W, middle

5   initial J., last name S-C-O-T-T.

6   **Q.**   Since you led with "Doctor," can you just give us a sense

7   of your educational history?

8   **A.**   Sure, I have a doctor -- doctoral degree in criminal

9   justice, and I have a master's degree in human resources and

10  management, and then I have a BA degree in psychology.

11  That's my formal education.

12      And then I have a host of other education in law

13  enforcement related to law enforcement courses and the FBI

14  National Academy.

15  **Q.**   Got it.  So you were previously a police officer; is that

16  right?

17  **A.**   Yes.  I started out my career as an auxiliary officer

18  in 1976 at a community called Dania Beach, just by Fort

19  Lauderdale in Florida.  And then I moved over to North Miami

20  Police Department from 1978 to '82.  I was a patrolman

21  there.  Then I moved over to a neighboring city called North

22  Miami Beach Police Department, where I wound up starting out

23  as a patrolman and then advanced through the ranks, worked

24  in the detective bureau of the criminal investigations

25  bureau, homicide, was promoted to sergeant, lieutenant,

SCOTT - DIRECT (Owens)                                    1149

1    major, assistant chief during the course of my tenure with

2    the North Miami Beach Police Department.  And then I was

3    selected as chief of police in the Boca Raton Police

4    Department in 1998.

5    Q.   And how long did you serve as the chief of police in Boca

6    Raton?

7    A.   Sure.  I worked there as chief of police from 1998 till

8    approximately 2006.

9    Q.   And so, I guess, all told, how long were you an active

10   police officer?

11   A.   Sure.  So my law enforcement experience is about 30

12   years, a little bit over 30 years of actual law enforcement

13   experience.  And then I have approximately 16 years as an

14   expert witness on police practices and procedures, working

15   on my 17th year.

16   Q.   Got it.  And so I think -- let me just break that down a

17   little bit.  After you retired from being an active police

18   officer, did you -- what was your next big employment?

19   A.   Sure.  So I created -- I went into the expert witness

20   consulting field in 2006, although I had my consulting

21   company prior to leaving law enforcement.  I was doing

22   consulting on accreditation matters, law enforcement

23   accreditation.  And upon leaving law enforcement then, I

24   wound up opening up or expanding my expert witness

25   consulting to police practices and procedures and assisting

SCOTT - DIRECT (Owens)                                                  1150

1    both law enforcement and plaintiffs on cases of this nature.

2    Q.   Got it.  And so just to be totally clear, when you say

3    that you have a consulting agency to do expert testimony, is

4    that the type of work you're doing in this case?

5    A.   Yes, I am.  I've been hired by your firm to provide

6    certain opinions in this case.

7    Q.   Got it.  And you just mentioned the word "hired."  Are

8    you -- do you charge a rate for your services?

9    A.   I do.  The rate I charge is $280 an hour.  For

10   deposition testimony and trial testimony, it's $325 an hour.

11   Q.   Is that your standard rate, or does my firm get a special

12   discount?

13   A.   No, no.  That's the rate that we've agreed to with a

14   letter of engagement.

15   Q.   And just for the record so everyone knows, you've been

16   hired and retained by my firm in other cases; is that right?

17   A.   That's correct.  In approximately six or seven other

18   cases.

19   Q.   And would you provide an opinion about police practices

20   just because somebody's paying you to say it?

21   A.   No, absolutely not.  My credibility is important, and

22   so if I cannot feel comfortable in arguing a case on behalf

23   of a client that wants to hire me, I won't take the case.

24   Q.   Now, I want to talk about what you've done even though

25   you've been a consultant.  Have you taken steps to remain

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

SCOTT - DIRECT (Owens)                                    1151

1    active in education as it relates to police practices?

2    **A.**    Sure.  So as I discussed with you earlier, I just --

3    just recently obtained my doctoral degree.  That was in

4    December of 2021.  For the previous three and a half years,

5    I was actively engaged in coursework related to police

6    practices and procedures, ultimately defended my

7    dissertation, and subsequently awarded the doctoral degree.

8         I also am a member of the International Association of

9    Chiefs of Police.  That is one of the major think tanks in

10   law enforcement, has been for over a hundred years.  I

11   belong to the Police Executive Research Forum.  That's

12   another think tank, a research think tank.  That provides a

13   lot of studies and best practices for law enforcement, as

14   does the International Association of Chiefs of Police.  I'm

15   a life member of the IACP, the International Association of

16   Chiefs of Police.  I'm a member of the PERF, the

17   organization of Police Executive Research Forum.  I belong

18   to the Florida State Chiefs Association; I'm a life member

19   there.  I'm also a member of the Palm Beach County Chiefs

20   Association.

21        And so I stay up to breast and on top of current trends

22   within law enforcement.

23   **Q.**    And just -- I know you gave us a quick overview, and I

24   appreciate the brevity, but just to be clear, were you an

25   active police officer between 1988 and 1990?

SCOTT - DIRECT (Owens)                                    1152

1   **A.**   Oh, absolutely, yes, yes.

2   **Q.**   And are you aware of the police practices -- accepted

3   practices that exist in 1990?

4   **A.**   I was and I am.

5   **Q.**   And have you been permitted to testify as an expert in

6   federal court on the issues of police practices generally?

7   **A.**   I have, throughout the entire United States.

8   **Q.**   And have you been accepted as an expert in federal court,

9   specifically to testify about established practices related to

10  identification procedures?

11  **A.**   Yes, I have, on several occasions.

12          MR. OWENS:  Your Honor, I'd move to have Mr. Scott

13  qualified as an expert in the field of police practices.

14          MR. McLANDRICH:  No objection.

15          MS. FRICK:  No objection.

16          THE COURT:  He may be.

17  BY MR. OWENS:

18  **Q.**   All right.  Mr. Scott, so I want to talk about six things

19  related to police practices as they existed in 1990, okay?

20  **A.**   Yes, sir.

21  **Q.**   First, were there, in fact, actually established police

22  practices in 1990?

23  **A.**   Yes, there were.  There's -- through the International

24  Association of Chiefs of Police, they would periodically

25  publish what we call training keys, and those training keys

SCOTT - DIRECT (Owens)                                    1153

1   would highlight topical areas very relevant to law

2   enforcement.  And they have hundreds of them.

3       And then they also publish white papers specifically

4   related to certain aspects of law enforcement -- how to do

5   them better, laws relating to things, doing things better.

6   And basically those were available throughout the United

7   States.

8       Furthermore, agencies were becoming accredited around

9   that time, meaning law enforcement accreditation or the

10  Commission on Accreditation For Law Enforcement Agencies was

11  just developing whereby law enforcement agencies would

12  voluntarily try to become accredited, and the standards

13  related to practices in law enforcement and the agency that

14  wanted to become accredited would have to show through

15  policy and through actual deed that they were complying with

16  these law enforcement standards.

17  **Q.**   And so I know that you've issued a report that covers a

18  number of topics.  I am just going to hone in on a few today.

19      Were there training keys or general consensus documents

20  as it related to identification procedures that existed or --

21  in 1990?

22  **A.**   Yes, there was.

23  **Q.**   And can you just give us -- how would you refer to those?

24  **A.**   Sure.  So we go back to the issue that I mentioned

25  about training keys published by the International

SCOTT - DIRECT (Owens)                                        1154

1   Association of Chiefs of Police.  So back in the late '60s,

2   one of the training keys was called -- it's Number 67,

3   called "Witness Perception."

