```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF OHIO
 2                             AT DAYTON

 3   _____
                                        )
 4   ROGER DEAN GILLISPIE,              )
                                        )
 5                      Plaintiff,      ) CASE NO. 3:13-cv-416-TMR
                                        )
 6                   -vs-               )
                                        )
 7   THE CITY OF MIAMI TOWNSHIP, ET AL.,) JURY TRIAL
                                        )
 8                      Defendants.     ) VOLUME VIII
     _____)
 9             EXCERPT OF TRANSCRIPT OF PROCEEDINGS
                 THE HONORABLE THOMAS M. ROSE,
10          UNITED STATES DISTRICT JUDGE, PRESIDING
                 WEDNESDAY, NOVEMBER 16, 2022
11                      DAYTON, OH

12   For the Plaintiff:      MICHAEL KANOVITZ, ESQ.
                             DAVID B. OWENS, ESQ.
13                           MEGAN C. PORTER, ESQ.
                             Loevy & Loevy
14                           311 N. Aberdeen Street
                             3rd Floor
15                           Chicago, IL  60607

16   For the Defendant       JOHN T. McLANDRICH, ESQ.
     Matthew Scott Moore:    DAVID J. SIPUSIC, ESQ.
17                           Mazanec, Raskin & Ryder Co., LPA
                             3305 Solon Road
18                           100 Franklin's Row
                             Cleveland, OH  44139

19   For the Intervenor      DAWN M. FRICK ESQ.
     Miami Township:         CHRISTOPHER T. HERMAN, ESQ.
20                           Surdyk, Down & Turner Co., LLP
                             8163 Old Yankee Street
21                           Suite C
                             Dayton, OH  45458
22
          Proceedings recorded by mechanical stenography,
23   transcript produced by computer.
                        Mary A. Schweinhagen, RDR, CRR
24              Federal Official Court Reporter
                      200 West Second Street
25                      Dayton, OH  45402
                       *** *** *** ***
```

1    Courtroom Deputy:  Elizabeth Penski

2    Law Clerks:  Michael Mayer, Callum Morris

3    Also Present:  Roger Dean Gillispie, plaintiff; Valerie
     Barajas, paralegal; Matt Thibodeau, paralegal; Jeff Weber, IT
4

5                    **INDEX OF WITNESSES**

6    **PLAINTIFF'S WITNESSES**

7    **BRIAN POULTER**
           Direct Examination by Mr. Owens          1202
8          Cross-Examination by Mr. McLandrich       1229

9    **JIM OSBORNE**
           Direct Examination by Ms. Porter          1230
10
     **MARK GODSEY**
11         Direct Examination by Mr. Owens          1243
           Cross-Examination by Mr. McLandrich       1309
12         Cross-Examination by Ms. Frick            1316
           Redirect Examination by Mr. Owens         1319
13         Recross-Examination by Mr. McLandrich     1322
           Further Redirect Examination by Mr. Owens 1324
14
     **JUANA GILLISPIE**
15         Direct Examination by Mr. Owens          1332

16

17

18                    *      *      *      *      *

19

20

21

22

23

24

25

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
 1          P-R-O-C-E-E-D-I-N-G-S                    9:29 A.M.

 2          (Jury in at 9:28 a.m.)

 3          (In open court at 9:29 a.m.)

 4          THE COURT:  Ladies and gentlemen, good morning.

 5     Hopefully you had a good evening, got some rest.  Everybody

 6     was able to abide by my admonitions, correct?  Anybody that

 7     was not?

 8          (No verbal response.)

 9          THE COURT:  Ladies and gentlemen, I do apologize for

10     getting started a little bit late here today.  As I indicated

11     to you, on occasion -- and that may become more frequent as we

12     get towards possibly the end of the process -- we may take a

13     few breaks or not move in accordance with what I hoped to with

14     scheduling just because the fact that it is necessary for me

15     to deal with some things outside your presence.  So please

16     understand that we're not wasting time, but counsel and the

17     Court are attempting to resolve matters which will -- which

18     will move the case along.

19          We still plan -- my plan is, as I indicated to you

20     originally, I've indicated that the trial, we will move the

21     trial along as quickly as we can, of course respecting

22     everyone's, all the parties' right to be fully represented and

23     have a full and fair hearing.

24          However, as I indicated to you, if this case would happen

25     to go into next week, we will be meeting one day next week,
```

1  Monday.  If the case would happen to go beyond Monday of next

2  week, we will then reconvene the Monday following after

3  Thanksgiving.  I am not -- I am not saying that's going to

4  happen, but I want for your purposes of planning and just to

5  keep that all in mind.  I'm not going to interrupt your

6  Thanksgiving vacation, if that -- vacation or celebration or

7  travel, whatever.  As much as I can, I won't interrupt it, but

8  I just wanted to give you an idea of what the Court's -- I

9  don't know how the case is going to unfold.  I don't know how

10  fast, or I don't know whether there is going to be delays.  I

11  just don't know.  So I'm trying to give you as clear a map as

12  I can.  So there you go.  I don't have anything else.

13      All right, counsel.  We're on the record.  Counsel ready

14  to proceed?

15          MR. OWENS:  Yes, Your Honor.

16          THE COURT:  Counsel?

17          MR. McLANDRICH:  Yes, Your Honor.

18          MR. HERMAN:  Yes, Your Honor.

19          THE COURT:  First witness.

20          MR. OWENS:  We've got -- next witness called by the

21  plaintiff will be Brian Otis Poulter.

22          **BRIAN OTIS POULTER, PLAINTIFF'S WITNESS, SWORN**

23          THE COURT:  Mr. Poulter, please try to keep your

24  voice up so we can all hear your responses to the questions.

25  You have your microphone there, and as you can see, you can

POULTER - DIRECT (Owens)                                    1202

```
 1    utilize it as you wish.  I think it moves around.  You can

 2    move it closer, move it away.  If it gets too close, it

 3    muffles; if you get away, it won't pick you up.

 4              THE WITNESS:  Okay.

 5              THE COURT:  One way to -- there you go.  I think you

 6    have a good, strong voice.  One way to resolve that problem is

 7    just keep your voice up in answering, all right?

 8              THE WITNESS:  Yes, sir.

 9              THE COURT:  You may inquire.

10                          DIRECT EXAMINATION

11    BY MR. OWENS:

12    Q.   Good morning, sir.

13    A.   Good morning.

14    Q.   Would you please just state and spell your name for the

15    record?

