```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF OHIO
 2                             AT DAYTON

 3   _____
                                        )
     ROGER DEAN GILLISPIE,              )
 4                                      )
                        Plaintiff,      ) CASE NO. 3:13-cv-416-TMR
 5                                      )
                     -vs-               )
 6                                      )
     THE CITY OF MIAMI TOWNSHIP, ET AL.,) JURY TRIAL
 7                                      )
                        Defendants.     ) VOLUME IX
 8   _____)
                     TRANSCRIPT OF PROCEEDINGS
 9             THE HONORABLE THOMAS M. ROSE,
             UNITED STATES DISTRICT JUDGE, PRESIDING
10               WEDNESDAY, NOVEMBER 17, 2022
                         DAYTON, OH
11
     For the Plaintiff:      MICHAEL KANOVITZ, ESQ.
12                           DAVID B. OWENS, ESQ.
                             MEGAN C. PORTER, ESQ.
13                           Loevy & Loevy
                             311 N. Aberdeen Street
14                           3rd Floor
                             Chicago, IL  60607
15
     For the Defendant       JOHN T. McLANDRICH, ESQ.
16   Matthew Scott Moore:    DAVID J. SIPUSIC, ESQ.
                             Mazanec, Raskin & Ryder Co., LPA
17                           3305 Solon Road
                             100 Franklin's Row
18                           Cleveland, OH  44139

19   For the Intervenor      DAWN M. FRICK ESQ.
     Miami Township:         CHRISTOPHER T. HERMAN, ESQ.
20                           Surdyk, Down & Turner Co., LLP
                             8163 Old Yankee Street
21                           Suite C
                             Dayton, OH  45458
22
          Proceedings recorded by mechanical stenography,
23   transcript produced by computer.
                     Mary A. Schweinhagen, RDR, CRR
24               Federal Official Court Reporter
                     200 West Second Street
25                     Dayton, OH  45402
                      *** *** *** ***
```

*Mary A. Schweinhagen, RDR, CRR   (937) 512-1604*

1  Courtroom Deputy:  Jeffrey Garey

2  Law Clerks:  Michael Mayer, Callum Morris

3  Also Present:  Roger Dean Gillispie, plaintiff; Valerie
   Barajas, paralegal; Matt Thibodeau, paralegal; Jeff Weber, IT
4
                    *    *    *    *    *
5

6                  **INDEX OF WITNESSES**

7  **PLAINTIFF'S WITNESSES**

8  **TIMMY WILSON (READ INTO RECORD)**                    1369

9  **PLAINTIFF RESTS**                                    1384

10 **DEFENSE WITNESSES**

11 **ANTHONY MONHEIM**
        Direct Examination by Mr. McLandrich          1386
12      Cross-Examination by Mr. Owens                 1403
        Cross-Examination by Ms. Frick                 1424
13      Redirect Examination by Mr. McLandrich         1426
        Recross-Examination by Mr. Owens               1429
14
   **JOHN WIXTED**
15      Direct Examination by Mr. McLandrich           1432
        Cross-Examination by Mr. Owens                 1464
16      Redirect Examination by Mr. McLandrich         1491
        Recross-Examination by Mr. Owens               1497
17
   **DEFENDANT MOORE RESTS**                            **1501**
18

19

20
                    *    *    *    *    *
21

22

23

24

25

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1367

```
 1                          INDEX OF EXHIBITS
        PLAINTIFF'S                                   ADMITTED
 2        54                                          1507
          56, 58                                      1531
 3        64, 76, 104                                 1510
        138 (pg 4)                                    1513
 4      176 (pgs. 8, 9)                               1514
        177 (pgs. 19, 20, 25, 27)                     1513
 5      200 (pgs. 1, 3, 4, 5, 6)                      1514
        205 (pgs. 3, 6), 213, 215 (pgs. 1, 2)        1515
 6      247, 249 (pg. 1), 252 (pg. 1),
        281 (pgs. 1, 2), 282, 284 (pgs. 2, 5, 6, 8),
 7      285 (pgs. 6, 7, 9, 10)                        1517

 8      DEFENSE'S

 9       1 (pgs. 1-4), 2 (pgs. 1-14), 3 (pgs. 1-13),
        4, 5, 6 (pgs. 1, 2), 7 (pgs. 1, 2),
10      8 (pgs. 1-10), 9 (pgs. 1-4), 10 (pgs. 1 and 2) 1526
        11 (pg. 1), 12 (pg. 1), 13 (pgs. 1, 2),
11      14 (pg. 1), 15 (pg. 1, 2), 17 (pg. 1),
        18 (pgs. 1-3), 19 (pgs. 1-3), 22 (pgs. 1-3),
12      28 (pgs. 1-18), 31 (pgs. 1, 2),               1527
        23                                            1543
13      32 (pgs. 1, 2), 33 (pgs. 1, 2)               1530

14                      *     *     *     *     *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1           P-R-O-C-E-E-D-I-N-G-S                    9:28 A.M.

 2        (In open court at 9:28 a.m.)

 3           THE COURT:  Ladies and gentlemen, good morning.

 4    Hopefully you had a good evening.  Hopefully you didn't get

 5    stuck in the snow.  And hopefully you were able to abide by

 6    the Court's admonitions.  I assume you all were?  Anybody that

 7    wasn't?

 8        (No verbal response.)

 9           THE COURT:  Ladies and gentlemen, before we go -- we

10    start our presentation of evidence, I just want to again

11    remind you that we are probably to the point of the trial in

12    which we may, on occasion, take extended breaks in order for

13    the Court to deal with matters outside your presence.  Please

14    be patient.  Please don't try to put any specific reason on

15    that.  That's something that the Court has to do.  That's not

16    the fault of any party.  That's just the fact that the Court

17    has to make those decisions.  So we may, on occasion, take

18    breaks.  Breaks may be longer than usual, and there may be

19    more of them.  I am not saying there will be, I'm just

20    preparing you in case there are.  So, again, I would just ask

21    you to be patient and bear with us.

22        All right.  We are on the record.  Counsel ready to

23    proceed?

24           MR. OWENS:  We are, Your Honor.

25           MR. McLANDRICH:  Yes, sir, Your Honor.
```

```
 1              MR. HERMAN:  Yes, Your Honor.

 2              THE COURT:  Ladies and gentlemen, again, I am going

 3    to apprise you of the fact that -- well, first witness?

 4              MR. OWENS:  Your Honor, we've got the deposition of

 5    Sergeant Tim Wilson.

 6              THE COURT:  Ladies and gentlemen, as I indicated to

 7    you yesterday and I instructed you on it yesterday, a

 8    deposition is a witness's sworn statement that is taken before

 9    the trial, and during that deposition the witness is under

10    oath and swears to tell the truth.  And the lawyers for each

11    party may ask questions.  A court reporter is present, and

12    records -- records the questions and answer.

13         And as I indicated, this is a -- these are designations

14    of a deposition that was taken of one Tim L. Wilson on

15    December the 18th, 2018.  This deposition testimony, or these

16    designations -- when I mean "designations," I mean parts of

17    the deposition that the -- that the Court has -- is allowing

18    to be presented to you.  That testimony, those designations,

19    are entitled to the same consideration as any live testimony

20    that you might hear and consider, and you must judge it in the

21    same way as if the witness was testifying here in court.

22         And, again, we will have folks playing the part of

23    Mr. Wilson, and counsel will be asking questions.  Please

24    don't put any significance on the behavior or the tone of

25    voice of the people who are reading the deposition.
```

WILSON - (READ INTO RECORD)                             1370

```
 1        Any questions?

 2        (No verbal response.)

 3            THE COURT:  You may proceed.

 4        You may inquire.

 5    TIMMY LEE WILSON, PLAINTIFF'S WITNESS, READ AS FOLLOWS:

 6            MS. PORTER:  Tim L. Wilson was called as a witness,

 7    and having first been duly sworn, testifies as following.

 8                          EXAMINATION

 9    BY MS. PORTER:

10    Q.   Good morning, sir.

11    A.   Good morning.

12    Q.   Would you please state and spell your name for the

13    record?

14    A.   Tim Lee Wilson.  W-I-L-S-O-N is the last name.  Timmy,

15    T-I-M-M-Y.  Middle name Lee, L-E-E.

16    Q.   Was there anything that you read in Mr. Moore's

17    deposition that you can recall that conflicted with your

18    memory of how things worked in Miami Township during the

19    period of time in which the C.W. and B.W.'s rapes were being

20    investigated?

21    A.   It seemed pretty much accurate.

22    Q.   So what happened in June of 1990?

23    A.   I believe it was right on my birthday, June 15th of

24    1990, I received a call from Captain Scothorn of the Miami

25    Township Police Department asking if I was interested in a
```

1   detective-sergeant's position at the police department.  We

2   entered into negotiations, and right around that date I was

3   hired to go to Miami Township Police Department as a

4   detective-sergeant.

5   **Q.**   Okay.  Tell me first about what your duties were from the

6   internal affairs side of things.

7   **A.**   I would be assigned a case generally from Captain

8   Scothorn or Chief Tom Angel concerning any kind of

9   allegations against any of our officers, misconduct,

10  criminal cases, civil -- not civil -- but internal cases,

11  and I would investigate them and report back to the captain.

12  **Q.**   Were there any written general orders or special orders

13  governing how internal affairs' investigations worked in 1989?

14  **A.**   1990.

15  **Q.**   Excuse me.  Yeah, June of 1990, got it.

16  **A.**   We had a standard operating procedure book, pamphlet.

17  **Q.**   And were you, as the internal affairs supervisor, did you

18  have somebody below you who did the investigation, or did you

19  do the investigation yourself?

20  **A.**   I did.

21  **Q.**   And then would you report that up the chair to the

22  captain and the chief?

23  **A.**   Yes.

24  **Q.**   Did you ever overlap with Steve Fritz in the department?

25  **A.**   No.

WILSON - (READ INTO RECORD)                                    1372

1   **Q.**   Okay.  And now, what were your duties in relationship to

2   supervising these detectives when they were working on ongoing

3   investigations?

4   **A.**   When they are working on on -- in ongoing

5   investigation?

6   **Q.**   Yes, sir.

7   **A.**   As I said, first of all, I consider myself not a

8   micromanager.  I didn't look over their shoulder constantly.

9   They were all fairly experienced officers promoted in the

10  detective section.  They had all, I believe, handled some

11  pretty significant cases in the past.

12         My daily duties were just to observe, to be there

13  for them.  If they needed assistance or they needed help on

14  a case, I would assign additional help to them, ensure that

15  their case -- cases was wrapped up, so to say, presented to

16  the prosecutor's office, you know, and as timely as could

17  be; to assist them if they requested any assistance for

18  search warrants.  Just generally being there, being there

19  for them, assigning cases to them.  If they submitted

20  reports, I'd review the reports, document the reports to

21  records or whoever.

22              THE COURT:  Mr. Wilson, can you slow down a little.

23              THE WITNESS:  Sure.

24  BY MS. PORTER:

25  **Q.**   What was that process like?  And at the time, I just want

WILSON - (READ INTO RECORD)                              1373

1    to be really clear so that we are on the same page.  I'm

2    talking about between June of 1990, for about a year or year

3    and a half after, until the beginning of 1992.

4    **A.**    If I recall, that was about the time period they

5    switched from handwritten reports to computerized

6    generalized -- computerized generized reports.  The

7    detectives would open up the main case file or case report

8    in the computer that they had been assigned, and they would

9    do a supplemental report as the investigation was ongoing.

10   And they would either -- once finished with the supplemental

11   report, they would either or both save it in the computer

12   and/or print it out if they were pretty much finished with

13   it.

14        Once I received a printed copy of that report, I'd look

15   at it, review it, make suggestions, sometimes talk to

16   detectives about it if need be, sometimes not, and generate

17   or send that report to the records section for filing.

18   **Q.**    And when the reports were computerized, the case reports,

19   would you review them along the way or just at the end of the

20   investigation?

21   **A.**    Generally at the end.  Not generally.  Mostly at the

22   end.

23   **Q.**    Fair to say that when a detective at Miami Township

24   Police Department submitted a report in 1990 or 1991, that it

25   had to be reviewed by some sergeant or supervisor?

WILSON - (READ INTO RECORD)                                    1374

1   **A.**   When they printed it out, when they were finished with

2   their summaries or finished with the investigation and it

3   crossed our desk, yes.

4   **Q.**   I guess what I'm wondering is, as a matter of policy and

5   practice at the time, did detectives have to submit every

6   report to a supervisor?

7   **A.**   I would say yes.

8   **Q.**   Do you know if it was a Polaroid?

9   **A.**   I do not recall.

10  **Q.**   Did you directly oversee Scott Moore in his preparation

11  of any photographic lineups?

12  **A.**   No.  What I do recall is the officer, the detectives

13  constructing the photo lineup from a multitude of available

14  photographs or mugshots at the police department.  That was

15  the primary source of the photograph.  They would arrange an

16  array, sometimes, if I recall, six, maybe eight

17  photographs -- I'm sure nothing less than six, probably no

18  more than eight -- from one suspect on one incident.  They

19  would concentrate on having photographs of the suspect being

20  like and similar.  They would pay special interest obviously

21  to race, to the physical structure, facial hair structure.

22  Just try to get photographs of somebody that's as close as

23  they can to the suspect, put it in an organized chart or

24  bundle, and present it separately to the victim or victims

25  individually.

WILSON - (READ INTO RECORD)                                    1375

1           They may have them -- without trying to prejudice the

2      identification that might be made by the victim, they would

3      not refer to names and that type of thing.  They would just

4      simply say, "Look at it.  Do you see somebody that looks

5      familiar that may have assaulted," or whatever the case may

6      be.  If they identified that person, they may have the

7      victim sign their name on that particular photograph, date

8      it and time, and present the information to the prosecutor's

9      office somewhere along the line.

10     **Q.**   Now, you mentioned a couple minutes ago that there was

11     some kind of photograph, a photo database that is used --

12     excuse me.  Strike that.  You mentioned a moment ago that

13     there was photo -- photo databases that detectives could use

14     to generate the photo arrays.  Do you recall that?

15     **A.**   Yes.

16     **Q.**   And what were those photo databases that were available

17     in 1990 and 1991?

18     **A.**   During that period of time, the best I can recall, was

19     just a photo album-type things.  Mugshot books that we

20     housed in the detective section from people who have been

21     arrested in the past or what we called a field

22     interrogation, somebody that's acting suspicious, there was

23     reason for us to be there, for the patrol officer to be

24     there.

25          The patrol officer may take a Polaroid and do what was

WILSON - (READ INTO RECORD)                                    1376

1    called a memo card, just a brief card saying that on such a

2    date I saw John Doe.  John Doe was acting suspicious, had no

3    identification, we took a photograph.

4    **Q.**   Are you aware of any time that you were included in a

5    photographic lineup?

6    **A.**   I don't remember being involved.

7    **Q.**   Would you be surprised to find out that you were included

8    in a photographic lineup?

9    **A.**   No, because I've heard that I was in this photo lineup.

10   I wouldn't be surprised today.  But when I learned that,

11   yes, I was surprised.

12   **Q.**   Okay.  Now, I just want to be really clear about the way

13   in which your supervision of Detective Moore would have worked

14   in 1990.  And for the photographic lineup, it would have been

15   consistent with the practices of the department as you

16   understood them for him to create the lineup without showing

17   it to you before he showed it to the victims, correct?

18   **A.**   Would it be consistent?

19   **Q.**   Was it the practices of the department for Detective

20   Moore to have made the lineup and then shown it to the victims

21   without having any other officer review it?

22   **A.**   Yes.

23        In 1990, it would not have violated any practice or

24   rule of the department for Detective Moore to include police

25   officers --

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1              MR. KANOVITZ:  I'm sorry.  I think that's you.

2    **Q.**   In 1990, it would not have violated any practice or rule

3    of the department for Detective Moore to include police

4    officers in the photographic lineup, correct?

5    **A.**   Yes.

6    **Q.**   And are you aware of any circumstances in which Miami

7    Township detectives used the Miami Valley Regional Crime Lab

8    to create pictures to be used in a photographic lineup?

9    **A.**   Am I aware?

10   **Q.**   Yes.

11   **A.**   I am not.

12   **Q.**   Is that something you've ever specifically recalled

13   approving?

14   **A.**   I never did.

15   **Q.**   So did you have any impressions of Scott Moore as a

16   detective?

17   **A.**   Yes.

18   **Q.**   What was that?

19   **A.**   Scott Moore as a detective.  My impression would be

20   that he was a very thorough investigator.  He was

21   knowledgeable.  He was probably above average as an

22   investigator.  He was, I've often said, the type of

23   investigator that if you wrote a bad check on or committed a

24   forgery, because that was his main responsibilities that I

25   would assign him to, if you wrote a bad check, you wouldn't

1    want him on your tail.  He would track you down.

2    Q.    I was just trying to understand the perspective.  I

3    thought your testimony was that you were proud of him because

4    he was able to get convictions, not once, but twice, in this

5    case, correct?

6    A.    I think yes would be the answer.  Certainly, any time

7    you have a major case investigation like that where you got

8    multiple victims that's been harmed and you investigate and

9    you present it to the prosecutor's office and they accept

10   your investigation and they present it to a jury and you get

11   a conviction once, an appeal, and you get the conviction

12   again, yes, it's something to be proud of and should be

13   recognized by the police department.

14   Q.    It sounds like Captain Scothorn gave you sort of a run-

15   down, the backstory of all of the guys that you were

16   supervising; is that fair to say?

17   A.    Quite a few of them, yes.

18   Q.    Anything else you can recall about what Captain Scothorn

19   told you about -- told you when you were initially starting as

20   it relates to Mr. Moore?

21   A.    Yes.

22   Q.    What is that?

23   A.    Well, in general conversation, he told me things like,

24   "You know Scott Moore is Jim Moore's son.  Jim Moore was the

25   previous police chief."

WILSON - (READ INTO RECORD)                                    1379

1         And I said, "Yes."

2         And it was implicated that Chief Angel kind of owed a

3    little bit of allegiance to Chief Moore for getting Tom

4    Angel the job as police chief.  So it was kind of thought

5    that the chief would go an extra step for Scott Moore.

6    **Q.**   All right.  Is it fair to say that Scott Moore had more

7    leeway as a young detective in the department because his

8    father was the former chief?

9    **A.**   There was that appearance.

10   **Q.**   Now, I understand your testimony today is that you didn't

11   directly supervise Mr. Moore on the C.W., B.W. case, and you

12   learned about it sometime after you first arrived at the

13   department, right?  Basically?

14   **A.**   Yes.

15   **Q.**   And what I'm wondering is did you ever read the initial

16   case reports, the handwritten one, for the B.W., C.W. case?

17   **A.**   No.

18   **Q.**   All right.  Now, do you see this mentioned, yourself

19   being present for the arrest of Mr. Gillispie?

20   **A.**   I see it.

21   **Q.**   Does this refresh your recollection one way or the other

22   about whether or not you were present for that?

23   **A.**   I do not recall.  Don't think it ever happened.

24   **Q.**   Why don't you think it ever happened?

25   **A.**   I don't remember it.

WILSON - (READ INTO RECORD)                                    1380

1    **Q.**   Would it be typical practice for you as a sergeant in

2    Miami Township Police Department in 1990 to go out and

3    effectuate arrests with the detectives?

4    **A.**   No.

5    **Q.**   And why not?

6    **A.**   My understanding from my supervisor, Captain Scothorn,

7    his thinking was supervisors supervise, detectives go out in

8    the field and detect.  That was contrary to what I had done

9    at other departments.  Plus, we had fewer people at the

10   other department.  So as a detective-sergeant, I was also

11   out in the field a lot more.

12        In Miami Township, it was expected to let the field

13   detectives go out and do their investigations, and if they

14   needed assistance, ask for it and I would go.  Or if I saw

15   something that I thought needed my attention, I would do.

16   **Q.**   Okay.  And so you did not go with Scott Moore to arrest

17   Dean Gillispie; is that correct?

18   **A.**   I did not.

19   **Q.**   Let me show you, sir, what has previously been marked as

20   Exhibit 21.  Are you familiar with this form?  Without the

21   details being filled in, just the form of the document.

22   **A.**   I've seen similar writings like this, a similar form,

23   yes.

24   **Q.**   Is this a standard form that the Miami Township Police

25   Department used in 1990?

1    **A.**    "Standard" would be the key word.  And I do not think

2    it would be a standard form.

3    **Q.**    Okay.  Now, do you see the bottom two lines that happen

4    to be highlighted in yellow?

5    **A.**    Yes, I do.

6    **Q.**    Would those be part of the typical form, or is that

7    something that would have been added in this particular

8    instance?

9    **A.**    I do not remember this being standard procedure with

10   the wording as it is worded now.

11   **Q.**    And what do you mean by that?

12   **A.**    Well, I don't believe that -- I have to concentrate or

13   I have to express that during financial crimes is where I

14   saw this type of letter.  And I do not remember seeing

15   failure to -- quote, "failure to appear will result in a

16   warrant being issued for your arrest," unquote, because we

17   don't know if we could legally arrest that person or if that

18   person was actually the person that may have done a

19   financial crime.  But it was -- it was not out of routine to

20   send a letter to someone saying we have -- we're

21   investigating a financial crime.  Come to the police

22   department.

23   **Q.**    Right.  It wouldn't be out of routine to send a letter

24   asking someone to come to the police department -- come to the

25   police department like this one.  It would have been out of

WILSON - (READ INTO RECORD)                               1382

1  routine to include the last two lines; is that fair to say?

2  **A.**   It was not routine in my opinion.

3  **Q.**   Can you think of any other time that you have seen these

4  last two letters with these last two lines that are -- seen

5  these two letters with these last two lines that are

6  highlighted in yellow on this one?

7  **A.**   No.

8  **Q.**   Do you have any -- do you have any conversations with

9  Scott Moore that you can recall about his decision to pursue

10 Gillispie or arrest him?

11 **A.**   No.

12 **Q.**   Did you ever supervise Scott Moore in any way as it

13 relates to the things that he did or did not turn over to the

14 prosecutors or criminal defense?

15 **A.**   Personally supervise?  No.

16 **Q.**   Did you have any conversations with Scott Moore about

17 that topic?

18 **A.**   Not that I recall.

19 **Q.**   All right.  And then I don't recall, and I may not

20 understand, would you at least -- when the report was

21 completed, is that something you would have at least reviewed,

22 do you know, or would that have gone to somebody else within

23 the department?

24 **A.**   On that particular case, it very well could have went

25 to somebody else that was assigned the case.  Higher

WILSON - (READ INTO RECORD)                           1383

1    authority than me that assigned the case to Moore.

2    Q.    So as you sit here today, is it possible you may have

3    reviewed that and simply don't recall, or are you sure that

4    you did not review the final report before it would have gone

5    to the prosecutor's office?

6    A.    I may have reviewed it, but I don't remember reviewing

7    it.

8    Q.    All right.  Now, in the complaint there is an allegation

9    that Moore withheld and destroyed evidence, unlawfully

10   undermined Mr. Gillispie's defense, provided false and

11   misleading testimony.

12         All right.  First of all, if, in fact, that were to

13   occur, that evidence was being withheld, destroyed, or

14   providing false testimony, those actions themselves would, in

15   fact, be criminal acts, would they not?

16   A.    They would be criminal as far as I know, sir.

17   Q.    And, in fact, as a law enforcement officer, when you are

18   sworn as an officer, you take an oath that you are going to

19   uphold the Constitution of the United States, federal laws,

20   the Constitution of the State of Ohio, state laws, and all

21   local ordinances and laws, correct?

22   A.    Yes, sir.

23   Q.    All right.  And any officer who would knowingly or

24   intentionally either withhold or destroy evidence or

25   unlawfully undermine a suspect's defense or commit perjury or

WILSON - (READ INTO RECORD)                              1384

1    provide false testimony would be acting contrary to the oath

2    that they took when they became a police officer; is that fair

3    to say?

4    **A.**   It is, sir.

5    **Q.**   And did you have any knowledge of any other officers in

6    the Miami Township Police Department removing supplemental

7    reports authored by Bailey or Fritz?

8    **A.**   I do not have any knowledge, sir.

9    **Q.**   And if I mischaracterize anything, please let me know,

10   but my understanding from your testimony was that you

11   basically expected your detectives to basically provide

12   everything to the prosecutor's office, correct?

13   **A.**   It was mandatory, yes, sir.

14   **Q.**   All right.  And that was, in fact, during the time period

15   you were there the custom and practice of the Miami Township

16   Police Department, was it not?

17   **A.**   It was, sir.

18   **Q.**   So would you say that everyone knew that they had an

19   obligation to turn over the good, the bad, the ugly to the

20   prosecutors, right?

21   **A.**   As detectives, yes.

22   **Q.**   And that was the expectation that you had for your

23   officers, correct?

24   **A.**   Exactly.

25   **Q.**   But at the same time, you didn't take any steps to figure

1    out whether or not that was happening or monitor what they

2    did, correct?

3    **A.**    I didn't think I had to babysit them, no.

4              THE COURT:  All right.  Thank you.

5         Counsel approach.

6         (At sidebar off the record.)

7              THE COURT:  Counsel approach.

8         (At sidebar off the record.)

9              THE COURT:  We're back on the record.

10        Counsel.

11             MR. OWENS:  Your Honor, subject to the admission and

12   entry of the exhibits that have been offered, at this time the

13   plaintiff will rest our case.

14             THE COURT:  Thank you.

15                        **PLAINTIFF RESTS**

16             Is defendant ready to proceed?

17             MR. McLANDRICH:  Yes, sir.

18             THE COURT:  All right.  You may proceed.  First

19   witness.

20             MR. McLANDRICH:  Defendants call Anthony Monheim.

21        **ANTHONY MONHEIM, DEFENDANT MOORE'S WITNESS, SWORN**

22             THE COURT:  Mr. Monheim, please keep your voice up

23   so that we can all hear the responses to any questions that

24   may be posed.  You have a microphone there in front of you

25   which can be of assistance to you.  If it gets too close, it

MONHEIM - DIRECT (McLandrich)                                    1386

```
 1   muffles; if it gets too far away, it doesn't pick you up.  So

 2   I recommend to all witnesses that one way to solve that

 3   problem is keep your voice up so we can hear your responses.

 4   All right?

 5              THE WITNESS:  Yes, sir.

 6              THE COURT:  You may inquire.

 7              MR. McLANDRICH:  Thank you, Your Honor.

 8                       DIRECT EXAMINATION

 9   BY MR. McLANDRICH:

10   Q.   Good morning, Mr. Monheim.

11   A.   Good morning.

12   Q.   Would you start by giving your full name and spelling it

13   for the record, please.

14   A.   Anthony Monheim, M-O-N-H-E-I-M.

15   Q.   Mr. Monheim, would you start by telling the jury about

16   your educational background.

17   A.   I have a bachelor's degree in law enforcement from

18   Western Illinois University and a master's degree in public

19   administration from St. Thomas of Villanova University in

20   Miami, Florida.

21   Q.   All right, sir.  And would you tell the jury about your

22   training as a law enforcement officer?

23   A.   I started with Miami-Dade in 1974 and retired in 2004.

24   So I did 30 years as a police officer with Miami-Dade.  I

25   started in the academy in October of 1974, graduated in
```

1  March of '75, and remained as a uniformed police officer/

2  patrolman for the next 18 months.

3      I was fortunate enough to be transferred to the robbery

4  bureau after that, and I spent the next 16 years in robbery

5  as both a detective and a supervisor.  I was promoted to

6  sergeant in 1981 and remained in the robbery bureau as a

7  sergeant in charge of a squad of robbery detectives.

8      In 1992, I was transferred to homicide where I remained

9  until the end of my career in 2004.

10  **Q.**  And have you had further employment in the law

11  enforcement field subsequent to your retirement?

12  **A.**  I have.  I teach homicide investigations courses.  I

13  have written -- initially started teaching for the

14  International Association of Chiefs of Police, and I started

15  teaching for the Southern Police Institute, a group called

16  Taylor Group, Public Safety Training Council, in Indiana.

17      Eventually, after I taught several years for those

18  organizations, I formed my own company called

19  homicidetraining.com.  And I've traveled all over the United

20  States teaching homicide investigations courses, not only

21  homicide but death investigations.  We start with natural

22  death, go into suicide, accidental death, and eventually

23  murder.  So I've been doing that and a few expert witness

24  cases since I retired.

25  **Q.**  And have you had training and exposure and perform

MONHEIM - DIRECT (McLandrich)                    1388

1    training with respect to photo arrays?

2    A.    I have.  I started teaching actually in 1985 part-time

3    while I was working.  And one of the courses I taught was a

4    robbery investigations course for the Southern Police

5    Institute located in Louisville, Kentucky.

6         And I traveled across the country teaching robbery

7    investigations.  A significant block of that teaching was

8    photo lineup and photo IDs, live lineups, show-ups, et

9    cetera.

