1560

1
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
2
AT DAYTON

3
_____
)
ROGER DEAN GILLISPIE,                )
4                                     )
                  Plaintiff,         ) CASE NO. 3:13-cv-416-TMR
5                                     )
                  -vs-               )
6                                     )
THE CITY OF MIAMI TOWNSHIP, ET AL.,) JURY TRIAL
7                                     )
                  Defendants.        ) VOLUME X
8  _____)
                  TRANSCRIPT OF PROCEEDINGS
9           THE HONORABLE **THOMAS M. ROSE,**
         UNITED STATES DISTRICT JUDGE, PRESIDING
10            FRIDAY, NOVEMBER 18, 2022
                     DAYTON, OH
11

12  **For the Plaintiff:       MICHAEL KANOVITZ, ESQ.**
                              **DAVID B. OWENS, ESQ.**
                              **MEGAN C. PORTER, ESQ.**
13                            Loevy & Loevy
                              311 N. Aberdeen Street
14                            3rd Floor
                              Chicago, IL  60607
15

16  **For the Defendant        JOHN T. McLANDRICH, ESQ.**
    **Matthew Scott Moore:      DAVID J. SIPUSIC, ESQ.**
                              Mazanec, Raskin & Ryder Co., LPA
17                            3305 Solon Road
                              100 Franklin's Row
18                            Cleveland, OH  44139

19  **For the Intervenor       DAWN M. FRICK ESQ.**
    **Miami Township:           CHRISTOPHER T. HERMAN, ESQ.**
20                            Surdyk, Down & Turner Co., LLP
                              8163 Old Yankee Street
21                            Suite C
                              Dayton, OH  45458
22

        Proceedings recorded by mechanical stenography,
23  transcript produced by computer.
                    **Mary A. Schweinhagen, RDR, CRR**
24              Federal Official Court Reporter
                    200 West Second Street
25                    Dayton, OH  45402
                    *** *** *** ***

1   Courtroom Deputy:  Elizabeth Penski

2   Law Clerks:  Michael Mayer, Callum Morris

3   Also Present:  Roger Dean Gillispie, plaintiff; Valerie
    Barajas, paralegal; Matt Thibodeau, paralegal; Jeff Weber, IT

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        P-R-O-C-E-E-D-I-N-G-S                    9:00 A.M.

 2        (In open court outside the presence of the jury at 9:18

 3   a.m.)

 4             THE COURT:  Good morning, counsel.

 5             RESPONSE BY ALL:  Good morning, Your Honor.

 6             THE COURT:  We are on the record in the case of

 7   Roger Dean Gillispie versus Miami Township, et al.,

 8   3-13-cv-416.  We're on the record outside the presence of the

 9   jury.

10        Counsel, I just wanted to meet a few minutes to do some,

11   I would consider, housekeeping and maybe some rulings.

12        First thing I want to confirm with counsel is that -- I

13   don't know whether we actually put this on the record -- but

14   at the end -- at the close of all the cases where plaintiff

15   and defendant rested, it is my understanding that there was no

16   further request for any additional witnesses, correct?

17             MR. KANOVITZ:  Correct.

18             MR. McLANDRICH:  Yes, sir.

19             MS. FRICK:  Yes, Your Honor.

20             THE COURT:  All right.  The other thing I need to

21   confirm is that during, I believe, some meetings, there was an

22   agreement between the parties with regard to a Stipulation

23   Number 4, specifically agreed to drop Stipulation Number 4,

24   and I guess what I would ask is do all parties agree on that?

25             MR. OWENS:  That's right, Your Honor.
```

1    MR. McLANDRICH:  Yes, sir, Your Honor.

2    MS. FRICK:  Yes, Your Honor.

3    THE COURT:  And that's the "held in custody awaiting

4    trial," correct?

5    MR. OWENS:  Correct.  And it was just given the

6    other change to the stipulation.

7    THE COURT:  I understand.  I understand.  But that

8    was dropped.  Everyone's in agreement?

9    MR. McLANDRICH:  Yes, sir, Your Honor.

10   THE COURT:  Now, the other thing I need to confirm

11   is we had a discussion about the new -- the stipulation that

12   has been now incorporated into the jury instructions.

13   Initially, it was, I believe, submitted with regard to certain

14   exhibits, but it's my understanding that the new stipulation

15   extends to Plaintiff's 59, page 16; Plaintiff's 285, 6, 7, 9,

16   and 10; Defendant's 18, page 1 through 3; Defendant's 19, page

17   1 through 3; and Defendant's 22, page 1 through 3.

18   MR. OWENS:  Can I get those again, Your Honor?

19   THE COURT:  Do you want them all?

20   MR. OWENS:  I have the first one.  Just the second

21   one.

22   THE COURT:  Well, Plaintiff's 59, page 16.

23   MR. OWENS:  Got that.

24   THE COURT:  Plaintiff's 285, 6, 7, 9, and 10.

25   MR. OWENS:  With respect to 285, 9 and 10, I don't

```
 1    think that that would fall within the reach of the
 2    stipulation.  Those are not the images that were used in the
 3    photo array.
 4              THE COURT:  All right.  So it does not include 9 and
 5    10, right?
 6              MR. OWENS:  Correct, Your Honor.
 7              MR. McLANDRICH:  Agreed, Your Honor.
 8              THE COURT:  How about the defendant's exhibits?
 9              MR. McLANDRICH:  I'm sorry.  What were those numbers
10    again for defendant?
11              THE COURT:  Defendant's 18, 1 through 3; 19, 1
12    through 3; 22, 1 through 3.
13              MR. McLANDRICH:  No, I don't think it applies to
14    those either, Your Honor.
15              THE COURT:  None of those?  Didn't you indicate
16    there were certain pictures that do apply to?
17              MR. McLANDRICH:  So I believe it would be -- let me
18    just pull it up and I can tell you what page number.  I'm
19    sorry.
20              MR. OWENS:  Your Honor, I think with respect to 18,
21    19, and 22, there is a dispute about, or I'll just say, the
22    evidence is not entirely clear as to when those were created,
23    if those pictures were taken at the time or at some point
24    later, but I don't think it's the subject of a stipulation
25    that we were going to agree to.
```

```
1        I did mention that the stipulation may cover the black-
2   and-white photographs, but after further conferring, I think
3   we decided to just leave the genesis and what those represent
4   for argument.  And so the main issue was that the color
5   pictures that were in the exhibits that we've already agreed
6   on were not the ones as they appeared to the witnesses.  So I
7   think --
8             THE COURT:  Bottom line, you're saying that 18, 19,
9   and 22 are not part of the stipulation?
10             MR. OWENS:  We're fine doing that.  I doubt that
11  they are.
12             MR. McLANDRICH:  I think we're okay with that, Your
13  Honor.
14             THE COURT:  18, 19, and 22?  I'm not trying to
15  convince anybody.  I just want to know what you agree on.
16             MR. McLANDRICH:  They are not part of the
17  stipulation.
18             THE COURT:  What?
19             MR. McLANDRICH:  They are not part of the
20  stipulation.
21             THE COURT:  Well, if they are not part of the
22  stipulation, they are not part of the stipulation then.
23        So the stipulation includes Plaintiff's 59, page 16; 285,
24  6 and 7.
25             MR. OWENS:  Correct, Judge.
```

```
 1              THE COURT:  That's it?

 2              MR. McLANDRICH:  Yes, sir.

 3              THE COURT:  As to Plaintiff's Exhibit, proposed

 4    Exhibit 254, the Court sustains the objection.  It will not be

 5    admitted.

 6         Counsel, it is the obligation of the respective counsel

 7    to make sure with regard to all exhibits that have been

 8    admitted and will be going to the jury that any and all

 9    personal identification information is redacted from those

10    exhibits.

11         Is it counsel's plan to submit a thumb drive of all

12    exhibits for the jury?

13              MR. OWENS:  It can be if you'd like it to be.

14              MR. McLANDRICH:  Yes, we're happy to do that if you

15    like.

16              THE COURT:  Can we do that all on one thumb drive?

17              MR. OWENS:  Yeah.  We'll get it.

18              THE COURT:  There's also -- there's also the hard

19    copies of, my understanding, that you've all redacted; is that

20    correct?

21              MR. OWENS:  Yes, Judge.

22              MR. McLANDRICH:  Yes, Your Honor.

23              THE COURT:  Okay.  Backing up, DX 18, 19, and 22.  I

24    don't have my list.  Those were proposed and admitted?

25              MR. McLANDRICH:  Yes.
```

1    THE COURT:  Or subject to any argument, whatever.
2  All right.
3       With regard to the objections previously registered to
4  the jury instructions as we reviewed yesterday, the Court is
5  overruling those objections.
6       With regard to the proposed additional jury instruction
7  that the Court received late last night, I believe that's
8  Document 470, to the extent the Court should, it has
9  considered plaintiff's additional proposed jury instruction,
10  and they are overruled.
11      The Court, however, has, pursuant to the parties'
12  agreement of dropping the third claim, Destruction of
13  Evidence, after re-reviewing the intervenor issue instruction
14  and the Ohio statute at issue, the Court is modifying a few
15  words in the numbered portions of the intervenor issue
16  instruction to both correspond with the instruction's first
17  paragraph and the statute.
18      That having been said, the Court has provided counsel
19  with a copy of the updated instructions with all of those
20  modifications and changes.  Has the Court [sic] had ample
21  opportunity to review those?
22          MR. OWENS:  You mean the parties, Your Honor?
23          THE COURT:  What did I say?
24          MR. OWENS:  "The Court."
25          THE COURT:  I mean the parties.

```
 1              MR. OWENS:  Yes, Judge, and we have -- we object to

 2    the language in Number 29.

 3              THE COURT:  All right.

 4              MR. OWENS:  And just to be clear, we object to

 5    Number 29 for the reasons stated on the record and in the

 6    document that we filed last night that this Court has already

 7    addressed.

 8              THE COURT:  Thank you.

 9              MS. FRICK:  Are you waiting on us, Your Honor?

10              THE COURT:  Yes, I am waiting on defendant and

11    intervenor.

12              MR. McLANDRICH:  With respect to the change for the

13    intervenor claim, no objection, Your Honor.

14              THE COURT:  How about any -- any of the

15    modifications the Court has made subsequent to the last

16    meeting we had yesterday?

17              MR. McLANDRICH:  No new objections, Your Honor.

18              THE COURT:  Intervenor?

19              MS. FRICK:  No new objections, Your Honor.

20              THE COURT:  The Court would overrule the objection

21    of the plaintiffs.

22         We are to the point, counsel, where we are ready to

23    proceed with closing arguments.  Just for the purposes of me

24    thinking about it, how much time is being requested?

25              MR. KANOVITZ:  For the intervenor?
```

1        THE COURT:  No, for you.

2        MR. KANOVITZ:  Oh, for plaintiff.  With rebuttal?

3   Or just for the direct?

4        THE COURT:  With your entire time allocation which

5   the Court allows to be split.

6        MR. KANOVITZ:  We'd like an hour and a half.

7        THE COURT:  Well, whatever they get, you're going to

8   get.

9        MR. McLANDRICH:  All right.

10       THE COURT:  I mean, I don't require people to take

11  it all.

12       MR. McLANDRICH:  I'm sure I won't, Your Honor.

13       THE COURT:  Intervenor, do you want to say anything?

14       MS. FRICK:  I don't need an hour and a half.

15       THE COURT:  Here's what we'll do.  Counsel,

16  plaintiff and defendant will be given an hour and a half.  I

17  will time it.  I will give you warnings within five, ten

18  minutes of the end of your time.  I need to know from

19  plaintiff how you wish to divide that.

20       MR. KANOVITZ:  I think our plan would be to divide

21  it approximately an hour 15 and 15, but if we are able to

22  finish the direct earlier, we'd like to reserve the remainder

23  for rebuttal.

24       THE COURT:  So an hour and 15 and 15.  You want an

25  hour and you're either going to -- I'll make the determination

```
 1    of how much you have at the end after I find out what you
 2    take, but your request is an hour and 15 on direct?
 3              MR. KANOVITZ:  Yes.
 4              THE COURT:  All right.  I'll do the same with you
 5    folks.  I'll just give you a warning if you approach -- if you
 6    approach that hour and a half, hour and a half, 30.
 7        Any questions?
 8              MR. KANOVITZ:  No, Your Honor.
 9              MR. McLANDRICH:  No, Your Honor.
10              MS. FRICK:  Your Honor, just the question of whether
11    we will have any rebuttal.
12              THE COURT:  Will the 30 minutes give you enough time
13    for your rebuttal?
14              MS. FRICK:  I believe so, yes, Your Honor.
15              THE COURT:  You will be given an opportunity to have
16    a short rebuttal.
17              MR. McLANDRICH:  So, Your Honor?  I'm sorry.
18              THE COURT:  Yeah.
19              MR. McLANDRICH:  I presume that when the Township
20    closes, my hour and a half will be split between responding to
21    plaintiff and responding to the Township, or how do you see
22    that?  I highly doubt it will take an hour and a half
23    responding to the plaintiff.
24              THE COURT:  Correct.
25              MR. McLANDRICH:  Thank you.
```

1       THE COURT:  So it will be plaintiff, defendant,

2  intervenor, back to plaintiff, and I guess intervenor for a

3  few minutes.  Right?

4       MR. McLANDRICH:  It would seem to me, Your Honor,

5  plaintiff, defendant, plaintiff, intervenor, defendant,

6  intervenor.

7       MR. KANOVITZ:  Everybody in this room --

8       MR. McLANDRICH:  Because plaintiff doesn't speak to

9  the intervenor.  They are not a part of that claim.

10       MR. OWENS:  Actually, we do.

11       MR. McLANDRICH:  You are not a part of that claim.

12       MR. KANOVITZ:  Regardless, my understanding would be

13  it would go plaintiff, defendant, intervenor, plaintiff,

14  intervenor.

15       MR. McLANDRICH:  That didn't include defendant

16  responding to intervenor.

17       MR. KANOVITZ:  Oh, I see.

18       THE COURT:  That's what I said to begin with.

19       MR. KANOVITZ:  I misunderstood.

20       THE COURT:  What are you proposing, counsel?

21       MR. McLANDRICH:  What I was proposing is plaintiffs

22  put on close.  We respond to their close in case-in-chief.

23  Plaintiff does their rebuttal to our close on the case-in-

24  chief.  Intervenor presents their closing.  We respond to

25  intervenor's closing.  Intervenor does its rebuttal to our

1  close to their intervention claim.

2         MR. OWENS:  I think we would object to that.  I

3  think the only modification to what the Court suggested

4  previously is that it would be plaintiff, defendant,

5  intervenor, back to defendant, then plaintiff, then

6  intervenor.  So they get a chance to respond.  I understand

7  that's what -- but I think fairly this is -- that's our

8  proposal.

9         THE COURT:  Intervenor, do you have any thoughts?

10        MS. FRICK:  I mean, frankly, I think the one that

11 John has proposed, or Mr. McLandrich, probably works best.

12        THE COURT:  Give me a second.

13     (Pause.)

14        THE COURT:  The way we will proceed here is as

15 follows:  Plaintiff, defendant, intervenor, defendant,

16 plaintiff.

17        MR. KANOVITZ:  No objection from plaintiff.

18        THE COURT:  Intervenor?

19        MS. FRICK:  Well, Your Honor, you had previously

20 said that we would have an opportunity to rebut, and that

21 doesn't provide us that opportunity.

22        THE COURT:  Plaintiff, defendant, intervenor,

23 defendant, intervenor, plaintiff.

24        MR. KANOVITZ:  No objection.

25        THE COURT:  You've got a rebuttal.

```
 1            MS. FRICK:  Okay.  I don't think --
 2            THE COURT:  Did I do that wrong?
 3            MS. FRICK:  You did it differently that time.
 4            THE COURT:  It's a moving target.
 5            MS. FRICK:  So just to be clear, plaintiff will be
 6  the last?
 7            THE COURT:  Plaintiff will be the last.  Plaintiff
 8  is -- they will be the first and the last.
 9       Counsel for defendant?
10            MR. McLANDRICH:  I don't think plaintiff should be
11  heard on the intervention claim whether or not a party to it.
12  That's not my position.
13            MS. FRICK:  Your Honor, I would just agree with that
14  objection.
15            MR. KANOVITZ:  Your Honor, the intervenor claim has
16  the ability to, you know, they're talking about bad faith,
17  we're talking about mens rea.  We have to be able to address
18  it.
19            THE COURT:  We'll proceed as I've indicated.
20       Counsel, I think my schedule with regard to this would
21  be, I would like to go through -- we'll break between some of
22  these.  We'll take a break and let the jury get a breath.
23  Hopefully, by the time we are done with that time allocation,
24  we will break for the lunch hour.  It will be a late lunch
25  hour, but we'll break.  The Court will then come back and give
```

1574

 1    the instructions of law.

 2        We are planning on conducting a regular day.

 3        All right.  Bring the jury in.

 4        (Jury in at 9:46 a.m.)

 5            THE COURT:  Everyone be seated.

 6        Ladies and gentlemen of the jury, welcome back.  I

 7    apologize for the tardy start here this morning, but, again,

 8    as I've asked you to understand and be patient with, the Court

 9    needs to deal with certain things outside your presence.

10        The posture of the case -- first, let me ask you this:

11    Everybody was able to abide by their admonitions, correct?  No

12    one wasn't able to do that?

13        (No verbal response.)

14            THE COURT:  The posture of the case at this point in

15    time is that the parties have rested.  The evidence

16    presentation has concluded.  As I indicated to you at the

17    beginning of the trial, the trial proceeds in certain phases.

18        As you remember, the trial started with the opening

19    statements of counsel.  The opening statements of counsel, of

20    course, were not evidence, but they were their -- the parties'

21    opportunity, to talk to you about what they believe the

22    evidence would show.  Of course, now we've had a number of

23    days of presentation of evidence.

24        With that concluding, we now proceed to the stage of

25    final argument.  Again, the arguments that will be offered by

1  the parties are not evidence.  The evidence is that which the

2  Court admitted and was presented between that opening

3  statement and this final argument.  But the distinction

4  between that opening statement and the final argument is the

5  fact that, although, as I indicated, the opening statement was

6  what the parties believe the evidence will show, final

7  argument is indeed that; it's an argument by counsel as to

8  what they believe the evidence has shown.  Again, not

9  evidence, but an argument.  A summation of what they believe

10 the evidence will show -- or the evidence has shown.

11      So please give counsel your undivided attention for their

12 presentation.

13      Counsel ready to proceed?

14          MR. KANOVITZ:  We are, Your Honor.

15          MR. McLANDRICH:  Yes, sir, Your Honor.

16          MS. FRICK:  Yes, Your Honor.

17          THE COURT:  All right.  Plaintiff.

18      And it's my understanding one hour and fifteen minutes?

19          MR. KANOVITZ:  Yes, Your Honor.

20          THE COURT:  Thank you.

21          MR. KANOVITZ:  May it please the Court, counsel,

22 counsel.

23      Ladies and gentlemen, good morning.  We've been together

24 now for essentially two weeks.  We've seen a lot of evidence.

25 We've seen testimony.  We've seen documents.  We've heard from

1    experts.  We've seen impeachment with testimony that people

2    gave prior to this trial.  And that part of the case is over,

3    and this is now my opportunity and my privilege to speak to

4    you from the heart about what I saw in this trial and what I

5    believe you saw in this trial.

6        And this has been very much a trial about matters of the

7    heart, and we're going to go through it this morning.

8        The first thing I want to say from my heart, though, is

9    thank you.  I thank you for your service as a jury.  You

10   didn't -- you didn't get a choice about whether to be here.

11   You were summoned.  But you had a choice about how you showed

12   up.  And I saw you paying attention.  And I believe that

13   through the course of hearing the evidence, you've thought

14   critically.  You've managed to open your mind to something

15   that a lot of people don't realize happens, and that's that

16   wrongful convictions happen.  And you managed to open your

17   hearts to the way that those wrongful convictions damage the

18   victims, damage their families, damage the communities that

19   love them.

20       And in treating this case with critical thought and with

21   attention, you're doing a great service.  You are helping to

22   protect our democracy.  It is exactly what the founders of

23   this country hoped for and expected when they put the jury

24   system into the Constitution.  They wanted the people to be

25   available to protect the people's rights.  And we're fortunate

1577

1    as Americans, we have a wonderful Constitution; it assures us
2    a lot of rights.
3        But what we've seen is that there is an exception. You
4    know, you get -- you get great freedoms in this country unless
5    and until you're convicted. And that's why the right to a
6    fair trial is so important, because if you're convicted, the
7    government can take away your rights. They can take away your
8    freedom. And not just your physical freedom, your freedom to
9    be with your family, your freedom to start a family of your
10   own if you so choose. It can drain your resources till you
11   have nothing.
12       And it's vital that before we as a nation let that happen
13   to people, if our Constitution is going to have meaning, there
14   has to be a fair trial, and that's why the right to a fair
15   trial is in the Constitution, the United States Constitution.
16   That's why we are in a federal court of the United States;
17   that's why you are a federal court jury, is because our system
18   is designed to protect the right to a fair trial. And this is
19   the process that we go through.
20       Now, the first thing I'm going to talk about is
21   innocence. And innocence is, it's a funny kind of blessing
22   because in order to enjoy its benefits, you have to be able to
23   take it for granted. You know, in this country, you don't
24   have to walk around constantly trying, you know, proving that
25   you are innocent in order to enjoy your rights. You know, you

1578

1    don't meet somebody for the first time and have to say, hey,

2    before you judge me, just so you know, I'm innocent; or walk

3    into a bank and the teller looks at you funny and whoa, whoa,

4    I just want you to know I didn't do it.  Your innocence is

5    presumed.  You get to take it for granted.

6         But for 33 years Dean Gillispie has not gotten to take

7    that for granted.  He's an innocent man who for 30 years has

8    had to proclaim his innocence every day.  And his family's had

9    to proclaim it, and his friends have had to proclaim it.  And

10   that's not how it's supposed to work.

11        And the reason why Dean has had to do that is the fault

12   of one man:  Matthew Scott Moore.  And I'm going to be talking

13   today about what went wrong, why you have to correct it and,

14   you know, what I think your verdict should be.  And as I start

15   to, you know, lay out the case for why Dean is innocent, when

16   it's my turn to proclaim his innocence -- and I am hoping that

17   this is the last time anybody needs to do that because you're

18   going to issue a verdict that tells the world that Dean

19   Gillispie is innocent.

20        Okay.  I have ten reasons -- well, I have way more than

21   ten reasons.  I have ten categories of things that you should

22   be talking about on the topic of Dean Gillispie's innocence,

23   and the first category is Exhibit A, Dean Gillispie himself.

24        You spent two weeks in this trial.  You know, you had a

25   chance to see Dean testify.  You've met his family.  You've

1    met his friends.  You have some understanding of the measure

2    of this man, and you know that he does not have the darkness

3    in him that it takes to prey on another human being.

4         What have you heard about Dean Gillispie?  You've heard:

5    He's the greatest guy in the whole wide world.  You've heard:

6    Dean is the sort of person that will do anything for anybody.

7    You've heard:  My parents love Dean, and my dad felt safe when

8    I was with Dean.  Dean is not the person who did these crimes.

9         You also know that Dean's character has been tested

10   through fire.  He told you, "I got sent to one of the worst

11   places on earth."  Warren Correction, near max security, 70

12   percent of the people are never going home, and that place is

13   the jungle.  People don't care.  They can't -- you know, how

14   many life sentences can you give them?  There's no humanity

15   there.

16        But Dean Gillispie kept his humanity.  In the midst of

17   all of that, he found art.  He created beautiful things.  He

18   donated them so money could be raised for charity at a time

19   where he was making $24 a month.  He built dollhouses for the

20   children's home out of the found materials that were available

21   to him.

22        And he came out of it as a person who now has his

23   precious freedom again.  And what does he do with it?  He

24   spends his time advocating for other people who have been

25   wrongfully convicted, making sure that they have the resources

1   that they need when they get out.  That is not the person that

2   Matthew Scott Moore wants you to believe that he is.  He's a

3   person that deserves our respect, and he's a person that

4   deserves Matthew Scott Moore's respect.

5        Exhibit B is Dean's family.  You met Juana and Roger.

6   They are what Attorney General Jim Petro described as the salt

7   of the earth.  Kind, reliable, honest.  They raised four kids.

8   They love them all.  They did not raise a monster.  You know,

9   they did not spend their golden years fighting for a kid

10  who -- a parent would know what their character is.  They

11  didn't spend every penny they have fighting for a kid that

12  didn't deserve it.

13       Roger didn't work three jobs for that reason.  Juana, you

14  know, fought every moment.  And a mother knows her children's

15  character.  She knows who her children are.  And she never

16  gave up.  She fought with everything she had, including

17  physically.

18       Matthew Scott Moore wants you to believe that there is a

19  stain on their family's name.  I want you to issue a verdict

20  that says that that's not true.

21       The next reason you know Dean's not guilty were Dean's

22  friends.  You met some of them.  And to a person, they are

23  warm, wonderful people.  They are a testament to Dean that

24  people like that love him.

25       You met Marie Woods, a woman who hasn't seen Dean in 30

1581

```
1    years but knew it was important to take time out of her

2    vacation with her husband to come here and tell you the truth

3    and show you her calendar.