4        Then back in 1992, the next training key related to the

5   same concept generally on eyewitness identification

6   specifically dealt with show-ups, lineups, and photo arrays.

7   And in between that -- and I apologize.  Back in the '80s,

8   '83, '84, there was another training key published, 314

9   [sic], that dealt with the dynamics of eyewitness perception

10  and the things that impinge or not impinge a witness's

11  perspective of rendering a memory of what transpired.

12  **Q.**   Got it.  And did you say -- what was the year, sort of

13  range, on the first one you mentioned?

14  **A.**   Sure.  So back in the mid to early -- late '60s.  It's

15  a training key, 19 -- I'm sorry.  It's Training Key 67.

16  They numbered the training keys as well as titled them.

17  **Q.**   And so the testimony or practices I am going to be asking

18  you about today, you mentioned that there was a training key

19  from 1992; is that right?

20  **A.**   Yes, that's correct.

21  **Q.**   Does the training key -- and I think you said it's Number

22  414?

23  **A.**   Correct.

24  **Q.**   Does that training key reflect what the practices were in

25  1990?

SCOTT - DIRECT (Owens)                                        1155

1    **A.**    Yes.  Those were the practices that law enforcement

2    generally was participating in when it came to lineups,

3    photo arrays, and what they call show-ups.

4    **Q.**    Okay.  So second topic, I want to just talk about a few

5    issues related to identifications.  And even if it wasn't

6    well-known in the public in 1990, did police training

7    literature discuss the potential for witness

8    misidentification?

9    **A.**    Yes.  That was -- that was -- we were aware of that

10   back in the '80s and '90s, that there was some problems with

11   misidentification by witnesses.

12   **Q.**    Was there any -- any information in the sort of training

13   documents and based upon your experience about a concern for

14   potential wrongful convictions?

15   **A.**    Well, that was the theme of the literature, is that

16   back in the '60s, it was learned that many wrongful

17   convictions were based upon eyewitness identifications that

18   were not accurate.  And then back -- that was in the mid --

19   late to mid '60s.

20        And then as the law enforcement evolved, it became more

21   and more apparent that eyewitness identification may not

22   have been the best type of evidence, particularly if there

23   is no physical evidence, and that stands true today.  And so

24   in the '80s and '90s, we were familiar with the fact that

25   eyewitness identifications were problematic.

SCOTT - DIRECT (Owens)                                    1156

1   **Q.**   Got it.  And I want to just sort of focus on the

2   practices that -- as they existed in 1990.

3       Did any of the literature, even specifically, discuss how

4   wrongful identifications or convictions might happen in

5   situations of multiple witnesses identifying the same wrong

6   person?

7   **A.**   Sure.  So with regards to that information,

8   sometimes -- and there's been supporting literature in some

9   of the training keys where there were multiple witnesses in

10  one case, and the suspect was parading around the house, had

11  sexually molested the mother, and then the father was

12  transported by force to a bank to get some money.  And then

13  when the police came, they gave a description, and a suspect

14  was arrested.

15      And then it turned out that the suspect was clearly not

16  the suspect the family ID'd, multiple people, and he clearly

17  was in some other place.  And they discerned that it was

18  another person that committed the crimes, but they

19  wrongfully identified this particular person.

20  **Q.**   And is that example that you just sort of described, is

21  that from the training key from the '60s?

22  **A.**   Yes, that is correct.

23  **Q.**   Third topic.  What were the general -- and I want to just

24  talk about the creation of identification procedures.  What

25  were the general rules that existed in 1990 for creating photo

SCOTT - DIRECT (Owens)                                    1157

1    lineups?

2    **A.**    So a photo lineup, the training required that you have

3    no less than six photographs, and those photographs all

4    should be similar.  So if you had a target that you were

5    interested in having the victim identify or you think you

6    have a suspect, then you would be required to obtain an

7    additional five photographs, and those photographs did not

8    have to look exactly like the suspect but had to look

9    similar.

10        And then also the officer had to make sure that the

11   photographs were the same.  So if the faces were larger in

12   the frame, all the faces had to be larger.  If they had a

13   certain type of hair length, then all the photographs would

14   have to be similar to that, and what have you.

15        So that was the main thing, in having at least six

16   photographs for the photo array.

17        The other aspect back then was you would instruct the

18   potential witness that the individual that we're, you know,

19   we're looking for may or may not be represented in the photo

20   array.  So you didn't want the witness to say or think to

21   themselves, oh, they found the guy, so he's got to be in

22   there; so I have to pick a picture.  That was trying to

23   alleviate that because witnesses have a tendency to be

24   very -- they want to be very helpful in their case.  Even

25   though they are victims, they want to become very helpful

SCOTT - DIRECT (Owens)                                    1158

1    and hopefully not disappoint law enforcement.

2         The other thing is that, you know, witnesses were to

3    view the photo array separately, not together.  If you had

4    multiple victims, multiple witnesses and they knew each

5    other, then you would like to have the photo array viewed

6    one person right after the other.

7    **Q.**   And so I want to just focus on that last point that you

8    just mentioned.  Would it be a deviation from accepted police

9    practices that existed in 1990 to permit witnesses to have the

10   opportunity to confer with one another between identification

11   procedures?

12   **A.**   No.  That would be a -- you know, the cardinal rule not

13   to do that.  You don't want witnesses conferring amongst

14   each other, with one witness viewing the photo array and

15   they know each other and then scheduling them to come in and

16   view it the next day.  You just don't want the possibility

17   of collusion that, you know, they are discussing the photo

18   array, and so that it's not an impartial viewing.

19   **Q.**   Is there any established police practice from 1990 of

20   which you're aware that would sort of bless or condone giving

21   opportunities for multiple witnesses who know each other the

22   chance to confer over a period of a day between identification

23   procedures?

24   **A.**   No, not at all.

25        MR. McLANDRICH:  Objection.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

SCOTT - DIRECT (Owens)                                        1159

1           THE COURT:  Overruled.

2           THE WITNESS:  No, not at all.  That was an

3    unacceptable practice back then, and still is today.

4    BY MR. OWENS:

5    Q.   And you sort of mentioned this, and I just want to maybe

6    slow down a little bit, is you mentioned that when you are

7    selecting people who are not the suspect, would established

8    police practices -- would the quality of the picture, would

9    that be something a reasonable officer is supposed to

10   consider?

11   A.   Oh, sure.  In particular, you want to make sure that

12   all of the photographs look the same.  So you wouldn't want

13   to have a Polaroid and then a 35-millimeter picture of one

14   or two suspects.  And so you want the photographs to be the

15   same, the backdrop the same so there is no ability or

16   potential ability for a victim or a witness to be attracted

17   to that particular photograph over the other five

18   photographs.  So they all have to be similar, and the

19   backgrounds should be the same.

20   Q.   And I'm assuming that it was established police practices

21   that you would want -- in 1990 that you would want things

22   like -- basic things about, like, race, age, things like that

23   to be similar as well, right?

24   A.   Of course.  So when I refer to pictures that are

25   similar, so if you have a white suspect and you don't want

SCOTT - DIRECT (Owens)                                        1160

1   to put an African-American male in that photo array,

2   because, obviously, she saw a white suspect or he saw a

3   white suspect.  So you want to make sure that approximate

4   age, hair, obviously race, all of those are very important

5   to be similar when you're providing a photo array.

6   **Q.**   And when you talk about having individuals who are of the

7   same race, would it be important for officers to consider how

8   the people look in the pictures, regardless of however their

9   race is listed on a document or something like that?