16    A.   My name is Brian Otis Poulter, B-R-I-A-N  O-T-I-S

17    P-O-U-L-T-E-R.

18    Q.   Where do you work?

19    A.   I'm a driver for United Parcel Service.

20    Q.   UPS?

21    A.   Yes, UPS.

22    Q.   How long have you been -- worked at UPS?

23    A.   Going on my 37th year.

24    Q.   Did you say 37?

25    A.   37.
```

POULTER - DIRECT (Owens)                                    1203

1    Q.    And so when did you start that job?

2    A.    March of 1986.

3    Q.    And where do you live?

4    A.    Fairborn, Ohio.

5    Q.    And how long have you lived in Fairborn?

6    A.    Pretty much my whole life.  I moved away in 1991 for

7    three years.  I moved to West Carrollton.

8    Q.    Okay.  Did you grow up in Fairborn?

9    A.    Absolutely.

10   Q.    Did you grow up -- what high school did you go to?

11   A.    Fairborn High School.

12   Q.    Do you know a person named Dean Gillispie?

13   A.    Yes, I do.

14   Q.    Who is Dean Gillispie to you?

15   A.    A very good friend.  We have known each other since

16   ninth grade.  Been very good friends since then.

17   Q.    And have you remained good friends over the past 30

18   years?

19   A.    Absolutely.

20   Q.    So let's rewind a little bit.  What year did you graduate

21   high school?

22   A.    1984.

23   Q.    And were you and Dean -- did you have a group of friends

24   you all regularly hung out with?

25   A.    Yes.

1   **Q.**   Can you name some of those folks?

2   **A.**   Richard Winters, Scott Bowling, Tony Rice.  There was a

3   lot of -- a lot people that we hung -- probably ten.  John

4   Coppock, Chuck Taylor.  Quite a few tight-knit guys.

5   **Q.**   Got it.  And when you weren't at school, what sorts of

6   things would you all get into?

7   **A.**   You know, we just did -- ran around a lot, drove around

8   town.  What we called making laps.  We would drive around

9   town, see who's out.  Stop and talk to people.

10       Later on, you know, Dean and I really became really

11  close.  I got out of a relationship with one of my

12  girlfriends, and Dean and I were -- we were very close.  We

13  were almost inseparable.

14  **Q.**   Yeah.  And sort of what period of time was that when you

15  and Dean were almost inseparable?

16  **A.**   From probably 19 -- late 1985, '86.  We -- you know, I

17  got out of a relationship, and Dean and I just -- we just

18  really just liked to run around.

19  **Q.**   So between 1986 and 1990, you guys were pretty much

20  inseparable; is that right?

21  **A.**   Yes, that's correct.

22  **Q.**   Now, were you the hunting and fishing type?

23  **A.**   Unfortunately, I wasn't raised that way.  My dad didn't

24  do that kind of stuff, but they kind of called me the City

25  Slicker or whatever.  I mean, you know, a lot of the guys

1   that he ran around with, they would fish and stuff, and they

2   still do, but that was just something didn't interest me.

3   **Q.**   They called you the City Slicker of Fairborn?

4   **A.**   Well, I don't know about Fairborn, but of the group,

5   you know.  I mean, I was -- I guess I just -- that wasn't my

6   cup of tea.

7   **Q.**   Got it.  And were you familiar with Dean's family?

8   **A.**   Yes.

9   **Q.**   And who were his parents?

10  **A.**   Roger Gillispie and Juana Gillispie.

11  **Q.**   And how'd you know them?

12  **A.**   Well, me and Dean become so close, I spent a lot of

13  time at their house.  And, you know, just general

14  conversation, hanging out with them, BS'ing.  You know, it's

15  just what you do when you have a good friend.

16  **Q.**   Got it.  So I want to move forward a little bit.

17       Dean was arrested in 1990.  Do you recall that?

18  **A.**   Yes, I do.

19  **Q.**   And what do you remember sitting here today about the day

20  that he was arrested?

21  **A.**   Okay.  So me and a very good friend of me and Dean's

22  also, Charlie Tallent, we were out running around, went by

23  Dean's.  So pull up to Dean's and get out, and he's sitting

24  on his front porch.  He's whittling on a piece of wood or

25  something.  And we were just, you know, more or less BS'ing.

1    And I was like, "Hey, we are going to go to Taco Bell.  Do

2    you want to come?"

3         And he goes, "Nah, I'm just going to sit here.  I just

4    cooked me something to eat."

5         So Charlie and I left and went to Taco Bell, which is

6    maybe five minutes away from Dean's house at the time.  And

7    so we were probably gone about 20 minutes.  And there is a

8    building by Dean's house that he lived in, had a drive-thru,

9    kind of like had a tunnel that you drove through, and you

10   could drive through that building and almost drive straight

11   into Dean's house.

12        So Charlie and I came back from Taco Bell, and we went

13   through what we called the Bat Cave and pulled through.  And

14   we were like, "What the heck?"  We pulled up, and there were

15   several police cars and it looked like maybe unmarked police

16   cars and several people standing outside on Dean's porch and

17   in front of his porch.

18        And we were like, "Holy crap.  What's going on."

19        So we parked and got out, and we were approached by a

20   police officer.  And he says, you know, "Can I help you?"

21        And I said, "Yeah, this is our good friend.  What's

22   going on?"

23        And they were like, "Well, your friend's okay, but you

24   have to leave.  You can't come up here."

25        And we were, like, wow.

1          So, of course, we were concerned.  We went to Juana and

2     Roger's house.  And we were like, Juana, there is something

3     going on.  We need to -- you know, you need to go see --

4     Dean's in trouble apparently.

5          So I think we actually picked Juana and picked her and

6     dropped her off there.  And, of course, when she got there,

7     I don't think there was a police officer that was going to

8     stop her from getting on the porch to her son.  So Charlie

9     and I sit there for a couple minutes, and then we took off.

10    **Q.**   Got it.  And so I just want to break that down a little

11    bit.  At the time, where did Dean live?

12    **A.**   312 Spruce.

13    **Q.**   And where did Roger and Juana live?

14    **A.**   1512 Glendale.

15    **Q.**   How far apart are those two houses?

16    **A.**   Five minutes max.

17    **Q.**   And do you know who owned the house that Dean was at on

18    Spruce Street?

19    **A.**   Yeah, Dean did.  He had bought it.

20    **Q.**   Now, the day that Dean was arrested, did you see how he

21    responded to -- did you get to see him in that moment when he

22    was arrested?

23    **A.**   I believe that he was -- when, you know, we had got out

24    of the car, I believe that he was on the porch, and he might

25    have been in handcuffs.  I really -- I just know that we

POULTER - DIRECT (Owens)                                    1208

1    seen him on the porch, and I don't know if he was

2    handcuffed, but then I think they took him in the house.

3    **Q.**   Sure.  Now, at some point after Dean was arrested, did

4    you learn that the crimes he was accused of participating in

5    took place in 1988?

6    **A.**   Yes.

7    **Q.**   And we will sort of talk about --

8         MR. OWENS:  One second, Judge.

9         Sorry, Your Honor.

10        THE COURT:  No problem.

11   BY MR. OWENS:

12   **Q.**   So one of the days where -- that Dean was -- one of the

13   crimes had happened on August 5, 1988.  Does that sound

14   familiar?

15   **A.**   Correct.

16   **Q.**   The date, you know, when Dean was arrested, two years

17   later in 1990, did you know right that second where you were

18   on August 5, 1988?

19   **A.**   Obviously, no.

20   **Q.**   And were you with Dean on August 5, 1988?

21   **A.**   Yes.

22   **Q.**   How did you go about figuring that out?

23   **A.**   Pretty much came to me from my mind being refreshed

24   from a journal that a girl that we knew had.  She had like a

25   day planner, I think it was, and she had marked the date in

1   that day planner of a party that we had attended.

2   **Q.**   And who was the girl who had the calendar or planner?

3   **A.**   Marie Woods.

4   **Q.**   And who is Marie Woods?

5   **A.**   She was a girl that Dean and I had went to school with.

6   We graduated the same class.  A good friend.  She was in

7   college, Boston University I believe, at the time.

8   **Q.**   And you said that she had a calendar that indicated some

9   kind of party?

10  **A.**   Yes.  The party was actually on August 6th.

11  **Q.**   Got it.  And you used that calendar to refresh your

12  recollection about where you were that weekend?

13  **A.**   Yes.

14  **Q.**   And do you remember the events of that weekend?

15  **A.**   Yes, I do.

16  **Q.**   Okay.  And can you tell us anything about what stands out

17  in your memory today about that weekend?

18  **A.**   Well, that Thursday, Dean and I had met up with Marie

19  and were hanging out, and then we decided we were going to

20  see a movie.  So Dean, myself, Marie, and another friend of

21  ours, Gilbert Lures, that Thursday we went to go see the

22  movie "Cocktail."  So we went to the movie and decided we

23  would go to a nightclub down on 725, I believe, in

24  Washington Township.  It was called Safaris.

25      Really nothing happening.  So we actually left there

1    and went to the Cutters Pub, which was a local college bar

2    there by Wright State.  And at the time I was a part-time

3    employee of UPS, and I worked early in the morning.  So it

4    wasn't a very late night for me.  And I ended up going home.

5         So the following -- the following day, probably, I

6    guess around 4, 5 o'clock, 6 o'clock, something, I had

7    gotten a new Volkswagen Bug from Dean, or a Volkswagen

8    convertible I had bought.

9         I picked Dean up, and he and I were riding around.  And

10   it's like, "Hey, let's go by Lisa Glasser's house.  She is

11   home from college."  And I am, "All right."

12        So we went to Lisa's and got to her house and was

13   talking to her and her boyfriend and stuff, and her

14   boyfriend left.  So Dean and I hung out there for a little

15   while and might have had a beer or so, maybe two.

16        And then probably around, you know, 9, 9:30, we left

17   there.  And Dean and I liked to go to Bourbon Street, which

18   was a bar down on Woodman Drive in Dayton.  He and I left

19   there around 9:30 and went to Bourbon Street.  And typically

20   when we would go to Bourbon Street, you know, we stayed

21   there till it closed.

22   Q.   Okay.  Can I just stop you right there?

23   A.   Yeah.

24   Q.   And I'll let you finish in a minute.

25   A.   Okay.

POULTER - DIRECT (Owens)                                    1211

1   Q.   So I think you said on August 5th of 1988 you worked

2   early that morning; is that right?

3   A.   That would have been -- yes, yes, correct.

4   Q.   Friday, the 5th?

5   A.   Yes.

6   Q.   All right.  And what time was it that you mentioned that

7   you picked up Dean?

8   A.   Probably after 4, a little bit after 4.  He, you know,

9   if he worked -- or generally he would get off at like 3,

10  3:15.  And I think probably went, maybe had a bite to eat

11  before we went to Lisa's.  So probably between 4 and 6 we

12  were probably at Lisa's house, 6:30 maybe.

13  Q.   Got it.  And who is Lisa again?

14  A.   Lisa Glasser is another classmate of ours.  She is a

15  little bit younger than we were but, you know, a friend from

16  school.

17  Q.   And you said you went from Lisa's, and you were there for

18  a few hours and went to Bourbon Street; is that right?

19  A.   Correct.

20  Q.   Was there any particular reason you all went to Bourbon

21  Street on Friday nights?

22  A.   Well, generally, Friday nights was the most popular

23  night there, very crowded.  And they had a drink special

24  that Dean and I liked to drink.  It was a Long Island Iced

25  Tea for $1.50.  So, you know, that really -- but the main

1    thing was that was the best night to be there, but the cheap

2    drinks were nice too.

3    **Q.**   Got it.  Now, you mentioned something about drinking.

4    Was Dean a big drinker at that time?

5    **A.**   Not really.  I drank more so than he did.  But not

6    necessarily a big drinker, no.

7    **Q.**   Okay.  And do you remember anything else that happened

8    that weekend after the 5th?  On the 6th?

9    **A.**   Yes, on the 6th.  Of course, that's how I recollected,

10   you know, what was going on at that time in my life two

11   years, you know, after the fact.

12       You know, Lisa told us that night we were there that

13   she was going to have -- a girlfriend was coming home to

14   spend the weekend with her because her parents were out of

15   town.  She's like, "I'm going to have a party."

16       And I'm like, "Okay, we'll be there," you know.

17       So that following -- that following, on the 6th, you

18   know, Dean and I and Ray went to Lisa's house.  And, you

19   know, we were having and playing a couple drinking games and

20   quarters and what have you and, you know, just having a good

21   time.  And it's kind of unique, her parents had a big pit

22   couch.  And we were on the couch just messing around, and I

23   accidentally stood up and stuck my hand.  And there was a

24   fan there, and I broke one of the fan blades.

25       You know, that kind of, you know, silly of me to do

1    but, you know, we -- we ended up hanging out there.  And

2    then Marie and I kind of, you know, had a lit bit to drink,

3    feeling good, feeling each other, so we kind of had some

4    kisses and made out a little bit.  And that's how I

5    remember, you know, when she recollected the date in her day

6    planner, and I'm like, I absolutely remember that.

7    **Q.**    Got it.

8    **A.**    She was a very beautiful woman.

9    **Q.**    So two years later you had remembered breaking a fan and

10   making out with Marie at the party; is that correct?

11   **A.**    That's correct.

12   **Q.**    Now, just to be clear, did you ever have any other

13   parties or attend any other parties at Lisa Glasser's house?

14   **A.**    No, that's the only party that I attended there.

15   **Q.**    And do you know, do you remember where Lisa Glasser's

16   house is in Fairborn?

17   **A.**    Yes.

18   **Q.**    Where is it?

19   **A.**    She lives on -- I live at 1401 Court Ridge Lane or

20   Court Ridge Court.  She lives -- her parents live catty-

21   corner to my house that I live in now.  So I see her mother,

22   you know, frequently.

23   **Q.**    Did they ever forgive you for breaking the fan?

24   **A.**    Yeah.  Well, I don't know if they knew that I did it or

25   I don't know how Lisa played that out, you know.  I never

POULTER - DIRECT (Owens)                                          1214

1    heard anything about it.

2    **Q.**   Got it.  So back in 1990, so we talked about August 5th

3    weekend.

4    **A.**   Yes.

5    **Q.**   Do you also find out that one of the crimes that Dean had

6    been accused of committing took place on August 20, 1988?

7    **A.**   Yes.

8    **Q.**   And were you with Dean at the time that those crimes'

9    committed that weekend?

10   **A.**   Yes.

11   **Q.**   And did you remember that, the minute that Dean got

12   arrested, this is where I was on August 20, 1988?

13   **A.**   Absolutely not.

14   **Q.**   And just keep your voice up.

15   **A.**   Okay.  Sorry.

16   **Q.**   No problem.  And so how'd you go about sort of refreshing

17   your memory about where y'all were on August 20, 1988?

18   **A.**   The way that I recall that was there was a notebook

19   that a man named Homer Fyffe had, a little notepad.  And on

20   that weekend, he had noted that a hunting dog that he had

21   had pups.

22   **Q.**   And so what about, you know, some guy named Homer Fyffe

23   having pups on a weekend, why was that significant to you?

24   **A.**   Well, what had happened, that weekend Dean and I had --

25   Dean, myself, and another good friend of ours, maybe ten

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

POULTER - DIRECT (Owens)                                    1215

1    years older than Dean and myself, his name was Jerry Fyffe.

2    Well, in that time frame, we went to Morehead, or Cave Run

3    Lake in Morehead, Kentucky.  We went there quite a bit.  If

4    we weren't -- you know, had something planned, probably

5    twice out of the month we were at the lake.

6    **Q.**   And did you have a routine that you would follow when you

7    would go down to the lake in Kentucky?

8    **A.**   Yeah.  Like I said, I was a part-time employee at UPS.

9    So, generally, I would get off work at 9 a.m.  Sometimes I'd

10   come home, take a nap.  But, typically, Jerry was off.  He

11   worked third shift, I believe.  So he would be off Friday

12   morning.  And I think Dean's schedule at the time was kind

13   of revolved.  I think he covered different shifts.  And

14   sometimes he would, you know, work the first shift; he could

15   be at 3:15, I think's when he got off.

16       You know, we would typically leave midafternoon.  Jerry

17   would come and pick me and Spiz up.  And he had a big four-

18   wheel drive truck, and it was his boat.  He'd pick us up,

19   and Dean and myself would give him gas money, and gas money

20   for the boat.  And we would go down to a campground, Twin

21   Knobs there at Cave Run, and we would camp and boat for the

22   weekend.

23   **Q.**   And so what was your routine when you'd come back?

24   **A.**   Like I said, typically, we would probably get to the

25   lake, you know, maybe 6 or 7 on a Friday evening, and we

POULTER - DIRECT (Owens)                                    1216

1    would stay till, you know, early afternoon.  You know,

2    typically, we would have to, you know, load the boat up on

3    the Sunday morning or -- Sunday morning, late morning, but

4    we always stayed, you know, till Sunday.  And usually got

5    back home, you know, it would be late afternoon, early

6    evening.

7    Q.   And so help me tie this together with the pups.  How does

8    that stand out in your head related to August 20, 1988?

9    A.   Okay.  So that weekend, we, you know, were at the lake.

10   And so we're -- we pull up to Jerry's house.  He lived in a

11   farmhouse on State Route 235 there outside of Fairborn.  And

12   we pulled up and noticed Homer's truck was there.  And, you

13   know, we get out and start getting our gear out of the

14   truck.

15       And, you know, Jerry walks over and talks to his dad.

16   And we go over and notice that there was a dog, you know, a

17   hunting dog that had had pups.  And, you know, mid, late

18   August, it's pretty hot.  And it was very hot that day.  And

19   we saw the dog, and the dog had dug a fairly large hole in

20   the ground and had moved all the pups into the hole -- I'm

21   assuming it was under a shady tree -- to keep them cool.

22       And, you know, for me, my family didn't have pets as a

23   child growing up, and to me that really stood out, you know.

24   I was like in awe, you know.  That was pretty cool to see.

25   Q.   The City Slicker and not a dog person?

1    **A.**    Well, you know, I got to blame it on my parents, I

2    guess.

3    **Q.**    All right.  Now, I think I just want to cut to the chase

4    a little bit.  You testified about the stuff that you're

5    talking about right now about August 5th and August 20th at

6    Dean's, both of Dean's trials, correct?

7    **A.**    That's correct.

8    **Q.**    Do you have any doubts that you were with Dean Gillispie

9    on August 5th, the evening of, in 1988?

10   **A.**    None whatsoever.

11   **Q.**    Would you have testified to that if you weren't sure when

12   you testified at his trials?

13   **A.**    I would not.

14   **Q.**    Do you have any doubts that you were with Dean on August

15   20, 1988?

16   **A.**    I do not.

17   **Q.**    Would you have testified to that at his trials if you had

18   any doubts?

19   **A.**    Absolutely not.

20   **Q.**    Now, by the time that Dean was convicted in 1991, that

21   was -- you guys were pretty close friends, right?

22   **A.**    Absolutely.

23   **Q.**    What was Dean's sort of attitude like before he was

24   convicted, after he was arrested, in those few months?

25   **A.**    Honestly, to be -- what he was looking at, he was

1   very -- he was very confident.  He didn't seem scared, like

2   I think I would feel.  You know, he was confident in his

3   innocence, I believe.  You know, he -- he knew this was

4   something that he didn't do, and he felt that he had, I

5   believe, a good case and a good attorney; that, you know, he

6   had nothing to hide.

7   **Q.**   And so how did it impact you and your group when Dean was

8   convicted?

9   **A.**   It was tough.  You know, it's a hard thing when you can

10  watch something on TV and watch someone, but when you're

11  actually affected by the results of something, it was

12  devastating for all of us guys.  Well, I mean, for everyone.

13       Dean had a lot of -- a lot of friends, a loving family,

14  and it was -- it was terrible.  It was heartbreaking, you

15  know.  Dean and I were like brothers.  I never had a

16  brother.  And it was like losing a family member, honestly.

17  **Q.**   Did you stick by your family member, Dean, over the next

18  20-some years while he was in prison?

19  **A.**   Absolutely.

20  **Q.**   And are you married?

21  **A.**   Yes.

22  **Q.**   How long have you been married?

23  **A.**   I got married in 1991.

24       MR. OWENS:  Your Honor, I'd like to show the witness

25  what's been marked as Exhibit 284, at page 5.

POULTER - DIRECT (Owens)                                    1219

1              THE COURT:  That's been --

2              MR. McLANDRICH:  It hasn't been shown, but if I

3     understand what it is, I don't have an objection.

4              THE COURT:  Do you want to see it first?

5              MR. McLANDRICH:  I'm pulling it up now.

6              MR. OWENS:  I gave it to him.

7              MR. McLANDRICH:  Yeah, that's fine.

8              MR. HERMAN:  No objection.

9              MR. OWENS:  We can just put it on the screen.  Thank

10    you.

11         (Exhibit displayed.)

12    BY MR. OWENS:

13    Q.   All right, Brian.  Could you please just let us know what

14    this picture is?

15    A.   So this is my wedding day, and people here, of course,

16    came to celebrate me and my wife getting married, Tina.  And

17    we just wanted to let Dean know that we hadn't forgot about

18    him and that we loved him and, you know, we wished he would

19    have been there with us.

20         These are -- this group of guys you see here was the

21    group of guys that we ran around with.  This was -- this was

22    the 10 to 15 guys that I, you know, I told you, that we were

23    a close-knit group.

24    Q.   Got it.  I want to just direct your attention to this

25    sign that says "Dean, we love you."  Do you see that?

1    **A.**    Yes.

2    **Q.**    And what are all the names that are on this?

3    **A.**    Those are all the guys, you know, that -- this is the

4    people that love Dean.  You know, we all, every person on

5    that -- on that picture has a direct relationship with him.

6              MR. OWENS:  You can take that down, thanks.  Leave

7    the picture but take out the focus.

8    BY MR. OWENS:

9    **Q.**    So -- I'm sorry.  I forgot to ask you, when did you get

10   married?  I won't hold you to the date.  Do you remember the

11   month and the year?

12   **A.**    Yeah, it was September 14th of 1991.

13   **Q.**    So this was just a few months after --

14   **A.**    Yes.

15   **Q.**    -- Dean had been arrested?

16   **A.**    That's correct.

17   **Q.**    How many kids do you have?

18   **A.**    I have three children.

19   **Q.**    And before Dean was released from prison, did your -- did

20   any of your children get to know or meet him?

21   **A.**    Yeah, all my kids went to go see Dean when he was in

22   prison.  The way that the visitations are set up, typically,

23   is parents and his family would go through the week, and

24   they would save the Saturday and Sunday visits for the

25   friends that Dean had on his list because there was X amount

1    of people that would come and see him.  You'd have to be on

2    the list to be approved and all that stuff.

3        So never at one time did me and my whole family get to

4    go and see him at the same time.  It was typically, you

5    know, me and one child and then some two or three of our

6    friends, we'd all go together.

7    **Q.**   How often would you visit Dean in prison?

8    **A.**   I -- we were able, if you were on the list -- I wasn't

9    on the list.  I was kind of special.  But I always could go

10   see Dean twice a month.

11   **Q.**   What do you mean when you said you were kind of special?

12   **A.**   Well, I was -- somehow, I was considered family, you

13   know.  And he didn't have to put me on that list.  So, you

14   know, and I think when you bring a child, they are not

15   considered a person on the list, you know.  So I could

16   always bring one of my kids and, you know, have friends

17   there, 'cause everybody, you know, loved going to see him.

18   They want to support him.

19   **Q.**   So did you get to see Dean more frequently than some of

20   your other friends?

21   **A.**   I got to see Dean the most out of anyone, I believe,

22   besides his parents.

23   **Q.**   So I want to fast forward a little bit.  What happened

24   the day that Dean was released from prison?  Do you recall

25   that?

1  **A.**   Yes, I do.

2  **Q.**   And just briefly, can you sort of just briefly describe

3  what happened that night?

4  **A.**   It was a Thursday, I believe.  It was December 22nd of

5  2011.  I was at work and got a -- got a text that, you know,

6  Dean might be getting out of prison.  I'm like, you got to

7  be kidding me.  Here I am at work.

8       Anyways, fast forward, I really blew through my day to

9  get off work, big hustle to get there.  A bunch of --

10  Gilbert, Charlie, myself, Richie, Gilbert, we had got on the

11  phone talking to each other.  We were going to get a -- we

12  were going to rent a bus, a minibus.  We were going to go

13  with Mr. and Mrs. G to drive up for Dean to get released out

14  of prison.

15       And, you know, we got on a bus, taking the ride up

16  there, and we were just all really in awe.  Just couldn't

17  believe that, you know, something that you dreamed of and

18  prayed for was actually going to happen.  We were excited.

19  Mrs. G was just ecstatic.  Mr. G, his demeanor, he's -- you

20  can't really read him.  He's kind of -- he's even.  You

21  know, he's very level.

22       So we get up, and for some reason they were going to

23  release Dean.  They didn't want -- I can't remember if they

24  didn't want people at the prison.  So there was a decision

25  they were going to take him, and we all met at a bowling

1    alley somewhere in -- close to the prison in London, Ohio.

2    And he was at London Correctional Institute.

3        So we get to the bowling alley, and there's a lot of

4    media there.  And actually there was several people had

5    driven up also to be there, to see Dean get released.  So

6    we're all in the bowling alley.  And there was a lady named

7    Laura Quilleman that was there.  She was one of the -- she

8    was one of the factors on getting Dean exposure and media

9    that got him to that point.  And everybody's excited.

10       And then, you know, Dean comes through the door.  And

11   to see him without a light blue-dark blue pair of pants on,

12   wearing street clothes, it was something that we had prayed

13   for and wished for.  And he grabbed his mom.  He gave her a

14   kiss.  Everybody just -- they were just so happy.

15   **Q.**   That's all right.

16       I'd like to show you what's been marked as Plaintiff's

17   Trial Exhibit Number 284 at page 6.

18            THE COURT:  Has that been --

19            MR. OWENS:  It hasn't.  But I gave it to them

20   previously.

21            THE COURT:  Any objection?

22            MR. McLANDRICH:  Just one second.  I don't think so.

23       No objection.

24            MR. HERMAN:  No objection.

25            THE COURT:  It may be.

1           (Exhibit displayed.)

2    BY MR. OWENS:

3    Q.   Who are the people in this picture?

4    A.   I think you can pretty much go to my wedding picture,

5    but I think maybe all but one of those persons was at my

6    wedding in that picture.

7    Q.   Sir, keep your voice up.

8    A.   I'm sorry.

9    Q.   You can move the microphone.

10   A.   That picture represents, more or less, all the guys

11   that were in my wedding picture.  That was those 10, 15 guys

12   that we hung together and, as you can see, stayed together

13   for -- for 20 years.

14   Q.   So I want to switch gears a little bit.  You said that

15   you worked at UPS for the past, was it, 37 years?

16   A.   37.

17   Q.   Outside of working at UPS, have you done other things for

18   work or supplemental income?

19   A.   Yeah.  I got -- when I went full time in '91, started

20   driving, I believe it was that year that Richie and I went

21   in together and bought a foreclosed property.  And he and I

22   flipped that property right after I got married, I believe.

23       So I kind of got into that flipping deal.  I would buy

24   distressed properties and then, you know, fix them up and

25   flip them.

1    Q.    You mentioned Richie.  Is that Richie Winters?

2    A.    Yes, that's Richie Winters.

3    Q.    Got it.  And --

4          THE COURT:  Counsel, do you need that picture?

5          MR. OWENS:  Oh, we can take it down.  Thank you.

6    BY MR. OWENS:

7    Q.    And you mentioned that you sort of got into flipping

8    houses; is that right?

9    A.    Yes.

10   Q.    And just over the course of the last 20 years, have you

11   done more than just that first one in 1999?

12   A.    No.  I flipped several.  And I bought rentals that I

13   kind of, you know, flipped and kept and stuff like that.

14   Q.    You mentioned this is something that you and Richie did

15   together.  Before Dean got arrested, is that something that

16   you had anticipated you would be doing with him?

17   A.    No, but Dean was kind of like the pioneer, because he

18   had actually -- he had bought a house in Dayton on

19   Shaftesbury Drive.  And he had bought that to do a flip,

20   which he did.  And some of us guys that were in that picture

21   went down there and helped Dean work on the house.  And, you

22   know, he flipped that house.

23        And then the house that he was in on 312 Spruce in

24   Fairborn when he was arrested, that was a flip for him also.

25   He was in the process of flipping that house.

1  **Q.**   Got it.  So you all were just something that -- just like

2  hanging out that you all sort of also did together?

3  **A.**   Well, yeah.  You know, I saw Dean doing it and said,

4  heck, I'm going to jump on that, you know.  And I did that.

5        And then I also, me and my wife built like six houses

6  in a development that we lived in, GC, you know, Morris

7  general contracted the construction of some homes sold,

8  so --

9  **Q.**   So.  And rounding things out, you mentioned that you were

10  the person who you think saw Dean at the prison more than a

11  lot of your other friends, right?

12  **A.**   Yes.

13  **Q.**   Okay.  And can you just sort of describe, briefly

14  describe how do you think that that time in prison that you've

15  had the opportunity to see him out for ten years, how that's

16  impacted him and his personality in his everyday life today.

17  **A.**   So, typically, you know, a Saturday or Sunday, they had

18  two visitation times there to go see Dean.  Always four of

19  us would go.  I was always usually the reoccurring face in

20  the crowd.  But, you know, we would go and sit with Dean in

21  a large room full of a bunch of, you know, inmates.

22        And really, as time progressed, we would talk about

23  what was going on on our lives with our families, what kids

24  did -- our kids were doing, a house I might have been

25  working on, or whatever someone else was doing in their

1    life, you know.

2         And then our conversations always reverted back to, you

3    know, what we did prior to Dean being incarcerated because

4    we had a lot of good times.  And that for us is how we kind

5    of, you know, related to Dean.  He was -- he was -- his life

6    had stopped, you know, and we were the sponge.  You know, we

7    brought him life in prison.  He lived through what we had to

8    say, you know.  We were his ears and his eyes outside of

9    prison and in town and in general.

10        But, you know, man, we always had great times.  They

11   had vending machines.  You'd get food.  But, you know, there

12   comes a time where you have to leave, and it was hard, you

13   know.  We all would get up and give Dean a hug and tell him

14   we love him, you know.  But, you know, man, he would hug you

15   like he was never going to see you again.

16        And once you get ready to leave, they line you up to

17   walk all the people out.  And, you know, the inmates are

18   sitting at their table, and I'd always turn around to him,

19   and I'd say, "Spiz, keep 'em high."  You know, every time I

20   left him.  And really what that meant is for him to keep his

21   spirits high and his hands high, you know.  You just don't

22   know what he's living through in there.

23        And every time I left, I told him that.  And,

24   typically, we would ride together, you know, an hour, hour

25   and a half drive, to WCI or London.  But on the way home,

1    we'd usually stop in Cracker Barrel or something.  And we

2    were amazed how we could sit in there for three to four

3    hours and talk to Dean, and it was like I was sitting in his

4    Chevy truck driving around town.  He never changed who he

5    was, the way that he interacted.  It was just like I

6    couldn't believe it.  I could only fathom what he had to go

7    through in prison.

8         But when I went and saw him, it was like I had just

9    left him.  And I just -- it just -- it just awed me.  I

10   just -- and that was through the whole 20 years that I went

11   and visited Dean.

12        The whole -- I, you know -- he was in an environment

13   with some probably very bad characters.  The man never

14   changed who he was.  I mean, you know, I hate to stereotype,

15   but people go into prison, they get tattoos.  They change

16   who they are.  They talk differently.  The man never changed

17   who he was.  He does not have one tattoo on his body.  He

18   served time in prison.  He was on so many special

19   assignments.  He did so much for them.  Honorable prisoner.

20   Never got in trouble.

21   **Q.**   Yeah.

22   **A.**   You know, and it just amazed me how he could maintain

23   that, you know.  And that to me comes back to his character.

24   **Q.**   Sure.

25   **A.**   His morals.

1    **Q.**    And I appreciate that.  I just have to stop you there.

2    **A.**    No problem.

3            MR. OWENS:  Okay.  No further questions.

4            MR. McLANDRICH:  Just one or two, Your Honor.

5                    **CROSS-EXAMINATION**

6    BY MR. McLANDRICH:

7    **Q.**    Hello, Mr. Poulter.

8    **A.**    Hello.

9    **Q.**    I represent Detective Moore.

10   **A.**    Yes.

11   **Q.**    Just one or two questions.

12          With respect to August 5th, I believe at the criminal

13   trial you testified that you got together with Dean that

14   evening about 5 o'clock.  Does that sound about right?

15   **A.**    On the 5th?  I believe it was somewhere between 4 and

16   6, I believe.

17   **Q.**    All right.  Well, 5 would be right in the center of 4 and

18   6.

19   **A.**    Yeah, yeah.  4 to 6 o'clock, somewhere in that time.

20   **Q.**    You weren't with him earlier in the afternoon?

21   **A.**    No, I wasn't.

22   **Q.**    And with respect to the memory on the 20th, your memory

23   of that was dependent on the Homer Fyffe calendar, correct?

24   **A.**    That's what recollected me to that time frame in my

25   life, yes.

1    **Q.**    Thank you.  That's all.

2           MR. HERMAN:  No questions.

3           MR. OWENS:  This witness may be excused.

4           THE COURT:  Thank you very much, sir.

5        Next witness.

6           MS. PORTER:  Your Honor, plaintiff would like to

7    call Jim Osborne to the stand.

8           **JIM OSBORNE, PLAINTIFF'S WITNESS, SWORN**

9           THE COURT:  Mr. Osborne, please, please try to keep

10   your voice up for us so we can all hear your responses to any

11   questions that may be posed.  You have a microphone there.

12   You can utilize it as you desire.  You can move -- it moves.

13   It moves forwards and backwards.  But if you get too close, it

14   may muffle you; if you get too far away, it may lose you.  One

15   way to resolve that or solve that problem is just keep your

16   voice up so we can all hear you, all right?

17           THE WITNESS:  Sure.

18           THE COURT:  All right.  You may inquire.

19                     **DIRECT EXAMINATION**

20   BY MS. PORTER:

21   **Q.**    Good morning, sir.

22   **A.**    Good morning.

23   **Q.**    Could you please state and spell your name for the

24   record?

25   **A.**    Jim Osborne, J-I-M  O-S-B-O-R-N-E.

1    **Q.**   Where are you from, Mr. Osborne?

2    **A.**   Fairborn.

3    **Q.**   And how long have you lived there?

4    **A.**   Since '64.

5    **Q.**   Do you still live there?

6    **A.**   Yes.

7    **Q.**   And are you married, sir?

8    **A.**   I was.

9    **Q.**   How long were you married, sir?

10   **A.**   50 years.

11   **Q.**   And do you have any children?

12   **A.**   I got one.

13   **Q.**   Daughter or a son?

14   **A.**   Daughter.

15   **Q.**   And do you currently work?

16   **A.**   I used to.  I don't now.

17   **Q.**   You retired?

18   **A.**   Yes.

19   **Q.**   How long have you been retired?

20   **A.**   Probably eight or nine years.

21   **Q.**   All right.  And before you retired, can you give us a

22   brief recap of your employment history?

23   **A.**   Well, going back when I first came here, I worked for

24   National Homes.  And then I worked for NCR.  And then went

25   to work for an insurance company.  And I've worked for a

OSBORNE - DIRECT (Porter)                                    1232

1    painting contractor out of Columbus.  And after that,

2    started work for myself.

3    **Q.**   And how long did you work for yourself?

4    **A.**   I think I started '74 maybe.

5    **Q.**   And when you were working for yourself, what did you do?

6    What kind of work?

7    **A.**   Construction and painting and such as that.

8    Remodeling.

9    **Q.**   And would you say, were you successful in your

10   construction business?

11   **A.**   I'd say so.

12   **Q.**   What was the -- what kind of properties did you work on?

13   **A.**   Mainly residential.

14   **Q.**   Did you own those properties?

15   **A.**   I'm sorry?

16   **Q.**   Did you own the properties you worked on?

17   **A.**   Not all of them, no.

18   **Q.**   Did you own any portion of them?

19   **A.**   I did buy some and rent them and flip them.

20   **Q.**   What was the -- what would you say was the most

21   properties you owned at one time?

22   **A.**   Probably 50.

23   **Q.**   And was that 50 over the course of your entire career?

24   **A.**   Yes.

25   **Q.**   And were you in the military, sir?

OSBORNE - DIRECT (Porter)                                    1233

1    **A.**   Yes, I was.

2    **Q.**   When were you in the military?

3    **A.**   '67 through '69.

4    **Q.**   And how did you join the military?

5    **A.**   I'm sorry?

6    **Q.**   How did you join the military?

7    **A.**   I got drafted.

8    **Q.**   Okay.  And what were you drafted for?

9    **A.**   The Army.

10   **Q.**   And for the Army to do what?

11   **A.**   I'm sorry?

12   **Q.**   You were drafted into the Army to do what, sir?

13   **A.**   Defend the country.

14   **Q.**   To be more precise, were you drafted for a war?

15   **A.**   Yes.

16   **Q.**   Which war?

17   **A.**   Vietnam.

18   **Q.**   And when you were in Vietnam, were you deployed over in

19   Vietnam?

20   **A.**   Yes.

21   **Q.**   For how long?

22   **A.**   I was there about nine months.

23   **Q.**   All right.  And while you were there, what did you do?

24   **A.**   I was a scout observer and a launch helicopter.

25   **Q.**   Okay.  And while you were in Vietnam, did you ever see

OSBORNE - DIRECT (Porter)                                    1234

1    combat?

2    **A.**    Yes.

3    **Q.**    How often did you see combat, sir?

4    **A.**    Every day.

5    **Q.**    And how did you leave the military?

6    **A.**    How did I leave?

7    **Q.**    Um-hmm.

8    **A.**    When my time was up.

9    **Q.**    When you saw combat, were you ever injured?

10   **A.**    Yes.

11   **Q.**    All right.  And would you be able to tell us a little bit

12   about your injury?

13          MR. McLANDRICH:  Objection.

14          THE COURT:  Is there a relevance to this?

15          MS. PORTER:  Yes.  For explaining -- for the witness

16   to be able to describe both the end of his military career and

17   how he exited.

18          MR. McLANDRICH:  Objection.

19          MS. PORTER:  Can I rephrase, Your Honor?

20          THE COURT:  You may.

21   BY MS. PORTER:

22   **Q.**    Did you receive a Purple Heart for your injury?

23   **A.**    Yes.

24   **Q.**    How many?

25   **A.**    Two.

OSBORNE - DIRECT (Porter)                                    1235

1   **Q.**   And do you know Dean Gillispie?

2   **A.**   I'm sorry?

3   **Q.**   Do you know a man named Dean Gillispie?

4              THE COURT:  I overruled the objection to allow that

5   answer based on the rephrasing of the question.

6              MS. PORTER:  Thank you, Your Honor.

7   BY MS. PORTER:

8   **Q.**   And how long have you known Dean?

9   **A.**   Probably at least 40 years, maybe 50.  A long time.

10  **Q.**   Yeah, a long time.  How did you meet him?

11  **A.**   Through his mom and dad.

12  **Q.**   And how did you know his family?

13  **A.**   They had insurance with the company I worked for.

14  That's when I first met them, back in the '70s.

15  **Q.**   Got it.  Were you close with his parents?

16  **A.**   We become pretty good friends later.

17  **Q.**   And how would you describe Dean before he went to prison,

18  when he was a young man?

19  **A.**   He was pretty much a normal 16-year-old, ambitious kid.

20  **Q.**   Did he ever work for you?

21  **A.**   Yes, he did.

22  **Q.**   What was the first job he did for you?

23  **A.**   It was a parking lot in Fairborn, a shopping center

24  they just built.

25  **Q.**   What was he doing in the parking lot?

OSBORNE - DIRECT (Porter)                                     1236

1    **A.**   He was -- cleaned the parking lot and emptying trash

2    cans and such as that in the morning before he went to

3    school.

4    **Q.**   The morning before he went to school, okay.

5        And directing you back to your construction career, did

6    Dean ever do any work for you in your construction business?

7    **A.**   Yes, he did.

8    **Q.**   What kind of work did he do?

9    **A.**   Build a house in 1990 and '91 maybe it was, and he

10   worked on that.

11   **Q.**   Okay.  And did you train him to do this work?

12   **A.**   Well, yeah, I'd say I did.

13   **Q.**   What did you train him to do?

14   **A.**   A little bit of everything in the construction

15   business.

16   **Q.**   Okay.

17   **A.**   And he was eager to learn, too.

18   **Q.**   Okay.  Can you -- how was he eager to learn?  How did he

19   show that to you?

20   **A.**   Well, by wanting to do more every day of -- learn more

21   every day.

22   **Q.**   What was he like as a worker?

23   **A.**   I'm sorry?

24   **Q.**   What was he like as an employee?

25   **A.**   He'd be a good employee.  He was then.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

OSBORNE - DIRECT (Porter)                                    1237

1    **Q.**    And how was he with other employees you had?

2    **A.**    Friendly and nice.

3    **Q.**    Okay.  And did he ever tell you if he had any aspirations

4    to be in the same field as you?

5    **A.**    Yes, he did.

6    **Q.**    What'd he tell you?

7    **A.**    Well, he wanted to buy a house and flip it, and he did.

8    **Q.**    Okay.  Did you help him with those homes?

9    **A.**    Some.

10   **Q.**    Okay.  And how did you help him with flipping homes?

11   **A.**    Just kind of different things he wanted to know if he

12   should do or shouldn't do and things like that.

13   **Q.**    Okay.  Did you try to mentor him?

14   **A.**    I never thought about it, I guess, at the time.

15   **Q.**    Now how would you characterize it?

16   **A.**    Well, I probably did.

17   **Q.**    Okay, sir.  And do you know how many homes you helped him

18   with?

19   **A.**    I think two.

20   **Q.**    Okay.

21   **A.**    Best I can remember.

22   **Q.**    What do you remember about the first home you helped him

23   with?

24   **A.**    It was somewhere here in Dayton, and I don't remember

25   exactly what.  Several little things, I think.

OSBORNE - DIRECT (Porter)                                          1238

1    **Q.**    Do you remember what advice you gave him?

2    **A.**    I think on some drywall and some doors, I think maybe.

3    **Q.**    Okay.  And what do you remember about the second home you

4    helped him on?

5    **A.**    I think that was on some plumbing.  He was having some

6    plumbing issues, I think.

7    **Q.**    Do you remember if he finished fixing up the second home?

8    **A.**    I don't think he finished it because he was arrested

9    during the time.

10   **Q.**    And moving to that, what did you think when Dean was

11   arrested?

12   **A.**    I kind of thought it was a hoax.

13   **Q.**    Why did you think it was a hoax?

14   **A.**    Well, I couldn't understand why they was arresting him.

15   **Q.**    And did you attend his trial?

16   **A.**    Yes, I did.

17   **Q.**    What do you remember about the trial?

18   **A.**    Well, that's been a while back.  I thought it was all

19   kind of a setup.

20          MR. McLANDRICH:  Objection, Your Honor.

21          THE COURT:  Sustained.

22          THE WITNESS:  I mean, I didn't believe --

23          THE COURT:  Sustained.

24   BY MS. PORTER:

25   **Q.**    What did you think when Dean was convicted?

OSBORNE - DIRECT (Porter)                                    1239

1    **A.**   Well, I just couldn't believe that he was.

2    **Q.**   Did you ever visit him when he was in prison?

3    **A.**   Yes.

4    **Q.**   How often did you visit him?

5    **A.**   Not real often.  I don't remember exactly.

6    **Q.**   How -- if you -- how many times do you think you visited

7    him over the course of his 20 years?

8    **A.**   Probably four or five.

9    **Q.**   Okay.  And what were those visits like?

10   **A.**   Well, it was probably exciting to him, but it was kind

11   of shocking to me, I guess.

12   **Q.**   Why was it shocking?

13   **A.**   Well, it's just kind of a sad thing for me to see him

14   there.

15   **Q.**   And how did Dean seem on those visits?

16   **A.**   Most of the time he was kind of upbeat, but wouldn't

17   have been like me.

18   **Q.**   How did you feel after you left him at the end of the

19   each visit?

20   **A.**   Kind of depressed.

21   **Q.**   And why did you go visit him when he was in prison?

22   **A.**   Well, I just thought I needed to.

23   **Q.**   Why'd you think you needed to?

24   **A.**   I felt like he needed a friend.

25   **Q.**   And when you did visit him in prison, do you remember if

OSBORNE - DIRECT (Porter)                                    1240

1    you were on the visitation form as a friend or as a family

2    member?

3    **A.**   No, I don't.

4    **Q.**   And when did you find out that Dean was going to be

5    released?

6    **A.**   Probably the day that he was released.

7    **Q.**   Do you remember -- do you remember how you felt?

8    **A.**   Excited.

9    **Q.**   While he was incarcerated, did you stay close with his

10   family?

11   **A.**   Yes.

12   **Q.**   How did Dean's incarceration impact his parents?

13   **A.**   Very bad, I think.  It would me too.

14   **Q.**   And when you say "very bad," what do you mean?

15   **A.**   Well, I don't think they could believe what had

16   happened either, and his mother's real upset all the time.

17   **Q.**   And how was his father?

18   **A.**   I think he was maybe kind of depressed.  He didn't talk

19   much then.

20   **Q.**   Were you at the welcome party at Dean's house when he got

21   home?

22   **A.**   Yes.

23   **Q.**   And what was the party like?

24   **A.**   Well, everybody was excited.  Dean was excited.

25   **Q.**   How did you know Dean was excited?

OSBORNE - DIRECT (Porter)                                    1241

1    **A.**   You could just tell.  I mean, he was almost back to his

2    old self again.  But then, you know, he seen all of his

3    friends that he hadn't seen for years.

4    **Q.**   And do you remember how many people were at the party?

5    **A.**   No, I don't.

6    **Q.**   Was it packed?

7    **A.**   Yeah, it was -- it was pretty packed.

8    **Q.**   And have you seen him much since his release?

9    **A.**   Yes, I have.

10   **Q.**   How often have you seen him since his release?

11   **A.**   Probably once a month.

12   **Q.**   And since his release, how have you seen -- have you seen

13   any way that being in prison has changed him as a person?

14   **A.**   I'm sorry?

15   **Q.**   I can clarify.  Have you seen since his release any

16   impact the prison has had on his personality?

17   **A.**   Yeah, I think he's more upset and irritated now.

18   **Q.**   And since his release, have you given him any other

19   advice on real estate?

20   **A.**   No, not really.

21           MS. PORTER:  And I think that's all, Your Honor.

22   Thank you.

23           MR. McLANDRICH:  No questions, Your Honor.

24           MR. HERMAN:  No questions.

25           THE COURT:  Can this witness be excused?

OSBORNE - DIRECT (Porter)                                    1242

1          MS. PORTER:  Yes.  Thank you, sir.

2          THE COURT:  Thank you, sir.

3          MR. OWENS:  I believe Mark Godsey is here.

4          THE COURT:  Counsel, just for your purposes, there

5    will be a break some time.

6          MR. OWENS:  Could we take the break now, Your Honor?

7          THE COURT:  We can.  Ladies and gentlemen, we'll

8    break for the morning.  Please remember the Court's

9    admonitions.  We'll take about 10, 15 minutes, and then

10   reconvene.

11         MR. OWENS:  Thank you, Judge.

12         THE COURTROOM DEPUTY:  All rise.  This court stands

13   in recess.

14      (Jury out at 10:34 a.m.)

15      (Recess at 10:34 a.m.)

16      (Jury in at 10:54 a.m.)

17      (In open court at 10:55 a.m.)

18         THE COURT:  We're back on the record.

19      Counsel ready to proceed?

20         MR. OWENS:  Yes, Your Honor.

21         MR. McLANDRICH:  Yes, Your Honor.

22         MR. HERMAN:  Yes, Your Honor.

23         THE COURT:  Next witness.

24         MR. OWENS:  Mark Godsey.

25          **MARK GODSEY, PLAINTIFF'S WITNESS, SWORN**

GODSEY - DIRECT (Owens)                                          1243

1              THE COURT:  Mr. Godsey, please try to keep your

2      voice up so we can all hear your responses to any inquiries.

3      You have a microphone there that it appears you already know

4      how to work it.  You can either move it up or move it back

5      from you.

6              THE WITNESS:  Okay.

7              THE COURT:  I will caution you, if you get too close

8      to it, it will muffle you.

9              THE WITNESS:  Okay.  Thank you.

10             THE COURT:  If you get away from it, it won't pick

11     you up.

12             THE WITNESS:  It seems like I'm a little close.

13             THE COURT:  So if your voice is strong, that should

14     solve the problem, all right?

15             THE WITNESS:  Thank you, Judge.

16             THE COURT:  You may inquire.

17                          **DIRECT EXAMINATION**

18     BY MR. OWENS:

19     **Q.**   Could you please just state and spell your name for the

20     record.

21     **A.**   Mark Godsey, M-A-R-K  G-O-D-S-E-Y.

22     **Q.**   What's your current job title?

23     **A.**   I'm a law professor at the University of Cincinnati

24     College of Law, and I direct the Ohio Innocence Project.

25     **Q.**   Where are you from?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

GODSEY - DIRECT (Owens)                                    1244

1    **A.**    Cincinnati.

2    **Q.**    And where did you go to college?

3    **A.**    I went to Northwestern in Chicago and then law school

4    at Ohio State.

5    **Q.**    When did you graduate law school?

6    **A.**    '93.

7    **Q.**    And what did you do right after law school?

8    **A.**    Clerked for a federal judge, Tenth Circuit Court of

9    Appeals, in Salt Lake City in Denver.

10   **Q.**    And after you finished clerking, what was your first job

11   in practice?

12   **A.**    I worked two years for a big firm, first in Chicago,

13   then New York City, called Jones Day.

14   **Q.**    After you left Jones Day, I take it, what was your next

15   job as a lawyer?

16   **A.**    I was assistant United States Attorney, federal

17   prosecutor, in Manhattan, New York City, for about six

18   years.

19   **Q.**    And what sorts of cases did you work on as a federal

20   prosecutor?

21   **A.**    I did organized crime, public corruption, so

22   politicians who were corrupt, things of that nature.  I had

23   a full mix of cases -- child pornography cases, drug cases,

24   you know.  I think most of -- most of my cases were major

25   fraud, political corruption, or organized crime.

GODSEY - DIRECT (Owens)                                    1245

1   **Q.**   And do you know, sort of, generally the rough -- what

2   years you were at the federal -- worked as a federal

3   prosecutor?

4   **A.**   It was '95 to 2001.  And I know it was 2001 because I

5   left right before the World Trade Center.  I had been

6   working in the World Trade Center actually, and I had just

7   left.

8   **Q.**   And as a federal prosecutor, did you become familiar with

9   the rules that apply, the legal rules that apply to the

10  disclosure of evidence in the course of criminal prosecutions?

11  **A.**   Yeah, I had to make sure that things were properly

12  disclosed on all my cases and that the police were

13  disclosing -- that the files got turned over, sure.

14  **Q.**   Okay.  So you mentioned that you left being a federal

15  prosecutor in big New York City shortly before 9/11.  Where'd

16  you go after that?

17  **A.**   Well, I am from Cincinnati, and I wanted to be a law

18  professor.  And UC didn't have a spot that year but NKU

19  Chase Law School did.  So my first year after leaving there

20  was move back to Cincinnati, and I was a professor at Chase

21  Law School.

22  **Q.**   And what's NKU?

23  **A.**   NKU, Northern Kentucky University.  It's right across

24  the river.

25  **Q.**   Got it.  And how long were you -- excuse me.  What did

GODSEY - DIRECT (Owens)                                    1246

1   you teach at NKU?

2   A.   Criminal law, criminal procedure, evidence, federal

3   criminal prosecutions, a mix of classes.

4   Q.   And why did you want to leave law practice and become a

5   professor?

6   A.   I had always wanted to be a professor but also had

7   kids.  So it was time to get back in Cincinnati.  Being in

8   New York, working in a government job was kind of expensive.

9   It's a hard life.

10  Q.   Got it.

11  A.   So I wanted to come back to Ohio.

12  Q.   Did you say you only did one term at Kentucky Chase?

13  A.   I think I was there for two years.

14  Q.   And where did you go professionally after you were at

15  NKU?

16  A.   The criminal law spot opened up at University of

17  Cincinnati, which is where I wanted to end up.  So I applied

18  and got that job and moved across the river, and I have been

19  in that job ever since.

20  Q.   And so, I guess, how long have you been a law professor

21  at University of Cincinnati?

22  A.   Almost 20 years.  So next year, 2023, will be 20 years.

23  Q.   And what courses do you teach at the University of

24  Cincinnati law school?

25  A.   I teach Evidence, Criminal Law, Criminal Procedure 1,

1    Criminal Procedure 2, which is like police investigations.

2    I do seminars on police -- proper police investigations and

3    techniques.  Random seminars.  I taught a seminar on the TV

4    show *The Wire*.  But just basic criminal law courses.

5    **Q.**   Outside of your sort of teaching courses, do you run --

6    do you do any like sort of actual practice as a law professor?

7    **A.**   Yeah.  So I in 2003 co-founded the Ohio Innocence

8    Project, and I have directed it since its founding.  So

9    almost for 20 years.

10   **Q.**   And what is the Ohio Innocence Project?

11   **A.**   It's a law clinic.  So law schools have these, they are

12   just called law clinics, which are like little law firms.

13   And the professor supervises students.  So we have law

14   students who work in the Innocence Project.  So it's kind of

15   like in a firm you have the partners and the associates, you

16   know, the young attorneys and the partners who are

17   supervising them.

18       We have 20 students at any given time, and we're

19   looking into these cases of people in prison in Ohio who

20   write us and say they are innocent.  And then if we are able

21   to do an investigation and determine that that's true, we

22   file to seek their freedom.

23   **Q.**   Does -- the Ohio Innocence Project or its clients paying

24   clients?

25   **A.**   No.

GODSEY - DIRECT (Owens)                                    1248

1    **Q.**    So is the Ohio Innocence Project a nonprofit?

2    **A.**    Yes.

3    **Q.**    Does that mean you have to fundraise?

4    **A.**    Yes, um-hmm.  Unfortunately.

5    **Q.**    And do you have a board of directors?

6    **A.**    Yeah.  We have an advisory board of people who help in

7    fundraising.  So it's a lot of people who are former CEOs of

8    companies or general counsel of Kroger's and places like

9    that.  A lot of nonprofits or charities will have these

10   boards.

11   **Q.**    Okay.  Is anybody in this room on your advisory board?

12   **A.**    Yeah, Dean's on the board.  He's one of two exonerees

13   that are on the board.

14   **Q.**    And so what does he do in that capacity?

15   **A.**    Well, we have frequent meetings.  We have meetings of

16   the full board maybe every couple of months, and there are

17   subcommittees on fundraising or marketing or public

18   awareness, all sorts of different things.

19          And so Dean has a variety of responsibilities in terms

20   of the general board work, but he's also sort of become the,

21   I would guess, leader of the exonerees in terms of when

22   somebody needs something, they know to trust Dean, and he's

23   looking out for everybody.  And he will call up and say this

24   person's struggling.  Can we find a donor who can help this

25   person, you know, that kind of thing.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

GODSEY - DIRECT (Owens)                                    1249

1          So he's helped fundraise.  He's done tons and tons of

2     public speaking.  But he's also sort of become this sort of

3     unofficial liaison between the board and the exonoree

4     community.

5     **Q.**  And, now, you mentioned something about an exonoree

6     community.  At the Ohio Innocence Project, is -- have there --

7     have you been successful in getting other -- getting folks out

8     of prison?

9     **A.**  Yeah.  The number's 37 now.  And we won another case

10    yesterday.  The person's not released yet, but it's an

11    ongoing process.

12    **Q.**  And so just -- can you just explain a little bit about

13    how the intake process works at the Ohio Innocence Project?

14              MR. McLANDRICH:  Objection, Your Honor.

15              THE COURT:  Overruled.

16              THE WITNESS:  So somebody has to -- somebody, one of

17    the inmates, somebody who's been convicted writes to us and

18    says they want us to look into their case.  And so we have a

19    questionnaire.  I don't know.  It's like 20, 25 pages that we

20    send to them after we get a letter, asking them to fill it

21    out, which has all the details and why they are claiming they

22    are innocent.

23          And then some of the cases are cut right off the bat.

24    Like, they will admit that they are guilty or something, even

25    in the application, or they are from Pennsylvania and not in

GODSEY - DIRECT (Owens)                                    1250

1    Ohio.

2         But then assuming it's not cut for an obvious reason like

3    that, it gets farmed out to a group of students who are

4    working under the supervision of a professor who start an

5    investigation.

6         Since we started in 2003, we've reviewed over 12,000

7    files, and we are extremely picky.  So we've only, like, gone

8    to court, out of 12,000, and said we think this person is

9    innocent, about 40 times.

10   BY MR. OWENS:

11   **Q.**   And why is it important -- strike that.

12        MR. OWENS:  Sorry, Your Honor.  May I withdraw the

13   question?

14        THE COURT:  You may.

15   BY MR. OWENS:

16   **Q.**   Is it important for you, as you say, to be extremely

17   picky in terms of the clients that the Ohio Innocence Project

18   represents?

19   **A.**   Yeah.  I mean, for a couple reasons.  First of all, we

20   have absolutely no interest in getting somebody who's guilty

21   out of prison.

22        Secondly, if I get somebody who's out -- out of prison

23   and they go commit a crime, my ability to fundraise is shot.

24   So we're looking at the person, we're looking at the case,

25   and we're being very selective.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1        We've had cases where I could win it, but then we end

2    up catching the guy in a lie or something.  So we drop the

3    case.  Or we find out some evidence later that contradicts

4    what he was saying, that he's probably guilty.  We drop the

5    case even though we are at the point where if we went

6    forward we could probably win it.

7    **Q.**   Got it.  Let's sort of focus back at the time that the

8    Ohio Innocence Project was starting.  I think you said that

9    was around -- when did you begin starting that?

10   **A.**   Well, I guess the official launch was May of 2003.  But

11   in December of 2002 -- so the way it works in academia is I

12   knew all the way in the early fall of 2002 that I was

13   leaving and starting at UC the next year.  So I knew I was

14   like a lame duck in my second year at NKU.  I knew I was

15   going to be gone.

16        And we had a fundraiser to start the Innocence Project,

17   the Ohio Innocence Project, December of 20 -- excuse me --

18   December of 2002.  And I started getting things formed and

19   getting it set up through that spring, but we didn't

20   officially launch till May of 2003.

21   **Q.**   Now, you are starting this sort of nonprofit.  Why did

22   you sort of go into this work?  You were just a federal

23   prosecutor.  How did you sort of, I don't know, jump the

24   aisle, for lack of a better phrase?

25   **A.**   Actually, I think the work's very similar to being a

1    prosecutor.  But in any event, the -- at NKU they had an

2    Innocence Project, and I was not hired to run it.  I was

3    hired to just teach classes and write articles and do

4    research like professors do.

5         And there was an Innocence Project there, and the

6    professor who was running it was on sabbatical that year.

7    So I literally show up for my first day, and the dean's

8    like, you have got all this criminal investigation

9    background.  You are going to run this Innocence Project.

10        And as a prosecutor, I was not happy with being told

11   that.  And I didn't think innocent people were in prison,

12   but I am, you know, untenured, I am new.  Boss on your first

13   day, you can't say no.

14        And so I had to supervise this Innocence Project, and

15   at the first meeting there were these students talking about

16   this guy who they visited in prison and they were convinced

17   he was innocent.  And I am sitting there, like, just

18   thinking these bleeding-heart students, these students are

19   so naive.  And then DNA testing in that case ended up

20   proving him innocent.  So it was a huge, like, eye-opening

21   experience where I questioned myself.

22        You know, then I went to the national conference where

23   I met exonerees, people who had been wrongfully convicted

24   from all over the country, and I realized that, you know, we

25   can do better.

GODSEY - DIRECT (Owens)                                    1253

1    **Q.**   So when did -- was -- sorry.  When did the name Dean

2    Gillispie come across your plate?

3    **A.**   So I was -- hadn't even moved on to UC yet.  I was

4    still at Chase.  And the newspaper article had been in

5    December of 20 -- excuse me -- December 2002 that we were

6    starting one.  And if my memory serves me right, Dean's mom

7    tracked me down after seeing that newspaper article and

8    said, "I need to talk to you.  Can I come down and bring a

9    box.  You know, we've been yelling and screaming and trying

10   to get anybody to listen.  Will you meet with me."

11   **Q.**   Okay.  And so did you ultimately decide to take on

12   Mr. Gillispie's representation?

13   **A.**   Ultimately.  I mean, yeah.  It was a process, but,

14   sure.

15   **Q.**   Can you just briefly summarize that process?

16   **A.**   Well, I mean, you know, so things are slow or it's

17   taking a while to build the project to get it started.

18   We're also getting inquiries from other people through 2002,

19   and then really the floodgates opened in early 2003 when we

20   opened the Innocence Project.

21       But it's a matter of taking the case, seeing what's

22   there already, going back and reading the trial transcripts,

23   trying to get the police reports, doing your due diligence

24   to get as much information as you can about the case.  And,

25   you know, many cases -- a lot of the cases fall off pretty

GODSEY - DIRECT (Owens)                                    1254