10   Q.    And have you testified in state and federal courts, been

11   qualified as an expert witness?

12   A.    I have, yes.

13        MR. McLANDRICH:  Your Honor, I'd move that

14   Mr. Monheim be admitted as a -- qualified as an expert in

15   police practices.

16        MR. OWENS:  No objection.

17        THE COURT:  Okay.  He can be.

18   BY MR. McLANDRICH:

19   Q.    Now, Mr. Monheim, if you would slow down just slightly, I

20   think the court reporter would probably be happier.

21   A.    Sorry.

22   Q.    Would you tell the jury whether there were established

23   police practices with respect to the eyewitness

24   identifications, and particularly photo arrays, back in 1990?

25   A.    There were, yes.

1  **Q.**   All right.  And what were some of the sources of those

2  accepted practices?

3  **A.**   A lot of it was just on-the-job training.  Your

4  training officer, your training detective, once you made the

5  rank of detective, would teach you how to compile and

6  compose photo displays, how to conduct a live lineup, how to

7  conduct show-ups.  But there were publications from

8  associations like the International Association of Chiefs of

9  Police that gave guidelines on how to perform those.

10      But basically, it was just trial and error.  The

11  detectives learn as they -- as they went along by going to

12  suppression hearings and finding out what worked and what

13  didn't work, what was acceptable and what wasn't acceptable.

14  So it was kind of a learning experience for each detective

15  as they -- as they became a detective.

16  **Q.**   And you reference the International Association of Chiefs

17  of Police.  What exactly is that?

18  **A.**   It's a fraternal organization that promotes and

19  supports professionalism in police work.  It's made up

20  mostly of police chiefs and high-level administrators.

21  There are very few detectives or investigators or members or

22  hardly any really of their members of the International

23  Association of Chiefs of Police.  It's mostly for higher

24  level administrators.

25  **Q.**   And would they put out publications that not only set

1    current standards but were efforts to promulgate new standards

2    or improve the practice of police operations?

3    **A.**    Yes.  That was their function, was to try and improve

4    the professionalism of law enforcement, yes.

5    **Q.**    Now, do they actually make, quote-unquote, standards that

6    are adopted nationwide?

7    **A.**    No.  They make suggestions, but not all the suggestions

8    they make are adopted by every police agency.

9    **Q.**    And would each agency have its own standards or policies

10   and procedures that controlled photo arrays?

11   **A.**    Yes.

12   **Q.**    And various other police activities?

13   **A.**    Yes.  Not only photo arrays, but many other things,

14   yes.

15   **Q.**    All right.  Now, are you familiar with *Training Key 414*

16   that was issued by the International Association of Chiefs of

17   Police?

18   **A.**    I am.

19   **Q.**    And when was that published?

20   **A.**    I believe it was in 1992.

21   **Q.**    And that would have been after the photo array in this

22   case?

23   **A.**    Yes.

24   **Q.**    And, again, did that set out accepted standards for photo

25   arrays as well as proposed improvements for photo arrays?

MONHEIM - DIRECT (McLandrich)                            1391

1    **A.**   It did.  It made suggestions to try and raise the bar,

2    so to speak, in how professional police agencies work, yes.

3    **Q.**   And was that any sort of binding standard on police

4    officers or departments?

5    **A.**   No.

6    **Q.**   Now, was a double-blind administration an accepted police

7    standard in 1990?

8    **A.**   No, it was not.

9            MR. OWENS:  Objection.

10           THE WITNESS:  I was teaching --

11           THE COURT:  Hold on a second.

12           MR. OWENS:  Leading.

13           THE COURT:  I'll allow it.

14       Don't lead, Counsel.

15           MR. McLANDRICH:  Thank you, Your Honor.

16   BY MR. McLANDRICH:

17   **Q.**   You can respond.

18   **A.**   No.  I was teaching at the time robbery investigations

19   courses that taught photo displays and how to show photo

20   display, and double-blind was never mentioned.  It was never

21   used by any police agencies back then as far as I know.  In

22   fact, it's controversial even today.  Some agencies use it

23   and some don't.

24   **Q.**   Now, is double-blind administration referenced in

25   *Training Key 414*?

MONHEIM - DIRECT (McLandrich)                                1392

1   **A.**    It is, as a suggestion, yes.

2   **Q.**    And in your mind, is there a difference between a

3   suggestion and an accepted, recognized standard?

4   **A.**    Sure, absolutely.

5   **Q.**    Now, did accepted police standards in 1990 -- describe --

6   so I don't get into leading, describe, if you would, accepted

7   police standards for photo arrays in 1990.

8   **A.**    1990 -- it was the late '80s or early '90s, it was very

9   simple.  You would compile six pictures in a photo array.

10  Sometimes they called it photo display.  And when you

11  compiled the pictures, they were separate photographs, and

12  they were shown in what's known as a six-pack.  You would

13  lay -- if you were showing it at someone's home, you would

14  maybe use the dining room table, and you would lay the

15  photos out three in a row, two rows, and you would tell them

16  that the person may or may not be -- for example, in a case

17  where I was working as a robbery detective, the person that

18  robbed you may or may not be in these photos.  I'd like you

19  to take a look and see if you recognize anyone.  And then

20  you would ask them to look at the photographs.

21  **Q.**    And what's the purposes of those various elements or

22  standards?

23  **A.**    Well, you don't want them to feel that they have to

24  pick someone out.  You tell them they may or may not be in

25  this photo display so they are not -- they don't feel

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    compelled that that person is in there so they have to pick

2    a picture.

3    Q.   And what other sorts of concerns might exist aside from

4    telling them that they may or may not have to pick out

5    someone?

6    A.   Many times you would tell them that people's hair

7    changes.  Remember -- we would tell the witnesses, remember

8    that people cut their mustaches off, trim their beards,

9    sometimes they grow a beard, sometimes they cut their hair.

10   So pictures may not completely depict the way the person

11   looked at that time, so look at the facial features of that

12   person, is what we would try to instill in them.

13   Q.   Was such a standard -- I am sorry -- was such a comment

14   within accepted police standards at that time?

15   A.   Yes.

16   Q.   Is it today?

17   A.   Yes.

18   Q.   Now, when you contact a witness to view an array, do they

19   know why they are being contacted?

20           MR. OWENS:  Objection.

21           THE COURT:  Rephrase.

22   BY MR. McLANDRICH:

23   Q.   How would you go about contacting a person that you

24   wanted to show an array?

25   A.   Well, in the late '80s, early '90 was very -- way

MONHEIM - DIRECT (McLandrich)                          1394

1    different, very different than it is today.  If you recall,

2    there were no cell phones.  There was no email.  Many times

3    we would have to go to someone's house to see if we could

4    find them, to locate them to show them the photo display.

5    If we could -- if we could reach them on the phone, we might

6    ask them to come into the police department to look at

7    photos, but it was generally incumbent upon the detective to

8    go out and find the witnesses.

9    **Q.**   And would you explain to this person why you were

10   reaching out to them?

11   **A.**   No.  We'd just tell them we would like them to look at

12   some photographs.

13   **Q.**   And would they understand that was in connection with a

14   criminal investigation?

15               MR. OWENS:  Objection.

16               THE COURT:  Sustained as to what they understand.

17               MR. McLANDRICH:  All right.

18   BY MR. McLANDRICH:

19   **Q.**   With respect to the physical attributes of the picture

20   itself -- the pictures themselves that would be in a photo

21   array, what were the standards in 1990 with respect to that?

22   **A.**   Very similar to what they are today.  The overriding

23   factor is that the lineup has to be fair.  No one can stand

24   out, especially the person that is the suspect cannot stand

25   out in any way in the lineup.  It has to be a fair lineup.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    But it also has to be a lineup that's not too good.  We

2    can't put sextuplets or triplets in the lineup and make it

3    too hard for the witness to make an identification.  You

4    want them to -- it would defeat the purpose of showing the

5    lineup.

6         And when you show the lineup, the purpose of showing

7    the lineup is twofold:  It's to find out if the person that

8    you suspect is the person that committed the crime; and if

9    not, to exonerate them, to realize that they are not the

10   person and to direct your investigation in another

11   direction.

12   Q.   And what about the other attributes of the photograph

13   other than the persons in it, characteristics of the

14   photograph as a photograph?

15   A.   You try and make them similar if you can make them --

16   for example, if you have a Polaroid of the suspect, you

17   would try and include Polaroid pictures as fillers, the five

18   other fillers in the photograph.  If you use mugshots, you

19   would try to use mugshots at fillers.

20        Sometimes it was very difficult.  You could -- it's

21   even conceivable that you could mix and match as long as

22   that one person that is the suspect doesn't stand out in any

23   way.  It has to be fair.

24   Q.   When you had -- how did you -- what were the standards,

25   rather, in 1990 with respect to the presentation of photo

1    arrays if there was more than one witness to a crime?

2    **A.**    Well, we would certainly try to show the photo displays

3    at the same time.  It just saves the detective time and

4    energy if you can get those people together.  But that was

5    not always possible.  Remember, as I said, there were no

6    cell phones back then.  You couldn't text somebody and tell

7    them you were on your way.  You couldn't send them an email.

8    You couldn't call them on the cell phone.

9        So if we would respond to somebody's house, say, for

10   example, if a husband and wife were witnesses to a murder

11   or -- a murder or a robbery, if we would knock on the door

12   and the wife were there and the husband was not, maybe he

13   was at work, we would show the photo display to the wife and

14   then ask her to have the husband contact us so that we could

15   show the display to him.  We would explain to her that we

16   don't want her to discuss the -- if she did make an

17   identification, not to discuss the photo display in any way

18   with her husband.

19       And if we did return to show the photo display, we

20   would make sure that we rearranged the photos so that the

21   photo was not in the same position as it was when the wife

22   made the identification.  That's just an example.

23       I've had cases where we would have 40 people on a bus.

24            MR. OWENS:  Objection.

25            THE COURT:  Is that an objection?

 1              MR. OWENS:  Yes, Your Honor.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  I have had cases where we had 40

 4   people on a bus that were robbed by a gunman would come in and

 5   rob each person on the bus.  It was very difficult, of course,

 6   to bring all those people together and show them lineups all

 7   at the same time.  So we'd have to go individually to

 8   everyone's house and show those lineups.

 9   BY MR. McLANDRICH:

10   Q.   And that was within accepted police practice standards in

11   1990?

12   A.   Yes, it was.

13   Q.   Is there a difference in police practices between

14   something that's considered a best practice and something

15   that's considered a required standard?

16   A.   Yes.

17   Q.   And which are -- which is an officer bound by?

18   A.   The required standard.  Best practices are just raising

19   the bar, as I said earlier.

20   Q.   Police departments, do they develop their own policies

21   and procedures?

22   A.   Most do, yes.

23   Q.   And are at times those policies and procedures in excess

24   of what legal requirements may be?

25              MR. OWENS:  Objection.  This is undisclosed.

1             THE COURT:  Do you want to respond?

2             MR. McLANDRICH:  I don't see how it's any different

3     than the question before it, quite frankly.  It's just simply

4     an extension of it.

5             THE COURT:  Go ahead.

6             MR. OWENS:  I should have objected earlier.  He's

7     right.

8             THE COURT:  He can answer then.

9             MR. OWENS:  I mean, this is not in his report.  So I

10    am just trying to give a little leeway, but now he's

11    continuing to go down this road of an undisclosed opinion

12    about practices and departments and things like that.

13            THE COURT:  Restate your question.

14            MR. McLANDRICH:  Sure.

15    BY MR. McLANDRICH:

16    **Q.**   Do police departments at times develop policies and

17    procedures that are beyond the legal requirements?

18            THE COURT:  Okay.

19            MR. OWENS:  Objection.

20            THE COURT:  And you are objecting to that.

21            MR. OWENS:  It's undisclosed.

22            THE COURT:  It's undisclosed.

23        Overruled.  He can answer it.

24            THE WITNESS:  Yes.

25    BY MR. McLANDRICH:

1    **Q.**   And why is that?

2              MR. OWENS:  Same objection.

3              THE WITNESS:  Many departments try and --

4              THE COURT:  I'll overrule it.

5         Go ahead.

6              THE WITNESS:  I'm sorry.

7              THE COURT:  Go ahead.

8              THE WITNESS:  Many departments try to restrict their

9    officers even more.  For example, in chase situations, there

10   is no prohibition for chasing in general, but many departments

11   have a chase policy where they disallow chasing of a vehicle

12   at certain speeds.  So that would be an example.

13   BY MR. McLANDRICH:

14   **Q.**   And what's -- when you are presenting an array to a

15   witness, what's the standard practice in 1990?  What was the

16   accepted police practice?

17   **A.**   As far as presenting it?

18   **Q.**   Yes.  How would it be presented?  What were the steps

19   that an officer would take?

20   **A.**   Well, as I mentioned, you would locate a witness

21   probably at their home or ask them to come in.  And you

22   would ask them to sit down maybe at the dining room table or

23   kitchen table, and you would take a six-pack of photographs.

24        Back then -- the windows that are used today weren't as

25   prevalent as they are today, but back in the '80s, the late

1    '80s and early '90s, six photographs were laid down in

2    front -- of mugshots, so to speak, were laid down in front

3    of the witness, and they were asked to look at the

4    photographs.  They were told, as I said earlier, that the

5    person may or may not be in this photo array, and tell me if

6    you recognize anyone.

7    **Q.**   And then how would that identification be documented?

8    **A.**   If they made an identification, back then the only real

9    requirement was for them to sign the back of the picture.

10   **Q.**   Would they put any additional information on it?

11   **A.**   They may.  I usually asked them to write something

12   about what this person did, and I asked them to put the date

13   on that.  I would ask them to write, for example, this is

14   the person that robbed me, this is the person that had the

15   gun, something like that.  Just a short little sentence.

16   But that wasn't required.  The only requirement really at

17   the time was to sign the photo.

18   **Q.**   And were there additional documentation standards that

19   were required of the officer with respect to the performance

20   of the array?

21          MR. OWENS:  Objection; vague.  I don't know what he

22   means by "required."  By whom?

23          MR. McLANDRICH:  Required by accepted police

24   standards.  I'll just ask it over.

25          THE COURT:  Overruled.

1          He may answer.

2               THE WITNESS:  No, not really.  It was a lot of

3    leeway.  There was a lot of leeway for the detective to use.

4    BY MR. McLANDRICH:

5    **Q.**   What was the accepted police standard with respect to

6    communications with the witness once that identification had

7    been made?

8    **A.**    It was my practice not to tell the witness whether they

9    made an identification or not, and the reason I chose not to

10   do that would be because I didn't want the witness to go to

11   the prosecutor or go to the -- in front of a jury and say I

12   know it's that person because the detective told me so.  I

13   don't think there was any prohibition back then that you

14   could tell them, but it was my policy not to do that.

15   **Q.**   Were there any standard police practices with respect to

16   recording confidence statements in 1990?

17   **A.**    No.  Some detectives did, some -- most detectives are

18   note takers, and they take copious notes.  So most

19   detectives would -- in their notes, after the identification

20   was made, would make some type of notification in their

21   notes or notation, I shall say, in their notes of how the

22   display was presented and how the identification was made.

23   But there was no requirement to do that, no.

24   **Q.**   Was there any standard police practice in 1990 with

25   respect to recording the amount of time it took the witness to

MONHEIM - DIRECT (McLandrich)                                          1402

```
1    make the identification?
2    A.    No.  Detectives -- again, some detectives would do
3    that.  They would record it in their notes, but there was no
4    requirement.
5    Q.    Was there any police standard in 1990 with respect to a
6    requirement that the officer record all their statements in
7    the conversation regarding the presentation of the photo
8    lineup?
9    A.    No.
10   Q.    Are you familiar with the term "tunnel vision"?
11   A.    Yes.
12   Q.    And --
13          MR. OWENS:  Objection.  This is undisclosed.
14          THE COURT:  Counsel?
15          MR. McLANDRICH:  I don't frankly recall whether it's
16   in his report or not, Your Honor.
17          THE COURT:  Sustained.
18   BY MR. McLANDRICH:
19   Q.    When an officer -- well, strike that.
20          Are you familiar with the organization PERF?
21   A.    I am.
22   Q.    And in your opinion, is that an authoritative, respected
23   police standards organization?
24   A.    In my opinion, no.
25   Q.    Were there any other published standards that you're
```