4         You met Jerry Fyffe, now Pastor Fyffe.  He felt a

5    calling.  He's built 160-person church.  He didn't come to

6    trial to lie on behalf of somebody who preys on women.  He was

7    with Dean on the weekend of August 20th, and he told you what

8    it was like it is.

9         Scott Bowling, a former police officer who breaks down

10   into tears when he thinks about the potential that was lost

11   when his friend Dean was sent -- was kidnapped.  It hurts him

12   to think about what Dean's life would have been and what he

13   would have contributed to his community was he not taken away.

14        He told you, "Dean's not a smoker.  He kicked me out of

15   his truck when I was a kid for smoking."  He should believe

16   it.

17        Jim Petro, former AG of the State of Ohio.  The highest

18   law enforcement official in this state drove all the way from

19   Florida with his wife just so he could spend ten minutes to

20   speak to you on behalf of Dean.  That tells you who the

21   measure of this -- what the measure of this man is.

22        You heard from Lisa Glasser, somebody who lost touch with

23   her friend Dean when he was wrongfully convicted.  Got

24   married, and her life went on.  Well, she came here to tell

25   you, despite all of that, that even though she lost touch with
```

1582

1    him many years ago, she was with him on August 5th; and she

2    wanted you to know what kind of person he was, how good of a

3    person he is.

4        You heard from Richie Winters. He spent 20 years

5    visiting Dean as often as he could, eventually bringing his

6    children when he was old enough. And why did he do it?

7    Because that's what friends do. And the dedication that a

8    person like Richie shows to Dean is a testament to both of

9    them. You didn't do that for somebody who has the character

10    that Matthew Scott Moore wants you to believe that Dean has.

11        You heard from Brian Poulter, a man who is like a brother

12    to Dean. He honored Dean at his wedding. He too went and

13    visited Dean as often as was possible for two decades. Also

14    brought his kids. And he wanted you to know that he was with

15    Dean on the 5th and he was with Dean on the 20th because they

16    were tight and they were always together. And he wanted you

17    to know what it felt like to receive a hug from Dean when he

18    would visit him and his perception that, you know, Dean was

19    hugging him like he might never see him again and what that

20    meant for the environment that Dean was living in.

21        You heard from Jim Osborne, twice decorated veteran, who,

22    you know, saw the potential of a 15-year-old boy and wanted to

23    help him achieve his potential and would have had it not been

24    for the tragedy that brings us here.

25        You heard from Mark Godsey, the man who started the Ohio

1583

1    Innocence Project and who thankfully freed Dean.  Told you,

2    you know, Dean's never going to have kids.  But what did he do

3    with the organization that he gave birth to?  He put Dean in

4    charge of it.  He did that because of the character of this

5    man and the incredible energy that he's capable to bring to

6    bear when it comes to taking care of other people.

7         Matthew Scott Moore wants you to believe that all of

8    these good people are involved in a massive conspiracy to free

9    a rapist and a kidnapper, and that is absurd.  That is a

10   fantasy that he created in his own head because he's too

11   arrogant and narcicisstic to look and see what you saw and see

12   the truth.  He only believes what he decides in his own head,

13   and he believes that if he thinks it, it must be true.

14        Well, it isn't true.  You've seen the truth, and you need

15   to issue a verdict that says what that truth is:  Dean

16   Gillispie is innocent.

17        His friends are good people.  The truth has been told to

18   you.  It has been told to two juries.  And Dean did not

19   receive a fair trial.

20        Next reason why you know Dean is innocent.  Dean has

21   never wavered, not once.  When he was interviewed with Moore,

22   he said, "I'm ready to take a polygraph."  When he went

23   through his first trial, they came to him and they said, "You

24   know what?  We've seen the evidence; you've seen the evidence.

25   The jury's deliberating, how about you just agree to 30 days

1   and that will end this?"

2        And Dean was looking at 56 years.  And you know what he

3   said to his 30 days?  He said, "30 days, 30 minutes, 30 years,

4   it doesn't matter.  I didn't do this."  And for 33 years he's

5   had to say, "I didn't do this."  And it's time for that to

6   stop.  It's time for you to issue a verdict that puts that

7   behind him.

8        You know, even when it came up for parole, he spent 16

9   years in hell at that point.  And they said, "Sir, just show

10  remorse.  Admit that you're wrong."

11       And he stood by the truth and he said, "I won't do that,"

12  knowing that he had 40 more years to go.

13       Matthew Scott Moore wants you to believe that when Dean

14  says "I didn't do it," he's lying.  You need to issue a

15  verdict that says Dean's not lying.  Dean is showing the

16  highest dedication to the truth at grave personal loss.  And

17  we need to respect that.

18       Next way you know Dean's innocent.  Dean wasn't there.

19  August 5th, he's with Brian.  They're driving around in the

20  new convertible.  They go to Lisa's house.  And eventually

21  it's Friday night.  They go to Bourbon Street for the $1.50

22  Long Island iced teas.

23       And we have Marie's calendar here.  You know, she doesn't

24  claim to be with him on the 5th, but she saw him on the 4th --

25  could you zoom in please.  She saw him on the 4th.  She saw

1    him on the 6th at Lisa Glasser's party.  And she said, "You

2    know what?  His hair wasn't dyed on the 4th.  His hair wasn't

3    dyed on the 6th.  His appearance didn't change."

4         And if, in fact, Moore was right and there was this grand

5    conspiracy to lie for a rapist and a kidnapper, a serial

6    rapist and a kidnapper, then why isn't Friday the 5th filled

7    out?  That is Exhibit A to the honesty of Dean and the honesty

8    of the people who testified on his behalf.

9         And you know what?  Matthew Scott Moore looks at that and

10   he says, "Uh-Huh.  There's nothing for the 5th.  I know Dean

11   did it."  That is glaring evidence of innocence and truth

12   staring at us in the face.  But Matthew Scott Moore can't see

13   that.  Matthew Scott Moore has blinders on.  Matthew Scott

14   Moore has tunnel vision.  He does not have the temperament

15   that a detective should have, and the tragedy that happened

16   here is a direct result.

17        August 20th.  August 20th, Dean's at the lake.  He's

18   there with Jerry Fyffe, now Pastor Fyffe; he's there with

19   Brian.  And we have Homer 's calendar.

20        Could you pull it up, please.

21        They told you the story:  You know, I wasn't accused

22   falsely of this crime for two years after it happened, but

23   when I was accused falsely, I went around and I asked

24   everybody I could, Where were we?  Where were we?  Where were

25   we?  And, fortunately, Jerry and Homer have this calendar.

1    And, again, if they were going to fake it, this calendar would

2    look really different.  This is truth.  This calendar is

3    truth.

4          And, you know, on the 20th the dog had pups, and they

5    returned back from the lake in the afternoon like they usually

6    do, and they picked up the dog and the pups because it was hot

7    outside and they took them to the basement.  And they

8    remembered that, and they testified truthfully about that.

9          Here's the next reason you know Dean didn't do it.  Dean

10   didn't match.  First of all, he didn't match this crime.  Dean

11   had no criminal record.  The man who committed this crime was

12   a hardened criminal.  He abducted women at gunpoint in

13   daylight.  That is brazen.  He abducted two women and raped

14   two women at once.  You heard from a seasoned detective that

15   that's unheard of.  This is a hardened criminal.  That is not

16   Dean Gillispie.  Whoever committed this crime didn't get there

17   because they just decided on that particular day they were

18   going to go do it.  This is somebody who did it before and who

19   did it again.

20         You know, another way Dean didn't match -- we heard about

21   it a number of times -- his hair.  His hair was dark brown.

22   He was graying around the temples.  And, you know, you had --

23   could I have the descriptions from the three?

24         The three women at the time of the events in question

25   here, they described, while their memories were still good,

1    what the guy had looked like.  And we had a red hair that's

2    brownish.  We had orangish-brown hair.  And we had light-

3    colored/blondish hair.  None of those -- obviously, all three

4    women are describing the same guy, and they are describing it

5    from their perspective, but none of those described Dean.

6    None of them said dark brown hair.  None of them said graying

7    at the temples.

8         Can we have the -- thanks.

9         This is Dean in that time frame.  You know, you heard

10   about it:  The people in his family go gray prematurely.  This

11   guy is gray.  This guy has dark brown hair, very dark brown

12   hair.  Dean doesn't match the hair.

13        Next thing he didn't match -- you can take that down --

14   is Dean doesn't match the tan.

15        Could we have the description back up, please.

16        All three women, you know, remarked that when they are

17   trying to identify this guy, the tanning, the skin color stood

18   out to them.  Very, very tanned face.  And Dean, as you know,

19   he's fair skinned.  You know, he wears a shirt when he goes

20   swimming at the lake because he burns.  Jerry Fyffe said, "Oh,

21   yeah, he'd look like a big lobster when he got in the sun."

22   That's not Dean's complexion.  Dean doesn't match.

23        You know, they pulled a -- they showed you this picture

24   of Dean, you know, the defense did, where he's posing with

25   Brian at the prison.  And they're like, "Oh, doesn't he look

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1 tan?" Well, take a look at that picture. It's a cheap photo

2 taken in a prison. The colors are off. It is stained.

3 Dean's not tanned. And look at Brian. Brian is darker in

4 that picture than Dean. And then go compare it to the picture

5 of Brian's wedding, and you will see that he is fair-skinned

6 and that picture doesn't prove anything.

7   Next thing -- next way Dean doesn't match is he doesn't

8 match the clothes. You know, the women described what this

9 perpetrator was wearing. It was high tops. It was a hip hop

10 shirt. It was a gold chain with a medallion. And that's not

11 Dean. Dean wears button-down shirts and jeans and cowboy

12 boots because that's who he is.

13   And when Matthew Scott Moore went and searched his

14 apartment, or his house, he didn't find any of those things:

15 No gold chain, no high tops, no silver gun that was described

16 by the victims. None of it. Because Dean didn't do it.

17   Another way he doesn't match is the hair samples. You

18 know, the -- between the first trial and the second trial,

19 they found the hairs that were taken from the sweaters of B.W.

20 and C.W. And there were hairs. There was pubic hair, and

21 there were head hairs. And none of them matched Dean. And

22 those head hairs were the color that the women described. It

23 was a light brown color that didn't match Dean. It didn't

24 match C.W. It didn't match B.W. You will have the exhibit.

25 They went and apparently tested hairs from a couple other

1    people.  It didn't match.  It wasn't Dean.

2        You got the tattoo.  You know, Moore questioned him about

3    the tattoo, said let me see your arms when he -- when Dean

4    came down for the interview.  He wouldn't be asking that if

5    one of the women didn't remember tattoos.

6        You got the pant's size, you know, we no longer have the

7    reports, but when Fritz and Bailey, you know, dotted their i's

8    and crossed their t's and investigated this, they excluded

9    Dean, and one of the things they can remember all these years

10   later is that the pant size.  The pant size didn't match.  It

11   was too small to be Dean's waist.

12       And you heard from Lieberman.  He identified 55

13   differences between Dean and this perpetrator.  And he said,

14   you know, some of them are small, some of them are big, but

15   under no circumstances did Dean match.  Dean is innocent.

16       The next way you know that Dean is innocent is that

17   Mr. Cobb does match.  You saw the picture.  This guy has

18   orangish-brown hair.  This guy, because of his heritage, has

19   the characteristics of both dark complexion and light hair.

20   This man commits atrocities against women.  This man is a

21   serial criminal.  This man impersonates police officers in

22   order to kidnap.

23       So -- and also you heard the testimony from Mark about

24   when Nancy Petro, Jim Petro's wife, was comparing the

25   composite to the face and she folded them in half, he matched

1   the composite. And, you know, you can print those up. You

2   can do that when you're deliberating. Take a look.

3        Next way you know that Dean didn't do it. The science.

4   You know, you heard from -- you heard from Dysart. You heard

5   from Wixted. You know, Wixted, you know, you know likes to be

6   a contrarian. That's how he sees himself in the field. But

7   they both essentially told you all the same things. It's just

8   a question of the spin that got put on it.

9        After two years -- I'm sorry. After 11 months, 11

10  months, 93 percent of identifications pick an innocent person.

11  And that's done under experimental circumstances. It is

12  controlled. We know now from DNA exonerations what went

13  wrong. Two years is an extraordinarily long time to ask a

14  witness to make an identification, particularly under the

15  circumstances of this -- you know, of these crimes.

16       You know, we had sunglasses. The faces matched.

17  Presence of a gun. High stress situation.

18       You know, well, I'm going to talk a lot more about the

19  identification in just a little bit, but, you know, we have

20  contamination. We have the fact that, you know, C.W. was not

21  able to make an identification. She took two minutes.

22  Remember that 10- to 12-second rule? If you're going to

23  recognize somebody, you might have to look at them for a

24  minute -- or for a couple seconds, stare at them, but if

25  you're going to recognize them, you recognize them.

1    Two minutes is not a recognition. Two minutes is not an

2    identification. And Moore, he didn't reveal it, but he read

3    her that sentence. And you only read that sentence when a

4    person's not able to make an identification because you're

5    looking for second best. Second best: Does anyone here

6    resemble. Resemble's not identification.

7    You know, there was contamination. You know, C.W. --

8    Moore let C.W. contaminate B.W. He told them, you know,

9    before they went into court that Dean dyed his hair. The

10   science says all of these things are exactly what causes the

11   tragedy of a misidentification and a wrongful conviction.

12   The next way you know Dean didn't do it is the Ohio

13   Innocence Project took the case. Took it all the way. You

14   heard -- you heard from Mark. You know, his organization

15   exists to free people, and it survives only on donations. And

16   they are not going to do work on behalf of someone who they

17   have any question in their mind might be guilty, because

18   that's the end of the organization. And that's the end of

19   their good work.

20   You know, he described it like an assembly line. 12,000

21   applications. They've gone forward with something like 40 or

22   50, you know? At every stage, they get knocked out; they get

23   knocked out. Well, Dean never got knocked out, and thank god.

24   Here's the next reason, and I'll stop here, why you

25   can't -- why Dean -- why you know Dean is innocent. And

1592

1  that's because you can't trust Matthew Scott Moore.  This

2  whole case is something that got concocted in his head.  You

3  know, he looked at the photo array with me.  I asked him, you

4  know, we've got three of these -- three out of six have a

5  white background.  You know, Dean's got this gold background.

6  It totally, totally singles him out.  Three people got a white

7  background.  Well, I don't see a white background.  One of

8  them is rose.  One of them is blue, you know.  That's tunnel

9  vision.

10      You know, Dean's interview.  You know, Dean comes there.

11 He signs a *Miranda* waiver, which says I'm willing to speak to

12 you without an attorney.  He lets Moore take photographs of

13 him.  He lets Moore record it.  And he answers every question

14 that Moore poses to him.  And because the answers to those

15 questions didn't match the belief that Moore had in his head,

16 he declares that to be uncooperative.  Uncooperative.  Waived

17 every right.  Let him take photographs and answer all his

18 questions.  Matthew Scott Moore's perceptions are not

19 reliable.

20      Along those same lines, you know, we went through the

21 chronology where C.W. came to view the photo array.  It was

22 Monday evening.  Her sister was scheduled, her twin sister,

23 was scheduled to come on Saturday.  And then all of a sudden

24 the two of them show up the following morning.  And he says,

25 "I don't see contamination there.  I told them, 'Don't talk to

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    each other.'"  That should be good enough, you know.  He

2    doesn't -- he doesn't see the obvious.  The obvious that there

3    was contamination.  The obvious that Dean is innocent.

4         You know, another example is this idea that when the --

5    when the perpetrator gave the women the name Roger, that that

6    was a confession.  You know, that's another example of Moore

7    seeing only what he wants to see.  That was not a confession.

8    This is a man who was meticulous.  He blindfolded the twins,

9    and he -- because he was in a car with S.C.  He had her spit

10   the semen in a bag.  He left the scene with his DNA.  That is

11   not a person who is giving his real name in order to confess.

12   But Moore has tunnel vision.  He can't see that.  You can't

13   rely on what he tells you.

14        Same thing with the security guard.  This is -- this is

15   this perpetrator's MO.  He tells women that he's a security

16   guard to distract them long enough to get into their cars.

17   And Moore says, no, that's a confession, you know.  Dean was a

18   security guard; this guy said he was a security guard.  Case

19   closed.  You can't rely on what he says.  He's not reliable.

20   He's not based in reality.  He has the wrong temperament to

21   have been a detective.

22        And they didn't -- you know, they didn't supervise him.

23   He wasn't paired up with another -- another detective.  Wilson

24   was like, yeah, you know, they go and do what they do.  If

25   they need more help, they'll tell me, but I'm not looking over

1    their shoulder.

2        He wasn't trained.  Nobody told him how to do a photo

3    array.  And I'm not apologizing for him because common sense

4    told him not to do what he did, but I'm making a point that he

5    was not the right guy to be investigating this case.  He was

6    not trained.  He was not supervised.  He was inexperienced.

7        And he was given -- Miami Township Police Department gave

8    him wide latitude why?  Not because he had earned it -- he was

9    a rookie.  A rookie detective -- but because his dad had been

10   chief of police.  And so that is a perfect storm, everything

11   lining up.  A guy who shouldn't have been a detective, a lack

12   of supervision, a lack of training, and, you know, nepotism.

13   And that perfect storm took Dean out.  Took out his family,

14   took out his community.

15       All right.  So that's -- that is ten indisputable reasons

16   why Dean -- why you know Dean Gillispie is guilty.  And, you

17   know, you need to enter a verdict that tells the world Dean is

18   guilty.  He shouldn't have to go around proclaiming his

19   innocence.  He family shouldn't have to go around proclaiming

20   his innocence.  It's time to put it to rest.  Let that be the

21   last time anybody has to stand up there and try to explain

22   that Dean is innocent.

23       Okay.  Because Dean is innocent, and you know it, and he

24   went through hell, and he deserves compensation.

25       Could I have the document camera?

1595

 1    You are going to be given a verdict form, which is the

 2   way you go about making sure that this case turns out the

 3   right way.  And I want to show it to you, and then I'm going

 4   to come back and talk about some things.  There's several

 5   parts to this verdict form.

 6    The first part here -- the first part that requires you

 7   to do something is here where it says his first count, that's

 8   due process, fair trial, unreliable identification.  I'm going

 9   to talk about that evidence.  But if you want to find for

10   plaintiff -- and you should -- you're going to click -- check

11   for plaintiff.

12    Then there's a second part, which is about damages, but

13   there's a third part that you also have to fill out correctly.

14   And here, here's the third part, additional issues if you find

15   in favor of plaintiff.  And for Count One, it asks you, "Did

16   you find in favor of plaintiff?"  You got to answer that

17   right.  It's yes.

18    And then it's going to ask you some other questions, and

19   the answers to those are all noes.  No.  No.  No.  So yes, no,

20   no, no.  That's how you fill this out correctly.

21    And then you come to his second claim -- there's two

22   claims in this case.  The second claim.  Second claim is for

23   suppression of evidence.  You know, all those things that Dean

24   didn't get that would have helped him prove his innocence,

25   that would have impeached the witnesses, you find in favor for

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    Dean on that.  You check for plaintiff.

2        Then you come back again to the Section III that is for

3    Count Two.  You check for plaintiff, that's a yes, and each of

4    these questions -- and I'll talk about them -- is no, no, no.

5        It's important that you get your verdict right, and this

6    is the verdict that you should enter to make sure that justice

7    is done for Dean.

8        The next thing I want to talk to you about are some of

9    the instructions that you are going to receive from the judge.

10   And there's instructions about the claims, but there is also

11   instructions about the evidence.  Not the specific evidence

12   that we heard in here, but what evidence is and how you go

13   about assessing it.

14       And the first instruction I want to talk to you about is

15   called the "Burden of Proof" instruction.  And basically what

16   it explains is that Dean has the burden of proof on the claims

17   that he brings.  I'll talk to you about the no, no, no

18   questions.  He doesn't have the burden of proof on that.  I'll

19   talk to you about that later.  But on his claims, he has the

20   burden of proof.

21       So what is that burden of proof?  It tells you that the

22   burden of proof is the preponderance of the evidence.  The

23   preponderance of the evidence.  And what that means is that

24   the facts are more likely true than not true.  The way to

25   think about that is if you take all the evidence that, you

1   know, supports what Dean is contending and if you take all the

2   evidence that supports what Matthew Scott Moore is contending

3   and you put them on a scale and you give them the weight they

4   deserve -- 'cause it's not just a question of how many pieces

5   of evidence.  It's like how weight -- weighty is that

6   evidence.  How believable is it.  How strong is it.  How much

7   does it comport with the way you see the world.  So if you put

8   both of those in the side of the scale and if it tips even

9   slightly, even slightly, to plaintiff, then that fact has been

10  proved; it is more likely true than not true.

11        And what we have seen in this case, it's like this

12  (indicating).  There is no weighty evidence on Matthew Scott

13  Moore's side because he concocted this in his head.  And all

14  of the truth, all the truth is for Dean Gillispie.

15        Next instruction about evidence that I'd like to talk to

16  you about is called "Direct and Circumstantial Evidence."

17  And, you know, a lot of times you'll hear, oh, it's just a

18  circumstantial case -- you know, that's what they say on TV --

19  as if that means that it is not -- it's not a proven case.

20  This instruction tells you that's not how it works.  There's

21  direct evidence, which is if someone comes in and testifies to

22  a fact; and then there's circumstantial evidence, which is

23  when other facts help you determine that a given fact exists.

24        And so it gives you the example of, you know, if you see

25  a person walk in the front door and they're wet and holding an

1   umbrella, well, you haven't looked outside to see that it's

2   raining, but that is circumstantial evidence it is raining.

3       And, you know, in this case, I want to give you some

4   examples of what circumstantial evidence would be.

5   Circumstantial evidence in this case is that, you know, when

6   C.W. and B.W. showed up on Tuesday morning together, well,

7   that's circumstantial evidence that Moore could have scheduled

8   them on the same day and prevented contamination. And he --

9   you know, did he choose not to? Did he not care? Did he

10  believe in his tunnel vision, in his arrogance that twin

11  sisters weren't going to talk? It doesn't matter. The point

12  is when he tells you, when he says to you, "I tried. There

13  was something about work," that's direct evidence. But when

14  you see what C.W. and B.W. did, what in fact happened, then

15  you have circumstantial evidence that proves that his direct

16  evidence is meaningless. It's a fantasy.

17      Next thing is the "Inference" instruction. It's similar

18  to the circumstantial evidence instruction. The point is, you

19  can determine that one fact exists from another fact. I had

20  an example for you. I don't exactly remember what it is. But

21  the C.W. and B.W. example, you know, that's a perfectly good

22  example. You're inferring -- actually, you can use the C.W.

23  and B.W. example. You know, when B.W. and C.W. decided to

24  come back the next morning instead of the following Friday,

25  you can infer that C.W. said something to B.W. that caused

1599

1  B.W. to substantially change her plans.  So that is an

2  inference.

3      The last one I'm going to talk about is "Credibility of

4  Witnesses."  And there's a lot -- this is a two-page

5  instruction.  There is a lot of stuff on there.  You know, we

6  all live in this world.  We have an understanding about how to

7  assess somebody else's credibility, and we need to do it every

8  day.  But this, this spells it out for you.

9      And I want to highlight -- I want to highlight that, you

10  know, amongst how believable the testimony is and does it make

11  sense and did that person really have an opportunity to view

12  and is their memory as strong as they say it is.  You can

13  infer their manner -- you can infer their credibility from

14  their manner while testifying.

15      And I want to point out, when Dean testified, when his

16  family testified, when his friends testified you saw honest

17  people giving honest answers.  And, you know, like I said, we

18  have to do this every day.  I don't think your bullshit meters

19  went up and said, "Uh-Oh, that person's trying to deceive me."

20      When Matthew Scott Moore testified, first of all you saw

21  two totally different people.  How was he when I was asking

22  questions versus how was he when his counsel was asking

23  questions.  When I was asking questions, he didn't want to

24  make your job easy.  You're here as a federal jury to

25  determine the truth.  You know, his job, everybody's job once

1    they swear to tell the truth is to help you do your job.

2    Well, he was trying to prevent you from doing your job.  He

3    wouldn't answer a straight question.  He would just decide to

4    filibuster and start talking about something else entirely.

5        When his counsel was there and he thought that those

6    questions were good for him, what did he say?  "Yes, sir."

7    "Yes, sir."  "Yes, sir."

8        So that brings us to the instruction on plaintiff's first

9    claim, that is the suggestive identification claim.  And this

10   is their instruction you are going to receive on it.  It's

11   Instruction Number 23.  And it shows you that Dean has three

12   things he has to prove:

13       First, that Moore knowingly or recklessly used an

14   unnecessarily suggestive identification procedure and that it

15   resulted in unreliable identification.

16       Second, that the evidence of the -- of the unreliable

17   identification was offered into evidence in a criminal trial.

18       And, third, that Gillispie was injured.

19       Two and three, they're not disputed.  There are six

20   different instances of identifications being offered into

21   evidence in this criminal trial.  There's the pretrial

22   identifications that were described by C.W., by B.W., by S.C.,

23   and by Moore; and then there's the identifications in trial,

24   where each of those witnesses, each of those victims came to

25   trial and pointed the finger at Dean.  You have heard a lot of

 1    testimony -- I am going to go over it -- but those were

 2    unreliable identifications.  All you have got to do to find in

 3    Dean's favor on the suggestive claim is just got to find even

 4    one of them.  And for sure all six of them unreliable, but

 5    even if it's just one, one of those six, number two is

 6    satisfied.

 7         Number three, Dean was injured as a result.  You know, if

 8    these -- there was nothing, there was nothing to tie Dean to

 9    these horrible crimes other than the ID evidence that Moore

10    concocted.  Nothing.  And if even one of the victims couldn't

11    make an identification, wouldn't express that they weren't a

12    hundred percent certain when they were at trial, you know,

13    with a judge and a jury watching, Dean goes free.  So, yeah,

14    of course, these injured Dean.

15         So let's talk about the first one.  Moore knowingly or

16    recklessly.  I'm going to stop there because this is not a

17    case of knowingly.  Moore, I told you in opening, he's not a

18    monster.  He did not believe that what he was doing was going

19    to convict an innocent person.  That's not what he set out to

20    do.

21         But like I also said, he has tunnel vision.  He does not

22    have the temperament of a detective.  He convinced himself,

23    inexplicably, that Dean was guilty, and then he went about

24    proving that case.  And that's not knowing, but that is what's

25    called reckless.  This is a recklessness case.

 1      So let me talk to you about what recklessness means.

 2    Okay.  I mean, we all use the term "recklessness" in our

 3    daily, you know -- not in our daily lives, but it's a regular

 4    English word that we use from time to time.  It has legal

 5    elements to it, and they are this:  There is a risk, a risk of

 6    causing harm.  That risk is obvious, and taking that risk is

 7    unjustified.  And that's exactly what happened here.

 8      You know, there was a risk that Dean was innocent.  That

 9    risk was obvious, obvious to everyone in the world except

10    Matthew Scott Moore who set out to concoct the case against

11    Dean.  And, obviously, it was unjustified.

12      And so returning back to the instruction.  To number one.

13    Moore recklessly used unnecessarily suggestive identification

14    procedures -- and I'll talk about that, but you have seen

15    plenty of them.  You have got that photo array.  You got the

16    way he administered the photo array.  You've got the tainting

17    of the victims with the -- before they take the stand where he

18    said, hey, he dyed his hair.  All of those are unnecessarily

19    suggestive.  And we only got to prove one.  We have only got

20    to prove one unnecessarily suggestive identification

21    procedure.

22      And then that identification procedure had to have

23    resulted in one or more unreliable identifications.  And we

24    know that these were -- identifications were not reliable.

25    You know, first of all, Dean's innocent.  They picked the

 1    wrong guy.  And, you know, you heard testimony from two

 2    scientists, and both of them explained to you all the factors

 3    that go into making a reliable identification.  There was

 4    nothing pristine here.  And I'm going to talk through that

 5    now.

 6         Okay.  So the photo array.  The photo array is suggestive

 7    in multiple ways.  Again, we only need to prove one.  I'm

 8    going to list these, but then I am going to put up the photo

 9    array so I can talk about them with reference to the evidence.

10         You know, first of all, no one in there matched the

11    description that the women gave of the perpetrator.  There is

12    no, you know, orangish-brown hair.  There is no red with brown

13    tint.  There is no light blondish hair.  Everybody has darker

14    brown hair, and I'll show you, but the way Moore constructed

15    it, most of them have darker hair than Dean even, which is a

16    way that he singled him out.

17         Dean's got the blown-up face.  Nobody else had their face

18    blown up.  The orange background, he wants to call it goldish.

19    It doesn't matter.  It's striking, and it stands out, and it

20    singles out Dean.

21         The detectives -- you know, their own police practices

22    expert told you when you do a photo array, you need a minimum

23    of six.  Well, those detectives are obviously detectives.  And

24    as I'll say, you know, may very well have been seen by these

25    women.  So you are automatically down to four.  Four is a, per