10  **A.**   Oh, sure.  So, you know, clearly I go back to this, the

11  photograph -- all photographs within an array should look

12  similar to, and when I say "similar to," so if they have

13  shoulder-length hair, you are not going to put somebody with

14  short hair in the same photo array, particularly -- it's all

15  based upon the description provided by the victim or the

16  witness at the time.  So you want to keep them consistent.

17          THE COURT:  Counsel, since we have a shorter day, we

18  are going to take a very short break right now.

19          MR. OWENS:  Yes, sir.

20          THE COURT:  And then we will reconvene.

21      Ladies and gentlemen, we are going to take about a

22  ten-minute break here, and then we will continue.  And as I

23  indicated, we will conclude right at maybe just a few minutes

24  before 3:30.  Thank you.

25          THE COURTROOM DEPUTY:  All rise.  This court stands

1    in recess.

2          (Jury out at 2:24 p.m.)

3          (Recess at 2:24 p.m.)

4          (Jury in at 2:35 p.m.)

5          (In open court at 2:36 p.m.)

6              THE COURT:  We are back on the record.

7          Counsel can proceed.

8    BY MR. OWENS:

9    **Q.**   All right.  Dr. Scott, we were talking a little bit about

10   photo lineups and identifications, and was it an important

11   established practice in 1990 for officers to avoid making

12   suggestive statements to the witness that they may have a

13   suspect?

14   **A.**   Yes.  It's very clear in the literature and the

15   training that we received back in the '90s and even prior to

16   that that you make no suggestions or identify that the

17   suspect -- we have a suspect, and we want you to see him or

18   look for him in this photo array or what have you.  Make no

19   recommendations or suggestions.

20   **Q.**   And was there an understanding of why it was important to

21   avoid doing things like that?

22   **A.**   If you started to lead the witness on as to, yes, there

23   is a suspect within the photo array, the victim or the

24   witness is going to think, well, the suspect is in the

25   array, and, therefore, I have to make a choice.  And if I

SCOTT - DIRECT (Owens)                                    1162

1    don't, either I'm going to let the police officer down or,

2    you know, I'm going to let the case down.  But that's the

3    biggest reason.

4         Suggestion by a detective is not a good thing, and we

5    were prohibited from doing that or cautioned not to do it.

6    Q.   Now, even in 1990, was there advice given in terms of

7    established police practices that it's highly advisable that

8    officers who are not assigned to the case handle the

9    identification procedure?

10   A.   Yes.  That started the concept of a blind

11   administration.  And we didn't really understand that from a

12   law enforcement practitioner's perspective; the social

13   sciences did.  So that meant that a person -- that the

14   officer who is not involved in the case would administer the

15   photo array so there would be no subtle messaging to the

16   victim or the witness viewing the photo array leading them

17   to a particular photograph.

18   Q.   And I just want to be clear.  Even though there was

19   discussion of this as blind administration in the social

20   sciences, was it still the case in 1990 that police training

21   materials still advised against having the person

22   investigating the case conduct the identification procedure?

23   A.   Yes, that's correct.

24         MR. McLANDRICH:  Just objection to the broadness of

25   1990s.  I mean, that's 1990 to 1999.

 1              THE COURT:  Okay.

 2              MR. OWENS:  Sure.

 3              THE COURT:  If you can, and I would -- you might

 4    want to be less leading.

 5              MR. OWENS:  Yes, Judge.

 6    BY MR. OWENS:

 7    Q.   The question I just asked you about having the suspect --

 8    excuse me -- the officer who was conducting the photo

 9    identification not being the one investigating the case, was

10    that an established practice in 1990, not the '90s generally?

11    A.   Yes, that's correct.

12    Q.   All right.  And why would it have been advisable to have

13    an officer other than the one conducting the investigation to

14    administer the identification procedure?

15    A.   As I just previously testified, the fact is, is that

16    sometimes, inadvertent to, the officer that's involved in

17    the case in presenting the array may give some suggestions

18    or cues that even he or she doesn't know they are giving to

19    the witness.  So to avoid those cues, it was recommended

20    that somebody unrelated to the investigation would present

21    the photo array where they wouldn't even know who the

22    suspect was, to avoid that possibility.

23    Q.   Now, sort of forth topic, and we kind of already

24    transitioned to this a little bit, is about interaction

25    between the police and the witnesses.  And you've sort of

SCOTT - DIRECT (Owens)                                1164

1    talked about this a little bit.

2         Was there any sort of teaching or understanding about

3    this idea of a contamination of an identification or something

4    like that?

5    A.   Sure, sure.

6    Q.   What was that?

7    A.   So the contamination of identification could be based

8    upon simply comments being made by the investigator relative

9    to, perhaps, the complexion has changed over the course of

10   the years and so don't be surprised if you see that, or the

11   hair color maybe changed or something, they may have a

12   beard.

13        They are allowed to give general descriptions or

14   admonishment, so to speak, of, listen, there may be changes;

15   if you see these photographs, there may be changes to the

16   individual.  But you can't drill down and specifically start

17   to identify the hair's changed or they grew a beard or

18   something of that nature because it's very suggestive,

19   leading the witness to a particular picture in the photo

20   array.

21   Q.   So I just want to break that down.  Would it have been

22   consistent with established practices for a police officer

23   after an identification procedure has been used but before a

24   court proceeding to tell a witness that the suspect's

25   appearance has changed?

1    **A.**   No.  You wouldn't want to do that.  That's number one.

2    Number two, after the photo array is conducted, and let's

3    just say the victim identifies the suspect that you had in

4    mind, you're not supposed to give affirm -- you should not

5    give affirmation of, "Hey, you picked the right guy," "good

6    job," or anything like that.

7         And then subsequently, prior to trial, you don't want

8    to go back into speaking with the victim saying, "By the

9    way, the individual's looks may have changed.  He may have

10   colored his hair, got a crew cut," as opposed to the way he

11   looked at the time of the crime.

12   **Q.**   And just going to the example you gave of, "Hey, you did

13   a good job, thumbs up," would the proviso against that,

14   providing that type of thing apply to more subtle methods of

15   saying that than just a thumbs up?

16   **A.**   Sure, absolutely.  So you don't necessarily have to go,

17   "Hey, great job.  That's the guy."  You could say, "Thank

18   you very much.  That's good work for us.  You did a real

19   nice job on this," because you're cuing the individual to

20   feel comfortable in their identification when, in fact, it

21   may be a mistaken identification.

22   **Q.**   So you mentioned "cuing."  In 1990, was part of the

23   police training involved, discuss the psychological factors

24   that may apply to witnesses making an identification?

25   **A.**   Yes, there was a -- during the training courses, sure.

SCOTT - DIRECT (Owens)                                    1166

1    We were aware that victims want to be helpful.  They don't

2    want to disappoint the police.  They don't want to

3    disappoint themselves.  There's a thought that if they are

4    to be presented with a photo array, the suspect has to be in

5    there.  That's why law enforcement was trained to tell the

6    victim the suspect may or may not be in that particular

7    photo array.

8        Perceptions are different from individuals.  Eyesight,

9    lighting.  A variety of conditions and psychological factors

10   come into play when you're dealing with individuals who are

11   victims of crimes or witnesses of crimes.

12   **Q.**   Was it understood within policing communities in 1990

13   about whether or not stress might impact an identification?