```
1    early in that process.  There's overwhelming evidence of

2    guilt or, you know, other things like that.

3         And it's sort of like I describe it as these files on

4    an assembly line, and they're just moving along, and these

5    things are swinging and knocking them off.  But a very small

6    percentage stay on there, and they never get knocked off,

7    and after a while you are just like, man, every turn this

8    case keeps looking like it was a problem, and his was one of

9    those cases.

10   Q.   Got it.  And when you say "his was one of those cases,"

11   were you referring to Dean Gillispie?

12   A.   Yeah, um-hmm.

13   Q.   And so as part of, I think what you said, your due

14   diligence, you looked into the files that were available to

15   you?

16   A.   Yeah.

17   Q.   And as it relates to this particular case and deciding to

18   take Mr. Gillispie's representation on, did you get a copy of

19   the trial transcripts?

20   A.   Yes.

21   Q.   And did you read them?

22   A.   Yes.

23   Q.   And were there things from your perspective that stood

24   out to you as red flags about this investigation for why you'd

25   take the case?
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    **A.**   It wasn't just the transcripts.  It was the transcripts

2    and it was the police reports.  It was exhibits.  It was

3    things like the photo spread.  I had never seen a photo

4    spread like that --

5            MR. McLANDRICH:  Objection.

6            THE COURT:  Sustained.  It's not part of the

7    question.

8            THE WITNESS:  Sure.  You are asking me just about

9    the transcripts?

10   BY MR. OWENS:

11   **Q.**   Sure.

12   **A.**   From the transcripts, what stood out was the physical

13   discrepancies.

14           THE COURT:  Counsel, what was your original

15   question?  Your original question was what?

16           MR. OWENS:  As part of your due diligence, when you

17   received the trial transcripts, what were things that stood

18   out to you that led you to continue to investigate?

19           THE COURT:  Overruled.

20       You can answer.

21           THE WITNESS:  From the transcripts, it was a couple

22   things:  The physical discrepancies between the description

23   of -- the victims had given and Dean Gillispie, and also what

24   really piqued my interest was a part of the transcripts where

25   Detective Moore had told the victims that Dean had died his

GODSEY - DIRECT (Owens)                                        1256

1   hair and, you know, sort of not to be alarmed if he doesn't

2   look like the guy.  I had never, ever seen anything like that.

3   BY MR. OWENS:

4   **Q.**   Were there other things from the police reports or other

5   documents that stood out to you when you were determining

6   whether to take the case?

7   **A.**   Photo spread was a huge --

8          MR. McLANDRICH:  Objection.

9          THE COURT:  Overruled.

10         THE WITNESS:  Photo spread was very problematic.  It

11  was the worse photo spread I have seen in --

12         MR. McLANDRICH:  Objection.

13         THE COURT:  Sustained.

14      Wait a minute.  It will be stricken.  You are asking him

15  questions.

16      Professor, you are going beyond the question.

17         THE WITNESS:  I will focus on trying to just answer.

18  BY MR. OWENS:

19  **Q.**   Okay.

20  **A.**   So what was the question again?

21  **Q.**   So the question is, what were red flags that you saw as

22  when you received the police documentation in the case that

23  made you want to continue investigating?

24  **A.**   So the photo spread.  The second thing was Detective

25  Moore's notes, his reports.  Usually, you see somebody going

GODSEY - DIRECT (Owens)                                    1257

```
 1    through an investigation and not making up their mind,

 2    trying to keep an open mind.

 3            MR. McLANDRICH:  Objection, Your Honor.

 4            THE COURT:  Again, we're moving -- we're moving

 5    beyond your question.

 6            THE WITNESS:  So the photo spread and Detective

 7    Moore's police reports.

 8    BY MR. OWENS:

 9    Q.   Got it.

10            THE COURT:  Next question.

11            MR. OWENS:  Your Honor, can I show the witness

12    what's been marked as PX 104?  This has been previously shown

13    and extensively discussed.

14            THE COURT:  You may.

15        (Exhibit displayed.)

16    BY MR. OWENS:

17    Q.   And this is a 20-page document.  I, of course, am not

18    going to ask you to read the whole thing.  But just a moment

19    ago when you testified, you said that Detective Moore's notes.

20    Are these -- is this a document that you reviewed?

21    A.   Yeah.

22    Q.   And is this the -- these were the notes in which you

23    indicated there were some red flags about the nature of the --

24    excuse me -- the nature of the investigation?

25    A.   Yes.
```

GODSEY - DIRECT (Owens)                                    1258

1    **Q.**   Okay.  So after you read some, you know -- sorry.

2              THE COURT:  Are you done with that?

3              MR. OWENS:  I was telling -- yes, sir.

4    BY MR. OWENS:

5    **Q.**   After you read some initial documents as it relates to

6    the case, what do you do after -- what did you do in the

7    investigation with respect to Mr. Gillispie as part of your

8    Ohio -- representing him at the Ohio Innocence Project?

9    **A.**   So there were numerous avenues.  So I would call them

10   branches.  And the branches continued because what usually

11   happens is you start down some branches and they don't bear

12   fruit.  So you catch the person writing to you in a lie or

13   you find evidence that they are guilty, and you keep going

14   if the red flags keep happening, and this is a case where

15   the red flags kept happening at every turn.

16        So one branch that we spent a lot of time on in the

17   early years -- we investigated the case for five years

18   before filing.  But the early part was very depth

19   investigation into a man named Kevin Cobb.

20        We also did an investigation --

21   **Q.**   Can I stop you right there?

22   **A.**   Yeah.

23   **Q.**   Just two things.  First, you just mentioned a moment ago

24   that you did an investigation for roughly five years before

25   filing?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1   A.   Yes.

2   Q.   What do you mean when you say "before filing"?

3   A.   Before -- we wanted to be absolutely thorough, and

4   we're not going to go to court unless we've built a

5   credible, solid case that we believe in.  And it took five

6   years of crossing every "t" and dotting every "i" and

7   looking to see how many red flags keep showing and where

8   these avenues going.

9        And then, ultimately, it's like here's where we are.

10  We have run it down.  We have turned over every stone, and

11  we are ready to go to court and say this man's conviction

12  needs to be overturned.  He needs to be free.

13  Q.   One of the things -- and we are not going to talk about

14  all of the things that you investigated over that five-year

15  period.  So I am going to try to focus you a little bit.

16       Okay.  One of the things that you investigated was an

17  individual named Kevin Cobb; is that correct?