MONHEIM - CROSS (Owens)                                1403

```
 1   aware of that were nationally accepted standards in 1990?

 2   A.   No.

 3            MR. OWENS:  Objection.

 4            THE COURT:  Well, with regard to what, Counsel?

 5   BY MR. McLANDRICH:

 6   Q.   I'm sorry.  With respect to the development and

 7   presentation of photo arrays.

 8   A.   Not that I'm aware of, no.

 9   Q.   That's all I have for you.  Thank you, sir.

10            MR. OWENS:  Do they go next?  At this point, I don't

11   know the answer to that, actually.

12            THE COURT:  I don't either.  I shouldn't admit that.

13            MR. OWENS:  Sorry.  It just occurred to me.

14            MS. FRICK:  Your Honor, I would think that because,

15   you know, this deals with their claim, that they would go

16   next.

17            THE COURT:  That would be my -- that would be my

18   inclination, that you would go, and then if counsel has some

19   further things he can add.  And then as I've always done, I

20   have given everybody an opportunity to hear everything, so --

21   that's appropriate.

22            MR. OWENS:  Thank you, Judge.

23                       CROSS-EXAMINATION

24   BY MR. OWENS:

25   Q.   Good morning, sir.
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MONHEIM - CROSS (Owens)                                    1404

1   **A.**   Good morning.

2   **Q.**   And when you do your expert consulting work, you try to

3   be an umpire, right?

4   **A.**   Good choice of words, yes.

5   **Q.**   And that's the word you used at your deposition a couple

6   years ago, right?

7   **A.**   Did I?  Maybe.

8   **Q.**   All right.  And so you've done, I think you described it,

9   just a handful of consulting cases; is that right?

10  **A.**   Maybe seven or eight.

11  **Q.**   And most of those cases that you do your consulting with

12  involve individuals who were previously convicted, right?

13  **A.**   Yes.

14  **Q.**   The convictions were dismissed, right?

15  **A.**   Yes.

16  **Q.**   And so, for example, one case here in Ohio was --

17  involved a man named Dewey Jones, right?

18  **A.**   Yes.

19          MR. McLANDRICH:  Objection.  This is beyond the

20  scope of direct.

21          THE COURT:  What was the purpose?

22          MR. OWENS:  Bias.

23          THE COURT:  Are you going to go into all the facts

24  of that case?

25          MR. OWENS:  No.  I was going to just mention at a

1   very high level.  I have three questions.

2              THE COURT:  All right.  Go forward.

3        Overruled.

4   BY MR. OWENS:

5   **Q.**   Mr. Jones' case, like this case, involved issues related

6   to identifications, correct?

7   **A.**   Partially, yes.

8   **Q.**   And in that case, you were retained by the defendant

9   police officer accused of having improper identifications,

10  correct?

11  **A.**   Yes.

12  **Q.**   And you were also a defense expert in that case in Ohio

13  involving an individual named Clarence Elkins, correct?

14  **A.**   Yes.

15  **Q.**   That case, like this one, had identification issues,

16  right?

17  **A.**   Yes.

18  **Q.**   Mr. Elkins had been convicted, and his conviction was

19  overturned later by DNA evidence, right?

20  **A.**   That's correct.

21  **Q.**   Now, I want to make sure I understand.  So you did

22  indicate that there were established practices when it came to

23  policing administration of identifications in 1990, correct?

24  **A.**   Yes.

25  **Q.**   And police officers in 1990 also knew that there was a

MONHEIM - CROSS (Owens)                                    1406

1    risk of mistaken identification, correct?

2    A.    Yes.

3    Q.    And the -- there was a risk of mistaken identification

4    that was well understood in 1990 that because witnesses might

5    have a genuine desire to see the perpetrator of a violent

6    crime be brought to justice, that they might be -- excuse

7    me -- overly influenced by suggestions communicated to them

8    during an identification process, right?

9    A.    That's true.

10   Q.    And that was the case in 1980s?

11   A.    Yes.

12   Q.    And certainly by the time you got to 1990, right?

13   A.    Yes.

14   Q.    And the standards that existed in 1990 were more than

15   just trial and error.  They were well established, correct?

16   A.    Yeah, they were for the past 40 years.  The basic

17   methodology used to show a photo display had been handed

18   down from generation to generation of detectives, and that's

19   what they use.  That's what detectives and investigators

20   use, what was -- how they were trained, to show a photo

21   lineup or -- a live photo lineup or show-up.

22   Q.    In addition to being well-established for 40 years, as

23   you say, by the time you get to 1990, those standards didn't

24   change that much in the late to mid '90s right?

25   A.    That's true.  That's correct.

1   **Q.**   So, for example, in your report, you cite a *National*
2   *Institute of Justice* document from 1999, right?

3   **A.**   Yes.

4   **Q.**   And it's your testimony, as you stated in your report,
5   that the standards documented in that 1999 document from the
6   *National Institute of Justice* reflect standards that were in
7   effect generally in 1990, right?

8   **A.**   They were similar.  There may have been a higher bar in
9   some of the statements that were made, but they were
10  similar, yes, very similar.  As you said, they hadn't
11  changed much.

12  **Q.**   Well, at any point in your report, do you say there's a
13  higher bar related to those 1999 standards?

14  **A.**   No.  I just said that earlier.

15  **Q.**   Got it.  Also in your report, you do cite this training
16  key from the *International Associations of Police*, *414*, right?

17  **A.**   I do.

18  **Q.**   And that training key was published in 1992?

19  **A.**   That's correct.  I believe.

20  **Q.**   I'm sorry.

21  **A.**   I believe.

22  **Q.**   And that training key published in 1992 wasn't breaking
23  any new ground, correct?

24  **A.**   No.

25  **Q.**   And instead, it summarized police -- established policing

1    practices that were in effect in 1990 and years before,

2    correct?

3    A.    Some of it did.  Some of it actually went a little

4    beyond what was being done by detectives at that time.

5    Q.    Anywhere in your report, sir, did you indicate any part

6    of *Training Key 414* goes beyond the established practices that

7    existed in 1990?

8    A.    I don't know that I did, no.

9    Q.    And, in fact, at your deposition, when I asked you

10   questions about this training key, didn't you agree with me

11   that the 1992 training key reflects practices that were in

12   effect in 1990?

13   A.    It did, that's correct.  But there were some portions

14   of it that were -- I hate to use it again -- but a higher

15   bar, raising the bar.

16   Q.    The first time you said that about this is today, right?

17   A.    I don't know -- I don't recall what I said in the

18   deposition.

19              MR. OWENS:  283.

20              THE COURT:  What do you want?

21              MR. OWENS:  Well --

22              THE COURT:  He doesn't remember.

23              MR. OWENS:  Sure.

24   BY MR. OWENS:

25   Q.    Would it help you to see your deposition?

1    A.   It might.

2    Q.   All right.

3         MR. OWENS:  Can we show him Exhibit Number 283 at

4    page 34, starting on line 25 and then going over to page 35.

5    BY MR. OWENS:

6    Q.   Do you see where at the bottom of 34, sir, it's just the

7    last line where it says, "Question:  Right?" and then goes

8    onto the top of 35?

9    A.   Yes.

10        THE COURT:  And when you're done reading, just look

11   up.

12        THE WITNESS:  Yes.  All the way down to the end of

13   the page?

14   BY MR. OWENS:

15   Q.   No.  Just, I mean, I was just focusing on the first five

16   lines there.

17   A.   Okay.

18   Q.   Did you have a chance to glance at that, sir?

19   A.   Yes.

20        THE COURT:  You can have a seat now.

21   BY MR. OWENS:

22   Q.   You can have a seat.  Thank you.

23        THE COURT:  Question.

24   BY MR. OWENS:

25   Q.   And does that refresh your recollection that at your

MONHEIM - CROSS (Owens)                                    1410

1    deposition, that you testified that the *Training Key 414*

2    exemplifies best practices described in 1990, even if they

3    weren't required by every department?

4    **A.**    I don't know if that's what I said.

5          May I stand up again, Your Honor?

6          My answer was yes, but they would not have been used by

7    every department.  They were goals to aspire to.

8    **Q.**    Okay.  You also testified that -- at any rate, let's try

9    to move forward here and not get stuck.

10   **A.**    Okay.

11   **Q.**    You cited *Training Key 414* in your report, correct?

12   **A.**    Yes.

13   **Q.**    And *Training Key 414* provides that "Erroneous

14   identifications create more injustice and cause more suffering

15   to innocent persons than perhaps any other aspect of police

16   work," correct?

17   **A.**    I don't know if that came from *Training Key 414*.  It

18   could have.  But that was in my report, yes.  It may have

19   come from a court decision.  I'm not sure where it came

20   from.

21   **Q.**    And because of the risk of mistaken identification to

22   innocent individuals, police officers knew in 1990 that it was

23   important to be careful about how identifications were

24   administered, correct?

25   **A.**    That's correct, yes.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1  **Q.**    And so we mentioned one aspect of being careful is not

2  wanting to influence a witness, right?

3  **A.**    Yes.

4  **Q.**    And you would want to create a fair lineup, correct?

5  **A.**    That's correct.

6  **Q.**    And part of the reason that the fair lineups were

7  especially important at that time, as you mention on direct

8  examination, is that in the late '80s and early '90s there was

9  a lot less forensic evidence available, right?

10 **A.**    That's correct.  There was no DNA.  There was no

11 videos.  Today, videos are ubiquitous.  They are everywhere.

12 So people expect to see a video of a crime and DNA.  So

13 there was none of that in forensics.

14 **Q.**    And so police should be careful about influencing a

15 witness's memory before the photo identification, right?

16 **A.**    I think that's a correct statement, yes.

17 **Q.**    Police should avoid influencing a witness's memory during

18 the administration of a photo identification, correct?

19 **A.**    Sure, sure.

20 **Q.**    And police should avoid influencing a witness's memory

21 after a photo identification, correct?

22 **A.**    With -- within limits, yes, because once the photo

23 identification is made, it's made.  You can't -- you know,

24 you can't undo it, if it is a positive identification that's

25 made.

1          So there are certain statements that detectives can

2     make after that.  And it's axiomatic.  The defendant -- or

3     the witness is going to know when they are asked to sign the

4     photograph that they have made an identification.  And a few

5     days later, they are going to receive a subpoena to go to

6     the prosecutor's office, and with the name of the defendant

7     on there.  So it's not a secret.  There is no secret here.

8          But it was my policy not to tell them the name of the

9     person or that they had made an identification, but by

10    signing, they knew that they had made an identification.

11              MR. OWENS:  And this is Mr. Monheim's deposition at

12    page 81, lines 2 through 5.

13              THE COURT:  Okay.  And what are we doing there?

14              MR. OWENS:  We're impeaching the witness, Your

15    Honor.

16              THE WITNESS:  Do you want me to go to it?

17    BY MR. OWENS:

18    **Q**.    No.

19              MR. OWENS:  I think I can just read it, right?

20              THE COURT:  Yes, you can.

21         Wait a minute.  Do you guys have it?

22              MR. McLANDRICH:  Not yet, Your Honor.  I'm sorry.

23    What line?

24              MR. OWENS:  81, page 81.

25              MR. McLANDRICH:  And lines?

MONHEIM - CROSS (Owens)                                    1413

1           MR. OWENS:  At the top.

2           MR. McLANDRICH:  Okay.

3    BY MR. OWENS:

4    **Q.**   All right.  And at your deposition, were you asked these

5    questions -- or asked this question, and did you give this

6    answer?

7           "Question:  And police should avoid influencing a

8    witness's memory after an identification procedure and before

9    they go to court, correct?"

10          "Answer:  I think that's correct, yes."

11   **A.**   Yes.

12   **Q.**   Let's talk about the before aspect, before we administer

13   a lineup, all right?

14   **A.**   Okay.

15   **Q.**   You agree with me that it was an established practice in

16   1990 that police would want to avoid indicating to a witness

17   that you have a particular suspect whose picture is in the

18   array, correct?

19   **A.**   Yes.

20   **Q.**   Now let's talk about -- and as you testified here, that

21   blind administration was a new advent, right?  Not a -- not

22   applicable in 1990, right?

23   **A.**   Correct, that's correct.

24   **Q.**   And that's even though the fact that the *Training Key 414*

25   that you mention in your report specifically cautions that

1    there should be blind administration, right?

2           MR. McLANDRICH:  Objection.  I think that

3    mischaracterizes the training key.

4           THE COURT:  Well, try to rephrase, Counsel, and

5    we'll see whether we get there.

6           MR. OWENS:  No problem.

7    BY MR. OWENS:

8    **Q.**   The training key says, "In conducting the lineup, it is

9    highly advisable that officers who are not assigned to the

10   case handle the procedure.  This helps to minimize the

11   possibility that the officers who are conducting the

12   investigation will, in their zeal to solve the case, convey,

13   inadvertently or otherwise, clues to the witness as to which

14   person to pick out, or put pressure on the witness to pick out

15   somebody."

16        Do you recall that being in the training key?

17   **A.**   I do.

18   **Q.**   Is it your testimony that that was not something that was

19   well-known in 1990 but was a new suggestion?

20   **A.**   That's correct.  As far as I know -- and I was training

21   officers all over the country, detectives all over the

22   country -- no one was abiding by that.  No one was using the

23   blind -- the double-blind system to show a photo display.

24   **Q.**   And so even though it's in this training key, you don't

25   mention that there is a difference or discrepancy between the

MONHEIM - CROSS (Owens)                                    1415

1    training key that you cited in your report and that issue,

2    correct?

3    A.    I don't know that I did, no.

4    Q.    Now, do you think -- and we're talking, I sort of asked

5    you about before, during, and after.

6    A.    Um-hmm.

7    Q.    And you indicated on direct examination officers would

8    want to document aspects of the administration of the array,

9    correct?

10   A.    No.  What I said was some detectives would document it,

11   but there was no requirement to do it at that time.

12   Q.    Okay.  Would it be irregular for an officer in 1990 to

13   claim a person made an identification but failed to have the

14   witness sign it?

15              MR. McLANDRICH:  Objection.

16              THE COURT:  Basis?

17              MR. McLANDRICH:  It's not a question about police

18   standard.  It's a question asking about regularity or

19   irregularity.

20              MR. OWENS:  I can rephrase.

21              THE COURT:  Rephrase.

22   BY MR. OWENS:

23   Q.    Now, you just mentioned something about having witnesses

24   sign a photograph, correct?

25   A.    Correct.

MONHEIM - CROSS (Owens)                                          1416

1    **Q.**    After they have made an identification, correct?  And

2    it's your testimony that that was part of sort of practices

3    that existed on the ground in 1990, right?

4    **A.**    That's correct, yes.

5    **Q.**    Would it be a departure from those accepted practices for

6    an officer to claim that somebody made an identification

7    without having them sign the picture?

8    **A.**    Well, there are exceptions where it could be recorded

9    by a stenographer, the identification.  There are other

10   exceptions, that they could sign a supplemental form

11   indicating which photo they chose.  But back then the

12   standard was to sign the picture.

13   **Q.**    Got it.  And would it be a departure from accepted

14   practices for a police officer to claim that a witness had

15   made an identification if a witness had actually been unsure?

16   **A.**    Are you saying lie about the identification?

17   **Q.**    No, I didn't say that.  I said would it be a departure

18   from accepted practices for a police officer to claim that a

19   witness made an identification if the witness was actually

20   unsure or said that the person merely resembled the

21   perpetrator?

22   **A.**    That's not an identification, resemble.  That's a

23   tentative ID.  In photo displays, you are looking for

24   positive IDs, not tentative IDs or resembles.  Resembles is

25   not an identification, no.

1   **Q.**   Let's move to after the administration of an

2   identification procedure.  You wouldn't want to tell, even in

3   1990, a witness that they had picked out the right person or

4   the person you thought was the suspect, correct?

5   **A.**   That was my personal preference, yes.

6   **Q.**   Well, I thought you testified that you would never tell

7   them that they picked out the right person, correct?

8   **A.**   I would not.

9   **Q.**   And that was an established practice at the time,

10  correct?

11  **A.**   That was my policy.  I don't -- I don't think it was an

12  established practice at the time.  I don't think there is

13  any prohibition from telling them that they picked out the

14  right person after the identification is made because once

15  it's made, it's made.  That's it.

16  **Q.**   Got it.  Well, the *Training Key 414* that you cite in your

17  report indicates that "Witnesses should not be praised or

18  congratulated for picking out the suspect because this may

19  serve to reinforce a shaky identification, convincing the

20  witness that he has picked out the actual perpetrator when the

21  witness is in some doubt," correct?

22  **A.**   I would agree with that, yes.

23  **Q.**   And so that increases the chances of a miscarriage of

24  justice, correct?

25  **A.**   Correct.

MONHEIM - CROSS (Owens)                                    1418

1  **Q.**   Now, along those lines, it would be inconsistent with

2  established practices in 1990, after an identification, for a

3  police officer to tell a witness going into court that the

4  suspect has changed their appearance, right?

5  **A.**   Well, it's permissible for identification purposes to

6  say a person -- just remember, generally speaking, generally

7  speaking, people cut their hair, they change their hair,

8  they shave their beards, they shave their mustaches.  So,

9  generally speaking, people alter their facial -- I'm

10  sorry -- their hair features.  So that would be permissible.

11  **Q.**   You were talking about before you make an

12  identification --

13  **A.**   Right.

14  **Q.**   -- you have a standard admonition which is like, hey,

15  this may not be the suspect.  People's hair can change.

16  People's -- you know, things like that can change, right?

17  **A.**   Exactly.

18  **Q.**   I'm talking about a slightly different moment, okay?

19  **A.**   Okay.

20  **Q.**   After an identification is made, when somebody's going

21  into court to potentially make an identification, you agree

22  with me that it would have been inconsistent with practices in

23  1990 to tell a witness at that point in time that, hey, I've

24  seen the suspect and they've changed their appearance,

25  correct?

1    **A.**    You are referring prior to an in-court ID?

2    **Q.**    Correct.

3    **A.**    Yes.

4    **Q.**    In your report, you opine that in a stressful event a

5    witness's attention is heightened and they have better

6    attention; is that correct?

7    **A.**    Yes.

8    **Q.**    Isn't the opposite actually true in the established

9    policing documents that you have cited?

10   **A.**    Not that I'm aware of.  I've dealt with hundreds and

11   hundreds of victims, and when they are under stressful

12   situations, there's a dump of adrenaline.  They become more

13   perceptive, it seems to me.

14            THE COURT:  Counsel approach.

15        (At sidebar.)

16            THE COURT:  This is not an ID expert, and you're

17   talking about --

18            MR. OWENS:  I can frame it to make sure that we are

19   talking more specifically about the police procedures at the

20   time.

21            THE COURT:  Right.  Because now we are going to get

22   into -- I am not saying -- I'm just a little worried about

23   where we're going.

24            MR. OWENS:  Okay.  I understand.

25            THE COURT:  He's not here to basically talk as your

1    expert.  Your next expert will be talking.

2              MR. OWENS:  Sure.  I will be very clear about that.

3              THE COURT:  Thank you.

4         (In open court.)

5              THE COURT:  Ladies and gentlemen, we're going to

6    take a break this morning, and then we'll get back on it and

7    go on till our lunch hour.  Please remember the Court's

8    admonitions.  Thank you very much.

9              THE COURTROOM DEPUTY:  All rise.  This court stands

10   in recess.

11        (Jury out at 10:40 a.m.)

12        (Recess at 10:40 a.m.)

13        (Jury in at 11:09 a.m.)

14        (In open court at 11:10 a.m.)

15             THE COURT:  We're back on the record.

16        Ladies and gentlemen of the jury, I'm going to give you a

17   little preview of what we're going to be doing here.  We have

18   this witness, and we have another witness that we are trying

19   to get on again because of location and time restraints.

20   We're going to be a little bit out of our normal routine.

21        What I plan to do is we will go to our regular noon

22   recess for lunch, but I'm going to ask you if you could please

23   take a short lunch today and if you could be back here no

24   later than 12:35.  And we will move on, wherever we are in

25   these witnesses.  And hopefully, hopefully, by doing this, we

MONHEIM - CROSS (Owens)                                    1421

1    may be able to release you folks a little early today.  So

2    just bear with us and be patient.  I can't make any guarantees

3    about anything, but that's my plan at this point in time.

4         All right.  Thank you.

5         Counsel ready to proceed?

6              MR. OWENS:  Yes, Your Honor.

7              THE COURT:  All right.

8    BY MR. OWENS:

9    **Q.**   Just a few more questions, all right?

10   **A.**   Yes, sir.

11   **Q.**   I want to take a step back.  At some point in your

12   report, you indicated something about witnesses in stressful

13   events.  Do you remember that?

14   **A.**   I do.

15   **Q.**   Okay.  Your testimony here today is about what the police

16   understanding of eyewitness practices were in 1990, correct?

17   **A.**   That's correct, yes.

18   **Q.**   And you are just offering testimony generally about

19   what -- how police were trained, what they knew about best

20   practices in the policing field, correct?

21   **A.**   Yes, sir.

22   **Q.**   And so when you made that statement about high stress in

23   your report, you were talking about generally the way that

24   police officers might understand it at the time, right?

25   **A.**   I think that's a fair statement, yes.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MONHEIM - CROSS (Owens)                                          1422

1    **Q.**    And then I was getting ready to ask you about *Training*

2    *Key 414* from the International Associations of Chiefs of

3    Police.  That's a document you cited in your report, correct?

4    **A.**    Yes.

5    **Q.**    And, in fact, you testified in direct examination you

6    worked as an educator with the IACP, correct?

7    **A.**    I did.

8    **Q.**    Okay.  And the *Training Key 414* indicates that human

9    perception can be inaccurate especially when people are under

10   stress, correct?

11   **A.**    If it says that, I'd have to agree, yes.

12   **Q.**    Just one more thing about the *Training Key 414* that you

13   cited in your report.  Different topic.

14       You're dealing with a situation that has multiple

15   eyewitnesses.  Do you remember testifying about that on

16   direct?

17   **A.**    When I mentioned the bus, stuff like that?

18   **Q.**    Yes, exactly.  Just drawing your attention back to that.

19   **A.**    Yes.

20   **Q.**    Isn't it true that the *Training Key 414* from the IACP in

21   1992 actually addresses that topic specifically?

22   **A.**    I'm not sure.  I'd have to read it.

23   **Q.**    Doesn't that document say that "Where more than one

24   witness has viewed a lineup, witnesses should be kept separate

25   after the lineup procedure has been completed.  While

 1    discussions between witnesses filed in the lineup are

 2    presumably --" I'll stop there.

 3         It says that, right?

 4    A.   I think that's generally true.  If you have witnesses,

 5    say, if you have five or six witnesses at the police

 6    station, you would not let them congregate in a conference

 7    room and start showing them lineups and let them go back in

 8    that conference room.  I would agree with that, yes.

 9    Q.   Yeah.  And so you had a peculiar situation, and when you

10    had 40 people on a bus, that would be harder to manage, right?

11    A.   Exactly.

12    Q.   Now, if you had a controlled setting where you had two

13    witnesses that you wanted to view a lineup and there was no

14    sort of exigency, you would have kept them separate, right?

15    A.   Sure.  I wouldn't have shown them the same lineup at

16    the same time, no.

17    Q.   And you wouldn't allow them to speak to one another in

18    between showing them -- each one of the lineup separately,

19    right?

20    A.   That's not a good policy, I would agree.

21    Q.   Last topic.  As you understood police practices and

22    training that existed in 1990, you would have understood that

23    the likelihood that three people separately picking out the

24    same person mistakenly or wrongfully would be extraordinarily

25    unlikely unless there was some suggestivity or if that person

MONHEIM - CROSS (Frick)                                        1424

1    was just like a look-alike to the perpetrator, correct?

2              MR. McLANDRICH:  Objection.

3              THE COURT:  Sustained.

4              MR. OWENS:  What's the basis of the objection?

5              MR. McLANDRICH:  It's not a police policy or

6    practice.

7              MR. OWENS:  Okay.

8    BY MR. OWENS:

9    Q.   You indicated at least, just so we're on the same page --

10             MR. OWENS:  Actually, no further questions, Your

11   Honor.

12             THE COURT:  Thank you.  Counsel.

13                         **CROSS-EXAMINATION**

14   BY MS. FRICK:

15   Q.   Thank you.  Hello.  My name is Dawn Frick.  I represent

16   the Miami Township Board of trustees.  I just have a couple

17   questions.

18        In light of your experience and expertise, would there be

19   any logical reason as part of the employment, as their

20   employment as a police officer, for a detective to knowingly

21   use an unnecessary -- unnecessarily or unduly suggestive ID?

22             MR. OWENS:  Objection, Your Honor.  This is

23   undisclosed expert testimony.

24             THE COURT:  Overruled.

25             THE WITNESS:  Could you repeat?  I'm not sure what

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MONHEIM - CROSS (Frick)                                        1425

1    the question is.

2    BY MS. FRICK:

3    **Q.**   Sure.  Would there be any logical reason for a police

4    officer to knowingly use an unnecessary or unduly suggestive

5    photo array?

6              MR. OWENS:  The same objection.

7              THE WITNESS:  No.

8              THE COURT:  Sustained -- no.  Overruled.  I'm sorry.

9              THE WITNESS:  No.

10   BY MS. FRICK:

11   **Q.**   And would you agree with me that it would be in the

12   employer or the police department's interest to not have an

13   unduly or unnecessarily suggestive lineup?

14             MR. OWENS:  Objection; undisclosed and foundation.

15             THE COURT:  If you can rephrase, Counsel.

16             MS. FRICK:  Sure.

17   BY MS. FRICK:

18   **Q.**   Police or police departments have an interest in having a

19   reliable identification in a case, correct?

20   **A.**   Yes, I would agree.

21   **Q.**   Okay.  So it wouldn't be in the police department's

22   interest to have their detectives knowingly use an

23   unnecessarily suggestive identification procedure, correct?

24             MR. OWENS:  Objection.

25             MR. McLANDRICH:  Objection.

1          MR. OWENS:  Undisclosed.

2          THE COURT:  This is a -- this expert is qualified in

3    police procedures, right?

4          MR. OWENS:  He's been disclosed as it relates to

5    police procedures, yes.

6          THE COURT:  Is that correct, Counsel?

7          MR. McLANDRICH:  Yes, sir.

8          THE COURT:  Sustained.

9          MS. FRICK:  No further questions.

10         THE COURT:  Thank you.

11                    **REDIRECT EXAMINATION**

12   BY MR. McLANDRICH:

13   **Q.**   Just a couple, sir.

14        You were asked on cross-examination about prior expert

15   testimony you have given.  Do you recall that?

16   **A.**   Yes, sir.

17   **Q.**   And the fact that you've been an expert in other cases

18   wouldn't cause you to give testimony that wasn't truthful,

19   would it?

20   **A.**   No.

21   **Q.**   And you were asked about being an umpire, right?

22   **A.**   Yes.

23   **Q.**   And the job as an umpire is to call them as they see

24   them?

25   **A.**   Exactly.

1  Q.   With respect to the International Association of Chiefs

2  of Police training key or the NIJ study, again, are these

3  documents partly current standard and partly efforts to

4  improve standard?

5           MR. OWENS:  Objection.  It's both leading and

6  compound.

7           THE COURT:  Rephrase.

8           MR. McLANDRICH:  Yes, sir.

9  BY MR. McLANDRICH:

10  Q.   What are the purposes of organizations and documents

11  published by NIJ and the International Association of Chiefs

12  of Police?

13           MR. OWENS:  Objection.  It's still compound.  They

14  are separate agencies.

15           THE COURT:  Overruled.  You can answer it if you

16  can.

17           THE WITNESS:  Basically, to enhance professionalism

18  in law enforcement.

19  BY MR. McLANDRICH:

20  Q.   And how do they go about that?

21           MR. OWENS:  Objection.

22           THE WITNESS:  By doing a -- I'm sorry.

23           MR. OWENS:  It's still vague.  I don't know who the

24  "they" is.

25           THE COURT:  Do you understand the question?

 1           THE WITNESS:  I believe he's referring to IACP and

 2   NIJ, yes.

 3           MR. McLANDRICH:  Yes, sir.

 4           THE COURT:  I'll let him answer.

 5           THE WITNESS:  Could you repeat it?

 6   BY MR. McLANDRICH:

 7   **Q.**   Yeah.  How do they go about improving police

 8   professionalism and standards?

 9   **A.**   Well, over the years they've done various studies, and

10   they publish papers, publish model policies that try to

11   guide police departments toward a more professional stance

12   in law enforcement.

13   **Q.**   Would the training key be such a publication?

14   **A.**   It would.

15   **Q.**   Would the 1999 NIJ study that was referred to be such a

16   publication?

17   **A.**   Yes.

18   **Q.**   Now, you were asked about letting witnesses speak to each

19   other where there are multiple witnesses.  Do you recall that?

20   **A.**   Yes, sir.

21   **Q.**   And how does that correlate when those witnesses are

22   family members?

23   **A.**   Well, it's very difficult to stop them.  I mean, if you

24   have one witness that -- I gave the example of a husband and

25   wife.  If you respond to the house and show a lineup to the

1    wife if they were both witnesses to, say, a murder and the

2    wife makes an identification, I would tell that witness not

3    to discuss what she did or what occurred during the photo

4    display with her husband.

5        And to ensure that she didn't, I would rearrange the

6    photos.  I would not have the photos in the same position,

7    and just shuffle them like a deck of cards so that they

8    would not be able to talk about which one was the subject --

9    suspect of the lineup.

10            MR. McLANDRICH:  Nothing further.

11            THE COURT:  With regard to those four questions or

12   something like that.

13                    **RECROSS-EXAMINATION**

14   BY MR. OWENS:

15   **Q.**   As a police officer in 1990, you would have understood

16   that witnesses who might speak together about, you know,

17   photos, if they were like the husband and the wife, they might

18   be able to describe things other than just whether it's one,

19   two, three, four, five, and six and actually discuss the

20   pictures themselves, right?

21   **A.**   It's possible.  Unlikely, but possible, yes.

22   **Q.**   And if you could, if the witnesses were willing to come

23   to the police station and you could keep them separate, you

24   agree that you would want to do that when you are

25   administering the photo arrays, right?

MONHEIM - RECROSS (Owens)                                    1430

1   **A.**   That would be the ideal.  But logistically, many times

2   it's not possible.

3   **Q.**   If it were possible, that's what you'd do, right?

4   **A.**   That would be the ideal, yes.

5   **Q.**   If you had an unfair lineup on which one of the pictures

6   somebody stuck out, shuffling the pictures wouldn't very well

7   help much, right?

8   **A.**   Well, first of all, you wouldn't show an unfair lineup.

9   But, yes, I agree.

10  **Q.**   You were asked a couple questions on redirect a minute

11  ago about the IACP, and we've had a little bit of a discussion

12  about that, right?

13  **A.**   Yes.

14  **Q.**   *Training Key 414* wasn't the first training key that IACP

15  created about eyewitness identification and the problems

16  associated with it, correct?

17  **A.**   I don't know.

18  **Q.**   Well, training -- IACP *Training Key Number 67* from the

19  1960s describes some of those issues as well, correct?

20  **A.**   I've actually never read that training key.

21  **Q.**   You're not aware of this document?

22  **A.**   Not that I -- not that I recall, no.

23          MR. OWENS:  No further questions.

24          THE COURT:  Anything else?

25          MS. FRICK:  No, Your Honor.

 1              MR. McLANDRICH:  No, Your Honor.

 2              THE COURT:  Can this witness be excused?

 3              MR. McLANDRICH:  Yes, sir.

 4              THE COURT:  Thank you very much.

 5         And your next witness, counsel?

 6              MR. McLANDRICH:  Dr. Wixted, Your Honor.

 7              THE COURT:  All right.  Ladies and gentlemen, our

 8    next witness is by way of video.  The witness will be placed

 9    under oath and will testify as he would if he was here in the

10    courtroom.  You will judge that witness as you would judge any

11    witness that takes the stand with regard to his credibility

12    and his testimony.  So please give your attention to the

13    witness.  Once we get him there.

14         Counsel, then your next witness?

15              MR. McLANDRICH:  Dr. John Wixted, Your Honor.

16              THE COURT:  Thank you.

17    Doctor, can you hear me?

18    Doctor, can you hear me?

19    Doctor, can you hear me?

20              THE WITNESS:  I can.

21              THE COURT:  All right.  Doctor, if you would,

22    please, my courtroom deputy will swear you in.  Please raise

23    your right hand.

24         **JOHN WIXTED, DEFENDANT MOORE'S WITNESS, SWORN**

25              THE COURT:  Doctor, please just try to keep your

WIXTED - DIRECT (McLandrich)                                1432

```
 1   voice up.  We are doing this, of course, by way of video.  So

 2   we're hoping it works.  But we need to keep your voice up so

 3   that the jury and everyone here in the courtroom can hear your

 4   responses to the inquiries, all right?

 5              THE WITNESS:  All right.  I'm moving my microphone

 6   so it will help a little bit.

 7              THE COURT:  All right.  Whatever you -- whatever you

 8   believe helps you, okay?  All right.

 9        Counsel, you may inquire.

10              MR. McLANDRICH:  Thank you.

11                        DIRECT EXAMINATION

12   BY MR. McLANDRICH:

13   Q.   Good morning, Doctor, and thank you for being available

14   today.

15   A.   Good morning.

16   Q.   Would you start off with your full name, and spell it for

17   the record, please.

18   A.   My name is John Wixted, J-O-H-N W-I-X-T-E-D.

19   Q.   Thank you.  And would you describe for the jury your

20   educational background, please?