```
 1    se, an unnecessarily suggestive array.
 2         You got the eye color.  You know, S.C. described blue
 3    eyes, and I think Dean is the only one that has blue eyes.
 4    You are going to get a chance to look at it.  But at least
 5    three of the people clearly have brown eyes.  That's not six.
 6    Both of the -- both of the social science experts told you, if
 7    you got eye color, everybody's got to have the same eye color.
 8    So that's suggestive.
 9         The picture quality.  Dean's picture is fuzzier, of
10    course, because it's blown up.  And, again, you know Dean is
11    innocent.
12         So let me -- could you put up the array, please.
13         Can I have the document camera?
14         So what I'm showing you is this -- I'm going to put it up
15    on the document camera -- but this is the size of the photo
16    array that the women saw.  It's the one that has the State's
17    Exhibit 1 and State's Exhibit 26 on it.  It's got those
18    exhibits on there because there was two trials, all right.
19         So take a look at it.
20              THE COURT:  Wait a minute.  There is a problem with
21    the screen.
22              MR. KANOVITZ:  Can they just look at this screen so
23    I can keep going?
24              THE COURT:  They can.
25              MR. KANOVITZ:  You all saw it during trial.  You are
```

1  going to have it for deliberations. You know, three guys have

2  brown eyes. Dean's head is the largest by a lot. You compare

3  his to the Detective DePetrio, it's more than twice as big.

4  It's more than twice as big as five. It's about twice as big

5  as two. It's twice as big as one. And even number three,

6  it's substantially bigger. It is noticeably bigger. Dean is

7  singled out by the size of his background.

8      Look at the backgrounds. Dean is gold. You have got

9  three backgrounds that are white. One, the guy is clearly

10  sitting in an office. This is not a mugshot. And four,

11  DePetrio, he is standing in front of the door in the detective

12  division. You know, like the witness -- the witness knows

13  what that is, you know. Moore wants to tell you, oh, the

14  background on four is the same as two and three. I see white

15  there.

16      It's obvious -- again, that's tunnel vision. It's

17  obvious that that is an institutional dark wood door and the

18  flash is what hit it.

19      So Dean is singled out in substantial, important ways,

20  and that is suggestive. Particularly when -- when the women

21  are shown the photo array, there's nobody that resembles the

22  description that they gave, and both doctors told you that is

23  dangerous. That is a recipe for a wrongful conviction. You

24  have got to match each other. Everybody in the lineup needs

25  to match. You know, the same characteristics. And everybody

1 needs to match the description. None of them matched the

2 description.

3      Two of them, like I said, are detectives. Moore -- Moore

4 didn't bother to check if they were on duty the multiple times

5 that these women came to the police station. And Wilson he

6 knows is on duty. I mean, he took their pictures so he could

7 put them in the lineup. He knows when they are there. He

8 knows when they work. And they're dressed the same way he

9 does. It's obvious you are down to four. It's unnecessarily

10 suggestive.

11      So the photo array is suggestive in multiple ways. We

12 only have to prove one.

13      The next way in which there was reckless, unnecessary

14 suggestion is the way that he administered the photo arrays to

15 each of these victims. And, you know, we saw his report.

16 When he prepared this photo array, he's -- I mean, he gave you

17 a window into his thinking: I'm sending this photo out to get

18 it enlarged in hopes of identification. He's telling you how

19 his mind works. He has a goal. He is interested in the

20 outcome of this. And both of the social science experts told

21 you that gets communicated. You know, we're human beings. We

22 communicate to each other in multiple ways, and our voice

23 isn't the only one.

24      And, you know, frankly, I do think that he communicated

25 more than he told us, and I will tell you about that too.

1    So first one is the suggestive administration to C.W.

2    First of all, he gave her pre-identification information. He

3    calls her up -- it's been two years -- and he says, "Hey, I

4    have a suspect I want you to look at." Both of the experts

5    told you, that is suggestive.

6        For C.W., we also have the -- we also have what he wrote

7    down, and what he wrote down is telling. This is Plaintiff's

8    Exhibit 74, page 2. He wrote down these comments, and one of

9    them is, "His build is about right." Well, when you look at

10   the picture of the photo array -- I mean, sorry -- the

11   photocopy that he made, that he was required to make with the

12   taped-down pictures, there is nothing in there about build.

13   The fact that she is talking about build is circumstantial

14   evidence that they had a conversation that we didn't get to

15   hear about. A conversation that was suggestive.

16       So in multiple ways, he engages in subjective -- I'm

17   sorry -- suggestive pre-identification information.

18       He also was suggestive in that he didn't tell C.W. that

19   she didn't have to make an identification. So she walks in

20   there. There's a suspect. She doesn't know she has to -- and

21   what does she do? She stares at it for two minutes. And he

22   doesn't say, "You don't have to make an identification." It's

23   a 10- to 12-second rule. It's pretty obvious when 15 seconds

24   tick by that this woman isn't making an identification. And

25   instead, he reads her this sentence. And I'm not saying that,

1    you know, that that's a completely improper investigatory

2    technique under all circumstances, but in this circumstance it

3    was reckless.  And it is certainly reckless to not tell us

4    that he did that and instead allow the -- you know, create the

5    impression that there was an identification when there wasn't.

6        And then, you know, he also gave her the post-

7    identification confirmation.  You know, he said, yeah, you

8    picked out the person I think is the suspect.  You've verified

9    what I thought.  And all the experts told you, that leads to a

10   unnecessarily suggestive identification at the trial.

11       I'm going to start moving faster now in order to save

12   time.

13       But same thing with B.W.  He clearly let C.W. contaminate

14   B.W.  B.W. was coming down on Saturday.  All of a sudden

15   Tuesday morning she and C.W. show up.  And, you know, it

16   wouldn't take much to contaminate.  It's like, oh, it was the

17   guy with the gold background and the blown-up head.  That's

18   all you need to know.  So he let B.W. contaminate C.W.  He

19   didn't have to.  They could have been booked at the same time.

20   He hasn't given you a good reason.

21       He did the same pre-identification information with her:

22   Suspect.  There was some kind of phone call when he arranged

23   for these women to come down.  We have no record of it.  So

24   there's more out there.

25       And, you know, an instruction I forgot to read you is

1    that when you evaluate the evidence, you are entitled to use

2    your common sense.  You know, your common sense is when that

3    phone call was made and he said, hey, I know it's been two

4    years, but I need you to come down and look at a suspect.  It

5    wasn't just, oh, let me go get my date book and schedule it.

6    There were questions asked, and there were answers given.

7        He also didn't tell her that she didn't have to make the

8    ID, and the same post-identification confirmation.

9        S.C., he kept the orange background blown-up photo when

10   he showed it to S.C. even though he already had photographs of

11   Dean.  Dean standing in front of the same background as the

12   detectives.  That is reckless, and that is unnecessarily

13   suggestive.

14       He gave her the pre-identification information.  He

15   didn't tell her that she had to make an ID, and the post-

16   identification confirmation was the same.  And something I

17   forgot to mention before is she's the one that described the

18   blue eyes.  And if you remember what happened is she looked at

19   it, the -- you know, this, this size, and said, you know what?

20   I need to take it outside and look at it in the daylight.

21   What is she doing?  She's looking for who has blue eyes.

22       So that's three multiple reasons why they are

23   unnecessarily suggestive.  We only have to prove one.

24       But then we have the three in-court identifications.  And

25   we know that he made those unnecessarily suggestive as well.

 1    They were unnecessarily suggestive because he tainted them

 2    with the pretrial identification procedures that we just

 3    talked about.  You know, it's been two years, and he shows

 4    them that photo array, and he leads them in the way that he

 5    did in the administration.  And then he did it again before

 6    they got on the stand.  He says, "I just want you to know, I

 7    think he dyed his hair."  That's suggestive.  And it's

 8    unnecessarily.  And it's reckless.  Because if any of those

 9    women had gotten on the stand and said "His hair looks

10    different.  I'm not -- I'm not so sure anymore," that's it.

11    Dean goes free.  This tragedy doesn't happen.

12        So that brings you to the question of whether the

13    identifications that these women made were reliable.  And

14    you've heard the science.  There's a dozen reasons why you

15    know it's not reliable, not least of which is that you know

16    Dean is innocent.

17        But here's a long list.  These are the ones that I see,

18    you know.  You can write them down or you can just write down

19    "unreliable," because you know that those identifications are

20    unreliable.  Dean's innocent.  There were not pristine

21    conditions.  Two years, that's the 93 percent chance of a

22    misidentification.  High stress, presence of a gun, sunglasses

23    masking the face, blindfolds, the descriptions from the --

24    from the time of the events in question don't match.  It's not

25    double-blind.

 1      And we know that Moore was motivated.  He told you that

 2  himself in his report in hopes of identification.  The women

 3  made composites.  They reviewed photo books.  There's

 4  contamination.  The way he put that photo array is like a

 5  textbook example of lineup filler bias.  There was

 6  identification latency with C.W.  It took two minutes.  That's

 7  not recognition.  He gave them pretrial identification.  He

 8  gave them confirmation feedback, et cetera, et cetera, et

 9  cetera.

10      Those identifications are not reliable, and what that

11  means is that plaintiff has proven count -- this first count,

12  Count One, Suggestive Identification.  And so you're going to,

13  on the verdict form, you're going to put a check for

14  plaintiff.

15      When you go over to Part III, you're going to put a check

16  on the first line for yes, plaintiff proved it, and then you

17  are going to check no, no, no.

18      Okay.  Let me talk to you about those no, no, noes.

19      What you're being asked on those no, no, noes is you're

20  being asked two things:  One, what was going on in that man's

21  head?  And, two, was he acting as a police officer?  That's

22  the scope of employment questions.  So was he manifestly

23  outside the scope of his employment, or was he even outside

24  the scope of his employment at all?  The answer to both of

25  those is no is because he did everything that he did, he did

1    as a police officer.  I mean, a sullied police officer, a

2    police officer who had no business being a detective, but he

3    didn't, you know, step outside of his role.  He didn't, you

4    know, hop in his police cruiser, drive down to Florida, you

5    know.

6         Everything he did are things that police officers do.

7    You know, are of a type that police officers do.  And, in

8    fact, it doesn't say was he authorized to do it.  It says was

9    it within the scope, within the scope of what he was

10   authorized to do.  And, clearly, each of the things -- you

11   know, conducting investigations, that's within the scope of

12   employment for a police officer.  That's what police officers

13   do.  Photo arrays, that's what police officers do.  Presenting

14   the case to the prosecutor, that's -- he told you, those are

15   the elements of my job.

16        So was he within the scope of employment?  He was, but

17   these are worded funny because they ask you was he not within

18   the scope of employment.  That's why you got to answer no, no.

19        And then the other one is was he in good -- let's see.

20   Again, these are -- you got to be careful to answer these

21   correctly yes, no, no, no, because they are worded funny.

22        So with respect to Claim One, was it proven by a

23   preponderance of the evidence that Matthew Scott Moore was not

24   acting in good faith.  Now, again, remember, this is not

25   plaintiff's burden to prove, okay?  So right off the bat there

1   that the whole -- you know, what's in favor of Moore, what's

2   in favor of plaintiff, that's not on the table here, okay?

3       And then, you know, what is good faith?  Well, you're

4   going to receive an instruction on that.  And that's

5   Instruction Number 29.  And the definition of "good faith" is

6   in this paragraph here.  Or not -- I guess it's defining the

7   negative, not in good faith.  And what it tells you is those

8   are things like acting for a private purpose.  So are you

9   committing fraud -- "committing fraud" means that you know

10  that you are trying to convict an innocent man.  Are you

11  committing fraud and are you doing it for an ulterior motive,

12  something that doesn't have to do with being a police officer?

13  Trying to get convictions is what police officers do.

14      This is not a case where, you know, a police officer uses

15  his powers of arrest because he wants to get the -- you know,

16  his girlfriend's ex-boyfriend out of the picture.  That

17  happens.  That's bad faith.

18          THE COURT:  Counsel, you have about five minutes of

19  your requested time.

20          MR. KANOVITZ:  Thank you.

21      All right.  I'm going to move forward.  I'm going to have

22  to move quick.

23      So Count Two is the *Brady* claim.  Basically, what it

24  means is we didn't get exculpatory evidence.  We didn't get

25  impeachment evidence.  Here's a long list.  And they want to

1  say it's just about the files.  It's about a lot more than the

2  files.  The file -- you know, the reports didn't get to him.

3  But, you know, Wolfe and Fritz, you know, there was already an

4  investigation when he started.  You know, Wolfe was the

5  shortest witness of the trial, but he told you that

6  chronology.

7        So the whole -- the whole way this case was teed up, not

8  him.  You know, pant size, tattoos, you know, the

9  witness didn't -- C.W. didn't ID Dean.  All of this stuff

10 should have been disclosed to him, and had it been disclosed

11 to him, the case would have come out differently, or at least

12 you have every reason to believe it would.  This was an 8-4

13 hung in Dean's favor, and that's on a knife edge.  Any one of

14 those pieces of information, plaintiff should win.  He should

15 within Count Two.

16       I have got to talk to you about damages, and it's on me

17 that I have got to talk fast.

18       I told you in opening, I told you when we were selecting

19 the jury, you know, this is a case of massive damages.  It

20 requires a massive result.  He lost 20 years of his life.  20

21 years.  And you're going to have to assess what those 20 years

22 mean.  And think about what those years were.  Those were the

23 years from his young adulthood to middle age.  It's when you

24 build a career.  It's when you meet someone, hopefully you

25 fall in love.  You build a family if that's what you're going

1   to do.  All of that gone.

2       And it's when your parents are still young enough to have

3   the kind of relationship that you've always enjoyed with them.

4   You can still go hunting with your dad.  You can still dance

5   with your mom.  Those years, gone.  And how did he spend those

6   years?  He spent them in hell.

7       What he talked to you about, he broke down a surprisingly

8   few number of times.  When did you see it?  You saw it when he

9   was talking about the cruelty that he observed, the cruelty in

10  which he had to live for 20 years.  People don't care.

11  They've got life sentences.  He said, you know, first time you

12  see a murder, it never leaves you.  And that happened again

13  and again.

14      He saw people beaten till he watched the life leave them.

15  He saw a man stabbed with a pencil and broken off so that he

16  couldn't clot out.

17      He told you, no one should ever have to see what my eyes

18  have seen.  And I apologize that I have got to do this so

19  quick, but I have to.  And, you know, the fact of the matter

20  is, you know, you need a benchmark.

21      A lot of people tell you -- not a lot of people, but

22  there is people that out there that would say, oh, yeah, I'd

23  do a year in jail for a million dollars.  You know, that's

24  some kind of -- obviously, they don't know what they are

25  talking about.  But it's some sort of like emotional intuitive

1    benchmark about what a year in jail would be.

2         You ask those same people, how about five years?  It's

3    going to be a lot more than a million dollars per year.  Ten

4    years?  You know, lose your young adulthood.  20 years?  A

5    million dollars per year is paltry.

6         And, you know, you do need some kind of benchmark.  And

7    what I am going to suggest is $3 million a year.  And 3

8    million times 20, that's 60 million.  It is a substantial sum,

9    but it is fair for the magnitude of the injury that was done

10   in this case.

11        You know, it is also, I believe, conservative.  It leaves

12   out a lot.

13             THE COURT:  One minute, Counsel.

14             MR. KANOVITZ:  It leaves out the nightmares of the

15   ten years hanging over his head even after he got out, the

16   fear of going back, the debt he owes to people, the

17   humiliation, the PTSD, the anger that eats you up -- not anger

18   towards the victim, anger towards the system -- the pain of

19   his lost potential what his life could have been, the pain of

20   his lost legacy.  So, yes, $3 million a year is substantial,

21   but it is fair and it is reasonable.

22        If you decided to award something less, nobody would say

23   you were crazy.  If you decided to award something more, no

24   one would say you were crazy, but 3 million I think is the

25   right number.

1    That said, I need to sit down now.  My time for you is

2    up.  My colleague, Mr. Owens, is going to have a chance to

3    address you in rebuttal.  I thank you.  I thank you for

4    participating in this case in the spirit that you have.  I

5    thank you for doing the important work of being a federal

6    jury, protecting our Constitution, and I ask you to do

7    justice.

8        THE COURT:  Thank you, Counsel.

9    Ladies and gentlemen, we are going to break for five

10   minutes, and then we will hear from counsel for the defendant.

11       THE COURTROOM DEPUTY:  All rise.  This court's in

12   recess.

13   (Jury out at 11:06 a.m.)

14   (Recess at 11:06 a.m.)

15   (Jury in at 11:17 a.m.)

16   (In open court at 11:18 a.m.)

17       THE COURT:  Ladies and gentlemen, we're back on the

18   record.  Please give your attention to counsel for the

19   defendant.

20       MR. McLANDRICH:  Thank you, Your Honor.

21   Good morning, ladies and gentlemen.  I want to start by,

22   as plaintiff did, by thanking you.  We greatly appreciate the

23   time, patience, and attention that you've shown.  You have

24   been very attentive, and we greatly appreciate it.

25       So I want to start off by addressing the -- a few of the

1618

1   things that plaintiff pointed out.  So he made this commentary

2   about C.W. and B.W. and each contaminating the other,

3   notwithstanding Detective Moore's admonition that they not

4   speak to each other.

5       Now, you have been here for the better part of two weeks,

6   and what has the judge said to you?  He gave you an admonition

7   not to talk to each other during the breaks, after the court

8   day, until the case is yours to discuss back in the jury room.

9   And each of you have honored that commitment.  So the idea

10  that when someone makes a commitment like that, that they are

11  just going to disregard it and that there is going to be this

12  contamination that plaintiff wants you to believe occurred is

13  simply not realistic, it's not truthful.  People that are

14  honorable, as these victims were, stand by their commitments.

15      And I want to ask you about one other commitment.  You'll

16  recall when we did voir dire at the beginning of this case and

17  were selecting the jury I asked you to make a commitment.  And

18  I'm going to ask you to honor that commitment, and that

19  commitment is, even if you believe Mr. Gillispie is innocent,

20  to not find for Mr. Gillispie and against Mr. Moore unless you

21  find that Mr. Moore is the reason that Mr. Gillispie was

22  wrongfully convicted.  And we're going to go through and I'm

23  going to demonstrate to you why I believe it is and why I

24  believe you should agree that it's not Mr. Moore who's the

25  person responsible for any wrongful conviction, if, in fact,

1   there was a wrongful conviction.

2        Now, none of us can know whether Mr. Gillispie was

3   actually guilty of these crimes for which he was charged,

4   tried, and convicted. But I think what we've seen here over

5   the intervening days is that what plaintiff has put on is the

6   exact same evidence that was put on twice to two juries that

7   convicted Mr. Gillispie twice.

8        Now, does that mean they got it right? I don't know if

9   it means they got it right. But it means that those 12

10  civic-minded individuals, like yourselves, who sacrificed

11  their time to serve on a jury agreed and found him guilty.

12  Now, was one of those juries once upon a time 8 to 4 before

13  they reached their verdict? Yes, they were 8 to 4. But they

14  continued to deliberate in good faith and came back with a

15  conviction, meaning that all 12 unanimously agreed that he had

16  committed that crime.

17       Further, in a criminal trial, unlike this case, in a

18  criminal trial the burden of proof of the State is beyond a

19  reasonable doubt. So now those two juries in those two trials

20  found beyond a reasonable doubt that they believed that

21  Mr. Gillispie was the perpetrator.

22       Now, when this case started off, we had claims against

23  Mr. Moore that he had maliciously prosecuted Mr. Gillispie.

24  They've dismissed that claim.

25            MR. KANOVITZ: Objection.

1620

 1              MR. OWENS:  Objection.

 2              THE COURT:  Counsel approach.

 3         (At sidebar.)

 4              MR. OWENS:  Your Honor, this is David Owens on

 5    behalf of plaintiff.  I think it's improper to instruct the

 6    jury on claims that are not before the jury and allow them to

 7    speculate how or why certain claims were dismissed in the

 8    case.  It's totally improper.  It's not evidence.  It's not a

 9    fair argument.

10              MR. McLANDRICH:  I think it's a completely fair

11    argument.  They made claims against the man that were not

12    proven, and I think the jury's entitled to know that those

13    claims weren't proven.  I think, you know, they can say it's a

14    strategic move, and I can argue because they are unable to

15    prove those claims and chose to abandon them.  I don't think

16    that's an improper argument at all.

17              MS. FRICK:  Your Honor, I wouldn't add anything

18    additional.

19              THE COURT:  Is this an argument or what?  Are you

20    going to argue?

21              MR. OWENS:  I mean, so I guess I don't know why our

22    strategic product or strategy of the case is something that

23    you use as evidence of some sort of -- it's not for another

24    jury to ask them to speculate about things that are not

25    evidence and that are not the subject of evidence.

1       THE COURT:  All right.  I'm sustaining the objection

2   to the extent we're not going to talk.  I'm going to strike

3   with regard to the charge being dismissed.  You can, however,

4   go into the fact that there were certain allegations made

5   against him that --

6       MR. OWENS:  Like the factual allegations, of course.

7   No problem.

8       THE COURT:  Yes.  You can go through all the factual

9   allegations.

10      MR. McLANDRICH:  They said he did this; they said he

11  did that.

12      THE COURT:  Yes.

13      MR. McLANDRICH:  All right.  That's fair.

14      THE COURT:  Gentlemen --

15      MR. McLANDRICH:  Just stay away from the claim.

16      THE COURT:  Yes.

17   (In open court.)

18      THE COURT:  All right.  Back on the record.

19   Ladies and gentlemen, you just heard a question and an

20  answer with regard to a charge.  That is being -- the

21  objection to that is being sustained.  You are not to consider

22  that question or that answer in any way in your deliberations.

23  Thank you.

24   You may proceed, Counsel.

25      MR. McLANDRICH:  Thank you, Your Honor.

1622