14   **A.**   Yes, yes.  Trauma -- trauma can definitely impact a

15   witness identification.  And then not only does the trauma

16   impact that ability -- and this is just from my law

17   enforcement training -- meaning that it may skew their

18   perception of what the individual looked like.  Then, of

19   course, if you have a number of months or years from the

20   time of the crime till the time of the viewing of the photo

21   array, time has a tendency to erode the accuracy of the

22   memory.

23   **Q.**   Turning to the fifth topic.  Well, actually, sorry.

24   Staying with interactions between the police and the witnesses

25   during the administration of a photo array.  Would it be --

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

SCOTT - DIRECT (Owens)                                    1167

1   would it have been consistent with policing practices to use

2   one witness to schedule a viewing and identification procedure

3   for another?

4   **A.**   Sure, I guess under some extraordinary circumstances

5   that could happen, but it would be unusual to have that

6   happen.

7   **Q.**   Would you be concerned about -- strike that.

8       Now, I want to sort of break this down in three parts:

9   before, during, and after the administration of an array,

10  okay?

11  **A.**   Yes, sir.

12  **Q.**   We've talked a little bit about before already.  So I'm

13  not going to go into that.  But I want to talk about during

14  the administration of a photo array.  Were there established

15  practices for how police should conduct themselves while the

16  witness has the opportunity to view a photo array?

17  **A.**   Yes.  Show officers were required, number one, not to

18  make any type of suggestive comments or affirmation

19  comments.  That's number one.

20      Number two, if they are the investigating officer of

21  the case and they are providing the photo array, you ought

22  to document everything that the witness says relative to if

23  they make an identification, how -- you know, are they

24  certain.  And then the other thing is if they don't make an

25  identification or they say, "I'm pretty sure it's this guy,

SCOTT - DIRECT (Owens)                                        1168

1    but I can't say a hundred percent sure that it is," then you

2    want to write that down in notes and put that in your report

3    because it's extremely important later on as the case

4    progresses and if you ultimately do arrest an individual.

5    **Q.**   Would it also be important for police officers to make

6    contemporaneous recordings of things that they themselves

7    might have said if they say something during the

8    administration of a photo array?

9    **A.**   Well, of course.  Because anything that the officer

10   does, whether they say it or it's a response to a witness

11   within a very critical aspect of the case, you're going to

12   want to memorize -- memorialize that -- excuse me -- or

13   write that down in your report as to what was said and what

14   you said.

15   **Q.**   Got it.  And we had already talked about things after the

16   administration.  So now we can move to the fifth topic.  Was

17   there an established concept in policing in 1990 called

18   "tunnel vision"?

19   **A.**   Yes, long before the 1990s.  Tunnel vision, it can be

20   referred to in a couple of ways.  One is a physiological

21   aspect of tunnel vision where you just kind of black out a

22   lot of things and you just focused on one -- one particular

23   thing that's in your sight.

24        From an investigator's perspective or a law enforcement

25   officer's perspective, sometimes police officers, in their

SCOTT - DIRECT (Owens)                                    1169

1    best interests of wanting to serve the public, and they

2    focus on a particular target or a particular witness or a

3    particular suspect, there is a tendency then to block out

4    other information that may be contrary to the thought

5    process of that officer, meaning it's not fitting into the

6    narrow scale of what that individual's looking at; or he has

7    a person in mind, and then the information comes in from the

8    outside that says, awe, he may not be that person, and they

9    ignore that because they are so focused on that one in

10   particular individual that they have a tendency to ignore

11   other things that could direct them to other leads within a

12   case.

13   **Q.**   Now, does the concept of tunnel vision imply any malice

14   or specific negative intent by a police officer?

15   **A.**   No, it doesn't.  It can, but it normally doesn't.  And

16   the reason, based on my experience as a supervisor and an

17   officer myself, is that you're so earnest in trying to take

18   care of the public, they want to get an arrest and they want

19   to get a conviction because they're there to help the

20   public, and if you have a victim and you think you've got

21   the suspect, that's their intent.  They want to make that

22   arrest because that's their job.  And sometimes that

23   benevolency causes a tunnel vision, particularly in younger

24   officers.

25   **Q.**   Sixth and final topic.  Police agencies in 1990, were

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

SCOTT - DIRECT (Owens)                                    1170

1    they organized into specific jurisdictions?

2    **A.**    Sure.  So in states, you have state police; then you

3    have your county police because of each county has its own

4    police, which is usually the sheriff's department; and then

5    within a county, you have a municipality; and municipalities

6    have jurisdictions within their jurisdiction, their location

7    or locale; and then the county jurisdiction has jurisdiction

8    not only in the unincorporated areas of the county but also

9    within the municipalities of that county.  And so those are

10   the jurisdictional breakdowns.

11   **Q.**   So for lack of a better word, you know, police officer's

12   sort of a little bit territorial when it comes to

13   investigating cases in their jurisdiction versus others?

14   **A.**    Oh, sure.  First and foremost, not only are they

15   territorial with regards to investigating cases, there's

16   enough work to be done within your locale, you don't really

17   need to be going outside of your locale to be investigating

18   other cases.  That's number one.

19        And number two, you don't have the legal authority to

20   engage in law enforcement practices, particularly arrests,

21   outside your county.  If your case takes you there, you will

22   ultimately use the assistance of the jurisdictional

23   agencies.  Let's say it's a municipality going into a county

24   agency investigating a crime that occurred in the county,

25   you'd work with the county agency to facilitate that

SCOTT - DIRECT (Owens)                                    1171

1    investigation.  You wouldn't do it on your own.

2    Q.   Or if you had agencies within the same county, like two

3    municipalities, would it be consistent with established police

4    practices as they existed in 1990 for an officer from one

5    municipality to go and investigate a crime that happened in

6    another jurisdiction without the aid or knowledge of that

7    jurisdiction?

8    A.   No.  My experience has been that that would not be

9    acceptable.  And if that did occur, I'd probably, as chief

10   of police, be getting a call from another chief of police

11   saying, "How come your investigator's investigating our

12   crime?  We don't mind working with you."

13       So the appropriate way would have been to reach out to

14   that agency relative to that crime, tell them that you may

15   have a similar crime, and you'd like to -- you know, you

16   need their assistance.  That's the way to go about doing it.

17           MR. OWENS:  Can I just have one question -- one

18   moment on the sidebar, Your Honor.

19           THE COURT:  The side?

20           MR. OWENS:  Yes.

21           THE COURT:  Okay.

22       (At sidebar.)

23           MR. OWENS:  This is David Owens on behalf of

24   plaintiff.  I just realized that I hadn't informed the Court

25   or put on the record in this way, even though defendants

SCOTT - CROSS (McLandrich)                                    1172

1    didn't file a motion in limine with respect to Mr. Scott, they

2    reached an agreement, and this question is reflective of the

3    Court's order with respect to other witnesses that he could

4    testify about general practices but not the facts of the

5    particular case.  So we felt obligated to follow that rule.

6              THE COURT:  I appreciate that.  I have that order in

7    front of me.

8              MR. OWENS:  Yes.  So that's how this examination was

9    set up.

10             THE COURT:  I appreciate it.  All right.  You done?

11             MR. OWENS:  Yes, sir.

12        (In open court.)

13             MR. OWENS:  No further questions at this time.

14             THE COURT:  Thank you.

15        Counsel.

16             MR. McLANDRICH:  Thank you, Your Honor.

17                      **CROSS-EXAMINATION**

18   BY MR. McLANDRICH:

19   **Q.**   Good afternoon, Mr. Scott.

20   **A.**   Good afternoon, sir.  How are you?