18  A.   Yes.

19  Q.   And what was the investigation with respect to Kevin

20  Cobb?

21  A.   A lot of different things.  So I don't know what I can

22  say or not say, but one thing we did was get his rap sheet,

23  his criminal history, and went and talked to people who he

24  had committed crimes against.

25            MR. McLANDRICH:  Objection.

GODSEY - DIRECT (Owens)                              1260

```
 1            THE COURT:  Overruled.
 2   BY MR. OWENS:
 3   Q.   So let's start out, you got his rap sheet.  What's a rap
 4   sheet?
 5   A.   That lists somebody's criminal history.
 6   Q.   And the rap sheet that you were given, did that have a
 7   criminal history for Mr. Cobb?
 8   A.   Yes.
 9   Q.   Were there any things that, in your impression to
10   determine the next steps in your investigation, that stood out
11   worth investigating as it relates to Mr. Cobb's criminal
12   history?
13   A.   Yeah.  Both that and simultaneously we had gotten his
14   high school yearbook, and we were talking to people who had
15   gone to high school with him.
16   Q.   Let's just start -- let's just start with the rap sheet.
17   A.   With the rap sheet, we got police files, and we found
18   instances of flashing a badge and pretending to be a police
19   officer.  Sort of brazen abductions in broad daylight.
20   Photos that looked very much like the perpetrator --
21            MR. McLANDRICH:  Objection.
22            THE COURT:  Overruled.
23            THE WITNESS:  Photos of Cobb that looked very much
24   like the way that the victims had described the perpetrator in
25   this case.  And so it became a matter of a full-on
```

GODSEY - DIRECT (Owens)                                      1261

1    investigation, trying to track down every single crime victim,

2    trying to track down people that knew Kevin Cobb in high

3    school.  And I actually even talked to Kevin Cobb myself.

4    BY MR. OWENS:

5    **Q.**   Got it.  And so let's just stick to the rap sheet.  We

6    will get to those other parts.

7    **A.**   Okay.

8    **Q.**   So the -- so you mentioned that there were some criminal

9    allegations against him, and that's just the documentation you

10   were provided, right?

11              THE COURT:  Counsel approach.

12        (At sidebar.)

13              THE COURT:  I let you into his rap sheet, but we're

14   not going to -- I'm not going to listen to a bunch of like and

15   similar situations in which he investigated.

16              MR. OWENS:  Okay.

17              THE COURT:  We're not going to try three or four

18   rape cases or something like that.

19              MR. OWENS:  He was going to say that there was

20   another rape allegation.  I guess it would be --

21              THE COURT:  He's already said what in his rap sheet

22   brought attention that made him pursue.

23              MR. OWENS:  Sure.  Okay.

24              THE COURT:  So I don't know why we need to go into

25   anymore specifics.

1          MR. OWENS:  That's fine.  I had just intended to

2    follow up, and I am trying to keep him narrow to my question,

3    which is just he is on the rap sheet.  So I was going to ask

4    him about the people he talked to next.

5          THE COURT:  I mean, like I say, who he talked to,

6    but we are not going to talk about what they said or anything

7    like that.

8          MR. OWENS:  I guess -- so this is David Owens also,

9    for the record.  I guess, you know, it's our position, you

10   know, that that's continued the course of the investigation.

11   Like if they said I have never met this person or, you know,

12   or things that he was a great guy, that that impacts what he

13   ultimately submitted to the court of common pleas.  That's

14   where this is going, is what ends up being part of the end

15   result that you submitted to the court.

16         MR. McLANDRICH:  What's relevant is that he did an

17   investigation, that he prepared pleadings, that he submitted

18   them to the court.  The result it obtained.  The habeas was

19   granted.  That state court granted a new trial based on

20   alternate suspect.  But the rest of this opinion evidence is

21   not appropriate, or this character evidence that tries to show

22   that in his mind Cobb acted in conformity with his prior

23   character and conduct to commit the crime that Mr. Gillispie's

24   alleged to have committed is improper, in my view.

25         MS. FRICK:  No.  I would just agree with John.

1              MR. OWENS:  So I guess, Your Honor, I am not trying

2       to offer this as general, like, opinion evidence with respect

3       to that.  However, I do think, given particularly the defense

4       of this case, which is challenge the veracity of this

5       investigation that led to Mr. Gillispie's conviction being

6       overturned, that's why I think it's necessary to have a

7       thorough accounting of it.

8           By contrast, if there was no dispute about

9       Mr. Gillispie's innocence, if there was no dispute about the,

10      you know, the valid -- whether or not the basis for which his

11      conviction was overturned was valid, then I think I could see

12      a little bit of that.  But because they've challenged that

13      directly and indirectly, then I think that we have got to put

14      in so the jury doesn't think, for example, that his conviction

15      was turned over on some kind of shaky basis.  And I know we're

16      not going to get into the Court's reasoning.

17              THE COURT:  No, we are not going to get into the

18      Court's reasoning.  Plus --

19              MR. McLANDRICH:  The only thing that I've challenged

20      is questioned whether, in fact, Mr. Bailey created a report

21      and, more importantly, whether Mr. Moore ever had it and

22      destroyed it.  And the habeas is the habeas.  That's, you

23      know, that's --

24              THE COURT:  I think where we're at is I think I have

25      given flexibility.  I have allowed him to go through what he

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

GODSEY - DIRECT (Owens)                                    1264

1    did.  I have -- I guess I would allow him to say he continued

2    an investigation and talked to people, and based upon all of

3    this stuff that he did, not the guts of all that, what he did,

4    then he went ahead and filed.  This was the result of it.  And

5    that's the way it is.

6              MR. OWENS:  I'll try to -- so if the Court will

7    allow me to lead a little bit so I can try to avoid some

8    pitfalls, that's what I am doing, just -- and I'll try to be a

9    bit more summary.  Is that okay with the Court?  I don't want

10   to open up the door into an area you don't want me to go into.

11   But, I mean --

12             THE COURT:  Well, we are kind of close to that.

13             MR. OWENS:  I understand.  Okay.

14             THE COURT:  Well, I can tell you I'll give you a

15   little bit of flexibility, I guess, with regard to leading.

16       Counsel, you still can still object if you feel it

17   gets --

18             MR. McLANDRICH:  Yeah, if it gets out of place.

19             THE COURT:  If it gets out of hand.

20             MR. OWENS:  Just so you know where I am coming from.

21             MR. McLANDRICH:  I understand what you are saying,

22   and conceptually, a little bit of that is fine as long as

23   you're not, you know, doing the testifying for him.

24             MR. OWENS:  For sure I am not.

25             THE COURT:  I am kind of dividing the baby here, if

 1    he has --

 2            MR. OWENS:  Understood.  Thank you, Judge.

 3        (In open court.)

 4            THE COURT:  We're back on the record.

 5        Counsel.

 6            MR. OWENS:  Yes, Your Honor.

 7    BY MR. OWENS:

 8    **Q.**   Now, Mr. Godsey, we talked about a number of sort of

 9    documents that you reviewed related to Mr. Cobb's rap sheet

10    and stuff like that.  Did you -- you mentioned that you talked

11    to some folks too, correct?

12    **A.**   Yes.

13    **Q.**   And as part of your --

14            THE COURT:  I'm sorry.  Did you say "yes"?

15            THE WITNESS:  Yes.

16    BY MR. OWENS:

17    **Q.**   As part of your investigation into Kevin Cobb, who did

18    you speak to about him?

19    **A.**   Ex-girlfriends who had been -- filed domestic

20    violence --

21            MR. McLANDRICH:  Objection.

22            THE COURT:  Overruled.

23        Again, I think, Professor, the questions are -- the

24    question is who did you speak to, not why did you speak to

25    them or what.

GODSEY - DIRECT (Owens)                                    1266

1              THE WITNESS:  Ex-girlfriends, people who had --

2              THE COURT:  Okay.  That's good.

3    BY MR. OWENS:

4    **Q.**   Did you speak to Mr. Cobb's parents?

5    **A.**   I did not personally.

6    **Q.**   Did someone from your team speak with them?

7    **A.**   I believe Fritz had spoken prior to us getting

8    involved.  I'm trying to remember.  I don't know if we did

9    or not.

10   **Q.**   I was going to get to this in a minute.  Does the name

11   Emily Jo Cobb sound familiar?

12   **A.**   Yeah, I think that is Kevin Cobb's mom.

13   **Q.**   Did you speak to Mr. Cobb himself?

14   **A.**   Yes.

15   **Q.**   Now, as a result of the documents that you reviewed and

16   speaking with individuals, including Mr. Cobb himself, did you

17   move forward with making a claim to the court about Mr. Cobb

18   as an alternative suspect?

19   **A.**   Yes.  I want to add one thing that I -- when you said

20   who did you talk to from the rap sheet, I said ex-

21   girlfriends.  It was also just other people who had been

22   crime victims that weren't ex-girlfriends.

23             MR. McLANDRICH:  Objection.

24   BY MR. OWENS:

25   **Q.**   So there were other --

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
 1              THE COURT:  I'll allow -- overruled.  I will allow

 2    that to stand.

 3         Go forward.  Next question.

 4              MR. OWENS:  Yes, Your Honor.

 5    BY MR. OWENS:

 6    Q.   As part of your investigation into Kevin Cobb, did you

 7    obtain pictures of him?

 8    A.   Yes.

 9    Q.   As part of your investigation into Kevin Cobb, did you

10    obtain the original composite with the glasses from the case?

11    A.   Yes.

12    Q.   And as a result of your investigation, did you submit

13    something to the court that compared those things?

14    A.   Yes, I did.  We created an exhibit.

15              MR. OWENS:  And, Your Honor, if I can, I'd like to

16    show PX 54 at 72, which was previously shown to the jury.

17              MR. McLANDRICH:  No objection.

18              THE COURT:  No objection?

19              MR. McLANDRICH:  Not to this one.

20              THE COURT:  No objection?

21              MS. FRICK:  No, Your Honor.

22              THE COURT:  It may.

23         And the reason I'm asking about that, counsel, is we have

24    got a new witness on the stand.  There could be some, I guess,

25    some objection at this point.
```

GODSEY - DIRECT (Owens)                                    1268

```
1           (Exhibit displayed.)

2    BY MR. OWENS:

3    Q.    All right.  Mr. Godsey, who is the individual in this

4    picture?

5    A.    It's Kevin Cobb.

6    Q.    And do you recall where this picture is from?

7    A.    One of the police files for one of his cases.

8    Q.    And we will just move along.  We won't roll through a

9    bunch of these, but did you obtain multiple pictures of Kevin

10   Cobb?

11   A.    Yeah, we tried to get the police files for all his

12   cases.

13   Q.    Did you ever get his personnel file at the correctional

14   institution that he worked at?

15   A.    I believe so.  That was -- yeah.

16   Q.    All right.  And then so --

17           MR. OWENS:  You can take that down.  Thank you.

18   BY MR. OWENS:

19   Q.    And so, Mr. Godsey, you mentioned that you use that, that

20   image -- or you used an image and then created an exhibit with

21   the composite; is that right?