21   A.   I have undergraduate degrees in biology and psychology

22   from the University of California at San Diego.  I have a

23   Ph.D. in clinical psychology from Emory University in

24   Atlanta.

25   Q.   All right, sir.  And would you describe your current
```

WIXTED - DIRECT (McLandrich)                                      1433

1   employment, sir?

2   **A.**    I'm a professor of psychology in the department of

3   psychology at the University of California - San Diego.

4   **Q.**    All right, sir.  And what fields of study and research do

5   you engage in in your current employment?

6   **A.**    My research focuses on all aspects of memory, from the

7   brain mechanisms of memory to cognitive or mental models of

8   memory, to memory in the real world, such as eyewitness

9   memory and memory in the classroom.

10  **Q.**    And for how long have you been engaged in that sort of

11  research, sir?

12  **A.**    Let's see.  I think it's 33 years now.

13  **Q.**    And how is it that you became engaged in research with

14  respect to eyewitness memory?

15  **A.**    Well, I conducted research on the basic mechanisms of

16  memory for the first 20 years of my career.  That's the

17  brain mechanisms of memory and cognitive models of memory.

18  That's basic science.

19        And about ten years ago a colleague was asked to write

20  a chapter on eyewitness confidence, and he knew that I knew

21  a lot about confidence in general, the basic science

22  understanding of that.  And so he asked me to co-author that

23  chapter with him.  It's the first time I really read the

24  eyewitness memory literature.

25        But I did, and I started realizing I might have

WIXTED - DIRECT (McLandrich)                                1434

1   something important to contribute to that field.  And so I

2   shifted much of my focus about ten years ago to eyewitness

3   memory.

4   **Q.**   And in addition to research, have you published peer-

5   reviewed articles with respect to eyewitness memory?

6   **A.**   Yes, many.

7   **Q.**   And have you also lectured with respect to eyewitness

8   memory?

9   **A.**   Many times.

10  **Q.**   And have you testified in the past on eyewitness memory?

11  **A.**   I have, multiple times.

12          MR. McLANDRICH:  I would move that Dr. Wixted be

13  admitted as an expert in eyewitness memory.

14          MR. OWENS:  No objection.

15          THE COURT:  All right.  He will.

16  BY MR. McLANDRICH:

17  **Q.**   Doctor, how does your approach to eyewitness ID research

18  differ from someone who, say, is a social scientist?

19  **A.**   Well, the way I usually describe it is eyewitness

20  identification procedures conducted by the police, say in

21  the 1970s and 1980s and even the 1990s, often were

22  problematic in a social science sense.  So the police

23  officer might have an interpersonal impact on the witness,

24  leading them, inadvertently even, to pick the suspect.

25  That's a social influence on their performance.

1    But over the years, people have figured out how to get

2    rid of those social influences such that the eyewitness

3    memory test is a test of memory, per se.  And that's the

4    point at which memory expertise becomes needed.  And social

5    psychologists, that's not their area of expertise, but that

6    happened to be my area of expertise.  And that was what I

7    saw as being the case ten years ago when I jumped into the

8    field.

9    **Q.**   And before you became involved in the field, what was the

10   general belief with respect to the reliability or accuracy of

11   eyewitness identification?

12   **A.**   It was, in academia anyway, universally understood to

13   be inherently unreliable.  It was in every textbook.  Any

14   suggestion to the contrary was met with serious response.

15   But that was the general view.

16        It's still the view of many.  Many people to this day

17   are surprised to hear that the evidence with respect to that

18   issue has changed pretty dramatically.

19   **Q.**   And how has that evidence with respect to the reliability

20   of eyewitness identification, accuracy, or reliability changed

21   from, let's say, the late '80s, early '90s to the current day?

22   **A.**   Well, only recently has it become clear that there's

23   nothing particularly special about eyewitness memory.  It's

24   just like every other kind of forensic evidence.  There are

25   conditions under which it's reliable and conditions under

WIXTED - DIRECT (McLandrich)                                    1436

1    which it's not reliable.  For any kind of evidence, if it's

2    contaminated before you run the test or if you run the test

3    improperly, it can be unreliable.  That's also true of

4    eyewitness memory.

5        What's new is the understanding that memory's not

6    contaminated, if you haven't changed the witness's memory

7    inadvertently by the time of the first test, the witness can

8    provide highly reliable information.  That's -- that's an

9    understanding that is only a few years old.

10   **Q.**   And you're familiar with Dr. Wells, I take it?

11   **A.**   Yes.  We have argued quite extensively in the field.

12   **Q.**   All right.  And have you authored any papers together?

13   **A.**   We have.  And, in fact, one of the most impactful

14   papers ever in the field of eyewitness identification is

15   a -- we jointly authored a paper.  It surprised the field

16   that we would put our swords down and write a paper about

17   what we agree about, and that's what we did, and it's had an

18   amazing impact on the field.

19   **Q.**   And you're aware of the concepts that I believe were

20   developed by Dr. Wells with respect to what's been called

21   estimator variables and system variables?

22   **A.**   Yes.  I'm intimately familiar with that distinction.

23   **Q.**   Could you just describe in a general fashion, if you

24   will, what estimator variables are and system variables are

25   and the distinction between them?

WIXTED - DIRECT (McLandrich)                                        1437

1    **A.**    All right.  Well, when a crime is committed, it's

2    happening well before the police are involved, and there are

3    factors present at the time of the crime that determine how

4    well the witness will be able to remember the face of the

5    perpetrator.  For example, if it -- if it is pitch black

6    outside, well, the witness won't be able to even see the

7    perpetrator's face.  So that's -- the lighting is an example

8    of an estimator variable.

9        And many other things happening at the time of the

10   crime are like that.  They are estimator variables that the

11   police have no control over because they are not involved

12   yet.  So the witness might only get a brief look at the

13   perpetrator's face or they might get a long look, but

14   whether it's brief or long is not under the control of the

15   police but does affect the witness's ability to form a good

16   memory of the face of the perpetrator.

17       So variables like that, that are present at the time of

18   the crime that the police have no control over but that do

19   have an affect on the witness's ability to form a memory of

20   the perpetrator, those are estimator variables.

21       Then at some point the police are involved, and they

22   can talk -- now they have control over what they do, and one

23   of the things they do is often present an eyewitness

24   identification test, such as a photo lineup.  And how they

25   make the photo lineup, how they administer the photo lineup,

WIXTED - DIRECT (McLandrich)                            1438

1    they have control over that.  And those things can affect

2    memory as well, but those are called system variables

3    because the police have control over it.

4    Q.    All right.  And you mentioned the opportunity of the

5    victim to view the suspect.  And is the longer duration of the

6    ability to view, does that improve the memory or the imprint

7    of the image into the mind of the victim?

8    A.    It does.  The longer the exposure, the more clearly the

9    memorized face of the perpetrator will be.

10   Q.    All right.  And, likewise, I take it the quality of the

11   opportunity to view, whether they get to see them at closer

12   distance or further distance or get a good, direct look at

13   them, those things would also affect the quality of the

14   imprint of the memory?

15   A.    Yes, that's another estimator variable present at the

16   time of the crime.  The witness is either close to the

17   perpetrator and can see his face clearly or far away and

18   cannot see it as clearly and cannot form as good a memory.

19   Q.    And you mentioned the fact that the police will present

20   photo arrays at times to victims.  And does the delay between

21   the crime event and the presentation of the array, does that

22   impact the ability or accuracy of a witness to be able to make

23   an accurate identification?

24   A.    Yes.  And that word "accuracy" can be misleading.  So I

25   want to say yes to your question, but what that means is the

WIXTED - DIRECT (McLandrich)                          1439

1    longer -- we call it a retention interval or delay.  The

2    more time that goes by, the more memory fades and the less

3    likely it is that the witness is going to be able to

4    identify the guilty perpetrator even if he is in the lineup.

5         It's important to understand that what a delay does not

6    do, it does not, by itself, contaminate the witness's

7    memory.  It doesn't put the face of an innocent suspect who

8    might end up in a lineup into the brain of the eyewitness.

9    Other things do that.

10   **Q.**   And is the effect of delay on the ability to make a

11   witness identification, has -- that the understanding with the

12   impact of delay, has that changed over time?

13   **A.**   Yes, it has, because for many years the field made the

14   mistake of believing that a reduction in accuracy in the

15   sense that I just described, which certainly does happen,

16   accuracy goes down with delay, that was equated with the

17   notion that any ID that is made from a lineup after a long

18   delay is unreliable.  But unreliable --

19            MR. OWENS:  Objection.  Objection.  Can we be seen

20   at sidebar on this?

21            THE COURT:  All right.

22        (At sidebar.)

23            MR. OWENS:  The objection is that the witness is

24   opining about what makes an identification itself reliable.  I

25   have no problem with him using the phrase "accurate," things

WIXTED - DIRECT (McLandrich)                              1440

1    like that, but, you know, reliability is the ultimate issue to

2    be decided by the jury in this case.

3       I specifically avoided asking -- using that word with

4    Dr. Dysart because of that issue.  I think I slipped up once

5    and then corrected myself and then said "accurate" both times

6    it happened.  So this is the second time he's started to go

7    into reliability, and part of his report will distinguish

8    accuracy and reliability, and I think that's what he's about

9    to go into.  So that's our objection.

10          MR. McLANDRICH:  So, again, there was no motion in

11   limine with respect to -- and I understand those are

12   preliminary, but that said, he's not using "reliability" in

13   the legal sense in the jury instruction.  When he uses

14   "reliability," it's in the academic sense of his research.

15   And he can certainly explain the difference from an academic

16   research standpoint analysis between accuracy and reliability.

17          MR. HERMAN:  I have nothing.  Thank you.

18          MR. OWENS:  This is David Owens again.  Sorry for

19   not identifying myself.  There was a motion in limine, the

20   *Daubert* motion, and there was a ruling by the Court that the

21   eyewitnesses and other witnesses in the case couldn't address

22   the ultimate issue.

23          MR. McLANDRICH:  Couldn't address -- John

24   McLandrich.  Couldn't address the specific facts of the case.

25   And he's not going to testify that this particular

WIXTED - DIRECT (McLandrich)                                    1441

1  identification was either accurate or reliable but he is going

2  to explain the academic difference, the research difference

3  between what is meant by accuracy and reliability.

4      It's in a general sense.  It's not in a specific case.

5  He's not going to the ultimate issue.  He's not --

6          THE COURT:  No.  I understand that.  I'm trying

7  to -- modify your question to "accurate."

8          MR. McLANDRICH:  I'll try.  In the literature and in

9  his analysis, there's a fundamental distinction between

10  accuracy and reliability.  Again, this is no different than

11  like a police excessive force expert who testifies with

12  respect to what excessive force is in police standards.  He is

13  not then testifying that the force in a given case was or

14  wasn't excessive.

15          MR. OWENS:  This is David Owens again.  I guess that

16  would be objectionable.  With Dr. Dysart we were very, very

17  careful to avoid her opining or using the word "reliability."

18  It is the ultimate issue as it relates to the jury

19  instruction.  I think that there is a way around it for

20  counsel, which you could just ask him whether or not it's

21  accurate or whether or not there is still information that you

22  could gain from an identification over time.  What he will say

23  is that the few people who can make an identification, say,

24  nine months later, those -- if they are made with high

25  confidence, those will look -- you just shouldn't use that

WIXTED - DIRECT (McLandrich)                    1442

 1    magic word, which is a term of art.

 2            MR. McLANDRICH:  Well, again, it's a term of art in

 3    the science that has a different import than the ultimate

 4    issue of whether this particular identification was or was not

 5    reliable.

 6            THE COURT:  All right.  I'll rule when I get back

 7    there.

 8        (In open court.)

 9            THE COURT:  Sustained.

10        Rephrase, please.

11            MR. McLANDRICH:  I'm sorry.  I can't remember

12    exactly what was the question I asked.

13    BY MR. McLANDRICH:

14    Q.   So, Doctor, an identification that is made after a period

15    of delay, while there may be fewer of them, are those that are

16    made still highly likely to be correct?

17    A.   Yes, that is the effect of increasing delay.

18    Forgetting happens, so that's why the witness is less likely

19    to make an identification with high confidence.  But for

20    those that do, the literature shows, up to pretty long

21    delays, the likelihood of an identification that is made

22    being accurate remains very high.

23    Q.   And stress is another one of those estimator variables,

24    correct?

25    A.   Correct.

WIXTED - DIRECT (McLandrich)                    1443

1    Q.   And what's the effect of stress on a person's ability to

2    make an accurate identification?

3    A.   Well, it's -- there's no single answer to that

4    question.  And if stress is too low, if the witnesses --

5    which is unlikely, but just to be complete, if the witness

6    is bored and uninterested and not paying attention because

7    they are so under-stressed, that can impair their ability to

8    form a memory.  Then there's an optimal memory of stress.

9    And then stress can be too high, where you're so stressed,

10   again, you can't form a good memory of the perpetrator.

11        But -- and so it reduces accuracy in that sense.  If

12   stress is very high, the witness's -- witnesses who are

13   highly stressed are less likely to make a high-confidence

14   identification from a lineup even if the perpetrator is in

15   it.  Accuracy is reduced in that sense.

16        Accuracy is not reduced in the other sense, the more

17   important sense that we were just talking about, that given

18   that an ID of a suspect is made with high confidence, its

19   accuracy -- less likely to happen, but when it does happen,

20   its accuracy remains very high.

21   Q.   And, Doctor, several times now in your answers you've

22   indicated or described an eyewitness identification that is

23   made with high confidence.  Can you describe the import or the

24   importance of high confidence with respect to eyewitness

25   identifications?

WIXTED - DIRECT (McLandrich)                                    1444

**A.**   Yes.  When it became clear that the first time you test
an eyewitness's uncontaminated memory, it can be -- a
suspect identification can be accurate.  That isn't --
that -- well, it has to be more nuanced about it.  It's --
the confidence, the certainty of the witness's
identification of the suspect matters a lot, contrary to
what was understood to be true in the field literally for
decades where the assumption was that how certain a witness
is in that initial identification is largely uninformative.

It turns out to be the most important thing to know
because a witness who makes an identification of a suspect
from a lineup, a photo lineup on a first test of their
uncontaminated memory, if they're uncertain, such an ID is
like a clean slip; it's essentially uninformative, even
though the police officer might write down "Witness
positively identified the suspect," which sounds bad for the
suspect.  Well, it isn't because it's a coin flip.  It's
largely uninformative.

But if the -- but if the witness makes a high-
confidence identification, no signs of hesitancy or
uncertainty, that kind of suspect identification is highly
reliable.  So it's important to know that --

MR. OWENS:  Objection.

THE WITNESS:  -- additional piece of information --

THE COURT:  Hold on.

WIXTED - DIRECT (McLandrich)                          1445

1              MR. OWENS:  It's just the same issue before.

2              THE COURT:  The word?

3              MR. OWENS:  Yes.  I think we can move on.  I wanted

4    to note it for the record.

5              THE COURT:  I'll deal with it if it occurs again.

6         I'm sorry.  Go ahead.  I didn't mean to interrupt you,

7    Doctor.

8    BY MR. McLANDRICH:

9    Q.   And, Doctor, the Court would like you to avoid the word

10   "reliable" if you can in your answers.

11   A.   I understand.  And we use it in the scientific

12   literature to mean something other than what the court means

13   by it.

14              MR. OWENS:  Objection, Your Honor.

15              THE COURT:  Doctor, if you would, just not use it,

16   please.  Thank you.

17              THE WITNESS:  Okay.  I understand.  I won't use it.

18   BY MR. McLANDRICH:

19   Q.   Now, Doctor, in your research, is a -- is an eyewitness

20   identification considered a memory test?

21   A.   Yes, a recognition memory test.

22   Q.   And so the key feature of that memory test is what, sir?

23   A.   The thing that you're trying to remember is being

24   presented to you again, and you're being asked is this the

25   face that you saw at the time of the crime.  That's a face

WIXTED - DIRECT (McLandrich)                              1446

1    recognition memory test, and a photo lineup is such a test.

2    **Q.**   And do the various aspects of the photograph itself

3    interfere with the ability to engage in that facial

4    recognition memory test?

5    **A.**   I'm not 100 percent sure I understand your question.

6    But the quality of the photo matters.  So, for example, if

7    you have a photo that's fuzzy and hard to see, it's going to

8    be hard to tell whether it matches your memory.  I'm not

9    sure if I'm answering your question, though.

10   **Q.**   Yes.  So it was probably a very poor question.

11       So I'm wondering about various attributes such as the

12   color of the background of a photograph or the size of a head

13   in the photograph or the clothes that the suspect might be

14   wearing, the various finishes that the photograph may have

15   between the different six photos that are generally shown in

16   an eyewitness identification, those sorts of things.  Do those

17   impact the ability of the witness to engage in an accurate

18   memory test?

19   **A.**   Not very much at all.  That is a -- it came from the

20   social psychology perspective that we were talking about

21   earlier.  So you might worry, for example, that if only one

22   person is wearing a white shirt and it's the suspect, that

23   the police are giving a clue who do -- who to pick.

24       But the key point is that the witness might pick up on

25   such a clue, but it's not going to -- it's not going to

1    change the fact that the witness is going to realize that

2    the guy wearing that white shirt, who the police seem to

3    want me to pick, doesn't match the face in my memory.  They

4    are not going to fail to notice that.  They might pick the

5    guy in the white shirt in such a case, but it's going to be

6    a hesitant, slow, low-confidence identification if it

7    happens.

8         And the relevant research actually suggests that

9    that -- even that doesn't happen, that is, those clues --

10   it's the degree to which the face in the lineup matches the

11   face in the witness's brain that is the main determinate by

12   far about whether or not an identification occurs, not these

13   other factors, these perceptual factors that might be

14   construed by the witness as clues of who I should pick.

15   Those things don't really have much of an effect according

16   to the existing literature.

17        What has a major effect is the degree to which -- it's

18   a memory effect, not a perceptual effect.  It's the degree

19   to which the face in the photo lineup matches the witness's

20   memory of the perpetrator.  That's the determining variable

21   of whether or not they make an ID and how confident they

22   are.

23   Q.   And what you just described, is that a parameter or

24   controlling factor of whether a lineup is fair or not?

25   A.   Well, usually, in many discussions in the scientific

WIXTED - DIRECT (McLandrich)                              1448

1   literature about what a fair lineup is, they gloss over this

2   important distinction that I'm drawing attention to now.  So

3   if, for example, the background or the color of the clothing

4   is different between the suspect and the other people in the

5   lineup, that's a perceptual difference.

6       In the scientific literature, that kind of lineup is

7   often called unfair and is conflated, mixed up with the more

8   important kind of unfair lineup, which is where the

9   suspect's facial features differ from the facial features of

10  the other members of the lineup, and in such a way that it

11  better matches the witness's memory.  So to take an extreme

12  example of where this would apply, if a witness said it's a

13  20-year-old white guy who committed the crime and there is a

14  20-year-old white guy in the lineup surrounded by 40-year-

15  old black guys, well, now we know only that one suspect has

16  features that match the witness's memory differentially

17  because the witness told you what's in their memory, and now

18  only that guy has those features.  That's an unfair lineup.

19  That does compromise even high-confidence identifications.

20  They are no longer highly accurate under those conditions.

21  **Q.**   And in the literature, there is discussion of what's

22  characterized as pristine conditions.  You familiar with that?

23  **A.**   Intimately.

24  **Q.**   And what we've just been discussing, is it related to

25  this concept of a pristine condition?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    **A.**    Yes.  A pristine lineup is a lineup that follows the

2    guidelines that researchers have recommended in a consensus

3    statement.  And what I just described is one of those

4    pristine conditions.  Everyone should match the description

5    of the perpetrator provided by the witness because the

6    witness is telling you here are some features that are in my

7    memory.  So everybody should at least match those features.

8    Everybody should be a 20-year-old white guy, for example.

9    **Q.**    And what other elements are required for a lineup to be

10   sufficiently pristine to be fair?

11   **A.**    Well --

12   **Q.**    Or was that a poor question?

13   **A.**    If you had left off "to be fair," I could tell you what

14   some of the other pristine conditions are.  But to be fair,

15   that is what makes a fair lineup.  It's -- if everybody in

16   the lineup matches the description of the perpetrator

17   provided by the eyewitness, it is a fair lineup.  You don't

18   need anything else.

19   **Q.**    All right.  And will a high-confidence identification

20   with a fair lineup be accurate, or highly accurate?

21   **A.**    Those tend to be highly accurate, yes, on the first

22   test of the witness's uncontaminated memory.

23   **Q.**    All right.  And when a witness is asked to make a

24   composite before they are shown a photo array, what's the --

25   what's the impact of preparing a composite on that ability of

1    the witness to make an accurate identification at the photo

2    lineup?

3    **A.**    There's been some new science on that, very recent,

4    sort of contradicting what I previously believed to be true.

5    I thought that making a composite does have an effect on the

6    witness's ability to make an identification, an accurate

7    identification from a lineup.  It turns out actually that

8    that's probably not the case.

9        It looks like when you factor in the latest research,

10   and there's a new review of the literature on this exact

11   question that came out in 2020 that concludes that contrary

12   to what I thought was true, based on one paper that had been

13   published earlier -- it turns out if you factor in all the

14   papers, all the studies that have looked into this exact

15   question, there's really no evidence that it has any effect

16   on the accuracy of an identification made from a lineup.  I

17   didn't realize that before, but that is the current thinking

18   in the field.

19            MR. OWENS:  Objection.  We'd ask that to be

20   stricken.  That's undisclosed.  There was no supplemental

21   report in 2020, 2021.  This is the first time we're hearing

22   this.

23            THE COURT:  Well, I'll rule on that when we come

24   back.

25        Counsel, we're going to have to -- pursuant to my

1    schedule, we're going to have to break for approximately 35

2    minutes, and then we'll reconvene for the purposes of

3    testimony at that time.

4    BY MR. McLANDRICH:

5    **Q.**   So, Doctor, we're going to take a brief lunch break for

6    about a half hour, and then we will reconvene with you.

7    **A.**   Sounds good.

8    **Q.**   Thank you, Doctor.

9              THE COURT:  Ladies and gentlemen, please remember

10   the Court's admonitions.  We will see you back here in 35

11   minutes.  Thank you.

12             THE COURTROOM DEPUTY:  All rise.  This court stands

13   in recess.

14        (Jury out at 11:59 a.m.)

15        (Recess at 12:00 p.m.)

16        (Jury in at 12:37 p.m.)

17        (In open court at 12:38 p.m.)

18             THE COURT:  We are back on the record.

19        Doctor, you can hear me?

20             THE WITNESS:  I can.

21             THE COURT:  Please remember you're still under oath.

22        Counsel ready to proceed?

23             MR. McLANDRICH:  Yes, sir, Your Honor.

24             MR. OWENS:  Yes, Judge.

25             THE COURT:  The Court's going to sustain the last

WIXTED - DIRECT (McLandrich)                                    1452

1    objection and strike the previous answer.

2        Proceed.

3    BY MR. McLANDRICH:

4    **Q.**    Thank you for your patience, Doctor.

5        Would you explain to the jury, please, what blind or

6    double-blind administration of a photo array is.

7    **A.**    A blind administration of a photo array, that means

8    that the officer administering the photo lineup does not

9    even know who the suspect is.

10   **Q.**    And what does the research show with respect to whether

11   blind or double-blind administration is important to the

12   accuracy of an eyewitness identification?

13   **A.**    There's very limited research on that specific

14   question, and doesn't have any conclusive answer.  The

15   rationale for recommending that is mainly based on many

16   other lines of research having nothing to do with eyewitness

17   identification but showing that, you know, a researcher's

18   expectations, for example, can influence the outcome of a

19   study.  And so you want to make sure that the person running

20   the actual study hands-on, collecting data from subjects

21   doesn't know what the hypothesis is.

22       And because we know that, you know, people can be

23   unconsciously biased to -- to influence the performance of

24   the subjects in the experiment, it's better that that

25   researcher just doesn't know what the hypothesis is;

WIXTED - DIRECT (McLandrich)                                    1453

1    similarly, because of effects like that, since similar sorts

2    of things can happen in a police lineup, it's just best that

3    the police officer doesn't know who the suspect is.  And

4    that way the police officer cannot possibly unconsciously

5    provide a clue to who the suspect is or unconsciously steer

6    the witness to pick the suspect.  That potential problem

7    just goes away when you have a blind administrator.

8    **Q.**    And does the research show any differential between

9    whether the blind administrator is presenting a sequential

10   array versus an array where all the pictures are shown

11   simultaneously?

12   **A.**    Well, it's especially important for a sequential

13   procedure in which the photos are shown one at a time,

14   because under those conditions, the officer knows exactly

15   who the witness is looking at.  And so the officer who's not

16   blind will know exactly when the witness is looking at the

17   suspect, the one the officer thinks might be guilty.  And so

18   it's especially important for that to be administered by a

19   blind officer.

20        But in a simultaneous lineup, it's not as easy for the

21   officer to tell who the witness is looking at, when the

22   witness is casting eyes on the suspect.  And so it's harder

23   to have an influence.

24        But it's not a bad idea to have a blind administrator

25   in both cases.

WIXTED - DIRECT (McLandrich)                                    1454

1   **Q.**   And was blind administration part of the social science

2   recommendations in 1990?

3   **A.**   No.   Did you ask were those part of the

4   recommendations?   Was the recommendation to use a blind

5   administrator made as of 1990, was that your question?

6   **Q.**   Essentially, yes, sir.

7              MR. OWENS:   Objection.   Made by whom?   I'm a little

8   bit unclear.

9              THE COURT:   Made by the -- can you clarify your

10  question?

11             MR. McLANDRICH:   Sure.

12  BY MR. McLANDRICH:

13  **Q.**   Was a recommendation for blind administration made by ID

14  researchers in 1990, or was it later?

15             MR. OWENS:   Objection to the leading.

16             THE COURT:   Overruled.

17      You can answer.

18             THE WITNESS:   Okay.   So the recommendations are made

19  by a group of scientists who are commissioned to write a

20  consensus statement about what the science-based

21  recommendations are.   And such recommendations were first made

22  in 1998 and were never made prior to 1998.

23  BY MR. McLANDRICH:

24  **Q.**   Thank you.   And what's the effect of pre-identification

25  instructions on the accuracy of an eyewitness identification?

WIXTED - DIRECT (McLandrich)                                    1455

1    **A.**    Well --

2    **Q.**    Let me rephrase.

3    **A.**    I will start you --

4    **Q.**    Just let me rephrase.

5    **A.**    Okay.

6    **Q.**    If a witness is given instructions that the suspect may

7    or may not be present in the photo array, what's the impact on

8    the accuracy of the eyewitness identification?

9    **A.**    Just a small clarification.  There's always a suspect

10   in the array.  So the statement is that the perpetrator may

11   or may not be in the lineup, and that's a statement of

12   truth.  And when you ask what is the effect of that, you

13   have to ask compared to what.  So compared to not giving

14   them instruction?  There's minimal to no effect, based on

15   the research that's been conducted to date, but sometimes

16   it's compared to an alternative instruction where the police

17   officer says the perpetrator is in the lineup and we need

18   you to pick him.

19        Now, there's a difference in those two sets of

20   instructions, with the latter instruction that I just

21   mentioned is called biased instructions.  That strongly

22   encourages a witness to make an ID whether or not anybody in

23   the lineup matches their memory very strongly.

24        So when you ask that question, it has to be compared to

25   what.

1    **Q.**   Thank you.  And I believe you talked earlier about the

2    first identification that a witness makes of a suspect.  If

3    you would, please, describe to us in the research the

4    importance of that first identification.

5    **A.**   Okay.  Well, I mentioned earlier that eyewitness memory

6    is not special in that it can be contaminated just like any

7    kind of forensic evidence can be contaminated.  And so what

8    you want is the results of a test of uncontaminated memory

9    evidence.

10       And memory can be contaminated even before the very

11   first lineup, but that minimizes -- by focusing on that

12   first test, it minimizes the chances that the witness's

13   memory's been contaminated.  That's the first point.

14       And the second point is the very act of testing a

15   witness's memory with a photo lineup unavoidably,

16   irretrievably changes the witness's memory.  And so now it's

17   a different memory from that moment forward.  And so you

18   don't want to test their memory again because you just

19   changed it by testing it.  Instead, you want to focus on

20   what they say when given that first lineup test.  If, as an

21   example, the suspect in the lineup may be guilty, may be

22   innocent.  Let's assume just for illustration that the

23   suspect's innocent.  What that means is that the witness is

24   looking at that face and maybe making a decision like, maybe

25   it's him.  Could be him.  I'm not sure.  That's a low-

1    confidence identification.  It's not telling you anything

2    even though the witness landed on the suspect.  It's like a

3    coin flip.

4         But when making a decision about that face, looking at

5    it and making a decision, that face is activating space

6    processing regions in the witness's brain and laying down a

7    memory record of that face.  That innocent -- if it's an

8    innocent suspect, that face wasn't in the witness's brain

9    before the lineup.  That face is now in the witness's brain.

10        And so, in that sense, their memory has been changed,

11   and it generally does not make sense to test their memory a

12   second time.  It's important to focus -- because now their

13   memory's been contaminated by the test itself.  So focus --

14   the recommendation is to focus on the first uncontaminated

15   test of a witness's memory.

16   **Q.**   And how does that correlate with the in-court

17   identifications that happen at a trial?

18   **A.**   So whereas the first test is a test of minimally

19   contaminated eyewitness memory, in court is a test of

20   maximally contaminated memory.  And the witness is unaware

21   that their memory has changed.  And often -- well, I should

22   say there are many cases where the witness sat in trial and

23   confidently misidentified an innocent defendant.

24        Honestly, by that time the defendant did match their

25   memory very well, and so they're now highly confident that's

WIXTED - DIRECT (McLandrich)                                    1458

1    the person who committed the crime, but they're

2    misidentifying an innocent defendant.  This is something --

3    and so in court, it's an immediate, high-confident

4    misidentification because the face is matching memory so

5    well.

6         This sort of thing has almost never been documented on

7    an initial test of memory.  Virtually no examples where a

8    witness -- has been documented where a witness looked at an

9    innocent suspect in a photo lineup and immediately said I'm

10   positive that's him.  And that makes perfect sense, but that

11   doesn't happen on the first test because if it's an innocent

12   person, that face does not -- an innocent person and a test

13   of uncontaminated memory, that face in the lineup does not

14   match the face of the perpetrator in their brain.  Why would

15   an innocent suspect match -- who is not the perpetrator --

16   match their memory of a perpetrator if their memory has not

17   been contaminated by the time of that first test.

18   **Q**.   And this distinction that you've just described between

19   the accuracy of the first memory test and the contaminated

20   memory test that happens in an in-court identification, when

21   did this realization come into the social science, if you

22   will?

23   **A**.   So it was a consequence of the appreciation, the

24   growing appreciation that there's something special about

25   the first test.  And, remember, not so long ago it was

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

WIXTED - DIRECT (McLandrich)                          1459

1    controversial to say that eyewitnesses are reliable on the

2    first -- sorry, excuse me -- that eyewitnesses when they

3    make a suspect ID do so with high accuracy on a first test.

4    That was, until recently, a very controversial statement.

5    But once it became clear based on the data out there, it

6    became clear that there's something special about that first

7    test, which really started to emerge in the year 2015 and

8    was only cemented in year 2017, fairly recently.  Only then

9    did it become further clear that what's happening is not

10   that they're making mistakes when their uncontaminated

11   memory is tested.  What's happening is they are making

12   mistakes because their memory's being contested again, after

13   it has been changed by that first test and by many other

14   things can change their memory.

15        And that led to a consensus -- a new consensus

16   recommendation, for the first time, as in year 2020.

17   **Q.**   And is the current recommendation that it be the first

18   memory test that's relied upon as opposed to an in-court

19   identification?

20             MR. OWENS:  Objection.  Well, I'll withdraw it.

21             THE COURT:  Thank you.  You may answer.

22             THE WITNESS:  That is -- okay.  That is the

23   recommendation if the goal is to get accurate information from

24   the witness's memory.  If that's the goal, then it's best

25   served by focusing on the first test early in the police

1    investigation, not the last test in a court of law.

2    BY MR. McLANDRICH:

3    **Q.**   And as we've previously discussed, that photo lineup is

4    the first test?

5    **A.**   Normally, it is -- it is normally the first test that

6    is conducted early in a police investigation that minimizes

7    the chances of testing contaminated memory.

8    **Q.**   And when police historically would show witnesses photo

9    books and have them look through books of photographs, does

10   that contaminate their memory?

11   **A.**   Well, that's the first test, and it does change/

12   contaminate their memory.  So if the suspect who's later

13   going to appear in a photo lineup was seen in the mug book,

14   then what they said, it's the mug book test that you should

15   put your eyes on.

16        Just looking at mug book photos doesn't necessarily

17   contaminate their memory if none of those photos are going

18   to show up in a police lineup as a suspect.  But if the

19   suspect that's going to show up in the lineup was previously

20   viewed by the witness and the witness said something about

21   that photo and looked at that face, processed that face and

22   maybe said it kind of looks like that guy, that's the first

23   test.  That's the uncontaminated test.

24        Does that make sense?

25   **Q.**   Yes, sir.  And so if the suspect who later appears in a

WIXTED - DIRECT (McLandrich)                                    1461

1    photo array is not in the mug book, then showing the mug book

2    is not a contamination to their memory for the later lineup.

3    Am I understanding you correctly?

4    **A.**   Yes, that's correct.  It's seeing the suspect's face

5    previously that puts that face into their memory and

6    contaminates their memory for that suspect.  But if that

7    suspect wasn't seen in the mug books, no, memory has not

8    been contaminated by looking at those photos, mug book

9    photos.

10   **Q.**   And what, if any, correlation is there between

11   description accuracy that a witness might give and the

12   accuracy of a later eyewitness identification in a photo

13   array?

14   **A.**   Not much at all.  There's a small relationship in lab

15   studies, but the more realistic, the more real-world like

16   the lab studies are, the less of a connect -- any connection

17   there is.  There's no connection that's been identified from

18   the more realistic lineup studies between the description

19   and the later identification accuracy.

20   **Q.**   And so if I understand you correctly, if a witness gives

21   an inaccurate description, it won't affect their ability to

22   later make an accurate identification on that first memory

23   test, being the photo array?

24          MR. OWENS:  Objection to the form of the question.

25   It's leading, and I think it misstates the testimony.

WIXTED - DIRECT (McLandrich)                              1462

```
 1              THE COURT:  I don't know whether he was -- are you

 2      quoting testimony?

 3              MR. McLANDRICH:  No, I wasn't.  I think he's

 4      referring to the doctor's testimony.

 5              MR. OWENS:  I think he was summarizing in a way that

 6      was different than what the doctor just said.

 7              THE COURT:  Try again, Counsel.

 8              MR. McLANDRICH:  Sure, Your Honor.

 9      BY MR. McLANDRICH:

10      Q.   If a witness gives an inaccurate description, can they

11      still make an accurate identification on that first memory

12      test?

13      A.   I would say that follows from the finding that there's

14      no relationship between description accuracy and later

15      eyewitness identification accuracy from a photo lineup.

16      Q.   And when you talk about high confidence, how is that

17      expressed by a witness?

18      A.   Well, sometimes they actually give a number on a 1 to

19      10 scale or a 1 to 100 scale.  More often, it's the words

20      they use.  And really, although scientists have looked at

21      those words, what they have found is pretty much what you'd

22      expect.  Words like "That's him," or "I'll testify in court

23      that's him," "A hundred percent sure," "I'll never forget

24      that face," words like that correspond to high confidence.