```
 1        So in a case like this, civil trials -- this is a civil
 2    trial.  Civil trials are about two things:  They're about
 3    credibility, and they're about damages.  I'm going to speak a
 4    little bit about both.
 5        You will recall in opening statement where plaintiff's
 6    counsel said, well, the pant size was 35 inches.  You haven't
 7    heard any evidence about 35 inches.  You heard an allegation
 8    that, well, the pants would have been too small to fit
 9    Mr. Gillispie.  The description of the perpetrator, 6-3, 240;
10    Mr. Gillispie, 6-2, 230.  Now, it's only common sense that
11    individuals of those relative sizes are going to wear pants
12    that are substantially the same size.  Obviously, it's going
13    to depend to some degree on the build of the person.  But the
14    idea that someone could be excluded based on pants size with
15    those two physical descriptions defies common sense.
16        You heard plaintiff's counsel make a reference to common
17    sense.  Common sense is very much going to be your guidepost
18    throughout this matter.
19        So this report that Mr. Bailey reportedly authored.
20    Where was Mr. Bailey?  I didn't see Mr. Bailey in this trial.
21    No testimony from Mr. Bailey.  The person central to this
22    allegation did not appear in this courtroom, did not offer any
23    testimony.
24        So what did we get?  Instead, we got Mr. Fritz.  So
25    Mr. Fritz.  Mr. Fritz was the detective-sergeant who was
```

```
1    supervising Mr. Bailey.  As he leaves the department on June
2    15, 1990, he gives the file to Mr. Moore.  Why does he give
3    the file to Mr. Moore?  Because there's new evidence in the
4    case.  What's the new evidence?  It's the envelope of
5    photographs of GM ID badges that were brought in and delivered
6    to Mr. Fritz who then gives it to Mr. Moore to investigate.
7         Plaintiff attacks Mr. Moore and wants to make him the
8    villain in the story.  Every good story needs a villain,
9    right?  So, now, what have they done?  They've said, whoa,
10   whoa, whoa, wait a minute.  We're not saying Mr. Moore acted
11   knowingly.  He's a villain, but he's not a villain that acted
12   knowingly.  He's just a villain that acted recklessly.
13        Recklessly.  He consciously disregarded a known risk.
14   What known risk did he consciously disregard?  He was given a
15   case.  He was given information to investigate, and he
16   investigated it.
17        And let's talk a little bit about that investigation.
18   You've seen the records, and you'll have them with you in your
19   jury room.  What do we know?  We know there was no DNA
20   evidence, no seminal fluid found on the clothes.  And before
21   he ever gets the file, those reports have come back, come back
22   with Mr. Fritz's name on them.  Those reports went to
23   Mr. Lieberman.
24        Mr. Lieberman:  I didn't know Mr. Fritz was involved in
25   this case.
```

1624

1    How could you not know?  A defense attorney, one of the

2    first things you're going to do, you are going to review the

3    lab reports, right?  And he said, "I reviewed all the

4    evidence, and I knew this was only ever going to be an

5    eyewitness ID case because there was no DNA evidence and there

6    were no fingerprints and there was no forensic evidence."

7    Those forensic reports have Mr. Fritz all over them.

8        And then he says -- he has the temerity to tell us all

9    that, "Oh, I didn't know Mr. Fritz was involved in the

10   investigation of this case."

11       So Mr. Bailey leaves the detective section on the same

12   day Detective Moore comes in.  Gets this file.  He has no

13   forensic evidence to go on.  What does he have?  He has the

14   composite, and he has the General Motors ID badges, and he has

15   people telling him that I think the composite resembles

16   Mr. Gillispie.

17       He looks at them, and in his mind, he also forms an

18   opinion that, yeah, there is some similarity there.

19       Now, what did we hear from the experts?  And what did we

20   see in the descriptions that plaintiff's counsel put up?  The

21   descriptions aren't consistent with respect to hair color.

22   They are only consistent with respect to the height and weight

23   of the suspect, right.

24       So how are you going to know whether this person is, in

25   fact, a legitimate suspect; could, in fact, be the

1625

1    perpetrator?  Well, what do you do if you're a detective?

2    Well, first off, you see if this person had an opportunity to

3    commit the crime.  He gets the work schedules.  The work

4    schedules show that Mr. Gillispie wasn't working on the 20th,

5    wasn't working on the 5th.  So now he knows at least there's a

6    possibility that this man could have committed this crime, at

7    least as far as he wasn't at work.  Right?

8        Tries to reach out to Mr. Gillispie, get some basic

9    information.  Mr. Gillispie, from his perspective, says I

10   don't know anything about this.  This is coming to me out of

11   the blue.  Not particularly anxious to talk to the police

12   about it.  I don't blame him for that.  That's his

13   constitutional right not to talk to the police.  But it

14   doesn't give Detective Moore any additional information.

15       So what does he do?  He searches Mr. Gillispie's criminal

16   record.  Doesn't have any criminal record.  Now, you know,

17   plaintiff has put forth this theory, really just an argument,

18   right?  And as the Judge said, argument isn't evidence.  What

19   I'm saying isn't evidence either.  I'm just trying to help

20   you, guide you through the evidence and give you some things

21   to think about when you review the evidence.

22       But so -- but that's not conclusive, you know.  Does his

23   family love him?  Sure, they love him.  I don't dispute that

24   for a moment.  Do his friends like him, his friends love him?

25   Sure, I don't dispute that for a moment.  But that's not

1    evidence either.  It's certainly not evidence of innocence as

2    plaintiff would like to contend.

3        I don't know how many times -- and I'm sure you've all

4    experienced it in your own lives -- you're watching TV, and

5    here, all of a sudden, this person has committed this heinous

6    crime.  And what do the neighbors and families say?  "I can't

7    imagine this."  "He was the nicest guy in the world."  "He

8    would play with our kids."  "He was at the church."  He was

9    this, he was that, he was the other thing.  "And this is

10   completely out of character for him."

11       Unfortunately, human beings are complex characters,

12   complex beings.  And they do things that are out of character.

13   Is it out of character for Mr. Gillispie?  I don't really know

14   the man.  I know the evidence that we've seen, and that

15   evidence certainly indicates that he could have committed this

16   out-of-character act.

17       In any event, what does Detective Moore do?  He takes the

18   only photograph he has at that time, he sends it to the crime

19   lab.  And bear in mind, this is 1988.  This isn't:  I'll put

20   it on the computer.  I'll scan it.  I'll Photoshop it.  I'll

21   change the color background.  I will shrink the head size,

22   increase the head size and manipulate the head sizes and the

23   background to the other photo so they are all the same.  This

24   is 1988.

25       He sends it to the crime lab.  They make him a picture.

```
 1    The picture's the wrong size.  He tells them, no, that's the
 2    wrong size.  He sends it back, tells them to make it the right
 3    size, gets another one back.  Is it exactly the right size?  I
 4    guess we could all say it's not exactly the right size 'cause
 5    it's not exactly the same size as all the other pictures.
 6         But, now, there is no allegation that he did this
 7    knowingly anymore.  So that's -- that's gone.  So, now, was he
 8    consciously disregarding a known risk when he took that photo,
 9    which he's now tried twice to get to be the right size, and
10    put it into that array?  I would submit to you that he wasn't.
11         He creates the array.  Is it a perfect array?  I think we
12    could all say it's not a perfect array.  Now, if you think
13    about it, go back over the last 30 years of your life, think
14    of something you did 30 years ago.  Is there something that
15    you did that you could look back and say, you know, boy, now
16    that I look back at that, I could have done that better?  You
17    know, I --
18              MR. OWENS:  Object.
19              MR. McLANDRICH:  I wasn't perfect.  I could have
20    done that better.  This case has been going on for eight
21    years.  Mr. Gillispie's conviction has been under review for
22    30 years, majority of the 30 years in any event.  How many
23    things in your lives that you did could be put under that
24    level of a microscope --
25              MR. OWENS:  Objection, Your Honor.
```

1     MR. McLANDRICH: -- and not be found to have some --

2     THE COURT: Overruled. Argument.

3     MR. McLANDRICH: -- common sense.

4     So now what does he do? He takes this array that he's

5     created, and he presents it to the first sister. And that

6     woman identifies Mr. Gillispie.

7     The next sister comes in the next day. She's presented

8     the array. She identifies Mr. Gillispie.

9     At this point, Detective Moore has every reason to

10    believe that Mr. Gillispie could be the perpetrator. Reaches

11    out to Mr. Gillispie and sends the letter ordering him to come

12    in. And it says at the bottom, as plaintiff has pointed out,

13    you know, if you don't come in, a warrant will be issued for

14    your arrest.

15    Well, sure, a warrant might be issued for his arrest. At

16    this point he's got two women that says this is the guy that

17    violated me.

18    Mr. Gillispie comes in. And Detective Moore asks him a

19    number of questions, and you heard plaintiff go through them:

20    I don't smoke. I don't wear a gold chain. I don't have a

21    gun. So forth, so on.

22    Now, if you're a policeman and you already have two

23    victims that have identified the man, yes, you're not going to

24    necessarily take those answers at face value. You may, in

25    fact, say to yourself, "I don't believe those answers. I just

1  sat down with two ladies who said, 'That's him.  That's the

2  guy.'"

3      Now, plaintiff says, well, wait a minute.  93 percent of

4  identifications made after two years are inaccurate.  Now, of

5  course, that's not what the witnesses said.  Both witnesses,

6  both expert witnesses agreed, both Dr. Dysart and Dr. Wixted

7  said a delay does not make a high-confidence identification

8  inaccurate.  To the contrary.  It may reduce the number of

9  people that are able to make that high-confidence

10  identification, but those that can are highly accurate.

11      And Dr. Wixted testified -- you didn't hear Dr. Dysart

12  disagree with him.  As a matter of fact, she agreed with

13  him -- they are 95 percent accurate.

14      Now, all this science that we heard about, it's

15  interesting, right?  But it's not science from 1988.  That

16  science didn't exist in 1988.  And, you know, you heard -- you

17  saw plaintiff put up the list, you know, latency.  The

18  latency.  It took her, you know, up to a minute.  You know,

19  here, he didn't have the stopwatch.  He didn't time those.

20  What did he do?  When he read the instructions, he wrote down

21  the date and the time.  After they identified somebody and

22  they completed it, he wrote down a time.

23      He didn't know he was going to be in the courtroom 30

24  years later defending that array.  If he's trying to hide

25  something, trying to railroad Mr. Gillispie, he's not writing

1    down the times.

2         That whole issue of latency is in the last few years.

3    It's all new research.  He had no idea about that.  It's not

4    evidence that this man was out to railroad Mr. Gillispie.

5         The same is true for a number of these other attributes.

6    You heard plaintiff talk about, well, you know, they were

7    under stress.  And the color of the background of the

8    photograph is different.  And the head size is a little

9    different.

10         You heard the testimony from Dr. Wixted, none of that

11    matters.  It doesn't change the accuracy of that eyewitness

12    identification.  When those women made a high-confidence

13    identification, it's facial recognition.  And that's what

14    Dr. Wixted testified to.

15         Fair lineup.  What a fair lineup is -- and Dr. Wixted

16    testified to this -- a fair lineup is when the face of the

17    suspect doesn't stand out from the other faces in terms of the

18    witness memory.  And he testified that that's what triggers

19    the memory response.  This is a memory test.  And when they

20    see that face and they -- their memory's engaged, it's the

21    face that they recognize.

22         And he testified the science has shown it wasn't known

23    back in 1988, but it's known now that the color background

24    doesn't change the accuracy of that eyewitness identification.

25    The size of the head doesn't change the accuracy of that

1    eyewitness identification.  The clothing the person's wearing

2    doesn't change the accuracy of that eyewitness identification.

3        It doesn't make what Scott Moore did in 1988 reckless.

4    Again, the jury instruction you're going to get says knowing

5    and reckless.  You know, he's not a monster, but he's the

6    villain, and he's responsible, but he didn't do it knowingly.

7    Now he was just careless.

8        So what was known back then?  You heard these experts

9    testify about police standards and practices with respect to

10   presenting eyewitness IDs.  Nobody presented any standard from

11   1988.  You got a standard from 1992.  It's not even a

12   standard.  What is it?  It's a training key from the

13   International Association of Chiefs of Police.

14       Now, what plaintiff wants to do is turn back the clock,

15   right?  This document is published in 1992, and 'cause you

16   don't have a document from 1988 or 1990, you got to gloss over

17   it.  And how do you gloss over it?  You say, well, you know,

18   yeah, it was published in 1992, but nothing's changed.  It's

19   the same as 1990.  Moore would have known what they were going

20   to say in 1992.

21       This is Miami Township, not Miami-Dade.

22       The idea that this training key represented nothing more

23   than a regurgitation of what everybody already knew, then

24   what's the point of putting it out.

25       You heard Mr. Scott -- Dr. Scott testify that the