21   **Q.**   Fine, thank you.  I represent Detective Moore.

22        So your experience in law enforcement is in the state of

23   Florida, correct?

24   **A.**   That's correct, sir.

25   **Q.**   And you didn't study the policies and practices in

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

SCOTT - CROSS (McLandrich)                                    1173

1    existence in Ohio in 1988 and 1990 in reaching your opinions,

2    correct?

3    **A.**   No, I did not.  I was not provided those policies.  I

4    don't think they were available.

5    **Q.**   All right.  And so it is your understanding, though, is

6    it not, that beyond the general instruction sheet, there was

7    no policy or practice specific to photo array identifications

8    at Miami Township, correct?

9            MR. OWENS:  Objection, Your Honor.  This is about

10   the specific facts of the case.

11           THE COURT:  Counsel?

12           MR. McLANDRICH:  It's about the -- all right.

13           THE COURT:  Sustained.

14   BY MR. McLANDRICH:

15   **Q.**   The International Chiefs of Police, I believe you

16   testified this is a think tank?

17   **A.**   Yes.  That's my --

18   **Q.**   Your characteristic?

19   **A.**   -- vernacular, yes.

20   **Q.**   And the same for the -- I'm sorry -- what exactly you

21   called it, the Police Research Forum?

22   **A.**   Yes, the Chief Executive Research Forum.  The acronym

23   is called PERF.

24   **Q.**   And so you're not in the position to testify as to how

25   quickly any particular thought that a think tank may have, how

SCOTT - CROSS (McLandrich)                                    1174

1    quickly that boils itself down to a particular jurisdiction,

2    let's say the Miami Township Police Department?

3    **A.**    Actually, no, I don't have that timeline in which that

4    would occur.

5    **Q.**    And you would agree, would you not, that there's a

6    difference between best practices and the policies and

7    procedures that might exist at any given police department?

8    **A.**    That's correct.  And that was -- that is probably one

9    of the biggest things that law enforcement suffers from is

10   exactly what you are just saying, is that best practices

11   don't permeate down to all of the agencies throughout the

12   country.

13   **Q.**    Right.  And so a given agency, whatever it might be,

14   isn't held to best practices; it's held to compliance with

15   legal standards?

16         MR. OWENS:  Objection, Your Honor.  This is, I

17   think, beyond the scope of what we've been permitted to offer

18   into this case.

19         MR. McLANDRICH:  I'm not asking to talk about the

20   law.  I'm just seeking to establish that there is a

21   differential between best practices and standards that

22   officers are held to as a general matter.

23         MR. OWENS:  I understood the question differently

24   about how practices may impact what the policies of a

25   particular department are, and I thought he was implying

SCOTT - CROSS (McLandrich)                                1175

1    something about this case.

2                MR. McLANDRICH:  I'll reask it.

3                THE COURT:  All right.  I'll sustain.  Rephrase.

4                MR. McLANDRICH:  Yes, sir.

5    BY MR. McLANDRICH:

6    Q.   As a general matter, Mr. Scott, there's a difference

7    between what a think tank might suggest is a best practice and

8    what a legal standard might be that a given police officer

9    might be held to?

10   A.   Well, the best practice is commensurate with the legal

11   standard.

12   Q.   The legal standards are not set by think tanks, right?

13   A.   Correct.  They are set by the courts.  But the think

14   tank, and in this particular case, the largest think tank in

15   law enforcement, 1,800 -- 18,000 members, many of those

16   policies and recommendations are predicated upon case law.

17   Q.   Well, many of them may be, but not all of them are,

18   correct?

19   A.   I would say the majority of them have case law behind

20   them.  That's why they create these model policies, and they

21   are permeated amongst law enforcement agencies.

22   Q.   Inherently, if we are a think tank, we are trying to push

23   the envelope beyond where it currently is and improve things,

24   right?

25   A.   I don't understand the question.

SCOTT - CROSS (McLandrich)                                  1176

1   Q.   Sure.  A think tank is trying to take things beyond where

2   they currently are to some new standard that they think is

3   preferable to the current state of the art.  Isn't that what a

4   think tank does?

5   A.   They are actually -- in this particular case, the

6   professional organization of the International Association

7   of Chiefs of Police is to augment the professionalism of law

8   enforcement.  And they're not pushing any envelope.  They're

9   identifying what is currently being practiced and getting

10  that information out to its members.

11  Q.   And you don't know -- well, strike that.

12       Is there anything in Training Key 414 that says or even

13  recommends blind administration?

14  A.   Yes, sir, it does.

15  Q.   On what page, sir?

16  A.   Sure.  So if you go to page 2 --

17  Q.   Yes, sir.

18       THE COURT:  Now, what are we looking at?

19       MR. McLANDRICH:  We're looking at an exhibit to his

20  deposition.  That's also Plaintiff's Exhibit, I believe, 243,

21  if memory serves.

22       MR. OWENS:  That's correct.

23       MR. McLANDRICH:  That is Training Key 414 from the

24  International Association of Chiefs of Police.

25       THE COURT:  All right.  I think he needs to look at

SCOTT - CROSS (McLandrich)                              1177

1    the exhibit.  Not his notes.

2              THE WITNESS:  I have a copy.

3              THE COURT:  No.  He needs to look at the exhibit.

4              THE WITNESS:  Thank you, Your Honor.

5              THE COURT:  Now, can you give him some direction?

6              MR. McLANDRICH:  Yes.

7    BY MR. McLANDRICH:

8    Q.    First off, with respect to Training Key 414, this was

9    published in 1992, correct?

10   A.    That is correct, yes.

11   Q.    And that would be after the photo array that's at issue

12   in this case?

13   A.    The publication would be, but the practices were

14   occurring prior to that.

15   Q.    And how do you know those practices were occurring in the

16   State of Ohio prior to that?

17   A.    Well, unless the State of Ohio was in the Dark Ages

18   relative to law enforcement practices and procedure, they

19   were commensurate throughout the entire United States.

20   Q.    And how do you know that?

21   A.    Simply because of the law that we were made aware of

22   that we had to do certain things relative to presenting

23   photo arrays.

24   Q.    All right.  So there's a difference between something

25   that must be done and something that should be done, right?

SCOTT - CROSS (McLandrich)                                1178

1    **A.**    Yes.

2    **Q.**    Something that should be done is merely a recommendation.

3    It's not a command, correct?

4    **A.**    It's not -- it's not a command, but if your

5    professional organization is strongly recommending

6    something, you would want to do that practice.

7    **Q.**    So back to my question.  My question is, something that

8    must be done is something that is required; something that

9    should be done is in the nature of a recommendation, correct?

10              MR. OWENS:  Objection; asked and answered.

11              THE WITNESS:  Sure.  Putting it that way --

12              THE COURT:  You --

13              THE WITNESS:  I'm sorry, Your Honor.

14              THE COURT:  When there's an objection, you need to

15    wait until I have ruled.

16              THE WITNESS:  Yes, sir.

17              THE COURT:  It has -- well, you are answering it,

18    and you said yes; is that right?

19              THE WITNESS:  Yes, sir.

20              THE COURT:  Next question.

21    BY MR. McLANDRICH:

22    **Q.**    All right.  So I had asked you about where the

23    requirement for blind administration is in Training Key 414.

24    **A.**    Sure.  So it's on page 3.

25    **Q.**    Yes, sir.

SCOTT - CROSS (McLandrich)                                    1179

1    **A.**    And it's the third paragraph from the bottom of the

2    first column.  And it states, "In conducting a lineup, it is

3    highly advisable that officers who are not assigned to that

4    case handle the procedure."