22   A.    Correct.

23   Q.    And can you just sort of describe what that exhibit was?

24   A.    We took the composite sketch and sliced it in half so

25   it was the right side of the face, and then we took the
```

GODSEY - DIRECT (Owens)                                    1269

1    picture of Kevin Cobb from the same era and sliced it in

2    half so it showed his left side, and put them together.

3           MR. OWENS:  And just to be clear, can I show PX 247?

4    This is the composite that's been previously shown.

5           THE COURT:  I assume there is no objection?

6           MR. McLANDRICH:  No objection.

7           THE COURT:  All right.

8       (Exhibit displayed.)

9    BY MR. OWENS:

10   **Q.**   Okay.  So as far as I understand it, you juxtaposed this

11   composite with an image of Kevin Cobb; is that correct?

12   **A.**   Right.

13   **Q.**   And was there anything else contained on the exhibit?

14   **A.**   We put on the side that had Kevin Cobb's face different

15   things from our investigation that matched the way that the

16   perpetrator committed the crime or things he said.  And on

17   the side with the composite sketch, we put facts from the

18   rapists so you could go across and see how it just matches

19   up.

20   **Q.**   And is that something that you ultimately submitted to

21   the Court?

22   **A.**   Yes.

23          MR. OWENS:  Your Honor, I'd like to publish Exhibit

24   PX 21.

25          MR. McLANDRICH:  Objection.

GODSEY - DIRECT (Owens)                                      1270

1           THE COURT:  I have no idea what it is.

2           MR. McLANDRICH:  Can we approach, Your Honor?

3           THE COURT:  You can.

4       (At sidebar.)

5           THE COURT:  On the record.

6           MR. McLANDRICH:  Yes.  John McLandrich, Your Honor.

7   I object to this exhibit.  You know, the photos have obviously

8   been manipulated to create this black-and-white of Cobb to

9   make him look like the composite; plus, the dialog on the

10  report or the document, rather, contains a number of things

11  that aren't, I mean based on our previous dialog, admissible

12  into evidence, shouldn't be shown to the jury.  And,

13  notwithstanding, he's already testified to essentially the

14  content of it.

15      The jury can decide for itself how much Mr. Cobb looks

16  like the composite without this demonstrative or whatever

17  characterization you want to give it.

18          MS. FRICK:  This is Dawn Frick.  I don't have

19  anything further other than I am not even sure there is a

20  foundation for all the comments on the side because we don't

21  know where they came from.  But because the Court said we

22  shouldn't hear everything, that all the conversations he

23  has --

24          MR. OWENS:  Your Honor, this is David Owens on

25  behalf of Dean Gillispie.  I've got three general responses.

GODSEY - DIRECT (Owens)                                    1271

1    The first is that I think that the witness has laid the

2    foundation for this, and any cross-examination about the

3    differences between the pictures is something for

4    cross-examination.

5         The second, as I indicated in setting up the foundation

6    with respect to this exhibit, is that this is part of what was

7    submitted to the Court.

8              THE COURT:  And the Court made a decision.

9              MR. OWENS:  It did.  And here's the third, the third

10   issue that I have.  I am trying to move along quickly.  So --

11   and part of the Township's objection here is that, you know,

12   some of the things here they are saying there is not an

13   adequate foundation with.  I didn't ask, for example,

14   Mr. Godsey about his conversation with Kevin Cobb where

15   Mr. Godsey would testify, based upon his discussion with him,

16   "I talked to Kevin Cobb.  It's a super authoritative voice.

17   It's very distinctive."  I didn't do that because I didn't

18   think they would let me.  For example, this is here for a 404

19   exclusively.  There was an affidavit from a woman named

20   Stephanie Walters, who under oath in that affidavit said that

21   she was sexually assaulted by Mr. Cobb and that he had a

22   fetish for oral sex.  I was trying to move beyond that to

23   simply say, you know -- provide this.  This is what was

24   provided to the Court.  It's not being offered obviously for

25   the truth of the matter asserted in that sentence.  So I don't

GODSEY - DIRECT (Owens)                                    1272

1    think there is any prejudice.

2              MR. McLANDRICH:  Those statements would be at a --

3    John McLandrich.  Those statements, at a minimum, would be

4    double hearsay.

5              THE COURT:  All right.  I'm sustaining the

6    objection.

7              MR. OWENS:  Sure.  Your Honor?

8              THE COURT:  Sure.

9              MR. OWENS:  What would you feel about the

10   juxtaposition without the commentary on the side of the images

11   that were already shown?

12             MR. McLANDRICH:  Your Honor, I don't know how that

13   was manipulated to make it look like a sliced face.  And,

14   again, I think we've got the picture of Kevin Cobb.  We've got

15   the description and the picture, the composite.  The jury can

16   form its own impression from those documents with respect to

17   how much Kevin Cobb looks like the composite.

18             THE COURT:  I think, Counsel, I've let you display

19   his picture.  I've let you display Cobb's picture.

20             MR. OWENS:  Sure.

21             THE COURT:  I've let you display the whatever you

22   call that, that mock-up.

23             MR. OWENS:  Sure.

24             THE COURT:  I've allowed you to explain what you

25   did.  I've allowed you to explain what you presented to the

GODSEY - DIRECT (Owens)                                    1273

1    Court.

2              MR. OWENS:  Sure.

3              THE COURT:  We are not going into the specifics of

4    all this.  So I am sustaining it with regard to the whole

5    document, including (indicating).

6              MR. OWENS:  Thank you.

7         (In open court.)

8              THE COURT:  Counsel.

9              MR. OWENS:  Thank you, Judge.

10   BY MR. OWENS:

11   **Q.**   Now, Mr. Godsey, you mentioned that there was an exhibit

12   that was created that was a juxtaposition of the picture in

13   the composite; is that right.

14   **A.**   Correct.

15   **Q.**   Whose idea was it to juxtapose those like that?

16   **A.**   I believe -- well, my co-counsel was Jim Petro, and I

17   believe it was Nancy Petro, his wife.

18   **Q.**   Okay.  So just summary fashion, you submitted this

19   evidence about Kevin -- I apologize.  You submitted this

20   evidence about Kevin Cobb to the Court, correct?

21   **A.**   Yes, we submitted live witnesses.  We submitted -- it

22   was like a trial.

23   **Q.**   Okay.  And the -- in the history that you've had in

24   the working at the Ohio Innocence Project, have you submitted

25   any other claims seeking post-conviction relief just based

GODSEY - DIRECT (Owens)                                    1274

1    upon the existence of an alternative suspect?

2    **A.**   Of like a Rule 33 motion?

3    **Q.**   Well, I don't know the numbers, and I don't want you to

4    talk about the law so --

5    **A.**   I don't think so.

6    **Q.**   Okay.  In your estimation and practice, are those types

7    of motions common or rare?

8    **A.**   Rare.

9    **Q.**   So let's move, as I said, to -- we're not going to talk

10   about your entire investigation, but I want to turn to another

11   aspect of that investigation, which is the -- relates to Fritz

12   and Bailey reports.  Does that sounds familiar?

13   **A.**   Yeah, um-hmm.

14   **Q.**   Okay.  Now, before we get too far down that road, I want

15   to just -- if you can help us understand some of the terms

16   that we've been using.

17        When you're doing post-conviction litigation, how do you

18   submit evidence to the court before you have your little

19   trial?

20   **A.**   Well, you have to put things in sworn testimony form of

21   an affidavit, and the Court has to look at that first to

22   decide whether you get a hearing/trial.

23   **Q.**   And just generally in colloquial terms, what's an

24   affidavit?

25   **A.**   It's like a statement of what the person's testimony

GODSEY - DIRECT (Owens)                                    1275

1   is, what they saw, what happened.  It's not question and

2   answer like a trial, but it's just this is what I know, and

3   then they sign it with a notary public, swear to it.

4   **Q.**   Got it.  So I think you mentioned this.  It's under oath?

5   **A.**   Yes.

6   **Q.**   And do attorneys prepare these or is it lay witnesses or

7   both?

8   **A.**   In my practice, both as a prosecutor and now, I will

9   interview the witness, then I will try to type up, often

10  taking notes on my computer as they are talking.  And then I

11  will give it to them and say "Go over this, change anything

12  you want, make sure it's accurate."  And sometimes they will

13  be like, well, that's not exactly what I meant and blah,

14  blah, blah, blah, blah.  And so you perfect it together.

15  **Q.**   So is it common for both as a prosecutor and as a defense

16  attorney or just an attorney in the world to submit affidavits

17  of sworn statements to the courts?

18  **A.**   Yeah, um-hmm.

19  **Q.**   And, now, when you submit an affidavit to the court, do

20  you have an obligation that you believe that you have before

21  submitting it to the Court?

22  **A.**   Yeah.  I mean, I can't submit false testimony or

23  information that I know or believe is false.

24           MR. OWENS:  So I want to, Your Honor, show what's

25  been previously marked -- and I don't think that this has been

GODSEY - DIRECT (Owens)                                    1276

1    shown -- is PX 79, which is the 11-14-2007 affidavit from Gary

2    Bailey.

3              MR. McLANDRICH:  Objection.

4              MS. FRICK:  Objection.

5              MR. OWENS:  Yes, Your Honor.  May I respond?

6              THE COURT:  Yes.

7              MR. OWENS:  So there is three things.  The first is

8    that I just want to have Mr. Godsey explain sort of the

9    mechanics of what an affidavit is, how it looks, where the

10   content comes from, things like that, which is what I sort of

11   thought there wouldn't be an objection about.  And --

12             THE COURT:  It seems like to me the objection is to

13   display the affidavit.

14             MR. OWENS:  Sure.  I mean, and the second thing --

15             THE COURT:  That's an affidavit of another

16   individual, right?

17             MR. OWENS:  Correct, Your Honor.  And I think that

18   the only instruction, which was the second thing, is that the

19   jury should be instructed that it's not being offered or shown

20   for the truth of the matter asserted in the affidavit itself.

21             THE COURT:  Well, I am going to sustain the

22   objection as to any display of that.  If you want to talk to

23   this witness about how he performs or does an affidavit or

24   what's part of an affidavit, that's fine.  Well, I'll allow

25   that.

1            MR. OWENS:  Sure.  I could use a different one.  I

2    don't care.  Would you have any objection to the Macy

3    affidavit?

4            MR. McLANDRICH:  I think he can talk about what an

5    affidavit is without them seeing it.

6            THE COURT:  I just said that.

7            MR. McLANDRICH:  I'm sorry.

8            THE COURT:  I just said that.

9            MR. OWENS:  All right, Judge.

10   BY MR. OWENS:

11   **Q.**   So just a little bit more without any pictures.  And let

12   me sort of breeze through this quickly, which is, you have

13   potential witnesses in the case, and then what do you do

14   before something ultimately ends up as an affidavit?  How does

15   that process go?

16   **A.**   You create an affidavit, that's, you talk to them.  And

17   usually I am sitting there taking notes on my laptop.  And

18   if you let a witness just sit there and take notes, they

19   don't know what's relevant or not, so they will just drone

20   on and on with all kinds of irrelevant stuff.  And you are

21   not supposed to talk to them about this is what we're

22   finding.  So this is what's relevant or what's not.

23        So you just take down the notes and then end up

24   deleting the things that aren't relevant, or putting them in

25   paragraphs, trying to put them in a logical order so you can

1    understand.  And then you go, hey, will you review this,

2    read it carefully, what's wrong.  And they will say, well,

3    this is not exactly what I meant.  And so we'll say change

4    that how you want it.  And it's a back-and-forth process.

5        It's basically typing up notes of what they've said and

6    trying to put it in a way that makes sense.

7    Q.   Got it.  And do lay witnesses you are interviewing, do

8    they know the things necessarily that might be important for

9    you to put in an affidavit for your legal claims?

10   A.   No.

11   Q.   So, for example, is it sometimes common for you to put --

12   to exclude things that they might have told you that they

13   think are relevant?

14   A.   Right.  I'm not going to waste the judge's time.  So I

15   am just going to put in the parts that are relevant to the

16   case.

17   Q.   Got it.  And then sometimes are there things that people

18   might tell you that they don't know are relevant but you think

19   are for your legal claim?

20   A.   Yes, exactly.

21   Q.   So you mentioned this, and we talked about when you

22   filed.  Do you remember saying that earlier?

23   A.   Yeah, um-hmm.

24   Q.   And do you remember ultimately a rough time when you

25   filed the post-conviction petition for Dean Gillispie?

GODSEY - DIRECT (Owens)                                    1279

1    **A.**    February of 2008.

2    **Q.**    Okay.  Were there any affidavits support -- offered in

3    support of that post-conviction petition?

4    **A.**    Affidavit from Detective Fritz, from Gary Bailey, and

5    from Dennis Lieberman.

6    **Q.**    And --

7    **A.**    I believe there were others, as well.

8    **Q.**    You are right on cue.

9           Were there -- do you recall whether or not there was more

10   than one affidavit from Steve Fritz?

11   **A.**    Yeah.  Yeah, yes, there was.

12   **Q.**    Okay.  And did the first affidavit from Steve Fritz, did

13   that include mention that Mr. Gillispie had been excluded as a

14   suspect?

15   **A.**    Yeah, I believe briefly it talked about Rick Wolfe had

16   come over and they excluded him.

17   **Q.**    And the information in that affidavit, is that stuff that

18   Mr. Fritz had told you?

19   **A.**    Yes.

20   **Q.**    And if you thought Fritz was lying, would you have

21   included it in an affidavit you submitted to the Court?

22   **A.**    No.

23   **Q.**    And do you remember roughly when that affidavit was

24   signed?

25   **A.**    February of 2007.  That's a rough guess.

GODSEY - DIRECT (Owens)                                    1280

1    **Q.**    No problem.  And do you remember when the second

2    affidavit that Mr. Fritz signed was submitted, roughly?

3    **A.**    There were three all in a row, boom, boom, boom.  It

4    was the second one from Fritz, one from Gary Bailey, and

5    Dennis Lieberman was late in 2007.  So November-December

6    time period.  So all within, you know, 15, 20 days,

7    something like that.

8    **Q.**    Okay.  And did the second affidavit from Fritz, did it

9    mention that Mr. Gillispie had been eliminated as a suspect?

10   **A.**    Yes.

11   **Q.**    Did it also discuss the fact that there were reports

12   documenting it?

13   **A.**    Right, exactly.  That's what prompted the flurry of

14   affidavits.

15   **Q.**    Can you please explain to us what you meant when you just

16   said that that "prompted the flurry of affidavits"?  What was

17   that conversation?

18   **A.**    Who, my conversation with Fritz?

19           THE COURT:  Well, wait a minute.  Who was the

20   conversation with?

21           MR. OWENS:  Sure.

22   BY MR. OWENS:

23   **Q.**    You mention that there was a conversation that you had

24   that prompted the flurry of affidavits, the one from Bailey --

25   **A.**    Um-hmm.

GODSEY - DIRECT (Owens)                                    1281

1   **Q.**   -- one from Lieberman, and a second one from Fritz; is

2   that right?

3   **A.**   Right.

4   **Q.**   Okay.  And the conversation you had was with Mr. Fritz?

5   **A.**   Also, I finally got Bailey on the phone.  So a couple

6   things happened simultaneously.

7   **Q.**   Okay.  And, now, when you say "simultaneously," were

8   Mr. Bailey and Mr. Fritz together when you spoke with them?

9   **A.**   No.

10  **Q.**   Okay.

11  **A.**   I had been trying to get ahold of Bailey for a long

12  time.

13  **Q.**   Got it.

14  **A.**   He was what you call a hostile witness.

15  **Q.**   Got it.  And what was the conversation that you had with

16  Mr. Fritz that led to this flurry of other affidavits?

17          MR. McLANDRICH:  Objection.

18          MS. FRICK:  Objection.

19          MR. OWENS:  May I respond, Your Honor?

20          THE COURT:  You may.

21          MR. OWENS:  And I have the pages -- pages from the

22  rough transcript yesterday, which is where --

23          MR. McLANDRICH:  Objection.

24          THE COURT:  Well, counsel, I think Detective Fritz

25  did testify, correct?  Or he testified yesterday, right?

GODSEY - DIRECT (Owens)                                    1282

1              MR. OWENS:  Correct, Your Honor.

2              THE COURT:  And we have his testimony.  The witness

3     is able to indicate that he did talk with Mr. Fritz.  If he

4     wants to indicate after reviewing or formulating or submitting

5     whatever, the affidavits, as part of whatever filing he made,

6     if his understanding of the difference between one affidavit

7     and the other, he can do that.

8              MR. OWENS:  Sure.

9              THE COURT:  If that's where you are going.  I don't

10    know where you are going.

11             MR. OWENS:  That's not where I am going, Your Honor.

12    Let me --

13             THE COURT:  We are not going to the testimony.  We

14    are not going to someone else's testimony.

15             MR. OWENS:  I wasn't trying to go to Mr. Fritz's

16    testimony.  I was going to say that the defense's questioning

17    yesterday of Mr. Fritz opened the door to this particular

18    conversation.  And I have copies if the Court probably wants

19    to discuss it at sidebar.

20             THE COURT:  All right.

21        (At sidebar.)

22             THE COURT:  All right, Counsel.

23             MR. OWENS:  Yes, Your Honor.  This is David Owens on

24    behalf of Dean Gillispie.  So yesterday Mr. Fritz testified

25    about this conversation that happened between Mr. Godsey and

1    himself where they came to realize that the reports in the

2    case had not been produced.  And Mr. McLandrich asked

3    specifically about this conversation that -- both before trial

4    and the time until 2007, some conversation with Mr. Godsey,

5    did you all of a sudden realize that there was a report that

6    was excluded.  Gillispie and had gone on and on, and then

7    Mr. Fritz goes on to describe that conversation, specifically

8    being put at issue about the nature of how there was a

9    discovery that the reports hadn't been turned over to the

10   defense.

11       So I think it's -- the hearsay exception would be for,

12   you know, rebutting an inference of prior fabrication, and I

13   think the door has been opened by the defense as to this.

14           MR. McLANDRICH:  Well, first off, it's my

15   understanding that rough transcripts can't be cited to the

16   Court.  But that aside, what I asked Mr. Fritz about was what

17   he said in his conduct.  I didn't ask him for what Mr. Godsey

18   said.  When Mr. Godsey talks about Mr. Fritz's statements to

19   him, that's clear hearsay.  I don't think there is a hearsay

20   exception that allows that to come in.

21           MR. OWENS:  I could rephrase it to make it clear

22   that I am asking him what he said of this conversation.

23   That's fine.

24           MR. McLANDRICH:  I mean, I think we all know that

25   Mr. Fritz -- strike that.  I think we all know that as a

GODSEY - DIRECT (Owens)                                    1284

1    result of the conversation, that's why the affidavit was

2    prepared.  He's already testified to that.  I think that's the

3    only pertinent part of it.  I don't think he gets to --

4           THE COURT:  I guess I am not sure what the relevance

5    is to go beyond.  Basically, what you have presented, and good

6    job, you presented that there were two affidavits, one that

7    brings the distinction about this, these reports never being

8    submitted.  I mean, it's already in there.

9           MR. OWENS:  I think -- but so for this particular

10   issue, Your Honor, I think it's really important that the jury

11   have an opportunity to assess the credibility of these

12   witnesses when they talk about the veracity of this moment.

13   Like, you know, and I'll just tell you they have called it a

14   "eureka" moment or "ah-ha" moment in the case, because I

15   didn't know I didn't have these things, I didn't know you

16   didn't have these things.

17      Because it's essentially the defense's position everybody

18   should have had those moments decades before.  And so he is

19   going to say I investigated this case for five years and I

20   didn't have that moment until this time.  And I think it's

21   absolutely essential that the jury not sort of be left in the

22   dark about that crucial --

23          THE COURT:  So what you are proposing is that you

24   are going to present here --

25          MR. OWENS:  So I would ask him the following:  Did

GODSEY - DIRECT (Owens)                                        1285

1    you have a conversation with Mr. Fritz at some point in 2007

2    in between these affidavits?  What did you say to him that led

3    to the second affidavit?  And I'll just say it like that.

4              THE COURT:  That's not hearsay.

5              MR. McLANDRICH:  Well, yeah.  So I kind of lost my

6    train of thought.

7              MS. FRICK:  Your Honor, this is Dawn Frick.  I would

8    just say to the extent John's already said it, but if he's

9    testifying about what he said, I have no problem with it.  But

10   I don't know how you do that and get to his next point without

11   getting into what Fritz said --

12             MR. OWENS:  -- isn't the effect on the listener

13   because he is going to say --

14             THE COURT:  Okay.  You are talking over each other

15   now.

16             MR. OWENS:  I apologize.

17             MR. McLANDRICH:  What I was going to say before my

18   mind went blank is that it's not appropriate for Mr. Godsey to

19   be testifying to the credibility of Mr. Fritz.  This is all

20   about the credibility of Mr. Fritz.  Mr. Fritz testified

21   yesterday.  The fact that Mr. Godsey had a conversation with

22   him where he relayed this information to Mr. Godsey doesn't

23   make Mr. Fritz more or less credible.

24        All we're going to have -- and, obviously, the import of

25   this I think you kind of indicated -- was that the effort is

1    to have Mr. Godsey vouch for the credibility of Mr. Fritz, and

2    that's inappropriate.

3              MR. OWENS:  I would agree that it would be

4    inappropriate for a witness to vouch for one another.  I am

5    talking about his own credibility as an investigator when he

6    says to the Court I didn't know about this, that Gillispie had

7    been eliminated, that there are reports, documents that I

8    didn't know about that until 2007.  Because you have said a

9    number of times in this case that everybody should have

10   realized this way before that --

11             THE COURT:  Slow down.

12             MR. OWENS:  So I'll just say that it's beyond clear

13   that the manner in which this issue of the reports separately

14   from the elimination itself has been significantly challenged

15   at every juncture by the defense in this case, and it is

16   Mr. Godsey's credibility that this pertains to.

17             THE COURT:  Okay.  You guys can go back.  I'll rule.

18        (In open court.)

19             THE COURT:  We're back on the record.

20        Counsel, I am sustaining the objection.  However, I will

21   allow you to rephrase your question in the manner in which you

22   have indicated to the Court.  However, I would ask you to

23   tread slightly -- tread lightly.

24             MR. OWENS:  Thank you, Your Honor.

25        May I just sort of reorient us to where we are, a couple

GODSEY - DIRECT (Owens)                                    1287

1    questions?

2            THE COURT:  All right.

3    BY MR. OWENS:

4    **Q.**   So before our little break, we were talking about the

5    moment in time between the first Fritz affidavit which

6    mentions the elimination of Gillispie as a suspect and the

7    second Fritz affidavit that mentions not only the elimination

8    but also written reports about that as well.

9    **A.**   Correct.

10   **Q.**   All right.  Same page?

11   **A.**   Yes.

12   **Q.**   Okay.  What did you say to Mr. Fritz in this conversation

13   that ultimately culminated in the second affidavit being

14   submitted to the Court?

15   **A.**   He was talking about --

16           THE COURT:  Well, no, no, no, no, no, no, no.

17           THE WITNESS:  What did I say?

18           THE COURT:  What did you say.

19           THE WITNESS:  I was listening to him, and I said,

20   "Why didn't you write any of this down?"

21   BY MR. OWENS:

22   **Q.**   And did you have further conversation with him about

23   that?

24   **A.**   Yeah, he answered my question.

25           MR. OWENS:  Your Honor, the natural question is to

GODSEY - DIRECT (Owens)                                    1288

1    ask him what did he say, right?  And I assume that will raise

2    an objection, but that is the next question.

3                MR. McLANDRICH:  Yes, I would object to that, Your

4    Honor.

5                THE COURT:  Sustained.

6    BY MR. OWENS:

7    **Q.**   How did Fritz -- what was Fritz's response to you

8    accusing him of not writing reports?

9                MR. McLANDRICH:  Object.

10               THE COURT:  Wait a minute.  Wait a minute.  Wait a

11   minute.  Wait a minute.  What is that, what's his response?

12               MR. OWENS:  I'll rephrase.

13               THE COURT:  Thank you.

14               MR. OWENS:  I appreciate the assistance.

15   BY MR. OWENS:

16   **Q.**   What was Fritz's reaction to you saying that he didn't

17   have the reports?

18               THE COURT:  Counsel, first, I want to instruct --

19   I'm going to instruct the witness that a reaction is not a

20   statement.

21               THE WITNESS:  He had a strong emotional reaction.

22   BY MR. OWENS:

23   **Q.**   Okay.  And how would you describe that strong emotional

24   reaction?

25   **A.**   Strong and emotional.

GODSEY - DIRECT (Owens)                                    1289

1              THE COURT:  There you go.

2              THE WITNESS:  Right back at me -- right back at you.

3    BY MR. OWENS:

4    **Q.**   Okay.  So as a result of that strong emotional reaction

5    and conversation, did you take additional investigative steps?

6    **A.**   I said I've got to get a new affidavit with what you

7    just told me.

8    **Q.**   Okay.  And is that the genesis for the second Fritz

9    affidavit?

10   **A.**   That, and I around the same time finally got Moore to

11   call me back.

12   **Q.**   Moore?

13   **A.**   I'm sorry.  Bailey.

14   **Q.**   Got it.  And so you had a conversation with Mr. Bailey,

15   correct?

16   **A.**   A phone conversation, yeah.

17   **Q.**   And then did that ultimately lead to you getting an

18   affidavit from Mr. Bailey?

19   **A.**   Yes.

20   **Q.**   And where did you get that affidavit from Mr. Bailey?

21   **A.**   Kinko's.

22   **Q.**   Why did you have a conversation with an important witness

23   at a Kinko's?

24   **A.**   He was -- so to explain this, I had been trying to

25   reach him for a long time.  He would not return calls,

GODSEY - DIRECT (Owens)                                          1290

1   having -- leaving notes on doors, to the point where I

2   finally said, "Just give me ten minutes, please, and I might

3   not ever have to bother you again.  I just have to ask you a

4   couple questions.  So, if you don't, I am going to continue

5   calling and leaving notes on your door, banging on your

6   door."

7        So he finally gave me a call, and we talked for ten

8   minutes, asked just a few questions.  His answers made me

9   realize I had to get an affidavit from him, but he's not

10  somebody who I felt comfortable would show up or actually

11  meet me.  So I wanted it to be at a Kinko's so if he

12  actually showed up, there is a notary there.  We can sit

13  down and do an affidavit right there.  I can print it out,

14  get it all done, because I probably have one chance to meet

15  this guy for a couple minutes.

16  **Q.**   And did he arrive at the Kinko's?

17  **A.**   Yes, he did.

18  **Q.**   And, ultimately, did you submit an affidavit to the court

19  from Mr. Bailey?

20  **A.**   Yes.

21  **Q.**   And did that generally -- affidavit indicate that he had

22  written reports about Mr. Gillispie --

23  **A.**   Yes.

24  **Q.**   -- as a -- eliminating --

25           MR. McLANDRICH:  Objection.

GODSEY - DIRECT (Owens)                                    1291

1          MR. OWENS:  -- Mr. Gillispie as a suspect?

2          MR. McLANDRICH:  Objection.

3          MS. FRICK:  Objection.

4          THE COURT:  I'm going to allow that.

5          THE WITNESS:  Yes.

6    BY MR. OWENS:

7    Q.    And you also mentioned around this same period of time

8    you spoke with Mr. Lieberman?

9    A.    Correct.

10   Q.    And did Mr. Lieberman provide you an affidavit?

11   A.    Yes.

12   Q.    And did that affidavit ultimately get submitted to the

13   court?

14   A.    Yes.

15   Q.    And just generally, did that affidavit indicate

16   Mr. Lieberman had no clue that there were reports eliminating

17   Gillispie as a suspect?

18   A.    Correct.

19   Q.    Now, you said that --

20          THE COURT:  We're breaking for lunch, counsel.

21      Ladies and gentlemen, we're going to break for the lunch

22   hour.  Please remember the Court's admonitions.  We will try

23   to reconvene right at 1:15 so that we can move on.

24      Anything further, counsel?

25          MR. OWENS:  No, thank you.  We appreciate it.

1              MR. McLANDRICH:  No, thank you, Your Honor.

2              MS. FRICK:  No, Your Honor.

3              THE COURT:  Thank you very much.

4              THE COURTROOM DEPUTY:  All rise.  This court stands

5    in recess.

6         (Jury out at 11:58 a.m.)

7         (Recess at 11:58 a.m.)

8         (Jury in at 1:28 p.m.)

9         (In open court at 1:30 p.m.)

10        THE COURT:  Welcome back, everyone.  We're back on

11   the record.

12        Counsel ready to proceed?

13             MR. OWENS:  Yes, Your Honor.

14             THE COURT:  Counsel?

15             MR. McLANDRICH:  Yes, Your Honor.

16             MS. FRICK:  Yes, Your Honor.

17             THE COURT:  You may inquire.

18   BY MR. OWENS:

19   Q.   Before the break, we were just talking about the

20   affidavits and other evidence that you submitted to the Court

21   on behalf of Mr. Gillispie.

22   A.   Correct.

23   Q.   Okay.  And is there a sort of formal name for the filing

24   that you filed in February of 20 -- or excuse me -- of 2008?

25   A.   Motion for new a trial and post-conviction relief.

GODSEY - DIRECT (Owens)                                    1293

1    **Q.**   Okay.  What happened after you filed that motion?

2    **A.**   Whatever you file, then the opposition gets a chance to

3    file a response.

4    **Q.**   Got it.  And what -- did the State file a response in

5    this case?

6    **A.**   Yes.

7    **Q.**   And in this case, did the State file a response in 2008

8    that had affidavits attached?

9    **A.**   I believe it had one.

10   **Q.**   Okay.  Who wrote the affidavit in 2008 opposing

11   Mr. Gillispie's post-conviction petition?

12   **A.**   Detective Moore.

13   **Q.**   After you got the State's opposition with Detective

14   Moore's affidavit, what did you do next?

15   **A.**   Got new affidavits from Lieberman and Fritz.

16   **Q.**   And why did you get additional affidavits from Lieberman

17   and Fritz?

18   **A.**   They had to respond to things that had been said in the

19   State's response.

20   **Q.**   Got it.  And did you go through the same process that you

21   went through in creating the other affidavits?

22   **A.**   Yes.

23   **Q.**   Now, did you ultimately have a hearing as it relates to

24   Kevin Cobb?

25   **A.**   Yes.

GODSEY - DIRECT (Owens)                                    1294

1    **Q.** And then did you ultimately have a hearing related to the

2    Fritz, Bailey affidavits and all that?

3    **A.** Yes.

4    **Q.** And did Fritz testify at that hearing?

5    **A.** Yes.

6    **Q.** Did -- well, let me just ask it a better way. Who

7    testified at that hearing?

8    **A.** Fritz, Bailey, and Lieberman.

9    **Q.** And at any point, did you feel like you suborned perjury

10   during that hearing?

11   **A.** No.

12              MR. McLANDRICH: Objection.

13              MS. FRICK: Objection, Your Honor.

14              THE COURT: It will be sustained. And stricken.

15   BY MR. OWENS:

16   **Q.** Okay. Let's just take a step back. Did Detective Moore

17   testify at that hearing in federal court about the Fritz-

18   Bailey reports?

19   **A.** No.

20   **Q.** Was he present?

21   **A.** Yes.

22   **Q.** Now, without saying anything about what the Court said or

23   what its reasoning was, what was the results of that federal

24   hearing?

25   **A.** The Court threw out Dean Gillispie's convictions.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

GODSEY - DIRECT (Owens)                                          1295

1    **Q.**   And then what happened to Mr. Gillispie after that?

2    **A.**   He was released from custody.

3    **Q.**   Got it.  And what kind of timeline was this?

4    **A.**   The hearing -- the hearing was in, I believe, May of

5    2011, and the decision came down in December of 2011.  And

6    then Dean was released right after the decision came down.

7    **Q.**   All right.  When you found out that Mr. Gillispie's

8    conviction had been overturned, what'd you do?

9    **A.**   I went to his parents' house.

10   **Q.**   What did you do when you got there?

11   **A.**   I told them Dean's coming home.

12   **Q.**   And did you know his parents at that point?

13   **A.**   Yeah.

14   **Q.**   And how did you let Dean know?  Strike that.

15          Did you let Dean know he was going to be released?

16   **A.**   Yes.

17   **Q.**   And how did that happen?

18   **A.**   By phone.  I mean, I didn't drive to the prison.  And

19   with his parents, we placed a call to the prison and

20   eventually got him brought to the phone.

21   **Q.**   Was there some time between when the decision came down

22   and when Mr. Gillispie was released from prison?

23   **A.**   It was a couple of days, I think.

24   **Q.**   After Mr. Gillispie was released, was he totally free, no

25   restrictions?

GODSEY - DIRECT (Owens)                                    1296

1    **A.**    No.  The prosecution said they wanted to appeal.  So

2    the judge had a monitor, ankle monitor for a while.

3    **Q.**    And this was in sort of December of 2011 into 2012?

4    **A.**    Yes.

5    **Q.**    How long did Mr. Gillispie have to wear that ankle

6    monitor after being released in 2012?

7    **A.**    Until April of 2012.  I think it was April 12th.

8    **Q.**    What happened in April of 2012 relative to Mr. Gillispie?

9    **A.**    A second court, so a different court, the state court

10   of appeals, also overthrew -- overturned Dean Gillispie's

11   convictions.

12   **Q.**    And that was related to Kevin Cobb?

13   **A.**    Correct.

14   **Q.**    How did it impact Dean to be -- and was Dean released

15   from the ankle monitor in 2012?

16   **A.**    Yes.

17   **Q.**    How did it impact him to be released?  You were there?

18   **A.**    Yeah.  I mean, it's hard to even put into words.  When

19   you've been in prison for 20 years for something you didn't

20   do and you're -- the psychology of that, you know, which I

21   got to know well, to finally win is something that is hard

22   to even describe.

23   **Q.**    Now, even then in 2012, was Mr. Gillispie totally free to

24   do whatever he wanted?

25   **A.**    After the ankle monitor came off?

GODSEY - DIRECT (Owens)                                        1297

1   **Q.**   Yes, sir.

2   **A.**   No.  They were continuing to try to appeal, and the

3   litigation just dragged on for years.  So he had this

4   hanging over his head.

5   **Q.**   And so at some point, and without describing the exact

6   machinations in court, were you still litigating the dismissal

7   of the charges?

8   **A.**   It dragged on seven -- about seven years.

9   **Q.**   Okay.

10  **A.**   I mean, it just -- every possible thing to file to drag

11  it out.

12  **Q.**   Got it.  And I want to just -- I asked a poor question.

13  I apologize.

14        At some point in 2013, did the State submit a brief

15  opposing the dismissal of the charges?

16  **A.**   I'm sure they did.  It was ongoing from 2011 till 2017.

17  **Q.**   And regardless, at some --

18  **A.**   Oh, yeah, yeah, yeah, in front -- yeah, yes.

19  **Q.**   Do you remember, sir, what I am referring to?

20  **A.**   Yeah, the litigation in common pleas court in

21  Montgomery County, yeah.

22  **Q.**   Got it.  And during that litigation, did the State rely

23  on any evidence from -- by way of affidavit in opposing the

24  charges being dismissed?

25  **A.**   There was a new affidavit by Detective Moore.

GODSEY - DIRECT (Owens)                                1298

1    **Q.**   Do you remember anything that was said in that affidavit

2    by Detective Moore?

3              MR. McLANDRICH:  Objection.

4              THE COURT:  Sustained.

5              MR. OWENS:  Can I have the basis, Your Honor?

6              THE COURT:  The basis is that you're talking about

7    him testifying as to what an affidavit of someone else said.

8              MR. OWENS:  It's a party in the case, Detective

9    Moore.

10             THE COURT:  That's not hearsay?

11             MR. OWENS:  No.  It's a party opponent.  It's not

12   hearsay.

13             THE COURT:  Come forward.

14       (At sidebar.)

15             MR. OWENS:  Your Honor, this is David Owens on

16   behalf of --

17             THE COURT:  Wait a minute.  I'm sorry.  Your

18   objection.

19             MR. McLANDRICH:  I'm not sure exactly what affidavit

20   he's referring to, but unless he's admitted in that affidavit

21   that he's destroyed the report or that he knowingly or

22   recklessly created a photo array that was unfair to

23   Mr. Gillispie, I don't see how it's relevant to any of the

24   issues in this case.

25        So, you know, they are talking about an affidavit that

1    the State of Ohio proffered apparently in the criminal

2    litigation that the State of Ohio controlled.

3             THE COURT:  Maybe I'm missing this.

4             MR. McLANDRICH:  He's trying to suggest that it's

5    some sort of admission against interest, it seems to me, and

6    so unless it's an admission as to something that's relevant to

7    this case -- and the only two claims in this case, as I

8    understand it, relate to either this report that was allegedly

9    suppressed or destroyed and the photo array.  So unless the

10   affidavit speaks to one of those two things, I'm not sure how

11   it's relevant to anything in this case.  It's still a hearsay

12   document.

13       Mr. Moore has testified in this case.  He could have been

14   asked whatever the content of the affidavit is.  Trying to get

15   it in with this witness is inappropriate.

16            MR. OWENS:  That's a lot of words.  I think it's

17   straightforward.  It's a statement by a party opponent.  It is

18   not hearsay.  And the content of it, presumably counsel knows,

19   is the affidavit that was produced in discovery and that was

20   filed in the state court.  And I will say that it does address

21   the Fritz and Bailey elimination of Gillispie as a suspect.

22   So that's where this is going.

23            MS. FRICK:  This is Dawn Frick, Your Honor.  I would

24   just say if they have got something, then why wasn't it

25   brought up in the testimony of Mr. Moore then.  It could have

GODSEY - DIRECT (Owens)                                    1300

```
 1    been used either to impeach or refresh his recollection.  It

 2    seems inappropriate to bring it in through this witness.

 3         MR. OWENS:  Your Honor, I don't think there is any

 4    rule that I am aware of that requires you to use all of your

 5    evidence about a witness with that particular witness.  In

 6    fact, I think the Court's jury instructions will say something

 7    to the effect of you consider all the evidence, regardless,

 8    whoever admitted it.  So that's not something I remember

 9    seeing in 801, 802, 803, or 804.

10         THE COURT:  And so where are you going with this?

11         MR. OWENS:  I think what he will say, if he

12    remembers, is that there was an affidavit that was submitted

13    at that time where Moore said that he had submitted reports by

14    Fritz and Bailey.  That's it.

15         THE COURT:  Did it say supplementary reports, or

16    just supplementary reports?