25      Words like "It looks most like him," "It might be him," "I
```

1    think it's him but I'm not sure," that's -- those are

2    indications of low confidence.

3    Q.   Has there been recent research with respect to the

4    importance of how quickly the witness is able to make the

5    identification?

6           MR. OWENS:  Objection with respect to "recent."  I

7    hope it's disclosed.

8           THE COURT:  Is it within the part of his report?

9           MR. McLANDRICH:  That's a good question.

10      I'll withdraw it.  That's fine.

11          THE COURT:  Thank you.

12   BY MR. McLANDRICH:

13   Q.   If a witness has made a high-confidence identification

14   under appropriate conditions, is the later court testimony

15   simply a recitation of their prior high-confidence

16   identification?

17          MR. OWENS:  Objection; foundation.

18          THE WITNESS:  Yes.

19          THE COURT:  I'm going to allow it.  Overruled.

20          THE WITNESS:  Yes.

21   BY MR. McLANDRICH:

22   Q.   And if that witness is required to testify more than

23   once, is the second court appearance and testimony essentially

24   just a recitation of the prior high-confidence identification?

25          MR. OWENS:  Same objection.

WIXTED - CROSS (Owens)                                    1464

1                THE COURT:  Overruled.

2         You can answer.

3                THE WITNESS:  Yes.

4    BY MR. McLANDRICH:

5    **Q.**   Thank you, Doctor.  Those are the questions I have for

6    you today.

7                THE COURT:  Thank you, Counsel.

8         Doctor, you're now on counsel for plaintiff will be

9    asking you some questions.

10               THE WITNESS:  Okay.

11                        **CROSS-EXAMINATION**

12   BY MR. OWENS:

13   **Q.**   Dr. Wixted, good to see you again.  Can you hear me all

14   right?

15   **A.**   I can.

16   **Q.**   Now, in this case, you read a report authored by

17   Dr. Jennifer Dysart, correct?

18   **A.**   Correct.

19   **Q.**   And you and Dr. Dysart actually agree a lot about some of

20   the science in the field and opinions in this case, correct?

21   **A.**   I'm not sure I would characterize our level of

22   agreement in those exact terms, but we agree about some

23   things and disagree about other things.

24   **Q.**   All right.  Well, let's start with the list of things

25   where we can find out where y'all agree, okay?

WIXTED - CROSS (Owens)                                    1465

1    **A.**    Okay.

2    **Q.**    First, you agree that if three eyewitnesses select the

3    wrong innocent person, the probability of that happening,

4    absent suggestion or contamination, is extremely low, correct?

5    **A.**    As a general rule, I would say that's correct.

6    **Q.**    Well, you stated in your second report in this case,

7    quote -- well, that -- well, I'll take away the quote, but you

8    said in your second report that on the assumption that a

9    suspect is innocent, there is a very low probability that

10   three eyewitnesses would select him as the perpetrator unless

11   some suggestion, bias, and/or administrator influence

12   occurred, correct?

13   **A.**    That sounds like something I would write.

14   **Q.**    All right.  So, second, another thing that you and

15   Dr. Dysart agree about is that the scientific-based guidelines

16   for preparing identification procedures are that the suspect

17   shouldn't stand out, correct?

18   **A.**    Correct.

19   **Q.**    A third thing that you and Dr. Dysart agree about is that

20   a lineup can be fair or biased, and a biased lineup can lead

21   to an inaccurate identification, correct?

22   **A.**    Yes.  Depending on which kind of biased lineup we're

23   talking about, yes.

24   **Q.**    So, for example, in studies that you've written and

25   yourself cited in your papers, you talk about DNA-based

1    exonerations and as examples of individuals in which there's

2    been an inaccurate identification, correct?

3    **A.**    Are you still on the topic of biased lineups, or are

4    you just switching to something else?  I didn't hear any

5    mention of lineup.  So I am just making sure that we're not

6    talking about biased lineups now.

7    **Q.**    Well, let's just take a step back.  In the literature

8    that you have written about discussing fair and biased

9    lineups, you discuss what we've learned from DNA-based

10   exonerations, correct?

11   **A.**    I guess that's correct, although I'm puzzled a little

12   bit just because I don't remember making a direct connection

13   between those two things in my writings about those two

14   things.  But maybe I'm just forgetting something.

15   **Q.**    Okay.  So on direct examination, do you remember that you

16   mentioned a paper that you wrote with Gary Wells?  Do you

17   remember being asked about that?

18   **A.**    Yes.

19   **Q.**    And I believe -- and I'm trying to just refresh myself

20   with your exact quote -- but you said something to the effect

21   of, you know, it was a paper that was very path-breaking or

22   one of the most impactful papers in recent memory, correct?

23   **A.**    Correct.

24   **Q.**    And you didn't say the title, but I want to make sure

25   we're on the same page.  Was that the 2017 paper that you

1    wrote with Gary Wells called *The Relationship Between Witness*

2    *Confidence and Identification Accuracy:  A New Synthesis*?

3    **A.**    Yes.

4    **Q.**    And on page 1, paragraph one of the introduction of that

5    paper begins by discussing the fact that since 1989, there

6    have been 349 wrongful convictions overturned through DNA and

7    that eyewitness misidentification played a role in over 70

8    percent of those cases, far more than any other contributing

9    cause, correct?

10   **A.**    Correct.

11   **Q.**    All right.  And in this most impactful paper, you also

12   talk about fair and unfair lineups, correct?

13   **A.**    Correct.

14   **Q.**    And in that paper, you discuss that unfair lineups can

15   increase confidence with which eyewitnesses make a mistaken

16   identification, right?

17   **A.**    Yes.  My own research shows that to be true.

18   **Q.**    And so if there is an unfair lineup, according to your

19   own research, the unfair lineup undermines our ability to

20   infer high accuracy from high confidence, right?

21   **A.**    Yes, if it's unfair in the sense that I described

22   earlier.  There's more than one way in which people talk

23   about a lineup being unfair, one of which I am talking

24   about, the other of which I am not talking about.  But, yes.

25   **Q.**    Sure.  Let's just put it in more simple terms.  As I

WIXTED - CROSS (Owens)                                    1468

1    understand it, if there's an unfair lineup in the way that you

2    define an unfair lineup, that witnesses can still make a

3    high-confidence identification but it doesn't necessarily

4    correlate to it being accurate, right?

5    A.    It's still the case that a high-confidence ID is

6    considerably more accurate than a low-confidence ID, even

7    for an unfair lineup.  However, the accuracy of a high-

8    confidence-identification of the suspect is no longer -- you

9    know, I'll just use a number as an example.  It's no longer

10   95 percent correct, something very high.  It's considerably

11   lower than that.

12   Q.    Right.  So I'm sure we can't get into percentages, but at

13   the end, an unfair lineup runs a much higher overall rate of

14   mistaken identifications of the innocent, correct?

15   A.    Correct.

16   Q.    And the fourth thing that you and Dr. Dysart I think

17   agree about is that one type of unfair or biased lineup that

18   can lead to an inaccurate identification is if the features of

19   the suspect match the witness memory of the perpetrator better

20   than the fillers, right?

21   A.    I missed the very end of your question.  Could you

22   repeat that?

23   Q.    Not a problem.  So a fourth thing that you and Dr. Dysart

24   agree on is that there is one type of lineup bias that could

25   lead to an inaccurate identification even with high confidence

WIXTED - CROSS (Owens)                                    1469

1    is that if the features of the suspect match the witness

2    memory of the perpetrator better than the fillers, right?

3    A.   Well, just to clarify.  A high-confidence

4    identification can be inaccurate even under the best of

5    circumstances.  What we're talking about in science is the

6    probability of it being accurate, and that probability is

7    really quite high in an unbiased lineup and is lower in the

8    kind of lineup that you just referred to, where the suspect

9    matches the witness's description of what's in his or her

10   brain better than the fillers do, yes.

11   Q.   Right.  And so one of the examples you gave on direct

12   examination about an unfair lineup is if you had the 20-year-

13   old white suspect and then -- as a suspect, and then the rest

14   of the guys are all black dudes as fillers, right?

15   A.   Right.

16   Q.   Okay.  So another type of unfair lineup, you would agree,

17   would be if the witness described the perpetrator as having a

18   certain eye color and the suspect is the only one or -- to

19   have that eye color, correct?

20   A.   So you're saying if in the photo lineup you can see

21   that the suspect has blue eyes and you can see that the

22   other members of the lineup have, say, brown eyes, if that's

23   true, then, yeah.  If the photo lineup is clear enough that

24   you can tell blue eyes versus other color eyes, I would say

25   yes.

1  Q.   Got it.  And do you agree -- we're on Number 5 -- is that

2  it's the photos themselves that can also create an unfair

3  lineup so long as there's a second biassing mechanism, right?

4  A.   I'm sorry.  I don't understand that question.  Can

5  you --

6  Q.   Absolutely.

7  A.   -- restate it.

8  Q.   I apologize.  So you agree that a suspect can stand out

9  when it relates to the nonfacial features, the picture itself,

10 right?

11 A.   Yes.  So I think you are referring to the fact that the

12 perceptual features of the picture itself -- the size of the

13 faces, the background, the clothing, something like -- that

14 can be perceptually different for the suspect versus the

15 rest of the lineup.  I think that's what you're talking

16 about.

17 Q.   That's exactly right.  And in order for you -- for that

18 to be an unfair lineup, there needs to be another biassing

19 mechanism, like a comment by a police officer, "We got a

20 suspect," something like that, right?

21 A.   Well, I mean, I'm happy to call that a problematic

22 lineup, not because it's been shown to have any influence on

23 what a witness does, even though it seems like it might be

24 giving the witness a clue.  It's -- you know, the

25 recommendation is that that shouldn't be the case.  Because

WIXTED - CROSS (Owens)                                        1471

1   it just creates this question that people are going to be

2   wondering about even though the research that's available

3   indicates that that really isn't much of an issue at all

4   compared to the other way of biassing lineups.

5   **Q.**   Got it.  Let me --

6   **A.**   Where the -- okay.

7   **Q.**   Sorry.  Go ahead.  Finish.  I didn't mean to interrupt.

8   **A.**   I was just going to say compared to the other way of

9   biassing a lineup, where the witness tells you what's in his

10  or her memory and only the suspect matches it.  That's by

11  far the more important consideration in whether a lineup is

12  biased in a way that's going to influence what the witness

13  does or not.

14  **Q.**   Okay.  And I want to just step back for a second.  On

15  direct examination you mentioned that there was a consensus

16  document commissioned and contributed to that had been

17  published in 1998.  Do you recall that?

18  **A.**   Yes.

19  **Q.**   And that was a white paper.  Is that what it was called?

20  **A.**   Yes.

21  **Q.**   And white paper's kind of a big deal, not the normal type

22  of thing that you publish regularly, right?

23  **A.**   Right.  Because regularly we are doing the opposite.

24  We're challenging each other and arguing with each other

25  because that's our job as scientists.  But at some point,

WIXTED - CROSS (Owens)                                    1472

 1    you need to get together and say will you agree, and that's

 2    what makes those papers special, yes.

 3    Q.    Got it.  And so there was an update to the 1998 white

 4    paper, consensus document, where everybody got together to

 5    agree, and you participated in that, right?

 6    A.    I did.

 7    Q.    And one of the consensus recommendations on that document

 8    was that the physical characteristics of the fillers are not

 9    the only factors that can make the suspect stand out in a

10    lineup.  Instead, in photo lineups, the background of the

11    photos, the size or brightness of the images, and the source

12    of the photo can make the suspect's photo stand out from the

13    others.  Correct?

14    A.    Yes.  This is undeniably true.

15    Q.    Okay.  Thank you.  So another area, you were asked on

16    direct examination about biased administrators and blind

17    versus non-blind administration of a lineup.  Do you recall

18    that?

19    A.    Yes.

20    Q.    Now, you agree with the recommendation in the white paper

21    that there be non-blind administration of a photo lineup,

22    correct?

23    A.    I strongly -- wait.  Sorry.

24    Q.    No problem.

25    A.    Can you repeat that question?

1    **Q.**   Yes.  Do you agree with the recommendation in the white

2    paper that you contributed to that lineups should be conducted

3    with blind administration?

4    **A.**   Yes, I strongly agree with that.

5    **Q.**   Okay.  And do you agree that there is evidence that

6    lineup administrators -- the police officers conducting the

7    lineups -- can influence witnesses' confidence even when the

8    administrators are given an unbiased script that they are

9    supposed to follow?

10   **A.**   That can -- there is research showing that that can

11   happen verse -- or that that does happen.  What was your

12   question?

13   **Q.**   I'm just asking if you agree with that statement.

14   **A.**   Yeah, I wasn't sure if you said that that can happen or

15   that that does happen in practice.  I'm just asking for

16   clarification of what you were asking me.

17   **Q.**   Okay.  I see.  I was just quoting the white paper.  Do

18   you recall that we were just discussing that?

19   **A.**   Yes.

20   **Q.**   Okay.  Which states that there is evidence that lineup

21   administrators influence witness confidence even when the

22   administrators are given an unbiased script that they were

23   supposed to follow.

24   **A.**   Yes.

25   **Q.**   And you sort --

WIXTED - CROSS (Owens)                                    1474

1    **A.**   Did we say that in the white paper?  Was your question

2    did we say that in the white paper, and do I agree with it?

3    And if that's -- those are the questions, yes and yes.  We

4    said it, and I agree with it.

5    **Q.**   Sure.  And just to go back a little bit to direct

6    examination, you mentioned that administrator bias, aka, by

7    the police officer, can happen consciously, but it can also

8    happen inadvertently too, right?

9    **A.**   Yes.

10   **Q.**   And one of the ways -- we're on Number 7 -- that

11   non-biased administrators or police officers can influence

12   witnesses is, for example, by the things that they say to a

13   witness before the lineup is conducted, right?

14   **A.**   Right.

15   **Q.**   All right.  So one of the things that you have brought to

16   the field of eyewitness discussion and memory is your

17   experience in cognitive science and memory, right?

18   **A.**   Right.

19   **Q.**   And one of the things that you have talked about in this

20   2017 path-breaking paper is about pristine conditions, right?

21   **A.**   Correct.

22   **Q.**   And I just want to make sure that we're on the same page

23   about what those are.  Those are that you got to only include

24   one suspect per lineup, right?

25   **A.**   Right.

1    **Q.**   The suspect should not stand out in the lineup, right?

2    **A.**   Right.

3    **Q.**   Three, you got to caution that the offender may not be in

4    the lineup, right?

5    **A.**   Right.

6    **Q.**   Four, you got to use double-blind testing, right?

7    **A.**   Right.

8    **Q.**   And, five, it's important to collect a confidence

9    statement at the time of the identification, right?

10   **A.**   Definitely.

11   **Q.**   And so confidence is an unmalleable thing in witnesses,

12   right?

13   **A.**   It is.

14   **Q.**   And because of that, you want to make sure you have

15   pristine conditions so you don't contaminate a witness's

16   memory, right?

17   **A.**   Yes, that minimizes the chances of that happening.

18   **Q.**   For sure.  And another way to minimize the chance of that

19   happening would be to require objective evidence of guilt

20   before even putting a person in a lineup that might

21   contaminate their memory, right?

22   **A.**   Yes.  I think we usually put it as that the officer

23   should be able to articulate their reason for believing that

24   that might be the guilty person, you know, some evidence

25   that that person might be guilty, yes.  I think the short

1    answer is yes.

2    **Q.**    Right.  And the way that you put it in your peer-reviewed

3    published papers is that one way to reduce bias is to have

4    objective evidence of guilt before placing a suspect in a

5    lineup, correct?

6    **A.**    Reducing bias, did you say?  I'm not sure that this is

7    connected with bias lineups.  This is -- this refers to the

8    base rate of guilt.

9          So, for example, if you just randomly pick people off

10   the street who match the description and put them in

11   lineups, you would almost always have an innocent person in

12   the lineup.  And so then, in that case, any suspect

13   identification would be of an innocent person because you

14   are just making lineups of innocent people.  That's what's

15   important.

16         You don't just match the description.  There also has

17   to be some, you know, some reason to believe this might be a

18   person who not only matches the description but also may

19   have committed the crime.  For example, he's got a history

20   of committing similar crimes in that neighborhood and he

21   fits the description.  So it makes sense to put him in a

22   lineup and see if the witness recognizes that individual.

23   That's the best way to do it.

24   **Q.**    Thank you.  And so you say is if we have these pristine

25   conditions, then high confidence can tell us a lot about

WIXTED - CROSS (Owens)                                          1477

1    accuracy, right?

2    **A.**    Yes.

3    **Q.**    Okay.  If you have a suspect who's been misidentified,

4    who is innocent, does that suggest to you that it's unlikely

5    that pristine conditions were used?

6              MR. McLANDRICH:  Objection.

7              THE COURT:  Rephrase your question.

8              MR. OWENS:  Yes, Your Honor.

9    BY MR. OWENS:

10   **Q.**    If you assume that somebody is innocent but was

11   mistakenly identified, that provides you a strong indication

12   that pristine conditions were not used, right?

13   **A.**    Let me think about that for a second.  I mean, such

14   errors can occur.  Remember, I am not saying that high

15   confidence is infallible.  So even under pristine

16   conditions -- I use the number 95 percent credit just

17   because in our studies it often comes out to be about that

18   number.  There's -- 5 percent of the time they're making a

19   mistake, even under pristine conditions.

20        So, for example, if the police only use pristine

21   conditions and you came to me and said there's this innocent

22   person who was misidentified with high confidence, does this

23   mean that they use nonpristine procedures?  It doesn't

24   necessarily mean that.

25        So I don't know.  I haven't reasoned the backwards in

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    that way.  I haven't thought through reasoning backwards.

2            THE COURT:  Hold on.  Counsel, can you approach.

3        (At sidebar off the record.)

4            THE COURT:  Ladies and gentlemen, we're going to

5    break for about five minutes, five minutes.  So we'll

6    reconvene in five minutes.  Thank you.

7            THE COURTROOM DEPUTY:  All rise.  This court stands

8    in recess.

9        (Jury out at 1:20 p.m.)

10       (Recess at 1:20 p.m.)

11       (Jury in at 1:29 p.m.)

12       (In open court at 1:29 p.m.)

13           THE COURT:  We're back on the record.  Counsel.

14           MR. OWENS:  Thank you, Judge.

15   BY MR. OWENS:

16   Q.   Dr. Wixted, can you still hear me?

17   A.   I can.

18   Q.   Great.  So just to refresh, we were talking about

19   pristine conditions, and I think there's no disagreement about

20   what those are between you and Dr. Dysart, right, that you're

21   aware of?

22   A.   Right.

23   Q.   And that what I was just asking was that in the absence

24   of pristine conditions, the error rate of identification goes

25   up, right?

1   **A.**   No.

2   **Q.**   Okay.

3   **A.**   The absence -- sorry.  In the absence of certain

4   nonpristine factors, such as one we've already talked about,

5   an unfair lineup in the sense that I've described, that

6   changes the accuracy of even a high-confidence

7   identification.  Certain ones.

8   **Q.**   Got it.  But the -- sort of the take-home message from

9   your big 2017 paper with Gary Wells was that you need these

10  pristine conditions.  If they are met, then that tells us a

11  lot about accuracy, correct?

12  **A.**   Correct.

13  **Q.**   And if you have an unfair lineup, that take-home message

14  doesn't apply, correct?

15  **A.**   An unfair lineup in the sense that I described,

16  correct.

17  **Q.**   And, in fact, that you state if there's an unfair lineup

18  in the sense in which you've described, it would be a mistake

19  to assume that a high-confidence initial ID is highly

20  accurate, even when there is an unfair lineup that is used,

21  because that would be a recipe for wrongfully convicting the

22  innocent?

23        MR. McLANDRICH:  Objection.  It was an

24  unintelligible question from my perspective.

25        MR. OWENS:  I can rephrase.

WIXTED - CROSS (Owens)                                    1480

1              THE COURT:  I think there's about three questions in

2      there.

3              MR. OWENS:  My apologies, Your Honor.  I'll

4      rephrase.

5      BY MR. OWENS:

6      Q.   Let me just ask you this:  In your 2017 very important

7      paper, you wrote, with Gary Wells, that mistakenly assuming

8      that a high-confidence initial ID is highly accurate even when

9      an unfair lineup is used is a recipe for wrongfully convicting

10     the innocent, correct?

11     A.   Yes, correct.

12     Q.   You mention this a little bit on direct examination, so I

13     won't tarry on it for too long, but you and Dr. Dysart, Number

14     12 here, agree that an identification test itself contaminates

15     memory, right?

16     A.   Right.

17     Q.   And so because being asked to conduct -- to look at a

18     photo spread where there is a suspect, I think you described

19     on direct examination, that puts that person's face into that

20     person's memory, right?

21     A.   Into the witness's memory, yes.

22     Q.   Great.  And I just wanted to focus on something that you

23     said on direct examination is that you can't, after that goes

24     in there, disentangle the initial memory that somebody had

25     from the scene itself from the identification procedure,

1    correct?

2    **A.**    Would it be fair to say that you are asking me whether

3    it's possible to uncontaminate memory once you've

4    contaminated it?  I understand your question to be asking

5    that.

6    **Q.**    That's a better way -- sure.  That's a better way of

7    phrasing it.

8    **A.**    No, it is not possible to -- that's another way in

9    which eyewitness memory's like other forms of forensic

10   evidence:  once contaminated, there's no way to

11   uncontaminate it.

12   **Q.**    Or just more simply, once the -- once the ingredients go

13   into the stew, you can't separate them out later, right?

14   **A.**    Right.  That's a good analogy, I guess.

15   **Q.**    Thank you.  Next, you were asked about -- actually, I

16   want to skip ahead.  But you indicated that, well, on direct

17   examination that the subsequent identifications in court can

18   be maximally contaminated, right?

19   **A.**    Yes.

20   **Q.**    And that -- I don't know how you get double maximally,

21   but one of the reasons that you recommend non-blind

22   administration is to prevent feedback after an identification,

23   correct?

24   **A.**    Correct.

25   **Q.**    And, in fact, that's one of the most important things

WIXTED - CROSS (Owens)                                    1482

1    that you've written about where a lineup conducted in pristine

2    conditions, as you've defined them, you can still impact

3    negatively the process by having non-biased -- or biased

4    administrators, correct?

5    **A.**    I'm sorry.  I didn't quite understand that question.

6    **Q.**    Sure.  Let me ask it again.

7         As part of the recommendations that you make in your 2017

8    paper with Gary Wells, you talk about blind administration of

9    the photo arrays, correct?

10   **A.**    Correct.

11   **Q.**    All right.  And then one of the pristine conditions is

12   not just about the photo array, but it's also getting a

13   confidence statement from somebody right after they view a

14   photo array, right?

15   **A.**    Right.

16   **Q.**    And you're so concerned about feedback that you want the

17   person taking the confidence statement after the fact to also

18   be a blind administrator, correct?

19   **A.**    Yes.  Ideally, it would be a blind administrator

20   recording that confidence statement.  I think that's what

21   you're asking.  And that's the ideal scenario, yes.

22   **Q.**    Okay.  Well, and let me just break it down in terms of

23   what you wrote in the white paper.  In the white paper, am I

24   correct that you wrote, quote, "Two decades of research

25   supports the conclusion that providing feedback to witnesses

WIXTED - CROSS (Owens)                                          1483

1    that they identified the suspect increases their confidence in

2    the accuracy of their decisions, especially among eyewitnesses

3    who have made a mistaken identification"?

4    **A.**   Yes.

5    **Q.**   And then, "The confirming feedback effect attenuates the

6    relationship between confidence and accuracy, rendering

7    witnesses' reports of their confidence useless for judging

8    their accuracy," correct?

9    **A.**   Yes, that's why you want to focus on their confidence

10   before the feedback.  And if you do that, it doesn't matter

11   if feedback happens because, yeah, it's going to be inflated

12   in that way.  And by the time of court, they are going to be

13   certain that that's another factor that makes the courtroom

14   ID much less informative than the initial ID.

15   **Q.**   And so if there is even more feedback given to a witness

16   after they've made the identification, that would be an even

17   greater risk when they walk into court, correct?

18   **A.**   Correct.

19   **Q.**   And I just want to be clear about this.  I assume that

20   it's part of your opinions about what's in this case that when

21   we -- that we want to have accurate recording of a witness's

22   confidence statement and any other things that are said to the

23   witness before, during, or after the administration of a

24   lineup, correct?

25   **A.**   Correct.

WIXTED - CROSS (Owens)                                    1484

1    **Q.**   Right.  And so you want to know contemporaneous records

2    should include like whether or not a witness was able to make

3    an identification or if they said some kind of low-confidence

4    thing like you described earlier, "That kind of looks like

5    him," stuff like that, right?

6    **A.**   Right.

7    **Q.**   Now, you agree -- we'll move ahead.

8        Now, as -- from a scientific perspective, you focused on

9    the first memory test.  But as you know, witnesses often get

10   called to court to talk about the identification procedures

11   itself, correct?

12   **A.**   Correct.

13   **Q.**   And it's true, isn't it, that when there is unfair

14   lineups or feedback provided to witnesses, that that

15   contamination can affect how they describe or report on what

16   they observed?

17   **A.**   I'm not fully understanding your question.

18   **Q.**   Okay.  Let me rephrase.  Do you agree that post-

19   identification feedback produces some type of distortion, not

20   just for retrospective confidence, but also for other

21   testimony such as self reports by witnesses, how much

22   attention they paid at the time, or how good their view was of

23   the perpetrator?

24              MR. McLANDRICH:  Objection.

25              THE WITNESS:  Yes.

1              THE COURT:  He answered.  I'm going to allow it.

2              THE WITNESS:  Yes.

3    BY MR. OWENS:

4    **Q.**   I'm skipping.  Now, you agree that it's consistent with

5    the recommendations of the social science that witnesses must

6    not be allowed to consult with one another about their

7    identification either before, during, or after a photo spread,

8    correct?

9    **A.**   Correct.

10   **Q.**   Okay.  Just a couple more questions, and I skipped some

11   of the ones that I have had to ask -- planned on asking you.

12         In your report in this case that was disclosed several

13   years ago, you indicated that the process of creating a

14   composite can contaminate memory, correct?

15   **A.**   Correct.

16   **Q.**   And that's also what you said again at your deposition,

17   that the possibility of a composite contaminating a witness's

18   memory is also greater when there's a large amount of time

19   that has passed between the event and creating the composite,

20   right?

21   **A.**   Right.

22   **Q.**   I want to return just for the -- one question you were

23   asked about on direct examination was about description

24   accuracy and the correlation between description accuracy or

25   the description and the accuracy of an identification.  Do you

1    recall that topic?

2    **A.**   I do.

3    **Q.**   Okay.  And I just want to make sure I heard you

4    correctly, 'cause I might not have.  Did you say that there

5    was no relationship whatsoever between description accuracy

6    and the accuracy of a potential perpetrator identification?

7    **A.**   I'm saying that's what has been reported in the

8    scientific literature when the study is conducted to be

9    realistic rather than as an artificial laboratory test.

10   That doesn't mean there is no relationship.  It means that

11   science has not detected that relationship so far.

12   **Q.**   Okay.  And this came up in your report, a little back-

13   and-forth between you and Dr. Wixted about this Meissner

14   article from 2008, correct?

15   **A.**   Yes, and there's been research on it since then as

16   well, but, yes.

17   **Q.**   Okay.  Well, let's just focus with what you cited in your

18   report.  That's what I'm talking about, okay?

19   **A.**   Okay.

20   **Q.**   All right.  The article that you cited in your report

21   indicates, quote, "Across 33 research papers and a total of

22   4,278 participants, our analysis found support for a

23   significant relationship between description accuracy and

24   identification accuracy as well as a relationship between the

25   number of incorrect descriptors recalled and identification

1    inaccuracy."  Correct?

2    **A.**    Are you aware of what they're referring to when they

3    say those words?

4    **Q.**    Please just answer my question.

5    **A.**    Well, it's relevant to what you're getting at, but

6    that's what they wrote, but it's important to be aware of

7    what -- the studies they're referring to when they say that

8    is all I'm saying, because that is not being consistent with

9    what I'm saying.

10   **Q.**    Now, when we talk about description accuracy, and if you

11   assume that there is an innocent suspect that has been

12   misidentified, the mismatch between the description of the

13   perpetrator and that misidentified suspect would be

14   scientifically significant, correct?

15   **A.**    Well, that's a vague question, because -- so, if

16   there's a mismatch between what the witness described and

17   then there is an innocent suspect in a lineup and the

18   witness picks that guy, what's most likely to be true is

19   that it's going to be an inconclusive identification.

20        So the witness is going to -- under such conditions,

21   it's usually the case that the witness is going to give some

22   indication of awareness of that discrepancy between the

23   person they described and the person they're picking in the

24   lineup.

25   **Q.**    Okay.  My question was a little bit different, which is,

1    if you assumed that the person is innocent and has been

2    misidentified, does the lack of consistency between the

3    description of the misidentified person and the original

4    description provided by the witness as a matter of social

5    science indicate to you that the identification is likely to

6    be inaccurate?

7    **A.**   Well --

8              MR. McLANDRICH:  Objection.

9              THE WITNESS:  -- it has to be inaccurate because you

10   said assuming that the suspect is innocent, and so you

11   conditioned on it being a misidentification.

12   BY MR. OWENS:

13   **Q.**   Okay.  So, I guess, let me -- I appreciate the revision,

14   which is this:  You would expect there to be a mismatch

15   between the -- well, let me ask it a different way.

16        The -- if you assume that an innocent suspect was

17   misidentified and -- actually, I'll just strike that.

18        Two other questions.  You asked -- you testified on

19   direct examination about identifications as being a memory

20   match test, right?

21   **A.**   Yes.

22   **Q.**   Okay.  And so what you meant by that was that somebody's

23   got a memory in their head.  They look at some pictures.  And

24   they're trying to figure out which one it matches, right?

25   **A.**   Which one matches their memory of the perpetrator.  Is

1    that what you mean?

2    **Q.**    Correct.

3    **A.**    Yes.

4    **Q.**    And we already talked about it.  If their memory's been

5    contaminated or corrupted, then that memory match process is

6    sort of broken, right?

7    **A.**    Right.  If it's already been contaminated by the time

8    of the all-important first test, even that first test is

9    problematic.

10   **Q.**    Got it.  And you don't know, as a matter of social

11   science from your research, whether when somebody makes --

12   somebody says, "Oh, it's this picture," whether or not they

13   are making a memory match or they are just choosing somebody

14   that might be the closest or something like that?  There is no

15   research that gets inside of people's heads like that, right?

16   **A.**    Well, I wouldn't go along with that, actually.

17   There's -- there are a lot of indicators that provide

18   information about the degree to which that face is matching

19   what's in the witness's memory of the perpetrator.  We

20   talked about confidence, for example, and there is more than

21   just confidence, but confidence is one indicator.

22        If they pick with low confidence, they are telling you

23   it's not a great match.  It's a somewhat match, but it's not

24   a great match, and that's why that's hardly giving you any

25   information that you're looking for.  Whether it's an

1    innocent guy or a guilty guy, such that outcome has hardly

2    given you any information.

3        But if it's high confidence and memory hasn't been

4    contaminated, that means it's a strong match.  Now, there's

5    a small chance that happened randomly, that the innocent

6    suspect just happens to look just like the guilty

7    perpetrator.  That can happen.  It's rare.  But it,

8    nevertheless, does mean that that face matches the memory of

9    the perpetrator in my brain.

10   **Q.**   And by contrast, on the flip side, is if you have got an

11   innocent person who's been misidentified, strong evidence that

12   there's been some contamination to that memory or unfairness

13   in the process, correct?

14   **A.**   No.  That's reasoning backwards again.  I don't think

15   you can -- I mean, it happens even if everything's perfect.

16   You occasionally get a high confidence misidentification of

17   an innocent suspect.  It's relatively -- it's rare under

18   perfect conditions, but it still happens.  So the mere fact

19   that it happened -- I don't know.  I'd have to think about

20   it.  Again, I don't usually reason backwards like that, and

21   I haven't thought through that.  So I wouldn't be prepared

22   to go there without thinking through it.

23   **Q.**   Okay.  Well, let's just end with a source of agreement.

24   You agree that if there's an unfair identification procedure,

25   the likelihood of there being a mistake in identification of

WIXTED - REDIRECT (McLANDRICH)                        1491