```
 1   International Association of Chiefs of Police, it's a think
 2   tank.  A think tank.  A think tank is trying to be what?
 3   Forward looking.  And you heard both of the police experts
 4   testify, these organizations are trying to further and promote
 5   a greater police professionalism and improve the way things
 6   are done.
 7        Well, you don't improve the way things are done simply by
 8   regurgitating what already exists.  These were documents
 9   designed to change the way things were done, not to
10   regurgitate the way things were done.
11        And you heard me discuss with him that very fact, the
12   language of the document.  These are things that should be
13   done.  It's not to say this is the law.  This is what a police
14   officer's required to do.  This defendant is only liable if he
15   didn't comply with the law.  He's not liable for failing to
16   comply with best practices or somebody's ideal of what should
17   have been done.
18        Further, you heard the testimony, there were no policies
19   and procedures at Miami Township that told him how to do a
20   photo array, right?  On-the-job training.  You heard
21   Mr. Monheim testify to that, on-the-job training.  That's what
22   they got.
23        This is 1988, right?  And you heard Mr. Monheim say that
24   in 1988 things were very different than they are today.  In
25   1988, we didn't have all these resources.  1988, there were no
```

1    policies and procedures to tell Mr. Moore how to make this

2    photo array.  There were no policies and procedures that would

3    have told him that he was consciously disregarding a known

4    risk to do it a certain way.

5        And he testified, I did what I had seen done at the

6    department.  They would go to the books.  They would try to

7    find pictures in the books.  If you couldn't find pictures in

8    the books that matched, then sometimes did you use the picture

9    of a police officer?  You did.  Mr. Monheim testified to the

10   same thing.  Sometimes you have to do that to get a picture

11   that's close enough.

12       This is not the conscious disregard of a known risk.  In

13   retrospect, could somebody say, well, you could have done it

14   better?  Would it have been better if you didn't use a police

15   officer?  Would it have been better if his head was a little

16   smaller?  Would it have been better if they could see more of

17   his torso?  Would it have been better this?  Would it have

18   been better that?  But that's not a conscious disregard of a

19   known risk.  That's what we call Monday morning

20   quarterbacking.  That's not a conscious disregard of a known

21   risk.

22       What else do we know?  Well, we know that when Mr. Fritz

23   leaves the police department he goes to work for Area Wide

24   Investigations.  Common sense.  None of this makes sense.

25       So he goes to work for Area Wide.  Area Wide assigns him

1   to work on this case.  He has concerns about working on this

2   case because it's a Miami Township Police Department case.

3   Mr. Lieberman has concerns about him working on this case

4   because it's a Miami Township Police Department case.

5   Mr. Lieberman has the documents with Mr. Fritz's name on them.

6   Mr. Fritz knows he worked on this case.  He knows that he

7   supervised Bailey, and he knows, supposedly, that Bailey wrote

8   this report excluding Mr. Gillispie as a suspect.

9        Now, you're taking these people's money to work on this

10   case.  And you heard Mr. Lieberman say, "Gillispies, god bless

11   them.  Not wealthy people.  They are taking their hard-earned

12   money, they are giving it to Mr. Lieberman, they are giving it

13   to Area Wide to try to find a way to get their son acquitted."

14        So what's Mr. Lieberman's -- I'm sorry -- what's

15   Mr. Fritz's obligation and what's Mr. Lieberman's obligation?

16   It's inconceivable to me, and I think inconsistent with common

17   sense, to suggest these two men that both have concerns about

18   Fritz working on this file 'cause he's a former Miami Township

19   Police Department sergeant and are having a conversation about

20   that very concern, neither one of them are going to raise the

21   fact that Fritz worked on this very file.  Fritz isn't going

22   to say to him, "Hey, you know, by the way, I know you're

23   concerned about the fact that I'm a Miami Township -- former

24   Miami Township police officer.  I worked on this case."  Who

25   doesn't say that?

1       And Fritz -- reviewing the lab reports with Fritz's name

2   on them, Lieberman doesn't say to him, "Hey, you worked on

3   this case."

4       And if you're trying to help Mr. Gillispie find things

5   that could prove his innocence and you know there is this

6   report that Mr. Bailey wrote, you don't say to Mr. Lieberman,

7   "Hey, we excluded this guy.  There's a report that says we

8   excluded this guy."

9       No.  Instead, what do we get?  We get the story of, well,

10  I figured you already knew that.  What's the point of telling

11  him?  He already knows.  I don't know.  I don't think that

12  comports with common sense.

13      Then what do we get?  Mr. Fritz says, well, I drove down

14  to Kentucky with Mr. Gillispie to look for camping receipts.

15  Okay.  On the way down, you know, I'm still not really sure

16  about the guy.

17      We go down there.  We go through the receipts.  We don't

18  find anything.  We go talk to the waitresses, and they know

19  this guy.  They say he's down here frequently.

20      And I think it was Mr. Poulter said, you know, we would

21  go down there maybe two times a month if the schedules

22  permitted, because, of course, sometimes Mr. Fyffe worked

23  weekends; and without Mr. Fyffe, they're not going down there

24  because they don't have the boat and so forth and so on.

25      After that, he says, well, now, you know, now I'm feeling

1   pretty good about Mr. Gillispie and my relationship with him.

2   Notwithstanding that, two and a half hours back in the car,

3   you're taking this man's money, you're working to try and

4   prove he's innocent, and you don't tell him, "Hey, we excluded

5   you as a suspect, and there is a report that says that"?

6       I mean, it defies common sense. Not only doesn't tell

7   him then, doesn't tell him ever. Watches the man get

8   convicted once. Doesn't tell him before the first trial.

9   Doesn't tell him before the second trial. When's he tell him?

10  Well, it's not until 2003. I mean, I can't even do the math

11  in my head, you know. How much later is that before he ever

12  writes down, "Oh, you know what? We excluded Mr. Gillispie."

13  This is a guy who says I'm working my fingers to the bone.

14  I'm working for free, I believe in this guy's innocence so

15  much.

16      And yet never in a document does it appear until 2003

17  that they had excluded the guy. And even then there is no

18  mention of a report. We got to go another four years, four

19  more years, till 2007 before, all of a sudden, there's a

20  mention of a report.

21      And where does that come from, right? So Mr. Godsey from

22  the Innocence Project is talking to Mr. Fritz. And all of a

23  sudden, "Wait, you didn't write a report?"

24      "Wrote a report? Oh, yeah, I wrote a report."

25      It took him all that time to realize he wrote a report?

1    He knew it all along.

2        Correspondingly, what did Mr. Fritz say?  "Oh, no, no,

3    no.  I told Mr. Riley.  I told Mr. Riley before the first

4    trial back in 1991 we excluded Gillispie."

5        So let's think about this.  This makes no sense either.

6    If Mr. Riley, also working for Mr. Gillispie -- if Mr. Riley

7    knows Mr. Gillispie's been eliminated as a suspect, he's not

8    going to tell Lieberman?  And if Lieberman knows, he's not

9    going to use it?

10       What did Lieberman say?  "Nobody ever told me.  I didn't

11   know anything.  I didn't know anything until 2007 either."

12       Until Mr. Godsey said, "Hey, wait a minute.  Bailey and

13   Fritz are saying they eliminated him and there's a report."

14       "Oh, you are kidding me?  They eliminated him and there's

15   a report?  Well, nobody ever told me."

16       Well, how can that be?

17       There -- because there, there's the fall guy.  There's

18   the fall guy (indicating).  And if I want to get him out of

19   prison, I need to have a missing report, because a missing

20   report gives me my habeas claim.  All the appeals have been

21   denied.  All kinds of appeals had been denied.  But the only

22   way I get him out is if there's a missing document.

23       And you heard Mr. Godsey sit right there and admit,

24   "Well, I don't have it."  It all hinges on the credibility of

25   Bailey and Fritz.  Two guys we know aren't credible.  Godsey

1    himself said, "Oh, yeah, you're right.  I wrote an affidavit

2    for Mr. Lieberman that said Mr. Bailey perjured himself on the

3    first trial."

4         And they all admitted it.  You know, Bailey is asked at

5    the first trial, "Was Mr. Gillispie a suspect?"

6         "Oh, no."

7         He's sitting at the counsel -- he's sitting at defense

8    table, right?  He's a criminal defendant.  And you're going to

9    say, no, he wasn't a suspect?

10        If he answers that question truthfully, if, in fact, he

11   had been a suspect -- there's no evidence that he was, but

12   other than their testimony, right?  Their story is he was.  If

13   he was a suspect and he answers that question truthfully --

14   you know, you've heard the witnesses take the oath here,

15   right, to tell the truth, the whole truth, and nothing but the

16   truth.  The whole truth.

17        So was he a suspect?  "Oh, yeah, he was.  And we

18   eliminated him as a suspect and wrote a report."

19        And you heard initially the story of, well, you know, he

20   was -- he was dodging that question because it was coming from

21   the criminal defense lawyer, and as a police officer, he

22   didn't want to help out the criminal defense lawyer.

23        It wasn't the criminal defense lawyer.  It was the

24   prosecutor, and that's been admitted.  It was the prosecutor

25   that asked that question.

1    If this, in fact, happened and Mr. Bailey answers that

2  question truthfully, if, in fact, it happened, then we don't

3  have this miscarriage of justice that plaintiff is complaining

4  about.  And that's not Scott Moore's fault.  The only person

5  who's admitted lying in this matter is Mr. Bailey, not

6  Mr. Moore.

7    Now, Mr. Godsey, he's not a neutral witness.  He's

8  Mr. Gillispie's lawyer.  He's his advocate.  You know, lawyers

9  are bound to be zealous advocates for their clients.  So this

10 is not a man offering neutral testimony.  This is a man who's

11 advocating for his client.

12    So common sense.

13    Now, plaintiff's made an issue of the fact that Scott

14 Moore's dad was the chief of police.  So let's talk about

15 Scott Moore.  Doesn't have the temperament to be a police

16 officer, be a detective.  Never should have been a detective.

17 Got tunnel vision.  So forth, so on.

18    Well, like I said, every good story needs a villain.  So

19 this guy's a police officer for 25 years.  This is the only

20 case that anybody's challenged.

21         MR. OWENS:  Objection, Your Honor.

22         THE COURT:  Basis?

23         MR. OWENS:  There's no evidence in the record to

24 support that.  And I think it wouldn't have also likely been

25 admissible as it relates to other acts.

1    THE COURT:  Sustained.  It will be stricken.

2        Go ahead, counsel.

3        MR. McLANDRICH:  So this man's a career police

4    officer.  Father's chief of police, right?  He didn't know

5    Mr. Gillispie from Adam when he gets this case.  Why is he

6    going to try and railroad Dean Gillispie?  What's in it for

7    him?  What, he's going to get his detective's merits badge.

8    That's the idea?

9        And you heard the testimony -- I think plaintiff elicited

10   it -- if he suppressed this report, it would have been a

11   criminal offense, right?

12       So for no reason, for a man he's never met before, he's

13   got no ax to grind, he's going to risk a criminal offense?

14   He's going to ruin his own career?  He's going to shame his

15   father, shame his father's reputation, shame his own

16   reputation for what?  To try and put in prison a man that he

17   has no relationship to, never saw before.  It defies common

18   sense.

19       We hear this dialog about the fact that the perpetrator

20   used the name Roger, said he was a security guard.  You know,

21   is his name really Roger?  Who knows.

22       Their own expert agreed, it doesn't exclude the person.

23   It's not like Scott Moore, you know, like, "Oh, the guy's

24   name's Roger?  Well, let's run out and arrest him."  Didn't do

25   that.

1       "Oh, he worked as a security guard?  Well, let's run out

2  and arrest him."  Didn't do that.

3       He got positive identifications from the two sisters.

4  Then what did he do?  And you heard him testify to it.  I

5  wanted to try and corroborate the accuracy of their

6  identification.  So I went to the third person who has no

7  relationship to them, wouldn't have been, quote-unquote,

8  contaminated by speaking to them.  Showed them the same

9  array -- showed her the same array, S.C.  And she identifies

10  him.

11       You heard their own expert say, it would be highly

12  unlikely that three people would identify the same suspect out

13  of the array.  Now, here's where the spin comes in, right?

14  And the spin is, well, then Scott Moore, he must have told

15  them all who to pick.  Of course there's no evidence of that.

16       You know, these guys are good advocates, right?  So --

17  but you can draw an inference that he did.  Well, you could

18  also draw an inference that he was guilty.  If he's guilty, of

19  course they're all going to pick the same person, their

20  premise is -- and, of course, again, they are advocates for

21  their clients, so they have to say it -- he's innocent.  So

22  there is only one possible outcome, and that is that this man

23  manipulated the array, except there's no evidence of it.

24  Maybe argument.  It's certainly not evidence.  There's no

25  evidence of that.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1642

1     "Well, he must have said something 'cause they picked

2     him."  Well, no, that's what we call supposition.

3     Mr. Gillispie got a second trial.  He got a second trial

4     because of the hair evidence.  Plaintiff says, the hairs

5     didn't match Dean Gillispie.  The jury knew that.  That was

6     put on.  The jury knew that.  He was convicted anyway.

7     The alleged defects in the photo array.  And I think

8     plaintiff said it in close, "Well, Mr. Lieberman pointed out

9     55 differences between Mr. Gillispie and the suspect."  The

10    jury didn't believe it.  The jury convicted him anyways.

11    You heard the, "Well, he doesn't wear a gold medallion.

12    He doesn't tan.  He doesn't smoke."  There's nothing new

13    there.  Both those juries heard that.  And they both convicted

14    him.

15    The alibis.  Plaintiff's counsel puts up the Marie Woods

16    calendar.  August 4th, they go to the movie.  August 6th, they

17    go to the party.  Well, of course, the crime didn't occur on

18    either one of those days.

19    August 5th, plaintiff said it in closing, "Well, he was

20    out driving around with Mr. Poulter on August 5th."  Problem

21    is, you heard Mr. Poulter, "We got together between 4 and 6.

22    The crime occurred early afternoon, 2 o'clock."  That's not an

23    alibi.  That's an alibi for nothing.  There is no alibi for

24    the 5th.  Does it mean he committed the crime?  It doesn't

25    mean he committed the crime.  It means there's no alibi.  It

1    means that Scott Moore's not trying to railroad him.  There's

2    no alibi.

3        The various friends about August 20th.  "Well, we were

4    down in Kentucky at the lake."  Okay.  Mr. Moore, he doesn't

5    go down to Kentucky.  What does he do?  He calls down to the

6    ranger station and he says, "Hey, can you guys look and see if

7    you have any receipts for Jerry Fyffe and/or Roger Gillispie

8    for the month of August and the few months surrounding it,

9    before it?"

10        And what's he get back?  He gets back three receipts.

11   Now, of course, again, every good story needs a villain.

12   "Well, there must be more receipts."  Well, why must there be

13   more receipts?  Because they want them to be, and because they

14   want to sully the man.  They want to assassinate the man's

15   character without foundation.

16        So then what do we have?  And, of course, this wasn't

17   known at the time that Mr. Moore took this to the prosecutor,

18   right?  This is all evidence that they developed, the criminal

19   defense team developed in an effort to defend a trial.

20        They start looking around, and you heard the testimony:

21   We couldn't find it for a while.  Then we found Homer Fyffe's

22   calendar.  And what does the calendar say?  The calendar says

23   the dogs had puppies.  And then the fact that the dogs had

24   puppies becomes the hinge upon which hangs the story of, well,

25   that triggers my memory that we were at the lake because, when

1    we came back from the lake, we saw the puppies.

2        You know, those are the kinds of issues we're talking

3    about here.  They are issues of credibility, right?  Now,

4    those issues of credibility were presented to the juries, two

5    juries.  Two juries of 12.  Two juries that were charged and

6    acted in the same good faith that you are going to act in this

7    case, and that found beyond a reasonable doubt that they

8    didn't believe that.  They couldn't have believed it.  If they

9    believed it, the man would have been acquitted.

10        Now, what plaintiff wants you to do is re-evaluate that

11    and say, you know, notwithstanding that 24 separate people

12    didn't believe those stories, you ought to believe him.  And

13    you ought to blame it on this guy (indicating).

14        That's not -- if they were mistaken, that's not his

15    fault.  A police officer gathers information.  And what did he

16    do?  Again, you got the identifications.  And between the

17    identifications by the two ladies and the identification by

18    S.C., he goes to Mr. Gillispie and says to him, "Do you have

19    anything that would prove where you were?"  And you'll see it

20    in the police reports.  "Do you have anything that would prove

21    where you were?"

22        And you heard him testify to it.  "Do you have any credit

23    card receipts?  Any bank records?  Something that would show

24    where you were?"  If he's looking to railroad the guy and he's

25    got tunnel vision, he doesn't do that.  'Cause he's not

1    looking.  And it says in the report, "looking to prove or

2    disprove Mr. Gillispie's innocence."

3         If he's looking to railroad him, he's not asking those

4    questions.  That's not a guy who's consciously disregarding

5    the known risks, that's a guy who's trying to gather the

6    evidence.

7         Now, unfortunately, Mr. Gillispie didn't have credit

8    cards.  He didn't have receipts that could establish with any

9    level of solidity where he was on that date.  It's not till

10   much later that we get the description of being down at Cave

11   Run Lake.

12        This is not a man who was consciously disregarding a

13   known risk.

14        So then he gets the identification from S.C.  What does

15   he do?  A police officer, if he wants to at that point, he's

16   got probable cause.  He could just swear out a criminal

17   complaint and go put the cuffs on Mr. Gillispie.  He doesn't

18   do that.  What's he do?  He takes that information, he gathers

19   up his file, and he goes to the prosecutor.  And the

20   prosecutor reviews it.  And she, she authorizes at that time

21   one charge against Mr. Gillispie, one of the rape counts.  And

22   a criminal complaint is sworn out, and he's arrested.

23        The remaining counts go to grand jury.  The ladies

24   testify at the grand jury.  Mr. Moore testifies at grand jury.

25   The grand jury indicts.

1     Now the case is in the hands of the prosecutors.

2  Whatever they choose to have investigated or not, they direct

3  the case.  Again, the case is tried twice, two convictions.

4     Mr. Cobb, newly acquired evidence.  Mr. Cobb was known

5  about at the first trial.  He is asked about at the first

6  trial.  It's not new evidence.  It may have developed

7  additional evidence regarding Mr. Cobb.  What didn't you hear

8  about Mr. Cobb?  You didn't hear that his physical

9  description, his height and weight, don't match the

10 perpetrator.  You didn't hear him say, "He's 6-3, 240."  You

11 didn't hear that.  You didn't hear him say, "Oh, well, we

12 looked into it and Mr. Cobb was in the area on August 5th.

13 Mr. Cobb was in the area on August 20th."  There's no evidence

14 that that man -- as much of a criminal as maybe he is -- had

15 the opportunity to commit these crimes.

16    Even, even if he did, he was presented at trial one and

17 was certainly available to be presented, if he wasn't -- I

18 don't recall, frankly -- presented at trial two.  And that's

19 not Scott Moore.  He didn't know -- there had been no evidence

20 that he knew about Mr. Cobb and said, "Oh, well, you know, I'm

21 tunnel-visioned.  I'm not looking at Mr. Cobb."  There is no

22 evidence that he knew about Mr. Cobb.

23    It's not recklessly disregarding a known risk.

24    So what does that bring us back to?  It brings us back to

25 the claims in this case.  What are those claims?  Two claims,

1    right?  Now, on both those claims, they are now saying, now,

2    after nine years, we're not claiming he did it knowingly.

3    Well, how do you recklessly suppress evidence?  Right?  If

4    you've got the evidence, you either turn it over or you don't.

5    If you've got the report, you either hand it in or you don't.

6         Now, interestingly, not a single person, not a single

7    person has testified that he had that report.  What are we

8    going to hear -- probably hear in rebuttal?  "Oh, well, you

9    know, Bailey said he wrote the report.  Fritz said he signed

10   off on the report," which, of course, they never bothered to

11   tell anybody about, and then the report would have gone in the

12   file.

13        Well, you heard Mr. Fritz say, "Reports were misfiled all

14   the time."  Well, if the report's misfiled and Scott Moore

15   doesn't have it, he couldn't have recklessly suppressed the

16   report.  He couldn't have consciously disregarded the known

17   risk of not turning the report in.

18        I don't know how you consciously disregard the risk of

19   not turning a report in, but that apparently now is the

20   allegation.

21        We've talked about the reports and the fact that it's

22   just simply not believable, the story they want you to accept

23   with respect to this suppressed report.

24        It brings us back to Claim Two.  Claim Two, the photo

25   array.  Again, we've already talked about the fact he used the

1  only picture he had.  He didn't have the ability to change the

2  background color of the picture.  More importantly, or equally

3  importantly I should say, the expert testimony is, the color

4  of the background, that's not what people are looking at.

5  They're not picking the guy because this background's red or

6  that background's blue or this background's yellow.  They're

7  looking at the man's face.

8      And let's talk about that for a minute.  You heard the

9  experts say -- and they all said it, right -- opportunity to

10  view the perpetrator.

11      S.C., she sits in the car with this man.  How far is it?

12  It's no further than this (indicating).  It's no further than

13  the length of my arm.  And they're looking the man right in

14  the face.

15      B.W. and C.W., all these women forced to perform oral sex

16  on this man.  Well, how close are you when that happens?  You

17  don't get any closer.  You're nose to nose.  You have every

18  opportunity in the world to see this person's face.

19      And as the ladies testified -- and I'll skip that because

20  they didn't testify here.  Why didn't they testify?

21          MR. OWENS:  Objection, Your Honor.

22          THE COURT:  Sustained.

23          MR. McLANDRICH:  Didn't get to hear from the women.

24          MR. OWENS:  Same objection.

25          THE COURT:  Overruled.

1     Go ahead.

2         MR. McLANDRICH:  They had every opportunity.

3     You heard the experts say, people who are making these

4     identifications, they're acting in good faith.  Nobody's

5     suggesting that these three women identified somebody that

6     they didn't in their hearts believe was the perpetrator.

7     Could all three be wrong?  Could all three pick this man out

8     of a lineup?  What?  All three of them are going to pick this

9     man -- this is what they want you to believe:  All three of

10    these women are going to pick this man out of a lineup because

11    his picture's a little bit bigger, because the color of his

12    background is orange.

13        I don't think that's believable, quite frankly.  And I

14    don't think it's consistent with the science.  I know it's not

15    consistent with the science.  You heard Dr. Wixted say the

16    first memory test -- that's the photo array -- that's the one

17    that counts.  The first memory test, it's facial recognition.

18    It's the face of the suspect, the perpetrator, that's

19    implanted in the memory.

20        And when they look at the array, it's that face that

21    triggers the response.  Not the color of the background, not

22    the clothes the person has on.  The face.

23        And you heard Scott Moore say that.  They said, "Well,

24    why did you pick these people?"

25        "I was looking for people whose faces were like and

1   similar." He wasn't focused on the background either. He

2   wasn't focused on the clothes. He was focused on faces that

3   were like and similar.

4       Did he do a perfect job? Well, I don't know. That's, I

5   guess, for you to describe -- to decide. But he is not held

6   to a standard of perfection. It's certainly not the standard

7   of the instructions. The standard of the instructions,

8   consciously disregarded a known risk.

9       Okay. And I am sure you are going to hear in rebuttal,

10  because I don't get rebuttal so I got to say it now, right?

11  So should he have known that there is a risk if you have a bad

12  lineup, that a bad ID could be made and the wrong person could

13  be convicted? Yeah, everybody knew that. Everybody knew it

14  then. But that's not the question. The question is whether

15  he knew on that array when he created it that he was creating

16  and disregarding consciously, consciously disregarding a known

17  risk, a high risk that the wrong person would be identified.

18  But he's focused on facial recognition, not focused on color

19  of background, not focused on clothes.

20      Eye color. C.W. and B.W., you heard the testimony, the

21  perpetrator had sunglasses on. Eye color wasn't a factor for

22  them. So when they picked Mr. Gillispie -- and, you know,

23  y'all have to decide for yourself whether you can see the eye

24  color of everybody in the array or not -- but eye color is not

25  a factor for C.W. and B.W. They had no eye color implanted in

1    their memory.  They just had the face implanted in their

2    memory.

3        You heard plaintiff talk about the identifications at

4    trial.  And the fact that Mr. Moore said, you know, I think

5    maybe he's dyed his hair, he's changed his appearance.  Well,

6    when you read the photo array instructions, you'll see it's

7    included right in there, that a person may change their

8    appearance -- hair, beards, things like that.  That's

9    standard.  It's done today.

10       The IDs at trial?  You heard Dr. Wixted say and

11   Dr. Dysart, you know -- and this is new science, right?  Those

12   are -- those are just merely repetitions of what they've

13   already said on the first memory test.  Because it's the first

14   memory test that matters.  When those three women made those

15   identifications from those arrays, none of that -- there's no

16   statement about he's changed his hair.  They just picked him,

17   and they picked him because of facial recognition.

18       Even if one was to believe it was mistaken, which is

19   suspect, there's no evidence that this man consciously

20   disregarded a known risk.

21       You heard some dialog about things that Scott said in his

22   report, right?  "I'm going to go out there in hopes of

23   obtaining an identification."  And for -- for that potential

24   imprecision with use of the English language, they now want to

25   pillory this man and villainize him in hopes of, in an effort

1    to, in hopes of, "Oh, my god I hope they identify him."

2    That's not what this file reflects.  He wasn't consciously

3    disregarding a known risk.

4        The presentation of the array.  Well, he didn't tell them

5    that they didn't have to identify anybody.  You'll see the

6    instructions.  And he read them the instructions.  You know,

7    they read them to themselves, and then he reads them the

8    instructions, right?  "The suspect may or may not be in the

9    array."  Well, if he may or may not be in there, obviously,

10   that's indicating you don't have to pick somebody, because he

11   may or may not be in there.  This is word games.  This is word

12   games.  This is not conscious disregard of a known risk.

13       He said to them, after two years, well, we have a

14   suspect.  We want you to look at some pictures.  Think about

15   it, again.  Common sense.  It's been two years.  The police

16   call you up and say to you -- let's take their perfect world,

17   right.  The police call you up after two years.  You have been

18   the victim of a crime.  We'd like you to look at some

19   pictures.

20       What?  Your family album?  Your trip to Cancun?  I mean,

21   who's kidding who here?  Everybody knows if the police call

22   you up, if it's been two years or two days, why would they

23   want me?  Why would they want me to look at some pictures?

24   Oh, yeah, I was the victim of a crime.  I guess they must have

25   a suspect.  I mean, what are we talking about?

1        And the instructions again, the instructions

2   themselves -- which no one has challenged.  You didn't hear

3   either expert say those instructions are no good.  The

4   instructions say the suspect --

5             MR. OWENS:  Objection.

6             MR. McLANDRICH:  -- may or may not be in the array.

7             MR. OWENS:  There was an objection.  The Court --

8   neither expert testified anything with respect to the specific

9   instructions in this case, per this Court's order.

10            THE COURT:  Sustained.  It will be stricken.

11        Proceed.

12            MR. McLANDRICH:  Thank you, Your Honor.

13        The instructions say the suspect may or may not be in the

14   picture.  Again, it's just simple common sense.  People aren't

15   stupid.  You're not stupid.  If the police call you and say we

16   want you to look at some pictures, you know exactly why

17   they're calling you.

18        Of course, there's no evidence that he told them, "Oh,

19   we've got a suspect we want you to look at."  Even if he

20   had -- he maybe did.  I don't know -- but he is not telling

21   them anything they don't already know.  It's just -- it's

22   readily apparent.

23        You heard some emotional testimony in this case.

24   Mrs. Gillispie's very emotional.  Mr. Gillispie was emotional.

25   Some of his friends were emotional.  But you know what?  God

1654

1    bless them.  I am sure they are all good people.  But emotion

2    is not evidence.  And in the instructions, you will be

3    instructed to disregard the emotions of this case and decide

4    it on the evidence.

5        And, again, bear in mind that some of these -- most of

6    these issues that they want to use to try and characterize

7    Scott Moore as a now reckless detective, or recklessly

8    disregarding a known risk, aren't things that were known to

9    him when he turned the case over to the prosecutor.

10       The prosecutor makes the decision to go forward.  If

11   Mr. Gillispie was offered a plea deal, that's got nothing to

12   do with Scott Moore.  He is not in control of that.  If the

13   State of Ohio decided to oppose a habeas petition, that's got

14   nothing to do with Scott Moore.  He didn't make that decision.

15       And, again, with respect to these ladies, this issue of

16   contamination between the sisters, all of you were able to

17   abide by your commitment not to speak to others about the

18   matter, so why would we presume that these women act with any

19   less good faith than you?

20       Plaintiff asked you for, I don't know, $60 million.  You

21   know, I don't know if Mr. Gillispie's innocent.  I just know

22   he was convicted twice, that 24 people unanimously agreed,

23   based on the same evidence that you've heard, that the man was

24   guilty.  I'm not here to tell you how much somebody's life is

25   worth, how much the time in prison is worth.  That's not for

1    me to judge.  That's for you to judge.

2        We certainly don't believe that the scales have been

3    tipped.  Plaintiff used the analogy of the scales, right?

4    Preponderance of the evidence.  More likely than not.  So no

5    evidence that Scott Moore had the reports.  Evidence that if

6    the reports ever existed, which is highly suspect based on the

7    credibility of Fritz and Bailey, and certainly not enough

8    evidence to prove that it's more likely than not that Scott

9    Moore had that report and kept it from the prosecution or the

10   defense team, particularly when one considers the testimony of

11   Fritz that, even if the report existed, reports were often

12   misfiled.

13       I think plaintiff used the phrase, 'cause I wrote it

14   down, "It's a Recklessness Case Now."  Right?  Took obvious

15   and unjustifiable risk.

16       Again, as I said with respect to the report, there's no

17   evidence that puts that report in that man's hands, and that

18   man has no reason in the world to suppress that report.

19   Police detectives investigate any number of crimes over their

20   careers.  What's the difference if this one gets solved or

21   doesn't, if this man gets convicted or not, when I have no

22   relationship, no ax to grind with this man, and no one has

23   suggested that he did.

24       One of the things I can't stress enough to you.  This

25   array presented in 1990, the science you heard from both these

1    experts, smart people, didn't exist in 1990.  They're all

2    testifying about things that were never in the contemplation

3    of a Scott Moore.  Weren't in policies and procedures of

4    police departments.  Weren't information that he had that

5    would have told him that he was, quote-unquote, consciously

6    disregarding a known risk, or in the words of plaintiff's

7    counsel, taking an obvious and unjustifiable risk.  He picked

8    pictures that in his mind looked as close to Mr. Gillispie as

9    he could find.  He put them in the array to let these ladies

10   choose the person that they believed committed this crime.

11       We don't think that that array when you look at it is

12   going to say to you that this man consciously disregarded a

13   known risk of an identification, that he put his thumb on the

14   scale to tilt the prosecution to Mr. Gillispie.  They didn't

15   prove by a preponderance of the evidence, 51 percent if you

16   will, that Officer Moore should have appreciated that what he

17   was doing represented an unjustifiable risk of an unlawful

18   identification that would have deprived this man of a fair

19   trial.

20       I thank you for your time.

21           THE COURT:  All right.  Thank you, Counsel.

22       Counsel approach.

23       (At sidebar off the record.)

24           THE COURT:  Ladies and gentlemen, you've been at

25   this for a while now, and I know you must be a little tired

 1    and getting a little hungry.  So we're going to recess for

 2    about 45 minutes, and then we'll get back together.  That will

 3    be just around 1:15, 1:20, something like that, so we can keep

 4    going.  There are still more presentations to be made.

 5         So, again, please remember the admonitions that the Court

 6    has given you, and we'll be back with you in about 45 minutes.

 7         I will see counsel in about 35 minutes.

 8         Anything further, counsel?

 9              MR. KANOVITZ:  No, Your Honor.

10              MR. McLANDRICH:  No, Your Honor.

11              MS. FRICK:  No, Your Honor.

12              THE COURT:  Thank you very much.

13              THE COURTROOM DEPUTY:  All rise.  This court stands

14    in recess.

15         (Jury out at 12:32 p.m.)

16         (Recess at 12:32 p.m.)

17         (Jury in at 1:23 p.m.)

18         (In open court at 1:25 p.m.)

19         (At sidebar off the record.)

20              THE COURT:  We're back on the record.

21         Ladies and gentlemen, before we start, I just want to --

22    based upon the presentations of counsel, I need to tell you

23    that in deliberations, you're not to imagine yourself in the

24    position of either party.  You need -- in your deliberations,

25    you should only consider the evidence as I instruct you.

1       Counsel ready to proceed?

2               MS. FRICK:  Yes, Your Honor.

3               MR. McLANDRICH:  Yes, Your Honor.

4               THE COURT:  You may proceed.

5               MS. FRICK:  Thank you, Your Honor.

6       Good afternoon, ladies and gentlemen.  I just want to

7   echo what my colleagues have said, thanking you for what we

8   know to be the sacrifices that you all have put out for the

9   past two weeks, on behalf of counsel, but mostly on behalf of

10  the parties, and we appreciate that, and I just echo their

11  sentiments.

12      There's a couple things I want to start out with in

13  particular, and that's the Miami Township Board of Trustees

14  are not here to argue before you whether Detective Moore is

15  liable to Mr. Gillispie, whether Mr. Gillispie was innocent or

16  not innocent.  Those are not the reasons that we are here.

17      The other thing I want to point out to you is the

18  Township is not a party to any claims by Mr. Gillispie at this

19  trial.

20      And so what you will be asked on behalf of the Township

21  is if and only if you as a jury find on behalf of

22  Mr. Gillispie on either one or both of his claims, three

23  things:  The first thing is you'll be asked to determine if an

24  act or omission that deprived Mr. Gillispie of his

25  constitutional right occurred while Mr. Moore was not acting

1    in good faith.

2         Next, you'll be asked to determine if that act or --

3    excuse me -- act or omission occurred manifestly, or

4    obviously, outside the scope of his employment or official

5    responsibilities as a Miami Township police detective.

6         And, third, if at the time of an act or omission by Scott

7    Moore, was he not acting within the scope of his employment or

8    official responsibilities.

9         Now, you won't see documents or pictures or things like

10   that that will go directly to those issues as you might on the

11   other sides' claims.  So what you will have to do is you'll

12   have to take a look at -- think about the testimony and the

13   evidence that you heard from everyone and use your common

14   sense, as both counsel have previously said.

15        So, first, let's talk about the claim that Mr. Gillispie

16   makes that Scott Moore violated his constitutional right as it

17   relates to the identification process in his investigation.

18   What was the testimony that you heard in regard to this claim?

19        First of all, you heard Scott Moore say that in 1990 he

20   understood that a police officer was not to construct an array

21   that singled out a particular suspect.

22        You also heard him testify that he understood the reason

23   for not doing that is because there was a risk of

24   misidentification, and that misidentification could then lead

25   to an unfair trial.

1    You heard plaintiff's expert, Dr. Anthony Scott, testify

2    that there would be no reason for a police officer to

3    construct an unfair or suggestive array to influence victims

4    to choose a particular suspect.

5    And you heard defendant's expert say that there wouldn't

6    be any logical reason for, as part of their employment, for an

7    officer to use an unduly suggestive identification procedure,

8    and that's because the police department has an interest in

9    having reliable identifications in its criminal cases.

10    Plaintiff contends in this case that Scott Moore

11    recklessly used an unnecessarily or unduly suggestive

12    identification procedure.

13    If and only if you believe that contention, it's the

14    Township's position that you must find that Scott Moore acted

15    not in good faith.  And what would that be based upon?

16    Mr. Moore -- or Detective Moore knew that he wasn't supposed

17    to construct an unreliable or unduly suggestive photo array.

18    He knew that there was a risk if you did that, and the risk

19    was an unreliable identification, which could then lead to an

20    unfair trial.  He could not have done that in good faith if he

21    knew those things because he would have consciously been

22    disregarding what he knew his duty was as a police officer.

23    If he was using an unduly suggestive array to lead the

24    victims to look to a particular suspect, he would have been

25    doing that to mislead another, and that cannot be done in good

1    faith.

2         These things would be conscious wrongdoing on behalf of

3    Scott Moore if you believe plaintiff's allegations.

4         Additionally, if you believe his allegations as it

5    relates to the identification, that using an unduly or

6    unnecessarily suggestive identification process, Scott Moore

7    could not have reasonably believed that he was acting in the

8    interest of his employer, the police department, because he

9    knew that he wasn't to do that.  And so he would have been

10   outside of what his official responsibilities were as a

11   detective, which you heard were to investigate crimes and to

12   collect evidence.  And if he was knowingly or consciously

13   doing something that he wasn't supposed to do, it would have

14   to be outside of what his official responsibilities were.

15        Now, let's talk next about the suppression of evidence.

16   What was the evidence that you heard regarding that?  You

17   heard Scott Moore testify that he knew in 1990 that he had an

18   obligation to turn over all reports or exculpatory or

19   impeachment evidence to the prosecutor.  And he went so far to

20   say that if he didn't, that would not be -- or that would be

21   outside of his official responsibilities.  Not turning over

22   the evidence, he testified, would be contrary to the oath of

23   office that he took in order to become a police officer.

24        You heard from Dennis Lieberman, Mr. Gillispie's criminal

25   trial attorney.  He said within the judicial system the

1662

1  parties have to be able to rely upon one another to provide

2  the information that's required by law to one another.  And

3  that at the time, Montgomery County, which this criminal case

4  was in, had an open discovery policy.  And all the police

5  officers knew that that meant you turned everything over to

6  the prosecutor.

7      You heard Steven Fritz testify that it was the official

8  responsibility of a police officer and a police detective to

9  collect, preserve, and maintain evidence.  And you did that

10  because it was expected at Miami Township that the police

11  detectives in the department would turn over reports to the

12  prosecutor.  Steven Fritz, again, said that was part of their

13  official responsibility as a police detective.

14      And if an officer didn't do so, again, that would be

15  inconsistent with their oath, their solemn promise that they

16  took to become a police officer.

17      Finally, you heard read the testimony of Tim Wilson.  He

18  went so far as to say if a police officer withheld evidence,

19  that could potentially be criminal.  He said if a police

20  officer intentionally withholds evidence or unlawfully

21  undermines a suspect 's defense, that would be contrary to

22  their oath as a police officer.

23      And he, who was the supervisor of Scott Moore at the time

24  of the Best Products rape investigation, he said that he

25  expected all of his detectives to provide everything to the

1    prosecutor's office.  They had a mandatory duty.  And they

2    all -- everyone knew their obligation to turn over, in his

3    words, the good, the bad, and the ugly.

4         So if, and only if, you believe that plaintiffs have

5    shown that Scott Moore suppressed or withheld material or

6    readily apparent exculpatory and/or impeachment evidence, you

7    must find that he would have acted not in good faith.

8         He testified he knew he had a duty to turn over such

9    evidence, and because of that knowledge, if he did not do so,

10   he would have consciously disregarded his known duty.  If he

11   consciously withheld or concealed that evidence, it would only

12   have been with the design to mislead Mr. Gillispie's criminal

13   defense team, which could not reasonably be done in good

14   faith.

15        Even if you find that he recklessly withheld or

16   suppressed this evidence, you must still find that it could

17   not have been done in good faith.  And the reason for that

18   is -- and you've heard it said over and over again -- was this

19   a conscious disregard of a known risk?  He knew he had an

20   obligation to do so.  He knew the risks of not doing so.  And

21   if he didn't do so, then he consciously acted in the face of

22   an obvious or unjustifiable risk, which is reckless.

23        Finally, Scott Moore acknowledged that police -- a police

24   officer is a position of trust.  So much so that one -- before

25   one begins their position as a police officer, they have to

1    take an oath, a solemn promise to uphold the Constitution and

2    the laws of the United States and the State of Ohio.

3        You heard overwhelming evidence from the police officers

4    in this case that testified and the prosecutors and the

5    attorneys that testified that it was -- it's a mandatory duty.

6    It's an official responsibility of police officers to abide by

7    that oath.  And if you don't turn over obviously apparent

8    exculpatory or impeachment evidence, you would be in breach of

9    that oath.  And to do so could not be in the interest of the

10   Miami Township Police Department and, therefore, could not be

11   within the scope of his employment or official

12   responsibilities.

13       Again, we thank you very much for your service today.

14   Have a good afternoon.

15           THE COURT:  Thank you, Ms. Frick.

16       Counsel for the defendant for a response to Ms. Frick's

17   presentation.

18           MR. McLANDRICH:  Thank you, Your Honor.

19       Hello again.  Just very quickly.  There is no question in

20   this case that Scott Moore was acting within the course and

21   scope of his employment as a police officer.

22       First, of course, as we went on at some length -- and I

23   apologize for the length -- we don't believe that he

24   suppressed any police reports or other material evidence in

25   this case, and we certainly don't believe that he created a

1   photo array that was unduly or unnecessarily suggestive.

2       That said, if someone should disagree with us in that

3   regard, which we certainly fervently hope you do not, the

4   actions that he took were the actions of a police officer.  He

5   created the array that, to the best of his ability, was

6   appropriate; picked faces that he believed were most like the

7   suspect or sufficiently similar like the suspect to make the

8   array fair.  This was something he did as a part of his duties

9   as an officer in the pursuit of those duties in investigating

10  the offense and trying to come to a resolution as to who the

11  perpetrator of that offense was.

12      His actions in that regard he took with the best of

13  intentions in an effort to perform and uphold his duties.

14      The suppression of evidence is a bit of a queer duck in

15  the sense that, you know, how does one recklessly suppress

16  evidence.  I think I sort of spoke to this briefly in my prior

17  closing.  You know, one either produces the report or you

18  don't produce the report.  Certainly, again, we fervently deny

19  that he had any report that was not produced by him.

20      Now, with respect to the filing system at Miami Township,

21  to the extent somebody misfiled something and was reckless in

22  that misfiling, we don't believe it was Scott Moore.  If

23  somehow -- and I frankly don't know how -- you might find that

24  he recklessly misfiled the report and, therefore, it didn't

25  get to the plaintiff, that action also would have been taken

1666