5    **Q.**    All right.  And so advisable, again, is not suggesting

6    something that's a mandate?

7    **A.**    No, they are not mandating it, but they are strongly

8    suggesting it should be done.

9    **Q.**    And that would be in the nature of best practices beyond

10   the current state of the art then?

11   **A.**    I can't say that it was not the state of the art back

12   then.  It was strongly recommended.

13   **Q.**    Now, you testified that an eyewitness ID that occurs

14   after a period of delay is less accurate, correct?

15   **A.**    Potentially, it can be less accurate, yes.

16   **Q.**    Are you aware that both experts on eyewitness

17   identifications in this case agree that an eyewitness

18   identification that occurs after a period of delay is still

19   highly accurate if it's done under the proper circumstances?

20            MR. OWENS:  Objection to the form of the question.

21   Beyond his expertise.

22            THE COURT:  Sustained.

23       Counsel, you can ask him general questions, but --

24            MR. McLANDRICH:  All right.  Thank you, Your Honor.

25   BY MR. McLANDRICH:

1    **Q.**   Are you aware that science does not support your position

2    that a delayed identification makes it less accurate?

3         MR. OWENS:  Objection, Your Honor.  That's not the

4    testimony, and that's beyond his expertise.  This is police

5    practices.

6         MR. McLANDRICH:  I'm asking what he's aware of.

7    He's offered an opinion, and now I am speaking to understand

8    whether there is a scientific underpinning for his opinion and

9    whether it's accurate.

10         THE COURT:  Can you answer that question?

11         THE WITNESS:  Sure.

12         THE COURT:  Okay.

13         THE WITNESS:  Sure.  So you're saying based on what

14   you're telling me that exclusively that time does not erode

15   memory, and that's not the case.

16   BY MR. McLANDRICH:

17   **Q.**   That's not what I said.

18   **A.**   Okay.  Then repeat your question then.  I apologize.

19   **Q.**   So your testimony, as I understand it, was that an

20   identification made after a delay between the event and the

21   identification is less accurate.  That's your testimony?

22   **A.**   It can potentially be less accurate, that's correct,

23   yes.

24   **Q.**   All right.  And my question is, are you aware that the

25   science does not support that statement?

SCOTT - CROSS (McLandrich)                                    1181

1              MR. OWENS:  Objection.  It misstates the testimony.

2     It's beyond the scope of this witness.

3              THE COURT:  Plus -- okay.  Can you answer that

4     question?

5              THE WITNESS:  No, because I haven't seen the

6     scientific study that the counselor is referring to.

7              THE COURT:  Sustained.

8     BY MR. McLANDRICH:

9     Q.   Each police department will have its own policies and

10    procedures independent of the International Association of

11    Chiefs of Police, correct?

12    A.   Correct.

13    Q.   And each police officer in each department is expected

14    and required to follow his individual police department's

15    policies and procedures irrespective of what the International

16    Association of Chiefs of Police might say or think, correct?

17    A.   Sure.  And they do so at their own peril, and they have

18    to adhere to the law that's currently in existence.

19    Q.   Well, that would presume that their police department is

20    not adhering to the laws of the United States, correct?

21              MR. OWENS:  Objection; argumentative.

22              THE COURT:  Sustained.

23    BY MR. McLANDRICH:

24    Q.   But in any event, a police officer is trained and

25    directed that he's to follow the policies and procedures of

SCOTT - CROSS (McLandrich)                                    1182

1    his own department, correct?

2    **A.**    Yes, sir.

3    **Q.**    With respect to this issue of tunnel vision,

4    investigating any particular lead or tip to its end is not

5    tunnel vision, correct?

6    **A.**    Clearly.  As long as you're also investigating all

7    other leads that come to your attention as well.

8    **Q.**    Now, if you're investigating a crime in your own

9    jurisdiction, sometimes an officer has to go outside his

10   jurisdiction to gather additional evidence to support his own

11   case; isn't that true?

12   **A.**    Sure, as long as it doesn't interfere with the outside

13   jurisdiction's investigation of a case.

14   **Q.**    The various things you talked about with respect to

15   administration of an array or the conduct of an officer during

16   the administration of an array or the conduct of an officer

17   after an array, those would be things that would be delineated

18   in their own policies and procedures, correct?

19            MR. OWENS:  Objection; assumes facts not in

20   evidence.

21            THE COURT:  To his knowledge.

22            THE WITNESS:  I don't know because I haven't seen

23   the policies.

24   BY MR. McLANDRICH:

25   **Q.**    But those would typically be things that would be

SCOTT - CROSS (Frick)                                                    1183

1     included within the policy of any given police department?

2               MR. OWENS:  Same objection.

3               THE COURT:  Sustained.

4     BY MR. McLANDRICH:

5     **Q.**   Okay.  That's all I have for you.  Thank you.

6               MS. FRICK:  Just a couple, Your Honor.

7               MR. OWENS:  I was only going to ask if it was my

8     turn.

9               THE COURT:  Counsel.

10                        **CROSS-EXAMINATION**

11    BY MS. FRICK:

12    **Q.**   Good afternoon, Dr. Scott.  My name is Dawn Frick.  I

13    represent Miami Township Board of Trustees.  I just have a

14    very few questions.

15         Based on your experience and expertise, is it part of the

16    duties and official responsibilities of the police officer to

17    provide a photo lineup or to prepare a photo lineup that's not

18    knowingly suggestive or unnecessarily suggestive of a

19    particular suspect?

20    **A.**   Sure, that makes sense.

21    **Q.**   And so the accepted policies and practices or these best

22    practices are guidelines to help prevent that knowingly

23    suggestive or unnecessarily suggestive lineup, correct?

24    **A.**   Correct, with the understanding that a well-trained

25    officer would know that the photo lineup is either

SCOTT - CROSS (Frick)                                            1184

1    suggestive or not.

2    **Q.**    And in your opinion as an expert in this field, would

3    there be any good faith basis for a police officer to make a

4    knowingly suggestive lineup?

5            MR. OWENS:  Objection, Your Honor.

6            THE COURT:  Sustained.

7    BY MS. FRICK:

8    **Q.**    I think you just testified that you would assume that a

9    police officer would be able to determine whether or not a

10   lineup was knowingly or unnecessarily suggestive?

11   **A.**    Yes.  And the caveat I used of a well-trained police

12   officer.

13   **Q.**    Okay.  And so if, in fact, you have a well-trained police

14   officer, if it is a knowingly suggestive lineup, would you

15   agree with me that that -- there would be no good faith basis

16   to do that?

17           MR. OWENS:  Objection, Your Honor.

18           THE COURT:  Sustained.

19       You can rephrase, Counsel, without the terms.

20   BY MS. FRICK:

21   **Q.**    In your experience as a police officer and your expertise

22   as an expert in policies and practices, should a police

23   officer knowingly make a suggestive or an overly suggestive

24   lineup?

25   **A.**    No, under no circumstances should that happen.

SCOTT - REDIRECT (Owens)                                    1185

1    **Q.**    Okay.  Thank you.  That's all I have.

2            THE COURT:  Counsel, with regard to those few

3    matters that were covered by defense counsels and keeping in

4    mind that I'm recessing in about 15 minutes.

5            MR. OWENS:  Perfect, Your Honor.  I have got another

6    witness who I think we can complete in that time and --

7            THE COURT:  There you go.

8            MR. OWENS:  -- I have three questions of this

9    particular witness.