17         MR. OWENS:  Supplementary reports.

18         MR. McLANDRICH:  What does that have to do with

19    anything?  He's already testified he had supplementary reports

20    from Fritz and Bailey.

21         MR. OWENS:  I don't think he testified he saw any

22    supplementary report from Fritz?  What report did he

23    supplement from Fritz?

24         THE COURT:  All right.

25       (In open court.)
```

```
 1              THE COURT:  All right.  We're back on the record.
 2        Counsel, ready?
 3              MR. OWENS:  Yes, Judge.
 4              THE COURT:  Objection's overruled.
 5   BY MR. OWENS:
 6   Q.   Do you remember the question?
 7   A.   Yes.
 8              THE COURT:  Well, why don't you restate the
 9   question.
10              MR. OWENS:  Yes, Judge.
11   BY MR. OWENS:
12   Q.   The question, as best I can say it again, was do you
13   recall what Mr. Moore's affidavit from 2013 stated when it was
14   submitted in opposition to your request to have the charges
15   against Gillispie dismissed?
16              THE COURT:  Is there some parameter with regard to
17   the question?  I mean --
18              MR. OWENS:  That was how I phrased it.
19              THE COURT:  With regard to certain, I mean -- do you
20   want him to review the entire affidavit for you or what?
21              MR. OWENS:  Well, it's two pages, but I can ask -- I
22   was trying to ask the same question I asked before.  I can ask
23   a narrower one.
24              THE COURT:  I would ask you to ask a narrower one.
25              MR. OWENS:  Thank you, Judge.
```

1    BY MR. OWENS:

2    **Q.**    Do you recall whether or not the affidavit Detective

3    Moore submitted in 2013 said anything about whether or not he

4    reviewed ports -- reports authored by Fritz and Bailey?

5    **A.**    Yes, it said that he had.

6    **Q.**    Now, eventually, what was the ultimate outcome of

7    Mr. Gillispie's criminal case?

8    **A.**    It was dismissed, with prejudice.

9    **Q.**    So if I understand correctly, you've been representing --

10   or you've known Dean Gillispie for almost 20 years?

11   **A.**    Yes.

12   **Q.**    Now, in that time, have -- how would you describe your

13   relationship with Dean?

14   **A.**    We've become very close friends.

15   **Q.**    And as his attorney and friend, have you seen the impact

16   that his incarceration has had on him?

17   **A.**    Yes.

18   **Q.**    And can you just describe that?

19   **A.**    Well, it's just something I am always aware of.  So one

20   incident while he was -- well, when he was still in prison,

21   so I was representing him from '03 until '11, while he was

22   still in prison, and unlike other people in prison I

23   represent, he could not be updated on the case.  It was too

24   painful.

25        So I would start off saying we filed this and I'm going

GODSEY - DIRECT (Owens)                              1303

1    to mail it to you and then the State responded this way.

2    And then I'd go visit him and he would say, you know, I

3    can't even -- I couldn't even sleep after you mailed that to

4    me.

5         And so it got to the point where I'm like, you just

6    want me just to not talk about it?  And he's like, just

7    don't -- don't tell me about it.  I came to visit him, I'd

8    just give him very vague this is what's going on, 'cause he

9    couldn't handle it.

10   Q.   And so did that remain true from that point through the

11   rest of his litigation, that you didn't give him extensive

12   updates about his case?

13   A.   Yeah.  That he couldn't handle it.  It would trigger

14   him.

15   Q.   Now, are there other moments, any other particular

16   moments that you can have where you sort of saw how this

17   incarceration impacted Dean while he was still in prison?

18   A.   There was one time I went to visit him where I had

19   been -- I was really tired.  So I had little kids, and I had

20   been running around all weekend at soccer, basketball, and

21   all that kind of stuff.  And then a kid was sick and kept me

22   up all night.  So in the morning, I had to go visit Dean.

23        So they bring me into the attorney visiting room, and

24   it took them a while to go get Dean and bring him, and I

25   fell asleep.  So I didn't -- I was sitting in the chair and

GODSEY - DIRECT (Owens)                                    1304

1    I fell asleep sitting up.

2        And so he came in and woke me up.  And I was real

3    apologetic; I felt bad.  I just said, "Man, you know, the

4    kids are kicking my butt.  You know, I've been up all night

5    and I'm really sorry.  Damn soccer games all weekend, and I

6    am just beat.  I'm really sorry."

7        And he said, "Man, I would die to have a kid keep me up

8    sick all night.  I would die to be able to take my kids

9    around soccer games.  And don't come in here and talk to me

10   like that again."

11       And I said, "I'm sorry."

12   Q.  And at some point, as we discussed, Mr. Gillispie was --

13   well, we haven't talked about this with you, but do you know

14   about the art that he's started to create?

15   A.  Yeah, we talked about his art.  We talked about music.

16   And in 2010 we had a conference in Cincinnati, and it was at

17   the International Freedom Center, which is a museum in

18   Cincinnati.  And we asked our clients in prison if they

19   would, you know, share a poem or a painting or something

20   they had done artistic to put on the walls.

21       And Dean had already given me one painting that he had

22   done for me, but he did one specifically for that

23   conference, as well.

24   Q.  Can you describe that painting?

25   A.  It was a toilet that was a prison cell toilet or truck

1    stop toilet, you know, very dirty toilet, and it had all his

2    things important to him in his life swirling around and

3    going down the toilet:  It was children and his family who

4    had been born, relatives who had died, people who had got

5    married, friends who had gotten married and had children,

6    you know, all the things that he wished he was there for.

7    And then on the outside of the toilet were written things

8    from the prosecution's responses, like "We need another 90-

9    day extension," stuff he didn't even want to hear from me

10   because it would get him too upset.

11        And at the top left corner was a painting of him that

12   he had done of himself at the time he was arrested, and down

13   at the bottom right it had a painting of him as he saw

14   himself at that time, and you could see the age and how much

15   he had changed.  And he put a plate over his face and both

16   of them that said "No one's listening."

17        The -- the one in the top left, which was him when he

18   got arrested, had a date, and in the bottom right that date

19   changed to an odometer, just keeping track of the time, just

20   constantly clicking.

21   **Q.**   Where is that painting?

22   **A.**   It's at my office.

23   **Q.**   One of the things we talked about was there was a period

24   of time in which you were still trying to get --

25             MR. OWENS:  Can I withdraw, Your Honor?

GODSEY - DIRECT (Owens)                                    1306

1           THE COURT:  You may.

2           MR. OWENS:  Thank you.

3    BY MR. OWENS:

4    **Q.**  We talked a little bit about Dean being released in

5    December of 2011.

6    **A.**  Yeah.

7    **Q.**  Were you there that night?

8    **A.**  No.

9    **Q.**  Okay.

10   **A.**  I was out of town with family.

11   **Q.**  And did Dean have a party celebrating that release one

12   year later?

13   **A.**  Yes.

14   **Q.**  Anything significant happen that weekend relative to his

15   case?

16   **A.**  So the news channel was there and got footage and did a

17   story of the celebration.  And that was on like a Saturday

18   night.  And it was celebrating the one year anniversary of

19   his freedom.  There were a lot of people there.

20        And then I got a call from the opposition on Monday

21   morning.

22   **Q.**  And when you say "the opposition," what do you mean?

23   **A.**  Well, at that point, the State's position was being

24   represented by the Attorney General's Office.

25   **Q.**  Okay.

1    **A.**    So an attorney from the Attorney General's Office.

2    **Q.**    And what did they inform you about Mr. Gillispie?

3    **A.**    "We're going to arrest him if he doesn't go register as

4    a sex offender."

5    **Q.**    And what was your reaction to that?

6    **A.**    "What are you talking about?  He had his convictions

7    overturned.  That makes no sense."

8    **Q.**    Did Mr. Gillispie ultimately have to end up filling out

9    sex offender paperwork at that time?

10   **A.**    Yeah, because -- I felt we could win, but they said,

11   "Well, you're going to have to litigate it with him back in

12   jail because we are going to go arrest him."

13          So I had to call Dean and say they saw this on the news

14   and they want you to go register as a sex offender or they

15   are going to arrest you.  We are going to win because you

16   got your convictions overturned, but you're going to have to

17   go through this.

18          And he said, "I don't care.  I will go register as a

19   sex offender.  They can't do anything to me at this point."

20   **Q.**    Did you see whether or not that had any impact on Dean

21   even after a year out?

22   **A.**    It was just never-ending.  It was just a part of never-

23   ending delay, fight back.  No matter what you say, we're

24   going to come back after you.  And so it was just part of

25   the whole picture.

GODSEY - DIRECT (Owens)                                    1308

1    **Q.**   Okay.  Last question.  You've become good friends with

2    Dean over the past 20 years.  Have you, from your perspective,

3    seen how this continual situation has had an impact on him

4    since he's been released over the past few years in terms of

5    his mental health?

6    **A.**   Yeah, he's an inspirational person because despite what

7    happened to him, he's the first guy that lights up the room

8    and, you know, tells everybody to keep smiling and don't let

9    things get you down.  But it's just a never-ending beating

10   drum.

11          And, you know, I had to reach out and try to get some

12   counseling.  It's not uncommon for people in his position.

13   But you know, in the meantime, other things would happen in

14   other cases where exonerees would have an easier time, the

15   prosecutor would agree, you know, let them out and all these

16   sort of things, and he's just seeing how he's being treated

17   differently, and that would, like, trigger him.  So you'd

18   see him go into these periods of like depression or anger

19   that he's trying to control.

20          And so all of us who love Dean, you know, we're always

21   kind of talking about how we could help him, how we could

22   support him, what's upsetting him right now, and how we

23   could be there for him.

24   **Q.**   Did he --

25              MR. OWENS:  That's all.  No further questions at

GODSEY - CROSS (McLandrich)                    1309

1    this time.

2         THE COURT:  Thank you.

3      Counsel.

4         MR. McLANDRICH:  Thank you, Your Honor.

5                      **CROSS-EXAMINATION**

6    BY MR. McLANDRICH:

7    **Q.**   Good afternoon, Mr. Godsey.

8    **A.**   Hello.

9    **Q.**   I represent Detective Moore in this matter.

10      The actions that you were just talking about in terms of

11   making register as a sex offender, those were actions of the

12   State of Ohio?

13   **A.**   Yes.

14   **Q.**   Not Detective Moore?

15   **A.**   I would argue that people were taking certain positions

16   because of the key players involved.

17   **Q.**   So you think Detective Moore was controlling the Attorney

18   General's Office of the State of Ohio; is that what you're

19   suggesting?

20   **A.**   I wouldn't say "controlling."  I would say when one of

21   these cases develops, the response of the person who was

22   involved sometimes dictates and sets the tone for how the

23   State responds.

24   **Q.**   And so what you're suggesting is that Detective Moore

25   continued to believe that Mr. Gillispie was guilty?

GODSEY - CROSS (McLandrich)                                1310

1   **A.**    I'm sorry.  Say the question again.

2   **Q.**    Yes.  What you're suggesting is that Detective Moore

3   continued to believe that Mr. Gillispie was guilty?

4   **A.**    I don't know what he believed.

5   **Q.**    Oh, all right.  With respect to the Fritz and Bailey

6   reports, you don't have any personal knowledge that those

7   reports existed, do you, other than what --

8   **A.**    No.  I was not there.

9   **Q.**    And with respect to any allegation that if the reports

10  existed, that they were destroyed or suppressed by Detective

11  Moore, don't have any personal knowledge of that either,

12  correct?

13  **A.**    No, I wouldn't have been there.

14  **Q.**    And those allegations that the reports existed depend

15  upon the credibility of Mr. Fritz and Mr. Bailey, correct?

16  **A.**    Yes, but there's corroboration for it.

17  **Q.**    Certainly no corroboration in the sense of a report ever

18  being produced, correct?

19  **A.**    I would say in a strange way, Moore's second affidavit

20  corroborates.  And I'll explain why.  He said, "I read the

21  reports of Fritz and Bailey."

22       But there were no reports of Fritz and Bailey.  So what

23  in the world did you read.

24  **Q.**    There were certain reports from Detective Bailey in the

25  file, correct?

GODSEY - CROSS (McLandrich)                                1311

1    **A.**    Not of Fritz, though.

2    **Q.**    And Mr. Fritz had signed off on those reports, correct?

3    **A.**    Right, um-hmm.

4    **Q.**    Okay.  And so you don't know whether Detective Moore,

5    when he said that, was referring to reports written by Fritz

6    and approved by Bailey?

7    **A.**    I don't understand the question.

8    **Q.**    Then you don't have to answer it.

9         Now, in one of the -- one or more of the affidavits that

10   you prepared for Mr. Lieberman, it recited the belief that

11   Detective Bailey had perjured himself during the first

12   criminal trial, correct?

13   **A.**    I don't remember.  I mean, I didn't -- I typed up what

14   they were telling me.

15        THE COURT:  Now, Counsel, I have limited referring

16   to deposition or affidavits and things such as that.  If you

17   want to ask general questions with regard to it, but let's not

18   go to the affidavits.

19        MR. McLANDRICH:  I understand.

20   BY MR. McLANDRICH:

21   **Q.**    Do you remember at the habeas hearing where you, in fact,

22   asked Mr. Bailey about the fact that he was asked at the first

23   criminal trial whether Mr. Gillispie had ever been identified

24   as a suspect during his investigation, and the fact that he

25   had said no during the criminal trial.  Do you recall asking

GODSEY - CROSS (McLandrich)                                    1312

1    him about that?

2    **A.**    Yeah, um-hmm.

3    **Q.**    And do you recall that his response was something to the

4    effect of:  Well, I was being like Bill Clinton when he was

5    asked about Monica Lewinski and he said, "I didn't have sex

6    with that woman."  Do you recall that testimony?

7    **A.**    Yeah, um-hmm.

8    **Q.**    And, in fact, the purpose of that testimony was to

9    demonstrate his admission, although he was trying to sort of

10   weasel on it, if you will, as the president had with respect

11   to Monica Lewinski, that I really didn't lie.  I was, you

12   know, playing word games.

13   **A.**    Right.

14   **Q.**    Now, if, in fact, these reports excluding Mr. Gillispie

15   existed, this would have been something that Mr. Fritz and

16   Mr. Bailey knew about during the entire duration of the

17   investigation of Mr. Gillispie and the entire duration of his

18   criminal prosecution, correct?

19   **A.**    Right.  Although I think they left the department.

20   But, yes.  Once they created them, they would know about

21   them.

22   **Q.**    Certainly.  And you're aware, are you not, that Mr. Fritz

23   was the criminal investigator for Mr. Lieberman once he left

24   the department?

25   **A.**    Yes, um-hmm.

1    **Q.**   And that would be -- as demonstrated by being the focus

2    of your habeas petition, that would be pertinent information

3    that Mr. Fritz should have conveyed or would convey to his

4    criminal defense lawyer he's working for, correct?

5              MR. OWENS:  Objection.

6              THE COURT:  Hold on.

7              MR. OWENS:  It lacks foundation about what somebody

8    else would do.

9              THE COURT:  Overruled.  You can answer it if you

10   can.

11             THE WITNESS:  No.

12   BY MR. McLANDRICH:

13   **Q.**   Okay.

14   **A.**   And you would -- never occur to you that this had not

15   been turned over.  So it would be weird to say, by the way,

16   these exist.

17   **Q.**   Now, Kevin Cobb, that was something that was known to the

18   criminal defense even before the first trial, correct?

19   **A.**   I think his name perhaps, but not the details that we

20   uncovered.

21   **Q.**   And, in fact, Kevin Cobb was brought to the attention of

22   the defense by Mr. Gillispie himself, correct?  Brought to

23   Mr. Fritz's attention, who then brought it to the attention of

24   Mr. Lieberman by Mr. Gillispie himself?

25   **A.**   May have been something like:  Somebody told me this

GODSEY - CROSS (McLandrich)                                    1314

1   guy looks like the composite sketch, this guy named Kevin

2   Cobb, or something like that, yeah.

3   **Q.**   But it came from Mr. Gillispie?

4   **A.**   I can't be for certain.  I think I've seen something

5   like that somewhere.

6   **Q.**   Now, when you're pursuing a potential habeas petition or

7   investigating a potential habeas petition, the idea of missing

8   exculpatory evidence is not an uncommon avenue to pursue,

9   obviously if it's available to you, correct?

10  **A.**   You need to define "missing."  Normally, in a case like

11  this, police reports are not turned over, but they -- later

12  you get them in a public records request.  Missing in terms

13  of they just vanished is not usual.

14  **Q.**   I understand.  But the idea that there was a report that

15  existed that was not produced, was not produced or was not

16  produced because it was destroyed, is something that is

17  pursued with some frequency in seeking a habeas petition?

18            MR. OWENS:  Objection; it's compound.

19            THE COURT:  Counsel, do you -- I mean, sir, do you

20  understand that question?

21            THE WITNESS:  Yeah.  It's hard to answer.

22            THE COURT:  Okay.  Hold on.  Rephrase.

23            MR. McLANDRICH:  Sure.

24  BY MR. McLANDRICH:

25  **Q.**   So there's various grounds on which a court might grant a

GODSEY - CROSS (McLandrich)                                1315

1    habeas petition, correct?

2    **A.**    Correct.

3    **Q.**    And one of those grounds would be if the police had

4    reports and didn't produce them to the prosecution, correct?

5    **A.**    Or to the defense, correct.

6    **Q.**    Yes.  Exactly.  To the defense.

7         And sometimes that can be because the report simply

8    exists and wasn't actually produced, correct?

9    **A.**    Still exists and wasn't produced, right.

10   **Q.**    Or sometimes there can be an allegation, as there is in

11   this case, that the report exists and wasn't produced and yet

12   we never have the report to be able to know for sure whether

13   that report existed or not?

14   **A.**    I would -- I would answer it this way:  I guess it's

15   possible that in some cases there's evidence of a report and

16   the report vanished in some way that we can't identify.

17   **Q.**    And sometimes that evidence that the report might have

18   existed and vanished is just someone's testimony?

19   **A.**    Correct.

20   **Q.**    And for the person who's alleged to have had that report

21   and suppressed or destroyed it, very hard to prove the

22   negative of that, isn't it?

23   **A.**    Sure, yeah.

24   **Q.**    Because, again, now it's just going to be one person's

25   testimony against the others, correct?

GODSEY - CROSS (Frick)                                          1316

1    **A.**    Right.

2    **Q.**    That's all I have for you, sir.  Thank you.  Appreciate

3    your time.

4              MS. FRICK:  Just briefly, Your Honor.

5                        **CROSS-EXAMINATION**

6    BY MS. FRICK:

7    **Q.**    Mr. Godsey, my name is Dawn Frick.  I represent the Miami

8    Township Board of Trustees.  I just have a couple of quick

9    questions.

10        You -- I think you testified that you were one of the

11   attorneys that filed a petition for post-conviction relief and

12   a motion for new trial?

13   **A.**    Yes.

14   **Q.**    And in that you were making representations based upon

15   your investigation, correct?

16   **A.**    Yes.

17   **Q.**    And isn't it true that specifically in that petition you

18   had argued that the failure to preserve or disclose materially

19   exculpatory evidence was done so in bad faith?

20             MR. OWENS:  Object.

21             THE COURT:  That's what he argued.

22             THE WITNESS:  I don't think so.  I'd have to refresh

23   my memory.

24             MS. FRICK:  Do you have a copy of that post petition

25   up there that she can refresh his memory.  The ones you just

```
 1    sent to us?

 2              MR. OWENS:  We sent it to the Court.

 3              THE COURT:  Is there an exhibit?

 4              MS. FRICK:  It's PX 286.

 5              MR. OWENS:  Do you have a page number?

 6              MS. FRICK:  52.

 7              MR. OWENS:  Thank you.

 8              THE COURT:  This is a refreshing recollection,

 9    correct?

10              MS. FRICK:  Yes, Your Honor.

11              THE COURTROOM DEPUTY:  It goes up to 285.

12              MR. OWENS:  I have it pulled up here, if I could

13    give it to your deputy, Your Honor.

14              THE COURT:  Okay.  Now, for the purposes of the

15    record, is this an exhibit?

16              MR. OWENS:  It is, Your Honor.  I know it was on the

17    USB that we provided to the Court over the weekend, but it

18    sounds like the paper copy might not have been updated.

19              MS. FRICK:  I think in the paper copy it's actually

20    page 49.

21              THE COURT:  And so, basically, the question is a

22    specific question.  So once you're done reviewing the document

23    that you are reviewing, just please raise your head and we

24    will -- they will restate that specific question.