```
 1   an innocent suspect goes up, right?
 2   A.    Unfairness in the sense that I described, yes.
 3            MR. OWENS:  No further questions.
 4            MS. FRICK:  No, none.
 5            MR. McLANDRICH:  Thank you, sir.
 6                     REDIRECT EXAMINATION
 7   BY MR. McLANDRICH:
 8   Q.    So, Doctor, let's start sort of where we finished with
 9   this cross-examination.
10       Since the issue of unfair lineup was brought up so many
11   times, again, what is your definition of an unfair lineup?
12   A.    The suspect in the lineup matches the witness's
13   described memory of the perpetrator more so than the fillers
14   in the lineup.
15   Q.    All right.  But when a lineup is constructed, we're
16   trying to select people that are similar to the perpetrator to
17   make the lineup, quote-unquote, fair, correct?
18            MR. OWENS:  Objection.  I don't know who "we" is.
19            MR. McLANDRICH:  People who are creating lineups.
20            THE COURT:  With that clarification, you can answer
21   the question, Doctor.
22       Overruled.
23            THE WITNESS:  Yes, that's what they're trying to do.
24   There has to be some degree of similarity.
25   BY MR. McLANDRICH:
```

WIXTED - REDIRECT (McLandrich)                                    1492

1    Q.    All right.  So when you talk about a lineup that's

2    unfair, we're now talking about that degree of similarity

3    being so disproportionate -- or, I'm sorry.  Let me start

4    over.

5         When you say an unfair lineup, you're talking about a

6    lack of similarity that is so high that now the lineup is,

7    quote-unquote, unfair, correct?

8    A.    Yeah, it is so high that if I gave a random person the

9    witness's description, they'd be able to pick out the

10   suspect.

11   Q.    Thank you.

12   A.    Did you understand that?

13   Q.    Yes, I believe I did.

14   A.    Okay.

15   Q.    Now, I just want to go through some of these things that

16   you were asked about.  This concept that we've been talking

17   about and that you discussed on cross-examination about a high

18   confidence ID and the impact of these various issues, this is

19   all new science in the last, what?  I think the paper you said

20   was 2015?

21   A.    Yes.  That's when we got the ball rolling on this

22   argument, and it was extremely controversial for a fairly

23   short period of time because it was such a dramatic shift in

24   thinking.  But by the time of 2017 when Gary Wells wrote

25   that paper with me and people knew that we were not exactly

WIXTED - REDIRECT (McLandrich)                    1493

1    friends, we argued a lot, the fact that we came together and

2    made that statement and by reanalyzing -- we didn't present

3    new data.

4         We analyzed all the exact same data that has been out

5    there for many years that had convinced people otherwise.

6    We showed that when you analyze it the right way, the story

7    changes.  And that sort of -- once Gary Wells and I both

8    made that argument in 2017, pretty much on a dime it changed

9    thinking in the field.  Overturned decades of counterclaims.

10   Q.   So certainly not information or science that a police

11   officer in 1990 could have known about or been held to?

12             MR. OWENS:  Objection.  This is excluded by the

13   Court.

14             THE COURT:  Overruled.  I mean, I'm sorry.

15   Sustained, sustained.

16   BY MR. McLANDRICH:

17   Q.   When you were asked about the DNA exoneration cases, what

18   was the impact of high confidence versus low confidence

19   identifications with respect to those DNA exonerations?

20   A.   Well, that's one line of evidence.  And other lines of

21   evidence had already converged on the notion that

22   eyewitnesses should not be making very many high-confidence

23   misidentifications on the first test.  And then, when we

24   looked at the DNA exoneration cases where a witness got on

25   the stand and confidently misidentified an innocent person,

WIXTED - REDIRECT (McLandrich)                    1494

1    when we looked at those cases -- a law professor named

2    Brandon Garrett did this -- there was trial testimony in

3    many of those cases about the initial, the all-important

4    initial identification.

5         And the amazing thing, in every single case where there

6    was -- where there was trial testimony, there wasn't always

7    information about the initial test, but in every case where

8    there was -- and there were 92 such cases -- every single

9    one of them, the initial identification was something other

10   than a high-confidence identification of a suspect,

11   something other than what happened in a court of law later

12   on.  It was made with low confidence, or it was a filler ID,

13   or the lineup was rejected.

14        It was only later, after the witness -- and that's how

15   it ought to be.  Multiple, additional lines of evidence

16   suggest that it should be that way.  And when those results

17   became clear, I mean, everything just came together.

18   Q.   You were asked earlier about -- when you were discussing

19   blind administration, that there could be inadvertent

20   influence to the identification.  Do you recall that?

21   A.   I do.

22   Q.   And so inadvertent influence would not be something that

23   was done knowingly, correct?

24   A.   Correct.

25   Q.   Are pristine conditions generally present in the real

WIXTED - REDIRECT (McLandrich)                    1495

1    world?

2              MR. OWENS:  Objection.

3              THE COURT:  Well, wait a minute.

4         Overruled.  He can answer it if he knows.

5         Can you answer that, Doctor?

6              THE WITNESS:  I can.  There's been surveys of police

7    department practice by scientists that speak to this issue.

8         No, I would say pristine conditions remain the exception

9    rather than the rule.

10   BY MR. McLANDRICH:

11   Q.   And so then the bottom line is that if we want to know

12   whether an eyewitness identification is accurate, we're

13   focused on an initial memory test, the first memory test, and

14   it being performed with high confidence, correct?

15   A.   Yes, that's the most important thing, and we've learned

16   that, as I mentioned a moment ago, from multiple lines of

17   research, even in the DNA contamination cases where those

18   also did not involve pristine lineup conditions.

19        Pristine lineup conditions are ideal and recommended

20   strongly, but even if you don't have them, it's rare that

21   you get a high confidence -- so far, based on all the

22   evidence that's available, it's rare that you get high-

23   confidence misidentification on the initial test.

24   Q.   And the accuracy rate for such high-confidence

25   identifications approaches what level, sir?

1    **A.**    Well, I have to answer that question with respect to

2    what we find in our studies.  In the real world, it's who

3    knows.  But in our studies and lab studies where we conduct

4    what we call mock crime studies -- not a real crime, it's a

5    mock crime.  The witnesses aren't real witnesses; they're

6    participants in the study -- but in those, we averaged

7    across all the studies, those kind of studies, a high-

8    confidence identification is on the order of 95 percent

9    correct.

10        And then there's the one study of real eyewitnesses in

11   the real criminal cases making identifications from actual

12   lineups during part of a police investigation where you have

13   to estimate how accurate they are, and the same story

14   emerges, estimated -- estimated high-confidence accuracy is

15   about the same as you get in the lab studies.

16        But I should mention that in this police department

17   field study, pristine conditions were present.  We used

18   pristine lineup procedures.  So there hasn't actually been a

19   study of real eyewitnesses using nonpristine conditions that

20   are generally prevalent in the real world.  There hasn't

21   been such a study.  Nobody's ever going to conduct such a

22   study.  So we have to rely on the DNA exoneration data to

23   give us some insight about that, how often do high-

24   confidence misidentifications happen when you have less than

25   perfect lineup procedures.

WIXTED - RECROSS (Owens)                                    1497

1       And to the extent that those data give us any

2   information, it suggests that even under most nonpristine

3   conditions you are not getting these high-confidence

4   misidentifications.

5       You might see there are cases where we -- also DNA

6   exoneration cases where we have no information about what

7   happened on the first test.  Who knows what's happening

8   there.  There's -- I would say there is reason to believe

9   they are not happening in that case either, but we don't

10  know for sure.

11  **Q.**   Thank you.  That's all I have for you, sir.

12          THE COURT:  With regard to those matters.

13          MR. OWENS:  Very narrow.  I think three things.

14          THE COURT:  That's fine.

15          MR. OWENS:  Thank you, Judge.

16                  <u>**RECROSS-EXAMINATION**</u>

17  BY MR. OWENS:

18  **Q.**   I want to just make sure that I understand your testimony

19  here today about the DNA cases and the study you mentioned

20  involving Brandon Garrett, okay?

21  **A.**   Okay.

22  **Q.**   And was it your testimony that in every single DNA

23  exoneration that Mr. Garrett studied, which was the first 250,

24  that all of the initial confident identifications were made

25  with low confidence?

WIXTED - RECROSS (Owens)                                    1498

1    **A.**   No.  He studied -- he got trial transcripts for 161 of

2    those 270 cases so far.  So of that set of 161, there was --

3    the number's either 91 or 92, but I'll say 92 -- there was

4    92 cases where there was -- it came up at trial information

5    about the initial identification.  And in those 92 cases --

6    well, in those 92 cases, the witness was confident at trial

7    in their misidentification.

8        But in those 92 cases, which are the only cases we have

9    information about the initial ID, the initial ID was

10   something other than that.  Low confidence, filler

11   identification, even a non-identification, things like that

12   happened on the initial test.

13       And when I say not a single case, what I mean is not a

14   single one of those 92 cases did the court testimony

15   indicate that the witness was highly confident on the first

16   test.  And that just makes sense that it would be that way

17   because we know later that that person didn't -- shouldn't

18   have matched their memory, right?  It's an innocent person,

19   not the guilty perpetrator.  It would make sense that they

20   wouldn't be making a high-confidence misidentification on

21   the first test.

22   **Q.**   Sir --

23   **A.**   And those data would confirm what one would have

24   thought would be true.

25   **Q.**   Okay.  Please just listen to my question.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

WIXTED - RECROSS (Owens)                                    1499

1        So in those cases, it's your testimony, consistent with

2    the science, that the testimony given about their confidence

3    at the time itself had probably itself been contaminated,

4    right?

5    **A.**   Yes.  But you got to be careful about that because --

6    **Q.**   So the --

7    **A.**   -- the bias is in the other --

8            THE COURT:  Doctor, do you need to explain that?

9            THE WITNESS:  Yes, because it's going to be

10   misunderstood otherwise.

11   BY MR. OWENS:

12   **Q.**   It's just a yes-or-no question.  I think I understand.

13           THE COURT:  I know.  But if the doctor feels he

14   needs to explain it, I am going to let him explain it.

15       A short explanation, Doctor.

16           THE WITNESS:  The short explanation is that the

17   bias, the contamination and bias that you'd expect is that

18   witnesses would misremember their low confidence as being high

19   confidence.  There's no principle of memory that suggests that

20   they be at risk of remembering -- now that they are highly

21   confident, that they would misremember their initial ID as

22   being made with low confidence.  The bias would be in the

23   opposite direction, which to me --

24           THE COURT:  All right.  Thank you.

25           THE WITNESS:  -- makes it more believable.

WIXTED - RECROSS (Owens)                                    1500

```
 1              THE COURT:  Next question.

 2              MR. OWENS:  Thank you, Judge.

 3   BY MR. OWENS:

 4   Q.   I just want to clarify what you're saying is that

 5   witnesses, sometimes, for example, they can get feedback after

 6   they've made an identification, and that can inflate their

 7   confidence -- their stated confidence at a trial proceeding,

 8   right?

 9   A.   Yeah, inflate their remembered confidence on the

10   initial ID even if had been made with low confidence.

11   Q.   And that's why it's important for the administrators of

12   the lineups to be careful in recording the stated confidence

13   at the time, because you wouldn't want it to be

14   mischaracterized later, right?

15   A.   That's right.

16              MR. OWENS:  No further questions.

17              THE COURT:  Anything?

18              MR. McLANDRICH:  No, sir.  Thank you.

19              THE COURT:  Anything?

20              MS. FRICK:  No, Your Honor.

21              MR. McLANDRICH:  Thank you, Doctor.

22              THE COURT:  Can this witness be executed?

23              MR. McLANDRICH:  He can be excused.

24              THE COURT:  Doctor, thank you very much.  I think we

25   made your timeline here.
```

```
 1              THE WITNESS:  You did.

 2              THE COURT:  Thank you very much.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  You're excused.

 5         Sidebar.

 6         (At sidebar off the record.)

 7              THE COURT:  Counsel for defendant, next witness.

 8              MR. McLANDRICH:  Your Honor, defendants rest subject

 9    to admission of exhibits.

10                        DEFENDANT MOORE RESTS

11              THE COURT:  Township.

12              MS. FRICK:  Your Honor, we would rest, also subject

13    to the admission of the exhibits.

14              THE COURT:  Ladies and gentlemen, we're going --

15    it's come a point in time where we're going to recess for the

16    day and have you come back at 9 o'clock in the morning.  We'll

17    be hopefully prepared to proceed with our next phase of the

18    case, but I do need you to still abide by the admonitions.

19    Ask your family and friends just for a little while longer.

20    Please don't discuss the case amongst yourselves or with

21    anyone else.  Please don't formulate any opinions or

22    conclusions.  And we'll try our best to be ready for you

23    tomorrow and proceed with the case at that time.

24         Anything further to come before the Court by counsel?

25              MR. OWENS:  Not at this time, Your Honor.
```

```
 1            MR. McLANDRICH:  No, sir, Your Honor.

 2            MS. FRICK:  No, Your Honor.

 3            THE COURT:  Ladies and gentlemen, we'll stand in

 4   recess until 9 o'clock tomorrow morning.

 5            THE COURTROOM DEPUTY:  All rise.  This court stands

 6   in recess.

 7        (Jury out at 2:07 p.m.)

 8        (Recess at 2:07 p.m.)

 9        (In open court outside the presence of the jury at 3:41

10   p.m.)

11            THE COURT:  We're on the record outside the presence

12   of the jury, and the plaintiff having rested subject to the

13   ruling by the Court on exhibits.

14        You can have a seat.

15        Does the plaintiff wish to move for admission of

16   exhibits?

17            MR. OWENS:  We do, Your Honor.

18            THE COURT:  Is there any way that -- is there any

19   way that you can -- am I going to go through this entire list

20   of this proposed list or are there a number of agreed

21   exhibits?  Have we narrowed objections or anything?

22            MR. McLANDRICH:  Your Honor, if I might.  Most of

23   them we don't have any issue with.  There is a couple of

24   issues.  One, we don't believe that transcripts that were used

25   to refresh recollection or that were used to impeach ought to
```

```
1    go back and become exhibits for the jury.

2         And the other issue that we have I think we have a

3    resolution for, but it would -- just requires a stipulation on

4    the record that would have to go back to the jury with the

5    exhibits, and that relates to the photo arrays and the fact

6    that the pictures in the arrays are not necessarily in the

7    places where they were when they were presented back in the

8    day.  And so with that stipulation, if it gets entered into

9    the record for the jury, then we wouldn't object to the couple

10   of exhibits that they have that represent pictures of the

11   photo arrays.

12         THE COURT:  Let me go back to plaintiff.

13         Plaintiff, do you know which of the exhibits that you

14   propose to be admitted are not objected to?

15         MR. OWENS:  I don't have clarity on that.

16         THE COURT:  So we're going to go through each one,

17   right?

18         MR. McLANDRICH:  I think if we answer the question

19   with respect to whether transcripts are going back or not, I

20   can tell you which ones I believe those are, and then, quite

21   frankly, with the stipulation, I don't know that there is any

22   that are objected to.

23         THE COURT:  Well, I don't think there are very many,

24   at least if my list is correct --

25         MR. OWENS:  Sure.
```

1    THE COURT:  -- I don't think there are a lot of

2  trial -- I assume trial transcripts?  I also see a suppression

3  hearing transcript here.

4    MR. McLANDRICH:  And grand jury transcript, as well,

5  and Moore's deposition.  So I think all those were used for

6  either refreshing or impeaching, and I don't think any of them

7  are exhibits.

8    THE COURT:  Well, let's let plaintiff, do you

9  want to go -- I guess without some type of process, I guess

10  I'll need to -- I'll rule on the ones that I can rule on.  If

11  I need to take something under advisement, I'll do it.

12    MR. OWENS:  Yes, Judge.

13    THE COURT:  So why don't you go ahead and move, and

14  then I would ask if counsel can just say objection or not.

15    MR. McLANDRICH:  Yes, Your Honor.

16    THE COURT:  If I need -- if I need argument from you

17  or basis, I'll ask for that.

18    MR. OWENS:  Thank you, Judge.

19    So we would move for admission as it relates to PX Number

20  1, which is the pretrial hearing transcript from the

21  suppression hearing, pages 18, 72, and 53.  As a general

22  matter, I think that the transcripts -- we agree with the

23  defense that transcripts that were just shown to a witness

24  just to refresh their recollection, we're not seeking to admit

25  any of those whatsoever, as opposed to the other transcripts

```
 1    that are testimony that happened at the criminal hearing or

 2    from Detective Moore in this case.  I believe they are

 3    substantive evidence and should be given to the jury.

 4              THE COURT:  Trial transcripts of Detective Moore in

 5    this hearing?  Or trial?

 6              MR. OWENS:  The original criminal proceedings.

 7              THE COURT:  All right.  Counsel?  Let's just deal

 8    with a bunch of this.  We got a suppression hearing

 9    transcript, we've got PX 1, PX 3, PX 5, PX 9, PX 10.  Are

10    those all transcripts?

11              MR. OWENS:  Yes, they are, Your Honor, and it's just

12    select pages within those transcripts.  I think the total is

13    like 11 pages.

14              THE COURT:  Counsel?

15              MR. McLANDRICH:  Yes, Your Honor.  As I've

16    indicated, I don't believe those should be exhibits to the

17    jury.  They were used for either impeachment -- well, we've

18    already agreed that the refreshed won't go back.  The

19    impeachment ones, the jury heard the testimony.  They don't

20    need the document.

21         Plus, the document is the full page and not even just the

22    portion that was used for impeachment.  And so I don't think

23    it's appropriate that the pages go back.

24              MR. HERMAN:  The Township would echo those same

25    objections as Mr. McLandrich.
```

```
 1            THE COURT:  Anything else?

 2            MR. OWENS:  One other small thing for the record,

 3   Your Honor, which is that with respect to any testimony of

 4   Detective Moore at the prior criminal proceedings, we would

 5   argue that it's more than impeachment.  Many of them are

 6   admissions by a party opponent and should be admitted.

 7            THE COURT:  PX 1, 3, 5, 9, and 10, if that's what

 8   those all are, will not be admitted.

 9       Let's go to PX then -- is your next PX 54?

10            MR. OWENS:  Yes, Your Honor.

11            THE COURT:  I don't know what these are.

12            MR. OWENS:  There is a number of pictures from the

13   Montgomery County evidence inspection.  I think this is a

14   point in which there should be no objection so long as the

15   parties, I believe, have a stipulation with respect to two of

16   the pictures in this exhibit and in 285 of the photo array,

17   which is the stipulation, is along the lines of that the

18   parties stipulate that the photocopied versions of the array

19   in black and white are what Detective Moore claims the arrays

20   looked like at the time in which they were administered.  The

21   photographs that you have now show the colors of the

22   photographs and the -- sort of the boxes in the array, but are

23   not in the position -- the pictures are not in the exact

24   position they were at the time they were shown to the

25   witnesses.  Something like that.
```

```
 1              THE COURT:  Now, the photo array, is that within PX
 2    54?
 3              MR. OWENS:  It is, Your Honor.
 4              THE COURT:  Counsel?
 5              MR. McLANDRICH:  I'm just looking to see if, in
 6    fact, the arrays are in there.
 7              MR. OWENS:  I misspoke.  It's in PX 59.
 8              THE COURT:  Well, let's just talk about PX 54.
 9              MR. McLANDRICH:  I don't think I have any objection
10    to PX 54, Your Honor.  The pages that are listed, that is.
11              MR. HERMAN:  We have no objections, the Township, to
12    PX 54.
13              THE COURT:  They'll be admitted.
14         (Plaintiff's Exhibit 54 was received in evidence.)
15              MR. OWENS:  We've got PX -- well, I think that we
16    could fast forward.  There's -- PX 56 are LEADS sheets; PX 58
17    is the C.W. array.  I don't think there are any objections
18    with respect to those.
19              MR. McLANDRICH:  Correct.
20              MR. HERMAN:  Correct.
21              THE COURT:  No objections?
22              MR. McLANDRICH:  No objections.
23              MR. HERMAN:  None.
24              THE COURT:  All right.
25              MR. OWENS:  And then PX 59 at page 16, Your Honor,
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1508

```
1    is the photo array which I had just mentioned.  I think there

2    is no objection subject to the stipulation being given to the

3    jury previously described.

4              MR. McLANDRICH:  Correct.

5              THE COURT:  Is there such a stipulation out there?

6              MR. McLANDRICH:  Well, we're going to have to put it

7    on the record, but we have conceptually agreed to it, yes.

8              THE COURT:  So no objection subject to you guys

9    agreeing on a stipulation?

10             MR. McLANDRICH:  Yes, sir.

11             THE COURT:  So I'll admit it subject to you guys

12   agreeing on a stipulation.  I don't know what my ruling would

13   be but --

14             MR. OWENS:  No, I don't think it's something that

15   needs to go into the -- like the rest of the stipulations,

16   like the outset?

17             MR. McLANDRICH:  I think this stipulation needs to

18   go to the jury, yes.

19             MR. OWENS:  I think it does need to go to the jury,

20   but I think it's something that --

21             THE COURT:  I think the issue is, counsel, whether

22   or not the jury instructions -- not the jury instructions --

23   whether or not the stipulation with regard to the lineup photo

24   needs to be part of the jury instructions.  Am I right?

25             MR. OWENS:  I think so.  A perfect question.  I
```

```
 1    think that I have two ideas immediately.  The first one is
 2    that the --
 3              THE COURT:  Here's what I'm going to do.  I'm going
 4    to let you guys work that out.
 5              MR. OWENS:  Sure, Judge.
 6              THE COURT:  But we need to know what's going on.
 7              MR. OWENS:  Thank you.
 8         After that, there are Exhibits PX 64; PX 76; PX 80 at
 9    pages 19 and 20; PX 104, pages 1, 2, 3, 4, 5, 6, 11, and 12;
10    PX 131; PX 138 at -- I apologize.  PX --
11              THE COURT:  We're down to 131.  Are there any
12    objections to those?
13              MR. McLANDRICH:  We object to 80 for the same reason
14    that 80 is the habeas transcript that was used for either
15    refreshing or impeaching.  I forget which it was.
16              THE COURT:  How about the rest of those?
17              MR. McLANDRICH:  131 is grand jury transcript.
18    Again, it's either refreshing or impeaching.  And I think
19    that's as far as we've got.
20              THE COURT:  Then we are down to 131.  So the
21    objection from defendant is the transcript and the grand jury,
22    more grand jury -- I guess that's a transcript of that.
23              MR. McLANDRICH:  And I believe the grand jury was
24    just for refreshing.
25              MR. HERMAN:  The Township has those same objections
```

1510

1    to those two transcript pieces.

2           THE COURT:  The Court will admit 64, 76, 104.  It

3    will not admit 80 or 131.

4        (Plaintiff's Exhibits 64, 76, and 104 were received in

5    evidence.)

6           THE COURT:  All right.  We're down to 138, I guess.

7           MR. OWENS:  Sure.  And just for the record, I think

8    the list the Court has with respect to page -- or PX 131 is

9    missing some pages that we seek to offer.  I just want to make

10   sure the record's clear.  We're seeking to offer pages 5 and 6

11   and 24 of the grand jury proceedings.  I think they are

12   admissions of an opponent, should be given to the jury.  I

13   just want to make sure you have that.

14          THE COURT:  Counsel, with that modification of his

15   motion to admit, does that change your objection?

16          MR. McLANDRICH:  No, sir.  We still object.

17          MR. HERMAN:  No, Your Honor.

18          THE COURT:  It will not be admitted.

19       All right.  138.

20          MR. OWENS:  Right.  We've got PX 138, PX 153 --

21   excuse me.  PX 138 at page 4; PX 153 at page 208; PX 176 at

22   pages 8 and 9; PX 177 at pages 19, 20, 25, and 27; PX 200 at

23   pages 1, 3, 4, 5, 6, and 11; PX 205 at pages 3 and 6; PX 213;

24   PX 215 at pages 1 and 2 --

25          THE COURT:  Stop right there.

```
1            MR. OWENS:  Yes, Your Honor.

2            THE COURT:  Counsel?

3            MR. McLANDRICH:  We don't object to 138.

4       We do object to 153.  That was used for either refreshing

5   or impeaching.  It's the Moore deposition.

6       We don't object to --

7            THE COURT:  You're talking about Detective Moore

8   that testified here in this trial, right?

9            MR. OWENS:  His -- sure.  I understand the Court's

10  ruling.  I just -- I thought -- I didn't realize that was

11  there.  I understand the Court's ruling.

12      Again, and I wish counsel would stop saying this is not

13  something that was offered just to refresh.  We're not

14  proffering any exhibits for that.

15           THE COURT:  I understand.  Well, you're offering it.

16           MR. OWENS:  We are offering it, but as counsel

17  knows, it's not being offered because it was just merely

18  showed to refresh.

19           THE COURT:  Okay.  That will not be admitted.

20      What about, what's your position, counsel, on 76 -- 176,

21  177, 200?

22           MR. McLANDRICH:  So 176, pages 8 and 9, are fine.

23      177, I think it's 19, 20, 25 and 27, that's fine.

24      200, I have to pull it up because I think I had an issue

25  with one page, or at least I thought it wasn't in.  Let me
```

1512

1     pull it up real quick.  I'm sorry.

2              THE COURT:  While you are waiting, counsel, how

3     about with regard to those?

4              MR. HERMAN:  PX 138, it's only the last page of the

5     S.C. report.  So I don't know why we would only have just the

6     last page of the report.  It's a four-page report.