```
1    in the normal routine of his duties, not something that he did

2    in any sort of effort to prejudice the plaintiff's rights with

3    respect to a fair trial.

4         These actions that Detective Moore has testified to and

5    that he performed were just routine police duties.  There was

6    nothing exceptional about anything he did.  Yes, there's a

7    duty to turn over reports, and, again, we believe all the

8    evidence is that he did so.

9         But, again, if one were to disagree, we certainly don't

10   think that any action that he took was with any ill intent,

11   no, quote-unquote, bad faith.  Everything he did, he did with

12   the best of intentions on behalf of the Miami Township Police

13   Department and did it within the course and scope of his

14   employment.  Thank you.

15              THE COURT:  Thank you, Counsel.

16        All right.  Ms. Frick, do you want to do your reply, or

17   rebuttal?

18              MS. FRICK:  Just very briefly.  Again, our position

19   is if, and only if, you find and believe the allegations that

20   have been made by Mr. Gillispie do you make these

21   determinations.  But keep in mind that the determination is

22   whether or not someone acted outside of the scope of their

23   employment or their official duties.  And the testimony was

24   overwhelming as to what the police officer's official duties

25   are, and those official duties include those things which
```

1    were -- were contained that oath of office:  to uphold the

2    Constitution and the laws of the United States and the State

3    of Ohio.  Thank you.

4          THE COURT:  Thank you.

5       Now, plaintiff's rebuttal to the defendant's response to

6    the plaintiff's closing argument.

7       And, Mr. Owens, I've got you at 15, okay?

8          MR. OWENS:  Thank you, Your Honor.

9       And I'll echo the course of people thanking you all for

10   your time over the last two weeks.  We spent a lot of time

11   together, and we're spending a lot of time together today.

12      The judicial system is important.  Courts are important.

13   They matter.  And there are values we all hold:  love,

14   justice, and fairness.  In trials, like this one, we put our

15   trust in one another.  We're putting our trust in you.  And we

16   expect the system to be fair.

17      So you ask a question, which was raised by counsel, how

18   could it be that an innocent person could be convicted twice

19   by two juries, again and again, two juries?  The system, the

20   process, was unfair.

21      When you go to the state fair and you have the ring toss

22   and you are throwing things up there, you don't win that much

23   because it's an unfair process.  And so that is how, when you

24   have a broken system, bad results can happen.

25      And we know in particular that eyewitness identification,

1668

1    cases involving those types of -- that type of evidence, can

2    be particularly unfair or that error rates, the mistakes, can

3    be very high.  So it's important to keep that in mind as for

4    why we're talking about a fair trial here.

5        I wanted to address something very briefly about this

6    idea that every good story needs a villain.

7        First, this is not a story.  This is not a massive

8    conspiracy by a group of people to free an innocent person --

9    or to free some brazen criminal.  It is truth.  It is life.

10   And Mr. Gillispie's innocence matters.

11       And there's a reason why Defendant Moore is the defendant

12   in this case.  He is the one who prosecuted Dean.  He was at

13   the pretrial hearings.  He did all three of the

14   identifications.  He was at both of the trials.  He submitted

15   affidavits in post conviction in 2008 and 2013 trying to keep

16   Dean in prison.  Or keep the criminal process going.

17       So it's not a story.  And he's not just some rogue

18   villain that we are drawing up as part of some grand

19   conspiracy.  Instead, a mistake was made and unfairness

20   ensued.

21       I do -- you had an opportunity to see Dean and hear him

22   testify, hear everything that he had to say.  The idea that he

23   could somehow break out and do some brazen criminal act

24   because he's not a simple person, there is some darkness lying

25   in him.  There is no darkness in this man.  He was faced with

1669

 1   the darkest of dark, and the light shown.  You've seen his

 2   art.  You've seen all of these things:  the buildings, the

 3   Frodo house, the this, the that, the other.  That's the

 4   character of this person.

 5       He had every opportunity in the world to show -- to be

 6   somebody that he is not, but this is Dean Gillispie.

 7       And the defense, the thing that really struck me that

 8   quite frankly made me pretty upset about their closing

 9   argument was you didn't hear them at any time credit the

10   testimony of Dean Gillispie.  He testified here for more than

11   a day.  This is hard on him.  It's not easy.  It's not fun.

12   It's not a conspiracy.  He testified, "I'm innocent.  I know

13   it.  I wasn't there.  And this is what happened to me."

14       So all of those things are what this trial is about, is I

15   was treated unfairly.  And he's the type of people, he is the

16   type of person that -- and people around him who had no

17   concept in 1988-1990 that just a person in the community

18   running around with his friends, meeting people, driving

19   trucks could somehow be wrongfully convicted for something

20   that they didn't do.  In 1990, that wasn't on his radar.

21       Now things have changed.  We're in a different world.

22   But we are certainly not in this moment or in this trial

23   asking you to be unfair to Detective Moore.  I am not asking

24   you to evaluate him based on new scientific standards that

25   exist today.

1       So let me just explain a few things.  There is a lot of

2   new evidence in the world that's happened since those trials.

3   First, Dean's conviction was vacated in 2011 by a federal

4   court.  Second, Dean's conviction was vacated by a separate

5   state court in 2012 related to Kevin Cobb.  There was new

6   evidence -- we all didn't all hear all about it -- that led to

7   those convictions being vacated.

8       Specifically with respect to Kevin Cobb, you heard Mark

9   Godsey testify that he got the rap sheet; that he got the

10  picture -- you have seen the picture; that he also talked to

11  people, "Who is this guy?"  He talked to his parents.  He

12  talked to his ex-girlfriend.  He talked to --

13          MR. McLANDRICH:  Objection.

14          THE COURT:  Well, he's not said anything -- he

15  talked to him.  That was the testimony.

16      Go ahead.  Overruled.

17          MR. OWENS:  He talked to Kevin Cobb himself.  He

18  filed a motion in court, as an officer of the court, with the

19  former Attorney General, the State of Ohio, saying that this

20  guy's innocent and his conviction needed to be overturned.

21      So let's turn briefly to the two claims that we have in

22  this case.  The first one is about the eyewitness

23  identifications.  Now, you heard the defense say, well, it's

24  just about the photo array.  It's not just about the photo

25  array.  The photo array is a component.  If Detective Moore

 1     got a photo array and threw it in a drawer, nothing bad would

 2     have ensued to Mr. Gillispie.

 3         Instead, it involves the corruption of a criminal process

 4     in a way that is unfair.  So don't just disregard all of the

 5     things that happened, and you will see in the elements

 6     instruction that you are given on Instruction Number 24 that

 7     number two is that the identifications were used in the

 8     criminal case.

 9         So we have an unfair process.  Like my ring toss game.

10     And so all of these things about the head being blown up,

11     about the color of the background, do they matter?

12     Absolutely.  But I think of it like this:  It's sort of like

13     the sprinkles on the ice-cream.  The ice-cream cone of

14     unfairness that this detective created with respect to Dean

15     Gillispie so he couldn't get a fair trial happened before,

16     during, and after, at each stage of the process.  So we'll

17     just skip the before.  We don't even need to talk about the

18     array.  Let's talk about what happened during the

19     administration.  For example, C.W. didn't even make an

20     identification.

21         Could we get the --

22         One reason I'm talking about the before, during, and

23     after is because, as you'll see in the jury instruction, the

24     claim involves the totality of the circumstances, not just one

25     point in time.  And so what we know is that during the

```
 1    administration, that C.W. expressed significant hesitation.

 2    And it wasn't just from our mouth, it wasn't just griping

 3    about response latency -- though I do enjoy reading all those

 4    scientific articles.  Detective Moore himself testified that

 5    it took her about two minutes and that he had seen her narrow

 6    it down, and that was the testimony.

 7         And then he sat at the original criminal proceedings --

 8    if we can get it up here -- is that within a couple minutes

 9    she had narrowed it down to a couple photographs.  So she's

10    going back and forth between two people.  She picked up

11    Mr. Gillispie.

12         But there's much more to the story.

13         Next page.

14         We've seen this photographic instruction here.  What it

15    says is if a witness does not -- cannot make an

16    identification, should read them the following thing:  "Do any

17    of the persons shown in this photograph resemble the person

18    you saw?"