10                      **REDIRECT EXAMINATION**

11   BY MR. OWENS:

12   **Q.**    Mr. -- Dr. Scott, when police officers go outside of

13   their own jurisdiction, are they supposed to coordinate with

14   the officials in the other jurisdiction?

15   **A.**    Absolutely, yes.

16   **Q.**    Great.  Second question.  You reviewed the police

17   practices report of the Defendant Moore's expert, police

18   practices expert Anthony Monheim?

19   **A.**    I have.  Yes, I have.

20   **Q.**    Was Mr. Monheim also trained in the areas of police

21   practices in Florida?

22           MR. McLANDRICH:  Objection.

23           THE COURT:  Do you know?

24           THE WITNESS:  Yes, I do.

25           THE COURT:  I'll let him answer it.

SCOTT - REDIRECT (Owens)                                    1186

1              THE WITNESS:  Yes, I know Mr. Monheim was trained by

2    Miami-Dade Police Department, as was I, as part of my

3    training, my criminal investigation, homicide training, photo

4    array training through the Metro-Dade Police Department or the

5    Miami-Dade Police Department, of which he belonged during the

6    same period of time.

7    BY MR. OWENS:

8    **Q.**   Got it.  Third and final question.  Are you aware whether

9    or not Mr. Monheim, like you, testified that Training Key 414

10   published in 1992 reflected the practices that existed in

11   1990?

12             MR. McLANDRICH:  Objection.

13             THE COURT:  Sustained.

14             MR. OWENS:  No further questions, Your Honor.

15             MR. McLANDRICH:  Nothing further.

16             MS. FRICK:  Nothing further, Your Honor.

17             THE COURT:  Can this witness be excused?

18             MR. OWENS:  Yes, Your Honor.

19             THE COURT:  Thank you very much, sir.

20        Next witness.

21             MR. OWENS:  Roger Gillispie.

22        **ROGER D. GILLISPIE, PLAINTIFF'S WITNESS, SWORN**

23             THE COURT:  Mr. Gillispie, please try to keep your

24   voice up so that we can hear your responses to any questions

25   that are posed to you.  You have a microphone there.  Utilize

ROGER D. GILLISPIE DIRECT (Owens)                              1187

```
1    it if you wish.  If you get too close to it, it muffles you;

2    if you get too far away, I probably wouldn't even catch you

3    there, but just if you keep your voice up, we will all hear

4    you, all right?

5              THE WITNESS:  All right.  Yes.

6              THE COURT:  Go.

7                        DIRECT EXAMINATION

8    BY MR. OWENS:

9    Q.   Good afternoon, sir.  Can you hear --

10             THE COURT:  But you will have to answer.  I know

11   that didn't need an answer, but you are not going to be able

12   to nod your head.

13   BY MR. OWENS:

14   Q.   Can you hear me all right?

15   A.   Yes.

16   Q.   All right.  And what's your name?

17   A.   Roger Gillispie.

18   Q.   And who's this right here (indicating)?

19   A.   That's Dean Gillispie.

20   Q.   And how do you know Dean?

21   A.   I'm his father.

22   Q.   And where are you originally from, sir?

23   A.   I'm from the eastern part of Kentucky.

24   Q.   And when did you make your way to Ohio?

25   A.   As soon as I graduated from high school.
```

ROGER D. GILLISPIE DIRECT (Owens)                    1188

1    **Q.**   And how would you describe your son, Dean, growing up?

2    **A.**   Well, he is an excellent kid.  And all of his friends

3    was good people.  I had a family of four kids, with my wife.

4           MR. OWENS:  Your Honor, I think if we could move the

5    microphone a little closer.  Thank you, sir.

6           THE COURT:  Mr. Gillispie, that microphone moves.

7    You don't have to move to it.

8           THE WITNESS:  Okay.

9           THE COURT:  There you go.

10   BY MR. OWENS:

11   **Q.**   Can you hear me all right?

12   **A.**   Yes.

13   **Q.**   All right.  Thank you, sir.

14          And I believe that you said that you had four kids?

15   **A.**   Yes.

16   **Q.**   And where did Dean fall in that line?

17   **A.**   He was the oldest.

18   **Q.**   Who are your other kids?

19   **A.**   I've got Jodi was next to him, and James and Zandra.

20   **Q.**   Who's your wife?

21   **A.**   Her name is Juana.  We were high school sweethearts.

22   **Q.**   How long have you been married?

23   **A.**   About 59 year.

24   **Q.**   And what sorts of things did you like to do with Dean

25   when he was growing up?

1    **A.**   Well, we'd go fishing occasionally, and the fall there

2    we'd go squirrel hunting sometimes.

3    **Q.**   Go ahead.

4    **A.**   And somewhere along the line, he got him a high-powered

5    pellet gun.  He liked to use that.

6    **Q.**   For hunting squirrels?

7    **A.**   Yeah.  Yeah, that was the only thing.

8    **Q.**   Got it.  And I think that you mentioned a minute ago that

9    you knew some of Dean's friends growing up?

10   **A.**   Oh, yeah.  There's -- I had a houseful of kids there

11   all the time, you know.

12   **Q.**   And --

13   **A.**   All of our kids had friends.

14   **Q.**   Got it.  And you'd let them hang out at your house?

15   **A.**   Oh, yeah.  Oh, yeah.  I never did see nothing wrong

16   with any of them.

17   **Q.**   And after Dean graduated high school, did you help him

18   find his first job after high school?

19   **A.**   I don't know if it was the first job, but he had a job.

20   He worked for Tatone.  I don't think it was at -- I don't

21   know which Tatone it was.  I don't think it was the one you

22   seen on TV all the time, though.

23   **Q.**   Got it.  And what kind of a business is Tatone?

24   **A.**   It was a dealership, a car dealership.

25   **Q.**   Got it.  And where did you work, sir?

ROGER D. GILLISPIE DIRECT (Owens)                              1190

1    **A.**    I started off as a barber.  I barbered for 14 years,

2    and then I went to General Motors.

3    **Q.**    And where did you work at General Motors?

4    **A.**    I worked at Products, Delco Products for the biggest

5    part of my -- but in order to chase that little pension

6    down, I worked at five different General Motors' plants.

7    **Q.**    How long all told were you at General Motors?

8    **A.**    I was there 30 year.

9    **Q.**    And what town did you raise Dean in?

10   **A.**    I didn't hear what the question was.

11   **Q.**    Yes, sir.  What town did you raise your family?

12   **A.**    In Fairborn, Ohio.

13   **Q.**    And without giving us the exact address, did you have a

14   home in Fairborn?

15   **A.**    Yes.

16   **Q.**    What street was that on?

17   **A.**    Glendale Drive.

18   **Q.**    Do you still live there today?

19   **A.**    Yes.

20   **Q.**    And how long have you had that home?

21   **A.**    Probably 42 years or something of that nature.

22   **Q.**    Now, I just want to fast forward a little bit.  Do you

23   recall a time when Dean got arrested?

24   **A.**    Yeah.