25              THE WITNESS:  You are asking me to read page 49?
```

 1    BY MR. McLANDRICH:

 2    **Q.**   Yes.  I think if you look in Section 2 of page 49.

 3    **A.**   Okay.

 4    **Q.**   And my question was, Mr. Godsey, isn't it true that you

 5    argued on behalf of Mr. Gillispie that the failure to preserve

 6    or disclose materially exculpatory evidence was done so in bad

 7    faith?

 8              MR. McLANDRICH:  Objection.  The sentence at issue

 9    isn't an argument, it's simply a quotation of the case as --

10              THE COURT:  Sustained.  If you want to ask him your

11    question that you asked him previously, you can ask him.

12              THE WITNESS:  I'm just citing case law.

13              THE COURT:  Hold on.

14         What was your previous question?

15              MS. FRICK:  I thought that was it, Your Honor.

16    BY MR. McLANDRICH:

17    **Q.**   Wasn't the basis of one of the arguments in that post-

18    petition -- post-conviction relief and motion for new trial

19    that you filed on behalf of Mr. Gillispie that the failure to

20    preserve or disclose materially exculpatory evidence was done

21    so in bad faith?

22    **A.**   No.  I'm talking about the legal standards there in

23    *Arizona versus Youngblood.*

24              THE COURT:  All right.  The answer is "No."

25    BY MS. FRICK:

GODSEY - REDIRECT (Owens)                                      1319

1    **Q.**   Mr. Godsey, just one last question.  Isn't it true that

2    you were married to Michelle Barry?

3    **A.**   Yes.

4    **Q.**   And she is one of the trial attorneys on the record for

5    this case, isn't she?

6    **A.**   Yes, um-hmm.

7              MS. FRICK:  Thank you.  Nothing further, Your Honor.

8              THE COURT:  Anything, counsel?

9              MR. OWENS:  Very briefly.

10             THE COURT:  With regard to those matters that have

11   been covered on cross.

12             MR. OWENS:  Yes, Your Honor.

13                      **<u>REDIRECT EXAMINATION</u>**

14   BY MR. OWENS:

15   **Q.**   Mr. Godsey, the post-conviction petition that you were

16   just being questioned about, the one you filed on behalf of

17   Mr. Gillispie, were you the only attorney who signed that

18   document?

19   **A.**   I believe Jim Petro did as well.  Yeah.

20   **Q.**   You were asked about Detective Moore's 2013 affidavit and

21   the statement in that affidavit that he had read reports by

22   Fritz and Bailey.  Do you recall that?

23   **A.**   Say that one more time, please.

24   **Q.**   You were asked by counsel for Officer Moore about his

25   2013 affidavit in which he stated that he read reports that

1    were authored by Fritz and Bailey.

2    A.    Yes.

3    Q.    Do you recall that?

4          MR. OWENS:  Your Honor, could we show the witness

5    what's been previously admitted, I think in a number of

6    iterations, Plaintiff's Trial Exhibit 282?

7          THE COURT:  It has been shown before?

8          MR. OWENS:  Yes, a number of times.

9          THE COURT:  Hold on a second.

10         MR. McLANDRICH:  No objection.

11         MR. HERMAN:  No objection.

12         THE COURT:  All right.

13    (Exhibit displayed.)

14   BY MR. OWENS:

15   Q.    All right, sir.  And I'll direct your attention to

16   Exhibit 282 at the bottom, the very bottom.  The whole bottom.

17         Do you recall being asked on cross-examination about

18   reading supplemental reports that were written by Detective

19   Bailey?

20   A.    About me reading?

21   Q.    Yes.

22   A.    Yeah, yes.

23   Q.    And does -- this Exhibit 282 here, do you see

24   Mr. Bailey's signature?

25   A.    Yeah, um-hmm.

1    **Q.**    Is there any signature by Fritz on this document?

2    **A.**    No.

3    **Q.**    Is there any signature by any supervisor on this

4    document?

5    **A.**    No.

6              MR. OWENS:  Can we pull up Plaintiff's Trial Exhibit

7    Number 281.  Shown repeatedly.

8              THE COURT:  All right.  Any objection?

9              MR. McLANDRICH:  No, sir.

10   BY MR. OWENS:

11   **Q.**   This is a report --

12             MR. HERMAN:  No objection.

13             THE COURT:  I'm sorry.  I thought you did say that.

14   BY MR. OWENS:

15   **Q.**   This too is a report authored by Detective Bailey,

16   correct?

17   **A.**    Yes.

18   **Q.**    And did Fritz sign this report?

19   **A.**    No.

20   **Q.**    Is there any supervisor who signed off on this report?

21   **A.**    No.

22             MR. OWENS:  No further questions.

23             THE COURT:  Does that raise anything anyone?

24             MR. McLANDRICH:  Yes, Your Honor.

25             THE COURT:  With regard to those two or three

1       questions.

2               MR. McLANDRICH:  Yes.  Understood, Your Honor.  Give

3       me one moment if I could.

4           If we could, I'd like to show the witness Plaintiff's

5       249, please.  It's a Miami Valley Crime Lab report which I

6       believe has been previously shown.

7               MR. OWENS:  No objection.

8               MS. FRICK:  No objection.

9               THE COURT:  It may be.  Thank you.

10                      **RECROSS-EXAMINATION**

11      BY MR. McLANDRICH:

12      **Q.**   Sir, showing you Plaintiff's Exhibit 249, who does it

13      indicate is the investigating officer on this Miami Valley

14      Regional Crime Laboratory report?

15      **A.**    Fritz.

16              MR. McLANDRICH:  Could I have Exhibit 252, please.

17              MR. OWENS:  Objection.  This is beyond the scope.

18              THE COURT:  Well, okay.  Counsel, respond.

19              MR. McLANDRICH:  I don't see how it's beyond the

20      scope when his point was Detective Fritz is not on any of the

21      investigating reports, and these are investigating reports

22      from the file.

23              MR. OWENS:  It wasn't that they are not on the

24      investigative reports generally, it's about supplemental

25      reports from Miami Township.  That's from Miami Valley.

1          THE COURT:  The issue was whether or not there were

2     reports in the file from both Fritz and Bailey.  I didn't hear

3     that to be specifically -- you can follow up if this brings

4     questions.  I am going to overrule the objection.  He can

5     testify.

6          MR. McLANDRICH:  Would you bring up Exhibit 252,

7     Plaintiff's 252.  This is also a Miami Valley Regional Crime

8     Lab report.  I believe that's been previously displayed.

9          MS. FRICK:  No objection here.

10          MR. OWENS:  No objection.

11          THE COURT:  Okay.

12      (Exhibit displayed.)

13    BY MR. McLANDRICH:

14    Q.   This is also a document from the Miami Valley Crime Lab,

15    and who's it directed to?

16    A.   To Fritz.

17    Q.   Now, isn't it true that after the initial report, every

18    report in a file is a supplemental report to the original?

19    A.   I'm not sure how they use that terminology.

20    Q.   All right.  That's all.  Thank you.

21          THE COURT:  All right.  Now, counsel -- I'm sorry.

22          MS. FRICK:  No, Your Honor.

23          THE COURT:  Counsel?

24          MR. OWENS:  Very briefly.

25          THE COURT:  With regard to those two questions.

1              MR. OWENS:  Yes, sir.

2         **FURTHER REDIRECT EXAMINATION**

3  BY MR. OWENS:

4  **Q.**   Mr. Godsey, were either of the exhibits that you were

5  just shown supplemental reports prepared by Miami Township

6  Police Department?

7  **A.**   No.

8  **Q.**   And did Detective Moore's affidavit that we've been

9  discussing indicate that he had reviewed reports that were

10 authored by Fritz and Bailey?

11 **A.**   Yes, that's my memory.

12             MR. OWENS:  No further questions.

13             THE COURT:  Anything, Counsel?

14             MR. McLANDRICH:  Just one second, Your Honor.  All

15 of a sudden, the computer doesn't want to respond.

16      No, thank you, Your Honor.

17             THE COURT:  All right.  Can this witness be excused?

18             MR. OWENS:  Yes, sir.

19             THE COURT:  Mr. Godsey, thank you very much.

20      Next witness.

21             MR. OWENS:  We've got Juana Gillispie.

22      I apologize, Your Honor.  Thank you.

23      We will call Sergeant Tim Wilson via deposition.

24             THE COURT:  All right.  But -- no, no, no, not her.

25             MR. OWENS:  I apologize.

1              THE COURT:  Ladies and gentlemen, we are going to

2      recess for about five minutes, five minutes, and we'll be back

3      in here.

4          I will see counsel in chambers on the record.

5              THE COURTROOM DEPUTY:  All rise.  This court stands

6      in recess.

7          (Jury out at 2:17 p.m.)

8          (In chambers at 2:26 p.m., with the exclusion of David

9      Owens.)

10             THE COURT:  Counsel we're on the record outside the

11     presence the jury for the purposes of hearing objections to a

12     deposition, video deposition or a written deposition of Tim L.

13     Wilson.

14         Counsel has provided the Court a copy of the designated

15     testimony to be presented.  There are two objections with

16     regard to that testimony, and the Court will at this point in

17     time entertain any argument that wishes to be made with regard

18     to those objections.

19         We will first deal with -- well, let me first ask,

20     counsel, enter their appearance, since we're on the record.

21             MR. KANOVITZ:  Mike Kavovitz, Megan Porter for

22     plaintiff.

23             MR. McLANDRICH:  John McLandrich and David Sipusic

24     for Defendant Moore.

25             MS. FRICK:  Dawn Frick and Chris Herman on behalf of

1    Miami Township Board of Trustees.

2            THE COURT:  The first objection that has been raised

3    is at page 41, line 17, through page 43, line 2.  The Court at

4    this time would entertain the objection and any response

5    thereto.  Counsel.

6            MR. SIPUSIC:  Your Honor, we want to object to this

7    portion of the testimony from Officer Wilson in that it seems

8    to wander across the line from lay witness testimony into the

9    expert realm when he talks in generalities about the type of

10   officers and photographic lineups, procedures, policies for a

11   period of years.  We don't see a reference in this highlighted

12   text to Miami Township.  It seems, again, broad, and he's

13   talking about general police officers, and, again, it crosses

14   the line into the expert realm.

15           THE COURT:  All right.

16           MR. KANOVITZ:  I think it's clearly he is talking

17   about how it worked in Miami.  He was the direct supervisor at

18   issue here when Detective Moore did the lineups.  And he was

19   not -- he was not opining as to general police practices at

20   all.  He was saying here's how it was inside of Miami Township

21   Police Department.  And how it was inside of Miami Township

22   Police Department is directly relevant on the good faith/bad

23   faith issue because it is evidence of what Moore would have

24   known.

25           THE COURT:  Anything?  Final word?

1          MR. SIPUSIC:  No.  Again, the highlighted text we

2     are not seeing references to Miami Township as we sit here.

3          THE COURT:  Counsel, anything?

4          MS. FRICK:  No, Your Honor.

5          THE COURT:  All right.  After considering the

6     arguments, considering the testimony provided in the

7     designations, the Court's going to sustain the objection from

8     page 41, 17, through 42, 19.  The Court will overrule the

9     objection as to 42, line 20, through 43, line 2.

10         So the testimony or the deposition testimony from 17

11    through -- 41, 17, through 42, 19, will not be read.  And the

12    testimony from 41, 20, to 43, 2, may be read.

13         There is an objection at page 60, lines 6 through 9.

14    Counsel?

15         MR. SIPUSIC:  Your Honor, in this excerpt, we're

16    objecting based on relevance, foundation.  It's talking about

17    Scott Moore had leeway as a young detective because his father

18    was the chief.  We don't see the import and the relevance of a

19    comment regarding leeway, and it implies that there is a

20    foundation of leeway because it's talking and asking about

21    more leeway for Scott.  And we don't see relevance or the

22    foundation that's provided for this question or comment.

23         THE COURT:  Counsel?

24         MR. KANOVITZ:  Well, foundationwise, the man was the

25    supervisor; so he certainly had the opportunity to know that.

1   And, secondly, there's been evidence here about the issue of

2   tunnel vision and the need to have multiple officers working

3   on the same case.  And saying they had leeway meant that he

4   had the, you know, the room given to him to pursue this case

5   as he solely decided.

6            THE COURT:  All right.  Anything?

7            MR. SIPUSIC:  We don't know what he's implying by

8   "leeway," the subject matter.  And, again, is it shining his

9   shoes, you know, coming in late?  Just examples of that.

10            THE COURT:  Anything?

11            MS. FRICK:  No, Your Honor.

12            THE COURT:  Overruled.  6 through 9 on page 60 may

13   be read.

14       How are we doing this?

15            MR. KANOVITZ:  I'll be Mr. Wilson and Megan will be

16   the questioner.  And she'll read the question; I'll read the

17   answer, if that's appropriate.

18            THE COURT:  Surely.

19       (Off the record.)

20            THE COURT:  Back on the record.

21       The Court has -- there's been a request to allow the

22   reading of an interrogatory into the record by the plaintiff.

23       Counsel.

24            MR. KANOVITZ:  Yes.

25            THE COURT:  The basis for that.

1           MR. KANOVITZ:  So the basis is, it is an admission

2      by a party.  It is evidence.  That's why you ask

3      interrogatories, or at least why interrogatories have to be

4      answered under oath.  And so we would like to offer this as

5      some evidence on the issue of the officer's mental state.

6           THE COURT:  Mental state?

7           MR. KANOVITZ:  Yeah.  If he violated policies and

8      that's -- you know, one inference can be drawn is that he

9      should have known better.  If he didn't violate policies, it's

10     very hard to draw an inference that he should have known

11     better.

12          MR. HERMAN:  Your Honor, this was just proposed

13     today, this morning, as the Court is well aware.  And it

14     involves interrogatory responses that were served on October

15     the 12th, 2018.  And there was qualifying language within

16     that.

17         Since the Township -- and this is when the Township was a

18     party, not Miami Township Board of Trustees.  Since the

19     interrogatories were served, there were 18 depositions that

20     took place after that fact.  Scott Moore served his discovery

21     responses after those interrogatories were served on behalf of

22     Miami Township.

23         Expert discovery went on --

24          MR. KANOVITZ:  May I --

25          THE COURT:  No, no.  He is arguing against it.

1              MR. KANOVITZ:  I know.  I'm hearing it, and I'd like

2     to withdraw the motion to read it.  He's making sense to me.

3     It would become complicated to explain all of that.

4              THE COURT:  You win.

5         (Concluded at 2:43 p.m.)

6         (Jury in at 2:49 p.m.)

7         (In open court at 2:50 p.m.)

8              THE COURT:  We're back on the record.

9         Ladies and gentlemen, I wasn't very good in that estimate

10    for you on time.  But I've had a pretty good track record so

11    far up till that.

12        All right.  Counsel, we ready to proceed?

13             MR. KANOVITZ:  Just one moment.

14             THE COURT:  All right.

15        (Pause.)

16             THE COURT:  Counsel, while you're preparing, I'm

17    going to read an instruction to the jury.

18        Ladies and gentlemen, the next witness will be by way of

19    deposition designation.  Basically, a deposition is a

20    witness's sworn testimony that is taken before trial.  During

21    a deposition, that witness is under oath and answers -- under

22    oath and swears to tell the truth.  And, of course, the

23    lawyers for the parties may ask questions.

24        A court reporter is present at the deposition and records

25    the questions and the answers.  The deposition designations of

1    Mr. Tim L. Wilson, was taken on December the 18th, 2018, will

2    be read to you at this time.  Those parts or the designations

3    of the deposition will be presented to you by the reading of

4    those deposition's designations on the record.

5         Now, this deposition testimony that is read is entitled

6    to the same consideration as live testimony, and you must

7    judge it in the same way as if the witness was testifying in

8    court.  Please don't place any significance or -- on the tone

9    of voice or the behavior of any of the persons reading the

10   questions or the answers.

11        Counsel ready to proceed?

12        MR. KANOVITZ:  Almost, Your Honor.  We have a small

13   quality control issues, Judge.

14        THE COURT:  All right.

15        (Pause.)

16        MR. OWENS:  I take back my take-back.  Our next

17   witness will be Juana Gillispie.

18        THE COURT:  All right.

19        **JUANA GILLISPIE, PLAINTIFF'S WITNESS, SWORN**

20        THE COURT:  Ms. Gillispie, I need you to try to keep

21   your voice up so that we can all hear any responses that you

22   make with regard to any of the questions that are posed to

23   you.

24        You have a microphone there, and you can move it closer

25   to you or you can move closer to it, however you desire.  If

1    it gets too close, it might muffle you; but if it gets too far

2    away, it won't pick you up.  I don't know how strong your

3    voice is, but if you can keep your voice up as much as you

4    can, that helps solve the problem, all right?

5              THE WITNESS:  Yes, sir.

6                        **DIRECT EXAMINATION**

7    BY MR. OWENS:

8    **Q.**   Hi, Juana.  Right here.

9    **A.**   Oh, hi.

10   **Q.**   Hi.  Can you hear me?

11   **A.**   Yes.

12   **Q.**   All right.  So you've got to scootch just a little closer

13   or you can move the mike.

14   **A.**   Okay.

15   **Q.**   So it should be able to pick you up.  You can scoot it a

16   little closer.

17   **A.**   Closer?

18   **Q.**   There you go.  Perfect.

19   **A.**   Okay.

20   **Q.**   Can you just state and spell your name?

21   **A.**   Juana Gillispie, J-U-A-N-A  G-I-L-L-I-S-P-I-E.

22   **Q.**   And where do you live?

23   **A.**   1512 Glendale Drive, Fairborn, Ohio.

24   **Q.**   How long have you lived in Fairborn?

25   **A.**   Oh, Fairborn, probably 53 years.

JUANA GILLISPIE - DIRECT (Owens)                                    1333

1   **Q.**   All right.

2   **A.**   Yeah, but not in the same house.  We lived in two

3   houses.

4   **Q.**   Got it.  And do you know who this guy is to my left over

5   here?

6   **A.**   That's my son.

7   **Q.**   Is he your only son?

8   **A.**   No.  I have Dean and James, two sons.

9   **Q.**   Do you have any daughters?

10  **A.**   Two daughters, Jodi and Zandra.

11  **Q.**   Who's Roger Gillispie?

12  **A.**   My husband.

13  **Q.**   Is he here today?

14  **A.**   Yeah, I see him over there.

15  **Q.**   All right.  And were you originally from Ohio, or did you

16  grow up somewhere else?

17  **A.**   I grew up in Eastern Kentucky.

18  **Q.**   Got it.

19  **A.**   Yeah.

20  **Q.**   What brought you to Ohio?

21  **A.**   When I was in Eastern Kentucky, I went to a one-room

22  schoolhouse.

23  **Q.**   Uh-huh.

24  **A.**   From the first to the fifth grade.

25          What brought me to Ohio?  My mother moved us to Ohio so

JUANA GILLISPIE - DIRECT (Owens)                    1334

```
1    that we could get a better education.
2    Q.    When did you meet your husband, Roger?
3    A.    In high school.
4    Q.    Where was that?
5    A.    Mead Memorial High School.
6    Q.    And how long have you all been married?
7    A.    Oh, my.  It's about 58, 59 years.
8    Q.    And what sorts of things did you do for employment when
9    you did work?
10   A.    I was a hair dresser.
11   Q.    Outside of hair dressing, did you have any sort of
12   hobbies or things that occupied your life when Dean was
13   growing up?
14   A.    Well, when my -- when my kids started school, I
15   volunteered at the school.
16   Q.    Do you do anything with the church?
17   A.    Yes.  Yes, I -- I was a Sunday school teacher.
18   Q.    How long did you teach Sunday school?
19   A.    I taught Sunday school in our small church for years.
20   And then we went to another church, and I taught there for
21   years, but I can't remember how many years.
22   Q.    Now, was Dean a big church guy?
23   A.    Yeah, um-hmm.
24   Q.    And did he also do things outside of church?
25   A.    Well, he loved to fish.  He loved to be with his
```

JUANA GILLISPIE - DIRECT (Owens)                    1335

1   friends.  He was in the Awanas.  We had a club in church

2   that was called Awanas, and they were in sports and

3   different things.

4   Q.   Okay.  Now, I want to fast forward a little bit.  After

5   Dean graduated high school, did he stay in the house for a

6   little while?

7   A.   He did, but he was -- he was working on a house.

8   Q.   Got it.  And what do you mean by -- when you say --

9   A.   He and my -- a friend of ours, he was teaching Dean how

10  to fix up old homes and sell 'em.

11  Q.   Who is that friend?

12  A.   Jim Osborne.

13  Q.   Do you remember how old Dean was when he started working

14  on homes?

15  A.   I think it's after he graduated, but I'm not sure.

16  Q.   Got it.  Did Dean at some point start working at General

17  Motors?

18  A.   Yes.

19  Q.   And anybody else in your family work there at the time?

20  A.   My husband.

21  Q.   How would you describe your relationship with Dean when

22  he was in high school and thereafter about, you know, when he

23  was working at General Motors?

24  A.   Dean loved to work.  He loved it.  I mean, he went to

25  Jim Osborne and said "I want a job" when he was a kid.

1           And he said, "Okay, how about going and cleaning this

2    parking lot."

3           So he went.  And he was -- he cleaned the parking lot.

4           I remember his -- Jim gave him his first check.  And he

5    went to the bank and tried to cash it, and they said you got

6    to show us identification.  He handed them his library card.

7    So then they're saying he can't, you know, do this and that.

8    So I had to go up there and take care of that.  But he

9    worked.  But Dean loved to work.

10   **Q.**   Yeah.

11   **A.**   And when he worked at General Motors, he was also going

12   to carpentry school.

13   **Q.**   Got it.  And what was your relationship like with Dean

14   when he was a young adult, before he got arrested?

15   **A.**   He was wonderful.  He just loved being with his

16   friends.  We loved having his friends at our house.  We

17   tried to make sure we knew where they was at.  I never had

18   any problem at all.

19   **Q.**   Now, were you the --

20   **A.**   He --

21   **Q.**   Sorry.

22   **A.**   That's okay.

23   **Q.**   Were you the kind of parent that had -- how would you

24   describe your relationship with Dean?  Did you talk to him or

25   see him regularly?

1    A.    Oh, yeah, every day.  Every day.  Yeah.

2    Q.    Now, do you remember what Dean's hair looked like when he

3    was in high school?

4    A.    Yeah.

5    Q.    What was that?

6    A.    It was -- it was brown, but he had started getting

7    gray.  And he had gray in the sides, and a few in the back.

8    But I did the same thing at 16; I started getting gray.

9    Q.    Got it.  And so that was my next question.  Were you

10   surprised that Dean started going gray a little early?

11   A.    No.

12   Q.    Anybody else in your family that happened to?

13   A.    Yeah.  All my children.  My youngest daughter was born

14   with a gray streak in her hair.  And then my oldest

15   daughter, she started graying early.  They're all gray now.

16   Q.    It's been a long time.

17          And is there anything that was noticeable about Dean's

18   face back when he was in high school or as a young adult?

19   A.    Dean always had a clear complexion.  He has a cleft in

20   his chin, like his father.  And he's fair-skinned.

21   Q.    Sure.

22   A.    Like I am.

23   Q.    Now, when he was growing up, did he have bad acne or

24   anything like that on the sides of his cheeks?

25   A.    He never did have that.  I never did either.  Never had

JUANA GILLISPIE - DIRECT (Owens)                           1338

1    that.

2    **Q.**   Was Dean a smoker?

3    **A.**   No.

4    **Q.**   I am just going to move forward a little bit here.  Do

5    you remember the summer of 1990 and the lead-up before your

6    son got arrested?

7    **A.**   Um-hmm.

8    **Q.**   I am going to draw your attention to that time, okay?

9    **A.**   Um-hmm.

10   **Q.**   Did you ever have any interactions with this guy over

11   here, Detective Scott Moore, that summer?

12   **A.**   Yeah, he called me on the phone.  Yes.  And also he was

13   at the house when they came and got Dean.

14   **Q.**   Got it.  Let's separate those things out.

15   **A.**   Um-hmm.

16   **Q.**   What was the conversation that you had with Detective

17   Moore on the phone?

18   **A.**   He wanted to know where Dean was at, and I told him I

19   didn't know at the time.  And he wanted to know where his

20   grandfather lived, and I said he lives in Columbus.  And I

21   think he even asked if he had a gun, and I said I think Dean

22   got -- or I know Dean got a beebee gun for Christmas.

23   **Q.**   Anything else you can recall about that conversation with

24   Detective Moore back in 1990?

25   **A.**   No, I can't.

JUANA GILLISPIE - DIRECT (Owens)                    1339

1   **Q.**   Okay.  At any point during that conversation did

2   Detective Moore tell you he was trying to prove your son's

3   innocence?

4   **A.**   Oh, no.

5   **Q.**   So I believe that you said your next interaction with

6   Detective Moore was the day that Dean got arrested?

7   **A.**   They came to his house.

8   **Q.**   Tell me what you remember about that.

9   **A.**   I was out back, and I had just hung two lines of

10  clothes up on the clothesline.  My daughter Zandra was in

11  the house.  My neighbor, Joyce Blair, came over with a tall

12  glass of ice tea.  Dean's friends came to the back gate and

13  told me the police were at his house and they would not let

14  them in.  They wouldn't let them in.  And so my daughter

15  took me over there to the house.

16      And I got to the house, and the police were there, and

17  they -- they said I could not come in, that he was all

18  right.  And I said I want to see him with my own eyes.  And

19  so I said I'm coming in.

20      So I went in, and there was other police downstairs, I

21  think, and police upstairs.  Moore was upstairs with someone

22  else.  I don't know if his name was Deperio [phonetic] or

23  something.  And Moore is pulling out a box from under Dean's

24  bed that had notes in it, it had bills in it, and that's all

25  he had.

JUANA GILLISPIE - DIRECT (Owens)                              1340

1       And he was looking for some of Dean's clothes.  So he

2   took a pair of wool gray pants because this man who did

3   this --

4   **Q.**   I got to stop you.  Just talk about the things that --

5   **A.**   So what he said was --

6            MR. McLANDRICH:  Objection.

7   BY MR. OWENS:

8   **Q.**   Let's just take it one step at a time, all right?

9   **A.**   Okay.  So --

10  **Q.**   Juana, can I stop you for a second?

11           THE COURT:  Hold on, hold on.

12       Why don't we start again --

13           MR. OWENS:  Yes, sir.

14           THE COURT:  -- and ask your question again.

15           MR. OWENS:  Thank you, Judge.

16  BY MR. OWENS:

17  **Q.**   Just one step at a time, all right?

18  **A.**   Uh-huh.

19  **Q.**   Were you surprised when Dean was being arrested?

20  **A.**   Yes.  I couldn't even believe it.

21  **Q.**   Okay.

22  **A.**   He was downstairs.  Well, I -- that's when I went

23  upstairs and Moore was there.

24  **Q.**   Okay.  Now, did you have any interactions with Detective

25  Moore while --

JUANA GILLISPIE - DIRECT (Owens)                    1341

1   **A.**   Um-hmm.

2   **Q.**   -- he --

3   **A.**   Um-hmm.

4   **Q.**   Just one second.

5        Did you have any interactions with Detective Moore while

6   he was searching the house?

7   **A.**   He was just in that one area --

8   **Q.**   Okay.

9   **A.**   -- pulling those out, and another policeman was there.

10  And they said, "You seem close with your son.  You better

11  tell him to admit -- you better tell him to admit to this

12  crime or he will never see --"

13           MR. McLANDRICH:  Objection.

14           THE WITNESS:  "-- daylight again."

15           THE COURT:  Sustained.

16  BY MR. OWENS:

17  **Q.**   So let's just talk about the things that you remember,

18  okay?

19  **A.**   Um-hmm.

20  **Q.**   So --

21           THE COURT:  First, counsel, ladies and gentlemen,

22  with regard to any statements that were made by other folks,

23  those are stricken from your consideration.

24       Next question.

25           MR. OWENS:  Sure.

JUANA GILLISPIE - DIRECT (Owens)                          1342