7              MR. McLANDRICH:  I think, David, we agreed that 11

8     wouldn't come in because it's not dated.

9              MR. OWENS:  I don't think we agreed that that's why

10    it wouldn't come in, but we can agree that it won't come in.

11        I apologize, Your Honor.  Let me just start again so we

12    have a clean record.

13        As it relates to PX 200, we seek to offer pages 1, 3, 4,

14    5, and 6, not page 11.

15        Then with respect to --

16             THE COURT:  Wait a minute.  Let me stop right there

17    because counsel was indicating that they had some concerns

18    about PX --

19             MR. HERMAN:  138.

20             THE COURT:  -- 138 in that it only included one

21    page.  And supposedly the document was an event report.

22             MR. OWENS:  That's correct, Your Honor.  And that's

23    the -- page 4 is the only page that was shown to the jury.

24    This is the Montgomery County Sheriff's Department report

25    about the arrest of S.C. -- not the arrest -- the incident of

```
 1    S.C.  Only page 4 was shown in relation to her description of
 2    the perpetrator.
 3              THE COURT:  Counsel?
 4              MR. HERMAN:  We have no objection to that.
 5              THE COURT:  All right.  So 138 will be admitted.
 6         (Plaintiff's Exhibit 138, page 4, was received in
 7    evidence.)
 8              THE COURT:  153 will not.
 9         176, any objections to that, counsel for the Township?
10              MR. HERMAN:  No.
11              MS. FRICK:  No.
12              THE COURT:  I believe counsel for defendant has
13    already said no objection to that.
14         PX 177, any objections there?
15              MR. McLANDRICH:  No objection.
16              MR. HERMAN:  No objection.
17              THE COURT:  That will be admitted.
18         (Plaintiff Exhibit 177, pages 19, 20, 25, and 27, was
19    received in evidence.)
20              THE COURT:  Photos with the modification that Photo
21    Number 11 in PX 20 -- sorry -- PX 200, with the fact that
22    Photo Number 11 will be not offered, Photos 1, 3, 4, 5, and 6
23    will be, is there any objection?
24              MR. McLANDRICH:  No, sir.
25              MR. HERMAN:  Your Honor, with respect to page 3,
```

```
 1    that was one where we moved the bottom of the picture.  I
 2    think it's the Airstream camper.
 3             MR. OWENS:  I've already redacted it.
 4             MR. HERMAN:  Just making sure.  Thank you.
 5         Then no objections from the Township.
 6             THE COURT:  176 will be admitted.
 7         177 will be admitted.
 8         With the clarification, 200 will be admitted with the
 9    exception of Photo 11.
10         (Plaintiff Exhibits 176, pages 8 and 9; and 200, pages 1,
11    3, 4, 5, and 6, were received in evidence.)
12             THE COURT:  Okay.  Let's move on.  PX 205.
13             MR. OWENS:  Yes, Your Honor.  And I'll go a little
14    bit slower to make sure I don't get anything mistaken.  So PX
15    205, these are attachments to Detective Moore's affidavit,
16    pages 3 and 6.  Page 3 is a cover letter.  Page 6 is a camping
17    receipt.
18         PX 213 is a letter that Mr. Gillispie sent to Judge
19    Foley.
20         PX 215 at pages 1 and 2 are documents related to
21    Mr. Gillispie being required to register as a sex offender.
22             THE COURT:  Okay.  Let's stop right there, and we
23    will go to a different page.
24         Counsel, positions?
25             MR. McLANDRICH:  205, no objection.  213, no
```

```
 1    objection.  215, I don't think so.  Let me just pull it back

 2    up.  No objection.

 3               THE COURT:  Counsel?

 4               MR. HERMAN:  No objection to 205, no objection to

 5    213, no objection to 215.

 6               THE COURT:  Okay.  205, 213, 215 will all be

 7    admitted.

 8         (Plaintiffs Exhibits 205, pages 3 and 6; 213, and 215,

 9    pages 1 and 2, were received in evidence.)

10               MR. OWENS:  Your Honor, unless I'm mistaken, which I

11    very may would be, just in an effort to maybe speed things up,

12    I don't think that there are anymore objections to the

13    remaining exhibits that plaintiff seeks to offer.  So I could

14    continue to go down the list, but I think --

15               THE COURT:  Why don't we do this.  Why don't we do

16    this.  It won't take -- there are what, eight more exhibits

17    plaintiff plans to offer?

18               MR. OWENS:  That's right.  And I created this list

19    as an inclusive list because there were some exhibits that the

20    plaintiff used that were defendant's markings.  So I don't

21    know if it matters who offers it, but I can continue to go

22    down the list.

23               THE COURT:  Okay.  Let's deal with plaintiff's

24    exhibits.

25               MR. OWENS:  Sure.  Yes, Judge.
```

1516

1    THE COURT:  Plaintiff's exhibits, just run through

2    the numbers first for me.

3    MR. OWENS:  Yes, Judge.  The next would be 247, the

4    composite with the glasses.

5    249 at page 1.  It's a Miami Valley report.

6    PX 252 at page 1 is another Miami Valley report.

7    PX 254 at pages 1, 8, and 9.  This is the forensic report

8    of Susan Perry Dyer which was used during the testimony of

9    Dr. Benjamin Miller.

10    PX 281 at pages 1 and 2 is a report from Detective

11    Bailey.

12    PX 282 is another report from Detective Bailey.

13    PX 284 at pages 2, 5, 6, and 8 are photos of

14    Mr. Gillispie and his art that were shown during his

15    examination.

16    PX 285 are pictures from the more recent inspection of

17    the evidence and include photo array and other pictures.

18    That's pages 6, 7, 9, and 10 I think would be admitted subject

19    to the stipulation we previously discussed.

20    Those are plaintiff's.  Those are the exhibits that

21    plaintiff intends to offer that have plaintiff's designation.

22    THE COURT:  So you are moving to offer those, right?

23    MR. OWENS:  Yes, Your Honor.

24    THE COURT:  Counsel?

25    MR. McLANDRICH:  I don't have an objection with the

```
1    exception of 254, which I think is a hearsay record.  It's not
2    authenticated and shouldn't be admitted.
3              THE COURT:  But no objections as to 247, 249, 252,
4    281, 282, 284, and 285?
5              MR. McLANDRICH:  I believe so.  I'm sorry.  What
6    were the 285 pages again?  Because I think there are some more
7    that I didn't have on my sheet here.
8              THE COURT:  Those are Photos 6, 7, 9, and 10.
9              MR. McLANDRICH:  Subject to the stipulation, I have
10   no objection, Your Honor.
11             THE COURT:  Counsel?
12             MR. HERMAN:  The only objection we had was to 254,
13   which Mr. McLandrich raised.  Otherwise, no objections to the
14   other ones.
15             THE COURT:  They'll all be admitted except for PX
16   254.
17        (Plaintiff's Exhibits 247; 249, page 1; 252, page 1; 281,
18   pages 1 and 2; 282; 284, pages 2, 5, 6, and 8; and 285, pages
19   6, 7, 9, and 10, were received in evidence.)
20             THE COURT:  Now, counsel for --
21             MR. OWENS:  Can --
22             THE COURT:  Go ahead.
23             MR. OWENS:  With respect to 254, there was no
24   objection made to the foundation of this document being shown
25   to the jury.  It was shown to the jury.  And if there was --
```

```
 1            THE COURT:  The foundation of it, what do you mean?

 2            MR. OWENS:  I thought that the objection here was

 3   that there wasn't adequate foundation to present it to the

 4   jury.  If I missed that --

 5            THE COURT:  That's not what I heard.

 6       What is --

 7            MR. McLANDRICH:  My objection is that, A, it's a

 8   hearsay document and, B, it wasn't authenticated.  And the

 9   fact that the doctor reviewed it as a part of his report

10   doesn't make it an exhibit in the trial anymore than his

11   exhibit is -- his report is an exhibit.

12            MR. OWENS:  So, I mean, this is a little bit of a

13   surprise, but the first thought I have is that it's probably a

14   self-authenticating document.  It's a document that's created

15   by state agency, the Ohio Department of Corrections.  It's

16   their document, actually.  But I don't --

17            THE COURT:  All right.  Here's what we'll do.  I'm

18   admitting all of them from 247, 249, 252, 281, 282, 284, 285.

19   Those will all be admitted.  I'll reserve ruling.  I'm not

20   quite sure I understand the argument, but I'll consider it.

21       Now, how do you want to deal with these?  My

22   understanding is that plaintiff wishes to also move -- and I

23   don't know whether they are the same exhibits that you want to

24   move, Defendant.  I don't know.

25            MR. McLANDRICH:  I'm sorry.  So we have exhibits
```

1519

1    that we intend to move in.  Some of them, you know, may be

2    duplicative, but sort of going based on what the Court was

3    indicating previously --

4                THE COURT:  Right.

5                MR. McLANDRICH:  -- that the jury may have notes

6    that, you know, they've --

7                THE COURT:  Then let's do this.  Let's do this.

8    Counsel, if there are no objections, what I'm going to do is I

9    am going to have defendant then move for -- well, wait a

10   minute.

11       I guess at this point in time I should hear any motions

12   with regard to the defendant.  Defendant's motion.

13               MR. McLANDRICH:  Yes, sir, Your Honor.  We would

14   move for a directed verdict on the allegation that Detective

15   Moore suppressed or destroyed reports.  The evidence is too

16   equivocal to allow a reasonable jury to find by a

17   preponderance of the evidence that Detective Moore suppressed

18   or destroyed reports.

19       There was testimony from Mr. Fritz that Mr. Bailey, he

20   believes, created a report and that he approved it, but he

21   likewise testified that reports are often misfiled.  Did not

22   testify and, as a matter of fact, testified specifically that

23   he could not say that Detective Moore was ever in possession

24   of such a report.

25       And we don't believe that there is sufficient evidence

1     upon which a reasonable jury could find by a preponderance of

2     the evidence that Detective Moore was ever in possession of

3     the report and, more importantly, no evidence that he ever

4     suppressed or destroyed the report.

5          We believe that any effort to rely on an inference that

6     someone testified to the mere existence of the report would

7     justify a finding that he suppressed it or destroyed it is

8     negated by the alternative explanation, which is at least

9     equally likely, that the report was never -- was misfiled and

10    never came into his possession.

11         So based on that, Your Honor, we would move that a

12    directed verdict be entered for Detective Moore with respect

13    to the allegation of the suppressed or destroyed report.

14         Likewise, with respect to any other sort of alleged

15    suppressed or destroyed evidence, specifically, let's say, the

16    campground receipts, there is no evidence that any other

17    campground receipts ever existed or ever came into the

18    possession of Detective Moore, which he again could have

19    suppressed or destroyed.  There is no evidence that he had and

20    suppressed or destroyed such documents.  Certainly not enough

21    to allow a jury to make -- a reasonable jury to make a finding

22    by a preponderance of the evidence on that issue.

23              THE COURT:  Counsel for plaintiff.

24              MR. OWENS:  Yeah.  Your Honor, I understand that

25    counsel has a duty to zealously defend their client.  This

1    motion, to me, I have trouble understanding any kind of

2    factual basis for this motion that --

3        THE COURT:  You heard his argument.  Just respond to

4    his argument.

5        MR. OWENS:  Sure.  First, as it relates to generally

6    the suppression of evidence claim in this case, I don't think

7    it would be appropriate to pars specific legal theories and

8    sort of was it this or was it that.  There's a number of

9    different bases for -- of evidence that is in the record that

10   would illustrate that -- that would substantiate a claim that

11   evidence was suppressed.

12        So even assuming, even though it would be improper to do

13   so, that you could sort of excise one particular theory from a

14   larger due process claim as it relates to the reports, the

15   motion here is sort of a regurgitation of the things that were

16   argued at summary judgment.  You don't have specific knowledge

17   that -- of exactly what was in the file when Detective Moore

18   received it.  But *Elkins* itself, you know, illustrates that

19   the jury is allowed to infer from circumstantial evidence.

20   And I think there was something in the Court's summary

21   judgment order about this, that, you know, this is the normal

22   course of business, that you have a detective who testified

23   that the reports, one, that they exist, two, that they were

24   put in the file.

25        Detective Moore has sworn under oath he read supplemental

1    reports from -- that were authored by -- specifically authored

2    by Fritz.  Those have not been produced.  That is beyond

3    sufficient for a reasonable jury to find, construing the

4    evidence in the favor and light most favorable to the

5    plaintiff as the Court must at this juncture, that the reports

6    existed.  They were in the report, and the Detective Moore did

7    not turn them over.

8        In addition to that, the counsel's suggestion that there

9    is an alternative explanation for where the reports went, that

10   reports were frequently misfiled, something like that, I think

11   that's a very telling admission.  There is an alternative

12   explanation.  Is it proven as a matter of law that the files

13   were mis -- that this was misfiled?  No, it is not.  This is a

14   quintessence jury question that the jury must decide, and it's

15   not something that this Court can do at this juncture, is to

16   weigh the evidence as relates to that.

17       And I will apologize, Your Honor.  I did not mean to sort

18   of seem so harsh with respect to my front on the other side.

19   However, as it relates to this issue of the campground

20   receipts, it was -- the evidence in the case is beyond

21   sufficient to find that Mr. Moore had the camping receipts,

22   had more than the three that he claims that he had.  So

23   Detective Moore's testimony is I only had three camping

24   receipts:  one from May, one from June, one from July.  I had

25   none from August.

1523

1    However, he testified at the grand jury that he had the

2    camping receipts for the few months before, which is

3    sufficient to find that he had more than these three specific

4    receipts.  But even if the Court were not inclined to find

5    that that admission is not required denying the motion, the

6    next sentence in the grand jury is.  He says Gillispie was

7    down there for the four days after.  Of course -- after the

8    rapes, which, of course, took place in August.

9        Detective Moore has never produced any campground

10   receipts for the month of August, which he claims under oath

11   that he had in front of the grand jury.  And so I don't -- I

12   have trouble with the idea that the evidence construed in the

13   light most favorable to the plaintiff would not substantiate

14   that claim.

15           THE COURT:  All right.  Are you done?  I'm sorry.

16           MR. OWENS:  I am, Your Honor.

17           THE COURT:  I didn't mean to cut you off.

18           MR. OWENS:  No, no.  I appreciate it.

19       I guess the last thing that I would say is that, as a

20   general matter, the evidence that has been presented on the

21   suppression claims far exceeds that which was before this

22   court at summary judgment.  A Rule 50 motion is analogous to

23   that.  And so I think that it's time to submit this case to

24   the jury.

25           THE COURT:  All right.  Last word, Counsel.

1524

1     MR. McLANDRICH:  I will stand on what I've said.

2   Thank you.

3     THE COURT:  Thank you for your arguments, counsel.

4   The Court's considered your arguments, considered what I've

5   listened to over the last week.  Viewing the evidence in light

6   most favorable to the plaintiff, the Court does not find that

7   there is -- there is no genuine issue of material fact for a

8   jury and reasonable minds could come to but one conclusion.

9   And so, therefore, the motion is denied.

10     Now, let's move on to defendant's exhibits.

11     I've quickly reviewed the, I think plaintiff's counsel

12   said composite or something, but it looks as though they are

13   pretty much all the same.  But, Counsel, I am going to let you

14   go forward, and if you want to run through the exhibits that

15   the defendant wishes to move into evidence.

16     MR. OWENS:  Can I ask a question?  What document are

17   you going to be using to read from, if you are?  The one that

18   you sent or the one that we sent?

19     MR. SIPUSIC:  The one that had been sent.

20     MR. OWENS:  And that one includes all the stuff on

21   ours and more; is that right?

22     THE COURT:  There's a few more things.

23     MR. McLANDRICH:  I think there were a couple more.

24     THE COURT:  Did you get it?

25     MR. OWENS:  I got it as the Court was walking out.

1525

```
 1              THE COURT:  Well, there is not a whole lot more.
 2   I'm sure, Mr. Owens, you will be able to respond to it.
 3              MR. McLANDRICH:  Yes, sir, Your Honor.  We would
 4   move for the admission of Defendant's Exhibit 1, pages 1 to 4.
 5              THE COURT:  Let's run through about ten of those.
 6              MR. McLANDRICH:  Sure.  Defendant's Exhibit 2, 1 to
 7   14.
 8        Defendant's Exhibit 3, 1 to 13.
 9        Defendant's Exhibit 4.
10        Defendant's Exhibit 5.
11        Defendant's Exhibit 6, pages 1 and 2.
12        Defendant's 7, pages 1 and 2.
13        Defendant's 8, 1 through 10.
14        Defendant's 9, 1 through 4.
15        Defendant's 10, pages 1 and 2.
16              THE COURT:  Let's hang right there.
17        Any objections?
18              MR. OWENS:  I need a minute, Your Honor.
19              THE COURT:  All right.
20              MR. OWENS:  I apologize.  We made it all the way to
21   10?
22              THE COURT:  Right.
23              MR. OWENS:  No objections with those exhibits, Your
24   Honor.
25              THE COURT:  Okay.  So Defendant's Exhibits 1, 2, 3,
```

*Mary A. Schweinhagen, RDR, CRR   (937) 512-1604*

1    4, 5, 6, 7, 8, 9, and 10 will be admitted.

2         (Defendant's Exhibits 1, pages 1 to 4; 2, pages 1 to 14;

3    3, pages 1 to 13; 4; 5; 6, pages 1 and 2; 7, pages 1 and 2; 8,

4    pages 1 through 10; 9, pages 1 through 4; and 10, pages 1 and

5    2, were received in evidence.)

6              THE COURT:  All right, Counsel.

7              MR. McLANDRICH:  Defendant's Exhibit 11, page 1.

8         Defendant's Exhibit 12, page 1.

9         Defendant's Exhibit 13, pages 1 and 2.

10             THE COURT:  Hang on just a second.

11             MR. McLANDRICH:  Surely.

12             THE COURT:  Do you have a position on any of those

13   exhibits, counsel?

14             MS. FRICK:  We have no objection.

15             THE COURT:  Go ahead.  I'm sorry.

16             MR. McLANDRICH:  Quite all right.  Defendant's

17   Exhibit 13, pages 1 and 2.

18        Defendant's 14, page 1.

19        Defendant's Exhibit 15, pages 1 and 2.

20        Defendant's Exhibit 17, page 1.

21        Defendant's Exhibit 18, pages 1 through 3.

22        Defendant's Exhibit 19, pages 1 through 3.

23        Defendant's Exhibit 22, pages 1 through 3.

24        Defendant's Exhibit 28, pages 1 through 18.

25        Defendant's Exhibit 31, pages 1 and 2.

```
 1              THE COURT:  Let's stop right there.

 2              MR. OWENS:  I need a moment to check DX 28, but no

 3    objection with respect to all of those.  If I can have one

 4    minute on 28.

 5              THE COURT:  Surely.

 6              MR. McLANDRICH:  Just to perhaps assist, 28 is

 7    redacted to eliminate the Torrie Strohman references that we

 8    agreed to.

 9              MR. OWENS:  That's what I was trying to check.

10              THE COURT:  That made you happy, Mr. Owens?

11              MR. OWENS:  It was just a thing to double check so I

12    didn't get myself in trouble.  So no objection.

13              THE COURT:  No objection?

14              MR. HERMAN:  No objections, Your Honor.

15              THE COURT:  All right.  Defendant's Exhibits 11, 12,

16    13, 14, 15, 17, 18, 19, 22, 28, and 31 will be admitted --

17    well, as described will be admitted.

18       (Defendant's Exhibits 11, page 1; 12, page 1; 13, pages 1

19    and 2; pages 1 and 2; 14, page 1; 15, pages 1 and 2; 17, page

20    1; 18, pages 1 through 3; 19, pages 1 through 3; 22, pages 1

21    through 3; 28, pages 1 through 18; and 31, pages 1 and 2, were

22    received in evidence.)

23              MR. McLANDRICH:  And I should note, Your Honor, that

24    Defendant's Exhibits 18, 19, and 22 are also the subject

25    matter in the stipulation we have talked about earlier with
```

```
 1    respect to the photo arrays.

 2              MR. OWENS:  So you will provide us with a redacted

 3    version of 28.  I mean, our 104 is redacted.

 4              MR. McLANDRICH:  We will send it to you if we

 5    haven't already.

 6              MR. OWENS:  The one I have, I mean.  There's a lot

 7    of versions of it in the cloud.

 8              MR. McLANDRICH:  Got you.

 9              THE COURT:  Let's move on to the second page.  I

10    guess we're up to Defendant's 32.

11              MR. McLANDRICH:  Yes, Your Honor.  Defendant's

12    Exhibit 32, pages 1 and 2.

13         Defendant's 33, pages 1 and 2.

14         Defendant's -- I'm sorry.  45 and 46 we withdraw.

15         And then we would withdraw PX 3, PX 5 that are also on

16    our list.

17         PX 54, we used page 72.  I think that's redundant.

18    Plaintiff already has that in, I believe, but if not, PX 54,

19    pages 72.

20         PX 56.

21              THE COURT:  Did I already --

22              MR. OWENS:  You did already.

23              THE COURT:  I already admitted that.

24              MR. McLANDRICH:  PX 80 we would withdraw.

25         PX 249.
```

 1          PX 252.

 2               MR. OWENS:  252's already in.

 3               MR. McLANDRICH:  So the rest of these are already

 4     admitted by plaintiff.  So I think we're good, Your Honor.  We

 5     would move those to be admitted.

 6               THE COURT:  So the exhibits that have not already --

 7     you don't -- Counsel, you don't have any real concern about

 8     the fact that they were admitted in as plaintiff's exhibits?

 9               MR. McLANDRICH:  No, sir, Your Honor.

10               THE COURT:  So the exhibits that have been moved

11     into -- are there certain pages on -- well, that's Plaintiff's

12     exhibit.

13          Are you moving for the same pages, the photos that were

14     included in the -- I guess what I'm asking you, is your motion

15     for plaintiff's exhibits any different than plaintiff's

16     motions were?  I guess, like, for example, PX 285, plaintiff

17     moved for admission of 6, 7, 9, and 10.

18               MR. McLANDRICH:  I think we -- no.  I think they

19     have 9.  I think we're fine.

20               THE COURT:  I just want to make sure that we've got

21     the same exhibit and we're not -- one person's not asking for

22     an exhibit with different pages than the others.

23          252 is page 1.  Is that what you've moved, Counsel?

24               MR. McLANDRICH:  Yes.

25               THE COURT:  And what else was there?

1530

```
 1              MR. McLANDRICH:  249, page 1.

 2              THE COURT:  249, page 1?

 3              MR. McLANDRICH:  I think that's, frankly, a

 4    redundant exhibit.  I think we only used page 1 of that.

 5              THE COURT:  Well, that's what was admitted for the

 6    plaintiff.

 7         Okay.  So the Court -- anything?

 8              MR. HERMAN:  No objections.

 9              THE COURT:  Defense Exhibit 32, pages 1 and 2;

10    Defendant's Exhibit 33, pages 1 and 2, will be admitted.

11         (Defendant's Exhibits 32, pages 1 and 2; and 33, pages 1

12    and 2, were received in evidence.)

13              THE COURT:  It is my understanding that Defendant's

14    45 and 46 are being withdrawn, and the defendant's motion with

15    regard to Plaintiff's 3 and 5 and 54, as well as 80, have been

16    withdrawn.

17         What was your position on the LEADS sheet?  I think

18    that's already been admitted under plaintiff, right?

19              MR. OWENS:  It hadn't.  We have no objection.

20              THE COURT:  Is that what you want?

21              MR. McLANDRICH:  Yes, sir.

22              THE COURT:  And then PX 249, page 1; 252, page 1;

23    and PX 285, pages 6, 7, 8, and 10 will be admitted.

24         You didn't object to any of those, did you?

25              MR. HERMAN:  No, we didn't.
```

1531

```
 1                  THE COURT:  If I've not, I've admitted Plaintiff's
 2      56.
 3          (Plaintiff's Exhibit 56 was received in evidence.)
 4                  MR. OWENS:  Sweet.
 5                  THE COURT:  Are there any other exhibits?
 6                  MR. McLANDRICH:  No, sir.  I think that's it.
 7                  MR. HERMAN:  No.
 8                  THE COURT:  Okay.  Plaintiff having rested, the
 9      Court dealing with plaintiff's proposed -- or exhibits;
10      defendant now having rested, defendant's exhibits have been
11      dealt with.
12          Any -- there's a motion.  Anything from the Township?
13                  MS. FRICK:  Your Honor, we'd like to make a motion
14      as well.
15                  THE COURT:  You'd like to make a motion?
16                  MS. FRICK:  Yes, Your Honor.
17                  THE COURT:  All right.  Well, we've got a motion
18      that's been filed too.  Let's go to that -- let's go that way.
19          Plaintiff.
20                  MR. OWENS:  Yes, Your Honor.  So with respect to the
21      issue of Detective Moore acting within the scope of his
22      duties, no reasonable jury could find that his actions were
23      outside the scope of his duties.  The evidence construed in
24      the light most favorable to the Township shows, at best, that
25      Detective Moore might have not had the best mental state.
```

1532

1    However, the functions that he has performed in this case --

2    creating lineups, turning evidence over to the prosecutor,

3    arresting Mr. Gillispie -- are quintessential police

4    functions.  The idea here is essentially that this is what the

5    police do.  That's what he was employed to do.

6        It's undisputed in this case that he is acting under

7    color of law.  That issue is not even being submitted to the

8    jury.  So I don't think any reasonable jury could find that

9    the Detective Moore was doing anything but acting in the scope

10   of his duties as a police officer.

11       And I want to address this because I think it's

12   important, and the reason we are filing the motion is to try

13   to clear some up -- some stuff up for the jury and to narrow

14   what's in front of them as it relates to these issues about

15   manifestly and all this other stuff.

16       The Township's response to our motion conflates the

17   separate inquiries that exist with respect to scope of

18   employment and with respect to the mental state of not good

19   faith.

20       The issue here has to do solely with was he acting like a

21   police officer when he did this.  The answer's obviously yes.

22   The case law shows pretty clearly that people who make

23   mistakes, even when they are on duty, are still acting within

24   the scope of their employment.  I know that Detective Moore

25   doesn't think that he's made a mistake, but the evidence,

1    construed in the light most favorable to the Township, could

2    permit an inference that he was acting in not good faith.

3    However, he was acting in not good faith as a police officer.

4        He hasn't done anything that's sort of extreme type

5    conduct that you would see that would fall outside the scope

6    of employment.  The quintessential example here is sexually

7    assaulting somebody, and that type of thing is sort of

8    analogous to absolute immunity that, you know, prosecutors and

9    judges have, like under *United States against Lanier*.  There

10   is absolute immunity, but, whoa, that is something that does

11   not have to do with your job whatsoever.  Making a mistake

12   with respect to a photo lineup or suppressing evidence or

13   doing quintessential police functions falls in that category.

14       So for those reasons, we think that this issue should be

15   resolved on this type of a motion and not submitted to the

16   jury because no reasonable jury could conclude that Moore

17   acted outside of the scope of his employment without sort of

18   collapsing the entire inquiry into itself to which is, if

19   anybody makes a mistake in the course of their duties, then

20   they are acting outside of their scope of their employment,

21   which is simply not the law, simply not the basic agency

22   principles that would apply to such a circumstance.

23              THE COURT:  All right.  Counsel?

24              MS. FRICK:  Yes, Your Honor.  In response to that,

25   first of all, we would say that there is sufficient duty or

1       sufficient evidence that a reasonable jury could find not only

2       that he was outside the scope of his employment, but they

3       ignored the second part of that test that says "or official

4       duties."

5            There was significant testimony about what the official

6       duties of a police officer are, and there was also testimony

7       that we lay out in the motion with respect to not only

8       Mr. Moore, Mr. Fritz, Dr. Scott, Mr. Wilson, and even

9       Mr. Monheim today that if, in fact, actions that have been

10      alleged by plaintiff's counsel did occur, that they would be

11      outside of those official duties.

12           Additionally, with respect to the issue of scope of

13      employment, it still has to be acting within the employer's

14      interest.  Mr. Monheim today said that the -- with respect to,

15      for example, the photo arrays, it's in the employer's interest

16      to provide a -- not an unduly or unnecessarily suggestive

17      photo array.  And in this case, the allegation is that that

18      was knowingly done.  There's been evidence about that by

19      plaintiffs claiming that that was knowingly done, that

20      Mr. Moore would have known and should have known what the

21      techniques were that were appropriate for a photo array at

22      that time, and that he didn't do it.

23           But, again, without addressing the official

24      responsibility, or official responsibility portion of the

25      statue, plaintiffs are essentially -- or plaintiffs and

1535

1    defendant, if they have joined the motion, are ignoring a

2    portion of the statute that we don't believe the Court can do

3    because it's in there for a reason, and the legislature put it

4    in there for a reason, and there's significant testimony about

5    those official responsibilities of an officer.