19         Their police practices expert, guy from Miami, pretty

20    old-school guy, yeah, a resemblance is not an identification.

21    That's what he said yesterday.

22         Next page.

23         But at the grand jury, unbeknown to Gillispie, his

24    defense attorneys at the time, Mr. Lieberman, Mr. Godsey,

25    Mr. Moore read her this question:  Does it look like somebody?
```

1    Is it a resemblance?  Why?  Because she did not make an

2    identification.

3         So every time you heard him say here today, oh, they made

4    an identification, all of this stuff, they're still trying to

5    deny the truth that he said and that was withheld from

6    Mr. Gillispie for years.

7         Next page.

8         And so you'll see when Detective Moore wrote up the form,

9    it doesn't say anything at all about reading her this question

10   that the person resembles him; that C.W. did not make an

11   identification when it took her two minutes to look at this

12   array.

13        So the process, we all agree, if it took you that long

14   and it was just resembled, this was not an identification.

15   But he represented it as if it was.  He didn't include the

16   crucial information in the form.

17        You can take that down.  Thank you.

18        So that goes directly to our next claim in this case,

19   which is about the suppression of evidence.  Detective Moore

20   didn't put that there.  We didn't know about that.  And,

21   again, I -- the defense has tried to make it seem like the

22   Brady claim as it relates to the suppression of evidence just

23   relates to Fritz and Bailey.  It does not.  It includes the

24   fact that I just showed you there, that Detective Moore hid

25   the fact that C.W. did not make an identification and that he

1    knew it.  And he read her that question.

2        Our claim about the -- excuse me -- about the suppression

3    of evidence goes to the fundamental fairness of the criminal

4    proceedings.  And I want to talk to you about why it's so

5    important, for a whole bunch of reasons, that you saw the

6    people who testified at their original criminal proceedings.

7    Because it was a close call.  Even in a rigged, broken, unfair

8    system, at trial, Mr. Gillispie still almost won.  And that's

9    because these are all incredibly powerful people.  He still

10   almost won.  So it would only take a little bit more, maybe

11   that admission we have from Moore at the grand jury that was

12   never disclosed, to say, "Oh, wait, C.W. didn't make an

13   identification?"  Oh, that's going to cause you to question

14   the entire process, and that's why suppression of evidence is

15   so troublesome, because you don't get a fair shake.

16       Dean never got a fair shake.  And we can talk long and

17   long and long about --

18           THE COURT:  Five minutes, Counsel.

19           MR. OWENS:  Thank you, Your Honor.

20       -- about the suppression of evidence.  And you heard from

21   Mr. Godsey.  The idea that there is a long list of liars

22   involved in a conspiracy to just fabricate a habeas claim by

23   former AG Petro, Mr. Godsey, Fritz, Bailey, Lieberman, all of

24   these people?  No.

25       So when you look at that and you think about it, there's

```
1    things that have not been disclosed.  And go back to as it
2    relates to the grand jury.
3         We can go to the next one.
4         Detective Moore hid more evidence.  And as you know,
5    there's this camping card receipts thing as it relates to
6    August 20th.  Detective Moore, when you heard him on the
7    stand, talked about this passage.  He said, "Well, I might
8    have been mistaken.  When I said last few months, that doesn't
9    mean I had a bunch of cards for the last few months, May,
10   June, and July.  I just had the one each.  I only had three."
11        But then he says this:  He was down there for four days
12   after the girls got raped.  What month was that?  August.  So
13   either he's mistaken or he hid something from the criminal
14   process.  Either way, he had to disclose this.  This is
15   sufficient on its own for us to prevail on our due process
16   claim.
17        Now, I could talk for a really, really long time about
18   some of the things that we disagree with.  For example, you
19   heard Mr. Poulter testify that he was out with Dean between 4
20   and 6.  The S.C. crime on that day, you will see it in PX 8,
21   happened at 4 in the afternoon.  So the idea that there was
22   some half an hour for them to commit some rogue, heinous crime
23   is kind of difficult to understand.
24        But I want to move to this question of mens rea and
25   recklessness.  You will get an instruction about it, and I
```

1   think there's -- you will just read it, but it talks about

2   obvious errors.  It was obvious to police in 1990 that

3   witnesses can be mistaken.  And so, yes, the question's what

4   do you do when you have an obvious risk?  When I'm in my car,

5   I wear a seat belt.  Sometimes on my bike -- but not always --

6   I wear a helmet because I know it's risky.

7       What precautions did Detective Moore take because he knew

8   about the risk?  They are obvious.  It's not many.

9       So I want to come to the last issue as it relates to --

10  and you will see -- as it relates, very briefly, to the

11  Township, their instruction.  We've talked a lot about

12  recklessness today, Instruction Number 29.

13              MS. FRICK:  Objection, Your Honor.

14              MR. OWENS:  Conduct that is reckless --

15              THE COURT:  Counsel, Counsel, Counsel, there is an

16  objection.

17              MR. OWENS:  I apologize.

18              THE COURT:  Approach.  I won't take your time, but

19  approach.

20      (At sidebar.)

21              MS. FRICK:  Just before we got started, that this

22  was his rebuttal to --

23              THE COURT:  Rebuttal to him.

24              MR. OWENS:  Oh, I apologize.  That didn't even occur

25  to me.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
 1              THE COURT:  It's just a rebuttal to him.

 2              MR. OWENS:  My apologies.

 3              THE COURT:  But I am not going to take your minute

 4    away from you.

 5              MR. OWENS:  Can I get one more?

 6              THE COURT:  Yes, you can get one more.

 7         (In open court.)

 8              THE COURT:  Continue, Counsel.  About three.

 9              MR. OWENS:  Thank you, Your Honor.  I really do

10    appreciate it.

11         So, let's turn back to Dean.

12         Well, I apologize.  I think a detective could recklessly

13    suppress evidence like you just saw in the sheet.  He didn't

14    include that thing in the form.  It did include other

15    information, which Detective Moore did himself admit was undue

16    suggestion.  He said, "I never should have told her a hundred

17    percent."  That was undue.

18         So I think by Detective Moore's admission, I don't know

19    why we don't --

20              MR. McLANDRICH:  Objection; mischaracterizes.

21              THE COURT:  With regard to?

22              MR. McLANDRICH:  Saying that -- he never said that

23    the hundred percent was some sort of misrepresentation.

24              THE COURT:  Sustained.

25         Go back.  Go from there.
```

1           MR. OWENS:  What Detective Moore said, and at least

2      what I recall him saying and you will remember and be the

3      judge of the evidence -- is that by saying, you know, you need

4      to be a hundred percent, that he put undue pressure on her.

5      That's all I was referring to.

6           Anyways, this is a case where there is an unfathomable

7      damage that has been done.  And the idea that we have to put

8      it into money is hard and it is difficult, and it is your

9      charge.

10          You will get an instruction about compensatory damages.

11     My counsel forwarded the idea of 60 million; you could go

12     above that, go below that.  What you didn't hear counsel for

13     Mr. Moore say was that that was an unreasonable number, and I

14     think there is really an important reason why.  You know,

15     there is a saying that love don't mean nothing unless there is

16     something worth fighting for.  And what you've seen is love.

17     What you've seen is love.  What you've seen is love.  There is

18     something worth fighting for.  That's because he's an innocent

19     man who was wrongfully convicted.

20          In this trial, because they will not concede that he's

21     innocent, even though all of these things have happened:  The

22     charges have been dismissed.  He's been declared a wrongfully

23     imprisoned individual.  They don't want to concede that here.

24     This trial is about his innocence.  This trial is about

25     fighting for love.  And this trial is about fairness.  And

1    that's why at the end we'll ask you to enter a verdict on

2    behalf of the plaintiff.  And we'll also ask you to say no and

3    no and no when it comes to the issue of whether Mr. Moore was

4    acting outside of the scope of his employment or in bad faith.

5    He's done reckless conduct that ruined a life.  Love

6    prevailed.  And we ask that truth, justice, and fairness, the

7    fundamental tenet of our system, will adhere in your verdict

8    today.  Thank you.

9            THE COURT:  Thank you, Counsel.

10    Ladies and gentlemen of the jury, now it's time for me to

11   instruct you about how the law -- about the law that you must

12   be following in deciding this case.

13    I'll start by explaining your duties and general rules

14   that apply in every case.

15    Then I'll explain some rules that you must use in

16   evaluating particular testimony.

17    All right.  We're going to give you some copies of this.

18   So you can feel free to follow along if you so desire.

19    Can you write on them?  Yes.

20    No objection to the jurors writing on the instructions,

21   is there?  It's their copy.

22           MR. KANOVITZ:  No objection.

23           MR. McLANDRICH:  No objection.

24           MS. FRICK:  No, Your Honor.

25           MR. HERMAN:  No, Your Honor.

1        THE COURT:  As I indicated, I'll be explaining some

2   rules that you must use in evaluating particular testimony and

3   evidence.

4        Then I will explain the elements or parts of the specific

5   laws that govern in this case.

6        And, last, I'll explain the rules that you must follow

7   during your deliberations in the jury room and the possible

8   verdicts that you may return.

9        Of course, please listen carefully to everything that I

10  say.

11       You have two main duties as jurors.  The first one is to

12  decide what the facts are from the evidence that you saw and

13  heard here in court.  Deciding what the facts are is your job,

14  not mine, and nothing that I have said or done during this

15  trial was meant to influence your decision about the facts in

16  any way.

17       Your second duty is to take the law as I give it to you,

18  apply it to the facts, and decide if the plaintiff has proven

19  defendant liable by a preponderance of the evidence.  It is my

20  job to instruct you about the law, and you are bound by oath

21  that you took at the beginning of the trial to follow the

22  instructions that I give you, even if you personally disagree

23  with them.  This includes the instructions that I have given

24  you during -- given you before and during trial, and these

25  instructions.  All the instructions are important, and you

1    should consider them together as a whole.

2        Perform these duties fairly.  Do not let any bias,

3    sympathy, or prejudice that you may feel toward one side or

4    the other influence your decision in any way.

5        In this case, Plaintiff Dean Gillispie is a private

6    citizen, and Defendant Scott Moore is a former police officer

7    for Miami Township.  All parties are equal before the law, and

8    both plaintiff and the defendant are entitled to the same fair

9    consideration.

10        Now, during the trial, I sometimes may have asked a

11    witness questions.  Please do not assume that I have any

12    opinion about the subject matter of any questions I may have

13    asked.

14        You must make your decision based only on the evidence

15    that you saw and heard here in court.  Do not let rumors,

16    suspicions, or anything else that you may have seen or heard

17    outside of this court influence your decision in any way.

18        The evidence in this case includes only what the

19    witnesses said while they were testifying under oath, the

20    exhibits that I allowed into evidence, and the stipulations

21    that the lawyers have agreed to.

22        A stipulation is an agreement between both sides that

23    certain facts are true.  Now, nothing else is evidence.  The

24    lawyers' statements and arguments are not evidence.  Their

25    purpose is to discuss the issues and the evidence.  If the

1    evidence as you remember it differs from what the lawyers

2    said, your memory is what counts.  The lawyers' questions and

3    objections are not evidence.  My legal rulings are not

4    evidence.  And my comments and questions, if any, are not

5    evidence.

6        During the trial, I did not let you hear the answers to

7    some of the questions that the lawyers asked.  I also ruled

8    that you should not see some of the exhibits that the lawyers

9    wanted you to see.  And sometimes I ordered you to disregard

10   things that you saw or heard, or I struck things from the

11   record.  You must completely ignore all these things.  Do not

12   even think about them.  Do not speculate about what a witness

13   might have said or what an exhibit might have shown.  These

14   things are not evidence, and you are bound by your oath not to

15   let them influence your decision in any way.

16       Make your decision based only on the evidence, as I have

17   defined it here, and nothing else.

18       You should use your common sense in weighing the

19   evidence.  Consider it in light of your everyday experience

20   with people and events, and give it whatever you believe it

21   deserves.  If your experience tells you that certain evidence

22   reasonably leads to a conclusion, you are free to reach that

23   conclusion.

24       Now, some of you may have heard the terms "direct

25   evidence" and "circumstantial evidence."

1    Direct evidence is simply evidence like the testimony of

2    an eyewitness which, if you believe it, directly proves a

3    fact.  If a witness testified that he saw it raining outside

4    and you believed him, that would be direct evidence that it

5    was raining.

6    Now, circumstantial evidence is simply a chain of

7    circumstances that indirectly proves a fact.  If someone

8    walked into the courtroom wearing a raincoat covered with

9    drops of water and carrying a wet umbrella, that would be

10   circumstantial evidence from which you could conclude that it

11   was raining.

12   It was your job to decide how much weight to give the

13   direct and circumstantial evidence.  The law makes no

14   distinction between the weight that you should give to either

15   one, or say that one is any better evidence than the other.

16   You should consider all the evidence, both direct and

17   circumstantial, and give it whatever weight you believe it

18   deserves.

19   You are to consider only the evidence in the case.

20   However, you are not limited to the statements of the

21   witnesses.  You may draw from the facts you find have been

22   proved such reasonable inferences as seemed justified in the

23   light of your experience.

24   "Inferences" are deductions or conclusions that reason

25   and common sense lead you to draw from facts established by

1684

1    the evidence in the case.

2        Another part of your job as jurors is to decide how

3    credible or believable each witness was. This is your job,

4    not mine. It is up to you to decide if a witness's testimony

5    was believable and how much weight you think it deserves. You

6    are free to believe everything that a witness said, or only

7    part of it, or none of it at all. But you should act

8    reasonably and carefully in making these decisions.

9        Let me suggest some things for you to consider in

10   evaluating each witness's testimony.

11       Ask yourself if the witness was able to clearly see or

12   hear the events. Sometimes even an honest witness may not

13   have been able to see or hear what was happening and may make

14   a mistake.

15       Ask yourselves how good the witness's memory seemed to

16   be. Did the witness seem able to accurately remember what

17   happened?

18       Ask yourself if there was anything else that may have

19   interfered with the witness's ability to perceive or remember

20   the events.

21       Ask yourself how the witness acted while testifying. Did

22   the witness appear honest? Or did the witness appear to be

23   lying?

24       Ask yourself if the witness had any relationship to the

25   plaintiff or the defendant or anything to gain or lose from

1    the case that might influence the witness's testimony.  Ask

2    yourself if the witness had any bias or prejudice or reason

3    for testifying that might cause the witness to lie or to slant

4    the testimony in favor of one side or the other.

5        Ask yourself if the witness testified inconsistently

6    while on the witness stand, or if the witness said or did

7    something, or failed to say or do something, at any other time

8    that is inconsistent with what the witness said while

9    testifying.  If you believe that a witness was inconsistent,

10   ask yourself if this makes the witness's testimony less

11   believable.  Sometimes it may; other times it may not.

12   Consider whether the inconsistency was about something

13   important or about some unimportant detail.  Ask yourself if

14   it seemed like an innocent mistake or if it seemed deliberate.

15       And ask yourself how believable the witness's testimony

16   was in light of all of the other evidence.  Was the witness's

17   testimony supported or contradicted by other evidence that you

18   found believable?  If you believe that a witness's testimony

19   was contradicted by other evidence, remember that people

20   sometimes forget things, and that even two honest people who

21   witness the same event may not describe it exactly the same

22   way.

23       These are only some of the things that you may consider

24   in deciding how believable each witness was.  You may also

25   consider other things that you think shed some light on the

1  witness's believability.  It is your common sense and your

2  everyday experience in dealing with other people and then

3  decide -- I'm sorry.  Use your common sense and your everyday

4  experience in dealing with other people.  And then decide what

5  testimony you believe and how much weight you think it

6  deserves.

7      You've heard witnesses give opinions about matters

8  requiring special knowledge or skill.  You should judge this

9  testimony in the same way that you judge the testimony of any

10  other witness.  The fact that such person has given an opinion

11  does not mean that you are required to accept it.  Give the

12  testimony whatever weight you think it deserves, considering

13  the reasons given for the opinion, the witness's

14  qualifications, and all of the other evidence in the case.

15      A witness may be discredited or impeached by

16  contradictory evidence or by evidence that at some other time

17  the witness has said something or has failed to say something

18  that is inconsistent with the witness's present testimony.

19      If you believe any witness has been impeached and thus

20  discredited, you may give that -- the testimony of that

21  witness such credibility, if any, you think it deserves.

22      Ladies and gentlemen, it is proper for a lawyer to meet

23  with any witness in the preparation of the trial.

24      One more point about witnesses.  Sometimes jurors wonder

25  if the number of witnesses who testify makes a difference.

1    Do not make any decisions based only on the number of

2   witnesses who testified.  What is more important is how

3   believable the witnesses were and how much weight you think

4   their testimony deserves.  Concentrate on that, not the

5   numbers.

6    Remember that -- remember that if you elected to take

7   notes during the trial, your notes should be used only as a

8   memory aid.  You should not give your notes greater weight

9   than your independent recollection of the evidence.  You

10   should rely upon your own independent recollection of the

11   evidence or lack of evidence, and you should not be unduly

12   influenced by the notes of another juror.  Notes are not

13   entitled to any more weight than the memory or the impression

14   of each juror.

15    Whether you took notes or not, each of you must form and

16   express your own opinion as to the facts of the case.

17    In determining whether any fact has been proved, you

18   should consider all of the evidence bearing on the question

19   regardless of who introduced it.

20    The law does not require any party to call as a

21   witness -- as witnesses all persons who might have been

22   present at the time or the place involved in the case, or who

23   may appear to have some knowledge of the matter at issue in

24   the trial.  Nor does the law require any party to produce as

25   exhibits all papers and things mentioned in the evidence in

1     the case.

2          Ladies and gentlemen, in this case the parties have

3     stipulated or agreed that:

4          One, on August the 20th, 1988, two twin sisters, B.W. and

5     C.W., were sexually assaulted after being abducted at gunpoint

6     by a stranger in the parking lot of the Best Products store in

7     Dayton, Ohio.  These crimes were investigated by the Miami

8     Township Police Department.

9          Two, after seeing news about the Best Products assaults,

10    another woman, S.C., reported being assaulted on August the

11    5th, 1988, in a similar manner in a store parking lot in

12    Montgomery County.  This crime was investigated by the

13    Montgomery County Sheriff's Office.

14         On September the 5th, 1990, Gillispie was arrested and

15    then prosecuted for the Best Products crimes and those related

16    to S.C.

17         Number four, Gillispie was convicted at a criminal trial

18    in February of 1991 and then granted a new trial.  Gillispie

19    was convicted again in June of 1991 for the Best Products

20    crime involving B.W. and C.W., as well as crimes against S.C.

21         Five, Gillispie was confined for approximately two weeks

22    after his arrest and on bond then until his first trial in

23    February 1991.  Gillispie was continuously incarcerated

24    between February the 5th, 1991, and December the 22nd, 2011.

25    Gillispie was released following a federal court's order to

1    vacate the convictions and requiring a new trial on the basis

2    of the claim that exculpatory evidence was not produced to

3    Gillispie during a -- the criminal prosecution.

4         Six, in 2012, a separate Ohio court vacated Gillispie's

5    conviction and ordered a new trial due to the existence of new

6    evidence about an alternative suspect.

7         Seven, following an order by a judge in Montgomery County

8    Court of Common Pleas, which became final on July the 26th,

9    2017, the charges against Gillispie were dismissed with

10   prejudice.

11        Eight, on November the 19th, 2021, Gillispie was declared

12   to be a wrongfully imprisoned individual pursuant to Ohio law

13   by a judge in the Montgomery County Court of Common Pleas.

14        Nine, Plaintiff's Exhibit PX 59 at page 16 and

15   Plaintiff's Exhibit PX 285 at pages 6 and 7 are colored

16   photographs of the photo array that do not necessarily

17   replicate the location of the photographs in the array when

18   they were administered.

19        Ladies and gentlemen, you must treat these facts as

20   having been proven for the purpose of this case.

21        There is one more general subject that I want to talk to

22   you about before I begin explaining the elements of the claims

23   alleged in the case.

24        The lawyers for both sides objected to some of the things

25   that were said and done during the trial.  Do not hold that

1    against either side.  The lawyers have a duty to object

2    whenever they think that something is not permitted by the

3    rules of evidence.  Those rules are designed to make sure that

4    both sides received a fair trial.

5        And do not interpret my rulings on their objections as

6    any indication of how I think the case should be decided.  My

7    rulings were based on the rules of evidence, not on how I feel

8    about the case.  Remember that your decision must be based

9    only on the evidence that you saw and heard here in court.

10       Plaintiff Gillispie has the burden in a civil action such

11   as this to prove every element of his claims by a

12   preponderance of the evidence.  If the plaintiff should fail

13   to establish any element of his claims by a preponderance of

14   the evidence, you should find for the defendant as to that

15   claim.  When a party has a burden to prove any matter by a

16   preponderance of the evidence, it means that you must be

17   persuaded by the testimony and the exhibits that the matter

18   sought to be proved is more probably true than not true.

19       When I instruct you that a party has the burden of proof

20   on any proposition, or use the expression "if you find" or "if

21   you decide," I mean that you must be persuaded, considering

22   all the evidence in the case, that the proposition is more

23   probable -- probably true -- I'm sorry -- than not.

24       In determining whether any fact and issue has been proved

25   by a preponderance of the evidence, unless otherwise

1    instructed, you may consider the testimony of all witnesses,

2    regardless of who may have called them, and all exhibits

3    received in evidence, regardless of who may have produced

4    them.

5        In this case Plaintiff Gillispie makes two claims against

6    Defendant Moore.  Each one of those claims is a claim pursuant

7    to 42, U.S.C., Section 1983, typically referred to as Section

8    1983.  The elements required to prove such a claim will be

9    detailed for you in a separate instruction.

10       The Fifth and the Fourteenth Amendment to the United

11   States Constitution guarantee all citizens the right to due

12   process of law, which includes the right to a fair trial,

13   before being deprived of life, liberty, or property.  A fair

14   trial requires the police to produce all materially

15   exculpatory and impeachment evidence.  A fair trial also

16   requires the police to refrain from using eyewitness

17   identifications that are unreliable.  Plaintiff Gillispie

18   claims that Defendant Moore violated his right to a fair trial

19   in one or more of the following ways:

20       First, that Defendant Moore violated his right to a fair

21   trial through unreliable identifications that were used as

22   evidence against him in the criminal case.

23       And, second, that Defendant Moore violated his right to a

24   fair trial by suppressing material evidence.

25       Defendant Moore denies each of these claims.

1     I will instruct you on the elements of each of the -- of

2  Plaintiff Gillispie's claims.

3     Again, each of Plaintiff Gillispie's claims is a claim

4  under Section 1983.  In order to prove a Section 1983 claim,

5  the burden is upon the plaintiff to establish by a

6  preponderance of the evidence each of the following elements:

7     First, Defendant Moore performed acts that operated to

8  deprive plaintiff of one of plaintiff's federal constitutional

9  rights, as defined and explained in these instructions.

10     Second, Defendant Moore acted under the color of state

11  law.

12     And Defendant Moore's acts were the proximate cause of

13  damages sustained by plaintiff.