25   **Q.**    And do you recall anything about anything that happened

ROGER D. GILLISPIE DIRECT (Owens)                              1191

```
 1    with Dean's interactions, what he told you about his

 2    interactions with Scott Moore before he got arrested?

 3                MR. McLANDRICH:  Objection.

 4                THE COURT:  Wait a minute.  Hold on.  Basis?

 5                MR. McLANDRICH:  The question was what Dean told

 6    him.

 7                THE COURT:  Counsel?

 8                MR. OWENS:  Yeah, I can back up.

 9    BY MR. OWENS:

10    Q.   Do you remember when Dean got arrested in 1990?

11    A.   Yes.

12    Q.   Okay.  Before that, were you aware whether or not he had

13    had any actions with a police officer, Scott Moore?

14    A.   Nothing other than they sent him a letter, I will just

15    say that.  I don't know just exactly how he got it, but it

16    was some kind of letter that -- I don't know what the

17    wording was on it.  I don't remember what the wording was on

18    it, something like they wanted him to come in.

19    Q.   Got it.  And do you know whether or not, you know, before

20    he got arrested Dean did, in fact, go to the police station?

21    A.   Yes, before, yes.

22    Q.   Did Dean tell you anything about the interactions he had

23    with Scott Moore during that interaction at the police

24    station?

25                MR. McLANDRICH:  Objection.
```

ROGER D. GILLISPIE DIRECT (Owens)                          1192

1              MR. OWENS:  Sure.

2              THE COURT:  Sustained.

3              MR. OWENS:  I'll withdraw the question.

4      BY MR. OWENS:

5      Q.    How did it impact your family once Dean got arrested?

6      A.    Well, once he got arrested, you know, you try to do the

7      best you could do with him as far as furnishing him money

8      for lawyers and that type thing.  But when he was at -- when

9      he was getting ready to go to the police station, I knew a

10     former chief of that department there.  His name was

11     Woodworth.  And I asked Woodworth to go while he was at that

12     police station.  I just didn't want him to get him in

13     there -- you seen them TV movies and so forth where they

14     beat a guy into submission or something like that, and I

15     didn't want that.  So I asked him to go down there and just,

16     you know, like, he was dropping in or whatever, and he did.

17           And he come back and said --

18     Q.    Sir, I got to stop you.  You can't tell the jury about

19     what somebody told you.

20     A.    Okay.

21     Q.    So fair to say that as a father, you were concerned about

22     what happened -- what might happen to your son if he went to

23     the police station?

24     A.    Yeah, yeah.

25     Q.    And at some point, you also mentioned that you spent some

1    money in terms of helping Dean pay for his legal expenses; is

2    that right?

3    **A.**   That's correct.

4    **Q.**   And was that just a little bit right at the outset or was

5    that over time?

6    **A.**   You know, if you raise a family as I did -- and I loved

7    all my kids, you know.  If you knew that he was accused of

8    something that he didn't do, you'll spend everything you

9    got.  It don't make any difference.

10   **Q.**   And you mentioned you've had your house for 42 years,

11   right?

12   **A.**   Yeah.

13   **Q.**   Is it paid off?

14   **A.**   No.  We borrowed against the house several times, I

15   guess.

16   **Q.**   And why'd you have to borrow against the house?

17   **A.**   Well, you pay lawyers.  I don't know how many lawyers

18   I've had.

19   **Q.**   And was that over the course of the last --

20   **A.**   Yeah.

21   **Q.**   -- 20 or 30 years?

22   **A.**   Yes.

23   **Q.**   And how has it affected -- how have you as a father seen

24   how being imprisoned has impacted Dean?

25   **A.**   Well, it impacts you 'cause you're making -- you're

1    making visits to go see him in prison.

2            THE COURT:  Sir, I think he asked how it impacted

3    Dean, right?  Isn't that your question?

4            MR. OWENS:  Sure.  I think he was starting to say --

5    BY MR. OWENS:

6    Q.    How would you see Dean -- how would Dean be on those

7    visits?

8    A.    I probably didn't understand what your question was.

9    Q.    Let me ask it again, sir.  Did you see how being

10   imprisoned impacted your son?

11   A.    Well, sure, yeah.  You know, he was -- you know, you

12   sit there and you visit him, but, you know, you didn't want

13   to see him over there like that.  They had to sit on the

14   other side of the table from you, and all you could do, you

15   first -- whenever you went in, you could first greet him or

16   whatever, hug him, but that was it.  And it just hurt.  It

17   hurt to see him like that, and it impacted him and me and

18   the whole family.

19   Q.    Aside from visits and spending money to pay for his legal

20   defenses, are there other ways that you can describe how over

21   the course of that 20 years Dean being in prison impacted you

22   all?

23   A.    Well, actually, you can't ever get it off of your mind.

24   You might go 30 minutes, you know, and not think about it.

25   But it just pops right back in your mind all the time,

ROGER D. GILLISPIE DIRECT (Owens)                    1195

1   wondering what he is doing now or, you know, how can we get

2   this all straightened out or whatever.

3   Q.   How has it been over the last ten years since Dean has

4   been home?

5   A.   Well, it's been great to have him home, but if he's

6   like he is now and he's had a felon against him, you can't

7   get a decent job.

8   Q.   Have you noticed any changes in Dean's moods or behaviors

9   since before he went into prison?

10  A.   No, I can't say that I have.  He's just, he's -- he's

11  nice right now, and he was nice before he went in.  And he's

12  always treated me nice, and we treated them nice.

13  Q.   Last question.  Can you just describe what you observed

14  of Dean the night he was released from prison?

15  A.   Oh, we was all -- we was all happy as we could be, but,

16  you know, you'd walk -- you'd seen different movies or

17  whatever of people getting out of prison and there is, you

18  know, coming out of the steps and so forth.  But that night

19  that they let him out, we had to meet him at a bowling

20  alley.  I don't know, that's hard to believe.

21       And they brought him up there, and then they had to put

22  a monitor on him, on his leg before he could even come in,

23  in the bowling alley.  And they got in there, and they --

24  prison guards and so forth was in there in a bowling league.

25  It seemed strange.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

ROGER D. GILLISPIE DIRECT (Owens)                          1196

1    **Q.**   Absolutely.

2    **A.**   And it was raining too.  Made you think of a shower

3    shake or something, you know.

4    **Q.**   Certainly.  Those are all my questions, sir.

5             MR. McLANDRICH:  No questions, Your Honor.

6             MS. FRICK:  No questions, Your Honor.

7             THE COURT:  All right.  Sir, thank you very much.

8    You're excused.

9             THE WITNESS:  Thank you.

10            THE COURT:  Ladies and gentlemen, we're going to

11   recess for the day, as I've indicated.  Please remember the

12   Court's admonitions:  Don't discuss the case amongst

13   yourselves or with anyone else.  Don't formulate any opinions

14   or draw any conclusions.  You're probably getting tired of me

15   saying that, but I need to say it.

16       So have a restful evening, and we'll start right back up

17   at the same time tomorrow morning.

18       Counsel, anything further?

19            MR. OWENS:  No, Your Honor.

20            MR. McLANDRICH:  No, sir, Your Honor.

21            MS. FRICK:  No, Your Honor.

22            MR. HERMAN:  No, Your Honor.

23            THE COURT:  Thank you very much.

24            THE COURTROOM DEPUTY:  All rise.  This court stands

25   in recess.

1    (Jury out at 3:29 p.m.)

2    (Court adjourned at 3:29 p.m.)

3

4                    CERTIFICATE OF REPORTER

5

6        I, Mary A. Schweinhagen, Federal Official Realtime

7    Court Reporter, in and for the United States District Court

8    for the Southern District of Ohio, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is

13   in conformance with the regulations of the Judicial Conference

14   of the United States.

15

16   s/Mary A. Schweinhagen

17   _____ 21st of December, 2023

18   MARY A. SCHWEINHAGEN, RDR, CRR
     FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25