```
 1    BY MR. OWENS:
 2    Q.   The day that Dean got arrested, did you already have an
 3    attorney set up for him?
 4    A.   No.
 5    Q.   And did you help him get an attorney after that?
 6    A.   Yeah, our neighbor gave us a name of a attorney.
 7    Q.   And who is that attorney?
 8    A.   Dennis Lieberman.
 9    Q.   Now, did you know Mr. Lieberman personally before that at
10    all?
11    A.   No.
12    Q.   Just relying on your neighbor?
13    A.   Yeah.
14    Q.   Sort of fast-forwarding through the process here, did you
15    go to the court dates when Dean was being prosecuted?
16    A.   I remember going downtown when I think it may have been
17    the grand jury back there, and Lieberman said, well, I will
18    meet you downtown.
19    Q.   Got it.
20    A.   And so he met us downtown.
21    Q.   Okay.  So that -- so soon after Dean got arrested, you
22    went downtown?
23    A.   Um-hmm.
24    Q.   Okay.  And do you remember whether or not y'all had
25    enough money originally to post his bail?
```

JUANA GILLISPIE - DIRECT (Owens)                        1343

1    **A.**    We never had any -- no, we didn't have enough.

2    Lieberman told us that we could get a -- check into -- what

3    is it -- our house, see how much we could borrow.

4    **Q.**    Got it.  And just since you brought it up, over the

5    course of the last 30 years, did you have to borrow against

6    your house to help pay for lawyers for Dean?

7    **A.**    32 years.  Yes, yes, we've borrowed against our house.

8    **Q.**    More than once?

9    **A.**    More than once.  We still owe.  We owe everybody.

10   **Q.**    And going back to 1990, Dean had a number of court

11   dates --

12   **A.**    Um-hmm.

13   **Q.**    -- throughout the next year; is that right?

14   **A.**    Um-hmm.

15   **Q.**    Did you attend court?

16   **A.**    I attend everything.

17   **Q.**    All right.  And did you see how Dean was impacted by

18   going through these court proceedings?

19   **A.**    Yes.  It was very, very difficult.  He was exhausted.

20   **Q.**    And just going to February of 1991, do you remember when

21   Dean was convicted?

22   **A.**    Yeah.

23   **Q.**    And how did that impact you?

24                MR. McLANDRICH:  Objection.

25                MR. OWENS:  I'll withdraw.

JUANA GILLISPIE - DIRECT (Owens)                    1344

1    BY MR. OWENS:

2    Q.   Did you see -- what was your reaction when Dean was

3    convicted in February of 1991?

4    A.   He stood up.  They asked him to stand.  And I stood up,

5    and I just stepped two steps forward.  Three policemen took

6    me and slammed me against the concrete wall, and they threw

7    me to the floor and sit on me.  And, of course, you know, my

8    husband tried to get me outside, and I just cried.

9         The library came out and said can we calm it down a

10   little.

11   Q.   Sure.  There was another trial --

12   A.   Yes.

13   Q.   -- right?  And Dean was convicted again; is that right?

14   A.   Um-hmm.

15   Q.   All right.  So did you see how Dean responded when he was

16   convicted a second time?

17   A.   He cried.  He said he didn't do it.  And I knew he

18   didn't.

19   Q.   During the court proceedings -- and you said you were

20   there -- did you make eye contact with Dean from time to time?

21   A.   He was setting in front of us.  I don't think we could

22   make any eye contact at all.

23   Q.   Got it.  Did you visit him at the jail?

24   A.   All the time we could go.  When we could go.

25   Q.   All right.  So what was it like -- how did he seem when

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

JUANA GILLISPIE - DIRECT (Owens)                              1345

1    you saw him in the jail here in Montgomery County?

2    **A.**   He was exhausted.  I think he might have been there for

3    six months.  He was exhausted.  He said they were not giving

4    him much food.  He was so distraught because he said, "Mom,

5    what's happening to the young people?  These guys, these

6    young people are on drugs.  They don't even want to eat.

7    They just -- mashed potatoes and gravy is all they will

8    eat."  And he said, "I'm hungry."

9        And it hurt him so bad that he did a piece of art about

10   that:  *What is Happening to America's Youth.*

11       And so I called down there, and I said, "Let me speak

12   to somebody."  And I said, "Why can't you just fix beans and

13   cornbread?  If these guys who want to eat can eat, I mean,

14   surely your budget is --"

15           MR. McLANDRICH:  Objection.

16   BY MR. OWENS:

17   **Q.**   Got it.

18           THE COURT:  Counsel.

19           MR. OWENS:  I don't want to intrude, but is it okay

20   if I interrupt when I feel it's appropriate, Your Honor?

21           THE COURT:  You may.

22           MR. OWENS:  All right.  I don't want to step on

23   anybody's toes.

24   BY MR. OWENS:

25   **Q.**   So after Mr. -- sorry.  After Dean was convicted, what

1   sorts of steps did you take, if any, as a mom relative to his

2   criminal prosecution?

3   **A.**   That was so long ago --

4   **Q.**   Sure.

5   **A.**   -- that they had microscopically looked at the hair,

6   okay.  But when he was convicted, I was reading about DNA,

7   and my lawyers called me one night and said what is this --

8   **Q.**   So you can't -- you can't talk about things that people

9   told you, okay?

10  **A.**   Okay.  They just asked me a question, what it was.

11  **Q.**   I understand.

12  **A.**   So I was reading about that, and I wanted to have a

13  mitochondrial DNA done.

14  **Q.**   And did you have to hire attorneys to help you with that?

15  **A.**   Oh, we had attorneys.  I can't even name them all off.

16  **Q.**   And did you -- do you know whether or not that was

17  pursued in the courts?

18  **A.**   Yeah, they sent it -- sent it out, the hair.  That was

19  supposed to be the hair that they had.  None of it matched

20  Dean.  But there was two unknown hairs.

21  **Q.**   Sure.  So just focus on my -- so was there DNA testing

22  that was ultimately done that was -- that Dean was able to use

23  in his defense?

24  **A.**   No.

25  **Q.**   Okay.

JUANA GILLISPIE - DIRECT (Owens)                    1347

1    **A.**    Can I tell you about that hair?

2    **Q.**    No, you can't.

3         All right.  After a while, you had gone through that

4    process where the DNA didn't pan out.  Did you -- at some time

5    did you continue to seek to get your son out of prison without

6    using attorneys?

7    **A.**    We -- we had attorneys.  And when they filed a brief, I

8    would go down and make sure they did file it.

9    **Q.**    Sure.

10   **A.**    The books back then were that big (indicating).

11   **Q.**    They were --

12   **A.**    So they had to go over -- the runners went over and

13   wrote it down.

14   **Q.**    Sure.  So what I want to just focus your attention is

15   after you sort of ran out of DNA options, did you do other

16   things outside of the courts?

17   **A.**    Yeah.

18   **Q.**    What was that?

19   **A.**    I got a call from a lady that was in the visiting room

20   at the prison, and she said, "We are going to --"

21            MR. McLANDRICH:  Objection.

22            THE COURT:  Counsel, we are --

23            MR. OWENS:  I understand.  I can --

24            THE COURT:  Ma'am, I think he is asking you what did

25   you do.  In any case, it's not proper to say what someone else

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

JUANA GILLISPIE - DIRECT (Owens)                    1348

```
 1    told you.
 2              THE WITNESS:  Okay.
 3              THE COURT:  But you can say, in response to your
 4    counsel's question, what you did.
 5              THE WITNESS:  Um-hmm.
 6              THE COURT:  All right?
 7              THE WITNESS:  I pursued the Innocence Project when I
 8    found out they was going in existence.
 9    BY MR. OWENS:
10    Q.   Okay.  Perfect.  How did you find out about the Innocence
11    Project going into existence?
12    A.   The lady in the room told me.  She said, "We're --"
13    Q.   Okay.
14    A.   "-- starting a fundraiser."
15    Q.   Did you ultimately meet an individual named Mark Godsey?
16    A.   Yes.
17    Q.   All right.  And was that at the Ohio Innocence Project?
18    A.   Yes.  He told me to bring the transcripts.
19    Q.   And was the Ohio Innocence Project fully set up at the
20    time that you first met Mr. Godsey?
21    A.   I think they were.
22    Q.   Did you talk to any reporters or media outlets about
23    doing research about Dean?
24    A.   I know that we had a reporter, Laura Bischoff, came on
25    the case.
```

JUANA GILLISPIE - DIRECT (Owens)                    1349

1    **Q.**   Did you ever talk to anybody from the I-Team in

2    Cleveland -- or excuse me -- in Cincinnati?

3    **A.**   Oh, yeah, yeah, I called them.  Jeff Keane.

4    **Q.**   Can you remember all the people that you called trying to

5    listen to you talk to you about your son?

6    **A.**   I called the media around here, but they said they was

7    going to look into it, but they didn't.  So a friend of Dean

8    wrote a letter to Cincinnati, and he said he would -- Jeff

9    Keane was an investigator.

10   **Q.**   Got it.

11   **A.**   So he investigated this case.  For months.  And then

12   they reported it, and then they went in the prison to get

13   Dean -- talk to Dean.

14   **Q.**   Got it.  Over the course of between, you know, when Dean

15   went into prison --

16   **A.**   Um-hmm.

17   **Q.**   -- did you have the opportunity to visit him there?

18   **A.**   Yes.

19   **Q.**   And how often would you go visit your son?

20   **A.**   As often as that prison would let us.  Twice a month at

21   that time.

22   **Q.**   Got it.  And did Dean ever -- you mentioned earlier that

23   he did some painting; is that right?

24   **A.**   Um-hmm, um-hmm.

25   **Q.**   What kind of paintings did Dean do while he was in

JUANA GILLISPIE - DIRECT (Owens)                                1350

1   prison?

2   A.   He started out doing diorama art.  These, you can

3   take -- you take like the -- he built me a home.  And I love

4   yellow; so he made it all yellow.  And he built me this

5   house.

6        And so I went in, and they had Kool-Aid.  And the

7   warden came in.  But the warden -- I was supposed to take

8   that house home, but the warden confiscated my house and

9   took it to his office.  I never saw it again.  So he made

10  all kinds of diorama arts, and then he started painting.

11       And then, so I would go in, and I'd bring the paintings

12  out when they allowed me to bring the paintings out.

13       Dean was -- they voted him the president of the art

14  club.

15  Q.   Got it.  And so I wanted to talk a little bit about that.

16  Did you ever see any things that Dean might have built for the

17  Cincinnati horticulture club?

18  A.   Oh, yeah.  They called me and told me to come down.

19  Tim Young, he went into the prison and talked to Dean, and

20  so he was building the thing.  And he called me and told

21  me --

22  Q.   I got to stop you.  You can't talk about what people have

23  told you, okay?

24  A.   Oh, he told me to come down there.

25  Q.   There we go.

JUANA GILLISPIE - DIRECT (Owens)                        1351

```
 1              MR. OWENS:  Your Honor, can we just show what's PX

 2    284 at page number 2?

 3              THE COURT:  Objection?

 4              MR. McLANDRICH:  No, sir.

 5              MR. HERMAN:  No objection.

 6              THE COURT:  You may.

 7         (Exhibit displayed.)

 8    BY MR. OWENS:

 9    Q.   I am just going to have you look at the screen here.

10    A.   Yes, um-hmm.  That was just one of them.

11    Q.   Do you see the screen right there, right below you?

12    A.   Yeah.  That was just one of them.

13    Q.   Okay.  What is this?

14    A.   This is -- I think it's -- it may be the hobbit house.

15    Q.   Could it be a different house?

16    A.   Or a pub.  They brought in a man to do this fashion.

17    They flew him in.

18    Q.   Got it.

19              MR. OWENS:  Can we go to the next page, please.

20         (Exhibit displayed.)

21              MR. OWENS:  And the next page.  Or actually, I think

22    it's page number 1.  I apologize.

23         (Exhibit displayed.)

24              MR. OWENS:  Take it down.

25    BY MR. OWENS:
```

JUANA GILLISPIE - DIRECT (Owens)                           1352

1    **Q.**   Did you just describe something called the hobbit house?

2    **A.**   Yeah, he did a hobbit house.

3    **Q.**   Just make sure you are in the microphone.  Thank you.

4    **A.**   Yeah, he did the hobbit house, the Pinsner house, which

5    was -- the queen built those for their retired helpers.

6    **Q.**   So how -- he built those while he was in the prison?

7    **A.**   Yeah, um-hmm.  And he had to break them down so they'd

8    break down and fit in a big truck.

9    **Q.**   Okay.

10           MR. OWENS:  Your Honor, we'd show Plaintiff's

11   Exhibit 284 at page 8.  I apologize for the numbering.

12           THE COURT:  I assume there is no objection?

13           MR. McLANDRICH:  No.

14           MR. OWENS:  It's the hobbit house.

15           MR. McLANDRICH:  No.

16           THE COURT:  Do you got any?

17           MR. McLANDRICH:  No, sir.

18        (Exhibit displayed.)

19   BY MR. OWENS:

20   **Q.**   Now, Ms. Gillispie, do you see the picture on your screen

21   there right again?

22   **A.**   Um-hmm.

23   **Q.**   All right.  What's that a picture of?

24   **A.**   I think that was the hobbit house garden house or

25   something.

1    **Q.**    Got it.  And is this something Dean built in prison?

2    **A.**    Yeah.

3    **Q.**    All right.  And how do you think that building the

4    structures that we've just seen -- you can take that down --

5    in Exhibit Number 284 here are reflective of who your son was

6    as a person in the world?

7    **A.**    That's who he was.  That's just his character.  He

8    wanted a job.  He would call me and say, "Mom, I wish they'd

9    give me a job in here."  But he was doing these things too.

10    **Q.**    Now, he talked about some -- you talked about some

11    paintings.  Do you recall any of the titles of his paintings

12    that stand out to you?

13    **A.**    Yes, I have one hanging in my house now.  And it says,

14    *Look, Mom, what could have been*.  And it's about this big

15    (indicated).  And it is a house and a little child looking

16    up in the child's eyes -- or the horse's eyes.  And he said

17    he didn't know if he would have had a boy and girl, but my

18    son didn't get to have children.

19    **Q.**    Any other pictures you have that Dean's painted at your

20    home?

21    **A.**    Yeah, I got lots of them.  What isn't traveling, what

22    isn't traveling around being in museums or shows or

23    whatever.

24    **Q.**    Got it.

25    **A.**    I have a few left.

JUANA GILLISPIE - DIRECT (Owens)                        1354

1    **Q.**   Has Dean done any other art that stands out to you that's

2    about his experience in being wrongfully convicted?

3    **A.**   I can't remember.

4    **Q.**   All right.

5    **A.**   There's so many of them.

6    **Q.**   So let's just fast forward.  At some point in December of

7    2011 Dean was released from prison, right?

8    **A.**   Uh-huh.

9    **Q.**   Can you just describe what happened that night?

10   **A.**   Well, I got a call from the marshal, and she said, "Can

11   you pick your son up in two hours?"

12       I said, "I don't have any transportation.  My

13   daughter's there visiting him now."

14       And so I called Richie, and Richie said that he would

15   get a van, and we could just get on the van -- or anybody

16   that wanted to go could get on the van.

17       And so we thought that Petro was going to speak outside

18   at the door of the prison because he believed in my son, but

19   Petro called me back and said, "Juana, they won't let you on

20   the grounds."

21   **Q.**   Just tell me about the things that you experienced.

22   **A.**   When he come to the house or what?

23   **Q.**   Well, did you see him before he got home?  Where did you

24   first see your son after --

25   **A.**   Oh, they said we had to go to the bowling alley.

1    **Q.**   Got it.  And could you just describe the first moment

2    that you got to see your son not in a prison in 20 years?

3    **A.**   Yes.  It was a while before he came in, but -- so we

4    just hugged each other, and we danced and cried.  And there

5    was a lot of people there, and they cried.  And it was, you

6    know, just overwhelming, exhausting overwhelming.

7    **Q.**   And how would you describe sort of Dean's general

8    attitude or mood before he went into prison?

9    **A.**   Dean, he always was in a good mood.  He always was.

10   Nothing ever really got him down.  He just was in a good

11   mood.  He loved being with his friends.  He loved fishing.

12   He loved going camping, you know.  One of his friend's mom

13   and dad, they worked in the church, and they would go with

14   them, and she would cook.

15   **Q.**   Sure.  Since he's been released, have you seen Dean

16   exhibit -- you know, go from happiness to sadness in a shorter

17   period of time or have a shorter fuse or anything like that?

18   **A.**   I didn't know anything about PTSD.  And my husband

19   was -- Dean was speaking with Mark Godsey, and my husband

20   was ironing his shirts getting them ready.  He's always

21   ready to go.  And so we went in to hang those shirts on the

22   rack, and the rack broke.

23        So we got a new rack, and we put it in there.  And my

24   husband said, well, I am going to run the sweeper, and he

25   ran the sweeper.  But when Dean came home, he didn't even

JUANA GILLISPIE - DIRECT (Owens)                    1356

1    like that we had been in his room.  You know, because he

2    knew where everything -- because they did that at prison all

3    the time.

4    Q.    Okay.  Let's back up a little bit.  So after Dean was

5    released, was he living with you?

6    A.    Yes.

7    Q.    And while he was out, you fixed something in his room?

8    A.    Yeah.

9    Q.    Okay.

10   A.    He didn't speak to me three days, for three days, he

11   was so angry with me.

12   Q.    Just about some small thing?

13   A.    Yeah, he went into -- he went into yelling and

14   screaming, and his face turned red.  I didn't understand it

15   at all.

16   Q.    And had you ever seen him do anything like that before he

17   had been in prison?

18   A.    No.

19   Q.    The things -- you had some time with Dean since he's been

20   out.

21   A.    Um-hmm.

22   Q.    And did you -- has he interacted -- I'm sorry.  Let me

23   withdraw that.

24         While Dean was in prison, did he miss out on any family

25   events that were particularly significant?

JUANA GILLISPIE - DIRECT (Owens)                    1357

1    **A.**   Yes, he missed out on everything.  My first grandchild

2    was only two, I think, when Dean went to prison.  Dean spent

3    a lot of time with him.  My second granddaughter was born,

4    and he was in prison at that time.  And so he missed out on

5    all that.

6         And I -- I had a son go into the war at the same time

7    my son was going to prison.  He was going to war, and he's

8    going to prison.  That was hard.  I only have two sons.  And

9    I was giving them up for what?  What?  You know, for what?

10   This fighting for justice, but I didn't see no justice.

11   He's going to war to fight for justice so that blood

12   wouldn't come here and be in our front yard.

13   **Q.**   Got it.

14   **A.**   And I had no justice for him.

15   **Q.**   That's all right.

16   **A.**   I might as well been fighting the organized crime

17   because at least I knew who they were.

18             THE COURT:  Counsel, counsel.

19             MR. McLANDRICH:  Objection.

20             THE COURT:  Counsel, counsel.

21             MR. OWENS:  Sure.

22   BY MR. OWENS:

23   **Q.**   Why don't we just take a minute.

24   **A.**   So my son is sent to a different country --

25   **Q.**   So just take a pause, okay.  And just see -- just take a

JUANA GILLISPIE - DIRECT (Owens)                    1358

```
 1    minute.  Just take a minute.
 2         All right.  You okay?
 3    A.   (Nodded head.)
 4    Q.   Okay.  So we will just go nice and slow and just answer
 5    my questions, okay?
 6         Over time, before Dean went to prison, did he tell you
 7    what he wanted to do sort of when he grew up, for lack of a
 8    better phrase?
 9    A.   He wanted to flip homes, and he was -- he was good at
10    it.  But he even worked for a -- people in Fairborn that
11    owned homes before he went to prison.  And he was cleaning
12    their homes out for them to sell and all that.
13    Q.   And while Dean was in prison -- strike that.
14         Did he ever talk to you about his ability to sleep while
15    he was in prison?
16    A.   Yeah.  You can't sleep.  You had to be afraid of those
17    around you.
18    Q.   Has Dean talked to you about ongoing difficulties
19    sleeping since he's been released?
20    A.   Yeah.  He had problems sleeping.
21    Q.   Anything about nightmares?
22    A.   Yes, he had nightmares.  I did too.  He had nightmares.
23    You never get -- you don't have any relief from this.  There
24    is no relief.  Your head has got all this stuff in it, all
25    this ugly stuff.  And this side of your head's trying to
```

1    make sense of it (indicating).  And you're just trying to --

2    you're trying to keep yourself together to be in the middle

3    of it, just try to keep yourself together.

4         But there's no getting rid of the horrible things that

5    I heard.

6    **Q.**    Okay.

7    **A.**    There's no getting rid of it.

8    **Q.**    Okay.

9    **A.**    And when I had to do things --

10              THE COURT:  Counsel --

11              THE WITNESS:  -- over and over again --

12              THE COURT:  Counsel, counsel, counsel --

13              THE WITNESS:  -- then it all comes back again.

14              THE COURT:  Ma'am, you just have to answer the

15   questions.  I'm trying to give a lot of leeway here.  But you

16   have to answer his questions.

17              THE WITNESS:  Okay.

18              THE COURT:  I understand what you're saying, but

19   it's --

20              THE WITNESS:  Okay.

21              THE COURT:  It just has to be him asking you a

22   question and you answer that question.

23              THE WITNESS:  Okay.

24              THE COURT:  You have -- Mr. Owens knows what type of

25   questions and what type of information he wants to obtain from

JUANA GILLISPIE - DIRECT (Owens)                          1360

1    you.  So you have to just listen to his questions and just

2    answer those questions.

3              THE WITNESS:  Okay.

4              THE COURT:  Okay?  Thank you.

5    BY MR. OWENS:

6    **Q.**   All right.  Just a couple more things, okay?

7         Did -- since Dean's been out, have you had the ability to

8    go watch him give speeches and things like that?

9    **A.**   Yes.

10   **Q.**   Okay.  And how has it been seeing Dean give speeches and

11   do other sorts of work in that field?

12   **A.**   I loved it.  You guys got these things that tell you

13   where to go and a map and all that, but I was over here with

14   a map, and he was driving.  So I was telling him where to

15   go.  And so I enjoyed that very much.  And I felt very

16   blessed that he was reaching out and helping others and that

17   he was making it known that this -- this happens.

18        He went to -- he went to schools -- and I was there

19   too -- of young children and telling them, and they just --

20   and they sent -- they sent thank you notes.  All the time he

21   got thank you notes.

22        But he spoke, he spoke -- he has spoke all over the

23   world.  He's been sent all over the world.  In this state he

24   spoke to lawyers and judges.  And he helps these guys that's

25   out.

JUANA GILLISPIE - DIRECT (Owens)                    1361

1    **Q.**   Got it.  And when Dean is giving these speeches, has he

2    been talking about his work with the Ohio Innocence Project

3    and being wrongfully convicted?

4    **A.**   Yes, uh-huh.  The Ohio Innocence Project got him out.

5              MR. OWENS:  So no further questions, Your Honor.

6              THE COURT:  Thank you.

7         Any questions?

8              MR. McLANDRICH:  No, sir, Your Honor.

9              THE COURT:  Any questions?

10             MR. HERMAN:  No, Your Honor.

11             THE COURT:  Ma'am, thank you very much.  You're

12   excused.

13        Counsel approach.

14        (At sidebar off the record.)

15             THE COURT:  Ladies and gentlemen, we've come to a

16   point in time in the trial, and with regard to witnesses, it

17   would be, I believe, appropriate and advisable to recess for

18   the day.

19        We've been moving along quite well, and I'm hopeful we're

20   still within our timelines.  So, again, I'm going to ask you

21   to abide with us and remember your admonitions, ask your

22   family to still abide by the fact that you can't talk to them

23   about anything.  And, again, like I said, once this is over,

24   then you have every -- you can talk to them -- you can talk to

25   anybody about anything.

     1          So please remember those admonitions.  We'll try to

     2     start -- we will start right at 9 o'clock in the morning.  And

     3     like I said, we are moving along pretty well.

     4          You may find, however, in the last -- as you did today --

     5     things don't necessarily run like clockwork.  Now I take the

     6     blame for some of that, but it's not -- it's not -- there is

     7     no blame to be put on any of the parties or the attorneys.

     8     It's just the fact that a lot of things that need to be done

     9     here need to be done outside your presence, and there are

    10     important questions of law, there's important questions that

    11     need to be answered by the Court before presentation of

    12     evidence.

    13          So be patient.  Bear with us.  I'm attempting to make

    14     sure that everyone gets their say here, gets a fair trial.

    15     So -- and to do that, we need to make some of those breaks.

    16     So it may be a little bit sporadic over the next day or two,

    17     three, but we're doing the best we can.

    18          With the thanks of the Court and the party -- well,

    19     first, counsel, do you have anything else?

    20               MR. OWENS:  No, Your Honor.

    21               THE COURT:  Counsel?

    22               MR. McLANDRICH:  No, Your Honor.

    23               THE COURT:  Counsel?

    24               MR. HERMAN:  No, Your Honor.

    25               THE COURT:  We will stand in recess until 9 o'clock

1     tomorrow morning.

2          I will see counsel briefly in chambers.

3               THE COURTROOM DEPUTY:  All rise.  This court stands

4     in recess.

5          (Jury out at 3:42 p.m.)

6          (Court adjourned at 3:42 p.m.)

1364

1        CERTIFICATE OF REPORTER

2

3            I, Mary A. Schweinhagen, Federal Official Realtime

4    Court Reporter, in and for the United States District Court

5    for the Southern District of Ohio, do hereby certify that

6    pursuant to Section 753, Title 28, United States Code that the

7    foregoing is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is

10   in conformance with the regulations of the Judicial Conference

11   of the United States.

12

13   s/Mary A. Schweinhagen

14   _____  21st of December, 2023

15   MARY A. SCHWEINHAGEN, RDR, CRR
     FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25