6            MR. OWENS:  Yes.  The official responsibilities of a

7    police officer is doing things like creating photo lineups,

8    turning stuff over to the prosecutor.  I don't think that

9    there is a separate inquiry implied under the law.  There is

10   certainly not in a case as cited by the Township that would

11   indicate that.  But even if you assume that hypothetical,

12   these are just the quintessential basic official

13   responsibilities of a police officer.  It's not like he is not

14   being a police officer even if the photo lineup was

15   suggestive.  If a police officer arrests somebody and a jury

16   finds that they committed excessive force, it's not like, oh,

17   you are no longer a cop because a jury found, you know, you

18   engaged in excessive force.  You were being a police officer

19   doing your quintessential function, and that's why the motion

20   should be granted.

21           THE COURT:  All right.

22           MR. McLANDRICH:  Your Honor, if I might be heard on

23   this?

24           THE COURT:  Sure.

25           MR. McLANDRICH:  So a couple of observations.  First

1    off, while we certainly agree that Mr. Moore was acting in the

2    course and scope of his employment, as I think plaintiff

3    noted, we certainly don't agree with the conduct allegations

4    against him.  But we certainly do agree that at all times he

5    was acting within the course and scope of his employment.

6         Since plaintiff isn't a party to that claim, I'm not sure

7    they can move for a directed verdict on it.  It seems to be

8    sort of a obvious issue.  But that said, certainly Defendant

9    Moore would move for a directed verdict on the intervenor

10   complaint.  I think certainly there is no evidence that he

11   acted in bad faith or outside the course and scope of his

12   employment.  But, you know, recognizing what the Court has

13   already said with respect to our motion for a directed verdict

14   on the suppression and destruction claim, it seems to me that

15   those issues may be interrelated.

16        THE COURT:  Thank you.  Let me get all this under my

17   belt here.

18        Do you have a motion back there?

19        MS. FRICK:  Well, Your Honor, I think -- I mean,

20   this addresses just the issue of scope of employment and

21   official responsibilities.  We would maintain that in

22   addition, that there should be a directed verdict as to the

23   issue of bad faith or outside of the scope.  Outside of the

24   scope and official responsibilities is already addressed, but

25   in terms of bad faith, I think that, you know, the definition

1   of bad faith is just, in fact, that it would be conscious

2   wrongdoing.

3       And there's been a sufficient amount of evidence that

4   plaintiff has presented that Mr. Moore would have, you know --

5   he knew that he had these receipts, and he didn't turn them

6   over.  He knew that he had reports because of this testimony

7   that he apparently gave -- or excuse me -- that he put in the

8   affidavit, and he didn't turn them over.

9       This was the evidence that the plaintiff himself put on.

10  And because of that, we would take the position that there

11  should be, as well, a judgment as a matter of law as to the

12  issue of bad faith.

13          THE COURT:  Did I let you respond to --

14          MR. McLANDRICH:  I would respond to her motion just

15  noting that the evidence is, at best, equivocal with respect

16  to Defendant Moore's conduct in terms of any alleged bad

17  faith, suppression, destruction of reports that could be the

18  possible foundation of any finding that he acted outside the

19  course and scope or in bad faith.

20      And as has been noted with respect to the other motions,

21  you know, the evidence must be construed most strongly against

22  the Township as the movant on this issue.  And until there is

23  a jury finding with respect to whether he even engaged in any

24  inappropriate conduct, I think it's impossible to suggest that

25  a directed verdict finding that he acted not in good faith and

1538

```
1    outside the course and scope of his employment is possible.
2         MR. OWENS:  This is fun.  I guess I just think
3    plaintiff's position is while there is, with respect to the
4    officer's mental state is a quintessential jury instruction --
5    or jury question.  You know, you'll find that in basic law.
6    So that's fine.
7         And -- but two brief things.  One, I do think that given
8    this is a trial in which the jury in this case has heard from
9    the Township, they have been, you know, participating in the
10   case and they note -- they were allowed to give opening
11   statements, the jury instructions will be viewed as a whole,
12   we absolutely have standing with respect to the issues that
13   will be presented to the jury.  If plaintiff prevails in this
14   matter, you know, it could be a judgment creditor.  One of
15   them might be the Township.  So I think we absolutely have
16   standing with respect to preserving our right to seek a
17   potential judgment as a judgment creditor, notwithstanding
18   whatever the Ohio Supreme Court has to say as a matter of
19   state law with respect to the statute.
20        Last, I don't think I have heard anybody say that there's
21   any evidence that Detective Moore, when he prepared photo
22   arrays or gave evidence or didn't give evidence to the
23   prosecutor, was not performing a quintessential function that
24   a police officer does every day.  And so our motion should be
25   granted.
```

1539

```
 1        As stuff related to mental state, that's something that

 2   should go before the jury.  Thank you.

 3        THE COURT:  You responded at this point.

 4        Any final words back there?

 5        MS. FRICK:  No, Your Honor.  I mean, I would tend to

 6   agree with defendants that I'm not sure that they do have the

 7   standing, any more than we were able to argue on the issues

 8   between those two parties on liability itself.  I'm not

 9   sure -- I mean, we clearly had an interest in that, as well,

10   if, as plaintiff says, they may be a judgment creditor.  But I

11   think that the intervenor complaint is between the Township

12   and Mr. Moore.

13        THE COURT:  Final word on your motion?

14        MR. McLANDRICH:  No, sir.  Thank you.

15        THE COURT:  Folks, give me about three or four

16   minutes, and I'll be back in and rule on the motions.

17        The other thing, what we need to do is I think you've

18   been delivered copies of the proposed jury instructions.  Now,

19   I am not prejudging these motions, but I have given you copies

20   of the jury instructions, and I would entertain when I come

21   back in -- well, do you need some time to look at them?

22        MR. OWENS:  No.

23        THE COURT:  Counsel?

24        MR. McLANDRICH:  We'll look at it in the time that

25   you're absent.
```

1540

```
1        THE COURT:  All right.  I'll give you an opportunity
2   to place on the record any objections to the jury
3   instructions.  Thank you.
4        THE COURTROOM DEPUTY:  All rise.  This court stands
5   in recess.
6        (Recess at 442 p.m.)
7        (In open court outside the presence of the jury at 4:54
8   p.m.)
9        THE COURT:  Everyone, the Court has considered the
10  motions now before the Court.
11      With regard to Plaintiff Gillispie's motion for a
12  judgment as a matter of law on the scope of employment, under
13  Ohio Revised Code Section 2744.07, Document Number 467, the
14  intervenor filed a response in opposition, Document Number
15  468.  The Court finds that the motion is denied.
16      The intervenor filed a single-count intervenor complaint
17  against Matthew Scott Moore.  In that complaint, the
18  intervenor seeks a declaratory judgment that it does not owe a
19  duty to Defendant Moore in connection with the amended
20  complaint in the underlying action; and, two, it does not owe
21  a duty to indemnify Moore in connection with the claims
22  asserted against him in the amended complaint filed in the
23  underlying action.
24      In the motion, plaintiff argues that no reasonable jury
25  could find that Moore took an act outside the scope of his
```

1  employment.  First, the Court finds that the motion is denied

2  because it does not appear that plaintiff has standing to file

3  the motion because plaintiff is not a party to the

4  intervenor's complaint.

5      Second, even if no reasonable jury could find that Moore

6  took an act outside the scope of his employment, that does not

7  mean that the intervenor's claim must fail.  In other words,

8  even agreeing with Gillispie would not lead to a judgment

9  against the intervenor on its claim.

10     Rule 50(a) provides that the Court may grant a motion for

11  judgment as a matter of law against a party on a claim or

12  defense that, under the controlling law, can be maintained or

13  defeated only with a favorable ruling on that issue.

14     Here -- but here, Ohio Revised Code, Section 2744.07 at

15  subparts (A)(2) and (B)(2) provide for alternative ways that a

16  political subdivision would not have a duty to defend or a

17  duty to indemnify.  Moreover, the Court is not being asked to

18  decide the intervenor's complaint.

19     Third, the Court finds that the motion does fail on its

20  merits, as well.  Viewing the evidence in light most favorable

21  to the Township, the Court does not find there is no genuine

22  issue of material fact for the jury and reasonable minds could

23  come to but one conclusion in favor of the moving parties.

24     For all those reasons as I've indicated, the motion is

25  denied.

1    With regard to the Township's motion, the Court finds

2    viewing the evidence in light most favorable to the

3    defendant -- or the plaintiff, the Court does not find that

4    there is no genuine issue of material fact for the jury and

5    reasonable minds could come to but one conclusion in favor of

6    the moving party.  So, therefore, that motion is denied.

7    With regard to the defendant's motion against the

8    Township, the Court finds that the viewing the light most --

9    viewing the evidence in light most favorable to the Township,

10   the Court does not find that there is no genuine issue of

11   material fact for the jury and reasonable minds could come to

12   but one conclusion in favor of the moving party.  So,

13   therefore, all motions are denied.

14   One correction.  Just correcting my recitation on the

15   ruling by -- on the Gillispie motion.  I guess I mentioned

16   Rule 58.  It was 50(a).

17            MR. OWENS:  I heard that.  How could 58 apply?

18            THE COURT:  Well, that's right.

19   The other thing was that I believe the Court also said

20   that, moreover, the Court here is not being asked.  I think

21   it's the jury that's not being asked.

22   Other than that, everything stays the same.

23            MR. McLANDRICH:  Your Honor?

24            THE COURT:  Yes.

25            MR. McLANDRICH:  We noticed with respect to exhibits

1  that there was one we inadvertently failed to list that we

2  would like to have admitted.

3          THE COURT:  All right.

4          MR. McLANDRICH:  And that was Defendant's 23.

5          THE COURT:  Any objection?

6          MR. OWENS:  No, Your Honor.

7          MS. FRICK:  I have to pull it up.  Nobody said

8  anything to us about it.

9          MR. HERMAN:  Is that the work schedule?

10          MR. McLANDRICH:  It's the letter about the work

11  schedule.

12          MR. HERMAN:  We have no objection.

13          THE COURT:  It will be admitted without objection.

14      (Defendant's Exhibit 23 was received in evidence.)

15          MR. McLANDRICH:  Thank you, Your Honor.

16          THE COURT:  Counsel, you've been distributed copies

17  of the jury instructions that the Court has drafted and

18  finalized after your comments, concerns, and, I believe,

19  objections; but to formally place any further comments,

20  concerns, or objections upon the record, the Court will afford

21  an opportunity for all counsel to at this point in time

22  register any objections that they wish with regard to the jury

23  instructions.

24      So counsel for plaintiff.

25          MR. OWENS:  Would you like to go sort of instruction

```
 1    by instruction or take them all together?
 2              THE COURT:  Well -- do we have, I guess it makes a
 3    difference with regard to the number of instructions.  We can
 4    go instruction by instruction, but then I would -- I'll tell
 5    you what I'll do.  I'll ask each of the parties if there is
 6    any objection with regard to the instructions.
 7         Go ahead.
 8              MR. OWENS:  I think that the first potential
 9    objection -- and I don't mean to speak for all parties -- it
10    probably starts at page number 21.  So I don't know if the
11    Court would need to go through the first preliminarily --
12              THE COURT:  Let me ask this:  Counsel for the
13    defendant, are there any objections prior to 21?
14              MR. McLANDRICH:  No, I don't believe so, Your Honor.
15    The one observation I would offer, though, is --
16              MR. OWENS:  Oh, sorry.  I'm -- just totally blanked.
17         Plaintiff's going to voluntarily drop the destruction of
18    evidence claim, the third claim.  We discussed this with
19    Mr. McLandrich during our break.
20         So we also discussed sort of doing the same thing that we
21    did earlier in the week in terms of stipulation, and so there
22    will be -- and we do apologize to the Court for not bringing
23    this to your attention earlier.  There's, frankly, a
24    miscommunication on our side about that.  And so that would --
25    that will require some revision.
```

```
 1          Is that what you are referring to?

 2              MR. McLANDRICH:  Yeah.

 3              THE COURT:  All right.  You need to follow the same

 4   procedures that you did before, and we'll try to --

 5              MR. OWENS:  Yes, Your Honor.

 6              THE COURT:  When do you think that's going to be

 7   done?

 8              MR. OWENS:  Give me half an hour after we get out of

 9   here.

10       Now, with -- I guess the question's -- none of that

11   impacts anything --

12              THE COURT:  All right.

13              MR. OWENS:  -- before page 21, I'll say that.  With

14   respect to page 21, given that the Court has denied our and

15   Defendant Moore's motion with respect to the Township -- and

16   the Township is part of the case -- the first two sentences of

17   page -- of the burden of proof we believe are objected to and

18   inappropriate given that there are claims in this case by

19   which other parties have the burden of proof.  And it's

20   redundant of the other claims which do set forth the burden as

21   it relates to those particular claims.

22              THE COURT:  All right.  Anything from the defense?

23              MR. McLANDRICH:  I would just respond to that by

24   noting that with respect to the Township's claim, the jury

25   will not be making a finding of whether a burden of proof is
```

1   sustained.  The dec action is a question of law for the Court

2   to decide.  The jury's merely making some advisory factual

3   findings which the Court can consider in making its own ruling

4   on the legal question presented by the declaratory judgment

5   action.

6           THE COURT:  Anything else with regard to 21, Burden

7   of Proof?

8           MS. FRICK:  No, Your Honor.  We would agree.  We

9   think that it's standard.

10          THE COURT:  The next objection?

11          MR. OWENS:  Your Honor, this isn't an objection but

12  with respect to page 22, it will need to be amended to just

13  the -- to note the issue that we had raised with respect to

14  the destruction of evidence claim.

15          THE COURT:  All right.  Well, I'm assuming -- okay,

16  fine.  Thank you for the notation about that.

17          MR. OWENS:  With respect to plaintiff's next

18  objection, Your Honor, there is, as it relates to the

19  compensatory damages instruction on page 30 --

20          THE COURT:  Okay.  Let me do this then:  If your

21  next objection is on page 30, are there any other objections

22  prior to page 30?

23          MR. McLANDRICH:  Yes, Your Honor.

24          THE COURT:  All right.

25          MR. McLANDRICH:  With respect to page 25, the

1547

1    instruction with respect to suggestive identification, we

2    object to there being no indication to the jury, as we had

3    indicated in our red line to the Court, that they are not

4    being instructed noting that there are certain allegations

5    with respect to the photo array that courts within the circuit

6    as recently as the last few years have found are not, in and

7    of themselves, sufficient to make the photo array unduly or

8    unnecessarily suggestive.

9         And we think it gives the jury insufficient direction and

10   an incorrect impression that the mere fact that the background

11   color, for instance, of one of the photographs is different

12   can be a basis for finding the array unduly suggestive when

13   the circuit has made it clear that such is not the case.  And

14   that was just illustrative of the issues we had raised in our

15   red line.  And so to preserve a potential error, we would

16   assert that.

17        The issues that we raised in our red line we believe

18   should be offered to the jury as appropriate instructions and

19   would, if you will, tender the red line as necessary to

20   preserve the errors.  I know I have to proffer the proper

21   instruction that we would request to preserve the error, and

22   so we would proffer that, if you will.

23             THE COURT:  All right.  Counsel, anything?

24             MR. OWENS:  Just on behalf of plaintiff, we, of

25   course, disagree.  The Court's instruction states the correct

```
 1    test, which is the totality of the circumstances, and it's

 2    proper to not include instructions that would weigh -- direct

 3    the jury to find a directed verdict for Defendant Moore.

 4              THE COURT:  Had you filed that proposed instruction?

 5              MR. McLANDRICH:  Well, the way the instructions were

 6    provided, the plaintiff provided the initial draft.  We

 7    provided our comments by red line.  So our submission would be

 8    in the red line.  If we need to do it in a more formal

 9    fashion, you know, we'll be happy to do that to make sure that

10    we have a proper proffer.

11              MR. MAYER:  I understand what you're saying.  My

12    understanding was that the defendant had also filed on the

13    CM/ECF system a copy of his proposed jury instructions which

14    would have incorporated, essentially, the defendant's red

15    lines, such that I believe that the record would already

16    reflect that.  I'm not 100 percent sure, but I believe that

17    that is the case --

18              MR. OWENS:  That's correct.

19              MR. MAYER:  -- if that ends up averting to having to

20    file the red lines.

21              MR. McLANDRICH:  You may well be right.  The brain's

22    getting a little soft at this point.  And, yes, I see that we

23    did file --

24              THE COURT:  And that's what you are -- that's your

25    proposal then?
```

```
 1              MR. McLANDRICH:  Yes, Your Honor.

 2              THE COURT:  Which was your proposal before, right?

 3              MR. McLANDRICH:  Yes, Your Honor.

 4              THE COURT:  All right.

 5              MR. McLANDRICH:  And before we get to 31, also with

 6    respect to the next instruction, the Suppression of Material

 7    Evidence instruction, we see where the Court has chosen the --

 8    I'm sorry.  Actually, I'm back still in this Suggestive

 9    Identification instruction.

10        Where the Court has chosen the word "unnecessarily

11    suggestive" and, you know, having reviewed the matter, I see

12    where courts have used "unnecessarily" and also used "unduly."

13    Some courts have chosen to use both.  I think that there's a

14    different connotation to "unnecessarily" than "unduly," and I

15    would request the Court put it in the alternative, if you

16    will, of "unnecessarily or unduly suggestive" to cure that

17    issue.  Thank you.

18              THE COURT:  Anything?

19        Okay.  Moving on to what, 31?  Anything before 31?

20        Counsel.

21              MR. OWENS:  So there's -- as it relates to

22    compensatory damages, there was two things removed since the

23    version we saw this morning.

24              THE COURT:  Now you're referring to what

25    instruction?
```

1550

1    MR. OWENS:  The Compensatory Damage Instruction on

2    page 30, I guess.  I apologize, Your Honor.

3    THE COURT:  All right.

4    MR. OWENS:  There was two things deleted, "the

5    reasonable value of necessary medical care, treatment, and

6    services rendered," "the wages and earnings plaintiff lost."

7    So those we would ask to be re-inserted into the instruction.

8    And I don't know if there was potentially some confusion.

9    In a prior iteration, we had agreed, based upon the

10   defendant's objections and discussion amongst counsel, to

11   remove consideration of future wages and things like that.

12   But not -- but we did not intend to --

13   THE COURT:  The Court understands that.

14   Anything?

15   MR. McLANDRICH:  Your Honor, I think that the

16   modification is appropriate.  I don't believe that there was

17   evidence offered that would have justified inclusion of the

18   two lines that were omitted.

19   THE COURT:  Next objection?

20   MR. McLANDRICH:  You know, I think that my next

21   objection would be with respect to -- I'm sorry.  Let me

22   consider one moment longer.

23   No, Your Honor.

24   MR. OWENS:  Am I supposed to be up?

25   THE COURT:  Yes.

1551

1           MR. OWENS:  Oh, I apologize.

2           MR. McLANDRICH:  He was looking.  I don't think he

3    came up with one yet.

4           MR. OWENS:  Thank you, Judge.  I think that we've

5    indicated plaintiff's objections.

6           THE COURT:  Oh, that's it?

7           MR. OWENS:  That's it.

8           THE COURT:  There you go.

9           MS. FRICK:  Are you looking at me now, Your Honor?

10   Are you looking at him or are you looking at me?  I can't

11   tell.

12          THE COURT:  I'm looking at both of you.

13          MS. FRICK:  Are we just talking instructions or are

14   we talking the verdict form, as well?

15          THE COURT:  Well, we are just talking instructions

16   right now.  It shouldn't be too long, I don't think, till we

17   get to verdicts.

18          MR. McLANDRICH:  No further objections, Your Honor.

19          THE COURT:  On the instructions?

20          MR. McLANDRICH:  Yes, sir.

21          MS. FRICK:  Your Honor, although I think it's been

22   somewhat clarified in the language that was added, I just am

23   going to make a general objection to the Mental State

24   instruction on page 29, as I believe it may cause confusion in

25   the jury with respect to our claim.

1552

```
 1              THE COURT:  All right.  You're objecting to the
 2    entire instruction?
 3              MS. FRICK:  The inclusion of the instruction, yes.
 4              MR. OWENS:  We'll stand by the copious authorities
 5    that we cited.
 6              THE COURT:  All right.  Are there any other
 7    objections now as to any of the instructions?
 8         We'll move to verdict forms if you want to comment on
 9    those, if you need to.  Any?
10         And, of course, those will have to be modified.  Even
11    though being modified, are there any objections to the jury
12    instructions from plaintiff?
13              MR. OWENS:  No additional objections, Your Honor.
14              MR. McLANDRICH:  Just sort of a question, I suppose,
15    more than an objection.  In the verdict form, we have the
16    instruction Part III with respect to the intervenor claim.
17    And they are asked to find with respect to whether Officer
18    Moore was acting manifestly outside the scope of his
19    employment; and then in the next question, asked to find
20    whether he was not acting within the course of -- within the
21    scope of his employment.
22         I just don't know that there is anywhere where the jury's
23    given any guidance into manifestly to make that distinction
24    between "scope of employment" and manifestly outside the scope
25    of his employment.  So not so much an objection as a question
```

1553

 1    with respect to guidance on that issue for the jury.

 2            MS. FRICK:  Your Honor, I believe that the jury

 3    instruction that's included regarding our claim at the very

 4    last line does define what's meant by "manifestly" in order

 5    to, I think, clarify that.  And because of the differences

 6    between the defending and indemnification, I think you have to

 7    have them both.

 8            MR. McLANDRICH:  I do too.  And I see it now, so I'm

 9    satisfied.

10            THE COURT:  Now, counsel for Township, you had an

11    objection?

12            MS. FRICK:  Just generally, again with respect to

13    Part III, it would be our position that it need not be broken

14    down by claim but that just by generally if any act was not

15    acting in good faith, and then each of the three, but just as

16    a general matter.  Because I believe -- if they find that any

17    act was in bad faith or outside of the scope of his employment

18    or official duties, that that -- that you can't separate out

19    what that -- what damage that would have caused and,

20    therefore, I think eventually that could cause more problems

21    when ultimately if there is a determination to be made on

22    indemnification.

23            THE COURT:  That goes along with the same discussion

24    you had on damages and things such as that.

25            MR. OWENS:  Just to the extent that we are allowed

1    on behalf of plaintiff, I think the inference goes the

2    opposite direction.  You know, if the jury found -- say that

3    there were two different claims and the jury found that one of

4    them was within the scope of employment and not in bad faith

5    or whatever the language is, it wouldn't be relevant that some

6    other act was outside the scope of employment.  Because as the

7    Township pointed out in its brief with respect to the double

8    recovery issues, that there should be a single line with

9    respect to damages because the damage is the same.  So it

10   would actually be irrelevant if there were one other act for

11   which Mr. Moore were liable that was not in good faith.  So I

12   think they have it backwards.

13              MS. FRICK:  I'm not sure I --

14              THE COURT:  I didn't either.  I didn't get it.

15              MR. McLANDRICH:  I think that -- if I could.  I

16   think that given now that damages aren't being found

17   separately on each claim, that there probably doesn't need to

18   be separate finding on the intervention indemnity issue by

19   claim because, you know, at this point we won't know what

20   damages are attributable.  So I sort of agree with Dawn in the

21   sense that if any of the acts are outside the course and

22   scope, then it's going to apply, as for as we know, to all the

23   damages that are found; or if it's in bad faith, as far as we

24   know, it will apply to all the damages.

25              THE COURT:  I am not quite sure what plaintiffs --

*Mary A. Schweinhagen, RDR, CRR   (937) 512-1604*

1    well, you can have your own concerns if you want to.  I'm not

2    sure what that concern is.

3         MR. OWENS:  I think the concern -- and maybe I'm

4    not articulating -- well, actually, I know I'm not

5    articulating it well -- is that if there were sort of two

6    acts, right, and one were -- he was found liable on and one he

7    was not, and then the jury need only find that one of the

8    actions was within the scope of employment in order to find

9    that -- to find the factual predicate for indemnification.

10   It's not the fact that one bad act, so that would necessarily

11   take you outside the scope of employment, if there were other

12   acts, for example, that were within the scope of employment.

13       I understood the Township to be saying -- and maybe I

14   misunderstood the Township as saying -- you've got a whole

15   bunch of acts here, call it ten acts.  If you find that one of

16   those acts was outside -- was in bad faith or something, then

17   there is no duty to defend.  I don't think that that's

18   necessarily true.  That's what I was trying to address.

19       THE COURT:  All right.  We'll look at it.  We'll

20   look at it.

21       MR. OWENS:  Thank you, Judge.

22       MR. McLANDRICH:  Thank you, Your Honor.

23       MS. FRICK:  Thank you, Your Honor.

24       THE COURT:  Anything else?

25       MR. OWENS:  No.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1556

1    MR. McLANDRICH:  No, sir.

2    MS. FRICK:  No, Your Honor.

3    MR. HERMAN:  No.

4    THE COURT:  When was the last time you were in a

5    fire drill, counsel?

6    MR. OWENS:  Actually, Your Honor, I do have one

7    question.  I apologize.  I guess I just wanted to say, wanted

8    to have an understanding of what the Court was anticipating us

9    being allowed to say about why the Township is here.  I know

10   in openings there was, you know -- it's sort of they got a

11   legal claim that was not as it related to our claims.  That's

12   not the same.  But I assume the Court doesn't -- wouldn't

13   permit any argument more beyond that; is that right?

14   THE COURT:  Right.

15   MR. McLANDRICH:  Your Honor, one other issue on the

16   instructions.  We will have to insert the stipulation that

17   we've talked about previously with respect to the photo

18   arrays, and we'll have to, you know, draft something to submit

19   so that it can be added to the stipulations with respect to

20   the stipulation being that the photographs -- the position of

21   the photographs within the array may not represent what they

22   were back in the day, and that Detective Moore believes that

23   the black and white versions represent the position of the

24   photos at the time.

25   THE COURT:  Right.  My understanding, I thought you

1    were saying it didn't have to be in the final instructions.

2              MR. OWENS:  I thought you told us to sort it out.

3              THE COURT:  How quickly were you going to have that?

4              MR. McLANDRICH:  I think we could, you know, do it

5    as we sit here.  I just wanted to -- before we close the

6    record on instructions, I remembered it.  So I wanted to --

7              THE COURT:  All right.  If you can draft it, we'll

8    try to get it concluded.

9              MR. McLANDRICH:  Thank you, Your Honor.

10             THE COURT:  Anything else?

11             MR. McLANDRICH:  No, sir.

12             THE COURT:  I am hoping that we can get through

13   closing arguments right off the bat tomorrow morning, followed

14   by instructions, and get these folks out and start

15   deliberating at least tomorrow.  I'm trying to think.  It's

16   been about five days of evidence.  I'm just trying to figure

17   out how long I'm going to let you talk.

18        Any thoughts?  And that's all they are really, thoughts.

19             MR. OWENS:  We're at your leisure.  I think -- I

20   know we'd like to get the jury deliberating soon and don't

21   want to tarry too long.

22        I guess one practice thing, since you brought it up while

23   it's on my mind, does the Court have any rules against

24   splitting the argument?

25             THE COURT:  Yes, you can if you want to.  But what I

1558

```
 1    will do, though, is I will hold you to your time.  I've been

 2    burnt too many times.  I will hold you to my time.  And so,

 3    for example, you, whoever gives your opening, if you want a

 4    certain amount of time, about ten minutes before that's up, I

 5    will let you know that.

 6              MR. OWENS:  Sure.

 7              THE COURT:  And then we'll stop right at that point

 8    in time.  So the timeline -- the time allocation I give you is

 9    the same time allocation I give to defendant, but you can

10    split yours.  The defendant's all going to get the same time.

11        Now, as to the -- I haven't thought about the Township.

12    But I will.

13              THE COURTROOM DEPUTY:  All rise.  This court stands

14    in recess.

15        (Court adjourned at 5:26 p.m.)

16

17

18

19

20

21

22

23

24

25
```

1                        CERTIFICATE OF REPORTER

2

3        I, Mary A. Schweinhagen, Federal Official Realtime

4  Court Reporter, in and for the United States District Court

5  for the Southern District of Ohio, do hereby certify that

6  pursuant to Section 753, Title 28, United States Code that the

7  foregoing is a true and correct transcript of the

8  stenographically reported proceedings held in the

9  above-entitled matter and that the transcript page format is

10  in conformance with the regulations of the Judicial Conference

11  of the United States.

12

13  s/Mary A. Schweinhagen

14  _____ 21st of December, 2023

15  MARY A. SCHWEINHAGEN, RDR, CRR
      FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*