14     Because Defendant Moore was acting as a police officer of

15  Miami Township at the time of the acts in question, he was

16  acting under the color of state law.  In other words, the

17  second element is satisfied.

18     An injury or damage is proximately caused by an act, or

19  failure to act, whenever it appears from the evidence in the

20  case that the act or omission played a substantial part in

21  bringing about or actually causing the injury or damage to

22  Plaintiff Gillispie.  And that Gillispie's injury or damage

23  was either a direct result of or a reasonably probable

24  consequence of the acts or omissions of Defendant Moore.

25     Plaintiff Gillispie's first claim is that Defendant Moore

1     violated his constitutional right to due process of law and a

2     fair trial through identification evidence.

3          To succeed on this claim, plaintiff must prove the

4     following by a preponderance of the evidence:

5          One, that Moore knowingly or recklessly used

6     unnecessarily suggestive identification procedures that

7     resulted in one or more unreliable identifications; two, that

8     the evidence of one or more unreliable identifications was

9     offered into evidence in the criminal case; and, three,

10    Gillispie was injured as a result.

11         In order to determine whether Moore's actions were

12    suggestive, you should consider if a witness's attention was

13    directed to plaintiff through the circumstances of the

14    identification process overall.  To find the circumstances

15    suggestive, you need not find that Moore intended to single

16    out Gillispie, only that the procedures and methods overall

17    were suggestive.

18         With regard to evidence about the photo array

19    identification offered against Gillispie in the criminal case,

20    you may consider the photo arrays themselves, the manner in

21    which the array was presented, the details of the photographs,

22    any conduct of Moore before or during the photo array you are

23    considering, and any other evidence concerning the matter in

24    which the identification was made.

25         With regard to identifications of Mr. Gillispie made in

1694

1    court, you may consider any of the foregone -- any of the

2    foregoing evidence with regard to the photo array procedure

3    prior to trial as well as any conduct of Moore during the

4    photo arrays which resulted in unreliable identifications in

5    court.

6         As indicated in item one of this instruction, if you find

7    that Moore used unnecessarily suggestive identification

8    procedures, then you must consider whether the identification

9    was nevertheless reliable.  In order to determine whether a

10   witness's identification was reliable, you must consider the

11   totality of the circumstances concerning the identification.

12   You may consider any factors that bear upon the reliability of

13   the identification and determine which weight to -- which

14   weight to accord or not to accord any factor.

15        Factors to consider include but are not limited to:  the

16   opportunity of the witness to view the perpetrator at the

17   initial time of the assault; the witness's degree of attention

18   and whether it was distracted by any other issue, for example,

19   like the presence of a weapon or disguise; accuracy of the

20   witness's prior description of the perpetrator; the level of

21   certainty shown by the witness at the pretrial identification

22   and whether that level of certainty is trustworthy; the length

23   of time between the observation and the identification;

24   whether the perpetrator was a stranger or someone familiar

25   with any victim; and continuing impact of any suggestiveness

1    on the identifications.

2         These factors are just examples, and you are entitled to

3    evaluate the evidence before you.  The fundamental question is

4    whether you consider the identification to be reliable and

5    fair evidence.

6         If you find from your consideration of all the evidence

7    that the plaintiff has proven these three numbered items in

8    this instruction, then your verdict should be for the

9    plaintiff on this claim and you should go to -- on to consider

10   the question of damages.

11        On the other hand, if you find that the plaintiff has

12   failed to prove any one of the three numbered items in the

13   instruction, you should find for the defendant on this claim.

14        Plaintiff Gillispie's second claim is that Defendant

15   Moore violated his right to a fair trial by failing to

16   disclose exculpatory and/or impeachment evidence that was

17   material to plaintiff's defense in the criminal case.  To

18   succeed on this claim, plaintiff must prove each of the

19   following three things by a preponderance of the evidence:

20        One, Moore knowingly or recklessly concealed from the

21   prosecutor readily apparent exculpatory and/or impeachment

22   evidence during the criminal case and/or during Gillispie's

23   appeal.

24        Two, the evidence was material.

25        And, three, Gillispie was injured as a result.

1696

1    Exculpatory evidence is evidence that tends to show that

2    the accused is not guilty of the crime.

3    Impeachment evidence is evidence that would have been --

4    have made the jury at the criminal trial less likely to

5    believe a witness, including the police officers themselves,

6    who testified against the accused at the criminal trial.

7    Exculpatory evidence or impeachment evidence is material

8    if there is a reasonable likelihood that the suppressed

9    evidence could have affected the judgment of the jury.  If you

10   find multiple pieces of evidence were concealed or suppressed,

11   you must consider the cumulative effect on the jury's verdict

12   in the criminal case in the context of the entire record.  To

13   be material, it is not necessary that the plaintiff prove that

14   he would have been acquitted.  It is enough that withheld

15   evidence, taken together, undermines confidence in the outcome

16   of the criminal proceedings.

17   If you find from your consideration of all the evidence

18   that plaintiff has proven these three things, then your

19   verdict should be for the plaintiff on this claim and you

20   should go on to the consideration -- consider the question of

21   damages.

22   On the other hand, if you find that the plaintiff has

23   failed to prove any one of these three claims -- sorry --

24   three things, then you should find for the defendant on this

25   claim.

1     For the purpose of Plaintiff Gillispie's claims,

2   Defendant Moore need not have acted with bad faith, malice, or

3   ill will toward Gillispie in order for you to find that he

4   acted knowingly or recklessly.

5     A person acts recklessly when that person acts or, if the

6   person has a duty to act, fails to act in the face of an

7   unjustifiable high risk of harm that is either known or so

8   obvious that it should be known.

9     If you find in favor of plaintiff on one or more of

10  plaintiff's claims, then you must determine the amount of

11  money that will fairly compensate Plaintiff Gillispie for any

12  injury that you may find he sustained as a result of Defendant

13  Moore's conduct, as well as any injury he is reasonably

14  certain to sustain in the future.  This is called compensatory

15  damages.

16    Plaintiff must prove his damages by a preponderance of

17  the evidence.  Your award of damages must be based on evidence

18  and not speculation or guesswork.  This does not mean,

19  however, that compensatory damages are restricted to the

20  actual loss of money.  They include both mental and emotional

21  aspect of injury, even if they are not easy to measure.

22  Compensatory damages include but are not limited to:  the

23  physical, mental, or emotional pain and suffering plaintiff

24  has experienced; the physical, mental, or emotional pain and

25  suffering plaintiff is reasonably certain to experience in the

1   future; the loss of enjoyment of life plaintiff has

2   experienced; the loss of enjoyment of life plaintiff is

3   reasonably certain to experience in the future.

4       No evidence of the dollar value of physical, mental, or

5   emotional pain and suffering or loss of a normal life has been

6   or needs to be introduced.  There is no exact standard for

7   setting damages to be awarded on a count of these factors.

8   You are to determine an amount that will fairly compensate

9   plaintiff for any injury he has sustained.

10      Present value is the proper measure for all aspects of

11  any damage award.

12      You must not award damages more than once for the same

13  injury.  If you find that Defendant Moore violated more than

14  one of Plaintiff Gillispie's rights, Gillispie is entitled to

15  be compensated only for the injuries he actually suffered.

16  Thus, if Defendant Moore violated more than one of Gillispie's

17  rights but the resulting injury was no greater than it would

18  have been had Defendant Moore violated one of those rights,

19  you should award an amount of compensatory damages no greater

20  than you would award if Defendant Moore had violated only one

21  of Gillispie's rights.

22      Now, the fact that I have instructed you as to the proper

23  measure of damages should not be considered as indicating any

24  view of mine as to which party is entitled to your verdict in

25  this case.  Instructions as to the measure of damages are

1699

1    given for your guidance only in the event you should find in

2    favor of the plaintiff from a preponderance of the evidence in

3    the case in accordance with other instructions.

4        If, and only if, you find in favor of Plaintiff Gillispie

5    and against Defendant Moore on one or more of plaintiff's

6    claims, then there is another issue that you must decide.  You

7    must determine whether at the time of Defendant Moore's act or

8    omission that deprived Plaintiff Gillispie of his

9    constitutional right Defendant Moore was not acting in good

10   faith, was acting manifestly outside the scope of his

11   employment or official responsibilities, or was not acting

12   within the scope of his employment or official

13   responsibilities.

14       The issue does not involve any element of Plaintiff

15   Gillispie's claims.  The Plaintiff -- and Plaintiff Gillispie

16   has no burden of proof whatsoever regarding this issue one way

17   or the other.

18       In the event that you find that Defendant Moore violated

19   the constitutional rights of Plaintiff Gillispie with respect

20   to one or more of plaintiff's claims, then separately for each

21   of those claims only you must determine whether:  One, the act

22   of Defendant Moore was not taken in good faith; two, Defendant

23   Moore was acting manifestly outside the scope of his

24   employment or official responsibilities when he took the act;

25   and, three, Defendant Moore was not acting within the scope of

1    his employment or official responsibilities when he took the

2    act.

3        For the purpose of this issue, one does not act in good

4    faith when his conduct evinces a dishonest purpose, conscious

5    wrongdoing, or the breach of a known duty through some

6    ulterior motive.  Bad faith is the opposite of good faith,

7    generally implying or involving actual or constructive fraud,

8    or a design to mislead or deceive another, not promoted by an

9    honest mistake as to one's rights or duties but by some

10   interested or sinister motive.  Bad faith, although not

11   susceptible of concrete definition, embraces more than bad

12   judgment or negligence.  It imports a dishonest purpose, moral

13   obliquity, conscious wrongdoing, breach of a known duty

14   through some ulterior motive, or ill will partaking of a

15   nature of fraud.  Conduct that is reckless may still be in

16   good faith.

17       Scope of employment means the employee is engaged in an

18   activity that is logically related to the business of the

19   employer.  Determination of whether conduct is within the

20   scope of employment necessarily turns on the perception of

21   whether the employee acted, or believed himself to have acted,

22   at least in part, in his employer's interest.  However, if an

23   employee's actions are self serving or have no relationship to

24   the employer's business, then the conduct is manifestly

25   outside the scope of employment.  "Manifestly" is defined as

1    plainly and obviously.

2        Now, ladies and gentlemen, let me finish up my

3    instructions by explaining some things about your deliberation

4    in the jury room and your possible verdicts.

5        The verdict must represent the considered judgment of

6    each juror.  In order to return a verdict, it is necessary

7    that each juror agree.  Your verdict must be unanimous.

8        It is your duty as jurors to consult with one another and

9    to deliberate with the view to reaching an agreement if you

10   can do so without disregard to your individual judgment.  You

11   must each decide the case for yourselves, but only after

12   consideration of the evidence in the case with your fellow

13   jurors.  In the course of your deliberations, do not hesitate

14   to re-examine your own views and change your opinions if

15   convinced that it had been erroneous.  But do not surrender

16   your honest conviction as to the weight or the effect of the

17   evidence solely because of the opinion of your fellow jurors

18   or for the mere purpose of returning a verdict.

19       Remember at all times you are not partisans, you are

20   judges, judges of the facts.  Your sole interest is to seek

21   the truth from the evidence in the case.

22       Now, remember that if you elected to take notes during

23   the trial, your notes should be used only as a memory aid.

24   You should not give your notes greater weight than your

25   independent recollection of the evidence, and you should rely

1    upon your independent recollection of the evidence or the lack

2    of evidence, and you should not be unduly influenced by the

3    notes of other jurors.  Notes are not entitled to do -- notes

4    are not entitled to any more weight than the memory or

5    impression of each juror.  Whether you took notes or not, each

6    of you must form and express your own opinion as to the facts

7    of this case.

8         Upon retiring to the jury room, you will select one of

9    your number to serve as your foreperson.  The foreperson will

10   preside over your deliberations and will be your spokesman

11   here in court.

12        During the trial, several items were received into

13   evidence as exhibits.  We will have a computer system in the

14   deliberation room, and that will enable you to view the

15   exhibits electronically.  You will get some instructions on

16   using that system that when you go -- when you go in to and

17   begin your deliberations.

18        Remember that you must make your decision based only on

19   the evidence that you saw and heard here in court.

20        During your deliberations, you must not communicate with

21   or provide any information to anyone by any means about this

22   case.  You may not use any electronic device or media, such as

23   a telephone, cell phone, smartphone, iPhone, BlackBerry,

24   computer, Internet, any Internet service, or any text or

25   instant messaging service, any Internet chat room, blog,

website such as Facebook, MySpace, LinkedIn, YouTube, Twitter
to communicate to anyone any information about the case or to
conduct any research about the case until I accept your
verdict.  In other words, you cannot talk to anyone on the
phone, correspond with anyone, or electronically communicate
with anyone about the case.  Basically, it's the same thing,
same admonition I have been giving you all the time.  You can
only discuss the case in the jury room with your fellow jurors
during deliberation.  I expect you will inform me as soon as
you become aware of another juror's violation of these
instructions.

     You may not use these electronic means to investigate or
communicate about the case because it is important that you
decide the case based solely on the evidence presented in this
courtroom.  The information on the Internet or available
through social media might be wrong, incomplete, inaccurate.
You are only permitted to discuss the case with your fellow
jurors during deliberations because they have seen and heard
the same evidence you have.  In our judicial system, it is
important that you are not influenced by anything or anyone
outside of this courtroom.  Otherwise, your decision may be
based on information known only by you and not your fellow
jurors or the parties in the case.  This would unfairly and
adversely impact the judicial process.  A juror who violates
these restrictions jeopardizes the fairness of these

proceedings and a mistrial could result, which would require
the entire trial process to start again.

Once you start deliberating, do not talk to the court
security officers or to me or to anyone else except each other
about the case.  If you have any questions or messages, you
must write them down on a piece of paper, sign them, and then
give them -- or bring it to the attention of the court
security officer who will be outside your room.  And
Ms. Penski will obtain the piece of paper.  Ms. Penski will
then give them to me, and I will respond as soon as I can.  I
may have to talk with the lawyers about what you've asked, so
it may take some time to get back to you.  Any questions or
messages normally should be sent to me through your
foreperson.

One more thing about messages.  Do not ever write down or
tell anyone, including me, how you stand on your votes.  For
example, do not write down or tell anyone that you are split 4
to 3 or 6 to 1 or whatever your vote happens to be.  That
should stay secret until you are finished.

Ladies and gentlemen, I have prepared a verdict form that
you should use to record your verdict.  The form will read as
follows:

"Verdict.  For each claim, if you decide that Plaintiff
Gillispie has proved his claim against Defendant Moore, say so
by having your foreperson mark the appropriate place on the

1    form in Part I.  If you decide that plaintiff has not proved

2    the particular claim against Defendant Moore, say so by having

3    your foreperson mark the appropriate place on the form in Part

4    I."

5         "If you do decide that Plaintiff Gillispie has proven one

6    or more of the claims against Defendant Moore, then you must

7    complete both Part II and III of the verdict form.  On the

8    other hand, if you decide that Plaintiff Gillispie has not

9    proven any of the claims against Defendant Moore, then you

10   will skip Part II and Part III of the verdict form."

11        Once completed, sign -- once completed, you would sign

12   and date the verdict form.

13        The verdict form will read as follows:

14        "Part I, Liability.  We, the jury, considering each claim

15   individually, unanimously find as follows on Plaintiff

16   Gillispie's claims against Defendant Moore."

17        "Claim One, Due Process/Fair Trial, Unreliable

18   Identification."

19        "We, the jury, find," and then there is a line for "For

20   Plaintiff" and "For Defendant."  You will have your jury

21   foreman mark the appropriate line based upon your unanimous

22   decision.

23        "Claim Two, Due Process/Fair Trial, Suppression of

24   Evidence."

25        "We, the jury, find," again there is a blank "For

1　　Plaintiff," "For Defendant."  You will have the jury

2　　foreperson mark the appropriate line or place, based upon a

3　　unanimous verdict.

4　　　　Now, Part I is damages.  "We, the jury, having found in

5　　favor of Gillispie and against Defendant Moore on any one or

6　　more of the plaintiff's claims now assess damages as follows:"

7　　　　You will fill in the damages.  That will be filled in,

8　　again, if a verdict was returned for plaintiff on either Claim

9　　One or Two.

10　　　　"Part III, Additional Issue If the Jury Finds in Favor of

11　　Plaintiffs on Any of His Claims."

12　　　　The verdict form reads:  "We, the jury, having found in

13　　favor of Plaintiff Gillispie and against Defendant Moore on

14　　any one or more of the plaintiff's claims now assess the

15　　following questions."

16　　　　"For Claim One, Unreliable Identification, did we find in

17　　favor of the plaintiff?"  You will answer either "Yes" or

18　　"No."

19　　　　If you answer "No," then skip the next three questions

20　　and proceed to question regarding Claim Two.  If the answer is

21　　"Yes," then you will answer the next three questions.

22　　　　The next three questions are as follows:

23　　　　"With respect to Claim One only, was it proven by a

24　　preponderance of the evidence that Matthew Scott Moore was not

25　　acting in good faith?"

1     You will unanimously determine and mark -- have the

2  foreperson mark either "Yes" or "No."

3     "With respect to Claim One only, was it proven by a

4  preponderance of the evidence that Matthew Scott Moore was

5  acting manifestly outside the scope of his employment or

6  official responsibilities as a police officer with Miami

7  Township?"

8     Again, based upon a unanimous decision of your number,

9  you will have the foreperson mark the appropriate spot.

10     "With respect to Claim One only, was it proven by a

11  preponderance of the evidence that Matthew Scott Moore was not

12  acting within the scope of his employment or official

13  responsibilities as a police officer with Miami Township?"

14     Again, upon a unanimous agreement, you will have the

15  foreperson mark the appropriate spot.

16     For Claim Two, Suppression of Evidence, it reads, "For

17  Claim Two, did we find in favor of plaintiff?"

18     Upon unanimous decision, you will have the foreperson

19  either mark "Yes" or "No."  Again, if the answer is "No," then

20  you skip the next three questions and proceed to signing and

21  dating the verdict form.  If the answer is "Yes," then answer

22  the next three questions.

23     The next three questions are as follows:

24     "With we respect to Claim Two only, was it proven by a

25  preponderance of the evidence that Matthew Scott Moore was not

1  acting in good faith?"

2       Upon the unanimous decision, you will have the foreperson

3  mark the appropriate spot.

4       "With respect to Claim Two only, was it proven by a

5  preponderance of the evidence that Matthew Scott Moore was

6  acting manifestly outside the scope of his employment or

7  official responsibilities as a police officer with Miami

8  Township?"

9       Again, based upon unanimous agreement, you will have the

10  foreperson mark the appropriate spot.

11       Finally, "With respect to Claim Two only, was it proven

12  by a preponderance of the evidence that Matthew Scott Moore

13  was not acting within the scope of his employment or official

14  responsibilities as a police officer of Miami Township?"

15       Upon unanimous agreement, you will have the foreperson

16  mark the appropriate spot.

17       Upon executing the verdict form, whether or not it was in

18  favor or the plaintiff or the defendant, you will then -- all

19  jurors will sign at the signature line provided for them and

20  date their signatures.  You must understand that your verdict

21  and all findings must be unanimous.

22       Counsel, any objections to the jury instructions that

23  have not been previously raised?

24            MR. KANOVITZ:  None.

25            MR. McLANDRICH:  No, sir.

1    MS. FRICK:  No, Your Honor.

2    THE COURT:  Ladies and gentlemen, at this point in

3    time -- let's see.  At this point in time we are going to

4    allow you to commence your deliberations.  You can take a

5    little break here for a while, and that will give us an

6    opportunity to get to you the exhibits and all the things

7    necessary for you deliberations.

8    I think we may even have -- in addition to the flash

9    drive, we also have copies, I believe, of the -- hard copies

10   of all the exhibits.  There is no objection to the jury having

11   both the flash drive and the hard copies?

12   MR. McLANDRICH:  No, sir.

13   MR. KANOVITZ:  No, Judge.

14   MS. FRICK:  No, Your Honor.

15   THE COURT:  For your assistance.

16   Ladies and gentlemen, I truly appreciate your patience

17   and cooperation and attention in listening to me as I get

18   hoarse, but I do truly -- and I know, I'm not just speaking

19   for the Court, I'm speaking for plaintiff, defendant,

20   intervenor.  I know they appreciate your attention.  You're a

21   necessary part in this, and we appreciate everything you're

22   doing.

23   So with that, that's all.  You have your copy of this.

24   Now, obviously, if during your deliberations, if you have to

25   go home -- if you go home, the deliberations aren't concluded,

```
 1   you are going to need to leave everything there -- your notes,

 2   all of the material, okay?  All right.

 3        Anything further, counsel.

 4            MR. OWENS:  No, Your Honor.

 5            MR. McLANDRICH:  No, sir, Your Honor.

 6            MS. FRICK:  No, Your Honor.

 7            THE COURT:  Thank you very much.

 8            THE COURTROOM DEPUTY:  All rise.  This court stands

 9   in recess.

10        (Recess at 3:06 p.m.)

11        (Jury in at 4:46 p.m.)

12        (In open court at 4:47 p.m.)

13            THE COURT:  Ladies and gentlemen, we've come to the

14   end of a long day, so the Court's going to recess for the day

15   and ask you to be back Monday morning, 9 o'clock.  You will

16   not need to meet with me.  As soon as you're all here and in

17   the jury room -- I guess you report to eight as you always do,

18   and then we'll get you up here and get you started right away.

19   There won't be any interruptions to your deliberations at that

20   point in time.

21        So, however, I do need to tell you, although you can talk

22   amongst yourselves, as the instructions say, don't discuss the

23   case with anyone else or formulate any opinions or conclusions

24   outside of your discussions with your fellow jurors.  And all

25   the admonitions still apply.  We're getting close to the end,
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
 1    but, you know, when that happens, then you will be given the

 2    opportunity to talk to anyone you wish about the case.

 3         So, counsel, anything?

 4              MR. KANOVITZ:  No --

 5              MR. OWENS:  One thing, Your Honor, if I could have a

 6    moment.

 7              THE COURT:  Sure.

 8         (At sidebar off the record.)

 9              THE COURT:  One other thing.  Ladies and gentlemen,

10    of course, don't start -- when you come back in and you are

11    starting to gather, you shouldn't start your deliberations

12    until you actually get into the jury room, all right?

13         Anything else, counsel?

14              MR. OWENS:  No, Judge.  Thank you.

15              MR. McLANDRICH:  No.  Thank you, Your Honor.

16              MS. FRICK:  No.  Thank you, Your Honor.

17              THE COURT:  Have a wonderful, wonderful weekend.

18    Thank you.

19              THE COURTROOM DEPUTY:  All rise.  This court stands

20    in recess.

21         (Court adjourned at 4:49 p.m.)

22

23

24

25
```

1712

1        CERTIFICATE OF REPORTER

2

3        I, Mary A. Schweinhagen, Federal Official Realtime

4    Court Reporter, in and for the United States District Court

5    for the Southern District of Ohio, do hereby certify that

6    pursuant to Section 753, Title 28, United States Code that the

7    foregoing is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is

10   in conformance with the regulations of the Judicial Conference

11   of the United States.

12

13   s/Mary A. Schweinhagen

14   _____  21st of December, 2023

15   MARY A. SCHWEINHAGEN, RDR, CRR
     FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25